UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| CLINGMAN & HANGER MANAGEMENT ASSOCIATES, LLC, as Trustee,<br><br>Plaintiff,<br><br>v.<br><br>DAVID KNOBEL, JEFFREY PIERNE, NEAL YAWN, DEAN BARTNESS, SIANA STEWART, and CID YOUSEFI,<br><br>Defendants. | CASE NO. :<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Clingman & Hanger Management Associates, LLC, as trustee (the "Trustee") of the liquidating trust (the "Trust") established by the chapter 11 plan of liquidation (the "Plan") of FCC Holdings, Inc. and its subsidiaries (together, "FCC"), hereby alleges:

### PRELIMINARY STATEMENT

1.      FCC's officers made a bet that they could take unauthorized funds from the United States Department of Education (the "DOE"), use them to fund a company expansion, sell the company at a tremendous profit, and receive tens of millions of dollars in bonus compensation. Foreseeably, the DOE discovered the scheme and cut FCC off from 90% of its cash flow. Without cash flow, FCC – an otherwise profitable company valued at over $150 million and with only $30 million in debt – collapsed in a matter of weeks. The board of directors (the "Board") was forced to sell its most profitable assets in a fire sale and the company filed for bankruptcy protection.

2.      Prior to its collapse, FCC owned and operated forty-one for-profit, post-secondary education schools in fourteen states. Pursuant to Title IV of the Higher Education Act of 1965, the DOE provided tuition funding for students attending Title IV-eligible programs at FCC

schools in the form of grants and loans, such as the Direct Loan and Pell Grant programs ("Title IV funds"). Approximately 90% of FCC's revenue and cash consisted of Title IV funds paid to FCC to satisfy student tuition obligations.

3. However, instead of limiting its Title IV fund draws based on FCC's then-current enrollment data or treating Title IV funds as trust funds, as required by DOE regulations, defendants took advantage of the ability to draw Title IV funds before having to "substantiate" the same with the DOE (by identifying specific students to whom the funds were "disbursed") by drawing tens of millions of dollars to pay FCC's operating costs and capital expenditures.

4. Specifically, defendants engaged in the following conduct, in each case in contravention of DOE regulations (as discussed below):

(a)     drawing Title IV funds in amounts far greater than that which could be supported by current enrollment numbers;

(b)     failing to refund "excess" Title IV funds which were drawn for students who withdrew from or failed to commence attending their respective programs;

(c)     failing to reconcile Title IV fund draws with student-level disbursement data;

(d)     pre-drawing Title IV funds based on projected future enrollment numbers which management knew to be overstated; and

(e)     subsequently abandoning the pretense of limiting draws to illusory enrollment numbers and simply drawing based on the company's general liquidity needs.

5. Defendants knew or should have known of DOE regulations designed to prevent the use of Title IV funds in this manner, but nevertheless drew Title IV funds based on the company's short term cash needs, without regard whether FCC's schools had enrollment numbers that could justify the draws.

6. Each of the above-named defendants participated in the foregoing scheme:

(a)     Neil Yawn ("Yawn"), FCC's Chief Operations Officer ("COO"), submitted inflated projected enrollment numbers to FCC's Financial Services Office upon which the office's Title IV fund draws were premised, which resulted in the office drawing substantially more from the DOE than it should have.  In addition, Yawn systematically underreported student withdrawals from FCC programs to the Financial Services Office, which if properly reported would have triggered the refund of Title IV funds to the DOE.  This, in turn, resulted in a significant mismatch between the amount of Title IV funds drawn by FCC and the amount substantiated with the DOE.

(b)     Siana Stewart ("Stewart"), FCC's Vice President of Financial Services, supervised FCC's Financial Services Office, as did Cid Yousefi ("Yousefi") following Stewart's resignation.  The imbalance resulting from the foregoing should have been kept in check, but was not due to their failure to reconcile, on a monthly basis, Title IV fund draws with student-level disbursement data reported to the DOE, as required by DOE regulations.

(c)     David Knobel ("Knobel"), the Chief Executive Officer ("CEO") and a director of FCC, and Jeffrey Pierne ("Pierne"), FCC's Chief Financial Officer ("CFO"), aggravated existing imbalances by directing the drawdown of Title IV funds based on inflated projected enrollment numbers to pay current operating expenses and to fund the company's expansion, even though Pierne and Stewart knew FCC could not comply with the DOE's "prompt disbursement rule" (defined below) with respect to such funds.

(d)     Pierne and Yousefi also completely abandoned their responsibility to ensure FCC held Title IV funds in trust by engaging in a practice akin to check kiting, namely, repeatedly directing the drawing of or causing to be drawn large amounts of Title IV funds on behalf of certain FCC schools without regard to whether the draws could be

justified by enrollment numbers, then refunding the bare minimum required by the DOE's payment system.

(e)     Dean Bartness ("Bartness"), FCC's Chief Compliance Officer ("CCO"), was responsible for ensuring compliance with DOE regulations.   He completely abandoned his primary responsibility of ensuring FCC complied with Title IV and did nothing to prevent FCC from drawing Title IV funds or failing to substantiate or refund Title IV funds as required by DOE regulations, which directly contributed to the company's collapse.

7.      In May 2013, the DOE temporarily suspended FCC's ability to draw Title IV funds without first substantiating the same after FCC drew but did not properly substantiate or refund over $15 million in Title IV funds.   After substantiating or refunding the $15 million, management re-engaged in the same conduct/inaction as it had the prior year and additional conduct, in each case in violation of DOE regulations (*see* ¶4(e), *supra*).   By March 2014, after FCC had drawn approximately $20 million in unsubstantiated Title IV funds, the DOE demanded that FCC repay or substantiate all unsubstantiated funds within thirty days and permanently eliminated FCC's ability to draw Title IV funds without first substantiating the same.

8.      Immediately upon learning of defendants' misconduct, the Board, in April 2014, removed Knobel as director and CEO and Yawn resigned.   However, by then the company's liquidation was inevitable.   By August 2014, the company sold off its most valuable schools and filed for bankruptcy protection.

