# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

| | |
|---|---|
| CLINGMAN & HANGER MANAGEMENT ASSOCIATES, LLC as Trustee <br><br> Plaintiff, <br><br> v. <br><br> DAVID KNOBEL, JEFFREY PIERNE, NEAL YAWN, DEAN BARTNESS, SIANA STEWART and CID YOUSEFI <br><br> Defendants. | CASE NO. 16-CV-62028-JAL |

**AMENDED MEMORANDUM IN SUPPORT OF DEFENDANTS DAVID KNOBEL, JEFFREY PIERNE, DEAN BARTNESS, SIANA STEWART, AND CID YOUSEFI'S <u>MOTION TO DISMISS COMPLAINT FOR BREACH OF FIDUCIARY DUTY</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

I.      Introduction ............................................................................................................ 1

II.     Choice of Law ........................................................................................................ 2

III.    Standards of Review .............................................................................................. 2

        1.      Motion to Dismiss ..................................................................................... 2

        2.      Business Judgment Rule ............................................................................ 2

IV.     Argument ............................................................................................................... 4

        A.      Plaintiff has failed to plead around the business judgment rule. ............................ 5

                1.      Plaintiff does not adequately allege knowing violations of the law. .......... 6

                2.      Plaintiff fails to allege that Defendants' actions were irrational. .............. 18

        B.      Knobel and Pierne's actions are protected by FCC's exculpatory clause.............. 20

        C.      Stewart and Yousefi were not fiduciaries. ........................................................ 20

        D.      Plaintiff's claim is barred by the statute of limitations......................................... 22

        E.      Plaintiff lacks standing to bring the creditors' claim
                for breach of fiduciary duty. ........................................................................... 23

        F.      Plaintiff cannot show breach of the Credit Agreement
                without a fiduciary breach. ............................................................................. 25

V.      Conclusion ........................................................................................................... 25

VI.     Request for Hearing ............................................................................................. 26

        CERTIFICATE OF SERVICE ............................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C ASES

*Anic v. DVI, Inc.*,
  2002 WL 31804014 (N.D. Ill. Dec. 13, 2002) .......................................................................22

*Brautigam v. Rubin*,
  55 F. Supp. 3d 499 (S.D.N.Y. 2014)......................................................................................14

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) .................................................................................................14, 19

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) .........................................................................................................3

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007)...................................................................................................6

*Frota v. Prudential-Bache Sec., Inc.*,
  639 F. Supp. 1186 (S.D.N.Y. 1986).........................................................................................4

*Gagliardi v. TriFoods Int'l, Inc.*,
  683 A.2d 1049 (Del. Ch. 1996)...............................................................................................18

*Gimbel v. Signal Cos.*,
  316 A.2d 599 (Del. Ch. 1974)...................................................................................................3

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003)...................................................................................................9

*In re Capital One Derivative S'holder Litig.*,
  979 F. Supp. 2d 682 (E.D. Va. 2013) .....................................................................................17

*In re Caremark International Inc. Derivative Litigation*,
  698 A.2d 959 (Del. Ch. 1996)...................................................................................... *passim*

*In re China Auto. Sys. Inc. Derivative Litig.*,
  2013 WL 4672059 (Del. Ch. Aug. 30, 2013) .....................................................7, 10, 11, 16

*In re Citigroup Inc. S'holder Derivative Litig.*,
  964 A.2d 106 BL 45811, 13 (Del. Ch. 2009) ............................................................. *passim*

*In re Dean Witter P'ship Litig.*,
  1998 WL 442456 (Del. Ch. July 17, 1998)............................................................................22

*In re Gen. Motors CompanyDerivative Litig.*,
    2015 WL 3958724 (Del. Ch. June 26, 2015)................................................14, 15, 18

*In re Massey Energy Co.*,
    2011 WL 2176479 (Del. Ch. May 31, 2011)........................................................13

*In re Orchard Enterprises, Inc. Stockholder Litig.*,
    88 A.3d 1 (Del. Ch. 2014)....................................................................2

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013)...................................................................19

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ......................................................................5

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005)...............................................................3, 16

*Ironworkers Dist. Council v. Andreotti*,
    2015 WL 2270673 (Del. Ch. May 08, 2015).......................................................16

*Jallali v. Sun Healthcare Grp.*,
    2016 WL 3564248 (11th Cir. July 1, 2016).......................................................4

*Kaye v. Lone Star Fund V (U.S.), L.P.*,
    453 B.R. 645 (N.D. Tex. 2011)..................................................................3

*Lyondell Chem. Co. v. Ryan*,
    970 A.2d 235 (Del. 2009) ....................................................................14

*Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc.
v. Jacobs*,
    2016 WL 4076369 (Del. Ch. Aug. 1, 2016) .................................................. *passim*

*Mills Acquisition Co. v. Macmillan, Inc.*,
    559 A.2d 1261 (Del. 1989) ....................................................................3

*Mitchell Lane Publishers, Inc. v. Rasemas*,
    2014 WL 4925150 (Del. Ch. Sept. 30, 2014)............................................20, 21, 22

*Mukamal v. Bakes*,
    378 F. App'x 890 (11th Cir. 2010) ........................................................2, 3, 23

*North American Catholic Educational Programming Foundation, Inc. v.
Gheewalla*,
    930 A.2d 92 (Del. 2007) ..................................................................23, 24

*Oklahoma Firefighters Pension & Ret. Sys. v. Citigroup Inc.*,
2015 WL 1884453 (Del. Ch. Apr. 24, 2015) ..........................................................................7

*Reiter v. Fairbank et. al*,
2016 WL 6081823 (Del. Ch. Oct. 18, 2016) ........................................................................7

*Ret. Sys. v. Pyott*,
46 A.3d 313 (Del. Ch. 2012) ..............................................................................................13

*Sci. Accessories Corp. v. Summagraphics Corp.*,
425 A.2d 957 (Del. 1980) ...................................................................................................22

*Silvin v. GEICO Gen. Ins. Co.*,
2012 WL 12875879 (S.D. Fla. Aug. 16, 2012) .................................................................2, 8

*Staehr v. Miller*,
2010 WL 11030716 (S.D. Fla. Mar. 31, 2010) ...................................................................9

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
911 A.2d 362 (Del. 2006) ...............................................................................................5, 6, 7

*Toner v. Allstate Ins. Co.*,
821 F. Supp. 276 (D. Del. 1993) ..........................................................................................4

