**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 16-62028-CIV-LENARD/GOODMAN**

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC, as Trustee,

                Plaintiff,

    - against -

DAVID KNOBEL, JEFFREY PIERNE,
NEAL YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI,

                Defendants.           /

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**Page**

Table of Authorities ................................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................................... 4

I.      THE TRUSTEE HAS STANDING TO BRING THIS ACTION AND ITS
COMPLAINT NEED ONLY STATE A PLAUSIBLE CLAIM TO WITHSTAND
DEFENDANTS' MOTIONS ........................................................................................... 4

II.     THE BUSINESS JUDGMENT RULE HAS NO APPLICATION HERE ....................... 8

III.    PLAINTIFF STATES A BREACH OF FIDUCIARY DUTY CLAIM ......................... 10

      A.     Causation and Statute of Limitations .................................................................. 10

      B.     The Complaint Plausibly Alleges Defendants Breached Their Duty of Care ...... 12

          1.     The Duty of Due Care ............................................................................. 13

          2.     No Defendant Has Been Exculpated ...................................................... 16

      C.     The Complaint Plausibly Alleges Defendants Breached Their Duty of Loyalty .. 18

      D.     At a Minimum, the Complaint States a *Caremark* Claim .................................... 21

          1.     FCC Lacked Any Reporting System or Controls .................................... 23

          2.     Failure to Monitor ................................................................................. 24

CONCLUSION ....................................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford,*
    554 F. Supp. 2d 538 (D. Del. 2008) ................................................................................. 16

*Alidina v. Internet.com Corp.,*
    No. 17235, 2002 WL 31584292 (Del.Ch. Nov. 6, 2002) ................................................. 16

*Am. Home Assur. Co. v. Plaza Materials Corp.,*
    908 So.2d 360 (Fla. 2005) ................................................................................................ 11

*Arnold v. Soc'y for Sav. Bancorp, Inc.,*
    650 A.2d 1270 (Del. 1994) ............................................................................................... 17

*Aronson v. Lewis, overruled on other grounds in Brehm v. Eisner,* 746 A.2d 244 (Del. 2000)
    473 A.2d 805 (Del. 1984) ............................................................................................ 8, 15

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................................................... 7

*Beard Research, Inc. v. Kates,*
    8 A.3d 573 (Del. Ch. 2010) .............................................................................................. 13

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................................... 5

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000) .............................................................................................. 5, 8

*Buckley v. O'Hanlon,*
    No. 04-955, 2007 WL 956947 (D. Del. Mar. 28, 2007) .................................................. 21

*Caremark Int'l Inc. Deriv. Litig.,*
    698 A.2d 959 (Del. Ch. 1996) .................................................................................... passim

*Citigroup Inc. S'holder Deriv. Litig.,*
    964 A.2d 106 (Del. Ch. 2009) .................................................................................... passim

*Desimone v. Barrows,*
    924 A.2d 908 (Del. Ch. 2007) ...................................................................................... 8, 18

*Durgin v. Mon,*
    659 F. Supp. 2d 1240 (S.D. Fla. 2009) ............................................................................ 10

*eBay Domestic Holdings, Inc. v. Newmark,*
    16 A.3d 1 (Del. Ch. 2010) ................................................................................................ 15

ii

*Frota v. Prudential-Bache Sec., Inc.*,
    639 F. Supp. 1186 (S.D.N.Y. 1986)........................................................................ 6

*Gantler v. Stephens*,
    695 A.2d 695 (Del. Sup. Ct. 2009) ......................................................... 11, 12, 17

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003)............................................................................... 18

*In re Am. Bus. Fin. Servs., Inc.*,
    361 B.R. 747 (Bankr. D. Del. 2007) ...................................................................... 6

*In re Broadstripe, LLC*,
    444 B.R. 51 (Bankr. D. Del. 2010) ...................................................................... 14

*In re Career Educ. Corp. Deriv. Litig.*,
    No. 1398-VCP, 2007 WL 2875203 (Del. Ch. Sept. 28, 2007) ............................. 22

*In re Celera Corp. S'holder Litig.*,
    No. 6304, 2012 WL 1020471 (Del. Ch. 2012) .................................................... 17

*In re China Auto. Sys. Inc. Derivative Litig.*,
    No. 7145, 2013 WL 4672059 (Del. Ch. Aug. 30, 2013) ................................ 14, 21

*In re CHS Electronics, Inc.*,
    261 B.R. 538 (Bankr. S.D. Fla. 2001).................................................................... 4

*In re Foothills Texas, Inc.*,
    408 B.R. 573 (Bankr. D. Del. 2009) .................................................................... 12

*In re Fruehauf Trailer Corp.*,
    250 B.R. 168 (D. Del. 2000)................................................................................... 6

*In re InaCom Corp.*,
    No. 00-2426, 2001 WL 1819987 (Bankr. D. Del. Aug. 7, 2001) ........................... 6

*In re Liberty State Benefits of Del., Inc.*,
    541 B.R. 219 (Bankr. D. Del. 2015) ...................................................................... 7

*In re Massey Energy Co.*,
    No. 5430, 2011 WL 2176479 (Del. Ch. May 31, 2011) ...................................... 17

*In re Pettibone Corp.*,
    244 B.R. 906 (Bankr. N.D. Ill. 2000) .................................................................... 4

*In re The Brown Schools*,
    368 B.R. 394 (Bankr. D. Del.2007) ..................................................................... 16

*In re World Health Alternatives, Inc.*,
    385 B.R. 576 (Bankr. D. Del. 2008) .................................................................... 21

*Ironworkers Dist. Council of Phila. v. Andreotti*,
No. 9714, 2015 WL 2270673 (Del. Ch. May 08, 2015) ....................................................... 12

*Jallali v. Sun Healthcare Grp.*, *cert. petition filed*, Nov. 21, 2016
No. 15-14231, 2016 WL 3564248 (11th Cir. July 1, 2016)................................................... 7

*Loftin v. United States*,
6 Cl. Ct. 596 (1984) ............................................................................................................ 19

*McPadden v. Sidhu*,
964 A.2d 1262 (Del. Ch. 2008)........................................................................................... 12

*Mehlenbacher ex rel. Asconi Corp. v. Jitaru*,
No. 04-1118, 2005 WL 4585859 (M.D. Fla. June 6, 2005)................................................. 6

*Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs*,
No. 10872, 2016 WL 4076368 (Del. Ch. Aug. 1, 2016) ............................................... passim

*Metro Commc'ns  Corp. BVI v. Adv. Mobilecomm Techs., Inc.*,
854 A.2d 121 (Del. Ch. 2004).................................................................................... 17, 18

*Mosier v. Stonefield Josephson, Inc.*,
No. 11-2666, 2011 WL 5075551 (C.D. Cal. Oct. 25, 2011)............................................... 10

*Mukamal v. Bakes*,
378 Fed. App'x 890 (11th Cir. 2010) .................................................................................. 4

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007) ...................................................................................................... 4

*Palmer v. Reali*,
No. 15-994, 2016 WL 5662008 (D. Del. Sept. 29, 2016)............................................ 12, 13

