**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-62028-CIV-LENARD/GOODMAN**

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC, as Trustee,

               Plaintiff,

   - against -

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA STEWART,
and CID YOUSEFI,

             Defendants.

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Clingman & Hanger Management Associates, LLC, as trustee (the "Trustee") of the

liquidating trust (the "Trust") established by the chapter 11 plan of liquidation (the "Plan") of

FCC Holdings, Inc. and its subsidiaries (together, "FCC"), hereby alleges:

**PRELIMINARY STATEMENT**

1.      FCC's officers made a bet that they could take unauthorized funds from the

United States Department of Education (the "DOE"), use them to fund a company expansion,

sell the company at a tremendous profit, and receive tens of millions of dollars in bonus

compensation. Foreseeably, the DOE discovered the scheme and cut FCC off from 90% of its

cash flow. Without cash flow, FCC – an otherwise profitable company valued at over $150

million and with only $30 million in debt – collapsed in a matter of weeks. The board of

directors (the "Board") was forced to sell its most profitable assets in a fire sale and the company

filed for bankruptcy protection.

2.      Prior to its collapse, FCC owned and operated forty-one for-profit, post-secondary

education schools in fourteen states. Pursuant to Title IV of the Higher Education Act of 1965,

the DOE provided tuition funding for students attending Title IV-eligible programs at FCC schools in the form of grants and loans, such as the Direct Loan and Pell Grant programs ("Title IV funds").  Approximately 90% of FCC's revenue and cash consisted of Title IV funds paid to FCC to satisfy student tuition obligations.

3.     However, instead of limiting its Title IV fund draws based on FCC's then-current enrollment data or treating Title IV funds as trust funds, as required by DOE regulations, Defendants took advantage of the ability to draw Title IV funds before having to "substantiate" the same with the DOE (by identifying specific students to whom the funds were "disbursed") by drawing tens of millions of dollars to pay FCC's operating costs and capital expenditures without regard to whether those funds were or could be justified based on the actual tuition FCC earned from qualified, bona fide enrolled students.

4.     Specifically, Defendants engaged in the following conduct, in each case in contravention of DOE regulations (as discussed below):

(a)     failing to hold Title IV funds in trust either in a separate account or through accounting or internal controls sufficient to track Title IV funds as if they were held in a separate account;

(b)     drawing Title IV funds in amounts far greater than that which could be supported by current enrollment numbers;

(c)     failing to refund "excess" Title IV funds which were drawn for students who withdrew from or failed to commence attending their respective programs;

(d)     failing to reconcile Title IV fund draws with student-level disbursement data;

(e)     pre-drawing (defined below) Title IV funds based on projected future enrollment numbers which management knew to be overstated; and

(f)     subsequently abandoning the pretense of limiting draws to illusory enrollment numbers and simply drawing based on the company's general liquidity needs.

5.     Defendants knew or should have known of DOE regulations designed to prevent the use of Title IV funds in this manner.  FCC had previously had its funding frozen by the DOE less than a year earlier in May of 2013 when the difference between the amounts drawn down

and the amount substantiated grew too large.  Despite this prior DOE funding freeze, Defendants continued to draw Title IV funds based on the company's short term cash needs, without regard to whether FCC's schools had enrollment numbers that could justify the draws.

6.      Each of the above-named Defendants participated in the foregoing scheme:

(a)      Neil Yawn ("Yawn"), FCC's Chief Operations Officer ("COO"), submitted inflated projected enrollment numbers to FCC's Financial Services Office upon which the office's Title IV fund draws were premised, which resulted in the office drawing substantially more from the DOE than it should have.  In addition, Yawn systematically underreported student withdrawals from FCC programs to the Financial Services Office, which if properly reported would have triggered the refund of Title IV funds to the DOE.  This, in turn, resulted in a significant mismatch between the amount of Title IV funds drawn by FCC and the amount substantiated with the DOE.

(b)      Siana Stewart ("Stewart"), FCC's Vice President of Financial Services, supervised FCC's Financial Services Office, and then Cid Yousefi ("Yousefi") oversaw FCC's drawing, reconciliation, and refunding of Title IV funds following Stewart's resignation.  The imbalance resulting from the foregoing should have been kept in check, but was not due to their requests for funds beyond what even the inflated student data could support and their failure to reconcile, on a monthly basis, Title IV fund draws with student-level disbursement data reported to the DOE, as required by DOE regulations.

(c)      David Knobel ("Knobel"), the Chief Executive Officer ("CEO") and a director of FCC, and Jeffrey Pierne ("Pierne"), FCC's Chief Financial Officer ("CFO"), enabled the abuse of Title IV funds by not holding the funds in trust, either by keeping them in a separate account or by employing accounting or internal controls sufficient to track Title IV funds as if they were held in a separate account.  Title IV funds should

3

have been held separately until they were promptly disbursed to students, resulting in the majority of the funds coming back to FCC in the form of tuition payments and some funds going directly to students for living expenses. Instead, Title IV funds from all of FCC's various schools registered under different identification numbers (*see*, *infra* ¶¶ 30-31) were deposited directly into FCC's operations accounts to be used without substantiating how much tuition FCC was owed. Knobel and Pierne also aggravated existing imbalances by directing the drawdown of Title IV funds based on inflated projected enrollment numbers to pay current operating expenses and to fund the company's expansion, even though Pierne and Stewart knew FCC could not comply with the DOE's "prompt disbursement rule" (defined below) with respect to such funds.

(d)     Pierne, Stewart, and Yousefi also completely abandoned their responsibility to ensure FCC held Title IV funds in trust by engaging in a practice akin to check kiting, namely, repeatedly directing the drawing of or causing to be drawn large amounts of Title IV funds on behalf of certain FCC schools without regard to whether the draws could be justified by enrollment numbers, then refunding the bare minimum required by the DOE's payment system.

(e)     Dean Bartness ("Bartness"), FCC's Chief Compliance Officer ("CCO"), was responsible for ensuring compliance with DOE regulations. He completely abandoned his primary responsibility of ensuring FCC complied with Title IV and did nothing to prevent FCC from drawing Title IV funds or failing to substantiate or refund Title IV funds as required by DOE regulations, which directly contributed to the company's collapse.

7.     In May 2013, the DOE temporarily suspended FCC's ability to draw Title IV funds without first substantiating the same after FCC drew but did not properly substantiate or

refund over $15 million in Title IV funds.  After substantiating or refunding the $15 million, management re-engaged in the same conduct/inaction as it had the prior year and additional conduct, in each case in violation of DOE regulations (*see* ¶4(e), *supra*).  By March 2014, after FCC had drawn approximately $20 million in unsubstantiated Title IV funds, the DOE demanded that FCC repay or substantiate all unsubstantiated funds within thirty days and permanently eliminated FCC's ability to draw Title IV funds without first substantiating the same.  This doomed FCC, which relied on Title IV funds to supply approximately 90% of its revenue and cash.

8.     Immediately upon learning of Defendants' misconduct, the Board, in April 2014, removed Knobel as director and CEO, and Yawn resigned.  However, by then the company's liquidation was inevitable.  By August 2014, the company sold off its most valuable schools and filed for bankruptcy protection.  After several months in bankruptcy, FCC confirmed a chapter 11 plan (the "Plan") in which it could not recover enough to pay even administrative expense claims in full, let alone pre-petition claims.  The Plan created the Trust for, among other things, the express purpose of asserting FCC's causes of action against any parties causing harm to FCC. A copy of the First Amended Joint Plan of Orderly Liquidation of FCC Holdings, Inc., and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code; the FCC Holdings, Inc. Liquidating Trust Agreement among FCC Holdings, Inc. and the Other Affiliated Debtors Party Hereto; and the Order Confirming First Amended Joint Plan of Orderly Liquidation of FCC Holdings, Inc. and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code are attached as Exhibits 1 – 3.

9.     All told, Defendants' acts and omissions were the direct and proximate cause of the collapse of profitable schools which had been valued at over $150 million only two years

before, but sold for less than $3 million.  But for Defendants' greed and fiduciary duty breaches, none of this had to happen.

10.     Accordingly, the Trustee, as the assignee of FCC's causes of action and as Plan fiduciary for the bankruptcy estate, the beneficiaries of which are FCC's creditors (which include FCC's lenders, trade creditors, and the DOE) and FCC's equity holders, seeks damages suffered by FCC from the Defendants on account of their breaches of fiduciary duty and their destruction of approximately $150 million in value, to the detriment of FCC and its bankruptcy estate, the Debtor's prepetition creditors and its equity holders.

## PARTIES

### I.     THE PLAINTIFF

11.     The Trustee is trustee of the Trust established by the Plan confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 18, 2015 in FCC's chapter 11 bankruptcy case.  The Trustee's members, W. Edward Clingman, Jr. and Teresa S. Hanger, are Virginia citizens.

