# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CLINGMAN & HANGER MANAGEMENT ASSOCIATES, LLC as Trustee | CASE NO. 16-CV-62028-JAL-JG |
| Plaintiff, | |
| v. | |
| DAVID KNOBEL, JEFFREY PIERNE, NEAL YAWN, DEAN BARTNESS, SIANA STEWART and CID YOUSEFI | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS DAVID KNOBEL, JEFFREY PIERNE, NEAL YAWN, DEAN BARTNESS, SIANA STEWART, AND CID YOUSEFI'S MOTION TO DISMISS AMENDED COMPLAINT

CASE NO. 16-CV-62028-JAL-JG

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii
I.      Introduction ............................................................................................................. 1
II.     Choice of Law ......................................................................................................... 2
III.    Standards of Review ............................................................................................... 2
        A.      Motion to Dismiss ....................................................................................... 2
        B.      Business Judgment Rule .............................................................................. 2
IV.     Argument ................................................................................................................. 3
        A.      Plaintiff has failed to state a claim for breach of the duty of loyalty. ....... 3
                1.      Plaintiff failed to allege Defendants knowingly violated
                        regulations. ...................................................................................... 5
                2.      Plaintiff has failed to allege any "red flags". ................................. 8
                3.      The Department of Education's interactions with FCC constituted
                        a "green flag" approval of Defendants' conduct ............................ 10
                4.      Defendants cannot be held personally liable because their software
                        malfunctioned. ............................................................................... 12
                5.      Defendants' alleged actions did not cause FCC to collapse, let
                        alone cause the claimed $150 million-plus in damages ................. 14
                6.      Plaintiff failed to allege any self-dealing. ................................... 15
                7.      Plaintiff's claims do not improve when evaluated on an individual
                        basis ................................................................................................ 16
        B.      Plaintiff has failed to state a claim for breach of the duty of care. ......... 17
        C.      Plaintiff's action is time-barred. .............................................................. 20
        D.      Knobel and Pierne's actions are protected by FCC's exculpatory clause. .......... 22
        E.      Stewart and Yousefi were not fiduciaries. ............................................... 23
        F.      Plaintiff failed to state a claim for breach of the credit agreement ......... 25
V.      Conclusion ............................................................................................................ 25
VI.     Request for Hearing .............................................................................................. 26
CERTIFICATE OF SERVICE ........................................................................................... 27

i

CASE NO. 16-CV-62028-JAL-JG

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*100079 Canada, Inc. v. Stiefel Labs., Inc.*,
   596 F. App'x 744 (11th Cir. 2014) ......................................................................20

*Anic v. DVI, Inc.*,
   2002 WL 31804014 (N.D. Ill. Dec. 13, 2002) ......................................................24

*Brautigam v. Rubin*,
   55 F. Supp. 3d 499 (S.D.N.Y. 2014) ....................................................................10

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) ....................................................................................18

*Cede & Co. v. Technicolor, Inc.*,
   634 A.2d 345 (Del. 1993) ....................................................................................16

*Cliff v. Payco Gen. Am. Credits, Inc.*,
   363 F.3d 1113 (11th Cir. 2004) ...........................................................................21

*David B. Lilly Co. v. Fisher*,
   810 F. Supp. 592 (D. Del. 1992), *vacated on other grounds*,
   18 F.3d 1112 (3d Cir. 1994) ................................................................................20

*Fuston v. Florida*,
   2013 WL 937575 (M.D. Fla. Mar. 11, 2013) ...............................................21, 22

*Gagliardi v. TriFoods Int'l, Inc.*,
   683 A.2d 1049 (Del. Ch. 1996) ...........................................................................18

*Gaskins v. Nahmad*,
   2017 WL 1335166 (S.D. Fla. Jan. 19, 2017) ........................................................4

*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003)...............................................................................9

*In re Capital One Derivative S'holder Litig.*,
   979 F. Supp. 2d 682 (E.D. Va. 2013) ..................................................................15

*In re Caremark International Inc. Derivative Litigation*,
   698 A.2d 959 (Del. Ch. 1996)........................................................................ *passim*

ii

*In re China Auto. Sys. Inc. Derivative Litig.*,
  2013 WL 4672059 (Del. Ch. Aug. 30, 2013) ............................................................4, 10, 16

*In re Citigroup Inc. S'holder Derivative Litig.*,
  964 A.2d 106 (Del. Ch. 2009)........................................................................................15, 18

*In re Dean Witter P'ship Litig.*,
  1998 WL 442456 (Del. Ch. July 17, 1998)..........................................................................20

*In re Gen. Motors Company Derivative Litig.*,
  2015 WL 3958724 (Del. Ch. June 26, 2015),
  *aff'd sub nom. In re Gen. Motors Co. Derivative Litig.*,
  133 A.3d 971 (Del. 2016) ....................................................................................................13

*In re Massey Energy Co.*,
  2011 WL 2176479 (Del. Ch. May 31, 2011) .......................................................................11

*In re Orchard Enterprises, Inc. Stockholder Litig.*,
  88 A.3d 1 (Del. Ch. 2014)......................................................................................................2

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2006) ......................................................................................................17

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005)...........................................................................................2, 16

*Ironworkers Dist. Council v. Andreotti*,
  2015 WL 2270673 (Del. Ch. May 08, 2015) .......................................................................14

*Kaye v. Lone Star Fund V (U.S.), L.P.*,
  453 B.R. 645 (N.D. Tex. 2011)...............................................................................................2

*Kerns v. Dukes*,
  2004 WL 766529 (Del. Ch. Apr. 2, 2004) ...........................................................................21

*La. Mun. Police Empls.' Ret. Sys. v. Pyott*,
  46 A.3d 313, 340 (Del. Ch. 2012)........................................................................................11

*Lyondell Chem. Co. v. Ryan*,
  970 A.2d 235 (Del. 2009) ....................................................................................................25

*Melbourne Mun. Firefighters' Pension Trust Fund
  on Behalf of Qualcomm, Inc. v. Jacobs*,
  2016 WL 4076369 (Del. Ch. Aug. 1, 2016) ................................................................ *passim*

*Mills Acquisition Co. v. Macmillan, Inc.*,
  559 A.2d 1261 (Del. 1989) ....................................................................................................2

iii

*Mitchell Lane Publishers, Inc. v. Rasemas*,
  2014 WL 4925150 (Del. Ch. Sept. 30, 2014) ...................................................23, 24

*Mukamal v. Bakes*,
  378 F. App'x 890 (11th Cir. 2010) ...........................................................2, 3, 19

*Oklahoma Firefighters Pension & Ret. Sys. v. Citigroup Inc.*,
  2015 WL 1884453 (Del. Ch. Apr. 24, 2015) ...........................................................4

