```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                            MIAMI DIVISION
                      CASE NO. 16-62028-CIVIL-LENARD
 3

 4   CLINGMAN & HANGER MANAGEMENT        Miami, Florida
     ASSOCIATES, LLC, as Trustee,
 5
                    Plaintiff,            August 18, 2017
 6
             vs.                          4:32 p.m.
 7
     DAVID KNOBEL, JEFFREY PIERNE,
 8   NEAL YAWN, DEAN BARTNESS,
     SIANA STEWART and CID YOUSEFI,
 9
                    Defendants.           Pages 1 to 97
10   _____

11
                          DISCOVERY HEARING
12          BEFORE THE HONORABLE JONATHAN GOODMAN,
                 UNITED STATES MAGISTRATE JUDGE
13        (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)

14
     APPEARANCES:
15

16   FOR THE PLAINTIFF:       AVERY SAMET, ESQ.
                              CARA SCHMIDT, ESQ.
17                            STORCH AMINI, PC
                              Two Grand Central Tower
18                            140 East 45th Street
                              25th Floor
19                            New York, New York 10017

20
                              BRIAN S. DERVISHI, ESQ.
21                            WEISSMAN & DERVISHI, P.A.
                              One Southeast Third Avenue
22                            Suite 1700
                              Miami, Florida 33131
23

24

25
```

```
1    APPEARANCES, CONTINUED:

2    FOR THE DEFENDANTS:      JAMES J. WARD, ESQ.
                             MICHAEL KREITZER, ESQ.
3                            KENNETH DUVALL, ESQ.
                             BILZIN, SUMBERG, BAENA, PRICE &
4                              AXELROD, LLP
                             1450 Brickell Avenue
5                            23rd Floor
                             Miami, Florida 33131
6

7    TRANSCRIBED BY:         LISA EDWARDS, RDR, CRR
                             Official Court Reporter
8                            United States District Court
                             400 North Miami Avenue
9                            Twelfth Floor
                             Miami, Florida 33128
10                           (305) 523-5499

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURTROOM DEPUTY:  Calling Case 16-62028-Civil-
 2    Lenard, Clingman & Hanger Management Associates, LLC, as
 3    Trustees, versus Knobel, et al.
 4              THE COURT:  All right.  Good afternoon, folks.  Please
 5    be seated.  Make yourself comfortable.  So happy Friday to
 6    everybody.
 7              MR. WARD:  Happy Friday, Judge.
 8              THE COURT:  I mentioned at a hearing earlier today,
 9    this is our last day of not-horrible traffic because school
10    starts on Monday.  So for those of you who drive downtown or
11    leave downtown, Monday will be a whole new day, unfortunately.
12              So in any event, why don't we start off with
13    appearances, starting first with the Plaintiff.
14              MR. SAMET:  Good afternoon, your Honor.  Avery Samet of
15    Storch Amini from New York, *pro hac vice*.  With me today is
16    Cara Schmidt, my associate, also admitted *pro hac vice*, and
17    local counsel, who can introduce himself, Mr. --
18              MR. DERVISHI:  Brian Dervishi, your Honor.
19              THE COURT:  All right.  Very well.  Thank you.
20              And I think, Mr. Samet, you were on the telephone the
21    last time we had a hearing.  Right?
22              MR. SAMET:  Correct, your Honor.
23              THE COURT:  Okay.  Very good.
24              And so I see that your office is in Grand Central
25    Tower.  Does that mean it's above Grand Central Station?
```

1            MR. SAMET:  It's nearby.  It's one of those addresses

2    that you can apparently buy from the post office.  It's Two

3    Grand Central Tower.  I don't think there's a one or a three.

4            THE COURT:  Okay.  And is there still that famous

5    oyster bar in Grand Central Station?  There is.  Okay.

6    Interesting.

7            And who's here for the defense?

8            MR. WARD:  Good afternoon, your Honor.  Jay Ward,

9    Michael Kreitzer and Ken Duvall on behalf of the Defendants.

10            THE COURT:  All right.  So which one's Ward and which

11    one's --

12            MR. WARD:  I'm Mr. Ward.

13            MR. KREITZER:  I'm Mr. Kreitzer, Judge.

14            THE COURT:  Okay.  So let me just write this down so I

15    know.  In seat position No. 1, if this was a racetrack, the

16    inside pole position is No. 1.  Okay?

17            Pole position No. 2 is?

18            MR. KREITZER:  Michael Kreitzer, your Honor.

19            THE COURT:  Michael Kreitzer.  Pole position 2.  All

20    right.

21            And then pole position No. 3 is Mr. Duvall.

22            MR. DUVALL:  That is correct, your Honor.

23            THE COURT:  Okay.  Very good.

24            So, folks, as I may have mentioned the last time we

25    were together, I have my discovery calendar hearings on Friday

```
 1   purposefully because I find that many times that scheduling
 2   causes the lawyers to resolve their disputes because, let's
 3   face it:  Who wants to be in court on a Friday afternoon
 4   battling out a discovery dispute?  And in my view, most
 5   discovery disputes can in fact be resolved by the lawyers
 6   without intervention by the judge.  And so many of our
 7   discovery calendar hearings get canceled at the last minute
 8   when the lawyers call up and say, in effect:  Never mind.
 9   We've worked certain things out.
10           But, my gosh.  We've got six lawyers here today.  So
11   that tells me you haven't worked everything out.
12           MR. WARD:  We haven't, your Honor.
13           THE COURT:  Have you worked anything out?  Is there any
14   positive news?
15           MR. SAMET:  Yes.  Yes, your Honor.  There is.
16           THE COURT:  All right.
17           MR. SAMET:  First, let me back up.
18           The Defendants have noticed certain issues for today.
19   Plaintiffs have noticed certain issues for today.
20           THE COURT:  All right.
21           MR. SAMET:  One of the issues, we noticed, was
22   scheduling of depositions.  We have now scheduled all the party
23   depositions and we right before the hearing -- we had
24   noticed -- an amended notice of hearing on your Honor 's
25   calendar, your Honor's docket, marked now as "Resolved."
```

```
 1              THE COURT:  I'm sorry?

 2              MR. SAMET:  Marked now as "Resolved."  That issue is

 3     resolved.

 4              THE COURT:  Okay.

 5              MR. SAMET:  Depositions have now been scheduled.

 6              THE COURT:  Okay.

 7              MR. SAMET:  That was Issue 3.

 8              THE COURT:  Issue 3:  Depositions is resolved.

 9     Deposition scheduling.

10              MR. SAMET:  We have.

11              And I think we have -- I don't mean to go first on my

12     issues, but I think we have some resolution of those issues

13     that, as a phone call earlier today, some colloquy, that I'm

14     happy to report to the Judge what those are.

15              THE COURT:  All right.  By the way, I don't remember if

16     I mentioned this the last time or not.  But I see that you're

17     sort of like an old-school, old-style lawyer standing up.  So

18     that's fine.  I appreciate the respect; I appreciate the

19     courtesy.  But you don't need to stand up if you feel more

20     comfortable sitting down.  Just move that microphone in front

21     of you, and that's fine.

22              And the same, obviously, goes for the defense team as

23     well.

24              Some lawyers can't help themselves and they say:  Okay,

25     Judge.  I'll sit down.  And then the next time they start
```

```
1   speaking, they jump up again because they've been doing it for

2   many, many years.

3           But I'm just putting it out for you in case you want to

4   relax.

5           MR. SAMET:  If it's all right with you, your Honor, I

6   think I would be more comfortable standing up.

7           THE COURT:  See what I mean?  That's okay.  All right.

8           And you folks can handle it in whatever way you see

9   fit.

10          So I have here the Plaintiff's amended notice of

11  hearing.  Issue No. 3:  Resolved.  Okay.  So let's take a

12  look -- which one would you like to talk to me about first:

13  Issue 1 or Issue 2?

14          MR. WARD:  Just to be clear, your Honor, there's

15  actually two hearings scheduled for this afternoon.

16          THE COURT:  Yes.  Correct.

17          MR. WARD:  Defendants have the 4:30 slot and the

18  Plaintiffs have the 5:30 slot.

19          THE COURT:  All right.  Fine.

20          MR. WARD:  So it's -- you know, obviously, your Honor,

21  if you'd prefer to proceed with these issues, that's totally

22  fine for us as well.  But....

23          THE COURT:  If you were to prepared to argue the other

24  way and talk about your issues first on your notice of hearing,

25  that's fine.
```

1          MR. WARD:  That's fine.  I mean, if Mr. Samet is

2     standing to represent to the Court that the issues that they've

3     noticed have been substantially resolved, then that's fine.  We

4     can get that out of the way as a housekeeping matter.

5          If there's more substance, I think we'd prefer to just

6     proceed with the order in which they were noticed.  So it's

7     really....

8          MR. SAMET:  Why don't you proceed, so I don't step on

9     anybody.

10          MR. WARD:  Okay.  That's -- that's fine.

11          Judge, we very much would have liked to have been able

12     to cancel our notice of today's hearings.  But I think they

13     represent the three issues noticed, sort of a fundamental

14     problem for us in proceeding in the case.

15          And you'll see that there's three issues that have been

16     noticed.  But really, in sum and substance, they're one.  And

17     that is our inability to obtain sufficient and adequate

18     discovery from the Plaintiff.

19          As your Honor knows, the Plaintiff is the liquidating

20     trustee who works on behalf of the bankruptcy trustee.  And in

21     this case, the amended complaint goes to great lengths to make

22     clear that the liquidating trustee has stepped into the shoes

23     of the debtor and not its creditors.

24          So what we'll really dealing with here is the former

25     FCC company suing former officers.  And as a consequence of

```
 1      that, our clients are put in a disadvantageous position because

 2      the vast majority of the documents that existed and that are

 3      relevant to this case -- and there are many of them -- are in

 4      the possession, custody and control of the former FCC and the

 5      Plaintiffs.

 6             Now, we've served discovery requests that are before

 7      your Honor in the courtesy copies that you've received, which

 8      demonstrate our attempt to gather as much information as to

 9      precisely what this case is predicated on, how the Plaintiff

10      has come to the conclusion that these officers are somehow

11      responsible for the failure of FCC and now its board or changes

12      in the regulatory environment.

13             And as a consequence of that, the Plaintiffs have

14      produced -- Plaintiff has produced to us the following:  There

15      is a 125-gigabyte PST set, a group of email folders -- and

16      we'll talk about that in some detail in a moment -- and then

17      1.1 terabytes' worth of a mirror drive.  And we discussed this

18      last time with your Honor.

19             There's also been a number of third-party productions

20      that they have made to us; in other words, documents that they

21      obtained from third parties and have passed along to us.

22             The problem, although 1.3 or 1.4 terabytes sounds like

23      an awful lot of data, is that it is riven with gaps and it is

24      not presented to us in a manner that allows us to meaningfully

25      make use of it.
```

1        So, for instance, among the 125 gigabytes of PSTs, the

2   custodial PST for David Knobel and for Neal Yawn, two of the

3   Defendants in the case, are missing.  So there are emails that

4   they sent to other people, but none of the emails that they

5   received and none of the information that those emails would

6   have contained.

7        There are reams of data missing regarding FCC's

8   communications with the Department of Education, for instance.

9   We're missing many of the board minutes, the corporate board

10   minutes.  We have board minute meetings from individual schools

11   scattered throughout the country, so we know, for instance,

12   what was happening in Parsippany, New Jersey, in 2012, but we

13   don't know what was going on at FCC's board meetings during the

14   relevant time period.  We have some, but not all of this

15   information.

16        And I think your Honor can see in this situation, we

17   are truly blind as to, number one, the real nature of the

18   claims that we're battling.  I mean, the amended complaint does

19   have some documents attached, but it's difficult for us to

20   piece together from what we've received from the Plaintiff just

21   exactly how this case came together.

22        And not only is that a problem more broadly; it's a

23   problem for us in terms of presenting our own defense and

24   successfully mounting a defense for our clients.

25        And so where we are now is, the Plaintiff has said on

1    repeated occasions:  Well, you know, we need you to tell us

2    where this information is.  We need to know, you know, what

3    documents exist.

4         And not only is that not our burden or our

5    responsibility; it's also not something that we know.  Again,

6    these are -- our clients are former employees of the company.

7    They didn't bring, because they were prohibited by their

8    employment contracts -- and they're law-abiding folks -- they

9    don't bring any devices with them.  They didn't take a phone.

10   They didn't take a computer.  They certainly didn't carry a

11   server out of the building on their back.  And so our clients

12   don't know where the relevant information is and can't produce

13   it.  And it isn't their obligation to do that for the Plaintiff

14   anyway.

15        So we're in a very difficult position.  As your Honor

16   can see, we can't get the information they need.

17        The Plaintiff says:  Well, we either don't have it or

18   we don't know where it is, which of course is an unacceptable

19   answer when they've been served with valid discovery requests.

20   So we're sort of in the dark here at this point and we've been

21   trying to come up with a solution to get the information we

22   need.

23        But we've been met with a lot of "I don't know what I

24   don't know" from the other side.  And under the circumstances,

25   because they are the debtor, they have the possession of all of

1    the information, all of the old computers that exist, all of

2    the files that exist, all of the passwords to the cloud that

3    exist.  That's what they have.  And we don't.  So we're here

4    because we didn't even know where to begin in this discovery

5    process.

6           MR. SAMET:  Thank you.

7           Your Honor, I don't think that's a fair recitation of

8    the issue here or our discussions about it.

9           So let me explain.  And we discussed this all in great

10    detail at last April's hearing, which I believe was April 4th.

11    We served our amended responses on February 24th.

12           The issue is --

13           THE COURT:  April 7th we were together.

14           MR. SAMET:  April 7th.  Thank you, your Honor.

15           Let me break up some of the different issues.  First,

16    what have we produced to the Defendant?  What do we have?  The

17    liquidating trustee does not work on behalf of the bankruptcy

18    trustee.  The liquidating trustee is the trustee of the trust

19    that was created pursuant to the confirmed plan of liquidation

20    of FCC.

21           The liquidating trustee took over or came into

22    existence after that confirmed plan, which I believe was in the

23    first or second quarters of 2015.  The trustee did not take

24    over any computers, servers, anything.

25           The trustee as liquidating trustee then went out and

1   did an investigation to get documents from third parties who

2   either were in possession of FCC's old documents or were in a

3   consulting position to FCC and had documents relevant to FCC.

4          So, for example, the trustee went to the debtors'

5   auditors.  The trustee went to the debtors' lawyers.  The

6   trustee also went to the purchaser of the servers and computer

7   records and email files of FCC.  Those parties cooperated to

8   some extent and produced information to the trustee, and the

9   trustee has produced all of that information that it received

10  from third-party sources -- and they are all third-party

11  sources -- to the Defendants.

12         Now, there's a couple of issues, specific issues here

13  that Mr. Ward mentioned.  First, the missing emails of

14  Mr. Knobel and Mr. Yawn:  Mr. Knobel was the chief executive

15  officer of the debtor and he also was a board member and he

16  owned a portion of the company as well.  He founded the

17  company.

18         Mr. Yawn was the chief operating officer.  Both of

19  their email files are missing.

20         IEC, which is the one who has possession of all these

21  email files, have told us --

22         THE COURT:  I'm sorry.  The name of the entity in

23  possession of the --

24         MR. SAMET:  I'm sorry.  IEC, International Education

25  Corporation.  International Education Corporation.  They

```
 1    purchased the bulk of the assets and they purchased the -- and
 2    they acquired the email records.
 3            IEC has told us that the email files for Mr. Knobel and
 4    Mr. Yawn are missing.  That fact actually appears in our
 5    complaint against the Defendants.  I'll come back to that in a
 6    minute.
 7            The second issue is this mirror drive, this -- which
 8    is, again, only gotten through third-party discovery.  IEC
 9    acquired FCC's records.  IEC produced this mirror drive to the
10    trustee.  And we've produced that drive to the Defendants.
11            That drive -- and actually, we went to some length in
12    our written discovery responses back in February to describe
13    the nature of that drive and what form it was in.  Numerous
14    conversations with counsel about it.  They've had that since, I
15    believe, February.
16            That drive is again 1.3 terabytes of information.
17    We've produced it to them in the same manner that we maintained
18    it.
19            Prior to today, I had thought that the issue that we
20    were going to be debating in the discovery dispute was
21    Defendants' contention that they had raised back in February --
22    and I understood had been resolved but then had -- we raised in
23    July -- that we should take this terabyte drive and put it
24    into -- upload it into some sort of a data review system,
25    change it to a different format.
```

1       We had told them previously back in -- that this would

2   be hundreds and hundreds of thousands, if not over half a

3   million dollars, to do this, that that didn't seem to make any

4   sense to us.  We were willing to work with them to narrow it.

5   That was our discussions about that drive.

6       The other thing that I think your Honor should know

7   about is both parties have served IEC -- again, the purchaser

8   of all the records -- both parties have served IEC with a

9   subpoena.  The Defendant served them with a document subpoena

10  for the documents they were looking for, including the

11  documents they're seeking here.

12       And we served IEC with a document subpoena and said:

13  Hey, to the extent that you didn't give us stuff in the

14  investigation phase, we think that you need to produce those

15  documents.  And our subpoena also includes a request for an

16  inspection of their servers.

17       This was -- IEC had filed a motion to quash the

18  Defendants' subpoena which your Honor had stricken, I believe,

19  earlier this week for failure to comply with your discovery

20  procedures.

21       So that's -- that's the state of play here.  And what I

22  told counsel is I need to know what it is that they would like

23  me to do and not just beat on me that there's going to be some

24  spoliation motion here, which I think is what this is about.

25       I can only produce the documents that I have in the

1    form that I have it in.  And that's what I've done.  And I

2    don't think there's -- and I haven't heard any allegation that

3    that's not the case.

4         If your Honor has further questions, that's all I have

5    to say.

6         THE COURT:  So this is a question I have.  It's not

7    related to the main part of what you tell me; but toward the

8    tail end, a comment you made raised a question in my mind.  So

9    I figured I would just jump on it, which is:  Concerning the

10   subpoena that you served on IEC, and IEC's now stricken motion

11   to quash or for a protective order -- have I incorrectly

12   phrased something?

13        MR. SAMET:  The only -- just to be clear, both the

14   parties served subpoenas.

15        THE COURT:  Yes.

16        MR. SAMET:  IEC made a motion to quash the Defendants'.

17        THE COURT:  All right.  But it was your subpoena that

18   included the inspection request?

19        MR. SAMET:  That's correct, your Honor.

20        THE COURT:  All right.  So that's interesting.  So you

21   both served subpoenas.  IEC moved to quash the Defendants'

22   subpoena but didn't move to quash yours.

23        MR. SAMET:  I'm happy to explain that as well.  But

24   yes.  That's correct.

25        THE COURT:  Well, I'd like -- that sounds curious.  Why

```
 1   is that?

 2         MR. SAMET:  IEC from my understanding went to both

 3   parties with a proposed protective order for their subpoena

 4   from the substance of IEC's motion to quash.  They allege --

 5   and I have no knowledge of this whatsoever -- they allege that

 6   they moved to quash because Defendants summarily rejected the

 7   protective order.  Again, I don't know if that's true.

 8         I have worked -- they have not moved to quash.  I told

 9   them that I'm working with them on the protective order.

10         Mr. Ward and I had some further conversations about

11   that.  I would hope that ultimately we can get to one

12   protective order to submit to your Honor.

13         So that's the status of -- that's the status.

14         THE COURT:  All right.  Well, we still haven't gotten

15   to my question about that subpoena.

16         So this question concerns the now-stricken motion to

17   quash filed by IEC targeting the Defendants' subpoena.  So this

18   happens from time to time.  Where does the subpoena purport to

19   require compliance?  For example, is IEC located in New York,

20   New Jersey or some other place?  And if so, and if the subpoena

21   had been served there, then under the rules you have to

22   litigate that discovery dispute there unless the district court

23   there certifies that it's sort of an extraordinary circumstance

24   and transfers it back to me.

25         So where is IEC located?
```

```
 1              MR. WARD:  California.

 2              THE COURT:  California?

 3              MR. WARD:  Uh-huh.

 4              THE COURT:  And was the subpoena served in California?

 5              MR. WARD:  It was, your Honor.

 6              THE COURT:  And so to the extent you have a discovery

 7    dispute out there, shouldn't the California district court be

 8    resolving that dispute?

 9              MR. WARD:  Under the rules, your Honor, it would be.

10    The location for the performance of the subpoena, everything,

11    was in California.

12              THE COURT:  Right.

13              MR. WARD:  So it should have been in the Southern

14    District --

15              THE COURT:  Right.

16              MR. WARD:  -- of California.

17              THE COURT:  I guess that would be another reason to

18    quash that motion -- I mean, to strike that motion --

19              MR. WARD:  Correct, your Honor.

20              THE COURT:  -- because basically it was filed in the

21    wrong place.

22              Listen, different district courts and magistrate judges

23    throughout the country have different practices.  I go to

24    magistrate judge workshops all the time.  I just came back from

25    one two weeks ago in Chicago.  And some of my colleagues across
```

1    the country permit discovery motions.  Some don't.  Some have

2    the discovery calendar like I do.  Some have sort of a hybrid

3    system.

4          So I guess to the extent there's a motion to quash, the

5    Movant will need to find out what the procedures are out in

6    California.  And to the extent you have some further

7    conversations with IEC about compliance with your subpoena, you

8    may want to mention:  Hey, listen, Judge Goodman made a

9    comment; and based on the little bit that he's heard so far,

10   his view is this discovery dispute concerning the subpoena

11   belongs in California.

12          THE COURT:  Understood, your Honor.

13          MR. SAMET:  Your Honor, the only wrinkle with that --

14   and this is not a discussion I've had with IEC counsel -- but

15   under Rule 45, if the actual documents to be produced are here,

16   then I believe the subpoena would need to be litigated here.

17          THE COURT:  Oh, you --

18          MR. SAMET:  And it's not --

19          THE COURT:  -- you think that the documents are located

20   here in the Southern District?

21          MR. SAMET:  It's not clear to me whether the

22   documents -- I don't know the answer to this.  But if the

23   documents that IEC took over from FCC are still here in

24   Fort Lauderdale, then I would take the position that that needs

25   to be litigated here.

1          The inspection will need to be -- the inspection, as I

2   understand, is out in Irvine, California.  But I don't want to

3   leave your Honor -- that's an issue that either needs to be

4   litigated or needs to be resolved between the parties.

5          THE COURT:  Okay.  Well, if the main bugaboo there is

6   the language of a protective order, then maybe you'll be able

7   to hammer that out.  And if not, you'll need to tee up the

8   dispute and figure out where the most appropriate place is to

9   have that dispute resolved.  I guess it'll either be here or in

10  California.

11         MR. WARD:  Yes, your Honor.

12         THE COURT:  All right.  But that's a little bit of a

13  side issue.  It's not sort of the main point here.

14         So --

15         MR. WARD:  Your Honor, if I could briefly respond to

16  some of the points that counsel has made.

17         THE COURT:  Sure.

18         MR. WARD:  Just briefly.

19         THE COURT:  Sure.

20         MR. WARD:  I think it's -- I think it's right that you

21  latch onto this IEC question; and I think there's a couple of

22  important clarifying points here.

23         Number one, IEC didn't buy FCC.  It didn't buy the

24  totality of the companies.  It bought a portion of the

25  companies.  I think that's around 25 percent.  And in the

1    purchase and sale agreement between FCC and IEC, there's

2    nothing about FCC relinquishing control over all the data that

3    it had or deleting everything that it had.

4         IEC bought schools and it bought data.  But it didn't

5    have anything to say about what FCC did with the remainder of

6    its information.

7         So all of those computers, all of that data, all that

8    information, remained in the possession of FCC as debtor

9    because this sale wasn't consummated until after the bankruptcy

10   began.  So all of that material is still in the possession of

11   FCC.

12        And I want to emphasize to you that, you know, a lot of

13   the -- a lot of materials that have been produced to us from

14   IEC, when we had conversations with the Plaintiff, the position

15   was:  We'll give you -- we'll give you everything.  We'll give

16   you all that was from IEC.

17        And we asked if this information had been received by

18   the Plaintiff pursuant to a subpoena.

19        And the answer was no.

20        So IEC simply handed over materials to FCC without a

21   requirement for a subpoena.

22        Then, when we tried to get the same documents because

23   we later learned that not the entire universe of documents that

24   IEC had about FCC had been turned over, when we learned that,

25   we went to IEC with our own subpoena which they moved to quash

```
 1    and have now begun, you know, to engage in motions practice.

 2    So there's definitely a -- we're operating on two tracks here,

 3    Plaintiff and the Defendants, in terms of how we get

 4    information from IEC.

 5          But be all of that as it may, it doesn't change the

 6    fact that FCC as a company is suing our clients for purported

 7    wrongs while they were officers.

 8          THE COURT:  No.  No.  That's not correct.

 9          MR. WARD:  Well, the liquidating trustee.

10          THE COURT:  Right.

11          MR. WARD:  Well, but in the complaint, the liquidating

12    trustee has stepped into the shoes of and is fulfilling the

13    role of FCC.  And as a consequence of that, it's difficult to

14    believe that the Plaintiff is presenting a case that has a

15    substantial factual basis if they can't even tell us where the

16    information they have is.

17          So in order for us to meaningfully proceed with this

18    case, we need more than "I don't know what's out there,"

19    because until and unless we have a certification at the very

20    least that all computers and all files and everything that was

21    in the existence of FCC at the time of the bankruptcy has at

22    least been reviewed or there's been inquiry made into that, we

23    can't know what's happening.

24          THE COURT:  I hear what you're saying.  So it's quite

25    the conundrum.  You know, it's a bizarre situation.
```

```
 1              So let me ask a couple of questions to help me get a
 2    better feel for this.
 3              Is FCC still in any way in operation or is it defunct?
 4              MR. WARD:  It's defunct, your Honor.
 5              THE COURT:  There's no ongoing operation.  Correct?
 6              MR. WARD:  There are not.
 7              THE COURT:  Does it have any employees?
 8              MR. WARD:  I don't believe so.
 9              MR. SAMET:  No, your Honor.  And I think this might
10    help:  Pursuant to the plan, every last thing of FCC was
11    transferred over to IEC.  The trustee then took over
12    afterwards.  It didn't take over any employees with any shell,
13    with any -- with any -- with any file cabinets.
14              THE COURT:  All right.  So let's just say for the sake
15    of discussion hypothetically I were to say:  You know what,
16    defense?  I agree with you.  I'm going to require FCC to
17    produce this material.
18              How would that even happen?  Who would be responding on
19    behalf of FCC?  Does that entity even have somebody there to
20    respond?  Where are the servers located?  Where is the
21    information located?
22              If the answer is, it's really not anywhere because
23    everything has been transferred to IEC, then as a practical
24    matter all this is academic, isn't it?
25              MR. KREITZER:  Could I address that for a moment,
```

```
 1    Judge?

 2              THE COURT:  Sure.  Sure.

 3              MR. KREITZER:  Because you've asked and you're asking

 4    the very same questions that we've been asking.  But the

 5    process here was that FCC filed for bankruptcy.  A trustee was

 6    appointed in connection with that bankruptcy.  The bankruptcy

 7    went through the ordinary course of a bankruptcy, you know,

 8    with creditors filing claims and everything else.

 9              The trustee appointed for --

10              THE COURT:  You mean the bankruptcy trustee?  We're not

11    talking about the liquidating trustee.

12              MR. KREITZER:  Not talking about the liquidating

13    trustee.

14              THE COURT:  All right.

15              MR. SAMET:  There's no bankruptcy trustee, your Honor.

16    There never was one.

17              THE COURT:  Well, counsel was just using the term

18    bankruptcy trustee.

19              MR. KREITZER:  I'm not --

20              THE COURT:  Was there a bankruptcy trustee?

21              MR. KREITZER:  Judge, if counsel represents to the

22    Court there was none, then I will have to --

23              THE COURT:  Defer.

24              MR. KREITZER:  -- you know, defer to him.

25              THE COURT:  All right.
```

1          MR. KREITZER:  That is kind of news to me, to be

2     honest.  But, you know, again, if he's making a representation.

