# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-62028-CIV-LENARD/GOODMAN

**CLINGMAN & HANGER**
**MANAGEMENT ASSOCIATES, LLC,**
**as trustee,**

      Plaintiff,

**v.**

**DAVID KNOBEL, et al.,**

      Defendants.

_____/

## ORDER DENYING MOTION TO DISMISS AMENDED COMPLAINT (D.E. 99)

**THIS CAUSE** is before the Court on Defendants David Knobel, Jeffrey Pierne, Neal Yawn, Dean Bartness, Siana Stewart, and Cid Yousefi's Motion to Dismiss the Amended Complaint (D.E. 99) and Memorandum of Law in Support thereof, ("Motion," D.E. 99-1), filed July 26, 2017. Plaintiff Clingman & Hanger Management Associates, LLC, as Trustee of the liquidating trust established by the Chapter 11 plan of liquidation of FCC Holdings, Inc. and its subsidiaries, filed a Response on June 28, 2017, ("Response," D.E. 102), to which Defendants filed a Reply on August 16, 2017, ("Reply," D.E. 105). Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

I.     **Background**[1]

Prior to its collapse in 2014, FCC Holdings, Inc. ("FCC") owned and operated forty-one for-profit, post-secondary education schools—fourteen Florida Career College schools, twenty-two Anthem Education schools, and five schools in California.  (Compl. ¶¶ 2, 8, 21.)  Defendant Neal Yawn was FCC's Chief Operations Officer, (Compl. ¶ 6(a)); Defendant Siana Stewart was FCC's Vice President of Financial Services, (id. ¶ 6(b)); Defendant David Knobel was FCC's Chief Executive Officer and director of FCC, (id. ¶ 6(c)); Defendant Jeffrey Pierne was FCC's Chief Financial Officer, (id.); Defendant Cid Yousefi was FCC's Senior Vice President of Information Technology who, upon Stewart's resignation in December 2013, assumed Stewart's responsibilities and supervised FCC's Financial Services Office, (id. ¶ 18); and Defendant Dean Bartness was FCC's Chief Compliance Officer and the person responsible for ensuring compliance with Department of Education ("DOE") regulations, (id. ¶ 6(e)).

Pursuant to Title IV of the Higher Education Act of 1965, the DOE provided tuition funding for students attending the FCC schools that were eligible to receive Title IV funds.[2]  (Id. ¶ 2.)  Approximately 90% of FCC's revenue and cash consisted of Title IV funds paid to FCC to satisfy student tuition obligations.  (Id.)  To access Title IV funds, an institution must first apply for and receive a DOE Office of Postsecondary Education ID number ("OPEID").  (Id. ¶ 30.)  FCC had six OPEIDs—one for the

---

[1]     The following facts are gleaned from Plaintiff's Amended Complaint (D.E. 85) and are deemed to be true for purposes of ruling on Defendants' Motion.

[2]     All of the FCC schools except the five California schools were Title IV-eligible. (Compl. ¶ 21.)

fourteen Florida Career College schools, and five for the twenty-two Anthem schools.
(Id. ¶ 31.)

"Under the 'advance' payment method that was historically utilized by FCC, an institution may draw Title IV funds via the DOE's payment system ('G5') before 'substantiating' the same by reporting to the DOE the individual students to whom such funds are 'disbursed' via the DOE's common origination and disbursement system ('COD')." (Am. Compl. ¶ 33 (quoting 34 C.F.R. 668.162(b)).) Defendants took advantage of the ability to draw Title IV funds before having to "substantiate" them with the DOE (by identifying specific students to whom the funds were disbursed) by drawing tens of millions of dollars to pay FCC's operating costs and capital expenditures without regard to whether those funds were or could be justified based on the actual tuition FCC earned from qualified, bona fide enrolled students. (Id. ¶ 3.) The Amended Complaint alleges that Defendants knew, or should have known, that this conduct violated DOE regulations. (Id. ¶ 5.)

In May 2013, the DOE temporarily suspended FCC's ability to draw Title IV funds without first substantiating them after FCC drew but did not properly substantiate or refund over $15 million in Title IV funds. (Id. ¶ 7.) After substantiating or refunding the $15 million, management re-engaged in the same conduct/inaction as it had the prior year (as well as additional conduct), again violating DOE regulations. (Id.) By March 2014, after FCC had drawn approximately $20 million in unsubstantiated Title IV funds, the DOE demanded that FCC repay or substantiate all unsubstantiated funds within thirty

days, and permanently eliminated FCC's ability to draw Title IV funds without first substantiating them. (Id.)

Immediately upon learning of Defendants' misconduct, the Board, in April 2014, removed Knobel as director and CEO, and Yawn resigned. (Id. ¶ 8.) However, by then the company's liquidation was inevitable and, by August 2014, the company sold off its most valuable schools. (Id.) On August 26, 2014, FCC filed for Chapter 11 bankruptcy. (Id. ¶ 124.) On March 18, 2015, the United States Bankruptcy Court for the District of Delaware confirmed the Plan in FCC's Chapter 11 Bankruptcy Case, established a trust, and appointed Plaintiff as Trustee. (Id. ¶¶ 11-12.)

On August 23, 2016, Plaintiff initiated this lawsuit, filing a complaint alleging a single cause of action for breach of fiduciary duty. (D.E. 1.) On April 28, 2017, the Court granted Defendants' Motions to Dismiss the original complaint without prejudice for lack of standing. ("Dismissal Order," D.E. 76.) Specifically, the Court found that the complaint alleged claims on behalf of FCC's creditors, and that officers and directors do not owe a fiduciary duty to creditors under Delaware law. (Id. at 8.)

Plaintiff filed a Motion for Reconsideration in which it argued that it asserted its claims on behalf of the debtor, FCC, while acknowledging that part of the Complaint explicitly asserted that it was bringing its claims on behalf of FCC's creditors. (D.E. 78 at 1.) Plaintiff asked the Court to deny the Motion to Dismiss or, alternatively, for leave to file an Amended Complaint to clarify that the Trustee is asserting FCC's direct causes of action. On June 27, 2017, the Court entered an Order granting Plaintiff leave to file an Amended Complaint. (D.E. 83.) The Court stated that it was taking "no position as to

4

the merits of Plaintiff's arguments as to whether reconsideration of the Dismissal is warranted under Rule 59(e) or 60(b)." (Id.)

On June 28, 2017, Plaintiff filed the Amended Complaint on behalf of FCC, (D.E. 85), asserting claims for (1) breach of the fiduciary duty of care, (id. ¶¶ 126-138), and (2) breach of the fiduciary duty of loyalty, (id. ¶¶ 139-150).

Defendants move to dismiss the Amended Complaint as time-barred and for failure to state a claim.  (See Mot. at 3.)

Additional facts will be provided where relevant to the Court's discussion.

