## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 16-62028-CIV-LENARD/GOODMAN

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC as Trustee

Plaintiff,

v.

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI

Defendants.

**ORAL ARGUMENT REQUESTED**

---

## DEFENDANTS' MOTION TO EXCLUDE PROPOSED EXPERT JAMES DONOHUE

Defendants David Knobel, Jeffrey Pierne, Neal Yawn, Dean Bartness, Siana Stewart, and

Cid Yousefi, pursuant to Federal Rules of Evidence 702 and 703, move to exclude Plaintiff's

proposed expert witness, James Donohue, and in support state as follows:

### I.   Introduction

James Donohue is Plaintiff's proposed damages expert and he ostensibly offers two types

of opinions in his Report, each of which should be excluded for different reasons.

First, this Court should exclude Mr. Donohue's valuation opinion because the underlying

premise of his opinion is entirely unsupported.  While Mr. Donohue claims he is simply applying

a "but-for" assumption of causation as the predicate to his valuation (damages) opinion, he

assumes that his valuation would have been realized if it were not for Defendants' actions

regardless of  any other factors, economic or otherwise.  But Mr. Donohue provides no basis for

the assumption that Florida Career College ("FCC") would have survived if Defendants had not

allegedly breached their fiduciary duties to FCC.  In other words, Mr. Donohue assumes that

FCC would have remained a going concern if the conduct alleged in the Amended Complaint were not true.  That assumption is essential to his opinion and he provides absolutely no basis for making it.  In fact, the evidence shows that even if Defendants' alleged actions did not occur the company still would have entered bankruptcy because of its severe liquidity constraints, rendering Mr. Donohue's valuation worthless.

Second, this Court should exclude Mr. Donohue's opinion of value because he chose to rely on a single poorly-executed and uncorroborated valuation method that is not the best indicator of value in this context.  The case law is clear that in valuing a company, an income approach, specifically, the discounted cash-flow ("DCF") approach is the clearly preferred method to determine value at a specific point in time.  Mr. Donohue, however, does not use the DCF method and fails to justify its omission.  Further, after calculating value using another inferior income method, Mr. Donohue discarded that result in favor of a higher value generated by a third approach, a market approach using  comparable companies.  That leaves Mr. Donohue with a single non-income valuation that was not validated by any other valuation method.  Further compounding his errors, Mr. Donohue's market valuation contains multiple material errors rendering it entirely untrustworthy.

Finally, this Court should exclude the "forensic accounting" section of Mr. Donohue's Report because he does not rely upon it in his valuation analysis and he included its data to generate tables and charts for Plaintiff's other experts, James Murphy and Aaron Lacey, to use.[1]

---

[1] Defendants are also moving to exclude Mr. Murphy and Mr. Lacey because, *inter alia*, they rely upon these charts and tables from Mr. Donohue without independently verifying the data.  *See Masforce Europe, BVBA v. Mastry Marine & Indus. Design, Inc*., No. 811-CV-1814-T-24AEP, 2013 WL 8148666, at *4 (M.D. Fla. Aug. 27, 2013) ("Of course an expert doing so may not simply adopt the findings of the other expert without conducting an independent investigation."); *see also, e.g.*, *United States v. Batchelor-Robjohns*, No. 03-20164-CIV, 2005 WL 1761429, at *5 (S.D. Fla. June 3, 2005)  (pointing to a Third Circuit opinion where an

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Because these tables and charts do not form the basis for his valuation opinions, the only possible reason for their inclusion is to allow Plaintiff to introduce otherwise-inadmissible hearsay data for the benefit of its other experts.  This Court should prohibit Plaintiff from circumventing the bar against hearsay through the guise of expert reports.

## II.   Procedural History

On January 12, 2018, Plaintiff served the Expert Report of James J. Donohue.  On February 7, 2018, Plaintiff served the amended Expert Report of Mr. Donohue to account for depositions of additional witnesses taken after his initial report ("Donohue Report," attached as **Exhibit 1**).  Defendants' counsel deposed Mr. Donohue on February 7, 2018 ("Donohue Tr.," attached as **Exhibit 2**).  Defendants now move to exclude the Donohue Report.

