# EXHIBIT 2

Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                    FORT LAUDERDALE DIVISION
3                    No. 16-62028-CIV-LENARD/GOODMAN
4     CLINGMAN & HANGER MANAGEMENT
      ASSOCIATES, LLC, as Trustee,
5
                     Plaintiff,
6     vs.
7     DAVID KNOBEL, JEFFREY PIERNE,
      NEAL YAWN, DEAN BARTNESS, SIANA STEWART,
8     and CID YOUSEFI,
9                    Defendants.
      _____/
10
                                 One S.E. Third Avenue
11                               Miami, Florida
                                 February 9, 2018
12                               9:36 a.m. - 5:50 p.m.
13
14              VIDEO DEPOSITION OF JIM DONOHUE
15
16       Taken before SUZANNE VITALE, R.P.R., F.P.R.
17    and Notary Public for the State of Florida at Large,
18    pursuant to Notice of Taking Deposition filed in the
19    above cause.
20
21
22
23
24
25

```
 1    APPEARANCES:

 2

      On behalf of Plaintiff:

 3

      STORCH AMINI PC

 4    2 Grand Central Tower

      140 East 45th Street

 5    25th Floor

      New York, New York 10017

 6    BY:  LITA BETH WRIGHT, ESQ.

 7

      On behalf of Defendants:

 8

      BILZIN SUMBERG BAENA PRICE & AXELROD, LLP

 9    1450 Brickell Avenue

      23rd Floor

10    Miami, FL  33131

      BY:  MICHAEL N. KREITZER, ESQ.

11

12    ALSO PRESENT:

13         Bijan Amini (via phone)

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1

2                          I N D E X

3

Examination                               Page

4   Direct          By Mr. Kreitzer:           4

5

6                    DEFENSE EXHIBITS

7   No.                                      Page

8   Exhibit 321   Notice                        5

Exhibit 322   Expert Report of Jim Donohue   33

9   Exhibit 323   Amended Complaint            88

10           CERTIFIED QUESTION:  Page 30:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1  Thereupon the following proceedings were had:

2          THE VIDEOGRAPHER:  We are now on the video

3      record for the videotaped deposition of Jim

4      Donahue in the matter of the case Clingman

5      Hanger Management Associates, LLC, versus David

6      Knobel, et al.

7          Today is Friday, February 9th of 2018, and

8      the time is 9:36 a.m.

9          At this time, counsel, please say your

10      appearances for the record and after this, the

11      court reporter will swear in the witness.

12          MS. WRIGHT:  Lita Beth Wright from the

13      Storch Amini for witness.

14          MR. KREITZER:  Michael Kreitzer on behalf

15      of the defendants.

16  Thereupon:

17                  JIM DONOHUE

18  a witness named in the notice heretofore filed,

19  being of lawful age and having been first duly

20  sworn, testified on his oath as follows:

21          THE WITNESS:  I do.

22              DIRECT EXAMINATION

23  BY MR. KREITZER:

24      Q.   Mr. Donohue, good morning.

25      A.   Good morning.

1           (Thereupon, the referred-to document was

2      marked by the court reporter for Identification as

3      Defendant's Exhibit 321.)

4      BY MR. KREITZER:

5           Q.   Thanks for joining us today.

6                Mr. Donohue, I'm showing you what's been

7      marked as Exhibit 321, which is a notice of taking

8      the videotaped deposition duces tecum.

9                Have you seen this document before?

10               MS. WRIGHT:  Do you have a copy for me?

11               MR. KREITZER:  I gave it to you.

12               MS. WRIGHT:  Thanks.  Sorry.

13               THE WITNESS:  I don't believe I have.

14      BY MR. KREITZER:

15           Q.   This document required you to bring

16      certain documents with you today.  Those documents

17      are identified on page 7 of the actual notice.

18                Did you have a discussion with your

19      counsel about bringing any of these documents with

20      you today?

21           A.   No.

22           Q.   Did you bring with you documents and

23      communications concerning compensation for your

24      expert study or testimony?

25           A.   I did not bring documents with me today to

1   the deposition.

2       Q.    How much are you being compensated for --

3   well, let's start with your expert study.

4           How much were you compensated for the

5   preparation of your expert study?

6       A.    My firm has billed approximately

7   $200,000 to date in this matter.

8       Q.    How much are you being paid to testify

9   here today?

10      A.    During this matter, my hourly rate --

11          MS. WRIGHT:  Objection to form.

12          THE WITNESS:  -- for my firm for my time

13      is 575 per hour.

14  BY MR. KREITZER:

15      Q.    So are you being paid 575 an hour to being

16  be here?

17          MS. WRIGHT:  Object to the form.

18          THE WITNESS:  Yes, my firm is billing

19      575 an hour for my time, my time today and my

20      time in my work.

21  BY MR. KREITZER:

22      Q.    All right.  And do you charge a different

23  rate for your testimony at trial?

24      A.    No.

25      Q.    So to the extent you testify in this case

1   at trial, would it be a correct statement to say

2   that you will also be paid $575 an hour for that

3   testimony?

4           MS. WRIGHT:  Objection to form.

5           THE WITNESS:  Not totally.  My firm would

6       bill 575 an hour for my work in this matter and

7       that would include hours required to testify.

8   BY MR. KREITZER:

9       Q.   Are you a partner in your firm?

10      A.   No.

11      Q.   Do you share in the profits generated by

12  your firm?

13      A.   Well, I'm an employee.  So the revenues

14  and profits are used to pay my salary.

15      Q.   All right.  And do you make a bonus in

16  addition to your -- strike the question.

17          Do you make a base salary?

18      A.   I do.

19      Q.   Okay.  Are you paid a bonus in excess of

20  your base salary?

21      A.   Bonus and salary is part of my

22  compensation structure, yes.

23      Q.   All right.  And how is your bonus

24  compensation derived?

25      A.   Many factors.  But, generally, it's my

1   performance and my work for the firm in many facets.

2        Q.    And do you also share in the profits of

3   the firm?  Do you receive any kind of profit

4   participation?

5        A.    Not a profit sharing plan, if you will.

6   Again, it's more that the profits and revenues

7   generate my salary and bonus, for example.

8        Q.    So, in other words, would a component of

9   your bonus include the profitability of the firm?

10        A.    By definition, the revenues and profits

11   for the firm would fund the salaries and bonus that

12   all employees receive, including me.

13        Q.    Do you receive any percentage of the

14   profits of your firm?

15        A.    Not directly like that.  It would be more

16   my salary and bonus would be funded by the

17   performance of the firm and of myself.

18        Q.    Okay.  And does your -- in connection with

19   your bonus compensation, is that formulaic or is it

20   more discretionary?

21        A.    There's some formula and some discretion.

22        Q.    What is the formula?

23        A.    I wish I knew, but I understand that they

24   look at things like revenue.  They look at things

25   like billable hours.  They look at my contribution

1    to training, my contribution to client development

2    and consultant development, things like that.  It's

3    multifaceted.

4        Q.   So to the extent you're spending time

5    here, you would be generating billable hours,

6    correct?

7        A.   Correct.

8        Q.   So the more time you spend on this matter,

9    the higher your bonus compensation would be,

10   correct?

11            MS. WRIGHT:  Objection.

12            THE WITNESS:  It's hard to say.  If my

13        time that year and the firm that year has

14        performed, yes, it could reach a point where

15        additional time would help.  But, generally,

16        the more hours you have and the more you

17        perform and the more you provide service for

18        the firm in terms of training and things like

19        that, yes, that would generally increase my

20        compensation.

21   BY MR. KREITZER:

22       Q.   Okay.  You were also asked to bring with

23   you documents and communications identifying facts

24   and data that either the Storch Amini firm or the

25   Weissman and Dervishi firm had provided to you in

Page 10

```
 1   connection with formulating your opinions in this
 2   case.
 3           Did you bring any of those documents with
 4   you?
 5       A.   As I said, I didn't bring documents with
 6   me.  I have a report and things in this case, but I
 7   didn't bring anything with me physically today.
 8       Q.   All right.  You didn't even bring your
 9   record; is that correct?
10       A.   I did bring my report, yes.
11       Q.   Does your report contain the actual facts
12   and data that -- let me strike the question.
13           Does your report contain any documents
14   that would have contained facts or data that the
15   Storch Amini firm had provided to you?
16       A.   My report contains quotes, cites and
17   information that is within those documents, but
18   obviously it doesn't attach the documents.  Those
19   documents are in the record which I understand has
20   been produced to the parties.
21       Q.   Is every document that was produced to you
22   by the Storch Amini firm referenced in some capacity
23   in your report?
24       A.   Either directly or indirectly, because I
25   cite the ranges of information available to me.
```

1   They are referenced that way.

2          Some are cited directly with quotes and

3   things like that.  Others are within the Bates stamp

4   range that was available to me.

5      Q.   All right.  In connection with the Bates

6   stamp ranges that are set forth in your report,

7   would it be a correct statement to say that every

8   single document that you reviewed in connection with

9   formulating your opinions in this case is somewhere,

10  somehow referenced specifically in your report?

11     A.   Within the ranges, yes.  I'm not aware of

12  anything else I would see in this matter that's

13  outside those ranges and outside the things that I'm

14  specifically citing in my report.

15     Q.   Did you provide or did you bring -- strike

16  the question.

17          Did you bring with you all documents and

18  communications identifying every assumption that

19  either Storch Amini and/or Weissman and Dervishi

20  asked you to assume in connection with formulating

21  your opinions in the case4?

22     A.   Can you read that back, please?

23     Q.   I'll just rephrase it.  It will be faster.

24     A.   Sure.  Thank you.

25     Q.   So the request was, and I'll just read it

```
 1    verbatim, "All documents and communications
 2    identifying assumptions that Storch Amini and/or
 3    Weissman and Dervishi provided you and/or that you
 4    relied on in formulating or informing the opinions
 5    to be expressed by you in your report."
 6              Did you bring those documents with you?
 7         A.   I think, as we discussed this morning, I
 8    have my report and my report cites those documents
 9    and cites assumptions and things like that within
10    it.  But I didn't bring --
11         Q.   But you didn't bring documents.
12         A.   I'm sorry.  Let me finish.  I didn't bring
13    the actual documents.  No.  I brought my report.
14              MS. WRIGHT:  Michael, you're aware we
15         produced the documents to the extent that they
16         weren't already produced in the litigation with
17         this report.  I just want to make sure you're
18         aware of that.
19    BY MR. KREITZER:
20         Q.   The fourth request was to ask you to bring
21    with you all documents referenced in your expert
22    report upon which you base some or all of your
23    opinions, including any sources identified in the
24    exhibits to your report and all documents listed in
25    Exhibits 2 and 2A of your report.
```

Page 13

1           Did you bring those with you?

2      A.    Outside of my report, I did not bring the

3   production, which I understand has been produced.

4      Q.    Okay.

5           MR. KREITZER:  So, obviously, we'll

6           continue with the deposition, but we'll move to

7           continue it based on his failure to respond to

8           the notice.

9           MS. WRIGHT:  We've already -- the

10          documents were produced to you when we provided

11          the report to you.  You actually wanted us to

12          physically bring all the documents with us?

13          MR. KREITZER:  Of course.  That's what the

14          notice requires.

15          MS. WRIGHT:  You've had them available --

16          well, you have them.  And in a much easier

17          fashion than having to --

18          MR. KREITZER:  We can debate that in front

19          of the judge.

20          MS. WRIGHT:  Okay.  That's fine.

21          MR. KREITZER:  That's fine.

22   BY MR. KREITZER:

23      Q.    Mr. Donohue, did you have any assistance

24   in preparing your report?

25      A.    Yes.

Page 14

1     Q.   Who, if anyone, assisted you in preparing
2   the report?
3     A.   Fellow consultants at my firm were my
4   primary support.
5     Q.   Would you identify each of their names,
6   please?
7     A.   Sure.  Rich Franciosia.
8     Q.   Spell that for us.
9     A.   F-R-A-N-C-I-O-S-I-A.  Marie Minasi,
10  M-I-N-A-S-I.  Elhad Toam, T-O-A-M.  Michael Herrgle.
11  That was the primary support team.
12        There may have been some other analysts
13  that did some other assistance, but that was the
14  primary support team.
15    Q.   What is the position of Rich Franciola?
16    A.   Franciosia.
17    Q.   That's my bad handwriting.  I'm sorry.
18    A.   That's okay.  Senior associate.
19    Q.   And how did he assist you in connection
20  with formulating your opinions in the case, if at
21  all?
22    A.   He prepared analyses and research at my
23  direction that was used in connection with the
24  preparation of my report and exhibits.
25    Q.   What analysis and research did he perform?

Page 15

1        A.    He would help provide data collection

2   analysis.  For example, there's a lot of data

3   records here, and he would help provide those

4   records, identify them, help compile the information

5   that ends up in my report.

6        Q.    And how did he communicate to you whatever

7   findings or analysis that he actually performed?

8        A.    We would talk about it, in the first

9   instance, after talking about what needs to be done

10  and what should be researched.  That was one way we

11  communicated.

12          And, also, we prepared exhibits that

13  summarized the analyses.

14       Q.    And did he ever communicate to you by

15  e-mail?

16       A.    Yes.

17       Q.    Did he ever provide written reports to you

18  or summaries of the information that he was

19  locating?

20       A.    Yes, in that we would prepare Excel files

21  or Word documents, which is my report that would

22  contain this information.

23       Q.    Would his original versions of every one

24  of those files find their way into your report

25  without edit?

1      A.   No.  Those are living Excel files.

2   They're updated with new data, things like that.

3      Q.   Did you produce here today any of those

4   Excel files?

5      A.   No.  Those Excel files are the product

6   that's in my report.

7      Q.   Well, what you mean to say is, after you

8   reviewed, edited and otherwise altered those

9   reports, they are the product that's in your report,

10  correct?

11     A.   The product that's in the final version of

12  those files after my analysis was completed.

13     Q.   Did you bring any of the initial versions

14  of those documents, the drafts, the preliminary

15  analysis, those sorts of things, did you bring any

16  of those with you here today?

17     A.   No, I did not.  And, again, those are

18  living documents that are updated.  So I don't know

19  if those versions would exist.

20     Q.   But you didn't even look, right?

21          MS. WRIGHT:  Objection.

22          THE WITNESS:  I didn't have to look.  I

23       know that those documents are updated.  The

24       Excel files are updated.  There's clearly a

25       process that goes on to collect that data.

1   BY MR. KREITZER:

2        Q.   So, in other words, there could be a first

3   version and a second version and a third version and

4   so on, right?

5        A.   I don't know how to find it because again

6   it's being created.  Ten minutes after the document

7   is created, yes, it's a version, but it's in

8   process.  So I don't know if it's a version or

9   something that's in process.

10        Q.   If you went back to your computer system,

11   you might be able to look at the computer system and

12   determine whether there are earlier versions in any

13   of those documents still stored in your system,

14   right?  You could at least try to do that, right?

15        A.   If a particular version gets saved, but

16   there is one version of my report in Excel files.

17        Q.   The final version?

18        A.   Correct.

19        Q.   The one that you wanted to communicate

20   here today?

21        A.   Well, the appropriate version, the version

22   that has my complete analysis.

23        Q.   The version for which you're being paid

24   $575 an hour to present, right?

25        A.   All the work I did, my firm was

```
 1   compensated 575 an hour.
 2            MS. WRIGHT:   Objection.
 3   BY MR. KREITZER:
 4        Q.   Okay.  Tell me about Marie Minasi?
 5        A.   Minasi.
 6        Q.   Okay.  At least I got that right.
 7             And what is Ms. Minasi's position at your
 8   firm?
 9        A.   She's a consulting associate.
10        Q.   What is a consulting associate?
11        A.   That's a title for consulting.  After a
12   few years of experience, it's one of our titles in
13   our chain.
14        Q.   Was Mr. Franciosia?
15        A.   Franciosia.
16        Q.   Franciosia.  Was he the most senior person
17   working on this file with you?
18        A.   Elhad Toam is a principal.  So in terms of
19   titles, he would have a more senior title.  They're
20   both senior employees, in my view, but ...
21        Q.   Are you a principal in the firm?
22        A.   No.
23        Q.   What is your position in the firm?
24        A.   I'm a vice president.
25        Q.   How long have you been a vice president?
```

Page 19

1        A.    Since 2004.

2        Q.    I presume a vice president is more senior

3    than a principal?

4        A.    Yes.

5        Q.    And what role did Ms. Minasi perform?

6        A.    Similar to Mr. Franciosia, certain

7    analyses, research, finding information, compiling

8    information, doing other analyses at my direction.

9        Q.    And did you bring any of her work papers

10   or any of her preliminary reports with you here

11   today?

12       A.    No.  As we discussed, I only brought my

13   report with me here today.

14       Q.    What role did Mr. Toam play?

15       A.    Similar.  Doing certain research,

16   investigating certain data, preparing certain

17   analyses.

18       Q.    And did you bring all of his research,

19   data and analyses with you here today?

20            MS. WRIGHT:  Objection.

21            THE WITNESS:  As we discussed, I only

22       brought my report here today.

23   BY MR. KREITZER:

24       Q.    All right.  And what work did Mr. Hergle,

25   correct?

Page 20

1    A.    Yes.

2    Q.    What work did Mr. Hergle perform?

3    A.    Similar, in that he was supporting some of

4    those efforts, supporting some of the research

5    findings, some of the information gathering, other

6    analyses and research done at our direction.

7    Q.    And what position did Mr. Hergle have in

8    the firm?

9    A.    He is an analyst.

10   Q.    Give us an understanding of what an

11   analyst does relevant to, say, a principal or a

12   consulting associate.

13   A.    An analyst may be more responsible for

14   some of the initial research, finding certain

15   information, compiling some of the initial analyses,

16   whereas, the more senior team might be directing

17   that or instructing him to do that analysis,

18   reviewing that analysis, things of that nature.

19   Q.    Can you give us a sense of on how many

20   occasions you have been engaged to provide expert

21   testimony in a legal proceeding?

22        MS. WRIGHT:  Ever?

23        MR. KREITZER:  Yes.

24        THE WITNESS:  I don't have an exact number

25   for you, but it's clearly dozens of matters.

Page 21

1    BY MR. KREITZER:

2        Q.   Would you say more than 40?

3        A.   Yes.

4        Q.   Would you say more than 60?

5        A.   Yes.

6        Q.   Would you say more than a hundred?

7        A.   That's possible.  I've been doing this for

8    over 25 years.  So it's hard to think of it as in

9    counts of matters, because some matters take 10

10   hours, some matters take hundreds of hours, so ...

11       Q.   When you say you've been doing "this" for

12   more than 25 years, what is the "this" you're

13   referring to?

14       A.   My financial consulting, which includes

15   litigation and valuation work and things like that,

16   but my engagements overall.

17       Q.   On how many occasions have you actually

18   testified in a court of law?

19           MS. WRIGHT:  Objection.

20           THE WITNESS:  In trial, in a court?

21   BY MR. KREITZER:

22       Q.   Yes.

23       A.   A handful.

24       Q.   Describe for me or give me a better idea

25   of what a handful is to you.

Page 22

1      A.    It's around five or something like that.

2      Q.    Okay.  So of the between 60 and a hundred

3  or more litigation matters you've worked on, you've

4  testified in somewhere around five; is that correct?

5      A.    With respect to trials, yes.

6      Q.    Have you ever performed any of work --

7  strike the question.

8            Have you ever been hired by the Storch and

9  Amini firm to provide any work prior to this case,

10  before this case?

11      A.    My firm has been retained by Storch Amini

12  before, yes.

13      Q.    On how many occasions?

14      A.    I can think of at least two, as I sit

15  here.

16      Q.    Which are those?

17      A.    I recall a matter involving a biotech

18  company and another matter involving a breach of

19  contract for a supplier and distributor.

20      Q.    Do you remember the name of the case

21  involving the biotech company?

22      A.    Orbimed comes to mind.

23      Q.    Spell that for us.

24      A.    O-R-B-I-M-E-D.  That is probably not the

25  way to spell it, but that's all I remember.

Page 23

1          Q.    And in what court was that case?

2          A.    That was in New York City, and it was

3     probably -- it was probably state.

4          Q.    Did you testify in that case, that is,

5     testify at trial?

6          A.    No.

7          Q.    Do you know what the outcome of the case

8     was?

9          A.    I believe that case settled.

10          Q.    In connection -- how long ago was that

11     case?

12          A.    More than ten years ago.

13          Q.    And what attorney did you report to in

14     connection with your work on that case?

15          A.    I worked with Bijan Amini.

16          Q.    That's the same attorney who hired you in

17     this case?

18                MS. WRIGHT:  Objection.

19                THE WITNESS:  Well, his firm hired me, but

20          he's been working on this case, yes.

21     BY MR. KREITZER:

22          Q.    And in connection with the breach of

23     contract action, the breach of contract for a

24     supplier/distributor, do you remember the name of

25     that case or the parties involved in that case?

Page 24

1          A.    New England Wood Pellet, I believe was the

2     name of it.

3          Q.    And what was your role in that case?

4          A.    I was retained to investigate damages in

5     that case.

6          Q.    Okay.  Was that also the role you had in

7     the biotech case, that is, to investigate damages?

8          A.    Yes.

9          Q.    And how long ago did you perform your work

10    on that case?

11              MS. WRIGHT:  You're talking about the Wood

12         Pellet one?

13              MR. KREITZER:  Yes.

14              MS. WRIGHT:  Thank you.

15              THE WITNESS:  Less than five years ago.

16              And I should add that both of those cases

17         also involved some investigative records work

18         as well.

19    BY MR. KREITZER:

20         Q.    Okay.  Did that case proceed to trial?

21         A.    It did not.

22         Q.    Did it settle?

23         A.    That's my understanding.

24         Q.    And did you work with Mr. Amini on that

25    case as well?

Page 25

1      A.    I did, among others.

2      Q.    Can you think of any other cases in which

3  you have been engaged by Mr. Amini or his law firm?

4          MS. WRIGHT:  Objection to form.

5          THE WITNESS:  I can't as I sit here.  I

6      could look over my cases, but I can't as I sit

7      here.

8  BY MR. KREITZER:

9      Q.    Okay.  I want to talk to you a little bit

10  about your access to documents in this case.  I am

11  going to ask you a series of questions about that.

12          Were you able to review the business

13  records of Florida Career College in connection with

14  performing your work?

15      A.    To a large extent, I believe I was.  The

16  discovery included business records.

17      Q.    Were you able to review all of the

18  business records of the company?

19          MS. WRIGHT:  Objection.

20          THE WITNESS:  I don't know.  I was able to

21      review a large amount of business records, but

22      I don't know if there's other things out there

23      that I can't review.

24  BY MR. KREITZER:

25      Q.    Did you ever ask to review a business

Page 26

```
 1   record which was not available or which you

 2   understood was not available for you to review?

 3              MS. WRIGHT:  Objection.

 4   BY MR. KREITZER:

 5        Q.   And, of course, I'm speaking in terms of

 6   this case, business records about --

 7              MS. WRIGHT:  I don't think you can ask him

 8        about his communications with us.

 9              MR. KREITZER:  Sure, I can, because he's a

10        testifying expert.  There's no privilege.

11              MS. WRIGHT:  I don't think you're allowed

12        to ask -- I don't think you're allowed to get

13        discovery of your communications.  It's

14        communications with us.

15              MR. KREITZER:  I'm not even asking about

16        your communications.  I'm asking about the

17        documents that he had an opportunity --

18              MS. WRIGHT:  You just said, did you ever

19        ask to review.  That's communication.

20              MR. KREITZER:  No, I disagree.  If you

21        want to take it up or instruct him not to

22        answer, just say so.

23              MS. WRIGHT:  I'm just asking you a

24        question so I can clarify your position.

25              MR. KREITZER:  My position is --
```

Page 27

1           MS. WRIGHT:  Asking to request a

2     communication?

3           MR. KREITZER:  No.  Because I'm trying to

4     understand the documents that he had access to.

5     I'm not interested in what your answers were.

6           MS. WRIGHT:  Then ask him what documents.

7           MR. KREITZER:  I'll decide.  Respectfully,

8     I'll decide how to ask the question.  You

9     decide what objections you want to raise.

10          Fair enough?

11          MS. WRIGHT:  Yeah.  If you're going to ask

12     him for communications, I'm going to direct him

13     not to answer.

14          If you want to rephrase the question so

15     you can talk about his access to documents, I'm

16     happy to let him.

17   BY MR. KREITZER:

18     Q.   Did you ask to review any records that

19   were not made available to you?

20     A.   I can't answer your question in terms of

21   what I've asked.  I looked for records, and I recall

22   trying to find data and not always finding the data

23   in the format I would like or for the time period

24   and things like that.

25          I -- generally, I recall looking for some

1   things and not being able to find them, but I

2   can't -- I don't think I -- I think of it as asked,

3   but I certainly looked for things and sometimes some

4   information isn't available.

5        Q.   What was the source of the data that

6   you're now referring to?  When you say you tried to

7   find data, but in some cases you couldn't locate it,

8   what was the source in which you were looking for

9   that data?

10       A.   Throughout my assignment, I had access to

11  the depositions, most of the depositions in this

12  matter.

13            I had access to some legal filings.  I had

14  access to the production, which was basically

15  produced by many parties, including the parties in

16  the matter and third parties, if you will, as well.

17  They produced information.

18            That's the universe of the information

19  that I had.

20       Q.   Were you provided with a complete --

21  strike the question.

22            Were you -- strike that question.

23            Were you provided with the computer

24  records of Florida Career College?

25            MS. WRIGHT:  Objection.

1          MR. KREITZER:  I'm just curious.

2          What is your objection to that?

3          MS. WRIGHT:  I don't know what you mean by

4      "computer records."  Could be anything.

5          MR. KREITZER:  Okay.  Thank you.

6   BY MR. KREITZER:

7      Q.   You can answer.

8      A.   To some extent, I believe, yes, because I

9   had access to native files.  I had access to

10  e-mails.  I had access to reports.  I had access to

11  things that people were working with while at the

12  firm.  I had access as to data they were storing.

13         So I did have access to computer files.

14  In fact, some of them were produced in the

15  litigation.

16     Q.   Okay.  Do you believe you had access to

17  the entire computer records of Florida Career

18  College?

19         MS. WRIGHT:  Objection.

20         THE WITNESS:  I would doubt that

21      everything ends up in a litigation scenario.

22      They had 40 campuses and those campuses have

23      records.

24         I don't know, but I would suspect that,

25      while it was a lot of information and

 1         information necessary to do what I was doing, I

 2         can't say that everything that FCC ever

 3         maintained was produced.

 4    BY MR. KREITZER:

 5         Q.   Did you ever ask for a record, ask the

 6    attorneys for Storch Amini for a record that they

 7    told you was not available?

 8              MS. WRIGHT:  Objection.  I'm not going to

 9         let him answer that question.

10              Rephrase it.

11              MR. KREITZER:  Certify the question.

12    BY MR. KREITZER:

13         Q.   Was every record that you requested of the

14    attorneys who engaged you in this case provided to

15    you?

16              MS. WRIGHT:  Objection.  That's the same

17         question.  Same instruction.

18              MR. KREITZER:  You're instructing him not

19         to answer?  I just want to be clear.  Is that a

20         yes?  You need to speak verbally.

21              MS. WRIGHT:  Yes.

22              MR. KREITZER:  Okay.  Thank you.

23    BY MR. KREITZER:

24         Q.   Were there any records that you wished to

25    have seen which were not made available to you in

Page 31

```
 1    connection with your investigation?
 2         A.    Nothing that prevented me from issuing in
 3    my report.
 4         Q.    That wasn't my question.
 5         A.    Okay.
 6         Q.    Do you understand my question?
 7         A.    Maybe I don't.
 8         Q.    Okay.  My question was, were there any
 9    records that you wished to have seen which were not
10    made available to you in connection with your
11    investigation?
12         A.    Wished?  I think there's records that
13    could have been more native and made my assignment
14    simpler and saved costs for the parties.  But aside
15    from that, I mentioned some things in my report that
16    weren't available.
17              So the wish part, I guess, is what I'm
18    having trouble with.
19              Do I wish that everything was native and
20    provided on day one and every deposition was done?
21    I'm sure we all do, but I lay out things in my
22    report that I was looking for.
23         Q.    Was every record that you desired to see
24    in connection with your investigation made available
25    to you?
```

1     A.   I don't know how to answer your question.

2    Every record that I desired -- that I needed to

3    create my report was provided to me.

4          There were probably other things that

5    would have further supplemented the report or made

6    the process simpler like that.

7          So, yes.  So, to some degree, there was

8    records that would probably make it simpler, in a

9    format that would make it simpler.

10    Q.   What were those records?

11    A.   Well, for example, some of the DG5 data

12    was in PDF form versus native.  So having it all in

13    native would make it simpler.

14          It wouldn't change anything, but it would

15    make it simpler.

16    Q.   What else?  What other documents?

17    A.   The bad debt write-off, documents for the

18    bad debt write-off, some of those were estimates

19    made by the company.  I don't know if there's

20    further records surrounding those bad debt

21    write-offs, but that would have made things simpler.

22    Q.   What else?

23    A.   That's what comes to mind.  I would need

24    to look at my report to see if there's other areas

25    that I, as an example, that could have made the

Page 33

```
 1   process simpler and provided more information.
 2        Q.   Okay.  Let me show you what I've marked as
 3   Exhibit 322 to your deposition.  It's a document
 4   entitled "Expert Report of Jim Donohue, Submitted
 5   January 12, 2018."
 6             MS. WRIGHT:  Do you have a copy of that
 7        one?  Thank you.
 8             (Thereupon, the referred-to document was
 9   marked by the court reporter for Identification as
10   Defendant's Exhibit 322.)
11             MS. WRIGHT:  You're calling it 322?
12             MR. KREITZER:  Number 322.
13   BY MR. KREITZER:
14        Q.   Do you recognize that document?
15        A.   I do.
16        Q.   What is it?
17        A.   It appears to be a copy of the expert
18   report I issued in this case in January.
19        Q.   All right.  Have you made any amendments
20   or alterations to that report since January 12,
21   2018?
22        A.   One thing I recall is that I provided a
23   list of information that was provided to me after I
24   issued this report.
25        Q.   What do you mean by that?
```

Page 34

1      A.   There were certain depositions that

2   occurred after I issued the report.  So I've

3   provided a list of documents and things like that,

4   such as the depositions that occurred after my

5   report.

6      Q.   Did you read those depositions and other

7   materials?

8      A.   I did read those depositions, yes.

9      Q.   Did they change or alter, in any respect,

10  any of the opinions that you set forth in your

11  report on January 12, 2018?

12     A.   No.

13     Q.   Now, you said that, if you had an

14  opportunity to review your report, that you might be

15  able to have your recollection refreshed as to other

16  documents that had not been provided to you in in

17  connection with formulating your opinions.

18          So I want to give you an opportunity, take

19  as much time as you need, to look over your report

20  and see if any -- if that assists in refreshing your

21  recollection.

22          MS. WRIGHT:  Note my objection.

23          THE WITNESS:  Reviewing my report, I

24      recall that there's-- it's basically the same

25      thing.

1          There are some documents and some

2      information that, in a more native format or if

3      it was being tracked, would have been simpler

4      to prepare.  It wouldn't have changed the

5      analysis, but it would have been simpler to

6      prepare, and I think I already mentioned the G5

7      records.

8          I'm also reminded that the unsubstantiated

9      balance wasn't being tracked, and so having

10     more records on that would make the process

11     simpler, would have been more efficient, not

12     change anything.

13         And I think I already mentioned the bad

14     debt area.  There are some records there that

15     would have simplified matters.

16  BY MR. KREITZER:

17     Q.   Anything else?

18     A.   No.  That's the general theme.  I think a

19  lot of the areas was just finding the information

20  and getting it more efficient would have -- you

21  know, I certainly would desire that, but...

22     Q.   When you say "the unsubstantiated balances

23  weren't being tracked," what did you mean by that?

24     A.   Well, they were not being tracked

25  systematically at the company.  The unsubstantiated

 1    balances that I saw were provided by a series of

 2    e-mails and other DOE communications, and that's how

 3    I prepared them, but I assume that that could have

 4    been in native or something like that, but it

 5    wasn't.  It was in these e-mails, and it wasn't

 6    being tracked and people testified -- they were not

 7    aware of these balances at certain times.  So that's

 8    what I mean.

 9         Q.   All right.  When you say it wasn't being

10    tracked, do you reach that conclusion after having

11    reviewed the entirety of the computer records of

12    Florida Career College?

13              MS. WRIGHT:  Objection.

14              THE WITNESS:  I don't know when I reached

15         that conclusion during my work.

16    BY MR. KREITZER:

17         Q.   I wasn't asking when.

18              Finish your answer.  I apologize.  I

19    didn't mean to interrupt you.

20         A.   I thought that was your question.  Maybe

21    you can help me with your question.

22         Q.   Sure.  My actual question was, when you

23    say that it wasn't being tracked, did you reach that

24    conclusion after having reviewed the entire computer

25    records of Florida Career College?

1              MS. WRIGHT:   Objection.

2              THE WITNESS:   I think I testified earlier

3      about "entire."   I don't know what else is out

4      there that hasn't been produced in this case.

5   BY MR. KREITZER:

6      Q.   Okay.

7      A.   I reached that conclusion with the

8   information available to me.

9      Q.   All right.   So I guess you would agree

10  with me that you just don't know what you don't

11  know.

12             Is that a fair statement?

13     A.   It's always a fair statement.   But, in

14  this matter, not necessarily, because I also see the

15  records.   I see what people are testifying about

16  what they know.   So if it was in the computer

17  records, and they knew it, they weren't talking

18  about it.

19     Q.   But I'm not asking you about the testimony

20  right now.   I'm asking you about records.

21             So, in that regard, did you come across or

22  when you reached the conclusion that the only

23  documents that you did not have access to would have

24  been the native G5 data, the company's estimates of

25  the bad debt, and -- or the composition of the bad

 1  debt, and the fact that the company was not

 2  allegedly tracking unsubstantiated balances, is it

 3  your testimony that every other record that you

 4  desired to see in this case was provided to you?

 5          MS. WRIGHT:  Objection.

 6          THE WITNESS:  "The desire" I have trouble

 7      with in your question.

 8          I've tried to answer it by explaining that

 9      I had the records needed to reach the

10      conclusions I reached.

11          And, yes, I'm aware that there's other

12      records that could have facilitated that

13      process and made it easier, but I'm not aware

14      of other records that I needed to reach my

15      opinions.

16  BY MR. KREITZER:

17      Q.   Well, when you say that you're aware that

18  there were other records that would have or they

19  could have facilitated your process, what other

20  records do you believe existed that could have

21  facilitated that process, your -- and the process I

22  a presume you mean is formulating your opinions,

23  right?

24          MS. WRIGHT:  Objection.

25          THE WITNESS:  The work in this case, yes.

Page 39

1    BY MR. KREITZER:

2         Q.    Yeah.   So what other records do you

3    believe would have facilitated your work?

4              MS. WRIGHT:   Objection.

5              THE WITNESS:   I think I explained that

6         native records would exist that would track G5,

7         for example, as one example.

8    BY MR. KREITZER:

9         Q.    Give me other examples.   I don't want just

10   examples.

11             I want to know every record that you

12   wished you had had access to that would have

13   assisted you in formulating your opinions, but which

14   you did not have access to.

15             MS. WRIGHT:   Objection.

16   BY MR. KREITZER:

17        Q.    If any.

18             MS. WRIGHT:   Same objection.

19             THE WITNESS:   Well, again, you're asking

20        "wished."   So would I have wished that some

21        things were in native so it's simpler process?

22        It's always helpful.

23   BY MR. KREITZER:

24        Q.    What documents do you wish -- let's take a

25   step back.

```
 1              Explain to the jury what you mean by a
 2      "native file."
 3          A.   It's a --
 4              MS. WRIGHT:  Objection.
 5              THE WITNESS:  For example, it's an Excel
 6         file.  It's actually in the computer.  The data
 7         is there.  You can look at the data, add up the
 8         data, subtract the data and -- rather than
 9         physically taking a piece of paper and adding
10         up those points.
11      BY MR. KREITZER:
12          Q.   And what native files do you -- did you
13      desire to have access to but which you did not have
14      access to in formulating your opinions?
15              MS. WRIGHT:  Objection.
16      BY MR. KREITZER:
17          Q.   If any.
18              MS. WRIGHT:  Same objection.
19              THE WITNESS:  I gave you an example that
20         there's G5 records that I assume were in native
21         format in some form, but some of them were in
22         paper form, so it had to be created.
23              It doesn't change anything, but it would
24         make the process simpler.
25      BY MR. KREITZER:
```

1      Q.   What other documents, if any?

2           MS. WRIGHT:  Objection.

3           THE WITNESS:  I think I already mentioned

4      that there's some bad debt records that would

5      have made that process simpler.  It wouldn't

6      change anything.  The unsubstantiated balance,

7      the records available to me, I utilized the DOE

8      communications which I assume were in native as

9      well.

10  BY MR. KREITZER:

11      Q.   Do you know if the company maintained

12  records of the unsubstantiated balances between G5

13  and COD -- I assume that's what you mean by

14  unsubstantiated balances, right, the balances

15  between G5 and COD?

16      A.   Correct.  Right.

17      Q.   Do you know if the company retained

18  records of the unsubstantiated balances between G5

19  and COD?

20           MS. WRIGHT:  Objection.

21           THE WITNESS:  Well, I know the company was

22      receiving e-mails that would show that, that

23      balance, for example, yes.

24  BY MR. KREITZER:

25      Q.   And do you know if the company maintained

Page 42

 1   any other records, other than e-mails, regarding

 2   unsubstantiated balances between COD and G5?

 3        A.   Those e-mails are coming from DOE.  So I

 4   assume the company had access to those e-mails.

 5        Q.   That wasn't my question.

 6             Maybe I should talk slower, respectfully.

 7   Maybe I'm just talking too fast.

 8             My question was, do you know if the

 9   company maintained any other records, other than

10   e-mails, regarding unsubstantiated balances between

11   COD and G5?

12             MS. WRIGHT:  Objection.

13             THE WITNESS:  I don't know what other

14        records would have those figures.  I do know

15        that the testimony and the accounting

16        infrastructure was apparently not tracking that

17        balance.  So I don't know if there's something

18        else out there that was.

19   BY MR. KREITZER:

20        Q.   Did you look in the computer records of

21   FCC to determine whether there was any records,

22   aside from e-mails, that were tracking the

23   unsubstantiated balances between COD and G5?

24             MS. WRIGHT:  Objection.

25             THE WITNESS:  Yes, I looked at the

Page 43

1        accounting records.

2    BY MR. KREITZER:

3        Q.   You did, okay.

4             So tell us which accounting records you

5    looked at.

6        A.   I looked at monthly board reports.

7        Q.   Okay.

8        A.   I looked at -- there's some general ledger

9    data, trial balance data, journal entries.

10            I looked at -- there were certainly some

11   detail for some of the entries.

12       Q.   What entries?

13       A.   For example, the bad debt entries.

14       Q.   Okay.

15       A.   There's detail for those.  I looked at

16   some bank statements.  I looked at some summary

17   reports, various summary reports that were used to

18   attempt to manage and monitor cash, and there was

19   different reports that did that.

20            I had records from a system they called

21   STARS that tracked some information.  I had some

22   other reports from the DOE that also tracked the

23   authorization and I -- it wasn't only DOE e-mails.

24   I should be more specific.  There were some other

25   reports that tracked G5 and COD balances that were

Page 44

```
 1    from a system.

 2         Q.    Anything else?

 3         A.    There's a lot of records in this case and

 4    that's a sampling of them that comes to mind.

 5               There are probably others.  I mean, I

 6    looked at a lot of records in this case.

 7         Q.    You mentioned STARS.

 8               What did you understand STARS to be, if

 9    anything?

10         A.    From the testimony and from some of the

11    records in the case, I understand that STARS was

12    being used to manage --

13               MS. WRIGHT:  People have been trying to

14         call in.

15               MR. KREITZER:  Sorry.  Let's take a short

16         break.

17               THE VIDEOGRAPHER:  Off the record.  The

18         time is 10:24.

19               (Short recess taken.)

20               THE VIDEOGRAPHER:  We're now back on the

21         record.  The time is 10:26.

22    BY MR. KREITZER:

23         Q.    I apologize, sir, you got interrupted.

24               I asked you, what did you understand STARS

25    to be, if anything.
```

1      A.   From the testimony in the case and some

2  records, I understand that STARS, as they would

3  refer to it, was the student information system that

4  would track many things, including the receipt of

5  Title IV funds, among other funds, and the use of

6  those funds, the disbursements to student, and it

7  would do so in some detail.

8      Q.   Okay.  And did you have complete access to

9  the STARS program in connection with performing your

10  investigation of this case?

11          MS. WRIGHT:  Objection.

12          THE WITNESS:  I'm sorry.  Complete access

13      to the program, what do you mean?

14  BY MR. KREITZER:

15      Q.   Were you able to run the program and

16  actually physically run the reports yourself by

17  directing the program to print reports?

18      A.   No, I did not run a live STARS program.  I

19  relied on the record, the contemporaneous record

20  that was provided in the production.

21      Q.   Who provided you with that contemporaneous

22  record, as you put it?

23      A.   Well, the record was provided by many

24  parties.

25      Q.   Okay.  Tell me which parties and which

Page 46

 1   records you relied upon.

 2        A.   Well, they are cited in my report.

 3        Q.   All right.

 4        A.   But, in general, there was STARS, STARS

 5   types of records in the accounting records that I

 6   received from the company.  I believe those are from

 7   the company.  I'd have to think about the Bates

 8   stamp.

 9        Q.   Take your time, sir.  But I want to know

10   every STARS report that you relied upon in

11   formulating your opinions in this case.

12        A.   An example of those would be --

13        Q.   And, sir, I'm sorry to interrupt, but I

14   just want to be more efficient about this.  I didn't

15   ask you for an example.

16             I asked you, very specifically, for every

17   STARS report that you relied upon in formulating

18   your opinions in this case.

19             Go ahead.

20        A.   The sources listed on my Exhibit 9 would

21   be STARS information.

22             The sources I listed on Exhibit 9A would

23   be STARS information.

24             The sources I listed on Exhibit 9B would

25   include STARS information.

1          The sources I listed on Exhibit 9C would

2    include STARS information.

3          The sources I listed on Exhibit 9D would

4    include STARS information.

5          The sources I listed on Exhibit 10A would

6    include STARS information.

7          The sources I listed on Exhibit 10C would

8    include STARS information.

9          The sources I listed on Exhibit 11 would

10   also include STARS information.

11         The sources I listed on Exhibit 12 would

12   also includes STARS information.

13         The sources I listed on Exhibit 13B would

14   include STARS information.

15         My report also includes cites to some

16   testimony just for completeness, and some exhibits

17   to depositions that included STARS information.

18         That would include deposition Exhibit 124.

19   And I believe deposition Exhibit 55, 56 and 57.

20         I think footnote 80 in my report is also

21   some STARS information.

22         I don't believe that's all of it, because

23   some of it, it's hard for me to tell in the

24   deposition exhibit numbering.  I don't know them by

25   number.  Some of them, I recall, but there was also

```
 1    STARS information that was used to prepare the 90/10

 2    reports that were attached to the audit financials,

 3    and that's attached to some of these deposition

 4    exhibits, for example, and it's attached to any cite

 5    to a financial statement, for example, but that's

 6    all that comes to mind.

 7              I mean, there was STARS information in the

 8    record that I've seen or used here.

 9         Q.   So, respectfully, sir, again, you didn't

10    answer the question that I asked you.  So let me ask

11    you the exact same question again.

12              What I asked you was specifically to

13    identify every STARS report that you relied upon in

14    formulating your opinions in this case.

15              Do you understand the question?

16         A.   I do.

17         Q.   I didn't ask you to tell me which exhibits

18    of yours may contain STARS data, which you spent

19    five or ten minutes telling us about.

20              I asked you specifically to tell us every

21    report that you relied upon, generated by STARS, in

22    formulating your opinions in this case.

23              Are you able to do that?

24         A.   I am, and I believe I did answer your

25    question.  Those sources are the STARS information
```

Page 49

1    and reports that I did use to prepare those

2    exhibits.

3         Q.   Is it your contention, therefore -- let's

4    go to Exhibit 9 -- is it your contention that

5    Exhibit 9, which was one of the answers that you

6    just gave, that Exhibit 9 is in the format of a

7    STARS report?

8              It's a simple yes or no.

9         A.   In the format of, I've seen STARS reports

10   that do the 90/10 calculation and Exhibit 9 is

11   roughly in that format.

12        Q.   Not roughly, sir.

13             Is it generated by STARS?  Is that a hard

14   question for you to understand?  That's my question.

15             Is that a difficult question for you to

16   understand?

17        A.   It's not a difficult question.

18        Q.   Because I'll try to simplify my question.

19        A.   It's not a difficult question, sir.

20        Q.   All right.  So now I'd like you to tell

21   me, is Exhibit 9A in a form generated by STARS?

22        A.   Exhibit 9 is obviously my report.

23        Q.   Thank you.

24        A.   If that's what you're asking.

25        Q.   So it's not generated by STARS, is it?

Page 50

1      A.   STARS did not generate Exhibit 9.

2      Q.   Thank you.  Did STARS generate --

3      A.   Let me finish.

4           The data in STARS provided the data that

5  was used to prepare Exhibit 9.

6      Q.   What STARS report, if any, did you rely

7  upon in creating Exhibit 9, if any?

8      A.   Much of this is in something they call the

9  90/10 report.

10     Q.   That wasn't generated by STARS, was it?

11     A.   The 90/10 report?

12     Q.   Yeah.

13     A.   That says STARS on it?

14     Q.   I don't know.  You tell me.

15          Is the 90/10 report generated by STARS?

16     A.   I think STARS is used to produce 90/10

17  reports.  I'm not saying it's the only thing that's

18  used to produce them.

19     Q.   So I'll go back to my question.

20          Is Exhibit 9 a report generated by STARS?

21     A.   As I testified before --

22          MS. WRIGHT:  Objection.

23          THE WITNESS:  -- Exhibit 9 is prepared by

24      me using STARS information.

25  BY MR. KREITZER:

1      Q.   And, likewise, Exhibit 9B, 9C, 9D, these

2    aren't reports that were generated by STARS,

3    correct?

4           MS. WRIGHT:  Objection.

5           THE WITNESS:  All my exhibits were

6         prepared by me using information from the

7         company, including STARS information.

8    BY MR. KREITZER:

9      Q.   And can you tell me any STARS reports --

10   do you understand what a STARS report is?  Let's

11   start with that.  Maybe that will be easier.

12     A.   Generally, I include -- that includes

13   information coming from STARS, which includes a lot

14   of things.

15     Q.   Were you aware of the fact that STARS

16   actually created physical reports, just like any

17   computer program, you can ask it -- a lot of

18   computer programs -- you can ask it to create a

19   report and it prints out a report.

20           Are you familiar with that?

21     A.   I've seen that in the testimony, yes.

22     Q.   Okay.  Were you able to create any reports

23   using the STARS program?

24     A.   As I testified before, I did not have a

25   live STARS environment.  I'm relying on data and

Page 52

1   contemporaneous printouts from STARS or Excel files

2   from STARS.

3       Q.   Why weren't you given access to the STARS

4   program, if you know?

5       A.   I don't know one way or the other.  It was

6   not in the production in the live environment.

7       Q.   Did you ask?

8       A.   I don't recall asking for the company

9   systems to be turned back on.  They're in a

10  bankruptcy situation, and I'm dealing with data

11  after that point.

12      Q.   Would it have been helpful to you, in your

13  opinion, to have access to the actual STARS program

14  that was utilized at FCC?

15      A.   In the broadest sense, it would have made

16  things more efficient, because I wouldn't have to go

17  searching for STARS information.  But other than

18  that, no.

19      Q.   Did you have all of the information --

20  strike the question.

21           In connection with reports created by

22  STARS, are you of the view, are you of the opinion

23  that you had all the information necessary in order

24  for you to reach your conclusions?

25           MS. WRIGHT:  Objection.

1          THE WITNESS:  Yes.  I had the information

2      I needed to reach my conclusions.

3  BY MR. KREITZER:

4      Q.   Okay.  Did you have access to the actual

5  student records that were maintained in STARS?

6      A.   Some of the STARS data was in student

7  form.  So I had some access to those records.

8      Q.   How many student records were you given

9  access to?  Strike the question.

10          You weren't given access to any, right?

11  But you're just saying you found some documents that

12  had student record information on it; is that

13  correct?

14          MS. WRIGHT:  Objection.

15          THE WITNESS:  Yes, some of the -- I was

16      not given access to a live STARS system, but I

17      had record data that was by student.  So if

18      that's what you mean when you say student

19      records, I had access to some student records.

20  BY MR. KREITZER:

21      Q.   Were you aware of a record called a pay

22  list?

23      A.   I recall some testimony about it, but

24  nothing specific comes to mind.

25      Q.   So, in other words, you weren't given

Page 54

```
 1    access to a record called a pay list, right?
 2              MS. WRIGHT:  Objection.
 3              THE WITNESS:  I don't know if someone else
 4         would refer to that as a pay list.  I was given
 5         access to some STARS data, and if they looked
 6         at it and said, oh, I call this a pay list,  I
 7         don't know.
 8    BY MR. KREITZER:
 9         Q.   Do you know what a pay list is?
10         A.   From my review of the testimony, I had
11    understood that that had something to do with what
12    the people felt was students available to draw down
13    money.
14         Q.   What do you mean by "what people felt"?
15         A.   Just my recollection of the testimony,
16    that when talking about the pay list, it was talking
17    about a student record being ready to pay or
18    something like that.
19         Q.   What does it mean for a student record to
20    be ready to pay, if you know?
21         A.   I don't recall that specific testimony
22    well enough, as I sit here, to describe it.  I
23    understand there's a process that you need to go
24    through to substantiate a record.  And, at some
25    point, you can.  And at points before that, you
```

Page 55

1   can't.

2       Q.    What do you mean "it's a process you need

3   to go through to substantiate a record"?

4       A.    That to substantiate a student, certain

5   things have to be done to get it ready to pay, put

6   it into COD and eventually get paid.  I am

7   simplifying that process, but that's my

8   understanding.

9       Q.    Did you perform any analysis of the pay

10  list that were generated by STARS during the fiscal

11  years of 2013 and 2014?

12      A.    I don't recall performing a specific

13  analysis on something called pay list data.  I

14  recall working with student data from my STARS

15  exhibits that we went through, but I don't recall

16  something called an analysis in the pay list data.

17      Q.    Do you have an understanding as to how the

18  school determined the amount of money to be drawn

19  down from G5 during the years twenty -- during the

20  fiscal years 2013 and 2014?

21      A.    I don't think I have a complete

22  understanding.  I've seen a lot of records about it.

23  And, in theory, I did understand that it relates to

24  having students that are substantiated and eligible

25  to pull down funds, but also I know there was

1    references to predraws, and that's some of the

2    allegations in this case, that there were pulled

3    down without those records.

4        Q.   Did you see any STARS-generated reports

5    that caused you to conclude that funds were drawn

6    down from G5 without actual student records to

7    support the draw?

8        A.   Can you read that back, please?

9        Q.   Sure.

10           MR. KREITZER:  Read it back.

11           (Last question read back.)

12           THE WITNESS:  I don't know how to answer

13       your question, because, in my work, it wouldn't

14       just be looking at STARS records.  You're

15       considering the G5 balance as well and COD and

16       things like that.  So I can't narrow it to just

17       looking at STARS records in my work.

18   BY MR. KREITZER:

19       Q.   Did you review any STARS-generated reports

20   that caused you to conclude that funds were drawn

21   down from G5 without student records to support the

22   draw?

23       A.   I've seen records and exhibits to

24   depositions that suggest that.  I don't have

25   opinions about FCC's Title IV responsibilities, but

```
 1    I have seen records that show that, at times, COD
 2    and STARS and G5 were not in balance, so generally,
 3    yes, but I'm not -- maybe I'm not understanding your
 4    question.
 5         Q.   Okay.  I am not asking you whether you saw
 6    records showing an imbalance between G5 and COD.
 7              I'm asking you whether you saw any
 8    STARS-generated reports that caused you to conclude
 9    that funds were drawn down from G5 without actual
10    student records to support the draw.
11         A.   I've seen STARS reports or data that are
12    clearly below the G5 record at that time, so --
13         Q.   That wasn't my question.  You've said
14    that, but that's not my question.  I don't mean to
15    interrupt you, but I really -- we're only going to
16    get through this if you can answer the questions
17    that I'm asking, right?
18              So the question I'm asking you is whether
19    you have ever seen any STARS-generated reports that
20    caused you to conclude that the funds that were
21    drawn down from G5 at any point in time were not
22    supported by actual student records that would
23    entitle the student to receive the student loan that
24    was a portion of that draw?
25              MS. WRIGHT:   Objection.
```

Page 58

```
 1            THE WITNESS:  I guess the trouble I'm
 2        having with your question is that you're saying
 3        -- you're limiting it to a STARS record, yet,
 4        it's a STARS record versus G5, but I can't rely
 5        on the G5 difference.  So I don't know how to
 6        answer that question without referring to G5.
 7    BY MR. KREITZER:
 8        Q.   Would it be a fair statement to say that
 9    you never actually performed a forensic examination
10    of the actual student records that constituted or
11    were submitted in connection with any particular G5
12    draw-down?
13            MS. WRIGHT:  Objection.
14            THE WITNESS:  At that micro level, that
15        would generally be fair.  Obviously, I have
16        macro data here that's talking about direct
17        loans and award years and comparing those, but
18        I did not prepare an analysis of student detail
19        for STARS draws or STARS records associated
20        with specific draws.
21            I've seen things about them in my work,
22        but my exhibits, as you know, don't relate to
23        that.
24    BY MR. KREITZER:
25        Q.   Fair enough.
```

1         For example, for any specific draw-down on

2    the G5 system in the year, fiscal year 2014, would

3    it be a correct statement to say that you didn't

4    actually look at the date of that draw, the amount

5    of that draw, and then try to correlate it to

6    whether there were sufficient students who were

7    entitled to financial aid that would equal or exceed

8    the amount of that draw, on any particular draw?

9         MS. WRIGHT:  Objection.

10        THE WITNESS:  I don't recall -- my work

11        doesn't approach it that way.  My work

12        approaches it at a macro level, which is

13        looking at G5 versus STARS and COD.

14   BY MR. KREITZER:

15        Q.   And I want to be -- I want you to define

16   for me -- you're obviously making a distinction --

17   you're using the term "macro," but you're making a

18   distinction, I suppose, between macro and micro.

19        Is that a fair statement?

20        A.   That is.

21        Q.   Can you explain to us, please, what you

22   mean by micro as compared with macro?

23        A.   Sure.  I think, in this instance, you are

24   talking about individual draws and individual

25   student listings and asking if I looked at

 1   individual student records.

 2          The answer to that isn't no, because I've

 3   looked at the G5 balance and the STARS balance and

 4   the COD balance, just like DOE did, to compare them.

 5       Q.   But you didn't actually look at the

 6   student data itself?

 7          MS. WRIGHT:  Objection.

 8          THE WITNESS:  Well, other than what we

 9       talked about before, which is the STARS data,

10       was at a student level.  So, yes, but, again,

11       it's being aggregated to create a balance at a

12       given time.

13   BY MR. KREITZER:

14       Q.   Right.  And you didn't look at that

15   balance at any given time.  Let me strike the

16   question.

17          You didn't look at the student data

18   underlying that balance at any given time to

19   determine whether there were actual students who

20   were entitled to equal to or greater than the Title

21   IV loan proceeds that were the subject of that

22   particular draw-down, correct?

23       A.   That's correct in that I looked at the

24   STARS balance.  I did not look at the STARS record

25   and look at individual students.  And I assumed that

1    when the STARS report showed me a balance, I'm using

2    that balance.  I did not go underneath to see, well,

3    are there some students that shouldn't be in the

4    balance and things like that.

5        Q.   Fair enough.  Have you ever heard of a

6    projected funding report?

7        A.   Yes.

8        Q.   Did you review all of the projected

9    funding reports that were available within the STARS

10   system.

11            MS. WRIGHT:  Objection.

12   BY MR. KREITZER:

13       Q.   For, say, the fiscal year 2014?

14            MS. WRIGHT:  Objection.

15            THE WITNESS:  I don't know.

16   BY MR. KREITZER:

17       Q.   When you say you don't know, why don't you

18   know?

19       A.   I don't know that I've seen all of them.

20   I believe some were attached to depositions, as

21   exhibits, and I don't know if I've seen all of them.

22       Q.   Would it have been helpful in formulating

23   your opinions in this case to have had access to the

24   actual student data that represented a draw on any

25   particular day, say, in the fiscal year 2014?

1          MS. WRIGHT:  Objection.

2          THE WITNESS:  To the extent -- it would be

3      helpful to the extent that the student data

4      isn't supporting the STARS numbers that I'm

5      using.  But other than that, no, because I'm

6      using a G5 balance and a STARS balance and a

7      COD balance.

8   BY MR. KREITZER:

9      Q.   And you wouldn't know, with respect to any

10  given G5 draw, whether the student data supported

11  that draw or not, correct, the individual student

12  data?

13      A.   Can you say that again?  I don't think

14  I --

15      Q.   That's okay.

16          MR. KREITZER:  Let's take just a

17      two-minute break, if that's okay, because I

18      think I left some documents upstairs.  I want

19      to go get them.

20          THE WITNESS:  This is your show.

21          THE VIDEOGRAPHER:  Off the record.  The

22      time is 10:54.

23          (Short recess taken.)

24          THE VIDEOGRAPHER:  We're now back on the

25      record.  The time is 11:08.  Media No. 2.

```
 1   BY MR. KREITZER:

 2        Q.   Mr. Donohue, I've put in front of you

 3   Exhibits 305 through 310.

 4             Have you ever seen these documents before.

 5             I'll ask this question again --

 6             MR. KREITZER:  You heard me?

 7             THE VIDEOGRAPHER:  It's fine.

 8             THE WITNESS:  He did hear you?  I'm sorry.

 9   BY MR. KREITZER:

10        Q.   He did hear me, and you can answer the

11   question.

12        A.   All right.  Yes.

13        Q.   What do you understand these to be?

14        A.   I understand these to be G5 award history

15   reports for various OPE IDs.

16        Q.   What is a G5 award history report?

17        A.   It generally shows draws and refunds and

18   authorization for a particular OPE ID for a

19   particular awards year.

20        Q.   Did you utilize these G5 award history

21   reports in formulating any of your opinions in this

22   case?

23        A.   I did use them.  I don't know if I used

24   the versions you've marked, but I did use

25   information like this.  These, I understand, were
```

Page 64

1    marked at Ms. Davis' deposition.

2         Q.   And you had a chance to even review

3    Ms. Davis' deposition testimony before you came here

4    today, correct?

5         A.   I did.

6         Q.   All right.  Now, do these documents

7    reflect the actual draws of funds by FCC for the

8    fiscal years 2013 and 2014?

9              And by FCC, let me be even broader, as you

10   put it in your report, the three largest OPE IDs.

11        A.   I believe they do.  I don't have the DUNS

12   numbers memorized, so I -- there are reports like

13   this that would reflect the draws and refunds for a

14   particular OPE ID for a particular program for a

15   particular year.

16        Q.   So if we just look at Exhibit 310, which

17   is the first one on top, I want to ask you a general

18   question, but it's effectively going to apply to all

19   of these reports, but I want to just use an example.

20             So if, on Exhibit 310, there is a draw of

21   $50,000 indicated on February 26th, 2014.

22             Do you see that?

23        A.   I do.

24        Q.   Did you perform any analysis to determine

25   whether, when the school drew down that $50,000 from

1    the Department of Education, whether there were

2    actual students that supported that

3    $50,000 draw-down, that is, actually students with a

4    sufficient amount of entitlement to loan proceeds to

5    support that $50,000 draw?

6        A.   When you say "any," yes, I looked at the

7    overall balances of the G5 versus COD and STARS, and

8    that analysis would relate to this.

9            Did it narrowly relate to just that

10   $50,000?  No.  It was a macro basis.

11       Q.   And so, again, you're drawing that

12   distention between macro versus micro, and I want to

13   explore that for just one moment.

14           By macro, is it a correct statement to say

15   that your analysis compared, using this as a

16   hypothetical, because I know you did more than just

17   one date on on draw, but your analysis looked at

18   this $50,000 draw and it also looked at a COD

19   report, correct?

20       A.   Correct.

21       Q.   And from those two sources, you drew

22   certain conclusions.

23           Is that a fair statement?

24           MS. WRIGHT:  Objection.

25           THE WITNESS:  Yes, it wouldn't only be

```
 1        those two sources.  But, yes, I looked at the
 2        balance, and, of course the balance is
 3        basically made up of transactions like this.
 4        So I considered it in my analysis.
 5   BY MR. KREITZER:
 6        Q.   But you did not do a micro analysis where
 7   you would have drilled down to understand whether
 8   there were a sufficient number of student records
 9   reflecting students who were entitled to direct
10   student loans that would have equal or exceeded this
11   $50,000 draw on the date in which it was drawn,
12   February 26, 2014; is that correct?
13        A.   I did not isolate it that way, because,
14   again, it's a balance.  Both items are moving.
15             So looking at the one, you wouldn't get
16   the complete picture of the balance.  So I'm looked
17   at the balances.
18        Q.   Would your answer be the same for all of
19   draws that are reflected on Exhibits 305 through
20   310?
21        A.   It would generally be the same.  There
22   were some large predraws that were discussed at the
23   depositions which I looked at them and was aware of
24   them.  So we looked at those draws.
25             But, again, even that, we're looking at
```

1    the balance at the time and comparing it with COD

2    and STARS, and there's testimony about the students

3    or lack of students for those particular draws, but

4    I did -- some draws and refunds, I paid -- I looked

5    at more, given the testimony.

6         Q.   Were you able to isolate any one or more

7    draw where there were a lack of students, student

8    records reflecting entitlement to direct student

9    loan monies for any particular draw?

10              MS. WRIGHT:  Objection.

11              THE WITNESS:  I recall some testimony

12         about some of the larger predraws, but, again,

13         my analysis is looking at the balances and the

14         large difference between COD, STARS and G5.  So

15         it's inherently considering a balance.

16    BY MR. KREITZER:

17         Q.   Okay.  So I know you said you looked at

18    some -- or you recall some testimony, but I'm asking

19    you a different question.

20              Did you actually perform any independent

21    analysis where you concluded that any single draw in

22    the fiscal year 2013 or the fiscal year 2014 where

23    there was a lack of students or student data to

24    substantiate that draw?

25              MS. WRIGHT:  Objection.

```
 1          THE WITNESS:  When you say "any analysis,"
 2      I saw testimony about some predraws where it
 3      was before the start of the year and things
 4      like that where they called it a predraw.  So I
 5      looked at those.
 6          And, also, I reached my opinions in my
 7      report, which are about the balance, which
 8      would certainly imply that.  But, again, I'm
 9      not looking at it on a daily draw basis.  I'm
10      looking at the balances and what needs to be
11      substantiated.
12  BY MR. KREITZER:
13      Q.   Now, you mentioned -- you used this phrase
14  "predraw" a couple of times in your last answer or
15  two.
16          What do you understand a predraw to be?
17      A.   I understood, from the context of some of
18  the depositions and the documents, that it was
19  taking funds that would not necessarily be
20  substantiated already.
21      Q.   What do you mean by "not yet substantiated
22  already"?
23      A.   Well, basically, that wouldn't be
24  supported by student records at the time.
25      Q.   Okay.  Did you find, you personally, find
```

```
 1    any actual analytical evidence that there were any
 2    draws done by FCC in fiscal year 2013 or fiscal year
 3    2014 which were not supported by actual student
 4    records at the time?
 5            MS. WRIGHT:  Objection.
 6            THE WITNESS:  Yes, in that my analysis
 7        shows that COD and, at times, STARS were well
 8        below the G5 draws, and I understand the
 9        allegations in the case are about that, from
10        other expert witnesses, but I did see that
11        balance.  And, so, yes, I see that difference.
12    BY MR. KREITZER:
13        Q.   You see a difference in the balance?
14        A.   I do.
15        Q.   Did you ever analyze the difference in the
16    balance for any individual transaction, either for
17    fiscal year '13 or fiscal year '14, to determine
18    whether there were not students to support the
19    actual draw, student records to support the actual
20    draw?
21            MS. WRIGHT:  Objection.
22            THE WITNESS:  Well, I already mentioned
23        the predraw examples, where the testimony was
24        suggesting it, and I looked at those amounts.
25            But my work, again, was on the balances,
```

Page 70

```
 1        and that's what that would suggest, that there
 2        was a large difference between the two and the
 3        testimony shows that as well.
 4              And then, of course, there's write-downs
 5        that suggest that it was.
 6   BY MR. KREITZER:
 7        Q.   I just want to focus in on the answer that
 8   you just gave, because you said you -- you had
 9   mentioned predraw examples -- strike the question.
10              When you say you looked at those amounts,
11   what did you mean by that?
12        A.   Well, I looked at those draws and the
13   context of those draws, like there was some in
14   December, for example, because they were raised in
15   the testimony.
16        Q.   Okay.  December of what year?
17        A.   December of '13.
18        Q.   When you say you looked at certain draws
19   in December of '13, did you look at the individual
20   student data to determine whether there were, in
21   fact, support in the student data for the amount of
22   the draw that occurred in December of '13?
23        A.   Not outside the balance concept we've been
24   talking about, which is I looked at the STARS
25   records and COD records and also the testimony that
```

Page 71

1    talked about it being a predraw for early -- early

2    starts or something like that.  So not beyond that.

3         Q.   Are you aware of any -- strike the

4    question.

5              I want to go back to documents that you

6    reviewed in formulating your opinions in this case.

7              Did you review any COD reject records or

8    record error documents?

9         A.   I'm not sure.  I've seen records that talk

10   about rejects, and I don't know if it's what you're

11   referring to as a reject record or not, but I've

12   seen discussions of rejects.

13        Q.   Okay.  Did anyone ever make you aware of

14   an issue that the company, that FCC was having in

15   terms of an unusually large number of rejects

16   occurring when data was uploaded into COD?

17        A.   I've generally seen testimony about that,

18   yes.

19        Q.   Did you formulate any opinions in

20   connection with whether the number of rejects

21   occurring in terms of those uploads was unusual?

22        A.   I didn't form opinions either way.  I saw

23   some testimony about having some rejects, more so in

24   fiscal '13, but I didn't form an opinion on the

25   amount of them either way.

1      Q.   And did your work, that is, your expert

2   work, involve any determination of what was causing

3   the rejects of student data that was being uploaded

4   into the Department of Education's COD system?

5      A.   I don't have expert opinions about that.

6   I've read the record like others in this case, and I

7   see that there's discussion about it, but --

8      Q.   What, if any, impact, if you know, did the

9   large number of rejects caused by data being

10   uploaded into the COD system, have on the

11   unsubstantiated balances between G5 and COD?

12         MS. WRIGHT:  Objection.

13         THE WITNESS:  First, when you say "large,"

14      I don't know relative to what that means, but I

15      was aware that that was something that was

16      being discussed, and I looked at the balances

17      over time.

18         So I don't know if it's quantified against

19      that, because I'm looking at balances over

20      time.  I'm not looking at any one draw with

21      some rejects that gets kicked back.

22         I'm looking at balances over time that

23      would consider if you had a reject, you put the

24      paperwork in later, for example.

25   BY MR. KREITZER:

1    Q.   Okay.  Did you perform any analysis on any

2    individual draw with respect to, say, in the 2013

3    time frame, fiscal year 2013, as to the impact

4    that -- I'm sorry.  Let me strike the question.

5         Let me focus your attention on a

6    particular draw in 2013.  Maybe we'll do it this

7    way.

8         Again, looking at, say, exhibit -- let's

9    go to Exhibit 307.  Let me just have you, for

10   example, look at the draw that's on page 3 of 8, of

11   June 4, 2013.

12        This is a draw for -- I picked the wrong

13   one.  Hold on a second.

14        I'm sorry.  Let me have you focus on a

15   different one.  So let me have you look at the draw

16   that occurred on June 10, 2013.

17   A.   Same page?

18   Q.   Yes, same page, in the amount of $300,000.

19   A.   I see that.

20   Q.   Okay.  Do you know if, upon uploading

21   data, student data into COD to substantiate that

22   draw, how many rejects occurred as a consequence of

23   that upload?

24   A.   I do not.

25   Q.   And would your answer be the same with

Page 74

1    respect to all of the different draws that are

2    reflected on Exhibit 307?

3        A.    Specifically with respect to each draw,

4    no, I do not -- to the extent there were rejects, I

5    don't know the extent of them.

6        Q.    Okay.  And to the extent of any reject

7    that occurred in connection with any upload in the

8    COD, did your work include any investigation into

9    the cause of that reject?

10        A.    Yes, in that I looked at the testimony

11    about the rejects, and that was part of the things I

12    considered in reaching my opinions.

13        Q.    Did you reach any opinions in connection

14    with the cause of the rejects that were being

15    experienced at the three largest OPE IDs?

16        A.    I didn't reach opinions.  I just observed

17    that the fact witnesses were discussing software

18    issues.  That's what they were saying.

19        Q.    And what did you understand the software

20    issues to be?

21        A.    I don't have opinions about this, but just

22    from reading the record, I understand that they

23    related to how STARS would eventually talk with COD,

24    and that the software that was used to upload into

25    COD was, at least in fiscal '13 and some discussion

Page 75

1  in fiscal '14, causing some reject issues.  That's

2  what people have alleged.

3      Q.   Now, you do have opinions with respect to

4  the unsubstantiated balances between COD and G5,

5  correct?

6      A.   Yes, that's part of my forensic opinions,

7  yes.

8      Q.   All right.  And do you know what all the

9  causes were of the unsubstantiated balances between

10  G5 and COD?

11     A.   Well, the cause was the pulling net of

12  draws beyond what was substantiated in COD.

13     Q.   What do you mean by "the pulling net of

14  draws beyond what was substantiated in COD"?

15     A.   Thank you.  That was not artfully stated.

16          The net number.  In other words, the net

17  balance.  It was draws and refund activity on a net

18  basis resulted in a balance that was above the COD

19  balance.  Thank you.

20     Q.   So maybe in lay terms, are you saying that

21  the balance in G5 appeared to be greater than the

22  balance in COD?

23     A.   Correct.  Over time, across multiple OP

24  EIDs.

25     Q.   Did your work, your expert opinion, draw

1    any conclusions as to what caused that imbalance

2    between COD and G5, the actual root cause of it?

3         A.    I can't get into people's heads as to why

4    they did what they did, but the root cause was

5    pulling, drawing down more money than you were

6    substantiating at COD over time.

7         Q.    Do you know why more money was -- strike

8    the question.

9              Do you know why COD was rejecting --

10   rejecting files that were being submitted -- strike

11   that question.

12             Do you know if the rejection of files by

13   the COD system contributed to the unsubstantiated

14   balances between G5 and COD?

15             MS. WRIGHT:   Note my objection.

16             THE WITNESS:   While it may have been one

17        of the things that would do that at a spot time

18        period, for example, over time, and with the

19        other information I've seen in the case, it

20        didn't occur to be the only thing, by any

21        means, that was causing that.

22   BY MR. KREITZER:

23        Q.    Well, let's start with the rejections and

24   then we'll talk about the other things.

25             So would you agree that rejections of COD

Page 77

```
 1    records by the Department of Education was

 2    contributing to the -- the unsubstantiated balances

 3    between G5 and COD?

 4              MS. WRIGHT:  Objection.

 5              THE WITNESS:  Not with respect to my

 6         analysis.  Again, for any spot draw, I could

 7         understand how that could be occurring and

 8         people are suggesting it, but I'm looking at

 9         balances over time.

10              So I don't -- I don't know if it would be

11         a cause to that, but I could see, on any one

12         draw, if that's what you're saying occurred,

13         that's possible.  That would be one

14         contributing factor.

15    BY MR. KREITZER:

16         Q.   What other contributing factors did you

17    conclude caused, on any given draw, the amount of

18    the G5 draw-down to be different than the upload of

19    COD data?

20              MS. WRIGHT:  Objection.

21              THE WITNESS:  Again, I'm answering your

22         question about a particular draw, but my

23         opinions are about the balances.

24              I don't have specific opinions about

25         specific draws.  I'm looking at the balances
```

1    over time.

2    BY MR. KREITZER:

3        Q.   Okay.  So, for example, you don't know

4    whether, on any given draw, you're not here to say,

5    on any given draw, that FCC drew down more money

6    than they actually had students to substantiate that

7    draw.

8            That's not one of your opinions, correct?

9        A.   I don't have expert opinions from a

10   liability perspective.  That's other witnesses and

11   fact witnesses.

12           But I am certainly seeing the evidence in

13   this case, and I've already mentioned that there

14   were some that - people testified that occurred,

15   that they pulled down predraws and Mr. Murphy

16   suggested they weren't students.

17       Q.   Did you ever substantiate whether

18   Mr. Murphy's alleged statement that there weren't

19   students was true or not?

20           MS. WRIGHT:  Objection.

21   BY MR. KREITZER:

22       Q.   Let me ask the question differently.

23           Did you ever find any evidence in your

24   forensic examination to suggest that Mr. Murphy's

25   alleged allegation that there weren't actual

Page 79

1    students was true or not?

2         A.    There was evidence of that, yes.

3         Q.    Tell me about that evidence.

4         A.    Well, in addition to testimony saying it,

5    there was the need to refund extensive amounts of

6    money, and there's some suggestion in the record

7    that overdrawn funds weren't applied to a student,

8    so when they came back, they couldn't be recorded

9    back.

10           Also, when the bad debt expense process

11   was done, it wasn't, again, by student, or at least

12   not magnitude, it was simply allocated against

13   revenue.  So it didn't appear to be by student.

14           So those things would support that.  But

15   there's fact witnesses and expert opinion about that

16   in other matters, other reports.

17        Q.    Did you ever find any evidence that

18   overdrawn funds, as you put it, weren't applied to a

19   particular student?

20        A.    Were or were not?

21        Q.    Were not.

22        A.    Yes.  I saw an e-mail where Ms. Turgot

23   suggests that overdrawn funds were not in the

24   ledger.

25        Q.    Any other evidence other than her

Page 80

1    statement.

2        A.    I believe Mr. Murphy testified about that.

3        Q.    Anything else?

4        A.    Ms. Davis testified about that, but I

5    believe she was talking about Mr. Murphy's

6    testimony.

7              This is indirect, but the inability to

8    relate the bad debt expense to students and campuses

9    directly could suggest that, because if it was by

10   student, you would know which receivable and which

11   campus to apply it to and you would take it off.

12       Q.    So all of your responses so far have been

13   in references to other witnesses' testimony.

14             Would that be a fair statement?

15       A.    Some of it was.  But the bad debt, that

16   was not referenced to someone else's testimony.

17       Q.    Well, you --

18       A.    They talked about that, too.  Sorry.

19       Q.    Right.

20       A.    Correct.

21       Q.    So you haven't found any actual analytical

22   evidence, yourself, that would suggest that

23   overdrawn funds weren't applied to a particular

24   student; isn't that correct?

25             MS. WRIGHT:  Objection.

1           THE WITNESS:  No.  I mean, the bad debt,

2       for example, there is evidence, there's records

3       that show that, mechanically, they were not

4       able to actually take the bad debt charge and

5       apply it to particular campuses or students.

6   BY MR. KREITZER:

7       Q.   What is your evidence that they weren't

8   able to do that?  Because there's a difference, you

9   would agree with me, between being able to do it and

10  what was actually done, right?

11      A.   They did not do it during this time.  I

12  don't want to go back to testimony, but when talking

13  about doing it, Ms. Turgot testified that overdrawn

14  funds were not associated with a ledger.  So that

15  would suggest you're not able, but that's, granted,

16  the testimony.

17      Q.   So we can all read the testimony, and the

18  jury will certainly reach conclusions about hearing

19  the testimony, but I think your purpose here today

20  is to talk about your forensic examination, what

21  analytics you actually uncovered independent of

22  testimony.

23           Is that a fair statement of what your

24  understand your role to be?

25           MS. WRIGHT:  Objection.

1           THE WITNESS:  Well, my role is to answer

2      your questions, which I'm doing.

3  BY MR. KREITZER:

4      Q.   Well, that's not your role in the case,

5  though, is it?

6      A.   To answer your questions?

7      Q.   Yeah.

8      A.   It's part of my role, yes.

9      Q.   All right.  But your role in this case,

10  just reading your expert opinion, is you have a

11  whole section of your expert opinion that's entitled

12  "Forensic Accounting Analysis," right?

13      A.   Yes.  That's one of my roles.

14      Q.   What's a forensic accounting analysis?

15  Tell us what that is.

16      A.   In this case, it was to analyze data and

17  reach certain conclusions and reach -- you know,

18  provide information about certain amounts of data.

19      Q.   So I want to just talk about the data that

20  you analyzed for a moment.  Is that okay?

21      A.   Okay.

22      Q.   All right.  So in connection with the data

23  that you analyzed, did you find any evidence to

24  suggest that there were any overdrawn funds that

25  weren't applied to a student?

Page 83

1           MS. WRIGHT:  Objection.

2           THE WITNESS:  I've already mentioned the

3      bad debt expense calculations that were not

4      related to a student.  That's data.

5           Testimony is outside of data, I

6      understand.  It's part of the forensic

7      accounting analysis, but it's outside of data.

8           And the amount of refunds that were sent

9      back would support that statement.  Again, I am

10     quantifying that amount.  I'm not -- I'm not

11     making opinions about Title IV process, but the

12     amount of refunds and the extent of the

13     balance, coupled with DOE information about it,

14     would support that.

15 BY MR. KREITZER:

16     Q.   What was the reason, to your

17 understanding, what was the reason that any

18 particular amount of refund was sent back to the

19 DOE?  Do you have a factual understanding?

20     A.   Well, they were sending back money that

21 they were not entitled to or had not substantiated.

22     Q.   Do you think there's a distinction between

23 not entitled to on the one hand and not

24 substantiated on the other?

25     A.   I don't know how it's viewed in DOE's

Page 84

```
1    eyes, but I understand the substantiated amount,

2    within reason, is what you're entitled to.

3         Q.   Did you perform any forensic examination

4    as to why any particular sums of money were not

5    substantiated?

6         A.   Again, that would be on a balance level,

7    looking at the balances.

8         Q.   From a macro level, but not a micro level,

9    correct?

10        A.   Yes, because they're both moving with

11   pluses and minuses, and so to do that analysis, you

12   need to look at the balance.

13        Q.   So you would agree with me, to the extent

14   there is any evidence in this case as to why any

15   particular sum of money was not substantiated, you

16   would not be the witness to be providing that

17   testimony, correct?

18             MS. WRIGHT:   Objection.

19             THE WITNESS:   Other than my forensic

20        accounting opinions about the balances as

21        described in my report, I am not providing the

22        Title IV or legal opinions that talk about

23        those balances.  I'm providing the forensic

24        opinion, correct.

25   BY MR. KREITZER:
```

1      Q.   But you don't have a forensic opinion as

2   to why any particular sum of money was not

3   substantiated, correct?

4      A.   Well, collectively, I do, because it's a

5   balance.  So I'm laying out, with the data, that

6   your G5 -- the G5 balance was greater than COD and,

7   at times, STARS.

8      Q.   But I'm asking you the reasons why, and

9   you don't know the reasons why, correct?

10          MS. WRIGHT:  Objection.

11          THE WITNESS:  Well, I know that the reason

12       why is that they pulled more money than they

13       substantiated.

14   BY MR. KREITZER:

15      Q.   Right.  But you don't know why they

16   allegedly pulled more money than they substantiated.

17      A.   I don't want to get into their heads.

18   There's testimony about why they did what they did.

19   They apparently needed the money.

20      Q.   You're speculating now, correct?

21      A.   Well, I am, in part.  I've seen testimony

22   that suggests they needed the money for rent and

23   things like that, so I ...

24      Q.   Did you review audit reports prepared by

25   the Deemer Dana that firm?

Page 86

1      A.    Yes.

2      Q.    I think they call them attestation

3  reports.

4      A.    Well, thank you.  The title of the report,

5  I don't recall, but I recall reviewing the exhibits

6  to the Ken Wood deposition, whatever they're called.

7      Q.    What conclusions, if any, did you reach

8  from reviewing the attestation reports prepared by

9  the Deemer Dana firm in 2011 for the fiscal year

10  2011 and '12?

11      A.    Only that there was some error rates that

12  were a problem.  And I understood that that was one

13  of the reasons the full audit or full student record

14  review was eventually done, but that's what I recall

15  from that.

16      Q.    Do you know if a close-out audit was ever

17  prepared upon the closing of the FCC schools?  Let

18  me strike that question and do it differently.

19          Do you know what a close-out audit is?

20      A.    In this case, I recall that it's something

21  that reviews a particular award year or a particular

22  type of award at the end of the process.

23      Q.    Do you know what the purpose of a

24  close-out audit is?

25      A.    I don't recall documents about that, but

1   from my reading of the record, I understood it to be

2   to see if Title IV funds were handled appropriately.

3       Q.   Do you know if a close-out audit was

4   performed at the close of the FCC schools?

5       A.   I don't recall that they occurred.  I

6   don't have a recollection for fiscal '14, anyway.

7       Q.   Do you have an understanding as to what

8   the effect on the individual OPE ID numbers is as a

9   consequence of a close-out audit having not been

10  performed?

11      A.   I don't know.

12      Q.   Did you take into account in your

13  financial analysis the -- the fact that a close-out

14  audit was not performed?

15          MS. WRIGHT:  Objection.

16          THE WITNESS:  I was aware it was not

17      performed when I did my analysis, yes.

18  BY MR. KREITZER:

19      Q.   What, if any, impact is reflected in your

20  analysis as a consequence of the close-out audit

21  having not been performed for the -- for the, as you

22  say, the three biggest OPE IDs?

23      A.   I'm not aware of any, as I sit here.  If

24  some other records had some concerns, I suppose that

25  could alter some of the substantiated balance,

Page 88

```
1    something like that.  That would be a potential

2    impact, but I don't see it having any impact on my

3    opinions.

4         Q.   It would be fair to say you didn't take it

5    into account, that is to say, you didn't adjust your

6    financial conclusions as a consequence of a

7    close-out audit having not been performed for the

8    OPE ID numbers upon which you based your

9    investigation?

10             MS. WRIGHT:  Objection.

11             THE WITNESS:  I was aware of it and

12        reached my conclusions, and I can't point you

13        to something that mechanically changes my

14        opinions because of that.

15   BY MR. KREITZER:

16        Q.   I'm going to have you take a look at the

17   amended complaint in this case.  I don't know that

18   we've ever marked it as an exhibit.  So I'm just

19   going to mark it as Exhibit 323.

20             (Thereupon, the referred-to document was

21   marked by the court reporter for Identification as

22   Defendant's Exhibit 323.)

23   BY MR. KREITZER:

24        Q.   Have you ever seen and read the amended

25   complaint that was filed in this action?
```

Page 89

1        A.    Yes.

2        Q.    Turn your attention to page 2, paragraph 4

3   of the amended complaint.

4              Paragraph 4 states, "Specifically

5   defendants engaged in the following conduct in each

6   case in contravention of DOE regulations."

7              Did I read that correctly?

8        A.    Yes.

9        Q.    Item A says, "Failing to hold Title IV

10  funds in trust either in a separate account or

11  through accounting or internal controls sufficient

12  to track Title IV funds as if they were held in a

13  separate account."

14             Do you see that?

15       A.    I do.

16       Q.    Do you have an opinion as to whether that

17  is a correct statement or not?

18       A.    Just for clarification, correct as in

19  that's a requirement under Title IV, or correct as

20  if in that's what the plaintiffs are alleging?

21       Q.    Neither, actually.

22             I'm asking you whether you have an opinion

23  as to whether my clients failed to hold Title IV

24  funds in trust, either in a separate account or

25  through accounting or internal controls, sufficient

Page 90

1    to track Title IV funds as if they were held in a

2    separate account?

3         A.    I don't have legal or regulatory opinions

4    about the DOE regulations.  I have forensic

5    accounting opinions that I could see would relate to

6    this, and I make those in my report.

7         Q.    Do you have a forensic accounting opinion

8    as to whether or not my clients failed to hold Title

9    IV funds in trust either in a separate account or

10   through accounting or internal controls sufficient

11   to track Title IV funds as if they were held in a

12   separate account?

13        A.    That requires some legal and regulatory

14   interpretations that I'm not making, but my forensic

15   accounting opinions relate to these in that I was

16   tracking balances and how refunds were being

17   handled, how the balances were far greater than the

18   COD in STARS.

19            So I could see how that would relate to

20   that.  But, again, I'm not making regulatory and

21   legal opinions about this.

22        Q.    I'm not asking you to make a regulatory

23   opinion or a legal opinion.

24        A.    Okay.

25        Q.    I'm asking you to make an opinion based

1   upon your forensic accounting work.

2        A.   It still, unfortunately, requires some

3   legal or regulatory interpretation as to what this

4   means, but I could see, from a layman, that having

5   those balances be the way they were and the

6   suggestion that they were not -- at times, that they

7   can't associate with students, you know, that could

8   be an internal control problem, but, again, it does

9   require some legal or regulatory.  At least A does.

10       Q.   So you're not a lawyer, correct?

11       A.   I am not.

12       Q.   And you're not a regulator, correct?

13       A.   I am not.

14       Q.   So would it be a fair statement to say

15   you're not forming an opinion, one way or the other,

16   with respect to item 4A?

17       A.   Not with respect to 4A from a legal or

18   regulatory process.

19       Q.   Sir, I'm not asking you from a legal

20   process or a regulatory process.

21            I'm just asking you what you're being paid

22   here to do.

23            Do you have an opinion as to item 4A?

24       A.   From a forensic accounting perspective,

25   one of the things that would concern me is that the

Page 92

1    bank recs for those accounts weren't being done in a

2    sufficient manner.  So that would concern me.

3            Whether or not that's a legal or

4    regulatory issue, I don't know, but from a forensic

5    accounting point of view, not doing the recs to know

6    what's in those separate accounts would concern me.

7        Q.   By recs, you mean?

8        A.   Reconciling the money that's being

9    deposited into the OPE ID bank accounts with the

10   student ledger.

11       Q.   Do you have an opinion as to whether the

12   monies were being reconciled between the OPE ID bank

13   accounts and the student ledgers?

14       A.   My work has led me to believe that they

15   were not occurring at times.

16       Q.   Would you show me where that is in your

17   opinion, please, if at all?

18       A.   Those words are not in my opinion.

19       Q.   Then let's move on.

20            How about 4B?  Do you have an opinion as

21   to whether my clients drew Title IV funds in amounts

22   far greater than that which could be supported by

23   current enrollment numbers?

24       A.   Again, with my forensic accounting caveat

25   that we talked about --

Page 93

1      Q.   No.   Tell me what caveat you have, sir.
2    It's a different question.
3      A.    This is a DOE -- this is being suggested
4    as a DOE regulation, which is a regulatory/legal
5    issue.   I'm not making regulatory/legal opinions.
6          I'm telling you, from my work in this
7    case, you're asking me if I saw evidence that they
8    were drawing funds far greater than which could be
9    supported by current enrollment numbers.   And my
10   work found that the G5 draws were greater than the
11   COD balance and, at times, the STARS balance.
12     Q.   And that would be the only factual basis
13   for you to reach this conclusion with respect to 4B,
14   correct?
15          MS. WRIGHT:   Objection.
16          THE WITNESS:   That would be the most
17       direct.   The others relate to it in that they
18       are reflecting the consequences of that in some
19       respect.
20   BY MR. KREITZER:
21     Q.   Let's move on to item 4C.
22          Do you have an opinion as to whether my
23   clients failed to refund excess Title IV funds which
24   were drawn for students who withdrew from or failed
25   to commence attending their respective programs?

Page 94

1          A.    As my forensic accounting role, I don't
2    know.
3                I know that the refund balance was, in
4    part, related to that, but I didn't analyze
5    individual student records.  But the refunds were
6    for -- you know, to the extent there was a draw that
7    was taken without students, I'm not sure how it
8    would apply, but there were refunds that were sent
9    back for students.
10         Q.    Let's move on to item E.
11               Do you have an opinion as to whether my
12   clients predrew, I'm changing the words slightly, it
13   says predrawing, but that my clients predrew, as
14   defined below, Title IV funds based on projected
15   future enrollment numbers which management knew to
16   be overstated?
17               MS. WRIGHT:  Objection.
18               THE WITNESS:  I can't talk about what
19        management knew and did not know.
20   BY MR. KREITZER:
21         Q.    Let's move on to the next item.
22               Do you have an opinion as to whether my
23   clients abandoned the pretense of limiting draws to
24   illusory enrollment numbers and simply drawing based
25   on the company's general liquidity needs?

1      A.   Again, my opinions provide some underlying

2  foundation to that, but if this is talking about

3  management and what they were doing, I see in the

4  record that suggested, and I've seen the financial

5  accounting analysis that supports it, but I'm not

6  making opinions about this.

7      Q.   I want to turn your attention to page 14.

8  Allegation paragraph number 40.  It says, "The

9  Anthem school" -- the amended complaint states, "The

10  Anthem schools engaged in a similar practice, but

11  would also predraw Title IV funds from time to time

12  by causing its institutions to draw Title IV funds

13  during a given month premised upon enrollment

14  projections for future months."

15          And then it cites to a footnote, number 8,

16  and you're welcome to read the entire footnote, but

17  the portion that I want to focus on is the last two

18  sentences that says, "This is not the same as the

19  predraw practice FCC was engaged in which was to

20  draw money for student tuition months in advance of

21  the actual enrollment of students and disbursement

22  of funds to them.  Such premature draws necessarily

23  violate the three-day disbursement requirement."

24          Did I read that correctly?

25      A.   You did.

Page 96

1      Q.   Did you find any evidence that my clients

2   caused FCC to draw money for student tuition months

3   in advance of the actual enrollment of students and

4   disbursement of funds to them?

5           MS. WRIGHT:  Objection.

6           THE WITNESS:  I can't think of student

7        examples as I sit here.  It's only -- this

8        relates to my forensic opinions and that

9        clearly they were well above the COD, and this

10        would be one of the potential reasons it was

11        happening.

12   BY MR. KREITZER:

13      Q.   Let me turn your attention to paragraph 46

14   of the amended complaint on page 16.

15           The allegation is that, "Inflated

16   projected enrollment numbers, upon which monthly

17   draws were premised, were transmitted to the

18   financial services office which, in turn, resulted

19   in the financial services office drawing

20   substantially more than it should have."

21           Did I read that correctly?

22      A.   You did.

23      Q.   Did you find any evidence, in connection

24   with your forensic examination to suggest that my

25   clients inflated projected enrollment numbers upon

                                                          Page 97

1    which monthly draws were premised?

2              MS. WRIGHT:  Objection.

3              THE WITNESS:  I don't know one way or the

4         other.

5    BY MR. KREITZER:

6         Q.   Okay.

7         A.   Other than it's another potential way that

8    balance that I had found in my analysis would come

9    to be.

10        Q.   Let me turn your attention to paragraph 60

11   on page 19 of the amended complaint.

12             The allegation is as follows,

13   "Significantly, the financial services office would

14   regularly post refunds resulting from student

15   withdrawals to its internal records, meaning it

16   specifically knew that a given student withdrew and

17   that a refund was in order, but would not make

18   matching entries in COD or actually make the

19   required refund to the DOE."

20             Did I read that correctly?

21        A.   You did.

22        Q.   Did you find any evidence, in your

23   forensic examination, to support that allegation?

24             MS. WRIGHT:  Objection.  You probably

25        should read the whole paragraph.

```
 1          MR. KREITZER:  You want to answer the
 2     question for the witness, too, Counsel?
 3          MS. WRIGHT:  I'm not.  You're doing
 4     something misleading.
 5          MR. KREITZER:  I would urge you not to
 6     coach him.
 7          MS. WRIGHT:  I'm not coaching him.
 8          MR. KREITZER:  He's a very sophisticated
 9     witness who has testified more than a hundred
10     times, according to his testimony.
11          MS. WRIGHT:  I'm glad you agree.
12          MR. KREITZER:  I don't think you need to
13     coach him, all right?
14          MS. WRIGHT:  You offered to let him read
15     all of footnote 8 before.  I'm just saying --
16          MR. KREITZER:  He's welcome to read
17     whatever he'd like.  I just don't think you
18     should be helping him.  He's doing just fine on
19     his own.
20          MS. WRIGHT:  I agree.
21          MR. KREITZER:  Okay.  Good.  Then you
22     don't need to help him.
23          MS. WRIGHT:  Why don't you just wait for
24     his -- listen to his answer.
25          THE WITNESS:  First, I want to make sure
```

1        we're communicating.  I did not say I testified

2        over a hundred times.  Just for the record.

3   BY MR. KREITZER:

4        Q.    Would you like me to ask the question

5   again.  Why don't I?

6        A.    Why don't you.  Thank you.

7        Q.    You're welcome to read, sir, any parts of

8   this amended complaint, including the entirety of it

9   at your leisure.

10            But I'm asking you specifically about the

11  first sentence of the allegation in the amended

12  complaint in paragraph 60.  And it says,

13  "Significantly, the financial services office would

14  regularly post refunds resulting from student

15  withdrawals to its internal records, meaning it

16  specifically knew that a given student withdrew and

17  that a refund was in order, but would not make

18  matching entries in COD or actually make the

19  required refund to the DOE."

20            Did I read that correctly?

21       A.    You did.

22       Q.    Okay.  My question is simply this.  In

23  connection with your personal forensic examination

24  of this case, did you find facts to support that

25  allegation?

Page 100

```
 1            MS. WRIGHT:  Objection.
 2            THE WITNESS:  Yes.
 3   BY MR. KREITZER:
 4       Q.   What facts did you find to support that
 5   allegation?
 6       A.   Well, first --
 7       Q.   Forgive me.  Let me withdraw that and ask
 8   it differently.
 9            Is this one of your opinions?  Is this one
10   of your opinions in the case?
11       A.   It's not worded like this in my report,
12   no.  My opinions are about the balances and they're
13   described in my report.
14       Q.   Then let's move on.
15            I'd like to turn your attention to
16   paragraph 66.
17            Did you find any evidence to support this
18   allegation that the financial services office did
19   not reconcile its COD-G5 discrepancies monthly as
20   required by DOE regulations and, instead, would only
21   reconcile discrepancies at the end of each program
22   year?
23       A.   I have found evidence about the failure to
24   reconcile, yes.
25       Q.   And that the school would only reconcile
```

Page 101

1    discrepancies at the end of each program year, you

2    found evidence to support that?

3        A.   I don't know when they -- how to

4    understand when they did it.  I know they did it

5    during fiscal '14.

6        Q.   So you didn't find any forensic evidence

7    to support the allegation that the school would only

8    reconcile discrepancies at the end of each program

9    year, correct?

10               MS. WRIGHT:  Objection.

11               THE WITNESS:  I don't know how to time it

12        for you.  I just know they weren't doing them.

13   BY MR. KREITZER:

14       Q.   Let me turn your attention to paragraph 80

15   of the amended complaint.

16               Do you have an opinion as to whether,

17   beginning in early December 2013, if not sooner, FCC

18   abandoned the pretense of limiting draws to

19   projected enrollments?

20       A.   I recall the December predraw that wasn't

21   related to projected enrollment as I sit here.

22       Q.   Tell me what evidence you have uncovered

23   in connection with your forensic opinion to cause

24   you to conclude that the December predraw wasn't

25   related to projected enrollment.

Page 102

1          A.   Well, again, it would relate to the

2     balance and the substantial disconnect between G5,

3     STARS and COD.

4          Q.   So do I understand correctly from your

5     opinion, that your sole evidence to cause you to

6     conclude that the December predraw wasn't related to

7     projected enrollment was the disconnect between the

8     balance between G5, STARS and COD?

9               MS. WRIGHT:   Objection.

10               THE WITNESS:   No, that wouldn't be my sole

11          evidence.   I cite testimony and e-mails and

12          other business records throughout my report,

13          but you're asking about December, and I

14          remember the December predraw and there was

15          testimony about that.

16     BY MR. KREITZER:

17          Q.   Aside from testimony of other witnesses,

18     did you uncover any facts in connection with your

19     forensic analysis to cause you to conclude that the

20     December predraw wasn't related to projected

21     enrollment?

22          A.   I didn't categorize it that way.   I see

23     that my opinion is supporting this as to the why.

24     But there's certainly a disconnect in December,

25     among other months.

Page 103

1      Q.   When you say "there's certainly a

2  disconnect in December," you mean a difference

3  between the balance in G5 and the balance in COD,

4  correct?

5      A.   And the balance in STARS, as I've used

6  STARS in my report.

7      Q.   And other than that disconnect that you

8  just described, are you aware of any other forensic

9  evidence to support that allegation?

10          MS. WRIGHT:  Objection.

11          THE WITNESS:  We've already talked about

12      testimony and the forensics -- the bad debt

13      write-down would also indirectly support that,

14      because if there was no students and it was off

15      of something else, that would be a reason why

16      you don't know which campus to apply to.

17  BY MR. KREITZER:

18      Q.   Anything else?

19      A.   That's all that comes to mind as I sit

20  here.

21      Q.   Let me talk to you a few minutes about

22  STARS.

23          You mentioned that there was a disconnect

24  between G5, COD and STARS.

25          Do you remember that testimony?

1          A.     Yeah, at times, yes.

2          Q.     Explain to us what you mean by the

3     disconnect in respect to STARS.

4          A.     The STARS records available provided cash

5     basis revenue for FCC at certain times, and that was

6     very different, at times, than G5 and COD.

7          Q.     Do you know why it was different?

8               MS. WRIGHT:  Objection.

9               THE WITNESS:  I assume multiple things can

10          influence those numbers, but one of them would

11          be drawing more G5 than you're supporting.

12    BY MR. KREITZER:

13         Q.     What do you mean by "drawing more G5 than

14    you're supporting"?

15         A.     Pulling down more G5 Title IV money than

16    is substantiated.

17         Q.     And what do you mean by "than is

18    substantiated"?  "Pulling down more G5 money than is

19    substantiated"?

20         A.     Substantiated at COD with the student

21    records to support the money you're drawing down.

22         Q.     If a student file was rejected by COD,

23    what would be the effect of that rejection on the

24    balance between G5, COD and STARS, if you know?

25               MS. WRIGHT:  Objection.

Page 105

1           THE WITNESS:  In theory, the rejection in

2       COD would remove that amount of dollars from

3       the substantiated balance.

4  BY MR. KREITZER:

5       Q.   So, in other words, a rejection would

6  cause the imbalance between G5 and COD to grow,

7  correct?

8           MS. WRIGHT:  Objection.

9           THE WITNESS:  For a time.

10  BY MR. KREITZER:

11       Q.   Get bigger?

12       A.   For a time.

13       Q.   Right.  And what would be the effect of a

14  reject on the record, the student's record in STARS,

15  if you know?

16           MS. WRIGHT:  Objection.

17           THE WITNESS:  It depends if they recorded

18       the reject back into STARS or not.

19  BY MR. KREITZER:

20       Q.   Did they?  What did your research show?

21       A.   There was a lot going on during the

22  reconciliation process.  So I can't tell you what

23  they were doing during that process.

24           Eventually, they were -- the reject

25  problem, I understood, was between STARS out to COD

Page 106

```
 1    through Region 8, and so it was a COD problem from

 2    the testimony I've seen, but a lot went on during

 3    the reconciliation, and so --

 4        Q.   We're going to come back to this, and

 5    we're going to spend a lot of time on it, but when

 6    you say the reconciliation -- I think you called it

 7    the reconciliation problem, or the reconciliation

 8    project, but let me not put words in your mouth --

 9    you called it the reconciliation process.

10            So let me just understand, what do you

11    mean by "the reconciliation process"?

12        A.   Thank you.  There was an effort in late

13    fiscal '14, once the DOE -- it started happening

14    with the DOE after the March -- early March DOE

15    communication.  There was a process to reconcile G5

16    and COD, reconcile internally with the bank

17    statements back to G5, things like that.

18            The witnesses referred to the

19    reconciliation project that involved Mr. Yousefi,

20    Mr. Pierne talked about it, things like that.

21        Q.   Have you ever heard of a reconciliation

22    project regarding R2T4 or refunds?

23        A.   I believe that was part of that.

24        Q.   So, in your mind's eye, the reconciliation

25    project, using that term broadly, includes not only
```

Page 107

1    whatever efforts were being undertaken to explore

2    the R2T4 and refund project, but also the return to

3    the Department of Education of what you claim are

4    unsubstantiated balances between G5 and COD,

5    correct?

6              MS. WRIGHT:  Objection.

7              THE WITNESS:  Well, I'm using the term

8         like the witnesses used the term.

9              There was talk about a reconciliation

10        project in late fiscal '14, and I understand it

11        included many things, such as refunds and R2T4,

12        the cash balances with bank statements, things

13        like that.

14   BY MR. KREITZER:

15        Q.   Okay.  Now, I want to go back to STARS for

16   a moment.

17              If the testimony in this case were that

18   upon a student record being rejected by COD, that

19   whatever credit was -- whatever credit was posted in

20   the student's account, vis-a-vis, a disbursement

21   would be reversed because the COD wasn't approved,

22   how would that affect the -- the imbalance between

23   G5, COD and STARS?

24              MS. WRIGHT:  Objection.

25              THE WITNESS:  Again, if COD and STARS

1           reflects something that is not substantiated

2           and it's adjusted, they would show an imbalance

3           between G5 until you either correct the

4           rejection and paper it back up to COD and STARS

5           or return the money.

6     BY MR. KREITZER:

7           Q.   In connection with the imbalance between

8     G5, COD and STARS, did you perform any forensic

9     analysis with respect to individual student records

10    to understand what actual student data, for lack of

11    a better term, was affecting that imbalance?

12              Do you understand my question?

13              MS. WRIGHT:  Objection.

14              THE WITNESS:  I don't know if I do.

15    BY MR. KREITZER:

16          Q.   Okay.  To the extent there was an

17    imbalance between G5, COD and STARS, would you agree

18    with me that that imbalance would have been caused

19    by the fact that the STARS -- the STARS data showed

20    a different number than the COD data which showed a

21    different number than the G5 data with respect to

22    draw-downs from the Department of Education?

23          A.   I think that's one sided, because it's not

24    just draw-downs.  It's also the substantiation of

25    student records.  So it's two different concepts

Page 109

1    there.

2         Q.   By substantiation of student records, you

3    mean the upload into COD of the actual disbursement

4    that occurred as a consequence of the G5 draw-down,

5    right?

6              MS. WRIGHT:  Objection.

7              THE WITNESS:  Not necessarily.  It's,

8         again, COD is reflecting what's substantiated.

9         They're pulling money before and after that

10        point at times, but, again, COD reflects what's

11        been substantiated.

12   BY MR. KREITZER:

13        Q.   What do you mean by "COD reflects what has

14   been substantiated"?

15             MS. WRIGHT:  Objection.

16             THE WITNESS:  I mean what FCC has uploaded

17        and told the DOE and what the DOE has accepted

18        and posted.

19   BY MR. KREITZER:

20        Q.   And if -- I want to ask you a

21   hypothetical.

22             If, on any given day, FCC had $100,000,

23   round numbers, $100,000 of student records of

24   students who were entitled to receive a Title IV

25   direct loan on any particular day, and the school

Page 110

1    wished to process that $100,000 worth of students,

2    is it your understanding that a step in that process

3    would be for the school to draw down $100,000 from

4    the G5 system at the Department of Education?

5                MS. WRIGHT:  Objection.

6                THE WITNESS:  Yes, that could be a step in

7           the theoretical process, depending on your

8           status with the DOE.

9    BY MR. KREITZER:

10        Q.   Correct.  And then, within a certain

11   period of time, the school has an obligation to

12   upload into the COD system the actual disbursements

13   that were made to the students that made up that

14   $100,000, right?

15        A.   Yes.  At that level, it's -- they have

16   some obligation to basically put in the COD, the

17   student detail, if you will.  The G5 is a wire.  No

18   student detail.  In COD, they put the student detail

19   that's supposed to be related to that amount.

20        Q.   And if there were $100,000 worth of

21   student detail, then, at the end of that

22   transaction, that is, the G5 draw-down and the COD

23   upload of disbursements, there would be no imbalance

24   at all, correct?

25        A.   In your hypothetical example, yes.

Page 111

1      Q.   Now, if the COD system rejected

2  $50,000 worth of those $100,000 of students, what,

3  if any, imbalance would appear at that moment in

4  time?

5      A.   At that instance --

6           MS. WRIGHT:  Objection.

7           THE WITNESS:  -- it would be

8      $50,000 difference.

9  BY MR. KREITZER:

10     Q.   And if that had actually occurred, would

11 you believe that -- or would you conclude that that

12 would have been an act of noncompliance by the

13 financial aid office?

14          MS. WRIGHT:  Objection.

15          THE WITNESS:  An act of non -- I don't

16     understand what you mean by an act of

17     noncompliance.

18 BY MR. KREITZER:

19     Q.   Sure.  If the COD -- if the COD system

20 rejected $50,000 worth of the files, would you

21 believe that my clients were at fault for the COD

22 system rejecting the files?

23          MS. WRIGHT:  Objection.

24          THE WITNESS:  They're subject to certain

25     regulations.  I'm not getting into that, but I

1          understand, in my analysis, that they're

2          supposed to, at some point in time,

3          substantiate the draw-down of money.

4     BY MR. KREITZER:

5          Q.   In your mind's eye, it just doesn't matter

6     what the reason is that the imbalance occurs.

7               It doesn't matter to your analysis,

8     correct?

9               MS. WRIGHT:  Objection.

10              THE WITNESS:  When you say it doesn't

11         matter, in your hypothetical example, you're

12         talking about one day.

13              My analysis is about a balance over time

14         continuing.

15    BY MR. KREITZER:

16         Q.   Well, we'll get there.  We'll talk about a

17    balance over time, but I just want to focus on the

18    one day for a moment.

19              Does it matter to you, in your analysis,

20    what the reasons are why the COD file got rejected?

21         A.   Since I'm doing my analysis over time,

22    it's -- my analysis is still simply comparing the

23    balances as to why they're different.

24         Q.   Right.  Rather than the reasons why the

25    balances are different?

1      A.   Well, my analysis has other forensic

2   accounting opinions that talk about differences with

3   STARS and bad debt concerns that go to that, but,

4   again, that particular opinion, which is the first

5   bullet on page 7, it's simply showing the difference

6   between DOE balance, COD and G5.

7      Q.   Again, without regard to the reasons why

8   there's an imbalance?

9      A.   That particular work isn't discussing the

10   why.  But to answer your question, it is looking at

11   it over time, so the why about a particular day is

12   less important.

13      Q.   Okay.

14          MR. KREITZER:  Why don't we break for

15      lunch and we'll reconvene.

16          THE VIDEOGRAPHER:  Let's go off the

17      record.  The time is 12:24.

18          (Lunch recess taken.)

19          THE VIDEOGRAPHER:  We are now back on the

20      record.  The time is 1:32.

21   BY MR. KREITZER:

22      Q.   Mr. Donohue, had you been provided with

23   sufficient records to enable you to determine

24   whether my clients were drawing down Title IV funds

25   in amounts greater than that which could have been

Page 114

1    supported by current enrollment numbers?

2        A.    I believe my analysis is directly related

3    to that, so I have been provided records that go to

4    that question, yes.

5        Q.    What records specifically are you now

6    referring to?

7        A.    Well --

8        Q.    The complete population.

9        A.    It would be the records supporting the

10   balance in G5 and the balance in COD, the records

11   concerning STARS.  There's testimony about some of

12   the predraws and things like that.

13           So those records would provide information

14   relevant to that question.

15       Q.    Tell me each STARS report or record you

16   were provided with.

17           MS. WRIGHT:  Objection.

18           THE WITNESS:  I believe we went through

19       that this morning.  I identified within my

20       report instances where I cite sources.

21   BY MR. KREITZER:

22       Q.    No, I understand.  But I'm asking you for

23   the actual STARS reports that you relied upon.

24           Do you know any of the names of the

25   reports that you relied upon?

Page 115

1        A.    I think we talked about there was

2   something called -- that people referred to as a

3   90/10 report --

4        Q.    Okay.  Anything else?

5        A.    -- within STARS.

6              Then there is STARS data.  I don't know if

7   it has a name, per se, but there's STARS data that

8   make up the cash basis revenue of the company at

9   times.

10       Q.    Anything else?

11       A.    Those are the -- the STARS data and the

12  90/10 report are the primary reports I recall as I

13  sit there.  I listed footnotes for you, and I think

14  that's what they're called.

15             I think one of my challenges is that some

16  of those are reports of STARS information.  Do I

17  have -- what other people call them, I don't know.

18  But it's STARS data.

19       Q.    Okay.  And in connection -- the STARS data

20  that you're referring to is that which enabled you

21  to determine or understand the cash basis revenue of

22  FCC, correct?

23       A.    Yes.  It's one of the things, absolutely.

24       Q.    Were you able to access the individual

25  student data for the periods fiscal year '13, fiscal

Page 116

```
 1   year '14?
 2            MS. WRIGHT:  Objection.
 3            THE WITNESS:  Some of that STARS data is
 4       by student as opposed to a collective total for
 5       a period.
 6   BY MR. KREITZER:
 7       Q.   So, in other words, you weren't able --
 8   well, were you able to look at the entire population
 9   of students who received financial aid as reported
10   in the STARS system for the fiscal year 2014?
11            MS. WRIGHT:  Objection.
12            THE WITNESS:  It appeared to be a record
13       of fiscal '14.  I don't know if there's more,
14       but there was a STARS -- there was STARS data
15       that was by student that was the vast majority
16       or purported to be all of fiscal '14.
17   BY MR. KREITZER:
18       Q.   Was it all students who received financial
19   aid in fiscal year '14?
20            MS. WRIGHT:  Objection.
21            THE WITNESS:  I don't know if there's
22       others, but the way the reports were looked at,
23       it was looking at cash basis revenue for fiscal
24       '14 and there's some for fiscal '13.
25   BY MR. KREITZER:
```

1          Q.   I'm not asking about cash basis revenue.

2     I'm asking you about specific student by

3     identification, name, et cetera, that identified how

4     much that student was disbursed or not disbursed

5     during fiscal year '14 for attending classes at FCC.

6               Were you able to access that data?

7               MS. WRIGHT:   Objection.

8               THE WITNESS:   There were student level

9          records for fiscal '14 for cash basis revenue

10         that I understand comes from STARS.

11    BY MR. KREITZER:

12         Q.   What student level records are you

13    referring to now?

14         A.   I am referring to -- I'm sorry.  Let me

15    ask you to clarify.  Can you just clarify your

16    question?

17         Q.   Sure.  You said there were student level

18    records for fiscal '14.  And so I'm asking you to

19    identify for me what those records were.

20              While you're at it, I'm going to ask you

21    the same question with respect to fiscal year '13,

22    so if you find them at the same time, that would be

23    great.

24         A.   My Exhibit 9, source 6.

25         Q.   Okay.  Of the document entitled

1    P2222704-705?

2         A.   Yes.  I believe that Excel file has

3    student level information.

4         Q.   Okay.  Anything else that you relied upon

5    for student level information, other than that one

6    document?

7         A.   I believe that those -- the IEC footnotes

8    in the sources 2 and 5 may also be student level,

9    but I need to look at the file to confirm.

10        Q.   Did you bring those files with you?

11        A.   As I talked about this morning, I only

12   brought my report with me.

13        Q.   Even though you were required by the

14   notice to do it.  So you're not able to answer these

15   questions today; is that correct?

16             MS. WRIGHT:  Objection.

17             THE WITNESS:  I have answered your

18        question.

19             MS. WRIGHT:  You have them.  We provided

20        copies to you.  We identified it to you.

21             MR. KREITZER:  Excuse me.  Counsel, I

22        think -- you're not under oath at the moment,

23        but I can put you under oath if you want.

24             MS. WRIGHT:  Be my guest.  Give it a shot.

25   BY MR. KREITZER:

Page 119

```
 1        Q.   Anything else, sir?
 2        A.   Source 2 and source 5, I believe, are
 3   student level.
 4        Q.   Anything else that you relied upon in
 5   forming your opinions with respect to student level
 6   data?
 7        A.   These other STAR data references, I would
 8   need to look at to see if it was student or not.
 9        Q.   This is your chance, sir, so tell us what
10   it is.
11             MS. WRIGHT:  Objection.
12             THE WITNESS:  I do recall some other
13        STARS-type data being at a student level.  I
14        can't tell you which one of these files may
15        have had other student level data as I sit
16        here, other than the ones I gave you.
17   BY MR. KREITZER:
18        Q.   Okay.  Thank you.
19             From that data that you claim you
20   reviewed, would you have been able to determine
21   whether the school had sufficient students on
22   rosters during any given draw to substantiate the G5
23   draw?
24             Would you have been able to determine that
25   if you elected to do so?
```

```
                                            Page 120

 1            MS. WRIGHT:  Objection.

 2            THE WITNESS:  As we talked about this

 3       morning, as to any given draw, that data was

 4       aggregated by student, often by type of STARS

 5       entry.  So my analysis was looking at the

 6       balances.

 7            I don't recall --

 8   BY MR. KREITZER:

 9       Q.   You don't mean it was aggregated by

10   student.  You mean it was aggregated in total,

11   correct?

12            I don't understand what you mean by

13   "aggregated by student."  It seems like a

14   contradiction.

15       A.   Sorry.  Sometimes it would total activity

16   for a student.

17       Q.   What do you mean by that?

18       A.   For a particular transaction type, it

19   would total the activity for a student, for example.

20       Q.   I don't understand what you mean.  So

21   let's break that down.

22            By transaction type, what do you mean by

23   that?

24       A.   Well, within STARS, there are multiple

25   transaction types in the data, and some reports I've
```

1    seen at times might aggregate individual line items

2    for a particular student or a particular transaction

3    type, a refund or --

4        Q.   What do you mean by "aggregate"?

5        A.   Total, total.

6        Q.   So, in other words, are you saying that

7    you had access to each student, and that student's

8    data, that would have justified a particular G5

9    draw.  That's what I'm asking you.

10            MS. WRIGHT:  Objection.

11   BY MR. KREITZER:

12       Q.   Did you have that student level data

13   available to you?

14            MS. WRIGHT:  Objection.

15            THE WITNESS:  I don't know if it justified

16       a G5 draw, but I had student level data within

17       STARS information that was by student that

18       rolled up and provided the totals that you see

19       in Exhibit 9 and other places for cash basis

20       revenue for STARS.

21   BY MR. KREITZER:

22       Q.   Okay.  And, again, you've already told us,

23   then, what documents you're referring to, correct?

24       A.   I have given you a couple of examples.

25       Q.   No.

Page 122

1       A.   I strongly suspect that some of the other

2   files also have detail.

3       Q.   Take all the time you need, sir, but I

4   want you to identify every document you relied upon

5   that had student level records.

6            We'll wait as long as you need, because we

7   intend to ask you about those records.  So it's

8   incredibly important that we know what they are.

9       A.   I believe I already covered the ones on

10  Exhibit 9.

11           I had a few specific, and a few of those

12  other ones may include detail as well.

13      Q.   Let's go through them.

14           You said 2, 5 and 6, footnotes 2, 5 and 6,

15  right?

16      A.   Yes.

17      Q.   Anything else?

18      A.   Not that I can recall or remember as I sit

19  here.

20      Q.   Okay.  Thank you.

21      A.   And then -- again, on 10C, I believe that

22  some of that IEC data may be by student.

23      Q.   What IEC data are you referring to?

24      A.   On 10C, there's some sources, 1 and 2, and

25  that may be by student, but I can't be sure as I sit

Page 123

1  here.

2      Q.   Exhibit 9A and Exhibit 7C?  Is that what

3  you're referring to?

4      A.   No.  I'm sorry.  10C, as in cat.  10C, as

5  in cat.

6      Q.   Okay.  Let's take a look.

7      A.   Sources 1 and 2.

8      Q.   So that is the AR history summary, 2012,

9  2013, Excel SX, correct?

10      A.   Yes.

11      Q.   And AR history summary 2013, 2014 and then

12  there's a big long number, but it's footnote number

13  2, correct?

14      A.   Yes.

15      Q.   Any others that you claim is source --

16  that you claim is student level records?

17          MS. WRIGHT:  Objection.

18          THE WITNESS:  That's all that comes to

19      mind.

20          I recall seeing student level data in the

21      IEC production, and I cited a few here.  I

22      don't know if there's more.

23  BY MR. KREITZER:

24      Q.   Let me turn your attention to your

25  report -- in fact, before I get there, I apologize.

Page 124

1    Let me ask you one more question.

2            I had put Exhibit 190 in front you a

3    moment ago.  Let me just cover that since it's in

4    front of you and then we'll move on from there.

5            Exhibit 190 is the Declaration of Sean

6    Harding in Support of the Debtor's Chapter 11

7    Petitions and Request for First Day Relief.

8            Did you have an opportunity to review this

9    document in formulating your opinions in this case?

10    A.    Yes.

11    Q.    And you understood that Mr. Harding was

12    making these statements under penalty of perjury,

13    correct?

14    A.    Yes, I believe that's probably --

15    hopefully, the standard, as it says on page 48.

16    Q.    I want to turn your attention to page 20

17    of his sworn statement.  And, in particular, I want

18    to refer first to paragraph 46.

19            Mr. Harding writes -- first of all, do you

20    understand who Mr. Harding is and was?

21    A.    Yes.

22    Q.    Okay.  What was Mr. Harding's role, if

23    anything, in connection with FCC?

24    A.    I understand that, in fiscal '14, FTI and

25    Mr. Harding, through FTI, was brought in to work

Page 125

1    with FCC.

2        Q.   What was Mr. Harding's role in working

3    with FCC?

4        A.   I believe it was -- for lack of a better

5    term, a restructuring advisor to come in and work

6    with FCC to see what was going on and investigate.

7        Q.   Okay.  Did you have occasion to interview

8    Mr. Harding at any time in connection with

9    formulating your opinions?

10            MS. WRIGHT:  Objection to form.

11            THE WITNESS:  I did not.

12   BY MR. KREITZER:

13       Q.   Did speak with him in any respect?

14       A.   I did not talk with Mr. Harding, no.

15       Q.   Did any of your team have occasion to

16   speak with Mr. Harding?

17       A.   No.

18       Q.   At paragraph 46, Mr. Harding writes, "The

19   debtor's financial problems began upon ETC," you

20   understand that to be FCC, effectively, right?

21       A.   I do.

22       Q.   So "The debtor's financial problems began

23   upon FCC's acquisition of Anthem Education in 2012."

24       A.   Do you agree with that statement, by the

25   way, based on your forensic examination?

1          MS. WRIGHT:  Objection.

2          THE WITNESS:  I don't know if I agree or

3      disagree.  I understand people have testified

4      that the Anthem acquisition was a big

5      acquisition for the company, and I've seen this

6      testimony before or this declaration before.

7  BY MR. KREITZER:

8      Q.   Did you reach any conclusions on whether

9  the acquisition of Anthem had an adverse financial

10  impact upon FCC?

11     A.   No.  My opinions and my report are not

12  about the Anthem acquisition, per se, but it was

13  about the combined Anthem/FCC organization

14  thereafter.

15     Q.   Did you perform any cash flow analyses of

16  FCC beginning at the time that FCC acquired Anthem

17  in April of 2012 and going forward?

18     A.   Nothing that would begin in April 2012.  I

19  looked at cash flow activity throughout the period,

20  but my focus was largely fiscal '14, and I also

21  provided some cash flow information for fiscal '13.

22     Q.   How, if at all, did the Anthem acquisition

23  affect the cash flow or affect the available

24  resources -- strike the question.

25          How, if at all, did the acquisition of

1   Anthem in April of 2012 affect the ongoing ability

2   of FCC to timely meet its financial obligations?

3            MS. WRIGHT:  Objection.

4            THE WITNESS:  Can you read that back,

5        please?

6   BY MR. KREITZER:

7        Q.   Sure.  How, if at all, did the acquisition

8   of Anthem -- let me read it exactly.

9            How, if at all, did the Anthem acquisition

10  affect the cash flow -- I'm reading the wrong

11  question.  Let's try it one more time.

12           How, if at all, did the acquisition of

13  Anthem in April of 2012 affect the ongoing ability

14  of FCC to meet timely its financial obligations?

15           MS. WRIGHT:  Objection to the form.

16           THE WITNESS:  I don't have an analysis of

17       that as I sit here.  It's an acquisition

18       that -- resources capital was raised for the

19       acquisition, some of it was used to pay for the

20       acquisition, some of it was used as excess

21       capital into the business.  It provided

22       revenue.  It provided cost.  I haven't analyzed

23       that question.

24  BY MR. KREITZER:

25       Q.   Fair enough.  Okay.

Page 128

```
 1            Mr. Harding writes, "At the time of the

 2    acquisition, Anthem Education had been a distressed

 3    company that was losing approximately $800,000 of

 4    cash per month."

 5            Do you have any reason to dispute

 6    Mr. Harding's sworn statement in that regard?

 7        A.   I have no reason one way or the other.

 8        Q.   Did you take into account the cash drain

 9    that Anthem Education had on FCC and its financial

10    resources?

11            MS. WRIGHT:  Objection.

12            THE WITNESS:  Indirectly.  I considered

13         the FCC's records which reflect Anthem activity

14         during this time period.  So, indirectly, yes.

15    BY MR. KREITZER:

16        Q.   But not directly?

17        A.   Well, maybe better said.  It's -- Anthem

18    was acquired in April '12, so its financial activity

19    was within the records I was reviewing.  So I'm

20    directly reviewing them.

21            Did I look at Anthem separately in some

22    way?  No.  But it's within the same records I'm

23    reviewing.

24        Q.   At paragraph 47, Mr. Harding writes,

25    "Integration of the Anthem Education student
```

1    information software systems and the FCC school

2    student information and financial aid management

3    software systems proved to be a major challenge for

4    the company and resulted in significant difficulties

5    and processing and reconciling Title IV funding."

6            Do you agree with Mr. Harding's statement

7    in that regard?

8            MS. WRIGHT:  Objection.

9            THE WITNESS:  I don't agree or disagree.

10       I generally recall testimony about system

11       issues in fiscal '13.  I haven't analyzed those

12       issues in fiscal '13 like Mr. Harding

13       apparently did or didn't.

14   BY MR. KREITZER:

15       Q.   So then you wouldn't know how those

16   financial aid and student information systems may

17   have actually proven to be a significant challenge

18   to FCC.

19            You just wouldn't know one way or the

20   other; is that correct?

21       A.   I recall testimony that that was

22   eventually resolved, but I wouldn't know one way or

23   the other about the instance and times that Mr.

24   Harding is talking about here.

25       Q.   Can we agree that, first of all, you don't

Page 130

1    really have any -- you haven't derived -- I'll

2    withdraw that question.

3         You said in your last answer that the

4    student information and financial aid management

5    software had somehow been -- those problems with

6    that software had somehow eventually been resolved.

7         Do you remember that answer?

8         MS. WRIGHT:  Objection.

9         THE WITNESS:  Generally, I do remember

10        something suggesting that they felt they were

11        reconciled and COD and G5 were matching again,

12        things like that.

13   BY MR. KREITZER:

14        Q.   Tell me about that.  What evidence or what

15   documents did you review that caused you to conclude

16   that?

17        A.   Well, G5 and COD were matching for much

18   of -- for periods in fiscal '13, late in fiscal '13

19   when -- I guess after the software issue came to

20   light.

21        Q.   Did you confirm, independently, that, in

22   fact, COD and G5 were matching in 2013 at a point in

23   time, that is, hey were reconciled or substantiated?

24        A.   Yes.  There's certain data points, along

25   with STARS data that show that, like for a

                                        Page 131

1    particular OPE ID, for a particular loan year, that

2    the two are in balance, according to those records.

3         Q.   What about for all three of the OPE IDs

4    that you examined?

5              MS. WRIGHT:  For 2013, right?

6              MR. KREITZER:  Yes.

7              THE WITNESS:  I can't recall all three as

8         I sit here, but I do recall testimony

9         suggesting that things -- they believed they

10        were reconciled, and things were in balance at

11        certain times, and a balance -- an

12        unsubstantiated balance issue in fiscal '13 was

13        brought down to the point that allowed the

14        schools to go back on -- at least some of the

15        OPE IDs, go back on advanced pay, for example.

16   BY MR. KREITZER:

17        Q.   Were you aware of the fact that some time

18   in 2013, there was a cash freeze implemented by the

19   department with respect to several of the OPE IDs?

20        A.   Yes.

21        Q.   What was the cause of that cash freeze, if

22   you know?

23             MS. WRIGHT:  Objection.

24             THE WITNESS:  Barbara Davis and the DOE

25        would have more information about that than me,

Page 132

```
 1          but I had understood it, from the testimony,
 2          that it was, in part, due to the difference
 3          between the G5 balance and the COD
 4          substantiated balance.
 5  BY MR. KREITZER:
 6          Q.   So what you're saying, I think, is that
 7  here was a point in time, in 2013, where the G5
 8  balance and the COD balance were not reconciled,
 9  that there was a difference between the two,
10  correct?
11          A.   Absolutely.
12          Q.   When was that, if you know?
13          A.   I want to say April.  I believe April of
14  2013.
15          Q.   And did your forensic analysis of the
16  records of FCC reveal to you how those accounts
17  became out of balance?
18          A.   Well, they became out of balance by having
19  more G5 Title IV funds than were substantiated in
20  COD.
21          Q.   And do you know why there was more G5
22  Title IV funds than what was substantiated or
23  reconciled in COD?
24          A.   A combination of pulling down more cash or
25  not substantiating.
```

Page 133

1      Q.   Do you know why the COD accounts were not

2   substantiated?  Were you able to determine that from

3   your review of FCC's records?

4      A.   I recall testimony about it.  I don't

5   recall specifically, but I generally recall

6   testimony about what was going on at the time.

7      Q.   So you didn't do any independent analysis

8   in that respect, correct?

9      A.   Well, other than reviewing the factual

10  information about the G5 balances and the COD

11  balances and STARS balances to some degree as well

12  back at that time.

13     Q.   Did you, in your review of other

14  deposition testimony in this case, did you become

15  aware of the fact that the student information

16  systems and the financial aid management systems

17  caused by the integration of these two schools, that

18  is, Anthem and FCC, caused significant difficulties

19  in processing Title IV funds?

20          MS. WRIGHT:  Objection.

21          THE WITNESS:  I'm aware of testimony

22      saying that.  I'm aware of testimony talking

23      about challenges in fiscal '13.

24  BY MR. KREITZER:

25     Q.   Were you able, forensically, to dispute

                                                    Page 134

1    any of that testimony, that is, did you come across

2    any records, not testimony, but records in the

3    company that would cause that not to be the case or

4    cause you to question that testimony?

5              MS. WRIGHT:  Objection.

6              THE WITNESS:  Indirectly, yes.

7    BY MR. KREITZER:

8         Q.   What did you come across?

9         A.   I came across -- I later learned that bank

10   statements weren't being reconciled with G5,

11   financial accounting wasn't necessarily working with

12   them in a way to reveal some of these issues.  So it

13   did, indirectly, give me some pause about what

14   people were believing at the time and why those

15   things were caused.

16             But that's just my observation from

17   looking at the records.

18        Q.   What testimony are you relying upon to

19   cause you to conclude that financial accounting

20   wasn't working with financial aid in the year 2013?

21             MS. WRIGHT:  Objection.

22             THE WITNESS:  Well, testimony from

23        Mr. Dicicco, testimony from Mr. Zutes,

24        testimony from Mr. Pierne.  Ms. Zutes' report.

25   BY MR. KREITZER:

Page 135

1      Q.    Was Ms. Zutes even at the company in 2013?

2

3      A.    No.

4      Q.    So you think she had -- did you place any

5   great weight on what Ms. Zutes said about what the

6   company was doing in 2013 when she wasn't even

7   there?

8      A.    Maybe we're not communicating, but I

9   didn't say that she said something specifically

10   about '13.  She said things and she found things

11   that were concerning about the accounting

12   infrastructure.  And, to my knowledge, that's the

13   same infrastructure they had in '13 versus '14.

14      Q.    So you're just concluding that, because

15   whatever Ms. Zutes said in 2014 must be true for

16   2013.  That's your conclusion?

17           MS. WRIGHT:  Objection.

18           THE WITNESS:  Well, my conclusion is that

19       if there weren't processes to do these things,

20       I haven't seen evidence to suggest the process

21       was happening and stopped.

22   BY MR. KREITZER:

23      Q.    What process is it exactly that you're now

24   referring to that didn't exist?

25      A.    Well, for example, she talks about bank

Page 136

1    reconciliations, where you would compare the draws

2    from STARS -- I'm sorry -- the draws from G5 with

3    your student ledgers.

4         Q.   Okay.  Were you able to independently

5    confirm whether the company's bank statements

6    reconciled with the STARS data?

7              MS. WRIGHT:  Objection.

8              THE WITNESS:  Can you help me when?

9    BY MR. KREITZER:

10        Q.   Yeah, in 2013, at the point in time we're

11   talking about.

12             I mean, let's take a step back.

13             You've told us that you drew the

14   conclusion that the company was not reconciling its

15   bank statements with monies received in G5, and I

16   think you also told us, but you'll correct me if I'm

17   wrong, that you concluded that, in 2013, the

18   financial accounting department was not working with

19   the financial aid department.

20             Did I understand your testimony correctly?

21             MS. WRIGHT:  Objection.

22             THE WITNESS:  I think you generalized it a

23        little too much.

24   BY MR. KREITZER:

25        Q.   Okay.  So correct me.

Page 137

1          A.   I don't think I said -- for example, you

2     asked me what evidence I had about my concerns with

3     the rationale provided in fiscal '13 as to why there

4     was imbalances, and I provided my answer which was

5     about my concern with the accounting infrastructure

6     and that included evidence provided by Ms. Zutes

7     that the bank reconciliations weren't happening

8     properly, but also included looking at fiscal '14

9     and understanding how disconnected financial

10    accounting was from the financial aid people, and

11    recognizing that there's no suggestion that that

12    changed.  And so that's what I'm driving at.

13          It's Mrs. Zutes' comments about the bank's

14    reconciliations, for example.

15          Q.   Were you able to independently verify any

16    of Ms. Zutes' statements or claims in that regard?

17          A.   Yes.

18          Q.   How did you independently verify it?

19          A.   Well, my analysis, which does largely

20    relate to fiscal '14.

21          Q.   Well, I'm talking about '13, now, sir.

22    Let's stay with '13.

23          A.   Okay, '13.

24          So my analysis for fiscal '13 would still

25    be relevant because it's looking at that data and

Page 138

```
 1    noticing it's not reconciled, and there's these

 2    unsubstantiated balances that are not necessarily

 3    being reflected by financial accounting, and so that

 4    would give pause about the fiscal '13 activity.

 5         Q.   So you're basing your conclusion about

 6    fiscal '13 on what you observed in '14?

 7              MS. WRIGHT:  Objection.

 8              THE WITNESS:  About the processes then.

 9    BY MR. KREITZER:

10         Q.   Did you observe any of those facts in

11    2013?  I've asked you that three or four times now.

12              MS. WRIGHT:  He also answered it three or

13         four times.

14              THE WITNESS:  In addition to my concern

15         from fiscal '14, I do recall some documents

16         that showed that the bank accounts would have

17         amounts or I should say the OPE ID dollars

18         drawn for that month in the bank account were

19         different than the STARS reconciliation.

20              They're there.  I recall those.

21    BY MR. KREITZER:

22         Q.   Okay.  Anything else?

23         A.   No.  I think I covered it.

24         Q.   What, if any, impact, do you think

25    rejected student records out of COD would have on
```

Page 139

1    the reconciliation between the company's bank

2    accounts and the STARS data, if you know?

3        A.   I don't have anything specific for you

4    but, in theory, obviously, the three work in tandem

5    at times.  And if you put one and one but not the

6    other, it would have an impact.

7        Q.   Were you able to determine, from your

8    forensic examination, what the difficulties were

9    that the company had in processing and reconciling

10   Title IV funds in 2013 were?

11           MS. WRIGHT:  Objection.

12           THE WITNESS:  I only recall from testimony

13       that there was -- I recall testimony about the

14       Regent software, rejects, R24, things like

15       that.

16   BY MR. KREITZER:

17       Q.   Anything else you recall?

18       A.   No.  That's generally what I recall.

19       Q.   So what did you understand, from your

20   forensic examination, that -- or how the Regent 8

21   software caused problems with the school's ability

22   to reconcile the G5 with the COD accounts?

23           MS. WRIGHT:  Objection.

24           MR. KREITZER:  What's your objection?

25           MS. WRIGHT:  I'm not sure if it properly

```
 1       transcribed.
 2            "So what did you understand from your
 3       forensic examination, how the Regent 8 software
 4       problems caused problems with the school's
 5       ability to reconcile."
 6            MR. KREITZER:  So your objection is with
 7       the way in which the court reporter is --
 8            MS. WRIGHT:  No, not at all.
 9            MR. KREITZER:  -- simultaneously
10       reporting?
11            MS. WRIGHT:  No.  First of all, you paused
12       in the middle of it and sort of changed the
13       question.
14            MR. KREITZER:  We'll move on.
15            MS. WRIGHT:  Why don't you try -- try
16       again?
17            MR. KREITZER:  Respectfully, let's not
18       base your objections on a realtime screen,
19       because I think we would all agree that the
20       court reporter's working as hard as she can,
21       but not every word comes out correct.
22            MS. WRIGHT:  I actually think she recorded
23       your question correctly.  I didn't understand
24       your question as posed.  That was the
25       objection.  It didn't make sense, and there was
```

Page 141

1    no foundation to it.

2    BY MR. KREITZER:

3       Q.   What do you understand the Regent 8 system

4    to be?

5       A.   I understand it has, from my testimony in

6    this case and things like that, from other people's

7    testimony in this case, I understand it's a software

8    program that was being used to, among other things,

9    to communicate and upload data into COD from FCC.

10      Q.   And when did, if you know, the company

11   implement the Regent 8 software?

12      A.   I don't have a date for you.  I recall

13   that there's a Regent and then a Regent 8, and I

14   just can't remember when the Regent 8 was.

15      Q.   From your forensic examination, were you

16   able to learn or understand how the Regent 8 system

17   affected the data that was transmitted to and from

18   STARS?

19          MS. WRIGHT:   Objection.

20          THE WITNESS:   How it affected data?   I

21      don't understand your question.

22   BY MR. KREITZER:

23      Q.   Sure.  So you told us that your

24   understanding of Regent 8 is that it was a software

25   program used to communicate and upload data into COD

```
                                           Page 142
 1    from FCC.

 2           Did I understand that correctly?

 3      A.   That's my layman software understanding

 4    from the testimony, yes.

 5      Q.   And from your forensic examination, were

 6    you able to determine whether the Regent 8 system

 7    properly uploaded the data from STARS into COD?

 8           MS. WRIGHT:  Objection.

 9           THE WITNESS:  I don't know.  I've seen

10        testimony suggesting at times it may not have,

11        and they're alleging it may not have, but I

12        didn't look at every Regent 8 upload into COD.

13    BY MR. KREITZER:

14      Q.   Did you look at any Regent 8 uploads into

15    COD?

16      A.   I did not look at them, but people talk

17    about them on the record.

18      Q.   So you didn't forensically, independently

19    determine anything in respect to how Regent 8

20    performed its role of uploading COD -- pardon me --

21    uploading STARS data into COD; is that correct?

22      A.   I did not look at Regent 8 code and Regent

23    8 issues like that, no, I did not look at Regent 8

24    software.

25      Q.   Did you come to understand, at any point
```

Page 143

```
 1    in your forensic examination, that the Regent 8
 2    program corrupted the data that was being uploaded
 3    into COD?
 4         A.   At times, in some testimony, there's
 5    suggestion that that's -- that there was a software
 6    problem with Regent 8.  That's what people are
 7    saying in their testimony.
 8         Q.   What consideration did you give to that
 9    corruption in terms of trying to understand the
10    unsubstantiated balances between COD and G5?
11              MS. WRIGHT:  Objection.
12              THE WITNESS:  The consideration included
13         first recognizing that's what was being said by
14         company witnesses, and also looking at balances
15         over time.
16    BY MR. KREITZER:
17         Q.   So do you agree with the conclusion that
18    Regent 8 corrupted the data that was being uploaded
19    from STARS into COD?
20              MS. WRIGHT:  Objection.
21              THE WITNESS:  No, I don't agree with it
22         one way or the other.  Again, when you talk
23         about uploads, uploads occur on a weekly or a
24         daily basis.  I don't know if all were
25         corrupted or one was corrupted and when they
```

Page 144

1      were fixed.

2   BY MR. KREITZER:

3        Q.   All right.  So would it be a fair

4   statement to say that you didn't take into account

5   those claims by company officials of this corruption

6   issue in reaching your opinions in respect to the

7   unsubstantiated balances between G5 and COD?

8             MS. WRIGHT:  Objection.

9             THE WITNESS:  No, that would not be fair.

10  BY MR. KREITZER:

11       Q.   Tell me how you took into account the

12  corruption problem created by COD in reaching your

13  conclusions regarding the substantiation of G5 and

14  COD.

15            MS. WRIGHT:  Objection.

16            THE WITNESS:  One way I did that was by

17       not looking at an isolated draw and COD

18       substantiation.

19            I looked at multiple over time periods, in

20       fact, more than a fiscal time period, to help

21       look at the balances over time.

22  BY MR. KREITZER:

23       Q.   Do you know how Regent 8 corrupted the

24  data?

25            MS. WRIGHT:  Objection.

Page 145

1    BY MR. KREITZER:

2         Q.   Has that ever been explained to you?

3              MS. WRIGHT:  Objection.

4              THE WITNESS:  I vaguely recall some

5         testimony about it, but ...

6    BY MR. KREITZER:

7         Q.   What do you vaguely recall?

8         A.   I vaguely recall something about

9    corrupting the record, and it would not be accepted

10   by COD.  That's what the allegation is, that they

11   would not -- that it would not end up in COD because

12   of whatever software problem.  That's what some

13   people have alleged.

14        Q.   Where did the corruption take place?  Did

15   it take place at the COD program hosted by the

16   Department of Education or at FCC, if you know?

17             MS. WRIGHT:  Objection.

18             THE WITNESS:  I don't know.

19   BY MR. KREITZER:

20        Q.   How many files were corrupted by Regent 8,

21   how many student files?

22             MS. WRIGHT:  Objection.

23             THE WITNESS:  I don't have a count for

24        you.

25   BY MR. KREITZER:

Page 146

1      Q.   What was the result of a file being

2   corrupted by Regent 8, how did that impact COD, if

3   you know?

4           MS. WRIGHT:  Objection.

5           THE WITNESS:  Well, in your

6       hypothetical --

7   BY MR. KREITZER:

8      Q.   There's nothing hypothetical about my

9   question, but you can answer it.

10     A.   Assuming it was corrupted, I understood

11  that the allegation is that the corruption would

12  prevent -- let's say it's a thousand dollars of

13  substantiation, it would prevent the thousand

14  dollars from being posted and accepted at COD, at

15  least at that time.

16     Q.   Okay.  And how long did the corruption

17  issue continue to infect the data of students that

18  attended FCC schools?

19          MS. WRIGHT:  Objection.

20          THE WITNESS:  I don't know.

21  BY MR. KREITZER:

22     Q.   Okay.  Would it have been meaningful for

23  you to know how long that data corruption problem

24  lasted in reaching conclusions about the

25  unsubstantiated balances between G5 and COD?

1              MS. WRIGHT:  Objection.

2              THE WITNESS:  To the extent I was talking

3         about one day, yes, that would be meaningful to

4         know, but I'm not.  I'm talking about a long

5         time period.

6    BY MR. KREITZER:

7         Q.   Why would it be meaningful to know that if

8    it were one particular day?

9         A.   Well, if you're isolating something, and

10   there's -- it wouldn't change that the two are

11   different.  So to that extent, my analysis doesn't

12   change at all.

13        Q.   I don't understand what you mean by that.

14   I'm sorry.

15             What do you mean "it wouldn't change if

16   the two are different"?

17             What does that mean?

18        A.   Well, if G5 and COD are different and I'm

19   reporting they're different on that day and DOE

20   believed they're different on that day, it doesn't

21   change that fact that they are.

22        Q.   Okay.  But it also doesn't assist you in

23   understanding why they're different, right?

24        A.   It would assist me in understanding why

25   that particular upload was different.

Page 148

1      Q.   Okay.  So if there were, say, rejects,

2   hundreds of them, that is -- let me rephrase that.

3           If there were thousands of rejects of

4   student files in the year 2013, would that have been

5   meaningful for you to know in connection with

6   understanding why there were unsubstantiated

7   balances between G5 and COD?

8      A.   I already testified I knew about

9   allegations about Regent 8 issue in '13.  So I knew

10   that already.

11      Q.   Okay.  Did you know there were similar

12   corruption issues in 2014?

13           MS. WRIGHT:  Objection.

14           THE WITNESS:  I've seen testimony that's

15       alleging that there were similar corruption

16       issues.

17   BY MR. KREITZER:

18      Q.   In connection with your forensic

19   examination, which you tell us now you've spent over

20   $200,000 performing, were you able to verify whether

21   there were corruption issues in the COD files of

22   students who attended FCC schools that was caused by

23   Regent 8?

24           MS. WRIGHT:  Objection.

25           THE WITNESS:  I was not asked, and have

```
 1       not verified the software corruption issue that

 2       you're talking about.

 3  BY MR. KREITZER:

 4       Q.   So whether the software infected the data

 5  of students that attended FCC schools and whether

 6  that infection of data caused the imbalance of COD

 7  between G5, that's not something you were asked to

 8  render an opinion about, correct?

 9       A.   Can you read that back, please?

10            (Last question read back.)

11            MS. WRIGHT:  Objection.

12            THE WITNESS:  Not in that specific way,

13       no.  I was asked more broader questions about

14       the balances.

15  BY MR. KREITZER:

16       Q.   Did you review any of the reject codes

17  issued by -- do you know what a reject code is?

18  Let's start with that.

19       A.   Only a vague recollection of some

20  testimony.

21       Q.   Do you have an understanding that when a

22  file is uploaded to COD, if COD rejects that file,

23  it creates a document that identifies the students

24  whose files were rejected?  Are you aware of that?

25       A.   That was generally my vague recollection.
```

1    Q.   Did you review any of those documents that

2  would show files rejected by COD, student files

3  rejected by COD?

4    A.   I'm not sure.  I saw some files with

5  rejects and people saying they were rejects.  There

6  was no context to them, so I don't know if that's

7  what that is.

8    Q.   Would you agree with me that, if a file

9  was rejected by COD, that that would create an

10  imbalance between G5 and COD?

11         MS. WRIGHT:  Objection.

12         THE WITNESS:  In isolation, for that

13      particular student and their commensurate G5

14      pull, yes.

15  BY MR. KREITZER:

16    Q.   If there were thousands of these rejects

17  occurring, that would cause certainly a more

18  substantial imbalance between G5 and COD, based on

19  your understanding of how those records were,

20  correct?

21         MS. WRIGHT:  Objection.

22         THE WITNESS:  At that moment, yes, it

23      would be whatever that amount is times a

24      thousand.

25  BY MR. KREITZER:

Page 151

1      Q.   In connection with your forensic

2  examination, did you look at how long it takes the

3  financial aid department to correct a student record

4  that was corrupted by the Regent 8 software?

5           MS. WRIGHT:   Objection.

6           THE WITNESS:   Nothing specific comes to

7      mind.  I just recall some testimony about it

8      taking some time to handle it.

9  BY MR. KREITZER:

10     Q.   Do you remember Barbara Davis' testimony

11 on that question?

12     A.   I think that's the testimony I recall,

13 something about somewhat manual, and it can take

14 time to put it --

15     Q.   She said, actually, it could take longer

16 than a week.

17          Isn't that what she said?

18     A.   I knew it was a day or more.  I don't

19 recall the time.

20     Q.   So if there were thousands of these

21 records infected by the defective Regent 8 software,

22 you would agree with me that it could take a very

23 substantial period of time for those records to be

24 created and for the imbalance between G5 and COD to

25 be corrected.

Page 152

```
 1            Is that a reasonable conclusion?

 2            MS. WRIGHT:  Objection.

 3            THE WITNESS:  I don't know one way or the

 4       other.  I haven't repaired a reject myself, so

 5       I don't --

 6  BY MR. KREITZER:

 7       Q.   So when you say that your examination

 8  looked at the magnitude of the irreconciliations or

 9  the imbalances and the amount of time of those

10  imbalances, and that was what you looked at,

11  correct?

12       A.   Among other things, yes.

13       Q.   You didn't take into consideration how

14  much time it may have taken the financial aid staff

15  to actually correct the records that had caused that

16  imbalance to correct the data corruption issue;

17  isn't that correct?

18            MS. WRIGHT:  Objection.

19            THE WITNESS:  I knew that if there was a

20       reject, it would take time to fix it.  So I was

21       aware of that.

22            And as I testified, that is why I looked

23       at not spot data of one draw, but I looked at

24       balances over time, and I looked at other

25       things, too, that go to that question.
```

1          I looked at the amount of refunds that

2       came back at certain times, coupled with

3       eventual bad debt write-downs that occurred.

4    BY MR. KREITZER:

5       Q.   Did you ever find the backup documentation

6    that categorized the actual bad debt write-down?

7            By that I mean what actual bad debts were

8    being written down?

9       A.   I did find some documents about that, yes.

10      Q.   What did you find?

11      A.   I found journal entries that recorded the

12   bad debt entry in the GL by campus, for example.

13      Q.   Uh-huh.  Anything else?

14      A.   And I think some of the reconciliation

15   work that was being done at the time in late fiscal

16   '14 related to that.

17      Q.   Anything else?

18      A.   That's what comes to mind.

19      Q.   Let's talk about the journal entries

20   first.

21           Do you actually have in your report the

22   actual text of those journal entries that recorded

23   the bad debt in the general ledger?

24      A.   When you say "the actual text," what do

25   you mean?

Page 154

1      Q.   Yeah.  Well, there would be, in a journal
2    entry, right, there would actually be text
3    indicating the fact that there had been a bad debt
4    entry, right?
5      A.   Yes.
6      Q.   Okay.  What did that text say, if
7    anything?
8      A.   It said debit.  It basically had debits
9    and credits where it was reserving -- taking an
10   expense and reserving the accounts receivable by
11   campus.
12     Q.   Did it explain -- did that entry explain
13   what the reason for the bad debt was?
14     A.   It said additional bad debt.
15     Q.   Did it say anything else?
16     A.   There may have been some stuff about notes
17   receivable on the bad debt as well.  But the journal
18   entry itself, it said additional bad debt.
19     Q.   So what is it about an entry that states,
20   quote, Additional bad debt, that causes you to
21   believe that that was a write-down caused by the
22   imbalance between G5 and COD?
23     A.   Mr. Pierne's testimony and my analysis
24   overall showed -- Mr. Pierne testified that the
25   additional bad debt was due to the reconciliation

Page 155

```
 1    project, which included returning millions of
 2    dollars to the DOE.
 3         Q.   Let's break out your answer, because I
 4    just want to be -- I want to understand specifically
 5    what your thinking is in this regard.
 6              Those words, "additional bad debt," that
 7    you read on the general ledger, what caused -- was
 8    there anything about those words that enabled you to
 9    conclude that that bad debt entry was a result of
10    the reconciliation between G5 and COD?
11         A.   Yes, there was.
12         Q.   So what about those words that caused you
13    to conclude that?
14         A.   Among other things, Mr. Pierne's testimony
15    said that we're recording an additional bad debt for
16    the reconciliation project -- I'm paraphrasing --
17    but he explained that the debt -- the bad debt due
18    to the reconciliation project was recorded in March,
19    April, May and June, and he explained in multiple
20    e-mails that that's what that bad debt was for.
21         Q.   Isn't it, in fact, the truth that the bad
22    debt recorded in March, April, May and June was a
23    result of the R2T4 project?
24         A.   I would assume it's part of it.
25    Mr. Pierne characterized it as due to the
```

Page 156

1    reconciliation and the return of funds to the DOE
2    and certain non-reoccurring issues, things like
3    that.  That's how he characterized it.
4         Q.   So, first of all, the return of funds to
5    the DOE doesn't indicate to you what the reason for
6    that return was, correct?
7              In other words, there's many, many funds
8    being returned, lots of funds being returned to the
9    DOE in the ordinary course of business; isn't that
10   correct?
11        A.   Not anywhere near the magnitude that was
12   going on now.
13        Q.   How many financial aid -- strike the
14   question.
15             How many schools have you provided
16   forensic examinations on before FCC?
17        A.   I don't know.
18        Q.   None, right?  I mean, I looked at your
19   resume.  There were none on your resume.
20        A.   I recall an evaluation at this time.  I
21   don't know if that included forensic activity as I
22   sit here.
23        Q.   And you couldn't possibly tell us the name
24   of that school, right?
25        A.   No.  It was a number of years ago.

1      Q.   How many years ago?

2      A.   I don't know.

3      Q.   So you really don't have an independent

4  understanding of what would be ordinary or

5  extraordinary in terms of the flow of monies going

6  back and forth between the DOE and a particular

7  school; isn't that right?  You just don't have any

8  prior experience in that regard?

9      A.   I think the most relevant experience here

10  is the actual DOE activity for this school.

11      Q.   Right.  So tell me, from your experience,

12  what is the average return of funds to the DOE for

13  students that begin a class but don't conclude it?

14  What percentage of students -- strike the question.

15          What is the average amount of funds that a

16  school returns to the DOE on account of students

17  that begin classes but don't conclude them?

18          MS. WRIGHT:  Objection.

19          THE WITNESS:  I don't have an average for

20      you as I sit here.

21  BY MR. KREITZER:

22      Q.   And what is the average amount of refunds

23  that -- in fact, let me not jump ahead.

24          Do you understand the difference between

25  an R2T4 and a refund?

Page 158

1        A.    I've seen testimony about that, yes.

2        Q.    Okay.  What's your understanding?

3        A.    My understanding is that one of them

4   relates to the refund of money back to DOE for a

5   student that has essentially started, and the other

6   relates to students that don't start, generally.

7   That's the testimony I've seen.

8        Q.    What's the title -- what is the title that

9   is given to monies that are returned because a

10  student doesn't start classes?

11       A.    I believe that's R2T4.  That's what the

12  testimony suggested, and the STARS records track

13  R2T4 and REF or just refunds as well.

14       Q.    And so it's your testimony that R2T4 is

15  the term used for students that do not start classes

16  and refunds is the term used for students that start

17  classes but don't complete them?

18       A.    I'm recalling some testimony.  I would

19  need it to refresh my recollection.  But that's what

20  I understood.

21            I understood there was a distinction, and

22  some of the witnesses talked about that.

23       Q.    What is the average amount of refunds that

24  a school the size of FCC would return to the

25  Department of Education on a yearly basis?

Page 159

```
 1          MS. WRIGHT:  Objection.
 2          THE WITNESS:  I don't have a particular
 3      number for you, but from their FCC history, you
 4      can see that it grew dramatically in fiscal
 5      '14.
 6  BY MR. KREITZER:
 7      Q.   What caused you to conclude that the
 8  amount of R2T4s and -- strike the question.
 9          What caused you to conclude that the
10  amount of money returned to the Department of
11  Education for reconciliation work was out of line
12  with similarly situated schools?
13          MS. WRIGHT:  Objection.
14          THE WITNESS:  I don't know if I can --
15      maybe we're not connecting this.  I don't think
16      I've testified that I believe it's out of line
17      for similarly situated schools.
18          It was higher than what FCC had done in
19      the past.
20  BY MR. KREITZER:
21      Q.   How do you know that the funds that were
22  being returned in March, April, May and June were
23  the result of unsubstantiated balances between G5
24  and COD as compared with refunds or R2T4s?
25      A.   I'm sorry.  Can you restate that or read
```

Page 160

```
 1    it back?
 2         Q.    Sure.  How do you know that the funds that
 3    were returned to the DOE in March, April, May and
 4    June of 2014 were the result of unsubstantiated
 5    balances between G5 and COD as compared to R2T4s or
 6    refunds?
 7         A.    I'm not understanding your question,
 8    because the money sent back in March, for example,
 9    was -- called the refund of DOE, and the STARS
10    records called most of those refunds either REF or
11    R2T4.  So they're sending money back.
12         Q.    Yep.
13         A.    It's going back so it has to be called
14    something, and some of it was overfunded, and it
15    wasn't an issue with the ledger, according to
16    testimony, but that's what the STARS records called
17    it.
18         Q.    So all of the monies that you were able to
19    identify in March, April, May and June of 2014 that
20    were returned to the DOE were either identified as
21    R2T4s or REFs, refunds; is that correct?
22         A.    Well, in the DOE's records that I've seen,
23    there were -- they're referred to as refunds,
24    period.  No distinction.  They're just refunds back
25    against a particular award year, direct loan, Pell.
```

Page 161

```
 1              Within STARS, which is not direct cash
 2     activity, because it's a database of recording cash
 3     activity, they record refunds during this time
 4     period, they record REFs and R2T4s.
 5          Q.   Did it record return of reconciliation
 6     imbalances?
 7              MS. WRIGHT:  Objection.
 8              THE WITNESS:  I don't recall that data as
 9          I sit here.
10     BY MR. KREITZER:
11          Q.   Okay.
12          A.   Maybe I should clarify.  Can you read your
13     question back?
14              (Last question read back.)
15              THE WITNESS:  I should have asked you to
16          clarify.  Are you suggesting that that is a
17          code in STARS?
18     BY MR. KREITZER:
19          Q.   I'm not suggesting anything.  I got your
20     answer.
21          A.   Well, then I -- I understood --
22          Q.   Do you want to amend your answer?
23              MS. WRIGHT:  Objection.
24              THE WITNESS:  I want to understand the
25          question, because I understood, from your
```

Page 162

1         question, that you were suggesting there's
2         something called -- I had answered there's a
3         reference STARS, REF, and R2T4, and then the
4         next question was about that phrase, and that's
5         not a phrase I've seen in STARS.
6    BY MR. KREITZER:
7         Q.   Okay.  Let me turn your attention to
8    paragraph 48 of the declaration of Mr. Harding.
9              Paragraph 48 is much of what we've been
10   talking about for the last hour or so.  It says,
11   quote, When the company attempted to integrate the
12   Anthem Education system into the FCC system," paren,
13   "which also included implementation of a new third
14   party financial aid management system," close paren,
15   "in early 2013, the software files did not process
16   correctly, which corrupted student records
17   transmitted to COD, creating an imbalance between G5
18   and COD systems."
19             Did I read that correctly?
20        A.   You did.
21        Q.   Do you agree with Mr. Harding's statement
22   based upon your forensic examination?
23             MS. WRIGHT:  Objection.
24             THE WITNESS:  I don't agree or disagree.
25        I was aware that this was something that was

Page 163

1          talked about in testimony.

2     BY MR. KREITZER:

3          Q.   Okay.  And you've performed no independent

4     examination to determine whether Mr. Harding's

5     statement was correct or not.

6               Is that your testimony?

7          A.   Aside from what I testified this morning

8     about my concerns with the accounting

9     infrastructure, but I haven't looked at the software

10    issues, no.

11         Q.   Let's move on to paragraph 49.

12              "Because of the software issues, the

13    company had to reconcile approximately 10,000

14    student records that were corrupted and begin having

15    to manually process its Title IV funding."

16              Did I read that correctly?

17         A.   Yes.

18         Q.   Okay.  And did your forensic examination

19    confirm Mr. Harding's statement?

20              MS. WRIGHT:  Objection.

21              THE WITNESS:  Not one way or the other.  I

22         was aware of this software issue, but I didn't

23         analyze the software back then.

24    BY MR. KREITZER:

25         Q.   So you didn't look at how much time, for

Page 164

1    example, may have been consumed or -- strike that.

2              You didn't look at how much time was

3    necessary for the financial aid department to expend

4    in order to reconcile the G5 with the COD accounts,

5    correct?

6         A.   Other than knowing that it was occurring,

7    it would take time and, therefore, I wasn't

8    analyzing a day.  I was analyzing the time period we

9    talked about.

10        Q.   The next sentence says, "Manually

11   processing and reconciling the Title IV funding for

12   a company now triple its original size, however,

13   proved to be extremely difficult and costly."

14             Did your forensic examination of the

15   records of FCC confirm that statement?

16        A.   Not one way or the other.

17             MS. WRIGHT:  Objection.

18   BY MR. KREITZER:

19        Q.   You didn't see an increase in labor

20   expenses associated with the financial aid

21   department attempting to reconcile these plus or

22   minus 10,000 student records that had been

23   corrupted?

24        A.   I don't recall anything as I sit here.

25        Q.   Okay.  That wasn't -- you weren't asked to

1   investigate that, correct?

2         A.   The cost of the labor needed to correct

3   the software issue, no.

4         Q.   Do you think it is a material fact that,

5   as a result of the software issues encountered at

6   FCC, that approximately 10,000 student records were

7   corrupted?  Do you think that's a material fact?

8               MS. WRIGHT:  Objection.

9               THE WITNESS:  I don't know one way or the

10         other.  It depends on what issue you're talking

11         about.

12   BY MR. KREITZER:

13         Q.   How would that fact, the fact that 10,000

14   student records were corrupted, according to

15   Mr. Harding, have impacted the ability of the

16   company to timely reconcile a G5 with the COD

17   program?

18               MS. WRIGHT:  Objection.

19               THE WITNESS:  I assume it would have an

20         impact on that spot moment, yes, because

21         they're not -- your COD number is not what you

22         thought it was, and you need to put those

23         rejects back in the system.

24   BY MR. KREITZER:

25         Q.   And it's your general understanding that

Page 166

1    that event, to the extent it happened, was only at a

2    spot in time, only one time?  Is that your general

3    understanding?

4              MS. WRIGHT:  Objection.

5              THE WITNESS:  No, that's my example.

6         That, for a particular draw, it would be off,

7         but I don't know how many times it happened.

8    BY MR. KREITZER:

9         Q.   Were you aware of the fact that it

10   happened throughout 2014?

11             MS. WRIGHT:  Objection.

12             THE WITNESS:  Again, I don't know how many

13        times it happened.  My use of the term "spot"

14        is about, if you're looking at one spot upload,

15        you might look at what happened to that upload.

16        I understand.

17   BY MR. KREITZER:

18        Q.   Were you aware of the fact that the data

19   was corrupted and continued to be corrupted

20   throughout January, February and March of 2014?

21             MS. WRIGHT:  Objection.

22             THE WITNESS:  I was aware of testimony

23        alleging that there was software issues during

24        this time.

25   BY MR. KREITZER:

Page 167

1          Q.    That wasn't my question.

2                Were you aware of the fact that the data

3    of student records in COD continued to be corrupted

4    throughout January, February and March of 2014?

5                MS. WRIGHT:  Objection.

6                THE WITNESS:  I didn't make an opinion on

7           whether or not it was or was not, but I saw

8           testimony alleging that there was software

9           issues.

10   BY MR. KREITZER:

11         Q.    Based on your forensic examination, were

12   you ever able to conclude that that was not the

13   case, that the data had not been corrupted

14   throughout January, February and March of 2014?

15               MS. WRIGHT:  Objection.

16               THE WITNESS:  As I said, I didn't look at

17          the software corruption either way.  So I

18          didn't make an opinion that it was or was not.

19   BY MR. KREITZER:

20         Q.    Well, when you formed the opinion through

21   all these various charts, you have lots of charts in

22   your report, colorful, red dots and orange lines and

23   things like that, would it not have been important

24   for you to understand the reason why the G5 accounts

25   were larger than the COD accounts?

Page 168

1        A.    The background and the things that are

2    important are in my report, and I already told you

3    this morning that the reason it was higher was that

4    it was -- the balance was greater than that was

5    substantiated, and I also know that they had to send

6    back significant amounts of money to the DOE.

7            The DOE elected to shut them down on

8    advanced pay in late March.  And, eventually, bad

9    debts needed to correct their financial accounting

10   records.  So I know those things as well, and as I

11   said earlier, I'm looking at it over time.

12       Q.    Is it your contention that the Department

13   of Education discontinued the ability of FCC to draw

14   down Title IV financial aid direct loans?

15       A.    When?

16            MS. WRIGHT:  Objection to form.

17   BY MR. KREITZER:

18       Q.    Say on April 1st or April 2nd.

19            I'll ask the question differently because

20   I don't have the exact dates, so let me do it

21   differently.

22            You're aware that the Department of

23   Education wrote a letter, I think, on either

24   March 1st or March 2nd, advising FCC that it needed

25   to substantiate the imbalance between G5 and COD,

Page 169

1  correct?

2          MS. WRIGHT:  Objection to form.

3          THE WITNESS:  Among other things, yes.

4      It's one of the things they said.

5  BY MR. KREITZER:

6      Q.   Okay.  And at the end of that month,

7  whether it was -- whether it was March 30 or

8  April 1st, I honestly don't remember as we sit here

9  right now, the Department of Education took specific

10  action because the accounts had not been fully

11  substantiated, correct?

12      A.   Correct.  They weren't substantiated or

13  the balance hadn't come down to match the

14  substantiated balance.

15      Q.   As a consequence of that, the department

16  took some action, correct?

17      A.   Yes.

18      Q.   And what was the action that it took?

19      A.   They took away their ability to be

20  advanced pay.

21      Q.   What is the effect of taking away the

22  school's ability to be on advanced pay?

23      A.   You can't draw down -- you can't draw down

24  money without records.  So you become records first,

25  essentially.

Page 170

1      Q.   Okay.  So, in other words, you have to

2  upload your records to COD before you can download

3  funds from G5, correct?

4           MS. WRIGHT:  Objection.

5           THE WITNESS:  Yes, records first.  You

6      have to substantiate first and then once it's

7      substantiated, then you can pull.  You're no

8      longer on advanced pay.

9  BY MR. KREITZER:

10     Q.   Explain to us what you understand the

11 school physically had to do in order to engage in

12 records first?

13          How did that look different, if at all,

14 from advanced pay?

15     A.   Well, there would -- you don't have access

16 to your funds in the same way.  It's taking out

17 capital from the company because now you need to

18 substantiate the record, make sure it's posted, and

19 then you can pull the money.

20     Q.   Okay.  You said "substantiate the record,

21 make sure it's posted."

22          That's one and the same, correct?

23     A.   Yes.  I'm generalizing the terms, but I

24 understand it that you have to substantiate the

25 student, it has to be accepted and posted before you

Page 171

1    can have the cash.  Something they were doing with

2    our OPE IDs earlier in their time.

3         Q.   Is there anything more complicated -- when

4    you say substantiating the student, is there

5    anything more complicated than just uploading that

6    student's disbursement into COD?

7              MS. WRIGHT:  Objection.

8              THE WITNESS:  That's a DOE detail I'm not

9         aware of.  If it's different -- I understood

10        that the big difference is that you no longer

11        have advanced access to cash, and you need to

12        substantiate first.

13   BY MR. KREITZER:

14        Q.   Okay.  And did you ever perform any cash

15   flow analyses to show the distinction between being

16   on advanced pay at FCC versus being on records

17   first?

18        A.   I looked at some testimony on that.  I

19   looked at some records for OPE IDs that -- some that

20   were on advanced first and some that weren't.  So I

21   did look at that issue, yes.

22        Q.   And what did you conclude?

23        A.   I concluded that it takes some capital out

24   of the business because now you need to substantiate

25   it first and schools want to be on advanced pay.

Page 172

1       Q.   How much capital did you conclude was

2   removed from the business, so to speak, as a result

3   of the decision of the department to put FCC on

4   records first?

5            MS. WRIGHT:  Objection.

6            THE WITNESS:  I don't have a particular

7         number for you.  I understood it was important

8         to the schools.  Mr. Knobel testified or wrote

9         a letter that it was important.

10            They tried to get back on advanced pay.  I

11         don't have an exact number for you.

12   BY MR. KREITZER:

13       Q.   Is it your conclusion that the

14   department's decision to put the school on records

15   first caused the bankruptcy?

16       A.   I understand that's the plaintiff's

17   allegation, that --

18       Q.   What is your conclusion, if any?

19       A.   My conclusion is that advanced pay is

20   important and takes capital out of the school.

21       Q.   That wasn't my question.

22            My question is, did you conclude that the

23   decision by the Department of Education to put FCC

24   on records first caused the company to have to file

25   for bankruptcy?

Page 173

1           MS. WRIGHT:  Objection.

2           THE WITNESS:  I don't have an independent

3       opinion about this, but I see from the record

4       that it was a serious factor in their

5       bankruptcy.  It took away capital.

6   BY MR. KREITZER:

7       Q.   Clearly wasn't the sole factor, was it?

8           MS. WRIGHT:  Objection.

9           THE WITNESS:  I don't know, is it the sole

10      factor, but it was a serious concern, and I

11      understand plaintiff is alleging that that's

12      what happened.  And people have testified as

13      much.

14  BY MR. KREITZER:

15      Q.   What were the other factors that were in

16  play at the moment in time when the department put

17  the school on records first in 2014?

18          MS. WRIGHT:  Objection.

19          THE WITNESS:  The other factors?  I'm

20      sorry.

21  BY MR. KREITZER:

22      Q.   That's fair.  My question probably wasn't

23  complete.

24          What were the other factors affecting the

25  financial well-being of the company as of, say,

Page 174

1   April 1st, 2014, aside from the fact that the DOE

2   had decided to put the school on records first?

3          MS. WRIGHT:  Objection.

4          THE WITNESS:  Well, their financial

5      position at the time, including owing the DOE

6      money.

7   BY MR. KREITZER:

8      Q.   What was the financial position of the

9   company at the time?

10     A.   I can't recall off the top of my head.

11  But, at the time, they owed the DOE substantial

12  money and were trying to pay the DOE back.

13     Q.   Now, you claim that the school owed the

14  DOE substantial money.

15          What were the components of the money that

16  you claim the school owed the DOE?

17     A.   I understood they were unsubstantiated

18  balances that had to be paid back or substantiated.

19     Q.   What do you mean by that?

20     A.   The balances, as we talked, is two

21  different things.  It's a combination of the G5 net

22  amount and the COD amount.  And if you have a

23  balance, you either need to send money back to bring

24  the balance down or you need to substantiate that

25  balance for money you already took.

1        Q.   Was, to your knowledge, the school

2   actively attempting to substantiate the balances for

3   the money it had taken?

4        A.   From the communication and the balance,

5   they were doing both.  They were trying to

6   substantiate the balance and they were wiring money

7   back at this time period.

8        Q.   Do you fault my clients for attempting to

9   try to substantiate the accounts?

10            MS. WRIGHT:  Objection.

11            THE WITNESS:  No.

12   BY MR. KREITZER:

13        Q.   Do you fault my clients for suffering

14   through the software corruption caused by Regent 8?

15            MS. WRIGHT:  Objection.

16            THE WITNESS:  When you say "do I fault

17       your clients," I really need you to explain

18       that to me.

19   BY MR. KREITZER:

20        Q.   Well, in your report, you say, as a

21   consequence of the breaches of my client, and then

22   you go on to reach certain opinions.

23            Do you remember that?

24        A.   I do.

25        Q.   So you're drawing a distinction between

Page 176

```
 1   what you claim are breaches of my client that you
 2   think entitle your client to money, right?
 3            MS. WRIGHT:  Objection.
 4            THE WITNESS:  Well, let's be clear.  I'm
 5        not the plaintiff.  I'm preparing analyses and
 6        I'm being asked to do things like assume
 7        liability.  So we can't confuse those things.
 8   BY MR. KREITZER:
 9        Q.   Well, you didn't say, in your opinion, if
10   the plaintiff's allegations prove to be correct.
11            You actually say, based upon the breaches
12   of the defendants.
13            I mean, I could read it to you, if you'd
14   like.
15            Would you like me to?
16        A.   You could, but I believe I say --
17        Q.   I will read it to you.  It says --
18   paragraph 67, it says, quote --
19            MS. WRIGHT:  Whoa, whoa, whoa.  I think
20        Jim was talking.  You interrupted him.
21   BY MR. KREITZER:
22        Q.   Do you want to say something, sir?
23        A.   I certainly say alleged in parts of my
24   report.
25        Q.   Really?  You do.  Actually, you do.
```

Page 177

1    You're correct?

2         A.   I say alleged.  In parts of my report, if

3    I have a breach without the word "alleged," I

4    clearly understand that the plaintiff needs to prove

5    its case.

6         Q.   I'll stand corrected on paragraph 67.  You

7    do say "alleged."

8              What it says is, quote, As discussed

9    above, the defendant's alleged breaches concern

10   FCC's improper use at DOE Title IV funds.

11             And then above that, in paragraph 67, you

12   say, "I have been asked by counsel for the

13   plaintiffs to estimate the fair value of FCC's

14   business enterprise but for the defendant's alleged

15   breaches."

16             So that's why I'm asking you about these

17   breaches.

18             So do you understand why I'm focusing in

19   on this issue?

20        A.   I do, but I'm assuming the breaches.

21        Q.   So let's go back to the financial position

22   of FCC as of the date that the department put the

23   company on records first.

24             You said that the company was returning

25   funds to the Department of Education at that time,

Page 178

1   correct?

2       A.   They had been throughout March and other

3   months, yes.

4       Q.   To your knowledge, is the fact that any of

5   those funds had to be returned the fault of any one

6   or more of my clients?

7           MS. WRIGHT:  Objection.

8           THE WITNESS:  I'm not here to ascribe

9       fault.  I know the plaintiff is alleging that

10      they -- your clients had an infrastructure that

11      allowed them to pull down money beyond what

12      they were supposed to take, but that's an

13      allegation in this case.

14          I'm not ascribing fault.  That's my

15      understanding of the allegations in this case.

16  BY MR. KREITZER:

17      Q.   And in point of fact, you don't have an

18  opinion whether there really was an infrastructure

19  that allowed my clients or allowed FCC to pull down

20  money beyond what it was supposed to take, correct?

21      A.   I have opinions in my report that clearly

22  relate to that subject, and my opinions are

23  described and I lay out the differences and the

24  balances, my concern with some of the accounting

25  infrastructure, but those are my opinions.

1      Q.   How, if at all -- strike the question.

2           Do you know who my clients are?  Let's

3      start with that.

4      A.   Yes.

5      Q.   Okay.  And it's not a memory test, so I'm

6      not going to make you do that.

7           Now you understand that my clients are

8      David Knobel, Jeffrey Pierne, Neal Yawn, Dean

9      Bartness, Siana Stewart and Cid Yousefi, correct?

10     A.   Yes.

11     Q.   My client is not FCC, right?

12     A.   No.  I understand your clients are the

13     directors and officers, if you will, of the company.

14     Q.   One director, right?

15     A.   I'm using that as a term, but, yes.

16     Q.   And in all of your forensic examination

17     work that you did in this case, were you ever able

18     to determine whether any one or more of my clients

19     individually profited from any of the conduct that

20     the plaintiff is alleging?

21          MS. WRIGHT:  Objection.

22          THE WITNESS:  I don't know.

23     BY MR. KREITZER:

24     Q.   You weren't able to uncover any profit

25     earned by any one or more of them, correct?

1      A.   I have not analyzed their personal salary

2   and things like that, no.

3           MR. KREITZER:  Why don't we take a break

4       so you can -- everybody can relax and we'll be

5       right back.

6           THE VIDEOGRAPHER:  We're going off the

7       record.  The time is 2:57.

8           (Short recess taken.)

9           THE VIDEOGRAPHER:  We're now back on the

10      record.  The time is 3:30.  Media No. 4.

11  BY MR. KREITZER:

12      Q.   Mr. Donohue, you said that, at the time

13  that the department elected to put FCC on records

14  first, that, aside from that event, there were other

15  events that were occurring or that the company was

16  experiencing that would have had a negative impact

17  upon the financial condition of the company.

18           Is that a fair statement?

19           MS. WRIGHT:  Objection.

20           THE WITNESS:  I don't know if I said that.

21      I don't recall saying something --

22  BY MR. KREITZER:

23      Q.   Let me ask you that question.

24           Do you believe that, at the same time that

25  the Department of Education placed FCC on records

Page 181

1   first in approximately April of 2014, that there

2   were other financial events occurring to the company

3   that were having a negative impact on its ability to

4   continue as an ongoing entity?

5           Is that a fair statement?

6       A.   I believe I do talk about some things in

7   my report.  There was -- you have to read that back.

8   I'm sorry.  I don't think I understand your

9   question.

10      Q.   Were there other events occurring to the

11  company in a financial nature that were having a

12  negative impact upon its ability to continue as an

13  ongoing enterprise aside from the Department of

14  Education's decision, in April of 2014, to put the

15  company on records first?

16      A.   Well, in that situation, in the actual

17  terms that they were also -- they had sent back a

18  lot of money prior to that point, which drained

19  resources, and they were about to miss payroll.  So

20  those are some of the, I guess, consequences of this

21  problem, but those are the things that were going on

22  at the time.

23      Q.   Aside from the fact that the company had

24  sent back money to the DOE, which you claim drained

25  resources and the fact that, according to you, the

Page 182

 1   company was about to miss payroll, were there any

 2   events that were, from your opinion, material to its

 3   long-term survivability at that time?

 4           MS. WRIGHT:  Objection.

 5           THE WITNESS:  I think the only other thing

 6       is that, at that time, they had already spent

 7       some capex.

 8           But, again, it all relates to this problem

 9       and liquidity issues that the company incurred

10       during this reconciliation and the need to pay

11       back the DOE, but I'm not aware of any outside

12       event or other major issue in the economy and

13       things like that, that were impacting them.

14   BY MR. KREITZER:

15       Q.  The money that had to be sent back to the

16   department, as you claim, we already discussed the

17   fact that you do not know what the relative

18   proportion of that money was that was either refunds

19   or R2T4s on the one hand versus monies that

20   allegedly had to be returned in order to balance the

21   G5 and the COD accounts; am I correct?

22       A.  No.  I know that all of that was going on

23   and all of that was helping balance the COD

24   accounts.

25       Q.  Right.  But you don't know -- how much

Page 183

1    money was allegedly returned -- let me strike the

2    question.

3              How much money was allegedly returned to

4    the Department of Education in, say, the first

5    quarter of 2014?

6         A.   March was about 8 million -- I'm sorry.  I

7    mixed up my years.

8              You said first quarter of fiscal '14 or do

9    you mean calendar?

10        Q.   Let's say calendar year 2014.

11        A.   Close to $15 million.

12        Q.   How much?

13        A.   15.

14        Q.   One five?

15        A.   One five.

16        Q.   Do you break it out by month?

17        A.   I do.

18        Q.   How much is it per month?

19        A.   It's about 2.8 million, rounding in

20    January; 3.2 million in February; and 8.7 million

21    and change in March.

22        Q.   So of that 2.8 million in January, are you

23    able to say how much of that was refund money or

24    R2T4 money?

25        A.   The DOE records I have, G5, do not

Page 184

 1   specify, for example, Davis 307, doesn't specify.

 2   It calls them all refunds.  So those records don't

 3   specify that.

 4          The only thing that would be instructive

 5   there, potentially, would be the STARS records that

 6   are supposed to record that activity in an

 7   individual student level and we call them either

 8   refund or return, R2T4.

 9      Q.   Wouldn't it also appear in the financial

10   records of FCC?

11      A.   Well, those are financial records of FCC,

12   yes.

13      Q.   I know they are.  But by that, I mean the

14   accounting records, the general ledger, for example.

15      A.   In some aggregate, we're looking at cash

16   management, and things like that.

17          But the description you're looking for,

18   which I assume is you're using the STARS

19   descriptions, would be recorded in the STARS system,

20   primarily.

21      Q.   And were you able to look into the STARS

22   data for January of 2014 to determine how much money

23   was returned to the department for R2T4?

24      A.   I was able to look into the STARS records

25   themselves and what FCC reflected in STARS to record

Page 185

1    activity with the DOE, but they're two different

2    things.

3            STARS was out of balance with DOE, COD and

4    G5, so there's a timing difference because G5 is the

5    actual wires back.  STARS is the accounting

6    recording of that activity during the time.

7        Q.   Right.  Understood.

8            So now were you able to look into the

9    STARS data to tell me how much money, in January of

10   2014, was returned to the department on account of

11   R2T4?

12       A.   Well, for example, the STARS records --

13       Q.   What exhibit are you looking at?

14       A.   I'm in 9A.

15       Q.   Okay.

16       A.   First, the STARS records for fiscal '14

17   show that there was substantial REF classified

18   refunds and R2T4 classified refunds.  And for

19   January, in particular, it's 2.5 million for refunds

20   and 1.234 million for R2T4, but that is the STARS

21   representation of that, not the wire to G5.

22       Q.   I presume you're looking at the row that

23   says REF and R2T4, right?

24       A.   Correct, in my Exhibit 9A, as in apple.

25       Q.   Below that is another row called SR.

Page 186

1           Do you see that?

2       A.   I do.

3       Q.   What is that?

4       A.   SR, I understand, is student refunds.

5       Q.   What does that mean?

6       A.   People have used this term in different

7  ways, but I understand what it means in here is an

8  actual repayment to the student for a credit

9  balance.

10      Q.   Is there an entry in STARS reflective of

11 monies being returned to the department on account

12 of the imbalance between G5 and COD?

13      A.   Can you ask that again, please?

14      Q.   Sure.  Is there any indication in STARS

15 data that would indicate monies being returned to

16 the department on account of the unsubstantiation

17 issue that you've been testifying about between G5

18 and COD?

19      A.   In part, in a broad sense, STARS is

20 tracking it internally.  So to the extent that cash

21 is sent back or activity is substantiated, that

22 would be activity that would be one way to close

23 that difference between STARS and G5.

24      Q.   Right.  That is to say if you actually

25 uploaded a student record, you're able to clean out

```
                                              Page 187
 1    whatever corruption was originally in the data and

 2    COD actually accepted the student record, then your

 3    point is that that would reduce the imbalance

 4    because the amount now in COD would be a larger

 5    amount, correct?

 6              MS. WRIGHT:  Objection.

 7              THE WITNESS:  We're talking about STARS,

 8         and that would be about how the STARS -- if the

 9         STARS data gets reflected in COD.

10    BY MR. KREITZER:

11         Q.   Right.  It doesn't change the STARS data.

12    It changes the COD data, right?

13         A.   Well, efforts to close the balance, which

14    I believe was your question, would be reflected in

15    STARS to either record a refund or an additional

16    substantiation.

17         Q.   Okay.  So show me where, in your words, an

18    additional substantiation would be reflected in

19    STARS.

20         A.   Well, it's the start of an additional

21    substantiation.  But, basically, within the total

22    Pell and those direct loan amounts, those are by

23    students, and I understand that that would be the

24    individual ledger that would be part of the process

25    to substantiate COD.
```

1      Q.    All right.  So it wouldn't matter, in a

2    theoretical sense, what numbers were contained in

3    STARS if someone was trying to -- let me not go

4    there, because we'll go down a rabbit's hole for an

5    hour.  Let's do it differently.

6            MS. WRIGHT:  My daughter thanks you.

7    BY MR. KREITZER:

8      Q.    If there is a refund of or an R2T4 that is

9    required for students that were attending classes,

10   that number would appear in the columns -- I'm

11   sorry -- in the rows called REF and R2T4, correct?

12           MS. WRIGHT:  Objection.

13           THE WITNESS:  It depends on how that's

14       recorded, but I understood that adjustments to

15       STARS included refunds and R2T4 for different

16       types of circumstances.  That's what's been

17       suggested in the testimony.

18   BY MR. KREITZER:

19     Q.    But did you confirm that?

20     A.    Did I confirm that FCC was recording STARS

21   data correctly?

22     Q.    Yeah.

23     A.    I've not audited the student ledger to see

24   if they were recording STARS correctly.  I'm using

25   their STARS information as they've been using it.

Page 189

1    I've not looked at student records to see if they

2    were not recording STARS correctly, other than my

3    macro analysis, which is looking at all the records

4    together and the cash flows and how they relate to

5    one another with G5 and COD.

6        Q.   So we're back to the question of when the

7    school is allegedly refunding money back to the

8    department in order to reconcile G5 with COD.

9            You were trying to explain to us that that

10   event would be reflected in STARS.  That's what I

11   understood you to tell us earlier.  That's why we

12   started this conversation.

13           Am I correct?

14       A.   It could be, yes.

15       Q.   Show me where it is.

16       A.   If it was in STARS in the first place,

17   yes.

18       Q.   Show me where it is.

19       A.   Well, some of the refunds would be in the

20   first two lines.  The REF and R24s would be --

21       Q.   No.  These would not be refunds on account

22   of balancing G5 with COD.  You're not suggesting

23   that, are you?

24       A.   Well, I am suggesting that in that there's

25   balances.  They both have balances and the STARS

Page 190

1    activity, which becomes COD activity, in theory, is
2    reflected there.
3         Q.   I don't know if it's just late in the day
4    and maybe I'm not understanding you or you're not
5    understanding me.
6              But your report -- this is not a STARS
7    report that we're looking at, Exhibit 9A.  This is
8    your report, correct?
9         A.   It's my report.
10        Q.   All right.  And you're standing by this
11   report as being an accurate representation of
12   whatever it is you're trying to communicate by way
13   of this report, correct?
14        A.   Yeah.  These are the company's records.
15        Q.   Well, this is not the company's records.
16   This is your assimilation of the company's records,
17   correct?  There is no record created by the company
18   that looks like this, right?
19        A.   Not exactly like Exhibit 9A.
20        Q.   You created this.
21        A.   I created it, summarizing and showing that
22   the STARS 90/10 report, that's what the company
23   calls it, and I've characterized it by month like
24   they do.
25        Q.   Okay.  But to be clear, it's your report,

Page 191

 1    not the company's?
 2         A.    The company's report says the same numbers
 3    as this.
 4         Q.    Well, that remains to be seen, but I
 5    understand your representation, okay?
 6         A.    Okay.
 7         Q.    All right.  We can agree to disagree on
 8    that point.
 9              But now I'm asking you where, if at all,
10    in this report is it reflected when the company
11    refunds money back to the department on account of
12    trying to substantiate the G5 and the COD accounts.
13              MS. WRIGHT:  Objection.
14    BY MR. KREITZER:
15         Q.    If at all.
16              MS. WRIGHT:  Objection.
17              THE WITNESS:  This report would reflect,
18         it would be an internal entry to reflect
19         activity that's either influencing the balance
20         of G5 or the balance of COD, and so that ends
21         up being reflected here.
22    BY MR. KREITZER:
23         Q.    So if the -- as if and when a student's
24    record is adjusted to reflect a disbursement from
25    Title IV, clearly, that event should be reflected in

Page 192

1    the student's individual ledger within STARS,

2    correct?

3        A.   Yes.

4        Q.   And, eventually, hopefully, that data is

5    uploaded into COD, correct?

6        A.   That's my general understanding, yes.

7        Q.   Unless the data is corrupted, it will

8    upload and be accepted, right?

9        A.   Yes.

10       Q.   Likewise, if the school experiences a

11   scenario where a student does not -- registers for

12   classes but does not actually commence attending

13   those classes, there would be a refund reflected in

14   STARS, correct?

15       A.   If the student was there in the first

16   place, yes.

17       Q.   Well, you and I have a difference of

18   agreement there -- a difference of opinion there, so

19   we won't -- we don't have to debate the difference

20   between a refund and an R2T4, but you would agree

21   with me that if the student doesn't show up or if

22   the student shows up but then ceases to continue to

23   matriculate, then, in either of those cases, the

24   school has an obligation to refund some or all of

25   the T4 money, right?

Page 193

1          A.    Yes, they have to refund the money, and my

2     reference before was about he would need to be in

3     STARS to take a credit back out again.   So whatever

4     it is, a refund or a T4.

5          Q.    So, in other words, if you looked at the

6     student's ledger card, and hypothetically the

7     student had $2,000 as a tuition expense, when the

8     school draws down money from G5, it should show a

9     disbursement on that student's ledger card in the

10    amount of $2,000, right?

11         A.    Yes.

12         Q.    Which means now the student, based on the

13    ledger card, doesn't owe anything more to the school

14    because the student has paid his tuition by virtue

15    of that loan?

16         A.    I understand.

17         Q.    And then that student account is uploaded

18    into COD showing that disbursement, and so now COD

19    recognizes that those funds have been properly

20    allocated to that student, correct?

21              MS. WRIGHT:   Objection.

22              THE WITNESS:   Understood.

23    BY MR. KREITZER:

24         Q.    All right.   And that is the process as you

25    generally understand it?

Page 194

1       A.   The timing differs, depending on what

2   advance pay records first you're on.  But, in

3   general, as to the timing, yes, you have to

4   substantiate and put the records up so you can pull

5   the two grand or support the two grand you pulled.

6       Q.   Since we're on the subject, to make sure

7   we have a meeting of the minds, if the school was on

8   records first, records first, then the school would

9   have to show the disbursement in STARS on the

10  student's account reflecting the credit to the

11  student for payment of that $2,000, and then upload

12  that student account into COD, correct?

13      A.   Yes.  It has to -- it can't just be in

14  STARS.  It needs to be up in CO.

15      Q.   Yep.  Once it's uploaded into COD, then

16  and only then can the school draw down that

17  $2,000 from G5?

18           MS. WRIGHT:  Objection.

19           THE WITNESS:  Yes, subject to any

20       regulations that come with being records first.

21       But that's my understanding.

22  BY MR. KREITZER:

23      Q.   Okay.  And just because you threw out that

24  qualification, are you aware of any?

25      A.   I'm not aware as I sit here, but I'm not

1  purporting to be a master of the rules regarding

2  records first, but that's the general purpose of

3  those records.

4       Q.   I understand you and I are on the same

5  plane, we seem to have a similar understanding of

6  the process.

7            And, likewise, I see in your report 9A,

8  that there are, on a monthly basis, a certain amount

9  of money that is being refunded -- that is being

10  returned back to the department on account of

11  refunds or R2T4s, right?  That's right there on your

12  record.

13       A.   Well, it's being recorded in STARS.

14       Q.   Yes.  And so one would expect that it's

15  also being returned -- you would expect it to be

16  returned to G5, right?

17            MS. WRIGHT:  Objection.

18            THE WITNESS:  Yes.

19  BY MR. KREITZER:

20       Q.   The place I'm getting hung up in

21  understanding your testimony is where on this

22  schedule, if at all, does it show any monies being

23  returned or the accumulated amount of monies per

24  month being returned to the department just on

25  account of the imbalance between COD and G5.

Page 196

1        Does that appear anywhere in this report,

2   this Exhibit 9A?

3        A.   Well, it does.  Because when you say "just

4   on account of the imbalance" --

5        Q.   Yeah.

6        A.   -- the imbalance is about the

7   substantiated versus G5.  And so given that the

8   STARS records are supposed to be reflecting in COD,

9   to the extent you are substantiating more students

10  or ones you hadn't substantiated or to the extent

11  that you're returning money that you owed and

12  changing your COD balance, it would be there.  It

13  would be reflected that way.

14       Q.   Where?  Show me where the entry is in the

15  scenario where the school is returning money owed.

16  You've used that term.  So I want to use exactly the

17  same term.

18       A.   Well, if they're wiring money back, just

19  like for most draws and refunds, just like the draw

20  is associated with individual students, the refund

21  is often associated with individual students.

22       Q.   Right.  So show me which line on your

23  Exhibit 9A reflects that sum of money, the sum of

24  money that's being returned back to the department

25  because it's allegedly owed.

Page 197

1      A.   Well, STARS would be reflecting

2  internally, and the REF and the R2T4 lines would be

3  reflecting that.  The G5 would be reflecting the

4  actual cash payment of that amount, but not at the

5  same time, given the various differences between

6  STARS and G5 that I talk about in my report.

7      Q.   So any and all monies, to the best of your

8  understanding, that were returned back to the

9  department between January of 2014 and June 30th of

10 2014, would have fallen into the category of either

11 refunds, R2T4s or SRs; is that correct?

12     A.   No.

13     Q.   What other categories were returned to the

14 department between January of 2014 and June 30th of

15 2014?

16     A.   SR -- I don't believe SRs are returned to

17 the department.

18     Q.   Okay.  They're returned to the student?

19     A.   Returned to the student.

20     Q.   That was the only part of my question that

21 you were objecting to or responding to?

22     A.   I believe so.  If you want to ask it

23 again.

24     Q.   I will.  Is it a correct statement to say

25 then, in studying your Exhibit 9A, the only monies

Page 198

1   that were returned to the Department of Education

2   between January of 2014 and June 30th of 2014, would

3   have been in the category of refunds or R2T4s?

4        A.   In normal course, I believe that would be

5   correct, because every draw and every refund, even

6   if it's a dollar amount, would have individual

7   students supporting each of those amounts.

8             However, in fiscal 2014, I saw testimony

9   that overdrawn amounts were not in the ledger, that

10  there was predrawn amounts that weren't associated

11  with students, according to Mr. Murphy.  And so to

12  the extent those amounts were not in STARS to be

13  returned, then I'm not sure an entry would show at

14  that time.

15       Q.   Okay.  And in connection with your

16  forensic examination in this case, were you able to

17  identify any monies which were returned to the

18  department which were funds that had not been

19  recorded in STARS?

20       A.   It's hard to associate them directly like

21  that because we're talking about total balances.

22            So, for example, in March 2014, they

23  physically wired $8 million back.  But STARS only

24  records $3 million in refunds.  So there are timing

25  differences.  There's testimony about the overdrawn

Page 199

1    amounts not being associated with a student.

2         So I see that evidence, and it's two

3    different things.  One is cash activity, actual cash

4    activity.  The other is people's reflection of

5    refund activity in the STARS system.

6         Q.   Well, I understand your answer, but aside

7    from this testimony, allegedly, of Mr. Murphy, were

8    you able to find any evidence of any monies which

9    were returned to the department for funds that had

10   not been recorded in STARS?

11        A.   The evidence includes the fact that the

12   timing is different.  Ms. Turgot also talked about

13   this, and Mr. DiCicco's e-mails did.  That's the

14   evidence I've seen, that these things aren't

15   matching.

16        Q.   You couldn't forensically, though,

17   numerically prove that; am I correct?

18             MS. WRIGHT:  Objection.

19             THE WITNESS:  No.  I forensically provided

20        information that shows that STARS and G5 were

21        out of balance.

22   BY MR. KREITZER:

23        Q.   Got that.

24        A.   The monthly balances don't match up, and

25   that suggests that there was -- at times, there was

Page 200

1    money drawn that was outside of STARS.

2         Q.   And that's your only evidence of the fact

3    that money was drawn outside of STARS, is that the

4    G5 and the COD did not balance?

5              MS. WRIGHT:  Objection.

6              THE WITNESS:  Well, that forensic

7         evidence, coupled with the testimony we've

8         talked about, and other forensic analyses in

9         here, including the way the bad debt was

10        handled as well.

11   BY MR. KREITZER:

12        Q.   All right.  And nothing in Exhibit 9A

13   would tell us -- none of the information contained

14   in Exhibit 9A would tell us how much money was

15   allegedly returned to the Department of Education as

16   a result of funds drawn down that were not

17   associated with a student?

18        A.   It would depend, because you could look at

19   the draws and the refunds, and to the extent they

20   get outside of STARS, which they do, you could

21   ascribe those additional funds and refunds as

22   outside of STARS, but eventually there's

23   reconciliations going on.  So it's really a timing

24   issue there.

25        Q.   Are you able to tell us how much money was

Page 201

1  returned to the department between January and June

2  of 2014 that was not either refund money or R2T4

3  money?

4        A.    Not as I sit here.  Again, in theory, in

5  normal course, it should all be refund or R2T4.

6              To the extent there was some overdrawn

7  monies, that would be in addition to that if it

8  wasn't recorded.

9        Q.    All right.

10        A.    Again, the G5 records call them refunds.

11        Q.    Is it your opinion, Mr. Donohue, that, but

12  for the school's requirement to return refund monies

13  and R2T4 monies in 2014, that the FCC schools would

14  have continued to be a going concern?

15              MS. WRIGHT:  Objection.

16              THE WITNESS:  I don't have opinions about

17        the liability issues in this case.  So I'm

18        having trouble answering your question.

19  BY MR. KREITZER:

20        Q.    In this case, I'm not asking you liability

21  at all.

22              I'm simply asking you whether -- I mean,

23  you're not disputing the fact that the school

24  returned R2T4 funds and refund monies in 2014,

25  right?

Page 202

1          You've been talking about it all day.

2     A.   No.  No.  They certainly returned millions

3 of dollars.  I can't characterize them all, as we

4 talked about it this way, because there's other

5 monies that's being returned.

6     Q.   But I asked you how much that other money

7 was and you haven't been able to tell me, right?

8     A.   Again, theoretically, it should have been

9 either refund or R2T4 --

10    Q.   I just want to be clear --

11    A.   -- that clearly were overdrawn amounts

12 that are refunded and they characterize it

13 internally one way and the G5 calls it a refund.

14    Q.   And I'm asking you now that, is it your

15 opinion that, but for the school's refund of R2T4

16 monies -- let me strike that.

17         I'm asking you now, sir, is it your

18 opinion that, but for the school's return of refund

19 monies and R2T4 monies in 2014, that the FCC schools

20 would have continued to be a going concern?

21         MS. WRIGHT:  Objection.

22         THE WITNESS:  I haven't analyzed it that

23      narrowly.  I understand that an allegation in

24      the case is that the breaches caused the Title

25      IV issues, which caused the bankruptcy, and

Page 203

1        I've been asked to assume the breaches don't

2        occur and that they would be a going concern.

3   BY MR. KREITZER

4        Q.   But I do think you've been asked, I think,

5   not to determine whether the breach has occurred or

6   not, but determine what the cause of the bankruptcy

7   was, right?  Isn't that part of your charge?

8             MS. WRIGHT:  Objection.

9   BY MR. KREITZER:

10        Q.   Maybe I'm misunderstanding your role.

11        A.   It wasn't necessarily part of my direct

12   charge, no.  It was related to what I'm doing, but

13   my direct charge was the financial analysis that

14   I've described in my report we've talked about

15   today, and I was providing valuation of FCC, but for

16   the breaches.

17        Q.   And your analysis evaluation -- let me ask

18   it differently.

19             Were there events occurring in the 2014

20   time frame that, in your opinion, had an impact on

21   the solvency of FCC which were unrelated to what the

22   plaintiff claims were the breaches by my clients?

23             MS. WRIGHT:  Objection.

24             THE WITNESS:  I'm not aware of anything

25        else like the Title IV reconciliation issue,

Page 204

1      given that it's 90 percent of their revenue in

2      cash.

3            And everything else I talked about stems

4      from the breach.  And we've talked about the

5      ability to restrict capital and things like

6      that.

7            But, again, that's the same issue.  It's

8      related to those breaches.  I understand the

9      plaintiff is claiming that the breaches caused

10     the bankruptcy of this company.

11           MR. KREITZER:  How much time do we have?

12           THE VIDEOGRAPHER:  4.37.

13           MR. KREITZER:  We used 4.37.

14           THE VIDEOGRAPHER:  Off the record.  The

15     time is 4:09.

16           (Short recess taken.)

17           THE VIDEOGRAPHER:  We're back on the

18     record.  The time is 4:10.

19  BY MR. KREITZER:

20     Q.   So in your report, Mr. Donohue, at

21  paragraph 7, you say, "To prepare my but-for

22  evaluation of FCC, I've been asked to assume that

23  FCC did not misuse DOE Title IV funds, and as a

24  result, did not lose the ability to receive Title IV

25  funds in the normal course of operations and would

```
1   have continued to be a going concern."

2           I want to ask you about the notion of

3   losing the ability to receive Title IV funds in the

4   normal course of operations.

5           So we have talked, I think at great

6   length, about the distinction between advanced

7   funding on the one hand and records first on the

8   other.

9           Is it your opinion that the DOE's decision

10  to convert the company's funding mechanism to

11  records first was the sole cause of FCC's failure to

12  be a going concern?

13          MS. WRIGHT:  Objection.

14          THE WITNESS:  I don't have opinions about

15      the bankruptcy and the plaintiff's claims here,

16      but I do know that -- in that sentence, it's,

17      yes, it's the Title IV misuse, and part of that

18      is the losing of advanced pay, but it's also

19      the records reconstruction that has to happen

20      and the money has to flow back.

21          I understand that that is alleged to have

22      caused a liquidity crisis that put the company

23      in bankruptcy.

24  BY MR. KREITZER:

25      Q.   So this is where I'm having my challenges
```

Page 206

1   in understanding your testimony.  So I'm glad we're

2   at this point.

3           So I'm not asking you to assume that FCC

4   misused DOE Title IV funds.  Of course, we adamantly

5   disagree with that, in point of fact.

6           But I understand that you weren't charged

7   with that responsibility.  So you're not here to

8   tell us whether the funds were misused or not,

9   correct?

10      A.   Not from a legal and regulatory point of

11  view.  I'm just providing financial accounting

12  opinions which I understand relate to that question,

13  but not from a legal point of view.

14      Q.   And not even from a factual point of view.

15  You're not here to factually say that my clients

16  misused Title IV funds, correct?

17          MS. WRIGHT:  Objection.

18          THE WITNESS:  The testimony and records

19      say what they say.  I'm providing --

20  BY MR. KREITZER:

21      Q.   I'm asking you about that testimony and

22  that record.  I'm asking you for your opinion in

23  this regard.

24          Sorry to interrupt you.  I didn't mean to.

25          Do you want to finish?

Page 207

1          A.    No.

2          Q.    Okay.  My question is a pretty discrete

3     one.

4               Are you rendering an opinion that my

5     clients factually, from your determination, misused

6     DOE Title IV funds?

7          A.    I am not providing liability opinions on

8     that.  I'm providing forensic accounting opinions

9     that relate to it.

10         Q.    The forensic accounting opinions that

11    you're rendering are entirely related to the damages

12    as a consequence of that alleged conduct; is that

13    correct?

14              MS. WRIGHT:  Objection.

15              THE WITNESS:  Not entirely.  They're

16         important to it, and I'm using it as support

17         for my analysis, my valuation analysis, but the

18         factual forensic accounting analysis I've done

19         is also instructive to the liability phase, but

20         other experts are opining on legalities and

21         regulatory issues with that.

22    BY MR. KREITZER:

23         Q.    And from the forensic analysis that you've

24    done, and by that I assume you mean your analytics

25    addressing the unsubstantiated balances --

1      A.   Yes, the forensic section of my report,

2    right.

3      Q.   That forensic section doesn't cause you to

4    have an opinion on whether my clients misused Title

5    IV funds, correct?

6           MS. WRIGHT:   Objection.

7           THE WITNESS:   Doing my work, I lay out

8       some concerns within my report about control

9       and the accounting infrastructure and things

10      like that.   They're in there.

11           But, again, the misuse I am talking about

12      here is about the legal and regulatory issues

13      with that.

14           Do I have observations about accounting

15      infrastructure and how you can get to a point

16      like this?   I lay them out in my report.

17   BY MR. KREITZER:

18      Q.   We'll come back to that in just a couple

19   of minutes.

20           So now I want to focus not on the question

21   of whether my clients did or did not misuse DOE

22   Title IV funds, because you kind of -- that's not

23   part of your opinion, but I want to focus on this

24   concept that your opinion is based on the fact, or

25   you've been asked to assume that the company did not

Page 209

1   lose the ability to receive Title IV funds in the

2   normal course of operations.  I want to focus on

3   that for a moment.

4            You understand where I'm going?

5       A.   I do.

6       Q.   So, hypothetically, if my clients had

7   allegedly engaged in this misuse of DOE Title IV

8   funds, which is not part of your opinion, but had

9   they done that, and despite that, the department had

10  not put the company on records first, that the

11  company still enjoyed the right to advanced funding,

12  is it your opinion that the company would continue

13  to be a going concern?

14            MS. WRIGHT:  Objection.

15            THE WITNESS:  In that hypothetical, you

16       appear to be suggesting that they would be able

17       to use the DOE line as a credit source, and the

18       credit source would not be shut down.  And so

19       it wouldn't be advanced -- it would be assumed

20       to be advanced pay, and, you know, there's

21       still balances that need to be paid.

22            So that's what I'm confused at, is that

23       that's still going on, and that's the

24       plaintiff's allegations.

25  BY MR. KREITZER:

1      Q.   So that's really what I'm trying to

2  understand, is that, is your opinion based on the

3  fact that there were monies that -- large amounts of

4  monies that were being repaid back to the Department

5  of Education in the first four months of 2014 and

6  that was the result or that was the cause of the

7  bankruptcy versus that the Department of Education

8  changed the method in which the schools were able to

9  draw down Title IV funds and that caused the

10 bankruptcy to occur.

11      I'm trying to understand what you claim

12 caused the bankruptcy to occur, if anything.

13      MS. WRIGHT:  Objection.

14      THE WITNESS:  I understand the plaintiff

15      is claiming that the breaches, which include

16      things like the misuse of funds, letting that

17      balance grow, losing the ability for Title IV

18      funds, that all of that caused the bankruptcy,

19      as -- you know, did one cause it versus the

20      other?  I haven't analyzed that question.

21      That's what did occur, and that's -- the

22      bankruptcy resulted.  All of that went on, and

23      it's not just that they were reduced to records

24      first.  It was the not knowing your financial

25      position throughout the years, and no longer

Page 211

```
 1          having to show up and have an emergency capital
 2          raise, missing payroll, spending capex that
 3          maybe you shouldn't have spent if you weren't
 4          going to have capital to do so.  It's a
 5          combination of all of those, which I have
 6          broadly defined throughout my report, it's a
 7          Title IV issue in my report.
 8   BY MR. KREITZER:
 9      Q.    Let's go in order.  So you mentioned that
10   one of the circumstances that caused, in your mind,
11   the company to have to file for bankruptcy was
12   allegedly the company's not understanding or not
13   knowing its financial position.
14          Did I state that correctly?
15          MS. WRIGHT:  Objection.
16          THE WITNESS:  I am commenting that that
17          would contribute to it, and I understand that's
18          one of the things the plaintiff is alleging,
19          that the breach of duties which include these
20          problems result in things like that.
21   BY MR. KREITZER:
22      Q.    Did you uncover any evidence, aside from
23   testimony, I mean, numeric, forensic evidence to
24   suggest that the company did not know what its --
25   the management within the company did not know what
```

Page 212

1   its financial position was?

2        A.   Yes.

3        Q.   What forensic evidence did you uncover?

4        A.   One, there was a large unsubstantiated

5   balance growing throughout fiscal '14.

6             Two, the bad debt charges and the return

7   of the money and the reconciliation project wasn't

8   reflected in their financial statements until the

9   end.

10       Q.   Wasn't the reconciliation project

11  reflected contemporaneous with the actual refunds

12  being identified during the project?

13       A.   It was reflected at the end, after losing

14  Title IV ability, growing the balance and things

15  like that.

16       Q.   So when did the Department of Education

17  order that there be a program review of R2T4 and

18  refunds at the OP EIDs that belonged to FCC?

19       A.   I don't have a date for you.

20       Q.   Do you remember what year it was?

21       A.   I understood it was after fiscal '13 but,

22  again, I don't have an exact date for you.

23       Q.   Would you have anticipated that management

24  should have foreseen the decision of the department

25  to have a program review of R2T4 and refunds before

1    the department asked for it?

2            MS. WRIGHT:  Objection.

3            THE WITNESS:  I don't have specific

4        opinions about the Title IV regulation

5        process -- sorry.  Mine is more about the need

6        for the refunds, the growing unsubstantiated

7        balance and things like that.

8    BY MR. KREITZER:

9        Q.   Is it your understanding that there is

10   something extraordinary or unusual about the

11   department asking a school to review its R2T4 and

12   refund calculations?  In other words, is that an

13   extra ordinary event?

14           MS. WRIGHT:  Objection.

15           THE WITNESS:  I don't know how to classify

16       it.  I don't know.

17   BY MR. KREITZER:

18       Q.   The reason I'm asking these questions is

19   because you pointed out that one of your bases for

20   believing that the school's management did not

21   understand its financial position is because of the

22   reconciliation project.

23           Do you remember that testimony?

24       A.   I do.

25       Q.   Okay.  And so I'm trying to understand why

Page 214

1    you believe that the management of the school should

2    have anticipated the reconciliation project at any

3    time before the department requested that there be a

4    reconciliation project.

5           MS. WRIGHT:  Is that a question?

6       Objection.

7           THE WITNESS:  Maybe we've miscommunicated,

8       but when I talk about the reconciliation

9       project, I'm talking, again, about the

10      unsubstantiated balance and bringing it down.

11      Not some narrower particular program audit.

12      It's all of them.

13          And, basically, not knowing your Title IV

14      positioning throughout the year.

15   BY MR. KREITZER:

16      Q.   So, to be clear, the reconciliation

17   project that you're referring to is not the R2T4

18   program audit that was ordered by the department?

19      A.   The reconciliation project I'm referring

20   to is the fiscal '14 effort to solve that

21   unsubstantiated balance, which I understood

22   eventually included things like that and other Title

23   IV issues.

24          People talk about it in a lot of ways, but

25   I appreciate that there's internal and external

Page 215

1    reconciliations, for example, but I'm talking about,

2    as defined in my report, what Mr. Pierne talked

3    about with respect to the bad debt, for example.

4         Q.   So the reconciliation project that you're

5    referring to, using that term, would be the refunds

6    that occurred in March of 2014?

7              MS. WRIGHT:   Objection.

8    BY MR. KREITZER:

9         Q.   Right?

10        A.   I don't know if that solved all of it, but

11   that would be part of it, some of those refunds in

12   2014.

13        Q.   Did you find any evidence in your forensic

14   examination that any of the monies refunded in 2014

15   related to G5 draw-downs for -- related to

16   non-existing student?

17             MS. WRIGHT:   Objection.

18             THE WITNESS:   I've seen testimony that

19        said that, but my analytical analysis, again,

20        I'm talking about balances, so the balance is

21        high and it was high because you pulled money

22        that was not a student.   It would relate to

23        that.

24             For example, if it was outside of STARS

25        and your cash basis revenue and COD and G5 were

1        out of balance, that could be a possibility.

2   BY MR. KREITZER:

3        Q.   I know anything is a possibility, right?

4             But we're in a court of law where the

5   sworn testimony of witnesses is what is relevant,

6   and I'm not suggesting anything derogatory here.

7             But it is critical for me to understand

8   what you're trying to communicate by way of your

9   expert opinion.

10             So if it is your belief that part of the

11   monies refunded by the school, say, in the

12   March 2014 time period related to G5 draw-downs for

13   students that didn't exist and you have analytical

14   evidence of that, because that's why you were hired,

15   not just to read depositions of other witnesses, but

16   to do your own analysis, then we want to understand

17   what your evidence is in that regard.

18             Do you understand?

19        A.   I do.

20        Q.   So let me just ask the question again, and

21   if your answer is I didn't do that analysis, I

22   completely understand, but if you did do that

23   analysis, then I obviously have a lot of questions I

24   want to ask you about it.

25             So, again, my question is, in connection

1   with your forensic examination, were you able to

2   determine whether any of the funds drawn -- any of

3   the funds returned to the department in March of

4   2014 related to G5 draw-downs for non-existent

5   students?

6         MS. WRIGHT:  Objection.

7         THE WITNESS:  It's hard to narrow it to

8         March of 2014.  A lot of money was returned in

9         March of 2014, and I've looked at the entire

10        time period.  So my opinions and conclusions

11        about it relate to the entire time period.

12            Again, it's money put in a system for a G5

13        balance and a COD balance, so it's not

14        fungible -- you know, it's fungible.  So you

15        need to be more specific about it than saying

16        that this dollar in March is something.

17  BY MR. KREITZER:

18        Q.   Well, let's start with March and then

19  we'll start going back in time.

20            But were you able to reach that conclusion

21  with respect to any of the monies that were refunded

22  in March of 2014?

23        MS. WRIGHT:  Objection.

24        THE WITNESS:  Same answer.  I'm not

25        looking at in just terms of March.  I'm looking

```
 1        at it overall.  And there was clearly a
 2        suggestion in the testimony that there was
 3        overdrawn amounts and the records support that
 4        the balances are very different and the bad
 5        debt process wasn't able to get back to a
 6        student, so that supports that notion.
 7             It's not just a possibility.  It's
 8        concerning that that's possible.
 9   BY MR. KREITZER:
10        Q.   But you weren't able to nail down any
11   particular draw that was based upon a fake student,
12   correct?
13             MS. WRIGHT:  Objection.
14             THE WITNESS:  I have not looked at draws
15        that way to say that name is fake.  I have not
16        done that, individual draws that way.  Thank
17        you.
18   BY MR. KREITZER:
19        Q.   If you were not able to conclude that any
20   particular amount was drawn down by my clients in
21   connection with their employment of FCC for a fake
22   student, for lack of a better term, then would you
23   agree with me that the monies that were refunded
24   were initially drawn down based upon a student on a
25   roster?
```

Page 219

1            MS. WRIGHT:  Objection.

2            THE WITNESS:  No, because my overall

3       analysis showed that there were amounts beyond

4       STARS and amounts beyond COD over a period of

5       time.  So I don't think I can take away that

6       just because I can't identify a fake student

7       name, that it means that money wasn't pulled

8       beyond the rosters.

9  BY MR. KREITZER:

10       Q.   But you have no actual evidence?

11       A.   My forensic analysis --

12            MS. WRIGHT:  Objection.

13            THE WITNESS:  -- that I talked about this

14       morning and the testimony suggests that.

15  BY MR. KREITZER:

16       Q.   Are you aware of any dollar amount that

17  the school drew down under G5 that it was not

18  entitled to draw down when it drew it?

19       A.   I don't have a specific dollar amount for

20  you.  All I know is that the result of the

21  draw-downs, coupled with the COD amounts, were

22  clearly out of balance.

23       Q.   And that's the entirety of your answer?

24       A.   Well, I think a lot of my report goes to

25  that answer as well, and what I did, along with the

Page 220

```
 1   testimony we've been talking about from other
 2   witnesses.
 3        Q.   I don't want you to talk about other
 4   witnesses at the moment.
 5             I'm just asking for your forensic
 6   analysis.
 7        A.   It remains that you need to look at it
 8   overall and look at the balances and see how those
 9   balances relate.  You can't just cherry pick one and
10   say --
11        Q.   I'm not.  I'm just asking you, with
12   respect to any G5 draw-down, do you have any
13   evidence that you've identified forensically,
14   financially that would, you know, in connection with
15   your examination of the records of the company, not
16   people's testimony, that would cause you to form the
17   opinion that the company was not entitled to draw
18   down the monies that it drew down.
19             MS. WRIGHT:  Objection.
20             THE WITNESS:  I believe my analysis
21        relates to the other expert's opinions that
22        talk about that from a legal and regulatory
23        point of view, but it's providing that data and
24        you can see in the data that the two balances,
25        STARS and COD and G5, three balances, along
```

Page 221

1      with some of the draws that are called predraws

2      and pull-down and whole round number amounts,

3      for example, that would relate to that

4      question.  But, again, I'm not the legal or

5      regulatory expert here.

6           But the forensic analysis shows that

7      information, which is relevant to that

8      question.

9   BY MR. KREITZER:

10      Q.   Again, that information that you're

11  referring to is the imbalance between G5 and COD?

12      A.   The imbalance there, the STARS imbalance

13  as well, the bad debt write-down, things of that

14  nature.

15      Q.   How does the bad debt write-down cause you

16  to conclude that the company drew down funds from G5

17  that it wasn't entitled to?

18      A.   Again, I think it wasn't entitled to, no

19  legal or regulatory.  It's my forensic work that is

20  supporting that opinion.  But the bad debt

21  write-down and not being able to associate with a

22  student and seeing communications suggesting that

23  overdrawn funds are not associated in the ledger

24  would suggest that.

25      Q.   Can you identify for me any particular

Page 222

```
 1    draw-down of funds by the school that was not able

 2    to be associated with a student?

 3              MS. WRIGHT:  Objection.

 4              THE WITNESS:  I don't have a particular

 5         draw in my few.  Again, it's the results of

 6         activity and balances and statements about

 7         overdrawn funds.

 8    BY MR. KREITZER:

 9         Q.   You mentioned that, in your report, you

10    render an opinion with respect to accounting

11    infrastructure or management control.

12         A.   I do talk about that.

13         Q.   Can you identify that section for me,

14    please?

15         A.   Well, first, I talk about, in my bad debt

16    opinion on page 7 into 8, that --

17         Q.   One second.

18         A.   Sorry.

19         Q.   Go ahead.

20         A.   That talks a little bit about the -- how

21    FCC apparently could not associate the bad debt with

22    specific activity and allocate it across schools.

23              While a lot of the report is -- could be

24    said to be the result of some of these lack of

25    controls.  Footnote 73 on page 25 talks about people
```

Page 223

1    not knowing about the extent of the refunds.

2            Paragraphs 50 and -- starting at paragraph

3    50, the gap between STARS and Title IV cash.

4            Footnote 79, talking about some of the

5    cash balances and the bank reconciliation report,

6    the account info report.  That's another.

7            Footnote 89 on paragraph 32 -- I'm

8    sorry -- page 32.

9            Footnote 90 on page 33.

10           And then on page 35, footnote 103 is

11   another example of me talking a little bit about the

12   lack of reconciliations and procedures for doing

13   that, and how these two numbers can get out of

14   balance like that.

15           Those would all touch on accounting

16   control issues.

17      Q.   In any of those footnotes, do you actually

18   render an opinion about the alleged lack of

19   accounting controls?

20      A.   Footnote 103 talks about a concern for the

21   lack of procedures and things like that, but

22   reviewing their controls isn't something I focused

23   on in my report.  But those are my observations

24   doing my work.

25      Q.   In connection with the assignment and

Page 224

 1    summary of opinions section of your report, which

 2    starts at page 4, paragraphs 6 through 12 -- I guess

 3    it's 6 through 11 -- 6 through 12.  Sorry.

 4         In those paragraphs, do any of those

 5    paragraphs render an opinion in connection with lack

 6    of controls at FCC?

 7         A.   This section is my opinions about my

 8    assignment in this matter.  While the lack of

 9    controls likely contributed to some of these issues,

10    I'm not opining on their controls as part of my

11    primary assignment here, no.

12         Q.   Thank you.

13         Do you think that there are any other

14    possible explanations for the imbalance over time of

15    the G5 and COD accounts other than the alleged

16    breaches that the plaintiff has asked you to assume?

17              MS. WRIGHT:  Objection.

18              THE WITNESS:  I'm not aware of that extent

19         in that time period, what else would be causing

20         the imbalances.  But, again, I'm assuming

21         liability.

22    BY MR. KREITZER:

23         Q.   Let me talk to you about the capital raise

24    for a moment.

25              At paragraph 122, at page 58, you state

Page 225

1    that, "The former employees of FCC also believed" --
2    that's not the paragraph.  Stand by.
3              Paragraph 121.  That's the one I want to
4    look at.  You state that, "Despite the various
5    breaches as well as knowledge that DOE had ceased
6    FCC's ability to obtain advanced Title IV funding,
7    various investors loaned FCC more than $18 million
8    during the four months before the August 24th
9    bankruptcy."
10             Did I read that correctly?
11        A.    You did.
12        Q.    Who were the various investors that you're
13    referring to there?
14        A.    I don't recall if some of the banks
15    provided that or the Palmer Group.  I don't recall
16    the names of the investors as I sit here.
17        Q.    Do you remember whether any of the
18    $18 million that was provided came from the Abrams
19    Group and the Greenhill Group?
20        A.    I don't specifically recall.  I said
21    lenders.  I had understood that some of this might
22    have come from existing stakeholders.  I wasn't sure
23    how much or what their names were.
24        Q.    Okay.  How was the $18 million used?
25        A.    It was put into the company to meet

Page 226

1    obligations in the company.

2         Q.    Now, the amount of the bad debt that you

3    have identified as creating a real challenge for the

4    company was what, about $36 million, I think?  You

5    tell me.  I don't want to put words in your mouth.

6         A.    I think that was their bad debt for the

7    year.  The additional bad debt charge that they

8    recorded was about 17, 18 million.

9         Q.    When you say "the additional bad debt

10   charge," recorded when?

11        A.    Recorded in March, April, May, June.

12   There was an additional bad debt charge above sort

13   of their normal bad debt or somewhat above.  I don't

14   know if the normal bad debt was normal during that

15   period due to the issues, but they referred to it as

16   additional.

17        Q.    And how much was that?

18        A.    I believe it was 17 and change.

19        Q.    17?  One-seven?

20        A.    One-seven, I believe.

21        Q.    Okay.  So it's your thinking that the

22   company ordinarily incurs bad debt somewhere in the

23   range of how much?

24        A.    Just a few percentage points a year.

25        Q.    Can you give me a number?

Page 227

1      A.   I think it was something like 18 or 17 or
2   something like that.
3      Q.   17 to 18 million?
4      A.   Yes.
5      Q.   And that would be ordinary course of
6   operations, correct, historically?
7      A.   Yes.  Let me find that for you.
8      Q.   Sure.
9      A.   One moment.  Yeah, something like that,
10  like 18, 19 versus 18, 17.
11     Q.   And then it's your position that the
12  additional bad debt of $17 million recorded in
13  January through April, plus or minus, was
14  extraordinary, that is, out of the ordinary,
15  correct?
16     A.   Yes.  Given their history and given
17  testimony about it, yes.
18     Q.   And it's your position that it's that
19  incurrence of that additional bad debt that caused
20  the company to have to file for bankruptcy; am I
21  correct?
22          MS. WRIGHT:  Objection.
23          THE WITNESS:  No.  Again, I'm not making
24      plaintiff's allegations here.  But I understood
25      that it's not just the bad debt.  That's the

1            kind of a result of the problem or one of the

2            results.  It's also the Title IV issues,

3            mismanaging Title IV, things like that.

4    BY MR. KREITZER:

5            Q.   But the Title IV issue, to the extent

6    funds had to be returned to the department on

7    account of what you're calling the Title IV issues,

8    that amount was, plus or minus, 17 million, wasn't

9    it?

10           A.   It grew to about 18 million at one point,

11   yes.

12           Q.   Right.  And that is the amount of the

13   additional bad debt, right?

14           A.   It is.  I don't know if those are --

15   that's necessarily not one and the same thing.

16           Q.   Well, was the amount of monies that had to

17   be returned to the department on account of the

18   imbalance of COD and G5 recorded somewhere other

19   than in additional bad debt?

20           A.   It depends if you recognize it or not.

21           Q.   I don't understand what you mean by that.

22           A.   Well, the bad debt would only be unwinding

23   things that -- would traditionally be unwinding

24   things you've recognized as revenue and earnings

25   already.  That's why you're subtracting it.

Page 229

1      Q.   But you already testified that the

2  adjustments or the refunds back to the department

3  were recorded in the ledger as additional bad debt.

4           Are we debating that?

5           Did I misunderstand you earlier?

6      A.   I think those are -- that's going on, but

7  it's not the only place that this -- that Title IV

8  reconciliation of fiscal - late fiscal '14 could be

9  reflected.

10     Q.   Where else was it reflected?

11     A.   Well, again, if you didn't recognize

12 certain revenue, it would not be a bad debt, so it

13 would be reflected somewhere else.

14     Q.   Well, where was it?  I mean, you did the

15 analysis.

16          Where did they reflect it, if somewhere

17 else?

18     A.   Again, it's balancings that are being

19 compared.  And so you asked me if there's anything

20 else, and it's possible there's revenue that's not

21 recognized, deferred, and if you sent that back, if

22 that was related to it, it would in there as well.

23     Q.   Respectfully, I feel like we're talking in

24 circles, and I'm sure it's my fault.

25          But you claim that there was a sum of

Page 230

1    money that was returned to the department in the

2    first four to five months of 2014 on account of the

3    need to substantiate G5 with COD; am I right?

4              MS. WRIGHT:  Objection.

5              THE WITNESS:  That's part of it.  But, of

6         course, there's also a COD substantiating going

7         on.

8              The balance is a combination of two

9         things.  You can either lower it with sending

10        money back or you can provide COD records to

11        support the --

12   BY MR. KREITZER:

13        Q.   If the school provided the COD records to

14   substantiate the disbursement, then the school could

15   keep the money, right?

16        A.   Yes, they could.

17        Q.   All right.  So we're not really talking

18   about that here today, are we?

19        A.   I just want to appreciate that it is two

20   things.

21             MS. WRIGHT:  Objection.

22   BY MR. KREITZER:

23        Q.   I thought that was self-evident.

24             So what you are concerned about in

25   connection with your expert opinion is the

1    $17 million that was returned to the department

2    allegedly to balance the unsubstantiated G5 with the

3    COD, correct?

4         A.   Well, when you say "concerned about," my

5    analysis is focused on the balance and that included

6    those monies going back.

7         Q.   And are there any other accounting entries

8    that exist that would show additional monies that

9    were being sent back to the department other than

10   this 17 million?

11            MS. WRIGHT:  Objection.

12            THE WITNESS:  I'm sure that the refunding,

13        the wiring back of money to bring the balance

14        down results in lots of accounting entries, or

15        it should.

16            So those are going on as well.  I'm not

17        saying there's no other entries going on.

18   BY MR. KREITZER:

19        Q.   Okay.  How much money do you ascribe or do

20   you claim that the company had to -- strike that.

21            How much cash do you claim that the

22   company had to return to the department in order to

23   reconcile the G5, COD accounts?

24            MS. WRIGHT:  Objection.

25            THE WITNESS:  My exhibits would show the

Page 232

```
 1          refunds back to the DOE that were needed to
 2          bring the balance down in March and thereafter.
 3               And of course, those refunds would include
 4          not only refunds needed to bring the balance
 5          down, but refunds that are happening in the
 6          normal course.
 7     BY MR. KREITZER:
 8          Q.   I understand that.  We're not talking
 9     about the ordinary course refunds.
10          A.   Okay.
11          Q.   Okay.  So I'm talking about the refunds
12     that were necessary to bring the balance in line or
13     to balance G5 with COD.
14               Do you understand my question?
15          A.   I do.
16          Q.   How much money did the company pay in cash
17     to do that?
18          A.   The records and testimony talk about a $17
19     million figure.
20               But, again, it's a balance.  So when
21     there's wires going back, it's the wire is more than
22     just the amount being used to bring it down, because
23     they talk about $17 million.
24          Q.   And the company borrowed $18 million,
25     right, from its investors sometime after April of
```

Page 233

1  2014, right?

2       A.   Yes.

3       Q.   So if the company borrowed $18 million and

4  it had to go out of pocket $17 million, then why did

5  the company -- why was the company not able to

6  sustain itself?

7            MS. WRIGHT:  Objection.

8            THE WITNESS:  Because I believe there was

9       continued DOE balances, and the balance was

10      growing over time.  And, of course, advanced

11      pay, losing advanced pay didn't help.  So all

12      of those things.

13 BY MR. KREITZER:

14      Q.   Let's talk about it.

15           Are there any others or just those three?

16      A.   No.  The Title IV reconciliation and the

17 issues that the plaintiffs are alleging are all

18 related to that.

19      Q.   So we've talked about the Title IV issues

20 because that was the $17 million that the school had

21 to return back to the DOE, correct?

22      A.   I don't think it can be isolated to be

23 just the $17 million.  There was other things going

24 on.  There was other refunds being requested.

25      Q.   I want to hear about those.

1          What are these other things that are going

2    on?  Would you show me where they are reflected in

3    your reports?  Because I'm not familiar with these

4    other things.  So maybe you can help.

5          A.   I'm trying to see if there's a cite.  I

6    just recall other Title IV issues coming up around

7    the time of that issue.  I don't think it's just the

8    $17 million.

9          Q.   I need to understand that, sir.

10          Tell me what you know about that subject

11    that impacted your opinions in this case.

12          A.   All I can recall is that I recall some

13    other things and investors complaining that the

14    balance grew from when they put the money in to when

15    -- to after that point.  That's all I recall.

16          Q.   Do you have any -- do you reflect that

17    alleged circumstance in your opinion in any way?

18          A.   Only in an indirect way in that I'm

19    looking at all the dollars that are going back and

20    all the cash and the entire balance.

21          So to the extent that that's in there,

22    it's reflected in my cash numbers already.

23          Q.   Well, in your report, you made clear that

24    the company was able to substantiate, that is, bring

25    into balance the COD and the G5, correct?

1      A.   Well, they bring it down at some point,

2  but it's still not totally in balance.

3      Q.   What does that mean, "bring it down"?

4      A.   They bring it down from 17 to some other

5  smaller number.

6      Q.   So you're taking issue with the fact that

7  -- you now claim the company did not balance its COD

8  and G5 accounts?

9      A.   I'm not claiming that.  I am claiming

10 that -- I don't think it was completely in balance

11 at some point in late 2014.

12     Q.   What does your report say about that?

13     A.   I don't think my report is talking about

14 what the balance was around the bankruptcy and

15 things like that.  I just knew that there was some

16 balance owed then.

17     Q.   We'll save that one for trial.

18          Other than this vague reference to, quote,

19 other things going on, end quote, are you able to

20 identify with any specificity what those other

21 things were?

22     A.   Can you ask that another way?  I don't

23 think I understand your question.

24     Q.   No, I can't.  You're the one that said it.

25          You said there's, quote, other things

Page 236

1  going on, end quote.  And I asked you what they

2  were.  And you answered by saying, I'm not exactly

3  sure, but there's other things going on.

4          So I'm now asking you one final time, can

5  you tell me what was going on at the company that

6  you think was material that affected the abilities

7  -- the ability of the company to be a going concern

8  after it had paid back the $17 million to the

9  department and after it received a loan from its

10  investors of almost an equal amount, 18 million

11  bucks?

12          MS. WRIGHT:  Objection.

13          THE WITNESS:  I understood that other

14      Title IV issues came to light after the

15      investors put money in.

16  BY MR. KREITZER:

17      Q.   And what were they?

18      A.   I don't know.

19      Q.   How much did those other Title IV issues

20  cost the company, if anything?

21          MS. WRIGHT:  Objection.

22          THE WITNESS:  I don't know.  I do know

23      that there was a balance between G5 cash and

24      COD of low single digit millions, but that's a

25      Title IV issue.  I don't know.

Page 237

1    BY MR. KREITZER:

2        Q.   Was it that low single digit millions that

3    caused the company to fail?

4            MS. WRIGHT:  Objection.

5            THE WITNESS:  No, I haven't testified that

6        that's what caused it to fail.  All the things

7        contributed to that, according to the

8        plaintiff's allegations.

9            MR. KREITZER:  I'm told we have five

10       minutes left on the video.  Now is probably a

11       good time.

12           THE VIDEOGRAPHER:  We're going off the

13       record.  The time is 5:02.

14           (Short recess taken.)

15           THE VIDEOGRAPHER:  We're now back on

16       record.  The time is 5:18.  Media No. 5.

17   BY MR. KREITZER:

18       Q.   Mr. Donohue, I want to ask you about your

19   actual valuation analysis.

20           Do I understand correctly that you

21   calculated alleged damages using two methodologies?

22           MS. WRIGHT:  Objection.

23           THE WITNESS:  I've calculated the

24       valuation of FCC using two methodologies.

25   BY MR. KREITZER:

Page 238

1          Q.    One of those methodologies, you refer to

2     as the fair value using market approach, correct?

3          A.    Correct.

4          Q.    And the second of those methodologies is

5     fair value using the income approach, correct?

6          A.    Correct.

7          Q.    And your market approach analysis resulted

8     in you formulating an opinion that the enterprise

9     value of FCC had a range of 37 to 51 million,

10    correct?

11         A.    Correct.

12         Q.    And we're going to talk a little bit about

13    that in a moment, but in the second approach, the

14    income approach, you reached the conclusion that the

15    enterprise value, after applying a 20 percent

16    marketability discount, ranged from 29 to

17    $27 million, correct?

18         A.    Correct.

19         Q.    And so are those your two opinions in

20    respect to the valuation, one being a value of 37 to

21    51, and the other being a valuation of 29 to 27?

22         A.    They are my opinions about those two

23    approaches, and then I conclude and select the

24    market approach for my valuation opinion.

25         Q.    And why do you select the market approach

Page 239

1   over the income approach?

2       A.   Mainly because I felt that I had

3   sufficient comparables to make that opinion and the

4   lack of long-term, but-for-the-breach projections

5   for FCC.

6       Q.   What do you mean by the "lack of

7   long-term, but-for-breach projections"?

8       A.   Well, the income approach is often done

9   using a projection of the cash flows of the company,

10  and the projections in this case were actual

11  projections with the breach, if you will, and there

12  was a lack of projections in the long-term view

13  without the breach.

14      Q.   But you knew, historically, what the

15  income of FCC was for many, many years, right?

16      A.   I did.

17      Q.   The alleged breach, even if it could be

18  proven, only occurred in one or two years, right?

19      A.   The breach relates to those more recent

20  years, I understand, yes.

21      Q.   So why did you feel uncomfortable

22  utilizing the income that had historically been

23  demonstrated by the company?

24          MS. WRIGHT:  Objection.

25          THE WITNESS:  Because, at the time of the

1          breach, at the time of -- at the end of the

2          breach, 2014, where I had some financials that

3          were adjusted for breach activity, if you will,

4          I didn't have anything going forward from that

5          point in time.  So I did have history, but I

6          did not create projections for 2016, 2017,

7          things like that.

8     BY MR. KREITZER:

9          Q.   But could you have, if you elected to?

10         A.   Anything is possible.  But, again, I

11    also -- my answer was that I don't have the

12    long-term breach projections, and I have sufficient

13    market comparables, and analysts and people in this

14    industry appear to rely on that as a valuation

15    method, and so I had that as well.

16         Q.   So, in connection with the income

17    approach, though, you had a very, very long track

18    record with FCC, perhaps longer than many companies

19    that you've performed analytics on, correct?

20         A.   Well, the FCC, in its form, at the time of

21    bankruptcy, I had that for fiscal '14, '13 and part

22    of '12.

23         Q.   Even before that, many years before that,

24    but it hadn't yet acquired Anthem?

25         A.   Correct.

Page 241

1     Q.   Didn't you ultimately conclude that Anthem
2  was actually a drain on the financial resources of
3  the company?
4          MS. WRIGHT:   Objection.
5          THE WITNESS:   I didn't conclude one way or
6      the other.   I used the Anthem financial results
7      as they were incorporated into the FCC overall
8      financials.
9  BY MR. KREITZER:
10     Q.   Is that the reason why you decided not to
11  use the income approach, because the acquisition of
12  Anthem was a horrible decision at the end of the
13  day?  It substantially reduced the success of FCC,
14  and you didn't want to reflect the decision to
15  acquire Anthem in your overall analysis because it
16  had the effect of depressing the value of the
17  business by, I don't know, plus or minus $25
18  million; isn't that right?
19          MS. WRIGHT:   Objection.
20          THE WITNESS:   That's not why.  I lay out
21      why in my report, which is I had sufficient
22      market comparables that use the EBITDA from the
23      combined entity, which would include any
24      impacts associated with Anthem.
25          And I don't have management prepared

Page 242

1          projections but for the breach.  It's a unique

2          scenario.  You're valuing a company without --

3          in a but-for scenario, so it's a little

4          different.

5     BY MR. KREITZER:

6          Q.   So the challenge with doing a comparable

7     analysis, a market approach analysis, is you have to

8     find comparable businesses, right?

9          A.   Yes.

10         Q.   And I guess you went about doing that by

11    first identifying what you call table 16, a

12    description of potentially comparable companies,

13    right?

14         A.   Yes.  I started with companies in

15    educational services and then I narrowed it from

16    there.

17         Q.   Now, the reason for you picking these

18    comparable companies is you were -- you're hoping to

19    convince the jury that these are truly comparable

20    companies and, therefore, an analogy can be drawn

21    between the alleged success of these companies with

22    the alleged success of FCC, right?

23              MS. WRIGHT:  Objection.

24              THE WITNESS:  I'm not hoping to convince

25         anyone.  I am preparing an analysis that uses

Page 243

1          comparable companies to determine a benchmark

2          and that benchmark can be used to value your

3          subject.

4    BY MR. KREITZER:

5          Q.   Have you done any forward-looking analysis

6    of these selections, that is to say, following 2014,

7    whether all of your table 16 comparables -- let me

8    strike the question.  Let me ask it a different way.

9               In connection with your table 16

10   comparables, can you tell me whether all of those

11   companies are still in business today?

12         A.   I cannot.

13         Q.   No?  How about Corinthian Colleges, do you

14   have any insight into whether that company is still

15   in business today?

16         A.   I recall it being in the news more

17   recently.  But, again, my analysis is as of this

18   point in time.  And I'm looking at my report here at

19   that point in time.

20         Q.   Well, in other words, it was in the news

21   because it filed for bankruptcy, right?

22         A.   I don't know what form it took, but I do

23   know there was some distress, and I just don't know

24   what form it took.

25         Q.   And is that the reason why you elected not

Page 244

1    to use Corinthian as one of your comps because you

2    knew, as you wrote this report, that Corinthian had

3    gone under?

4         A.   No, that is not the reason.

5         Q.   What's the reason?

6         A.   I believe that Corinthian was the size.

7         Q.   You claimed in this report that Corinthian

8    was one of the largest for-profit post-secondary

9    education companies in the United States.

10        A.   Corinthian was the size.

11             What I did was I looked at the educational

12   services providers and then looked at FCC's size, a

13   few hundred million dollars in revenue, and I

14   excluded very large companies, including Corinthian,

15   that had revenues of some $1.3 billion, along with

16   other large companies like DeVry and Apollo that had

17   revenues in the billions versus the 200 million for

18   FCC.

19        Q.   Well, what was -- other than the fact

20   that, obviously, there's a difference between a

21   couple hundred million and a billion, I understand

22   that, but what was your thinking as to why a larger

23   school could not be comparable to FCC?

24        A.   I just -- looking at all of the

25   comparables and looking at the shear size of those

Page 245

```
 1   larger ones, I felt it was better to look at
 2   companies that were comparable in terms of size.
 3        Q.   Was there any scientific reason that you
 4   based your decision to exclude companies that were
 5   larger than 500 million?
 6             MS. WRIGHT:  Objection.
 7             THE WITNESS:  I don't know how -- if it's
 8        scientific or not, but size is something you
 9        can consider when looking at comparables, and
10        several hundred million is more appropriate
11        than several billion for a few of them.  I
12        think a couple were 2 billion.  And I felt that
13        narrowing the sample was more appropriate.
14   BY MR. KREITZER:
15        Q.   Which of the other schools in your table
16   16 have failed since -- well, failed sometime after
17   2014?
18        A.   I don't know.
19        Q.   Is there anything other than size that
20   would make these schools in table 16 not comparable?
21        A.   Table 16, okay.  Sorry.  I just wanted to
22   make sure I was on the same table as you.
23             I also -- one of them had more of an
24   online presence with limited or no physical campus,
25   so I removed that.
```

1        Q.    Which one was that?

2        A.    I believe it was Capella Education Center.

3        Q.    Did you reach out for any industry

4   consultants or experts or people that were

5   knowledgeable in the education space to seek their

6   opinion as to what might be a comparable school to

7   FCC?

8        A.    I did not speak to any other consultants.

9   I looked at some research and other valuations that

10  were done, analyst reports, things of that nature.

11       Q.    I know you looked at 10Ks.  That would be

12  public filings with the SEC, right?

13       A.    Yes.

14       Q.    When you say you looked at other

15  analytics, what would those be?

16       A.    I'm sorry.  Analyst reports.  So

17  investment bank analyst reports.

18       Q.    Would you show me where those reports are?

19       A.    For example, on Exhibit 6, I cite the

20  Stifel, which is source footnotes 2 and 3, Stifel

21  report.

22       Q.    What is the Stifel report?

23       A.    It's an analyst report that's talking

24  about the industry.

25            I also cite -- I cite, on page 14 of my

Page 247

1    report, I looked at a Deutsche Bank analyst report,

2    a Capstone Partners analyst report, Piper Jaffray

3    analyst report.  In my Exhibit 2, I also list them

4    and several others.

5        Q.   So let's break those down for a moment.

6             So what in the Stifel report of July 2013

7    assisted you in determining which schools to select

8    for the comparable analysis?

9        A.   As general background in the industry, it

10   just gave me some information about some of the

11   companies I found in my screen of comparable

12   companies.  So it was just instructive to help me

13   learn a little bit more about the industry,

14   understand some of the players and analyst estimates

15   for those players.

16       Q.   Were there analyst estimates in the Stifel

17   report as to these ten or so schools?

18            MS. WRIGHT:  Objection.

19            THE WITNESS:  There may have been.  I know

20       there's some in some of the other investment

21       bank analyst reports that we mentioned.

22   BY MR. KREITZER:

23       Q.   I'm not asking whether there may have

24   been.  I'm asking what you remember.

25       A.   Well, there were several investment

Page 248

1    analyst reports.

2         Q.   We're going to talk about each one

3    separately.  So that's why I'm asking about that one

4    first.

5         A.   I don't remember.  I know some of them had

6    projections and others did not.

7         Q.   And in connection with the Capstone

8    Partners Investment Banking Advisor's report

9    entitled "Post-Secondary Education," Q2 2014, at

10   page 10, how did that page 10 somehow educate you on

11   which of the, again, 10 or 15, it looks like,

12   schools that you should have selected as the

13   comparable schools?

14        A.   I'm sorry.  Are you on page 10 of my

15   report or page 10 of --

16        Q.   No.  I thought you said that you gave me,

17   if my memory serves me, when I asked you about your

18   sources for determining which would be most

19   comparable schools, you pointed to the Stifel

20   report, which was footnote 2 of your report that is

21   Exhibit 6.  And then I thought you took me to page

22   15, and you told me about the Capstone Partners

23   Investment Banking Advisors' papers that is footnote

24   42.

25             Did I misunderstand you?

Page 249

1      A.   No, no, that was a cite.  I thought you

2    meant page 10.  You mean page 10 of that document.

3      Q.   Page 10 of that document.  That's what you

4    cite.

5      A.   Correct.

6      Q.   So my question is, what in that report

7    helped educate you as to the different comparables

8    of these 10 or 15 schools?

9      A.   General background.  That's all I can

10   recall as I sit here.  I looked at it as part of my

11   analysis to understand the businesses of some of

12   these schools.

13     Q.   Did you look at anything else?  You did

14   tell me, sir, you pointed to Exhibit 2, but I'm not

15   sure I heard what it was in Exhibit 2 that --

16     A.   Exhibit 2 would list the analyst reports,

17   including the ones we talked about, and potentially

18   some others.  I think there was others.

19     Q.   Would you show me where those others are,

20   please?

21     A.   Sure.  Exhibit 2, which is probably the

22   third page of Exhibit 2.

23          I think, in addition to some of the ones

24   we talked about, there's some other particular

25   analyst reports on particular companies.

1          So, for example, the first one, BMO

2    Capital Markets, also provided general background.

3         Q.   So aside from the decision to cut off some

4    schools because they had revenues in excess of

5    500 million, was there any other reason to exclude

6    some schools as opposed to others?

7         A.   I think we also mentioned -- I also

8    mentioned the online presence versus physical

9    presence.  For example, there was one that only had

10   online presence.

11        Q.   Had you included Corinthian in your study,

12   Corinthian being the school that has since filed for

13   bankruptcy, how would that have affected your

14   analysis of the going concern value of FCC?

15             MS. WRIGHT:  Objection.

16             THE WITNESS:  I'm not sure as I sit here,

17        because that would assume that I would feel

18        that larger schools, such as the $2 billion

19        schools should be comparable, and so it

20        wouldn't just be an adjustment for the one.

21        You would have to -- you would consider

22        adjusting the others as well.

23             So I don't know.  I don't have that

24        calculation.

25   BY MR. KREITZER:

Page 251

1      Q.   Is it customary, in your judgment, that

2   the comparable approach and the income approach

3   would vary so dramatically as they did in this case?

4      A.   Well, there's a lot of facts and

5   circumstances.  And you do want to look at the

6   approaches and try to reconcile them.

7           But, in this case, it's the facts and

8   circumstances here with the lack of projections.  It

9   explains some of that difference.

10      Q.   What do you mean by "it explains some of

11   that difference"?  The facts and circumstances here

12   with the lack of projections, it explains some of

13   that difference, what does that mean?

14      A.   Well, you're doing a but-for valuation

15   without projections, because they're not available.

16   So you're relying on the capitalization of earnings

17   method, which is a little more spot than the typical

18   income approach that might have a projection of cash

19   flow.

20      Q.   But the only reason you would do an income

21   approach -- strike that question.

22           In any business that fails, there's --

23   it's quite common to project out or forecast the

24   revenues and income of the company over time, isn't

25   it?  It's not unusual, is it?

Page 252

1        A.    I don't know if -- if it fails, what's

2    usual and not unusual, but I do appreciate that the

3    income approach is a method people use, and those

4    often include a projection or a spot capitalization

5    of earnings method.

6        Q.    And, in this case, what would you have had

7    to adjust in order to give yourself comfort that the

8    income approach could have been utilized?  Like is

9    there some adjustment you would have wanted to make

10   that you didn't?

11       A.    Well, what I would have wanted to adjust

12   is to have projections, reliable projections from

13   management of the cash flow stream that -- the

14   potential for this platform.

15       Q.    What was your source of projections when

16   utilizing the income approach?

17       A.    Here, I relied on the adjusted 2014

18   EBITDA.

19       Q.    Okay.

20       A.    And a projection -- a budget for just

21   2015.

22       Q.    Could you show me that budget?

23       A.    My Exhibit 14.

24       Q.    All right.

25       A.    And the budget would be deposition Exhibit

Page 253

1    133.  Yes, one -- I'm sorry.  I think I'm reading

2    the wrong line.  Hang on.

3         Q.   Okay.

4         A.   131.  Sorry.

5              And it's -- for completeness, it's 131,

6    and there's another file, P1740716-718.

7         Q.   What is that file?

8         A.   That is a native Excel file that is the

9    budget that is being reflected in deposition Exhibit

10   131.

11        Q.   Why did you elect to use this particular

12   budget?

13        A.   Because it was at or around the time of

14   the date of value, 6/30/2014.  It was prepared by

15   management after this Title IV reconciliation was

16   known, and I thought was a way to provide

17   information about what the but for the breach FCC

18   would look like.

19        Q.   Okay.  Did you satisfy yourself that this

20   was the most current projection of management?

21        A.   It was the most current.  Maybe I don't

22   understand what you're saying.  It was as of 6/24,

23   which is right around the valuation date.

24        Q.   Okay.

25              MR. KREITZER:  Give me two minutes and we

Page 254

1      may be done.

2           THE VIDEOGRAPHER:  Off the record.  The

3      time is 5:46.

4           (Short recess taken.)

5           THE VIDEOGRAPHER:  We're now back on the

6      record.  The time is 5:49.

7           MS. WRIGHT:  I note for the record that

8      the documents were provided with the report to

9      the extent that they weren't produced in the

10     litigation.  So that was over a month --

11     actually, a month ago almost.

12          THE VIDEOGRAPHER:  We're going off the

13     video record.  The time is 5:50.

14          (Adjourned at 5:50 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                          AFFIDAVIT
2

  STATE OF FLORIDA            )
3 COUNTY OF _____  )
4

           I, _____, being
5 first duly sworn, do hereby acknowledge that I did
  read a true and certified copy of my deposition
6 which was taken in the case of Clingman v. Knobel,
  et al., taken on the 9th day of February, 2017, and
7 the corrections I desire to make are as indicated on
  the attached Errata Sheet.
8
                      _____
                              (Deponent)
9
10        + + + + + + + + + + + + + + + + + +
11                        CERTIFICATE
12
13 STATE OF FLORIDA           )
   COUNTY OF _____  )
14
15
           Before me personally appeared
16 _____,
   to me well known / known to me to be the person
17 described in and who executed the foregoing
   instrument and acknowledged to and before me that he
18 executed the said instrument in the capacity and for
   the purpose therein expressed.
19
20         Witness my hand and official seal, this
   ____ day of _____, _____.
21
22
23
                      _____
                             (Notary Public)
24
   My Commission Expires:
25

Page 256

1                          ERRATA SHEET

2        Clingman v. Knobel, et al.

         Deponent:  JIM DONOHUE

3        Date of :  February 11th, 2018

4

5        PAGE    LINE        REMARKS

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20

21                           _____

22                           Signature of Witness

         _____

23       (Notary Public)

24       Dated this _____ day of _____, _____.

25       My Commission Expires: _____

Page 257

1                       CERTIFICATE OF OATH

2

3       STATE OF FLORIDA    )

4       COUNTY OF BROWARD   )

5

6                  I, the undersigned authority, certify

7

8       that JIM DONOHUE personally appeared before me

9

10      and was duly sworn.

11

12                  WITNESS my hand and official seal this

13

14      12th day of February, 2018.

15

16

17

18

19                        _Suzanne Vitale_

20      _____

21

22      SUZANNE VITALE, R.P.R., F.P.R.

23      Notary Public, State of Florida

24      My Commission No. DD179981

25      Expires: 5/24/2020

Page 258

1                          CERTIFICATE

2

3        STATE OF FLORIDA  )

4        COUNTY OF DADE )

5

6                I, SUZANNE VITALE, R.P.R., F.P.R. do

7        hereby certify that I was authorized to and did

8        stenographically report the foregoing deposition

9        of JIM DONOHUE; that a review of the transcript

10       was requested; and that the transcript is a true

11       record of my stenographic notes.

12                I FURTHER CERTIFY that I am not a

13       relative, employee, attorney, or counsel of any

14       of the parties, nor am I a relative or employee

15       of any of the parties' attorney or counsel

16       connected with the action, nor am I financially

17       interested in the action.

18                Dated this 12th day of February, 2018.

19

20

21                    _Suzanne Vitale_

22       _____

23           SUZANNE VITALE, R.P.R., F.P.R.

24           My Commission No. DD179981

25           Expires: 5/24/2020

Page 259

```
 1    1                 VERITEXT LEGAL SOLUTIONS
                     One Biscayne Tower, Suite 2250
 2    2                  2 South Biscayne Boulevard
                          Miami, Florida 33131
 3    3                       305-376-8800
 4    4    February 14, 2018
           Jim Donohue
 5    5    c/o Lita Beth Wright,
           Storch Amini PC
 6    6    140 E 45th St.
           2 Grand Central Tower 25th Fl
 7    7    lbwright@storchamini.com
 8    8    RE: Clingman & Hanger Management Associates, LLC -vs-
               Knobel, David, Et Al
 9    9    Dear Ms. Wright:
10   10    With reference to the deposition of Jim Donohue
           taken on 2/9/2018 in connection with the above-captioned
11   11    case, please be advised that the transcript of the
           deposition has been completed and is awaiting
12   12    signature.
13   13    Please have your client read the transcript and complete
           the errata page. Upon completion, please send the signed
14   14    errata to our office at Two South Biscayne Blvd., Ste. 2250,
           Miami, FL, 33131, or email it to litsup-fla@veritext.com.
15   15
           If this is not taken care of, however, within the
16   16    next 30 days, we shall conclude that the reading
           and signing of the deposition has been waived and
17   17    the original, which has already been forwarded to
           the ordering attorney, may be filed with the Clerk
18   18    of the Court without further notice.
19   19    Sincerely,
20   20
21   21    Production Department
           Veritext Florida
22   22
23   23
24   24
25   25
```

**[& - 2a]**

Page 260

**&**

**&**   1:4 2:8 259:8

**1**

**1**   122:24 123:7
259:1
**1.234**   185:20
**1.3**   244:15
**10**   21:9 73:16
248:10,10,11,14,15
249:2,2,3,8 259:10
**10,000**   163:13
164:22 165:6,13
**100,000**   109:22,23
110:1,3,14,20
111:2
**10017**   2:5
**103**   223:10,20
**10:24**   44:18
**10:26**   44:21
**10:54**   62:22
**10a**   47:5
**10c**   47:7 122:21,24
123:4,4
**10ks**   246:11
**11**   47:9 124:6 224:3
259:11
**11:08**   62:25
**11th**   256:3
**12**   33:5,20 34:11
47:11 86:10 128:18
224:2,3 240:22
259:12
**121**   225:3
**122**   224:25
**124**   47:18
**12:24**   113:17
**12th**   257:14 258:18
**13**   69:17 70:17,19
70:22 71:24 74:25
115:25 116:24

117:21 126:21
129:11,12 130:18
130:18 131:12
133:23 135:10,13
137:3,21,22,23,24
138:4,6 148:9
212:21 240:21
259:13
**131**   253:4,5,10
**133**   253:1
**13b**   47:13
**14**   69:17 75:1 87:6
95:7 101:5 106:13
107:10 116:1,13,16
116:19,24 117:5,9
117:18 124:24
126:20 135:13
137:8,20 138:6,15
153:16 159:5 183:8
185:16 212:5
214:20 229:8
240:21 246:25
252:23 259:4,14
**140**   2:4 259:6
**1450**   2:9
**15**   183:11,13
248:11,22 249:8
259:15
**16**   96:14 242:11
243:7,9 245:16,20
245:21 259:16
**16-62028**   1:3
**17**   226:8,18,19
227:1,3,10,12
228:8 231:1,10
232:18,23 233:4,20
233:23 234:8 235:4
236:8 259:17
**18**   225:7,18,24
226:8 227:1,3,10
227:10 228:10

232:24 233:3
236:10 259:18
**19**   97:11 227:10
259:19
**190**   124:2,5
**1:32**   113:20
**1st**   168:18,24 169:8
174:1

**2**

**2**   2:4 12:25 62:25
89:2 118:8 119:2
122:14,14,24 123:7
123:13 245:12
246:20 247:3
248:20 249:14,15
249:16,21,22
250:18 259:2,2,6
**2,000**   193:7,10
194:11,17
**2.5**   185:19
**2.8**   183:19,22
**2/9/2018**   259:10
**20**   124:16 238:15
259:20
**200**   244:17
**200,000**   6:7 148:20
**2004**   19:1
**2011**   86:9,10
**2012**   123:8 125:23
126:17,18 127:1,13
**2013**   55:11,20 64:8
67:22 69:2 73:2,3,6
73:11,16 101:17
123:9,11 130:22
131:5,18 132:7,14
134:20 135:1,6,16
136:10,17 138:11
139:10 148:4
162:15 247:6
**2014**   55:11,20 59:2
61:13,25 64:8,21

66:12 67:22 69:3
116:10 123:11
135:15 148:12
160:4,19 166:10,20
167:4,14 173:17
174:1 181:1,14
183:5,10 184:22
185:10 197:9,10,14
197:15 198:2,2,8
198:22 201:2,13,24
202:19 203:19
210:5 215:6,12,14
216:12 217:4,8,9
217:22 230:2 233:1
235:11 240:2 243:6
245:17 248:9
252:17
**2015**   252:21
**2016**   240:6
**2017**   240:6 255:6
**2018**   1:11 4:7 33:5
33:21 34:11 256:3
257:14 258:18
259:4
**21**   259:21
**22**   259:22
**2250**   259:1,14
**23**   259:23
**23rd**   2:9
**24**   259:24
**24th**   225:8
**25**   21:8,12 222:25
241:17 259:25
**25th**   2:5 259:6
**26**   66:12
**26th**   64:21
**27**   238:17,21
**29**   238:16,21
**2:57**   180:7
**2a**   12:25

**2nd** 168:18,24

**3**

**3** 73:10 198:24
246:20 259:3
**3.2** 183:20
**30** 3:10 169:7
259:16
**300,000** 73:18
**305** 63:3 66:19
**305-376-8800**
259:3
**307** 73:9 74:2 184:1
**30th** 197:9,14
198:2
**310** 63:3 64:16,20
66:20
**32** 223:7,8
**321** 3:8 5:3,7
**322** 3:8 33:3,10,11
33:12
**323** 3:9 88:19,22
**33** 3:8 223:9
**33131** 2:10 259:2
259:14
**35** 223:10
**36** 226:4
**37** 238:9,20
**3:30** 180:10

**4**

**4** 3:4 73:11 89:2,4
180:10 224:2 259:4
**4.37.** 204:12,13
**40** 21:2 29:22 95:8
**42** 248:24
**45th** 2:4 259:6
**46** 96:13 124:18
125:18
**47** 128:24
**48** 124:15 162:8,9

**49** 163:11
**4:09** 204:15
**4:10** 204:18
**4a** 91:16,17,23
**4b** 92:20 93:13
**4c** 93:21

**5**

**5** 3:8 118:8 119:2
122:14,14 237:16
259:5
**5/24/2020** 257:25
258:25
**50** 223:2,3
**50,000** 64:21,25
65:3,5,10,18 66:11
111:2,8,20
**500** 245:5 250:5
**51** 238:9,21
**55** 47:19
**56** 47:19
**57** 47:19
**575** 6:13,15,19 7:2
7:6 17:24 18:1
**58** 224:25
**5:02** 237:13
**5:18** 237:16
**5:46** 254:3
**5:49** 254:6
**5:50** 1:12 254:13,14

**6**

**6** 117:24 122:14,14
224:2,3,3 246:19
248:21 259:6
**6/24** 253:22
**6/30/2014** 253:14
**60** 21:4 22:2 97:10
99:12
**66** 100:16
**67** 176:18 177:6,11

**7**

**7** 5:17 113:5 204:21
222:16 259:7
**73** 222:25
**79** 223:4
**7c** 123:2

**8**

**8** 73:10 95:15 98:15
106:1 139:20 140:3
141:3,11,13,14,16
141:24 142:6,12,14
142:19,22,23,23
143:1,6,18 144:23
145:20 146:2 148:9
148:23 151:4,21
175:14 183:6
198:23 222:16
259:8
**8.7** 183:20
**80** 47:20 101:14
**800,000** 128:3
**88** 3:9
**89** 223:7

**9**

**9** 1:11 46:20 49:4,5
49:6,10,22 50:1,5,7
50:20,23 117:24
121:19 122:10
259:9
**90** 204:1 223:9
**90/10** 48:1 49:10
50:9,11,15,16
115:3,12 190:22
**9:36** 1:12 4:8
**9a** 46:22 49:21
123:2 185:14,24
190:7,19 195:7
196:2,23 197:25
200:12,14

**9b** 46:24 51:1
**9c** 47:1 51:1
**9d** 47:3 51:1
**9th** 4:7 255:6

**a**

**a.m.** 1:12 4:8
**abandoned** 94:23
101:18
**abilities** 236:6
**ability** 127:1,13
139:21 140:5
165:15 168:13
169:19,22 181:3,12
204:5,24 205:3
209:1 210:17
212:14 225:6 236:7
**able** 17:11 25:12,17
25:20 28:1 34:15
45:15 48:23 51:22
67:6 81:4,8,9,15
115:24 116:7,8
117:6 118:14
119:20,24 133:2,25
136:4 137:15 139:7
141:16 142:6
148:20 160:18
167:12 179:17,24
183:23 184:21,24
185:8 186:25
198:16 199:8
200:25 202:7
209:16 210:8 217:1
217:20 218:5,10,19
221:21 222:1 233:5
234:24 235:19
**abrams** 225:18
**absolutely** 115:23
132:11
**accepted** 109:17
145:9 146:14
170:25 187:2 192:8

**access** 25:10 27:4
27:15 28:10,13,14
29:9,9,10,10,12,13
29:16 37:23 39:12
39:14 40:13,14
42:4 45:8,12 52:3
52:13 53:4,7,9,10
53:16,19 54:1,5
61:23 115:24 117:6
121:7 170:15
171:11

**account** 87:12 88:5
89:10,13,24 90:2,9
90:12 107:20 128:8
138:18 144:4,11
157:16 185:10
186:11,16 189:21
191:11 193:17
194:10,12 195:10
195:25 196:4 223:6
228:7,17 230:2

**accounting** 42:15
43:1,4 46:5 82:12
82:14 83:7 84:20
89:11,25 90:5,7,10
90:15 91:1,24 92:5
92:24 94:1 95:5
113:2 134:11,19
135:11 136:18
137:5,10 138:3
163:8 168:9 178:24
184:14 185:5
206:11 207:8,10,18
208:9,14 222:10
223:15,19 231:7,14

**accounts** 92:1,6,9
92:13 132:16 133:1
138:16 139:2,22
154:10 164:4
167:24,25 169:10
175:9 182:21,24

191:12 224:15
231:23 235:8

**accumulated**
195:23

**accurate** 190:11

**acknowledge** 255:5

**acknowledged**
255:17

**acquire** 241:15

**acquired** 126:16
128:18 240:24

**acquisition** 125:23
126:4,5,9,12,22,25
127:7,9,12,17,19
127:20 128:2
241:11

**act** 111:12,15,16

**action** 23:23 88:25
169:10,16,18
258:16,17

**actively** 175:2

**activity** 75:17
120:15,19 126:19
128:13,18 138:4
156:21 157:10
161:2,3 184:6
185:1,6 186:21,22
190:1,1 191:19
199:3,4,5 222:6,22
240:3

**actual** 5:17 10:11
12:13 36:22 52:13
53:4 56:6 57:9,22
58:10 60:19 61:24
64:7 65:2 69:1,3,19
69:19 76:2 78:25
80:21 95:21 96:3
108:10 109:3
110:12 114:23
153:6,7,22,24
157:10 181:16

185:5 186:8 197:4
199:3 212:11
219:10 237:19
239:10

**adamantly** 206:4

**add** 24:16 40:7

**adding** 40:9

**addition** 7:16 79:4
138:14 201:7
249:23

**additional** 9:15
154:14,18,20,25
155:6,15 187:15,18
187:20 200:21
226:7,9,12,16
227:12,19 228:13
228:19 229:3 231:8

**addressing** 207:25

**adjourned** 254:14

**adjust** 88:5 252:7
252:11

**adjusted** 108:2
191:24 240:3
252:17

**adjusting** 250:22

**adjustment** 250:20
252:9

**adjustments**
188:14 229:2

**advance** 95:20 96:3
194:2

**advanced** 131:15
168:8 169:20,22
170:8,14 171:11,16
171:20,25 172:10
172:19 205:6,18
209:11,19,20 225:6
233:10,11

**adverse** 126:9

**advised** 259:11

**advising** 168:24

**advisor** 125:5

**advisor's** 248:8

**advisors** 248:23

**affect** 107:22
126:23,23 127:1,10
127:13

**affidavit** 255:1

**age** 4:19

**aggregate** 121:1,4
184:15

**aggregated** 60:11
120:4,9,10,13

**ago** 23:10,12 24:9
24:15 124:3 156:25
157:1 254:11

**agree** 37:9 76:25
81:9 84:13 98:11
98:20 108:17
125:24 126:2 129:6
129:9,25 140:19
143:17,21 150:8
151:22 162:21,24
191:7 192:20
218:23

**agreement** 192:18

**ahead** 46:19 157:23
222:19

**aid** 59:7 111:13
116:9,19 129:2,16
130:4 133:16
134:20 136:19
137:10 151:3
152:14 156:13
162:14 164:3,20
168:14

**al** 4:6 255:6 256:2
259:8

**allegation** 78:25
95:8 96:15 97:12
97:23 99:11,25

100:5,18 101:7
103:9 145:10
146:11 172:17
178:13 202:23
**allegations** 56:2
69:9 148:9 176:10
178:15 209:24
227:24 237:8
**alleged** 75:2 78:18
78:25 145:13
176:23 177:2,3,7,9
177:14 205:21
207:12 223:18
224:15 234:17
237:21 239:17
242:21,22
**allegedly** 38:2
85:16 182:20 183:1
183:3 189:7 196:25
199:7 200:15 209:7
211:12 231:2
**alleging** 89:20
142:11 148:15
166:23 167:8
173:11 178:9
179:20 211:18
233:17
**allocate** 222:22
**allocated** 79:12
193:20
**allowed** 26:11,12
131:13 178:11,19
178:19
**alter** 34:9 87:25
**alterations** 33:20
**altered** 16:8
**amend** 161:22
**amended** 3:9 88:17
88:24 89:3 95:9
96:14 97:11 99:8
99:11 101:15

**amendments** 33:19
**amini** 2:3,13 4:13
9:24 10:15,22
11:19 12:2 22:9,11
23:15 24:24 25:3
30:6 259:5
**amount** 25:21
55:18 59:4,8 65:4
70:21 71:25 73:18
77:17 83:8,10,12
83:18 84:1 105:2
110:19 150:23
152:9 153:1 157:15
157:22 158:23
159:8,10 174:22,22
187:4,5 193:10
195:8,23 197:4
198:6 218:20
219:16,19 226:2
228:8,12,16 232:22
236:10
**amounts** 69:24
70:10 79:5 82:18
92:21 113:25
138:17 168:6
187:22 198:7,9,10
198:12 199:1
202:11 210:3 218:3
219:3,4,21 221:2
**analogy** 242:20
**analyses** 14:22
15:13 19:7,8,17,19
20:6,15 126:15
171:15 176:5 200:8
**analysis** 14:25 15:2
15:7 16:12,15
17:22 20:17,18
35:5 55:9,13,16
58:18 64:24 65:8
65:15,17 66:4,6
67:13,21 68:1 69:6

73:1 77:6 82:12,14
83:7 84:11 87:13
87:17,20 95:5 97:8
102:19 108:9 112:1
112:7,13,19,21,22
113:1 114:2 120:5
127:16 132:15
133:7 137:19,24
147:11 154:23
189:3 203:13,17
207:17,17,18,23
215:19 216:16,21
216:23 219:3,11
220:6,20 221:6
229:15 231:5
237:19 238:7
241:15 242:7,7,25
243:5,17 247:8
249:11 250:14
**analyst** 20:9,11,13
246:10,16,17,23
247:1,2,3,14,16,21
248:1 249:16,25
**analysts** 14:12
240:13
**analytical** 69:1
80:21 215:19
216:13
**analytics** 81:21
207:24 240:19
246:15
**analyze** 69:15
82:16 94:4 163:23
**analyzed** 82:20,23
127:22 129:11
180:1 202:22
210:20
**analyzing** 164:8,8
**answer** 26:22 27:13
27:20 29:7 30:9,19
32:1 36:18 38:8

48:10,24 56:12
57:16 58:6 60:2
63:10 66:18 68:14
70:7 73:25 82:1,6
98:1,24 113:10
118:14 130:3,7
137:4 146:9 155:3
161:20,22 199:6
216:21 217:24
219:23,25 240:11
**answered** 118:17
138:12 162:2 236:2
**answering** 77:21
201:18
**answers** 27:5 49:5
**anthem** 95:9,10
125:23 126:4,9,12
126:13,16,22 127:1
127:8,9,13 128:2,9
128:13,17,21,25
133:18 162:12
240:24 241:1,6,12
241:15,24
**anticipated** 212:23
214:2
**anyway** 87:6
**apollo** 244:16
**apologize** 36:18
44:23 123:25
**apparently** 42:16
85:19 129:13
222:21
**appear** 79:13 111:3
184:9 188:10 196:1
209:16 240:14
**appearances** 2:1
4:10
**appeared** 75:21
116:12 255:15
257:8

**appears**  33:17
**apple**  185:24
**applied**  79:7,18
  80:23 82:25
**apply**  64:18 80:11
  81:5 94:8 103:16
**applying**  238:15
**appreciate**  214:25
  230:19 252:2
**approach**  59:11
  238:2,5,7,13,14,24
  238:25 239:1,8
  240:17 241:11
  242:7 251:2,2,18
  251:21 252:3,8,16
**approaches**  59:12
  238:23 251:6
**appropriate**  17:21
  245:10,13
**appropriately**  87:2
**approved**  107:21
**approximately**  6:6
  128:3 163:13 165:6
  181:1
**april**  126:17,18
  127:1,13 128:18
  132:13,13 155:19
  155:22 159:22
  160:3,19 168:18,18
  169:8 174:1 181:1
  181:14 226:11
  227:13 232:25
**ar**  123:8,11
**area**  35:14
**areas**  32:24 35:19
**artfully**  75:15
**ascribe**  178:8
  200:21 231:19
**ascribing**  178:14
**aside**  31:14 42:22
  102:17 163:7 174:1

180:14 181:13,23
  199:6 211:22 250:3
**asked**  9:22 11:20
  27:21 28:2 44:24
  46:16 48:10,12,20
  137:2 138:11
  148:25 149:7,13
  161:15 164:25
  176:6 177:12 202:6
  203:1,4 204:22
  208:25 213:1
  224:16 229:19
  236:1 248:17
**asking**  26:15,16,23
  27:1 36:17 37:19
  37:20 39:19 49:24
  52:8 57:5,7,17,18
  59:25 67:18 85:8
  89:22 90:22,25
  91:19,21 93:7
  99:10 102:13
  114:22 117:1,2,18
  121:9 177:16 191:9
  201:20,22 202:14
  202:17 206:3,21,22
  213:11,18 220:5,11
  236:4 247:23,24
  248:3
**assignment**  28:10
  31:13 223:25 224:8
  224:11
**assimilation**  190:16
**assist**  14:19 147:22
  147:24
**assistance**  13:23
  14:13
**assisted**  14:1 39:13
  247:7
**assists**  34:20
**associate**  14:18
  18:9,10 20:12 91:7

198:20 221:21
  222:21
**associated**  58:19
  81:14 164:20
  196:20,21 198:10
  199:1 200:17
  221:23 222:2
  241:24
**associates**  1:4 4:5
  259:8
**assume**  11:20 36:3
  40:20 41:8,13 42:4
  104:9 155:24
  165:19 176:6
  184:18 203:1
  204:22 206:3
  207:24 208:25
  224:16 250:17
**assumed**  60:25
  209:19
**assuming**  146:10
  177:20 224:20
**assumption**  11:18
**assumptions**  12:2,9
**attach**  10:18
**attached**  48:2,3,4
  61:20 255:7
**attempt**  43:18
**attempted**  162:11
**attempting**  164:21
  175:2,8
**attended**  146:18
  148:22 149:5
**attending**  93:25
  117:5 188:9 192:12
**attention**  73:5 89:2
  95:7 96:13 97:10
  100:15 101:14
  123:24 124:16
  162:7

**attestation**  86:2,8
**attorney**  23:13,16
  258:13,15 259:17
**attorneys**  30:6,14
**audit**  48:2 85:24
  86:13,16,19,24
  87:3,9,14,20 88:7
  214:11,18
**audited**  188:23
**august**  225:8
**authority**  257:6
**authorization**
  43:23 63:18
**authorized**  258:7
**available**  10:25
  11:4 13:15 26:1,2
  27:19 28:4 30:7,25
  31:10,16,24 37:8
  41:7 54:12 61:9
  104:4 121:13
  126:23 251:15
**avenue**  1:10 2:9
**average**  157:12,15
  157:19,22 158:23
**awaiting**  259:11
**award**  58:17 63:14
  63:16,20 86:21,22
  160:25
**awards**  63:19
**aware**  11:11 12:14
  12:18 36:7 38:11
  38:13,17 51:15
  53:21 66:23 71:3
  71:13 72:15 87:16
  87:23 88:11 103:8
  131:17 133:15,21
  133:22 149:24
  152:21 162:25
  163:22 166:9,18,22
  167:2 168:22 171:9
  182:11 194:24,25

203:24 219:16
224:18
**axelrod**   2:8

**b**

**b**   22:24
**back**   11:22 17:10
39:25 44:20 50:19
52:9 56:8,10,11
62:24 71:5 72:21
79:8,9 81:12 83:9
83:18,20 94:9
105:18 106:4,17
107:15 108:4
113:19 127:4
131:14,15 133:12
136:12 149:9,10
153:2 157:6 158:4
160:1,8,11,13,24
161:13,14 163:23
165:23 168:6
172:10 174:12,18
174:23 175:7
177:21 180:5,9
181:7,17,24 182:11
182:15 185:5
186:21 189:6,7
191:11 193:3
195:10 196:18,24
197:8 198:23
204:17 205:20
208:18 210:4
217:19 218:5 229:2
229:21 230:10
231:6,9,13 232:1
232:21 233:21
234:19 236:8
237:15 254:5
**background**   168:1
247:19 249:9 250:2
**backup**   153:5

**bad**   14:17 32:17,18
32:20 35:13 37:25
37:25 41:4 43:13
79:10 80:8,15 81:1
81:4 83:3 103:12
113:3 153:3,6,7,12
153:23 154:3,13,14
154:17,18,20,25
155:6,9,15,17,20
155:21 168:8 200:9
212:6 215:3 218:4
221:13,15,20
222:15,21 226:2,6
226:7,9,12,13,14
226:22 227:12,19
227:25 228:13,19
228:22 229:3,12
**baena**   2:8
**balance**   35:9 41:6
41:23 42:17 43:9
56:15 57:2 60:3,3,4
60:11,15,18,24
61:1,2,4 62:6,6,7
66:2,2,14,16 67:1
67:15 68:7 69:11
69:13,16 70:23
75:17,18,19,21,22
83:13 84:6,12 85:5
85:6 87:25 93:11
93:11 94:3 97:8
102:2,8 103:3,3,5
104:24 105:3
112:13,17 113:6
114:10,10 131:2,10
131:11,12 132:3,4
132:8,8,17,18
168:4 169:13,14
174:23,24,25 175:4
175:6 182:20,23
185:3 186:9 187:13
191:19,20 196:12

199:21 200:4
210:17 212:5,14
213:7 214:10,21
215:20 216:1
217:13,13 219:22
223:14 230:8 231:2
231:5,13 232:2,4
232:12,13,20 233:9
234:14,20,25 235:2
235:7,10,14,16
236:23
**balances**   35:22
36:1,7 38:2 41:12
41:14,14,18 42:2
42:10,23 43:25
65:7 66:17 67:13
68:10 69:25 72:11
72:16,19,22 75:4,9
76:14 77:2,9,23,25
84:7,20,23 90:16
90:17 91:5 100:12
107:4,12 112:23,25
120:6 133:10,11,11
138:2 143:10,14
144:7,21 146:25
148:7 149:14
152:24 159:23
160:5 174:18,20
175:2 178:24
189:25,25 198:21
199:24 207:25
209:21 215:20
218:4 220:8,9,24
220:25 222:6 223:5
233:9
**balancing**   189:22
**balancings**   229:18
**bank**   43:16 92:1,9
92:12 106:16
107:12 134:9
135:25 136:5,15

137:7 138:16,18
139:1 223:5 246:17
247:1,21
**bank's**   137:13
**banking**   248:8,23
**bankruptcy**   52:10
172:15,25 173:5
202:25 203:6
204:10 205:15,23
210:7,10,12,18,22
211:11 225:9
227:20 235:14
240:21 243:21
250:13
**banks**   225:14
**barbara**   131:24
151:10
**bartness**   1:7 179:9
**base**   7:17,20 12:22
140:18
**based**   13:7 88:8
90:25 94:14,24
125:25 150:18
162:22 167:11
176:11 193:12
208:24 210:2
218:11,24 245:4
**bases**   213:19
**basically**   28:14
34:24 66:3 68:23
110:16 154:8
187:21 214:13
**basing**   138:5
**basis**   65:10 68:9
75:18 93:12 104:5
115:8,21 116:23
117:1,9 121:19
143:24 158:25
195:8 215:25
**bates**   11:3,5 46:7

**began** 125:19,22
**beginning** 101:17
126:16
**behalf** 2:2,7 4:14
**belief** 216:10
**believe** 5:13 23:9
24:1 25:15 29:8,16
38:20 39:3 46:6
47:19,22 48:24
61:20 64:11 80:2,5
92:14 106:23
111:11,21 114:2,18
118:2,7 119:2
122:9,21 124:14
125:4 132:13
154:21 158:11
159:16 176:16
180:24 181:6
187:14 197:16,22
198:4 214:1 220:20
226:18,20 233:8
244:6 246:2
**believed** 131:9
147:20 225:1
**believing** 134:14
213:20
**belonged** 212:18
**benchmark** 243:1,2
**best** 197:7
**beth** 2:6 4:12 259:5
**better** 21:24 108:11
125:4 128:17
218:22 245:1
**beyond** 71:2 75:12
75:14 178:11,20
219:3,4,8
**big** 123:12 126:4
171:10
**bigger** 105:11
**biggest** 87:22

**bijan** 2:13 23:15
**bill** 7:6
**billable** 8:25 9:5
**billed** 6:6
**billing** 6:18
**billion** 244:15,21
245:11,12 250:18
**billions** 244:17
**bilzin** 2:8
**biotech** 22:17,21
24:7
**biscayne** 259:1,2
259:14
**bit** 25:9 222:20
223:11 238:12
247:13
**blvd** 259:14
**bmo** 250:1
**board** 43:6
**bonus** 7:15,19,21
7:23 8:7,9,11,16,19
9:9
**borrowed** 232:24
233:3
**boulevard** 259:2
**breach** 22:18 23:22
23:23 177:3 203:5
204:4 211:19 239:4
239:7,11,13,17,19
240:1,2,3,12 242:1
253:17
**breaches** 175:21
176:1,11 177:9,15
177:17,20 202:24
203:1,16,22 204:8
204:9 210:15
224:16 225:5
**break** 44:16 62:17
113:14 120:21
155:3 180:3 183:16
247:5

**brickell** 2:9
**bring** 5:15,22,25
9:22 10:3,5,7,8,10
11:15,17 12:6,10
12:11,12,20 13:1,2
13:12 16:13,15
19:9,18 118:10
174:23 231:13
232:2,4,12,22
234:24 235:1,3,4
**bringing** 5:19
214:10
**broad** 186:19
**broader** 64:9
149:13
**broadest** 52:15
**broadly** 106:25
211:6
**brought** 12:13
19:12,22 118:12
124:25 131:13
**broward** 257:4
**bucks** 236:11
**budget** 252:20,22
252:25 253:9,12
**bullet** 113:5
**business** 25:12,16
25:18,21,25 26:6
102:12 127:21
156:9 171:24 172:2
177:14 241:17
243:11,15 251:22
**businesses** 242:8
249:11

**c**

**c** 14:9 259:5
**calculated** 237:21
237:23
**calculation** 49:10
250:24

**calculations** 83:3
213:12
**calendar** 183:9,10
**call** 44:14 50:8 54:6
86:2 115:17 184:7
201:10 242:11
**called** 43:20 53:21
54:1 55:13,16 68:4
86:6 106:6,9 115:2
115:14 160:9,10,13
160:16 162:2
185:25 188:11
221:1
**calling** 33:11 228:7
**calls** 184:2 190:23
202:13
**campus** 80:11
103:16 153:12
154:11 245:24
**campuses** 29:22,22
80:8 81:5
**capacity** 10:22
255:18
**capella** 246:2
**capex** 182:7 211:2
**capital** 127:18,21
170:17 171:23
172:1,20 173:5
204:5 211:1,4
224:23 250:2
**capitalization**
251:16 252:4
**capstone** 247:2
248:7,22
**captioned** 259:10
**card** 193:6,9,13
**care** 259:15
**career** 25:13 28:24
29:17 36:12,25
**case** 4:4 6:25 10:2,6
11:9 14:20 22:9,10

22:20 23:1,4,7,9,11
23:14,17,20,25,25
24:3,5,7,10,20,25
25:10 26:6 30:14
33:18 37:4 38:4,25
44:3,6,11 45:1,10
46:11,18 48:14,22
56:2 61:23 63:22
69:9 71:6 72:6
76:19 78:13 82:4,9
82:16 84:14 86:20
88:17 89:6 93:7
99:24 100:10
107:17 124:9
133:14 134:3 141:6
141:7 167:13 177:5
178:13,15 179:17
198:16 201:17,20
202:24 234:11
239:10 251:3,7
252:6 255:6 259:11
**case4** 11:21
**cases** 24:16 25:2,6
28:7 192:23
**cash** 43:18 104:4
107:12 115:8,21
116:23 117:1,9
121:19 126:15,19
126:21,23 127:10
128:4,8 131:18,21
132:24 161:1,2
171:1,11,14 184:15
186:20 189:4 197:4
199:3,3 204:2
215:25 223:3,5
231:21 232:16
234:20,22 236:23
239:9 251:18
252:13
**cat** 123:4,5

**categories** 197:13
**categorize** 102:22
**categorized** 153:6
**category** 197:10
198:3
**cause** 1:19 74:9,14
75:11 76:2,4 77:11
101:23 102:5,19
105:6 131:21 134:3
134:4,19 150:17
203:6 205:11 208:3
210:6,19 220:16
221:15
**caused** 56:5,20
57:8,20 72:9 76:1
77:17 96:2 108:18
130:15 133:17,18
134:15 139:21
140:4 148:22 149:6
152:15 154:21
155:7,12 159:7,9
172:15,24 175:14
202:24,25 204:9
205:22 210:9,12,18
211:10 227:19
237:3,6
**causes** 75:9 154:20
**causing** 72:2 75:1
76:21 95:12 224:19
**caveat** 92:24 93:1
**ceased** 225:5
**ceases** 192:22
**center** 246:2
**central** 2:4 259:6
**certain** 5:16 19:6
19:15,16,16 20:14
34:1 36:7 55:4
65:22 70:18 82:17
82:18 104:5 110:10
111:24 130:24
131:11 153:2 156:2

175:22 195:8
229:12
**certainly** 28:3
35:21 43:10 68:8
78:12 81:18 102:24
103:1 150:17
176:23 202:2
**certificate** 255:11
257:1 258:1
**certified** 3:10 255:5
**certify** 30:11 257:6
258:7,12
**cetera** 117:3
**chain** 18:13
**challenge** 129:3,17
226:3 242:6
**challenges** 115:15
133:23 205:25
**chance** 64:2 119:9
**change** 32:14 34:9
35:12 40:23 41:6
147:10,12,15,21
183:21 187:11
226:18
**changed** 35:4
137:12 140:12
210:8
**changes** 88:13
187:12
**changing** 94:12
196:12
**chapter** 124:6
**characterize** 202:3
202:12
**characterized**
155:25 156:3
190:23
**charge** 6:22 81:4
203:7,12,13 226:7
226:10,12

**charged** 206:6
**charges** 212:6
**charts** 167:21,21
**cherry** 220:9
**cid** 1:8 179:9
**circles** 229:24
**circumstance**
234:17
**circumstances**
188:16 211:10
251:5,8,11
**cite** 10:25 48:4
102:11 114:20
234:5 246:19,25,25
249:1,4
**cited** 11:2 46:2
123:21
**cites** 10:16 12:8,9
47:15 95:15
**citing** 11:14
**city** 23:2
**civ** 1:3
**claim** 107:3 119:19
123:15,16 174:13
174:16 176:1
181:24 182:16
210:11 229:25
231:20,21 235:7
**claimed** 244:7
**claiming** 204:9
210:15 235:9,9
**claims** 137:16
144:5 203:22
205:15
**clarification** 89:18
**clarify** 26:24
117:15,15 161:12
161:16
**class** 157:13
**classes** 117:5
157:17 158:10,15

158:17 188:9
192:12,13
**classified**   185:17
185:18
**classify**   213:15
**clean**   186:25
**clear**   30:19 176:4
190:25 202:10
214:16 234:23
**clearly**   16:24 20:25
57:12 96:9 173:7
177:4 178:21
191:25 202:11
218:1 219:22
**clerk**   259:17
**client**   9:1 175:21
176:1,2 179:11
259:13
**clients**   89:23 90:8
92:21 93:23 94:12
94:13,23 96:1,25
111:21 113:24
175:8,13,17 178:6
178:10,19 179:2,7
179:12,18 203:22
206:15 207:5 208:4
208:21 209:6
218:20
**clingman**   1:4 4:4
255:6 256:2 259:8
**close**   86:16,19,24
87:3,4,9,13,20 88:7
162:14 183:11
186:22 187:13
**closing**   86:17
**coach**   98:6,13
**coaching**   98:7
**cod**   41:13,15,19
42:2,11,23 43:25
55:6 56:15 57:1,6
59:13 60:4 62:7

65:7,18 67:1,14
69:7 70:25 71:7,16
72:4,10,11 73:21
74:8,23,25 75:4,10
75:12,14,18,22
76:2,6,9,13,14,25
77:3,19 85:6 90:18
93:11 96:9 97:18
99:18 100:19 102:3
102:8 103:3,24
104:6,20,22,24
105:2,6,25 106:1
106:16 107:4,18,21
107:23,25 108:4,8
108:17,20 109:3,8
109:10,13 110:12
110:16,18,22 111:1
111:19,19,21
112:20 113:6
114:10 130:11,17
130:22 132:3,8,20
132:23 133:1,10
138:25 139:22
141:9,25 142:7,12
142:15,20,21 143:3
143:10,19 144:7,12
144:14,17 145:10
145:11,15 146:2,14
146:25 147:18
148:7,21 149:6,22
149:22 150:2,3,9
150:10,18 151:24
154:22 155:10
159:24 160:5
162:17,18 164:4
165:16,21 167:3,25
168:25 170:2 171:6
174:22 182:21,23
185:3 186:12,18
187:2,4,9,12,25
189:5,8,22 190:1

191:12,20 192:5
193:18,18 194:12
194:15 195:25
196:8,12 200:4
215:25 217:13
219:4,21 220:25
221:11 224:15
228:18 230:3,6,10
230:13 231:3,23
232:13 234:25
235:7 236:24
**code**   142:22 149:17
161:17
**codes**   149:16
**collect**   16:25
**collection**   15:1
**collective**   116:4
**collectively**   85:4
**college**   25:13 28:24
29:18 36:12,25
**colleges**   243:13
**colorful**   167:22
**columns**   188:10
**combination**
132:24 174:21
211:5 230:8
**combined**   126:13
241:23
**come**   37:21 97:8
106:4 125:5 134:1
134:8 142:25
169:13 194:20
208:18 225:22
**comes**   22:22 32:23
44:4 48:6 53:24
103:19 117:10
123:18 140:21
151:6 153:18
**comfort**   252:7
**coming**   42:3 51:13
234:6

**commence**   93:25
192:12
**commensurate**
150:13
**commenting**
211:16
**comments**   137:13
**commission**   255:24
256:25 257:24
258:24
**common**   251:23
**communicate**   15:6
15:14 17:19 141:9
141:25 190:12
216:8
**communicated**
15:11
**communicating**
99:1 135:8
**communication**
26:19 27:2 106:15
175:4
**communications**
5:23 9:23 11:18
12:1 26:8,13,14,16
27:12 36:2 41:8
221:22
**companies**   240:18
242:12,14,18,20,21
243:1,11 244:9,14
244:16 245:2,4
247:11,12 249:25
**company**   22:18,21
25:18 32:19 35:25
38:1 41:11,17,21
41:25 42:4,9 46:6,7
51:7 52:8 71:14
115:8 126:5 128:3
129:4 134:3 135:1
135:6 136:14 139:9
141:10 143:14

144:5 162:11
163:13 164:12
165:16 170:17
172:24 173:25
174:9 177:23,24
179:13 180:15,17
181:2,11,15,23
182:1,9 190:17,22
191:10 204:10
205:22 208:25
209:10,11,12
211:11,24,25
220:15,17 221:16
225:25 226:1,4,22
227:20 231:20,22
232:16,24 233:3,5
233:5 234:24 235:7
236:5,7,20 237:3
239:9,23 241:3
242:2 243:14
251:24
**company's** 37:24
94:25 136:5 139:1
190:14,15,16 191:1
191:2 205:10
211:12
**comparable** 242:6
242:8,12,18,19
243:1 244:23 245:2
245:20 246:6 247:8
247:11 248:13,19
250:19 251:2
**comparables** 239:3
240:13 241:22
243:7,10 244:25
245:9 249:7
**compare** 60:4
136:1
**compared** 59:22
65:15 159:24 160:5
229:19

**comparing** 58:17
67:1 112:22
**compensated** 6:2,4
18:1
**compensation** 5:23
7:22,24 8:19 9:9,20
**compile** 15:4
**compiling** 19:7
20:15
**complaining**
234:13
**complaint** 3:9
88:17,25 89:3 95:9
96:14 97:11 99:8
99:12 101:15
**complete** 17:22
28:20 45:8,12
55:21 66:16 114:8
158:17 173:23
259:13
**completed** 16:12
259:11
**completely** 216:22
235:10
**completeness** 47:16
253:5
**completion** 259:13
**complicated** 171:3
171:5
**component** 8:8
**components** 174:15
**composition** 37:25
**comps** 244:1
**computer** 17:10,11
28:23 29:4,13,17
36:11,24 37:16
40:6 42:20 51:17
51:18
**concept** 70:23
208:24

**concepts** 108:25
**concern** 91:25 92:2
92:6 137:5 138:14
173:10 177:9
178:24 201:14
202:20 203:2 205:1
205:12 209:13
223:20 236:7
250:14
**concerned** 230:24
231:4
**concerning** 5:23
114:11 135:11
218:8
**concerns** 87:24
113:3 137:2 163:8
208:8
**conclude** 56:5,20
57:8,20 77:17
101:24 102:6,19
111:11 130:15
134:19 155:9,13
157:13,17 159:7,9
167:12 171:22
172:1,22 218:19
221:16 238:23
241:1,5 259:16
**concluded** 67:21
136:17 171:23
**concluding** 135:14
**conclusion** 36:10
36:15,24 37:7,22
93:13 135:16,18
136:14 138:5
143:17 152:1
172:13,18,19
217:20 238:14
**conclusions** 38:10
52:24 53:2 65:22
76:1 81:18 82:17
86:7 88:6,12 126:8

144:13 146:24
217:10
**condition** 180:17
**conduct** 89:5
179:19 207:12
**confirm** 118:9
130:21 136:5
163:19 164:15
188:19,20
**confuse** 176:7
**confused** 209:22
**connected** 258:16
**connecting** 159:15
**connection** 8:18
10:1 11:5,8,20
14:19,23 23:10,14
23:22 25:13 31:1
31:10,24 34:17
45:9 52:21 58:11
71:20 74:7,13
82:22 96:23 99:23
101:23 102:18
108:7 115:19
124:23 125:8 148:5
148:18 151:1
198:15 216:25
218:21 220:14
223:25 224:5
230:25 240:16
243:9 248:7 259:10
**consequence** 73:22
87:9,20 88:6 109:4
169:15 175:21
207:12
**consequences**
93:18 181:20
**consider** 72:23
245:9 250:21
**consideration**
143:8,12 152:13

considered 66:4
74:12 128:12
considering 56:15
67:15
constituted 58:10
consultant 9:2
consultants 14:3
246:4,8
consulting 18:9,10
18:11 20:12 21:14
consumed 164:1
contain 10:11,13
15:22 48:18
contained 10:14
188:2 200:13
contains 10:16
contemporaneous
45:19,21 52:1
212:11
contention 49:3,4
168:12
context 68:17
70:13 150:6
continue 13:6,7
146:17 181:4,12
192:22 209:12
continued 166:19
167:3 201:14
202:20 205:1 233:9
continuing 112:14
contract 22:19
23:23,23
contradiction
120:14
contravention 89:6
contribute 211:17
contributed 76:13
224:9 237:7
contributing 77:2
77:14,16

contribution 8:25
9:1
control 91:8 208:8
222:11 223:16
controls 89:11,25
90:10 222:25
223:19,22 224:6,9
224:10
conversation
189:12
convert 205:10
convince 242:19,24
copies 118:20
copy 5:10 33:6,17
255:5
corinthian 243:13
244:1,2,6,7,10,14
250:11,12
correct 7:1 9:6,7,10
10:9 11:7 16:10
17:18 19:25 22:4
41:16 51:3 53:13
59:3 60:22,23
62:11 64:4 65:14
65:19,20 66:12
75:5,23 78:8 80:20
80:24 84:9,17,24
85:3,9,20 89:17,18
89:19 91:10,12
93:14 101:9 103:4
105:7 107:5 108:3
110:10,24 112:8
115:22 118:15
120:11 121:23
123:9,13 124:13
129:20 132:10
133:8 136:16,25
140:21 142:21
149:8 150:20 151:3
152:11,15,16,17
156:6,10 160:21

163:5 164:5 165:1
165:2 168:9 169:1
169:11,12,16 170:3
170:22 176:10
177:1 178:1,20
179:9,25 182:21
185:24 187:5
188:11 189:13
190:8,13,17 192:2
192:5,14 193:20
194:12 197:11,24
198:5 199:17 206:9
206:16 207:13
208:5 218:12 227:6
227:15,21 231:3
233:21 234:25
238:2,3,5,6,10,11
238:17,18 240:19
240:25 249:5
corrected 151:25
177:6
corrections 255:7
correctly 89:7
95:24 96:21 97:20
99:20 102:4 136:20
140:23 142:2
162:16,19 163:16
188:21,24 189:2
211:14 225:10
237:20
correlate 59:5
corrupted 143:2,18
143:25,25 144:23
145:20 146:2,10
151:4 162:16
163:14 164:23
165:7,14 166:19,19
167:3,13 192:7
corrupting 145:9
corruption 143:9
144:5,12 145:14

146:11,16,23
148:12,15,21 149:1
152:16 167:17
175:14 187:1
cost 127:22 165:2
236:20
costly 164:13
costs 31:14
counsel 4:9 5:19
98:2 118:21 177:12
258:13,15
count 145:23
counts 21:9
county 255:3,13
257:4 258:4
couple 68:14
121:24 208:18
244:21 245:12
coupled 83:13
153:2 200:7 219:21
course 13:13 26:5
66:2 70:4 156:9
198:4 201:5 204:25
205:4 206:4 209:2
227:5 230:6 232:3
232:6,9 233:10
court 1:1 4:11 5:2
21:18,20 23:1 33:9
88:21 140:7,20
216:4 259:18
cover 124:3
covered 122:9
138:23
create 32:3 51:18
51:22 60:11 150:9
240:6
created 17:6,7
40:22 51:16 52:21
144:12 151:24
190:17,20,21

**creates** 149:23
**creating** 50:7
  162:17 226:3
**credit** 107:19,19
  186:8 193:3 194:10
  209:17,18
**credits** 154:9
**crisis** 205:22
**critical** 216:7
**curious** 29:1
**current** 92:23 93:9
  114:1 253:20,21
**customary** 251:1
**cut** 250:3

**d**

**d** 3:2 22:24
**dade** 258:4
**daily** 68:9 143:24
**damages** 24:4,7
  207:11 237:21
**dana** 85:25 86:9
**data** 9:24 10:12,14
  15:1,2 16:2,25
  19:16,19 27:22,22
  28:5,7,9 29:12
  32:11 37:24 40:6,7
  40:8,8 43:9,9 48:18
  50:4,4 51:25 52:10
  53:6,17 54:5 55:13
  55:14,16 57:11
  58:16 60:6,9,17
  61:24 62:3,10,12
  67:23 70:20,21
  71:16 72:3,9 73:21
  73:21 77:19 82:16
  82:18,19,22 83:4,5
  83:7 85:5 108:10
  108:19,20,21 115:6
  115:7,11,18,19,25
  116:3,14 117:6
  119:6,7,13,15,19

120:3,25 121:8,12
121:16 122:22,23
123:20 130:24,25
136:6 137:25 139:2
141:9,17,20,25
142:7,21 143:2,18
144:24 146:17,23
149:4,6 152:16,23
161:8 166:18 167:2
167:13 184:22
185:9 186:15 187:1
187:9,11,12 188:21
192:4,7 220:23,24
**database** 161:2
**date** 6:7 59:4 65:17
  66:11 141:12
  177:22 212:19,22
  253:14,23 256:3
**dated** 256:24
  258:18
**dates** 168:20
**daughter** 188:6
**david** 1:7 4:5 179:8
  259:8
**davis** 64:1,3 80:4
  131:24 151:10
  184:1
**day** 31:20 61:25
  95:23 109:22,25
  112:12,18 113:11
  124:7 147:3,8,19
  147:20 151:18
  164:8 190:3 202:1
  241:13 255:6,20
  256:24 257:14
  258:18
**days** 259:16
**dd179981** 257:24
  258:24
**dealing** 52:10

**dean** 1:7 179:8
**dear** 259:9
**debate** 13:18
  192:19
**debating** 229:4
**debit** 154:8
**debits** 154:8
**debt** 32:17,18,20
  35:14 37:25 38:1
  41:4 43:13 79:10
  80:8,15 81:1,4 83:3
  103:12 113:3 153:3
  153:6,12,23 154:3
  154:13,14,17,18,20
  154:25 155:6,9,15
  155:17,17,20,22
  200:9 212:6 215:3
  218:5 221:13,15,20
  222:15,21 226:2,6
  226:7,9,12,13,14
  226:22 227:12,19
  227:25 228:13,19
  228:22 229:3,12
**debtor's** 124:6
  125:19,22
**debts** 153:7 168:9
**december** 70:14,16
  70:17,19,22 101:17
  101:20,24 102:6,13
  102:14,20,24 103:2
**decide** 27:7,8,9
**decided** 174:2
  241:10
**decision** 172:3,14
  172:23 181:14
  205:9 212:24
  241:12,14 245:4
  250:3
**declaration** 124:5
  126:6 162:8

**deemer** 85:25 86:9
**defective** 151:21
**defendant's** 5:3
  33:10 88:22 177:9
  177:14
**defendants** 1:9 2:7
  4:15 89:5 176:12
**defense** 3:6
**deferred** 229:21
**define** 59:15
**defined** 94:14
  211:6 215:2
**definition** 8:10
**degree** 32:7 133:11
**demonstrated**
  239:23
**department** 65:1
  72:4 77:1 107:3
  108:22 110:4
  131:19 136:18,19
  145:16 151:3
  158:25 159:10
  164:3,21 168:12,22
  169:9,15 172:3,23
  173:16 177:22,25
  180:13,25 181:13
  182:16 183:4
  184:23 185:10
  186:11,16 189:8
  191:11 195:10,24
  196:24 197:9,14,17
  198:1,18 199:9
  200:15 201:1 209:9
  210:4,7 212:16,24
  213:1,11 214:3,18
  217:3 228:6,17
  229:2 230:1 231:1
  231:9,22 236:9
  259:21
**department's**
  172:14

depend 200:18
depending 110:7
194:1
depends 105:17
165:10 188:13
228:20
deponent 255:8
256:2
deposited 92:9
deposition 1:14,18
4:3 5:8 6:1 13:6
31:20 33:3 47:18
47:19,24 48:3 64:1
64:3 86:6 133:14
252:25 253:9 255:5
258:8 259:10,11,16
depositions 28:11
28:11 34:1,4,6,8
47:17 56:24 61:20
66:23 68:18 216:15
depressing 241:16
derived 7:24 130:1
derogatory 216:6
dervishi 9:25 11:19
12:3
describe 21:24
54:22
described 84:21
100:13 103:8
178:23 203:14
255:17
description 184:17
242:12
descriptions
184:19
desire 35:21 38:6
40:13 255:7
desired 31:23 32:2
38:4
despite 209:9 225:4

detail 43:11,15
45:7 58:18 110:17
110:18,18,21 122:2
122:12 171:8
determination 72:2
207:5
determine 17:12
42:21 60:19 64:24
69:17 70:20 113:23
115:21 119:20,24
133:2 139:7 142:6
142:19 163:4
179:18 184:22
203:5,6 217:2
243:1
determined 55:18
determining 247:7
248:18
deutsche 247:1
development 9:1,2
devry 244:16
dg5 32:11
dicicco 134:23
dicicco's 199:13
difference 58:5
67:14 69:11,13,15
70:2 81:8 103:2
111:8 113:5 132:2
132:9 157:24
171:10 185:4
186:23 192:17,18
192:19 244:20
251:9,11,13
differences 113:2
178:23 197:5
198:25
different 6:22
43:19 67:19 73:15
74:1 77:18 93:2
104:6,7 108:20,21
108:25 112:23,25

138:19 147:11,16
147:18,19,20,23,25
170:13 171:9
174:21 185:1 186:6
188:15 199:3,12
218:4 242:4 243:8
249:7
differently 78:22
86:18 100:8 168:19
168:21 188:5
203:18
differs 194:1
difficult 49:15,17
49:19 164:13
difficulties 129:4
133:18 139:8
digit 236:24 237:2
direct 3:4 4:22
27:12 58:16 66:9
67:8 93:17 109:25
160:25 161:1
168:14 187:22
203:11,13
directing 20:16
45:17
direction 14:23
19:8 20:6
directly 8:15 10:24
11:2 80:9 114:2
128:16,20 198:20
director 179:14
directors 179:13
disagree 26:20
126:3 129:9 162:24
191:7 206:5
disbursed 117:4,4
disbursement
95:21,23 96:4
107:20 109:3 171:6
191:24 193:9,18
194:9 230:14

disbursements
45:6 110:12,23
disconnect 102:2,7
102:24 103:2,7,23
104:3
disconnected 137:9
discontinued
168:13
discount 238:16
discovery 25:16
26:13
discrepancies
100:19,21 101:1,8
discrete 207:2
discretion 8:21
discretionary 8:20
discussed 12:7
19:12,21 66:22
72:16 177:8 182:16
discussing 74:17
113:9
discussion 5:18
72:7 74:25
discussions 71:12
dispute 128:5
133:25
disputing 201:23
distention 65:12
distinction 59:16
59:18 83:22 158:21
160:24 171:15
175:25 205:6
distress 243:23
distressed 128:2
distributor 22:19
23:24
district 1:1,1
division 1:2
document 5:1,9,15
10:21 11:8 17:6
33:3,8,14 88:20

117:25 118:6 122:4
124:9 149:23 249:2
249:3
**documentation**
153:5
**documents**  5:16,16
5:19,22,25 9:23
10:3,5,13,17,18,19
11:17 12:1,6,8,11
12:13,15,21,24
13:10,12 15:21
16:14,18,23 17:13
25:10 26:17 27:4,6
27:15 32:16,17
34:3,16 35:1 37:23
39:24 41:1 53:11
62:18 63:4 64:6
68:18 71:5,8 86:25
121:23 130:15
138:15 150:1 153:9
254:8
**doe**  36:2 41:7 42:3
43:22,23 60:4
83:13,19 89:6 90:4
93:3,4 97:19 99:19
100:20 106:13,14
106:14 109:17,17
110:8 113:6 131:24
147:19 155:2 156:1
156:5,9 157:6,10
157:12,16 158:4
160:3,9,20 168:6,7
171:8 174:1,5,11
174:12,14,16
177:10 181:24
182:11 183:25
185:1,3 204:23
206:4 207:6 208:21
209:7,17 225:5
232:1 233:9,21

**doing**  19:8,15 21:7
21:11 30:1 81:13
82:2 92:5 95:3 98:3
98:18 101:12
105:23 112:21
135:6 171:1 175:5
203:12 208:7
223:12,24 242:6,10
251:14
**dollar**  198:6 217:16
219:16,19
**dollars**  105:2
138:17 146:12,14
155:2 202:3 234:19
244:13
**donahue**  4:4
**donohue**  1:14 3:8
4:17,24 5:6 13:23
33:4 63:2 113:22
180:12 201:11
204:20 237:18
256:2 257:8 258:9
259:4,10
**dots**  167:22
**doubt**  29:20
**download**  170:2
**downs**  70:4 108:22
108:24 153:3
215:15 216:12
217:4 219:21
**dozens**  20:25
**drafts**  16:14
**drain**  128:8 241:2
**drained**  181:18,24
**dramatically**  159:4
251:3
**draw**  54:12 56:7,22
57:10,24 58:12
59:1,4,5,8,8 60:22
61:24 62:10,11
64:20 65:3,5,17,18

66:11 67:7,9,21,24
68:9 69:19,20
70:22 72:20 73:2,6
73:10,12,15,22
74:3 75:25 77:6,12
77:17,18,22 78:4,5
78:7 94:6 95:12,20
96:2 108:22,24
109:4 110:3,22
112:3 119:22,23
120:3 121:9,16
144:17 152:23
166:6 168:13
169:23,23 194:16
196:19 198:5 210:9
215:15 216:12
217:4 218:11
219:18,21 220:12
220:17 222:1,5
**drawing**  65:11 76:5
93:8 94:24 96:19
104:11,13,21
113:24 175:25
**drawn**  55:18 56:5
56:20 57:9,21
66:11 93:24 138:18
200:1,3,16 217:2
218:20,24 242:20
**draws**  58:19,20
59:24 63:17 64:7
64:13 66:19,24
67:3,4 69:2,8 70:12
70:13,18 74:1
75:12,14,17 77:25
93:10 94:23 95:22
96:17 97:1 101:18
136:1,2 193:8
196:19 200:19
218:14,16 221:1
**drew**  64:25 65:21
78:5 92:21 136:13

219:17,18 220:18
221:16
**drilled**  66:7
**driving**  137:12
**duces**  5:8
**due**  132:2 154:25
155:17,25 226:15
**duly**  4:19 255:5
257:10
**duns**  64:11
**duties**  211:19

**e**

**e**  3:2 15:15 22:24
29:10 36:2,5 41:22
42:1,3,4,10,22
43:23 79:22 94:10
102:11 155:20
199:13 259:6
**earlier**  17:12 37:2
168:11 171:2
189:11 229:5
**early**  71:1,1 101:17
106:14 162:15
**earned**  179:25
**earnings**  228:24
251:16 252:5
**easier**  13:16 38:13
51:11
**east**  2:4
**ebitda**  241:22
252:18
**economy**  182:12
**edit**  15:25
**edited**  16:8
**educate**  248:10
249:7
**education**  65:1
77:1 107:3 108:22
110:4 125:23 128:2
128:9,25 145:16
158:25 159:11

162:12 168:13,23
169:9 172:23
177:25 180:25
183:4 198:1 200:15
210:5,7 212:16
244:9 246:2,5
248:9
**education's** 72:4
181:14
**educational** 242:15
244:11
**effect** 87:8 104:23
105:13 169:21
241:16
**effectively** 64:18
125:20
**efficient** 35:11,20
46:14 52:16
**effort** 106:12
214:20
**efforts** 20:4 107:1
187:13
**eids** 75:24 212:18
**either** 9:24 10:24
11:19 69:16 71:22
71:25 89:10,24
90:9 108:3 160:10
160:20 167:17
168:23 174:23
182:18 184:7
187:15 191:19
192:23 197:10
201:2 202:9 230:9
**elect** 253:11
**elected** 119:25
168:7 180:13 240:9
243:25
**elhad** 14:10 18:18
**eligible** 55:24
**else's** 80:16

**email** 259:14
**emergency** 211:1
**employee** 7:13
258:13,14
**employees** 8:12
18:20 225:1
**employment**
218:21
**enable** 113:23
**enabled** 115:20
155:8
**encountered** 165:5
**ends** 15:5 29:21
191:20
**engage** 170:11
**engaged** 20:20 25:3
30:14 89:5 95:10
95:19 209:7
**engagements** 21:16
**england** 24:1
**enjoyed** 209:11
**enrollment** 92:23
93:9 94:15,24
95:13,21 96:3,16
96:25 101:21,25
102:7,21 114:1
**enrollments** 101:19
**enterprise** 177:14
181:13 238:8,15
**entire** 29:17 36:24
37:3 95:16 116:8
217:9,11 234:20
**entirely** 207:11,15
**entirety** 36:11 99:8
219:23
**entitle** 57:23 176:2
**entitled** 33:4 59:7
60:20 66:9 82:11
83:21,23 84:2
109:24 117:25
219:18 220:17

221:17,18 248:9
**entitlement** 65:4
67:8
**entity** 181:4 241:23
**entries** 43:9,11,12
43:13 97:18 99:18
153:11,19,22 231:7
231:14,17
**entry** 120:5 153:12
154:2,4,12,18,19
155:9 186:10
191:18 196:14
198:13
**environment** 51:25
52:6
**equal** 59:7 60:20
66:10 236:10
**errata** 255:7 256:1
259:13,14
**error** 71:8 86:11
**esq** 2:6,10
**essentially** 158:5
169:25
**estimate** 177:13
**estimates** 32:18
37:24 247:14,16
**et** 4:6 117:3 255:6
256:2 259:8
**evaluation** 156:20
203:17 204:22
**event** 166:1 180:14
182:12 189:10
191:25 213:13
**events** 180:15
181:2,10 182:2
203:19
**eventual** 153:3
**eventually** 55:6
74:23 86:14 105:24
129:22 130:6 168:8
192:4 200:22

214:22
**everybody** 180:4
**evidence** 69:1
78:12,23 79:2,3,17
79:25 80:22 81:2,7
82:23 84:14 93:7
96:1,23 97:22
100:17,23 101:2,6
101:22 102:5,11
103:9 130:14
135:20 137:2,6
199:2,8,11,14
200:2,7 211:22,23
212:3 215:13
216:14,17 219:10
220:13
**evident** 230:23
**exact** 20:24 48:11
168:20 172:11
212:22
**exactly** 127:8
135:23 190:19
196:16 236:2
**examination** 3:3
4:22 58:9 78:24
81:20 84:3 96:24
97:23 99:23 125:25
139:8,20 140:3
141:15 142:5 143:1
148:19 151:2 152:7
162:22 163:4,18
164:14 167:11
179:16 198:16
215:14 217:1
220:15
**examinations**
156:16
**examined** 131:4
**example** 8:7 15:2
32:11,25 39:7,7
40:5,19 41:23

43:13 46:12,15
48:4,5 59:1 64:19
70:14 72:24 73:10
76:18 78:3 81:2
110:25 112:11
120:19 131:15
135:25 137:1,14
153:12 160:8 164:1
166:5 184:1,14
185:12 198:22
215:1,3,24 221:3
223:11 246:19
250:1,9
examples   39:9,10
69:23 70:9 96:7
121:24
exceed   59:7
exceeded   66:10
excel   15:20 16:1,4
16:5,24 17:16 40:5
52:1 118:2 123:9
253:8
excess   7:19 93:23
127:20 250:4
exclude   245:4
250:5
excluded   244:14
excuse   118:21
executed   255:17,18
exhibit   3:8,8,9 5:3
5:7 33:3,10 46:20
46:22,24 47:1,3,5,7
47:9,11,13,18,19
47:24 49:4,5,6,10
49:21,22 50:1,5,7
50:20,23 51:1
64:16,20 73:8,9
74:2 88:18,19,22
117:24 121:19
122:10 123:2,2
124:2,5 185:13,24

190:7,19 196:2,23
197:25 200:12,14
246:19 247:3
248:21 249:14,15
249:16,21,22
252:23,25 253:9
exhibits   3:6 12:24
12:25 14:24 15:12
47:16 48:4,17 49:2
51:5 55:15 56:23
58:22 61:21 63:3
66:19 86:5 231:25
exist   16:19 39:6
135:24 216:13
231:8
existed   38:20
existent   217:4
existing   215:16
225:22
expect   195:14,15
expend   164:3
expense   79:10 80:8
83:3 154:10 193:7
expenses   164:20
experience   18:12
157:8,9,11
experienced   74:15
experiences   192:10
experiencing
180:16
expert   3:8 5:24 6:3
6:5 12:21 20:20
26:10 33:4,17
69:10 72:1,5 75:25
78:9 79:15 82:10
82:11 216:9 221:5
230:25
expert's   220:21
experts   207:20
246:4

expires   255:24
256:25 257:25
258:25
explain   40:1 59:21
104:2 154:12,12
170:10 175:17
189:9
explained   39:5
145:2 155:17,19
explaining   38:8
explains   251:9,10
251:12
explanations
224:14
explore   65:13
107:1
expressed   12:5
255:18
extensive   79:5
extent   6:25 9:4
12:15 25:15 29:8
62:2,3 74:4,5,6
83:12 84:13 94:6
108:16 147:2,11
166:1 186:20 196:9
196:10 198:12
200:19 201:6 223:1
224:18 228:5
234:21 254:9
external   214:25
extra   213:13
extraordinary
157:5 213:10
227:14
extremely   164:13
eye   106:24 112:5
eyes   84:1

f

f   14:9
f.p.r.   1:16 257:22
258:6,23

facets   8:1
facilitated   38:12,19
38:21 39:3
fact   29:14 38:1
51:15 70:21 74:17
78:11 79:15 87:13
108:19 123:25
130:22 131:17
133:15 144:20
147:21 154:3
155:21 157:23
165:4,7,13,13
166:9,18 167:2
174:1 178:4,17
181:23,25 182:17
199:11 200:2
201:23 206:5
208:24 210:3 235:6
244:19
factor   77:14 173:4
173:7,10
factors   7:25 77:16
173:15,19,24
facts   9:23 10:11,14
99:24 100:4 102:18
138:10 251:4,7,11
factual   83:19 93:12
133:9 206:14
207:18
factually   206:15
207:5
fail   237:3,6
failed   89:23 90:8
93:23,24 245:16,16
failing   89:9
fails   251:22 252:1
failure   13:7 100:23
205:11
fair   27:10 37:12,13
58:8,15,25 59:19
61:5 65:23 80:14

81:23 88:4 91:14 127:25 144:3,9 173:22 177:13 180:18 181:5 238:2 238:5
**fake** 218:11,15,21 219:6
**fallen** 197:10
**familiar** 51:20 234:3
**far** 80:12 90:17 92:22 93:8
**fashion** 13:17
**fast** 42:7
**faster** 11:23
**fault** 111:21 175:8 175:13,16 178:5,9 178:14 229:24
**fcc** 30:2 42:21 52:14 64:7,9 69:2 71:14 78:5 86:17 87:4 95:19 96:2 101:17 104:5 109:16,22 115:22 117:5 124:23 125:1 125:3,6,20 126:10 126:13,16,16 127:2 127:14 128:9 129:1 129:18 132:16 133:18 141:9 142:1 145:16 146:18 148:22 149:5 156:16 158:24 159:3,18 162:12 164:15 165:6 168:13,24 171:16 172:3,23 177:22 178:19 179:11 180:13,25 184:10 184:11,25 188:20 201:13 202:19

203:15,21 204:22 204:23 206:3 212:18 218:21 222:21 224:6 225:1 225:7 237:24 238:9 239:5,15 240:18,20 241:7,13 242:22 244:18,23 246:7 250:14 253:17
**fcc's** 56:25 125:23 128:13 133:3 177:10,13 205:11 225:6 244:12
**february** 1:11 4:7 64:21 66:12 166:20 167:4,14 183:20 255:6 256:3 257:14 258:18 259:4
**feel** 229:23 239:21 250:17
**fellow** 14:3
**felt** 54:12,14 130:10 239:2 245:1 245:12
**figure** 232:19
**figures** 42:14
**file** 18:17 40:2,6 104:22 112:20 118:2,9 146:1 149:22,22 150:8 172:24 211:11 227:20 253:6,7,8
**filed** 1:18 4:18 88:25 243:21 250:12 259:17
**files** 15:20,24 16:1 16:4,5,12,24 17:16 29:9,13 40:12 52:1 76:10,12 111:20,22 118:10 119:14 122:2 145:20,21

148:4,21 149:24 150:2,2,4 162:15
**filings** 28:13 246:12
**final** 16:11 17:17 236:4
**financial** 21:14 48:5 59:7 87:13 88:6 95:4 96:18,19 97:13 99:13 100:18 111:13 116:9,18 125:19,22 126:9 127:2,14 128:9,18 129:2,16 130:4 133:16 134:11,19 134:20 136:18,19 137:9,10 138:3 151:3 152:14 156:13 162:14 164:3,20 168:9,14 173:25 174:4,8 177:21 180:17 181:2,11 184:9,11 203:13 206:11 210:24 211:13 212:1,8 213:21 241:2,6
**financially** 220:14 258:16
**financials** 48:2 240:2 241:8
**find** 15:24 17:5 27:22 28:1,7 68:25 68:25 78:23 79:17 82:23 96:1,23 97:22 99:24 100:4 100:17 101:6 117:22 153:5,9,10 199:8 215:13 227:7 242:8

**finding** 19:7 20:14 27:22 35:19
**findings** 15:7 20:5
**fine** 13:20,21 63:7 98:18
**finish** 12:12 36:18 50:3 206:25
**firm** 6:6,12,18 7:5 7:9,12 8:1,3,9,11 8:14,17 9:13,18,24 9:25 10:15,22 14:3 17:25 18:8,21,23 20:8 22:9,11 23:19 25:3 29:12 85:25 86:9
**first** 4:19 15:8 17:2 64:17 72:13 98:25 99:11 100:6 113:4 124:7,18,19 129:25 140:11 143:13 153:20 156:4 169:24 170:5,6,12 171:12,17,20,25 172:4,15,24 173:17 174:2 177:23 180:14 181:1,15 183:4,8 185:16 189:16,20 192:15 194:2,8,8,20 195:2 205:7,11 209:10 210:5,24 222:15 230:2 242:11 248:4 250:1 255:5
**fiscal** 55:10,20 59:2 61:13,25 64:8 67:22,22 69:2,2,17 69:17 71:24 73:3 74:25 75:1 86:9 87:6 101:5 106:13 107:10 115:25,25 116:10,13,16,19,23

116:24 117:5,9,18
117:21 124:24
126:20,21 129:11
129:12 130:18,18
131:12 133:23
137:3,8,20,24
138:4,6,15 144:20
153:15 159:4 183:8
185:16 198:8 212:5
212:21 214:20
229:8,8 240:21
**five**   22:1,4 24:15
48:19 183:14,15
230:2 237:9
**fix**   152:20
**fixed**   144:1
**fl**   2:10 259:6,14
**fla**   259:14
**floor**   2:5,9
**florida**   1:1,11,17
25:13 28:24 29:17
36:12,25 255:2,13
257:3,23 258:3
259:2,21
**flow**   126:15,19,21
126:23 127:10
157:5 171:15
205:20 251:19
252:13
**flows**   189:4 239:9
**focus**   70:7 73:5,14
95:17 112:17
126:20 208:20,23
209:2
**focused**   223:22
231:5
**focusing**   177:18
**following**   4:1 89:5
243:6
**follows**   4:20 97:12

**footnote**   47:20
95:15,16 98:15
123:12 222:25
223:4,7,9,10,20
248:20,23
**footnotes**   115:13
118:7 122:14
223:17 246:20
**forecast**   251:23
**foregoing**   255:17
258:8
**forensic**   58:9 75:6
78:24 81:20 82:12
82:14 83:6 84:3,19
84:23 85:1 90:4,7
90:14 91:1,24 92:4
92:24 94:1 96:8,24
97:23 99:23 101:6
101:23 102:19
103:8 108:8 113:1
125:25 132:15
139:8,20 140:3
141:15 142:5 143:1
148:18 151:1
156:16,21 162:22
163:18 164:14
167:11 179:16
198:16 200:6,8
207:8,10,18,23
208:1,3 211:23
212:3 215:13 217:1
219:11 220:5 221:6
221:19
**forensically**   133:25
142:18 199:16,19
220:13
**forensics**   103:12
**foreseen**   212:24
**forgive**   100:7
**form**   6:11,17 7:4
25:4 32:12 40:21

40:22 49:21 53:7
71:22,24 125:10
127:15 168:16
169:2 220:16
240:20 243:22,24
**format**   27:23 32:9
35:2 40:21 49:6,9
49:11
**formed**   167:20
**former**   225:1
**forming**   91:15
119:5
**formula**   8:21,22
**formulaic**   8:19
**formulate**   71:19
**formulating**   10:1
11:9,20 12:4 14:20
34:17 38:22 39:13
40:14 46:11,17
48:14,22 61:22
63:21 71:6 124:9
125:9 238:8
**fort**   1:2
**forth**   11:6 34:10
157:6
**forward**   126:17
240:4 243:5
**forwarded**   259:17
**found**   53:11 80:21
93:10 97:8 100:23
101:2 135:10
153:11 247:11
**foundation**   95:2
141:1
**four**   138:11,13
210:5 225:8 230:2
**fourth**   12:20
**frame**   73:3 203:20
**franciola**   14:15
**franciosia**   14:7,16
18:14,15,16 19:6

**freeze**   131:18,21
**friday**   4:7
**front**   13:18 63:2
124:2,4
**fti**   124:24,25
**full**   86:13,13
**fully**   169:10
**fund**   8:11
**funded**   8:16
**funding**   61:6,9
129:5 163:15
164:11 205:7,10
209:11 225:6
**funds**   45:5,5,6
55:25 56:5,20 57:9
57:20 64:7 68:19
79:7,18,23 80:23
81:14 82:24 87:2
89:10,12,24 90:1,9
90:11 92:21 93:8
93:23 94:14 95:11
95:12,22 96:4
113:24 132:19,22
133:19 139:10
156:1,4,7,8 157:12
157:15 159:21
160:2 170:3,16
177:10,25 178:5
193:19 198:18
199:9 200:16,21
201:24 204:23,25
205:3 206:4,8,16
207:6 208:5,22
209:1,8 210:9,16
210:18 217:2,3
221:16,23 222:1,7
228:6
**fungible**   217:14,14
**further**   32:5,20
258:12 259:18

**future** 94:15 95:14

**g**

**g5** 35:6 37:24 39:6
40:20 41:12,15,18
42:2,11,23 43:25
55:19 56:6,15,21
57:2,6,9,12,21 58:4
58:5,6,11 59:2,13
60:3 62:6,10 63:14
63:16,20 65:7
67:14 69:8 72:11
75:4,10,21 76:2,14
77:3,18 85:6,6
93:10 100:19 102:2
102:8 103:3,24
104:6,11,13,15,18
104:24 105:6
106:15,17 107:4,23
108:3,8,17,21
109:4 110:4,17,22
113:6 114:10
119:22 121:8,16
130:11,17,22 132:3
132:7,19,21 133:10
134:10 136:2,15
139:22 143:10
144:7,13 146:25
147:18 148:7 149:7
150:10,13,18
151:24 154:22
155:10 159:23
160:5 162:17 164:4
165:16 167:24
168:25 170:3
174:21 182:21
183:25 185:4,4,21
186:12,17,23 189:5
189:8,22 191:12,20
193:8 194:17
195:16,25 196:7
197:3,6 199:20

200:4 201:10
202:13 215:15,25
216:12 217:4,12
219:17 220:12,25
221:11,16 224:15
228:18 230:3 231:2
231:23 232:13
234:25 235:8
236:23
**gap** 223:3
**gathering** 20:5
**general** 35:18 43:8
46:4 64:17 94:25
153:23 155:7
165:25 166:2
184:14 192:6 194:3
195:2 247:9 249:9
250:2
**generalized** 136:22
**generalizing**
170:23
**generally** 7:25 9:15
9:19 27:25 51:12
57:2 58:15 63:17
66:21 71:17 129:10
130:9 133:5 139:18
149:25 158:6
193:25
**generate** 8:7 50:1,2
**generated** 7:11
48:21 49:13,21,25
50:10,15,20 51:2
55:10 56:4,19 57:8
57:19
**generating** 9:5
**getting** 35:20
111:25 195:20
**give** 20:10,19 21:24
34:18 39:9 118:24
134:13 138:4 143:8
226:25 252:7

253:25
**given** 52:3 53:8,10
53:16,25 54:4
60:12,15,18 62:10
67:5 77:17 78:4,5
95:13 97:16 99:16
109:22 119:22
120:3 121:24 158:9
196:7 197:5 204:1
227:16,16
**gl** 153:12
**glad** 98:11 206:1
**go** 46:19 49:4 50:19
52:16 54:23 55:3
61:2 62:19 71:5
73:9 81:12 107:15
113:3,16 114:3
122:13 131:14,15
152:25 175:22
177:21 188:3,4
211:9 222:19 233:4
**goes** 16:25 219:24
**going** 25:11 27:11
27:12 30:8 57:15
64:18 88:16,19
105:21 106:4,5
117:20 125:6
126:17 133:6
156:12 157:5
160:13 179:6 180:6
181:21 182:22
200:23 201:14
202:20 203:2 205:1
205:12 209:4,13,23
211:4 217:19 229:6
230:6 231:6,16,17
232:21 233:23
234:1,19 235:19
236:1,3,5,7 237:12
238:12 240:4 248:2
250:14 254:12

**good** 4:24,25 98:21
237:11
**goodman** 1:3
**grand** 2:4 194:5,5
259:6
**granted** 81:15
**great** 117:23 135:5
205:5
**greater** 60:20
75:21 85:6 90:17
92:22 93:8,10
113:25 168:4
**greenhill** 225:19
**grew** 159:4 228:10
234:14
**group** 225:15,19,19
**grow** 105:6 210:17
**growing** 212:5,14
213:6 233:10
**guess** 31:17 37:9
58:1 130:19 181:20
224:2 242:10
**guest** 118:24

**h**

**hand** 83:23 182:19
205:7 255:20
257:12
**handful** 21:23,25
**handle** 151:8
**handled** 87:2 90:17
200:10
**handwriting** 14:17
**hang** 253:2
**hanger** 1:4 4:5
259:8
**happen** 205:19
**happened** 166:1,7
166:10,13,15
173:12
**happening** 96:11
106:13 135:21

137:7 232:5
**happy** 27:16
**hard** 9:12 21:8
  47:23 49:13 140:20
  198:20 217:7
**harding** 124:6,11
  124:19,20,25 125:8
  125:14,16,18 128:1
  128:24 129:12,24
  162:8 165:15
**harding's** 124:22
  125:2 128:6 129:6
  162:21 163:4,19
**head** 174:10
**heads** 76:3 85:17
**hear** 63:8,10
  233:25
**heard** 61:5 63:6
  106:21 249:15
**hearing** 81:18
**held** 89:12 90:1,11
**help** 9:15 15:1,3,4
  36:21 98:22 136:8
  144:20 233:11
  234:4 247:12
**helped** 249:7
**helpful** 39:22 52:12
  61:22 62:3
**helping** 98:18
  182:23
**heretofore** 4:18
**hergle** 19:24 20:2,7
**herrgle** 14:10
**hey** 130:23
**high** 215:21,21
**higher** 9:9 159:18
  168:3
**hired** 22:8 23:16,19
  216:14
**historically** 227:6
  239:14,22

**history** 63:14,16,20
  123:8,11 159:3
  227:16 240:5
**hold** 73:13 89:9,23
  90:8
**hole** 188:4
**honestly** 169:8
**hopefully** 124:15
  192:4
**hoping** 242:18,24
**horrible** 241:12
**hosted** 145:15
**hour** 6:13,15,19 7:2
  7:6 17:24 18:1
  162:10 188:5
**hourly** 6:10
**hours** 7:7 8:25 9:5
  9:16 21:10,10
**huh** 153:13
**hundred** 21:6 22:2
  98:9 99:2 244:13
  244:21 245:10
**hundreds** 21:10
  148:2
**hung** 195:20
**hypothetical** 65:16
  109:21 110:25
  112:11 146:6,8
  209:15
**hypothetically**
  193:6 209:6

**i**

**idea** 21:24
**identification** 5:2
  33:9 88:21 117:3
**identified** 5:17
  12:23 114:19 117:3
  118:20 160:20
  212:12 220:13
  226:3

**identifies** 149:23
**identify** 14:5 15:4
  48:13 117:19 122:4
  160:19 198:17
  219:6 221:25
  222:13 235:20
**identifying** 9:23
  11:18 12:2 242:11
**ids** 63:15 64:10
  74:15 87:22 131:3
  131:15,19 171:2,19
**iec** 118:7 122:22,23
  123:21
**illusory** 94:24
**imbalance** 57:6
  76:1 105:6 107:22
  108:2,7,11,17,18
  110:23 111:3 112:6
  113:8 149:6 150:10
  150:18 151:24
  152:16 154:22
  162:17 168:25
  186:12 187:3
  195:25 196:4,6
  221:11,12,12
  224:14 228:18
**imbalances** 137:4
  152:9,10 161:6
  224:20
**impact** 72:8 73:3
  87:19 88:2,2
  126:10 138:24
  139:6 146:2 165:20
  180:16 181:3,12
  203:20
**impacted** 165:15
  234:11
**impacting** 182:13
**impacts** 241:24
**implement** 141:11

**implementation**
  162:13
**implemented**
  131:18
**imply** 68:8
**important** 113:12
  122:8 167:23 168:2
  172:7,9,20 207:16
**improper** 177:10
**inability** 80:7
**include** 7:7 8:9
  46:25 47:2,4,6,8,10
  47:14,18 51:12
  74:8 122:12 210:15
  211:19 232:3
  241:23 252:4
**included** 25:16
  47:17 107:11 137:6
  137:8 143:12 155:1
  156:21 162:13
  188:15 214:22
  231:5 250:11
**includes** 21:14
  47:12,15 51:12,13
  106:25 199:11
**including** 8:12
  12:23 28:15 45:4
  51:7 99:8 174:5
  200:9 244:14
  249:17
**income** 238:5,14
  239:1,8,15,22
  240:16 241:11
  251:2,18,20,24
  252:3,8,16
**incorporated** 241:7
**increase** 9:19
  164:19
**incredibly** 122:8
**incurred** 182:9

incurrence 227:19
incurs 226:22
independent 67:20
  81:21 133:7 157:3
  163:3 173:2
independently
  130:21 136:4
  137:15,18 142:18
indicate 156:5
  186:15
indicated 64:21
  255:7
indicating 154:3
indication 186:14
indirect 80:7
  234:18
indirectly 10:24
  103:13 128:12,14
  134:6,13
individual 59:24,24
  60:1,25 62:11
  69:16 70:19 73:2
  87:8 94:5 108:9
  115:24 121:1 184:7
  187:24 192:1
  196:20,21 198:6
  218:16
individually 179:19
industry 240:14
  246:3,24 247:9,13
infect 146:17
infected 149:4
  151:21
infection 149:6
inflated 96:15,25
influence 104:10
influencing 191:19
info 223:6
information 10:17
  10:25 15:4,18,22
  19:7,8 20:5,15 28:4

28:17,18 29:25
  30:1 33:1,23 35:2
  35:19 37:8 43:21
  45:3 46:21,23,25
  47:2,4,6,8,10,12,14
  47:17,21 48:1,7,25
  50:24 51:6,7,13
  52:17,19,23 53:1
  53:12 63:25 76:19
  82:18 83:13 114:13
  115:16 118:3,5
  121:17 126:21
  129:1,2,16 130:4
  131:25 133:10,15
  188:25 199:20
  200:13 221:7,10
  247:10 253:17
informing 12:4
infrastructure
  42:16 135:12,13
  137:5 163:9 178:10
  178:18,25 208:9,15
  222:11
inherently 67:15
initial 16:13 20:14
  20:15
initially 218:24
insight 243:14
instance 15:9 59:23
  111:5 129:23
instances 114:20
institutions 95:12
instruct 26:21
instructing 20:17
  30:18
instruction 30:17
instructive 184:4
  207:19 247:12
instrument 255:17
  255:18

integrate 162:11
integration 128:25
  133:17
intend 122:7
interested 27:5
  258:17
internal 89:11,25
  90:10 91:8 97:15
  99:15 191:18
  214:25
internally 106:16
  186:20 197:2
  202:13
interpretation 91:3
interpretations
  90:14
interrupt 36:19
  46:13 57:15 206:24
interrupted 44:23
  176:20
interview 125:7
investigate 24:4,7
  125:6 165:1
investigating 19:16
investigation 31:1
  31:11,24 45:10
  74:8 88:9
investigative 24:17
investment 246:17
  247:20,25 248:8,23
investors 225:7,12
  225:16 232:25
  234:13 236:10,15
involve 72:2
involved 23:25
  24:17 106:19
involving 22:17,18
  22:21
irreconciliations
  152:8

isolate 66:13 67:6
isolated 144:17
  233:22
isolating 147:9
isolation 150:12
issue 71:14 92:4
  93:5 130:19 131:12
  144:6 146:17 148:9
  149:1 152:16
  160:15 163:22
  165:3,10 171:21
  177:19 182:12
  186:17 200:24
  203:25 204:7 211:7
  228:5 234:7 235:6
  236:25
issued 33:18,24
  34:2 149:17
issues 74:18,20
  75:1 129:11,12
  134:12 142:23
  148:12,16,21 156:2
  163:10,12 165:5
  166:23 167:9 182:9
  201:17 202:25
  207:21 208:12
  214:23 223:16
  224:9 226:15 228:2
  228:7 233:17,19
  234:6 236:14,19
issuing 31:2
item 89:9 91:16,23
  93:21 94:10,21
items 66:14 121:1
iv 45:5 56:25 60:21
  83:11 84:22 87:2
  89:9,12,19,23 90:1
  90:9,11 92:21
  93:23 94:14 95:11
  95:12 104:15
  109:24 113:24

129:5 132:19,22
133:19 139:10
163:15 164:11
168:14 177:10
191:25 202:25
203:25 204:23,24
205:3,17 206:4,16
207:6 208:5,22
209:1,7 210:9,17
211:7 212:14 213:4
214:13,23 223:3
225:6 228:2,3,5,7
229:7 233:16,19
234:6 236:14,19,25
253:15

**j**

**jaffray**  247:2
**january**  33:5,18,20
34:11 166:20 167:4
167:14 183:20,22
184:22 185:9,19
197:9,14 198:2
201:1 227:13
**jeffrey**  1:7 179:8
**jim**  1:14 3:8 4:3,17
33:4 176:20 256:2
257:8 258:9 259:4
259:10
**joining**  5:5
**journal**  43:9
153:11,19,22 154:1
154:17
**judge**  13:19
**judgment**  251:1
**july**  247:6
**jump**  157:23
**june**  73:11,16
155:19,22 159:22
160:4,19 197:9,14
198:2 201:1 226:11

**jury**  40:1 81:18
242:19
**justified**  121:8,15

**k**

**keep**  230:15
**ken**  86:6
**kicked**  72:21
**kind**  8:3 208:22
228:1
**knew**  8:23 37:17
94:15,19 97:16
99:16 148:8,9
151:18 152:19
235:15 239:14
244:2
**knobel**  1:7 4:6
172:8 179:8 255:6
256:2 259:8
**know**  16:18,23 17:5
17:8 23:7 25:20,22
29:3,24 32:1,19
35:21 36:14 37:3
37:10,11,16 39:11
41:11,17,21,25
42:8,13,14,17 46:9
47:24 50:14 52:4,5
54:3,7,9,20 55:25
56:12 58:5,22
61:15,17,18,19,21
62:9 63:23 65:16
67:17 71:10 72:8
72:14,18 73:20
74:5 75:8 76:7,9,12
77:10 78:3 80:10
82:17 83:25 85:9
85:11,15 86:16,19
86:23 87:3,11
88:17 91:7 92:4,5
94:2,3,6,19 97:3
101:3,4,11,12
103:16 104:7,24

105:15 108:14
114:24 115:6,17
116:13,21 121:15
122:8 123:22 126:2
129:15,19,22
131:22 132:12,21
133:1 139:2 141:10
142:9 143:24
144:23 145:16,18
146:3,20,23 147:4
147:7 148:5,11
149:17 150:6 152:3
156:17,21 157:2
159:14,21 160:2
165:9 166:7,12
168:5,10 173:9
178:9 179:2,22
180:20 182:17,22
182:25 184:13
190:3 205:16
209:20 210:19
211:24,25 213:15
213:16 215:10
216:3 217:14
219:20 220:14
226:14 228:14
234:10 236:18,22
236:22,25 241:17
243:22,23,23 245:7
245:18 246:11
247:19 248:5
250:23 252:1
**knowing**  164:6
210:24 211:13
214:13 223:1
**knowledge**  135:12
175:1 178:4 225:5
**knowledgeable**
246:5
**known**  253:16
255:16,16

**kreitzer**  2:10 3:4
4:14,14,23 5:4,11
5:14 6:14,21 7:8
9:21 12:19 13:5,13
13:18,21,22 17:1
18:3 19:23 20:23
21:1,21 23:21
24:13,19 25:8,24
26:4,9,15,20,25
27:3,7,17 29:1,5,6
30:4,11,12,18,22
30:23 33:12,13
35:16 36:16 37:5
38:16 39:1,8,16,23
40:11,16,25 41:10
41:24 42:19 43:2
44:15,22 45:14
50:25 51:8 53:3,20
54:8 56:10,18 58:7
58:24 59:14 60:13
61:12,16 62:8,16
63:1,6,9 66:5 67:16
68:12 69:12 70:6
72:25 76:22 77:15
78:2,21 81:6 82:3
83:15 84:25 85:14
87:18 88:15,23
93:20 94:20 96:12
97:5 98:1,5,8,12,16
98:21 99:3 100:3
101:13 102:16
103:17 104:12
105:4,10,19 107:14
108:6,15 109:12,19
110:9 111:9,18
112:4,15 113:14,21
114:21 116:6,17,25
117:11 118:21,25
119:17 120:8
121:11,21 123:23
125:12 126:7 127:6

127:24 128:15
129:14 130:13
131:6,16 132:5
133:24 134:7,25
135:22 136:9,24
138:9,21 139:16,24
140:6,9,14,17
141:2,22 142:13
143:16 144:2,10,22
145:1,6,19,25
146:7,21 147:6
148:17 149:3,15
150:15,25 151:9
152:6 153:4 157:21
159:6,20 161:10,18
162:6 163:2,24
164:18 165:12,24
166:8,17,25 167:10
167:19 168:17
169:5 170:9 171:13
172:12 173:6,14,21
174:7 175:12,19
176:8,21 178:16
179:23 180:3,11,22
182:14 187:10
188:7,18 191:14,22
193:23 194:22
195:19 199:22
200:11 201:19
203:3,9 204:11,13
204:19 205:24
206:20 207:22
208:17 209:25
211:8,21 213:8,17
214:15 215:8 216:2
217:17 218:9,18
219:9,15 221:9
222:8 224:22 228:4
230:12,22 231:18
232:7 233:13
236:16 237:1,9,17

237:25 240:8 241:9
242:5 243:4 245:14
247:22 250:25
253:25

**l**

**labor**  164:19 165:2
**lack**  67:3,7,23
108:10 125:4
218:22 222:24
223:12,18,21 224:5
224:8 239:4,6,12
251:8,12
**large**  1:17 25:15,21
66:22 67:14 70:2
71:15 72:9,13
210:3 212:4 244:14
244:16
**largely**  126:20
137:19
**larger**  67:12
167:25 187:4
244:22 245:1,5
250:18
**largest**  64:10 74:15
244:8
**lasted**  146:24
**late**  106:12 107:10
130:18 153:15
168:8 190:3 229:8
235:11
**lauderdale**  1:2
**law**  21:18 25:3
216:4
**lawful**  4:19
**lawyer**  91:10
**lay**  31:21 75:20
178:23 208:7,16
241:20
**laying**  85:5
**layman**  91:4 142:3

**lbwright**  259:7
**learn**  141:16
247:13
**learned**  134:9
**led**  92:14
**ledger**  43:8 79:24
81:14 92:10 153:23
155:7 160:15
184:14 187:24
188:23 192:1 193:6
193:9,13 198:9
221:23 229:3
**ledgers**  92:13 136:3
**left**  62:18 237:10
**legal**  20:21 28:13
84:22 90:3,13,21
90:23 91:3,9,17,19
92:3 93:4,5 206:10
206:13 208:12
220:22 221:4,19
259:1
**legalities**  207:20
**leisure**  99:9
**lenard**  1:3
**lenders**  225:21
**length**  205:6
**letter**  168:23 172:9
**letting**  210:16
**level**  58:14 59:12
60:10 84:6,8,8
110:15 117:8,12,17
118:3,5,8 119:3,5
119:13,15 121:12
121:16 122:5
123:16,20 184:7
**liability**  78:10
176:7 201:17,20
207:7,19 224:21
**light**  130:20 236:14
**likewise**  51:1
192:10 195:7

**limited**  245:24
**limiting**  58:3 94:23
101:18
**line**  121:1 159:11
159:16 196:22
209:17 232:12
253:2 256:5
**lines**  167:22 189:20
197:2
**liquidity**  94:25
182:9 205:22
**list**  33:23 34:3
53:22 54:1,4,6,9,16
55:10,13,16 247:3
249:16
**listed**  12:24 46:20
46:22,24 47:1,3,5,7
47:9,11,13 115:13
**listen**  98:24
**listings**  59:25
**lita**  2:6 4:12 259:5
**litigation**  12:16
21:15 22:3 29:15
29:21 254:10
**litsup**  259:14
**little**  25:9 136:23
222:20 223:11
238:12 242:3
247:13 251:17
**live**  45:18 51:25
52:6 53:16
**living**  16:1,18
**llc**  1:4 4:5 259:8
**llp**  2:8
**loan**  57:23 60:21
65:4 67:9 109:25
131:1 160:25
187:22 193:15
236:9
**loaned**  225:7

**loans** 58:17 66:10
168:14
**locate** 28:7
**locating** 15:19
**long** 18:25 23:10
24:9 122:6 123:12
146:16,23 147:4
151:2 182:3 239:4
239:7,12 240:12,17
**longer** 151:15
170:8 171:10
210:25 240:18
**look** 8:24,24,25
16:20,22 17:11
25:6 32:24 34:19
40:7 42:20 59:4
60:5,14,17,24,25
64:16 70:19 73:10
73:15 84:12 88:16
116:8 118:9 119:8
123:6 128:21
142:12,14,16,22,23
144:21 151:2
163:25 164:2
166:15 167:16
170:13 171:21
184:21,24 185:8
200:18 220:7,8
225:4 245:1 249:13
251:5 253:18
**looked** 27:21 28:3
42:25 43:5,6,8,10
43:15,16 44:6 54:5
59:25 60:3,23 65:6
65:17,18 66:1,16
66:23,24 67:4,17
68:5 69:24 70:10
70:12,18,24 72:16
74:10 116:22
126:19 144:19
152:8,10,22,23,24

153:1 156:18 163:9
171:18,19 189:1
193:5 217:9 218:14
244:11,12 246:9,11
246:14 247:1
249:10
**looking** 27:25 28:8
31:22 56:14,17
59:13 66:15,25
67:13 68:9,10
72:19,20,22 73:8
77:8,25 84:7
113:10 116:23
120:5 134:17 137:8
137:25 143:14
144:17 166:14
168:11 184:15,17
185:13,22 189:3
190:7 217:25,25
234:19 243:5,18
244:24,25 245:9
**looks** 190:18
248:11
**lose** 204:24 209:1
**losing** 128:3 205:3
205:18 210:17
212:13 233:11
**lot** 15:2 29:25
35:19 44:3,6 51:13
51:17 55:22 105:21
106:2,5 181:18
214:24 216:23
217:8 219:24
222:23 251:4
**lots** 156:8 167:21
231:14
**low** 236:24 237:2
**lower** 230:9
**lunch** 113:15,18

**m**

**m** 14:10,10 22:24
**macro** 58:16 59:12
59:17,18,22 65:10
65:12,14 84:8
189:3
**magnitude** 79:12
152:8 156:11
**mail** 15:15 79:22
**mails** 29:10 36:2,5
41:22 42:1,3,4,10
42:22 43:23 102:11
155:20 199:13
**maintained** 30:3
41:11,25 42:9 53:5
**major** 129:3 182:12
**majority** 116:15
**making** 59:16,17
83:11 90:14,20
93:5 95:6 124:12
227:23
**manage** 43:18
44:12
**management** 1:4
4:5 94:15,19 95:3
129:2 130:4 133:16
162:14 184:16
211:25 212:23
213:20 214:1
222:11 241:25
252:13 253:15,20
259:8
**manner** 92:2
**manual** 151:13
**manually** 163:15
164:10
**march** 106:14,14
155:18,22 159:22
160:3,8,19 166:20
167:4,14 168:8,24
168:24 169:7 178:2

183:6,21 198:22
215:6 216:12 217:3
217:8,9,16,18,22
217:25 226:11
232:2
**marie** 14:9 18:4
**mark** 88:19
**marked** 5:2,7 33:2
33:9 63:24 64:1
88:18,21
**market** 238:2,7,24
238:25 240:13
241:22 242:7
**marketability**
238:16
**markets** 250:2
**master** 195:1
**match** 169:13
199:24
**matching** 97:18
99:18 130:11,17,22
199:15
**material** 165:4,7
182:2 236:6
**materials** 34:7
**matriculate** 192:23
**matter** 4:4 6:7,10
7:6 9:8 11:12 22:17
22:18 28:12,16
37:14 112:5,7,11
112:19 188:1 224:8
**matters** 20:25 21:9
21:9,10 22:3 35:15
79:16
**mean** 16:7 29:3
33:25 35:23 36:8
36:19 38:22 40:1
41:13 44:5 45:13
48:7 53:18 54:14
54:19 55:2 57:14
59:22 68:21 70:11

75:13 81:1 92:7
103:2 104:2,13,17
106:11 109:3,13,16
111:16 120:9,10,12
120:17,20,22 121:4
136:12 147:13,15
147:17 153:7,25
156:18 174:19
176:13 183:9
184:13 186:5
201:22 206:24
207:24 211:23
228:21 229:14
235:3 239:6 249:2
251:10,13
**meaning**  97:15
99:15
**meaningful**  146:22
147:3,7 148:5
**means**  72:14 76:21
91:4 186:7 193:12
219:7
**meant**  249:2
**mechanically**  81:3
88:13
**mechanism**  205:10
**media**  62:25 180:10
237:16
**meet**  127:2,14
225:25
**meeting**  194:7
**memorized**  64:12
**memory**  179:5
248:17
**mentioned**  31:15
35:6,13 41:3 44:7
68:13 69:22 70:9
78:13 83:2 103:23
211:9 222:9 247:21
250:7,8

**method**  210:8
240:15 251:17
252:3,5
**methodologies**
237:21,24 238:1,4
**miami**  1:11 2:10
259:2,14
**michael**  2:10 4:14
12:14 14:10
**micro**  58:14 59:18
59:22 65:12 66:6
84:8
**middle**  140:12
**million**  183:6,11,19
183:20,20,22
185:19,20 198:23
198:24 225:7,18,24
226:4,8 227:3,12
228:8,10 231:1,10
232:19,23,24 233:3
233:4,20,23 234:8
236:8,10 238:9,17
241:18 244:13,17
244:21 245:5,10
250:5
**millions**  155:1
202:2 236:24 237:2
**minasi**  14:9 18:4,5
19:5
**minasi's**  18:7
**mind**  22:22 32:23
44:4 48:6 53:24
103:19 123:19
151:7 153:18
211:10
**mind's**  106:24
112:5
**minds**  194:7
**mine**  213:5
**minus**  164:22
227:13 228:8

241:17
**minuses**  84:11
**minute**  62:17
**minutes**  17:6 48:19
103:21 208:19
237:10 253:25
**miscommunicated**
214:7
**misleading**  98:4
**mismanaging**
228:3
**missing**  211:2
**misunderstand**
229:5 248:25
**misunderstanding**
203:10
**misuse**  204:23
205:17 208:11,21
209:7 210:16
**misused**  206:4,8,16
207:5 208:4
**mixed**  183:7
**moment**  65:13
82:20 107:16 111:3
112:18 118:22
124:3 150:22
165:20 173:16
209:3 220:4 224:24
227:9 238:13 247:5
**money**  54:13 55:18
76:5,7 78:5 79:6
83:20 84:4,15 85:2
85:12,16,19,22
92:8 95:20 96:2
104:15,18,21 108:5
109:9 112:3 158:4
159:10 160:8,11
168:6 169:24
170:19 174:6,12,14
174:15,23,25 175:3
175:6 176:2 178:11

178:20 181:18,24
182:15,18 183:1,3
183:23,24 184:22
185:9 189:7 191:11
192:25 193:1,8
195:9 196:11,15,18
196:23,24 200:1,3
200:14,25 201:2,3
202:6 205:20 212:7
215:21 217:8,12
219:7 230:1,10,15
231:13,19 232:16
234:14 236:15
**monies**  67:9 92:12
136:15 157:5 158:9
160:18 182:19
186:11,15 195:22
195:23 197:7,25
198:17 199:8 201:7
201:12,13,24 202:5
202:16,19,19 210:3
210:4 215:14
216:11 217:21
218:23 220:18
228:16 231:6,8
**monitor**  43:18
**month**  95:13 128:4
138:18 169:6
183:16,18 190:23
195:24 254:10,11
**monthly**  43:6 96:16
97:1 100:19 195:8
199:24
**months**  95:14,20
96:2 102:25 178:3
210:5 225:8 230:2
**morning**  4:24,25
12:7 114:19 118:11
120:3 163:7 168:3
219:14

**mouth** 106:8 226:5
**move** 13:6 92:19
  93:21 94:10,21
  100:14 124:4
  140:14 163:11
**moving** 66:14
  84:10
**multifaceted** 9:3
**multiple** 75:23
  104:9 120:24
  144:19 155:19
**murphy** 78:15 80:2
  198:11 199:7
**murphy's** 78:18,24
  80:5

**n**

**n** 2:10 3:2 14:9,10
**nail** 218:10
**name** 22:20 23:24
  24:2 115:7 117:3
  156:23 218:15
  219:7
**named** 4:18
**names** 14:5 114:24
  225:16,23
**narrow** 56:16
  217:7
**narrowed** 242:15
**narrower** 214:11
**narrowing** 245:13
**narrowly** 65:9
  202:23
**native** 29:9 31:13
  31:19 32:12,13
  35:2 36:4 37:24
  39:6,21 40:2,12,20
  41:8 253:8
**nature** 20:18
  181:11 221:14
  246:10

**neal** 1:7 179:8
**near** 156:11
**necessarily** 37:14
  68:19 95:22 109:7
  134:11 138:2
  203:11 228:15
**necessary** 30:1
  52:23 164:3 232:12
**need** 30:20 32:23
  34:19 54:23 55:2
  79:5 84:12 98:12
  98:22 118:9 119:8
  122:3,6 158:19
  165:22 170:17
  171:11,24 174:23
  174:24 175:17
  182:10 193:2
  209:21 213:5
  217:15 220:7 230:3
  234:9
**needed** 32:2 38:9
  38:14 53:2 85:19
  85:22 165:2 168:9
  168:24 232:1,4
**needs** 15:9 68:10
  94:25 177:4 194:14
**negative** 180:16
  181:3,12
**neither** 89:21
**net** 75:11,13,16,16
  75:17 174:21
**never** 58:9
**new** 2:5,5 16:2 23:2
  24:1 162:13
**news** 243:16,20
**non** 111:15 156:2
  215:16 217:4
**noncompliance**
  111:12,17
**normal** 198:4 201:5
  204:25 205:4 209:2

226:13,14,14 232:6
**notary** 1:17 255:23
  256:23 257:23
**note** 34:22 76:15
  254:7
**notes** 154:16
  258:11
**notice** 1:18 3:8 4:18
  5:7,17 13:8,14
  118:14 259:18
**noticing** 138:1
**notion** 205:2 218:6
**number** 20:24
  33:12 47:25 66:8
  71:15,20 72:9
  75:16 95:8,15
  108:20,21 123:12
  123:12 156:25
  159:3 165:21 172:7
  172:11 188:10
  221:2 226:25 235:5
**numbering** 47:24
**numbers** 62:4
  64:12 87:8 88:8
  92:23 93:9 94:15
  94:24 96:16,25
  104:10 109:23
  114:1 188:2 191:2
  223:13 234:22
**numeric** 211:23
**numerically** 199:17

**o**

**o** 14:9,10 22:24
  259:5
**oath** 4:20 118:22
  118:23 257:1
**object** 6:17
**objecting** 197:21
**objection** 6:11 7:4
  9:11 16:21 18:2
  19:20 21:19 23:18

25:4,19 26:3 28:25
29:2,19 30:8,16
34:22 36:13 37:1
38:5,24 39:4,15,18
40:4,15,18 41:2,20
42:12,24 45:11
50:22 51:4 52:25
53:14 54:2 57:25
58:13 59:9 60:7
61:11,14 62:1
65:24 67:10,25
69:5,21 72:12
76:15 77:4,20
78:20 80:25 81:25
83:1 84:18 85:10
87:15 88:10 93:15
94:17 96:5 97:2,24
100:1 101:10 102:9
103:10 104:8,25
105:8,16 107:6,24
108:13 109:6,15
110:5 111:6,14,23
112:9 114:17 116:2
116:11,20 117:7
118:16 119:11
120:1 121:10,14
123:17 125:10
126:1 127:3,15
128:11 129:8 130:8
131:23 133:20
134:5,21 135:17
136:7,21 138:7
139:11,23,24 140:6
140:25 141:19
142:8 143:11,20
144:8,15,25 145:3
145:17,22 146:4,19
147:1 148:13,24
149:11 150:11,21
151:5 152:2,18
157:18 159:1,13

161:7,23 162:23
163:20 164:17
165:8,18 166:4,11
166:21 167:5,15
168:16 169:2 170:4
171:7 172:5 173:1
173:8,18 174:3
175:10,15 176:3
178:7 179:21
180:19 182:4 187:6
188:12 191:13,16
193:21 194:18
195:17 199:18
200:5 201:15
202:21 203:8,23
205:13 206:17
207:14 208:6
209:14 210:13
211:15 213:2,14
214:6 215:7,17
217:6,23 218:13
219:1,12 220:19
222:3 224:17
227:22 230:4,21
231:11,24 233:7
236:12,21 237:4,22
239:24 241:4,19
242:23 245:6
247:18 250:15
**objections** 27:9
  140:18
**obligation** 110:11
  110:16 192:24
**obligations** 127:2
  127:14 226:1
**observation** 134:16
**observations**
  208:14 223:23
**observe** 138:10
**observed** 74:16
  138:6

**obtain** 225:6
**obviously** 10:18
  13:5 49:22 58:15
  59:16 139:4 216:23
  244:20
**occasion** 125:7,15
**occasions** 20:20
  21:17 22:13
**occur** 76:20 143:23
  203:2 210:10,12,21
**occurred** 34:2,4
  70:22 73:16,22
  74:7 77:12 78:14
  87:5 109:4 111:10
  153:3 203:5 215:6
  239:18
**occurring** 71:16,21
  77:7 92:15 150:17
  164:6 180:15 181:2
  181:10 203:19
**occurs** 112:6
**offered** 98:14
**office** 96:18,19
  97:13 99:13 100:18
  111:13 259:14
**officers** 179:13
**official** 255:20
  257:12
**officials** 144:5
**offs** 32:21
**oh** 54:6
**okay** 7:19 8:18 9:22
  13:4,20 14:18 18:4
  18:6 22:2 24:6,20
  25:9 29:5,16 30:22
  31:5,8 33:2 37:6
  43:3,7,14 45:8,25
  51:22 53:4 57:5
  62:15,17 67:17
  68:25 70:16 71:13
  73:1,20 74:6 78:3

82:20,21 90:24
97:6 98:21 99:22
107:15 108:16
113:13 115:4,19
117:25 118:4
119:18 121:22
122:20 123:6
124:22 125:7
127:25 136:4,25
137:23 138:22
146:16,22 147:22
148:1,11 154:6
158:2 161:11 162:7
163:3,18 164:25
169:6 170:1,20
171:14 179:5
185:15 187:17
190:25 191:5,6
194:23 197:18
198:15 207:2
213:25 225:24
226:21 231:19
232:10,11 245:21
252:19 253:3,19,24
**once** 106:13 170:6
  194:15
**ones** 119:16 122:9
  122:12 196:10
  245:1 249:17,23
**ongoing** 127:1,13
  181:4,13
**online** 245:24
  250:8,10
**op** 75:23 212:18
**ope** 63:15,18 64:10
  64:14 74:15 87:8
  87:22 88:8 92:9,12
  131:1,3,15,19
  138:17 171:2,19
**operations** 204:25
  205:4 209:2 227:6

**opining** 207:20
  224:10
**opinion** 52:13,22
  71:24 75:25 79:15
  82:10,11 84:24
  85:1 89:16,22 90:7
  90:23,23,25 91:15
  91:23 92:11,17,18
  92:20 93:22 94:11
  94:22 101:16,23
  102:5,23 113:4
  149:8 167:6,18,20
  173:3 176:9 178:18
  182:2 192:18
  201:11 202:15,18
  203:20 205:9
  206:22 207:4 208:4
  208:23,24 209:8,12
  210:2 216:9 220:17
  221:20 222:10,16
  223:18 224:5
  230:25 234:17
  238:8,24 239:3
  246:6
**opinions** 10:1 11:9
  11:21 12:4,23
  14:20 34:10,17
  38:15,22 39:13
  40:14 46:11,18
  48:14,22 56:25
  61:23 63:21 68:6
  71:6,19,22 72:5
  74:12,13,16,21
  75:3,6 77:23,24
  78:8,9 83:11 84:20
  84:22 88:3,14 90:3
  90:5,15,21 93:5
  95:1,6 96:8 100:9
  100:10,12 113:2
  119:5 124:9 125:9
  126:11 144:6

175:22 178:21,22
178:25 201:16
205:14 206:12
207:7,8,10 213:4
217:10 220:21
224:1,7 234:11
238:19,22
**opportunity** 26:17
34:14,18 124:8
**opposed** 116:4
250:6
**orange** 167:22
**orbimed** 22:22
**order** 52:23 97:17
99:17 164:4 170:11
182:20 189:8 211:9
212:17 231:22
252:7
**ordered** 214:18
**ordering** 259:17
**ordinarily** 226:22
**ordinary** 156:9
157:4 213:13 227:5
227:14 232:9
**organization**
126:13
**original** 15:23
164:12 259:17
**originally** 187:1
**outcome** 23:7
**outside** 11:13,13
13:2 70:23 83:5,7
182:11 200:1,3,20
200:22 215:24
**overall** 21:16 65:7
154:24 218:1 219:2
220:8 241:7,15
**overdrawn** 79:7,18
79:23 80:23 81:13
82:24 198:9,25
201:6 202:11 218:3

221:23 222:7
**overfunded** 160:14
**overstated** 94:16
**owe** 193:13
**owed** 174:11,13,16
196:11,15,25
235:16
**owing** 174:5

**p**

**p.m.** 1:12 254:14
**p1740716-718**
253:6
**p2222704-705**
118:1
**page** 3:3,7,10 5:17
73:10,17,18 89:2
95:7 96:14 97:11
113:5 124:15,16
222:16,25 223:8,9
223:10 224:2,25
246:25 248:10,10
248:14,15,21 249:2
249:2,3,22 256:5
259:13
**paid** 6:8,15 7:2,19
17:23 55:6 67:4
91:21 174:18
193:14 209:21
236:8
**palmer** 225:15
**paper** 40:9,22
108:4
**papers** 19:9 248:23
**paperwork** 72:24
**paragraph** 89:2,4
95:8 96:13 97:10
97:25 99:12 100:16
101:14 124:18
125:18 128:24
162:8,9 163:11
176:18 177:6,11

204:21 223:2,7
224:25 225:2,3
**paragraphs** 223:2
224:2,4,5
**paraphrasing**
155:16
**pardon** 142:20
**paren** 162:12,14
**part** 7:21 31:17
74:11 75:6 82:8
83:6 85:21 94:4
106:23 132:2
155:24 186:19
187:24 197:20
203:7,11 205:17
208:23 209:8
215:11 216:10
224:10 230:5
240:21 249:10
**participation** 8:4
**particular** 17:15
58:11 59:8 60:22
61:25 63:18,19
64:14,14,15 67:3,9
73:6 77:22 79:19
80:23 81:5 83:18
84:4,15 85:2 86:21
86:21 109:25 113:4
113:9,11 120:18
121:2,2,8 124:17
131:1,1 147:8,25
150:13 157:6 159:2
160:25 166:6 172:6
185:19 214:11
218:11,20 221:25
222:4 249:24,25
253:11
**parties** 10:20 23:25
28:15,15,16 31:14
45:24,25 258:14,15

**partner** 7:9
**partners** 247:2
248:8,22
**parts** 99:7 176:23
177:2
**party** 162:14
**pause** 134:13 138:4
**paused** 140:11
**pay** 7:14 53:21 54:1
54:4,6,9,16,17,20
55:5,9,13,16
127:19 131:15
168:8 169:20,22
170:8,14 171:16,25
172:10,19 174:12
182:10 194:2
205:18 209:20
232:16 233:11,11
**payment** 194:11
197:4
**payroll** 181:19
182:1 211:2
**pc** 2:3 259:5
**pdf** 32:12
**pell** 160:25 187:22
**pellet** 24:1,12
**penalty** 124:12
**people** 29:11 36:6
37:15 44:13 54:12
54:14 75:2 77:8
78:14 115:2,17
126:3 134:14
137:10 142:16
143:6 145:13 150:5
173:12 186:6
214:24 222:25
240:13 246:4 252:3
**people's** 76:3 141:6
199:4 220:16
**percent** 204:1
238:15

**percentage**  8:13
  157:14 226:24
**perform**  9:17 14:25
  19:5 20:2 24:9 55:9
  64:24 67:20 73:1
  84:3 108:8 126:15
  171:14
**performance**  8:1
  8:17
**performed**  9:14
  15:7 22:6 58:9 87:4
  87:10,14,17,21
  88:7 142:20 163:3
  240:19
**performing**  25:14
  45:9 55:12 148:20
**period**  27:23 76:18
  110:11 116:5
  126:19 128:14
  144:20 147:5
  151:23 160:24
  161:4 164:8 175:7
  216:12 217:10,11
  219:4 224:19
  226:15
**periods**  115:25
  130:18 144:19
**perjury**  124:12
**person**  18:16
  255:16
**personal**  99:23
  180:1
**personally**  68:25
  255:15 257:8
**perspective**  78:10
  91:24
**petitions**  124:7
**phase**  207:19
**phone**  2:13
**phrase**  68:13 162:4
  162:5

**physical**  51:16
  245:24 250:8
**physically**  10:7
  13:12 40:9 45:16
  170:11 198:23
**pick**  220:9
**picked**  73:12
**picking**  242:17
**picture**  66:16
**piece**  40:9
**pierne**  1:7 106:20
  134:24 154:24
  155:25 179:8 215:2
**pierne's**  154:23
  155:14
**piper**  247:2
**place**  135:4 145:14
  145:15 189:16
  192:16 195:20
  229:7
**placed**  180:25
**places**  121:19
**plaintiff**  1:5 2:2
  173:11 176:5 177:4
  178:9 179:20
  203:22 204:9
  210:14 211:18
  224:16
**plaintiff's**  172:16
  176:10 205:15
  209:24 227:24
  237:8
**plaintiffs**  89:20
  177:13 233:17
**plan**  8:5
**plane**  195:5
**platform**  252:14
**play**  19:14 173:16
**players**  247:14,15
**please**  4:9 11:22
  14:6 56:8 59:21

92:17 127:5 149:9
  186:13 222:14
  249:20 259:11,13
  259:13
**plus**  164:21 227:13
  228:8 241:17
**pluses**  84:11
**pocket**  233:4
**point**  9:14 52:11
  54:25 57:21 88:12
  92:5 109:10 112:2
  130:22 131:13
  132:7 136:10
  142:25 178:17
  181:18 187:3 191:8
  206:2,5,10,13,14
  208:15 220:23
  228:10 234:15
  235:1,11 240:5
  243:18,19
**pointed**  213:19
  248:19 249:14
**points**  40:10 54:25
  130:24 226:24
**population**  114:8
  116:8
**portion**  57:24
  95:17
**posed**  140:24
**position**  14:15 18:7
  18:23 20:7 26:24
  26:25 174:5,8
  177:21 210:25
  211:13 212:1
  213:21 227:11,18
**positioning**  214:14
**possibility**  216:1,3
  218:7
**possible**  21:7 77:13
  218:8 224:14
  229:20 240:10

**possibly**  156:23
**post**  97:14 99:14
  244:8 248:9
**posted**  107:19
  109:18 146:14
  170:18,21,25
**potential**  88:1
  96:10 97:7 252:14
**potentially**  184:5
  242:12 249:17
**practice**  95:10,19
**predraw**  68:4,14
  68:16 69:23 70:9
  71:1 95:11,19
  101:20,24 102:6,14
  102:20
**predrawing**  94:13
**predrawn**  198:10
**predraws**  56:1
  66:22 67:12 68:2
  78:15 114:12 221:1
**predrew**  94:12,13
**preliminary**  16:14
  19:10
**premature**  95:22
**premised**  95:13
  96:17 97:1
**preparation**  6:5
  14:24
**prepare**  15:20 35:4
  35:6 48:1 49:1 50:5
  58:18 204:21
**prepared**  14:22
  15:12 36:3 50:23
  51:6 85:24 86:8,17
  241:25 253:14
**preparing**  13:24
  14:1 19:16 176:5
  242:25
**presence**  245:24
  250:8,9,10

**present** 2:12 17:24
**president** 18:24,25
  19:2
**presume** 19:2
  38:22 185:22
**pretense** 94:23
  101:18
**pretty** 207:2
**prevent** 146:12,13
**prevented** 31:2
**price** 2:8
**primarily** 184:20
**primary** 14:4,11,14
  115:12 224:11
**principal** 18:18,21
  19:3 20:11
**print** 45:17
**printouts** 52:1
**prints** 51:19
**prior** 22:9 157:8
  181:18
**privilege** 26:10
**probably** 22:24
  23:3,3 32:4,8 44:5
  97:24 124:14
  173:22 237:10
  249:21
**problem** 86:12 91:8
  105:25 106:1,7
  143:6 144:12
  145:12 146:23
  181:21 182:8 228:1
**problems** 125:19
  125:22 130:5
  139:21 140:4,4
  211:20
**procedures** 223:12
  223:21
**proceed** 24:20
**proceeding** 20:21

**proceedings** 4:1
**proceeds** 60:21
  65:4
**process** 16:25 17:8
  17:9 32:6 33:1
  35:10 38:13,19,21
  38:21 39:21 40:24
  41:5 54:23 55:2,7
  79:10 83:11 86:22
  91:18,20,20 105:22
  105:23 106:9,11,15
  110:1,2,7 135:20
  135:23 162:15
  163:15 187:24
  193:24 195:6 213:5
  218:5
**processes** 135:19
  138:8
**processing** 129:5
  133:19 139:9
  164:11
**produce** 16:3 50:16
  50:18
**produced** 10:20,21
  12:15,16 13:3,10
  28:15,17 29:14
  30:3 37:4 254:9
**product** 16:5,9,11
**production** 13:3
  28:14 45:20 52:6
  123:21 259:21
**profit** 8:3,5 179:24
  244:8
**profitability** 8:9
**profited** 179:19
**profits** 7:11,14 8:2
  8:6,10,14
**program** 45:9,13
  45:15,17,18 51:17
  51:23 52:4,13
  64:14 100:21 101:1

101:8 141:8,25
  143:2 145:15
  165:17 212:17,25
  214:11,18
**programs** 51:18
  93:25
**project** 106:8,19,22
  106:25 107:2,10
  155:1,16,18,23
  212:7,10,12 213:22
  214:2,4,9,17,19
  215:4 251:23
**projected** 61:6,8
  94:14 96:16,25
  101:19,21,25 102:7
  102:20
**projection** 239:9
  251:18 252:4,20
  253:20
**projections** 95:14
  239:4,7,10,11,12
  240:6,12 242:1
  248:6 251:8,12,15
  252:12,12,15
**properly** 137:8
  139:25 142:7
  193:19
**proportion** 182:18
**prove** 176:10 177:4
  199:17
**proved** 129:3
  164:13
**proven** 129:17
  239:18
**provide** 9:17 11:15
  15:1,3,17 20:20
  22:9 82:18 95:1
  114:13 230:10
  253:16
**provided** 9:25
  10:15 12:3 13:10

28:20,23 30:14
  31:20 32:3 33:1,22
  33:23 34:3,16 36:1
  38:4 45:20,21,23
  50:4 104:4 113:22
  114:3,16 118:19
  121:18 126:21
  127:21,22 137:3,4
  137:6 156:15
  199:19 225:15,18
  230:13 250:2 254:8
**providers** 244:12
**providing** 84:16,21
  84:23 203:15
  206:11,19 207:7,8
  220:23
**public** 1:17 246:12
  255:23 256:23
  257:23
**pull** 55:25 150:14
  170:7,19 178:11,19
  194:4 221:2
**pulled** 56:2 78:15
  85:12,16 194:5
  215:21 219:7
**pulling** 75:11,13
  76:5 104:15,18
  109:9 132:24
**purported** 116:16
**purporting** 195:1
**purpose** 81:19
  86:23 195:2 255:18
**pursuant** 1:18
**put** 45:22 55:5 63:2
  64:10 72:23 79:18
  106:8 110:16,18
  118:23 124:2 139:5
  151:14 165:22
  172:3,14,23 173:16
  174:2 177:22
  180:13 181:14

194:4 205:22
209:10 217:12
225:25 226:5
234:14 236:15

**q**

**q2**  248:9
**qualification**
194:24
**quantified**  72:18
**quantifying**  83:10
**quarter**  183:5,8
**question**  3:10 7:16
10:12 11:16 22:7
26:24 27:8,14,20
28:21,22 30:9,11
30:17 31:4,6,8 32:1
36:20,21,22 38:7
42:5,8 48:10,11,15
48:25 49:14,14,15
49:17,18,19 50:19
52:20 53:9 56:11
56:13 57:4,13,14
57:18 58:2,6 60:16
63:5,11 64:18
67:19 70:9 71:4
73:4 76:8,11 77:22
78:22 86:18 93:2
98:2 99:4,22
108:12 113:10
114:4,14 117:16,21
118:18 124:1
126:24 127:11,23
130:2 134:4 140:13
140:23,24 141:21
146:9 149:10
151:11 152:25
156:14 157:14
159:8 160:7 161:13
161:14,25 162:1,4
167:1 168:19
172:21,22 173:22

179:1 180:23 181:9
183:2 187:14 189:6
197:20 201:18
206:12 207:2
208:20 210:20
214:5 216:20,25
221:4,8 232:14
235:23 243:8 249:6
251:21
**questions**  25:11
57:16 82:2,6
118:15 149:13
213:18 216:23
**quite**  251:23
**quote**  154:20
162:11 176:18
177:8 235:18,19,25
236:1
**quotes**  10:16 11:2

**r**

**r**  14:9 22:24
**r.p.r.**  1:16 257:22
258:6,23
**r24**  139:14
**r24s**  189:20
**r2t4**  106:22 107:2
107:11 155:23
157:25 158:11,13
158:14 160:11
162:3 183:24 184:8
184:23 185:11,18
185:20,23 188:8,11
188:15 192:20
197:2 201:2,5,13
201:24 202:9,15,19
212:17,25 213:11
214:17
**r2t4s**  159:8,24
160:5,21 161:4
182:19 195:11
197:11 198:3

**rabbit's**  188:4
**raise**  27:9 211:2
224:23
**raised**  70:14
127:18
**range**  11:4 226:23
238:9
**ranged**  238:16
**ranges**  10:25 11:6
11:11,13
**rate**  6:10,23
**rates**  86:11
**rationale**  137:3
**reach**  9:14 36:10
36:23 38:9,14
52:24 53:2 74:13
74:16 81:18 82:17
82:17 86:7 93:13
126:8 175:22
217:20 246:3
**reached**  36:14 37:7
37:22 38:10 68:6
88:12 238:14
**reaching**  74:12
144:6,12 146:24
**read**  11:22,25 34:6
34:8 56:8,10,11
72:6 81:17 88:24
89:7 95:16,24
96:21 97:20,25
98:14,16 99:7,20
127:4,8 149:9,10
155:7 159:25
161:12,14 162:19
163:16 176:13,17
181:7 216:15
225:10 255:5
259:13
**reading**  74:22
82:10 87:1 127:10
253:1 259:16

**ready**  54:17,20
55:5
**real**  226:3
**really**  57:15 130:1
157:3 175:17
176:25 178:18
200:23 210:1
230:17
**realtime**  140:18
**reason**  83:16,17
84:2 85:11 103:15
112:6 128:5,7
154:13 156:5
167:24 168:3
213:18 241:10
242:17 243:25
244:4,5 245:3
250:5 251:20
**reasonable**  152:1
**reasons**  85:8,9
86:13 96:10 112:20
112:24 113:7
**recall**  22:17 27:21
27:25 33:22 34:24
47:25 52:8 53:23
54:21 55:12,14,15
59:10 67:11,18
86:5,5,14,20,25
87:5 101:20 115:12
119:12 120:7
122:18 123:20
129:10,21 131:7,8
133:4,5,5 138:15
138:20 139:12,13
139:17,18 141:12
145:4,7,8 151:7,12
151:19 156:20
161:8 164:24
174:10 180:21
225:14,15,20 234:6
234:12,12,15

243:16 249:10
**recalling**  158:18
**receipt**  45:4
**receivable**  80:10
154:10,17
**receive**  8:3,12,13
57:23 109:24
204:24 205:3 209:1
**received**  46:6 116:9
116:18 136:15
236:9
**receiving**  41:22
**recess**  44:19 62:23
113:18 180:8
204:16 237:14
254:4
**recognize**  33:14
228:20 229:11
**recognized**  228:24
229:21
**recognizes**  193:19
**recognizing**  137:11
143:13
**recollection**  34:15
34:21 54:15 87:6
149:19,25 158:19
**reconcile**  100:19,21
100:24,25 101:8
106:15,16 139:22
140:5 163:13 164:4
164:21 165:16
189:8 231:23 251:6
**reconciled**  92:12
130:11,23 131:10
132:8,23 134:10
136:6 138:1
**reconciliation**
105:22 106:3,6,7,7
106:9,11,19,21,24
107:9 138:19 139:1
153:14 154:25

155:10,16,18 156:1
159:11 161:5
182:10 203:25
212:7,10 213:22
214:2,4,8,16,19
215:4 223:5 229:8
233:16 253:15
**reconciliations**
136:1 137:7,14
200:23 215:1
223:12
**reconciling**  92:8
129:5 136:14 139:9
164:11
**reconstruction**
205:19
**reconvene**  113:15
**record**  4:3,10 10:9
10:19 26:1 30:5,6
30:13 31:23 32:2
38:3 39:11 44:17
44:21 45:19,19,22
45:23 48:8 53:12
53:17,21 54:1,17
54:19,24 55:3
57:12 58:3,4 60:24
62:21,25 71:8,11
72:6 74:22 79:6
86:13 87:1 95:4
99:2 105:14,14
107:18 113:17,20
114:15 116:12
142:17 145:9 151:3
161:3,4,5 170:18
170:20 173:3 180:7
180:10 184:6,25
186:25 187:2,15
190:17 191:24
195:12 204:14,18
206:22 237:13,16
240:18 254:2,6,7

254:13 258:11
**recorded**  79:8
105:17 140:22
153:11,22 155:18
155:22 184:19
188:14 195:13
198:19 199:10
201:8 226:8,10,11
227:12 228:18
229:3
**recording**  155:15
161:2 185:6 188:20
188:24 189:2
**records**  15:3,4
24:17 25:13,16,18
25:21 26:6 27:18
27:21 28:24 29:4
29:17,23 30:24
31:9,12 32:8,10,20
35:7,10,14 36:11
36:25 37:15,17,20
38:9,12,14,18,20
39:2,6 40:20 41:4,7
41:12,18 42:1,9,14
42:20,21 43:1,4,20
44:3,6,11 45:2 46:1
46:5,5 53:5,7,8,19
53:19 55:22 56:3,6
56:14,17,21,23
57:1,6,10,22 58:10
58:19 60:1 66:8
67:8 68:24 69:4,19
70:25,25 71:7,9
77:1 81:2 87:24
94:5 97:15 99:15
102:12 104:4,21
108:9,25 109:2,23
113:23 114:3,5,9
114:10,13 117:9,12
117:18,19 122:5,7
123:16 128:13,19

128:22 131:2
132:16 133:3 134:2
134:2,17 138:25
150:19 151:21,23
152:15 158:12
160:10,16,22
162:16 163:14
164:15,22 165:6,14
167:3 168:10
169:24,24 170:2,5
170:12 171:16,19
172:4,14,24 173:17
174:2 177:23
180:13,25 181:15
183:25 184:2,5,10
184:11,14,24
185:12,16 189:1,3
190:14,15,16 194:2
194:4,8,8,20 195:2
195:3 196:8 198:24
201:10 205:7,11,19
206:18 209:10
210:23 218:3
220:15 230:10,13
232:18
**recs**  92:1,5,7
**red**  167:22
**reduce**  187:3
**reduced**  210:23
241:13
**ref**  158:13 160:10
162:3 185:17,23
188:11 189:20
197:2
**refer**  45:3 54:4
124:18 238:1
**reference**  162:3
193:2 235:18
259:10
**referenced**  10:22
11:1,10 12:21

80:16
**references**  56:1
80:13 119:7
**referred**  5:1 33:8
88:20 106:18 115:2
160:23 226:15
**referring**  21:13
28:6 58:6 71:11
114:6 115:20
117:13,14 121:23
122:23 123:3
135:24 214:17,19
215:5 221:11
225:13
**reflect**  64:7,13
128:13 191:17,18
191:24 229:16
234:16 241:14
**reflected**  66:19
74:2 87:19 138:3
184:25 187:9,14,18
189:10 190:2
191:10,21,25
192:13 196:13
212:8,11,13 229:9
229:10,13 234:2,22
253:9
**reflecting**  66:9 67:8
93:18 109:8 194:10
196:8 197:1,3,3
**reflection**  199:4
**reflective**  186:10
**reflects**  108:1
109:10,13 196:23
**refresh**  158:19
**refreshed**  34:15
**refreshing**  34:20
**refs**  160:21 161:4
**refund**  75:17 79:5
83:18 93:23 94:3
97:17,19 99:17,19

107:2 121:3 157:25
158:4 160:9 183:23
184:8 187:15 188:8
192:13,20,24 193:1
193:4 196:20 198:5
199:5 201:2,5,12
201:24 202:9,13,15
202:18 213:12
**refunded**  195:9
202:12 215:14
216:11 217:21
218:23
**refunding**  189:7
231:12
**refunds**  63:17
64:13 67:4 83:8,12
90:16 94:5,8 97:14
99:14 106:22
107:11 153:1
157:22 158:13,16
158:23 159:24
160:6,10,21,23,24
161:3 182:18 184:2
185:18,18,19 186:4
188:15 189:19,21
191:11 195:11
196:19 197:11
198:3,24 200:19,21
201:10 212:11,18
212:25 213:6 215:5
215:11 223:1 229:2
232:1,3,4,5,9,11
233:24
**regard**  37:21 113:7
128:6 129:7 137:16
155:5 157:8 206:23
216:17
**regarding**  42:1,10
106:22 144:13
195:1

**regent**  139:14,20
140:3 141:3,11,13
141:13,14,16,24
142:6,12,14,19,22
142:22,23 143:1,6
143:18 144:23
145:20 146:2 148:9
148:23 151:4,21
175:14
**region**  106:1
**registers**  192:11
**regularly**  97:14
99:14
**regulation**  93:4
213:4
**regulations**  89:6
90:4 100:20 111:25
194:20
**regulator**  91:12
**regulatory**  90:3,13
90:20,22 91:3,9,18
91:20 92:4 93:4,5
206:10 207:21
208:12 220:22
221:5,19
**reject**  71:7,11
72:23 74:6,9 75:1
105:14,18,24
149:16,17 152:4,20
**rejected**  104:22
107:18 111:1,20
112:20 138:25
149:24 150:2,3,9
**rejecting**  76:9,10
111:22
**rejection**  76:12
104:23 105:1,5
108:4
**rejections**  76:23,25
**rejects**  71:10,12,15
71:20,23 72:3,9,21

73:22 74:4,11,14
139:14 148:1,3
149:22 150:5,5,16
165:23
**relate**  58:22 65:8,9
80:8 90:5,15,19
93:17 102:1 137:20
178:22 189:4
206:12 207:9
215:22 217:11
220:9 221:3
**related**  74:23 83:4
94:4 101:21,25
102:6,20 110:19
114:2 153:16
203:12 204:8
207:11 215:15,15
216:12 217:4
229:22 233:18
**relates**  55:23 96:8
158:4,6 182:8
220:21 239:19
**relative**  72:14
182:17 258:13,14
**relax**  180:4
**relevant**  20:11
114:14 137:25
157:9 216:5 221:7
**reliable**  252:12
**relied**  12:4 45:19
46:1,10,17 48:13
48:21 114:23,25
118:4 119:4 122:4
252:17
**relief**  124:7
**rely**  50:6 58:4
240:14
**relying**  51:25
134:18 251:16
**remains**  191:4
220:7

**remarks**  256:5
**remember**  22:20
   22:25 23:24 102:14
   103:25 122:18
   130:7,9 141:14
   151:10 169:8
   175:23 212:20
   213:23 225:17
   247:24 248:5
**reminded**  35:8
**remove**  105:2
**removed**  172:2
   245:25
**render**  149:8
   222:10 223:18
   224:5
**rendering**  207:4,11
**rent**  85:22
**reoccurring**  156:2
**repaid**  210:4
**repaired**  152:4
**repayment**  186:8
**rephrase**  11:23
   27:14 30:10 148:2
**report**  3:8 10:6,10
   10:11,13,16,23
   11:6,10,14 12:5,8,8
   12:13,17,22,24,25
   13:2,11,24 14:2,24
   15:5,21,24 16:6,9
   17:16 19:13,22
   23:13 31:3,15,22
   32:3,5,24 33:4,18
   33:20,24 34:2,5,11
   34:14,19,23 46:2
   46:10,17 47:15,20
   48:13,21 49:7,22
   50:6,9,11,15,20
   51:10,19,19 61:1,6
   63:16 64:10 65:19
   68:7 84:21 86:4

90:6 100:11,13
102:12 103:6
114:15,20 115:3,12
118:12 123:25
126:11 134:24
153:21 167:22
168:2 175:20
176:24 177:2
178:21 181:7 190:6
190:7,8,9,11,13,22
190:25 191:2,10,17
195:7 196:1 197:6
203:14 204:20
208:1,8,16 211:6,7
215:2 219:24 222:9
222:23 223:5,6,23
224:1 234:23
235:12,13 241:21
243:18 244:2,7
246:21,22,23 247:1
247:1,2,3,6,17
248:8,15,20,20
249:6 254:8 258:8
**reported**  116:9
**reporter**  4:11 5:2
   33:9 88:21 140:7
**reporter's**  140:20
**reporting**  140:10
   147:19
**reports**  15:17 16:9
   19:10 29:10 43:6
   43:17,17,19,22,25
   45:16,17 48:2 49:1
   49:9 50:17 51:2,9
   51:16,22 52:21
   56:4,19 57:8,11,19
   61:9 63:15,21
   64:12,19 79:16
   85:24 86:3,8
   114:23,25 115:12
   115:16 116:22

120:25 234:3
246:10,16,17,18
247:21 248:1
249:16,25
**representation**
   185:21 190:11
   191:5
**represented**  61:24
**request**  11:25
   12:20 27:1 124:7
**requested**  30:13
   214:3 233:24
   258:10
**require**  91:9
**required**  5:15 7:7
   97:19 99:19 100:20
   118:13 188:9
**requirement**  89:19
   95:23 201:12
**requires**  13:14
   90:13 91:2
**research**  14:22,25
   19:7,15,18 20:4,6
   20:14 105:20 246:9
**researched**  15:10
**reserving**  154:9,10
**resolved**  129:22
   130:6
**resources**  126:24
   127:18 128:10
   181:19,25 241:2
**respect**  22:5 34:9
   62:9 73:2 74:1,3
   75:3 77:5 91:16,17
   93:13,19 104:3
   108:9,21 117:21
   119:5 125:13
   131:19 133:8
   142:19 144:6 215:3
   217:21 220:12
   222:10 238:20

**respectfully**  27:7
   42:6 48:9 140:17
   229:23
**respective**  93:25
**respond**  13:7
**responding**  197:21
**responses**  80:12
**responsibilities**
   56:25
**responsibility**
   206:7
**responsible**  20:13
**restate**  159:25
**restrict**  204:5
**restructuring**
   125:5
**result**  146:1 155:9
   155:23 159:23
   160:4 165:5 172:2
   200:16 204:24
   210:6 211:20
   219:20 222:24
   228:1
**resulted**  75:18
   96:18 129:4 210:22
   238:7
**resulting**  97:14
   99:14
**results**  222:5 228:2
   231:14 241:6
**resume**  156:19,19
**retained**  22:11 24:4
   41:17
**return**  107:2 108:5
   156:1,4,6 157:12
   158:24 161:5 184:8
   201:12 202:18
   212:6 231:22
   233:21
**returned**  156:8,8
   158:9 159:10,22

160:3,20 178:5
182:20 183:1,3
184:23 185:10
186:11,15 195:10
195:15,16,23,24
196:24 197:8,13,16
197:18,19 198:1,13
198:17 199:9
200:15 201:1,24
202:2,5 217:3,8
228:6,17 230:1
231:1
**returning** 155:1
177:24 196:11,15
**returns** 157:16
**reveal** 132:16
134:12
**revenue** 8:24 79:13
104:5 115:8,21
116:23 117:1,9
121:20 127:22
204:1 215:25
228:24 229:12,20
244:13
**revenues** 7:13 8:6
8:10 244:15,17
250:4 251:24
**reversed** 107:21
**review** 25:12,17,21
25:23,25 26:2,19
27:18 34:14 54:10
56:19 61:8 64:2
71:7 85:24 86:14
124:8 130:15 133:3
133:13 149:16
150:1 212:17,25
213:11 258:9
**reviewed** 11:8 16:8
36:11,24 71:6
119:20

**reviewing** 20:18
34:23 86:5,8
128:19,20,23 133:9
223:22
**reviews** 86:21
**rich** 14:7,15
**right** 6:22 7:15,23
10:8 11:5 16:20
17:4,14,14,24 18:6
19:24 33:19 36:9
37:9,20 38:23
41:14,16 46:3
49:20 53:10 54:1
57:17 60:14 63:12
64:6 75:8 80:19
81:10 82:9,12,22
85:15 98:13 105:13
109:5 110:14
112:24 122:15
125:20 131:5 144:3
147:23 154:2,4
156:18,24 157:7,11
169:9 176:2 179:11
179:14 180:5
182:25 185:7,23
186:24 187:11,12
188:1 190:10,18
191:7 192:8,25
193:10,24 195:11
195:11,16 196:22
200:12 201:9,25
202:7 203:7 208:2
209:11 215:9 216:3
228:12,13 230:3,15
230:17 232:25
233:1 239:15,18
241:18 242:8,13,22
243:21 246:12
252:24 253:23
**role** 19:5,14 24:3,6
81:24 82:1,4,8,9

94:1 124:22 125:2
142:20 203:10
**roles** 82:13
**rolled** 121:18
**root** 76:2,4
**roster** 218:25
**rosters** 119:22
219:8
**roughly** 49:11,12
**round** 109:23
221:2
**rounding** 183:19
**row** 185:22,25
**rows** 188:11
**rules** 195:1
**run** 45:15,16,18

**s**

**s** 14:9,10
**s.e.** 1:10
**salaries** 8:11
**salary** 7:14,17,20
7:21 8:7,16 180:1
**sample** 245:13
**sampling** 44:4
**satisfy** 253:19
**save** 235:17
**saved** 17:15 31:14
**saw** 36:1 57:5,7
68:2 71:22 79:22
93:7 150:4 167:7
198:8
**saying** 50:17 53:11
58:2 74:18 75:20
77:12 79:4 98:15
121:6 132:6 133:22
143:7 150:5 180:21
217:15 231:17
236:2 253:22
**says** 50:13 89:9
94:13 95:8,18
99:12 124:15

162:10 164:10
176:17,18 177:8
185:23 191:2
**scenario** 29:21
192:11 196:15
242:2,3
**schedule** 195:22
**school** 55:18 64:25
95:9 100:25 101:7
109:25 110:3,11
119:21 129:1
156:24 157:7,10,16
158:24 170:11
172:14,20 173:17
174:2,13,16 175:1
189:7 192:10,24
193:8,13 194:7,8
194:16 196:15
201:23 213:11
214:1 216:11
219:17 222:1
230:13,14 233:20
244:23 246:6
250:12
**school's** 139:21
140:4 169:22
201:12 202:15,18
213:20
**schools** 86:17 87:4
95:10 131:14
133:17 146:18
148:22 149:5
156:15 159:12,17
171:25 172:8
201:13 202:19
210:8 222:22
245:15,20 247:7,17
248:12,13,19 249:8
249:12 250:4,6,18
250:19

**[scientific - situated]**                                                                    Page 295

scientific   245:3,8
screen   140:18
  247:11
se   115:7 126:12
seal   255:20 257:12
sean   124:5
searching   52:17
sec   246:12
second   17:3 73:13
  222:17 238:4,13
secondary   244:8
  248:9
section   82:11 208:1
  208:3 222:13 224:1
  224:7
see   11:12 31:23
  32:24 34:20 37:14
  37:15 38:4 56:4
  61:2 64:22 69:10
  69:11,13 72:7
  73:19 77:11 87:2
  88:2 89:14 90:5,19
  91:4 95:3 102:22
  119:8 121:18 125:6
  159:4 164:19 173:3
  186:1 188:23 189:1
  195:7 199:2 220:8
  220:24 234:5
seeing   78:12
  123:20 221:22
seek   246:5
seen   5:9 30:25 31:9
  48:8 49:9 51:21
  55:22 56:23 57:1
  57:11,19 58:21
  61:19,21 63:4 71:9
  71:12,17 76:19
  85:21 88:24 95:4
  106:2 121:1 126:5
  135:20 142:9
  148:14 158:1,7

160:22 162:5 191:4
  199:14 215:18
select   238:23,25
  247:7
selected   248:12
selections   243:6
self   230:23
send   168:5 174:23
  259:13
sending   83:20
  160:11 230:9
senior   14:18 18:16
  18:19,20 19:2
  20:16
sense   20:19 52:15
  140:25 186:19
  188:2
sent   83:8,18 94:8
  160:8 181:17,24
  182:15 186:21
  229:21 231:9
sentence   99:11
  164:10 205:16
sentences   95:18
separate   89:10,13
  89:24 90:2,9,12
  92:6
separately   128:21
  248:3
series   25:11 36:1
serious   173:4,10
serves   248:17
service   9:17
services   96:18,19
  97:13 99:13 100:18
  242:15 244:12
set   11:6 34:10
settle   24:22
settled   23:9
seven   226:19,20

share   7:11 8:2
sharing   8:5
shear   244:25
sheet   255:7 256:1
short   44:15,19
  62:23 180:8 204:16
  237:14 254:4
shot   118:24
show   33:2 41:22
  57:1 62:20 81:3
  92:16 105:20 108:2
  130:25 150:2
  171:15 185:17
  187:17 189:15,18
  192:21 193:8 194:9
  195:22 196:14,22
  198:13 211:1 231:8
  231:25 234:2
  246:18 249:19
  252:22
showed   61:1
  108:19,20 138:16
  154:24 219:3
showing   5:6 57:6
  113:5 190:21
  193:18
shows   63:17 69:7
  70:3 192:22 199:20
  221:6
shut   168:7 209:18
siana   1:7 179:9
sided   108:23
signature   256:22
  257:19 258:21
  259:12
signed   259:13
significant   129:4
  129:17 133:18
  168:6
significantly   97:13
  99:13

signing   259:16
similar   19:6,15
  20:3 95:10 148:11
  148:15 195:5
similarly   159:12,17
simple   49:8
simpler   31:14 32:6
  32:8,9,13,15,21
  33:1 35:3,5,11
  39:21 40:24 41:5
simplified   35:15
simplify   49:18
simplifying   55:7
simply   79:12 94:24
  99:22 112:22 113:5
  201:22
simultaneously
  140:9
sincerely   259:19
single   11:8 67:21
  236:24 237:2
sir   44:23 46:9,13
  48:9 49:12,19
  91:19 93:1 99:7
  119:1,9 122:3
  137:21 176:22
  202:17 234:9
  249:14
sit   22:14 25:5,6
  54:22 87:23 96:7
  101:21 103:19
  115:13 119:15
  122:18,25 127:17
  131:8 156:22
  157:20 161:9
  164:24 169:8
  194:25 201:4
  225:16 249:10
  250:16
situated   159:12,17

situation   52:10
   181:16
size   158:24 164:12
   244:6,10,12,25
   245:2,8,19
slightly   94:12
slower   42:6
smaller   235:5
software   74:17,19
   74:24 129:1,3
   130:5,6,19 139:14
   139:21 140:3 141:7
   141:11,24 142:3,24
   143:5 145:12 149:1
   149:4 151:4,21
   162:15 163:9,12,22
   163:23 165:3,5
   166:23 167:8,17
   175:14
sole   102:5,10 173:7
   173:9 205:11
solutions   259:1
solve   214:20
solved   215:10
solvency   203:21
somewhat   151:13
   226:13
sooner   101:17
sophisticated   98:8
sorry   5:12 12:12
   14:17 44:15 45:12
   46:13 63:8 73:4,14
   80:18 117:14
   120:15 123:4 136:2
   147:14 159:25
   173:20 181:8 183:6
   188:11 206:24
   213:5 222:18 223:8
   224:3 245:21
   246:16 248:14
   253:1,4

sort   140:12 226:12
sorts   16:15
source   28:5,8
   117:24 119:2,2
   123:15 209:17,18
   246:20 252:15
sources   12:23
   46:20,22,24 47:1,3
   47:5,7,9,11,13
   48:25 65:21 66:1
   114:20 118:8
   122:24 123:7
   248:18
south   259:2,14
southern   1:1
space   246:5
speak   30:20 125:13
   125:16 172:2 246:8
speaking   26:5
specific   43:24
   53:24 54:21 55:12
   58:20 59:1 77:24
   77:25 117:2 122:11
   139:3 149:12 151:6
   169:9 213:3 217:15
   219:19 222:22
specifically   11:10
   11:14 46:16 48:12
   48:20 74:3 89:4
   97:16 99:10,16
   114:5 133:5 135:9
   155:4 225:20
specificity   235:20
specify   184:1,1,3
speculating   85:20
spell   14:8 22:23,25
spend   9:8 106:5
spending   9:4 211:2
spent   48:18 148:19
   182:6 211:3

spot   76:17 77:6
   152:23 165:20
   166:2,13,14 251:17
   252:4
sr   185:25 186:4
   197:16
srs   197:11,16
st   259:6
staff   152:14
stakeholders
   225:22
stamp   11:3,6 46:8
stand   177:6 225:2
standard   124:15
standing   190:10
star   119:7
stars   43:21 44:7,8
   44:11,24 45:2,9,18
   46:4,4,10,17,21,23
   46:25 47:2,4,6,8,10
   47:12,14,17,21
   48:1,7,13,18,21,25
   49:7,9,13,21,25
   50:1,2,4,6,10,13,15
   50:16,20,24 51:2,7
   51:9,10,13,15,23
   51:25 52:1,2,3,13
   52:17,22 53:5,6,16
   54:5 55:10,14 56:4
   56:14,17,19 57:2,8
   57:11,19 58:3,4,19
   58:19 59:13 60:3,9
   60:24,24 61:1,9
   62:4,6 65:7 67:2,14
   69:7 70:24 74:23
   85:7 90:18 93:11
   102:3,8 103:5,6,22
   103:24 104:3,4,24
   105:14,18,25
   107:15,23,25 108:4
   108:8,17,19,19

113:3 114:11,15,23
   115:5,6,7,11,16,18
   115:19 116:3,10,14
   116:14 117:10
   119:13 120:4,24
   121:17,20 130:25
   133:11 136:2,6
   138:19 139:2
   141:18 142:7,21
   143:19 158:12
   160:9,16 161:1,17
   162:3,5 184:5,18
   184:19,21,24,25
   185:3,5,9,12,16,20
   186:10,14,19,23
   187:7,8,9,11,15,19
   188:3,15,20,24,25
   189:2,10,16,25
   190:6,22 192:1,14
   193:3 194:9,14
   195:13 196:8 197:1
   197:6 198:12,19,23
   199:5,10,20 200:1
   200:3,20,22 215:24
   219:4 220:25
   221:12 223:3
start   6:3 51:11 68:3
   76:23 149:18 158:6
   158:10,15,16 179:3
   187:20 217:18,19
started   106:13
   158:5 189:12
   242:14
starting   223:2
starts   71:2 224:2
state   1:17 23:3
   211:14 224:25
   225:4 255:2,13
   257:3,23 258:3
stated   75:15

**statement** 7:1 11:7
   37:12,13 48:5 58:8
   59:3,19 65:14,23
   78:18 80:1,14
   81:23 83:9 89:17
   91:14 124:17
   125:24 128:6 129:6
   144:4 162:21 163:5
   163:19 164:15
   180:18 181:5
   197:24
**statements** 43:16
   106:17 107:12
   124:12 134:10
   136:5,15 137:16
   212:8 222:6
**states** 1:1 89:4 95:9
   154:19 244:9
**status** 110:8
**stay** 137:22
**ste** 259:14
**stems** 204:3
**stenographic**
   258:11
**stenographically**
   258:8
**step** 39:25 110:2,6
   136:12
**stewart** 1:7 179:9
**stifel** 246:20,20,22
   247:6,16 248:19
**stopped** 135:21
**storch** 2:3 4:13
   9:24 10:15,22
   11:19 12:2 22:8,11
   30:6 259:5
**storchamini.com**
   259:7
**stored** 17:13
**storing** 29:12

**stream** 252:13
**street** 2:4
**strike** 7:16 10:12
   11:15 22:7 28:21
   28:22 52:20 53:9
   60:15 70:9 71:3
   73:4 76:7,10 86:18
   126:24 156:13
   157:14 159:8 164:1
   179:1 183:1 202:16
   231:20 243:8
   251:21
**strongly** 122:1
**structure** 7:22
**student** 45:3,6 53:5
   53:6,8,12,17,18,19
   54:17,19 55:4,14
   56:6,21 57:10,22
   57:23,23 58:10,18
   59:25 60:1,6,10,17
   61:24 62:3,10,11
   66:8,10 67:7,8,23
   68:24 69:3,19
   70:20,21 72:3
   73:21 79:7,11,13
   79:19 80:10,24
   82:25 83:4 86:13
   92:10,13 94:5
   95:20 96:2,6 97:14
   97:16 99:14,16
   104:20,22 107:18
   108:9,10,25 109:2
   109:23 110:17,18
   110:18,21 115:25
   116:4,15 117:2,4,8
   117:12,17 118:3,5
   118:8 119:3,5,8,13
   119:15 120:4,10,13
   120:16,19 121:2,7
   121:12,16,17 122:5
   122:22,25 123:16

123:20 128:25
   129:2,16 130:4
   133:15 136:3
   138:25 145:21
   148:4 150:2,13
   151:3 158:5,10
   162:16 163:14
   164:22 165:6,14
   167:3 170:25 171:4
   184:7 186:4,8,25
   187:2 188:23 189:1
   192:11,15,21,22
   193:7,12,14,17,20
   194:11,12 197:18
   197:19 199:1
   200:17 215:16,22
   218:6,11,22,24
   219:6 221:22 222:2
**student's** 105:14
   107:20 121:7 171:6
   191:23 192:1 193:6
   193:9 194:10
**students** 54:12
   55:24 59:6 60:19
   60:25 61:3 65:2,3
   66:9 67:2,3,7,23
   69:18 78:6,16,19
   79:1 80:8 81:5 91:7
   93:24 94:7,9 95:21
   96:3 103:14 109:24
   110:1,13 111:2
   116:9,18 119:21
   146:17 148:22
   149:5,23 157:13,14
   157:16 158:6,15,16
   187:23 188:9 196:9
   196:20,21 198:7,11
   216:13 217:5
**study** 5:24 6:3,5
   250:11

**studying** 197:25
**stuff** 154:16
**subject** 60:21
   111:24 178:22
   194:6,19 234:10
   243:3
**submitted** 33:4
   58:11 76:10
**substantial** 102:2
   150:18 151:23
   174:11,14 185:17
**substantially** 96:20
   241:13
**substantiate** 54:24
   55:3,4 67:24 73:21
   78:6,17 112:3
   119:22 168:25
   170:6,18,20,24
   171:12,24 174:24
   175:2,6,9 187:25
   191:12 194:4 230:3
   230:14 234:24
**substantiated**
   55:24 68:11,20,21
   75:12,14 83:21,24
   84:1,5,15 85:3,13
   85:16 87:25 104:16
   104:18,19,20 105:3
   108:1 109:8,11,14
   130:23 132:4,19,22
   133:2 168:5 169:11
   169:12,14 170:7
   174:18 186:21
   196:7,10
**substantiating** 76:6
   132:25 171:4 196:9
   230:6
**substantiation**
   108:24 109:2
   144:13,18 146:13
   187:16,18,21

**subtract** 40:8
**subtracting** 228:25
**success** 241:13
242:21,22
**suffering** 175:13
**sufficient** 59:6 65:4
66:8 89:11,25
90:10 92:2 113:23
119:21 239:3
240:12 241:21
**suggest** 56:24 70:1
70:5 78:24 80:9,22
81:15 82:24 96:24
135:20 211:24
221:24
**suggested** 78:16
93:3 95:4 158:12
188:17
**suggesting** 69:24
77:8 130:10 131:9
142:10 161:16,19
162:1 189:22,24
209:16 216:6
221:22
**suggestion** 79:6
91:6 137:11 143:5
218:2
**suggests** 79:23
85:22 199:25
219:14
**suite** 259:1
**sum** 84:15 85:2
196:23,23 229:25
**sumberg** 2:8
**summaries** 15:18
**summarized** 15:13
**summarizing**
190:21
**summary** 43:16,17
123:8,11 224:1

**sums** 84:4
**supplemented** 32:5
**supplier** 22:19
23:24
**support** 14:4,11,14
56:7,21 57:10 65:5
69:18,19 70:21
79:14 83:9,14
97:23 99:24 100:4
100:17 101:2,7
103:9,13 104:21
124:6 194:5 207:16
218:3 230:11
**supported** 57:22
62:10 65:2 68:24
69:3 92:22 93:9
114:1
**supporting** 20:3,4
62:4 102:23 104:11
104:14 114:9 198:7
221:20
**supports** 95:5
218:6
**suppose** 59:18
87:24
**supposed** 110:19
112:2 178:12,20
184:6 196:8
**sure** 11:24 12:17
14:7 26:9 31:21
36:22 56:9 59:23
71:9 94:7 98:25
111:19 117:17
122:25 127:7
139:25 141:23
150:4 160:2 170:18
170:21 186:14
194:6 198:13
225:22 227:8
229:24 231:12
236:3 245:22

249:15,21 250:16
**surrounding** 32:20
**survivability** 182:3
**suspect** 29:24
122:1
**sustain** 233:6
**suzanne** 1:16
257:22 258:6,23
**swear** 4:11
**sworn** 4:20 124:17
128:6 216:5 255:5
257:10
**sx** 123:9
**system** 17:10,11,13
43:20 44:1 45:3
53:16 59:2 61:10
72:4,10 76:13
110:4,12 111:1,19
111:22 116:10
129:10 141:3,16
142:6 162:12,12,14
165:23 184:19
199:5 217:12
**systematically**
35:25
**systems** 52:9 129:1
129:3,16 133:16,16
162:18

**t**

**t** 14:10
**t4** 192:25 193:4
**table** 242:11 243:7
243:9 245:15,20,21
245:22
**take** 21:9,10 26:21
34:18 39:24 44:15
46:9 62:16 80:11
81:4 87:12 88:4,16
122:3 123:6 128:8
136:12 144:4
145:14,15 151:13

151:15,22 152:13
152:20 164:7
178:12,20 180:3
193:3 219:5
**taken** 1:16 44:19
62:23 94:7 113:18
152:14 175:3 180:8
204:16 237:14
254:4 255:6,6
259:10,15
**takes** 151:2 171:23
172:20
**talk** 15:8 25:9
27:15 42:6 71:9
74:23 76:24 81:20
82:19 84:22 94:18
103:21 107:9
112:16 113:2
125:14 142:16
143:22 153:19
181:6 197:6 214:8
214:24 220:3,22
222:12,15 224:23
232:18,23 233:14
238:12 248:2
**talked** 60:9 71:1
80:18 92:25 103:11
106:20 115:1
118:11 120:2
158:22 163:1 164:9
174:20 199:12
200:8 202:4 203:14
204:3,4 205:5
215:2 219:13
233:19 249:17,24
**talking** 15:9 24:11
37:17 42:7 54:16
54:16 58:16 59:24
70:24 80:5 81:12
95:2 112:12 129:24
133:22 136:11

137:21 147:2,4
149:2 162:10
165:10 176:20
187:7 198:21 202:1
208:11 214:9 215:1
215:20 220:1 223:4
223:11 229:23
230:17 232:8,11
235:13 246:23
**talks** 135:25 222:20
222:25 223:20
**tandem** 139:4
**team** 14:11,14
20:16 125:15
**tecum** 5:8
**tell** 18:4 43:4 45:25
47:23 48:17,20
49:20 50:14 51:9
79:3 82:15 93:1
101:22 105:22
114:15 119:9,14
130:14 144:11
148:19 156:23
157:11 185:9
189:11 200:13,14
200:25 202:7 206:8
226:5 234:10 236:5
243:10 249:14
**telling** 48:19 93:6
**ten** 17:6 23:12
48:19 247:17
**term** 59:17 106:25
107:7,8 108:11
125:5 158:15,16
166:13 179:15
182:3 186:6 196:16
196:17 215:5
218:22 239:4,7,12
240:12
**terms** 9:18 18:18
26:5 27:20 71:15

71:21 75:20 143:9
157:5 170:23
181:17 217:25
245:2
**test** 179:5
**testified** 4:20 21:18
22:4 36:6 37:2
50:21 51:24 78:14
80:2,4 81:13 98:9
99:1 126:3 148:8
152:22 154:24
159:16 163:7 172:8
173:12 229:1 237:5
**testify** 6:8,25 7:7
23:4,5
**testifying** 26:10
37:15 186:17
**testimony** 5:24
6:23 7:3 20:21
37:19 38:3 42:15
44:10 45:1 47:16
51:21 53:23 54:10
54:15,21 64:3 67:2
67:5,11,18 68:2
69:23 70:3,15,25
71:17,23 74:10
79:4 80:6,13,16
81:12,16,17,19,22
83:5 84:17 85:18
85:21 98:10 102:11
102:15,17 103:12
103:25 106:2
107:17 114:11
126:6 129:10,21
131:8 132:1 133:4
133:6,14,21,22
134:1,2,4,18,22,23
134:24 136:20
139:12,13 141:5,7
142:4,10 143:4,7
145:5 148:14

149:20 151:7,10,12
154:23 155:14
158:1,7,12,14,18
160:16 163:1,6
166:22 167:8
171:18 188:17
195:21 198:8,25
199:7 200:7 206:1
206:18,21 211:23
213:23 215:18
216:5 218:2 219:14
220:1,16 227:17
232:18
**text** 153:22,24
154:2,6
**thank** 11:24 24:14
29:5 30:22 33:7
49:23 50:2 75:15
75:19 86:4 99:6
106:12 119:18
122:20 218:16
224:12
**thanks** 5:5,12
188:6
**theme** 35:18
**theoretical** 110:7
188:2
**theoretically** 202:8
**theory** 55:23 105:1
139:4 190:1 201:4
**thing** 33:22 34:25
50:17 76:20 182:5
184:4 228:15
**things** 8:24,24 9:2
9:18 10:6 11:3,13
12:9 16:2,15 20:18
21:15 25:22 27:24
28:1,3 29:11 31:15
31:21 32:4,21 34:3
39:21 45:4 51:14
52:16 55:5 56:16

58:21 61:4 68:3
74:11 76:17,24
79:14 85:23 91:25
104:9 106:17,20
107:11,12 114:12
115:23 130:12
131:9,10 134:15
135:10,10,19
139:14 141:6,8
152:12,25 155:14
156:2 167:23 168:1
168:10 169:3,4
174:21 176:6,7
180:2 181:6,21
182:13 184:16
185:2 199:3,14
204:5 208:9 210:16
211:18,20 212:14
213:7 214:22
221:13 223:21
228:3,23,24 230:9
230:20 233:12,23
234:1,4,13 235:15
235:19,21,25 236:3
237:6 240:7 246:10
**think** 12:7 21:8
22:14 25:2 26:7,11
26:12 28:2,2 31:12
35:6,13,18 37:2
39:5 41:3 46:7
47:20 50:16 55:21
59:23 62:13,18
81:19 83:22 86:2
96:6 98:12,17
106:6 108:23 115:1
115:13,15 118:22
132:6 135:4 136:16
136:22 137:1
138:23,24 140:19
140:22 151:12
153:14 157:9

159:15 165:4,7
168:23 176:2,19
181:8 182:5 203:4
203:4 205:5 219:5
219:24 221:18
224:13 226:4,6
227:1 229:6 233:22
234:7 235:10,13,23
236:6 245:12
249:18,23 250:7
253:1
**thinking** 155:5
226:21 244:22
**third** 1:10 17:3
28:16 162:13
249:22
**thought** 36:20
165:22 230:23
248:16,21 249:1
253:16
**thousand** 146:12
146:13 150:24
**thousands** 148:3
150:16 151:20
**three** 64:10 74:15
87:22 95:23 131:3
131:7 138:11,12
139:4 220:25
233:15
**threw** 194:23
**time** 4:8,9 6:12,19
6:19,20 9:4,8,13,15
27:23 34:19 44:18
44:21 46:9 57:12
57:21 60:12,15,18
62:22,25 67:1
68:24 69:4 72:17
72:20,22 73:3
75:23 76:6,17,18
77:9 78:1 81:11
95:11,11 101:11

105:9,12 106:5
110:11 111:4 112:2
112:13,17,21
113:11,17,20
117:22 122:3 125:8
126:16 127:11
128:1,14 130:23
131:17 132:7 133:6
133:12 134:14
136:10 143:15
144:19,20,21
146:15 147:5 151:8
151:14,19,23 152:9
152:14,20,24
153:15 156:20
161:3 163:25 164:2
164:7,8 166:2,2,24
168:11 171:2
173:16 174:5,9,11
175:7 177:25 180:7
180:10,12,24
181:22 182:3,6
185:6 197:5 198:14
203:20 204:11,15
204:18 214:3
216:12 217:10,11
217:19 219:5
224:14,19 233:10
234:7 236:4 237:11
237:13,16 239:25
240:1,5,20 243:18
243:19 251:24
253:13 254:3,6,13
**timely** 127:2,14
165:16
**times** 36:7 57:1
68:14 69:7 85:7
91:6 92:15 93:11
98:10 99:2 104:1,5
104:6 109:10 115:9
121:1 129:23

131:11 138:11,13
139:5 142:10 143:4
150:23 153:2 166:7
166:13 199:25
**timing** 185:4 194:1
194:3 198:24
199:12 200:23
**title** 18:11,19 45:5
56:25 60:20 83:11
84:22 86:4 87:2
89:9,12,19,23 90:1
90:8,11 92:21
93:23 94:14 95:11
95:12 104:15
109:24 113:24
129:5 132:19,22
133:19 139:10
158:8,8 163:15
164:11 168:14
177:10 191:25
202:24 203:25
204:23,24 205:3,17
206:4,16 207:6
208:4,22 209:1,7
210:9,17 211:7
212:14 213:4
214:13,22 223:3
225:6 228:2,3,5,7
229:7 233:16,19
234:6 236:14,19,25
253:15
**titles** 18:12,19
**toam** 14:10 18:18
19:14
**today** 4:7 5:5,16,20
5:25 6:9,19 10:7
16:3,16 17:20
19:11,13,19,22
64:4 81:19 118:15
203:15 230:18
243:11,15

**told** 30:7 109:17
121:22 136:13,16
141:23 168:2 237:9
248:22
**top** 64:17 174:10
**total** 116:4 120:10
120:15,19 121:5,5
187:21 198:21
**totally** 7:5 235:2
**totals** 121:18
**touch** 223:15
**tower** 2:4 259:1,6
**track** 39:6 45:4
89:12 90:1,11
158:12 240:17
**tracked** 35:3,9,23
35:24 36:6,10,23
43:21,22,25
**tracking** 38:2
42:16,22 90:16
186:20
**traditionally**
228:23
**training** 9:1,18
**transaction** 69:16
110:22 120:18,22
120:25 121:2
**transactions** 66:3
**transcribed** 140:1
**transcript** 258:9,10
259:11,13
**transmitted** 96:17
141:17 162:17
**trial** 6:23 7:1 21:20
23:5 24:20 43:9
235:17
**trials** 22:5
**tried** 28:6 38:8
172:10
**triple** 164:12

trouble 31:18 38:6
58:1 201:18
true 78:19 79:1
135:15 255:5
258:10
truly 242:19
trust 89:10,24 90:9
trustee 1:4
truth 155:21
try 17:14 49:18
59:5 127:11 140:15
140:15 175:9 251:6
trying 27:3,22
44:13 143:9 174:12
175:5 188:3 189:9
190:12 191:12
210:1,11 213:25
216:8 234:5
tuition 95:20 96:2
193:7,14
turgot 79:22 81:13
199:12
turn 89:2 95:7
96:13,18 97:10
100:15 101:14
123:24 124:16
162:7
turned 52:9
twenty 55:19
two 22:14 62:17
65:21 66:1 68:15
70:2 95:17 108:25
131:2 132:9 133:17
147:10,16 174:20
185:1 189:20 194:5
194:5 199:2 212:6
220:24 223:13
230:8,19 237:21,24
238:19,22 239:18
253:25 259:14

type 86:22 119:13
120:4,18,22 121:3
types 46:5 120:25
188:16
typical 251:17

**u**

uh 153:13
ultimately 241:1
uncomfortable
239:21
uncover 102:18
179:24 211:22
212:3
uncovered 81:21
101:22
underlying 60:18
95:1
underneath 61:2
undersigned 257:6
understand 8:23
10:19 13:3 27:4
31:6 44:8,11,24
45:2 48:15 49:14
49:16 51:10 54:23
55:23 63:13,14,25
66:7 68:16 69:8
74:19,22 77:7
81:24 83:6 84:1
101:4 102:4 106:10
107:10 108:10,12
111:16 112:1
114:22 115:21
117:10 120:12,20
124:20,24 125:20
126:3 136:20
139:19 140:2,23
141:3,5,7,16,21
142:2,25 143:9
147:13 155:4
157:24 161:24
166:16 167:24

170:10,24 172:16
173:11 177:4,18
179:7,12 181:8
186:4,7 187:23
191:5 193:16,25
195:4 199:6 202:23
204:8 205:21 206:6
206:12 209:4 210:2
210:11,14 211:17
213:21,25 216:7,16
216:18,22 228:21
232:8,14 234:9
235:23 237:20
239:20 244:21
247:14 249:11
253:22
understanding
20:10 24:23 55:8
55:17,22 57:3
83:17,19 87:7
110:2 137:9 141:24
142:3 147:23,24
148:6 149:21
150:19 157:4 158:2
158:3 160:7 165:25
166:3 178:15 190:4
190:5 192:6 194:21
195:5,21 197:8
206:1 211:12 213:9
understood 26:2
54:11 68:17 86:12
87:1 105:25 124:11
132:1 146:10
158:20,21 161:21
161:25 171:9 172:7
174:17 185:7
188:14 189:11
193:22 212:21
214:21 225:21
227:24 236:13

undertaken 107:1
unfortunately 91:2
unique 242:1
united 1:1 244:9
universe 28:18
unrelated 203:21
unsubstantiated
35:8,22,25 38:2
41:6,12,14,18 42:2
42:10,23 72:11
75:4,9 76:13 77:2
107:4 131:12 138:2
143:10 144:7
146:25 148:6
159:23 160:4
174:17 207:25
212:4 213:6 214:10
214:21 231:2
unsubstantiation
186:16
unusual 71:21
213:10 251:25
252:2
unusually 71:15
unwinding 228:22
228:23
updated 16:2,18,23
16:24
upload 73:23 74:7
74:24 77:18 109:3
110:12,23 141:9,25
142:12 147:25
166:14,15 170:2
192:8 194:11
uploaded 71:16
72:3,10 109:16
142:7 143:2,18
149:22 186:25
192:5 193:17
194:15

**uploading** 73:20
142:20,21 171:5
**uploads** 71:21
142:14 143:23,23
**upstairs** 62:18
**urge** 98:5
**use** 45:5 49:1 63:23
63:24 64:19 166:13
177:10 196:16
209:17 241:11,22
244:1 252:3 253:11
**uses** 242:25
**usual** 252:2
**utilize** 63:20
**utilized** 41:7 52:14
252:8
**utilizing** 239:22
252:16

**v**

**v** 255:6 256:2
**vague** 149:19,25
235:18
**vaguely** 145:4,7,8
**valuation** 21:15
203:15 207:17
237:19,24 238:20
238:21,24 240:14
251:14 253:23
**valuations** 246:9
**value** 177:13 238:2
238:5,9,15,20
241:16 243:2
250:14 253:14
**valuing** 242:2
**various** 43:17
63:15 167:21 197:5
225:4,7,12
**vary** 251:3
**vast** 116:15
**verbally** 30:20

**verbatim** 12:1
**verified** 149:1
**verify** 137:15,18
148:20
**veritext** 259:1,21
**veritext.com.**
259:14
**version** 16:11 17:3
17:3,3,7,8,15,16,17
17:21,21,23
**versions** 15:23
16:13,19 17:12
63:24
**versus** 4:5 32:12
58:4 59:13 65:7,12
135:13 171:16
182:19 196:7 210:7
210:19 227:10
244:17 250:8
**vice** 18:24,25 19:2
**video** 1:14 4:2
237:10 254:13
**videographer** 4:2
44:17,20 62:21,24
63:7 113:16,19
180:6,9 204:12,14
204:17 237:12,15
254:2,5,12
**videotaped** 4:3 5:8
**view** 18:20 52:22
92:5 206:11,13,14
220:23 239:12
**viewed** 83:25
**violate** 95:23
**virtue** 193:14
**vis** 107:20,20
**vitale** 1:16 257:22
258:6,23
**vs** 1:6 259:8

**w**

**wait** 98:23 122:6
**waived** 259:16
**want** 12:17 25:9
26:21 27:9,14
30:19 34:18 39:9
39:11 46:9,14
59:15,15 62:18
64:17,19 65:12
70:7 71:5 81:12
82:19 85:17 95:7
95:17 98:1,25
107:15 109:20
112:17 118:23
122:4 124:16,17
132:13 155:4,4
161:22,24 171:25
176:22 196:16
197:22 202:10
205:2 206:25
208:20,23 209:2
216:16,24 220:3
225:3 226:5 230:19
233:25 237:18
241:14 251:5
**wanted** 13:11
17:19 245:21 252:9
252:11
**way** 11:1 15:10,24
22:25 52:5 59:11
66:13 71:22,25
73:7 91:5,15 97:3,7
102:22 116:22
125:25 128:7,22
129:19,22 134:12
140:7 143:22
144:16 149:12
152:3 163:21
164:16 165:9
167:17 170:16
186:22 190:12

196:13 200:9 202:4
202:13 216:8
218:15,16 234:17
234:18 235:22
241:5 243:8 253:16
**ways** 186:7 214:24
**we've** 13:9 70:23
88:18 103:11 162:9
200:7 203:14 204:4
214:7 220:1 233:19
**week** 151:16
**weekly** 143:23
**weight** 135:5
**weissman** 9:25
11:19 12:3
**welcome** 95:16
98:16 99:7
**went** 17:10 55:15
106:2 114:18
210:22 242:10
**whoa** 176:19,19,19
**wire** 110:17 185:21
232:21
**wired** 198:23
**wires** 185:5 232:21
**wiring** 175:6
196:18 231:13
**wish** 8:23 31:17,19
39:24
**wished** 30:24 31:9
31:12 39:12,20,20
110:1
**withdraw** 100:7
130:2
**withdrawals** 97:15
99:15
**withdrew** 93:24
97:16 99:16
**witness** 4:11,13,18
4:21 5:13 6:12,18
7:5 9:12 16:22

19:21 20:24 21:20
23:19 24:15 25:5
25:20 29:20 34:23
36:14 37:2 38:6,25
39:5,19 40:5,19
41:3,21 42:13,25
45:12 50:23 51:5
53:1,15 54:3 56:12
58:1,14 59:10 60:8
61:15 62:2,20 63:8
65:25 67:11 68:1
69:6,22 72:13
76:16 77:5,21 81:1
82:1 83:2 84:16,19
85:11 87:16 88:11
93:16 94:18 96:6
97:3 98:2,9,25
100:2 101:11
102:10 103:11
104:9 105:1,9,17
107:7,25 108:14
109:7,16 110:6
111:7,15,24 112:10
114:18 116:3,12,21
117:8 118:17
119:12 120:2
121:15 123:18
125:11 126:2 127:4
127:16 128:12
129:9 130:9 131:7
131:24 133:21
134:6,22 135:18
136:8,22 138:8,14
139:12 141:20
142:9 143:12,21
144:9,16 145:4,18
145:23 146:5,20
147:2 148:14,25
149:12 150:12,22
151:6 152:3,19
157:19 159:2,14

161:8,15,24 162:24
163:21 165:9,19
166:5,12,22 167:6
167:16 169:3 170:5
171:8 172:6 173:2
173:9,19 174:4
175:11,16 176:4
178:8 179:22
180:20 182:5 187:7
188:13 191:17
193:22 194:19
195:18 199:19
200:6 201:16
202:22 203:24
205:14 206:18
207:15 208:7
209:15 210:14
211:16 213:3,15
214:7 215:18 217:7
217:24 218:14
219:2,13 220:20
222:4 224:18
227:23 230:5
231:12,25 233:8
236:13,22 237:5,23
239:25 241:5,20
242:24 245:7
247:19 250:16
255:20 256:22
257:12
**witnesses** 69:10
74:17 78:10,11
79:15 80:13 102:17
106:18 107:8
143:14 158:22
216:5,15 220:2,4
**wood** 24:1,11 86:6
**word** 15:21 140:21
177:3
**worded** 100:11

**words** 8:8 17:2
53:25 75:16 92:18
94:12 105:5 106:8
116:7 121:6 155:6
155:8,12 156:7
170:1 187:17 193:5
213:12 226:5
243:20
**work** 6:20 7:6 8:1
17:25 19:9,24 20:2
21:15 22:6,9 23:14
24:9,17,24 25:14
36:15 38:25 39:3
56:13,17 58:21
59:10,11 69:25
72:1,2 74:8 75:25
91:1 92:14 93:6,10
113:9 124:25 125:5
139:4 153:15
159:11 179:17
208:7 221:19
223:24
**worked** 22:3 23:15
**working** 18:17
23:20 29:11 55:14
125:2 134:11,20
136:18 140:20
**worth** 110:1,20
111:2,20
**wright** 2:6 4:12,12
5:10,12 6:11,17 7:4
9:11 12:14 13:9,15
13:20 16:21 18:2
19:20 20:22 21:19
23:18 24:11,14
25:4,19 26:3,7,11
26:18,23 27:1,6,11
28:25 29:3,19 30:8
30:16,21 33:6,11
34:22 36:13 37:1
38:5,24 39:4,15,18

40:4,15,18 41:2,20
42:12,24 44:13
45:11 50:22 51:4
52:25 53:14 54:2
57:25 58:13 59:9
60:7 61:11,14 62:1
65:24 67:10,25
69:5,21 72:12
76:15 77:4,20
78:20 80:25 81:25
83:1 84:18 85:10
87:15 88:10 93:15
94:17 96:5 97:2,24
98:3,7,11,14,20,23
100:1 101:10 102:9
103:10 104:8,25
105:8,16 107:6,24
108:13 109:6,15
110:5 111:6,14,23
112:9 114:17 116:2
116:11,20 117:7
118:16,19,24
119:11 120:1
121:10,14 123:17
125:10 126:1 127:3
127:15 128:11
129:8 130:8 131:5
131:23 133:20
134:5,21 135:17
136:7,21 138:7,12
139:11,23,25 140:8
140:11,15,22
141:19 142:8
143:11,20 144:8,15
144:25 145:3,17,22
146:4,19 147:1
148:13,24 149:11
150:11,21 151:5
152:2,18 157:18
159:1,13 161:7,23
162:23 163:20

164:17 165:8,18
166:4,11,21 167:5
167:15 168:16
169:2 170:4 171:7
172:5 173:1,8,18
174:3 175:10,15
176:3,19 178:7
179:21 180:19
182:4 187:6 188:6
188:12 191:13,16
193:21 194:18
195:17 199:18
200:5 201:15
202:21 203:8,23
205:13 206:17
207:14 208:6
209:14 210:13
211:15 213:2,14
214:5 215:7,17
217:6,23 218:13
219:1,12 220:19
222:3 224:17
227:22 230:4,21
231:11,24 233:7
236:12,21 237:4,22
239:24 241:4,19
242:23 245:6
247:18 250:15
254:7 259:5,9
**write** 32:17,18,21
70:4 103:13 153:3
153:6 154:21
221:13,15,21
**writes** 124:19
125:18 128:1,24
**written** 15:17
153:8
**wrong** 73:12
127:10 136:17
253:2

**wrote** 168:23 172:8
244:2

**x**

**x** 3:2

**y**

**yawn** 1:7 179:8
**yeah** 27:11 39:2
50:12 82:7 104:1
136:10 154:1
188:22 190:14
196:5 227:9
**year** 9:13,13 59:2,2
61:13,25 63:19
64:15 67:22,22
68:3 69:2,2,17,17
70:16 73:3 86:9,21
100:22 101:1,9
115:25 116:1,10,19
117:5,21 131:1
134:20 148:4
160:25 183:10
212:20 214:14
226:7,24
**yearly** 158:25
**years** 18:12 21:8,12
23:12 24:15 55:11
55:19,20 58:17
64:8 156:25 157:1
183:7 210:25
239:15,18,20
240:23
**yep** 160:12 194:15
**york** 2:5,5 23:2
**yousefi** 1:8 106:19
179:9

**z**

**zutes** 134:23,24
135:1,5,15 137:6
137:13,16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.