**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-CV-62028-LENARD/GOODMAN**

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC as Trustee

                   Plaintiff,

v.

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI

                   Defendants.


<u>**DEFENDANTS' MOTION FOR SANCTIONS AGAINST PLAINTIFF FOR**</u>
<u>**SPOLIATION OF EVIDENCE AND SUPPORTING MEMORANDUM OF LAW**</u>

CASE NO. 16-CV-62028-LENARD/GOODMAN

**INTRODUCTION**

Plaintiff, the Trustee of the liquidating trust established by the Chapter 11 plan of liquidation of Florida Career College ("FCC" or "Debtor"), inherited the causes of action that it has vigorously pursued against Defendants, former officers of FCC. Remarkably, however, and in violation of a Court order, Plaintiff failed to maintain the documents that go straight to the heart of disproving Plaintiff's theory of liability.

According to Plaintiff, Defendants breached their fiduciary duties to FCC by engaging in a scheme to take unauthorized Title IV funds from the U.S. Department of Education ("DOE") "in amounts far greater than that which could be supported by current enrollment numbers" and "fail[ed] to reconcile Title IV fund draws with student-level disbursement data." Am. Compl., D.E. 85 at ¶4. Allegations to this effect—pointing to purported inflated draws beyond what "FCC's then-current enrollment data" could support—are repeated throughout Plaintiff's pleading and form the basis for Plaintiff's claims. *Id*. at ¶3.

It should therefore come as no surprise that Defendants' principal defense is that the DOE withdrawals *were* authorized and appropriate at all times, and there *were*, in fact, sufficient students enrolled in the schools to support Defendants' funding draws. To both support this defense and rebut the incomplete and misleading evidence that Plaintiff has offered, Defendants must demonstrate that each draw was appropriately substantiated. This requires a comparison of each of FCC's draws from the DOE's G5 system with contemporaneously created records that detail the students enrolled in the schools at any given point in time supporting a draw.

It is for this reason that Defendants were laser-focused on obtaining student-level information in discovery. But what Defendants learned as a result of their exhaustive efforts is disturbing. Conspicuously missing from the terabytes of data produced by Plaintiff are the very

1

records—reports from the student information system ("STARS") and FCC's financial aid directories—containing the student-level data that absolves Defendants.

Plaintiff has no explanation for its failure to maintain this critical data. It would be egregious enough for Plaintiff to ignore Rule 37(e)'s specific requirement that a party take reasonable steps to preserve ESI in anticipation of litigation. But it gets worse. Plaintiff also flagrantly disregarded a Bankruptcy Court Order requiring it to preserve the documents at issue.

Now stripped of crucial data necessary to support its core defense in this case Defendants are left in the impossible position of having to defend meritless fraud claims—that Plaintiff supports with incomplete and misleading records—with both hands tied behind their backs. Simply put, the prejudice to Defendants of moving forward under the circumstances is devastating and not what the rules of this Court or the Bankruptcy Court envisioned.

To right the multitude of wrongs Plaintiff has perpetrated and to level the playing field, the law's only remedy is the issuance of sanctions. Plaintiff must be prevented from offering evidence derived from the incomplete portion of the electronic record that has been preserved, that only tells part of the story, and that only can be properly considered in conjunction with lost data. Alternatively, if Plaintiff is permitted to avail itself of fragmented records, then the nature and circumstances of Plaintiffs' spoliation and the relevance of the missing information should be presented to the jury and it should be instructed to consider that evidence in its determination.

## RELEVANT FACTUAL BACKGROUND

### I.      The Student Loan Reconciliation Process at FCC

Because the vast majority of FCC's students took out federal loans to finance their education, the primary function of FCC's financial aid department was to process Title IV fund applications for student loans from the DOE. The DOE allowed FCC to draw funds directly

from its G5 system to pay for a student's tuition and attendant expenses.  Often times, FCC's draws from G5 would include monies associated with funding multiple student loan applications.

G5 provided the necessary funding upon request, and FCC was required to disburse the funds to the student within three days.  Within fifteen days of each disbursement, FCC was required to provide student data to the DOE through another system known as Common Origination and Disbursement ("COD") to justify the Title IV funds that it drew.  This function of providing data to the DOE—assisted by FCC's internal software product—took student data (such as student rosters) from FCC's internal systems and transmitted them to COD in batches. If the information provided by FCC via COD reconciled with the funds previously withdrawn from G5, the loan was deemed substantiated in accordance with Title IV's requirements.

## II.        The Critical Electronic Records That Were Not Preserved

FCC kept extensive financial aid records regarding the substantiation of all DOE fund applications.  **Ex. A**, Decl. of Siana Stewart ("SS Decl.") at ¶3.  Defendants know this because they were FCC employees directly involved in creating, editing, reviewing, and maintaining those records, as well as implementing the programs used by FCC's financial aid office.  *Id*. ¶4.