9.      All told, defendants' acts and omissions were the direct and proximate cause of the collapse of profitable schools which had been valued at over $150 million only two years

before, but sold for less than $3 million.  But for defendants' greed and fiduciary duty breaches, none of this had to happen.

10.     Accordingly, the Trustee, as Plan fiduciary for FCC's creditors, which include FCC's lenders, trade creditors, and the DOE, seeks damages from the defendants on account of their breaches of fiduciary duty and their destruction of approximately $150 million in value, to the detriment of the Debtor's prepetition creditors.

## PARTIES

### I.     THE PLAINTIFF

11.     The Trustee is trustee of the Trust established by the Plan confirmed by the United States Bankruptcy Court for the District of Delaware on March 18, 2015 in FCC's chapter 11 bankruptcy case.  The Trustee's members, W. Edward Clingman, Jr. and Teresa S. Hanger, are Virginia citizens.

### II.     THE DEFENDANTS

12.     Knobel is a Florida citizen who in 1994 founded the FCC Schools (defined below) in Fort Lauderdale, Florida and served as a director and the CEO of FCC at all relevant times until his removal by the Board on or about April 29, 2014.  Knobel also served on the Florida Commission for Independent Education, the seven-member state commission charged with regulating for-profit education institutions in Florida, from at least 2004 through 2010, and was therefore no doubt well versed with the regulations applicable to FCC, including DOE regulations at the center of this action.

13.     Pierne is a Florida citizen who served as FCC's CFO from in or about December 2008 until August 22, 2014 and as a Board member from April 4, 2014 until August 22, 2014. As CFO, Pierne's responsibilities included financial planning/liquidity analysis, communicating financial risks to the Board, and supervising accounting personnel.

5

14.     Bartness is a Florida citizen who served as FCC's CCO and Corporate Secretary from in or about February 2005 until August 21, 2014.  As CCO, Bartness's responsibilities included ensuring compliance with DOE regulations and communicating related risks to the Board.

15.     Yawn is a Florida citizen who served as FCC's COO at least from April 2012 until his resignation on or about April 4, 2014.  As COO, Yawn's responsibilities included determining projected DOE funding amounts from current student enrollment in FCC's various programs and ensuring transmission of such projections to the Financial Services Office, as well as keeping track of student withdrawals from such programs and ensuring transmission of such information to the Financial Services Office.

16.     Stewart is a Florida citizen who was employed in FCC's Financial Services Office beginning in 2005, and oversaw the office's operations as FCC's Vice President of Financial Services from 2009 until her resignation in or about December 2013.  Following Stewart's resignation, she continued to provide consulting services to FCC.  As Vice President of Financial Services, Stewart reported to both Knobel and Pierne and her responsibilities included drawing, substantiating, and refunding Title IV funds in accordance with DOE regulations.

17.     Yousefi is a Florida citizen who served as FCC's Senior Vice President of Information Technology from in or about June 2013 until in or about August 2014.  Upon Stewart's resignation in or about December 2013, Yousefi supervised FCC's Financial Services Office and assumed Stewart's responsibilities.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship of the parties and the amount in controversy exceeds $75,000.

6

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendants are either residents of this judicial district, or a substantial part of the events or omissions giving rise to this action took place in this judicial district.

## BACKGROUND

### I.     FCC OVERVIEW

20.     Prior to the commencement of FCC's chapter 11 case, FCC owned and operated fourteen Florida Career College schools (the "FCC Schools"), twenty-two Anthem Education schools (the "Anthem Schools"), and five California schools which did not offer Title IV-eligible programs (the "US Colleges"), and further offered online courses through "Anthem Online."

### A.     FCC's History

21.     Knobel founded FCC in 1994.  In 2004, he sold a majority interest in FCC to private equity firm TA Associates for approximately $53 million.

22.     In 2007, private equity firms Greenhill Capital Partners LLC and Abrams Capital LLC invested approximately $132 million to purchase a majority interest in FCC, which at the time owned and operated seven schools.

23.     At the close of the transaction, Greenhill and Abrams Capital each owned 46% of FCC (through affiliates) and Knobel owned 7% of FCC (a final 1% was owned by a former FCC officer).

24.     From in or about 2011 until Knobel's removal in April 2014, the Board was comprised of him, two Abrams Capital directors, and two Greenhill directors.

25.     On April 12, 2012, FCC acquired the Anthem Schools for a net purchase price of approximately $16 million.

26.     In August 2013, FCC acquired the US Colleges for a net purchase price of nearly $2.8 million.

27.     FCC managed its schools from its Fort Lauderdale, Florida headquarters.

**B.      FCC's Drawdown Method**

28.     FCC derived approximately 90% of its revenues and cash from Title IV funds drawn from the DOE.

29.     In order for a post-secondary, higher education institution (an "institution") to draw Title IV funds, it must first apply for and receive a DOE Office of Postsecondary Education ID number (an "OPEID").

30.     The fourteen FCC Schools operated under one OPEID.  The twenty-two Anthem Schools operated under five OPEIDs, commonly referred to by the name of the institution's main campus or location (*i.e.*, Phoenix, Bryman, Maryland Heights, Parsippany, and Springfield).  The five US Colleges did not draw Title IV funds and did not have an OPEID.

31.     Once an institution receives an OPEID, it may draw Title IV funds using a DOE-approved payment method.

32.     Under the "advance" payment method that was historically utilized by FCC, an institution may draw Title IV funds via the DOE's payment system ("G5") before "substantiating" the same by reporting to the DOE the individual students to whom such funds are "disbursed" via the DOE's common origination and disbursement system ("COD").  *See* 34 C.F.R. § 668.162(b).