*Torch Liquidating Tr. v. Stockstill*,
561 F.3d 377 (5th Cir. 2009) .........................................................................................24, 25

*Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,
2009 WL 1387115 (Del. Ch. May 18, 2009) ...............................................................20, 21, 22

*Wood v. Baum*,
953 A.2d 136 (Del. 2008) ...........................................................................................8, 9, 10, 17

**STATUTES**

11 U.S.C. §108(a)(2) ...................................................................................................................22

8 Del. C. § 102(b)(7) .................................................................................................................20

8 Del. C. §141(a) ..........................................................................................................................1

Fla. Stat. § 607.1505(3) ..............................................................................................................2

**REGULATIONS**

34 C.F.R. § 668.166 ...................................................................................................................14

**RULES**

Fed. R. Civ. P. 8(a) ...................................................................................................................23

Fed. R. Civ. P. 9(b) ...................................................................................................................4

Fed. R. Civ. P. Rule 12(b)(6) ....................................................................................................2

Fed. R. Civ. P. 15 .....................................................................................................................24

Local Rule 7.1(b)(2)..................................................................................................................26

## I.   <u>Introduction</u>

Like many of its peers, FCC Holdings, Inc. ("FCC") struggled financially in recent years, ultimately going bankrupt. The reasons for FCC's downfall are numerous, including inadequate capitalization and broader market forces. But those reasons do not include any wrongful acts on the part of Defendants, including four directors and/or officers ("D&Os") and two employees.[1] Plaintiff, the bankruptcy trustee, is seeking to hold Defendants responsible for the failure of a business venture that simply reflects the collapse of an entire industry.[2]

The decision to cast Defendants as scapegoats is particularly curious given Plaintiff's failure to sue the majority of the board. Most actions for breach of fiduciary duty assert claims against the board because a corporation is controlled by its directors. *See* 8 Del. C. §141(a). Yet only one of the directors from the period in question is a named defendant here. Plaintiff has failed to sue the other four directors, who represented the two majority owners.

Instead, the unsecured creditors (acting through Plaintiff) have pinned their hopes of recovery on a single claim of breach of fiduciary duty against only the named Defendants. But Plaintiff has assumed a heavy burden in pleading that management knowingly violated Department of Education ("DOE") regulations. In fact, Delaware case law refers to such claims

---

[1] This Memorandum is written in support of the Motion to Dismiss for Defendants David Knobel (director and CEO), Jeffrey Pierne  (director and CFO), Dean Bartness (CCO), Siana Stewart (non-D&O), and Cid Yousefi (non-D&O). Thus, references to "Defendants" in this Memorandum refer to all named defendants except Neil Yawn.

[2] Department of Education data reveals that FCC's bankruptcy was just one example of a widespread pattern of school closures across the country. *See* http://www2.ed.gov/offices/OSFAP/PEPS/closedschools.html (click on "Closed School Search File"). In 2014—the year FCC declared bankruptcy—550 schools closed. This followed the closure of 680 schools in 2013 and 944 schools in 2012.

1

as perhaps the most difficult claims to make in all of corporate law because of the business judgment rule, the pleading standard of specificity, and the scienter requirement. Because Plaintiff has failed to carry its heavy burden, the Complaint should be dismissed.

## II.   Choice of Law

Under the internal affairs doctrine, Florida defers to the law of the state of incorporation on the issue of fiduciary duties. *See* Fla. Stat. § 607.1505(3); *see also, e.g., Mukamal v. Bakes*, 378 F. App'x 890, 896–97 (11th Cir. 2010). FCC was incorporated in Delaware. *See* FCC's Articles of Incorporation, attached as <u>Exhibit A</u>.

## III.   Standards of Review

### 1.   *Motion to Dismiss*

This Court has previously set forth the standard for reviewing a motion to dismiss:

[W]hile a complaint subject to a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, the complaint must provide the grounds for the plaintiff's entitlement to relief; labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. In evaluating a motion to dismiss, courts adopt a two-pronged approach whereby they first (1) eliminate any allegations in the complaint that are merely legal conclusions and then (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Silvin v. GEICO Gen. Ins. Co.*, 2012 WL 12875879, at *2 (S.D. Fla. Aug. 16, 2012) (citations and internal quotation marks omitted).

### 2.   *Business Judgment Rule*

Another standard of review—or, more accurately, non-review—is salient. "Delaware's default standard of review is the business judgment rule, a principle of non-review[.]" *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 33–34 (Del. Ch. 2014). "The business judgment rule is . . . a presumption that in making a business decision the [management] of a

2

corporation acted on an informed basis and in the honest belief that the action taken was in the best interests of the company and its shareholders." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746–47 (Del. Ch. 2005) ("*Disney II*").

"[B]ecause the effect of the proper invocation of the business judgment rule is so powerful . . . the determination of the appropriate standard of judicial review frequently is determinative of the outcome of derivative litigation." *Mills Acquisition Co. v. Macmillan, Inc*., 559 A.2d 1261, 1279 (Del. 1989). "When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste." *Disney II*, 907 A.2d at 747. "Even where a court finds that a particular activity should be (or should have been) enjoined, it is more difficult still to find that the actors are personally liable for monetary damages." *Gimbel v. Signal Cos.*, 316 A.2d 599, 615 (Del. Ch. 1974). Officers, as well as directors, are protected by the business judgment rule. *See, e.g., In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 125, 2009 BL 45811, 13 (Del. Ch. 2009).

The plaintiff bears the burden of proof in rebutting the business judgment rule. *Kaye v. Lone Star Fund V (U.S.), L.P.,* 453 B.R. 645, 679 (N.D. Tex. 2011) (citing *Cede & Co. v. Technicolor, Inc*., 634 A.2d 345, 361 (Del. 1993)). The plaintiff must allege facts that would "demonstrate by a preponderance of the evidence that the defendants violated their fiduciary duties and/or committed waste." *Disney II*, 907 A.2d at 756. A plaintiff's failure to plead around the business judgment rule results in dismissal. *Mukamal*, 378 F. App'x at 899 (affirming dismissal). Under substantive Delaware law that federal courts should apply, a plaintiff must plead around the business judgment rule with particularity. *See Kaye,* 453 B.R. at 679.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Likewise, under Fed. R. Civ. P. 9(b), allegations of fraud must be pled with particularity. While Plaintiff may not have brought an ostensible count of fraud, it is the substance of the allegations that determine whether Rule 9(b) applies. *See Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993); *see also, e.g., Frota v. Prudential-Bache Sec., Inc.,* 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or **fiduciary**.") (emphasis added). Plaintiff essentially alleges that Defendants defrauded DOE of monies and lied about it. *See* Complaint ¶48 (alleging "intentional misrepresentation"); ¶¶5, 9, 52, 55–57, 58, 63, and 103 (alleging knowing violation of regulations meant to defraud the federal government of money).