*Profilet v. Cambridge Fin. Corp.*,
231 B.R. 373 (S.D. Fla. 1999) ............................................................................................. 7

*Rabkin v. Philip A. Hunt Chem. Corp.*,
No. 7547, 1987 WL 28436 (Del. Ch. Dec. 17, 1987) ........................................................ 10

*Rosner v. Secretary of Health, Education and Welfare*,
306 F. Supp. 853 (S.D. Fla. 1970) ................................................................................ 10, 11

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*,
416 F.3d 229 (3d Cir. 2005)................................................................................................. 9

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
911 A.2d 362 (Del. 2006) .............................................................................................. passim

*Toner v. Allstate Ins. Co.*,
821 F. Supp. 276 (D. Del. 1993).................................................................................... 6, 7

iv

*Torch Liquidating Trust v. Stockstill*,
    561 F.3d 377 (5th Cir. 2009) ............................................. 4

*Walt Disney Co. Deriv. Litig.*,
    906 A.2d 27 (Del. 2006) ............................................. 17, 19, 20

*Walt Disney Co. Deriv. Litig.*,
    907 A.2d 693 (Del. Ch.2005) ............................................. passim

*Wood v. Baum*,
    953 A.2d 136 (Del. 2008) ............................................. 5, 18, 21

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) ............................................. 18

## Statutes and Rules

8 Del. C. § 102(b)(7) ............................................. 12, 17, 22

11 U.S.C. § 1123(b)(3) ............................................. 2

34 C.F.R. § 668.162 ............................................. 20

34 C.F.R. § 668.166 ............................................. 10

Del. Ch. Ct. R. 23.1 ............................................. passim

Fed. R. Civ. P. 8 ............................................. 5, 6, 21

Fed. R. Civ. P. 9(b) ............................................. 6, 7, 18

Fed. R. Civ. P. 15(a)(2) ............................................. 25

## Other Authorities

Leo J. Strine, Jr., et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporate Law*,
    98 GEO. L.J. 629 (2010) ............................................. 18

David Rosenberg, *Delaware's "Expanding Duty of Loyalty" and Illegal Conduct: A Step Towards Corporate Social Responsibility*,
    52 SANTA CLARA L. REV. 81 (2012) ............................................. 18

Plaintiff Clingman & Hanger Management Associates, LLC, as trustee (the "Trustee") of a liquidating trust established by the chapter 11 plan of FCC Holdings, Inc. and its debtor subsidiaries ("FCC"), submits this memorandum of law in opposition to the motions to dismiss of (1) Defendants David Knobel ("Knobel"), Jeffrey Pierne ("Pierne"), Dean Bartness ("Bartness"), Siana Stewart ("Stewart"), and Cid Yousefi ("Yousefi"), filed October 21, 2016 [ECF No. 20], as supported by the corrected memorandum of law, filed October 28, 2016 [ECF No. 23]; and (2) Defendant Neal Yawn ("Yawn"), filed November 30, 2016 [ECF No. 33]. Defendants are referred to collectively as "Defendants" and, inasmuch as Yawn's motion simply incorporates the arguments of the other Defendants, citations herein to "Def. Memo." refer to the memorandum of law filed by all Defendants other than Yawn.

## INTRODUCTION

FCC owned and operated for-profit colleges across the country. Its business model depended on students receiving federal financial aid to pay tuition and expenses, and approximately 90% of FCC's revenues came from federal funds disbursed to its institutions by the Department of Education ("DOE") under programs established by Title IV of the Higher Education Act ("Title IV funds"). Pursuant to DOE regulations, FCC's institutions were permitted to draw Title IV funds before having to document an entitlement to the same under the "advance" payment method, but eligibility to draw funds under such method was subject to compliance with stringent conditions and reporting obligations which ensured such funds were drawn only to support currently enrolled students and that any excess be refunded promptly to the government.

FCC, however, gamed the system by drawing Title IV funds that were not linked to actual enrolled students and which it used to further its own expansion plans and other impermissible purposes in violation of the law. The DOE caught on and temporarily terminated

1

FCC's ability to conduct further advance draws in April 2013, pending FCC's reconciliation of funds it had previously drawn (*i.e.*, substantiation or refunding). FCC scrambled to effectuate the reconciliation and ultimately satisfied the DOE.  However, once the crisis was averted, FCC promptly resumed its illegal draws during the July 2013-June 2014 program year.  Again the DOE caught on and, as it warned it would do, terminated FCC's ability to make further advance draws.  Deprived of the cash flow it had relied on (albeit illegally), FCC was compelled to liquidate within months and subsequently filed for bankruptcy protection.  The company that had been valued at over $150 million, and which had only $30 million in debt before the start of the scheme, was now insolvent and the DOE, alone, claimed to be owed over $34 million.

The Trustee was appointed pursuant to FCC's confirmed chapter 11 plan, as authorized by 11 U.S.C. § 1123(b)(3).  By this action, the Trustee seeks to hold Defendants, the FCC officers and directors who caused the company's demise, responsible for the damage which resulted from their illegal conduct.  While the Trustee has alleged facts strongly suggesting Defendants were culpable participants in the scheme to overdraw Title IV funds, as explained below, Defendants are nevertheless liable for the wrongdoing that occurred on their watch even if they were oblivious to what was occurring.

### FACTUAL BACKGROUND

The Complaint contains detailed factual allegations in 109 paragraphs and we summarize here just the general thrust, respectfully referring to the actual pleading for its full contents.

FCC operated fourteen for-profit schools under the name "Florida Career College" and acquired twenty-two additional for-profit schools operating under the "Anthem Education" name in April 2012.  (Complaint ¶¶20, 25.)  These schools were "Title IV-eligible," meaning their students qualified for financial aid under programs established by Title IV of the Higher Education Act.  (*Id.* ¶20.)  Schools like those operated by FCC depend heavily on Title IV funds

2

which are disbursed directly to its institutions (nearly 90% of its revenues came from such funds), and such funds are required to be held by the institution in trust for the benefit of the respective students (or returned to the DOE if the student ceases to qualify for aid). (*Id.* ¶¶28-33.)  Not surprisingly, the DOE has strict rules governing when Title IV funds may be drawn down, how they may be used, and how they must be accounted-for and refunded, including a "prompt disbursement rule" requiring that an institution which draws funds either disburse or refund them within three business days. (*Id.* ¶33 & nn.1-4, ¶38.)

The Complaint details (insofar as possible for a third-party outsider like the Trustee) how Defendants schemed to illegally draw and retain Title IV funds in order to use them to bolster the value of the business so FCC could be sold at a profit, 20% of which would be pocketed by management (including each Defendant). (*Id.* ¶36.)  Thus, among other things, they had FCC systematically "pre-draw" funds to which it was not entitled (*id.* ¶¶39-40, 51-54), draw funds based on inflated enrollment numbers (*id.* ¶45), underreport withdrawals (*id.* ¶¶46-49), fail to undertake required monthly reconciliations (*id.* ¶50), and engage in "kiting" by having an individual institution draw down funds to which it was not entitled and then, when required to refund those sums to the DOE, making it up by having another institution unjustifiably draw down the funds to replace the sums the prior institution had to refund (*id.* ¶¶55-57).   Thus, although Title IV funds were to be used solely for the actual expenses of students, Defendants contrived instead to impermissibly use those funds "as a line of credit for the Company to draw down on" (*id.* ¶44 n.7, quoting FCC's restructuring advisors).