12.     By order dated March 18, 2015 (the "Confirmation Order"), the Bankruptcy Court confirmed FCC's chapter 11 plan of liquidation (the "Plan") and expressly transferred FCC's retained causes of action to the Trust.  (Exhibit 3 Confirmation Order ¶¶ L and 11.)  As discussed above, the Plan created the Trust, and appointed the Trustee, for the purpose of maximizing recoveries for the bankruptcy estate.  Pursuant to the Plan, all of FCC's causes of actions were transferred to the Trust, and the Trustee was substituted for FCC in all relevant judicial proceedings.  (Exhibit 1 Plan §§ 5.02 ("the Debtors will transfer to the Liquidating Trust all of their rights, title, and interests in all of the Liquidating Trust Assets"), 5.06 ("the Liquidating Trustee shall be deemed to be a judicial substitute for each of the Debtors as the party-in-interest . . . in any judicial proceeding or appeal to which a Debtor is a party"), 13.06 ("The rights,

benefits . . . of any Entity named or referred to in the Plan . . . shall inure to the benefit of . . . [any] successor, or assign of such Entity, including, but not limited to, the Liquidating Trustee"); Exhibit 2 Trust Agreement §§ 1.2-4 (outlining the transfer and acceptance of the Liquidating Trust Assets to the Trustee for the partial purpose of pursuing retained Causes of Action), 3.1-2 (detailing the Trustee's duty to pursue retained Causes of Action), 6.3 (empowering the Trustee to prosecute retained Causes of Action).)  The Trustee brings several of those causes of action herein.

## II.    THE DEFENDANTS

13.    Knobel is a Florida citizen who in 1994 founded the FCC Schools (defined below) in Fort Lauderdale, Florida and served as a director and the CEO of FCC at all relevant times until his removal by the Board on or about April 29, 2014.  Knobel also served on the Florida Commission for Independent Education, the seven-member state commission charged with regulating for-profit education institutions in Florida, from at least 2004 through 2010, and was therefore no doubt well versed with the regulations applicable to FCC, including DOE regulations at the center of this action.

14.    Pierne is a Florida citizen who served as FCC's CFO from in or about December 2008 until August 22, 2014 and as a Board member from April 4, 2014 until August 22, 2014. As CFO, Pierne's responsibilities included financial planning/liquidity analysis, communicating financial risks to the Board, and supervising accounting personnel.

15.    Bartness is a Florida citizen who served as FCC's CCO and Corporate Secretary from in or about February 2005 until August 21, 2014.  As CCO, Bartness's responsibilities included ensuring compliance with DOE regulations and communicating related risks to the Board.

16.     Yawn is a Florida citizen who served as FCC's COO at least from April 2012 until his resignation on or about April 4, 2014.  As COO, Yawn's responsibilities included determining projected DOE funding amounts from current student enrollment in FCC's various programs and ensuring transmission of such projections to the Financial Services Office, as well as keeping track of student withdrawals from such programs and ensuring transmission of such information to the Financial Services Office.

17.     Stewart is a Florida citizen who was employed in FCC's Financial Services Office beginning in 2005, and oversaw the office's operations as FCC's Vice President of Financial Services from 2009 until her resignation in or about December 2013.  Following Stewart's resignation, she continued to provide consulting services to FCC.  As Vice President of Financial Services, Stewart reported to both Knobel and Pierne. Her responsibilities included drawing, substantiating, and refunding Title IV funds in accordance with DOE regulations.  Stewart managed and directed dozens of employees at various levels in order to handle her broad range of responsibilities.  Both Stewart's title and her level of managerial oversight and responsibility made her an officer of the company.

18.     Yousefi is a Florida citizen who served as FCC's Senior Vice President of Information Technology from in or about June 2013 until in or about August 2014.  In that role, Yousefi was responsible for all strategic and tactical activities related to FCC's systems, technology and student financial aid, and he reported directly to Knobel.  Upon Stewart's resignation in or about December 2013, Yousefi assumed Stewart's responsibilities of drawing, substantiating, and refunding Title IV funds in accordance with DOE regulations.  Both Yousefi's title and his level of managerial oversight and responsibility made him an officer of the company.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship of the parties and the amount in controversy exceeds $75,000.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendants are either residents of this judicial district, or a substantial part of the events or omissions giving rise to this action took place in this judicial district.

## BACKGROUND

### I.     FCC OVERVIEW

21.     Prior to the commencement of FCC's chapter 11 case, FCC owned and operated fourteen Florida Career College schools (the "FCC Schools"), twenty-two Anthem Education schools (the "Anthem Schools"), and five California schools which did not offer Title IV-eligible programs (the "US Colleges"), and further offered online courses through "Anthem Online."

        A.   FCC's History

22.     Knobel founded FCC in 1994.  In 2004, he sold a majority interest in FCC to private equity firm TA Associates for approximately $53 million.

23.     In 2007, private equity firms Greenhill Capital Partners LLC and Abrams Capital LLC invested approximately $132 million to purchase a majority interest in FCC, which at the time owned and operated seven schools.

24.     At the close of the transaction, Greenhill and Abrams Capital each owned 46% of FCC (through affiliates) and Knobel owned 7% of FCC (a final 1% was owned by a former FCC officer).

25.     From in or about 2011 until Knobel's removal in April 2014, the Board was comprised of him, two Abrams Capital directors, and two Greenhill directors.

26.     On April 12, 2012, FCC acquired the Anthem Schools for a net purchase price of approximately $16 million.

27.     In August 2013, FCC acquired the US Colleges for a net purchase price of nearly $2.8 million.

28.     FCC managed its schools from its Fort Lauderdale, Florida headquarters.

B.     FCC's Drawdown Method

29.     FCC derived approximately 90% of its revenues and cash from Title IV funds drawn from the DOE.   As such, access to Title IV funds was critical to FCC's continued operations.   As Ernst & Young noted in every consolidated balance sheet, loss of or even limited access to Title IV funds "could have a material adverse effect on financial position, results of operations and cash flows."

30.     In order for a post-secondary, higher education institution (an "institution") to draw Title IV funds, it must first apply for and receive a DOE Office of Postsecondary Education ID number (an "OPEID").

31.     The fourteen FCC Schools operated under one OPEID.   The twenty-two Anthem Schools operated under five OPEIDs, commonly referred to by the name of the institution's main campus or location (*i.e.*, Phoenix, Bryman, Maryland Heights, Parsippany, and Springfield).   The five US Colleges did not draw Title IV funds and did not have an OPEID.

32.     Once an institution receives an OPEID, it may draw Title IV funds using a DOE-approved payment method.

33.     Under the "advance" payment method that was historically utilized by FCC, an institution may draw Title IV funds via the DOE's payment system ("G5") before "substantiating" the same by reporting to the DOE the individual students to whom such funds

are "disbursed" via the DOE's common origination and disbursement system ("COD").  *See* 34 C.F.R. § 668.162(b).

34.     However, FCC's ability to draw funds under this method on behalf of its institutions was subject to its compliance with a number of conditions:

(a)     FCC was prohibited from drawing Title IV funds on behalf of an institution in an amount greater than that required to satisfy student loan balances of students currently enrolled at the institution;[1]

(b)     the institution was required to disburse Title IV funds to students within three days of drawing those funds;[2]

(c)     the institution was required to refund to the DOE Title IV funds drawn to the extent its students withdrew from its Title IV-eligible programs or never commenced attending such programs;[3]

(d)     the institution was required to hold Title IV funds it drew in trust for students, to the extent draws could be credited to a student account, or for the DOE, to the extent "excess" Title IV funds could not be timely substantiated and therefore had to be refunded;[4] and

---

[1] *See* 34 C.F.R. § 668.14(b)(1)-(2) (institution may only use Title IV funds to satisfy student loans taken to cover cost of attendance resulting from student enrollment in a Title IV-eligible program, and must "time its requests for funds … to meet the institution's immediate … needs" for such funds); 34 C.F.R. § 668.162(b)(1) (institution's requests for Title IV funds "may not exceed the amount of funds the institution needs immediately for disbursements the institution has made or will make to students" or to satisfy tuition obligations); 34 C.F.R. §§ 668.162(b)(3), 166 (institution must "disburse" Title IV funds drawn by crediting such funds against tuition balances within three business days of its receipt and is prohibited from holding "excess" Title IV funds).

[2] See 34 C.F.R. § 668.162(b)(3) ("The institution must disburse the funds requested as soon as administratively feasible but no later than three business days following the date the institution received those funds.")

[3] *See* 34 C.F.R. § 668.21 (Title IV funds must be promptly refunded if a student does not begin attendance at an institution.  "The institution must return those funds for which it is responsible under paragraph (a) of this section to the respective title IV, HEA program as soon as possible, but no later than 30 days after the date that the institution becomes aware that the student will not or has not begun attendance."); 34 C.F.R. § 668.22 (if a student withdraws from an institution after beginning attendance, the amount of Title IV assistance "earned" by him/her must be determined.  If the amount disbursed exceeds the amount earned, the institution must refund "unearned funds" within 45 days after the institution determines the student withdrew).