*On Top Records Corp. v. Sunflower Entm't Co.*,
  2015 WL 13264222 (S.D. Fla. Sept. 24, 2015) ........................................................21

*Science Accessories Corp. v. Summagraphics Corp.*,
  425 A.2d 957 (Del. 1980) ...................................................................................24

*Silvin v. GEICO Gen. Ins. Co.*,
  2012 WL 12875879 (S.D. Fla. Aug. 16, 2012).........................................................2

*South v. Baker*,
  62 A.3d 1 (Del. Ch. 2012)..............................................................8, 9, 12, 14

*Staehr v. Miller*,
  2010 WL 11030716 (S.D. Fla. Mar. 31, 2010)....................................................9, 10

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
  911 A.2d 362 (Del. 2006) ...........................................................................3, 4, 17

*Strong ex rel. Tidewater, Inc. v. Taylor*,
  877 F. Supp. 2d 433 (E.D. La. 2012) ......................................................................4

*Tow v. Amegy Bank N.A.*,
  976 F. Supp. 2d 889 (S.D. Tex. 2013) ............................................................23, 24

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
  906 A.2d 168 (Del. Ch. 2006).........................................................................2, 16

*Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,
  2009 WL 1387115 (Del. Ch. May 18, 2009)..........................................23, 24, 25

*Wayne v. Jarvis*,
  197 F.3d 1098 (11th Cir. 1999) ........................................................................22

*Wood v. Baum*,
  953 A.2d 136 (Del. 2008) .....................................................................8, 9, 10, 17

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

CASE NO. 16-CV-62028-JAL-JG

**STATUTES**

8 Del. C. § 102(b)(7)....................................................................................................................23

11 U.S.C. §108(a)(2)....................................................................................................................21

**OTHER AUTHORITIES**

34 CFR § 668.163(d)(1)..................................................................................................................8

Fed. R. Civ. P. 12...........................................................................................................................2

Fed. R. Civ. P. 15....................................................................................................................22, 23

Local Rule 7.1(b)(2).....................................................................................................................26

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

CASE NO. 16-CV-62028-JAL-JG

I.    **Introduction**

      This case is about a bankruptcy trustee's attempt to second-guess a company's management after a bankruptcy.[1] The reality is that FCC Holdings, Inc. ("FCC"), like many for-profit colleges, suffered a reversal of financial fortune in recent years. There were many reasons for the bankruptcy, including inadequate capitalization, an unfavorable regulatory environment, and the lasting effects of the Great Recession. But none of these reasons provide a basis to blame—much less assess personal and monetary liability against—Defendants.[2]

      In asserting claims for breach of fiduciary duty against Defendants, Plaintiff has assumed a heavy burden in pleading that management both knowingly violated Department of Education ("DOE") regulations and acted in bad faith to harm FCC. Delaware courts refer to such claims as "possibly the most difficult" claims to advance in all of corporate law due to the business judgment rule and the scienter requirement. Plaintiff cannot carry this heavy burden, especially where there is no allegation of self-dealing or motive to injure the company. Moreover, even if Plaintiff had stated a claim and overcome the business judgment rule, its action should still be dismissed as time-barred. Finally, certain Defendants are protected by FCC's exculpatory provision, and other Defendants are not fiduciaries in the first place. For these reasons, Plaintiff's case should be dismissed with prejudice.

---

[1] Department of Education data reveals that FCC's closure was just one of many. *See* http://www2.ed.gov/offices/OSFAP/PEPS/closedschools.html (click on "Closed School Search File"). In 2014—the year FCC declared bankruptcy—550 schools closed. This followed the closure of 680 schools in 2013 and 944 schools in 2012.

[2] This Memorandum is written in support of the Motion to Dismiss for Defendants David Knobel (director and CEO), Jeffrey Pierne   (director and CFO), Neal Yawn (COO), Dean Bartness (CCO), Siana Stewart (not a director or an officer), and Cid Yousefi (not a director or an officer).

1

CASE NO. 16-CV-62028-JAL-JG

**II.   Choice of Law**

Under the internal affairs doctrine, Florida defers to the law of the state of incorporation on the issue of fiduciary duties. *See Mukamal v. Bakes*, 378 F. App'x 890, 896–97 (11th Cir. 2010). FCC was incorporated in Delaware. *See* Exhibit A (FCC's corporate charter).

**III.   Standards of Review**

**A.   Motion to Dismiss**

"In evaluating a motion to dismiss, courts adopt a two-pronged approach whereby they first (1) eliminate any allegations in the complaint that are merely legal conclusions and then (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Silvin v. GEICO Gen. Ins. Co.*, 2012 WL 12875879, at *2 (S.D. Fla. Aug. 16, 2012) (citations and internal quotation marks omitted).

**B.   Business Judgment Rule**

Another standard of review—or, more accurately, non-review—applies here. "Delaware's default standard of review is the business judgment rule, a principle of non-review[.]" *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 33–34 (Del. Ch. 2014). The rule requires "a presumption that in making a business decision the [management] of a corporation acted on an informed basis and in the honest belief that the action taken was in the best interests of the company and its shareholders." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746–47 (Del. Ch. 2005) ("*Disney II*"). And "because . . . [the business judgment rule] is so powerful . . . [it] frequently is determinative of the outcome[.]" *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989). The rule applies to management in addition to directors. *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.,* 906 A.2d 168, 193 (Del. Ch. 2006). Plaintiff must carry its burden to "plead around" the business judgment rule, *see Kaye v.*

2

*Lone Star Fund V (U.S.), L.P.,* 453 B.R. 645, 679 (N.D. Tex. 2011) (citing Delaware law), or else its case must be dismissed. *Mukamal*, 378 F. App'x at 899 (affirming dismissal).

## IV.    Argument

Plaintiff's claims fail for several different reasons. First, as set forth in Part IV.A, Plaintiff has failed to state a claim for breach of the duty of loyalty. Second, as set forth in Part IV.B, Plaintiff has failed to state a claim for breach of the duty of care. Third, as set forth in Part IV.C, this action is time-barred. Fourth, as set forth in Part IV.D, Knobel and Pierne are protected by the exculpatory clause in the corporate charter. Fifth, as set forth in Part IV.E, Stewart and Yousefi were not fiduciaries in the first place. Finally, as set forth in Part IV.F, the credit covenant claim is dependent upon the fiduciary claims.

### A.    Plaintiff has failed to state a claim for breach of the duty of loyalty.

In claiming that Defendants are liable because they failed to ensure compliance with DOE regulations, Plaintiff assumes a heavy burden that it cannot carry. A plaintiff cannot simply allege that a company fell out of regulatory compliance; instead, it must show **intent** to violate the law **and** a **bad faith motive**. But the allegations fall short of showing that Defendants consciously violated the law, let alone that they did so with bad faith intent.