3          The point is, Judge --

4          THE COURT:  It's pretty easy to check.

5          MR. KREITZER:  I'm sorry, Judge?

6          THE COURT:  It's pretty easy to check.

7          MR. KREITZER:  Yes.  And we will, I assure you.

8          THE COURT:  So if you feel like checking later, you can

9     say to me:  Judge, Mr. Samet made a misrepresentation to you

10    when he told you that there was no bankruptcy trustee.  Here's

11    the docket sheet and the order from the bankruptcy judge

12    appointing the trustee.

13         And then Mr. Samet will say:  Oops, I'm sorry; or he'd

14    say:  No, that's not true.  There wasn't -- whatever will

15    happen.

16         MR. KREITZER:  What --

17         THE COURT:  But for purposes of today's hearing --

18         MR. KREITZER:  Yeah.  So --

19         THE COURT:  -- I'm going to assume that what Mr. Samet

20    said is correct --

21         MR. KREITZER:  So --

22         THE COURT:  -- that there's no bankruptcy trustee.

23         MR. KREITZER:  So the facts that we do know, Judge, is

24    that plus or minus 25 percent of the assets of FCC -- and let

25    me take a step back, Judge.

```
 1            FCC, Florida Career College, owned many, many, many

 2     career schools across the country.  So plus or minus 25 percent

 3     of those schools were sold to IEC.

 4            The balance -- some of the -- the balance of those

 5     schools, some were sold to other purchasers in the bankruptcy

 6     proceeding and others just simply went dark.

 7            But in the course of that bankruptcy, the assets of FCC

 8     were under the control of someone.  Now, counsel is saying it

 9     wasn't the trustee.  So I'll defer to that for the moment.  But

10     they were in control of someone or something.

11            And there came a point in time when the bankruptcy

12     court appointed the liquidating trustee --

13            THE COURT:  I'm sorry.  The bankruptcy court

14     appointed --

15            MR. KREITZER:  The bankruptcy court appointed the

16     liquidating trustee to, you know, look for assets to try to

17     bring money back into the estate.

18            And so it's beyond belief, Judge, that in the course of

19     the bankruptcy court overseeing this estate that all of the

20     servers and all of the records and so on and so forth of this

21     bankrupt entity just vanished.

22            And so when Mr. Ward said to you that at the very least

23     there ought to be a court-overseen inquiry by the liquidating

24     trustee as to what efforts they have made to locate these

25     servers, to locate files, and so on and so forth, because when
```

```
1    we make inquiry of counsel, counsel holds up his hands and just
2    keeps saying -- and I even had the same conversation before you
3    took the bench today -- and says:  I don't know.  I don't know
4    where anything is.  We don't know what we don't know.  That's
5    the response we keep getting.  We don't get a response:  Well,
6    we undertook an investigation and we couldn't find this and we
7    couldn't find this and we followed up with them.
8            What you heard counsel telling you is pretty much he
9    went to the lawyers for the bankruptcy, which I think was
10   Greenberg.  He told you that they went to the -- they went to
11   IEC, which again only purchased plus or minus 25 percent of the
12   assets of the estate.  And they went to the auditors.
13           Well, I don't think that's a sufficient investigation
14   under the rules, Judge.  And we're the -- you know, we're
15   suffering the consequences of that, because we're being asked
16   to defend a case with extraordinary allegations of misconduct
17   where they've had three, four years to prepare their case
18   before they even filed it.
19           Your Honor may recall they filed this lawsuit literally
20   on the day the statute ran or the day before the statute ran.
21           So they've had years to prepare their case.  And we're
22   on somewhat of a rocket docket in this case.  And we have a
23   trial coming up very early next year.
24           And we can't seem to get fundamental discovery, Judge.
25   So that's our problem.
```

28

 1          MR. SAMET:  Your Honor, I hate to --

 2          THE COURT:  Wait.  Wait just a minute.

 3      So are you suggesting that the Plaintiffs actually had

 4  this information, that they actually had the servers in their

 5  possession, but they're claiming that they don't?  Is that your

 6  position?

 7          MR. KREITZER:  Go ahead.

 8          MR. WARD:  No, your Honor.  I don't think this is an

 9  instance of opposing counsel being -- you know, playing hide

10  the ball or making untruthful representations.

11      What I don't know is what they've done to secure this

12  evidence.  I think the argument that you've heard was:  There

13  was FCC and then there was the liquidating trustee.  And then

14  in the interim, a lot of this information just vanished.

15          THE COURT:  Right.

16          MR. WARD:  And that may well be the case.  But I need

17  to know if it did vanish, when did it vanish?  How did this

18  happen?  Why doesn't -- why didn't FCC as a defunct, bankrupt

19  company maintain possession of these documents and computers

20  and servers?  What does the liquidating trustee know and what

21  has it done to try to identify and locate where those materials

22  are?

23      If we cut out the bankruptcy, you know, middle step of

24  this two-step process and it's just FCC to liquidating trustee,

25  there's even fewer instances -- there's more of a close causal

```
 1   chain between:  What do they have now and what did FCC have?

 2        So this is an instance -- this is a situation where

 3   they've received discovery, presuit discovery, from IEC --

 4        THE COURT:  And they've given it to us.

 5        MR. WARD:  They say that they've given us what they've

 6   gotten from IEC.  That's right.

 7        THE COURT:  Wait.  Wait.  Counsel, when I hear a lawyer

 8   say that, that they say they've given that to us, and you

 9   emphasize the word "say," you're sending me in my mind an

10   implicit message that you suspect that they haven't actually

11   done that.

12        So I want us to be perfectly clear.  They have

13   represented to me and to you that they have turned over

14   everything that they have received from third parties and from

15   IEC.  Do you think that they're lying about that?

16        MR. WARD:  I don't know.  I don't think that they're

17   lying.  And that's in no way my suggestion.

18        I think it's a slightly more nuanced issue.  And that

19   is:  I don't know what they said to IEC in their communications

20   presuit, what IEC sent them and what the relationship that they

21   have with IEC is, if it's a friendly scenario where they say:

22   Would you please send us this.  Who knows what was sent over?

23   And we know, for instance, it wasn't the full quantum of

24   documents that IEC has.

25        So my concern --
```

1          THE COURT:  So are you suggesting that when the

2     Plaintiffs communicated with IEC -- let's say they have a

3     friendly relationship -- that the liquidating trustee or their

4     lawyers say to IEC:  Look, do me a favor.  Send me over all the

5     emails.  Oh, but, by the way, don't send us the emails from

6     Mr. Knobel or Mr. Yawn, because we want to keep those a secret.

7     And when we turn everything over to the Defendants, we don't

8     want to have that in our possession.  Do you think that's

9     what's going on?

10          MR. WARD:  No.  That would be better, because at least

11     it would be clear what was going on.  We have a situation where

12     they've brought a suit against our clients, but we -- they

13     don't even have and we certainly don't have the emails that our

14     clients sent.

15          THE COURT:  Right.

16          MR. WARD:  So we're -- we're stuck in a position where

17     we're trying to figure out what we don't know, but we can't --

18     we don't have a mechanism by which to require them to tell us

19     what they have done, what they have and what's out there.

20          THE COURT:  So when FCC filed for bankruptcy, were your

21     clients the principals in charge of FCC at the time?

22          MR. WARD:  They were not.

23          THE COURT:  No.  They were already out by that time?

24          MR. WARD:  Knobel as CEO was already out by then.

25          THE COURT:  And how about some of the others?

1          MR. WARD:  Cid Yousefi was still employed there.  Siana

2    Stewart was still employed there.  Jeff was -- Jeff Pierne was

3    still there.

4          Was Dean still there?  I believe so.  I think.  Yes, he

5    was.

6          THE COURT:  So let's see if we can't get a better

7    handle on this.

8          So I assume that when FCC was operating, let's say the

9    day before it filed for bankruptcy, that it had some sort of a

10   headquarters located somewhere.  Right?  Okay.

11         Where was the headquarters for FCC?  Was it in

12   Fort Lauderdale?

13         MR. WARD:  Fort Lauderdale.

14         MR. SAMET:  Fort Lauderdale.

15         THE COURT:  Is that where the servers were located?

16   Fort Lauderdale?

17         MR. SAMET:  That's my understanding.

18         THE COURT:  Put the microphone towards you, please.

19         MR. SAMET:  That is my understanding, your Honor.

20         THE COURT:  All right.  So the company is defunct.

21   It's not in operation.  What happened physically to the

22   servers?  Where are they located?

23         MR. SAMET:  Your Honor, my understanding, which again

24   only comes from talking to third parties, is that all of the

25   servers went to IEC.  There's --

 1          THE COURT:  Meaning somebody came up with a truck,

 2    loaded them up on a truck and transported them to --

 3          MR. SAMET:  I don't know where --

 4          THE COURT:  -- IEC?

 5          MR. SAMET:  I don't know where they were physically

 6    transported or virtually where there was a VPN connection.  I

 7    don't know the answer to that, your Honor.

 8          THE COURT:  Well, IEC --

 9          MR. SAMET:  Took over all of those records.

10          THE COURT:  All right.  And so whatever office FCC had

11    been operating in at the time, that's no longer in operation.

12    Right?

13          MR. SAMET:  Yes.  That's correct, your Honor.

14          THE COURT:  The office space is either locked or maybe

15    even rented out to somebody else?

16          MR. SAMET:  Well, as I understand it -- and again, now

17    we're getting to areas -- I want to be careful.  I don't 100

18    percent know.  My understanding is that IEC still operates the

19    FCC schools under the FCC name.

20          I've gone --

21          THE COURT:  Are they operating under the same physical

22    office space in Fort Lauderdale?

23          MR. SAMET:  I do not believe they are operating in the

24    headquarters, your Honor.  But IEC took over the running of

25    this business.

```
 1              THE COURT:  So here's what in my view is what's

 2    happening here.

 3              MR. SAMET:  Yeah.

 4              THE COURT:  Let's assume both of you are -- I don't

 5    think it's a big leap in logic.  You're all telling me with

 6    complete accuracy what you know.  No one's playing hide the

 7    ball.  No one's engaged in any shenanigans.  You're saying what

 8    you know; more importantly, what you don't know.  You're

 9    invoking the famous phrase of Donald Rumsfeld:  We have no

10    knowns, no unknowns and unknown unknowns.

11              All right.  So it seems to me you're in a quandary.

12    You have a legitimate need for discovery to defend the case.

13    You haven't gotten that all, all that information yet.  So you

14    are frustrated and upset and annoyed, and legitimately so.

15    You're frantically trying to get this information.

16              So your main target, the target that's in your

17    cross-hairs, is the Plaintiff, because they're the ones who

18    brought the lawsuit.

19              Normally, that would be a good target.  But here,

20    because of the unusual circumstance, they're no longer in

21    control of that information.  Whatever assets, servers,

22    et cetera, contain that data, that information, they no longer

23    have.

24              So you can't get it from them.  It doesn't help you out

25    in your ability to defend the case, but I can't really place
```

```
 1    blame at the fault of the Plaintiff if they don't have the

 2    information.

 3           So it seems to me the next step logically is to say:

 4    Who does know the information?  It seems to me if anybody knows

 5    the information, it would be IEC.  Somebody had to be involved

 6    in the mechanical process, day-to-day operation, of taking over

 7    the business, acquiring the assets, whether they arranged for a

 8    truck to pull up to Fort Lauderdale and load the servers on

 9    there or virtually transfer the information or both.  Somebody,

10    some person or persons or a team of people, had to be involved

11    in the acquisition of all of the FCC assets.  Agreed?  Somebody

12    had to be doing that.  Right?

13           MR. SAMET:  I agree, your Honor.  I have a pretty good

14    idea who that was.

15           THE COURT:  Who?

16           MR. SAMET:  The Defendant, Mr. Yousefi, who was the

17    director of IT at the time.

18           THE COURT:  I'm not talking about who from the FCC; I'm

19    talking about who from IEC.

20           MR. SAMET:  Oh, I understand that, your Honor.

21           THE COURT:  IEC.  So who from IEC was involved?  Do you

22    know?

23           MR. SAMET:  That I don't know, although in the emails

24    that -- one of the things that Defendants asked from us, they

25    said:  Well, give us your emails with IEC.
```

1              We gave them to them.

2              And there's a technician -- I forgot what his name

3     is -- that is in those emails.

4              THE COURT:  So what were you telling me about

5     Mr. Yousefi?

6              MR. SAMET:  Well, my understanding, your Honor -- and

7     again, I don't have any personal knowledge --

8              THE COURT:  Just tell me your understanding.  I don't

9     need the qualifications.

10             MR. SAMET:  My understanding is Mr. Yousefi is director

11    of IT.

12             THE COURT:  For who?

13             MR. SAMET:  For FCC.

14             THE COURT:  But FCC is no longer in existence.

15             MR. SAMET:  Or --

16             THE COURT:  He was director of FCC.

17             MR. SAMET:  Was the director of IT.

18             THE COURT:  All right.  And was he director of IT when

19    the assets were transferred to IEC?

20             MR. SAMET:  My understanding, your Honor, is that

21    Mr. Yousefi facilitated the transfer of the electronic records

22    to IEC.

23             Now, I know your Honor doesn't want to qualify that;

24    but was that all the records?  Was that some of the records?  I

25    don't know and I wasn't there.

```
 1              THE COURT:  All right.  So now let's ask the defense.

 2              Do you represent Mr. Yousefi?

 3              MR. WARD:  Yes, your Honor.

 4              THE COURT:  Was he in fact involved in some way in the

 5    transfer of electronic records to IEC?

 6              MR. WARD:  He was -- he was present at the company when

 7    the transfer was going on.  He was not directly involved in the

 8    transfer.  So in other words, the transfer was managed by IT

 9    personnel, but he didn't personally manage --

10              THE COURT:  Managed by IT personnel for who?

11              MR. WARD:  For FCC.

12              So while Mr. Yousefi was at FCC, there were other

13    people who worked on IT.

14              THE COURT:  And do you know the names of those people?

15              MR. WARD:  We do.

16              THE COURT:  How many people were involved?

17              MR. WARD:  There were, we think, two people involved.

18              THE COURT:  What are their names?

19              MR. WARD:  So Aaron and Cornelia Anderson.

20              THE COURT:  Aaron and Cornelia?

21              MR. WARD:  Anderson.

22              THE COURT:  All right.

23              MR. SAMET:  I'm sorry.  Both of them have the last name

24    of Anderson?

25              MR. WARD:  Uh-huh.
```

```
1              THE COURT:  So where are they now?

2              MR. WARD:  In Boca Raton.

3              THE COURT:  That's not too far away.

4              MR. WARD:  It's not too far away.

5              THE COURT:  Have you spoken to them about what they

6   know about the transfer of information and data?

7              MR. WARD:  We have, your Honor.  I think the issue is

8   not necessarily that we can't know who participated in the

9   transfer of the data.  It's that they don't know -- they have

10  no idea now where any of the files are.

11             So while we are working to obtain discovery from IEC,

12  we are also working to coordinate from the FCC side to

13  understand where those servers, where the computers, were,

14  because they weren't working in the cloud; they were working on

15  actual computers that were maintained both on site at the

16  corporate headquarters and around the country at the schools

17  that FCC operated.

18             So it isn't just the servers that are located at the

19  central headquarters that are relevant to the case; it's

20  servers and computers located throughout the network of FCC

21  schools, because they also had a vast repository of information

22  about students that goes directly to the funding mechanism by

23  which those students were able to be enrolled.

24             So it isn't just a couple of people sitting at FCC

25  headquarters.  They oversaw FCC headquarters.  But even one of
```

1   the schools had their own independent IT teams.

2        So there's a lot of information and a lot of loci of

3   information out there that we're trying to gain access to.  And

4   it isn't just the case that Mr. and Mrs. Anderson or certainly

5   not Cid Yousefi had have knowledge of where all of this

6   material is in FCC's hands.  Yeah.  In FCC's hands.

7        In addition, not all of the schools were purchased by

8   IEC.  Premier Education also bought a number of the schools.

9   So where is the information that went to Premier prior to the

10  sale of the schools?  There's -- certainly that wouldn't have

11  been included in the -- in whatever was transferred to IEC

12  because it would have been the subject of a preexisting

13  contractual arrangement between FCC as extant business entity

14  and Premier as an extant business entity.

15        THE COURT:  So did the schools have information which

16  would not also be housed on the master FCC servers?

17        MR. WARD:  Yes.

18        THE COURT:  So -- and how many schools are there

19  throughout the country or were there throughout the country?

20        MR. WARD:  At the time of the bankruptcy, there were

21  more than -- more than 30.  Correct?

22        MR. KREITZER:  There were dozens.

23        MR. WARD:  There were dozens of them.  I don't have

24  the -- I don't --

25        MR. SAMET:  There were 41, your Honor.

```
 1              THE COURT:  41 schools throughout the country.  All
 2    right.
 3              And are any of those operating?
 4              MR. WARD:  Yes; but obviously, not under FCC's name.
 5              THE COURT:  Are they operating under IEC's name?
 6              MR. WARD:  IEC or Premier.  Yes, your Honor.
 7              THE COURT:  Or Premier.  Or maybe some other entity?
 8              MR. WARD:  Yes.  Entirely possible.
 9              THE COURT:  So it seems to me that this discovery
10    dispute, frustrating as it may be, is from my perspective, for
11    me, in terms of a ruling, premature, because you all really
12    don't know what you know and what you don't know.  You're going
13    to have to do some additional due diligence.
14              Maybe you folks want to take -- by "you folks," I mean
15    the Plaintiff -- maybe you want to take the deposition of
16    Mr. Yousefi to find out what happened on that day or days when
17    the actual transfer was made.  What happened to the computers?
18    What happened to the servers?  What happened to the other
19    equipment?  What happened to the laptops?  What happened to
20    anything else that was present?
21              And then there may also be a need to take the
22    depositions of Aaron and Cornelia Anderson, if there were at
23    the time, in your view they facilitated the transfer, in your
24    view they were merely present.  But maybe you want to take
25    their depositions to find out what they know.  I'm not telling
```

 1   you specifically whose depositions you need to take.  I'm not

 2   requiring you to do anything.

 3          But right now, both of you are flailing around in the

 4   dark.  You're making a discovery request.  They say:  We don't

 5   have anything else and we don't know where else to get it.

 6          You either don't believe them or you think that it's

 7   their obligation.

 8          But I can't get blood out of a stone.  They don't have

 9   it.

10          You may have the ability through your own people or

11   employees or former employees to find out what happened to this

12   information.  Once you get more information, you can take some

13   additional steps.  Maybe you can serve a subpoena on Premier to

14   get this information, if you think that --

15          MR. WARD:  We have, your Honor.  We have.

16          THE COURT:  And what happened?

17          MR. WARD:  It's still -- it's outstanding.  We're

18   working with them to schedule production and deposition.

19          THE COURT:  Okay.  But right now, the only thing that's

20   in front of me is, since I don't allow motions, it's not a

21   motion to compel, but it's a discovery dispute which is

22   tantamount to or equivalent to a motion to compel Plaintiff to

23   produce.

24          But it's really a motion to compel Plaintiff to produce

25   something that it doesn't have and it doesn't know where to

```
 1   find.

 2         So what am I supposed to do about that?

 3         MR. WARD:  Well, in the alternative, your Honor, you

 4   could require the Plaintiff to certify as they've said today

 5   that they have no documents, no servers, no computers, no

 6   physical property at all in their possession, custody or

 7   control from the debtor that's -- that provides information or

 8   documents responsive to our requests.

 9         THE COURT:  Well, didn't they already tell you that?

10         MR. WARD:  Not in so many words.

11         MR. SAMET:  They've said, Judge, they don't have them

12   in their possession.  They haven't said they don't have them in

13   their custody or their control.

14         THE COURT:  Okay.

15         MR. SAMET:  And that's a big issue for us.

16         THE COURT:  So, Mr. Samet, would that be a problem for

17   your team, to submit either a declaration or affidavit saying

18   exactly what they've requested?

19         MR. SAMET:  I don't see that as a problem at all.  I'd

20   like as a lawyer to look at the language carefully.

21         I would ask the same of them when we get to my things,

22   your Honor.  I have to say, I'm a little bit -- I mean, these

23   are witnesses that -- that I didn't even know about until --

24   that apparently they have a lot more information on this

25   subject than I do when I thought this whole day opened with
```

1    that they were completely in the dark.

2         So I am all for telling them what I know and stating

3    what I know.  And I would -- I would want the same from the

4    Defendants on this issue.

5         THE COURT:  So this happens from time to time in

6    discovery.  One side makes a representation to the other side.

7    Typically, the response is:  We don't have the material or we

8    have no more material or we've produced it.

9         And the other side says, in effect:  I don't believe

10   you.  And then they say:  Make them file an affidavit, Judge,

11   to prove that what they say actually is the truth.

12        And you can make that request in every single lawsuit

13   concerning every single discovery request.  Every single

14   response that you get back from any party in every lawsuit, you

15   may in your heart of hearts suspect that they're not completely

16   forthcoming.

17        So under that theory, every single discovery response

18   would have to be in the form of an affidavit swearing to the

19   accuracy of those representations, because it's perfectly

20   natural for you not to believe them and it's natural for them

21   not to believe you.

22        Now, I'm a big believer in the old saying of what's

23   sauce for the goose is sauce for the gander.  If you want the

24   Plaintiff to submit to you a declaration or affidavit

25   confirming what they know or what they don't know about the

43

```
 1    locations of the servers and the computers and the data, fine.
 2    I'll make them produce a declaration.
 3            But you'll have to do the same thing.  And you'll have
 4    to outline who knows information, what they know, what
 5    connection they have to the transfer of electronic records.  So
 6    presumably, you'd have to list Mr. Yousefi, Aaron and Cornelia
 7    Anderson and any other information that you know about
 8    concerning the location of information.
 9            And then in several weeks, if you're able to gather
10    additional information, maybe then you can use that to pursue
11    additional investigative or discovery leads to find out some
12    answers to this mysterious question.
13            But this is not all that unusual when you have a
14    situation where a company has gone out of business and somebody
15    else has taken over.  When does the new people -- what do the
16    new people know about what was happening there three years
17    earlier?  Frequently, not a lot.
18            MR. SAMET:  Well, except, Judge, as you astutely
19    pointed out, it's odd that in the case of IEC they're quite
20    happy to work with the Plaintiff.  They're quite not happy to
21    work with us, as evidenced by their filings.
22            But moreover, even to the extent that they provided
23    information to the Plaintiff, they seem unwilling to provide
24    even that identical information to us, so we could even test
25    the quality of the flow of information.
```

1           THE COURT:  I understand.  And it is somewhat odd and

2    perhaps mysterious.

3           But there are things that you can do to try to get to

4    the bottom of that.  For example, maybe you want to take a

5    deposition -- a 30(b)(6) deposition of an IEC representative.

6    And you can ask questions like:  Why is it that you're being so

7    cooperative with the liquidating trustee but not us?  Why did

8    you file a motion to quash our subpoena but not theirs?  When

9    you had these early communications, was there any discussion or

10   agreement, formal or informal, that not everything was going to

11   be produced, that other information would be produced later?

12          I mean, there are a lot of issues that you could

13   explore, because right now I'm just looking at, you know, a

14   situation which is confounding to both sides but not a lot of

15   actual facts that I can grab on to.  It's just a mystery to

16   you, to you and to me.

17          MR. SAMET:  We understand, Judge.

18          THE COURT:  Listen, I feel for you.  I empathize with

19   both sides, because you're both trying to get information.  You

20   can only get what you can get.  And when you don't get it, it's

21   frustrating.  But I don't think it's a situation where the

22   Plaintiff, the liquidating trustee, is intentionally

23   withholding the information or had the information.

24          Now, maybe you have a theory that they haven't quite

25   done enough.  But there are steps that you can take to find

```
 1   out.  Maybe you want to take a deposition of the trustee or a
 2   30(b)(6) deposition and find out:  What precise steps did you
 3   take to track all this down?
 4           MR. SAMET:  We plan to, your Honor.
 5           THE COURT:  Okay.  But right now, it's a little bit
 6   premature.  I wouldn't feel comfortable issuing a ruling
 7   compelling them to produce what they don't have.  I'm certainly
 8   not going to sanction them.  I don't feel comfortable saying
 9   that you have fallen down in your responsibilities because I
10   don't know what you've done with some of your own people,
11   either current or former.
12           So I'm sort of in a situation where I don't have enough
13   information to issue a ruling.
14           MR. SAMET:  We understand, your Honor.  I think, as you
15   said, it's -- we're trying three and a half months until the
16   cutoff of discovery --
17           THE COURT:  Right.
18           MR. SAMET:  -- to move from unknown unknowns to at
19   least known unknowns.  And that's why we're in the position we
20   are.
21           THE COURT:  Listen, this is just a suggestion.  But
22   maybe you want to take the deposition of Mr. Rumsfeld.
23           (Laughter.)
24           THE COURT:  Find out what exactly he meant by that
25   saying.  Right?
```

1          MR. SAMET:  Or buy his book.

2          THE COURT:  Well, perhaps.  Hopefully, if you buy a

3    book, you'll understand what he meant.

4          So in any event, I think additional steps need to be

5    taken.  All right.

6          So we've got those three issues, which were on the

7    Defendants' notice of hearing.  They're all intertwined.  But I

8    think that the discussion applies to all three.  Right?

9          MR. SAMET:  I think that's right, your Honor.

10         THE COURT:  So now let's get to the Plaintiff's amended

11   notice of hearing.

12         By the way, this sort of reminds me, this situation

13   that we just discussed -- have a seat.  It sort of reminds me

14   of what happens from time to time in a subrogation case where

15   the insurance company files a lawsuit in order to try to

16   recover some of the money that it's paid out.