## II.    Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship among the Parties and the amount in controversy exceeds $75,000.00.  (See id. ¶¶ 11-18.)  The Court also has jurisdiction under 28 U.S.C. § 1334, which provides that district courts have original jurisdiction over civil proceedings related to bankruptcy cases brought under Title 11 of the United States Code.

## III.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss.  Id.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  Id.; see also

Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the

plausibility standard).  "Factual allegations must be enough to raise a right to relief above

the speculative level[.]"  Twombly, 550 U.S. at 555 (citation omitted).  Additionally:

> Although it must accept well-pled facts as true, the court is not required to
> accept a plaintiff's legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 129
> S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (noting "the tenet that a court
> must accept as true all of the allegations contained in a complaint is
> inapplicable to legal conclusions").  In evaluating the sufficiency of a
> plaintiff's pleadings, we make reasonable inferences in Plaintiff's favor,
> "but we are not required to draw plaintiff's inference."  Aldana v. Del
> Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1248 (11th Cir. 2005).
> Similarly, "unwarranted deductions of fact" in a complaint are not admitted
> as true for the purpose of testing the sufficiency of plaintiff's allegations.
> Id.; see also Iqbal, 129 S. Ct. at 1951 (stating conclusory allegations are
> "not entitled to be assumed true").

Sinaltrainal v. Coca-Cola, 578 F.3d 1252, 1260 (11th Cir. 2009), abrogated on other

grounds by Mohamad v. Palestinian Auth., 566 U.S. 449, 132  S. Ct. 1702, 1706 n.2

(2012).  The Eleventh Circuit has endorsed "a 'two-pronged approach' in applying these

principles: 1) eliminate any allegations in the complaint that are merely legal conclusions;

and 2) where there are well-pleaded factual allegations, 'assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief.'"  Am. Dental

Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at

679).

**IV.    Choice of Law**

The Parties agree that Delaware law controls the substantive issues in this case.

"In determining which law applies, a federal district court sitting in diversity must apply

the choice of law rules of the forum state."  Trumpet Vine Invs., N.V. v. Union Capital

Partners I, Inc., 92 F.3d 1110, 1115 (11th Cir. 1996).  "The fiduciary duties owed to a

corporation by its officers and directors concern the internal affairs of a corporation."

Mukamal v. Bakes, 378 F. App'x 890, 896 (11th Cir. 2010) (citation omitted).  "The

Florida Business Corporation Act provides that the internal affairs of a corporation are

governed by the laws of the state of incorporation."  Id. (citing Fla. Stat. § 607.1505(3)).

Because FCC was incorporated in Delaware, the Court will apply Delaware law to the

substantive issues raised herein.  See id. (applying Delaware law to breach of fiduciary

duty claims pursuant to the Florida Business Corporation Act's "internal affairs"

provision).

## V.    Discussion

Defendants argue that the Amended Complaint (1) fails to state a claim for breach

of the duty of loyalty and (2) breach of the duty of care, and (3) is time-barred; and, in

any event, that (4) Knobel and Pierne are protected by the exculpatory clause in the

corporate charter, and (5) Stewart and Yousefi were not fiduciaries.[3]  (See Mot. at 3.)

Under Delaware law, corporate officers owe the same fiduciary duties as corporate

directors, including the duties of loyalty and care.  Gantler v. Stephens, 965 A.2d 695,

708-09 (Del. 2009).  Courts apply the "business judgment rule" when reviewing whether

---

[3]      Defendants also argue that "the credit covenant claim is dependent on the
fiduciary duty claims."  (Mot. at 3, 25.)  However, although the Amended Complaint contains
allegations regarding Defendants' breach of a credit agreement, (Am. Compl. ¶¶ 94-98) those
allegations are not set forth in either cause of action., (id. ¶¶ 126-150).  Thus, it does not appear
that Plaintiff is attempting to allege a claim for breach of the credit agreement.  Indeed, Plaintiff
did not respond to Defendant's argument regarding breach of the credit agreement.  Accordingly,
the Court need not address this argument.

a corporation's decision-makers have acted consistently with the standard of conduct

imposed by their fiduciary obligations.[4]  See McMullin v. Beran, 765 A.2d 910, 916-17

(Del. 2000).

---

[4]      It is unclear whether the business judgment rule applies to direct actions against a corporation's officers, like this one, or only to shareholder derivative suits against a corporation's directors.  See generally F.D.I.C. v. Baldini, 983 F. Supp. 2d 772, 780-82 (S.D. W. Va. 2013); see also In re Enivid. Inc., 345 B.R. 426, 450 n.18 (Bankr. D. Mass. 2006). Although the Court has found no authority limiting the Delaware Rule to shareholder derivative suits, it appears that all of the cases applying the Rule have been shareholder derivative suits against the corporation's directors.  See, e.g., McMullin v. Beran, 765 A.2d 910, 916-17 (Del. 2000); Cede & Co., 634 A.2d at 361.   These cases describe the business judgment rule in terms of "a shareholder plaintiff challenging a board decision."  Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993); see also McMullin, 765 A.2d at 917; Carsanaro v. Bloodhound Techs., Inc., 65 A.3d 618, 637 (Del. Ch. 2013).  Additionally, in Aronson v. Lewis, the Supreme Court of Delaware stated that the Rule's "protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment."  473 A.2d 805, 812 (Del. 1984) (emphasis added), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000).

On the other hand, several commentators have argued that the business judgment rule should apply to the actions of corporate officers:

Sound public policy points in the direction of holding officers to the same duty of care and business judgment standards as directors, as does the little case authority that exists on the applicability of the business judgment standard to officers, and the views of most commentators support this position.

F.D.I.C., 983 F. Supp. 2d at 781 (quoting Lyman P.Q. Johnson, Corporate Officers and the Business Judgment Rule, 60 Bus. Law. 439, 440–41 (2005)); see also Lawrence A. Hammermesh and A. Gilchrist Sparks, III, Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson, 60 Bus. Law. 865, (2005) ("[P]olicy rationales underlying the development and application of the business judgment rule to corporate directors similarly justify application of the rule to non-director officers, at least with respect to their exercise of discretionary delegated authority.").

Moreover, bankruptcy courts have applied the Rule in suits by a trustee against a corporation's officers.  See, e.g., In re DSI Renal Holdings, LLC, 574 B.R. 446, 471-72 (Bankr. D. Del. 2017).  Additionally, the Supreme Court of Delaware has declared that the business judgment rule is "a procedural guide for litigants and a substantive rule of law[,]" McMullin, 765 A.2d at 916-17.

Because the Court has been given no reason why a substantive rule of Delaware law should be applied only to corporate directors, the Court will assume for purposes of this discussion that the business judgment rule applies in direct actions against a corporation's officers.  See In re Enivid. Inc., 345 B.R. at 450 n.18.