## III.   Legal Standard

Rule 702 of the Federal Rules of Evidence, which governs the admission of expert witness testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

This Court has elaborated further on the admissibility of expert opinions based on Supreme Court and Eleventh Circuit precedent:

---

"expert's 'failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results'" (quoting *In re TMI Litig.*, 193 F.3d 613, 715 (3d Cir. 1999)).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

> In the Eleventh Circuit, the proponent of expert testimony must show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc*., 158 F.3d 548, 563 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 589); *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001).
>
> The burden of laying the proper foundation for expert testimony rests on the party offering the expert, and admissibility must be shown by a preponderance of the evidence. *Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1306 (11th Cir. 1999). In addition to the *Daubert* analysis, the Court must apply all of the Federal Rules of Evidence, including 402 and 403, to expert testimony. *Allison*, 184 F.3d at 1309. The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Id*. at 1311–12.

*Barrueto v. Fernandez Larios*, No. 99-0528-CIV, 2003 WL 25782075, at *2 (S.D. Fla. Sept. 18, 2003) (Lenard, J.). It is settled that Rule 702 and *Daubert* apply to accountants. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 n.17 (11th Cir. 1998).

"The valuation of [a company] is a mixed question of law and fact." *In re Seaside Eng'g & Surveying, Inc*., 780 F.3d 1070, 1075 (11th Cir. 2015) (citation omitted). "Selection of a valuation method is a legal matter subject to *de novo* review, and findings made under that standard are facts subject to clear error review." *Id.*

Finally, "Rule 703 . . . is not an open door to all inadmissible evidence disguised as expert opinion." *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987). "A party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc*., No. 8:12-CV-691-T-24-MAP, 2014 WL 4986482, at *2 (M.D. Fla. Oct. 6, 2014).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

IV.   <u>**Argument**</u>

This Court should exclude the Donohue Report for multiple reasons.  First, the Court should exclude Mr. Donohue's valuation opinion because it assumes that the company would have remained a going concern even if the alleged breaches did not occur without providing any basis for his assumption which assumption is contradicted by the report of Defendants' expert Robert Burton.  Second, the Court should exclude Mr. Donohue's valuation opinion because it is untrustworthy and uncorroborated.  Finally, the Court should exclude the "forensic accounting" section of the Donohue Report as a transparent attempt to introduce hearsay data into this case for other experts to rely upon, not a proper purpose for expert testimony.

### A.   Mr. Donohue provides no basis for his opinion that his valuation would be accurate but for Defendants' alleged actions.

Mr. Donohue's valuation opinion is based on a "but-for" assumption estimating FCC's value if the acts alleged in the Amended Complaint did not happen.  In giving his "but-for" opinion, Mr. Donohue necessarily assumes that FCC would have his valuation without any of the other adverse factors facing FCC.  Mr. Donohue, however, does **not** give an opinion about any causative factors that affect that value other than the conduct alleged in the Amended Complaint.  Without taking into consideration other value affecting factors, Mr. Donohue's "but-for" assumption is nothing but speculation.  Mr. Donohue must have assumed that "but for" the conduct alleged in the Amended Complaint, FCC would not have entered bankruptcy and Mr. Donohue's valuation would be accurate.[2]

---

[2]  Moreover, even if Mr. Donohue had attempted to give an opinion of value, Mr. Donohue has not established that he would be qualified to provide an opinion about what caused FCC's demise and bankruptcy.  "Expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014).  "[A]n expert must stay within the reasonable confines of his subject area.  Thus, many courts have excluded testimony when they determine that the witness is testifying to an area outside of—but related to—his expertise." *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

At the outset of his Report, Mr. Donohue says he was "asked to assume that FCC did not misuse DoE Title IV funds, and as a result, did not lose the ability to receive Title IV funds in the normal course of operations **and would have continued to be a going concern**." (emphasis added)  Report  ¶7.  Based on that assumption that was provided by counsel, Mr. Donohue states that the "valuation of FCC therefore assumes that FCC would have had continued timely access to Title IV funds and timely knowledge of the true cash and financial position of FCC throughout fiscal year 2014."   *Id.*   He then builds further upon the assumptions, stating that "[w]ith continued traditional access to Title IV funds and timely knowledge of FCC's true financial position, FCC also would have had the ability to restrict or delay capital expenditures and the ability to raise capital in normal course as opposed to [sic] during the cash crisis caused by the restricted Title IV funding."  *Id.  See also id.* ¶¶68–70.