There are two categories of financial aid records housed on the FCC network drive that Defendants know existed, have sought, and, despite exhausting efforts, have not received: (i) student ledger data and reports generated by the student information system, STARS; and (ii) shared network files used by the employees of FCC's financial aid department containing documents and memoranda created contemporaneously with the G5 draws.  *Id*. ¶¶ 5-15.

The significance of these two data sets is as follows.  The STARS ledgers contain detailed student level information, such as when a student attended a school, what type of financial aid was awarded to the student, when the school disbursed funds to the student, the amount of any such disbursement (or reimbursement), and the date that records of the student's

eligibility for the funds was posted to COD—the system used by schools to upload documentation to substantiate funds drawn down from G5. *Id*. ¶6-8.  In effect, STARS retained an audit trail with respect to every student for all financial aid transactions. *Id*. ¶7.

STARS also generated "Projected Funding Reports" that showed students expected to be eligible for loans in the near future. *Id*. ¶9.  Real-time data was also extracted from STARS to create "Ready to Pay" reports that showed which students had been "packaged" to receive Title IV loan funds. *Id.* ¶10.  The financial aid office's shared network folders contained final copies of the Projected Funding Reports and Ready to Pay Reports. *Id*. ¶¶12-15.  The financial aid office synthesized these reports to create final payment rosters (Pay Lists) that provide the basis for the sums drawn. *Id.* ¶¶11, 16.  These Pay Lists cannot be recreated on STARS because they are based on contemporaneous data that would have since been altered. *Id.* ¶17.

Taken together, these two sets of data would enable Defendants to correlate their G5 draws to actual students in immediate need of funds, disproving Plaintiff's contention that Defendants deviated from Title IV requirements when submitting applications. *Id.* ¶¶18, 19, 21. As detailed below, however, despite Defendants' thorough and far-reaching efforts to locate these records, the documents no longer exist and cannot be recreated.  SS. Decl. ¶¶ 20-27.

### A.    Plaintiff Admits It Does Not Possess the Critical Electronic Records

It is precisely because Defendants' ability to defend itself hinges principally on the contemporaneous STARs reports and financial aid records created at the time of the individual draws that early on in discovery (over a year ago) Defendants sought from Plaintiff the entire network drive maintained by FCC in the ordinary course that would contain this data.

On April 24, 2017, Plaintiff produced what it represented was a copy of the hard drive transferred by FCC to IEC--the purchaser of FCC--in September 2014 in connection with the

bankruptcy sale.  Plaintiff further confirmed that it requested and obtained the copy of the hard drive from IEC in Plaintiff's pre-suit investigation of the claims in this case.[1]  Conspicuously missing from the hard drive Plaintiff produced, however, were all of FCC's financial aid directories and STARS data—information that Defendants know existed and was maintained on the FCC network.  SS Decl. ¶¶ 15-16.  As recently as a February 23 hearing, Plaintiff admitted that the financial aid files and STARS reports do not exist on the hard drive it produced.

### B.     IEC Does Not Have the Electronic Documents Either

When Plaintiff confirmed it had failed to produce a full and complete network drive containing the critical student level data, Defendants issued a subpoena to IEC in hopes of obtaining a comprehensive data set.  On September 29, 2017—after lodging objections and engaging in a protracted meet and confer process that carried on for several months—IEC finally agreed to produce nothing short of the entire network drive it obtained from FCC.[2]

On December 5, 2017, less than a week before IEC's scheduled corporate representative deposition, Defendants received two drives from IEC containing multiple terabytes of data.[3] The first drive contained only emails in the form of PST files.  The second drive was completely unreadable and corrupted.  Defendants immediately requested a replacement drive from IEC.[4]

After reviewing the readable replacement drive, Defendants learned that the second drive was not the FCC network at all, but rather a collection of hundreds of individual "local drives" from FCC user desktops.  SS Decl. ¶¶22-23.  And while those local drives contained certain

---

[1] Pursuant to the August 27, 2014 Amended Asset Purchase Agreement ("APA"), IEC obtained the books and records (including electronic records) of FCC and was required to make them reasonably available to Plaintiff upon request.  **Ex. B**, APA, ¶¶ 2.1(p) and 6.3(c).

[2] **Ex. C**, September 29, 2017 email from J. Williams to J. Ward.

[3] IEC sent the same hard drives to Plaintiff. The drives sent to Plaintiff were not corrupted.

[4] On December 12, 2017, days *after* the conclusion of the IEC deposition, Plaintiff sent Defendants a copy of the version of the second drive that was not corrupted.

financial aid records (not contained on the drive produced by Plaintiff), they were only preliminary drafts and not final versions that would have been saved on the FCC shared network drive. *Id*. at 19. Equally concerning, after reviewing this drive that now contained local drives that Defendants had never seen, it became clear that the drive Plaintiff produced in April—that Plaintiff said was complete—was not. In fact, when Defendants compared Plaintiff's April 24 drive to IEC's December 12 drive, they did not contain a single common folder.