33.     However, FCC's ability to draw funds under this method on behalf of its institutions was subject to its compliance with a number of conditions:

> (a)     FCC was prohibited from drawing Title IV funds on behalf of an institution in an amount greater than that required to satisfy tuition balances of students currently enrolled at the institution;[1]

---

[1] *See* 34 C.F.R. § 668.14(b)(1)-(2) (institution may only use Title IV funds to satisfy tuition obligations resulting from student enrollment in a Title IV-eligible program, and must "time its requests for funds …

      (b)     the institution was required to refund to the DOE Title IV funds drawn to the extent its students withdrew from its Title IV-eligible programs or never commenced attending such programs;[2]

      (c)     the institution was required to hold Title IV funds it drew in trust for students, to the extent draws could be credited to a student account, or for the DOE, to the extent "excess" Title IV funds could not be timely substantiated and therefore had to be refunded;[3] and

      (d)     the institution was required to "reconcile" its COD-G5 discrepancies monthly, and at the end of each "program year" (which ran July 1-June 30).[4]

34.     As a practical matter, an institution operating under the advance payment method that complies with the foregoing conditions should not have cash flow problems absent a precipitous decline in enrollment numbers. By definition, the institution is receiving cash associated with educating a particular student before the student commences enrollment, and before the institution has incurred the cost of educating him or her. In contrast, the operating

---

to meet the institution's immediate … needs" for such funds); 34 C.F.R. § 668.162(b)(1) (institution's requests for Title IV funds "may not exceed the amount of funds the institution needs immediately for disbursements the institution has made or will make to students" or to satisfy tuition obligations); 34 C.F.R. §§ 668.162(b)(3), 166 (institution must "disburse" Title IV funds drawn by crediting such funds against tuition balances within three business days of its receipt and is prohibited from holding "excess" Title IV funds).

[2] *See* 34 C.F.R. § 668.21 (Title IV funds must be promptly refunded if a student does not begin attendance at an institution); 34 C.F.R. § 668.22 (if a student withdraws from an institution after beginning attendance, the amount of Title IV assistance "earned" by him/her must be determined. If the amount disbursed exceeds the amount earned, the institution must refund "unearned funds" within 45 days after the institution determines the student withdrew).

[3] *See* 34 C.F.R. § 668.161(b) (Title IV "funds received by an institution … are held in trust for the intended student beneficiaries [or] the Secretary"); 34 C.F.R. § 668.163(e) (institutions must "exercise the level of care and diligence required of a fiduciary with regard to maintaining and investing title IV … funds"); 34 C.F.R. § 668.14(b)(2) (institutions are "fiduciar[ies] responsible for administering Federal funds").

[4] *See*, *e.g.*, 34 C.F.R. § 685.300 (monthly reconciliation required for Direct Loans); 34 C.F.R. § 674.19(d)(1) (same for Perkins loans); Federal Student Aid Handbook, Vol. 4 (annual reconciliation required to complete mandatory Fiscal Operations Report).

expenses associated with educating the institution's students (*e.g.*, rent, payroll, etc.) are ordinarily paid and expensed over time.[5]

35.    The Financial Services Office, headed by Stewart and later Yousefi, was responsible for drawing Title IV funds on behalf of each FCC institution, substantiating draws via COD, and refunding unsubstantiated draws via G5.

### C.    FCC's Value Creation Plan

36.    Following FCC's acquisition of the Anthem Schools in April 2012, management proposed a plan to maximize owners' return on investment and management's incentive compensation which involved selling or closing thirteen Anthem Schools in states with regulators management considered "hostile to our industry," building out new schools across sun-belt states, and making operational improvements at the new schools and remaining Anthem Schools required to achieve annual per-school-EBITDA[6] comparable to that of the FCC Schools. Management believed once it began approaching EBITDA targets at these schools, it could sell the company for $450-$500 million by 2017, whereupon Knobel would receive 10% of the net proceeds and management (including each other defendant) would share in an additional 10% of the net proceeds.

37.    Over the next two years, FCC did not divest the Anthem Schools identified for divestment, but did commit over $20 million to capital expenditures associated with the buildout of three new schools that would operate under the FCC Schools' OPEID and additional improvements.

---

[5] Because the advance payment method pays institutions upfront, an advance payment method-eligible institution should not experience cash flow problems unless: (a) operating cash (*i.e.*, Title IV funds) is being used to fund long term capital expenditures which are more appropriately funded through the sale of equity interests or issuance of long term debt, or (b) operating expenses exceed operating revenues (indicating a fundamental problem with the business).

[6] The term "EBITDA" means earnings before interest, tax, depreciation, and amortization.

## II.   FCC NONCOMPLIANCE WITH DOE REGULATIONS

### A.   Pre-Merger Drawdown Practices

38.     Historically, the FCC Schools' Financial Services Office drew Title IV funds during a given month by netting projected DOE funding amounts from new student starts and continuing students that month with amounts to be refunded as a result of students' withdrawal from or failure to commence attending their programs.   Both figures were generated by aggregating enrollment projections and refund data supplied by the management of each campus, which in turn reported to the COO.   The Financial Services Office would then substantiate prior draws by updating COD and refund Title IV funds that could not be substantiated within three business days of the draw, as required by 34 C.F.R. § 668.162(b)(3) (the "prompt disbursement rule").

39.     The Anthem Schools engaged in a similar practice but would also "pre-draw" Title IV funds from time to time by causing its institutions to draw Title IV funds during a given month premised upon enrollment projections for future months (such draw, a "pre-draw").

40.     Both Pierne and Stewart knew the Anthem Schools' pre-draw practice violated DOE regulations because it would ordinarily result in the Anthem Schools holding Title IV funds that were neither disbursed nor refunded within three business days, as required by the prompt disbursement rule.

41.     In a June 8, 2012 document entitled "PreDrawMemo," Marc Prochello, the Anthem Schools' controller, explained to FCC's auditor, Ernst & Young LLP ("E&Y"), that the Anthem Schools pre-drew Title IV funds between December 1, 2011 and the merger date, and that as of the merger date there remained roughly $3.3 million in pre-drawn funds that had neither been disbursed nor refunded.   In response to this memo, E&Y e-mailed both Mr.

Prochello and FCC's controller, Stella Laurella, copying Pierne, asking that Mr. Prochello "include a comment in your memo as to the Company's compliance" as of the merger date.