Under the exacting standard of Rule 9(b), a "plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud." *Jallali v. Sun Healthcare Grp.*, 2016 WL 3564248, at *1 (11th Cir. July 1, 2016) ("plaintiff failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how'"). Plaintiff has not attempted to meet this standard.

## IV.    <u>Argument</u>

Plaintiff's claim fails for several different reasons. First, as set forth in Part IV.A, Plaintiff has failed to plead around the business judgment rule. Second, as set forth in Part IV.B, the claims against Knobel and Pierne fail because of the exculpatory clause in the corporate charter. Third, as set forth in Part IV.C, the claims against Stewart and Yousefi fail because they were not fiduciaries. Fourth, as set forth in Part IV.D, the claim is barred by the statute of limitations. Fifth, as set forth in Part IV.E, Plaintiff lacks standing to bring a direct claim on behalf of prepetition creditors. Finally, as set forth in Part IV.F, the adjunct claim regarding the credit covenants must fail because its fate is tied to that of the claim for breach of fiduciary duty.

### A. Plaintiff has failed to plead around the business judgment rule.

Plaintiff has not pled around the presumption created by the business judgment rule that Defendants were acting in the best interests of FCC. The business judgment rule is a significant hurdle for any plaintiff to overcome, but the bar is raised even higher in a case like this where the plaintiff is apparently alleging a breach of the duty of loyalty.

Plaintiff has not articulated which specific fiduciary duty Defendants purportedly breached; Plaintiff states only that "Defendants owed fiduciary duties of loyalty, care, and good faith to FCC." Complaint ¶97. This outdated description of a "triad" of fiduciary duties only adds to the confusion, as the duty of good faith is now considered a component of the duty of loyalty. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006).

As between the duties of loyalty and care, Plaintiff's allegations invoke concepts from the former. The core of the Complaint is that Defendants knowingly violated the law, which is an example of a breach of the duty of loyalty. *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (*Disney I*). The Delaware Supreme Court has declared that a bright line separates the duties of care and loyalty. *Id*. at 65–67. If the two duties were conflated, protections afforded to fiduciaries under Delaware law (including exculpation and indemnification) would be voided because they only apply to violations of the duty of care, not the duty of loyalty. *Id*. The court has further clarified that "the burden required for a plaintiff to rebut the presumption of the business judgment rule by showing [a breach of the duty of care] is a **difficult one, and the burden to show bad faith [i.e., a breach of the duty of loyalty] is even higher**." *In re Citigroup Inc. S'holder Derivative Litig*., 964 A.2d 106, 125 (Del. Ch. 2009) (emphasis added).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

1.  *Plaintiff does not adequately allege knowing violations of the law.*

Given that the heart of the Complaint is that Defendants breached their fiduciary duties by violating DOE regulations, Plaintiff has assumed the heavy burden of pleading Defendants' conscious participation in unlawful transactions, but it has not carried this burden.

a.  *Plaintiff has failed to allege with specificity that Defendants knowingly violated the DOE regulations.*

"A breach of fiduciary duty claim that seeks to hold [management] accountable for the consequences of a corporate trauma is known colloquially as a *Caremark* claim, in a tip of the judicial hat to Chancellor Allen's landmark decision [*In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996)]." *Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *7 (Del. Ch. Aug. 1, 2016). "In a typical *Caremark* case, plaintiffs argue that the defendants are liable for damages that arise from a failure to properly monitor or oversee employee misconduct or violations of law." *Id.* "The claim is that the [management] allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." *Id.*

In *Stone*, the Delaware Supreme Court adopted *Caremark* and "clarified one of the most difficult questions in corporate law—when [defendants] with no motivation to injure the firm can be held responsible if the corporation incurs serious harm as a result of its failure to obey the law." *Desimone v. Barrows,* 924 A.2d 908, 935 (Del. Ch. 2007). The test is whether defendants (a) "**utterly** failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, **consciously** failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."

6

*Stone*, 911 A.2d at 370 (emphasis added). *Stone* also clarified that this test "does not eviscerate the core protections of the business judgment rule[.]" *Citigroup*, 964 A.2d at 125.

When making a claim under the second prong, the plaintiff must show: "(1) that [management] knew or should have known that the corporation was violating the law, (2) that [management] acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation." *Qualcomm*, 2016 WL 4076369, at *8. "In practice, plaintiffs often attempt to satisfy the elements of a *Caremark* claim by pleading that the [defendants] had knowledge of certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding [their] duty to address that misconduct." *Id.*

"Because this theory of fiduciary duty breach requires a plaintiff to show that management '**knew** that they were not discharging their fiduciary obligations' i.e., **bad faith—as a 'necessary condition**[] predicate for [management] oversight liability,' it has been considered '**possibly the most difficult theory in corporation law**[.]'" *In re China Auto. Sys. Inc. Derivative Litig.*, 2013 WL 4672059, at *7 (Del. Ch. Aug. 30, 2013) (quoting *Stone*, 911 A.2d at 372) (other footnotes omitted) (emphasis added). A plaintiff must "properly **alleg[e] particularized facts** that show [management] consciously disregarded an obligation to be reasonably informed about the business and its risks or consciously disregarded the duty to monitor and oversee the business." *Citigroup*, 964 A.2d at 125 (emphasis added). The plaintiff must also plead the causation element with particularity. *See Reiter v. Fairbank et. al,* 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016). Accordingly, these claims are not merely difficult to prevail on at trial; "*Caremark* claims are among the **hardest to plead successfully**." *Oklahoma Firefighters Pension & Ret. Sys. v. Citigroup Inc*., 2015 WL 1884453, at *5 (Del. Ch. Apr. 24, 2015) (emphasis added).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Plaintiff's mantra that Defendants "knew or should have known" that DOE regulations were being violated falls short of satisfying *Caremark*. This repeated statement is a mere legal conclusion, which must be ignored. *Silvin*, 2012 WL 12875879, at *2. Further, the Complaint's purported "red flags" fall short of what is required under Delaware law.