The DOE caught on, but nevertheless gave FCC several chances to clean up its act. (*Id.* ¶¶69-81.)  The company initially claimed the problem was "an isolated incident" caused by faulty software—a factual assertion Defendants reiterate in their brief here (pp.14-16) even though the government specifically rejected that assertion (Complaint ¶71) and even though the

3

excuse is further belied by the fact that the illegal draws resumed after the software was "fixed" (*id*. ¶75). Ultimately, the DOE had enough and it cut-off off all further undocumented access to Title IV funding on March 31, 2014. (*Id*. ¶82.) As a result, FCC was forced to sell its most profitable schools in a fire sale whereupon the company filed for bankruptcy protection. (*Id*. ¶¶89-95.)

The Trustee was appointed under a chapter 11 plan confirmed by the United States Bankruptcy Court for the District of Delaware and the accompanying liquidating trust agreement, both available from the docket of FCC's chapter 11 case. (No. 14-11987, ECF Nos. 373, 420.) Under the plan and trust agreement, this cause of action was "retained" by FCC and transferred to the trust, and the Trustee was substituted for FCC in all relevant judicial proceedings. (Plan §§ 5.02, 5.06, 13.14; Trust Agreement §§ 1.3-4, 3.1-2.)

By this action, the Trustee seeks to hold the responsible directors and officers accountable for damage they caused to the company.

## ARGUMENT

## I.   THE TRUSTEE HAS STANDING TO BRING THIS ACTION AND ITS COMPLAINT NEED ONLY STATE A PLAUSIBLE CLAIM TO WITHSTAND DEFENDANTS' MOTIONS

As Trustee, Plaintiff has "standing to bring *direct claims* for breach of fiduciary duty on behalf of [FCC]." *Mukamal v. Bakes*, 378 Fed. App'x 890, 899 (11th Cir. 2010) (emphasis added). *See also In re CHS Electronics, Inc.*, 261 B.R. 538, 544 (Bankr. S.D. Fla. 2001) ("a liquidating trustee … stands in the shoes of the debtor"); *In re Pettibone Corp.*, 244 B.R. 906, 923 (Bankr. N.D. Ill. 2000) (same).[1] The question presented on Defendants' motions is the

---

[1] Defendants' argument that the Trustee lacks standing because this action will benefit creditors (Def. Mem. pp.23-24), was rejected in *Torch Liquidating Trust v. Stockstill*, a case they rely upon. There, the court held that a liquidating trustee who purported to bring claims "in the form of a shareholder and creditor derivative suit" still had standing to directly assert the debtor's claims for breach of fiduciary duty. 561 F.3d 377, 385 (5th Cir. 2009). *See also id*. at 387-88.

4

standard one when a pleading is governed by Fed. R. Civ. P. 8, namely, whether, accepting the Trustee's allegations as true and drawing all reasonable inferences in its favor, the Complaint states a plausible claim to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Defendants' subtle and not-so-subtle attempts to unjustifiably hold the Trustee to a higher pleading standard should be recognized and rejected.  The subtle attempts manifest themselves through citation of decisions in which breach of fiduciary duty claims are brought as derivative actions.  For example, Defendants quote *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) as stating—and they even emphasize in bold—that a plaintiff must "properly alleg[e] particularized facts."  (Def. Mem. pp.7, 20.)   But *Citigroup*, like virtually all fiduciary duty cases Defendants cite, was a derivative action where the court was determining if the plaintiff properly pleaded the futility of first making a demand on the board.  964 A.2d at 125.  Demand futility must be pleaded under Delaware Chancery Court Rule 23.1 which imposes "stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by [the Chancery analog to Fed. R. Civ. P. 8]."  *Brehm v. Eisner*, 746 A.3d 244, 254 (Del. 2000); *Citigroup*, 964 A.2d at 120.  The Trustee here is not asserting a derivative claim, but a direct claim (*see* p.4, *supra*), and the strict pleading standard imposed by that rule has no application here.

The importance of this point transcends the mere fact that Defendants quote an inapplicable pleading standard.  A shareholder bringing a derivative suit claiming that a demand upon the board is excused because the directors face personal liability in the suit is required to plead—with the particularity imposed by Chancery Rule 23.1—facts demonstrating that the directors face "*a substantial likelihood* of personal liability."  *Wood v. Baum*, 953 A.2d 136, 141

---

Defendants' citation to *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) is irrelevant as that case did not involve a liquidating trustee.

n.11 (Del. 2008) (emphasis added).  Thus, those cases dismissing such derivative complaints because they failed to plead demand futility with *particularized facts* to demonstrate *a substantial likelihood* of personal liability have little bearing on whether the Trustee's direct claim here adequately pleads a plausible claim in accordance with Rule 8.  Nevertheless, Defendants rely almost exclusively upon such demand futility cases without noting their inapposite context.

The less-than-subtle attempts consist of direct assertions that the Trustee "failed to plead around the business judgment rule" (Def. Mem. pp.3, 5) and that it is required to plead a fiduciary duty claim "with particularity" in accordance with Fed. R. Civ. P. 9(b) (Def. Mem. p.4).  The claim asserted by the Trustee is not subject to the business judgment rule at all, as discussed below.  And Rule 9(b) simply does not apply.

Defendants assert that even though the Trustee is not alleging fraud, "it is the substance of the allegations that determine whether Rule 9(b) applies" and that "Plaintiff essentially alleges that Defendants defrauded DOE of monies and lied about it."  (Def. Mem. p.4.)  The short answer to that, as discussed below, is that the Trustee's claims do not depend upon the DOE having been defrauded; the Trustee need only show Defendants' dereliction of duty and damages.

The longer answer is that breach of fiduciary duty claims need not comply with Rule 9(b).  *See, e.g, In re Fruehauf Trailer Corp.*, 250 B.R. 168, 197-98 (D. Del. 2000); *In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747, 757-58 (Bankr. D. Del. 2007); *In re InaCom Corp.*, No. 00-2426, 2001 WL 1819987, at *2 (Bankr. D. Del. Aug. 7, 2001); *Mehlenbacher ex rel. Asconi Corp. v. Jitaru*, No. 04-1118, 2005 WL 4585859, at *4 (M.D. Fla. June 6, 2005).  Defendants' assertion that it is necessary to plead a breach of fiduciary duty claim in accordance with Rule 9(b) finds support only in cases outside this Circuit and, even then, only where the claim is

actually dependent upon proving fraud, which is not the case here.  *See* Def. Mem. p.4, citing *Toner v. Allstate Ins. Co*., 821 F. Supp. 276, 284 (D. Del. 1993) (analogizing claim at issue there to "wrongful inducement to enter a contract"); *Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) (dismissing complaint's counts for "common law fraud and breach of fiduciary duty" because "[i]t merely incorporates the allegations of the securities fraud and RICO counts" which were defective under Rule 9(b)); *Jallali v. Sun Healthcare Grp*., No. 15-14231, 2016 WL 3564248, at *1 (11th Cir. July 1, 2016) (holding only that Rule 9(b) applied to claims under federal False Claims Act), *cert. petition filed*, Nov. 21, 2016.  Moreover, *Toner* recognized that "contrary to defendant's assertion, plaintiffs need not plead specifics as to date, time and place of the alleged fraud so long as plaintiffs 'use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"  821 F. Supp. at 284-85 (citations omitted).