[4] *See* 34 C.F.R. § 668.161(b) (Title IV "funds received by an institution … are held in trust for the intended student beneficiaries [or] the Secretary"); 34 C.F.R. § 668.163(e) (institutions must "exercise the level of care and diligence required of a fiduciary with regard to maintaining and investing title IV … funds"); 34 C.F.R. § 668.14(b)(2) (institutions are "fiduciar[ies] responsible for administering Federal funds"); 34 CFR § 668.163(d)(1) ("An institution must [m]aintain accounting and internal control systems that identify the cash balance of the funds of each title IV, HEA program that are included in the institution's depository account or accounts as readily as if those funds were maintained in a separate depository account . . .")

(e)   the institution was required to "reconcile" its COD-G5 discrepancies monthly, and at the end of each "program year" (which ran July 1-June 30).[5]

35.     As a practical matter, an institution operating under the advance payment method that complies with the foregoing conditions should not have cash flow problems absent a precipitous decline in enrollment numbers.  By definition, the institution is receiving cash associated with educating a particular student before the student commences enrollment, and before the institution has incurred the cost of educating him or her.  In contrast, the operating expenses associated with educating the institution's students (*e.g.*, rent, payroll, etc.) are ordinarily paid and expensed over time.[6]

36.     The Financial Services Office, headed by Stewart and later partially overseen by Yousefi, was responsible for drawing Title IV funds on behalf of each FCC institution, substantiating draws via COD, and refunding unsubstantiated draws via G5.

C.   FCC's Value Creation Plan

37.     Following FCC's acquisition of the Anthem Schools in April 2012, management proposed a plan to maximize owners' return on investment and management's incentive compensation which involved selling or closing nine Anthem Schools in states with regulators management considered "hostile to our industry," building out new schools across sun-belt states, and making operational improvements at the new schools and remaining Anthem Schools

---

[5] *See, e.g.*, 34 C.F.R. § 685.300 (monthly reconciliation required for Direct Loans); 34 C.F.R. § 674.19(d)(1) (same for Perkins loans); Federal Student Aid Handbook, Vol. 4 (annual reconciliation required to complete mandatory Fiscal Operations Report).

[6] Because the advance payment method pays institutions upfront, an advance payment method-eligible institution should not experience cash flow problems unless: (a) operating cash (*i.e.*, Title IV funds) is being used to fund long term capital expenditures or debt repayment which are more appropriately funded through the sale of equity interests or issuance of long term debt, or (b) operating expenses exceed operating revenues (indicating a fundamental problem with the business).

required to achieve annual per-school-EBITDA[7] comparable to that of the FCC Schools. Management believed once it began approaching EBITDA targets at these schools, it could sell the company for $450-$500 million by 2017, whereupon Knobel would receive 10% of the net proceeds and management (including each other defendant) would share in an additional 10% of the net proceeds.

38.    Over the next two years, FCC did not divest the Anthem Schools identified for divestment, but did commit over $20 million to capital expenditures associated with the buildout of three new schools that would operate under the FCC Schools' OPEID and additional improvements.

## II.    FCC NONCOMPLIANCE WITH DOE REGULATIONS

### A. Pre-Merger Drawdown Practices

39.    Historically, the FCC Schools' Financial Services Office drew Title IV funds during a given month by netting projected DOE funding amounts from new student starts and continuing students that month with amounts to be refunded as a result of students' withdrawal from or failure to commence attending their programs.   Both figures were generated by aggregating enrollment projections and refund data supplied by the management of each campus, which in turn reported to the COO.   The Financial Services Office would then substantiate prior draws by updating COD with current student enrollment information and refund Title IV funds, within the specified period of time (*see*, *infra*, n.3), that could not be substantiated when FCC was unable to disburse the funds within three business days of the draw, as required by 34 C.F.R. § 668.162(b)(3) (the "prompt disbursement rule")

---

[7] The term "EBITDA" means earnings before interest, tax, depreciation, and amortization.

40.     The Anthem Schools engaged in a similar practice but would also "pre-draw" Title IV funds from time to time by causing its institutions to draw Title IV funds during a given month premised upon enrollment projections for future months (such draw, a "<u>pre-draw</u>").[8]

41.     Both Pierne and Stewart knew the Anthem Schools' pre-draw practice violated DOE regulations because it would ordinarily result in the Anthem Schools holding Title IV funds that were neither disbursed nor refunded within the time required by the prompt disbursement rule.

42.     In a June 8, 2012 document entitled "PreDrawMemo," Marc Prochello, the Anthem Schools' controller, explained to FCC's auditor, Ernst & Young LLP ("<u>E&Y</u>"), that the Anthem Schools pre-drew Title IV funds between December 1, 2011 and the merger date, and that as of the merger date there remained roughly $3.3 million in pre-drawn funds that had neither been disbursed nor refunded.   In response to this memo, E&Y e-mailed both Mr. Prochello and FCC's controller, Stella Laurella, copying Pierne, asking that Mr. Prochello "include a comment in your memo as to the Company's compliance" as of the merger date.

43.     During the internal e-mail thread among FCC officers that followed, Ms. Laurella proposed stating to E&Y by telling the auditors that as of the merger date, the Anthem Schools "were in compliance with DOE regulations as the funds on-hand were in the process of being identified as belonging to student accounts or being prepared for returning to G5."  Mr. Prochello responded "[t]he only issue with that is, we really weren't in compliance" because pre-drawn

---

[8] Because of the various uses of the term "pre-draw," note that the DOE regulations define an acceptable pre-draw as one in which Title IV funds are drawn from G5 and immediately be disbursed to students to pay their tuition and other expenses.  This draw is based on an estimated enrollment, though, and so it is possible the school may have funds from the draw that are not disbursed due to student withdrawals or drops.  At that point the school has an additional 30-45 days to determine how much money is owed back to the DOE and refund it.  This is not the same as the pre-draw practice FCC was engaging in, which was to draw money for student tuition months in advance of the actual enrollment of students and disbursement of funds to them.  Such premature draws necessarily violate the three-day disbursement requirement.

funds had not been disbursed to students within three business days.    Stewart responded by proposing to modify the original memo by stating:

> As of … April 12, 2012, [the Anthem Schools were] in compliance with DOE regulations which allow institutions to pre-draw funds based on estimated student eligibility, [and] once drawn the institution goes through a process to determine actual eligibility. Upon the completion of this process all eligible funds are posted to student accounts and all ineligible funds are returned to the [DOE].

Substantially similar language made it into the revised memo submitted to E&Y, which Pierne signed off on.  The revised memo was misleading because it failed to disclose, among other things, that the pre-draws were not anticipated to be immediately disbursed and timely refunded as required by the prompt disbursement rule.

### B.  FCC's Post-Merger Drawdown Practice

44.    Following the acquisition of the Anthem Schools, FCC management assumed responsibility for managing all aspects of the drawdown process across all OPEIDs.  Thus, Yawn was responsible for projecting enrollments and DOE funding amounts across all OPEIDs, as well as supplying the Financial Services Office with all information required to determine amounts to be refunded to the DOE as a result of student withdrawals under 34 C.F.R. §§ 668.21-22.  In addition, Stewart, and later Yousefi, were responsible for drawing and refunding Title IV funds, reconciling COD-G5 discrepancies, and interfacing with the DOE.  Bartness was responsible for ensuring the drawdown, reconciliation, and refund process complied with DOE regulations.

45.    Following the acquisition, FCC management engaged in a variety of practices in furtherance of efforts to treat access to Title IV funds under the advance payment method as an interest-free credit line, in contravention of DOE regulations, as described below.[9]

---

[9] The notion that access to Title IV funds under the advance payment method was equivalent to an interest-free credit line was so ingrained in the mindset of FCC management that the company's restructuring advisors, FTI Consulting, Inc. stated as much in bankruptcy filings based upon communications and input from management and

1.     Draws Premised on Inflated Enrollment Numbers

46.     Inflated projected enrollment numbers, upon which monthly draws were premised, were transmitted to the Financial Services Office, which in turn resulted in the Financial Services Office drawing substantially more than it should have.  New student starts regularly fell short of projections by 10-20%.

47.     For example, on March 28, 2014, Pierne wrote directly to Knobel that the Title IV collections estimate for March, a single month, had been off by approximately $9 million: "cash flow in March from T4 funds was reduced to $12 million compared to our previous forecast of approximately $21 million (due both to the balancing issue and continued start shortfalls), which has created a significant cash squeeze."

48.     Further, on April 10, 2014, FTI circulated to Knobel and Pierne, among others, a "summary report of FTI's initial near-term liquidity analysis and financial aid funding process." Specifically, the report concluded that "There was a lack of adequate substantiated support for the cash projections in the forecast."