Claims such as Plaintiff's that allege "[a] breach of fiduciary duty . . . that seek[] to hold [management] accountable for the consequences of a corporate trauma [are] known colloquially as a *Caremark* claim." *Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *7 (Del. Ch. Aug. 1, 2016) (citing *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996)). "The claim is that the [management] allowed a situation to develop and continue which exposed the

3

corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." *Id.*; *see also* Am. Compl. ¶¶140, 145.

In *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006), the Delaware Supreme Court adopted and refined the *Caremark* test, holding defendants liable only where they: (a) "**utterly** failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, **consciously** failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370 (emphasis added).

Under the second prong, a plaintiff must show: "(1) that [management] **knew** . . . that the corporation was violating the law, (2) that [management] acted in **bad faith** by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation." *Qualcomm*, 2016 WL 4076369, at *8 (emphasis added). Notably, *Caremark* claims "require[] a plaintiff to show that management 'knew that they were not discharging their fiduciary obligations' i.e., **bad faith**—as a 'necessary condition[] predicate for [management] oversight liability,' it has been considered '**possibly the most difficult theory in corporation law**[.]'" *In re China Auto. Sys. Inc. Derivative Litig.*, 2013 WL 4672059, at *7 (Del. Ch. Aug. 30, 2013) (quoting *Stone*, 911 A.2d at 372) (footnotes omitted) (emphasis added).

The combination of having to show that Defendants **consciously** violated the law in **bad faith** or **utterly** failed to implement reporting systems has rendered "*Caremark* claims . . . among the **hardest to plead successfully**." *Oklahoma Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, 2015 WL 1884453, at *5 (Del. Ch. Apr. 24, 2015) (emphasis added). *See also, e.g., Gaskins v. Nahmad,* 2017 WL 1335166, at *7 (S.D. Fla. Jan. 19, 2017) (dismissing *Caremark* claim). Plaintiff falls well-short of these pleading standards.

4

1.      *Plaintiff failed to allege Defendants knowingly violated regulations.*

In its count for breach of the duty of loyalty, Plaintiff never properly alleges that Defendants "knowingly" engaged in illegal conduct, let alone that they acted in bad faith with a motive, both of which are necessary *Caremark* elements. Am. Compl. ¶142. Moreover, the only inference one can plausibly draw from Plaintiff's allegations is that Defendants tried to comply with technical governmental regulations, but were not always able to do so in the face of mounting technical difficulties beyond their control. Plaintiff simply has not satisfied its *Caremark* pleading burden.

For example, in a futile attempt to show that Defendants consciously violated regulations, Plaintiff relies on various alleged statements made by Defendants (and, often, non-Defendants), starting with enrollment projections. But merely pointing out that projected enrollment figures did not always match actual enrollment does not allege the requisite scienter; indeed, it does not show that Defendants **knew** the projections were wrong, much less that they violated DOE regulations intentionally, **or even at all**. *Id.* ¶¶46–53. The most this Court could infer from these allegations is that, like most companies in the for-profit college industry, FCC struggled to meet its enrollment targets as the economy was slumping.

Plaintiff also points to after-the-fact "findings" by a consultant reviewing the company's conduct, but *ex post facto* statements shed no light on the question of whether Defendants intentionally violated the law **at the time** they acted. *Id.* ¶¶48–49. In addition, Plaintiff's allegations regarding the unapproved PCT program have nothing to do with the DOE's purported decision to cut off Title IV funding or anything else pertinent to this case. *Id.* ¶¶50–53.

Similarly, Plaintiff's allegations that Defendants underreported withdrawals, even if true, do not plausibly show that Defendants did so purposefully. *Id.* ¶¶54–65. Plaintiff first cites to an

5

email from Stewart for the proposition that drawdowns were not based upon student enrollment. *Id*. ¶56. But when Yousefi asked Stewart whether the drawdown process "would be tied to a roster, so you can always balance," Stewart confirmed that the process "is based on the roster." *See id*. Her further comment about using the availability in the G5 system is fully consistent with drawdowns based on the roster. *Id*. Thus, contrary to Plaintiff's baseless assertion that Knobel, Pierne, and Stewart (but no others) drew down Title IV funds simply based on cash flow needs and not projected enrollment (*id*. ¶142), the allegations provide no plausible inference that any increased collection rates were detached from the roster.

Plaintiff also relies upon memoranda from Yousefi, but these allegations simply demonstrate Defendants' efforts to cope with software issues. The July 2013 "Timeline," for instance, simply confirms that any violations of the prompt-disbursement rule were the result of honest "struggle[s]" by the financial aid team, rather than bad faith acts. *Id*. ¶63. Similarly, Yousefi's email explaining that FCC did not possess "a silver bullet" for their problems highlights the intractable nature of the software issues. *Id*. ¶65.

Plaintiff also alleges that Stewart and Yousefi (the two non-fiduciaries, as described below in §IV.E) failed to reconcile COD-G5 discrepancies every month. *Id*. ¶143. But Plaintiff's allegations on this point (which only concern Yousefi and Yawn) do not show that either Defendant knowingly violated any regulation. *Id*. ¶67–68. At worst, these documents show only that the reconciliations were "cursory" and incomplete.

Plaintiff further claims that Defendants violated the prompt disbursement rule without alleging enough to show any violation, let alone a knowing one. *Id*. ¶¶69–79. Plaintiff first relies upon a non-Defendant's proposal that Anthem increase its collection rate. Plaintiff fails to allege, however, that Anthem lacked enrollment projections to justify this collection. *Id*. ¶70. Worse

6

still, Plaintiff does not even allege—nor does anything in the email chain show—that the "option" of raising the collection rate was actually exercised.

Plaintiff then dedicates well over a page to a single email string between Pierne, Knobel, Yousefi, and another unnamed employee. *Id.* ¶74. But Plaintiff never alleges that the draw-down was not based upon projected enrollment figures, let alone that any Defendants were consciously aware that their proposed plan of action would have violated regulations. Indeed, Plaintiff acknowledges that there was no "explanation of what the practice entailed or what the ramification of the same might be"; in other words, Plaintiff squarely admits that Defendants were not conscious of the purported ramifications.

Even assuming *arguendo* that the practice did run afoul of a regulation (which it did not), pleading ignorance on the part of Defendants falls far short of Plaintiff's burden: **namely, a bad-faith, intentional violation of law**. *Id.* ¶76. And the reason that there was no such "explanation" was because there was nothing nefarious about a draw-down based upon the roster, or using the funds to "pay rents and clear some payables by year end." *Id.* at 24. As the complaint elsewhere admits, how Title IV funds are ultimately spent is up to the institution. Thus, while Plaintiff may now argue that "capital expenditures or debt repayment . . . are **more appropriately** funded through the sale of equity interests or issuance of long term debt" (emphasis added), that is precisely the type of second-guessing barred by the business judgment rule. *See id.* ¶77-78 & n.6. And Plaintiff's retrospective criticism of Defendants' financial decisions does not stop there— Plaintiff goes so far as to contend that Title IV funds must be held in a separate trust. Yet Plaintiff's own authorities explicitly state that this is not required. *See* 34 CFR § 668.163(d)(1).