17         The Defendant, naturally, propounds discovery to the

18   Plaintiff, the insurance company.  They know nothing about the

19   case.  They've basically taken over a file years after the fact

20   from its insured, sometimes former insured.  So sometimes the

21   relationship between the insurance company filing the

22   subrogation claim and the party that had the information to

23   begin with the insured is bitter, sour, lousy and a complete

24   lack of cooperation.

25         So the Plaintiff, the insurance company, has no ability

1    to answer any interrogatories or produce any documents because

2    they say:  What do we know?  We're just the insurance company.

3           The Defendants say:  Yes.  But you filed the lawsuit.

4    We have to defend ourselves.

5           And the insurance company says:  I can't give you

6    information that I don't know.  I don't have any other records.

7    And my former client is not cooperating anymore, because they

8    have now placed insurance elsewhere or we terminated the policy

9    for nonpayment or whatever other reason.

10          A similar situation.  You know what I mean?  It happens

11   in these odd circumstances.  It doesn't mean it's no less

12   frustrating for you.  It is.

13          Plaintiff's amended notice of hearing.  So Issue 3 is

14   off the table.  Good news.

15          Which issue would you like to take first?  1 or 2?

16          MR. SAMET:  Why don't we start with 1 and then 2.

17          THE COURT:  All right.  By the way, do you have to be

18   out of here, Mr. Samet, by a certain time?

19          MR. SAMET:  Maybe once it gets close to 7:30.  But I

20   don't think it's going to be an issue, your Honor.  I

21   appreciate it.

22          THE COURT:  Okay.  I remember from last time you had

23   that issue.  If we're here at 7:30, that would be surprising to

24   me, because I'm not going to be here.

25          MR. SAMET:  Thank you, your Honor.

```
1              THE COURT:  All right.

2              MR. SAMET:  At this time of year, it's a lot easier.

3              THE COURT:  Right.  Let's go to No. 1.

4              MR. SAMET:  All right.  No. 1.

5         So we were here last April 7th.  Your Honor had

6    directed the Defendants to produce their personal email by

7    April 28th.  Coincidentally, on around 5:00 p.m., I believe, on

8    April 28th, the Court dismissed this action.  The Defendants

9    obviously did not make the production of emails on April 28th.

10             We then filed a motion for reconsideration.

11             The Court granted that on, I believe, June 27th, which

12   allowed us to file an amended complaint, and the Court reopened

13   the action.

14             On July 28th, the Defendants produced the emails.  We

15   raised some issues with them concerning the fact that the

16   emails were not produced in the agreed protocol.  In other

17   words, they didn't have their metadata.  They were missing

18   attachments.  There were redactions.  They seemed to have been

19   printed out.  Some of them had print dates of March.

20             We raised these issues with the Defendants.  And I

21   believe -- the Defendants say that they can produce to us the

22   emails with the metadata and the protocol within one week to

23   ten days of today.  And that's what we want.

24             And so I think that is -- that issue is resolved on

25   those terms, if I've stated that correctly, a week to ten days.
```

 1          MR. WARD:  That's correct, your Honor.

 2          THE COURT:  So Issue 1 is now off the table.

 3          MR. SAMET:  Issue 1 is off the table with that

 4   agreement.  That's correct.

 5          THE COURT:  Wonderful.

 6          MR. SAMET:  I agree.

 7          THE COURT:  Let's go to Issue No. 2.

 8          MR. SAMET:  Issue No. 2, we've narrowed this.  I want

 9   to set this also.  We had some discussions.  Issue No. 2

10   concerns -- we made a request for documents concerning

11   compensation in whatever type, whatever form, from whatever

12   source that the Defendants received for behalf of their work

13   with FCC.  The Defendants had previously said:  We don't want

14   to produce that information.

15          We had a hearing on April 7th, when the Defendants

16   said:  We are withholding information.  We are withholding

17   documents on that.  There was a colloquy, and the Defendants

18   after discussion with your Honor agreed to produce compensation

19   received.

20          I don't -- but in the production, we didn't get any

21   documents about any such compensation.

22          Now, again, this goes back to the question of:  You

23   can't get blood from a stone.  I recognize that.  We had a

24   followup question:  What about 1099?  I got a single -- like a

25   phone picture of, like, a 1099 sort of from an angle that's not

```
 1   readable.

 2          But -- and again, I can't get blood from a stone.  But

 3   the issue -- and we have some ideas of how to work it.  I'm

 4   going to get to that.  The issue is:  We went to a hearing on

 5   this issue to get those documents.  There's a representation

 6   that responsive documents existed.  I don't think that

 7   concerned a single photograph of a 1099 that took six months to

 8   produce.

 9          I need to know what -- if these officers received

10   compensation in some other source other than straight salary,

11   if they had -- you know, my understanding is they got stock

12   options and they had stock and there was vestments and there

13   was bonus plans.  Whatever it is, I need to know.

14          Now, in our colloquy trying to narrow this issue, one

15   of the suggestions is to include search terms in the further

16   review of the Defendants' documents that we're going to do

17   pursuant to your Honor's April order.  Pursuant to that order,

18   we had raised the issue that the Defendants employed their own

19   personal email accounts on their own personal devices while

20   they worked at FCC and afterwards.

21          And your Honor had ordered that they collect; and then

22   if we're not satisfied, basically, they pick a vendor and we

23   pay for the vendor to collect.  That's going forward, your

24   Honor.

25          The defense had suggested that included in that search
```

```
 1    we include search terms for some of these other financial

 2    compensation documents, which is something that I think is a

 3    fine idea.

 4         The only thing that I need in addition to that is

 5    ultimately the defense knows what kind of compensation they got

 6    or didn't get.  And they have an obligation to produce under

 7    our discovery response and under your Honor's order that

 8    compensation without me having to guess what the search term

 9    is.

10         Again, if the document doesn't exist, I can't get it.

11         THE COURT:  So before you came here today to raise this

12    issue with me, I'm sure, since you followed the local rule and

13    my discovery procedures already, you had a discussion with the

14    other side about this problem.

15         MR. SAMET:  Correct, your Honor.

16         THE COURT:  And what was the -- their response?

17         MR. SAMET:  Well, without -- we've had numerous

18    discussions and phone calls, including today before the

19    conference and including right here before conference.  And I

20    think the -- I can take you through all of that.

21         But I think the last of it is the -- is the notion that

22    suggested by counsel to include search terms in this review, to

23    search the Defendants' emails for things like stock options or

24    whatever.

25         THE COURT:  Just so I'm clear, the only document that
```

 1    you have received in response to this request for production

 2    concerning compensation is a picture of a 1099 form taken at an

 3    angle for one of the Defendants?

 4            MR. SAMET:  Let me be clear.  Hold on.

 5            Since -- since the hearing, since the hearing, I've

 6    received two 1099s.  Prior to the hearing, so not subject to

 7    this -- prior to the hearing, I had received a number of W-2s

 8    that were almost entirely redacted, like so.  I think you're

 9    kind of -- probably can see the redactions from there.

10            Those are the -- that was prior to the hearing.  Those

11    are the -- those are the sum of the documents I have received

12    on that.

13            THE COURT:  So did you receive a W-2 from each of the

14    Defendants?

15            MR. SAMET:  I received these redacted W-2s.

16            THE COURT:  From each of the Defendants?

17            MR. SAMET:  Yes, your Honor.

18            THE COURT:  All right.  So before -- so now let's just

19    limit our discussion to the W-2s.

20            Is there information which was redacted that you think

21    you need for this case?

22            MR. SAMET:  Well, I would like to see the complete W-2,

23    including 401(k) payments and any other form of nontaxable

24    income that's on the W-2.  I don't know what's under the

25    redaction, your Honor.  I would like to see the whole document.

 1          THE COURT:  So I'm confident that before coming here

 2     today, you spoke to opposing counsel and said:  Listen, can we

 3     get the information that you redacted or these categories?  You

 4     surely had that conversation.  So what did you --

 5          MR. SAMET:  At that --

 6          MR. WARD:  The conversation was:  Can we have an

 7     unredacted copy?

 8          And we said we're willing to do an unredacted copy if

 9     there is a protective or confidentiality stipulation in place.

10          And nothing has been done.

11          MR. KREITZER:  Well, I -- so the conversation had

12     happened at the last conference about whether we would have a

13     protective order in place.  And so I spoke with a colleague

14     over there about, you know, moving the ball forward on the

15     protective order.

16          And I think we're (inaudible) forward and, you know,

17     we're happy to, you know, submit a protective order to the

18     other side to move that forward and to, you know, try and --

19          THE COURT:  So, folks, listen, that discovery hearing

20     was April 7th.  So that was more than four months ago.  Right?

21          MR. SAMET:  Correct.

22          THE COURT:  So you're telling me in four months you

23     haven't been able to hammer out a basic protective order for

24     confidentiality?

25          MR. WARD:  Well, Judge, the Plaintiff has not really --

```
 1   they have not made any effort to secure one.  They haven't sent
 2   us a draft.  There has been nothing.
 3           THE COURT:  Okay.  All right.  So, listen, Mr. Samet,
 4   you're making a lot of --
 5           MR. SAMET:  Your Honor, this is -- this is not a fair
 6   representation of what happened.  My understanding is --
 7   Mr. Dervishi was in the hallway with defense counsel.
 8   Mr. Dervishi can speak to it more.
 9           My understanding is that they're not producing it to
10   us.  We've received no protective order that I had -- request.
11   There is none in the case.  We had to go to a hearing to
12   produce it.  None of this was discussed.
13           You know, the way discovery proceeds is that -- is that
14   this information needs to be produced.  This is my trustee who
15   had access to this information to begin with.
16           THE COURT:  So, Mr. Samet, have you at any point, you
17   or Mr. Dervishi or any other member of your team, sent to
18   defense counsel a draft version of a protective order?
19           MR. SAMET:  I have not, your Honor.
20           THE COURT:  So the answer is no?
21           MR. SAMET:  That's correct, your Honor.
22           THE COURT:  Why don't you do that?  Then you can get it
23   done.  I mean, my gosh, you could have gotten this worked out
24   in four months.
25           MR. SAMET:  What did we offer?  Hold on.
```

1          We'll file that, your Honor.

2          THE COURT:  And if for some reason you get jammed up,

3     let's assume in your view the Defendants are being unreasonable

4     in the language that they're going to agree to for the

5     protective order.  I can't imagine that happening, because

6     that's my least favorite kind -- you know, I was about to say

7     my least favorite kind of discovery disputes.  But I have so

8     many unfavorite kinds of discovery disputes.  I'm not going to

9     say it's the least favorite.  It's one of my least favorite

10    types.

11         I'm sure you can work it out.

12         But if for some reason you have a legitimate beef over

13    the language, I'll be happy to try to mediate that issue for

14    you.  We can do it in a phone call.

15         So as to the W-2s, you'll get them soon in an

16    unredacted way because you're going to work out a protective

17    order.

18         You also mentioned a few 1099s.  Did you get 1099s for

19    all Defendants or just a few?

20         MR. SAMET:  I believe I got 1099s from two Defendants.

21    I accept counsel's representation that the other Defendants

22    don't have 1099s.

23         THE COURT:  Okay.  So then the other issue is that one

24    of the 1099s is sort of illegible because it's on a phone taken

25    at an angle?

```
 1              MR. SAMET:  The 1099s are illegible.  I'm sure that

 2    counsel --

 3              THE COURT:  Illegible?

 4              MR. SAMET:  Are illegible.

 5              THE COURT:  Illegible.

 6              MR. SAMET:  I'm sure that counsel will provide the

 7    legible version.  That is the -- the cart of the horse, your

 8    Honor.

 9              THE COURT:  Right.  So you pick up the phone and you

10    say:  Listen, this 1099, this phone picture, isn't legible.

11    Can you send me a better copy?

12              Yes.

13              Done.

14              MR. SAMET:  That's not why we're here.  Correct.

15              THE COURT:  Done.

16              MR. WARD:  We've already agreed to do that, your Honor.

17              THE COURT:  Okay.  So the issue of illegible 1099s is

18    resolved.  The defense will produce legible copies in seven

19    days.  Okay.  Fair enough.

20              What else?

21              MR. SAMET:  What I -- what I would like, your Honor, is

22    I need -- again, if it's not there, it's not there.  I need a

23    representation by counsel -- or I shouldn't state that.  I

24    don't need a representation.  I would like counsel to go to

25    their clients and to produce to me other forms of compensation
```

1    that they received from FCC, whether I can guess the search

2    term or not.  I think they have that obligation to do that.

3    They made a representation last time that there were such

4    responsive documents.  And I would like to see them.

5        MR. WARD:  Judge, we've had our clients go back and

6    search their emails to try to find compensation materials.

7    We've produced them to the other side.

8        Our clients say that that's all there is and that's all

9    there is.

10        We've agreed as an accommodation to the Plaintiff to

11    include some term -- search terms in the vendor search of the

12    emails that's going to happen anyway in order to see if -- you

13    know, just belt and suspenders, to make sure that there's

14    nothing else.  So I'm not quite sure what the Plaintiff is

15    asking for at this point.

16        THE COURT:  So whatever documents you've produced to

17    the Plaintiff, either 1099s or W-2s, was as a result of a

18    request that you made to your clients.  Please find documents

19    concerning compensation.

20        MR. WARD:  That's right.

21        THE COURT:  You have what you have.  Plaintiff wants

22    more.

23        And to the extent that the Plaintiff is suggesting a

24    technique or protocol with the hope that more information will

25    be located, namely search terms, the vendor who will be

```
 1   searching your clients' phones and laptops and other material
 2   will be using search terms.
 3           Do I have that right?
 4           MR. SAMET:  That's right, your Honor.
 5           THE COURT:  Correct?
 6           MR. WARD:  That's correct, your Honor.
 7           THE COURT:  So wouldn't you -- Mr. Samet, wouldn't
 8   you --
 9           MR. SAMET:  I'm sorry.  I've been corrected.  The
10   protocol is only for emails, which is what counsel said.  But
11   again -- and I hate to belabor it -- if they have a stock
12   option vestment that's not in an email, they've got to produce
13   it to me.  And there was a specific representation on the
14   transcript last time that there were responsive documents that
15   had not been produced.
16           And if they exist --
17           THE COURT:  You think that they have some documents
18   that are not necessarily in an email, but an actual sort of
19   old-fashioned, traditional type of document like a piece of
20   paper in a folder that says "stock options," something like
21   that?
22           MR. SAMET:  If they do, they should produce it.  Your
23   Honor specifically asked -- it's on Page 17 of the
24   transcript -- "Are you withholding documents -- responsive
25   documents to this Request No. 9?  All right?"
```

```
 1          And the answer was:  "Yes."

 2          And so based upon that, I would like them to ask their

 3     clients to get these documents.  I understand if documents do

 4     not exist that I cannot get them.  But that's why I'm pushing

 5     this.

 6          THE COURT:  So are there such documents?

 7          MR. WARD:  No.  At this point, your Honor, we have --

 8     they have what we have.  They have the 1099s and we have the

 9     W-2s reflecting payments made by FCC or related to their

10     employment at FCC.  We've asked them to go back through all of

11     their personal files, hard copy files, on their desktop,

12     whatever they might have, to try to identify documents or

13     communications about comp.  They have given us what they have.

14     Now we're having the vendor come in to look through emails.

15     We're happy to have them take another look to see if there's

16     anything that they may have missed.  But what we've given is

17     what we have.

18          THE COURT:  So actually, Mr. Samet, I'm looking at Page

19     17 of the transcript.  And the question is:  "Has your client

20     in fact withheld any responsive documents to Request No. 9?"

21          Answer by Mr. Ward:  "We are not."

22          I say:  "I'm sorry."  And then I say:  "Please

23     continue.  I don't mean to interrupt you."

24          And then I say that's a question that can only be

25     answered one of two ways, those two ways being yes or no.
```

```
 1              And then Mr. Ward said:  "I'm going to pull the lawyer
 2    trick on you and say yes, we have, but there are documents that
 3    remain to be produced because we have not concluded our search
 4    of personal emails where there may be documents.  But we're
 5    conducting that search pursuant to an agreement with the
 6    Plaintiffs."
 7              So --
 8              MR. WARD:  And that's the 1099s that were produced
 9    after the hearing, your Honor.
10              THE COURT:  So as of today, you and your clients are
11    not withholding any documents concerning compensation, whether
12    that document be an email, an old-fashioned document, a piece
13    of paper in a folder or otherwise?
14              MR. WARD:  That's right.
15              THE COURT:  All right.  So that's your representation.
16              MR. SAMET:  Thank you, your Honor.
17              THE COURT:  Fair enough.  Okay.
18              What else?
19              MR. SAMET:  Your Honor, I -- I don't believe there's
20    anything else.  If your Honor likes, I was going to report on
21    what we're doing with the -- with this vendor, which I think we
22    already have.  We've -- defense have selected a vendor.  We've
23    signed them.  We've agreed to pay for them.  The vendor, I
24    believe, has reached out to them to collect the personal
25    devices your Honor just mentioned.
```

```
 1              The only thing that I would just point out is, again,

 2      there's a strict discovery cutoff of December 1.  And we have

 3      depositions coming up in September and October.  I surely do

 4      not foresee discovery disputes.

 5              I was going to ask your Honor, is there a way that if

 6      we unfortunately do have disputes to get on your calendar

 7      before those depositions have concluded or not?  I'm not sure

 8      if that's a fair question.  But I'm going to ask it.

 9              MR. WARD:  Judge, can I interpose before we get to the

10      prosaic deposition-scheduling question?

11              This is about devices.  So the order from the April 7th

12      hearing refers to email accounts.  And it is entirely our

13      intention and what we're going to do with the third-party

14      vendor, to give them access to the email accounts of our

15      clients.

16              But handing over devices is an entirely different

17      question not contemplated by the order; and it's an entirely

18      different question under the law.  Handing over personal

19      devices for search by third parties requires a particularized

20      showing of need that justifies the invasion into the owner of

21      the device's privacy.

22              And there is no such showing here other than that the

23      Plaintiff would like to have access to them.

24              There is no reason to suggest that -- we already know

25      that the devices that have any images of them, any images of
```

1    responsive documents, have been produced because we've heard of

2    the ill-lit and skewed photograph of the 1099.  But getting

3    into personal devices is an entirely different question than

4    getting into email accounts.

5         The latter we're totally on board with, and it's fine.

6    But the former requires much more than what the Plaintiff has

7    put forward so far.

8         MR. SAMET:  Your Honor, the order specifically says --

9    I won't read the whole thing -- to find out if any responsive

10   emails were deleted, to identify the date of such deletion and

11   to identify the extent of Defendants' efforts to preserve

12   evidence.

13        The only way to do that is to look at the device.

14        MR. WARD:  Judge, if we're talking about any personal

15   Internet service provider or email account provider, you do not

16   need the device to do that because the device itself is not the

17   repository of the information.  They're deleted on the central

18   repository at the email provider or they're deleted in the

19   cloud.

20        So it's just as simple to look up -- in Google, for

21   instance, you delete it on your phone.  A record is made at

22   Google that lets you know when it was accessed, when it was

23   read, when it was deleted.

24        Getting into the personal phone or devices has not been

25   shown necessary here because the information is just as

1    available from the email service provider.

2              MR. SAMET:  Your Honor, that's not correct.  Their

3    vendor has told us and put in the statement of work which we've

4    sent to them without objection that said "I need the device in

5    order to see it."  That's just -- it's just not correct, your

6    Honor.

7              MR. WARD:  We were not a part of the statement of work,

8    your Honor.  This is conversations that were had with a

9    third-party vendor *ex parte*.  And they were sent to us without

10   our consent and so that has -- that does not bear our

11   imprimatur.

12             You can tell when an object was deleted on a phone by

13   looking at the phone, but you can just as easily tell by

14   looking at the email accounts from the email service provider.

15             THE COURT:  So let's talk about this for a minute,

16   practically speaking.  The email -- I mean, the e-discovery

17   vendor:  What is that consultant actually going to be

18   searching?  If according to you you're not going to be turning

19   over the devices and you say that my prior order didn't cover

20   devices, what exactly is the vendor going to do?  Explain that

21   to me.

22             MR. WARD:  Personal email searches, your Honor.

23             THE COURT:  How?

24             MR. WARD:  We're going to have our clients give their

25   user name or their email address and their password.  The

```
1   vendor will go into the account, conduct a forensic analysis

2   within the account, pull the information.  Documents will be

3   pulled.  Discrete emails and attachment will be pulled.

4   Metadata will be pulled.  And that will be handed over to the

5   Plaintiffs.

6           The entire purpose of this third-party vendor issue was

7   driven by the fact that the Plaintiff did not approve of the

8   sufficiency of the self-collection efforts of personal emails

9   that our clients undertook.

10          THE COURT:  All right.  So, for example, Mr. Knobel,

11  for example, would say:  I have three personal email accounts:

12  dknobel1@google.com, dknobel99@hotmail.com and

13  dknobelschoolguru at, you know, some other dot.com.

14          MR. WARD:  Goodman.net.

15          THE COURT:  Yeah.  Att.net or something like that.

16          MR. WARD:  Right.

17          THE COURT:  And by the way, that's my email address.

18  And here's my password.

19          MR. WARD:  That's right.  That's right.

20          THE COURT:  So then the vendor will conduct the search

21  so that the integrity of the search generates more comfort and

22  you don't have to rely on the Plaintiff's self-collection

23  methods because, really, when a plaintiff self-collects, there

24  are two conceivable problems.  Number one is, the individual

25  may not have the technical sophistication to do an adequate
```

 1    job.  They may not have the necessary training or experience in

 2    ESI in order to a search that you're comfortable with.  And I

 3    think the last time I gave as an example if someone asked me to

 4    search my own emails, I probably wouldn't have a high level of

 5    comfort in my results.

 6           On the other hand, if you asked my 29-year-old son,

 7    that would be fine.  But I understand.  So that's one problem

 8    with self-collection.  The person doing the self-collection

 9    isn't an expert, doesn't have the sufficient training or

10    expertise.

11           The second problem isn't really relating to technical

12    expertise.  It has to do with inherent bias.  And naturally,

13    you might have your doubts as to whether or not the Defendant

14    is going to be finding emails and turning them over if they're

15    detrimental to his or her position.

16           I appreciate that.

17           This process with the vendor getting the email

18    addresses and the passwords is designed to deal with that issue

19    as well.  But, of course, that concern arguably is present in

20    every single lawsuit ever filed, whether it relates to

21    electronic discovery or otherwise.

22           I mean, in the old days, I'd propound a request to you

23    for documents:  all contracts that you entered into with

24    textbook distributors.  Then you'd pass it on to your client

25    and your client would have to basically self-collect and pull

 1    the contract files and they'd photocopy 80 pages of documents.

 2    Here they are.

 3            Well, maybe they intentionally withheld 20 pages.  Who

 4    knows?  But that concern over the integrity of the search is

 5    always part of any lawsuit.  Right?

 6            So here, we're trying to address a concern by bringing

 7    in the vendor.  But now you're getting into a little bit of a

 8    different area, which is your request, not the Defendants', to

 9    turn over their actual devices to the vendor:  cell phones,

10    laptops, if they still use a hard drive, any other type of

11    device.  I don't know if they have any other device.  But

12    that's basically -- iPads, things like that.

13            So your position is from the Plaintiff's perspective:

14    Yes, they should turn over all those devices?

15            MR. SAMET:  Yes.  I mean, to the extent that those

16    devices housed email documents.

17            THE COURT:  Well, presumably all devices.

18            MR. SAMET:  Presumably, that's probably the case.

19            THE COURT:  All right.

20            MR. SAMET:  Although I don't know.  The way that this

21    got here, your Honor, with the specific directives about

22    identifying deletion, because there was actually two issues

23    back in April.  One was the self-collection.  We didn't think

24    that it was proper to do self-collection.  But there actually

25    are indications in this case that emails have been deleted.

 1    And we wanted to know why and under what circumstances.

 2         For example, we in this process -- to remind your

 3    Honor, we had initially said we need the personal emails

 4    because the FCC, the work emails, indicated that the Defendants

 5    were using their personal emails.  We gave a number of examples

 6    of those emails to the Defendants.

 7         The defense said that certain of these -- many of the

 8    emails that we have no longer exist with the Defendants.  And

 9    furthermore, my understanding, for example, Ms. Stewart, that

10    her emails no longer exist from the period -- what was it?

11    December to -- December to February, 2013 to February 2014, one

12    of the important periods in the case.

13         Again, I don't know if they were deleted for a normal

14    reason, if for an accident, on purpose.  But that is -- that

15    is -- that's how we came up with the deletion language in here.

16    And again, my concern is that the vendor that they selected is

17    telling me that in order to determine whether something was

18    deleted, the web-based system will not necessarily tell you.

19    They need the device.

20         I could go on with other indications of these missing

21    documents, your Honor.  There are no emails, for example, from

22    knobel.com that have been produced by the Defendant.  Even

23    we've produced emails to them where knobel.com sent emails back

24    to people at FCC, working on this.  So Defendants have not been

25    able to identify any knobel.com emails or those emails

1    themselves to produce to us.  That indicates to us that those

2    emails have been deleted, which, again, could be for a normal

3    reason or for a nefarious reason.  But I would like to get to

4    the bottom of it.

5         MR. WARD:  Judge, I think you're hearing the very

6    arguments for why the devices shouldn't be turned over.

7         "I don't know the reason" is not a sufficient reason

8    under the law to require personal devices to be turned over.

9    For instance, on our side, we wanted to find the PST for David

10   Knobel that was in the possession of FCC and later IEC.  And

11   that's gone.

12        It would be improper for us to suggest, Well, they were

13   deleted -- they're gone.  So we have to presume they were

14   deleted.  We want all of the laptops and cell phones that were

15   registered during the relevant time period at FCC or IEC.

16        This is a premature argument based upon an issue that

17   hasn't arisen yet.  They haven't demonstrated a particularized

18   need for devices.  And it isn't necessarily even the case that

19   the deletions that they're talking about have been

20   substantiated.  They think that there might have been a

21   deletion and they don't know why there might have been a

22   deletion.

23        At this stage, the issue isn't teed up.  We have a

24   third-party vendor who's coming in to do a search of the

25   emails, which is what they wanted and what they're getting.  If

```
 1    after that point they conclude based on evidence that's been
 2    adduced that there is a problem based on deletions, then we can
 3    revisit the question again.
 4           But at this point, the intrusion into my clients'
 5    privacy hasn't been justified and frankly isn't necessary or
 6    proportional.
 7           MR. SAMET:  May I make a suggestion based on that, your
 8    Honor, a constructive one?  And I'll withhold my rebuttal?
 9           Which is, that's fine.  Let's set up a two-stage
10    process.  And let's set that up right now with firm dates.
11    Because we've got a lot of discovery to do in a short time.  I
12    want to get to the bottom of this.
13           THE COURT:  When is your vendor anticipated to start
14    this project?
15           MR. SAMET:  First of all, just to be clear, I don't
16    mean to spar.  It's -- it's the Defendants' vendor.  We're
17    paying for it.  And they're going to be able to review before
18    we get anything.
19           THE COURT:  When is --
20           MR. SAMET:  They're ready to go.
21           THE COURT:  When is the vendor going to start the
22    project?
23           MR. SAMET:  They're ready to go right now.
24           THE COURT:  And how long do you anticipate the project
25    will last?
```

70

1          MS. SCHMIDT:  The vendor anticipates that it takes

2     about several hours to download each email account and several

3     hours additionally to run search terms.  So pending the

4     privilege review by the Defendants before the emails are then

5     shared with us, it would only take the vendor a day or two to

6     pull down these emails and run search terms.