The business judgment rule "presumes that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re Orchard Enters., Inc. Stockholder Litig., 88 A.3d 1, 34 (Del. Ch. 2014) (quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." Id.

> The business judgment rule "operates as both a procedural guide for litigants and a substantive rule of law." Procedurally, the initial burden is on the shareholder plaintiff to rebut the presumption of the business judgment rule. To meet that burden, the shareholder plaintiff must effectively provide evidence that the defendant board of directors, in reaching its challenged decision, breached any one of its "triad of fiduciary duties, loyalty, good faith or due care." Substantively, "if the shareholder plaintiff fails to meet that evidentiary burden, the business judgment rule attaches" and operates to protect the individual director-defendants from personal liability for making the board decision at issue. . . . If the shareholder plaintiff succeeds in rebutting the presumption of the business judgment rule, the burden shifts to the defendant directors to prove the "entire fairness" of the transaction.[5]

McMillian, 765 A.2d at 916-17. (citations omitted). However, "in instances where directors have not exercised business judgment, that is, in the event of director inaction, the protections of the business judgment rule do not apply. Under those circumstances, the appropriate standard for determining liability is widely believed to be gross

---

[5]     It does not appear that the "entire fairness" standard applies to the challenged actions. "[T]he entire fairness standard requires the board of directors to establish 'to the court's satisfaction that the transaction was the product of both fair dealing and fair price.'" Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1163 (Del. 1995) (Cede & Co., 634 A.2d at 361). In this case, there were no purchases or monetary transactions that lend themselves to the "entire fairness" standard, and Defendants do not argue that, even assuming Plaintiff has rebutted the business judgment presumption, that their actions were "entirely fair."

negligence . . . ." In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 749 (Del. Ch. 2005) ("Disney I").  As such, the business judgment rule does not apply to Plaintiff's "Caremark claim."[6]  See Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs, C.A. No. 10872–VCMR, 2016 WL 4076369, at *6 n.35 (Del. Ch. Aug. 1, 2016) ("[I]n a Caremark claim, there is no challenged transaction to test against the business judgment rule.") (quoting David B. Shaev Profit Sharing Account v. Armstrong, No. Civ.A. 1449-N, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006)).

The Court will first address the preliminary questions of whether Plaintiffs' claims are time-barred and whether Stewart and Yousefi were fiduciaries before turning to whether the Amended Complaint states claims for breach of the fiduciary duties of loyalty and care.

### a.     Timeliness

"Under Delaware common law, a cause of action for breach of fiduciary duty is governed by a three-year statute of limitations."  100079 Canada, Inc. v. Stiefel Labs., Inc., 596 F. App'x 744, 749 (11th Cir. 2014) (citation omitted).  "The statute of limitations begins to run at the time that the cause of action accrues, which is generally

---

[6]     As will be discussed below, a "Caremark claim" alleges a breach of the fiduciary duty of loyalty based on a failure to monitor.  See Stone v. Ritter, 911 A.2d 362, 369-70 (Del. 2006) (citing In re Caremark Int'l Derivative Litig., 698 A.2d 959 (Del. Ch. 1996)).  "In a typical Caremark case, plaintiffs argue that the defendants are liable for damages that arise from a failure to properly monitor or oversee employee misconduct or violations of law."  In re Citigroup Inc. Shareholder Derivative Litig., 964 A.2d 106, 123 (Del. Ch. 2009).  "The claim is that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance."  Caremark, 698 A.2d at 967.

when there has been a harmful act by the defendant." Id. (quoting In re Tyson Foods, Inc. Consol. S'holder Litig., 919 A.2d 563, 584 (Del. Ch. 2007)).

The Parties appear to agree that the limitations period in this case is the three years preceding the filing of the bankruptcy petition on August 26, 2014, and, therefore, that the limitations period goes back to August 26, 2011.  (Mot. at 20; Resp. at 20.)

Defendants first argue that the Amended Complaint alleges that Anthem officials engaged in the illegal drawing down of the Title IV funds before August 26, 2011— which is before Anthem merged with FCC—and that Plaintiff's causes of action cannot be tolled as a continuing violation.  (Id. (citing Kerns v. Dukes, No. Civ.A.1999-S, 2004 WL 766529, at *4 (Del. Ch. Apr. 2, 2004) (finding that plaintiff's claims under 28 U.S.C. § 1983 for alleged violations of the Constitutional right to due process were time-barred because the complaint was filed after the limitations period expired)).)

Plaintiff argues that the Amended Complaint asserts claims against Defendants for their actions between 2012 and 2014, and that it asserts no claims against Anthem's officers for breaches of their fiduciary duties.  (Resp. at 20.)  Defendant's Reply fails to address Plaintiff's argument.

The Amended Complaint asserts claims against FCC's officers and directors for alleged breaches of their fiduciary duties to FCC between 2012 and 2014.  (Am. Compl. ¶ 6, 44-112.)  FCC merged with Anthem on April 12, 2012—well within the limitations period.  (Id. ¶ 26.)  The Amended Complaint asserts no claims against Anthem's officers or directors.  Therefore, the statute of limitations presents no bar to Plaintiff's claims.

Defendants also appear to argue that the Amended Complaint is untimely because it was not filed within two years of the bankruptcy petition.  (See Mot. at 20-22.)   The argument appears to go like this: the Trustee had two years from the date the bankruptcy petition was filed on August 26, 2014 to file its claims; the original Complaint was timely filed on August 23, 2016; the Court dismissed the original Complaint on the grounds that Plaintiff filed it on behalf of FCC's creditors (and therefore lacked standing to sue for breach of fiduciary duties); Plaintiff filed the Amended Complaint on behalf of FCC (as debtor) on June 28, 2017, more than two years after the bankruptcy petition; and the Eleventh Circuit has held that in certain circumstances, an amended complaint filed on behalf of a substitute plaintiff does not relate back to the original complaint.  (Id. at 21 (citing Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1131 (11th Cir. 2004)).

In Makro Capital of America, Inc. v. UBS AG, the Eleventh Circuit held that Rule 15(c)(1)(C) applies when an amendment to the complaint adds a plaintiff, even though the rule, by its terms, applies only when the amendment "changes the party . . . against whom a claim is asserted[.]"  543 F.3d 1254, 1259 (11th Cir. 2008).  That Rule provides:

> An amendment to a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > **(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > **(ii)** knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).  Under this Rule, courts allow an amendment to relate back to the original complaint when the defendant (1) knew or should have known that it would be called upon to defend against claims asserted by the newly-added plaintiff and (2) would not be unfairly prejudiced in maintaining a defense against the newly-added plaintiff.  Cliff, 363 F.3d at 1132 (citing SMS Fin., Ltd. Liab. Co. v. ABCO Homes, Inc., 167 F.3d 235, 244-45 (5th Cir. 1999); Nelson v. Cty. of Allegheny, 60 F.3d 1010, 1014-15 (3d Cir. 1995)).