These additional assumptions, whether provided by Plaintiff's counsel or reached by Mr. Donohue through extrapolation, lead him to the heart of his "but-for" assumption in the Report: "My valuation of FCC therefore assumes that FCC did not misuse Title IV funds, would have had continued advance use of Title IV funds (the essential source liquidity for the company), and **would be a going concern**."  Report ¶67 (emphasis added).  Mr. Donohue, therefore, must have assumed that Defendants' alleged breaches caused FCC's bankruptcy and nothing else would have kept his "but-for" valuation from becoming a reality.

When asked at his deposition whether he is providing an opinion about why FCC failed, Mr. Donohue repeatedly demurred.  For example, Mr. Donohue claimed that he doesn't "have

_____

2d 1293, 1304 (N.D. Ga. 2008) (citations and internal quotation marks omitted).  "Similarly, courts have excluded expert testimony that might implicate the expert's field or discipline if the expert has no specific experience or background with the topic in dispute and has not satisfied the court that he has obtained expertise in regard to the topic in preparation for litigation."  *Id.* (citing *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (additional citation omitted).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

opinions about the bankruptcy and the plaintiff's claims here[.]"  *Id.* at 205:14–15.  *See also, e.g.,* Donohue Tr. at 172:22–173:5 (stating that he does not have an independent opinion about whether the DoE's action caused the bankruptcy);  *Id.* at 237:5–8 (stating that he is not testifying about what caused FCC to fail).

What is clear from the deposition of Mr. Donohue is that he claims that he is not giving any opinion on what caused FCC to enter bankruptcy; he is only providing a valuation of FCC as of June 30, 2014.  But the question then becomes: what assumption is the basis of his valuation?  While Mr. Donohue tries not to answer whether Defendants' actions were the sole cause of the bankruptcy, he necessarily assumes it was and that nothing else in the world would have derailed his valuation.  Thus, Mr. Donohue cannot avoid the fact that his "but-for" valuation opinion necessarily relies on the assumption that no factors other than Defendants' alleged actions would have resulted in an FCC bankruptcy.

Despite this necessary assumption at the heart of his "but-for" valuation, Mr. Donohue has no support to make that assumption except for his instructions to assume it to be true. Without a connection to Plaintiffs' theory of liability, Mr. Donohue's "but-for" valuation simply is not appropriate in this case.

The Eleventh Circuit confronted a similar situation in *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1233 (11th Cir. 2009).  The plaintiff had offered both a liability expert and a damages expert, but the damages expert's theory would have held the defendant accountable for a wider array of damages than the liability expert's theory did.  *Id.*  In affirming the District Court's exclusion of the damages expert,[3] the Court of Appeals found that there must be "fit" between the liability and damages theories.  "Having tailored a trim-fitting

---

[3] *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 502 F. Supp. 2d 1237, 1249 (S.D. Fla. 2007).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

liability theory for the body of its case against [defendant], [plaintiff] cannot hang a baggy injury and damages theory on it.  Whatever expert opinion [the plaintiff] provided had to be suitable proportioned."  *Id*.  But "because [plaintiff's] injury and damages opinion was not confined to [damages] that its liability theory would consider unlawful, it was too broad. It was ill-fitting." *Id*. at 1233–34.

Here, Mr. Donohue's damages theory is "ill-fitting."  Plaintiff failed to offer an expert on causation, but the theory of the Amended Complaint articulated in the "but-for" assumption of the Donohue Report is that Defendants' alleged actions alone caused the bankruptcy.  Yet neither Mr. Donohue nor any other expert or evidence for that matter shows that Defendants' alleged actions were the sole cause of the bankruptcy.  Despite this absence of evidence, Mr. Donohue still "hang[s] a baggy injury and damages theory" on Plaintiff's case that would hold Defendants accountable for the entire loss of enterprise value notwithstanding other factors that contributed, in whole (as Defendants contend) or even just in part, to FCC's bankruptcy.

Had Mr. Donohue attempted to develop an opinion about what caused FCC's demise, he would have soon found out that FCC was facing strong headwinds from multiple sources that had nothing to do with the allegations in the Amended Complaint.  As pointed out by Mr. Burton in his Report, these adverse forces included: inadequate working capital; falling student enrollment; increasing regulation; problems from the acquisition of other schools; and software integration issues.  Burton Report at 3.  Mr. Donohue's failure to acknowledge and incorporate these factors renders his entire valuation opinion and its "but-for" premise unreliable, misleading, and unhelpful and it should be excluded.