In addition to requesting the readable replacement drive from IEC, Defendants also requested that IEC produce the STARS system (and all underlying data associated with the system) in its possession without delay so that Defendants could have the benefit of the information at the upcoming deposition of IEC. It was only in response to that request—just days before IEC's deposition—that IEC refused to provide the STARS system, citing issues related to insufficient hardware and operations.[5]

Defendants then requested that IEC run certain reports from STARS that were specifically target and retrieve the most important information. On December 9, 2017, IEC produced certain accounts receivable reports generated from STARS. Those reports were also deficient in several respects. Most notably, the reports reflected both erroneous and missing data. For example, the "award date" field was missing, and the data provided was from outside of the relevant January 2013-December 2014 time frame that was requested. SS Decl. ¶24.

This led to a February 23, 2018 hearing on Defendants' motion to compel documents from IEC. In response to the Court's inquires regarding the financial aid directories, IEC admitted that it had no understanding as to whether they still existed.[6] Similarly, with respect to

---

[5] **Ex**. **D**, December 7, 2017 email.
[6] **Ex**. **E**, Hrg. Tr. at 62:11-63:3 ("I don't know the definition of financial aid directories. . . . I think that would be contained in the Terabytes of data, but I just don't know.").

the incomplete reports it produced, IEC represented that while they had "resurrected" the "dormant" STARS system and attempted to extract underlying data, they no longer have staff that know how to use the system. The Court then ordered IEC to choose a consultant familiar with STARS to try locate and extract data (at Defendants' expense). As of this filing, however, IEC had not chosen a consultant or projected fees or a completion date for the project.

Thus, despite their Herculean efforts during an extensive, costly and exhaustive discovery process, Defendants still lack critical documents. And while Defendant are appreciative of the process the Court recently put in place to mine the STARS system, Defendants have no reason to believe that the exercise will result in retrieval of the full universe of FCC data that once existed—including, notably, the contemporaneous STARS Pay Lists (that cannot be recreated) and corporate level financial aid directories that no one has been able to locate to date.[7]

### C.  The Incomplete and Misleading Documents Produced by Third Parties

While Plaintiff admits that the very documents that would disprove their allegations no longer exist, it has not hesitated to use documents that (conveniently) *do* exist against Defendants when it suits them. The best example of this is Plaintiff's heavy reliance on a spreadsheet which Plaintiff claims is the "STARS" report containing the student level data for which Defendants have been so desperately searching. **Ex. F,** P2222704 ("Spring Zutes Email").

It is nothing of the sort. While the data in the spreadsheet originated from STARS, it was manipulated after extraction to such an extent that it is not fully representative or helpful. Most

---

[7] At the hearing, IEC went so far as to represent that "there is no network drive. . . this information is all over." *Id.* at 36:21-22. These types of statements—along with IEC's admission that does not know how to identify the corporate financial aid directory even if it did exist—give Defendants little comfort or hope. And given the apparent lack of urgency on IEC's part, even if the process is eventually completed and partially successful, any documents obtained would not be produced before impending deadlines and sufficiently before trial. Of course, should the consultant chosen by IEC miraculously uncover all of the information Defendants seek here, Defendants will immediately notify the Court and withdraw its Motion.

notably, the spreadsheet does not list "no show" or "cancelled" students whose funds were either never received by the schools or were fully refunded by the schools back to DOE.  SS Decl. ¶25. This omission is critical because without those students' data—which could account for up to 10 percent of FCC's total draws—Defendants cannot recreate a payment history based on *all* eligible students during the relevant period.  *Id.* ¶27.

Moreover, the spreadsheet only reflects the student level data at the time the spreadsheet was created (presumably around June 2014) and does not contain historical transaction information associated with each disbursement.  *Id*. ¶25.  Take, for example, a loan transaction that was originally instituted on October 1, 2103 in connection with an eligible student but was thereafter rejected several times before being cleared by COD.  Assume the multiple rejections caused the disbursement to the student to be delayed until February 1, 2014.  The loan would be inaccurately reflected on the spreadsheet as a February 1, 2014 transaction, rather than as a transaction that should be considered in this case in support of an October 1, 2013 draw down.

Another example of the incomplete information on which Plaintiffs rely and against which Defendants have been forced to defend are the reports produced by the DOE from its G5 system that purport to show disbursement dates for loans.  But here as well, the reports lack critical historical information regarding individual student-level loans and disbursements.

The following example illustrates the point.  Assume FCC draws down $1,500 for a student and appropriately disburses the funds three days later.  Assume further that FCC then timely attempts to provide proof to the DOE through COD for the $1,500 draw down, but that the record is subsequently rejected by COD.  DOE's records will show an imbalance between G5 and COD, which Plaintiffs have extrapolated to mean that the funds were improperly taken.  But in point of fact, the imbalance resulted through no fault of Defendants.  Without the benefit of a

contemporaneous STARS report that would provide student level data regarding what occurred before the rejection in terms of (quite legitimate) steps the school took to provide proof for the draws, Defendants are inhibited from demonstrating the validity of their actions.