42.     During the internal e-mail thread among FCC officers that followed, Ms. Laurella proposed stating to E&Y that as of the merger date, the Anthem Schools "were in compliance with DOE regulations as the funds on-hand were in the process of being identified as belonging to student accounts or being prepared for returning to G5."  Mr. Prochello responded "[t]he only issue with that is, we really weren't in compliance" because pre-drawn funds had not been disbursed to students within three business days.   Stewart responded by proposing to modify the original memo by stating:

> As of … April 12, 2012, [the Anthem Schools were] in compliance with DOE regulations which allow institutions to pre-draw funds based on estimated student eligibility, [and] once drawn the institution goes through a process to determine actual eligibility. Upon the completion of this process all eligible funds are posted to student accounts and all ineligible funds are returned to the [DOE].

Substantially similar language made it into the revised memo submitted to E&Y, which Pierne signed off on.

### B.    FCC's Post-Merger Drawdown Practice

43.     Following the acquisition of the Anthem Schools, FCC management assumed responsibility for managing all aspects of the drawdown process across all OPEIDs.  Thus, Yawn was responsible for projecting enrollments and DOE funding amounts across all OPEIDs, as well as supplying the Financial Services Office with all information required to determine amounts to be refunded to the DOE as a result of student withdrawals under 34 C.F.R. §§ 668.21-22.  In addition, Stewart, and later Yousefi, were responsible for drawing and refunding Title IV funds, reconciling COD-G5 discrepancies, and interfacing with the DOE.  Bartness was responsible for ensuring the drawdown, reconciliation, and refund process complied with DOE regulations.

44.     Following the acquisition, FCC management engaged in a variety of practices in furtherance of efforts to treat access to Title IV funds under the advance payment method as an interest-free credit line, in contravention of DOE regulations, as described below.[7]

          1.     Draws Premised on Inflated Enrollment Numbers

45.     Inflated projected enrollment numbers, upon which monthly draws were premised, were transmitted to the Financial Services Office, which in turn resulted in the Financial Services Office drawing substantially more than it should have.  New student starts regularly fell short of projections by 10-20%.  In fact, an April 24, 2014 Board presentation by FTI entitled "Financial Aid – Assessment, Deep Dive," cited "lack of trust in forecasts that originate from campus management" as a "systemic issue … associated with the Financial Aid area" which resulted in DOE action against FCC.

          2.     Noncompliance with Prompt Disbursement Rule; Persistent
                Underreporting of Student Withdrawals

46.     The Financial Services Office ceased refunding Title IV funds which could not be substantiated within three business days of the draw, as required by the prompt disbursement rule, and instead only refunded Title IV funds based on withdrawals reported to it by campus management through Yawn.

47.     However, campus management systematically underreported student withdrawals to the Financial Services Office.  The pattern of underreporting is evident from the fact that FCC's Title IV auditor identified major refund errors across all OPEIDs for the 2012-13 program

---

[7] The notion that access to Title IV funds under the advance payment method was equivalent to an interest-free credit line was so ingrained in the mindset of FCC management that the company's restructuring advisors, FTI Consulting, Inc. stated as much in bankruptcy filings based upon communications and input from management and FCC's DOE regulatory counsel.  *See* Declaration of Sean Harding, *In re FCC Holdings, Inc.*, Ch. 11 Case No. 14-11987 (Bankr. D. Del. Aug. 26, 2014) [ECF No. 13] at ¶45 ("Prior to April 2014, the Company operated under the 'advance funding method,' whereby the G5 system essentially operated as a line of credit for the Company to draw down on, based on the amount of funding an institution is eligible for based on what it inputs into the 'COD' system").

year, based on just a sample of student files.  The DOE concluded from the auditor's report that FCC's pattern of under-refunding Title IV funds was sufficiently egregious that it directed FCC to review and recalculate refunds at four of its six OPEIDs for all students that either withdrew or never commenced attending a program offered by the relevant institution during the program year, and to refund the difference between what was and what should have been refunded. FCC's subsequent review, in turn, revealed its overall error rate was around 50% (and reached 66% at the Parsippany OPEID).

48.     Significantly, the Financial Services Office would regularly post refunds resulting from student withdrawals to its internal records, meaning it specifically knew that a given student withdrew and that a refund was in order, but would not make matching entries in COD or actually make the required refund to the DOE.  A consultant who advised on reconciliation-related matters after the DOE revoked FCC's ability to draw Title IV funds under the advance funding method remarked as follows on this practice: "To post a refund to the ledgers, without having made the refund, gives the appearance of intentional misrepresentation.  I am further troubled by the fact that so many of the staff are aware of a decision to not post refunds/returns to COD which violates the Department's cash management requirements."

49.     Further, FCC's records reflect that more than 50% of its student population during a given year would withdraw, resulting in the need for a refund.  For example, FCC's records for the 2012-13 program year reflect that almost 28,000 students had enrolled in Title IV-eligible programs at the FCC and Anthem Schools that year.  Of those students, approximately 4,000 (14%) withdrew and approximately 11,000 (39%) never commenced attending, while approximately 3,500 (12%) graduated and approximately 8,500 (30%) were listed as actively

enrolled (30%).[8]   Despite the fact that a full _54%_ of students enrolled in Title IV-eligible programs that year withdrew or never commenced attending the programs for which they were enrolled, thereby necessitating a refund under 34 C.F.R. §§ 668.21-22, the Financial Services office continued to draw based on FCC's inflated estimates of *projected* new student starts and continuing students for DOE funding amounts for that month, and refund based only upon reported withdrawals.

### 3.   Failure to Reconcile Monthly

50.   The Financial Services Office did not reconcile its COD-G5 discrepancies monthly, as required by DOE regulations (*see* ¶33(d), *supra*), and instead would only reconcile discrepancies at the end of each program year.  This had major monetary consequences for FCC, as under 34 C.F.R. § 668.164 if reconciliation is not completed before the end of the applicable funding period for a particular student, FCC would forever lose the ability to substantiate Title IV funds drawn to satisfy that student's tuition obligations and would have to refund the same. Ultimately, FCC's failure to timely reconcile resulted in its having to refund millions of dollars in Title IV funds it would have been entitled to retain had it timely substantiated the related draws.