### b.   The financial reports do not qualify as "red flags."

In typical *Caremark* claim fashion, Plaintiff avers that "[n]one of the C-level executives took any action to prevent FCC's improper use of Title IV funds," including failure to ensure accurate financial reporting, failure to investigate the cause of liquidity problems, and failure to advise the board about violations of DOE regulations. Complaint ¶¶45–50 and 105. Such allegations claim that employees within the Financial Services Office ("FSO")—not Defendants themselves—violated DOE regulations. *Id*. ¶¶99–100 (alleging that FSO employees over-drew funds or failed to reconcile as required by regulation).

Plaintiff's attempt to show that Defendants knew FSO employees were not complying with regulations depends heavily upon financial reports that "should" have put Defendants on notice about discrepancies between enrollment figures and Title IV funds. *Id*. ¶103. But the financial reports at most "suggested" that the draws violated DOE Regulations. *Id*. at 19 ("FCC's Financial Reports to Management **Suggest** its Title IV Draws Violated DOE Regulations") (emphasis added). Such allegations are insufficient under Delaware law.

In *Wood v. Baum*, 953 A.2d 136 (Del. 2008), the Delaware Supreme Court held that the failure to properly oversee accounting practices did not establish a viable *Caremark* claim. *Id*. at 141–42. The plaintiff alleged four categories of misconduct purportedly giving rise to an inference of scienter, but the court found that none of these allegations "establish[ed] that [management] **knowingly** participated in illegal conduct." *Id*. at 142 (emphasis added).

First, the court found that the defendants' "execution of [the corporation's inaccurate] financial reports [filed with the SEC], without more, is insufficient to create an inference that [management] had actual or constructive notice of any illegality." *Id*. Next, the court held that it could not infer culpable knowledge merely because defendants had approved a transaction that later proved to be improper. *Id*. Then, the court found that it could not infer scienter based simply on the defendants' positions on audit committees. *Id*. at 142–43. Finally, the court held that "red flags are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer." *Id*. at 143. *See also Guttman v. Huang*, 823 A.2d 492, 496, 499 (Del. Ch. 2003) (holding that accounting irregularities did not support a *Caremark* claim).

This District has already applied *Wood* in dismissing a suit against corporate D&Os. In *Staehr v. Miller*, the plaintiff claimed that management must have been aware of the filing of false statements because of their positions on the audit committee and the "red flags" of troubling financial data. 2010 WL 11030716, at *9–10 (S.D. Fla. Mar. 31, 2010). But Judge Jordan found these allegations insufficient "to infer that the audit committee defendants were aware of any misstatements or omissions contained in these documents." *Id*., at *9. "These responsibilities are not particularized allegations of [management] involvement in preparation of the allegedly false or misleading reports sufficient to infer scienter." *Id*. Further, the "red flags" were insufficient; the problematic financial data "amount[ed] to nothing more than indications of worsening economic conditions and do not support a reasonable inference that the . . . defendants approved or disseminated the financial disclosures knowingly or in bad faith." *Id*., at *10.

Under *Wood* and *Staehr*, Defendants' positions are insufficient to establish liability. Further, the conclusory allegation that one Defendant was allegedly responsible for "generating and monitoring" the supposedly anomalous financial reporting, *see* Complaint ¶103, "is

9

insufficient to create an inference that [they] had actual or constructive notice of any illegality." *Wood*, 953 A.2d at 142; *see also, e.g., In re China*, 2013 WL 4672059, at *8. Similarly, Plaintiff's allegations that FSO employees engaged in drawdown practices that were subsequently criticized by the DOE are inadequate as a matter of law to establish liability.

Likewise, the data in FCC's financial reports (*see* Complaint ¶¶58–63) were "nothing more than indications of worsening economic conditions" and cannot support the inference that Defendants knowingly disseminated inaccurate information to the DOE or otherwise violated regulations. Simply put, Defendants cannot "be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf," even in troubled economic times. *Caremark*, 698 A.2d at 969.

> c. *The email strings do not provide an adequate basis from which to infer scienter.*

Plaintiff's only other attempts to allege with any detail that any Defendants knowingly violated regulations are references to two email strings. In the first one, Plaintiff claims that a non-defendant from the Anthem Schools (acquired by FCC on April 12, 2012) opined to Stewart that Anthem Schools had previously not been in compliance with a DOE regulation. *See* Complaint ¶42. To begin, these emails concerned pre-merger activity that may not be at issue in this suit. *See* Part IV.D, *infra*. Further, the email excerpt displayed in the Complaint actually shows Stewart responding to the concern about the prompt disbursement rule with her good faith belief—whether mistaken or not is irrelevant—that the Anthem Schools' practices of disbursement were in compliance with regulations, at least as of the merger with FCC. *See Qualcomm*, 2016 WL 4076369, at *12 (defendants were "under the impression that [their] conduct did not violate applicable . . . laws").

Moreover, Plaintiff cannot use this email exchange against any of the other Defendants. Plaintiff's generic claim that the email was sent "among FCC officers" is insufficient to allege anything against specific Defendants. *In re China*, 2013 WL 4672059, at *8 (prohibiting group pleading). The only other Defendant even mentioned is Pierne, who was allegedly copied on the initial email from FCC's outside auditor to FCC and Anthem's controllers, innocuously asking for ""a comment . . . as to the Company's compliance' as of the merger date." Complaint ¶41. But the Complaint fails to allege that Pierne received the subsequent email containing the Anthem employee's opinion. Then, the Complaint leaps forward to a memorandum, "which was the product" of the email string and which Pierne allegedly "signed off on." *Id*. ¶¶42 and 53. Again Pierne was entitled to rely upon the honesty and integrity of his employees.

The second email string that Plaintiff attempts to use to establish knowing violations does not even mention DOE regulations. Complaint ¶¶52 and 101. Instead, Knobel, Pierne, Yousefi, and an unnamed employee discuss an upcoming drawdown. *Id*. There is no suggestion that any of them were consciously aware of the regulatory implications under any DOE rule. Indeed, Plaintiff acknowledges that there was no "explanation of what the practice entailed or what the ramification of the same might be . . . ." *Id*. ¶54.

> d. *Plaintiff does not even attempt to allege scienter as to most of the purported regulatory violations.*

Moreover, the two alleged email strings do not even touch upon most of the claimed violations. The contention that Pierne and Yousefi engaged in "kiting" lacks any allegation—let alone particularized ones—showing how these Defendants knew that this practice violated DOE regulations or on what occasions they engaged in "kiting." Instead, Plaintiff devotes less than one page of conclusory allegations that cannot withstand this motion. *Id*. ¶¶55–57. Similarly, the claim about the failure to reconcile monthly lacks allegations of scienter. *Id*. ¶¶50 and 68.