Even where Rule 9(b) would be applicable, "courts have relaxed this [pleading] standard for bankruptcy trustees bringing claims of fraud on behalf of the debtor …. The policy justification … is that as a third party outsider, the trustee must rely on secondhand knowledge for the benefit of the estate."  *In re Liberty State Benefits of Del., Inc.*, 541 B.R. 219, 233 (Bankr. D. Del. 2015) (citations omitted).  *See also Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 379 (S.D. Fla. 1999) ("the Trustee argues—and the Court agrees—that courts should relax the specificity requirements where the plaintiff is a trustee in bankruptcy").

Inasmuch as there is no basis for holding the Trustee to any higher standard, the Complaint need only plead sufficient facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The mere fact that FCC was consistently violating the law in drawing the very funds upon which it depended for 90% of its revenues, and each Defendant knew or should have

known of the illegal conduct and was in a position to stop it even if not a direct participant, certainly gives rise to a very plausible inference that, at a minimum, they were culpably "asleep at the switch." But, as discussed below, the Trustee has pleaded far more than that and the Complaint would even satisfy the stringent particularity requirements if they had been applicable.

## II.   <u>THE BUSINESS JUDGMENT RULE HAS NO APPLICATION HERE</u>

The bulk of Defendants' motions seeks to find shelter under the business judgment rule. (Def. Mot. pp.5-18.) That rule, however, has no application to the fiduciary duty claim alleged against Defendants here which does not seek to second-guess any business decision they made, but to hold them responsible for their abdication of their duties and/or permitting FCC to engage in illegal conduct. The pleaded facts evidence three separate breaches of fiduciary duty by Defendants in connection with the scheme to illegally draw and use Title IV funds, none of which implicates the business judgment rule:

First, by knowingly participating in the illegal scheme. Under Delaware law, knowingly causing the company to engage in illegal activity is an unequivocal breach of the duty of loyalty, even if its purpose was to further the interests of the corporation. (*See* pp.17-19, *infra*.) The business judgment rule is inapplicable because, by definition, it is never a valid business judgment to break the law because "it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully." *See*, *e.g.*, *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007).

Second, by essentially abdicating the basic responsibility of an officer or director to pay attention to corporate affairs, which is a breach of the fiduciary duty of due care. Inasmuch as the lack of attention is the opposite of making a decision, there is no "judgment" to evaluate under the business judgment rule and, therefore, the rule does not apply. *See*, *e.g.*, *Aronson v.*

*Lewis*, 473 A.2d 805, 812 (Del. 1984) (the business judgment rule "has no role where directors have … abdicated their functions"), *overruled on other grounds in Brehm*, 746 A.2d 244; *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 371 (Del. 1993) ("This Court has consistently held that the breach of the duty of care, without any requirement of proof of injury, is sufficient to rebut the business judgment rule."), *modified on other grounds*, 636 A.2d 956 (Del. 1994); *In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 748 (Del. Ch. 2005) ("in the event of director inaction, the protections of the business judgment rule do not apply"), *aff'd*, 906 A.2d 27 (Del. 2006); *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 n.13 (3d Cir. 2005) ("it is more accurate to say that successfully alleging inattention *circumvents* the business judgment rule").

Third, by failing properly to oversee and monitor the employees engaged in illegal conduct and, thereby, disabling him- or herself from being able to stop it, as recognized in *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).   The Delaware Supreme Court explained this violates the duty of loyalty under the following circumstances:

> We hold that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.

*Stone*, 911 A.2d at 370.  The Supreme Court imposed those conditions precisely because they are inherently incompatible with any asserted good faith business judgment: "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."  *Stone*, 911 A.2d at 370.  *See also Caremark*, 698 A.2d at 970.

Like Defendants' attempts to hide behind pleading standards applicable only to derivative and fraud claims, as debunked above, their attempt to invoke the procedural hurdles attendant to the business judgment rule is unjustified.  There was, by definition, no defensible "judgment" involved in the breaches of duty alleged by the Trustee, as discussed in more detail below.

## III.   PLAINTIFF STATES A BREACH OF FIDUCIARY DUTY CLAIM

### A.   Causation and Statute of Limitations

Defendants assert that one cannot "assume[] that because FCC went into bankruptcy, management must be liable." (Def. Mem. p. 18.)  That has it backwards: the Complaint pleads that FCC went into bankruptcy because of the conduct for which management is liable. (Complaint ¶¶1, 9-10, 83-95, 98, 106-07.)  Given that 90% of FCC's revenues depended on continuing receipt of Title IV funds (*id.* ¶¶2, 28) and that FCC filed for bankruptcy within months of the DOE cutting-off undocumented access to those funds specifically because of the illegal conduct (*id.* ¶7, 57, 82, 94), such causation certainly is a plausible inference.  "[W]here it is reasonable to conclude that the failure to act would produce a particular result and that result has followed, causation may be inferred." *Rabkin v. Philip A. Hunt Chem. Corp.*, No. 7547, 1987 WL 28436, at *4 (Del. Ch. Dec. 17, 1987).  *See also Durgin v. Mon*, 659 F. Supp. 2d 1240, 1256 (S.D. Fla. 2009) (causation adequately pled as that "issue is inextricably woven into factual questions"); *Mosier v. Stonefield Josephson, Inc.*, No. 11-2666, 2011 WL 5075551, at *7 (C.D. Cal. Oct. 25, 2011) (same).

Defendants argue that causation is not alleged because "[e]ven if Defendants had known that their employees were violating DOE regulations, Plaintiff has not shown Defendants could have known that the DOE would take the drastic step of terminating Title IV funding in 2014, especially when the DOE allowed FCC to cure the same type of issue the prior year." (Def. Mem.  p.17.)  Defendants offer no authority for suggesting that damages that are the direct and

natural consequence of the illegal conduct must be foreseen before they are recoverable, and here they certainly were foreseeable: not only had the DOE specifically warned that termination would occur (Complaint ¶¶ 69, 80), but the DOE's regulations explicitly state that termination can be a consequence of failing to comply with the regulations (34 C.F.R. § 668.166(c)) and officers and directors, like the population in general, are presumed to know the law. *E.g., Rosner v. Secretary of Health, Education and Welfare*, 306 F. Supp. 853, 855 (S.D. Fla. 1970) ("Parties dealing with the Government are charged with knowledge of and are bound by statutes and lawfully promulgated regulations…."); *Am. Home Assur. Co. v. Plaza Materials Corp*., 908 So.2d 360, 375 (Fla. 2005) (Cantero, J., dissenting) (collecting cases). Indeed, given that 90% of FCC's revenues were dependent upon DOE funding, Defendants would be admitting to a fundamental breach of their duties if they professed to be unfamiliar with the penalties contained in the regulations on which that funding depended.