49.     An April 24, 2014 Board presentation by FTI entitled "Financial Aid – Assessment, Deep Dive," cited "lack of trust in forecasts that originate from campus management" as a "systemic issue … associated with the Financial Aid area" which resulted in DOE action against FCC.

50.     Not only did the Financial Services Office draw against inflated projected enrollment numbers, it also drew Title IV funds for a program unapproved by the DOE, the

---

FCC's DOE regulatory counsel.  *See* Declaration of Sean Harding, *In re FCC Holdings, Inc.*, Ch. 11 Case No. 14-11987 (Bankr. D. Del. Aug. 26, 2014) [ECF No. 13] at ¶ 45 ("Prior to April 2014, the Company operated under the 'advance funding method,' whereby the G5 system essentially operated as a line of credit for the Company to draw down on, based on the amount of funding an institution is eligible for based on what it inputs into the 'COD' system").

Patient Care Technician ("PCT") program, that was rolled out across multiple campuses despite not being authorized to receive such funds.

51.     Bartness acknowledged to a colleague that such wrongdoing was "obvious" in hindsight.  On June 12, 2014, Bartness stated to the VP–Regulatory and Legal Affairs that he "would bet [Knobel] told Mark [Young] to enroll as they were desperate to meet start budgets. They dug themselves into a ditch that got too deep for them to climb out of . . . ."

52.     Bartness—as Chief Compliance Officer—further explained, "We're toast on that PCT program…Maybe they could charge Mark Young….Gotta believe David [Knobel] knew, too[.]"  The VP–Regulatory and Legal Affairs replied, "had to, his name was on the provisional ecar[10][.]"

53.     On June 14, 2014, upon learning that disbursements to a non-approved program had occurred, an outside consultant performing due diligence on FCC on behalf of an outside investor wrote to Bartness, Yousefi and Pierne, among others, directing Bartness to "begin a project immediately to identify any program that currently does not have required approvals from the oversight agencies, programmatic accrediting agencies, and the U.S. Department of Education…. Further, you should prepare policy/procedures/process to ensure this can't happen in the future.  I just can't imagine starting a program without the requisite approvals."

       2.     <u>Noncompliance with Prompt Disbursement Rule; Persistent Underreporting of Student Withdrawals</u>

54.     FCC was required to disburse funds to students within three days of drawing them from the DOE's G5 system.  Schools are not permitted to draw Title IV funds and keep them for potential future use by students.  They are only permitted to draw funds when they can be used by students, though it is permissible for the school to estimate the number of students who need

---

[10] Eligibility and Certification Approval Report

funds.  Any imbalance created by such estimates are dealt with in the reconciliation and refund process.  (*See supra* ¶ 34(c) & n.3.)

55.    After its acquisition of Anthem, FCC began pre-drawing funds in advance of student needs in order to pay for capital expansion and operational expenses as Anthem had previously done.

56.    On December 4, 2013, Yousefi wrote to Stewart for clarification about the cash drawdown process.  Yousefi stated that the Manager of Financial Aid Processing had explained drawdowns to be "based on what is available in G5 and what [Stewart] approve[s]… My expectation is that everything would be tied to a roster, so you can always balance," that is, that the draws would be based on student enrollment because the funds were being disbursed to students.  Stewart responded that it was based on a roster, but immediately backtracked and admitted some Title IV drawdowns were unrelated to disbursements to students and used for other purposes, stating that "The availability in g5 has been used recently because of the number of rejects we have been having."  Stewart acknowledged that her approval was necessary "when our refunds are greater than our draws and a pre-draw [m]ay be needed."

57.    On February 4, 2014, the DOE expressly noted its concern about FCC's practices in this area, in an email that was then forwarded to Yousefi:

> We have been very concerned about the ongoing inability of the larger Anthem schools to reconcile funds drawn with disbursement records.  Seems like a large amount of cash is drawn and then when disbursements cannot be reported timely to substantiate those funds, the funds are returned.  And this has been recurring for months and months.

58.    The Financial Services Office also ceased timely refunding Title IV funds which could not be substantiated because they were not disbursed within three business days of the draw, as required by the prompt disbursement rule, and instead only refunded Title IV funds

based on erroneous reports from Yawn which Stewart and Yousefi knew misstated the amount of withdrawals.

59.     Campus management systematically and knowingly underreported student withdrawals to the Financial Services Office.  The pattern of underreporting is evident from the fact that FCC's Title IV auditor identified major refund errors across all OPEIDs for the 2012-13 program year, based on just a sample of student files.  The DOE concluded from the auditor's report that FCC's pattern of under-refunding Title IV funds was sufficiently egregious that it directed FCC to review and recalculate refunds at four of its six OPEIDs for all students that either withdrew or never commenced attending a program offered by the relevant institution during the program year, and to refund the difference between what was and what should have been refunded.  FCC's subsequent review, in turn, revealed its overall error rate was around 50% (and reached 66% at the Parsippany OPEID).

60.     Significantly, the Financial Services Office would regularly post refunds resulting from student withdrawals to its internal records, meaning it specifically knew that a given student withdrew and that a refund was in order, but would not make matching entries in COD or actually make the required refund to the DOE.  A consultant who advised on reconciliation-related matters after the DOE revoked FCC's ability to draw Title IV funds under the advance funding method remarked as follows on this practice: "To post a refund to the ledgers, without having made the refund, gives the appearance of intentional misrepresentation.  I am further troubled by the fact that so many of the staff are aware of a decision to not post refunds/returns to COD which violates the Department's cash management requirements."

61.     Further, FCC's records reflect that more than 50% of its student population during a given year would withdraw, resulting in the need for a refund.  For example, FCC's records for the 2012-13 program year reflect that almost 28,000 students had enrolled in Title IV-eligible

programs at the FCC and Anthem Schools that year.  Of those students, approximately 4,000 (14%) withdrew and approximately 11,000 (39%) never commenced attending, while approximately 3,500 (12%) graduated and approximately 8,500 (30%) were listed as actively enrolled (30%).[11]  Despite the fact that a full *54%* of students enrolled in Title IV-eligible programs that year withdrew or never commenced attending the programs for which they were enrolled, thereby necessitating a refund under 34 C.F.R. §§ 668.21-22, the Financial Services office continued to draw based on FCC's inflated estimates of *projected* new student starts and continuing students for DOE funding amounts for that month, and refund based only upon inaccurately reported withdrawals.

62.     As early as June 17, 2013, as part of his weekly review, Yousefi wrote directly to Knobel explaining that there was "No system of checks and balances in place to ensure what is exported out of STARS is the same as what is imported into Regent; the same for importing COD data into Regent."

63.     In a timeline of events as of July 2013 (the "Timeline") circulated among Knobel, Pierne, Yawn and Yousefi (the apparent author), Yousefi explained how large the refund problem had become.  The "[m]ajority of the $11,229,754 [of total refunds not paid as of 6/30/13] was carried forward to the next fiscal year, but probably not factored in the budgeted cashflow for FY 2014.  Meanwhile, monthly refunds are getting added to the pile!"  From July through September 2013, the "FA team" struggled to balance "cash drawdown, normal monthly refunds getting added to the balance forward, plus paying the refunds (from the balance forward)

---

[11] Approximately 3% of students did not fit in any of the foregoing categories (*e.g.*, students that enrolled for a future program year).

that are nearing the 45 day deadline."   During that time, the team processed "an additional $10,651,056 in refunds to add to the pile that was carried forward."

64.      As further example, on January 7, 2014, Pierne reported to Knobel that there was "an additional $1 million or so in T4 refunds" still owing from withdrawals in November that needed to be paid immediately.  Pierne reported that Yousefi was "working on quantifying this."

65.      On April 17, 2014, Yousefi explained to the VP–Corporate Controller that with respect to the reconciliation, "as much as we are all looking for a silver bullet, what we are doing is not going to fix all the ledger issues in STARS going back to the beginning of the FY[.]"

### 3.     Failure to Reconcile Monthly

66.      The Financial Services Office did not reconcile its COD-G5 discrepancies monthly, as required by DOE regulations (*see* ¶33(d), *supra*), and instead would only reconcile discrepancies at the end of each program year.  This had major monetary consequences for FCC, as under 34 C.F.R. § 668.164 if reconciliation is not completed before the end of the applicable funding period for a particular student, FCC would forever lose the ability to substantiate Title IV funds drawn to satisfy that student's tuition obligations and would have to refund the same.  Ultimately, FCC's failure to timely reconcile resulted in its having to refund millions of dollars in Title IV funds it would have been entitled to retain had it timely substantiated the related draws.

67.      On March 9, 2014, Yousefi authored a memo entitled "COD Reconciliation" that cast doubt as to whether FCC had even been reconciling at the end of the school year:

> [Stewart] claims that we reconciled through 6/30/2013, but the others discount the reconciliation as a cursory look and the amounts were not reconciled.  Reconciling through 6/30/2013 doesn't really help us with July through now.