Plaintiff next attempts to manufacture a regulatory violation based on Defendants' supposed "kiting" of Title IV funds. Am. Compl. ¶¶80–87 and 144. In brief, Plaintiff claims that

Pierne, Stewart, and Yousefi (but no others) drew down Title IV funds at one OPEID to make refunds under another OPEID. Plaintiff, however, fails to cite which—if any—DOE regulation would have been violated by doing so. Am. Compl. ¶¶ 80 and 144. Instead, Plaintiff merely states that the DOE repeatedly warned about the consequences of the alleged practice. Plaintiff failed to then show when and how the DOE issued these warnings, and incorrectly stated that the DOE "cited this specific practice in explaining its decision to permanently revoke FCC's ability to draw Title IV funds under the advance payment method."

> 2.   _Plaintiff has failed to allege any "red flags"._

Given Plaintiff's failure to allege any insight into Defendants' states of mind under Delaware law, Plaintiff must instead point to obvious "red flags" ignored by Defendants in order to warrant the inference that they consciously violated the regulations. *See Baker,* 62 A.3d at 15. But the only "red flags" the complaint possibly refers to are financial reports that supposedly "should" have put Defendants on notice about the discrepancies between their enrollment figures and their Title IV funds. Am. Compl. at ¶¶88-93. In Plaintiff's own words, the financial reports only "suggested" that the draws violated DOE Regulations. *Id*. at 28 ("FCC's Financial Reports to Management **Suggest** its Title IV Draws Violated DOE Regulations") (emphasis added). A tenuous "suggestion" that something **may** violate some regulation is not enough to satisfy Delaware law's standards for asserting a *Caremark* claim. Two particular cases are determinative on this issue.

In *Wood v. Baum*, 953 A.2d 136 (Del. 2008), the Delaware Supreme Court held that failing to properly oversee accounting practices does not establish a viable *Caremark* claim. *Id*. at 141–42. There the plaintiff alleged several categories of misconduct purportedly giving rise to an inference of scienter, but the Court found these allegations did not "establish that

8

CASE NO. 16-CV-62028-JAL-JG

[management] **knowingly** participated in illegal conduct." *Id*. at 142 (emphasis added). The court specifically explained that the defendants' mere "execution of [the corporation's inaccurate] financial reports [filed with the SEC], without more, is insufficient to create an inference that [management] had actual . . . notice of any illegality." *Id*. It also refused to infer knowledge simply because defendants had approved a transaction that later proved to be improper. *Id*. In addition, the Court also refused to infer scienter based simply on the defendants' positions on audit committees. *Id*. at 142–43. *See also Guttman v. Huang*, 823 A.2d 492, 496, 499 (Del. Ch. 2003) (holding that accounting irregularities did not support a claim).

A case from this District, which applied *Wood*, dismissed a factually-similar suit against corporate directors and officers. In *Staehr v. Miller*, the plaintiff claimed that because of their positions on the audit committee and the "red flags" of troubling financial data, management must have been aware of their filing of false statements. 2010 WL 11030716, at *9–10 (S.D. Fla. Mar. 31, 2010). But Judge Jordan found these allegations insufficient "to infer that the audit committee defendants were aware of any misstatements or omissions contained in these documents." *Id*., at *9. The court reasoned that "[t]hese responsibilities are not particularized allegations of [management's] involvement in preparation of the allegedly false or misleading reports sufficient to infer scienter." *Id*. Further, the supposed "red flags" were also insufficient: the problematic financial data "amount[ed] to nothing more than indications of worsening economic conditions and do not support a reasonable inference that the . . . defendants approved or disseminated the financial disclosures knowingly or in bad faith." *Id*., at *10.

*Wood* and *Staehr* demonstrate that Defendants' roles are insufficient to establish liability. *See also, e.g., South v. Baker,* 62 A.3d 1, 17 (Del. Ch. 2012). Further, the conclusory allegations that some Defendants allegedly were responsible for monitoring the supposedly anomalous

reporting (Am. Compl. ¶¶140, 145) are "insufficient to create an inference that [they] had actual . . . notice of any illegality." *Wood*, 953 A.2d at 142; *see also, e.g., In re China*, 2013 WL 4672059, at *8. Likewise, the data in FCC's financial reports were "nothing more than indications of worsening economic conditions" and cannot support the inference that Defendants knowingly disseminated inaccurate information to the DOE or otherwise violated regulations.

Simply put, Defendants cannot "be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf," even in troubled economic times. *Caremark*, 698 A.2d at 969. Rather than wrongdoing, Plaintiff's allegations actually reveal that Defendants did undertake remedial (if ultimately vain) measures in the face of financial and technical headwinds. This demonstrates Defendants' good faith (which is already presumed under the business judgment rule) and defeats the complaint. *See, e.g., Brautigam v. Rubin,* 55 F. Supp. 3d 499, 507 (S.D.N.Y. 2014), *aff'd*, 618 F. App'x 723 (2d Cir. 2015) ("[C]ontrary to the supposed red flags, the complaint contains allegations that [the defendant] was proactively responding to revelations about problems.").

3.    *The Department of Education's interactions with FCC constituted a "green flag" approval of Defendants' conduct.*

In addition to the above, the FCC's interactions with the DOE also show that Defendants were not consciously disregarding any so-called "red flags." In *Qualcomm*, for example, the Court of Chancery recently emphasized just how unequivocal and harsh governmental action must be to constitute a "red flag." The plaintiff alleged that company directors and officers damaged the company by forcing it to violate antitrust laws, and pointed to three supposed red flags: (1) an $891 million settlement in the United States; (2) a $208 million fine from the South Korean government; and (3) a cease-and-desist order from the Japanese government. 2016 WL 4076369, at *3–*4 and *10–*11. The *Qualcomm* court held that even if it assumed that these

10

substantial events constituted red flags, they were **still** not enough for it to find that the defendants had consciously disregarded them. The court reasoned that the defendants may have honestly believed the settled claims were meritless and that the fine and order against the company would be reversed on appeal. *Id.*, at \*10. The court distinguished the facts from those involved in another case, *In re Massey Energy Co.,* 2011 WL 2176479 (Del. Ch. May 31, 2011), where the company had not only disagreed with the underlying laws (as opposed to merely disagreeing with the regulator's interpretation of the laws, as Qualcomm had), but also pled guilty to **criminal** charges involving **willful**, **felonious** conduct that caused human fatalities. *Id.* The *Qualcomm* court also distinguished its facts from those in another case, *La. Mun. Police Empls.' Ret. Sys. v. Pyott,* 46 A.3d 313, 340 (Del. Ch. 2012), where the defendants' own counsel explicitly warned them about their illegal activities. *Id.*, at \*12.