7          THE COURT:  So why don't we do this:  The vendor will

8     conduct Stage 1 of the review; namely, reviewing emails based

9     on the password information provided by the Defendants.

10         The Defendants will conduct a privilege review.  And

11    then any non-privileged emails will be produced to the

12    Plaintiff.

13         If after that the Plaintiff believes that there are

14    grounds to have a second ESI vendor project, namely reviewing

15    Defendants' actual devices, then first you'll discuss it with

16    the Defendants.  Who knows?  Maybe they'll agree.  You never

17    know.  But if they don't agree and then you want to bring it to

18    my attention, you can do so.

19         But let me flag an issue.  Actually, this is what we're

20    going to do, now that I think about it.  I'm going to try to

21    short-circuit the process and avoid any delay.

22         So generally speaking, my discovery procedures prohibit

23    the filing of discovery motions and memoranda absent a court

24    order.  But this is a sufficiently sophisticated issue and a

25    particularized issue that I may want the benefit of some

1    written work product.

2           So if you want to pursue Stage 2, which would be the

3    ESI vendor reviewing the Defendants' actual devices, then

4    first, Step 1, you consult with defense counsel.  Maybe they'd

5    agree.  If they do, I don't need to get involved.

6           If they don't agree, then you'll actually file a

7    written motion with a memorandum not to exceed eight pages.

8    And then the Defendants will file a response within a week, not

9    to exceed eight pages.

10          No reply absent further court order, because it's a

11   fairly specific, isolated issue.

12          I have a general idea of what the memo will say.

13   You'll make your argument and defense will say:  It's just

14   speculation.  It's a hunch.  It's not sufficiently

15   particularized, et cetera, et cetera.

16          You'll say:  Yes, it is.

17          They will say:  No, it isn't.

18          But you'll give me the relevant case law and the

19   circumstances under which these sorts of searches have been

20   permitted and those scenarios where they have not been

21   permitted.  And then there won't be a need to have a discovery

22   hearing and try to squeeze something in on my calendar, because

23   I'm going to be pretty busy over the next several weeks.  And

24   then that way, you'll get a timely ruling.

25          Did you get all that?

```
1                THE LAW CLERK:  (Inaudible.)

2                THE COURT:  I'm sorry?

3                THE LAW CLERK:  (Inaudible.)

4                THE COURT:  A deadline to file the motion?  No.  I'm

5       not putting a deadline on it because it's up to them.  I mean,

6       it's whenever they want to file it.  But once the motion is

7       filed, then there'll be a deadline of one week to file the

8       response.

9                MR. SAMET:  Thank you, your Honor.  I think I

10      understood.

11               Mr. Dervishi had a question of clarification which I

12      should ask.

13               THE COURT:  Sure.

14               MR. SAMET:  The memorandum is not to exceed eight

15      pages.  But supporting materials could be in addition to that?

16               THE COURT:  Yes.

17               MR. SAMET:  I understand.  Only if necessary.

18               THE COURT:  By the way, just so we're really clear,

19      because I know how precise Mr. Dervishi is:  It's eight pages

20      excluding signature block and certificate of service.  That'll

21      squeeze out an extra third of a page.

22               MR. DERVISHI:  That's provided for in the local rules.

23               THE COURT:  Okay.  Oh, by the way, thank you for

24      reminding me:  Double-spaced only.  I know the rules

25      technically permit one-and-a-half spacing, but I have
```

 1   61-year-old eyes and I don't do well with one-and-a-half

 2   spacing.

 3        MR. SAMET:  Yes, your Honor.

 4        THE COURT:  But with the supporting exhibits, whatever

 5   you want to file, you know.

 6        MR. SAMET:  Thank you, your Honor.

 7        I think it would be useful to put in -- because of just

 8   the speed of the schedule, holding dates for Stage 1 while we

 9   are all here.

10        I would ask the Defendants to provide the passwords to

11   the ESI vendor, if not today, then on Monday.  And I would

12   ask -- you know, the ESI vendor will have to do what it has to

13   do.  I will ask the Defendants to complete their privilege

14   review within -- within one week of when they get it from the

15   ESI vendor.

16        MR. WARD:  Judge, I think there's two responses to

17   that.  First, we haven't agreed to the search terms yet.  We

18   need to agree to the search terms, which we'll do on an

19   expedited basis.  But we can't agree to turn over our clients'

20   passwords until we've agreed to the terms that we use to

21   search.

22        And the second point is I think a week is --

23        THE COURT:  Wait.

24        Mr. Samet --

25        MR. SAMET:  I'm sorry.

1          THE COURT:  -- can you just do me a favor?  Just

2    stop -- just --

3          MR. SAMET:  Relax.  I recall, your Honor.

4          THE COURT:  -- relax until he's done.

5          MR. SAMET:  I will, your Honor.

6          THE COURT:  Because you're making all sorts of facial

7    expressions.  I don't know if you are accusing him of lying, if

8    you're surprised, if you're shocked, if you're mortified.

9          MR. SAMET:  It's very late for me.  We woke up at 4:00

10   in the morning.  I apologize, your Honor.

11         Thank you.

12         THE COURT:  So your concern is, number one, search

13   terms haven't been agreed to?

14         MR. WARD:  Correct.

15         THE COURT:  You don't want to provide the password

16   until there are search terms?

17         MR. WARD:  Correct.

18         THE COURT:  What else?

19         MR. WARD:  And the other issue is just in terms of

20   scheduling the review of the documents for privilege and

21   responsiveness.

22         We're conceivably -- we'll be talking about, depending

23   upon how broad the terms are, a large number of documents.  I

24   don't want to commit to a week from the inception -- from

25   receiving the documents to review them if there's just --

```
 1    they're extremely voluminous.  So....

 2            THE COURT:  Mr. Samet, tell me why you were reacting

 3    the way you were.

 4            MR. SAMET:  Your Honor, really, I woke up very early to

 5    take a flight, your Honor.  I'm sorry.

 6            THE COURT:  No.  No.  But something troubled you.  So

 7    what was it?

 8            MR. SAMET:  It does trouble me.

 9            THE COURT:  What's troubling you?

10            MR. SAMET:  It does trouble me.

11            This protocol was put in place at the last hearing not

12    to agree to search terms because we had gone to the -- that

13    makes the whole -- this whole situation backwards, your Honor.

14    We had gone to them.  We had said:  We have agreed search terms

15    back in February.  We're using the search terms for our data.

16    We would like to use the search terms for your data.

17            The Defendants said:  No.  We don't want to use search

18    terms.  We're going to have the Defendants self-collect the

19    information.

20            That's why we came to your Honor in April.  We said:

21    That's improper.

22            Your Honor said:  I'm going to solve this by saying the

23    Defendants have to do their own search.  If Plaintiff is

24    dissatisfied with it, Plaintiffs can then pay for Defendants'

25    vendor to run their own search through those emails.
```

1          Now, it also -- so this is not, now we're going to do

2    discovery again.  It was Defendants' obligation to do the

3    search at the very beginning.

4          In addition, your Honor, the search terms that we have

5    are the identical ones that we agreed with the Defendants.

6    Plus, my colleague tells me we added the Defendants' names and

7    some documents concerning the bonus docs.  Is that right?  And

8    stock.  The compensation docs.  That's all that's added to the

9    search terms that were agreed back in the winter.

10          So this is not -- and this goes to the last comment of

11    that there's going to be so voluminous documents.

12          If it turns out that there are voluminous documents

13    that are found by this search that weren't produced, that's

14    going to indicate a really, really big problem here, because

15    that would indicate that documents that should have been

16    produced back in the winter have not been produced now.

17          THE COURT:  So --

18          MR. SAMET:  So I don't think that should --

19          THE COURT:  So the search terms that were agreed to in

20    the winter were supplemented by, number one, the names of the

21    Defendants?

22          MS. SCHMIDT:  Correct.

23          THE COURT:  What else?

24          MS. SCHMIDT:  And then the terms targeted towards

25    payments that weren't just salary.  So bonus, stock, dividends.

1          THE COURT:  Terms targeting towards non-salary

2    compensation?

3          MS. SCHMIDT:  Correct.

4          THE COURT:  And what else?

5          MS. SCHMIDT:  That I believe is it.

6          MR. WARD:  Judge, two clarifications:  The terms -- the

7    search terms that we talked about agreeing to were the terms

8    that were used to search IEC emails.  We said that those would

9    be an appropriate starting place for us to talk about the

10   review of our clients' emails.

11         So we haven't agreed to --

12         THE COURT:  Have or have not?

13         MR. WARD:  Have not agreed to search terms for personal

14   emails.

15         I have no reason to think that those -- that the search

16   terms that were provided aren't a reasonable starting point.

17   And we will work with opposing counsel on an expedited basis to

18   approve them so that the process can continue.

19         I do want to correct the misapprehension that I think

20   opposing counsel may be laboring under that if there's a lot of

21   documents, it means that we're withholding them.

22         If there's a lot of documents, it may just turn out

23   that some of the terms that they're using have mishits.  For

24   instance, if you use "tax" in one of your emails --

25         THE COURT:  This concerns an issue which hasn't come

1    up --

2              MR. WARD:  Exactly.

3              THE COURT:  -- and may never come up.

4              MR. WARD:  Correct.

5              THE COURT:  So let's not get into that.

6              So this to me is an illustration of what happens all

7    the time in discovery disputes, which is basically the parties

8    are not timely and adequately communicating.  The last time I

9    saw you was the first week of April.  Here it is now the end of

10   August.  And now for the first time you both seem shocked at

11   the other's position about whether or not search terms will

12   need to be used for this search that's going to be conducted by

13   the vendor.

14             So you've had four months to work this out.

15             Now suddenly when you say they should give us the

16   password on Monday, they're saying:  No.  We're not going to do

17   that yet.  We have to agree on the search terms.

18             How is it that that four months went by and you haven't

19   even spoken about that?  That to me is mind-boggling.  What are

20   you even doing in this case for the past four months?

21             MR. SAMET:  Your Honor, first of all, the case was

22   stayed for two months.  Let me correct that.  And I'm not

23   here -- because the case was dismissed.

24             Afterwards, on June 27th, we went to Defendants and we

25   said:  You need to produce the documents pursuant to the

1    magistrate's order, because we --

2          THE COURT:  Hopefully, you didn't use the word

3    "magistrate."  There's nobody here in this court that is called

4    a magistrate.  It's a magistrate judge.

5          MR. SAMET:  Oh, your Honor.

6          THE COURT:  We've been magistrate judges for, like, 30

7    years now.

8          MR. SAMET:  Your Honor, I'm sure that we used the --

9    with respect to the docket --

10         THE COURT:  I'm just beating you a little bit.  But you

11   need to be very careful about that language.

12         Folks, listen, here's what we're going to do.  Okay?

13   Because I can see where this is going.  I'm going to pull my

14   calendar up.  And we're going to force you to get this matter

15   resolved.  Okay?

16         Here's the ruling:  I am scheduling a discovery hearing

17   for Wednesday, August 23rd.  That's the following -- next

18   Wednesday -- at 3:30 in the afternoon.  Anybody who

19   participates will need to be here in person.

20         And the purpose of that discovery hearing will be to

21   resolve the issue of search terms to be used by the vendor.

22   The hearing will be canceled if by Tuesday at 5:00 somebody

23   provides written notice that you have worked out the search

24   terms yourselves.

25         At the risk of stating the obvious, I would be very

80

```
1    happy if you resolved the search term matter on your own.

2    Phrased differently, I'd be unhappy if you didn't work it out.

3         If you do work it out, and as good, professional,

4    hardworking, experienced lawyers, you should work it out, if

5    you work it out, then within two days of the resolution the

6    Defendants will provide to the vendor the password and log-in

7    information.

8         If you're not able to work it out and I have to have a

9    hearing, most likely there'll be a fee-shifting award against

10   the party who I determine is being unreasonable.

11        And these fees will be paid by the lawyers, not the

12   clients.  By the rules.  The rule allows me to enter an award

13   against the party, the attorney or both.  And when it comes to

14   this kind of thing, giving out search term protocols and what

15   words to put in, that's an issue that mostly the lawyers are

16   haggling over, not really the client.

17        So if you're unreasonable, you, the lawyers, you

18   personally are going to be pulling out your individual personal

19   checkbook and striking a check.  And the order will say you

20   will not be reimbursed by the firm and you may not pass on

21   directly or indirectly this cost to your client.  So this will

22   be, you know, on you.

23        So that's the ruling.

24        Now, let's go to the next part of the ruling, which is:

25   How long after the vendor's work is complete do the Defendants
```

1    have to review the work of the vendor?  Plaintiff suggested a

2    week.  The defense says:  I can't even really estimate a time

3    because who knows?  It all depends on what the vendor comes up

4    with.

5            So that's a fair point.  I mean, maybe a week is too

6    long.  I mean, maybe they should be able to review it in three

7    days if the number of hits is minimal.  On the other hand, if

8    it's a fairly voluminous response, it may take several weeks.

9            And I don't think it'll be fair to either party for me

10   to just right now pick a time off the top of my head without

11   knowing what the response is going to be, because maybe that's

12   a wildly unrealistic deadline.

13           So instead, once the vendor tallies up the results, the

14   Defendants will propose to the Plaintiffs within two days of

15   receiving the ESI vendor's report how long you need for your

16   review.

17           MR. SAMET:  They'll tell us within two days, your

18   Honor.

19           THE COURT:  The Defendants will tell you within two

20   weeks:  We need X number of days to review.  Maybe you'll

21   agree; maybe you won't.  Hopefully, there'll be a little give

22   and take, a little bit of horn swagging, a little bit of

23   negotiating, so that I never have to hear from you on this

24   issue again.

25           And then hopefully that'll be the time frame and you'll

```
 1    go from there.  And then, of course, if you have the other

 2    issue concerning Phase II, then it'll be the subject of my

 3    earlier ruling on the motion.

 4             All right?  Everybody clear?

 5             MR. SAMET:  Yes, your Honor.

 6             MR. WARD:  Yes, your Honor.

 7             THE COURT:  Okay.  So anything else?

 8             MR. WARD:  Nothing from the Defendants, your Honor.

 9             MR. SAMET:  No, your Honor.  I believe we've covered

10    everything.  Thank you.

11             THE COURT:  Okay.  So where are you staying while

12    you're here?

13             MR. SAMET:  I'm staying on a hotel near 41st Street on

14    Miami Beach, your Honor.

15             THE COURT:  That's near the Fontainebleau.

16             MR. SAMET:  Yes, your Honor.

17             THE COURT:  But it is not the Fontainebleau.

18             MR. SAMET:  No.  No, your Honor.

19             THE COURT:  Well, let me just say this:  I don't really

20    know this from personal experience, because I'm a 61-year-old

21    guy from the suburbs.  But Mr. Dervishi probably would be able

22    to take you to the Live nightclub, which is -- I've heard

23    that's a pretty hot spot.

24             (Laughter.)

25             MR. DERVISHI:  Those days are long gone, your Honor.
```

```
 1              THE COURT:  I don't think so, Mr. Dervishi.

 2              Actually, my son and daughter from time to time in

 3      years past have gone to that place, to the Live nightclub.  And

 4      when I hear what goes on there, I say:  Why do you want to go

 5      there?  You're just going to be abused by some security guard

 6      who's not going to let you in and you're on the wrong side of

 7      the velvet ropes and you're there for an hour and a half

 8      waiting to meet with your friends and then someone knows

 9      somebody who has a friend who knows a guy who knows a security

10      guard and you're all going to congregate and think you're all

11      going to go in at one time, and then an hour and a half later

12      some of you have gotten in and some of you have not gotten in.

13      And those of who you did get in, you have the privilege of

14      buying a drink for 25 bucks or something.  So I don't even get

15      it.  I don't even understand what the attraction is.

16              So why do you go there, Mr. Dervishi?

17              (Laughter.)

18              MR. DERVISHI:  Never been there, your Honor.  And I'll

19      certify to that.  I'll do that under oath.

20              THE COURT:  Well, certain things are just obvious.  So

21      I'll accept that at face value.

22              All right.  You probably have the grand slam breakfast

23      at Denny's.  Okay.

24              Folks, we'll be in recess.  Take care.

25              MR. SAMET:  Thank you, Judge.
```

```
 1              MR. WARD:  Thank you, your Honor.

 2              MR. DERVISHI:  Thank you.

 3           (Proceedings concluded.)

 4                    C E R T I F I C A T E

 5

 6        I hereby certify that the foregoing is an

 7   accurate transcription of the proceedings in the

 8   above-entitled matter to the best of my ability.

 9

10

11   _____        /s/Lisa Edwards
        DATE              LISA EDWARDS, RDR, CRR
12                        Official Court Reporter
                          United States District Court
13                        400 North Miami Avenue, Twelfth Floor
                          Miami, Florida 33128
14                        (305) 523-5499

15

16

17

18

19

20

21

22

23

24

25
```

## /

**/s/Lisa** [1] - 84:10

## 1

**1** [14] - 1:9, 4:15, 4:16, 7:13, 47:15, 47:16, 48:3, 48:4, 49:2, 49:3, 61:2, 70:8, 71:4, 73:8
**1.1** [1] - 9:17
**1.3** [2] - 9:22, 14:16
**1.4** [1] - 9:22
**100** [1] - 32:17
**10017** [1] - 1:19
**1099** [6] - 49:24, 49:25, 50:7, 52:2, 56:10, 62:2
**1099s** [11] - 52:6, 55:18, 55:20, 55:22, 55:24, 56:1, 56:17, 57:17, 59:8, 60:8
**125** [1] - 10:1
**125-gigabyte** [1] - 9:15
**140** [1] - 1:18
**1450** [1] - 2:4
**16-62028-Civil** [1] - 3:1
**16-62028-CIVIL-LENARD** [1] - 1:2
**17** [2] - 58:23, 59:19
**1700** [1] - 1:22
**18** [1] - 1:5

## 2

**2** [9] - 4:17, 4:19, 7:13, 47:15, 47:16, 49:7, 49:8, 49:9, 71:2
**20** [1] - 66:3
**2012** [1] - 10:12
**2013** [1] - 67:11
**2014** [1] - 67:11
**2015** [1] - 12:23
**2017** [1] - 1:5
**23rd** [2] - 2:5, 79:17
**24th** [1] - 12:11
**25** [5] - 20:25, 25:24, 26:2, 27:11, 83:14
**25th** [1] - 1:18
**27th** [2] - 48:11, 78:24
**28th** [4] - 48:7, 48:8, 48:9, 48:14
**29-year-old** [1] - 65:6

## 3

**3** [5] - 4:21, 6:7, 6:8, 7:11, 47:13
**30** [2] - 38:21, 79:6
**30(b)(6** [2] - 44:5, 45:2
**305** [2] - 2:10, 84:13
**33128** [2] - 2:9, 84:13
**33131** [2] - 1:22, 2:5
**3:30** [1] - 79:18

## 4

**400** [2] - 2:8, 84:12
**401(k** [1] - 52:23
**41** [2] - 38:25, 39:1
**41st** [1] - 82:13
**45** [1] - 19:15
**45th** [1] - 1:18
**4:00** [1] - 74:9
**4:30** [1] - 7:17
**4:32** [1] - 1:6
**4th** [1] - 12:10

## 5

**523-5499** [2] - 2:10, 84:13
**5:00** [2] - 48:7, 79:22
**5:30** [1] - 7:18

## 6

**61-year-old** [2] - 73:1, 82:20

## 7

**7:30** [2] - 47:19, 47:23
**7th** [6] - 12:13, 12:14, 48:5, 49:15, 53:20, 61:11

## 8

**80** [1] - 66:1

## 9

**9** [2] - 58:25, 59:20

## A

**Aaron** [4] - 36:19, 36:20, 39:22, 43:6
**abiding** [1] - 11:8
**ability** [4] - 33:25, 40:10, 46:25, 84:8
**able** [10] - 8:11, 20:6, 37:23, 43:9, 53:23, 67:25, 69:17, 80:8, 81:6, 82:21
**above-entitled** [1] - 84:8
**absent** [2] - 70:23, 71:10
**abused** [1] - 83:5
**academic** [1] - 23:24
**accept** [2] - 55:21, 83:21
**access** [4] - 38:3, 54:15, 61:14, 61:23
**accessed** [1] - 62:22
**accident** [1] - 67:14
**accommodation** [1] - 57:10
**according** [1] - 63:18
**account** [4] - 62:15, 64:1, 64:2, 70:2
**accounts** [6] - 50:19, 61:12, 61:14, 62:4, 63:14, 64:11
**accuracy** [2] - 33:6, 42:19
**accurate** [1] - 84:7
**accusing** [1] - 74:7
**acquired** [2] - 14:2, 14:9
**acquiring** [1] - 34:7
**acquisition** [1] - 34:11
**action** [2] - 48:8, 48:13
**actual** [8] - 19:15, 37:15, 39:17, 44:15, 58:18, 66:9, 70:15, 71:3
**added** [2] - 76:6, 76:8
**addition** [4] - 38:7, 51:4, 72:15, 76:4
**additional** [5] - 39:13, 40:13, 43:10, 43:11, 46:4
**additionally** [1] - 70:3
**address** [4] - 23:25, 63:25, 64:17, 66:6
**addresses** [2] - 4:1, 65:18

**adduced** [1] - 69:2
**adequate** [2] - 8:17, 64:25
**adequately** [1] - 78:8
**admitted** [1] - 3:16
**affidavit** [4] - 41:17, 42:10, 42:18, 42:24
**afternoon** [6] - 3:4, 3:14, 4:8, 5:3, 7:15, 79:18
**afterwards** [3] - 23:12, 50:20, 78:24
**ago** [2] - 18:25, 53:20
**agree** [13] - 23:16, 34:13, 49:6, 55:4, 70:16, 70:17, 71:5, 71:6, 73:18, 73:19, 75:12, 78:17, 81:21
**agreed** [15] - 34:11, 48:16, 49:18, 56:16, 57:10, 60:23, 73:17, 73:20, 74:13, 75:14, 76:5, 76:9, 76:19, 77:11, 77:13
**agreeing** [1] - 77:7
**agreement** [4] - 21:1, 44:10, 49:4, 60:5
**ahead** [1] - 28:7
**al** [1] - 3:3
**allegation** [1] - 16:2
**allegations** [1] - 27:16
**allege** [2] - 17:4, 17:5
**allow** [1] - 40:20
**allowed** [1] - 48:12
**allows** [2] - 9:24, 80:12
**almost** [1] - 52:8
**alternative** [1] - 41:3
**amended** [8] - 5:24, 7:10, 8:21, 10:18, 12:11, 46:10, 47:13, 48:12
**AMINI** [1] - 1:17
**Amini** [1] - 3:15
**analysis** [1] - 64:1
**Anderson** [6] - 36:19, 36:21, 36:24, 38:4, 39:22, 43:7
**angle** [2] - 49:25, 52:3, 55:25
**annoyed** [1] - 33:14
**answer** [9] - 11:19, 19:22, 21:19, 23:22, 32:7, 47:1, 54:20, 59:1, 59:21
**answered** [1] - 59:25
**answers** [1] - 43:12
**anticipate** [1] - 69:24

**anticipated** [1] - 69:13
**anticipates** [1] - 70:1
**anyway** [2] - 11:14, 57:12
**apologize** [1] - 74:10
**appearances** [1] - 3:13
**APPEARANCES** [2] - 1:14, 2:1
**applies** [1] - 46:8
**appointed** [5] - 24:6, 24:9, 26:12, 26:14, 26:15
**appointing** [1] - 25:12
**appreciate** [4] - 6:18, 47:21, 65:16
**appropriate** [2] - 20:8, 77:9
**approve** [2] - 64:7, 77:18
**April** [14] - 12:10, 12:13, 12:14, 48:5, 48:7, 48:8, 48:9, 49:15, 50:17, 53:20, 61:11, 66:23, 75:20, 78:9
**April's** [1] - 12:10
**area** [1] - 66:8
**areas** [1] - 32:17
**arguably** [1] - 65:19
**argue** [1] - 7:23
**argument** [3] - 28:12, 68:16, 71:13
**arguments** [1] - 68:6
**arisen** [1] - 68:17
**arranged** [1] - 34:7
**arrangement** [1] - 38:13
**assets** [8] - 14:1, 25:24, 26:7, 26:16, 27:12, 33:21, 34:7, 34:11, 35:19
**associate** [1] - 3:16
**ASSOCIATES** [1] - 1:4
**Associates** [1] - 3:2
**assume** [4] - 25:19, 31:8, 33:4, 55:3
**assure** [1] - 25:7
**astutely** [1] - 43:18
**Att.net** [1] - 64:15
**attached** [1] - 10:19
**attachment** [1] - 64:3
**attachments** [1] - 48:18
**attempt** [1] - 9:8
**attention** [1] - 70:18
**attorney** [1] - 80:13

**attraction** [1] - 83:15
**AUDIO** [1] - 1:13
**auditors** [2] - 13:5, 27:12
**August** [3] - 1:5, 78:10, 79:17
**available** [1] - 63:1
**Avenue** [4] - 1:21, 2:4, 2:8, 84:12
**Avery** [1] - 3:14
**AVERY** [1] - 1:16
**avoid** [1] - 70:21
**award** [2] - 80:9, 80:12
**awful** [1] - 9:23
**AXELROD** [1] - 2:4

**B**

**backwards** [1] - 75:13
**BAENA** [1] - 2:3
**balance** [2] - 26:4
**ball** [3] - 28:10, 33:7, 53:14
**bankrupt** [2] - 26:21, 28:18
**bankruptcy** [26] - 8:20, 12:17, 21:9, 22:21, 24:5, 24:6, 24:7, 24:10, 24:15, 24:18, 24:20, 25:10, 25:11, 25:22, 26:5, 26:7, 26:11, 26:13, 26:15, 26:19, 27:9, 28:23, 30:20, 31:9, 38:20
**bar** [1] - 4:5
**BARTNESS** [1] - 1:8
**based** [8] - 19:9, 59:2, 67:18, 68:16, 69:1, 69:2, 69:7, 70:8
**basic** [1] - 53:23
**basis** [3] - 22:15, 73:19, 77:17
**battling** [2] - 5:4, 10:18
**Beach** [1] - 82:14
**bear** [1] - 63:10
**beat** [1] - 15:23
**beating** [1] - 79:10
**beef** [1] - 55:12
**BEFORE** [1] - 1:12
**began** [1] - 21:10
**begin** [3] - 12:4, 46:23, 54:15
**beginning** [1] - 76:3
**begun** [1] - 22:1
**behalf** [5] - 4:9, 8:20,