Here, the Court finds that Defendants had adequate notice of the FCC's claims when the Trustee filed its original Complaint, and that relation back would not unfairly prejudice Defendants.  First, although the Court previously found that the original Complaint was brought on behalf of FCC's creditors,[7] it also alleges that Defendants breached the fiduciary duties they owed to FCC.[8]  (See, e.g., Compl. ¶¶ 97-98 ("Defendants owed fiduciary duties of loyalty, care, and good faith to FCC.  Defendants breached these duties, resulting in the loss of the one thing necessary for FCC to survive: access to Title IV funds."); id. ¶ 108 ("The Trustee is entitled to judgment against all defendants, jointly and severally, for damage caused to FCC.").  Thus, Defendants had

---

[7]  This finding was based on statements in the Complaint made explicitly on behalf of FCC's creditors.  For example, the Complaint states that "the Trustee, as Plan fiduciary for FCC's creditors, which include FCC's lenders, trade creditors, and the DOE, seeks damages from the defendants on account of their breaches of fiduciary duty and their destruction of approximately $150 million in value, to the detriment of the Debtor's prepetition creditors." (D.E. 1 ¶ 10 (emphases added); see also id. ¶ 107 ("As a result of defendants' fiduciary duty breaches, FCC's creditors, on whose behalf the Trustee commenced this action (including lenders, trade vendors, and the DOE), have been damaged in an amount to be determined after trial, but not less than $150 million.").)

[8]  This was the basis for Plaintiff's Motion for Reconsideration.  (D.E. 78 at 4-5.)

notice of Plaintiff's claims on behalf of FCC.  Furthermore, the Amended Complaint asserts the same claims as the initial Complaint, albeit with more detail.  Defendants will not be unfairly prejudiced by having to defend against identical claims.

For these reasons, the Court finds that the Amended Complaint relates back to the original Complaint, and that Plaintiff's claims are not time-barred.

### b.    Stewart and Yousefi were fiduciaries

Next, Defendants argue that Defendants Stewart and Yousefi cannot be held liable for breaching fiduciary duties because they were not fiduciaries.  (Mot. at 23.)  They argue that Stewart and Yousefi were neither directors, officers, nor "key managerial" personnel.  (Id. (citing Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc., Civil Action No. 3290–VCP, 2009 WL 1387115, at *9-10 *Del. Ch. May 18, 2009)).)  Plaintiffs argue that Stewart and Yousefi were key management personnel.  (Resp. at 18-19.)

"As with corporate fiduciaries, such as officers and directors, key managerial personnel owe fiduciary duties of good faith, loyalty, and fair dealing to their company." Mitchell Lane Publishers, Inc. v. Rasemas, C.A. No. 9144-VCN, 2014 WL 4925150, at *4 (Del. Ch. Sept. 30, 2014) (citing Triton Constr., 2009 WL 1387115, at *9).  Whether an individual qualifies as a key managerial employee depends on whether he exhibits the hallmarks of such an employee, such as "running a division of a company or supervising tiers of employees." Id. (citing Triton Constr., 2009 WL 1387115, at *9-10).

Here, the Amended Complaint alleges that Stewart was FCC's Vice President of Financial Services and supervised FCC's Financial Services Office from 2009 to December 2013.  (Am. Compl. ¶¶ 6(b), 17.)  "Her responsibilities included drawing,

14

substantiating, and refunding Title IV funds in accordance with DOE regulations." (<u>Id.</u> ¶ 17; <u>see also</u> <u>id.</u> ¶ 44 ("Stewart, and later Yousefi, were responsible for drawing and refunding Title IV funds, reconciling COD-G5 discrepancies, and interfacing with the DOE.").)  The Amended Complaint also contains allegations indicating that Stewart had managerial and supervisory authority.  (<u>See</u> <u>id.</u>¶ 17 ("Stewart managed and directed dozens of employees at various levels in order to handle her broad range of responsibilities."); <u>id.</u> ¶ 56 ("Stewart acknowledged that her approval was necessary 'when our refunds are greater than our draws and a pre-draw [m]ay be needed.'"); <u>see also</u> <u>id.</u> ¶¶ 82, 100.)

The Amended Complaint alleges that Yousefi was FCC's Senior Vice President of Information Technology between June 2013 and August 2014.  (<u>Id.</u> ¶ 18.)  "In that role, Yousefi was responsible for all strategic and tactical activities related to FCC's systems, technology and student financial aid, and he reported directly to Knobel."  (<u>Id.</u>)  When Stewart resigned in December 2013, Yousefi "assumed Stewart's responsibilities of drawing, substantiating, and refunding Title IV funds in accordance with DOE regulations."  (<u>Id.</u>)  The Amended Complaint contains allegations indicating that Yousefi had managerial and supervisory authority.  (<u>Id.</u> ¶ 44 ("Stewart, and later Yousefi, were responsible for drawing and refunding Title IV funds, reconciling COD-G5 discrepancies, and interfacing with the DOE."); <u>id.</u> ¶ 81 ("[N]one of these draws would have taken place without Yousefi's explicit approval."); <u>see also</u> <u>id.</u> ¶¶ 83, 85-86.)

The Court finds that the Amended Complaint adequately alleges that Stewart and Yousefi were key managerial employees who owed fiduciary duties to FCC.   <u>See</u>

Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti, C.A. No. 9714–VCG, 2015 WL 2270673, at *3 n.4-5 (Del. Ch. May 8, 2015) (accepting, at pleading stage, that the defendants, who were various "Vice President[s]" of DuPont, were key managerial personnel who owed fiduciary duties to the company).

### c.    Breach of the duty of loyalty

Defendants argue that the Amended Complaint fails to state a claim in Count II for breach of the duty of loyalty.  (Mot. at 3-17.)  Plaintiff argues that the Amended Complaint alleges that Defendants breached their duties of loyalty by (1) knowingly violating the law and (2) failing to monitor ("Caremark" claim).  (Resp. at 10-15.)

As an initial matter, Defendants argue that Plaintiff's claim for breach of the duty of loyalty for knowingly violating the law is subsumed into its Caremark claim.  (Reply at 4.)  Defendants cite no authority holding that a Caremark claim subsumes a claim for a knowing violation of the law; rather, their argument appears to rest on a case that identifies a knowing violation of the law as an element of a Caremark claim.  (See Mot. at 4, Reply at 3-4 (citing Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs, C.A. No. 10872–VCMR, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016)), aff'd 158 A.3d 449 (unpublished table decision).)  In Jacobs, the court stated that certain Caremark claims require the plaintiff to plead the following elements: "(1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation."  2016 WL 4076369, at *8.