### B.  Mr. Donohue's valuation approach is improper.

Mr. Donohue failed to use the most reliable method to determine value, i.e., the DCF method.  Moreover, he made multiple errors in both the income approach he chose in lieu of the

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

DCF method and the alternative market value approach.  Finally, after following the income approach, Mr. Donohue arbitrarily discarded that value in favor of the market approach, which yielded a higher value.

### 1.  Mr. Donohue failed to use the "essential" valuation method.

"Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow . . . method [, or DCF]."  *In re Bond*, No. 4:11-BK-33849-EWH, 2012 WL 3867427, at *4 (Bankr. D. Ariz. Sept. 5, 2012) (internal quotation marks omitted) (quoting *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003)).  *See also Lippe*, 288 B.R. at 689 (excluding expert for failure to use DCF, stating that the court was "simply not persuaded that . . . [the] proposed [expert] testimony rest[ed] on a 'reliable foundation'" (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)); *Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186 (7th Cir. 1993) (stating it was "problematic" that certain valuations had been admitted "into evidence just because . . . [the valuations were offered by] an expert in accounting," noting that the expert had "conceded that he did not employ the methodology that experts in valuation find essential").  "Many valuation experts state that the income approach, for example, the discounted cash flow method, is the most economically rigorous of the methodologies used to estimate business value because it considers all of the factors that determine value: cash flow, timing, and risk, etc."  Stan Bernstein et. al., Squaring Bankruptcy Valuation Practice with Daubert Demands, 16 Am. Bankr. Inst. L. Rev. 161, 186 (2008).[4]

---

[4] The DCF method is the dominant method not only in business valuation, but other valuation fields as well, such as real estate.  *See, e.g.*, John Collen, Real Estate Valuation Techniques, 8 J. Bankr. L. & Prac. 135, 146–47 (1999) ("**Recently, discounted case flow analysis has received attention as the preferred means of valuing income-producing property**.  However, because every method has limitations, good appraisal methodology often requires utilizing multiple

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Ultimately, "**DCF is 'the methodology that experts in valuation find essential**. . . . Regardless of what valuation approach is used, in order for it to make rational economic sense from a financial point of view, **the results should be compatible with what would result if a well-supported discounted economic income analysis were carried out**.'" *In re Bond*, 2012 WL 3867427, at *4 (quoting Shannon P. Pratt et al., Valuing a Business: The Analysis & Appraisal of Closely held companies 154 (4th ed. 2000) (emphasis added)).

In *In re Med Diversified, Inc*., 334 B.R. 89, 98–99 (Bankr. E.D.N.Y. 2005), the Court excluded the expert for failing to use the DCF method.  As in this case, the expert had only used variations of the market comparables approach.  *Id*. at 99.  The Court found that the expert's "failure to use the DCF  method amounts to a material flaw in his methodology sufficient to bar his testimony as an expert witness because his conclusions lack good grounds."  *Id*.  Without an income valuation method, there was no appropriate check on the value derived from the comparable approach.  *Id*.

The same holds true here. Mr. Donohue never even explicitly mentions the DCF approach in his Report.  In a terse, one-sentence description of why he chose to run the capitalization of earnings method as his income approach, Mr. Donohue merely states that he chose the capitalization method because of "the lack of long term projections for a but for FCC enterprise[.]"  Donohue Report ¶104.  But Mr. Donohue fails to show that there was a lack of long term projections, or explain why that would justify his failure to use a DCF.  Elsewhere in his report, for other purposes, Mr. Donohue relies on forward-looking projections prepared by FCC management, although the projections he relied upon were superseded.

---

techniques.  **Nevertheless, the discounted cash flow method is often the dominant analytic tool**.") (footnotes omitted) (emphasis added).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

At his deposition, Mr. Donohue reiterated his conclusory statement that "there was a lack of projections in the long-term view without the breach."   Donohue Tr. at 239:8–13. But Mr. Donohue was retained specifically to provide a valuation opinion, which should have included consideration of available business projections and other financial data as necessary.   *See* Stan Bernstein et. al., Squaring Bankruptcy Valuation Practice with Daubert Demands, 16 Am. Bankr. Inst. L. Rev. 161, 187–88 (2008) ("Under a discounted cash flow approach, the first step is to identify an appropriate set of projections (generally created by management or other investors (read broadly) in the firm as independently considered and analyzed by the expert) or create the projections from which to calculate each period's projected free cash flow").