### III.       The Court Order Requiring the Preservation FCC's Electronic Records

Separate and apart from the transfer of FCC's assets to IEC in connection with the sale, FCC's records—including the electronic records that are the subject of this Motion—were transferred from the Debtors to the Plaintiff when the plan of liquidation was confirmed.[8]  In relevant part, the Plan provides that as of the Plan's effective date, "the Debtors will transfer to the Liquidating Trust *all of their rights, title, and interests in all of the Liquidating Trust Assets*."[9]   The Plan, in turn, defines "Liquidating Trust Assets" to include, in addition to "Excluded Assets"[10] and other things, "all other assets of the Debtors or of the Estates existing on the Effective Date . . . . *including all books, records, and files of the Debtors and of the Estates, in all forms, including electronic and hard copy*."[11]

On March 18, 2015, the Bankruptcy Court entered its Confirmation Order ("Confirmation Order").  The Confirmation Order provides in relevant part:

> **Disposition of Books and Records.**  *From and after the Effective Date, the Liquidating Trustee shall continue to preserve and maintain any documents and electronic data transferred to the Liquidating Trustee by the Debtors and the Liquidating Trustee shall not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Bankruptcy Court after a hearing upon appropriate notice to parties-in-interest under the rules of the Bankruptcy Court*.[12]

---

[8] **Ex. G,** First Amended Plan (the "Plan"), No. 14-11987-CSS (Bankr. D. Del. 2015) [D.E. 373].
[9] *Id.* at § 5.02.  Unless noted, all emphasis is added and all internal quotations are omitted.
[10] "Excluded Assets" refers to assets not transferred to IEC pursuant to the APA.  *Id.* at ¶2.3(a) (defining "Excluded Assets"; **Ex. B**, APA at A-11 (defining "Records").
[11] **Ex. G,** Plan at 10.
[12] **Ex. H,** Confirmation Order, Bankr. D.E. 464 at ¶12.

Pursuant to the clear directives of the Bankruptcy Order and Plan, the records that Defendants seek here ought to have been transferred by the Debtors to the Trustee, should have been preserved by the Trustee, and should be available to this day.  They are not.

## MEMORANDUM OF LAW

### I.     <u>Legal Standard</u>

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.,* 310 Fed. Appx. 298, 301 (11th Cir. 2009).  "[T]he party seeking [spoliation] sanctions must prove . . . first, that the missing evidence existed at one time; second, that the alleged spoliator had a duty to preserve the evidence; and third, that the evidence was crucial to the movant being able to prove its prima facie case or defense."  *EEOC v. GMRI, Inc.,* 2017 WL 5068372, at *22 (S.D. Fla. Nov. 1, 2017).  Once the burden is met, a Court has broad discretion to sanction a party who commit misconduct.  *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 944 (11th Cir. 2005).  "Sanctions for spoliation of evidence are intended to accomplish two objectives: prevent unfair prejudice to litigants and to insure the integrity of the discovery process."  *Alabama Aircraft Ind's, Inc. v. Boeing Co.,* 319 F.R.D. 730, 739 (N.D. Ala. 2017).

### II.     <u>Plaintiff Failed to Preserve Electronically Stored Information</u>

#### A.     **Plaintiff is Responsible for the Spoliation of the Electronic Records**

While the details of the spoliation are unknown, Plaintiff, Defendants and IEC all agree that: (1) the evidence once existed, (2) the evidence was electronically stored, (3) the evidence is now lost, and (4) the evidence cannot be restored or replaced through additional discovery.

The spoliation is a result of one or more of three possibilities: (1) the Chief Restructuring Officer lost or failed to adequately maintain such records before FCC commenced its Bankruptcy case; (2) the FCC estate lost or failed to adequately maintain such records after the Bankruptcy

CASE NO. 16-CV-62028-LENARD/GOODMAN

petition was filed but prior to the effective date of the Plan; or (3) Plaintiff lost or failed to adequately maintain such records after its appointment as the liquidating trustee.

Under each of these scenarios, Plaintiff is responsible for the loss of the evidence.