### 4.   Pre-Draws Guaranteed Not to Comply with Prompt Disbursement Rule

51.   Despite the fact that Pierne and Stewart were aware the Anthem Schools' practice of pre-drawing Title IV funds violated DOE regulations (*see* ¶¶40-42, *supra*), following the

---

[8] Approximately 3% of students did not fit in any of the foregoing categories (*e.g.*, students that enrolled for a future program year).

merger FCC adopted the exact same practice across its institutions (including the FCC Schools), and without implementing a system designed to ensure prompt disbursement rule compliance.[9]

52.     The following December 24-27, 2013 e-mail thread among Knobel, Pierne, and Yousefi illustrated how FCC senior management would openly and knowingly pre-draw funds based solely on FCC's short-term cash needs, and not based upon substantiated, or even projected, enrollment numbers at a given institution:

> Pierne (to Knobel): To ensure that we make payroll this week I am going to draw the remaining $600,000 available on the revolver today.   That gives us about $1 million in cushion based on yesterday's cash forecast.  I talked to Cid yesterday and he has over $9 million in T4 posted at COD for the January start and available to draw that on 12/30.  I would like to do a pre-draw on this start to make sure we get some AP cleared prior to year end and to support cash on hand at the balance sheet date.  My thought is to set the pre-draw amount after we prepare an updated forecast later this morning.

> Knobel (to Pierne): I would be inclined to use a bit of float and draw down on the various accounts to the minimums, but I don't know the details as well as you.  I support your decision if you feel it is a necessity.

> Pierne (to Yousefi): Take a look at the attached forecast.  It shows about $1.2 million in T4 arriving between tomorrow and December 31.  Is any of that information accurate?  If not, I'm going to need to replace it with a pre-draw on the January start.  I'd like to keep the pre-draw low, so **$2 million** or so on 12/30 probably gets the job done …

> Yousefi (to Pierne): Jeff – we need to lower the projection by about $400k to $800k instead of $1.2m to come in by next Tue.

> Pierne (to Yousefi): If we disburse **$2.5 million** of funds from the January start to arrive on 12/30 and we collect all of the $800,000 in your earlier forecast, then we are good from a cash perspective until January 6, when we could pull the remaining Pell for the start. If you have a high level of confidence that the $800,000 will arrive

---

[9] Even had FCC implemented a system to ensure compliance with the prompt disbursement rule, the practice of pre-drawing Title IV funds violated 34 C.F.R. §§ 668.14(b)(1)-(2), 668.162(b)(1) (quoted in note 1, *supra*).

on time, then please accelerate $2.5 million from the January start to arrive on December 30 (Monday).  If you have a low level of confidence in the ability to collect the $800,000, then let's draw **$3 million** from January to arrive on December 30.  I am trying to do only one early draw to make the back end reconciliation process easier.

Yousefi (to Pierne): I'm thinking **$2.7M** just give us a little bit of cushion.  I don't fully understand Siana's formula [for determining how much to draw via G5] and feel better to have a little buffer.  If you are OK with that, then I'll arrange for the funds to get pulled down tomorrow morning … are you up for golf on Sat or Sun?

Yousefi (to Financial Services Office Employee): We need to do a $2.7M draw against the DL [Direct Loans] from Phoenix, Bryman and possibly FCC OPEID.  Please … let me know the available balances for DL for each … OPEID so that we can decide on the breakdown.  It is important that we have the funds on Monday …

Financial Services Office Employee (to Yousefi): Below are the balances for the OPEID's that you inquired about:
FCC DL 13/14 available balance - $28,121,756
Phoenix DL 13/14 available balance - $15,320,172
Bryman DL 13/14 available balance - $13,193,233.

Yousefi (to Financial Services Office Employee): [L]et's use the following breakdown: $1M from FCC, $1M from Phoenix and $700K from Bryman …

Pierne (to Knobel): We decided to pull $2.7 million from the January start on Monday.  That allows us to pay rents and clear some payables by year end.  It also covers us until we can pull the rest of the Pell …

Knobel (to Pierne): So tight.  We need to think about a 6 month pause in capex for July to Dec and build up cash.

53.    Pierne knew this practice violated DOE regulations, as he signed off on a memo following FCC's acquisition of the Anthem Schools which was the product of an e-mail thread discussing how the practice of pre-drawing Title IV funds typically resulted in a prompt disbursement rule violation (*see* ¶42, *supra*).

54.     That each of Yousefi, Pierne, and Knobel did not need an explanation of what the practice entailed or what the ramification of the same might be makes clear that by this time the practice had long become entrenched as a part of FCC's Title IV fund management strategy.[10]

5.     Title IV Fund "Kiting"

55.     Beginning in early January 2014, FCC abandoned the pretense of limiting draws to projected enrollments.  Instead, the Financial Services Office began drawing large amounts of Title IV funds at one or more OPEIDs to enable FCC to satisfy general business obligations, without regard to whether the funds could be substantiated and based upon DOE drawdown capacity, not realistic enrollment projections, and then refund the bare minimum required by G5 before repeating with funds from one or more different OPEIDs. This practice persisted through February 2014, despite repeated DOE warnings concerning the consequences of the same (described below).

56.     Pierne and Yousefi had to have known about this practice because, as demonstrated above, Yousefi took instructions from Pierne regarding the amount of Title IV funds needed during a given period in order for FCC to satisfy its expenses for such period. Moreover, none of these draws would have taken place without Yousefi's explicit approval.

57.     In addition, the DOE cited this specific practice in explaining its decision to permanently revoke FCC's ability to draw Title IV funds under the advance payment method, as described below.

---

[10] In undertaking its investigation prior to the filing of this complaint, the Trustee was unable to obtain e-mail records for Knobel or Yawn from IEC Corp. (which took possession of FCC's e-mail records upon its acquisition of FCC's most valuable schools, discussed below), which appear to have been removed from FCC's records prior to IEC Corp.'s receipt of the same.

     **C.**     **FCC's Financial Reports to Management Suggest its Title IV Draws Violated DOE Regulations**

58.     Based on FCC's internal monthly financial reports, as well as audited financial statements prepared by FCC's independent certified public accountants, management knew or should have known FCC was drawing far more in Title IV funds than it was entitled to under DOE regulations.