11

Assuming, *arguendo*, that this violation occurred, nothing in the Complaint indicates how any Defendant knew that regulations were being broken.

Likewise, the claim about inaccurate enrollment reporting is also unsupported by allegations of scienter. *Id.* ¶¶45–49. Plaintiff criticizes the lack of precision in projected enrollment numbers, but fails to explain how missing business projections violates DOE regulations or shows that Defendants were consciously manipulating the data. The fact that FCC missed its enrollment targets indicates only that FCC, like the industry as a whole, was struggling to meet its goals. Finally, as to the claim about inaccurate reporting of withdrawals, Plaintiff only makes an attempt to allege scienter as to unnamed FSO employees. *Id.* ¶¶46–49. Plaintiff relies on an opinion from an unnamed "consultant" regarding the purported failure to process refunds to the DOE in a timely manner, but nowhere is there an allegation that any Defendant was aware of this consultant's opinion, let alone that they agreed with it. *Id.* ¶48.

> ### e. The Department of Education's history of interactions with FCC constitutes a "green flag" approving of Defendants' conduct.

Further, the interactions between FCC and the DOE also show that Defendants were not consciously disregarding their duties. In *Qualcomm*, the Court of Chancery recently emphasized just how unequivocal and harsh governmental action must be to constitute a "red flag." The plaintiff alleged that D&Os had damaged the company by forcing it to violate antitrust laws, and pointed to three alleged red flags: an $891 million settlement in the United States; a $208 million fine from the Korean government; and a cease-and-desist order from the Japanese government. 2016 WL 4076369, at *3–*4 and *10–*11. The court assumed that these significant events constituted red flags, but still found that the defendants had not consciously disregarded the flags because they had honestly believed that the settled claim was meritless and that the fine and order against the company would be reversed on appeal. *Id.*, at *10. The court contrasted its facts

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

with *In re Massey Energy Co.,* 2011 WL 2176479 (Del. Ch. May 31, 2011), where the company had not only disagreed with the underlying laws (as opposed to merely disagreeing with the regulator's interpretation of the laws, as Qualcomm had), but also pled guilty to **criminal** charges arising from deadly safety violations resulting. *Id*. The court also distinguished *La. Mun. Police Empls.' Ret. Sys. v. Pyott,* 46 A.3d 313, 340 (Del. Ch. 2012), where the defendants' own counsel warned them about their illegal activities. *Id*., at *12.

If the bar set for "red flags" consists of criminal guilty pleas and explicit warnings of illegality from counsel, nothing communicated by the DOE to Defendants comes close to constituting a "red flag." Plaintiff alleges that the DOE did not even take issue with accounting discrepancies until April 2013. Complaint ¶71. Plaintiff then concedes that FCC reacted to the DOE's letter by hiring ten employees to manually reconcile the records "until it successfully reimplemented [the malfunctioning software]." *Id*. ¶72. FCC's efforts were vindicated when the DOE, instead of penalizing FCC in any way, actually awarded Title IV funds for the upcoming 2013–14 school year. *Id*. ¶¶47–53 and 73.

After discrepancies allegedly reappeared in late 2013 after reimplementation of the software, Plaintiff acknowledges that FCC took multiple, remedial steps. In March 2014, FCC "refunded/posted disbursements in excess of $7M" in an attempt to reconcile the books. Complaint ¶81. In April, "management scrambled to substantiate or refund Title IV funds it previously drew to avoid potential penalties associated with failing to repay trust funds. By the end of April 2014, management believed it resolved nearly all outstanding balances[.]" *Id*. ¶86. Plaintiff itself appears surprised at the DOE decision to file a proof of claim against FCC for allegedly outstanding funds, couching the DOE's action as "[n]otwithstanding" the remedial actions of Defendants. *Id*. ¶88.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Plaintiff also concedes that FCC had a monitoring system in the form of not only financial reporting but also independent auditing. *Id*. ¶¶41 and 58. Delaware law encourages management to rely on outside professionals, insulating some members of management from liability arising out of such reliance. *Brehm v. Eisner*, 746 A.2d 244, 261-62 (Del. 2000). That FCC promptly took remedial steps in response to the DOE's concerns, which were based on the auditors' findings (Complaint ¶47), turned any "red flag" into a "green" one. *See, e.g., Brautigam v. Rubin,* 55 F. Supp. 3d 499, 507 (S.D.N.Y. 2014), *aff'd*, 618 F. App'x 723 (2d Cir. 2015).

The fact that the DOE ultimately cut off Title IV funding because of alleged draw-down violations hardly means that Defendants ignored red flags; under *Qualcomm*, a defendant is not required to predict the actions of a regulator, and can even disagree in good faith with its actions. Defendants believed that they were complying with applicable regulations. For example, Defendants believed that their disbursement practices were in compliance with any excess cash requirements under 34 C.F.R. § 668.166, which allows an institution to exceed the three-day disbursement rule if the drawdown does not exceed one percent of its total prior-year drawdowns. Defendants' actions may have turned out to be inadequate, but that does not give rise to a cause of action under Delaware law. *See Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 243 (Del. 2009) ("[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties").

> ### f.   *Defendants cannot be held personally liable because their software malfunctioned.*

Ultimately, any alleged violations of DOE regulations were the result of software malfunctions. Under Delaware law, the failure of a system does not rise to the level of a "red flag" even when the system break-down has catastrophic effects. In *In re Gen. Motors Company Derivative Litig.,* 2015 WL 3958724 (Del. Ch. June 26, 2015), *aff'd sub nom. In re Gen. Motors*

14

*Co. Derivative Litig.*, 133 A.3d 971 (Del. 2016), the Court of Chancery confirms two key points of *Caremark* law: that it is very difficult to allege viable "red flags," and that even if red flags are shown, it is very difficult to establish a *Caremark* claim based on an inadequate—rather than a non-existent—reporting system. In a suit arising from the infamous ignition switches that caused multiple deaths, the plaintiff alleged that the defendants' inadequate reporting system had failed to catch the ignition switch issue. *Id.*, at *2. But the court observed that the plaintiffs failed to allege with particularity the existence of "red flags" that put the defendants on notice of problems with the reporting system, but which were consciously disregarded. *Id.*, at *16. "Plaintiff's counsel did not posit that there was a discernible motive for the [defendants] to disregard [their] oversight obligation[.]" *Id.* Nor did the plaintiff show that there was a "culture" of indifference that could provide the basis for inferring a conscious disregard of duties. *Id.*