Defendants also argue that the cause of action should be deemed to have accrued for statute of limitations purposes some time before August 2011 (a year before FCC acquired the Anthem Schools), because they infer that the illegal draws began at the Anthem Schools before that date (Def. Mem. pp.22-23). In other words, they are asserting that because the illegal conduct had begun at a company that FCC subsequently acquired, Defendants also acquired the right to forever engage in the illegal conduct themselves with impunity. Respectfully, that makes no sense. The Complaint alleges that it was the resumption of the illegal draws after approximately November 2013 that constituted the "final straw" for the DOE and which resulted in termination of FCC's right to make advance draws on Title IV funds which, in turn, is alleged to be the cause of the company's demise. (Complaint ¶¶55-57, 75-81.) Defendants do not dispute that their own wrongdoing occurred within the limitations period.

11

The only remaining question then is whether the Complaint sufficiently pleads that Defendants bear responsibility for that illegal conduct which caused the company's insolvency. Each Defendant was, at relevant times, a director of FCC (Knobel and briefly Pierne) and/or an officer (Knobel was CEO; Yawn was COO; Pierne was CFO; Bartness was CCO and Corporate Secretary; and Stewart and Yousefi were Senior Vice Presidents).  (Complaint ¶¶12-17.)  As such, each owed fiduciary duties of due care and loyalty to the company.  *Gantler v. Stephens*, 695 A.2d 695, 709 (Del. Sup. Ct. 2009).[2]  We discuss below how the Complaint states a claim against each of the Defendants for breach of those duties under the three theories outlined above in connection with the business judgment rule.

### B.    The Complaint Plausibly Alleges Defendants Breached Their Duty of Care

The duty of due care requires that officers and directors perform their corporate duties free of gross negligence.  *In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 750 (Del. Ch. 2005). Gross negligence, in turn, means "reckless indifference or actions that are without the bounds of reason."  *McPadden v. Sidhu*, 964 A.2d 1262, 1275 (Del. Ch. 2008).

Gross negligence is a bar so easily crossed that Delaware law permits corporations to exculpate directors—but not officers—from having to perform to that standard.  8 Del. C. § 102(b)(7).  Indeed, Defendants do not dispute the Complaint pleads a breach of duty of due care

---

[2] Defendants do not deny that Stewart and Yousefi were officers, but contend they were not "key managerial personnel" that had fiduciary duties.  (Def. Mem. p.20.)  At best, that contention raises an issue of fact inappropriate on a motion to dismiss because, for pleading purposes, their status as officers is sufficient to state a claim.  *E.g.*, *In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) ("a vice president is presumptively an officer … In order to overcome the presumption that a person holding an officer's title is not what he or she appears to be requires submission of evidence sufficient to establish that the officer is, in fact, not participating in the management of the debtor"); *Ironworkers District Council*, C.A. No. 9714-VCG, 2015 WL 2270673, at *3 n.5 (Del. Ch. May 8, 2015) ("given the plaintiff-friendly standard on a motion to dismiss, I will accept the Plaintiff's characterization [of defendants as officers] as true").

claim but merely argue that two—but only two—Defendants are exculpated.  (Def. Mem. p.20.)
They are wrong as to those two.

### 1.       The Duty of Due Care

"Under the duty of care, directors are required to 'use that amount of care which
ordinarily careful and prudent [people] would use in similar circumstances,' and to make
business decisions by 'consider[ing] all material information reasonably available.'"  *Palmer v.
Reali*, No. 15-994, 2016 WL 5662008, at *9 (D. Del. Sept. 29, 2016) (quoting *Disney*, 907 A.2d
at 749) (holding claim for breach of the duty of due care to be stated based on "present[ation] of
a series of forecasts with no reasonable basis in fact").

It is hardly debatable that "ordinarily careful and prudent people" running a company that
receives 90% of its revenues from Title IV funds would pay some attention to that revenue
stream.    (Complaint ¶¶2, 28.)  Certainly, one would expect at least some curiosity as to the
basic inputs that determined the amount of Title IV funds to be drawn—such as student
enrollment and attrition (*see id*. ¶¶58-63.)  Indeed, on the most basic level, one would expect
FCC could not have been, for years, illegally drawing millions of dollars from the very source
upon which the company utterly depended, if officers and directors were paying attention.
Inasmuch as each Defendant is specifically alleged to have been positioned to learn about and
stop the illegal activities, the Trustee adequately pleads that unconsidered inaction by each
Defendant was a cause of the ensuing damage to FCC.[3]

_____

[3] For this reason, alone, Defendants' objection to "group pleading" (Def. Mem.  pp.16-17) has no
application where, as here, the claim is predicated upon a failure to act when there was a duty to
do so. "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary
duty existed and (2) that the defendant breached that duty." *Palmer*, 2016 WL 5662008, at *8,
quoting *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).  When the breach is a
failure to act, there is nothing more to establish beyond each Defendant's duty to act.

While the alleged duration and scope of the illegality is, alone, enough to plausibly suggest Defendants breached their duty of due care through a lack of attentiveness to company affairs, the allegations go far beyond that. Most damning are the allegations that Defendants had received the very information that revealed the illegality—through at least the company's audited financial statements and monthly financial reports (Complaint ¶¶58-63)—but failed to notice. These are not the sort of allegations that are often held insufficient (generally when subject to the strict standard for pleading demand futility under Rule 23.1) against, for example, an audit committee accused of breaching the duty of loyalty for failing to ferret out falsity in the company's financials. (Def. Mem. p.16, citing *China Auto*, 2013 WL 4672059, at * 7-8.)

In contrast to *China Auto* (which expressly recognized that a claim would be stated through allegations that, for example, the "audit committee … met only sporadically and devoted patently inadequate time to its work"), the reports which Defendants received are not alleged to have been inaccurate and there was nothing to "ferret out." The allegation is that those reports disclosed on their face (or at least constituted "red flags") that FCC was not drawing Title IV funds lawfully. (*See* Complaint ¶¶58-63.) The only way that Defendants could have failed to know about the illegality is if they failed in their most elementary duty to look at the information they received—if Defendants had in fact looked, then they would have known of the illegality and their conduct is even more culpable, as discussed below in connection with the duty of loyalty. Indeed, Defendants recognize there is at least a triable issue here by acknowledging "the financial reports at most 'suggested' that the draws violated DOE Regulations." (Def. Mem. p.8.) Inasmuch as a failure to even read the company's documents is a quintessential example of a breach of the duty of due care, Defendants cannot escape liability by claiming not to have had knowledge of the illegal conduct that was clearly reflected in the reports they received. *E.g.*, *In re Broadstripe, LLC*, 444 B.R. 51, 105 (Bankr. D. Del. 2010) ("The exact behavior that will

14

constitute gross negligence varies based on the situation, but generally requires directors and officers to fail to inform themselves fully and in a deliberate manner").