68.      Yousefi's memo is supported by handwritten notes taken by Yawn dated March 26, 2014, in which he wrote that he was "told we hadn't reconciled COD since Jun 30, 2013."

Even in March 2014, when the DOE had made clear that failure to repay or substantiate all unsubstantiated funds would result in the permanent loss of FCC's ability to draw Title IV funds prior to substantiating them, Yawn noted "after DK call night of 3/26 re: Jeff + T4 collections" that "1. Doesn't know if we are actually reconciling COD or just posting enough to get the numbers closer."

    4.    <u>Pre-Draws Guaranteed Not to Comply with Prompt Disbursement Rule</u>

69.    Despite the fact that Pierne and Stewart were aware the Anthem Schools' practice of pre-drawing Title IV funds violated DOE regulations (*see* ¶¶40-42, *supra*), following the merger FCC adopted the exact same practice across its institutions (including the FCC Schools), and without implementing a system designed to ensure prompt disbursement rule compliance.[12]

70.    Even as early as mid-2012, Pierne expressed concern to the Director of Finance regarding the lack of available cash for FCC operations.  Pierne stated, "No way we are going to be able to sell running with $1.5 million in cash for the last six months of the year."  The Director of Finance responded that one option for increasing cash on hand would be "to push [Anthem's] T4 collection rate closer to 90 percent versus the current 87[.]"

71.    Throughout the post-acquisition life of FCC, Pierne repeatedly demanded that Title IV funds be drawn in order to generate cash for operational expenses.  As one example, on April 22, 2013, Pierne pushed Stewart to utilize drawdowns on Title IV funds to generate cash for payroll and other operational expenses: "We need to get cash in here this week.  It is a payroll week and we have rents to pay by next Tuesday."  In response, Stewart noted that she didn't "know what the DOE will say about our draws, so I will let you know about this week's funds

---

once we have the call at 2pm." Stewart invited Pierne to join the call with the DOE, to which Pierne responded that he "would prefer to be off the call."

72. As yet another example, on September 5, 2013, Pierne pressed Yousefi and Stewart to quickly draw down available Title IV funds to be applied toward operational expenses. Pierne stated, "Let's try for tomorrow please. I've got payroll going out today." When Stewart explained that the funds might not be available that quickly, Pierne asked her to confirm that her forecast for the next week would then increase by $1.1 million. He explained, "This is really important. I want to repay the remaining borrowings under the revolver and the answer to this question will drive the timing of repayment."

73. As noted in the Timeline, "The carried forward refunds caught up with us in December [2013] because of a no-revenue month, which forced [Stewart] to do a pre-draw to keep the float going."

74. A December 24-27, 2013 e-mail thread among Knobel, Pierne, and Yousefi illustrated how FCC senior management would openly and knowingly pre-draw funds based solely on FCC's short-term cash needs, and not based upon substantiated, or even projected, enrollment numbers at a given institution:

> Pierne (to Knobel): To ensure that we make payroll this week I am going to draw the remaining $600,000 available on the revolver today. That gives us about $1 million in cushion based on yesterday's cash forecast. I talked to Cid yesterday and he has over $9 million in T4 posted at COD for the January start and available to draw that on 12/30. I would like to do a pre-draw on this start to make sure we get some AP cleared prior to year end and to support cash on hand at the balance sheet date. My thought is to set the pre-draw amount after we prepare an updated forecast later this morning.
>
> Knobel (to Pierne): I would be inclined to use a bit of float and draw down on the various accounts to the minimums, but I don't know the details as well as you. I support your decision if you feel it is a necessity.

<u>Pierne (to Yousefi)</u>: Take a look at the attached forecast.  It shows about $1.2 million in T4 arriving between tomorrow and December 31.  Is any of that information accurate?  If not, I'm going to need to replace it with a pre-draw on the January start.  I'd like to keep the pre-draw low, so **$2 million** or so on 12/30 probably gets the job done…

<u>Yousefi (to Pierne)</u>: Jeff – we need to lower the projection by about $400k to $800k instead of $1.2m to come in by next Tue.

<u>Pierne (to Yousefi)</u>: If we disburse **$2.5 million** of funds from the January start to arrive on 12/30 and we collect all of the $800,000 in your earlier forecast, then we are good from a cash perspective until January 6, when we could pull the remaining Pell for the start. If you have a high level of confidence that the $800,000 will arrive on time, then please accelerate $2.5 million from the January start to arrive on December 30 (Monday).  If you have a low level of confidence in the ability to collect the $800,000, then let's draw **$3 million** from January to arrive on December 30.  I am trying to do only one early draw to make the back end reconciliation process easier.

<u>Yousefi (to Pierne)</u>: I'm thinking **$2.7M** just give us a little bit of cushion.  I don't fully understand Siana's formula [for determining how much to draw via G5] and feel better to have a little buffer.  If you are OK with that, then I'll arrange for the funds to get pulled down tomorrow morning … are you up for golf on Sat or Sun?

<u>Yousefi (to Financial Services Office Employee)</u>: We need to do a $2.7M draw against the DL [Direct Loans] from Phoenix, Bryman and possibly FCC OPEID.  Please … let me know the available balances for DL for each … OPEID so that we can decide on the breakdown.  It is important that we have the funds on Monday…

<u>Financial Services Office Employee (to Yousefi)</u>: Below are the balances for the OPEID's that you inquired about:
FCC DL 13/14 available balance - $28,121,756
Phoenix DL 13/14 available balance - $15,320,172
Bryman DL 13/14 available balance - $13,193,233.

<u>Yousefi (to Financial Services Office Employee)</u>: [L]et's use the following breakdown: $1M from FCC, $1M from Phoenix and $700K from Bryman…

<u>Pierne (to Knobel)</u>: We decided to pull $2.7 million from the January start on Monday.  That allows us to pay rents and clear some payables by year end.  It also covers us until we can pull the rest of the Pell…

> Knobel (to Pierne): So tight.  We need to think about a 6 month
> pause in capex for July to Dec and build up cash.

75.     Pierne knew this practice violated DOE regulations, as he signed off on a memo following FCC's acquisition of the Anthem Schools which was the product of an e-mail thread discussing how the practice of pre-drawing Title IV funds typically resulted in a prompt disbursement rule violation.  (*See*, *supra* ¶ 43.)

76.     That each of Yousefi, Pierne, and Knobel did not need an explanation of what the practice entailed or what the ramification of the same might be makes clear that by this time the practice had long become entrenched as a part of FCC's Title IV fund management strategy.[13]

77.     On March 6, 2014, Pierne wrote exclusively to Knobel, stating that they needed to discuss the cash forecast that day.  Pierne explained, "Cid's latest forecast takes T4 receipts for the rest of March from $16.9 million to $7.7 million, a $9.2 million reduction.  I am working with Cid to see if this can be increased because at this level I can't pay any payables until the end of the month."

78.     Despite the clear instruction from the DOE that FCC was to repay or substantiate approximately $20 million in unsubstantiated Title IV funds by the end of March or else lose the ability to draw Title IV funds without first substantiating them, Pierne continued—along with at least Knobel and Yousefi—to direct payment of operational expenses out of Title IV funds.  For example, on March 20, 2014, Pierne wrote to FCC's VP of Procurement and Development, copying Knobel, asking that he pay "critical project costs," as Pierne had "a bit more cash on hand than expected.  But I need to catch up with Cid on his updated draw plans."

---

[13] In undertaking its investigation prior to the filing of the original complaint, the Trustee was unable to obtain e-mail records for Knobel or Yawn from IEC Corp. (which took possession of FCC's e-mail records upon its acquisition of FCC's most valuable schools, discussed below), which appear to have been removed from FCC's records prior to IEC Corp.'s receipt of the same.

79.     On March 25, 2014, Pierne wrote to Knobel: "We received about $500,000 in net T4 proceeds today.  I think I am going to get Jeff Gray [a contractor] and Google paid today (about 4400,000 [*sic*] in total)."  Despite these payments, and Pierne's representation only five days earlier that he had "more cash on hand than expected," the DOE would determine by March 31, 2014 that FCC had failed to repay or substantiate the outstanding Title IV amounts.

5.     Title IV Fund "Kiting"

80.     Beginning in early December 2013, if not sooner, FCC abandoned the pretense of limiting draws to projected enrollments.  Instead, the Financial Services Office began drawing large amounts of Title IV funds at one or more OPEIDs to enable FCC to satisfy general business obligations, without regard to whether the funds could be substantiated and based upon DOE drawdown capacity, not realistic enrollment projections, and then used those draws, in part, to refund the bare minimum required by G5 before repeating with funds from one or more different OPEIDs. This practice persisted through February 2014, despite repeated DOE warnings concerning the consequences of the same (described below).

81.     Pierne and Yousefi had to have known about this practice because, as demonstrated above, Yousefi took instructions from Pierne regarding the amount of Title IV funds needed during a given period in order for FCC to satisfy its expenses for such period. Moreover, none of these draws would have taken place without Yousefi's explicit approval.