Thus, *Qualcomm* shows that conscious disregard of "red flags" must be tantamount to entering guilty criminal pleas or ignoring express warnings from counsel. Plaintiff's mere allegations that Defendants violated technical DOE regulations (i.e., non-criminal laws) are inadequate. Moreover, Plaintiff alleges that the DOE did not even take issue with accounting discrepancies until April 2013, and that FCC reacted to the DOE's letter by hiring ten employees to manually reconcile the records "until it successfully reimplemented [the malfunctioning software]." Am. Compl. ¶¶101–02. In fact, rather than penalize FCC (as occurred in *Qualcomm*), the government awarded FCC Title IV funds for the upcoming 2013–14 school year, thus waving a green, rather than a red, flag at Defendants. *Id.* ¶103; *see also, e.g., Ash v. McCall*, 2000 WL 1370341, at \*9 (Del. Ch. Sept. 15, 2000) (an outside auditor's approval constituted a "green flag").

11

CASE NO. 16-CV-62028-JAL-JG

Plaintiff also acknowledges that FCC took more corrective steps once the discrepancies allegedly reappeared upon reimplementation of the software in late 2013. For example, Plaintiff states that in March 2014 FCC "refunded/posted disbursements in excess of $7M" in an attempt to reconcile the books, *id.* ¶111, and that in April, "management scrambled to substantiate or refund Title IV funds it previously drew to avoid potential penalties associated with failing to repay trust funds. By the end of April 2014, management believed it resolved nearly all outstanding balances[.]" *Id.* ¶116. This again shows that far from consciously disregarding any potential "red flag" issues, Defendant took measures to reconcile the problems. In fact, Plaintiff even notes how the DOE filed a proof of claim against FCC for allegedly outstanding funds "[**n**]**otwithstanding**" Defendant's multiple curative actions, which shows that Plaintiff, too, was surprised by the DOE's actions. *Id.* ¶118.

The fact that the DOE ultimately cut off Title IV funding because of alleged draw-down violations does not mean that Defendants consciously disregarded obvious red flags. Under *Qualcomm*, a defendant is not required to predict the actions of a regulator, and is even entitled to **disagree** in good faith with the regulator's actions—even where the government has already obtained a judgment against the defendant, which did not occur here. Plaintiff's allegations pale in comparison to those dismissed in *Qualcomm*, and must be dismissed.

4.    *Defendants cannot be held personally liable because their software malfunctioned.*

Plaintiff's last resort is to allege the "utter" failure to assure reasonable reporting systems. *See Baker*, 62 A.3d at 15. But ultimately, any alleged violations of DOE regulations were the result of system malfunctions rather than the lack of any system. And under Delaware law, the failure of a system does not rise to the level of a "red flag," even when the system break-down has catastrophic effects. In *In re Gen. Motors Company Derivative Litig.*, 2015 WL 3958724

12

CASE NO. 16-CV-62028-JAL-JG

(Del. Ch. June 26, 2015), *aff'd sub nom. In re Gen. Motors Co. Derivative Litig.*, 133 A.3d 971 (Del. 2016), the Court of Chancery confirmed two important points about *Caremark* claims: first, that it is very difficult to allege viable "red flags;" and second, that even if red flags are shown, it is very difficult to establish a *Caremark* claim based on an inadequate—rather than a non-existent—reporting system.

For example, in *GM* the plaintiff alleged that the defendants' inadequate-reporting system failed to catch an ignition-switch defect that caused multiple deaths. *Id.*, at *2. The court observed, however, that the plaintiff failed to allege with sufficient particularity the existence of "red flags" placing the defendants on notice of problems with the reporting system that they then consciously disregarded. *Id.*, at *16. Critically, "Plaintiff's counsel did not posit that there was a **discernible motive** for the [defendants] to disregard [their] oversight obligation" or a "culture" of indifference that could provide the basis for inferring a conscious disregard of duties. *Id.*

Moreover, the court also held that the plaintiff did not allege that a reporting system was completely lacking, but instead that the reporting system was merely inadequate, which is not actionable. *Id.*, at *15. "Stated more generally . . . throughout the Complaint, the Plaintiffs concede that the [defendants were] exercising **some** oversight, albeit not to the Plaintiffs' hindsight-driven satisfaction." *Id.* The court thus found that because the defendants were receiving reports and taking some actions to mitigate risk, they had satisfied their duties. *Id.*

Here, Plaintiff admits that the accounting issues were the result of unintentional software glitches: "[FCC] struggled to reconcile the funds it drew down with student data, in part, because STARS and the Regents 8 system were not able to accurately transmit information from one to another." Am. Compl. ¶130; *see also id.* ¶63. And while Plaintiff alleges that "FCC's stated position that it could not reconcile because of a software malfunction was not credible," the

13

sequence of events shows that FCC's position was not only credible, but the only explanation for the situation. *Id*. ¶102. Plaintiff reasons that the manual reconciliation of the records somehow means that the software was not defective, but the need for a manual process only proves that the software was malfunctioning. Indeed, Plaintiff concedes that when Defendants reimplemented the software in November 2013, the problems reappeared. *Id*. ¶105. The only plausible inference from the chain of events is that the software was causing the accounting errors despite Defendants' acknowledged efforts to fix the issues and successfully reimplement the software.

Thus, Plaintiff acknowledges that Defendants not only had software systems in place to comply with DOE regulations, but also complemented the software with manual personnel when necessary and hired a new head of IT to reimplement the software. *Id*. ¶74. Plaintiff also concedes that FCC had both a financial reporting system and a compliance department in place, and also supplemented these systems with independent auditing. *See Baker,* 62 A.3d at 18 ("[T]he existence of an audit committee . . . is some evidence that a monitoring and compliance system was in place"). In the end, Defendants' good-faith efforts to fix the software may have fallen short, but that is insufficient to allege the "'utter failure" of oversight required by *Caremark*. "Demonstrating that a . . . system has failed is not the same as demonstrating an actionable breach of fiduciary duty[.]" *Ironworkers Dist. Council v. Andreotti*, 2015 WL 2270673, at *31 (Del. Ch. May 08, 2015) (dismissing *Caremark* claim).