12:17, 23:19, 49:12
**belabor** [1] - 58:11
**belief** [1] - 26:18
**believer** [1] - 42:22
**believes** [1] - 70:13
**belongs** [1] - 19:11
**belt** [1] - 57:13
**bench** [1] - 27:3
**benefit** [1] - 70:25
**best** [1] - 84:8
**better** [4] - 23:2, 30:10, 31:6, 56:11
**between** [5] - 20:4, 21:1, 29:1, 38:13, 46:21
**beyond** [1] - 26:18
**bias** [1] - 65:12
**big** [4] - 33:5, 41:15, 42:22, 76:14
**BILZIN** [1] - 2:3
**bit** [8] - 19:9, 20:12, 41:22, 45:5, 66:7, 79:10, 81:22
**bitter** [1] - 46:23
**bizarre** [1] - 22:25
**blame** [1] - 34:1
**blind** [1] - 10:17
**block** [1] - 72:20
**blood** [3] - 40:8, 49:23, 50:2
**board** [7] - 9:11, 10:9, 10:10, 10:13, 13:15, 62:5
**Boca** [1] - 37:2
**boggling** [1] - 78:19
**bonus** [3] - 50:13, 76:7, 76:25
**book** [2] - 46:1, 46:3
**bottom** [3] - 44:4, 68:4, 69:12
**bought** [4] - 20:24, 21:4, 38:8
**break** [1] - 12:15
**breakfast** [1] - 83:22
**BRIAN** [1] - 1:20
**Brian** [1] - 3:18
**Brickell** [1] - 2:4
**briefly** [2] - 20:15, 20:18
**bring** [4] - 11:7, 11:9, 26:17, 70:17
**bringing** [1] - 66:6
**broad** [1] - 74:23
**broadly** [1] - 10:22
**brought** [2] - 30:12, 33:18
**bucks** [1] - 83:14
**bugaboo** [1] - 20:5
**building** [1] - 11:11

**bulk** [1] - 14:1
**burden** [1] - 11:4
**business** [5] - 32:25, 34:7, 38:13, 38:14, 43:14
**busy** [1] - 71:23
**but...** [1] - 7:22
**buy** [5] - 4:2, 20:23, 46:1, 46:2
**buying** [1] - 83:14
**BY** [1] - 2:7

**C**

**cabinets** [1] - 23:13
**calendar** [7] - 4:25, 5:7, 5:25, 19:2, 61:6, 71:22, 79:14
**California** [10] - 18:1, 18:2, 18:4, 18:7, 18:11, 18:16, 19:6, 19:11, 20:2, 20:10
**cancel** [1] - 8:12
**canceled** [2] - 5:7, 79:22
**cannot** [1] - 59:4
**CARA** [1] - 1:16
**Cara** [1] - 3:16
**care** [1] - 83:24
**Career** [1] - 26:1
**career** [1] - 26:2
**careful** [2] - 32:17, 79:11
**carefully** [1] - 41:20
**carry** [1] - 11:10
**cart** [1] - 56:7
**Case** [1] - 3:1
**CASE** [1] - 1:2
**case** [32] - 7:3, 8:14, 8:21, 9:3, 9:9, 10:3, 10:21, 16:3, 22:14, 22:18, 27:16, 27:17, 27:21, 27:22, 28:16, 33:12, 33:25, 37:19, 38:4, 43:19, 46:14, 46:19, 52:21, 54:11, 66:18, 66:25, 67:12, 68:18, 71:18, 78:20, 78:21, 78:23
**categories** [1] - 53:3
**causal** [1] - 28:25
**causes** [1] - 5:2
**cell** [2] - 66:9, 68:14
**central** [2] - 37:19, 62:17
**Central** [5] - 1:17, 3:24, 3:25, 4:3, 4:5
**CEO** [1] - 30:24
**certain** [6] - 5:9,

5:18, 5:19, 47:18, 67:7, 83:20
**certainly** [5] - 11:10, 10:13, 38:4, 38:10, 45:7
**certificate** [1] - 72:20
**certification** [1] - 22:19
**certifies** [1] - 17:23
**certify** [3] - 41:4, 83:19, 84:6
**cetera** [3] - 33:22, 71:15
**chain** [1] - 29:1
**change** [2] - 14:25, 22:5
**changes** [1] - 9:11
**charge** [1] - 30:21
**check** [3] - 25:4, 25:6, 80:19
**checkbook** [1] - 80:19
**checking** [1] - 25:8
**Chicago** [1] - 18:25
**chief** [2] - 13:14, 13:18
**CID** [1] - 1:8
**Cid** [2] - 31:1, 38:5
**circuit** [1] - 70:21
**circumstance** [2] - 17:23, 33:20
**circumstances** [4] - 11:24, 47:11, 67:1, 71:19
**claim** [1] - 46:22
**claiming** [1] - 28:5
**claims** [2] - 10:18, 24:8
**clarification** [1] - 72:11
**clarifications** [1] - 77:6
**clarifying** [1] - 20:22
**clear** [11] - 7:14, 8:22, 16:13, 19:21, 29:12, 30:11, 51:25, 52:4, 69:15, 72:18, 82:4
**CLERK** [2] - 72:1, 72:3
**client** [6] - 47:7, 59:19, 65:24, 65:25, 80:16, 80:21
**clients** [18] - 9:1, 10:24, 11:6, 11:11, 22:6, 30:12, 30:14, 30:21, 56:25, 57:5, 57:8, 57:18, 59:3, 60:10, 61:15, 63:24, 64:9, 80:12

**clients'** [4] - 58:1, 69:4, 73:19, 77:10
**Clingman** [1] - 3:2
**CLINGMAN** [1] - 1:4
**close** [2] - 28:25, 47:19
**cloud** [3] - 12:2, 37:14, 62:19
**coincidentally** [1] - 48:7
**colleague** [1] - 53:13, 76:6
**colleagues** [1] - 18:25
**collect** [5] - 50:21, 50:23, 60:24, 65:25, 75:18
**collection** [6] - 64:8, 64:22, 65:8, 66:23, 66:24
**collects** [1] - 64:23
**College** [1] - 26:1
**colloquy** [5] - 6:13, 49:17, 50:14
**comfort** [2] - 64:21, 65:5
**comfortable** [6] - 3:5, 6:20, 7:6, 45:6, 45:8, 65:2
**coming** [4] - 27:23, 53:1, 61:3, 68:24
**comment** [3] - 16:8, 19:9, 76:10
**commit** [1] - 74:24
**communicated** [1] - 30:2
**communicating** [1] - 78:8
**communications** [4] - 10:8, 29:19, 44:9, 59:13
**comp** [1] - 59:13
**companies** [2] - 20:24, 20:25
**company** [15] - 8:25, 11:6, 13:16, 13:17, 22:6, 28:19, 31:20, 36:6, 43:14, 46:15, 46:18, 46:21, 46:25, 47:2, 47:5
**compel** [3] - 40:21, 40:22, 40:24
**compelling** [1] - 45:7
**compensation** [14] - 49:11, 49:18, 49:21, 50:10, 51:2, 51:5, 51:8, 52:2, 56:25, 57:6, 57:19, 60:11, 76:8, 77:2
**complaint** [5] - 8:21,

10:18, 14:5, 22:11, 48:12

**complete** [5] - 33:6, 46:23, 52:22, 73:13, 80:25

**completely** [2] - 42:1, 42:15

**compliance** [2] - 17:19, 19:7

**comply** [1] - 15:19

**computer** [2] - 11:10, 13:6

**computers** [11] - 12:1, 12:24, 21:7, 22:20, 28:19, 37:13, 37:15, 37:20, 39:17, 41:5, 43:1

**conceivable** [1] - 64:24

**conceivably** [1] - 74:22

**concern** [6] - 29:25, 65:19, 66:4, 66:6, 67:16, 74:12

**concerned** [1] - 50:7

**concerning** [11] - 16:9, 19:10, 42:13, 43:8, 48:15, 49:10, 52:2, 57:19, 60:11, 76:7, 82:2

**concerns** [3] - 17:16, 49:10, 77:25

**conclude** [1] - 69:1

**concluded** [3] - 60:3, 61:7, 84:3

**conclusion** [1] - 9:10

**conduct** [4] - 64:1, 64:20, 70:8, 70:10

**conducted** [1] - 78:12

**conducting** [1] - 60:5

**conference** [3] - 51:19, 53:12

**confident** [1] - 53:1

**confidentiality** [2] - 53:9, 53:24

**confirmed** [2] - 12:19, 12:22

**confirming** [1] - 42:25

**confounding** [1] - 44:14

**congregate** [1] - 83:10

**connection** [3] - 24:6, 32:6, 43:5

**consent** [1] - 63:10

**consequence** [3] - 8:25, 9:13, 22:13

**consequences** [1] - 27:15

**constructive** [1] - 69:8

**consult** [1] - 71:4

**consultant** [1] - 63:17

**consulting** [1] - 13:3

**consummated** [1] - 21:9

**contain** [1] - 33:22

**contained** [1] - 10:6

**contemplated** [1] - 61:17

**contention** [1] - 14:21

**continue** [2] - 59:23, 77:18

**CONTINUED** [1] - 2:1

**contract** [1] - 66:1

**contracts** [2] - 11:8, 65:23

**contractual** [1] - 38:13

**control** [7] - 9:4, 21:2, 26:8, 26:10, 33:21, 41:7, 41:13

**conundrum** [1] - 22:25

**conversation** [4] - 27:2, 53:4, 53:6, 53:11

**conversations** [5] - 14:14, 17:10, 19:7, 21:14, 63:8

**cooperated** [1] - 13:7

**cooperating** [1] - 47:7

**cooperation** [1] - 46:24

**cooperative** [1] - 44:7

**coordinate** [1] - 37:12

**copies** [2] - 9:7, 56:18

**copy** [4] - 53:7, 53:8, 56:11, 59:11

**Cornelia** [4] - 36:19, 36:20, 39:22, 43:6

**corporate** [2] - 10:9, 37:16

**Corporation** [2] - 13:25

**correct** [28] - 3:22, 4:22, 7:16, 16:19, 16:24, 18:19, 22:8, 23:5, 25:20, 32:13,

38:21, 49:1, 49:4, 51:15, 53:21, 54:21, 56:14, 58:5, 58:6, 63:2, 63:5, 74:14, 74:17, 76:22, 77:3, 77:19, 78:4, 78:22

**corrected** [1] - 58:9

**correctly** [1] - 48:25

**cost** [1] - 80:21

**counsel** [25] - 3:17, 14:14, 15:22, 19:14, 20:16, 24:17, 24:21, 26:8, 27:1, 27:8, 28:9, 29:7, 51:22, 53:2, 54:7, 54:18, 56:2, 56:6, 56:23, 56:24, 58:10, 71:4, 77:17, 77:20

**counsel's** [1] - 55:21

**country** [8] - 10:11, 18:23, 19:1, 26:2, 37:16, 38:19, 39:1

**couple** [4] - 13:12, 20:21, 23:1, 37:24

**course** [6] - 11:18, 24:7, 26:7, 26:18, 65:19, 82:1

**court** [11] - 5:3, 17:22, 18:7, 26:12, 26:13, 26:15, 26:19, 26:20, 70:23, 71:10, 79:3

**COURT** [212] - 1:1, 3:4, 3:8, 3:19, 3:23, 4:4, 4:10, 4:14, 4:19, 4:23, 5:13, 5:16, 5:20, 6:1, 6:4, 6:6, 6:8, 6:15, 7:7, 7:16, 7:19, 7:23, 12:13, 13:22, 16:6, 16:15, 16:17, 16:20, 16:25, 17:14, 18:2, 18:4, 18:6, 18:12, 18:15, 18:17, 18:20, 19:12, 19:17, 19:19, 20:5, 20:12, 20:17, 20:19, 22:8, 22:10, 22:24, 23:5, 23:7, 23:14, 24:2, 24:10, 24:14, 24:17, 24:20, 24:23, 24:25, 25:4, 25:6, 25:8, 25:17, 25:19, 25:22, 26:13, 28:2, 28:15, 29:4, 29:7, 30:1, 30:15, 30:20, 30:23, 30:25, 31:6, 31:15, 31:18, 31:20, 32:1, 32:4, 32:8, 32:10, 32:14, 32:21, 33:1, 33:4, 34:15, 34:18,

34:21, 35:4, 35:8, 35:12, 35:14, 35:16, 35:18, 36:1, 36:4, 36:10, 36:14, 36:16, 36:18, 36:20, 36:22, 37:1, 37:3, 37:5, 38:15, 38:18, 39:1, 39:5, 39:7, 39:9, 40:16, 40:19, 41:9, 41:14, 41:16, 42:5, 44:1, 44:18, 45:5, 45:17, 45:21, 45:24, 46:2, 46:10, 47:17, 47:22, 48:1, 48:3, 49:2, 49:5, 49:7, 51:11, 51:16, 51:25, 52:13, 52:16, 52:18, 53:1, 53:19, 53:22, 54:3, 54:16, 54:20, 54:22, 55:2, 55:23, 56:3, 56:5, 56:9, 56:15, 56:17, 57:16, 57:21, 58:5, 58:7, 58:17, 59:6, 59:18, 60:10, 60:15, 60:17, 63:15, 63:23, 64:10, 64:15, 64:17, 64:20, 66:17, 66:19, 69:13, 69:19, 69:21, 69:24, 70:7, 72:2, 72:4, 72:13, 72:16, 72:18, 72:23, 73:4, 73:23, 74:1, 74:4, 74:6, 74:12, 74:15, 74:18, 75:2, 75:6, 75:9, 76:17, 76:19, 76:23, 77:1, 77:4, 77:12, 77:25, 78:3, 78:5, 79:2, 79:6, 79:10, 81:19, 82:7, 82:11, 82:15, 82:17, 82:19, 83:1, 83:20

**Court** [9] - 2:7, 2:8, 8:2, 24:22, 48:8, 48:11, 48:12, 84:11, 84:12

**court-overseen** [1] - 26:23

**courtesy** [2] - 6:19, 9:7

**COURTROOM** [1] - 3:1

**courts** [1] - 18:22

**cover** [1] - 63:19

**covered** [1] - 82:9

**created** [1] - 12:19

**creditors** [2] - 8:23, 24:8

**cross** [1] - 33:17

**cross-hairs** [1] -

33:17

**CRR** [2] - 2:7, 84:11

**curious** [1] - 16:25

**current** [1] - 45:11

**custodial** [1] - 10:2

**custody** [3] - 9:4, 41:6, 41:13

**cut** [1] - 28:23

**cutoff** [2] - 45:16, 61:2

**D**

**dark** [4] - 11:20, 26:6, 40:4, 42:1

**data** [12] - 9:23, 10:7, 14:24, 21:2, 21:4, 21:7, 33:22, 37:6, 37:9, 43:1, 75:15, 75:16

**date** [1] - 62:10

**DATE** [1] - 84:11

**dates** [3] - 48:19, 69:10, 73:8

**daughter** [1] - 83:2

**David** [2] - 10:2, 68:9

**DAVID** [1] - 1:7

**day-to-day** [1] - 34:6

**days** [11] - 39:16, 48:23, 48:25, 56:19, 65:22, 80:5, 81:7, 81:14, 81:17, 81:20, 82:25

**deadline** [4] - 72:4, 72:5, 72:7, 81:12

**deal** [1] - 65:18

**dealing** [1] - 8:24

**Dean** [1] - 31:4

**DEAN** [1] - 1:8

**debating** [1] - 14:20

**debtor** [5] - 8:23, 11:25, 13:15, 21:8, 41:7

**debtors'** [2] - 13:4, 13:5

**December** [3] - 61:2, 67:11

**declaration** [3] - 41:17, 42:24, 43:2

**defend** [4] - 27:16, 33:12, 33:25, 47:4

**Defendant** [6] - 12:16, 15:9, 34:16, 46:17, 65:13, 67:22

**Defendants** [52] - 4:9, 5:18, 7:17, 10:3, 13:11, 14:5, 14:10, 17:6, 22:3, 30:7, 34:24, 42:4, 47:3,

48:6, 48:8, 48:14, 48:20, 48:21, 49:12, 49:13, 49:15, 49:17, 50:18, 52:3, 52:14, 52:16, 55:3, 55:19, 55:20, 55:21, 67:4, 67:6, 67:8, 67:24, 70:4, 70:9, 70:10, 70:16, 71:8, 73:10, 73:13, 75:17, 75:18, 75:23, 76:5, 76:21, 78:24, 80:6, 80:25, 81:14, 81:19, 82:8

**DEFENDANTS** [1] - 2:2

**defendants** [1] - 1:9
**Defendants'** [16] - 14:21, 15:18, 16:16, 16:21, 17:17, 46:7, 50:16, 51:23, 62:11, 66:8, 69:16, 70:15, 71:3, 75:24, 76:2, 76:6

**defense** [16] - 4:7, 6:22, 10:23, 10:24, 23:16, 36:1, 50:25, 51:5, 54:7, 54:18, 56:18, 60:22, 67:7, 71:4, 71:13, 81:2

**defer** [3] - 24:23, 24:24, 26:9

**definitely** [1] - 22:2
**defunct** [4] - 23:3, 23:4, 28:18, 31:20
**delay** [1] - 70:21
**delete** [1] - 62:21
**deleted** [11] - 62:10, 62:17, 62:18, 62:23, 63:12, 66:25, 67:13, 67:18, 68:2, 68:13, 68:14

**deleting** [1] - 21:3
**deletion** [5] - 62:10, 66:22, 67:15, 68:21, 68:22

**deletions** [2] - 68:19, 69:2

**demonstrate** [1] - 9:8
**demonstrated** [1] - 68:17

**Denny's** [1] - 83:23
**Department** [1] - 10:8
**deposition** [9] - 6:9, 39:15, 40:18, 44:5, 45:1, 45:2, 45:22, 61:10

**deposition-scheduling** [1] - 61:10

**depositions** [9] - 5:22, 5:23, 6:5, 6:8, 39:22, 39:25, 40:1, 61:3, 61:7

**DEPUTY** [1] - 3:1
**Dervishi** [9] - 3:18, 54:7, 54:8, 54:17, 72:11, 72:19, 82:21, 83:1, 83:16

**DERVISHI** [7] - 1:20, 1:21, 3:18, 72:22, 82:25, 83:18, 84:2
**describe** [1] - 14:12
**designed** [1] - 65:18
**desktop** [1] - 59:11
**detail** [2] - 9:16, 12:10

**determine** [2] - 67:17, 80:10
**detrimental** [1] - 65:15

**device** [7] - 62:13, 62:16, 63:4, 66:11, 67:19

**device's** [1] - 61:21
**devices** [20] - 11:9, 50:19, 60:25, 61:11, 61:16, 61:19, 61:25, 62:3, 62:24, 63:19, 63:20, 66:9, 66:14, 66:16, 66:17, 68:6, 68:8, 68:18, 70:15, 71:3

**different** [8] - 12:15, 14:25, 18:22, 18:23, 61:16, 61:18, 62:3, 66:8

**differently** [1] - 80:2
**difficult** [3] - 10:19, 11:15, 22:13

**DIGITAL** [1] - 1:13
**diligence** [1] - 39:13
**directed** [1] - 48:6
**directives** [1] - 66:21
**directly** [3] - 36:7, 37:22, 80:21
**director** [5] - 34:17, 35:10, 35:16, 35:17, 35:18
**disadvantageous** [1] - 9:1
**discovery** [49] - 4:25, 5:4, 5:5, 5:7, 8:18, 9:6, 11:19, 12:4, 14:8, 14:12, 14:20, 15:19, 17:22, 18:6, 19:1, 19:2, 19:10, 27:24, 29:3, 33:12, 37:11, 39:9, 40:4, 40:21, 42:6, 42:13, 42:17,

43:11, 45:16, 46:17, 51:7, 51:13, 53:19, 54:13, 55:7, 55:8, 61:2, 61:4, 63:16, 65:21, 69:11, 70:22, 70:23, 71:21, 76:2, 78:7, 79:16, 79:20

**DISCOVERY** [1] - 1:11

**discrete** [1] - 64:3
**discuss** [1] - 70:15
**discussed** [4] - 9:17, 12:9, 46:13, 54:12
**discussion** [7] - 19:14, 23:15, 44:9, 46:8, 49:18, 51:13, 52:19

**discussions** [4] - 12:8, 15:5, 49:9, 51:18
**dismissed** [2] - 48:8, 78:23

**dispute** [10] - 5:4, 14:20, 17:22, 18:7, 18:8, 19:10, 20:8, 20:9, 39:10, 40:21
**disputes** [7] - 5:2, 5:5, 55:7, 55:8, 61:4, 61:6, 78:7
**dissatisfied** [1] - 75:24

**distributors** [1] - 65:24
**DISTRICT** [2] - 1:1, 1:1

**District** [4] - 2:8, 18:14, 19:20, 84:12
**district** [3] - 17:22, 18:7, 18:22
**dividends** [1] - 76:25
**DIVISION** [1] - 1:2
**dknobel1@google. com** [1] - 64:12
**dknobel99@ hotmail.com** [1] - 64:12
**dknobelschoolgur u** [1] - 64:13
**docket** [4] - 5:25, 25:11, 27:22, 79:9
**docs** [2] - 76:7, 76:8
**document** [8] - 15:9, 15:12, 51:10, 51:25, 52:25, 58:19, 60:12
**documents** [61] - 9:2, 9:20, 10:19, 11:3, 13:1, 13:2, 13:3, 15:10, 15:11, 15:15, 15:25, 19:15, 19:19, 19:22, 19:23, 21:22,

21:23, 28:19, 29:24, 41:5, 41:8, 47:1, 49:10, 49:17, 49:21, 50:5, 50:6, 50:16, 51:2, 52:11, 57:4, 57:16, 57:18, 58:14, 58:17, 58:24, 58:25, 59:3, 59:6, 59:12, 59:20, 60:2, 60:4, 60:11, 62:1, 64:2, 65:23, 66:1, 66:16, 67:21, 74:20, 74:23, 74:25, 76:7, 76:11, 76:12, 76:15, 77:21, 77:22, 78:25

**dollars** [1] - 15:3
**Donald** [1] - 33:9
**done** [12] - 16:1, 28:11, 28:21, 29:11, 30:19, 44:25, 45:10, 53:10, 54:23, 56:13, 56:15, 74:4
**dot.com** [1] - 64:13
**double** [1] - 72:24
**double-spaced** [1] - 72:24
**doubts** [1] - 65:13
**down** [6] - 4:14, 6:20, 6:25, 45:3, 45:9, 70:6

**download** [1] - 70:2
**downtown** [2] - 3:10, 3:11
**dozens** [2] - 38:22, 38:23
**draft** [2] - 54:2, 54:18
**drink** [1] - 83:14
**drive** [11] - 3:10, 9:17, 14:7, 14:9, 14:10, 14:11, 14:13, 14:16, 14:23, 15:5, 66:10
**driven** [1] - 64:7
**due** [1] - 39:13
**during** [2] - 10:13, 68:15
**DUVALL** [2] - 2:3, 4:22
**Duvall** [2] - 4:9, 4:21

---

## E

**e-discovery** [1] - 63:16
**early** [3] - 27:23, 44:9, 75:4
**easier** [1] - 48:2
**easily** [1] - 63:13
**East** [1] - 1:18

**easy** [2] - 25:4, 25:6
**Education** [4] - 10:8, 13:24, 13:25, 38:8
**Edwards** [1] - 84:10
**EDWARDS** [2] - 2:7, 84:11
**effect** [2] - 5:8, 42:9
**effort** [1] - 54:1
**efforts** [3] - 26:24, 62:11, 64:8
**eight** [4] - 71:7, 71:9, 72:14, 72:19
**either** [10] - 11:17, 13:2, 20:3, 20:9, 32:14, 40:6, 41:17, 45:11, 57:17, 81:9
**electronic** [4] - 35:21, 36:5, 43:5, 65:21
**elsewhere** [1] - 47:8
**email** [27] - 9:15, 13:7, 13:19, 13:21, 14:2, 14:3, 48:6, 50:19, 58:12, 58:18, 60:12, 61:12, 61:14, 62:4, 62:15, 62:18, 63:1, 63:14, 63:16, 63:22, 63:25, 64:11, 64:17, 65:17, 66:16, 70:2
**emails** [48] - 10:3, 10:4, 10:5, 13:13, 30:5, 30:13, 34:23, 34:25, 35:3, 48:9, 48:14, 48:16, 48:22, 51:23, 57:6, 57:12, 58:10, 59:14, 60:4, 62:10, 64:3, 64:8, 65:4, 65:14, 66:25, 67:3, 67:4, 67:5, 67:6, 67:8, 67:10, 67:21, 67:23, 67:25, 68:2, 68:25, 70:4, 70:6, 70:8, 70:11, 75:25, 77:8, 77:10, 77:14, 77:24
**empathize** [1] - 44:18
**emphasize** [2] - 21:12, 29:9
**employed** [3] - 31:1, 31:2, 50:18
**employees** [5] - 11:6, 23:7, 23:12, 40:11
**employment** [2] - 11:8, 59:10
**end** [2] - 16:8, 78:9
**engage** [1] - 22:1
**engaged** [1] - 33:7

**enrolled** [1] - 37:23
**enter** [1] - 80:12
**entered** [1] - 65:23
**entire** [2] - 21:23, 64:6
**entirely** [6] - 39:8, 52:8, 61:12, 61:16, 61:17, 62:3
**entitled** [1] - 84:8
**entity** [6] - 13:22, 23:19, 26:21, 38:13, 38:14, 39:7
**environment** [1] - 9:12
**equipment** [1] - 39:19
**equivalent** [1] - 40:22
**ESI** [7] - 65:2, 70:14, 71:3, 73:11, 73:12, 73:15, 81:15
**ESQ** [6] - 1:16, 1:16, 1:20, 2:2, 2:2, 2:3
**estate** [3] - 26:17, 26:19, 27:12
**estimate** [1] - 81:2
**et** [4] - 3:3, 33:22, 71:15
**event** [2] - 3:12, 46:4
**evidence** [3] - 28:12, 62:12, 69:1
**evidenced** [1] - 43:21
**ex** [1] - 63:9
**exactly** [5] - 10:21, 41:18, 45:24, 63:20, 78:2
**example** [9] - 13:4, 17:19, 44:4, 64:10, 64:11, 65:3, 67:2, 67:9, 67:21
**examples** [1] - 67:5
**exceed** [3] - 71:7, 71:9, 72:14
**except** [1] - 43:18
**excluding** [1] - 72:20
**executive** [1] - 13:14
**exhibits** [1] - 73:4
**exist** [9] - 11:3, 12:1, 12:2, 12:3, 51:10, 58:16, 59:4, 67:8, 67:10
**existed** [2] - 9:2, 50:6
**existence** [3] - 12:22, 22:21, 35:14
**expedited** [2] - 73:19, 77:17
**experience** [2] - 65:1, 82:20