16

However, other cases from Delaware appear to treat the two claims as discrete claims for breach of the duty of loyalty.  See, e.g., Desimone, 924 A.2d 908, 934-35. Furthermore, knowingly taking an illegal action on behalf of a corporation is logically distinct from violations of the law that "arise from a failure to properly monitor or oversee employee misconduct or violations of law."  In re Citigroup Inc. Shareholder Derivative Litig., 964 A.2d 106, 123 (Del. Ch. 2009).  Accordingly, the Court finds that Plaintiff may plead separate claims for breach of the duty of loyalty for (1) knowingly violating the law, and (2) failure to monitor.

The Court will first address whether the Amended Complaint does, in fact, adequately allege claims for breaching the duty of loyalty for knowingly violating the law and failing to monitor.  Because it does, the Court will then turn to Defendants additional arguments regarding causation and individual liability.

### 1.      Knowing violation of the law

Under Delaware law, a fiduciary breaches his duty of loyalty when he knowingly violates the law.  Desimone, 924 A.2d at 934 ("[B]y consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused.").

The Amended Complaint alleges that Defendants engaged in the following conduct that violates DOE regulations:

- failing to hold Title IV funds in trust either in a separate account or through accounting or internal controls sufficient to track Title IV funds as if they were held in a separate account;
- drawing Title IV funds in amounts far greater than that which could be supported by current enrollment numbers;

- failing to refund "excess" Title IV funds which were drawn for students who withdrew from or failed to commence attending their respective programs;
- failing to reconcile Title IV fund draws with student-level disbursement data;
- pre-drawing . . . Title IV funds based on projected future enrollment numbers which management knew to be overstated; and
- subsequently abandoning the pretense of limiting draws to illusory enrollment numbers and simply drawing based on the company's general liquidity needs.

(Am. Compl. ¶ 4; <u>see also</u> <u>id.</u> ¶ 34 (discussing DOE regulations).)   It alleges specific instances where Defendants violated DOE regulations knowing they were violating DOE regulations.  (<u>Id.</u> ¶¶ 46-87.)

To take just one example, the Amended Complaint alleges that Defendants knowingly violated 34 C.F.R. § 668.21, which requires the institution to refund Title IV funds if a student does not begin attendance.  (Am. Compl. ¶¶ 56-57.)  It further alleges that Defendants knowingly violated the "prompt disbursement rule," 34 C.F.R. § 668.162(b)(3), which requires the institution to "disburse the funds requested as soon as administratively feasible but no later than three business days following the date the institution received those funds."   (Am. Compl. ¶ 58.)  It alleges that Defendants would instead only refund Title IV funds based on erroneous reports from Yawn which Stewart and Yousefi knew misstated the amount of withdrawals."  (<u>Id.</u>)  The Amended Complaint provides additional detailed allegations which, when construed in the light most favorable to Plaintiff, adequately allege that Defendants <u>knowingly</u> violated the law.  (<u>Id.</u> ¶¶ 88-93.)

**2.    Failure to monitor (<u>Caremark</u> claim)**

The Amended Complaint alleges that even if Defendants did <u>not</u> know that their actions violated DOE regulations, it is because they consciously failed to monitor or oversee FCC's operations.  (Am. Compl. ¶ 145.)

Delaware law recognizes a separate claim for breach of the duty of loyalty based on director oversight/failure to monitor, commonly referred to as a "<u>Caremark</u>" claim. <u>Stone v. Ritter</u>, 911 A.2d 362, 369-70 (Del. 2006) (citing <u>In re Caremark Int'l Derivative Litig.</u>, 698 A.2d 959 (Del. Ch. 1996)).  "In a typical <u>Caremark</u> case, plaintiffs argue that the defendants are liable for damages that arise from a failure to properly monitor or oversee employee misconduct or violations of law."  <u>In re Citigroup Inc. Shareholder Derivative Litig.</u>, 964 A.2d 106, 123 (Del. Ch. 2009).

A <u>Caremark</u> claim requires the Plaintiff to allege particularized facts satisfying one of two conditions—either that (1) "the directors utterly failed to implement any reporting or information system or controls"; or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." <u>Id.</u> at 370.  "Thus, to establish oversight liability a plaintiff must show that the directors <u>knew</u> they were not discharging their fiduciary obligations or that the directors demonstrated a <u>conscious</u> disregard for their responsibilities such as by failing to act in the face of a known duty to act."  <u>Citigroup</u>, 964 A.2d at 123.

"The test is rooted in concepts of bad faith; indeed, a showing of bad faith is a <u>necessary condition</u> to director oversight liability."  <u>Id.</u>  "In order to plead a claim under <u>Caremark</u>, therefore, a plaintiff must plead facts that allow a reasonable inference that the

directors acted with scienter which, in turn, 'requires [not only] proof that a director acted inconsistently with his fiduciary duties,' but also 'most importantly, that the director knew he was so acting.'" Horman v. Abney, C.A. No. 12290–VCS, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) (quoting In re Massey Energy Co., C.A. No. 5430–VCS, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011)).  Defendants argue that Plaintiff has failed to adequately allege that Defendants acted in bad faith.  (Mot. at 7.)

The Amended Complaint alleges generally that Knobel and Pierne are liable for the second type of Caremark claim—i.e., consciously failing to monitor or oversee operations even though a system was in place:

> Knobel, the CEO, and Pierne, the CFO, were responsible for monitoring the financial condition of FCC and, to that end, regularly received financial reports both in the form of informal cash flow or budget reports and formal audited financial statements. Based on these reports, they should have known FCC's draws did not comply with DOE regulations because major anomalies in FCC's financial reporting indicated as much.

(Am. Compl. ¶ 145; see also id. ¶ 6(c).)  The Amended Complaint further alleges that all Defendants are liable for the first type of Caremark claim:

> all of the Defendants utterly failed to implement systems and procedures or employ qualified personnel to ensure the technologies systems accurately reported information, the Financial Services Office's draw down procedure complied with DOE regulations, Title IV funds were kept separate in trust to be used for student tuition, and refunds were accurately processed in the time period required by the DOE.

(Am. Compl. ¶ 146.)   There are several well-pled allegations supporting these assertions.

First, the Amended Complaint alleges that Knobel and Pierne knowingly violated their duty of loyalty by failing to act when they knew that FCC was drawing Title IV

funds using inflated enrollment numbers.[9]   For example, "on March 28, 2014, Pierne wrote directly to Knobel that the Title IV collections estimate for March, a single month, had been off by approximately $9 million: 'cash flow in March from T4 funds was reduced to $12 million compared to our previous forecast of approximately $21 million . . . which has created a significant cash squeeze."  (Id. ¶ 47.)  "An April 24, 2014 Board presentation . . . cited 'lack of trust in forecasts that originate from campus management' as a 'systemic issue . . . associated with the Financial Aid area' which resulted in DOE action against FCC."   (Id. ¶ 49.)   Additionally, Bartness—FCC's Chief Compliance Officer—acknowledged to a colleague that drawing Title IV funds for a program that was not approved by DOE could subject FCC to liability.  (Id. ¶ 52 ("We're toast on that PCT program . . . Maybe they could charge Mark Young. . . . Gotta believe David [Knobel] knew, too[.]").).)