Mr. Donohue made no attempt to develop these projections even though he admits that he could have done so.   *Id*. at ("A:   So I did have history, but I did not create projections for 2016, 2017, things like that."   Q:   "But could you have, if you elected to?" A:   "Anything is possible. But, again, I also -- my answer was that I don't have the long-term breach projections, and I have sufficient market comparables, and analysts and people in this industry appear to rely on that as a valuation method, and so I had that as well.").   Mr. Donohue could have created the necessary projections for a DCF analysis.   Such projections would have reasonably considered FCC's limited prospects for future profitability and resulted in materially lower valuation consistent with the value realized at liquidation.   Mr. Donohue's failure to consider FCC's future anticipated cash flows deprives this Court of the essential valuation methodology.

Conversely, Mr. Donohue failed to explain why he relied upon the capitalization method. "[T]he capitalization method, was a popular method for many years but has since fallen out of favor."   *Dot.coms in Bankruptcy Valuations Under Title 11 or www.snipehunt in the Dark.noreorg.noassets.com\**, 9 Am. Bankr. Inst. L. Rev. 417, 423 (2001).   "The principal

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

limitation of direct capitalization is that it infers value based on a single year's (expected) income; therefore it does not necessarily adequately account for potential future fluctuations in income." John Collen, Real Estate Valuation Techniques, 8 J. Bankr. L. & Prac. 135, 146 (1999).

Mr. Donohue does not explain why his income approach should depend on a single year's income; especially given the long history of FCC and the volatility that FCC experienced leading up to the June 24, 2014 budget Mr. Donohue relied upon. Donohue Tr. at 252:15–18, 253:19–23. Mr. Donohue only could say that the capitalization approach "is a little more spot than the typical income approach that might have a projection of cash flow." *Id.* at 251:14–19, Again, he claimed that he lacked reliable projections from management even though it was his obligation as a valuation expert to develop those very projections. *Id.* at 252:11–14.

2. Mr. Donohue's income valuation contains multiple, serious errors.

Even when using the inferior capitalization of earnings method, Mr. Donohue failed to execute it. First, Mr. Donohue failed to consider an adjustment to value for a working capital deficiency. Second, Mr. Donohue adopted unrealistic industry projections.

By failing to consider FCC's substantial working capital deficiency, Mr. Donohue ignored a massive discount that should have been applied to his valuation. As pointed out by Robert Burton, retained by Defendants' counsel, "excess . . . asset deficiencies . . . should be . . . subtracted from the value of the operating company." *See* Expert Rebuttal Report of Robert Burton ("Burton Report," attached as **Exhibit 3**). In fiscal year 2014, FCC's revenue was approximately $232.2M. Burton Report at 31. Based on the guideline public companies, approximately 10% of revenue was reserved for working capital. FCC's revenue indicated it should have had working capital of approximately **$23M**. *Id.* FCC's actual working capital as of June 30, 2014 (the valuation date) was only **$1M**. *Id.* at 31–32. In light of this, Mr. Donohue should have applied a substantial adjustment to his valuation, but he did not.

12

Moreover, Mr. Donohue utilized a long-term growth rate in his capitalization approach that substantially exceeded industry projections. Unlike the more flexible DCF approach, the income approach chosen by Mr. Donohue is dependent upon the accurate capitalization of present earnings. Mr. Donohue, however, chose a capitalization rate based upon real GDP and inflation statistics from the Federal Reserve failing to consider specific industry data. Burton Report at 32. Specifically, Mr. Donohue utilized a discount rate of 16% and a long-term growth rate of 2%, which generated a capitalization rate of 14%. Industry data, though, showed that a more accurate growth rate was 0.8% which necessarily would reduce the capitalization rate.

### 3. Mr. Donohue's market approach is flawed.

In addition to preparing an income approach, Mr. Donahue also prepared a market approach. Specifically, Mr. Donohue developed a comparable companies approach. This approach is problematic, however, especially in this context. As with the income approach, Mr. Donohue committed multiple errors that render this approach untrustworthy.

"Although widely used as estimates of value, the use of comparable or guideline companies and similar transactions may be problematic." Stan Bernstein et. al., Squaring Bankruptcy Valuation Practice with Daubert Demands, 16 Am. Bankr. Inst. L. Rev. 161, 196 (2008) (hereinafter, "Squaring Bankruptcy Valuation"). "First, it is extremely difficult to find a truly comparable company or similar transaction. Adjustments to harmonize differences among comparables are often arbitrary and may lead to erroneous conclusions." *Id*. Indeed, the most important task in performing a comparables approach is selecting proper comparable companies. Mr. Donohue inexplicably excluded four companies that, by any reasonable measure, should have been included in the analysis. Burton Report at 35–37. Mr. Donohue's apparent rationale for exclusion was simply the larger revenues of these four companies compared to FCC.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Donohue Report  ¶86.  Yet all four of these companies inhabit the same micro-cap index, and even inhabit the "10-smallest" decile spectrum.  Burton Report at 37.