On April 11, 2014 Sean Harding ("Harding") of FTI Consulting, Inc. ("FTI") was engaged to serve as the Chief Restructuring Officer ("CRO") for FCC.[13]   Principal among the CRO's Scope of Services was to oversee "Critical Operational Process Remediation":

> Our Phase 1 review highlighted the need for operational remediation specifically *around the area of Financial Aid (FA) student application processing and the claiming of Title IV funds from the US Department of Education*. . . . *FTI proposes a deep dive—a forensic review into the FA process and will specify the information, data, and interview requirements necessary to determine the root causes of failure*.   We will stratify these root causes into people, process and technology impacts for this important process.[14]

Thus, by the express terms of the FTI engagement, preservation of FCC's data was essential to Harding's ability to fulfill his duties as CRO to determine the "root causes" of FCC's failure.[15]

Upon the commencement of FCC's bankruptcy, the FCC estate acquired the Debtors' right, title, and interest in any claims or causes of action that the Debtors had against Defendants, subject to the same limitations and defenses that may have existed prior to the commencement of the bankruptcy.   *See* 11 U.S.C. § 541(a); *see also Off'l Com. of Unsecured Creditors of PSA, Inc. v. Edwards,* 437 F.3d 1145, 1150 (11th Cir. 2006) ("there is no suggestion in the text of the Bankruptcy Code that the trustee acquires rights and interests *greater* than those of the debtor" and finding that "[i]f a claim of [the debtor] would have been subject to the defense of *in pari*

---

[13] **Ex. I**, FTI Engagement Letter, Ex. A, Bankr. D.E. 75-2.
[14] *Id.* This work "will also involve of *obtaining of financial and operations data* to ensure critical analysis supports our findings and assertions." *Id.* at 7.1.
[15] FTI and Harding remained in the role of CRO after the bankruptcy commenced**. Ex. J,** Order authorizing the retention of FTI (Sept. 22, 2014), Bankr. D.E. 158.

*delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.").

Once the Plan became effective, the FCC estate transferred its remaining property to Plaintiff, including all causes of action existing before the Plan's effective date.[16]  Thus, Plaintiff is the transferee of all claims of the Debtors, and then to the FCC Estate, and Plaintiff took those claims subject to all limitations, defenses, facts, and circumstances that existed when such claims were held by the Debtors or the FCC Estate.

We now know that the electronic records that Defendants have been seeking are not contained in the multiple terabytes of data produced.  SS Decl. ¶¶20-27.  We also know the spoliation could only have been caused by Plaintiff or one or more of Plaintiff's predecessors-in-interest who were expressly required to preserve the documents at issue.  Regardless of when the failure to maintain FCC's records actually occurred, however, as of the effective date of the Plan, Plaintiff stepped into the shoes of the Debtors for *all purposes* relating to the cause of action inherited—including being charged with the consequences of the spoliation.

> **B.** **Plaintiff or its Predecessors Had a Duty to Preserve the Electronically Stored Information in Anticipation of Litigation**

In some spoliation cases, courts grapple with factual disputes as to whether a party knew or should have known of its preservation duties, which often hinges on whether litigation was anticipated.  *See Graff,* 310 Fed. Appx. at 301 (the test for whether the duty to preserve attaches is whether litigation was "pending or reasonably foreseeable" at the time of the spoliation).[17]

This is not one of those difficult cases.  Here, there is no question that litigation was foreseeable.  Initially, the records resided with FCC under the control of FTI and Harding, who

---

[16] **Ex. G**, Plan at ¶5.02 and definition of "Liquidating Trust Assets" at 10.

[17] The standard for whether litigation should have been anticipated is an objective one based on what a reasonable party in the position would have anticipated.  *Boeing,* 319 F.R.D. at 742.

knew when they were engaged in April 2014 that FCC faced impending bankruptcy litigation. Thus, from the Debtors' and Harding's perspective, litigation was more than anticipated; it was specifically contemplated. Once the bankruptcy proceeding was instituted, the records came into the possession of the Debtors' respective estates—*active litigants* in a bankruptcy proceeding. Here, there was no future litigation to "anticipate"—it was well under way.

Plaintiff also knew full well when it inherited the Debtor's claims and liabilities following confirmation of the Plan that there was no end in sight to litigation. As is the case in any Chapter 11 insolvency, the objective of the liquidating trustee is to maximize the value of the Debtor's estate—including preserving claims against parties that could be responsible for FCC's failure—for the benefit of its constituent creditors. Therefore, from the Trustee's perspective, commencement of post-confirmation litigation was beyond anticipated; it was a virtual certainty.

The CRO was, of course, under the same impression. In fact, not only was the CRO's job requirement to determine the "root cause" of FCC's failure, but he was expressly authorized (in consultation with the Board) to "cause the Company to pursue, settle or compromise any litigation, controversy or other dispute involving the Company."[18]

The fact that litigation was anticipated is further evidenced by the Debtors' negotiation for rights to retain copies of FCC's records (*see* APA ¶2.1(p)) and access information transferred to IEC post-closing. *See* APA ¶6.3(c).[19] The Debtors' estate required that these provisions be included in the APA precisely because it understood the significance of FCC's records to litigation that it would inevitably pursue. Plaintiff's failure to preserve FCC's electronic records is all the more concerning considering Plaintiff clearly knew that FCC's contemporaneous documents would be highly relevant (if not essential) to supporting the claims it was

---

[18] **Ex. I,** FTI Engagement Letter at 13, ¶5(f).
[19] *See* Sections 2.1(p) and 6.3(c).

contemplating.  Thus Plaintiff's failure to maintain these records not only leaves Defendants stripped of its most potent defense, but begs the question: how could Plaintiff file this lawsuit without reviewing documentation of reconciliations that form the basis for its claims?