59.     <u>Stagnant Enrollment Numbers</u>. FCC's records reflect that upon the acquisition of the Anthem Schools, monthly student headcount increased from approximately 4,000 to 12,000. However, thereafter monthly student headcount numbers fluctuated significantly but by and large remained stagnant and trended lower, a situation which would not support significant growth in Title IV draws (discussed below).

60.     <u>Explosive Growth in A/R and Deferred Revenues</u>. Historically, accounts receivable ("<u>A/R</u>"), a component of gross revenues linked to Title IV draws, ranged from approximately $9-16 million per program year, or approximately 10-20% of FCC's total revenues. However, during the 2012-13 program year, the first full program year following the acquisition of the Anthem Schools, A/R grew to approximately $74 million (far outpacing headcount growth), and comprised approximately 34% of total revenues. Moreover, during the 2013-14 program year, during which headcounts and total revenues remained flat, A/R still grew to approximately $140 million, or approximately 66% of total revenues. Deferred revenue, which is also linked to Title IV draws, also deviated from its historic norm and increased significantly during the 2012-13 and 2013-14 program years.

61.     <u>Significant Reduction in A/R Allowance</u>. At the same time that FCC's financial reporting reflected major increases in A/R and deferred revenue, its records reflect a significant decrease in A/R allowance, representing the amount of A/R that FCC estimated writing off as

uncollectible.  Ordinarily, a company's A/R allowance is determined by its past, actual collection records, and historically, FCC's allowance was 52-57%.  However, following the merger date this figure dropped to 21-25%, meaning FCC management represented it expected to collect roughly 30% more A/R after the merger with Anthem, which at the time was not profitable, and before FCC implemented any of its contemplated operational improvements at the Anthem Schools.  This allowance was increased to 35% for the 2013-14 program year, presumably because its 21-25% estimate proved wholly inaccurate.

62.    Negative Cash Flow.  Prior to the merger date, FCC had positive cash flow, after accounting for its expenses.  However, following the merger FCC's capital expenditures grew significantly as it invested in the buildout of new schools and additional capital expenditures.  As a result, FCC had negative cash flow during each of the 2011-12, 2012-13, and 2013-14 program year, which would explain why it anticipated running out of cash in August 2014, only a few months after it was forced to refund the Title IV funds it previously overdrew.

63.    Divergence of Key Balance Sheet Items from Historic Norms.  The divergence of each of A/R, deferred revenue, A/R allowance, and cash flow from their historic norms should have been cause for alarm for FCC's C-level officers (i.e., Knobel, Pierne, Yawn, and Bartness), each of whom received monthly reports reflecting the foregoing, and in particular Pierne, the officer responsible for financial reporting.  At a minimum, management knew or should have known the significant growth in A/R and deferred revenue and corresponding decrease in A/R allowance in the face of stagnant enrollment numbers and revenue growth meant FCC was drawing far more in Title IV funds than permitted by DOE regulations.   However, management ignored the problem and took no steps to investigate the foregoing or otherwise stem its practice of overdrawing Title IV funds.

**D.     FCC's Drawdown Practices Resulted in a Covenant Breach under FCC's Credit Agreement**

64.     Section 8.14(a) of that certain Credit Agreement, dated as of November 2, 2012, among FCC Holdings, Inc., as borrower, its debtor subsidiaries, as guarantors, Bank of Montreal, as agent, and the lenders party thereto, pursuant to which FCC borrowed approximately $30 million, included a covenant that FCC:

> comply in all respects with the requirements of all federal, state, and local laws, rules, and regulations … pertaining to its Property or business operations, where any such non-compliance … could reasonably be expected to constitute a Significant Regulatory Event or have a Material Adverse Effect.

65.     The Term "Property," in turn, includes intangible property such as access to Title IV funds under the advance payment method.

66.     In addition, "Significant Regulatory Event" includes "any material limitation of Title IV Program funding."

67.     Further, "Material Adverse Effect" includes "a material adverse change in, or material adverse effect upon, the operations, business … or financial condition of [FCC] or … a material impairment of the ability of [FCC] to perform [its] material obligations under [the Credit Agreement]."

68.     Each of the above-mentioned drawdown practices which violated DOE regulations also violated Section 8.14(a):

> (a)     the practice of drawing Title IV funds premised on inflated enrollment projections and pre-drawing funds violated DOE regulations prohibiting FCC from drawing Title IV funds in amounts greater than that required to satisfy tuition balances of currently enrolled students;

> (b)     the persistent failure to report student withdrawals, or refund Title IV funds on account of the same, violated DOE regulations requiring the opposite;

(c)     the practice of treating access to Title IV funds under the advance payment method as an interest-free credit line and Title IV fund "kiting" during January and February 2014 in order to satisfy business expenses, not student tuition obligations, violated federal regulations requiring that FCC treat Title IV funds as trust funds; and

(d)     the failure to reconcile discrepancies between FCC's G5 draws and disbursement data reported to COD monthly violated federal regulations requiring monthly reconciliation.

*See* notes 1-4, *supra*.

### E.      DOE Response to Drawdown Practices that Violated DOE Regulations

#### 1.      2012-13 Program Year

69.     As a result of the foregoing (except for the Title IV fund "kiting"), on or about April 22, 2013 the DOE notified Stewart that FCC had unsubstantiated draws exceeding $15 million across all OPEIDs and availability under G5 at each OPEID would be reduced to $0 until FCC substantiated all of its prior draws.  The DOE further stated if FCC did not substantiate all prior draws by the end of May, none of its institutions would be eligible for advance draws of Title IV funds during the 2013-14 program year, and instead would need to substantiate before funds would become available via G5.

70.     Stewart attributed FCC's failure to substantiate its draws to malfunctioning financial aid management software (called "Regent 8") that was rolled out at the FCC and Anthem Schools in January and February 2013, respectively, and which Stewart alleged was not reporting disbursement data to COD accurately.