The court also held that the plaintiff was not actually alleging that a reporting system was lacking, but instead that the reporting system was inadequate, which does not establish a viable *Caremark* claim. *Id.*, at *15. "Stated more generally . . . throughout the Complaint, the Plaintiffs concede that the [defendants were] exercising **some** oversight, albeit not to the Plaintiffs' hindsight-driven satisfaction." *Id.* The court found that the defendants were receiving reports and taking some actions to mitigate risk, thus satisfying their duties. *Id.*

Here, Plaintiff admits that Defendants believed that the accounting issues were the result of unintentional software glitches. While Plaintiff alleges that "FCC's stated position that it could not reconcile because of a software malfunction was not credible," the support for this claim is a non-sequitur. Complaint ¶72. Plaintiff reasons that FCC's ability to manually reconcile records with additional staff somehow means that the software was not defective, but the one has nothing to do with the other. Plaintiff concedes that when Defendants reimplemented the

15

software in November 2013, the problems reappeared. *Id*. ¶75. The only plausible inference from the chain of events is that the software was causing the accounting errors.

Plaintiff has admitted both that Defendants had a system in place (including the software) to comply with DOE regulations, and that Defendants did not consciously disregard their oversight duties because they complemented the software with manual personnel when necessary and even hired a new head of IT in an attempt to reimplement the software. *Id*. ¶74. At worst, Defendants "failed to implement systems and procedures or employ qualified personnel to ensure financial reporting which would have prevented the misuse of Title IV funds and helped maintain management's credibility with the DOE[.]" Complaint ¶105(a). But this claim is insufficient to allege the "'utter failure" of oversight required by *Caremark*. "Demonstrating that a . . . system has failed is not the same as demonstrating an actionable breach of fiduciary duty[.]" *Ironworkers Dist. Council v. Andreotti*, 2015 WL 2270673, at *31 (Del. Ch. May 08, 2015) (dismissing *Caremark* claim).

> g.   *Plaintiff's claims do not improve when evaluated on an individual basis.*

Most of Plaintiff's allegations lump Defendants together, which is insufficient to state a cause of action against any single Defendant. *See Disney II*, 907 A.2d at 748. Even when Plaintiff does name individual Defendants, the allegations are still inadequate.

Besides naming Bartness as a defendant and claiming that he was the CCO during the relevant period in question, the Complaint has nothing else to say about him. Complaint ¶¶6(e), 14, 43, and 104. But merely holding an oversight position like CCO does not create liability when others might be breaching their fiduciary duties. *See, e.g., In re China Auto*, 2013 WL 4672059, at *8. Further, Plaintiff's claim that FCC took no action to address DOE's concerns in

the 2012–13 year (Complaint ¶104) are contradicted by the allegations that FCC hired manual personnel to reconcile the books and then hired a new head of IT to reimplement the software.

Plaintiff also relies heavily on Pierne's position as CFO to conclude that he must have known about accounting improprieties, *see* Complaint ¶103, but again, simply occupying a position of oversight, even in conjunction with the execution of erroneous financial reports filed with the government and the authorization of improper transfers, does not give rise to a cognizable claim under *Wood*. Knobel, as CEO, is even further removed than Pierne from oversight of the financial reporting.

Finally, even assuming, *arguendo*, that Stewart and Yousefi were fiduciaries (which they were not, *see* Part III.C, *infra*), they would be entitled to rely on their employees' honesty and integrity, just as the C-level officers were entitled to rely on Stewart and Yousefi. Likewise, they were allowed to rely on the "green flag" provided by the DOE when it approved Stewart's request to award FCC funding for the 2013–14 school year.

> ### h. *Defendants' alleged actions did not cause FCC to collapse, let alone cause the claimed $150 million-plus in damages.*

Even if Defendants had breached some duty to FCC, Plaintiff still fails to satisfy the third prong of the test outlined in *Qualcomm*, which is causation of harm to the corporation. Even if Defendants had known that their employees were violating DOE regulations, Plaintiff has not shown Defendants could have known that the DOE would take the drastic step of terminating Title IV funding in 2014, especially when the DOE had allowed FCC to cure the same type of issue the prior year. Complaint ¶¶69–82. Even if the Court considered the accounting issues in 2013 to be a red flag, the DOE's approval after FCC's remedial actions led "Defendants . . . to reasonably believe[] that the matter was resolved." *In re Capital One Derivative S'holder Litig*., 979 F. Supp. 2d 682, 696 (E.D. Va. 2013) (dismissing *Caremark* claim).

17

Plaintiff assumes that because FCC went into bankruptcy, management must be liable. But in cases with facts much worse, Delaware courts have cautioned against this *ex post facto* thinking. "Indeed, it is tempting in a case with such staggering losses for one to think that they could have made the 'right' decision if they had been in [management's] position." *Citigroup*, 964 A.2d at 131. "This temptation, however, is one of the reasons for the presumption against an objective review of business decisions by judges, a presumption that is no less applicable when the losses to the Company are large." *Id*. This Court should not succumb to any temptation to pin liability on Defendants simply because a company went bankrupt.

In addition, the failure to "monetize" the Anthem schools was a failure for which the board is responsible. *See* Complaint ¶95. Again, though, Plaintiff has failed to join the majority of the board in this action. *Id*. ¶24.

### 2.   *Plaintiff fails to allege that Defendants' actions were irrational.*

Because Plaintiff is pleading knowing violations of the law and a failure of oversight, it is pleading a violation of the duty of loyalty, not the duty of care. *In re Gen. Motors*, 2015 WL 3958724, at *17. But even if Plaintiff had alleged that Defendants violated the duty of care, Plaintiff has still failed to plead around the business judgment rule by averring with particularity that Defendants were irrational. It is "an elementary precept of corporation law [that] in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc*., 683 A.2d 1049, 1051 (Del. Ch. 1996). Because there is no allegation of self-dealing or improper motive here, Plaintiff's only avenue to recovery is to show bad faith. Having failed to allege bad

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

faith in the form of a knowing violation of the law, Plaintiff's only remaining option is to make plausibly allegations that Defendants' actions were nothing less than irrational.