Moreover, while Defendants argue that the whole problem was supposedly caused by a software malfunction (Def. Mem. p.14)—itself a fact question—the allegations as to the handling of that "malfunction" evidence further breaches of the duty of due care.  The Complaint alleges that soon after FCC acquired the Anthem Schools, such schools' controller informed Stewart and Pierne that the schools were drawing Title IV funds in violation of DOE regulations. (Complaint ¶¶38-42.)[4]

After the acquisition, FCC implemented a new software system and then it started engaging in the same type of illegality as the Anthem Schools had, until FCC was caught by the DOE.  (*Id.* ¶51.)  At that point, Defendants scrambled to rectify the problem through a manual reconciliation process.  (*Id.* ¶72.)    Once the DOE was satisfied, FCC re-implemented the software process and went right back to making illegal draws of Title IV funds.  (*Id.* ¶¶52, 73-82.)

Putting aside that certain of the alleged illegal conduct had no connection whatsoever to the software system Defendants blame (*e.g., id.* ¶¶45, 47-49, 51-57), and even crediting Defendants with their unreasonable assertion that they believed that the problem was solely attributable to software, no reasonable person would just cease manual reconciliation in favor of re-implementing the software without checking that the problem had actually been solved,

---

[4] Defendants assert Stewart had a "good faith belief" that Anthem Schools were in compliance. (Def. Mem. p.10, citing *Qualcomm*, 2016 WL 4076369, at *12.)  *Qualcomm*, however, was a Chancery Rule 23.1 case and the complaint there alleged that the defendants had an actual basis for contending that the challenged conduct was legal (evidenced by their "focusing on educating industry participants and government officials as to why its practices were legal and by pursuing appeals"), and Defendants do not even pretend that to have been the case here.  Here, there is merely the *ipse dixit* assertion as to good faith in their brief, but no basis for crediting the assertion which, at best, presents an issue of fact for trial.

particularly where, as here, the government source of 90% of FCC's revenues already found

violations of law (and consequently was likely to keep a close eye on the company).[5]   If

Defendants were not intentionally drawing Title IV funds in violation of DOE regulations after

November 2013 (*id.* ¶75), it certainly is plausible that they were at least grossly negligent.

The Trustee thus alleges that Defendants failed in the most basic duty an officer or

director has: the duty to pay attention to company affairs with due care.  Liability requires no

"malevolent intent."  *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64 (Del. 2006).  As

previously noted, Defendants do not argue the Complaint does not substantively state a claim for

breach of that duty, they merely argue that two of the Defendants are exculpated by FCC's

charter.  (Def. Mem. p.20.)

## 2.        No Defendant Has Been Exculpated

Defendants argue Knobel and Pierne—and only those two Defendants—are immune

from a claim for breach of the duty of due care (but not the duty of loyalty) because FCC's

Certificate of Incorporation exculpates FCC's directors against all claims *other* than those "(a)

for any breach of the Director's duty of loyalty to the Corporation or its stockholders, (b) for acts

or omissions not in good faith or which involve intentional misconduct or a knowing violation of

law."  (Def. Mem.  Exhibit A at Article VIII, pp.13-14, inaccurately paraphrased in Def. Mem.

p.20).  Only Knobel and Pierne served as directors.  (Complaint ¶¶12-13.)  In the federal courts

(unlike Delaware state courts), such exculpatory clause has been recognized to present an

---

[5] Unlike their wholesale failure to even review the information in their possession, which is a complete abdication of duty that cannot be justified by any claimed exercise of business judgment (*see* pp.8-9, *supra*), Defendants could argue that they did not abdicate their responsibility to consider the matter but *consciously* decided not to verify that the software fix actually remedied the problem.  Such an actual decision *would* be reviewable under the business judgment rule (*Aronson*, 473 A.2d at 815), but would be so irrational under the circumstances pleaded that the burden would fall to Defendants to explain and prove how that could possibly make sense.  *E.g.*, *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010).

affirmative defense that cannot be the basis for a Fed. R. Civ. P. 12(b)(6) dismissal.  *See, e.g., Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 (D. Del. 2008); *In re The Brown Schools,* 368 B.R. 394, 401 (Bankr. D. Del.2007).  Even in the Delaware courts, "when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision."  *Alidina v. Internet.com Corp.,* No. 17235, 2002 WL 31584292, at *8 (Del.Ch. Nov. 6, 2002).

But Defendants are too quick to conclude the exculpation clause in the charter absolves even Knobel and Pierne.  The clause protects only FCC's directors, not its officers. (Def. Mem. Exhibit A at Article VIII, pp.13.)  In fact, it could not lawfully exculpate officers from their obligation to exercise due care.  *See, e.g.*, *Gantler*, 695 A.2d at 709 n.37 ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers").   Pierne was a director of FCC for less than five months (Complaint ¶13) and exculpation as a director during that short period does not absolve him with respect to the majority of his alleged wrongdoing which occurred during prior periods.

More importantly, both Knobel and Pierne were officers of FCC even while they were directors (Complaint ¶¶12-13).  Even if the scheme to improperly acquire and use Title IV funds was formulated in their capacity as directors (which would not be exculpated because it would breach the duty of loyalty as discussed below), the funds were actually drawn down, improperly or otherwise, at the operational level overseen by Knobel and Pierne in their capacities as officers (CEO and CFO, respectively).  Their exculpation from claims of gross negligence only as directors does not protect them from the consequences of their gross negligence as officers. *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (if a defendant is both an officer and a director, only actions taken "solely in the defendant's capacity as an officer" may give rise to liability for acts for which section 102(b)(7) shields directors from liability); *In*

*re Celera Corp. S'holder Litig.*, No. 6304, 2012 WL 1020471, at *27 n.191 (Del. Ch. Mar. 23, 2012) (same).

### C.      **The Complaint Plausibly Alleges Defendants Breached Their Duty of Loyalty**

Under Delaware law, it is a breach of the fiduciary duty of loyalty for an officer or director to cause a company to engage in illegal conduct, even if the purpose for doing so was to benefit the company, because "a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." *In re Massey Energy Co.*,No. 5430, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011); *see also Disney*, 906 A.2d at 67; *Desimone*, 24 A.2d at 934; *Metro Commc'ns Corp. BVI v. Adv. Mobilecomm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004); *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

 Likewise, a fiduciary who is not directly involved in the illegality but knows that it is occurring and permits it to continue, breaches the duty of loyalty by "intentionally failing to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Disney,* 906 A.2d at 67 (citation and quotation marks omitted).   As Vice Chancellor Leo J. Strine, Jr., has noted: "Where … a corporation faces a major injury as a result of illegal conduct, we see no reason why corporate fiduciaries should not face responsibility if they knowingly caused or tolerated the illegal conduct." *Loyalty's Core Demand: The Defining Role of Good Faith in Corporate Law*, 98 GEO. L.J. 629, 652 n.69 (2010) (emphasis added).   "There has always been virtual universal agreement in the courts and by most scholars that approval of illegal activity constitutes a breach."   David Rosenberg, *Delaware's "Expanding Duty of Loyalty" and Illegal Conduct: A Step Towards Corporate Social Responsibility*, 52 SANTA CLARA L. REV. 81, 88 (2012).