82.     On December 10, 2013, Yousefi wrote to Stewart, among others, exclaiming surprise at the amount of refunds due.  In response, Stewart replied, "We can offset the impact by pre-drawing some of next week's funds and not refunding some until next week.  I have been managing this because of the demand for funds."  As addressed in Section II.B.5, *infra*, the use of Title IV funds allocated to one OPEID to pay refunds due from a different OPEID was an impermissible use of such funds.

83.     Again in Yousefi's March 9, 2014 memo entitled "COD Reconciliation," he explained how FCC had been using pre-draw Title IV funds to pay back previous draws that it could not substantiate with proof of student enrollment:

- It all stems from not processing refunds timely, and being squeezed for cash last April.  And, not reconciling refunds and rejects, and doing pre-draws to cover them.
- The focus was to increase the authorization so we could pull down the funds, so refunds and rejects became secondary – Some of the $11M refunds from June [2013] was [*sic*] carried forward to July
- We were paying refunds when we had to, within 45 days, and at times were doing pre-draws to pay refunds
- In addition, we weren't processing rejects daily, so the money we pulled down for rejected students were not put back.  The average was about $1M - $2M that got floated from month to month. Having discussed with [Stewart] herself, Kim and Julande. Although the stories vary a bit, the common theme is that we were not reconciling refunds and rejects, so we were borrowing (pre-drawing) to pay the refunds when they were due.

84.     For example, on March 17, 2014, Yousefi wrote to the Corporate Director of Student Financing, asking how much "of what is due" belonged to FCC.  The Director replied that "all of it" did, and that "we took what we drew today from pell and springfirled [*sic*] and did the 30 days refunds as follows; 45k for anthem, 195 for Bryman…..we are left with 1.1 mil for fcc[.]"

85.     Three days later, on March 20, 2014, that same Director informed Yousefi that "we have about 50k we can draw today which we will send towards the 13/14 dl for fcc…….will do the same with whatever we get tomorrow."  Yousefi replied, "We should use what we generate Monday to paydown the $5M in COD 30 day[.]"

86.     The next day, Yousefi wrote to Knobel and Pierne: "As of today, we have processed and prepped about $7M for a draw on Monday to come in by Wed; I expect us to be over $8M by Monday.  With the above draw, we will be able to pay COD the $5M that is due from last week by Wed, which is good news!"

87.     The DOE cited this specific practice in explaining its decision to permanently revoke FCC's ability to draw Title IV funds under the advance payment method, as described below.

C.  FCC's Financial Reports to Management Suggest its Title IV Draws Violated DOE Regulations

88.     Based on FCC's internal monthly financial reports, as well as audited financial statements prepared by FCC's independent certified public accountants, management knew or should have known FCC was drawing far more in Title IV funds than it was entitled to under DOE regulations.

89.     Stagnant Enrollment Numbers.  FCC's records reflect that upon the acquisition of the Anthem Schools, monthly student headcount increased from approximately 4,000 to 12,000. However, thereafter monthly student headcount numbers fluctuated significantly but by and large remained stagnant and trended lower, a situation which would not support significant growth in Title IV draws (discussed below).

90.     Explosive Growth in A/R and Deferred Revenues.  Historically, accounts receivable ("A/R"), a component of gross revenues linked to Title IV draws, ranged from approximately $9-16 million per program year, or approximately 10-20% of FCC's total revenues.  However, during the 2012-13 program year, the first full program year following the acquisition of the Anthem Schools, A/R grew to approximately $74 million (far outpacing headcount growth), and comprised approximately 34% of total revenues.  Moreover, during the 2013-14 program year, during which headcounts and total revenues remained flat, A/R still grew to approximately $140 million, or approximately 66% of total revenues.  Deferred revenue, which is also linked to Title IV draws, also deviated from its historic norm and increased significantly during the 2012-13 and 2013-14 program years.

91.     <u>Significant Reduction in A/R Allowance</u>.  At the same time that FCC's financial reporting reflected major increases in A/R and deferred revenue, its records reflect a significant decrease in A/R allowance, representing the amount of A/R that FCC estimated writing off as uncollectible.  Ordinarily, a company's A/R allowance is determined by its past, actual collection records, and historically, FCC's allowance was 52-57%.  However, following the merger date this figure dropped to 21-25%, meaning FCC management represented it expected to collect roughly 30% more A/R after the merger with Anthem, which at the time was not profitable, and before FCC implemented any of its contemplated operational improvements at the Anthem Schools.  This allowance was increased to 35% for the 2013-14 program year, presumably because its 21-25% estimate proved wholly inaccurate.

92.     <u>Negative Cash Flow</u>.  Prior to the merger date, FCC had positive cash flow, after accounting for its expenses.  However, following the merger FCC's capital expenditures grew significantly as it invested in the buildout of new schools and additional capital expenditures.  As a result, FCC had negative cash flow during each of the 2011-12, 2012-13, and 2013-14 program year, which would explain why it anticipated running out of cash in August 2014, only a few months after it was forced to refund the Title IV funds it previously overdrew.

93.     <u>Divergence of Key Balance Sheet Items from Historic Norms</u>.  The divergence of each of A/R, deferred revenue, A/R allowance, and cash flow from their historic norms should have been cause for alarm for FCC's C-level officers (*i.e.*, Knobel, Pierne, Yawn, and Bartness), each of whom received monthly reports reflecting the foregoing, and in particular Pierne, the officer responsible for financial reporting.  At a minimum, management knew or should have known the significant growth in A/R and deferred revenue and corresponding decrease in A/R allowance in the face of stagnant enrollment numbers and revenue growth meant FCC was drawing far more in Title IV funds than permitted by DOE regulations.  However, management

ignored the problem and took no steps to investigate the foregoing or otherwise stem its practice of overdrawing Title IV funds.

### D. FCC's Drawdown Practices Resulted in a Covenant Breach under FCC's Credit Agreement

94.     Section 8.14(a) of that certain Credit Agreement ("Credit Agreement"), dated as of November 2, 2012, among FCC Holdings, Inc., as borrower, its debtor subsidiaries, as guarantors, Bank of Montreal, as agent, and the lenders party thereto, pursuant to which FCC borrowed approximately $30 million, included a covenant that FCC:

> comply in all respects with the requirements of all federal, state, and local laws, rules, and regulations … pertaining to its Property or business operations, where any such non-compliance … could reasonably be expected to constitute a Significant Regulatory Event or have a Material Adverse Effect.

95.     The Term "Property," in turn, includes intangible property such as access to Title IV funds under the advance payment method.

96.     In addition, "Significant Regulatory Event" includes "any material limitation of Title IV Program funding."

97.     Further, "Material Adverse Effect" includes "a material adverse change in, or material adverse effect upon, the operations, business … or financial condition of [FCC] or … a material impairment of the ability of [FCC] to perform [its] material obligations under [the Credit Agreement]."

98.     Each of the above-mentioned drawdown practices which violated DOE regulations also violated Section 8.14(a) of the Credit Agreement:

> (a)     the practice of drawing Title IV funds premised on inflated enrollment projections and pre-drawing funds violated DOE regulations prohibiting FCC from drawing Title IV funds in amounts greater than that required to satisfy tuition balances of currently enrolled students;

(b)     the persistent failure to report student withdrawals, or refund Title IV funds on account of the same, violated DOE regulations requiring the opposite;

(c)     the practice of treating access to Title IV funds under the advance payment method as an interest-free credit line and Title IV fund "kiting" during January and February 2014 in order to satisfy business expenses and refund requirements, not student tuition obligations, violated federal regulations requiring that FCC treat Title IV funds as trust funds; and

(d)     the failure to reconcile discrepancies between FCC's G5 draws and disbursement data reported to COD monthly violated federal regulations requiring monthly reconciliation.

*See* notes 1-4, *supra*.

E.     DOE Response to Drawdown Practices that Violated DOE Regulations

1.     2012-13 Program Year

99.     As a result of the foregoing (except for the Title IV fund "kiting"), on or about April 22, 2013 the DOE notified Stewart that FCC had unsubstantiated draws exceeding $15 million across all OPEIDs and availability under G5 at each OPEID would be reduced to $0 until FCC substantiated all of its prior draws.  The DOE further stated if FCC did not substantiate all prior draws by the end of May, none of its institutions would be eligible for advance draws of Title IV funds during the 2013-14 program year, and instead would need to substantiate before funds would become available via G5.

100.     Stewart attributed FCC's failure to substantiate its draws to malfunctioning financial aid management software (called "Regent 8") that was rolled out at the FCC and Anthem Schools in January and February 2013, respectively, and which Stewart alleged was not reporting disbursement data to COD accurately.