     5.     *Defendants' alleged actions did not cause FCC to collapse, let alone cause the claimed $150 million-plus in damages.*

Even if Defendants had breached some duty to FCC, Plaintiff still fails to allege causation of harm to the corporation. Assuming *arguendo* Defendants knowingly violated DOE regulations, Plaintiff has not shown Defendants could have known that the DOE would take the purported step of terminating Title IV funding in 2014, especially when the DOE had allowed

14

CASE NO. 16-CV-62028-JAL-JG

FCC to cure the same type of issue the year prior. Thus, even if the Court considered the accounting issues in 2013 to be a red flag, the DOE's approval after FCC's remedial actions led "Defendants . . . to reasonably believe[] that the matter was resolved." *In re Capital One Derivative S'holder Litig.*, 979 F. Supp. 2d 682, 696 (E.D. Va. 2013) (dismissing *Caremark* claim). Further, Plaintiff misleads the Court by stating FCC lost all access to Title IV funds. *See* Am. Compl. at 34 ("FCC'S RESPONSE TO LOSS OF TITLE IV FUNDING"). As Plaintiff admits elsewhere, the DOE only required FCC to document enrollment before funds would be made available; the actual amount of funding available to FCC remained the same.

The essence of Plaintiff's claim is that, because FCC went bankrupt, someone must be liable. But in cases with alleged facts much worse, Delaware courts have cautioned against this thinking. "Indeed, it is tempting in a case with such staggering losses for one to think that they could have made the 'right' decision if they had been in [management's] position." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009). "This temptation, however, is one of the reasons for the presumption against an objective review of business decisions by judges, a presumption that is no less applicable when the losses to the Company are large." *Id.*

6.    *Plaintiff failed to allege any self-dealing.*

After focusing all of its general allegations on the alleged violations of Title IV regulations, Plaintiff attempts to save its breach-of-loyalty claim with a single paragraph about Defendants' (save Yousefi) alleged stock options or vested stock. Am. Compl. ¶141. This paragraph appears to be an attempt at suggesting that Defendants engaged in self-dealing. But the allegations fall well short of "self-interest" under the law, and in fact demonstrate that Defendants' financial incentives were aligned with FCC's.

15

CASE NO. 16-CV-62028-JAL-JG

"Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction **not received by the shareholders generally**." *Cede & Co. v. Technicolor, Inc*., 634 A.2d 345, 362 (Del. 1993). Here, Plaintiff has only alleged that Defendants received (or, rather, hoped to receive) a personal benefit from their activities that were received by the shareholders generally. Moreover, this allegation "suggests that the [management] had every interest in ensuring that the company would remain profitable." *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P*., 906 A.2d 168, 193 (Del. Ch. 2006). Thus, "[o]ne cannot conjure up . . . a scenario whereby these [defendants] had a personal motive to undermine the long-term viability of [the company]." *Id*. Defendants' alleged stock options only buttress the presumption that they were acting in good faith with the long-term viability of FCC in mind.

7.     *Plaintiff's claims do not improve when evaluated on an individual basis.*

By repeatedly lumping Defendants together in its allegations, Plaintiff has failed to sufficiently state a cause of action against any single Defendant. *See Disney II*, 907 A.2d at 748. And even where Plaintiff names individual Defendants, the allegations are still inadequate.

For example, besides naming Bartness as a defendant and claiming that he was the CCO during the relevant period in question, the complaint has little else to say about him. Am. Compl. ¶¶6(e), 15, 93, 134, and 141. But merely holding an oversight position like CCO does not create liability when others might be breaching their fiduciary duties. *See, e.g., In re China Auto,* 2013 WL 4672059, at *8. Further, Plaintiff's claim that FCC took no action to address DOE's concerns in the 2012–13 year (Am. Compl. ¶104) are contradicted by the allegations that FCC hired manual personnel to reconcile the books and then hired a new head of IT to reimplement

16

the software. Moreover, Plaintiff does not even allege that he, Yawn, or Yousefi engaged in "illegal" conduct. *Id*. ¶142.

Plaintiff also relies heavily on Pierne's position as CFO to conclude that he must have known about accounting improprieties. *Id*. ¶145. But again, simply occupying a position of oversight, even in conjunction with the execution of erroneous financial reports filed with the government and the authorization of improper transfers, does not give rise to a cognizable claim under *Wood*. Knobel, as CEO, is even further removed than Pierne from oversight of the financial reporting. Finally, assuming *arguendo* that Stewart and Yousefi were fiduciaries (which they were not, *see* Part IV.E, *infra*), there are no allegations in the complaint providing any insight into their states of mind or any motive on their part to act in bad faith. The complaint simply depicts them as grappling with the various challenges confronting their company.

**B.  Plaintiff has failed to state a claim for breach of the duty of care.**

In an apparent attempt to circumvent the showing of scienter necessary for a breach of loyalty claim, Plaintiff amended its complaint to include a breach of care claim. But the allegations animating the complaint are that Defendants violated the law, which falls exclusively under the duty of loyalty—not the duty of care. *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (*Disney I*). In *Disney I*, the Delaware Supreme Court held that "where the fiduciary acts with the intent to violate applicable positive law," the duty implicated is the duty of good faith, not the duty of care. *Id*. Shortly after *Disney I*, the court clarified that the duty of good faith is part of the duty of loyalty. *Stone*, 911 A.2d at 367.

Substantively, there are important differences between the duties of loyalty and care. *Disney I*, 906 A.2d at 65–67. "There is no basis in policy, precedent or common sense that would justify dismantling the distinction between gross negligence [i.e., the duty of care] and bad faith

17

CASE NO. 16-CV-62028-JAL-JG

[i.e., the duty of loyalty]." *Id*. at 66. The Delaware Supreme Court has clarified that "the burden required for a plaintiff to rebut the presumption of the business judgment rule by showing [a breach of the duty of care] is a **difficult one, and the burden to show bad faith [i.e., a breach of the duty of loyalty] is even higher**." *In re Citigroup Inc.*, 964 A.2d at 125 (emphasis added). In applying Delaware law, this Court must honor the distinction between the two duties and treat alleged violations of the law under the rubric of the duty of loyalty, which requires a higher burden of proof than the duty of care.

Even if the gravamen of the complaint were a breach of the duty of care, Plaintiff's claim would still fail because Plaintiff did not allege that Defendants acted irrationally. It is "an elementary precept of corporation law [that] in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del. Ch. 1996). Because there is no adequate allegation of self-dealing or improper motive here, Plaintiff's only avenue to recovery is to show bad faith. Having failed to show bad faith in the context of its breach of loyalty claim, Plaintiff's only remaining option is to make plausible allegations showing that Defendants' actions were irrational. *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000) ("Irrationality is the outer limit of the business judgment rule.").

In assessing irrationality, "[c]ourts do not measure, weigh or quantify [management's] judgments." *Brehm*, 746 A.2d at 264. Courts "do not even decide if [the judgments] were reasonable. . . . [because] [d]ue care in the decisionmaking context is **process** due care only." *Id*. "[W]hether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no

18

ground for [management] liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests." *Caremark*, 698 A.2d at 967–68. "To employ a different rule—one that permitted an 'objective' evaluation of the decision—would expose [management] to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests." *Id*.