**experienced** [1] - 80:4
**expert** [1] - 65:9
**expertise** [2] - 65:10, 65:12
**explain** [3] - 12:9, 16:23, 63:20
**explore** [1] - 44:13
**expressions** [1] - 74:7
**extant** [2] - 38:13, 38:14
**extent** [9] - 13:8, 15:13, 18:6, 19:4, 19:6, 43:22, 57:23, 62:11, 66:15
**extra** [1] - 72:21
**extraordinary** [2] - 17:23, 27:16
**extremely** [1] - 75:1
**eyes** [1] - 73:1

## F

**face** [2] - 5:3, 83:21
**facial** [1] - 74:6
**facilitated** [2] - 35:21, 39:23
**fact** [8] - 5:5, 14:4, 22:6, 36:4, 46:19, 48:15, 59:20, 64:7
**facts** [2] - 25:23, 44:15
**factual** [1] - 22:15
**failure** [2] - 9:11, 15:19
**fair** [7] - 12:7, 54:5, 56:19, 60:17, 61:8, 81:5, 81:9
**fairly** [2] - 71:11, 81:8
**fallen** [1] - 45:9
**famous** [2] - 4:4, 33:9
**far** [4] - 19:9, 37:3, 37:4, 62:7
**fashioned** [2] - 58:19, 60:12
**fault** [1] - 34:1
**favor** [2] - 30:4, 74:1
**favorite** [4] - 55:6, 55:7, 55:9
**FCC** [61] - 8:25, 9:4, 9:11, 12:20, 13:3, 13:7, 19:23, 20:23, 21:1, 21:2, 21:5, 21:8, 21:11, 21:20, 21:24, 22:6, 22:13, 22:21, 23:3, 23:10, 23:16,

23:19, 24:5, 25:24, 26:1, 26:7, 28:13, 28:18, 28:24, 29:1, 30:20, 30:21, 31:8, 31:11, 32:10, 32:19, 34:11, 34:18, 35:13, 35:14, 35:16, 36:11, 36:12, 37:12, 37:17, 37:20, 37:24, 37:25, 38:13, 38:16, 49:13, 50:20, 57:1, 59:9, 59:10, 67:4, 67:24, 68:10, 68:15
**FCC's** [7] - 10:7, 10:13, 13:2, 14:9, 38:6, 39:4
**February** [7] - 12:11, 14:12, 14:15, 14:21, 67:11, 75:15
**fee** [1] - 80:9
**fee-shifting** [1] - 80:9
**fees** [1] - 80:11
**few** [2] - 55:18, 55:19
**fewer** [1] - 28:25
**figure** [2] - 20:8, 30:17
**figured** [1] - 16:9
**file** [12] - 23:13, 42:10, 44:8, 46:19, 48:12, 55:1, 71:6, 71:8, 72:4, 72:6, 72:7, 73:5
**filed** [12] - 15:17, 17:17, 18:20, 24:5, 27:18, 27:19, 30:20, 31:9, 47:3, 48:10, 65:20, 72:7
**files** [6] - 12:2, 13:7, 13:19, 13:21, 14:3, 22:20, 26:25, 37:10, 46:15, 59:11, 66:1
**filing** [2] - 24:8, 46:21, 70:23
**filings** [1] - 43:21
**financial** [1] - 51:1
**fine** [13] - 6:18, 6:21, 7:19, 7:22, 7:25, 8:1, 8:3, 8:10, 43:1, 51:3, 62:5, 65:7, 69:9
**firm** [2] - 69:10, 80:20
**first** [16] - 3:13, 5:17, 6:11, 7:12, 7:24, 12:15, 12:23, 13:13, 47:15, 69:15, 70:15, 71:4, 73:17, 78:9, 78:10, 78:21
**fit** [1] - 7:9
**flag** [1] - 70:19

**flailing** [1] - 40:3
**flight** [1] - 75:5
**Floor** [4] - 1:18, 2:5, 2:9, 84:12
**FLORIDA** [1] - 1:1
**Florida** [6] - 1:4, 1:22, 2:5, 2:9, 26:1, 84:13
**flow** [1] - 43:25
**folder** [2] - 58:20, 60:13
**folders** [1] - 9:15
**folks** [9] - 3:4, 4:24, 7:8, 11:8, 39:14, 53:19, 79:12, 83:24
**followed** [2] - 27:7, 51:12
**following** [2] - 9:14, 79:17
**followup** [1] - 49:24
**Fontainebleau** [2] - 82:15, 82:17
**FOR** [2] - 1:16, 2:2
**force** [1] - 79:14
**foregoing** [1] - 84:6
**forensic** [1] - 64:1
**foresee** [1] - 61:4
**forgot** [1] - 35:2
**form** [6] - 14:13, 16:1, 42:18, 49:11, 52:2, 52:23
**formal** [1] - 44:10
**format** [1] - 14:25
**former** [9] - 8:24, 8:25, 9:4, 11:6, 40:11, 45:11, 46:20, 47:7, 62:6
**forms** [1] - 56:25
**Fort** [7] - 19:24, 31:12, 31:13, 31:14, 31:16, 32:22, 34:8
**forth** [2] - 26:20, 26:25
**forthcoming** [1] - 42:16
**forward** [5] - 50:23, 53:14, 53:16, 53:18, 62:7
**founded** [1] - 13:16
**four** [7] - 27:17, 53:20, 53:22, 54:24, 78:14, 78:18, 78:20
**frame** [1] - 81:25
**frankly** [1] - 69:5
**frantically** [1] - 33:15
**frequently** [1] - 43:17
**Friday** [4] - 3:5, 3:7, 4:25, 5:3
**friend** [1] - 83:9

**friendly** [2] - 29:21, 30:3
**friends** [1] - 83:8
**FROM** [1] - 1:13
**front** [2] - 6:20, 40:20
**frustrated** [1] - 33:14
**frustrating** [3] - 39:10, 44:21, 47:12
**fulfilling** [1] - 22:12
**full** [1] - 29:23
**fundamental** [2] - 8:13, 27:24
**funding** [1] - 37:22
**furthermore** [1] - 67:9

## G

**gain** [1] - 38:3
**gander** [1] - 42:23
**gaps** [1] - 9:23
**gather** [2] - 9:8, 43:9
**general** [1] - 71:12
**generally** [1] - 70:22
**generates** [1] - 64:21
**gigabytes** [1] - 10:1
**given** [5] - 29:4, 29:5, 29:8, 59:13, 59:16
**Goodman** [1] - 19:8
**GOODMAN** [1] - 1:12
**Goodman.net** [1] - 64:14
**Google** [2] - 62:20, 62:22
**goose** [1] - 42:23
**gosh** [2] - 5:10, 54:23
**grab** [1] - 44:15
**Grand** [5] - 1:17, 3:24, 3:25, 4:3, 4:5
**grand** [1] - 83:22
**granted** [1] - 48:11
**great** [2] - 8:21, 12:9
**Greenberg** [1] - 27:10
**grounds** [1] - 70:14
**group** [1] - 9:15
**guard** [2] - 83:5, 83:10
**guess** [5] - 18:17, 19:4, 20:9, 51:8, 57:1
**guy** [2] - 82:21, 83:9

## H

**hac** [2] - 3:15, 3:16
**haggling** [1] - 80:16

**hairs** [1] - 33:17
**half** [6] - 15:2, 45:15, 72:25, 73:1, 83:7, 83:11
**hallway** [1] - 54:7
**hammer** [2] - 20:7, 53:23
**hand** [2] - 65:6, 81:7
**handed** [2] - 21:20, 64:4
**handing** [2] - 61:16, 61:18
**handle** [2] - 7:8, 31:7
**hands** [3] - 27:1, 38:6
**HANGER** [1] - 1:4
**Hanger** [1] - 3:2
**happy** [10] - 3:5, 3:7, 6:14, 16:23, 43:20, 53:17, 55:13, 59:15, 80:1
**hard** [2] - 59:11, 66:10
**hardworking** [1] - 80:4
**hate** [2] - 28:1, 58:11
**head** [1] - 81:10
**headquarters** [7] - 31:10, 31:11, 32:24, 37:16, 37:19, 37:25
**hear** [4] - 22:24, 29:7, 81:23, 83:4
**heard** [6] - 16:2, 19:9, 27:8, 28:12, 62:1, 82:22
**hearing** [29] - 3:8, 3:21, 5:23, 5:24, 7:11, 7:24, 12:10, 25:17, 46:7, 46:11, 47:13, 49:15, 50:4, 52:5, 52:6, 52:7, 52:10, 53:19, 54:11, 60:9, 61:12, 68:5, 71:22, 75:11, 79:16, 79:20, 79:22, 80:9
**HEARING** [1] - 1:11
**hearings** [4] - 4:25, 5:7, 7:15, 8:12
**heart** [1] - 42:15
**hearts** [1] - 42:15
**help** [4] - 6:24, 23:1, 23:10, 33:24
**hereby** [1] - 84:6
**hide** [2] - 28:9, 33:6
**high** [1] - 65:4
**himself** [1] - 3:17
**hits** [1] - 81:7
**hold** [2] - 52:4, 54:25
**holding** [1] - 73:8
**holds** [1] - 27:1

**honest** [1] - 25:2
**Honor** [120] - 3:14, 3:18, 3:22, 4:8, 4:18, 4:22, 5:12, 5:15, 5:24, 7:5, 7:14, 7:20, 8:19, 9:7, 9:18, 10:16, 11:15, 12:7, 12:14, 15:6, 15:18, 16:4, 16:19, 17:12, 18:5, 18:9, 18:19, 19:12, 19:13, 20:3, 20:11, 20:15, 23:4, 23:9, 24:15, 27:19, 28:1, 28:8, 31:19, 31:23, 32:7, 32:13, 32:24, 34:13, 34:20, 35:6, 35:20, 35:23, 36:3, 37:7, 38:25, 39:6, 40:15, 41:3, 41:22, 45:4, 45:14, 46:9, 47:20, 47:25, 48:5, 49:1, 49:18, 50:21, 50:24, 51:15, 52:17, 52:25, 54:5, 54:19, 54:21, 55:1, 56:8, 56:16, 56:21, 58:4, 58:6, 58:23, 59:7, 60:9, 60:16, 60:19, 60:20, 60:25, 61:5, 62:8, 63:2, 63:6, 63:8, 63:22, 66:21, 67:3, 67:21, 69:8, 72:9, 73:3, 73:6, 74:3, 74:5, 74:10, 75:4, 75:5, 75:13, 75:20, 75:22, 76:4, 78:21, 79:5, 79:8, 81:18, 82:5, 82:6, 82:8, 82:9, 82:14, 82:16, 82:18, 82:25, 83:18, 84:1
**Honor's** [3] - 5:25, 50:17, 51:7
**HONORABLE** [1] - 1:12
**hope** [2] - 17:11, 57:24
**hopefully** [4] - 46:2, 79:2, 81:21, 81:25
**horn** [1] - 81:22
**horrible** [1] - 3:9
**horse** [1] - 56:7
**hot** [1] - 82:23
**hotel** [1] - 82:13
**hour** [2] - 83:7, 83:11
**hours** [2] - 70:2, 70:3
**housed** [2] - 38:16, 66:16
**housekeeping** [1] - 8:4
**hunch** [1] - 71:14

**hundreds** [2] - 15:2
**hybrid** [1] - 19:2
**hypothetically** [1] - 23:15

**I**

**idea** [4] - 34:14, 37:10, 51:3, 71:12
**ideas** [1] - 50:3
**identical** [2] - 43:24, 76:5
**identify** [5] - 28:21, 59:12, 62:10, 62:11, 67:25
**identifying** [1] - 66:22
**IEC** [64] - 13:20, 13:24, 14:3, 14:8, 14:9, 15:7, 15:8, 15:12, 15:17, 16:10, 16:16, 16:21, 17:2, 17:17, 17:19, 17:25, 19:7, 19:14, 19:23, 20:21, 20:23, 21:1, 21:4, 21:14, 21:16, 21:20, 21:24, 21:25, 22:4, 23:11, 23:23, 26:3, 27:11, 29:3, 29:6, 29:15, 29:19, 29:20, 29:21, 29:24, 30:2, 30:4, 31:25, 32:4, 32:8, 32:18, 32:24, 34:5, 34:19, 34:21, 34:25, 35:19, 35:22, 36:5, 37:11, 38:8, 38:11, 39:6, 43:19, 44:5, 68:10, 68:15, 77:8
**IEC's** [3] - 16:10, 17:4, 39:5
**II** [1] - 82:2
**ill** [1] - 62:2
**ill-lit** [1] - 62:2
**illegible** [6] - 55:24, 56:1, 56:3, 56:4, 56:5, 56:17
**illustration** [1] - 78:6
**images** [1] - 61:25
**imagine** [1] - 55:5
**implicit** [1] - 29:10
**important** [2] - 20:22, 67:12
**importantly** [1] - 33:8
**imprimatur** [1] - 63:11
**improper** [2] - 68:12, 75:21

**inability** [1] - 8:17
**inaudible** [3] - 53:16, 72:1, 72:3
**inception** [1] - 74:24
**include** [4] - 50:15, 51:1, 51:22, 57:11
**included** [3] - 16:18, 38:11, 50:25
**includes** [1] - 15:15
**including** [4] - 15:10, 51:18, 51:19, 52:23
**income** [1] - 52:24
**incorrectly** [1] - 16:11
**independent** [1] - 38:1
**indicate** [2] - 76:14, 76:15
**indicated** [1] - 67:4
**indicates** [1] - 68:1
**indications** [2] - 66:25, 67:20
**indirectly** [1] - 80:21
**individual** [3] - 10:10, 64:24, 80:18
**informal** [1] - 44:10
**information** [65] - 9:8, 10:5, 10:15, 11:2, 11:12, 11:16, 11:21, 12:1, 13:8, 13:9, 14:16, 21:6, 21:8, 21:17, 22:4, 22:16, 23:21, 28:4, 28:14, 33:13, 33:15, 33:21, 33:22, 34:2, 34:4, 34:5, 34:9, 37:6, 37:21, 38:2, 38:3, 38:9, 38:15, 40:12, 40:14, 41:7, 41:24, 43:4, 43:7, 43:8, 43:10, 43:23, 43:24, 43:25, 44:11, 44:19, 44:23, 45:13, 46:22, 47:6, 49:14, 49:16, 52:20, 53:3, 54:14, 54:15, 57:24, 62:17, 62:25, 64:2, 70:9, 75:19, 80:7
**inherent** [1] - 65:12
**inquiry** [3] - 22:22, 26:23, 27:1
**inside** [1] - 4:16
**inspection** [4] - 15:16, 16:18, 20:1
**instance** [9] - 10:1, 10:8, 10:11, 28:9, 29:2, 29:23, 62:21, 68:9, 77:24
**instances** [1] - 28:25
**instead** [1] - 81:13

**insurance** [7] - 46:15, 46:18, 46:21, 46:25, 47:2, 47:5, 47:8
**insured** [3] - 46:20, 46:23
**integrity** [2] - 64:21, 66:4
**intention** [1] - 61:13
**intentionally** [2] - 44:22, 66:3
**interesting** [2] - 4:6, 16:20
**interim** [1] - 28:14
**International** [1] - 13:24
**international** [1] - 13:25
**Internet** [1] - 62:15
**interpose** [1] - 61:9
**interrogatories** [1] - 47:1
**interrupt** [1] - 59:23
**intertwined** [1] - 46:7
**intervention** [1] - 5:6
**introduce** [1] - 3:17
**intrusion** [1] - 69:4
**invasion** [1] - 61:20
**investigation** [4] - 13:1, 15:14, 27:6, 27:13
**investigative** [1] - 43:11
**invoking** [1] - 33:9
**involved** [8] - 34:5, 34:10, 34:21, 36:4, 36:7, 36:16, 36:17, 71:5
**iPads** [1] - 66:12
**Irvine** [1] - 20:2
**isolated** [1] - 71:11
**issue** [41] - 6:2, 6:8, 7:13, 12:8, 12:12, 14:7, 14:19, 20:3, 20:13, 29:18, 37:7, 41:15, 42:4, 45:13, 47:15, 47:20, 47:23, 48:24, 50:3, 50:4, 50:5, 50:14, 50:18, 51:12, 55:13, 55:23, 56:17, 64:6, 65:18, 68:16, 68:23, 70:19, 70:24, 70:25, 71:11, 74:19, 77:25, 79:21, 80:15, 81:24, 82:2
**Issue** [9] - 6:7, 7:11, 7:13, 47:13, 49:2, 49:3, 49:7, 49:8, 49:9
**issues** [18] - 5:18, 5:19, 5:21, 6:12, 7:21,

7:24, 8:2, 8:13, 8:15, 12:15, 13:12, 44:12, 46:6, 48:15, 48:20, 66:22

**issuing** [1] - 45:6
**IT** [8] - 34:17, 35:11, 35:17, 35:18, 36:8, 36:10, 36:13, 38:1
**it'll** [3] - 20:9, 81:9, 82:2
**itself** [1] - 62:16

## J

**JAMES** [1] - 2:2
**jammed** [1] - 55:2
**Jay** [1] - 4:8
**Jeff** [2] - 31:2
**JEFFREY** [1] - 1:7
**Jersey** [2] - 10:12, 17:20
**job** [1] - 65:1
**JONATHAN** [1] - 1:12
**Judge** [20] - 3:7, 4:13, 6:14, 6:25, 19:8, 24:1, 25:3, 25:5, 25:23, 25:25, 26:18, 27:14, 27:24, 41:11, 42:10, 43:18, 44:17, 53:25, 61:9, 83:25
**judge** [12] - 5:6, 8:11, 18:24, 24:21, 25:9, 25:11, 57:5, 62:14, 68:5, 73:16, 77:6, 79:4
**JUDGE** [1] - 1:12
**judges** [2] - 18:22, 79:6
**July** [2] - 14:23, 48:14
**jump** [2] - 7:1, 16:9
**June** [2] - 48:11, 78:24
**justified** [1] - 69:5
**justifies** [1] - 61:20

## K

**keep** [2] - 27:5, 30:6
**keeps** [1] - 27:2
**Ken** [1] - 4:9
**KENNETH** [1] - 2:3
**kind** [6] - 25:1, 51:5, 52:9, 55:6, 55:7, 80:14
**kinds** [1] - 55:8
**KNOBEL** [1] - 1:7

**Knobel** [9] - 3:3, 10:2, 13:14, 14:3, 30:6, 30:24, 64:10, 68:10
**knobel.com** [3] - 67:22, 67:23, 67:25
**knowing** [1] - 81:11
**knowledge** [3] - 17:5, 35:7, 38:5
**known** [1] - 45:19
**knowns** [1] - 33:10
**knows** [11] - 8:19, 29:22, 34:4, 43:4, 51:5, 66:4, 70:16, 81:3, 83:8, 83:9
**kREITZER** [1] - 25:1
**KREITZER** [19] - 2:2, 4:13, 4:18, 23:25, 24:3, 24:12, 24:19, 24:21, 24:24, 25:5, 25:7, 25:16, 25:18, 25:21, 25:23, 26:15, 28:7, 38:22, 53:11
**Kreitzer** [4] - 4:9, 4:13, 4:18, 4:19

## L

**laboring** [1] - 77:20
**lack** [1] - 46:24
**language** [6] - 20:6, 41:20, 55:4, 55:13, 67:15, 79:11
**laptops** [4] - 39:19, 58:1, 66:10, 68:14
**large** [1] - 74:23
**last** [20] - 3:9, 3:21, 4:24, 5:7, 6:16, 9:18, 12:10, 23:10, 36:23, 47:22, 48:5, 51:21, 53:12, 57:3, 58:14, 65:3, 69:25, 75:11, 76:10, 78:8
**latch** [1] - 20:21
**late** [1] - 74:9
**latter** [1] - 62:5
**Lauderdale** [7] - 19:24, 31:12, 31:13, 31:14, 31:16, 32:22, 34:8
**laughter** [3] - 45:23, 82:24, 83:17
**law** [4] - 11:8, 61:18, 68:8, 71:18
**LAW** [2] - 72:1, 72:3
**law-abiding** [1] - 11:8
**lawsuit** [8] - 27:19, 33:18, 42:12, 42:14,

46:15, 47:3, 65:20, 66:5
**lawyer** [4] - 6:17, 29:7, 41:20, 60:1
**lawyers** [12] - 5:2, 5:5, 5:8, 5:10, 6:24, 13:5, 27:9, 30:4, 80:4, 80:11, 80:15, 80:17
**leads** [1] - 43:11
**leap** [1] - 33:5
**learned** [2] - 21:23, 21:24
**least** [9] - 22:20, 22:22, 26:22, 30:10, 45:19, 55:6, 55:7, 55:9
**leave** [2] - 3:11, 20:3
**legible** [3] - 56:7, 56:10, 56:18
**legitimate** [2] - 33:12, 55:12
**legitimately** [1] - 33:14
**Lenard** [1] - 3:2
**length** [1] - 14:11
**lengths** [1] - 8:21
**less** [1] - 47:11
**level** [1] - 65:4
**likely** [1] - 80:9
**limit** [1] - 52:19
**liquidating** [19] - 8:19, 8:22, 12:17, 12:18, 12:21, 12:25, 22:9, 22:11, 24:11, 24:12, 26:12, 26:16, 26:23, 28:13, 28:20, 28:24, 30:3, 44:7, 44:22
**liquidation** [1] - 12:19
**LISA** [2] - 2:7, 84:11
**list** [1] - 43:6
**listen** [9] - 18:22, 19:8, 44:18, 45:21, 53:2, 53:19, 54:3, 56:10, 79:12
**lit** [1] - 62:2
**literally** [1] - 27:19
**litigate** [1] - 17:22
**litigated** [3] - 19:16, 19:25, 20:4
**Live** [2] - 82:22, 83:3
**LLC** [2] - 1:4, 3:2
**LLP** [1] - 2:4
**load** [1] - 34:8
**loaded** [1] - 32:2
**local** [3] - 3:17, 51:12, 72:22
**locate** [3] - 26:24, 26:25, 28:21

**located** [11] - 17:19, 17:25, 19:19, 23:20, 23:21, 31:10, 31:15, 31:22, 37:18, 37:20, 57:25
**location** [2] - 18:10, 43:8
**locations** [1] - 43:1
**loci** [1] - 38:2
**locked** [1] - 32:14
**log** [1] - 80:6
**log-in** [1] - 80:6
**logic** [1] - 33:5
**logically** [1] - 34:3
**look** [8] - 7:12, 26:16, 30:4, 41:20, 59:14, 59:15, 62:13, 62:20
**looking** [5] - 15:10, 44:13, 59:18, 63:13, 63:14
**lousy** [1] - 46:23
**lying** [3] - 29:15, 29:17, 74:7

## M

**MAGISTRATE** [1] - 1:12
**magistrate** [6] - 18:22, 18:24, 79:3, 79:4, 79:6
**magistrate's** [1] - 79:1
**main** [4] - 16:7, 20:5, 20:13, 33:16
**maintain** [1] - 28:19
**maintained** [2] - 14:17, 37:15
**majority** [1] - 9:2
**manage** [1] - 36:9
**managed** [2] - 36:8, 36:10
**Management** [1] - 3:2
**MANAGEMENT** [1] - 1:4
**manner** [2] - 9:24, 14:17
**March** [1] - 48:19
**marked** [2] - 5:25, 6:2
**master** [1] - 38:16
**material** [6] - 21:10, 23:17, 38:6, 42:7, 42:8, 58:1
**materials** [5] - 21:13, 21:20, 28:21, 57:6, 72:15

**matter** [5] - 8:4, 23:24, 79:14, 80:1, 84:8
**mean** [21] - 3:25, 6:11, 7:7, 8:1, 10:18, 18:18, 24:10, 39:14, 41:22, 44:12, 47:10, 47:11, 54:23, 59:23, 63:16, 65:22, 66:15, 69:16, 72:5, 81:5, 81:6
**meaning** [1] - 32:1
**meaningfully** [2] - 9:24, 22:17
**means** [1] - 77:21
**meant** [2] - 45:24, 46:3
**mechanical** [1] - 34:6
**mechanism** [2] - 30:18, 37:22
**mediate** [1] - 55:13
**meet** [1] - 83:8
**meetings** [2] - 10:10, 10:13
**member** [2] - 13:15, 54:17
**memo** [1] - 71:12
**memoranda** [1] - 70:23
**memorandum** [2] - 71:7, 72:14
**mention** [1] - 19:8
**mentioned** [6] - 3:8, 4:24, 6:16, 13:13, 55:18, 60:25
**merely** [1] - 39:24
**message** [1] - 29:10
**met** [1] - 11:23
**metadata** [3] - 48:17, 48:22, 64:4
**methods** [1] - 64:23
**MIAMI** [1] - 1:2
**Miami** [8] - 1:4, 1:22, 2:5, 2:8, 2:9, 82:14, 84:12, 84:13
**Michael** [3] - 4:9, 4:18, 4:19
**MICHAEL** [2] - 2:2
**microphone** [2] - 6:20, 31:18
**middle** [1] - 28:23
**might** [6] - 23:9, 59:12, 65:13, 68:20, 68:21
**million** [1] - 15:3
**mind** [4] - 5:8, 16:8, 29:9, 78:19
**mind-boggling** [1] - 78:19

**minimal** [1] - 81:7
**minus** [3] - 25:24, 26:2, 27:11
**minute** [5] - 5:7, 10:10, 14:6, 28:2, 63:15
**minutes** [2] - 10:9, 10:10
**mirror** [3] - 9:17, 14:7, 14:9
**misapprehension** [1] - 77:19
**misconduct** [1] - 27:16
**mishits** [1] - 77:23
**misrepresentation** [1] - 25:9
**missed** [1] - 59:16
**missing** [8] - 10:3, 10:7, 10:9, 13:13, 13:19, 14:4, 48:17, 67:20
**moment** [3] - 9:16, 23:25, 26:9
**Monday** [4] - 3:10, 3:11, 73:11, 78:16
**money** [2] - 26:17, 46:16
**months** [9] - 45:15, 50:7, 53:20, 53:22, 54:24, 78:14, 78:18, 78:20, 78:22
**moreover** [1] - 43:22
**morning** [1] - 74:10
**mortified** [1] - 74:8
**most** [3] - 5:4, 20:8, 80:9
**mostly** [1] - 80:15
**motion** [18] - 15:17, 15:24, 16:10, 16:16, 17:4, 17:16, 18:18, 19:4, 40:21, 40:22, 40:24, 44:8, 48:10, 71:7, 72:4, 72:6, 82:3
**motions** [4] - 19:1, 22:1, 40:20, 70:23
**mounting** [1] - 10:24
**Movant** [1] - 19:5
**move** [4] - 6:20, 16:22, 45:18, 53:18
**moved** [4] - 16:21, 17:6, 17:8, 21:25
**moving** [1] - 53:14
**MR** [233] - 3:7, 3:14, 3:18, 3:22, 4:1, 4:8, 4:12, 4:13, 4:18, 4:22, 5:12, 5:15, 5:17, 5:21, 6:2, 6:5, 6:7, 6:10, 7:5, 7:14, 7:17, 7:20, 8:1, 8:8, 8:10, 12:6,