Moreover, despite the fact that Pierne and Stewart were aware that Anthem's pre-merger practice of "pre-drawing" Title IV funds violated DOE regulations, (id. ¶¶ 40-42, 75), they continued the same practice post-merger, (id. ¶¶ 69-72).  "As one example, on April 22, 2013, Pierne pushed Stewart to utilize drawdowns on Title IV funds to generate cash for payroll and other operational expenses: 'We need to get cash in here this week. It is a payroll week and we have rents to pay by next Tuesday.'"  (Id. ¶ 71.)  As another

---

[9]     See 34 C.F.R. § 668.14(b)(1)-(2) (institution may only use Title IV funds to satisfy student loans taken to cover cost of attendance resulting from student enrollment in a Title IV-eligible program, and must "time its requests for funds … to meet the institution's immediate . . . needs" for such funds); 34 C.F.R. § 668.162(b)(1) (institution's requests for Title IV funds "may not exceed the amount of funds the institution needs immediately for disbursements the institution has made or will make to students" or to satisfy tuition obligations).

example, on September 5, 2013, Pierne pressed Yousefi and Stewart to quickly draw down available Title IV funds to be applied toward operational expenses.  Pierne stated, "Let's try for tomorrow please. I've got payroll going out today."  (Id. ¶ 72.)  The Amended Complaint also contains an email chain between Knobel, Pierne, and Yousefi in which they discuss pre-drawing funds to meet payroll, rather than drawing based on student needs as required by the DOE regulations. Id. ¶ 74.

The Amended Complaint also alleges that Defendants knowingly violated their duty of loyalty by failing to act when they knew that FCC was not disbursing funds to students within three days of drawing them, as required by DOE regulations,[10] and underreporting student withdrawals, in violation of DOE regulations.[11]  For example, the Amended Complaint alleges that "[t]he Financial Services Office . . . ceased timely refunding Title IV funds which could not be substantiated because they were not disbursed within three business days of the draw, as required by the [DOE's] prompt disbursement rule, and instead only refunded Title IV funds based on erroneous reports from Yawn which Stewart and Yousefi knew misstated the amount of withdrawals."  (Id. ¶ 58.)  Furthermore, "[a]s early as June 17, 2013, as part of his weekly review, Yousefi

---

[10]    See 34 C.F.R. §§ 668.162(b)(3), 166 (institution must "disburse" Title IV funds drawn by crediting such funds against tuition balances within three business days of its receipt and is prohibited from holding "excess" Title IV funds).

[11]    See 34 C.F.R. § 668.21 (Title IV funds must be promptly refunded if a student does not begin attendance at an institution. "The institution must return those funds for which it is responsible under paragraph (a) of this section to the respective title IV, HEA program as soon as possible, but no later than 30 days after the date that the institution becomes aware that the student will not or has not begun attendance."); 34 C.F.R. § 668.22 (if a student withdraws from an institution after beginning attendance, the amount of Title IV assistance "earned" by him/her must be determined. If the amount disbursed exceeds the amount earned, the institution must refund "unearned funds" within 45 days after the institution determines the student withdrew).

wrote directly to Knobel explaining that there was 'No system of checks and balances in place to ensure what is exported out of STARS is the same as what is imported into Regent; the same for importing COD data into Regent.'"  (Id. ¶ 62.)  "Regent 8" was FCC's financial aid management software, (id. ¶ 100); it is not entirely clear what "STARS" is, but it appears to be the financial aid management software FCC utilized before going to the Regent 8 system, (see id. ¶¶ 62, 65, 130).

Defendants argue that they cannot be held personally liable for their software malfunctioning.  (Mot. at 12 (citing In re Gen. Motors Co. Derivative Litig., C.A. No. 9627–VCG, 2015 WL 3958724 (Del. Ch. June 26, 2015)).  In General Motors, the plaintiffs alleged that GM's "TREAD" database for storing data related to automobile safety and product defects—data which GM is required by law to report to the National Highway Traffic Safety Administration—was deficient.  2015 WL 3958724, at *5, 14. Stockholders brought a derivative action against GM's Board of Directors which included a Caremark claim.  Id. at *14.  However, the plaintiffs did not allege that the Board had knowledge that the TREAD system was inadequate or that the Board consciously remained uninformed of the issues with the system.  Id.  Consequently, the court found that the complaint failed to adequately allege the scienter element of a Caremark claim.  Id. at *15.

Here, Plaintiffs adequately allege that Defendants knew that their software was malfunctioning.  For example, the Amended Complaint alleges that in April 2013, Stewart attributed FCC's failure to substantiate $15 million in draws to the malfunctioning software.  (Id. ¶¶ 99-100.)  Then, in November 2013, Stewart told the

DOE that the inaccurate reporting was precipitated by malfunctioning software, which DOE found to be an "unacceptable and inadequate" excuse.  (Id. ¶ 101.)  DOE told FCC that it "must correct its procedures" so that FCC's reporting practices would comply with DOE regulations.  (Id.)  Although the Amended Complaint alleges that FCC manually fixed many of the problems created by the software malfunction, (id. ¶ 102), it apparently could not and did not fix them all:  "On April 17, 2014, Yousefi explained to the VP–Corporate Controller that with respect to the reconciliation, 'as much as we are all looking for a silver bullet, what we are doing is not going to fix all the ledger issues in STARS going back to the beginning of the FY,'" (Id. ¶ 65).  Thus, despite knowing that their software was generating incorrect data, Defendants failed to correct the issue.

The Amended Complaint also alleges that Defendants knowingly violated their duty of loyalty by failing to act when they knew that FCC was not reconciling its "COD-G5" discrepancies monthly, as required by DOE regulations.[12]   On March 9, 2014, Yousefi authored a memo titled "COD Reconciliation" in which he questions whether FCC had reconciled its discrepancies through the end of the 2012-2013 school year.  (Id. ¶ 67.)  Additionally, on March 26, 2014 Yawn noted that he was told that FCC hadn't reconciled since June 30, 2013.  (Id. ¶ 68.)  Yawn also noted that he spoke to Knobel in March and Knobel did not know whether FCC was "actually reconciling COD or just posting enough to get the numbers closer."  (Id.)