The similarities between these companies and FCC more than offset any differential in revenue.  Like FCC, all four companies offered diplomas with national accreditation.  *Id*. at 35. In fact, even the prior valuation reports cited by Mr. Donohue included all four of these companies.  *Id*. at 39.  But Mr. Donohue exclusion of them excluded three companies that currently have zero market value.  *Id*. at 39, Table 10.

Moreover, "[i]t is difficult to estimate how a multiple should change as a result of a change in a company's strategy, which makes them practically useless in evaluating companies that are undergoing volatile strategic and operational changes."  Squaring Bankruptcy Valuation, at 196.  FCC was in the midst of volatility on multiple fronts, including turnover at the financial aid office (John Murphy replaced Defendant Siana Stewart), an increasingly negative regulatory environment (*see* Burton Report at 16–18), and several significant effects from FCC's ill-advised acquisition of Anthem Education Group's schools, including severely constrained liquidity and draconian cost-cutting measures.  Burton Report at 13–14 and 22.

Further, "[t]he analysis of the multiples for comparable companies averages away the very distinctions that are most important in estimating value."  Squaring Bankruptcy Valuation Practice, at 196.  Mr. Donohue's choice of comparable schools defines away schools with the unique characteristics of FCC that would provide the most important indications of value.

Also, "[t]he analysis of multiples for comparable companies typically uses public company data to calculate value. However, incorporating the multiples derived from comparable publicly-held companies into a valuation of a privately-held debtor company introduces a wide array of potential distortions, which may only be partially alleviated by adjusting the valuation

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

both positively and negatively by additional factors, including, for example, the minority discount and the control premium." *Id*. This problem applies squarely here:  FCC was a privately-held company, forcing Mr. Donohue to apply adjustments for marketability and a control premium.  Donohue Report  ¶¶92–101.  But, as noted by Bernstein et al., these adjustments can only partially offset the distortion inherent in using public data to value a private company.  "By the time all of these adjustments are made, the integrity of the valuation may have been seriously compromised."  Squaring Bankruptcy Valuation Practice, at 196.

Mr. Donohue's reliance on the comparable market approach is flawed for another reason. Mr. Donohue fails to recognize that the use of the comparable companies approach is more appropriate where the goal is to "calculate damages that were incurred over a period of time[.]" *Celebrity Cruises Inc. v. Essef Corp*., 434 F. Supp. 2d 169, 180 (S.D.N.Y. 2006).  In *Celebrity Cruises*, the Court's goal was to calculate damages over time, and thus was willing to rely more heavily upon a market approach.  *Id*. at 180.  In contrast, "where the objective [is] to value a single business entity at a fixed point in time," the DCF method is the appropriate method.  *Id*. at 179–80.[5]  The goal here is to value FCC at a single point in time: June 30, 2014.  Report ¶6.

4.  <u>Mr. Donohue failed to validate his market approach with any income approach.</u>

Finally, Mr. Donohue failed to use the income approach he selected in lieu of the DCF at all.  Under his capitalization income approach, Mr. Donohue found that the enterprise value of FCC was $27M to $29M.  Donohue Report ¶114.  Yet he completely ignores this value in reaching his valuation of $37M to $51M which is based solely on his flawed comparable

---

[5] *Celebrity Cruises* also recognized that "[t]he need for conducting a DCF analysis as a check on other methods is not as critical in instances where the initial analysis is more trustworthy." 434 F. Supp. 2d at 180. But here—as in *Celebrity Cruises* itself—the market valuation analysis is doomed because of its own flaws noted above, including but not limited to a dubious selection of comparables.

15

companies approach.  *Id.* ¶124.  *See also* Donohue Tr. at 238:12–24 (relying only on the market approach when providing his valuation opinion).  The large gap between the values shows that the approaches do not validate each other.  They certainly do not justify his decision to choose the approach with the higher value and discard the other.