District courts have found litigation was anticipated under far less compelling circumstances.  *See Storey v. Effingham County,* No. CV415-149, 2017 WL 2623775, at *3 (S.D. Ga. June 16, 2017) (imposing sanctions where litigation was a "distinct possibly", would not be a "surprise", and noting that "the Court cannot fathom a reasonable defendant who would look at [the] facts and not catch the strong whiff of impending litigation on the breeze"); *Boeing,* 319 F.R.D. at 741-42 (defendants' argument that only a mere bid protest and not the current litigation was anticipated "would be to ask the court to assume [defendant] had its head in the sand.").

For all these reasons, the 'anticipation of litigation' standard is clearly satisfied.

C.     **Plaintiff Failed to Take Reasonable Steps to Preserve the ESI By Violating the Confirmation Order Requiring Preservation**

Separate and apart from its preservation obligations under the standard set forth in the rules and the case law, Plaintiff failed to act reasonably when it violated a separate Court Order expressly stating Plaintiff "<u>shall</u> continue to preserve and maintain" the documents at issue.  *See* **Ex. H,** Confirmation Order, at ¶12.  The recent amendment to the Rule 37(e) Advisory Committee Notes makes clear that when a party fails to abide by a separate court order to retain documents at issue, that fact should be taken into account in the sanctions determination.[20]

Plaintiff admits that it requested FCC's network drive from IEC in connection with its pre-suit investigation of its claims and thereafter received the drive.  Presumably, Plaintiff

---

[20] 2015 Amendment ("courts may sometimes consider whether there was an independent requirement that the lost information be preserved.  Such requirements arise from many sources—statutes, administrative regulations, ***an order in another case***, or a party's own information-retention protocols."); *see also Boeing,* 319 F.R.D. at 742 (issuing sanctions where data preservation procedures were specifically contemplated by parties' agreement).

searched for FCC's financial aid records and learned they were missing. Thus, at the very latest, as of August 23, 2016 (the date of the Complaint) Plaintiff was on notice that the drive in received from IEC's was incomplete. Aware of its preservation obligations under the Confirmation Order, Plaintiff should have been concerned. Certainly, a cursory inquiry and investigation into whether the duplicate drive it received from IEC was, in fact, complete should have been conducted before Plaintiff filed its Complaint. But at the very least, Plaintiff should have made such inquiry before making such a representation to Defendants in discovery. It failed to do so, opting instead to simply hand off the deficient drive to Defendants.

As a result of Plaintiff's misrepresentations, Defendants have now been forced to incur substantial expenses tracking down what Plaintiff's knew since case inception: that documents are missing, and as a result, Defendants are disabled from effectively defending this case.

### III.        Defendants Are Irreparably Prejudiced By the Loss of Crucial Evidence

Pursuant to Rule 37(e)(1), a Court may impose sanctions on the spoliating party after finding prejudice to the moving party. *Oil Equip. Co. v. Modern Welding Co*., 661 Fed. Appx. 646, 652 (11th Cir. 2016) (When determining the appropriate sanction Court examines "the extent of the prejudice caused by the spoliation (based on the importance of the evidence to the case), whether that prejudice can be cured, and the culpability of the spoliator.").

Here, the missing evidence is critical and the prejudice to Defendants is overwhelming. Again, this case boils down to whether there is evidence of sufficient eligible students associated with each G5 draw. Yet, incredibly, after more than a year of discovery, twenty-four depositions, and the production of over two terabytes' worth of documents, *the record is devoid* of comprehensive historical student-level disbursement data. The bottom line is Defendants know—to the point of certainty because they lived it—that disbursements were timely and

proper; yet no direct documentary evidence exits to prove it.  Instead, the record consists entirely of circumstantial evidence in the form of (i) fact witness testimony regarding recollections of written information that no longer exists; (ii) expert testimony opining on incomplete data; (ii) a smattering of emails that Plaintiff misinterprets; and (iv) non-final drafts of a fraction of the missing documents.  None of these can possibly serve as a substitute for the actual FCC data— *direct and contemporaneous* evidence of the loan applications at issue.

The degree to which the discovery process has been disrupted by Plaintiff's spoliation is best exemplified by the recent expert discovery phase.  Not surprisingly, the common thread in each of the expert depositions was each expert's ability to prove (or disprove) reconciliation of FCC's draws from G5, the disbursement of such funds to the actual student, and evidence of such disbursement by a corresponding upload into COD of a record proving the disbursement.