71.     However, the DOE rejected this excuse.  In its August 7, 2013 Program Review Report assessing compliance with DOE requirements at FCC's Atlanta campus, the DOE found that FCC inaccurately reported information to COD.  FCC's November 27, 2013 response to this finding stated disbursements the DOE identified as incorrect in its report "were processed using a previous Financial Aid Management system and is not a reflection of our current systems and

processes … we feel this was an isolated incident."  The DOE, in turn, stated as follows in its

February 10, 2014 reply:

> [FCC's] response to this finding is unacceptable and inadequate … [FCC] must review COD reporting procedures to determine why disbursement dates and conflicting information reported are not accurate for its students … [FCC] must correct its procedures so that disbursement dates reported to COD are the dates that Federal Pell funds and Direct Loans are credited to the student's account or paid to the student directly … In addition, [FCC] must describe procedures that the institution will put in place in order to correct these deficiencies.

72.    Moreover, FCC's stated position that it could not reconcile because of a software

malfunction was not credible.  In response to the FCC's April 22, 2013 notification, FCC hired

ten temporary employees to manually reconcile student records to ensure Title IV fund award

information was reported to COD.   In just one month's time, the Financial Services Office

achieved full balance between COD and G5 at its three largest OPEIDs, which together

represented 70% of the student population, via manual reconciliation.   FCC subsequently

continued to manually reconcile in this manner until it successfully reimplemented Regent 8

(discussed below).

73.    Nevertheless, the DOE granted Stewart's request and agreed to award each

OPEID an initial G5 funding level consistent with its historic norm for the subsequent program

year upon elimination of its COD-G5 imbalance (which already occurred at the largest OPEIDs).

2.    2013-14 Program Year

74.    FCC hired Yousefi in June 2013 to, *inter alia*, supervise the Regent 8

reimplementation.

75.    Although the software was reimplemented across all OPEIDs by November 2013,

a COD-G5 imbalance nevertheless reappeared at each OPEID due to FCC's drawdown practices.

76.     As a result of FCC's Title IV fund overdraws during the 2013-14 program year, its Financial Services Office believed that by January 28, 2014 its COD-G5 imbalance across all OPEIDs was approximately $10 million.

77.     On February 4, 2014, the DOE e-mailed John Murphy, who replaced Stewart on January 1, 2014 as Vice President of Financial Services (but reported to Yousefi) ("Murphy"), expressing concern about FCC's growing imbalance.

78.     In addition, on February 26, 2014, the DOE notified Murphy that FCC's three largest OPEIDs had over $15 million in unsubstantiated draws, and instructed FCC to promptly refund or substantiate the funds.

79.     No meaningful action was taken in response, and in fact, FCC pre-drew Title IV funds in advance of the March start date.

80.     On March 4, 2014, the DOE e-mailed Murphy and several other Financial Services Office employees requesting a conversation "regarding your [Direct Loan] processing and the weekly need to refund large sums of unsubstantiated funds for several of your schools." During this conversation, the DOE notified the FCC participants that the out-of-balance condition had grown to an unacceptable level and instructed them as follows:

> All of the [FCC and] Anthem Schools … need to be reconciled and have no funds unsubstantiated over 30 days by the end of March 2014 … [I]f by the end of March … we still see issues with drawing funds and not being able to submit records successfully to substantiate those funds then FSA will reduce the available balances for each of the schools to $0 which will place you in a position where you must successfully report Direct Loan disbursement records to COD prior to drawing any funding from G5.

81.     As a result, FCC had to stop drawing Title IV funds.  On March 18, 2014, Murphy notified the DOE FCC "refunded/posted disbursements in excess of $7M," but the next

day the DOE notified him FCC still had $13 million in unsubstantiated draws at the three largest OPEIDs.

82.     On March 31, 2014, the DOE notified Murphy that because substantial imbalances remained at the three largest OPEIDs, FCC's funding level under each OPEID would be reduced to $0, and each OPEID would need to substantiate disbursements via COD before Title IV funds would be available to draw via G5 for the 2014-15 program year.

III.     <u>FCC'S RESPONSE TO LOSS OF TITLE IV FUNDING</u>

A.     **Replacement of CEO and COO with Restructuring Advisors**

83.     During April 2014, FCC hired FTI as its restructuring advisor, Knobel was removed as director and CEO, and Yawn resigned.  Further, during this period Pierne was appointed to the Board.

B.     **Additional Debt**

84.     To keep FCC afloat, FCC entered into an amended Credit Agreement, dated as of April 29, 2014, pursuant to which loans under FCC's 2012 Credit Agreement were subordinated to $15 million in new loans from FCC's private equity fund owners and a third party.

C.     **Delay of Payments to Creditors**

85.     To manage its liquidity, FCC delayed payments to creditors, and even delayed payroll scheduled for April 4, 2014.  Knobel lied to his employees when he explained the delay was due to a "temporary disruption in funding our operating accounts" brought on by capital expenditures that would ensure the company's success.

D.     **Attempts to Resolve Outstanding DOE Obligations**

86.     In the meantime, management scrambled to substantiate or refund Title IV funds it previously drew to avoid potential penalties associated with failing to repay trust funds.  By the

end of April 2014, management believed it resolved nearly all outstanding balances at its three largest OPEIDs.

87.     Further, in or about June 2014, at FTI's recommendation FCC commenced using software which automatically searched FCC's COD records for inconsistencies with FCC's internal records, which FCC had not previously used even though the Federal Student Aid Handbook recommends use of such software to discover/address discrepancies.  Based on this analysis, FCC concluded it owed the DOE approximately $2.5 million in additional reconciliation-related obligations which it refunded.

88.     Notwithstanding the foregoing, the DOE subsequently filed a proof of claim against FCC Holdings, Inc. stating it still owed approximately $32 million and $1.4 million in unpaid Pell Grant and Direct Loan obligations, respectively, under four OPEIDs.