"Irrationality is the outer limit of the business judgment rule." *Brehm*, 746 A.2d at 264. "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013) (citations omitted). Under this standard, "[c]ourts do not measure, weigh or quantify [management's] judgments." *Brehm*, 746 A.2d at 264. Courts "do not even decide if [the judgments] were reasonable. . . . [because] [d]ue care in the decisionmaking context is **process** due care only." *Id*. "[W]hether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for [management] liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests." *Caremark*, 698 A.2d at 967–68. "To employ a different rule—one that permitted an 'objective' evaluation of the decision—would expose [management] to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests." *Id*.

At no point does Plaintiff allege any irrational conduct. Again, Plaintiff appears to conclude that because the DOE ultimately cut off Title IV funding, Defendants must have breached their duties. But the business judgment rule is concerned with process, not results, and the Complaint fails to show that Defendants' process was irrational. To the contrary, the Complaint shows that FCC attempted to comply with DOE regulations with multiple, rational processes including software and external auditing. Further, the FCC reacted with remedial processes when prompted by the DOE, implementing manual reconciliation in 2013 while the software reimplementation was pending and making refunds in 2014 in an effort to reconcile the

books. With hindsight bias, Plaintiff points out that Defendants' processes were inadequate, but such allegations do not support a viable claim under Delaware law.

**B.   Knobel and Pierne's actions are protected by FCC's exculpatory clause.**

Knobel and Pierne are also protected by the corporate charter's exculpatory clause. The articles of incorporation in effect during the relevant time mirror the protection provided under 8 Del. C. § 102(b)(7), which exculpates all claims except breaches of the duty of loyalty, bad faith conduct (such as knowing violations of the law), unlawful payment of dividends or unlawful stock purchase or redemption, and self-dealing. *See* Exhibit A, art. VIII.

If "the director defendants are exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *Citigroup*, 964 A.2d at 124–25. Plaintiff has failed to plead a non-exculpated claim of breach of the duty of loyalty, and if the Court were to treat that claim instead as a breach of the duty of care, such claim would be exculpated by the clause in the charter. Therefore, the exculpation clause shields Knobel and Pierne from any liability.

**C.   Stewart and Yousefi were not fiduciaries.**

The Court should also dismiss defendants Yousefi and Stewart from this case because they were not even fiduciaries under Delaware law. Because they are not D&Os, Plaintiff has to show Stewart and Yousefi were "key managerial" personnel to subject them to fiduciary duties. *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *9–*10 (Del. Ch. May 18, 2009). "Whether or not an individual qualifies as a key managerial employee depends on whether he exhibits any of the hallmarks of such a crucial employee." *Mitchell Lane Publishers, Inc. v. Rasemas,* 2014 WL 4925150, at *4 (Del. Ch. Sept. 30, 2014) (internal quotation marks and brackets omitted). "[O]ne may possess important responsibilities in an organization, and even hold [an important title]," without being considered a key managerial employee." *Id.*

In *Triton*, the Delaware Chancery Court found that the defendant was not a key managerial employee even though he was a project manager who had the ability to bind the company to contracts. *Id*., at *10. The court observed that the employee did not "supervise tiers of employees," or "shape the policy of the Company, or advise its CEO." *Id*. Ultimately, the employee only owed fiduciary duties to the company insofar as he had acted as its agent. *Id*.

Similarly, in *Rasemas*, the Chancery Court again found that an employee was not a fiduciary despite the job title of "manager." 2014 WL 4925150, at *4–*5. Denying the plaintiff's motion for injunctive relief, the court found that plaintiff had failed to show a substantial likelihood that it would establish that the defendant was a key managerial employee. *Id*., at *5. The court found merit in the defendant's argument that "[n]one of [the managers] had the authority to manage contractors, other employees, budgets, deadlines, or anything else usually connected with the title 'manager.'" *Id*., at  *5. "The facts that Plaintiff relies on, such as [the employee's] official title . . . do not compel the Court to find [the employee] to have been a key managerial employee." *Id*.

Like the employees in *Triton* and *Rasemas*, Stewart and Yousefi lack sufficient hallmarks of a key managerial employee. There are no allegations that they shaped company policy, advised the CEO, or possessed the attributes of a manager. While Plaintiff alleges that they were in charge of the FSO (and the IT division in Yousefi's case), there are no allegations that these divisions contained "tiers of employee," or any details of managerial authority besides conclusory statements that they "supervised" the Office. In fact, this case is easier to decide than *Triton* or *Rasemas*, because those defendants participated in weekly company meetings or had the ability to bind the company to contracts (as was the case in *Triton*).

21

Moreover, even assuming that Stewart and/or Yousefi were subject to some form of fiduciary duty, Defendants are unaware of any "case authority . . . to support the proposition that a managerial employee breaches his fiduciary duty simply failing to perform his job." *Anic v. DVI, Inc*., 2002 WL 31804014, at *3 (N.D. Ill. Dec. 13, 2002) (applying Delaware law). Without an allegation that they were "neglecting [their] duties . . . in order to pursue an interest adverse to the [company]—a clear violation of the duty of loyalty," Plaintiff's claim fails. *Id*. Indeed, *Triton*, *Rasemas*, and the seminal "key managerial" employee case of *Sci. Accessories Corp. v. Summagraphics Corp*., 425 A.2d 957 (Del. 1980) involved claims of classic disloyalty, such as usurping opportunities (*Summagraphics*) or stealing trade secrets (*Triton* and *Rasemas*). Because there are no allegations here that Stewart or Yousefi put themselves into positions antagonistic to FCC, Plaintiff has failed to allege a cognizable claim against them.

**D. Plaintiff's claim is barred by the statute of limitations.**

Plaintiff's claim is also time-barred. "It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty." *In re Dean Witter P'ship Litig*., 1998 WL 442456, at *4 (Del. Ch. July 17, 1998). "There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations." *Id*., at *3. "The general law in Delaware is that the statute of limitations begins to run, i.e., the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action." *Id*., at *4.

Here, the critical date is August 26, 2011. This date is three years (the length of the statute of limitations) prior to the August 26, 2014 bankruptcy filing. *See* Complaint ¶94. That filing had the effect of tolling the statute of limitations for two years. *See* 11 U.S.C. §108(a)(2).

While Plaintiff largely complains about certain actions taken (or not taken) in the 2012–13 and 2013–14 school years, Plaintiff also describes actions taken in the years before that. For

22

instance, Plaintiff discusses FCC and Anthem Schools' "[h]istorical[]" pre-merger drawdown practices. Complaint ¶¶38–42. These practices, at least on the part of Anthem, included "pre-draw" methods that allegedly violated DOE regulations. *Id.* Since the merger occurred on April 12, 2012 (Complaint ¶25), a fair reading of the Complaint and its allegation of "historical" practices means that these allegedly improper drawdown practices were occurring for several years before 2012. Therefore, the Court should dismiss the Complaint as time-barred.