Thus, the Trustee has stated a claim for breach of Defendants' duty of loyalty by alleging facts plausibly suggesting either that they were engaged in the illegal conduct themselves, or merely that they were aware of FCC's illegal conduct and permitted it to continue.  Even where Rule 9(b) applies, knowledge need only be alleged generally.  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).  Moreover, a plaintiff need only plead that a defendant had constructive knowledge that the conduct at issue was illegal.  *Wood*, 953 A.2d at 141 (plaintiff asserting duty of loyalty claim must allege defendants "had 'actual or constructive knowledge' that their conduct was legally improper"); *Citigroup*, 964 A.2d at 125 (same).

Here, facts are alleged to give rise to far more than just a plausible inference that each Defendant was aware of the abuse of Title IV funds.  As an initial matter, Defendants cannot claim to have been oblivious to the unlawful use of Title IV funds without admitting a breach of the duty of due care. (*See* pp.13-16, *supra*.) Moreover, the Complaint identifies the scope of each Defendant's responsibilities within the company as being such that each would be expected to see both the amounts being drawn and the absence of the required predicates for those draws (at a minimum, providing a plausible basis to infer knowledge). (Compl. ¶¶6, 12-17.)

The law charges each Defendant with knowledge of the DOE regulations that FCC was violating.  *Loftin v. United States*, 6 Cl. Ct. 596, 609 (1984), *aff'd*, 765 F.2d 1117 (Fed. Cir. 1985)) ("those who deal with government agents are charged with knowledge of the regulations which govern their dealings"); *see also* pp.10-11, *supra*.

But facts are also alleged that give rise to strong inferences that each Defendant was actually personally familiar with them.  *See* Complaint ¶6(c), 12 (Knobel founded and ran the company and was a member of a regulatory group); ¶6(a), 15, 43, 46 (Yawn) and ¶¶6(c), 13 (Pierne) (COO and CFO, respectively, of company that depended upon compliance with the regulations for 90% of its revenues); ¶¶6(e), 14, 43 (Bartness was responsible for ensuring

19

FCC's compliance with the regulations); ¶¶6(b), 16, 35, 43 (Stewart) and ¶¶6(b), 17, 35, 43 (Yousefi) (both responsible for reporting to the DOE in compliance with the regulations). Moreover, the Trustee has not even had the opportunity to review Knobel's or Yawn's e-mails from the period at issue.  (*Id*. ¶54 n.10.)  And both Pierne and Stewart were explicitly told how the Anthem Schools had been violating the DOE regulations prior to being acquired.  (*Id*. ¶¶40-42.)[6]

The Trustee's Complaint also recites (in ¶52) an e-mail string showing Defendants Knobel (CEO), Pierne (CFO) and Yousefi (VP of IT/Financial Services) agreeing among themselves to draw down Title IV funds without any regard to what the law actually permitted them to draw.  Under DOE regulations, FCC's ability to draw funds was limited to "the amount of funds the institution needs immediately for disbursements the institution has made or will make to students" or to satisfy tuition obligations (Complaint ¶33 n.1, quoting 34 C.F.R. 668.162(b)).  In other words, the amount of Title IV funds that could be drawn upon was limited by law to the immediate needs of enrolled students.

That e-mail exchange shows that those Defendants were drawing Title IV funds without any consideration of student enrollment or student needs, but based solely on the company's short-term cash flow requirements to make payroll, "pay rents and clear some payables" and to "support cash on hand at the balance sheet date."  (*See* Complaint ¶52.)  Of course, if there were sufficient enrollment and immediate student needs which entitled FCC draw funds, there would be no reason to draw less than the full amount—yet that e-mail string shows that, based solely on FCC's cash flow considerations, they discussed drawing $2 million, then $2.5 million, then $3 million and settled on $2.7 "to have a little buffer," validating the later observation of the

---

[6]  The argument that Pierne did not receive the full e-mail string (Def. Memo. p.10) is disingenuous.  He was copied on it (Complaint ¶¶40-41); a copy of the same can be made available to the Court.

restructuring consultant who noted that FCC simply viewed the Title IV funds "as a line of credit for the company to draw down on."  (Complaint ¶44 n.7.)

Defendants do not deny that the e-mail string vividly demonstrates that Defendants flouted DOE regulations and cavalierly took Title IV funds to which it was not entitled.  Instead, they write in their brief that, in that e-mail string, "[t]here is no suggestion that any of [Defendants] were aware of the regulatory implications under any DOE rule" and (quoting out of context the Trustee's Complaint at ¶54) that "there was no 'explanation of what the [draw-down] practice entailed or what the ramification of the same might be.'"  That is an astonishing statement because Defendants were running a business that depended upon Title IV funds for 90% of its revenues and if they really were freely drawing down DOE funds without being "aware of the regulatory implications under any DOE rule," then they have just admitted that they breached their fiduciary duty by "consciously disregard[ing] an obligation to be reasonably informed about the business." *Citigroup*, 964 A.2d at 125.

### D.    At a Minimum, the Complaint States a *Caremark* Claim

Defendants focus their motion solely on their contention that the Trustee failed to adequately allege a *Caremark* claim, emphasizing that such a claim is a "difficult" one. (Def. Memo. pp.6-7.)  The claim often is difficult for two reasons: First, it is typically asserted in a shareholder derivative suit where the plaintiff has a statutory obligation to "comply with the stringent requirements of factual particularity of Delaware Court of Chancery Rule 23.1." *Wood*, 953 A.2d at 140 (internal quotations omitted).  The second reason is the typical difficulty in pleading, under the stringent standard applicable in such cases, a "sustained or systematic failure of the board to exercise oversight." *China Auto.*, 2013 WL 4672059, at * 7 (quoting *Stone*, 911 A.2d at 372).  Neither difficulty is present here.

This is not a derivative claim and, as previously noted, is subject to no higher pleading standard than that of notice pleading under Rule 8.  (*See* pp.4-7, *supra*.)  Delaware law imposes the same fiduciary duties upon officers as it does upon directors and, therefore, a *Caremark* claim can be stated against officers as well as directors.  *E.g., Buckley v. O'Hanlon*, No. 04-955, 2007 WL 956947, at *3 & n.2 (D. Del. Mar. 28, 2007) (recognizing *Caremark* claim against officers and noting that when cited authorities refer to just officers or directors they should nonetheless be understood to apply to both groups); *In re World Health Alternatives, Inc.,* 385 B.R. 576, 591-92 (Bankr. D. Del. 2008) (recognizing *Caremark* claim against Vice President & General Counsel because, "[w]hile it is true that all of the cases relied upon by the Trustee involved directors' conduct, not officers', I believe the *Caremark* decision itself suggests that the same test would be applicable to officers").

Moreover, as discussed above, the Complaint pleads facts showing that Defendants necessarily either abdicated their oversight responsibilities completely by failing to pay attention to what was directly in front of them for years, or they necessarily knew—or at least should have known—of the illegal conduct without taking action. Either way, under applicable notice pleading standards the Complaint alleges "a sustained or systematic failure of the board to exercise oversight" which the Delaware Supreme Court noted will "withstand a motion to dismiss." *Stone*, 911 A.2d at 372.