101.     However, the DOE rejected this excuse.  In its August 7, 2013 Program Review Report assessing compliance with DOE requirements at FCC's Atlanta campus, the DOE found that FCC inaccurately reported information to COD.  FCC's November 27, 2013 response to this finding stated disbursements the DOE identified as incorrect in its report "were processed using a

31

previous Financial Aid Management system and is not a reflection of our current systems and processes … we feel this was an isolated incident."   The DOE, in turn, stated as follows in its February 10, 2014 reply:

> [FCC's] response to this finding is unacceptable and inadequate … [FCC] must review COD reporting procedures to determine why disbursement dates and conflicting information reported are not accurate for its students … [FCC] must correct its procedures so that disbursement dates reported to COD are the dates that Federal Pell funds and Direct Loans are credited to the student's account or paid to the student directly … In addition, [FCC] must describe procedures that the institution will put in place in order to correct these deficiencies.

102.    Moreover, FCC's stated position that it could not reconcile because of a software malfunction was not credible.  In response to the FCC's April 22, 2013 notification, FCC hired ten temporary employees to manually reconcile student records to ensure Title IV fund award information was reported to COD.  In just one month's time, the Financial Services Office achieved full balance between COD and G5 at its three largest OPEIDs, which together represented 70% of the student population, via manual reconciliation.   FCC subsequently continued to manually reconcile in this manner until it successfully reimplemented Regent 8 (discussed below).

103.    Nevertheless, the DOE granted Stewart's request and agreed to award each OPEID an initial G5 funding level consistent with its historic norm for the subsequent program year upon elimination of its COD-G5 imbalance (which already occurred at the largest OPEIDs).

2.    2013-14 Program Year

104.    FCC hired Yousefi in June 2013 to, *inter alia*, supervise the Regent 8 reimplementation.

105.    Although the software was reimplemented across all OPEIDs by November 2013, a COD-G5 imbalance nevertheless reappeared at each OPEID due to FCC's drawdown practices.

106.   As a result of FCC's Title IV fund overdraws during the 2013-14 program year, its Financial Services Office believed that by January 28, 2014 its COD-G5 imbalance across all OPEIDs was approximately $10 million.

107.   On February 4, 2014, the DOE e-mailed John Murphy, who replaced Stewart on January 1, 2014 as Vice President of Financial Services (but reported to Yousefi) ("Murphy"), expressing concern about FCC's growing imbalance.

108.   In addition, on February 26, 2014, the DOE notified Murphy that FCC's three largest OPEIDs had over $15 million in unsubstantiated draws, and instructed FCC to promptly refund or substantiate the funds.

109.   No meaningful action was taken in response, and in fact, FCC pre-drew Title IV funds in advance of the March start date.

110.   On March 4, 2014, the DOE e-mailed Murphy and several other Financial Services Office employees requesting a conversation "regarding your [Direct Loan] processing and the weekly need to refund large sums of unsubstantiated funds for several of your schools." During this conversation, the DOE notified the FCC participants that the out-of-balance condition had grown to an unacceptable level and instructed them as follows:

> All of the [FCC and] Anthem Schools … need to be reconciled and have no funds unsubstantiated over 30 days by the end of March 2014 … [I]f by the end of March … we still see issues with drawing funds and not being able to submit records successfully to substantiate those funds then FSA will reduce the available balances for each of the schools to $0 which will place you in a position where you must successfully report Direct Loan disbursement records to COD prior to drawing any funding from G5.

111.   As a result, FCC had to stop drawing Title IV funds.  On March 18, 2014, Murphy notified the DOE FCC "refunded/posted disbursements in excess of $7M," but the next

day the DOE notified him FCC still had $13 million in unsubstantiated draws at the three largest OPEIDs.

112.    On March 31, 2014, the DOE notified Murphy that because substantial imbalances remained at the three largest OPEIDs, FCC's funding level under each OPEID would be reduced to $0, and each OPEID would need to substantiate disbursements via COD before Title IV funds would be available to draw via G5 for the 2014-15 program year.

## III.    FCC'S RESPONSE TO LOSS OF TITLE IV FUNDING

### A.  Replacement of CEO and COO with Restructuring Advisors

113.    During April 2014, FCC hired FTI as its restructuring advisor, Knobel was removed as director and CEO, and Yawn resigned.  Further, during this period Pierne was appointed to the Board.

### B.  Additional Debt

114.    To keep FCC afloat, FCC entered into an amended Credit Agreement, dated as of April 29, 2014, pursuant to which loans under FCC's 2012 Credit Agreement were subordinated to $15 million in new loans from FCC's private equity fund owners and a third party.

### C.  Delay of Payments to Creditors

115.    To manage its liquidity, FCC delayed payments to creditors, and even delayed payroll scheduled for April 4, 2014.  Knobel lied to his employees when he explained the delay was due to a "temporary disruption in funding our operating accounts" brought on by capital expenditures that would ensure the company's success.

### D.  Attempts to Resolve Outstanding DOE Obligations

116.    In the meantime, management scrambled to substantiate or refund Title IV funds it previously drew to avoid potential penalties associated with failing to repay trust funds.  By the

end of April 2014, management believed it resolved nearly all outstanding balances at its three largest OPEIDs.

117.    Further, in or about June 2014, at FTI's recommendation FCC commenced using software which automatically searched FCC's COD records for inconsistencies with FCC's internal records, which FCC had not previously used even though the Federal Student Aid Handbook recommends use of such software to discover/address discrepancies.  Based on this analysis, FCC concluded it owed the DOE approximately $2.5 million in additional reconciliation-related obligations which it refunded.

118.    Notwithstanding the foregoing, the DOE subsequently filed a proof of claim against FCC Holdings, Inc. stating it still owed approximately $32 million and $1.4 million in unpaid Pell Grant and Direct Loan obligations, respectively, under four OPEIDs.

### E.  Sale of FCC's Schools

119.    FCC anticipated running out of cash in August, and commenced marketing its schools on or about June 15, 2014.

120.    Following preliminary discussions, FCC signed confidentiality agreements with five potential purchasers.

121.    FCC entered into a two-step asset purchase agreement with IEC Corp., dated as of August 21, 2014.  Step 1 involved the pre-bankruptcy sale of the FCC Schools and their OPEID. Step 2 involved the sale of the US Colleges and, subject to FCC receiving certain DOE change of control approvals by August 29, 2014, the sale of nine Anthem Schools and their four respective OPEIDs.

122.    Consideration for the transaction was $1 million in cash, a $1 million lender consent fee payable to Bank of Montreal, as agent under its Credit Agreement, the funding of

certain expenses to enable FCC to operate parts of its business through closing, and the assumption of certain liabilities (*i.e.*, DOE liabilities associated with the purchased OPEIDs).

123.    In addition, on August 22, 2014 FCC sold three Anthem Schools and the OPEID under which they operated to Premier Education Group, L.P.   Consideration for this transaction was a $150,000 lender consent fee and the assumption of certain liabilities (*i.e.*, DOE liabilities associated with the purchased OPEID).

124.    On August 26, 2014, FCC commenced a chapter 11 case.

125.    FCC did not receive the DOE approvals required to consummate the sale of the nine Anthem Schools which were the subject of the Step 2 sale to IEC by August 29, 2014.  As a result, FCC was unable to monetize these nine schools and the ten Anthem Schools which were not the subject of the IEC or Premier transactions, which were either closed or taught out.[14]

## CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY OF CARE
### (All Defendants)

126.    The Trustee incorporates by reference each allegation in the foregoing paragraphs.

127.    Defendants owed a fiduciary duty of care *to FCC*.   A fiduciary duty of care requires officers and directors to perform their duties free of gross negligence by using the amount of care that ordinarily careful and prudent officers would use in similar circumstances and by making business decisions considering all material information reasonably available. Defendants breached this duty, resulting in the loss of the one thing necessary for FCC to survive: access to Title IV funds.

---

[14] A "teach out" arrangement is one whereby a school closes, but another (typically unaffiliated) school accepts students from programs offered by the closed school so that they may continue their education without interruption.

128.    Knobel and Pierne violated their duty of care by directing the Financial Services Office to pre-draw Title IV funds, unrelated to student needs, which necessarily violated the prompt disbursement rule and risked the DOE eliminating FCC's ability to draw Title IV funds at all.  Those funds were crucial to FCC, as they made up 90% of its revenue.  Both Knobel and Pierne were aware that a potential consequence of violating these regulations was loss of funding, as FCC had suffered that exact consequence in May 2013 when it was first caught by the DOE.

129.    Furthermore, Knobel and Pierne both knew that taking actions that violated the terms of FCC's credit agreement, such as failing to "comply in all respects with the requirements of all federal, state, and local laws, rules, and regulations," would risk Bank of Montreal cancelling FCC's loan and requiring FCC to repay the balance immediately.  If FCC were already struggling to meets its cash needs, a careful and prudent officer would not risk exacerbating the situation by simultaneously violating the terms of his company's credit agreement.