At no point does Plaintiff allege that Defendants engaged in irrational conduct. Again, Plaintiff appears to conclude that because the DOE merely changed the method by which FCC could drawdown Title IV funds, Defendants must be liable. But the business judgment rule is concerned with process, not results, and the complaint fails to show that Defendants' decision-making processes were irrational. To the contrary, the complaint shows that Defendants made informed and defensible decisions, including: reviewing financial reports; using external auditors as a check on that reporting process; remediating the reconciliations (even manually when necessary); hiring a new IT director; and making refunds in 2014 to reconcile the books.

Perhaps most importantly, Plaintiff acknowledges that Defendants attempted to address the on-going software issues with action plans. *See, e.g.,* Am. Compl. ¶131 ("Yawn worked with Yousefi on trying to fix technology systems at FCC, but they never completed this project."). Plaintiff attempts to deflect this inconvenient fact by then claiming that Defendants knowingly relied on defective software. *Id*. ¶¶130–34. Not only does this claim blatantly contradict Plaintiff's concession that Defendants believed they had "successfully reimplemented Regent 8," *id*. ¶102, but it does not show that Defendants acted irrationally. When problems arose from the Regent software after reimplementation, Defendants did not blindly rely on the system, but took proactive measures to deal with the situation. Thus, because Plaintiff has failed to rebut the business judgment rule, its claim must be dismissed. *Mukamal*, 378 F. App'x at 899.

19

CASE NO. 16-CV-62028-JAL-JG

C. **Plaintiff's action is time-barred.**

Before even reaching the merits, the Court should dismiss Plaintiff's claims as time-barred. "Under Delaware common law, a cause of action for breach of fiduciary duty is governed by a three-year statute of limitations." *100079 Canada, Inc. v. Stiefel Labs., Inc*., 596 F. App'x 744, 749 (11th Cir. 2014). "The statute of limitations begins to run at the time that the cause of action accrues, which is generally when there has been a harmful act by the defendant." *Id*. "[E]ven if the plaintiff is ignorant of the cause of action," the statute begins to run. *In re Dean Witter P'ship Litig*., 1998 WL 442456, at *4 (Del. Ch. July 17, 1998). "There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations." *Id*.

The three-year statute of limitations is combined with the applicable two-year bankruptcy stay that began as of FCC's August 26, 2014 bankruptcy filing. *See* 11 U.S.C. §108(a)(2). Thus, any claim that accrued before August 26, 2011 is time-barred.

While Plaintiff spends much of the Amended Complaint discussing drawdown practices during the 2012–13 and 2013–14 school years, Plaintiff also traces such practices into previous years. Specifically, Plaintiff discusses FCC and Anthem Schools' "[h]istorical" pre-merger drawdown practices, including Anthem's "pre-draw" methods that allegedly violated DOE regulations. Am. Compl. ¶¶39–43. Any liabilities Anthem's actions passed to FCC upon the merger, and the statute of limitations for such liabilities continued to run. *See, e.g., David B. Lilly Co. v. Fisher,* 810 F. Supp. 592, 594 (D. Del. 1992), *vacated on other grounds,* 18 F.3d 1112 (3d Cir. 1994). Given that the merger date was April 12, 2012, it is implausible that these pre-merger practices described as "historical" did not date back until some point before August 26, 2011.

20

Because the allegedly harmful acts occurring at Anthem and/or FCC apparently began before August 26, 2011, this action is time-barred. Plaintiff cannot save its claims by arguing that it was the allegedly impermissible draws starting after August 26, 2011 that mark the accrual of the causes of action. "[W]here suit can be brought immediately and complete and adequate relief is available, a cause of action cannot be tolled as a continuing violation." *Kerns v. Dukes*, 2004 WL 766529, at *4 (Del. Ch. Apr. 2, 2004). Anthem could have sought injunctive relief to prevent the allegedly improper drawdown practices that began before August 26, 2011, but failed to do so. The fact that Plaintiff (or its predecessor-in-interest) waited until there were "significant money damages giving [it] an incentive to bring this action" does not toll the statute. *Id*. At best, the complaint must be dismissed because it is impermissibly ambiguous as to when the allegedly harmful acts began. *See On Top Records Corp. v. Sunflower Entm't Co.*, 2015 WL 13264222, at *3 (S.D. Fla. Sept. 24, 2015).

Even if Plaintiff's original complaint had been timely filed (which it was not), Plaintiff's Amended Complaint does not relate back to the original complaint. "Plaintiffs have the burden of demonstrating that an amended complaint relates back under Rule 15(c)." *Fuston v. Florida*, 2013 WL 937575, at *3 (M.D. Fla. Mar. 11, 2013). But Plaintiff cannot carry this burden.

Eleventh Circuit precedent holds that it is difficult for a plaintiff-substitution to relate-back. For example, in *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1131 (11th Cir. 2004), the court found that Rule 15(c)(3) does not contemplate amendments that add or change plaintiffs. But even if it does, *Cliff* concluded that the substitution before it did not relate back to the original complaint because (1) the original complaint had not put the defendants on notice of the proper plaintiffs, and (2) the substitution would prejudice the defendant. *Id*. at 1131–32. The test in *Cliff* is so difficult that at least one federal court in Florida has stated that it is impossible

21

for an amended complaint to relate-back where the new complaint effectively adds a new party. *See Fuston,* 2013 WL 937575, at *3 ("federal . . . law is clear that an amended complaint does not relate back to the original complaint's filing date **if it has the effect of adding a new party to the cause of action**.") (citing *Wayne v. Jarvis*, 197 F.3d 1098, 1102–03 (11th Cir. 1999)).

Here, the Amended Complaint is brought on behalf of the debtor. But as the Court determined previously, the original Complaint was brought on behalf of creditors. (Dkt. 76). The original complaint, therefore, did not place Defendants on notice of the new apparent party-in-interest, the debtor. Moreover, given that this Court found that Plaintiff's prior cause of action did not even exist, the complaint could not have provided Defendants notice about these new claims by the debtor. (Dkt. 76 at 7). Finally, the damages the original complaint sought to recover for the original parties-in-interest are distinct from those the Amended Complaint seeks to recover now, as FCC owes different liabilities to its creditors than to its shareholders. Therefore, Plaintiff's legally-null original complaint could not possibly have afforded Defendants sufficient—**if any**—notice of the claims it now brings on behalf of a different party.

### D. Knobel and Pierne's actions are protected by FCC's exculpatory clause.

Knobel and Pierne are also protected by the corporate charter's exculpatory clause. The articles of incorporation in effect during the relevant time mirror the protection provided under 8 Del. C. § 102(b)(7), which exculpates all claims except breaches of the duty of loyalty, bad faith conduct (such as knowing violations of the law), unlawful payment of dividends or unlawful stock purchase or redemption, and self-dealing. *See* Exhibit A, art. VIII.