12:14, 13:24, 16:13, 16:16, 16:19, 16:23, 17:2, 18:1, 18:3, 18:5, 18:9, 18:13, 18:16, 18:19, 19:13, 19:18, 19:21, 20:11, 20:15, 20:18, 20:20, 22:9, 22:11, 23:4, 23:6, 23:8, 23:9, 23:25, 24:3, 24:12, 24:15, 24:19, 24:21, 24:24, 25:1, 25:5, 25:7, 25:16, 25:18, 25:21, 25:23, 26:15, 28:1, 28:7, 28:8, 28:16, 29:5, 29:16, 30:10, 30:16, 30:22, 30:24, 31:1, 31:13, 31:14, 31:17, 31:19, 31:23, 32:3, 32:5, 32:9, 32:13, 32:16, 32:23, 33:3, 34:13, 34:16, 34:20, 34:23, 35:6, 35:10, 35:13, 35:15, 35:17, 35:20, 36:3, 36:6, 36:11, 36:15, 36:17, 36:19, 36:21, 36:23, 36:25, 37:2, 37:4, 37:7, 38:17, 38:20, 38:22, 38:23, 38:25, 39:4, 39:6, 39:8, 40:15, 40:17, 41:3, 41:10, 41:11, 41:15, 41:19, 43:18, 44:17, 45:4, 45:14, 45:18, 46:1, 46:9, 47:16, 47:19, 47:25, 48:2, 48:4, 49:1, 49:3, 49:6, 49:8, 51:15, 51:17, 52:4, 52:15, 52:17, 52:22, 53:5, 53:6, 53:11, 53:21, 53:25, 54:5, 54:19, 54:21, 54:25, 55:20, 56:1, 56:4, 56:6, 56:14, 56:16, 56:21, 57:5, 57:20, 58:4, 58:6, 58:9, 58:22, 59:7, 60:8, 60:14, 60:16, 60:19, 61:9, 62:8, 62:14, 63:2, 63:7, 63:22, 63:24, 64:14, 64:16, 64:19, 66:15, 66:18, 66:20, 68:5, 69:7, 69:15, 69:20, 69:23, 72:9, 72:14, 72:17, 72:22, 73:3, 73:6, 73:16, 73:25, 74:3, 74:5, 74:9, 74:14, 74:17, 74:19, 75:4, 75:8,

75:10, 76:18, 77:6, 77:13, 78:2, 78:4, 78:21, 79:5, 79:8, 81:17, 82:5, 82:6, 82:8, 82:9, 82:13, 82:16, 82:18, 82:25, 83:18, 83:25, 84:1, 84:2
**MS** [5] - 70:1, 76:22, 76:24, 77:3, 77:5
**mysterious** [2] - 43:12, 44:2
**mystery** [1] - 44:15

# N

**name** [7] - 13:22, 32:19, 35:2, 36:23, 39:4, 39:5, 63:25
**namely** [3] - 57:25, 70:8, 70:14
**names** [4] - 36:14, 36:18, 76:6, 76:20
**narrow** [2] - 15:4, 50:14
**narrowed** [1] - 49:8
**natural** [2] - 42:20
**naturally** [2] - 46:17, 65:12
**nature** [2] - 10:17, 14:13
**Neal** [1] - 10:2
**NEAL** [1] - 1:8
**near** [2] - 82:13, 82:15
**nearby** [1] - 4:1
**necessarily** [4] - 37:8, 58:18, 67:18, 68:18
**necessary** [4] - 62:25, 65:1, 69:5, 72:17
**need** [40] - 6:19, 11:1, 11:2, 11:16, 11:22, 15:14, 15:22, 19:5, 19:16, 20:1, 20:7, 22:18, 28:16, 33:12, 35:9, 39:21, 40:1, 46:4, 50:9, 50:13, 51:4, 52:21, 56:22, 56:24, 61:20, 62:16, 63:4, 67:3, 67:19, 68:18, 71:5, 71:21, 73:18, 78:12, 78:25, 79:11, 79:19, 81:15, 81:20
**needs** [4] - 19:24, 20:3, 20:4, 54:14
**nefarious** [1] - 68:3

**negotiating** [1] - 81:23
**network** [1] - 37:20
**never** [6] - 5:8, 24:16, 70:16, 78:3, 81:23, 83:18
**new** [3] - 3:11, 43:15, 43:16
**New** [6] - 1:19, 3:15, 10:12, 17:19, 17:20
**news** [5] - 5:14, 25:1, 47:14
**next** [6] - 6:25, 27:23, 34:3, 71:23, 79:17, 80:24
**nightclub** [2] - 82:22, 83:3
**NO** [1] - 1:2
**nobody** [1] - 79:3
**non** [2] - 70:11, 77:1
**non-privileged** [1] - 70:11
**non-salary** [1] - 77:1
**none** [5] - 10:4, 10:5, 24:22, 54:11, 54:12
**nonpayment** [1] - 47:9
**nontaxable** [1] - 52:23
**normal** [2] - 67:13, 68:2
**normally** [1] - 33:19
**North** [2] - 2:8, 84:12
**not-horrible** [1] - 3:9
**nothing** [6] - 21:2, 46:18, 53:10, 54:2, 57:14, 82:8
**notice** [8] - 5:24, 7:10, 7:24, 8:12, 46:7, 46:11, 47:13, 79:23
**noticed** [8] - 5:18, 5:19, 5:21, 5:24, 8:3, 8:6, 8:13, 8:16
**notion** [1] - 51:21
**now-stricken** [1] - 17:16
**nuanced** [1] - 29:18
**number** [12] - 9:19, 10:17, 20:23, 38:8, 52:7, 64:24, 67:5, 74:12, 74:23, 76:20, 81:7, 81:20
**numerous** [2] - 14:13, 51:17

# O

**oath** [1] - 83:19
**object** [1] - 63:12

**objection** [1] - 63:4
**obligation** [5] - 11:13, 40:7, 51:6, 57:2, 76:2
**obtain** [2] - 8:17, 37:11
**obtained** [1] - 9:21
**obvious** [2] - 79:25, 83:20
**obviously** [4] - 6:22, 7:20, 39:4, 48:9
**occasions** [1] - 11:1
**October** [1] - 61:3
**odd** [3] - 43:19, 44:1, 47:11
**OF** [1] - 1:1
**offer** [1] - 54:25
**office** [5] - 3:24, 4:2, 32:10, 32:14, 32:22
**officer** [2] - 13:15, 13:18
**officers** [4] - 8:25, 9:10, 22:7, 50:9
**official** [1] - 2:7
**Official** [1] - 84:11
**old** [8] - 6:17, 12:1, 13:2, 42:22, 58:19, 60:12, 65:22
**old-fashioned** [2] - 58:19, 60:12
**old-school** [1] - 6:17
**old-style** [1] - 6:17
**once** [4] - 40:12, 47:19, 72:6, 81:13
**One** [1] - 1:21
**one** [34] - 4:1, 4:3, 5:21, 7:12, 8:16, 10:17, 13:20, 17:11, 18:25, 20:23, 24:16, 34:24, 37:25, 42:6, 48:22, 50:14, 52:3, 54:1, 55:9, 55:23, 59:25, 64:24, 65:7, 66:23, 67:11, 69:8, 72:7, 72:25, 73:1, 73:14, 74:12, 76:20, 77:24, 83:11
**one's** [4] - 4:10, 4:11, 33:6, 33:7
**one-and-a-half** [2] - 72:25, 73:1
**ones** [2] - 33:17, 76:5
**ongoing** [1] - 23:5
**oops** [1] - 25:13
**opened** [1] - 41:25
**operated** [1] - 37:17
**operates** [1] - 32:18
**operating** [8] - 13:18, 22:2, 31:8,

32:11, 32:21, 32:23, 39:3, 39:5
   **operation** [5] - 23:3, 23:5, 31:21, 32:11, 34:6
   **opposing** [4] - 28:9, 53:2, 77:17, 77:20
   **option** [1] - 58:12
   **options** [3] - 50:12, 51:23, 58:20
   **order** [33] - 8:6, 16:11, 17:3, 17:7, 17:9, 17:12, 20:6, 22:17, 25:11, 46:15, 50:17, 51:7, 53:13, 53:15, 53:17, 53:23, 54:10, 54:18, 55:5, 55:17, 57:12, 61:11, 61:17, 62:8, 63:5, 63:19, 65:2, 67:17, 70:24, 71:10, 79:1, 80:19
   **ordered** [1] - 50:21
   **ordinary** [1] - 24:7
   **otherwise** [2] - 60:13, 65:21
   **ought** [1] - 26:23
   **ourselves** [1] - 47:4
   **outline** [1] - 43:4
   **outstanding** [1] - 40:17
   **oversaw** [1] - 37:25
   **overseeing** [1] - 26:19
   **overseen** [1] - 26:23
   **own** [11] - 10:23, 21:25, 38:1, 40:10, 45:10, 50:18, 50:19, 65:4, 75:23, 75:25, 80:1
   **owned** [2] - 13:16, 26:1
   **owner** [1] - 61:20
   **oyster** [1] - 4:5

---

**P**

   **P.A** [1] - 1:21
   **p.m** [2] - 1:6, 48:7
   **Page** [2] - 58:23, 59:18
   **page** [1] - 72:21
   **Pages** [1] - 1:9
   **pages** [6] - 66:1, 66:3, 71:7, 71:9, 72:15, 72:19
   **paid** [2] - 46:16, 80:11
   **paper** [2] - 58:20,

---

60:13
   **Parsippany** [1] - 10:12
   **part** [4] - 16:7, 63:7, 66:5, 80:24
   **parte** [1] - 63:9
   **participated** [1] - 37:8
   **participates** [1] - 79:19
   **particularized** [4] - 61:19, 68:17, 70:25, 71:15
   **parties** [12] - 9:21, 13:1, 13:7, 15:7, 15:8, 16:14, 17:3, 20:4, 29:14, 31:24, 61:19, 78:7
   **party** [14] - 5:22, 9:19, 13:10, 14:8, 42:14, 46:22, 61:13, 63:9, 64:6, 68:24, 80:10, 80:13, 81:9
   **pass** [2] - 65:24, 80:20
   **passed** [1] - 9:21
   **password** [6] - 63:25, 64:18, 70:9, 74:15, 78:16, 80:6
   **passwords** [4] - 12:2, 65:18, 73:10, 73:20
   **past** [2] - 78:20, 83:3
   **pay** [3] - 50:23, 60:23, 75:24
   **paying** [1] - 69:17
   **payments** [3] - 52:23, 59:9, 76:25
   **PC** [1] - 1:17
   **pending** [1] - 70:3
   **people** [12] - 10:4, 34:10, 36:13, 36:14, 36:16, 36:17, 37:24, 40:10, 43:15, 43:16, 45:10, 67:24
   **percent** [5] - 20:25, 25:24, 26:2, 27:11, 32:18
   **perfectly** [2] - 29:12, 42:19
   **performance** [1] - 18:10
   **perhaps** [2] - 44:2, 46:2
   **period** [3] - 10:14, 67:10, 68:15
   **periods** [1] - 67:12
   **permit** [2] - 19:1, 72:25
   **permitted** [2] -

---

71:20, 71:21
   **person** [3] - 34:10, 65:8, 79:19
   **personal** [20] - 35:7, 48:6, 50:19, 59:11, 60:4, 60:24, 61:18, 62:3, 62:14, 62:24, 63:22, 64:8, 64:11, 67:3, 67:5, 68:8, 77:13, 80:18, 82:20
   **personally** [2] - 36:9, 80:18
   **personnel** [2] - 36:9, 36:10
   **persons** [1] - 34:10
   **perspective** [2] - 39:10, 66:13
   **phase** [1] - 15:14
   **Phase** [1] - 82:2
   **phone** [12] - 6:13, 11:9, 49:25, 51:18, 55:14, 55:24, 56:9, 56:10, 62:21, 62:24, 63:12, 63:13
   **phones** [3] - 58:1, 66:9, 68:14
   **photocopy** [1] - 66:1
   **photograph** [2] - 50:7, 62:2
   **phrase** [1] - 33:9
   **phrased** [2] - 16:12, 80:2
   **physical** [2] - 32:21, 41:6
   **physically** [2] - 31:21, 32:5
   **pick** [3] - 50:22, 56:9, 81:10
   **picture** [3] - 49:25, 52:2, 56:10
   **piece** [2] - 10:20, 58:19, 60:12
   **PIERNE** [1] - 1:7
   **Pierne** [1] - 31:2
   **place** [9] - 17:20, 18:21, 20:8, 33:25, 53:9, 53:13, 75:11, 77:9, 83:3
   **placed** [1] - 47:8
   **plaintiff** [1] - 64:23
   **Plaintiff** [39] - 1:5, 3:13, 8:18, 8:19, 9:9, 9:14, 10:20, 10:25, 11:13, 11:17, 21:14, 21:18, 22:3, 22:14, 33:17, 34:1, 39:15, 40:22, 40:24, 41:4, 42:24, 43:20, 43:23, 44:22, 46:18, 46:25, 53:25, 57:10, 57:14,

---

57:17, 57:21, 57:23, 61:23, 62:6, 64:7, 70:12, 70:13, 75:23, 81:1
   **PLAINTIFF** [1] - 1:16
   **Plaintiff's** [5] - 7:10, 46:10, 47:13, 64:22, 66:13
   **Plaintiffs** [10] - 5:19, 7:18, 9:5, 9:13, 28:3, 30:2, 60:6, 64:5, 75:24, 81:14
   **plan** [2] - 12:19, 12:22, 23:10, 45:4
   **plans** [1] - 50:13
   **play** [1] - 15:21
   **playing** [2] - 28:9, 33:6
   **plus** [4] - 25:24, 26:2, 27:11, 76:6
   **point** [11] - 11:20, 20:13, 25:3, 26:11, 54:16, 57:15, 59:7, 61:1, 69:1, 69:4, 73:22, 77:16, 81:5
   **pointed** [1] - 43:19
   **points** [2] - 20:16, 20:22
   **pole** [4] - 4:16, 4:17, 4:19, 4:21
   **policy** [1] - 47:8
   **portion** [2] - 13:16, 20:24
   **position** [16] - 4:15, 4:16, 4:17, 4:19, 4:21, 9:1, 11:15, 13:3, 19:24, 21:14, 28:6, 30:16, 45:19, 65:15, 66:13, 78:11
   **positive** [1] - 5:14
   **possession** [13] - 9:4, 11:25, 13:2, 13:20, 13:23, 21:8, 21:10, 28:5, 28:19, 30:8, 41:6, 41:12, 68:10
   **possible** [1] - 39:8
   **post** [1] - 4:2
   **practical** [1] - 23:23
   **practically** [1] - 63:16
   **practice** [1] - 22:1
   **practices** [1] - 18:23
   **precise** [2] - 45:2, 72:19
   **precisely** [1] - 9:9
   **predicated** [1] - 9:9
   **preexisting** [1] - 38:12
   **prefer** [2] - 7:21, 8:5

---

   **premature** [3] - 39:11, 45:6, 68:16
   **Premier** [6] - 38:8, 38:9, 38:14, 39:6, 39:7, 40:13
   **prepare** [2] - 27:17, 27:21
   **prepared** [1] - 7:23
   **present** [4] - 36:6, 39:20, 39:24, 65:19
   **presented** [1] - 9:24
   **presenting** [2] - 10:23, 22:14
   **preserve** [1] - 62:11
   **presuit** [2] - 29:3, 29:20
   **presumably** [3] - 43:6, 66:17, 66:18
   **presume** [1] - 68:13
   **pretty** [6] - 25:4, 25:6, 27:8, 34:13, 71:23, 82:23
   **previously** [2] - 15:1, 49:13
   **PRICE** [1] - 2:3
   **principals** [1] - 30:21
   **print** [1] - 48:19
   **printed** [1] - 48:19
   **privacy** [2] - 61:21, 69:5
   **privilege** [5] - 70:4, 70:10, 73:13, 74:20, 83:13
   **privileged** [1] - 70:11
   **pro** [2] - 3:15, 3:16
   **problem** [12] - 8:14, 9:22, 10:22, 10:23, 27:25, 41:16, 41:19, 51:14, 65:7, 65:11, 69:2, 76:14
   **problems** [1] - 64:24
   **procedures** [4] - 15:20, 19:5, 51:13, 70:22
   **proceed** [4] - 7:21, 8:6, 8:8, 22:17
   **proceeding** [2] - 8:14, 26:6
   **proceedings** [2] - 84:3, 84:7
   **proceeds** [1] - 54:13
   **process** [9] - 12:5, 24:5, 28:24, 34:6, 65:17, 67:2, 69:10, 70:21, 77:18
   **produce** [22] - 11:12, 15:14, 15:25, 23:17, 40:23, 40:24, 43:2, 45:7, 47:1, 48:6, 48:21, 49:14, 49:18,

50:8, 51:6, 54:12,
56:18, 56:25, 58:12,
58:22, 68:1, 78:25
  **produced** [28] - 9:14,
12:16, 13:8, 13:9,
14:9, 14:10, 14:17,
19:15, 21:13, 42:8,
44:11, 48:14, 48:16,
54:14, 57:7, 57:16,
58:15, 60:3, 60:8,
62:1, 67:22, 67:23,
70:11, 76:13, 76:16
  **producing** [1] - 54:9
  **product** [1] - 71:1
  **production** [4] -
40:18, 48:9, 49:20,
52:1
  **productions** [1] -
9:19
  **professional** [1] -
80:3
  **prohibit** [1] - 70:22
  **prohibited** [1] - 11:7
  **project** [4] - 69:14,
69:22, 69:24, 70:14
  **proper** [1] - 66:24
  **property** [1] - 41:6
  **proportional** [1] -
69:6
  **propose** [1] - 81:14
  **proposed** [1] - 17:3
  **propound** [1] - 65:22
  **propounds** [1] -
46:17
  **prosaic** [1] - 61:10
  **protective** [15] -
16:11, 17:3, 17:7,
17:9, 17:12, 20:6,
53:9, 53:13, 53:15,
53:17, 53:23, 54:10,
54:18, 55:5, 55:16
  **protocol** [5] - 48:16,
48:22, 57:24, 58:10,
75:11
  **protocols** [1] - 80:14
  **prove** [1] - 42:11
  **provide** [5] - 43:23,
56:6, 73:10, 74:15,
80:6
  **provided** [4] - 43:22,
70:9, 72:22, 77:16
  **provider** [5] - 62:15,
62:18, 63:1, 63:14
  **provides** [2] - 41:7,
79:23
  **PST** [3] - 9:15, 10:2,
68:9
  **PSTs** [1] - 10:1
  **pull** [6] - 34:8, 60:1,
64:2, 65:25, 70:6,

79:13
  **pulled** [3] - 64:3,
64:4
  **pulling** [1] - 80:18
  **purchase** [1] - 21:1
  **purchased** [4] - 14:1,
27:11, 38:7
  **purchaser** [2] - 13:6,
15:7
  **purchasers** [1] -
26:5
  **purport** [1] - 17:18
  **purported** [1] - 22:6
  **purpose** [3] - 64:6,
67:14, 79:20
  **purposefully** [1] -
5:1
  **purposes** [1] - 25:17
  **pursuant** [7] - 12:19,
21:18, 23:10, 50:17,
60:5, 78:25
  **pursue** [2] - 43:10,
71:2
  **pushing** [1] - 59:4
  **put** [8] - 9:1, 14:23,
31:18, 62:7, 63:3,
73:7, 75:11, 80:15
  **putting** [2] - 7:3, 72:5

## Q

  **qualifications** [1] -
35:9
  **qualify** [1] - 35:23
  **quality** [1] - 43:25
  **quandary** [1] - 33:11
  **quantum** [1] - 29:23
  **quarters** [1] - 12:23
  **quash** [13] - 15:17,
16:11, 16:16, 16:21,
16:22, 17:4, 17:6,
17:8, 17:17, 18:18,
19:4, 21:25, 44:8
  **questions** [4] - 16:4,
23:1, 24:4, 44:6
  **quite** [5] - 22:24,
43:19, 43:20, 44:24,
57:14

## R

  **racetrack** [1] - 4:15
  **raise** [1] - 51:11
  **raised** [6] - 14:21,
14:22, 16:8, 48:15,
48:20, 50:18
  **ran** [2] - 27:20
  **Raton** [1] - 37:2

  **RDR** [2] - 2:7, 84:11
  **reached** [1] - 60:24
  **reacting** [1] - 75:2
  **read** [2] - 62:9, 62:23
  **readable** [1] - 50:1
  **ready** [2] - 69:20,
69:23
  **real** [1] - 10:17
  **really** [16] - 8:16,
8:24, 23:22, 33:25,
33:11, 40:24, 53:25,
64:23, 65:11, 72:18,
75:4, 76:14, 80:16,
81:2, 82:19
  **really...** [1] - 8:7
  **reams** [1] - 10:7
  **reason** [1] - 18:17,
47:9, 55:2, 55:12,
61:24, 67:14, 68:3,
68:7, 77:15
  **reasonable** [1] -
77:16
  **rebuttal** [1] - 69:8
  **receive** [1] - 52:13
  **received** [17] - 9:7,
10:5, 10:20, 13:9,
21:17, 29:3, 29:14,
49:12, 49:19, 50:9,
52:1, 52:6, 52:7,
52:11, 52:15, 54:10,
57:1
  **receiving** [2] - 74:25,
81:15
  **recess** [1] - 83:24
  **recitation** [1] - 12:7
  **recognize** [1] - 49:23
  **reconsideration** [1] -
48:10
  **record** [1] - 62:21
  **RECORDING** [1] -
1:13
  **records** [12] - 13:7,
14:2, 14:9, 15:8,
26:20, 32:9, 35:21,
35:24, 36:5, 43:5,
47:6
  **recover** [1] - 46:16
  **redacted** [4] - 52:8,
52:15, 52:20, 53:3
  **redaction** [1] - 52:25
  **redactions** [2] -
48:18, 52:9
  **refers** [1] - 61:12
  **reflecting** [1] - 59:9
  **regarding** [1] - 10:7
  **registered** [1] -
68:15
  **regulatory** [1] - 9:12
  **reimbursed** [1] -
80:20

  **rejected** [1] - 17:6
  **related** [2] - 16:7,
59:9
  **relates** [1] - 65:20
  **relating** [1] - 65:11
  **relationship** [3] -
39:20, 30:3, 46:21
  **relax** [3] - 7:4, 74:3,
74:4
  **relevant** [7] - 9:3,
10:14, 11:12, 13:3,
37:19, 68:15, 71:18
  **relinquishing** [1] -
21:2
  **rely** [1] - 64:22
  **remain** [1] - 60:3
  **remainder** [1] - 21:5
  **remained** [1] - 21:8
  **remember** [2] - 6:15,
47:22
  **remind** [1] - 67:2
  **reminding** [1] -
72:24
  **reminds** [2] - 46:12,
46:13
  **rented** [1] - 32:15
  **reopened** [1] - 48:12
  **repeated** [1] - 11:1
  **reply** [1] - 71:10
  **report** [3] - 6:14,
60:20, 81:15
  **Reporter** [2] - 2:7,
84:11
  **repository** [3] -
37:21, 62:17, 62:18
  **represent** [3] - 8:2,
8:13, 36:2
  **representation** [10] -
25:2, 42:6, 50:5, 54:6,
55:21, 56:23, 56:24,
57:3, 58:13, 60:15
  **representations** [2] -
28:10, 42:19
  **representative** [1] -
44:5
  **represented** [1] -
29:13
  **represents** [1] -
24:21
  **request** [11] - 15:15,
16:18, 40:4, 42:12,
42:13, 49:10, 52:1,
54:10, 57:18, 65:22,
66:8
  **Request** [1] - 58:25,
59:20
  **requested** [1] - 41:18
  **requests** [3] - 9:6,
11:19, 41:8
  **require** [5] - 17:19,

23:16, 30:18, 41:4,
68:8
  **requirement** [1] -
21:21
  **requires** [2] - 61:19,
62:6
  **requiring** [1] - 40:2
  **resolution** [2] - 6:12,
80:5
  **resolve** [2] - 5:2,
79:21
  **Resolved** [2] - 5:25,
6:2
  **resolved** [12] - 5:5,
6:3, 6:8, 7:11, 8:3,
14:22, 20:4, 20:9,
48:24, 56:18, 79:15,
80:1
  **resolving** [1] - 18:8
  **respect** [2] - 6:18,
79:9
  **respond** [2] - 20:15,
23:20
  **responding** [1] -
23:18
  **response** [12] - 27:5,
42:7, 42:14, 42:17,
51:7, 51:16, 52:1,
71:8, 72:8, 81:8,
81:11
  **responses** [3] -
12:11, 14:12, 73:16
  **responsibilities** [1] -
45:9
  **responsibility** [1] -
11:5
  **responsible** [1] -
9:11
  **responsive** [8] -
41:8, 50:6, 57:4,
58:14, 58:24, 59:20,
62:1, 62:9
  **responsiveness** [1] -
74:21
  **result** [1] - 57:17
  **results** [2] - 65:5,
81:13
  **review** [1] - 14:24,
50:16, 51:22, 69:17,
70:4, 70:8, 70:10,
73:14, 74:20, 74:25,
77:10, 81:1, 81:6,
81:16, 81:20
  **reviewed** [1] - 22:22
  **reviewing** [3] - 70:8,
70:14, 71:3
  **revisit** [1] - 69:3
  **risk** [1] - 79:25
  **riven** [1] - 9:23
  **rocket** [1] - 27:22

**role** [1] - 22:13
**ropes** [1] - 83:7
**rule** [2] - 51:12, 80:12
**Rule** [1] - 19:15
**rules** [6] - 17:21, 18:9, 27:14, 72:22, 72:24, 80:12
**ruling** [8] - 39:11, 45:6, 45:13, 71:24, 79:16, 80:23, 80:24, 82:3
**Rumsfeld** [1] - 33:9, 45:22
**run** [3] - 70:3, 70:6, 75:25
**running** [1] - 32:24