---

[12]    See 34 C.F.R. § 685.300 (monthly reconciliation required for Direct Loans); 34 C.F.R. § 674.19(d)(1) (same for Perkins loans); 34 C.F.R. 668.164

The Amended Complaint also alleges that Defendants knowingly violated their duty of loyalty by "fund kiting"—that is, drawing a large amount of Title IV funds at one OPEID to pay operating expenses and/or to refund the bare minimum at other OPEIDs. (Id. ¶¶ 80-87.)  For example, on March 17, 2014, the Corporate Director of Student Finance wrote Yousefi and told him that he drew from the Springfield OPEID (named after Anthem's Springfield campus, (id. ¶ 31)) to pay refunds on two other OPEIDs, with $1.1 million left over for FCC.  (Id. ¶ 84.)  The Amended Complaint alleges that Plaintiff's engaged in fund kiting despite DOE regulations requiring Title IV funds be held in trust and used only to satisfy current students' tuition obligations.  (Id. ¶ 144.)

In the light most favorable to Plaintiff, these claims plausibly allege that Defendants knowingly violated the law, or consciously disregarded their fiduciary responsibilities by failing to act in the face of a known duty to act.  Therefore, the Amended Complaint allows a reasonable inference that Defendants knew they were acting inconsistently with their duty of loyalty.  Horman, 2017 WL 242571, at *7.

### 3.    Causation of harm

Next, Defendants argue that even if the Amended Complaint adequately alleges that they breached a duty to FCC, it fails to allege that Defendants' actions caused FCC's collapse.  (Mot. at 14.)

It is unclear whether causation of damages is an element of a typical claim for breach of fiduciary duty under Delaware law.  The only case Defendants cite that identifies causation of damages as an element of a claim for breach of fiduciary duty— O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 919 (Del. Ch. 1999)—is

inapposite.  (Reply at 9.)  In O'Reilly, the court of chancery held that a plaintiff must allege damages in a claim for disclosure violations that implicate fiduciary duties in the broad sense but do not involve communications that contemplate stockholder action.  Id. at 918-20 (distinguishing Malone v. Brincat, 722 A.2d 5, 12 (Del. 1998), which held that "[a]n action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action does not include the elements of reliance, causation and actual quantifiable monetary damages") (emphasis added).

Other cases from the court of chancery do not identify causation of damages as a required element.  See Beard Research, Inc. v. Kates, 8 A.3d 573, 601 (Del. Ch. 2010) ("A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty.") (citing ZRii, LLC v. Wellness Acquisition Grp., Inc., Civil Action No. 4374–VCP, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing Heller v. Kiernan, No. Civ.A. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002))); see also Orban v. Field, Civ. A. No. 12820, 1993 WL 547187, at *1 (Del. Ch. Dec. 30, 1993) (concluding that "shareholder plaintiffs have no obligation to plead and to prove causation or injury as part of their complaint and . . . that lack of injury alone can never be the basis for a dismissal under Chancery Court Rule 12(b) of a shareholder action charging breach of fiduciary duty").

Regardless, the Amended Complaint adequately alleges that Defendants actions caused FCC harm.  Briefly, the Amended Complaint alleges that on March 31, 2014, as a result of Defendants' unsubstantiated drawing of Title IV funds, the DOE informed FCC that it would reduce the funding level under each OPEID to $0.  (Am. Compl. ¶ 112.)

"This doomed FCC, which relied on Title IV funds to supply approximately 90% of its revenue and cash."  (Id. ¶ 7.)  "By August 2014, the company sold off its most valuable schools and filed for bankruptcy protection."  (Id. ¶ 8.)  "All told, Defendants' acts and omissions were the direct and proximate cause of the collapse of profitable schools which had been valued at over $150 million only two years before, but sold for less than $3 million."  (Id. ¶ 9.)  Accordingly, even assuming arguendo that Plaintiff was required to plead causation of damages, the Amended Complaint plausibly does so.

### 4.    Individual liability

Finally, Defendants argue that the Amended Complaint fails to allege that Defendants individually breached their duties of loyalty to FCC.   (Mot. at 16.) According to Defendants, the Amended Complaint just "lump[s] Defendants together in its allegations."  (Id.)  The Court disagrees.

Paragraph 6 of the Amended Complaint specifically describes how each Defendant individually violated his or her duty of loyalty to FCC.  Paragraph 6(a) alleges that

> Neil Yawn ("Yawn"), FCC's Chief Operations Officer ("COO"), submitted inflated projected enrollment numbers to FCC's Financial Services Office upon which the office's Title IV fund draws were premised, which resulted in the office drawing substantially more from the DOE than it should have. In addition, Yawn systematically underreported student withdrawals from FCC programs to the Financial Services Office, which if properly reported would have triggered the refund of Title IV funds to the DOE.  This, in turn, resulted in a significant mismatch between the amount of Title IV funds drawn by FCC and the amount substantiated with the DOE.

(Am. Compl. ¶ 6(a).)  The Amended Complaint alleges that Yawn did these things knowingly in violation of DOE regulations and his fiduciary duties.  (See id. ¶¶ 58, 68.)

Paragraph 6(b) alleges that

Siana Stewart ("Stewart"), FCC's Vice President of Financial Services, supervised FCC's Financial Services Office, and then Cid Yousefi ("Yousefi") oversaw FCC's drawing, reconciliation, and refunding of Title IV funds following Stewart's resignation.  The imbalance resulting from the foregoing should have been kept in check, but was not due to their requests for funds beyond what even the inflated student data could support and their failure to reconcile, on a monthly basis, Title IV fund draws with student-level disbursement data reported to the DOE, as required by DOE regulations.

(Id. ¶ 6(b).)  The Amended Complaint alleges that Stewart and Yousefi did these things knowingly in violation of DOE regulations and their fiduciary duties.  (See id. ¶¶ 41-43, 56-58, 62, 67, 69, 82-83, 99.)

Paragraph 6(c) alleges that

David Knobel ("Knobel"), the Chief Executive Officer ("CEO") and a director of FCC, and Jeffrey Pierne ("Pierne"), FCC's Chief Financial Officer ("CFO"), enabled the abuse of Title IV funds by not holding the funds in trust, either by keeping them in a separate account or by employing accounting or internal controls sufficient to track Title IV funds as if they were held in a separate account.  Title IV funds should have been held separately until they were promptly disbursed to students, resulting in the majority of the funds coming back to FCC in the form of tuition payments and some funds going directly to students for living expenses.  Instead, Title IV funds from all of FCC's various schools registered under different identification numbers . . . were deposited directly into FCC's operations accounts to be used without substantiating how much tuition FCC was owed.  Knobel and Pierne also aggravated existing imbalances by directing the drawdown of Title IV funds based on inflated projected enrollment numbers to pay current operating expenses and to fund the company's expansion, even though Pierne and Stewart knew FCC could not comply with the DOE's "prompt disbursement rule" (defined below) with respect to such funds.

28

(Am. Compl. ¶ 6(c).)  The Amended Complaint alleges that Knobel and Pierne did these things knowingly in violation of DOE regulations and their fiduciary duties.  (See id. ¶¶ 47-49, 51-52, 62, 74-76, 78.)