"An inability to reconcile a comparable companies analysis and DCF analysis has been determined to be an indicator of unreliability."  *In re Iridium Operating LLC,* 373 B.R. at 351.  *See also Lippe v. Bairnco Corp.,* 99 F. App'x 274, 279 (2d Cir. 2004) (expert "failed to explain why her 'comparable companies' and DCF analyses did not yield similar results").  In both *In re Med Diversified* and *Lippe,* the Courts excluded the valuation opinions because a valuation opinion that relies solely on the market approach, without validation from the DCF approach, is unreliable.  *See In re Med Diversified,* 334 B.R. at 99  ("As in *Lippe,* this Court finds that [the expert's] use of only two 'comparable companies' methods simply did not provide the necessary 'check' on the value he arrived at that would render that value a reliable measure of the company's worth.")  *see Lippe,* 288 B.R. at 689 ("By failing to use the DCF method and relying solely on the comparable companies method, [the expert] did not have an ability to do a 'check' on his determinations."); *see also In re Iridium,* 373 B.R. at 351 (finding Trustee's expert's valuation conclusion to be of doubtful reliability because it relied on only one valuation methodology, even though the expert ran two analyses of the same methodology, and finding that Trustee failed to carry its burden of proof as a result).[6]

Mr. Donohue committed the same error here that warranted exclusion in both *Lippe* and *Iridium*:  failing to "check" his market approach with a DCF approach.  Mr. Donohue never even

---

[6] Mr. Donohue even falls short of the efforts of the excluded expert in *In re Med Diversified,* where that expert ran **two** analyses using the comparable companies method.  Mr. Donohue ran only one comparable companies analysis to arrive at his valuation opinion.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

prepared a DCF analysis to have the ability to validate his use of the market approach. Even when he ran the inferior income analysis, Mr. Donohue did not use it to check the value derived from the market approach. Instead, having found that the income approach generated a valuation that was far below the range of the market valuation, Mr. Donohue simply abandoned the income approach as if it had never existed and adopted the higher market figure as his valuation opinion. Mr. Donohue should have used a DCF approach, but did not.

In summary, Mr. Donohue should have utilized the DCF approach to establish value. He did not. Instead, he turned proper value analysis on its head, never running the DCF approach at all and rejecting an inferior income approach in favor of a market approach to value poorly suited to capturing the value of FCC on the date of June 30, 2014. For these reasons, the Court should exclude the valuation opinion of Mr. Donohue.

### C.        Mr. Donohue is functioning as a conduit for hearsay.

Finally, the "forensic accounting" portion of Mr. Donohue's Report should be excluded because it is not the basis for any opinion of Mr. Donohue. Those calculations are based on hearsay that Plaintiff wants to use for purposes outside the scope of the Donohue Report. "Although experts are sometimes allowed to refer to hearsay evidence as a basis for their testimony, such hearsay must be the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987). Thus, while Rule "703 allows an expert to testify based on facts otherwise inadmissible in evidence," that Rule "is not an open door to all inadmissible evidence disguised as expert opinion." *Id.*

In *Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, the movant argued that the non-movant was using an expert to introduce otherwise inadmissible hearsay recorded in documents and files. No. 8:12-CV-691-T-24-MAP, 2014 WL 4986482, at *2 (M.D. Fla. Oct. 6,

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

2014).  The non-movant countered that Rule 703 allows an expert to rely upon inadmissible evidence.  *Id.*  But Judge Bucklew rejected this argument, observing that an expert "cannot testify as to inadmissible hearsay under the guise that his opinions are based on such inadmissible evidence."  *Id.*, at *3.  The Court found that the expert lacked personal knowledge of any of the data at issue (namely, dates), and did "not apply any expertise to those dates or draw any conclusions based on those dates.  In other words, [the expert] offer[ed] no opinion based on the sale dates."  *Id.*  Without an actual opinion derived from the data, the Court concluded that "it appear[ed] that the purpose of [the expert] testifying as to specific sales dates is to introduce evidence of those sale dates, rather than to explain the basis of any expert opinion or help the jury to evaluate such opinion."  *Id.*  The Court granted the motion to exclude that portion of the expert's opinion.  *Id.*