While Plaintiff's experts conclude that Defendants are guilty of wrongdoing, both admit that they did not review any student-level data in formulating opinions.   Here is Mr. Donohue:

> Q: Would it be a fair statement to say that you never actually performed a forensic examination of the actual student records that constituted or were submitted in connection with any particular G5 draw-down? A: At that micro level, that would generally be fair. Obviously, I have macro data here that's talking about direct loans and award years and comparing those, ***but I did not prepare an analysis of student detail for STARS draws or STARS records associated with specific draws. I've seen things about them in my work, but my exhibits, as you know, don't relate to that***.[21]

---

[21] **Ex. K,** Dep. Tr., J. Donohue at 58:8-61:4.  Mr. Donohue acknowledged that the data would be helpful to his analysis.  *Id.* at 61:22-62:7.  Mr. Murphy--who relied on Mr. Donohue's findings--testified similarly: Q:  Aside from what Ms. Schmidt was showing you, would it be a correct statement to say that you did not, therefore, review any actual reports from the STARS system in formulating any of your observations?  A:  ***I did not use any reports from STARS to formulate any of my observations.*** **Ex. L**, Dep. Tr. J. Murphy at 43:25-44:6; *see also* at 110:5-18; 172:22-174:9; 180:21-181:10; 129:1-132:10; 145:4-146:21; 148:18-23; 185:19-186:1; 208:15-209:11.

CASE NO. 16-CV-62028-LENARD/GOODMAN

Thus, as Mr. Donohue acknowledges, his purported economic findings are supported entirely by G5 records produced by DOE and miscellaneous and incomplete documents retrieved from the still-existing portion of FCC's network.  These records are not based on actual evidence of individual student disbursements.  Instead, these documents simply record the occurrence of a G5 draw down and a batch upload of cumulative disbursement information.  And thus, this data fails to take into account the possibility the student timely received his or her disbursement but that the disbursement record was rejected by COD, through no fault of the Defendants.

On the other hand, Defendants' expert, Eric Weems, was upfront in his report that his opinions are limited based on the incomplete and unavailable documentary evidence:

> Without access to information missing in this case including student-level data, no one can conclude to a reasonable degree of professional certainty that the Financial Aid office of FCC drew more Title IV funds than that to which it was entitled, or that FCC did not perform reconciliations of its Title IV draws.

**Ex**. **M**, Feb. 14, 2018 Report at ¶4B.  At Mr. Weems' deposition, Plaintiff took full advantage of the situation.  Counsel posited question after question regarding Mr. Weems' inability to state "conclusively" that FCC performed proper reconciliations.  Here are some examples of Mr. Weems explaining that he could not possibly opine without the benefit of the lost documents:

- Q: Do you have any basis for claiming that the data you reviewed in this case is not accurate?  A:  I have no basis, without student level data, no basis to say the data is conclusive. 2/22/18 Dep. Tr. at 46:10-16.

- Q: I thought your opinion is that they were properly reconciling in that period, wasn't it?  A:  I have no documents to show the reconciliations themselves. *Id*. at 144:11-14.

- Q: Do you have an understanding of whether FCC undertook to reconcile those three; G5, COD and STARS?  A:  I have never seen—been able to see any of the reconciliation records from FCC.  *Id*. at 176:24-177:5.

The effect is clear.  On the case's seminal issue—reconciliations—the missing evidence emboldened Plaintiffs to take unsupportable positions and hampered Defendants' expert from offering final opinions.  This speaks volumes to the prejudice to Defendants.  *Compare with US EEOC,* 2017 WL 5068372 at *29, 30 (finding party failed to meet prerequisite for harshest adverse inference instruction where its "expert witness was still able to reach conclusions even without certain [documents] . . . complete his analysis and offer valid opinions in support of the [party]'s position").  Accordingly, the data Defendants seek is far more than relevant or cumulative; it is the <u>only</u> direct documentary evidence to exculpate Defendants completely. *Compare Storey,* 2017 WL 2623776, at *5 (imposing sanctions where evidence was "unique and irreplaceable," deprived party "of the best and most compelling evidence of what happened" and "would have offered the only unbiased and dispassionate depiction of events.") *with Living Color Enter's, Inc. v. New Era Aquaculture, Ltd.,* 2016 WL 1105297, at *6 (S.D. Fla. March 22, 2016) (no sanctions where evidence "appear to be unimportant, and the abundance of preserved information" was sufficient); *ML Healthcare Serv's, LLC v. Publix Super Markets, Inc.,* 881 F.3d 1293, 1309 (11th Cir 2018) (no sanctions where "this is not the sort of case where the unpreserved evidence clearly would have resolved a crucial issue in the case."); *Siciliano v. Target Corp.*, 2015 WL 11348279, at *4 (S.D. Fla. Apr. 24, 2015) (same).