### E.     Sale of FCC's Schools

89.     FCC anticipated running out of cash in August, and commenced marketing its schools on or about June 15, 2014.

90.     Following preliminary discussions, FCC signed confidentiality agreements with five potential purchasers.

91.     FCC entered into a two-step asset purchase agreement with IEC Corp., dated as of August 21, 2014.  Step 1 involved the pre-bankruptcy sale of the FCC Schools and their OPEID. Step 2 involved the sale of the US Colleges and, subject to FCC receiving certain DOE change of control approvals by August 29, 2014, the sale of nine Anthem Schools and their four respective OPEIDs.

92.     Consideration for the transaction was $1 million in cash, a $1 million lender consent fee payable to Bank of Montreal, as agent under its Credit Agreement, the funding of

certain expenses to enable FCC to operate parts of its business through closing, and the assumption of certain liabilities (*i.e.*, DOE liabilities associated with the purchased OPEIDs).

93.     In addition, on August 22, 2014 FCC sold three Anthem Schools and the OPEID under which they operated to Premier Education Group, L.P.   Consideration for this transaction was a $150,000 lender consent fee and the assumption of certain liabilities (*i.e.*, DOE liabilities associated with the purchased OPEID).

94.     On August 26, 2014, FCC commenced a chapter 11 case.

95.     FCC did not receive the DOE approvals required to consummate the sale of the nine Anthem Schools which were the subject of the Step 2 sale to IEC by August 29, 2014.  As a result, FCC was unable to monetize these nine schools and the ten Anthem Schools which were not the subject of the IEC or Premier transactions, which were either closed or taught out.[11]

## CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
### (All Defendants)

96.     The Trustee incorporates by reference each allegation in the foregoing paragraphs.

97.     Defendants owed fiduciary duties of loyalty, care, and good faith to FCC.

98.     Defendants breached these duties, resulting in the loss of the one thing necessary for FCC to survive: access to Title IV funds.

99.     As a result of Yawn's submission of inflated projected DOE funding amounts, FCC's Financial Services Office, first under Stewart's supervision and then under Yousefi's, consistently drew more in Title IV funds than FCC was entitled to under DOE regulations.

---

[11] A "teach out" arrangement is one whereby a school closes, but another (typically unaffiliated) school accepts students from programs offered by the closed school so that they may continue their education without interruption.

Moreover, Yawn's systematic failure to accurately report student withdrawals from FCC, which would have resulted in the need to refund Title IV funds, resulted in FCC retaining tens of millions of dollars in Title IV funds which FCC could not substantiate but was required to refund under DOE regulations.

100.    The Financial Services Office failed to reconcile G5 draws with disbursement data reported to COD on a monthly basis, as required by DOE regulations.  This not only enabled the resulting imbalance to spiral out of control, it resulted in FCC subsequently having to refund millions of dollars in legitimate Title IV fund draws that were not timely substantiated pursuant to 29 C.F.R. § 668.164.

101.    At the same time, Knobel and Pierne aggravated the resulting imbalance by directing that the Financial Services Office pre-draw Title IV funds without implementing any system to ensure prompt disbursement rule compliance, and even though Pierne and Stewart knew the practice violated DOE regulations.

102.    In addition, Pierne and Yousefi aggravated the resulting imbalance by directing that the Financial Services Office engage in conduct which amounted to Title IV fund "kiting" during January and February 2014 in a transparent attempt to use access to Title IV funds under the advance payment method as an interest-free credit line available to satisfy business expenses, in contravention of DOE regulations requiring that such funds be held in trust and used only to satisfy current students' tuition obligations.

103.    Pierne (and the other C-level officers) also knew or should have known FCC's draws did not comply with DOE regulations because major anomalies in FCC's financial reporting, which he was responsible for generating and monitoring, indicated as much.

104.    Bartness was responsible for ensuring compliance with DOE regulations. Although FCC temporarily lost access to Title IV funds during the 2012-13 program year as a

result of its failure to draw, substantiate, or refund Title IV funds in accordance with DOE regulations, he did not take any action to remedy the situation the following program year, which in turn directly contributed to the company's collapse.

105.   None of the C-level executives took any action to prevent FCC's improper use of Title IV funds:

    (a)   they failed to implement systems and procedures or employ qualified personnel to ensure financial reporting which would have prevented the misuse of Title IV funds and helped maintain management's credibility with the DOE;

    (b)   they failed to investigate the cause of FCC's liquidity problems when they first appeared, even though the advance payment method by definition protects institutions with remotely stable enrollment numbers from cash flow problems (*see* ¶34, *supra*); and

    (c)   they failed to advise the Board FCC was not drawing, substantiating, or refunding Title IV funds in accordance with DOE regulations, or the likely consequences of the same, until after it was too late (March 2014).

106.   The foregoing acts and omissions by defendants also caused FCC to breach the terms of its 2012 Credit Agreement.

107.   As a result of defendants' fiduciary duty breaches, FCC's creditors, on whose behalf the Trustee commenced this action (including lenders, trade vendors, and the DOE), have been damaged in an amount to be determined after trial, but not less than $150 million.

108.   The Trustee is entitled to judgment against all defendants, jointly and severally, for damage caused to FCC.

109.   In addition, defendants' conduct has demonstrated the high degree of moral turpitude and wanton dishonesty directed at the DOE, FCC's students, and the public at large such that an award of punitive damages is also warranted in an amount to be determined after trial.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee requests that this Court enter judgment in its favor against all

defendants, jointly and severally and in the amount determined after trial, but not less than $150

million, plus attorneys' fees and costs, prejudgment interest, and punitive damages, together with

such other and further relief as this Court deems just and proper.

Dated:  August 23, 2016

<div style="margin-left:40%">

Respectfully submitted,

WEISSMAN & DERVISHI, P.A.

By:   /s/ Brian S. Dervishi
        Brian S. Dervishi
Fla. Bar No. 350303
SunTrust International Center
One Southeast Third Avenue, Suite 1700
Miami, Florida 33131
305-347-4070 (Telephone)
305-347-4077 (Facsimile)
bdervishi@wdpalaw.com
service@wdpalaw.com

- and -

Bijan Amini
Avery Samet
Jeffrey Chubak
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
*(Pro hac vice application pending)*

*Attorneys for Plaintiff Clingman &*
*Hanger Management Associates, LLC,*
*as Trustee*

</div>