In the alternative, the Court should dismiss the Complaint for its failure to provide adequate notice as to when the alleged wrongful acts began. Under Fed. R. Civ. P. 8(a), Defendants are entitled to know when Plaintiff believes that the cause of action accrued, but the Complaint fails to provide this basic information. Plaintiff should be required to put Defendants on notice of when the allegedly wrongful acts began.

### E. Plaintiff lacks standing to bring the creditors' claim for breach of fiduciary duty.

The Court should also dismiss the Complaint for lack of standing. FCC's creditors cannot bring a direct action for breach of fiduciary duty against FCC's officers through the trustee. In *Mukamal*, the Eleventh Circuit recognized that direct actions by creditors against a corporation's fiduciaries do not exist under Delaware law. 378 F. App'x 890. "The Delaware Supreme Court held [in *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007)] that creditors of an insolvent company do not have a direct claim against directors or managers for breach of fiduciary duty." *Id.* at 898. Applying *Gheewalla*, the Eleventh Circuit affirmed the District Court for the Southern District of Florida, which had dismissed the plaintiff-trustee's claims as forbidden direct claims by creditors. *Id.*

*Mukamal* applies to the instant claim. From the outset, the plain language of the Complaint demonstrates that the trustee is seeking a recovery for damages to the creditors specifically, rather than to FCC more broadly: "[T]he Trustee, **as Plan fiduciary for FCC's**

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

**creditors, which include FCC's lenders, trade creditors**, and the DOE, seeks damages from the defendants on account of their breaches of fiduciary duty and their destruction of approximately $150 million in value, **to the detriment of the Debtor's prepetition creditors**." Complaint ¶10 (emphasis added). To erase any doubt, the trustee expressly confirms that it brought this action on behalf of the prepetition creditors: "As a result of defendants' fiduciary duty breaches, **FCC's creditors, on whose behalf the Trustee commenced this action (including lenders, trade vendors**, and the DOE), have been damaged in an amount to be determined after trial, but not less than $150 million." *Id.* ¶107 (emphasis added).

The Complaint even specifically cites FCC's delay of payments to creditors as an injury inflicted by the fiduciaries' actions. *Id.* ¶85 ("**C. Delay of Payments to Creditors**. To manage its liquidity, **FCC delayed payments to creditors**, and even delayed payroll scheduled for April 4, 2014.") (second emphasis added). The Complaint further points to the purported "covenant breach" of a "certain Credit Agreement" between FCC and its lenders as an example of the harm inflicted upon the creditors as a result of Defendants' purported actions. *Id.* ¶¶64–68.

Further, the Court's dismissal of the Complaint on the basis of a want of standing should be with prejudice because any attempted amendment would fail. In *Torch Liquidating Tr. v. Stockstill*, 561 F.3d 377, 391–92 (5th Cir. 2009), the Fifth Circuit affirmed the district court's dismissal with prejudice of the plaintiff's prohibited direct claims by corporate creditors. While Fed. R. Civ. P. 15 favors granting leave to amend, such leave "is not automatic," and one of the grounds for denying leave is "futility of amendment." *Id.* at 391. Applying Rule 15, the Fifth Circuit ruled that a plaintiff-trustee cannot avoid *Gheewalla* simply by replacing direct references to creditors with the magic words of a proper action on behalf of the corporation. *Id.* at 392–93. Specifically, the Fifth Circuit rejected the plaintiff's offer to "'easily amend' . . . the

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

complaint 'to delete the reference to creditors and shareholders to say [the corporation] suffered damages in the amount' of $35,800,000." *Id.* at 391. The court described the plaintiff's proposal as a pointless "'find and replace' exercise." *Id.*

Like the plaintiff in *Torch*, any amendment by the plaintiff-trustee here would amount to nothing more than a repackaging of creditor claims that are defunct in Delaware. Thus, the Court should order that its dismissal is with prejudice. To do any less would invite Plaintiff to engage in vain amendments that would only waste judicial resources.

### F.  Plaintiff cannot show breach of the Credit Agreement without a fiduciary breach.

Having failed to allege a cognizable breach of fiduciary duty, Plaintiff cannot support its claim regarding the breach of an agreement (the "Credit Agreement") between FCC and its creditors. Complaint ¶¶64–68. The purported breach of FCC's credit agreement hinges on the same allegations underlying the breach of fiduciary duty claim. Complaint ¶68 ("Each of the above-mentioned drawdown practices which violated DOE regulations also violated Section 8.14(a)"). Because the breach of fiduciary duty claim fails, this derivative claim also fails.

Further, the allegations regarding the "covenant breach" of the Credit Agreement are not tied to any pertinent cause of action. The sole count in the Complaint is a claim for breach of fiduciary duty; there is no separate count for breach of contract or something similar, which might cover the purported breach of the Credit Agreement. Accordingly, Plaintiff has failed to allege the basic elements of a cause of action arising from the purported breach of the Credit Agreement.

### V.  <u>Conclusion</u>

For all of the foregoing reasons, the Court should dismiss Plaintiff's sole count for breach of fiduciary with prejudice as to all Defendants, and grant all other relief it deems just and proper.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

## VI.  <u>Request for Hearing</u>

Pursuant to Local Rule 7.1(b)(2), Defendants request oral argument for their Motion to Dismiss. Defendants submit that a hearing might be helpful to the Court in ruling upon the Motion in light of the issues of Delaware law. Defendants estimate that thirty minutes should provide sufficient time for both sides to present their arguments and respond to questions from the Court.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Counsel for David Knobel, Jeffrey Pierne, Dean Bartness, Siana Stewart and Cid Yousefi*
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: ___/s/ Michael N. Kreitzer_____
        **MICHAEL N. KREITZER**
        (FBN 705561)
        mkreitzer@bilzin.com
        **JAMES J. WARD**
        (FBN 93651)
        jward@bilzin.com
        **KENNETH DUVALL**
        (FBN 121826)
        kduvall@bilzin.com
        eservice@bilzin.com
        mavin@bilzin.com
        stapanes@bilzin.com

26

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2016, I electronically filed the foregoing with the Clerk of Court, using CM/ECF. I also certify that the foregoing document was served on all counsel of record via transmission of Notice of Electronic filing generated by CM/ECF.

<u>      */s/Michael Kreitzer*        </u>
Michael Kreitzer