Defendants consistently—but erroneously—assert it is necessary to allege "knowing violations of the law" to state a *Caremark* claim.  (*E.g.*, Def. Memo. p.6, heading 1.)  But a *Caremark* claim is predicated upon culpable "ignorance of liability creating activities within the corporation."  *Stone*, 911 A.2d at 369.  The claim does not require allegations that Defendants actually knew of the wrongful conduct by employees, the essence of the claim is that they *should have known* but failed to act.  *Qualcomm*, 2016 WL 4076369, at *8; *In re Career Educ. Corp.*

*Deriv. Litig.*, No. 1398-VCP, 2007 WL 2875203, at *8 (Del. Ch. Sept. 28, 2007) (under *Caremark* standard, "Plaintiffs must show that Defendants 'knew or should have known the alleged … illegal activity was occurring or had occurred").

In *Disney*, the Delaware Supreme Court held that the gross negligence that would violate the duty of due care could not be evidence of non-exculpable "good faith" referred to in the statute (8 Del. C. § 102(b)(7)) "without something more."  907 A.2d at 64-65.  In *Stone,* the Court confirmed that the "something more" is "sustained and systematic" conduct and it applied that concept of "good faith" to the principle that "where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."  911 A.2d at 369, 370, 372.  Thus, the Court held a plaintiff would plead a *Caremark* claim by alleging "a sustained or systematic failure of the board to exercise oversight," *id*. at 372, and provided two examples: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  911 A.2d at 370.  Assuming, *arguendo*, that Defendants truly were unaware of the illegal conduct that had been ongoing for years, then it certainly is a reasonable inference that there either was no reporting system at all, or that Defendants failed in their duty to monitor it; the Complaint alleges facts which support liability under both prongs.

### 1.    FCC Lacked Any Reporting System or Controls

The Complaint alleges Defendants "failed to implement systems and procedures" designed to prevent the unlawful conduct.  (Complaint ¶105.)  Inasmuch as that alleges a negative, the Trustee can hardly be expected to plead further facts.  As the Delaware Supreme

Court recognized, a claim alleging "an utter failure to attempt to assure a reasonable reporting system exists" will survive a motion to dismiss.  *Stone*, 911 A.2d at 372.  And that the Complaint alleges Defendants were alerted to the existence of unlawful Title IV draws on at least three separate occasions—each time claiming to have been unaware until alerted only by outside sources (Complaint ¶¶42, 47, 71, 78, 80)—plausibly suggests there was no internal system to bring the problem to Defendants' attention.

The internal systems, such as the one they blame for the errors, are the very systems that need to be monitored, not systems "reasonably designed to provide to senior management and the board itself timely, accurate information [so as to be able] to reach informed judgments concerning both the corporation's compliance with law."  *Stone*, 911 A.2d at 368 (quoting *Caremark*.)  Indeed, in making this motion, Defendants even deny that the financial reports that they received were capable of notifying them of the problem (Def. Mem. pp.8-10.)

### 2.     **Failure to Monitor**

If Defendants can claim they actually had a system, then the allegations of the Complaint plausibly establish Defendants failed to monitor it: as noted above, between April 2012 and February 2014, Defendants were repeatedly alerted to regulatory violations, with each alert originating outside the company.

"In practice, plaintiffs often attempt to satisfy the [failure to monitor] elements of a *Caremark* claim by pleading that the board had knowledge of certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding its duty to address that misconduct."  *Qualcomm*, 2016 WL 4076369, at *8.  Each time the DOE (and others) notified FCC that it was violating the law, Defendants received a "red flag" that should have alerted them to the fact that FCC was out of compliance and that their internal system was not catching the problem.   The allegations that this happened repeatedly was evidence that the individual

instances of gross negligence had aggregated into "systematic or sustained failure." *Stone*, 911 A.2d at 372. (Contrary to Defendants' assertion, the fact that the DOE permitted FCC to draw additional funds after FCC addressed the problems it had identified did not constitute "green flags" (Def. Mem.  p.17); the DOE merely acknowledged that FCC succeeded in manually reconciling the accounts and had refunded monies improperly held, that gave Defendants no reason to expect that the problem would not recur).

Given that the facts alleged demonstrate Defendants were drawing Title IV funds without any concern as to what funds they were actually entitled to draw under DOE regulations, and that they continued to impermissibly pre-draw additional funds even after the DOE notified them that there were already $15 million in unsubstantiated draws outstanding (Complaint ¶¶78-79), the more reasonable inference is that Defendants simply resumed their unlawful draws once they thought the DOE was no longer paying attention after the manual reconciliation.  Indeed, the clearly intentional "kiting" of DOE funds (*i.e*, impermissibly drawing funds until they had to be refunded, and then replacing the funds by impermissibly drawing them on behalf of another school, Complaint ¶¶ 55-57) began (or resumed) once DOE was initially pacified.  But more importantly, under *Caremark*, once the Defendants were alerted to illegal activity by FCC's employees, they do not satisfy their duties of loyalty and good faith by simply telling those same employees to "fix it" and then closing their eyes again as the very same conduct continues.  It may well be that Defendants can show they in fact believed in good faith that it was a software glitch which reappeared despite their having taken appropriate steps to assure themselves that it had been rectified,[7] and, therefore, that there was no *Caremark* violation.  But the facts alleged

---

[7] Actually, Defendants state "***Plaintiff admits that Defendants believed*** that the accounting issues were the result of unintentional software glitches."  (Def. Mem. p.15 (emphasis added)).  Not true.  Defendants attributed the initial problem to software malfunctions (Complaint ¶70) but

render it more likely that Defendants intentionally gamed the system by illegally using Title IV funds for impermissible purposes or, at a minimum, that they breached their fiduciary duties by failing to stop that conduct despite ample notice that it was occurring.  Either way, it is an issue that should be determined at trial.

## <u>CONCLUSION</u>

Defendants' motion to dismiss should be denied for the foregoing reasons and the Trustee should be granted such other and further relief as the Court deems just and proper.  In the event this Court concludes the Complaint should be dismissed, the Trustee requests leave to amend pursuant to Fed. R. Civ. P. 15(a)(2).

---

the Complaint alleges such excuse was pretextual and, in fact, was rejected by the DOE.  (*Id.* ¶71.)

Dated: December 16, 2016

Respectfully submitted,

/s/ Brian S. Dervishi
Brian S. Dervishi (Bar No. 350303)
WEISSMAN & DERVISHI, P.A.
SunTrust International Center
One Southeast Third Avenue, Suite 1700
Miami, Florida 33131
(305) 347-4070
bdervishi@wdpalaw.com
service@wdpalaw.com

- and -

Avery Samet (admitted *pro hac vice*)
Jeffrey Chubak (admitted *pro hac vice*)
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
asamet@storchamini.com
jchubak@storchamini.com

*Attorneys for Plaintiff Clingman &*
*Hanger Management Associates, LLC,*
*as Trustee*

27

## CERTIFICATE OF SERVICE

I certify that on December 16, 2016 the foregoing was filed and served on counsel of

record for Defendants via the Court's ECF system.

/s/ Brian S. Dervishi