130.    Even when the Defendants were drawing down Title IV funds based on projected student enrollment and refunding funds based on withdrawal reports, Knobel, Pierne, Stewart, Yawn, and Yousefi were all still violating their duty of care because they were submitting information from and relying on reporting systems that they knew were inaccurate.  When FCC had been caught improperly drawing, substantiating, and refunding Title IV funds by the DOE in May 2013, it struggled to reconcile the funds it drew down with student data, in part, because STARS and the Regents 8 system were not able to accurately transmit information from one to another.  Thus, it was impossible for Regents 8 to accurately reconcile funds drawn with student enrollment data.  Furthermore, STARS was discovered to have a number of inaccuracies regarding student enrollment.  The failure of these systems required FCC to hire temporary staff

for the sole purpose of manually reconciling student data with funds drawn, a process which took months.  Yet once FCC had reconciled and was allowed to draw Title IV funds in advance again, Knobel, Pierne, Stewart, Yawn, and Yousefi made decisions based on the same, inaccurate information from failed systems as they had done before the DOE investigation.

131.    Yawn went back to submitting inflated projections of student enrollment, which was used to determine DOE funding amounts, and submitting inaccurate withdraw numbers. Yawn worked with Yousefi on trying to fix technology systems at FCC, but they never completed this project.  Thus, Yawn was aware that prior to the DOE permanently cutting off FCC's ability to pre-draw Title IV funds in March 2014, these systems had never been fixed, and yet he allowed the Financial Services Office to continue to base Title IV draws off of incorrect information.  Moreover, Yawn's systematic failure to accurately report student withdrawals from FCC, which would have resulted in the need to refund Title IV funds, resulted in FCC retaining tens of millions of dollars in Title IV funds which FCC could not substantiate but was required to refund under DOE regulations.

132.    Stewart and Yousefi, who oversaw the drawdown and refund of Title IV funds, went back to using the inaccurate information from STARS and Regents 8 to request and refund Title IV funds, even though they knew the enrollment data was inaccurate and, even if it had been accurate, was also not being correctly transmitted to Regents 8 for reconciliation. Additionally, they further caused the resulting imbalance to spiral out of control by also failing to reconcile G5 draws with disbursement data reported to COD on a monthly basis, as required by DOE regulations.

133.    At the same time, Knobel and Pierne went back to setting budgets and making capital expansion plans based on cash flow projections from systems they knew had never been fixed after the DOE investigation revealed their failure to accurately project enrollment,

withdrawals, funding, and refunds.  They too had been involved in the previous manual reconciliation process at the end of the 2012-13 school year and so were also aware that the technology systems resulted in millions of dollars of overdraws and insufficient refunds.

134.   Bartness was responsible for ensuring compliance with DOE regulations. Although FCC temporarily lost access to Title IV funds during the 2012-13 program year as a result of its failure to draw, substantiate, or refund Title IV funds in accordance with DOE regulations, he did not take any action to remedy the situation the following program year and ensure that those who oversaw the technology systems and the Financial Services Office were producing and using reliable information that would keep FCC compliant with DOE regulations.

135.   The foregoing acts and omissions by Defendants also caused FCC to breach the terms of its 2012 Credit Agreement.

136.   As a result of Defendants' fiduciary duty breaches *to FCC*, FCC suffered damages in an amount to be determined after trial, but not less than $150 million.  The Trustee, as FCC's assignee, commenced this action to recover the same as the judicial substitute for FCC and for the benefit of FCC and its bankruptcy estate.

137.   The Trustee is entitled to judgment against all Defendants, jointly and severally, *for damage caused to FCC*.

138.   In addition, Defendants' conduct has demonstrated the high degree of moral turpitude and wanton dishonesty directed at the DOE, FCC's students, and the public at large such that an award of punitive damages is also warranted in an amount to be determined after trial.

## SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY OF LOYALTY
### (All Defendants)

139.  The Trustee incorporates by reference each allegation in the foregoing paragraphs.

140.  Defendants owed a fiduciary duty of loyalty *to FCC*. A fiduciary duty of loyalty encompasses both a requirement that officers and directors monitor the business in good faith and that they refrain from engaging in illegal or self-dealing conduct. Defendants breached this duty, resulting in the loss of the one thing necessary for FCC to survive: access to Title IV funds.

141.  Knobel, Pierne, Yawn, Bartness, and Stewart all had stock options or vested stock and would financially benefit if FCC had achieved its goals of expanding rapidly and then selling its schools at the predicted valuation that reached as high as $450-500 million. Knobel, in particular, would have netted over 10% of the proceeds of such a sale, which could have amounted to as much as $45-50 million for him personally. Knobel, Pierne, Yawn, Bartness, and Stewart breached their duty of loyalty by engaging in or, at least, ignoring the improper draw of Title IV funds to fund expansion of campuses and programs.

142.  Knobel, Pierne, and Stewart also violated the duty of loyalty by engaging in illegal conduct. They drew down Title IV funds unrelated to even the flawed student data that was provided in violation of DOE regulations. In consultation with Knobel, Pierne repeatedly requested that Stewart draw down additional Title IV funds in a transparent attempt to use access to Title IV funds under the advance payment method as an interest-free credit line to satisfy business expenses, all in contravention of DOE regulations requiring that such funds be held in trust, disbursed within three days to satisfy current students' tuition obligations, and otherwise refunded to the DOE. After receiving Pierne's requests, Stewart would then direct employees to

pre-draw hundreds of thousands of dollars, sometimes more than a million dollars at one time, in Title IV funds beyond what was available based on the inaccurate student enrollment information.

143.    Stewart and Yousefi further violated the duty of loyalty by failing to reconcile G5 draws with disbursement data reported to COD on a monthly basis, as required by DOE regulations.  This not only enabled the resulting imbalance to spiral out of control, it resulted in FCC subsequently having to refund millions of dollars in legitimate Title IV fund draws that were not timely substantiated pursuant to 34 C.F.R. § 668.164.

144.    In addition, Pierne, Stewart, and Yousefi aggravated the resulting imbalance by directing that the Financial Services Office engage in conduct which amounted to Title IV fund "kiting," in which Title IV funds would be pre-drawn in the name of one institution in order to pay part of the refund owed by another institution in an attempt to prevent the DOE from being alerted to the overdraws, in contravention of DOE regulations requiring that such funds be held in trust and used only to satisfy current students' tuition obligations.

145.    In the alternative, if the Defendants did not know their actions violated DOE regulations it is because they consciously failed to monitor or oversee FCC's operations. Knobel, the CEO, and Pierne, the CFO, were responsible for monitoring the financial condition of FCC and, to that end, regularly received financial reports both in the form of informal cash flow or budget reports and formal audited financial statements.  Based on these reports, they should have known FCC's draws did not comply with DOE regulations because major anomalies in FCC's financial reporting indicated as much.

146.    In addition, all of the Defendants utterly failed to implement systems and procedures or employ qualified personnel to ensure the technologies systems accurately reported information, the Financial Services Office's draw down procedure complied with DOE

regulations, Title IV funds were kept separate in trust to be used for student tuition, and refunds were accurately processed in the time period required by the DOE.  The result was improper overdraws of Title IV funds, an inability to substantiate the money drawn down, improper use of the Title IV funds, and, as a natural consequence, an inability to refund the amounts that were owed back to the DOE.

147.    The foregoing acts and omissions by Defendants also caused FCC to breach the terms of its 2012 Credit Agreement.

148.    As a result of Defendants' fiduciary duty breaches *to FCC*, FCC suffered damages in an amount to be determined after trial, but not less than $150 million.  The Trustee, as FCC's assignee, commenced this action to recover the same as the judicial substitute for FCC and for the benefit of FCC and its bankruptcy estate.

149.    The Trustee is entitled to judgment against all Defendants, jointly and severally, *for damage caused to FCC*.

150.    In addition, Defendants' conduct has demonstrated the high degree of moral turpitude and wanton dishonesty directed at the DOE, FCC's students, and the public at large such that an award of punitive damages is also warranted in an amount to be determined after trial.

## **PRAYER FOR RELIEF**

WHEREFORE, the Trustee requests that this Court enter judgment in its favor against all Defendants, jointly and severally and in the amount determined after trial, but not less than $150 million, plus attorneys' fees and costs, prejudgment interest, and punitive damages, together with such other and further relief as this Court deems just and proper.

Dated: June 28, 2017

Respectfully submitted,

 /s/ Brian S. Dervishi_____
Brian S. Dervishi
WEISSMAN & DERVISHI, P.A.
SunTrust International Center
One Southeast Third Avenue
Suite 1700
Miami, Florida 33131
(305) 347-4070
bdervishi@wdpalaw.com
service@wdpalaw.com

- and -

Bijan Amini
Avery Samet
Jeffrey Chubak
STORCH AMINI PC
2 GRAND CENTRAL TOWER
140 EAST 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@samlegal.com
asamet@samlegal.com

*Attorneys for Plaintiff Clingman &*
*Hanger Management Associates, LLC,*
*as Trustee*