If "the director defendants are exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *Citigroup*, 964 A.2d at 124–25. Plaintiff has failed to

CASE NO. 16-CV-62028-JAL-JG

plead a non-exculpated claim of breach of the duty of loyalty, as demonstrated above in Section IV.A, and if the Court were to treat that claim instead as a breach of the duty of care, such claim would be exculpated by the clause in the charter.

### E. Stewart and Yousefi were not fiduciaries.

The Court should also dismiss Defendants Yousefi and Stewart from this case because they were not fiduciaries under Delaware law. Notably, because they are not directors or officers, they would only owe fiduciary duties if Plaintiff can show that Stewart and Yousefi were "key managerial" personnel. *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *9–*10 (Del. Ch. May 18, 2009). Plaintiff is unable to do so.

To be "key managerial employee[s]," Stewart and Yousefi would have had to "exhibit[] . . . the hallmarks of such a crucial employee." *Mitchell Lane Publishers, Inc. v. Rasemas,* 2014 WL 4925150, at *4 (Del. Ch. Sept. 30, 2014) (internal quotation marks and brackets omitted). It is not enough for "one [to] possess important responsibilities in an organization, [or] even hold [an important title], [to] be[] considered a key managerial employee." *Id.* Indeed, because "[t]he hallmark of fiduciary duty is discretionary control," Defendants must "ha[ve] [had] **discretionary control or authority** over" FCC. *Tow v. Amegy Bank N.A.*, 976 F. Supp. 2d 889, 903 (S.D. Tex. 2013) (applying Delaware law) (emphasis added).

In *Triton*, for example, the Delaware Chancery Court found that despite a project manager's ability to enter into binding contracts on the company's behalf, he was still not a key managerial employee. *Id.*, at *10. The court explained that he "did not shape the policy of the Company, or advise its CEO." *Id.*

Similarly, in *Rasemas*, the Chancery Court found that despite being a "manager," the defendant was not necessarily a fiduciary. 2014 WL 4925150, at *4–5. In denying the plaintiff's

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

motion for injunctive relief, the court held that plaintiff failed to show a substantial likelihood that it would establish that the defendant was a key managerial employee. *Id*., at *5. "The facts that Plaintiff relies on, such as [the employee's] official title . . . do not compel the Court to find [the employee] to have been a key managerial employee." *Id*.

Like the employees in *Triton* and *Rasemas*, Stewart and Yousefi lack sufficient hallmarks of a key managerial employee: there are no allegations that they shaped company policy (as opposed to simply managed activities within their discrete department), or advised (as opposed to merely "reported" to) the CEO. In fact, this is an easier case than one such as *Triton* where the defendants had the ability to bind the company to contracts. Without a showing that Stewart and Yousefi "acted on behalf" of FCC "or exercised control over [FCC] governance," Plaintiff's allegations fall short. *Tow*, 976 F. Supp. 2d at 903.

Finally, even assuming that Stewart and/or Yousefi were key managerial employees (they were not) and thus owed fiduciary duties (they did not), Defendants are unaware of any "case authority . . . to support the proposition that a managerial employee breaches his fiduciary duty by simply failing to perform his job." *Anic v. DVI, Inc*., 2002 WL 31804014, at *3 (N.D. Ill. Dec. 13, 2002) (applying Delaware law). Without an allegation that Stewart and/or Yousefi were "neglecting [their] duties . . . in order to pursue an interest adverse to the [company]—a clear violation of the duty of loyalty," Plaintiff has not alleged enough facts to support a breach of their supposed duties. *Id*. Indeed, *Triton*, *Rasemas*, and the seminal "key managerial" employee case of *Science Accessories Corp. v. Summagraphics Corp*., 425 A.2d 957 (Del. 1980) all involved classic claims of disloyalty, such as usurping opportunities (*Summagraphics*) or stealing trade secrets (*Triton* and *Rasemas*). Plaintiff does not allege that any Defendant acted disloyally or with bad faith toward FCC, and so Plaintiff's claims fail.

24

CASE NO. 16-CV-62028-JAL-JG

F. **Plaintiff failed to state a claim for breach of the credit agreement.**

Finally, the purported breach of the credit agreement must fail because its fate is tied to that of the breach of fiduciary duty claims. Am. Compl. ¶98 ("Each of the above-mentioned drawdown practices which violated DOE regulations also violated . . . the Credit Agreement"). Further, the allegations regarding the "covenant breach" are not set forth in any pertinent cause of action. The only counts in the complaint are claims for breach of fiduciary duty; there is no separate count for breach of contract. Accordingly, Plaintiff has failed to allege the basic elements of a claim arising from the alleged breach of the credit agreement.

V. **Conclusion**

Plaintiff could not allege that Defendants engaged in self-dealing transactions or any other classic forms of disloyalty. Instead, Plaintiff could only attempt to advance "possibly the most difficult" claim in corporate law, i.e., that Defendants not only consciously violated the law, but also did so with a bad faith motive. But in the end, the Amended Complaint only demonstrates that Defendants made good faith—if ultimately unsuccessful—efforts to address the financial, regulatory, and technical difficulties confronting FCC. Under Delaware law, "there is a **vast difference** between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 243 (Del. 2009) (emphasis added). At best, Plaintiff alleged that Defendants' efforts were inadequate, but it failed to allege that their efforts were in conscious disregard of their duties.

For all of the foregoing reasons, the Court should dismiss Plaintiff's action with prejudice as to all Defendants, and grant all other relief it deems just and proper.

25

CASE NO. 16-CV-62028-JAL-JG

## VI.     Request for Hearing

Pursuant to Local Rule 7.1(b)(2), Defendants request oral argument for their Motion to Dismiss. Defendants submit that a hearing might be helpful to the Court in ruling upon the Motion in light of the issues of Delaware law. Defendants estimate that thirty-to-sixty minutes should provide sufficient time for both sides to present their arguments and respond to questions from the Court.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
*Counsel for David Knobel, Jeffrey Pierne, Neal Yawn,
Dean Bartness, Siana Stewart and Cid Yousefi*
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By:   */s/ Michael N. Kreitzer*
       **MICHAEL N. KREITZER**
       (FBN 705561)
       mkreitzer@bilzin.com
       **JAMES J. WARD**
       (FBN 93651)
       jward@bilzin.com
       **KENNETH DUVALL**
       (FBN 121826)
       kduvall@bilzin.com
       eservice@bilzin.com
       mavin@bilzin.com
       stapanes@bilzin.com

26

CASE NO. 16-CV-62028-JAL-JG

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, I electronically filed the foregoing with the Clerk of Court, using CM/ECF. I also certify that the foregoing document was served on all counsel of record via transmission of Notice of Electronic filing generated by CM/ECF.

*/s/Kenneth Duvall*
Kenneth Duvall

27