## S

**sake** [1] - 23:14
**salary** [3] - 50:10, 76:25, 77:1
**sale** [3] - 21:1, 21:9, 38:10
**Samet** [14] - 3:14, 3:20, 8:1, 25:9, 25:13, 25:19, 41:16, 47:18, 54:3, 54:16, 58:7, 59:18, 73:24, 75:2
**SAMET** [123] - 1:16, 3:14, 3:22, 4:1, 5:15, 5:17, 5:21, 6:2, 6:5, 6:7, 6:10, 7:5, 8:8, 12:6, 12:14, 13:24, 16:13, 16:16, 16:19, 16:23, 17:2, 19:13, 19:18, 19:21, 23:9, 24:15, 28:1, 31:14, 31:17, 31:19, 31:23, 32:3, 32:5, 32:9, 32:13, 32:16, 32:23, 33:3, 34:13, 34:16, 34:20, 34:23, 35:6, 35:10, 35:13, 35:15, 35:17, 35:20, 36:23, 38:25, 41:11, 41:15, 41:19, 43:18, 44:17, 45:4, 45:14, 45:18, 46:1, 46:9, 47:16, 47:19, 47:25, 48:2, 48:4, 49:3, 49:6, 49:8, 51:15, 51:17, 52:4, 52:15, 52:17, 52:22, 53:5, 53:21, 54:5, 54:19, 54:21, 54:25, 55:20, 56:1, 56:4, 56:6, 56:14, 56:21, 58:4, 58:9, 58:22, 60:16, 60:19, 62:8,

63:2, 66:15, 66:18, 66:20, 69:7, 69:15, 69:20, 69:23, 72:9, 72:14, 72:17, 73:3, 73:6, 73:25, 74:3, 74:5, 74:9, 75:4, 75:8, 75:10, 76:18, 78:21, 79:5, 79:8, 81:17, 82:5, 82:9, 82:13, 82:16, 82:18, 83:25
**sanction** [1] - 45:8
**satisfied** [1] - 50:22
**sauce** [2] - 42:23
**saw** [1] - 78:9
**scattered** [1] - 10:11
**scenario** [1] - 29:21
**scenarios** [1] - 71:20
**schedule** [2] - 40:18, 73:8
**scheduled** [3] - 5:22, 6:5, 7:15
**scheduling** [6] - 5:1, 5:22, 6:9, 61:10, 74:20, 79:16
**SCHMIDT** [6] - 1:16, 70:1, 76:22, 76:24, 77:3, 77:5
**Schmidt** [1] - 3:16
**school** [2] - 3:9, 6:17
**schools** [15] - 10:10, 21:4, 26:2, 26:3, 26:5, 32:19, 37:16, 37:21, 38:1, 38:7, 38:8, 38:10, 38:15, 38:18, 39:1
**search** [51] - 50:15, 50:25, 51:1, 51:8, 51:22, 51:23, 57:1, 57:6, 57:11, 57:25, 58:2, 60:3, 60:5, 61:19, 64:20, 64:21, 65:2, 65:4, 66:4, 68:24, 70:3, 70:6, 73:17, 73:18, 73:21, 74:12, 74:16, 75:12, 75:14, 75:15, 75:16, 75:17, 75:23, 75:25, 76:3, 76:4, 76:9, 76:13, 76:19, 77:7, 77:8, 77:13, 77:15, 78:11, 78:12, 78:17, 79:21, 79:23, 80:1, 80:14
**searches** [2] - 63:22, 71:19
**searching** [2] - 58:1, 63:18
**seat** [2] - 4:15, 46:13
**seated** [1] - 3:5
**second** [5] - 12:23,

14:7, 65:11, 70:14, 73:22
**secret** [1] - 30:6
**secure** [2] - 28:11, 54:1
**security** [2] - 83:5, 83:9
**see** [17] - 3:24, 6:16, 7:7, 7:8, 8:15, 10:16, 11:16, 31:6, 41:19, 52:9, 52:22, 52:25, 57:4, 57:12, 59:15, 63:5, 79:13
**seeking** [1] - 15:11
**seem** [4] - 15:3, 27:24, 43:23, 78:10
**selected** [2] - 60:22, 67:16
**self** [9] - 64:8, 64:22, 64:23, 65:8, 65:25, 66:23, 66:24, 75:18
**self-collect** [2] - 65:25, 75:18
**self-collection** [6] - 64:8, 64:22, 65:8, 66:23, 66:24
**self-collects** [1] - 64:23
**send** [4] - 29:22, 30:4, 30:5, 56:11
**sending** [1] - 29:9
**sense** [1] - 15:4
**sent** [9] - 10:4, 29:20, 29:22, 30:14, 54:1, 54:17, 63:4, 63:9, 67:23
**September** [1] - 61:3
**serve** [1] - 40:13
**served** [12] - 9:6, 11:19, 12:11, 15:7, 15:8, 15:9, 15:12, 16:10, 16:14, 16:21, 17:21, 18:4
**server** [1] - 11:11
**servers** [20] - 12:24, 13:6, 15:16, 23:20, 26:20, 26:25, 28:4, 28:20, 31:15, 31:22, 31:25, 33:21, 34:8, 37:13, 37:18, 37:20, 38:16, 39:18, 41:5, 43:1
**service** [4] - 62:15, 63:1, 63:14, 72:20
**set** [4] - 9:15, 49:9, 69:9, 69:10
**seven** [1] - 56:18
**several** [1] - 43:9, 70:2, 71:23, 81:8
**shared** [1] - 70:5

**sheet** [1] - 25:11
**shell** [1] - 23:12
**shenanigans** [1] - 33:7
**shifting** [1] - 80:9
**shocked** [2] - 74:8, 78:10
**shoes** [2] - 8:22, 22:12
**short** [2] - 69:11, 70:21
**short-circuit** [1] - 70:21
**showing** [2] - 61:20, 61:22
**shown** [1] - 62:25
**SIANA** [1] - 1:8
**Siana** [1] - 31:1
**side** [11] - 11:24, 20:13, 37:12, 42:6, 42:9, 51:14, 53:18, 57:7, 68:9, 83:6
**sides** [2] - 44:14, 44:19
**signature** [1] - 72:20
**signed** [1] - 60:23
**similar** [1] - 47:10
**simple** [1] - 62:20
**simply** [2] - 21:20, 26:6
**single** [7] - 42:12, 42:13, 42:17, 49:24, 50:7, 65:20
**sit** [1] - 6:25
**site** [1] - 37:15
**sitting** [2] - 6:20, 37:24
**situation** [11] - 10:16, 22:25, 29:2, 30:11, 43:14, 44:14, 44:21, 45:12, 46:12, 47:10, 75:13
**six** [2] - 5:10, 50:7
**skewed** [1] - 62:2
**slam** [1] - 83:22
**slightly** [1] - 29:18
**slot** [2] - 7:17, 7:18
**so...** [1] - 75:1
**sold** [2] - 26:3, 26:5
**solution** [1] - 11:21
**solve** [1] - 75:22
**someone** [2] - 26:8, 26:10, 65:3, 83:8
**sometimes** [2] - 46:20
**somewhat** [2] - 27:22, 44:1
**somewhere** [1] - 31:10
**son** [2] - 65:6, 83:2

**soon** [1] - 55:15
**sophisticated** [1] - 70:24
**sophistication** [1] - 64:25
**sorry** [12] - 6:1, 13:22, 13:24, 25:5, 25:13, 26:13, 36:23, 58:9, 59:22, 72:2, 73:25, 75:5
**sort** [14] - 6:17, 8:13, 11:20, 14:24, 17:23, 19:2, 20:13, 31:9, 45:12, 46:12, 46:13, 49:25, 55:24, 58:18
**sorts** [2] - 71:19, 74:6
**sounds** [2] - 9:22, 16:25
**sour** [1] - 46:23
**source** [2] - 49:12, 50:10
**sources** [2] - 13:10, 13:11
**Southeast** [1] - 1:21
**SOUTHERN** [1] - 1:1
**Southern** [2] - 18:13, 19:20
**space** [2] - 32:14, 32:22
**spaced** [1] - 72:24
**spacing** [2] - 72:25, 73:2
**spar** [1] - 69:16
**speaking** [3] - 7:1, 63:16, 70:22
**specific** [4] - 13:12, 58:13, 66:21, 71:11
**specifically** [3] - 40:1, 58:23, 62:8
**speculation** [1] - 71:14
**speed** [1] - 73:8
**spoken** [2] - 37:5, 78:19
**spoliation** [1] - 15:24
**spot** [1] - 82:23
**squeeze** [2] - 71:22, 72:21
**stage** [2] - 68:23, 69:9
**Stage** [3] - 70:8, 71:2, 73:8
**stand** [1] - 6:19
**standing** [3] - 6:17, 7:6, 8:2
**start** [5] - 3:12, 6:25, 47:16, 69:13, 69:21
**starting** [3] - 3:13, 77:9, 77:16

**starts** [1] - 3:10
**state** [2] - 15:21, 56:23
**statement** [2] - 63:3, 63:7
**States** [2] - 2:8, 84:12
**STATES** [2] - 1:1, 1:12
**stating** [2] - 42:2, 79:25
**Station** [2] - 3:25, 4:5
**status** [1] - 17:13
**statute** [2] - 27:20
**stayed** [1] - 78:22
**staying** [2] - 82:11, 82:13
**step** [5] - 8:8, 25:25, 28:23, 28:24, 34:3
**Step** [1] - 71:4
**stepped** [2] - 8:22, 22:12
**steps** [4] - 40:13, 44:25, 45:2, 46:4
**Stewart** [2] - 31:2, 67:9
**STEWART** [1] - 1:8
**still** [12] - 4:4, 17:14, 19:23, 21:10, 23:3, 31:1, 31:2, 31:3, 31:4, 32:18, 40:17, 66:10
**stipulation** [1] - 53:9
**stock** [7] - 50:11, 50:12, 51:23, 58:11, 58:20, 76:8, 76:25
**stone** [3] - 40:8, 49:23, 50:2
**stop** [1] - 74:2
**Storch** [1] - 3:15
**STORCH** [1] - 1:17
**straight** [1] - 50:10
**Street** [2] - 1:18, 82:13
**stricken** [3] - 15:18, 16:10, 17:16
**strict** [1] - 61:2
**strike** [1] - 18:18
**striking** [1] - 80:19
**stuck** [1] - 30:16
**students** [2] - 37:22, 37:23
**stuff** [1] - 15:13
**style** [1] - 6:17
**subject** [4] - 38:12, 41:25, 52:6, 82:2
**submit** [4] - 17:12, 41:17, 42:24, 53:17
**subpoena** [23] - 15:9, 15:12, 15:15, 15:18, 16:10, 16:17,

16:22, 17:3, 17:15, 17:17, 17:18, 17:20, 18:4, 18:10, 19:7, 19:10, 19:16, 21:18, 21:21, 21:25, 40:13, 44:8
**subpoenas** [2] - 16:14, 16:21
**subrogation** [2] - 46:14, 46:22
**substance** [3] - 8:5, 8:16, 17:4
**substantial** [1] - 22:15
**substantially** [1] - 8:3
**substantiated** [1] - 68:20
**suburbs** [1] - 82:21
**successfully** [1] - 10:24
**suddenly** [1] - 78:15
**suffering** [1] - 27:15
**sufficiency** [1] - 64:8
**sufficient** [4] - 8:17, 27:13, 65:9, 68:7
**sufficiently** [2] - 70:24, 71:14
**suggest** [2] - 61:24, 68:12
**suggested** [3] - 50:25, 51:22, 81:1
**suggesting** [3] - 28:3, 30:1, 57:23
**suggestion** [3] - 29:17, 45:21, 69:7
**suggestions** [1] - 50:15
**suing** [2] - 8:25, 22:6
**suit** [1] - 30:12
**Suite** [1] - 1:22
**sum** [2] - 8:16, 52:11
**SUMBERG** [1] - 2:3
**summarily** [1] - 17:6
**supplemented** [1] - 76:20
**supporting** [2] - 72:15, 73:4
**supposed** [1] - 41:2
**surely** [2] - 53:4, 61:3
**surprised** [1] - 74:8
**surprising** [1] - 47:23
**suspect** [2] - 29:10, 42:15
**suspenders** [1] - 57:13
**swagging** [1] - 81:22
**swearing** [1] - 42:18

**system** [3] - 14:24, 19:3, 67:18

## T

**table** [3] - 47:14, 49:2, 49:3
**tail** [1] - 16:8
**tallies** [1] - 81:13
**tantamount** [1] - 40:22
**target** [3] - 33:16, 33:19
**targeted** [1] - 76:24
**targeting** [2] - 17:17, 77:1
**tax** [1] - 77:24
**team** [4] - 6:22, 34:10, 41:17, 54:17
**teams** [1] - 38:1
**technical** [2] - 64:25, 65:11
**technically** [1] - 72:25
**technician** [1] - 35:2
**technique** [1] - 57:24
**tee** [1] - 20:7
**teed** [1] - 68:23
**telephone** [1] - 3:20
**ten** [2] - 48:23, 48:25
**terabyte** [1] - 14:23
**terabytes** [2] - 9:22, 14:16
**terabytes'** [1] - 9:17
**term** [6] - 24:17, 51:8, 57:2, 57:11, 80:1, 80:14
**terminated** [1] - 47:8
**terms** [39] - 10:23, 22:3, 39:11, 48:25, 50:15, 51:1, 51:22, 57:11, 57:25, 58:2, 70:3, 70:6, 73:17, 73:18, 73:20, 74:13, 74:16, 74:19, 74:23, 75:12, 75:14, 75:15, 75:16, 75:18, 76:4, 76:9, 76:19, 76:24, 77:1, 77:6, 77:7, 77:13, 77:16, 77:23, 78:11, 78:17, 79:21, 79:24
**test** [1] - 43:24
**textbook** [1] - 65:24
**that'll** [2] - 72:20, 81:25
**THE** [218] - 1:12, 1:13, 1:16, 2:2, 3:1, 3:4, 3:8, 3:19, 3:23,

4:4, 4:10, 4:14, 4:19, 4:23, 5:13, 5:16, 5:20, 6:1, 6:4, 6:6, 6:8, 6:15, 7:7, 7:16, 7:19, 7:23, 12:13, 13:22, 16:6, 16:15, 16:17, 16:20, 16:25, 17:14, 18:2, 18:4, 18:6, 18:12, 18:15, 18:17, 18:20, 19:12, 19:17, 19:19, 20:5, 20:12, 20:17, 20:19, 22:8, 22:10, 22:24, 23:5, 23:7, 23:14, 24:2, 24:10, 24:14, 24:17, 24:20, 24:23, 24:25, 25:4, 25:6, 25:8, 25:17, 25:19, 25:22, 26:13, 28:2, 28:15, 29:4, 29:7, 30:1, 30:15, 30:20, 30:23, 30:25, 31:6, 31:15, 31:18, 31:20, 32:1, 32:4, 32:8, 32:10, 32:14, 32:21, 33:1, 33:4, 34:15, 34:18, 34:21, 35:4, 35:8, 35:12, 35:14, 35:16, 35:18, 36:1, 36:4, 36:10, 36:14, 36:16, 36:18, 36:20, 36:22, 37:1, 37:3, 37:5, 38:15, 38:18, 39:1, 39:5, 39:7, 39:9, 40:16, 40:19, 41:9, 41:14, 41:16, 42:5, 44:1, 44:18, 45:5, 45:17, 45:21, 45:24, 46:2, 46:10, 47:17, 47:22, 48:1, 48:3, 49:2, 49:5, 49:7, 51:11, 51:16, 51:25, 52:13, 52:16, 52:18, 54:3, 54:16, 54:20, 54:22, 55:2, 55:23, 56:3, 56:5, 56:9, 56:15, 56:17, 57:16, 57:21, 58:5, 58:7, 58:17, 59:6, 59:18, 60:10, 60:15, 60:17, 63:15, 63:23, 64:10, 64:15, 64:17, 64:20, 66:17, 66:19, 69:13, 69:19, 69:21, 69:24, 70:7, 72:1, 72:2, 72:3, 72:4, 72:13, 72:16, 72:18, 72:23, 73:4, 73:23, 74:1, 74:4, 74:6, 74:12, 74:15, 74:18, 75:2, 75:6,

75:9, 76:17, 76:19, 76:23, 77:1, 77:4, 77:12, 77:25, 78:3, 78:5, 79:2, 79:6, 79:10, 81:19, 82:7, 82:11, 82:15, 82:17, 82:19, 83:1, 83:20
**theirs** [1] - 44:8
**themselves** [2] - 6:24, 68:1
**theory** [2] - 42:17, 44:24
**there'll** [3] - 72:7, 80:9, 81:21
**they've** [18] - 7:1, 8:2, 11:19, 14:14, 27:17, 27:21, 28:11, 29:3, 29:4, 29:5, 29:8, 30:12, 41:4, 41:11, 41:18, 46:19, 58:12
**third** [14] - 9:19, 9:21, 13:1, 13:10, 14:8, 29:14, 31:24, 61:13, 61:19, 63:9, 64:6, 68:24, 72:21
**Third** [1] - 1:21
**third-party** [8] - 9:19, 13:10, 14:8, 61:13, 63:9, 64:6, 68:24
**thousands** [1] - 15:2
**three** [10] - 4:3, 8:13, 8:15, 27:17, 43:16, 45:15, 46:6, 46:8, 64:11, 81:6
**throughout** [6] - 10:11, 18:23, 37:20, 38:19, 39:1
**timely** [2] - 71:24, 78:8
**today** [15] - 3:8, 3:15, 5:10, 5:18, 5:19, 6:13, 14:19, 27:3, 41:4, 48:23, 51:11, 51:18, 53:2, 60:10, 73:11
**today's** [2] - 8:12, 25:17
**together** [4] - 4:25, 10:20, 10:21, 12:13
**took** [7] - 12:21, 19:23, 23:11, 27:3, 32:9, 32:24, 50:7
**top** [1] - 81:10
**totality** [1] - 20:24
**totally** [2] - 7:21, 62:5
**toward** [1] - 16:7
**towards** [3] - 31:18, 76:24, 77:1
**Tower** [3] - 1:17, 3:25, 4:3

**track** [1] - 45:3
**tracks** [1] - 22:2
**traditional** [1] - 58:19
**traffic** [1] - 3:9
**training** [2] - 65:1, 65:9
**TRANSCRIBED** [2] - 1:13, 2:7
**transcript** [3] - 58:14, 58:24, 59:19
**transcription** [1] - 84:7
**transfer** [11] - 34:9, 35:21, 36:5, 36:7, 36:8, 37:6, 37:9, 39:17, 39:23, 43:5
**transferred** [4] - 23:11, 23:23, 35:19, 38:11
**transfers** [1] - 17:24
**transported** [2] - 32:2, 32:6
**trial** [1] - 27:23
**trick** [1] - 60:2
**tried** [1] - 21:22
**trouble** [2] - 75:8, 75:10
**troubled** [1] - 75:6
**troubling** [1] - 75:9
**truck** [3] - 32:1, 32:2, 34:8
**true** [2] - 17:7, 25:14
**truly** [1] - 10:17
**trust** [1] - 12:18
**trustee** [43] - 8:20, 8:22, 12:17, 12:18, 12:21, 12:23, 12:25, 13:4, 13:5, 13:6, 13:8, 13:9, 14:10, 22:9, 22:12, 23:11, 24:5, 24:9, 24:10, 24:11, 24:13, 24:15, 24:18, 24:20, 25:10, 25:12, 25:22, 26:9, 26:12, 26:16, 26:24, 28:13, 28:20, 28:24, 30:3, 44:7, 44:22, 45:1, 54:14
**Trustee** [1] - 1:4
**Trustees** [1] - 3:3
**truth** [1] - 42:11
**try** [10] - 26:16, 28:21, 44:3, 46:15, 53:18, 55:13, 57:6, 59:12, 70:20, 71:22
**trying** [8] - 11:21, 30:17, 33:15, 38:3, 44:19, 45:15, 50:14, 66:6

**Tuesday** [1] - 79:22
**turn** [5] - 30:7, 66:9, 66:14, 73:19, 77:22
**turned** [4] - 21:24, 29:13, 68:6, 68:8
**turning** [2] - 63:18, 65:14
**turns** [1] - 76:12
**Twelfth** [2] - 2:9, 84:12
**two** [21] - 7:15, 10:2, 18:25, 22:2, 28:24, 36:17, 52:6, 55:20, 59:25, 64:24, 66:22, 69:9, 70:5, 73:16, 77:6, 78:22, 80:5, 81:14, 81:17, 81:19
**Two** [2] - 1:17, 4:2
**two-stage** [1] - 69:9
**two-step** [1] - 28:24
**type** [3] - 49:11, 58:19, 66:10
**types** [1] - 55:10
**typically** [1] - 42:7

# U

**ultimately** [2] - 17:11, 51:5
**unacceptable** [1] - 11:18
**under** [20] - 11:24, 17:21, 18:9, 19:15, 26:8, 27:14, 32:19, 32:21, 39:4, 39:5, 42:17, 51:6, 51:7, 52:24, 61:18, 67:1, 68:8, 71:19, 77:20, 83:19
**understood** [3] - 14:22, 19:12, 72:10
**undertook** [2] - 27:6, 64:9
**unfavorite** [1] - 55:8
**unfortunately** [2] - 3:11, 61:6
**unhappy** [1] - 80:2
**United** [1] - 84:12
**UNITED** [2] - 1:1, 1:12
**united** [1] - 2:8
**universe** [1] - 21:23
**unknown** [2] - 33:10, 45:18
**unknowns** [4] - 33:10, 45:18, 45:19
**unless** [2] - 17:22, 22:19
**unrealistic** [1] -

81:12
**unreasonable** [3] - 55:3, 80:10, 80:17
**unredacted** [3] - 53:7, 53:8, 55:16
**untruthful** [1] - 28:10
**unusual** [2] - 33:20, 43:13
**unwilling** [1] - 43:23
**up** [31] - 5:8, 5:17, 6:17, 6:19, 7:1, 7:6, 11:21, 12:15, 20:7, 27:1, 27:7, 27:23, 32:1, 32:2, 34:8, 55:2, 56:9, 61:3, 62:20, 67:15, 68:23, 69:9, 69:10, 72:5, 74:9, 75:4, 78:1, 78:3, 79:14, 81:3, 81:13
**upload** [1] - 14:24
**upset** [1] - 33:14
**useful** [1] - 73:7
**user** [1] - 63:25

# V

**valid** [1] - 11:19
**value** [1] - 83:21
**vanish** [2] - 28:17
**vanished** [2] - 26:21, 28:14
**vast** [2] - 9:2, 37:21
**velvet** [1] - 83:7
**vendor** [39] - 50:22, 50:23, 57:11, 57:25, 59:14, 60:21, 60:22, 60:23, 61:14, 63:3, 63:9, 63:17, 63:20, 64:1, 64:6, 64:20, 65:17, 66:7, 66:9, 67:16, 68:24, 69:13, 69:16, 69:21, 70:1, 70:5, 70:7, 70:14, 71:3, 73:11, 73:12, 73:15, 75:25, 78:13, 79:21, 80:6, 81:1, 81:3, 81:13
**vendor's** [2] - 80:25, 81:15
**version** [1] - 54:18, 56:7
**versus** [1] - 3:3
**vestment** [1] - 58:12
**vestments** [1] - 50:12
**vice** [2] - 3:15, 3:16
**view** [6] - 5:4, 19:10, 33:1, 39:23, 39:24, 55:3

**virtually** [2] - 32:6, 34:9
**voluminous** [4] - 75:1, 76:11, 76:12, 81:8
**VPN** [1] - 32:6
**vs** [1] - 1:6

# W

**W-2** [3] - 52:13, 52:22, 52:24
**W-2s** [6] - 52:7, 52:15, 52:19, 55:15, 57:17, 59:9
**wait** [5] - 28:2, 29:7, 73:23
**waiting** [1] - 83:8
**wants** [2] - 5:3, 57:21
**WARD** [87] - 2:2, 3:7, 4:8, 4:12, 5:12, 7:14, 7:17, 7:20, 8:1, 8:10, 18:1, 18:3, 18:5, 18:9, 18:13, 18:16, 18:19, 20:11, 20:15, 20:18, 20:20, 22:9, 22:11, 23:4, 23:6, 23:8, 28:8, 28:16, 29:5, 29:16, 30:10, 30:16, 30:22, 30:24, 31:1, 31:13, 36:3, 36:6, 36:11, 36:15, 36:17, 36:19, 36:21, 36:25, 37:2, 37:4, 37:7, 38:17, 38:20, 38:23, 39:4, 39:6, 39:8, 40:15, 40:17, 41:3, 41:10, 49:1, 53:6, 53:25, 56:16, 57:5, 57:20, 58:6, 59:7, 60:8, 60:14, 61:9, 62:14, 63:7, 63:22, 63:24, 64:14, 64:16, 64:19, 68:5, 73:16, 74:14, 74:17, 74:19, 77:6, 77:13, 78:2, 78:4, 82:6, 82:8, 84:1
**Ward** [8] - 4:8, 4:10, 4:12, 13:13, 17:10, 26:22, 59:21, 60:1
**ways** [2] - 59:25
**web** [1] - 67:18
**web-based** [1] - 67:18
**Wednesday** [2] - 79:17, 79:18
**week** [11] - 15:19, 48:22, 48:25, 71:8, 72:7, 73:14, 73:22, 74:24, 78:9, 81:2,

81:5
**weeks** [5] - 18:25, 43:9, 71:23, 81:8, 81:20
**WEISSMAN** [1] - 1:21
**whatsoever** [1] - 17:5
**whole** [6] - 3:11, 41:25, 52:25, 62:9, 75:13
**wildly** [1] - 81:12
**willing** [2] - 15:4, 53:8
**winter** [2] - 76:9, 76:16, 76:20
**withheld** [2] - 59:20, 66:3
**withhold** [1] - 69:8
**withholding** [6] - 44:23, 49:16, 58:24, 60:11, 77:21
**witnesses** [1] - 41:23
**woke** [2] - 74:9, 75:4
**wonderful** [1] - 49:5
**word** [2] - 29:9, 79:2
**words** [5] - 9:20, 36:8, 41:10, 48:17, 80:15
**works** [1] - 8:20
**workshops** [1] - 18:24
**worth** [1] - 9:17
**wrinkle** [1] - 19:13
**write** [1] - 4:14
**written** [4] - 14:12, 71:1, 71:7, 79:23
**wrongs** [1] - 22:7

# Y

**Yawn** [5] - 10:2, 13:14, 13:18, 14:4, 30:6
**YAWN** [1] - 1:8
**year** [2] - 27:23, 48:2
**years** [7] - 7:2, 27:17, 27:21, 43:16, 46:19, 79:7, 83:3
**York** [4] - 1:19, 3:15, 17:19
**yourself** [1] - 3:5
**yourselves** [1] - 79:24
**YOUSEFI** [1] - 1:8
**Yousefi** [10] - 31:1, 34:16, 35:5, 35:10, 35:21, 36:2, 36:12, 38:5, 39:16, 43:6