> Paragraph 6(e) alleges that
>
> Dean Bartness ("Bartness"), FCC's Chief Compliance Officer ("CCO"), was responsible for ensuring compliance with DOE regulations. He completely abandoned his primary responsibility of ensuring FCC complied with Title IV and did nothing to prevent FCC from drawing Title IV funds or failing to substantiate or refund Title IV funds as required by DOE regulations, which directly contributed to the company's collapse.

(Am. Compl. ¶ 6(e).)  The Amended Complaint alleges that Bartness did these things knowingly in violation of DOE regulations and their fiduciary duties.  (See id. ¶ 52.)

As such, the Amended Complaint plausibly alleges that each Defendant individually violated their fiduciary duty of loyalty to FCC.  And for all of these reasons, Defendants' Motion to Dismiss Count II is denied.

### d.    Duty of Care

Next, Defendants argue that Plaintiff failed to state a claim in Count I for breach of the duty of care.  (Mot. at 17.)  They argue that the allegations contained in the Amended Complaint allege that Defendants violated the law, and violations of the law constitute a breach of the duty of loyalty only.  (Id. (citing In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 67 (Del. 2006) ("Disney II")).)  It further argues that "[e]ven if the gravamen of the complaint were a breach of the duty of care, Plaintiff's claim would still fail because Plaintiff did not allege that Defendants acted irrationally." (Id. at 18.)    Plaintiff argues that the Amended Complaint adequately alleges that

defendants breached the duty of care by not keeping themselves informed and by acting with gross negligence.  (Resp. at 16-17.)

"The fiduciary duty of due care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent."  Disney I, 907 A.2d at 749 (internal quotation marks and citations omitted).  "The business judgment rule is rebutted if the plaintiff shows that the directors failed to exercise due care in informing themselves before making their decision."  McMullin, 765 A.2d at 922.

Here, construed in the light most favorable to Plaintiff, the Amended Complaint alleges that Defendants breached their duties of care.  For example, it alleges that Knobel and Pierne directed the Financial Services Office to pre-draw Title IV funds, unrelated to student needs, even though such a practice violated DOE regulations and could result in a loss of funding.  (Am. Compl. ¶ 128.)  It alleges that Knobel and Pierne both knew that taking actions that failed to comply with the law would risk Bank of Montreal cancelling FCC's loan and requiring FCC to repay the balance immediately.  (Id. ¶ 129.)  A careful and prudent officer would not breach FCC's credit agreement, especially considering that FCC was already struggling to meet is cash needs.  (See id.)

Additionally, after DOE caught FCC improperly pre-drawing and failing to substantiate funds in 2013, it told FCC that failure to substantiate the missing funds would result in FCC being ineligible for advance draws of Title IV funds during the

2013-14 program year.  (Id. ¶ 99.)  However, even after this warning, Knobel, Pierne, Stewart, Yawn, and Yousefi continued to rely on the software reporting systems they knew had previously produced inaccurate information.  (Id. ¶¶ 62, 65, 130.)  In fact, in June 2013, Yousefi told Knobel that there was "[n]o system of checks and balances in place to ensure" that the financial aid software was accurately importing and exporting data.  (Id. ¶ 62.)  Apparently, FCC did nothing to put such checks and balances in place because Defendants continued to rely on the faulty software, which resulted in millions of dollars in additional unsubstantiated funds, causing DOE to cut off Title IV funding.  (Id. ¶¶ 105-109, 112.)  A careful and prudent officer would not have persisted in the same drawdown practices, and relied on the same faulty software, that caused DOE to freeze FCC's Title IV funds the year prior.

Moreover, the Amended Complaint alleges that prior to FCC's collapse, its accounts receivable numbers were disproportionately greater than their historic numbers.  (Id. ¶¶ 90-93.)  It alleges that FCC's "C-level officers"—Knobel, Pierne, Yawn, and Bartness—each of whom received monthly reports reflecting the relevant account balances, "should have known the significant growth in [accounts receivable] and deferred revenue and corresponding decrease in [accounts receivable] allowance in the face of stagnant enrollment numbers and revenue growth meant FCC was drawing far more in Title IV funds than permitted by DOE regulations."  (Id. ¶ 93.)  Stated differently, a careful and prudent officer would have recognized that FCC was drawing more Title IV funds than it was legally permitted to.

In sum, the Amended Complaint alleges that Defendants failed to exercise due care in informing themselves before making their decisions to draw Title IV funds, causing DOE to cut off Title IV funding and resulting in a cash shortage that ultimately led to FCC's bankruptcy petition.  (Id. ¶¶ 112, 119, 121.)  Consequently, the Court finds that the Amended Complaint plausibly alleges that Defendants violated their duty of care.

### e.    Exculpatory clause

Finally, Defendants argue that, insofar as the Amended Complaint alleges that Knobel and Pierne breached the duty of care, their actions are protected by the exculpatory clause in FCC's corporate charter.  (Mot. at 22-23.)  Article VIII of the corporate charter provides, in relevant part:

> A Director of the Corporation shall not be personally liable to the Corporation . . . for monetary damages for breach of fiduciary duty as a Director of the Corporation, except for liability (a) for any breach of the Director's duty of loyalty to the Corporation . . . , [or] (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law . . . .

(D.E. 99-2 at 15-16.)  Plaintiff argues that this provision does not protect Knobel and Pierne from breaching the duty of care that they owed FCC as officers, as opposed to the duties they owed as directors.

Pursuant to Title 8, Section 102(b)(7) of the Delaware Code, a certificate of incorporation may contain a provision "eliminating or limiting the personal liability of a director to the corporation" for monetary damages for breaching his duty of care "as a

director[.]"[13]  Del. Code. Ann. tit. 8, § 102(b)(7) (emphasis added); see also Disney II,
906 A.2d at 65 ("Section 102(b)(7) authorizes Delaware corporations, by a provision in
the certificate of incorporation, to exculpate their directors from monetary damage
liability for a breach of the duty of care.").  In Gantler, the Supreme Court of Delaware
noted that Section 102(b)(7) is limited to exculpating directors and, "[a]lthough
legislatively possible, there currently is no statutory provision authorizing comparable
exculpation of corporate officers."  965 A.2d at 709 n.37.

The Court finds that FCC's exculpation clause does not exculpate Knobel and
Pierne from breaching the duties of care they owed FCC as corporate officers.  See id.

## VI.    Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion to
Dismiss (D.E. 99) is **DENIED** and Defendants shall have fourteen days from the date of
this Order to file an Answer to the Amended Complaint.

**DONE AND ORDERED** in Chambers at Miami, Florida this 9th day of January,
2018.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

---

[13]     However, an exculpatory provision cannot eliminate or limit a director's liability
for breaching the duties of loyalty and good faith.  Del. Code. Ann. tit. 8, § 102(b)(7).