Defendants submit that the reasoning in *Static Control* is persuasive here.  Mr. Donohue introduces various data into his Report, not for the sake of his valuation, but instead for other experts to rely upon.  As Mr. Donohue testified regarding his "forensic accounting" analysis:  "I believe my analysis relates to the **other expert's opinions** that talk about them from a legal and regulatory point of view, but it's providing that data . . . ."  "But, again, I'm not the legal or regulatory expert here.  But the forensic analysis shows that information, which is relevant to that question."  Donohue Tr. at 220:20–221:8 (emphasis added).  *See also Id.* at 207:15–212 ("[T]he factual forensic accounting analysis I've done is also instructive to the liability phase, but **other experts** are opining on legalities and regulatory issues with that.") (emphasis added); *Id.* at 83:6–14  ("It's part of the forensic accounting analysis . . . . **I'm not making opinions** about Tile IV process, but the amount of refunds and the extent of the balance, coupled with DoE information about it, would support that.") (emphasis added); *Id.* at 84:19–24 ("Other than my

18

forensic accounting opinions about the balances as described in my report, **I am not providing the Title IV or legal opinions** that talk about those balances. I'm providing the forensic opinion, correct.") (emphasis added); *id.* at 90:25–91:9  (Q:  "I'm asking you to make an opinion based upon your forensic accounting work." A:   "It still, unfortunately, requires some legal or regulatory interpretation as to what this means . . . ."); *Id.* at 207:7–9 ("I am not providing liability opinions on that.  I'm providing forensic accounting opinions that relate to it [the liability opinions].").

At other times during his deposition, Mr. Donohue ostensibly claimed that his "forensic accounting" analysis was "important" to his valuation analysis, but this is not actually the case. As noted above, Mr. Donohue's valuation opinion is based solely on his market approach, which is in a self-contained section in his Report.  Murphy Report V(C). The "forensic accounting" plays no role in the market approach analysis, or the income approach for that matter. *See id.* V(D). Mr. Donohue simply does not rely upon, cite to, or even mention the forensic accounting while explaining either valuation method. Thus, the only possible purpose for the "accounting" is to introduce otherwise-inadmissible evidence that another expert can rely upon without any independent analysis by that expert, which is forbidden.[7]

## V.  Conclusion

Mr. Donohue's entire premise for his "but-for" valuation is that Defendants' alleged actions caused the loss of the entire going concern value, but he provides no basis for this assumption.  Further, Mr. Donohue failed to utilize the most essential method in the field of valuation, and instead relied on a single, non-income-based valuation method that was poorly-

---

[7] As discussed in the Motion to Exclude Plaintiff's "legal and regulatory experts," James Murphy and Aaron Lacey, Defendants explain that these experts improperly adopt Mr. Donohue's "forensic accounting" without assessing its validity on their own.  *See, e.g.*, *United States v. Batchelor-Robjohns*, No. 03-20164-CIV, 2005 WL 1761429, at *5 (S.D. Fla. June 3, 2005).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

executed and not corroborated by any other valuation method.  Finally, Mr. Donohue should not be allowed to inject hearsay into this case, especially when he does not rely upon it himself and instead seeks to simply provide it to other experts to rely upon.

## CERTIFICATION PURSUANT TO S.D. Fla. L.R. 7.1(a)(3)

The undersigned counsel certifies that the parties have met and conferred in a good faith effort to resolve the issues listed above and were not able to do so.  Defendants' counsel requested that Plaintiff's counsel agree to the relief sought in this motion, but Plaintiff's counsel refused to do so.

## REQUEST FOR HEARING PURSUANT TO S.D. Fla. L.R. 7.1(b)(2)

Pursuant to Local Rule 7.1(b)(2), Defendants request oral argument for this Motion. Defendants submit that a hearing might be helpful for the Court in ruling on Defendants' multiple *Daubert* motions. Defendants estimate that two hours should provide sufficient time for both sides to present their arguments and respond to questions from the Court regarding all of the *Daubert* motions.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
 & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By: ___/s/ Michael N. Kreitzer_____
      **MICHAEL N. KREITZER**
      (FBN 705561)
      mkreitzer@bilzin.com
      **KENNETH DUVALL**
      (FBN 121826)
      kduvall@bilzin.com

20

**DAVID W. TRENCH, ESQ.**
(FBN 0202975)
dtrench@bilzin.com
eservice@bilzin.com
mavin@bilzin.com
stapanes@bilzin.com
*Counsel for David Knobel, Jeffrey*
*Pierne, Neal Yawn, Dean Bartness,*
*Siana Stewart and Cid Yousefi*

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2018, I electronically filed the foregoing with the Clerk

of Court, using CM/ECF.  I also certify that the foregoing document was served on all counsel of

record via transmission of Notice of Electronic filing generated by CM/ECF.

*/s/ Kenneth Duvall*
Kenneth Duvall