### IV.    <u>Plaintiff's Spoliation Warrants the Imposition of Appropriate Sanctions</u>

Once it is established that a party failed to take reasonable steps to preserve information in anticipation of litigation and that a party has been prejudiced, the Court next considers what curative measures are necessary.  The sanctions imposed should restore the moving party "to the same position he would have been in had the [spoliator] abided their duty to preserve" and

should "(1) deter parties from engaging in spoliation; and (2) place the risk of an erroneous judgment on the party who wrongfully created the risk. *Storey,* 2017 WL 2623775, at *5.

Because Defendants have been denied the ability to use critical evidence to its defense throughout the (now closed) fact and expert discovery periods, an unfair and unrepresentative record of evidence has resulted. Thus, the most appropriate remedy to place Defendants in a comparable position to what they would have been in but for the spoliation is to limit Plaintiff's ability to use the incomplete evidence that was selectively preserved.

Specifically, Plaintiff and its experts should be prohibited from presenting evidence derived from any of the following sources (containing data that can only be rebutted by missing evidence) to support its claim that FFC's Title IV draws were unsubstantiated: (1) the incomplete electronic drive produced by Plaintiff on April 24, 2017; (2) the incomplete electronic drive produced by IEC on December 12, 2017; (3) the G5 data produced by the DOE (DOE 000001-000078); (4) emails and reports purporting to show substantiating balances (*see, e.g.,* **Ex. N**, Donohue Report at Ex. 8))**;** (5) Spring Zutes email and attached spreadsheet (P2222704-05); (6) additional but incomplete reports purportedly generated by STARS produced by IEC (*see, e.g.,* **Ex. N**, Donohue Report at Ex. 2); (7) emails produced by Plaintiff referencing FCC's draws.

The exclusion of evidence as a curative measure is specifically contemplated by the 2015 Amendment to Rule 37 ("In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence. . . ."); *see also E.E.O.C. v. Troy State Univ.,* 693 F.2d 1353, 1358 (11th Cir. 1982) (sanction of limiting admissible evidence appropriate); *E.E.O.C. v. Jacksonville Shipyards, Inc.,* 690 F. Supp. 995, 998-99 (M.D. Fla. 1988) (limitation of evidence

would "remedy the prejudice"); *Graff,* 310 Fed. Appx. at 302 (upholding exclusion of expert testimony as sanction).

At a very minimum, the Court should enter the "mildest of sanctions"—allowing the jury to consider the spoliation. *GMRI, Inc.,* 2017 WL 5068372 at \*27. Specifically, the sanction should (i) permit Defendants to present evidence at trial regarding the circumstances surrounding the irretrievability and relevance of the missing ESI; and (ii) require a jury instruction that evidence of spoliation may be considered. *See* 2015 Amendment (permissible sanction is "allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instruction the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision."); *See also Storey,* 2017 WL 2623755 at \*5 (imposing these sanctions); *GMRI, Inc.,* 2017 WL 5068372 (allowing presentation of evidence of spoliation to jury and the relevance of these materials despite finding missing ESI were not crucial to case); *Managed Care Sols*., 736 F. Supp. 2d at 1334 (explaining that "ruling does not foreclose the possibility that the plaintiff will be able to introduce evidence of the defendant's failure to retain relevant documents at trial.").

## CONCLUSION

When a party selectively retains and purges information at its discretion and then files suit predicated on the selective portions of the information it chose to preserve, the judicial process is turned on its head. That is precisely what has occurred here. Accordingly, issuance of the sanctions set forth herein is necessary to restore fairness and equity to the proceedings. Defendants also seek attorneys' fees and costs incurred uncovering Plaintiffs' spoliation.

CASE NO. 16-CV-62028-LENARD/GOODMAN

<u>REQUEST FOR EVIDENTIARY HEARING</u>

In light of the complexities associated with the spoliation itself, the underlying evidence that no longer exists, and the documents that do exist that Defendants seek to exclude from evidence, Defendants request an evidentiary hearing to provide the Court with an opportunity to further consider relevant documents and testimony.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
  & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By:  */s/ Michael N. Kreitzer*
      **MICHAEL N. KREITZER**
      (FBN 705561)
      mkreitzer@bilzin.com
      **KENNETH DUVALL**
      (FBN 121826)
      kduvall@bilzin.com
      **DAVID W. TRENCH, ESQ.**
      (FBN 0202975)
      dtrench@bilzin.com
      eservice@bilzin.com
      mavin@bilzin.com
      stapanes@bilzin.com
      *Counsel for David Knobel, Jeffrey
      Pierne, Neal Yawn, Dean Bartness,
      Siana Stewart and Cid Yousefi*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2018, I electronically filed the foregoing with the Clerk of Court, using CM/ECF.  I also certify that the foregoing document was served on all counsel of record via transmission of Notice of Electronic filing generated by CM/ECF.

              */s/ Michael N. Kreitzer*
              Michael N. Kreitzer