**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 16-62028-CIV-LENARD/GOODMAN**

| | |
|---|---|
| CLINGMAN & HANGER MANAGEMENT ASSOCIATES, LLC as Trustee<br><br>Plaintiff,<br><br>v.<br><br>DAVID KNOBEL, JEFFREY PIERNE, NEAL YAWN, DEAN BARTNESS, SIANA STEWART, and CID YOUSEFI<br><br>Defendants. | **ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF LAW IN SUPPORT, AND STATEMENT OF MATERIAL FACTS

Defendants David Knobel, Jeffrey Pierne, Neal Yawn, Dean Bartness, Siana Stewart, and Cid Yousefi ("Defendants"), pursuant to Federal Rule of Civil Procedure 56, hereby move for summary judgment on all counts. In support of this Motion, Defendants incorporate the following memorandum of law in support and statement of material facts under Local Rules 7.1(a)(1) and 56.1(a):

I.     <u>Statement of Material Facts</u>

A.  **The Company, FCC**

1.     Prior to 2012, Florida Career College ("FCC") was a post-secondary educational institution with multiple campuses in Florida. Dep. Ex. 190 ¶15 (Dkt. 227-2 at pg. 239).

2.     As of 2012, two private equity firms—Greenhill Capital Partners ("Greenhill") and Abrams Capital ("Abrams")—held the majority interests in the company and controlled four of the five Board seats. Dep. Ex. 47 at P1705822 (Dkt. 238-2 at pg. 208); Harding Tr. 94:7–95:6 (Dkt. 227-1). Plaintiff has not sued either Greenhill or Abrams, or made allegations against them.

B.  **The Defendants and Their Roles**

3.     David Knobel purchased FCC in 1995 and was the majority owner and CEO of the company until 2004, when Mr. Knobel and his wife sold their majority stake in the company, though he continued as CEO until 2007. Knobel Tr. 119:14–20, 134:23–135:9 (Dkt. 221-1). Mr. Knobel returned as CEO from 2011 until April 2014. Knobel Tr. 95:4–6 (Dkt. 221-1).

4.     Jeffrey Pierne was the Chief Financial Officer from December 2008 until August 2014. Pierne Tr. 11:17–19 (Dkt. 238-1). The corporate (also known as "central") Financial Services department reported to Mr. Pierne. Pierne Tr. 14:11–18 (Dkt. 238-1).

5.     Dean Bartness was the Chief Compliance Officer from July 2011 to August 2014. Bartness Tr. 9:21–10:8(Dkt. 226-1). His duty was to ensure compliance with accrediting bodies and state licensure agencies. *Id*. 13:6–12.

6.     Neal Yawn was the Chief Operating Officer from April 2012 until April 2014. Yawn Tr. 7:21–24, 248:7–15(Dkt. 224-1). His duty was to manage daily operations at the individual schools, supervise placement at schools, and oversee the coursework. *Id*. 13–25.

7.     Siana Stewart was Vice President of Financial Services from 2010 until December 10, 2013. Stewart Tr. 7:24–12:21(Dkt. 219-1); Yousefi 100:15–18 (Dkt. 220-1).

8.      Cid Yousefi was the Senior Vice President of Information Technology from November 2013 until August 2014. Yousefi Tr. 7:17–20 (Dkt. 220-1). His duties included overseeing aspects of IT infrastructure. *Id.* 7:22–8:1. From December 10, 2013 until January 13, 2014, Mr. Yousefi had responsibility for Financial Services. Yousefi Tr. 8:2–7(Dkt. 220-1). He was replaced by John Murphy on January 14, 2014. *Id.* 108:24–109:1, 118:18.

### C. The Federal Title IV Process

9.      Under Title IV of the Higher Education Act, the United States Department of Education ("DoE") makes available to students various types of student financial aid.  *See* 20 U.S.C. § 1001 *et seq*. Because of the specific issues raised in this case, the following facts are specific to the DoE's Direct Student Loan Program ("Direct Loan").

10.      Approved schools help administer the Direct Loan program by disbursing Direct Loan funds to students. 34 C.F.R. § 668.16. These schools must qualify for an Office of Post-secondary Education Identification number ("OPEID"). Dep. Ex. 190 ¶36 (Dkt. 227-2 at pg. 239).

11.      Students approved to receive a Direct Loan receive a unique student number called an Institutional Student Information Record ("ISIR"). Davis Tr. 22:4–21 (Dkt. 236-1). When the student ultimately enrolls at a qualified post-secondary school (such as FCC), the school uploads to DoE certain student information to the DoE's Common Origination and Disbursement system ("COD"). Davis Tr. 21:3–6 (Dkt. 236-1).

12.      Under the Advance Payment method allowed by the DoE, a school is permitted to draw down Direct Loan funds from the DoE up to 10 days before a student starts classes. Stewart Tr. 161:14–17 (Dkt. 219-1). The funds are credited to the student's account by posting the disbursement to the student's ledger card. Verga Tr. 22:2–11(Dkt. 234-1). Upon crediting the account, the funds are booked by the school as tuition revenue and may be used by the school for

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

its general operational purposes. Davis Tr. 574:7–12 (Dkt. 239-1); Weems Tr. 304:10–19 (Dkt. 233-1).

13.     The school draws down Direct Loan funds through a DoE computer system called "G5." Dep. Ex. 335 (Dkt. 233-2 at 63). Within three days of drawing down Direct Loan funds, the school must disburse the funds to the student account. 34 C.F.R. 668.162(b)(3). Within fifteen (formerly thirty) days of disbursing the funds to the student account, the school must report the disbursement by uploading student-specific details about the disbursement to the COD system. Davis Tr. 158:9–22 (Dkt. 236-1). The DoE is indifferent as to whether the G5 draw down occurs before or after the upload to COD. Davis Tr. 248:8–17. The purpose of the COD upload is to confirm that the loan proceeds were received and credited to the student. *Id*. 250:16–251:24.

14.     The G5 drawdown is not student specific. Weems 94:23–95:3(Dkt. 233-1). For example, if a school has 500 students entitled to receive a Direct Loan award, the school would ordinarily aggregate the total amount of the awards and make a single draw down in an amount sufficient to make all 500 of the individual student disbursements. *Id*. 94:23–95:3. Once the school disburses the funds from the G5 draw-down to specific students, the upload of the disbursement information to COD closes the loop by informing the DoE as to which students received the funds that had been drawn down. Davis Tr. 23:3–17, 27:16–22, 246:4–15 (Dkt 236-1).

15.     Schools are required to reconcile on a monthly basis, which means that schools must track Direct Loan fund activity both internally (through the school's student information system) and externally (COD and G5). This is a distinct process from actually bringing COD and G5 into balance, which does not occur monthly, but instead occurs one year following the end of

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

an award year. Davis 383:11–12 (Dkt. 239-1); *id.* 390:9–11.

16.    If a student does not show up for classes, the school must refund the funds within thirty days, and if a student shows up for some classes but later withdraws, the school must return the funds within forty-five days. 34 C.F.R. § 668.21–22.

### D.  FCC's Information Systems and Customary Reporting Procedures

17.    At FCC, student-specific records were maintained in a student information system called "STARS." Yousefi Tr. 11:23–13:12(Dkt. 220-1). STARS stored student level data involving virtually every interaction between the student and the school, including student specific financial aid and accounting ledgers ("Student Ledgers") which recorded tuition both owed and/or paid to the school. Stewart Tr. 45:23–46:1(Dkt. 219-1). FCC would disburse Direct Loan funds to the student by entering a credit in the amount of the loan on the Student Ledgers in STARS. Similarly, if the student withdrew or failed to attend classes, FCC would refund some or all of the funds to the DoE and make a corresponding debit entry onto the student ledger in STARS. Turgot Tr. 179:8–21, 196:1–22(Dkt. 231-1).

18.    Separate from the student-specific data maintained in STARS, the accounting and business offices of FCC utilized a financial accounting software package developed by Great Plains, which did not track student specific accounts. Tiab Tr. 129:22–130:7(Dkt. 232-1).

19.    For at least seven years leading up to January 2013, FCC used a product called Carbon to process STARS files for upload to COD. Stewart Tr. 95:11–21, 98:18–23(Dkt. 219-1). Carbon was sold by a financial aid vendor called Regent Education. *Id.* 95:14–21.

20.    The Financial Services office would then transmit the files to COD via a system called EdConnect, which was a DoE product. *Id.* 97:5–98:5; Spirea Tr. 177:18–23 (Dkt. 230-1).

21.    For a brief time in early 2013, FCC utilized a financial aid processing platform called Regent 8, also designed by Regent Education. Lang Tr. 15:2–6 (Dkt. 240-1).

22.     After terminating its use of Regent 8, FCC used the government software called EdExpress to process student records from STARS for submission to COD via EdConnect. Stewart Tr. 98:1–11 (Dkt. 219-1). Processing student records through EdExpress was a manual, time-consuming process. Turgot Tr. 190:13–191:6 (Dkt. 231-1).

23.     In managing Financial Services, Ms. Stewart held weekly meetings. Stewart Tr. 27:21(Dkt. 219-1). Ms. Stewart also disseminated information via email, held ongoing trainings, met with each of her seven direct reports on a weekly basis, and met with Mr. Pierne on a weekly basis. *Id*. 27:22–28:10, 28:18–20, 128:18–22 (Dkt. 238-1).

24.     FCC's management had weekly team meetings whereby the officers and senior vice presidents, including all Defendants, remained apprised of any developments. Yousefi Tr. 119:6–120:9 (Dkt. 220-1).

### E.     The Processing of Direct Loans at FCC

25.     FCC utilized a non-traditional academic calendar. Bartness Tr. 248:15–21. Start dates for various programs were staggered over the calendar year. *Id*. Thus, Financial Services initiated G5 Direct Loan draw downs throughout the year. Dep. Ex. 346 (Dkt. 239-2 at 16).

26.     To determine the amount of Direct Loan funds to be drawn down from G5 at any given time, Financial Services created from STARS a "projected funding report" of students potentially eligible to receive Title IV funds based upon an expected course start date. Stewart 35:3–8, 306:18–21(Dkt. 219-1). This report pulled in any student who had a disbursement projection indicated in their student ledger card. Verga Tr. 18:9–16(Dkt. 234-1).

27.     Financial Services then validated the list to ensure that all of the proper documentation was in place and that the students were attending school. Stewart Tr. 35:9–13(Dkt. 219-1). This process was known as "packaging," and Financial Services would

5

determine which students were "ready to pay" in the sense of eligibility for access to Direct Loans. *Id* 37:1–9, 302:16–303:12.

28.     Through this process of reviewing the projected funding report and packaging students to ensure they were "ready to pay," Financial Services generated the final payment roster (in the form of an Excel file) upon which FCC would base its draws from G5. Stewart Tr. 35:14–17, 35:25–36:24, 37:18–38:9 (Dkt. 219-1); Dep. Ex. 19 (Dkt. 219-2 at pg. 111).

29.     After the payment roster was finalized, there were three actions that needed to be performed. Stewart Tr. 33:16–35:16 (Dkt. 219-1).

      a.   FCC first disbursed funds to students by posting a credit to the student's Student Ledger, which is maintained in STARS. *Id*. 36:20–24;  Pierne Tr. 161:13–17 (Dkt. 238-1).

      b.   FCC submitted student-level proof of disbursement to COD. Stewart Tr. 33:16–34:2, 36:23 (Dkt. 219-1). This proof was submitted according to the regulations (15 or 30 days depending on a regulatory amendment). Yousefi Tr. 156:24–25, 103:20–21(Dkt. 220-1); Verga Tr. 79:21–23 (Dkt. 234-1); Spirea 113:15–18 (Dkt. 230-1).

      c.   Further, FCC drew down the funds from G5. Stewart Tr. 36:23–24 (Dkt. 219-1); Spirea 218:11–20 (Dkt. 230-1).

30.     The amount of loan funds that FCC accessed through G5 was always based upon a payment roster. Verga 285:25–286:2 (Dkt. 234-1); Turgot 192:14–20, 195:15–25 (Dkt. 231-1); Spirea 188:21–189:15 (Dkt. 230-1); Murphy Tr. 240:20–248:1(Dkt. 228-1).

31.     On a weekly basis, FCC ran reports from STARS to calculate and process Direct Loan refunds or returns for students who had never attended classes or who withdrew after

B I L Z I N  S U M B E R G  B A E N A  P R I C E  &  A X E L R O D  L L P

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

starting to attend, respectively. Stewart Tr. 114:4–12(Dkt. 219-1). FCC ensured that refunds were always processed in a timely manner. Yousefi Tr. 166:23–167:14(Dkt. 220-1).

32.     Also on at least a monthly basis, Ms. Stewart and her department would reconcile the records in STARS to the records in COD. Yousefi Tr. 110:10–12(Dkt. 220-1).

33.     After extensive discovery, Plaintiff has **admitted** that:

a.     It cannot prove that Defendants drew down Title IV funds improperly for even one student. Pl. Interrog. Resp. No. 9 ("The Trustee does not contend and has not alleged that an improper draw of Title IV funds was made for any particular student.") (Dkt. 218-1).

b.     It cannot prove that there was even a single instance where Defendants relied upon an "inflated" projection of students when drawing down loan funds. Pl. Interrog. Resp. No. 13 ("The Trustee is not aware of and has not alleged individual identifiable inflated projections of enrollment numbers.") (Dkt. 218-1).

c.     It cannot prove even a single instance of a student for whom Defendants failed to timely refund or return loan monies. Pl. Interrog. Resp. No. 10 ("The Trustee is not aware of, and has not alleged, any specific instance of an identifiable student for whom one or more Defendants failed to reconcile and return Title IV funds.") (Dkt. 218-1).

d.     It cannot prove even a single instance where Defendants underreported a student withdrawal. Pl. Interrog. Resp. No. 11 ("The Trustee is not aware of and has not alleged any specific identifiable instance of underreported student withdrawals.") (Dkt. 218-1).

e.     It cannot prove even one occasion where Defendants acknowledged the necessity for a refund by posting information to COD but failing to actually make the refund. Pl. Interrog. Resp. No. 12 ("The Trustee has not described nor alleged in paragraph 60 any

7

specifically identifiable instances of Defendants posting a refund to FCC's ledgers without having made the refund") (Dkt. 218-1).

### F. Defendants Yawn and Bartness Had No Role in Connection with Financial Services and Plaintiff's Claims.

34.     Mr. Yawn did not have a role in processing, submitting, or overseeing the Title IV financial aid program; corporate Financial Services handled this process. Stewart Tr. 34:15–16, 35:3–17, 37:17–38:9, 43:7–11 (Dkt. 219-1). Nor was Mr. Yawn responsible for reporting student withdrawals. Yawn Tr. 182:10–19 (Dkt. 224-1).

35.     Mr. Bartness was not responsible for overseeing the corporate Financial Services office. Bartness Tr. 57:10–16(Dkt. 226-1); Pierne Tr. 21:24–22:21 (Dkt. 238-1).

### G. FCC's Auditor Found No Material Issues with FCC's Internal Controls.

36.     Since approximately 2006, FCC's financial aid processes were inspected by an independent auditing firm that determined FCC to be compliant with DoE regulations. The Compliance Attestation process included on-site testing of student records and all of FCC's reporting systems and would span multiple days. Wood Tr. 39:21–40:1 (Dkt. 235-1). Each yearly engagement would require 100-200 hours of audit work. *Id.* 40:12–41:8. Among other things, the Compliance Attestation tested for material errors and discrepancies including, but not limited to, fraud or illegal acts. *Id.* 170:19–24.

37.     For the 2012–13 academic year, the firm Deemer Dana & Froehle LLP ("Deemer Dana") issued written attestations that FCC's financial aid processes were compliant with, *inter alia*, federal Title IV requirements. Wood Tr. 8:14–9:12, 29:22–30:4 (Dkt. 235-1). Specifically, Deemer Dana found that "Florida Career College complied in all material respects with the aforementioned requirements for the year ended June 30, 2013." Dep. Ex. 279 at TJS007517 (Dkt. 235-2 at pg. 152). As part of the audit, Deemer Dana independently verified that FCC was

reconciling STARS with COD, Wood Tr. 139:23–140:12, and that FCC was not drawing down funds from G5 without a roster to support the draw. *Id.* 121:22–123:9.

38.     The "aforementioned requirements" referred to in the above paragraph (¶37) include, but are not limited to, DoE requirements, such as institutional eligibility, COD reporting, student eligibility, disbursements, refunds/return of Title IV funds, G5 system and cash management, and administrative capability. Dep. Ex. 279 at TJS007517 (FCC OPEID) (Dkt. 235-2 at 152); Dep. Ex. 283 at TJS004649 (Anthem OPEID) (Dkt. 235-2 at 211); Dep. Ex. 284 at TJS003438 (Bryman OPEID) (Dkt. 235-2 at 234); Dep. Ex. 286 at TJS001367 (Parsippany OPEID) (Dkt. 235-2 at 270); Dep. Ex. 285 at TJS000370 (Springfield OPEID) (Dkt. 235-2 at 253) ; Dep. Ex. 282 at TJS002420 (Maryland Heights OPEID) (Dkt. 235-2 at 192).

39.     Deemer Dana attempted to perform the closeout audits on the FCC schools that closed in August 2014. Wood Tr. 80:22–25(Dkt. 235-1). A closeout audit is required by the DoE for schools that cease operations. Wood Tr. 77:24–78:17(Dkt. 235-1).

40.     But officials at FCC's successor company, IEC, as well as FCC's Chief Restructuring Officer, Sean Harding, refused to engage any firm, including Deemer Dana. Wood Tr. 80:22–25(Dkt. 235-1); Harding TR. 210:2–211:2 (Dkt. 227-1). The closeout audit was never performed. Mortensen Tr. 90:25–91:16 (Dkt. 229-1).

41.     In addition to Deemer Dana's attestations, FCC received program reviews from the DoE during the 2012–13 academic year, which further validated its processes. For example, the DoE reviewed the Anthem Phoenix Online division in April 2013, and the DoE not only made no substantive findings, but also issued an expedited program review determination letter, which is an extremely rare practice. Dep. Ex. 72 at P1167440 (Dkt. 224-2).

B I L Z I N   S U M B E R G   B A E N A   P R I C E   &   A X E L R O D   L L P

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

### H.  The Anthem Acquisition

42.    In  April  2012,  FCC's  board  voted  to  acquire  Anthem  Education  Group ("Anthem"), which, at the time, comprised twenty-three schools. Dep. Ex. 190 ¶27(Dkt. 227-2 at pg. 239). Inasmuch as FCC only operated eleven schools at the time, the acquisition nearly tripled the size of FCC. *Id*. ¶49.

### I.  Implementation of Regent 8, Corruption of COD Data, and Mass Rejects

43.    As a consequence of the astronomical growth of the student body caused by the acquisition of the Anthem schools, FCC implemented a new product from Regent called Regent 8 to introduce greater automation into the process of submitting student records to COD and to place FCC and Anthem schools on a unified platform. Yousefi Tr. 8:24–9:5(Dkt. 220-1); Pierne Tr. 35:13–36:3 (Dkt. 238-1); Stewart Tr. 172:23–25(Dkt. 219-1); Dep. Ex. 190 ¶48 (Dkt. 227-2 at pg. 239).

44.    Regent 8 processed data from STARS into a format that could then be submitted from the school to COD. Lang Tr. 63:21–68:2 (Dkt. 240-1). Specifically, Regent 8 would receive a  student  batch  load  file  containing  student  records,  which  Regent  8  would  combine  with information from the DoE (including COD files) to create a file that could be submitted to the DoE. *Id*. 63:21–68:3, 175:15–176:6.

45.    Before  implementing  Regent  8,  FCC  tested  the  product  in  a  simulated environment but could not test the program in a live environment, as the DoE systems did not support such testing. Stewart Tr. 174:10–20 (Dkt. 219-1).

46.    On January 23, 2013, FCC activated Regent 8 across its schools. Dep. Ex. 279 at 20 (Dkt. 235-2 at pg. 152). Upon its implementation, Regent 8 corrupted student records in COD, causing a mass rejection of disbursement records submitted by FCC. Stewart Tr. 172:8–22(Dkt. 219-1); Pierne Tr. 60:8–11(Dkt. 238-1); Lang 226:14–21, 300:1–19, 300:1–19 (Dkt.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

240-1); Dep. Ex. 190 ¶48 (Dkt. 227-2 at pg. 239). By altering data in COD, Regent 8 impacted future eligibility of students and affected disbursement records. Lang Tr. 76:12–24, 98:19–22, 103:4–11(Dkt. 240-1). In November 2013, Deemer Dana independently confirmed that Regent 8 had corrupted COD records and caused rejects. Wood Tr. 170:25–172:20 (Dkt. 235-1). FCC has not been alone in encountering issues with Regent products. Davis 295:7–296:19 (Dkt. 236-1).

47.    FCC deactivated Regent 8 and began submitting student records to COD through a more manual process with EdExpress, which FCC had previously used before the Anthem acquisition. Stewart Tr. 177:10–14 (Dkt. 219-1); Davis Tr. 20:25–21:18 (Dkt. 236-1). Nonetheless, COD continued rejecting student records even after Regent 8 was deactivated. Stewart Tr. 177:14–178:7, 184:3–8 (Dkt. 219-1).

### J.    FCC successfully addresses the reject issue in the 2012–13 academic year.

48.    Ms. Stewart, Mr. Yousefi, and others at FCC expended significant effort working with Regent to try to fix the software issue and correct the data that had been corrupted within the COD system. Stewart Tr. 174:12–175:5 (Dkt. 219-1); Pierne Tr. 322:25–323:19 (Dkt. 238-1); Yousefi Tr. 83:21–84:6, 159:14–160:2 (Dkt. 220-1). But Regent was never able to fully identify or fix the issue. Stewart Tr. 174:12–175:8 (Dkt. 219-1); Lang Tr. 357:6–9 (Dkt. 240-1).

49.    The task of correcting was manual and very labor-intensive, requiring a record-by-record process of reviewing individual errors in records and correcting them. Stewart Tr. 173:12–174:7 (Dkt. 219-1). The DoE realized that FCC was "having trouble fixing their rejects in their system to be able to send them to COD so that the disbursement data would accept." Davis Tr. 55:11–18(Dkt. 236-1). In an email, the DoE attributed the problem to the Regent 8. Dep. Ex. 291 at 3 (Dkt. 236-2 at pg. 230).

50.    The DoE observed a massive numbers of rejects and a growing imbalance between the funds drawn down on G5 (to fund student tuition) and the amount of accepted

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

student records into COD. Dep. Ex. 291 at 4(Dkt. 236-2 at 230). The DoE recognized that FCC "has a really good reconciliation history," and that the school was simply going through a "rough patch while implementing some new software." *Id.* At no time did the DoE ever conclude that the imbalance between G5 and COD was caused by a failure on the part of the school to disburse Title IV funds to students.

51.    On April 22, 2013, the DoE placed the six FCC OPEIDs on a "records first" status. This status meant that funds would only be available on G5 after records were first submitted to and accepted (i.e., not rejected) by COD. Dep. Ex. 291 at 4 (Dkt. 236-2 at 230). Given FCC's excellent track record, the DoE expected that the imbalance would be resolved within two weeks. *Id.* at 2.

52.    Mr. Pierne advised Ms. Stewart that Financial Services could hire as much temporary staff as necessary to address assist with manually correcting the corrupted data. Stewart Tr. 184:15–25(Dkt. 219-1). Ms. Stewart utilized these additional resources and hired many additional staff to assist with the manual reject project. *Id.* 176:21–177:7, 114:23–25, 184:18–25. Mr. Knobel also remained apprised of the situation, staying in contact with Ms. Stewart and Mr. Pierne during the process. Dep. Ex. 8, 9 (Dkt. 219-2 at pgs. 43 and 45); Stewart Tr. 204:12–24 (Dkt. 219-1).

53.    On May 9, 2013, the DoE placed four of FCC's schools (all historic Anthem OPEIDs, not including the historic FCC OPEID) onto "freeze cash" status until the reject issue was resolved. Dep. Ex. 292 (Dkt. Dkt. 236-2 at 234). This status meant that the schools were not allowed to draw additional Title IV funds until any unsubstantiated funds were substantiated or returned. Davis Tr. 51:7–52:10(Dkt. 236-1); Dep. Ex. 292(Dkt. 236-2 at 234).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

54.     By May 30, though, FCC had made progress in reducing rejects by manually reviewing student records and attempting to correct the defective data causing the reject issue Stewart Tr. 177:1–178:7 (Dkt. 219-1); Dep. Ex. 190 ¶49 (Dkt. 227-2 at pg. 239).  The DoE accordingly lifted the freeze cash for some schools on June 25, 2013 (Davis Tr. 312:20–23).

55.     By that date, FCC had balanced most of the G5/COD discrepancy, at which point the DoE thanked Ms. Stewart and Mr. Knobel for their efforts in resolving the situation and removed all schools but one (OPEID 02239200) from the "freeze cash" status. Stewart Tr. 178:19–24, 213:5–8 (Dkt. 219-1); Dep. Ex. 11(Dkt. 219-2 at pg. 64); Dep. Ex. 190 ¶49 (Dkt. 227-2 at pg. 239).   On July 2, 2013, the DoE removed the "freeze cash" status from the remaining OPEID. Dep. Ex. 294(Dkt. 236-2 at pg. 257).

56.     Moreover, the DoE also removed the schools from the "records first" status, with the final OPEID being removed from that status in November 2013. Davis Tr. 59:4–9(Dkt. 236-1). Thus, FCC had successfully addressed the rejects issue for the 2012–13 academic year. Stewart Tr. 177:10–14, 186:5–21(Dkt. 219-1).

### K.  The Reject Problem Returns in 2013–14, and Defendants Again Respond.

57.     Beginning in November 2013, the reject issue re-appeared, with up to 75% of records being rejected by COD. Stewart 179:1–13, 187:17–25(Dkt. 219-1). Ms. Stewart concluded that the January 2013 Regent 8 corruption had affected not only data fields relevant to the 2012–13 financial aid year, but also additional data fields that would only arise upon a student's return for the 2013–14 award year. Stewart Tr. 309:10–16(Dkt. 219-1); Yousefi Tr. 85:16–23(Dkt. 220-1). Thus, although FCC had fixed the 2012–13 academic year data fields in the student records at COD, the 2013–14 academic year data fields remained corrupted until they were specifically addressed. Stewart Tr. 177:8–178:7(Dkt. 219-1); Yousefi Tr. 83:25–84:6(Dkt. 220-1); Weems Report ¶91(Dkt. 243-1); Dep. Ex. 190 ¶51 (Dkt. 227-2 at pg. 239).

58.     Because most students at FCC at a given time were returning (not new) students, most students in the 2013–14 year had records at COD during the Regent 8 implementation. Yousefi Tr. 157:15–158:15(Dkt. 220-1). Indeed, one type of latent error that remained undiscovered by FCC until a reject was encountered involved the "origination fee." Davis Tr. 321:22—324:7(Dkt. 236-1). On October 1 of each year, origination fees increase for loans with a first disbursement on or after October 1. Davis Tr. 321:22—324:7 (Dkt. 236-1); Weems Report ¶92(Dkt. 243-1). If a school submits a record with an incorrect origination fee, the record will be rejected. Davis Tr. 321:22—324:7 (Dkt. 236-1).

59.     The DoE realized that origination fees were one of FCC's larger challenges and invited an individual with knowledge about origination fee processing issues to "hear some of the challenges [FCC] is having." Dep. Ex. 295 (Dkt. 236-2 at 260).

60.     As before, Mr. Pierne authorized funds for Ms. Stewart to retain additional staffing to process the rejects. Stewart Tr. 189:10–15(Dkt. 219-1). While navigating through the massive rejects, Ms. Stewart and her department continued to ensure that G5 draws were based only on payment rosters. Stewart Tr. 239:18–22, 277:12–13(Dkt. 219-1).

61.     In June 2013, FCC hired Mr. Yousefi as a consultant to help address the Regent 8 problems, including running the pilot of Regent 8 for one of the smaller OPEIDs. Stewart Tr. 273:21–273:2 (Dkt. 219-1); Yousefi Tr. 7:8–16, 93:7–16 (Dkt. 220-1). Financial Services also added employees to deal with the rejections. Spirea Tr. 179:6–15 (Dkt. 230-1).

62.     Notwithstanding the continuing efforts to correct student records, the imbalance between G5 and COD remained during the 2013–14 academic year. Dep. Ex. 44 (Dkt. 221-2 at pg. 234). Importantly, the imbalances did not reveal any evidence that Title IV funds were not being disbursed to the student ledgers.  Instead, the imbalances (the existence of which does not

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

violate any DoE regulation) demonstrated that records from STARS evidencing the individual student level disbursements were not being accepted by COD. Davis TR. 55:15–18 (Dkt. 236-1). Based on the experience with the DoE in the 2012–13 academic year, FCC anticipated that it would have until June 20, 2014 to substantiate any funds and balance COD and G5. Dep. Ex. 44(Dkt. 221-2 at pg. 234); Dep. Ex. 50(Dkt. 220-2 at pg. 22).

63.     However, on March 4, 2014, the DoE advised that all unsubstantiated funds over thirty days old needed to be substantiated by the end of March. Dep. Ex. 38 (Dkt. 221-2 at 173). Mr. Yousefi informed Mr. Pierne of the efforts being made by himself and Mr. Murphy in addressing the unsubstantiated funds, and Mr. Pierne in turn relayed this information to Mr. Knobel. Knobel Tr. 282:1–283:2 (Dkt. 221-1).

**L.    The DoE Places FCC Back on "Records First."**

64.     On March 31, 2014, the DoE again placed FCC on "records first." Knobel 268:8–10 (Dkt. 221-1). Importantly, the decision to place FCC back on records first did not cause FCC to lose access to any Title IV funds whatsoever. Davis Tr. 45:19–46:25 (Dkt. 236-1). As in 2013, the records first directive merely meant that COD had to accept (i.e., not reject) the student records submitted by FCC before matching funds would be available on G5. *Id.* 46:11–46:25.

65.     The DoE never took any action, administrative, civil, or otherwise, against FCC or any Defendants. *See, e.g.,* Davis Tr. 437:18–24 (Dkt. 239-1).

**M. The Plaintiff and Its Pre-suit Investigation**

66.     Plaintiff is Clingman & Hanger Management Associates, LLC, the liquidating trustee on behalf of the bankrupt entity FCC. Clingman Tr. 5:24–6:1, 9:20–23(Dkt. 237-1).

67.     Plaintiff has no personal knowledge about any of the facts of this case beyond what documents its principals have read during the course of their pre-suit investigation. Clingman Tr. 28:12–18, 52:22–53:4, 84:20–23(Dkt. 237-1).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

## II.   Summary Judgment Standard

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant negates an essential element of the nonmoving party's claim or demonstrates that the nonmoving party's evidence is insufficient to establish an essential element of its claim, the burden shifts to the nonmoving party to come forward with evidence demonstrating a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).

"By its very terms, [Rule 56] provides that the mere existence of **some** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no **genuine** issue of **material fact**." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). A fact is material only if it might affect the outcome of the suit under the governing law. *Id.* An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50, 2511.

Similarly, "[u]nsupported speculation" does not create a genuine issue of material fact, *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir.2005), and 'bare and self-serving"' allegations made without personal knowledge are inadequate to survive summary judgment. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

In *Celotex*, the Supreme Court held that a party moving for summary judgment is not required to expressly negate the opponent's claims. *Id*. at 323, 2553. Rather, the Court explained, summary judgment is appropriate if, after a reasonable period for discovery, the non-movant has failed to make a showing sufficient to establish an element of its claims:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. **In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.** The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Id*. at 322-23, 2552-53 (emphasis added). The Court noted that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id*. at 323-24, 2553.

## III.   <u>Argument</u>

Plaintiff brings two claims for breach of fiduciary duty: one claim for breach of the duty of care and one for breach of the duty of loyalty.[1]  To establish its claim against each Defendant for breach of the duty of care, Plaintiff must show that the business judgment rule does not apply, which it can only do by showing that Defendants acted with reckless indifference or by actions that are beyond the bounds of reason.

To establish its claim for breach of the duty of loyalty against any particular Defendant, Plaintiff must prove that a given Defendant (1) acted on self-interest adverse to the company or (2) intentionally violated the law. Plaintiff also attempts to bring a *Caremark* claim against

---

[1] As determined in this Court's order disposing of the motion to dismiss the Amended Complaint, Delaware substantive law applies to this diversity action. (Dkt. 173 at 6–7).

Defendants, but as shown below, such a claim cannot be made against officers such as Defendants, and if it did, Plaintiff cannot prove it.

### A. Defendants Did Not Breach Their Duty of Care.

#### 1. The Business Judgment Rule Applies to All Defendants.

The fiduciary duty of care under Delaware law is tempered by the Business Judgement Rule ("BJR"). Delaware law affords directors making decisions on behalf a corporation a set of presumptions—known as the BJR—that, so long as management has no conflicting interest in the decision, their decision will not later be second-guessed by a court if it is undertaken with due care and in good faith. *Gagliardi v. TriFoods Int'l, Inc*., 683 A.2d 1049, 1051 (Del. Ch. 1996). The BJR, which applies even if a business decision later turns out to have been unwise, is the centerpiece of Delaware corporate law. The BJR is essentially a principle of "non-review." *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 33–34 (Del. Ch. 2014).

As correctly observed by this Court in its order denying dismissal of the Amended Complaint (Dkt. 173 at 8 n.4), although binding authority does not exist, there is ample persuasive authority that the BJR should be applied to the conduct of officers so that all Defendants have the benefit of the BJR. Delaware state courts have repeatedly stated in dicta that the BJR applies not only to the board of directors, but also to officers. *See, e.g., Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del.1995) ("the business judgment rule attaches to protect corporate **officers** and directors and the decisions they make") (emphasis added); *In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 125 (Del. Ch. 2009) ("[The *Caremark* obligation] does not eviscerate the core protections of the business judgment rule—protections designed to allow **corporate managers** and directors to pursue risky transactions without the

B I L Z I N   S U M B E R G   B A E N A   P R I C E   &   A X E L R O D   L L P

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

specter of being held personally liable if those decisions turn out poorly.") (emphasis added).[2]

Further, other courts interpret Delaware law as applying the Rule to officers. *See, e.g., RSH Liquidating Tr. v. Magnacca,* 553 B.R. 298, 317 n.12 (Bankr. N.D. Tex. 2016) ("The business judgment rule protects officers just as it does directors." (citing *Cede & Co. Cinerama, Inc. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993))).[3]

---

[2] *See also, e.g., Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.,* 906 A.2d 168, 193 (Del. Ch.2006) ("The business judgment rule exists precisely to ensure that directors **and managers** acting in good faith may pursue risky strategies that seem to promise great profit.") (emphasis added); *see generally* R. Franklin Balotti, Jesse A. Finkelstein, and Blake Rohrbacher, Del. L. of Corp. and Bus. Org § 4.10 Delegation by a Board of Directors, 2006 WL 2450219, at *6 n.244 (collecting additional Chancery Court cases).

[3] Moreover, the great weight of case authority beyond Delaware has applied the Rule to officers. *See Selcke v. Bove,* 258 Ill. App. 3d 932, 935, 629 N.E.2d 747, 750 (1994) (collecting cases). Florida is among the majority of jurisdictions applying the Rule to officers. *AmeriFirst Bank v. Bomar,* 757 F. Supp. 1365, 1376 (S.D. Fla. 1991) ("Under the business judgment rule, officers and directors of a corporation are presumed to have acted properly and in good faith.").

Likewise, the leading treatise on corporate law considers the issue beyond debate:

> It is too well settled to admit of controversy that ordinarily neither the directors <u>nor the other officers of a corporation</u> are liable for mere mistakes or errors of judgment, either of law of fact. . . . This rule is commonly referred to as the 'business judgment rule,' and applies to decisions of <u>executive officers</u> as well as those of directors. The business judgment rule is premised on the notion that those to whom the management of the corporation has been entrusted are primarily responsible for judging whether a particular act or transaction is one which is helpful to the conduct of corporate affairs.

3A Fletcher, Cyclopedia of Corporations § 1039, at 45 (Perm rev. ed. 1986) and § 1039, at 4 (Supp.1992) (emphasis added); *see also* Treatise on the Law of Corporations (3d), Directors' and Officers' Duties of Care and Loyalty, § 10:1 Directors' duty of care: the policy, purpose, and costs (same).

In addition, both the American Law Institute ("ALI") and the American Bar Association ("ABA") provide that the Rule applies to officers. *See* Gianfranco A. Pietrafesa, *Application of the Business Judgment Rule to Corporate Officers*, N.J. Law., December 2006, at 80–81 [hereinafter "Pietrafesa"] (citing ALI Section 4.01 and ABA Section 8.42). Virtually every other commentator agrees that the Rule applies to officers.[3]

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

The BJR as applied to the conduct of the Defendants requires that the Court to presume that "in making a business decision the [defendants] acted on an informed basis and in the honest belief that the action taken was in the best interests of the company and its shareholders." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746–47 (Del. Ch. 2005) ("*Disney II*"). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *In re Orchard Enters., Inc. Stockholder Litig,*, 88 A.3d 1, 34 (Del. Ch. 2014) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). It is "an elementary precept of corporation law [that] in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi*, 683 A.2d at 1051.

"Irrationality is the outer limit of the business judgment rule." *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000).  Under this standard, "[c]ourts do not measure, weigh or quantify [management's] judgments." *Brehm*, 746 A.2d at 264. Courts "do not even decide if [the judgments] were reasonable. . . . [because] [d]ue care in the decisionmaking context is process due care only." *Id*.

"[W]hether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for . . . liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests." *Caremark,* 698 A.2d at 967–68. "To employ a different rule—one that permitted an 'objective' evaluation of the decision—would expose [management] to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests." *Id*.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Thus, "the business judgment rule "operates as both a procedural guide for litigants and a substantive rule of law." *McMullin v. Beran*, 765 A.2d 910, 916–17 (Del. 2000). "Procedurally, the initial burden is on the . . . plaintiff to rebut the presumption of the business judgment rule." *Id*. Substantively, if the plaintiff fails to meet that evidentiary burden, "the business judgment rule attaches and operates to protect the individual director-defendants from personal liability for making the board decision at issue." *Id*. "[B]ecause . . . [the BJR] is so powerful . . . [it] frequently is determinative of the outcome[.]" *Mills Acquisition Co. v. Macmillan, Inc*., 559 A.2d 1261, 1279 (Del. 1989).

"[I]n instances where directors have not exercised business judgment, that is, in the event of director inaction, the protections of the business judgment rule do not apply. Under those circumstances, the appropriate standard for determining liability is widely believed to be gross negligence . . . ." *In re Walt Disney Co. Derivative Litig*., 907 A.2d 693, 749 (Del. Ch. 2005) ("*Disney I*"). "Duty of care violations are actionable only if the directors acted with gross negligence, which is conduct that constitutes **reckless indifference or actions that are without the bounds of reason**." *Zutrau v. Jansing*, No. CIV.A. 7457-VCP, 2014 WL 3772859, at *17 (Del. Ch. July 31, 2014), *aff'd*, 123 A.3d 938 (Del. 2015), and *aff'd*, 123 A.3d 938 (Del. 2015) (footnote and internal quotation marks omitted) (emphasis added).

2.  Defendants Acted in Good Faith.

On the record here, there is no evidence that any of the Defendants' actions in attempting to right the ship upon discovery of the data corruption debacle caused by the Regent 8 software were not taken in good faith. Thus, the protections of the BJR preclude Plaintiff from second-guessing Defendants' decision-making. Plaintiff cannot point to any plausible evidence that the decisions by any one or more of Defendants lacked any rationally-conceivable basis.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Although the fact of FCC's ultimate bankruptcy is undisputed, Plaintiff must prove that Defendants' decisions lacked any rational basis, and not simply point to the bankruptcy. *See, e.g., In re Caremark Int'l Inc. Derivative Litig*., 698 A.2d 959, 972 (Del. Ch. 1996) (finding inadequate support for conclusion that defendants lacked good faith despite "huge" liability).

The summary judgment evidence is unequivocal that FCC never had any material issues with the timeliness of financial aid processing until the ill-fated implementation of the Regent 8 software at the beginning of 2013. SMF ¶¶21, 46. The decision to deploy Regent 8 was warranted and reasonable because of the need to process a nearly three-fold increase in the student body population occasioned by the Anthem acquisition in 2013.[4] SMF ¶¶42–43. Ms. Stewart properly tested Regent 8, and Regent represented that its product was designed for its intended purpose. SMF ¶¶44–45 Moreover, FCC had used a previous Regent product (Carbon) for many years without incident. SMF ¶19.

Immediately upon deployment of Regent 8, the program caused FCC to upload erroneous data into thousands of student records maintained within the DoE's COD database. The software's failure became known almost immediately and Ms. Stewart acted promptly to take Regent 8 off-line. SMF ¶¶46–47. The damage, however, was both pervasive and deeply hidden. It was pervasive in the sense that in the subsequent months, FCC's attempts to upload student disbursement records into COD was met with recurring file rejections. SMF ¶47. At the same time, the full scope and breadth of the corruption was not apparent. SMF ¶¶58–59. Additional staff was employed to correct corrupted data that was known. SMF ¶¶52. But the corruption was so widespread that data fields within the COD records that were not relevant to 2012/2013 financial aid award year, and therefore not the cause of a COD rejection during the early months

---

[4] Although Mr. Knobel had a minority voting position on the Board, Plaintiff has made clear that he is being sued only in his capacity as an officer and not a director. (Dkt. 173 at 33).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

of 2013, would later become apparent as FCC attempted to process the same student in a new financial aid award year. SMF ¶¶46–47, 58.

To be clear, there is no evidence that any Defendant caused a draw down of Title IV monies that were not actually disbursed to an eligible student. SMF ¶¶33, 37–38. However, the growing disparity between the amounts of funds drawn down from G5 to pay for student tuition as compared to the amount of student disbursement records accepted by COD drew the attention of the DoE.  SMF ¶50.  As the disparity grew, DoE acted to protect itself. *Id*.  Ultimately, the DoE placed FCC on records first on April 22, 2013 and later instituted a complete freeze of Title IV fund draw-downs until the COD reject issue could be resolved.  SMF ¶¶51, 53.  The issue was believed to have been resolved on June 25, 2013 when the cash freeze was lifted.  SMF ¶¶54, 56.

An audit conducted in 2013 independently confirmed that blame for the reject issue rested with Regent 8 and also confirmed that at no time during the 2012–13 award year did FCC engage in any improper conduct in connection with Title IV regulations. SMF ¶¶36–38, 41. In other words, FCC was determined to properly draw down Title IV monies, properly disburse such monies to student, and properly reconcile such monies. SMF ¶41.

 In November 2013, the final FCC schools were removed from "records first" status and thereafter allowed to process Title IV funds as they had traditionally done by using the Advance Pay method. SMF ¶58. In December, however, the number of rejected files spiked. SMF ¶58. The school continued to timely disburse monies to students from the Title IV funds received from G5, SMF ¶56, but, as before, the disparity between the G5 balances and the amount of student disbursement records accepted by COD grew as the incidence of COD record rejects grew greater. SMF ¶43.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Each Defendant was made aware of the problem. SMF ¶43.  Defendants immediately reacted increasing the size of the financial aid team, first to understand and then to correct the corrupted data problems. SMF ¶46. Multiple errors were identified that were unique to the 2013-14 award year could not have been reasonably detected when files were being repaired earlier in the 2013 school year. SMF ¶58.

For reasons unrelated to the Regent 8 corruption issue, Ms. Stewart left the employment of FCC in December of 2013. SMF ¶57. By early 2014, FCC had over twenty employees working on various aspects of the financial aid process, including processing the student records through the EdExpress program and additional personnel to work on reconciling the records between COD and G5.

In January, 2014, John Murphy became the new Vice President of Financial Services. who is not a defendant in the case. In the period between Ms. Stewart and Mr. Murphy, Mr. Yousefi took over management of Financial Services, but only for a period of approximately 3 weeks in January 2014. SMF ¶8.

As was the case in 2013, the growing disparity between the amount drawn down from G5 account and the disbursement records uploaded to COD caused the DoE to return FCC to records first as of March 31, 2014. SMF ¶64. Title IV funding never was frozen and the school continued to draw down Title IV funds even after the Records First directive was issued.  SMF ¶64.

Significantly, none of the Defendants were in charge of Financial Services beginning on January 14, 2014.  The DoE's action to change the method of payment to records first occurred about 3 months **after** John Murphy took control of the Financial Services department. SMF ¶64.

There is no evidence that any Defendant violated any provision of Title IV. Specifically, at no time did FCC draw down monies without a qualified student on a roster, nor is there any

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

evidence that any funds drawn down from Title IV were not disbursed to an actual student for whom the draw was made. And there is no evidence that FCC was not reconciling internally and externally on a monthly basis.[5] SMF ¶¶61, 63. Further, the DoE's Anthem Phoenix Online review also confirmed for the 2012–13 academic year that the school was compliant with Title IV regulations. SMF ¶37.

A close-out audit would have conclusively revealed any conduct on the part of Defendants that was not complaint with Title IV regulations. Such an audit was required by the DoE in order to allow the sale of some of the FCC schools to IEC in August 2014 SMF ¶39. Regardless, Plaintiff, the Board of FCC, and IEC each refused to pay for the audit and thus no audit was performed. SMF ¶40. What is known is that the DoE has never taken any action— civil, administrative, or otherwise—against any Defendant SMF ¶66.

Although Plaintiff's focus is result-oriented (i.e., the bankruptcy must be someone's fault), the Court's focus here must be process-oriented. Defendants did not act recklessly in deciding to use Regent 8, in trying to fix Regent 8 over the course of months, or in working diligently to clear the rejects as they occurred. To the contrary, Defendants acted with good faith efforts to manage the extraordinarily difficult situation beyond their control. Thus, the Court should grant summary judgment as to the count for breach of the duty of care in favor of all Defendants.

### B. Defendants Did Not Breach Their Duty of Loyalty.

1. Plaintiff Fails to Provide Any Evidence of Self-Dealing.

As the Court knows, "[t]he burden required for a plaintiff to rebut the presumption of the business judgment rule is a difficult one[.]" *In re Citigroup Inc. S'holder Derivative Litig.*, 964

---

[5] The DoE's requirement that schools reconcile internally and externally on a monthly basis does not mean that the G5, COD and STARS accounts must balance. Rather, the recompilation is designed to identify reasons for why the accounts do not balance. SMF ¶15.

A.2d 106, 125 (Del. Ch. 2009). But "the burden to show bad faith is even higher." *Id*. As explained in *Disney I*, a plaintiff seeking to prove a breach of the duty of loyalty must prove a case of bad faith. 906 A.2d at 66–67.

"Evidence of mere self-interest alone is not enough." *Goodwin v. Live Entm't, Inc*., No. CIV. A. 15765, 1999 WL 64265, at *25 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999). "Rather, there must be evidence of substantial self-interest suggesting disloyalty, such as evidence of entrenchment motives, vote selling, or fraud." *Id. See also, e.g., Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 363–64 (Del. 1993) (holding that "self-interest, alone, is not a disqualifying factor" and that to rebut the BJR, "there must be evidence of disloyalty"), *decision modified on reargument*, 636 A.2d 956 (Del. 1994).

In its operative Complaint, Plaintiff alleges that some Defendants had an adverse interest to the company because they had stock (or even mere options) in the company. *See* Am. Compl. ¶141 (Dkt. 85). Merely holding stock cannot create a disqualifying self-interest because "[i]f that were so, shareholders could never be directors or officers." *Long v. Lampton*, 324 Ark. 511, 522, 922 S.W.2d 692, 699 (1996). *See also, e.g., Moran v. Household Int'l, Inc*., 490 A.2d 1059, 1074 (Del. Ch. 1985) ("[B]y the very nature of corporate life, a director has a certain amount of self-interest in everything he does[.]" (quoting *Johnson v. Trueblood*, 629 F.2d 287, 292 (C.A.3 1980))), *aff'd*, 500 A.2d 1346 (Del. 1985), *and disapproved of on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc*., 845 A.2d 1031 (Del. 2004); *Asarco, Inc. v. Court*, 611 F. Supp. 468, 473 (D.N.J. 1985) ("[T]he fact that [the] directors own stock is not sufficient to deprive their decision of the benefit of the business judgment rule"); *In re SRC Liquidation LLC*, No. AP 15-50771-BLS, 2017 WL 5501488, at *9 (D. Del. Nov. 16, 2017) (observing that

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

"directors' stock ownership is not sufficient to deprive their decision of the benefit of the business judgment rule" (applying Ohio law)).

Moreover, Defendants' stock options or vested stock (or even variable incentive plans), if any, only meant that they "had every interest in ensuring that the company would remain profitable." *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 (Del. Ch. 2006). "One cannot conjure up . . . a scenario whereby these [defendants] had a personal motive to undermine the long-term viability of [the company]." *Id.* Plaintiff has simply adduced no summary judgment evidence to prove that Defendants had a self-interested motive to sabotage their own employment prospects.

### 2.   Plaintiff Fails to Provide Any Evidence of an Intentional Violation of Law.

A "knowing violation of the law" is an "example[] of subjective bad faith." *Disney I*, 906 A.2d at 67. To make this onerous showing, Plaintiff must establish that "the fiduciary act[ed] with the **intent** to violate applicable positive law." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (emphasis added). *See also, e.g., Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("[B]y **consciously causing** the corporation to violate the law, a director would be disloyal to the corporation[.]") (emphasis added).  Accordingly, "[b]ad faith is a high standard." *OptimisCorp v. Waite*, No. CV 8773-VCP, 2015 WL 5147038, at *69 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016).

In the instant case, Plaintiff identifies five regulations within Title IV that Defendants allegedly violated: (1) The Prompt Disbursement Rule; (2) The Immediate Need Rule; (3) The Reconciliation Rule; and the (4) Return (and R2T4) Rule.  It should be noted that Plaintiff failed to allege which of the Defendants violated which of the regulations, although it is plain that not all of the Defendants had a meaningful role in the processing of Title IV funds. *See In re*

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

*Emerging Commc'ns, Inc. Shareholders Litig.,* No. CIV.A. 16415, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004) ("The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director."). It also bears repeating that the DoE never brought charges against FCC let alone any of the Defendants for an alleged violation of the law. SMF ¶66.

### a. **Plaintiff Cannot Show That Defendants Intentionally Violated the "Prompt Disbursement Rule" and/or Related Regulations**

Under 34 C.F.R. § 668.21, an institution is required to disburse funds received from G5 to students within three days of receipt of such funds. At all times material, FCC did, in fact, disburse all Title IV funds received from the DoE to the student accounts upon which the draw was made. SMF ¶61. In fact, Plaintiff has failed to adduce any summary judgement evidence that Defendants failed to disburse funds timely to students, let alone intentionally so.

The record evidence proves that FCC did in fact disburse funds within three days. MSF ¶13. In fact, the testimony is uncontroverted that the customary business practice of FCC was to disburse to the students' accounts by crediting the student's ledger card <u>even before</u> FCC would drew down the Title IV funds. SMF ¶¶12–13.

For the same reason, there is no evidence that Defendants failed to hold Title IV funds in "trust." *See* 34 C.F.R. § 668.161(b). Upon crediting the student accounts with the cost of tuition (and other eligible expenses), the required immediate disbursement rule is fulfilled. Thereafter, the school is entitled to realize the revenue for its operational purposes. SMF ¶12. Plaintiff's theory appears to be that the funds must be held by the school in perpetuity. But the argument is nonsensical. Once the student's account is credited, the school must be able to utilize the funds for its own operations. *Id.*

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

In the same vein, because any Title IV funds received by the school became operating revenue of FCC after disbursement of the funds to student accounts, Plaintiff's claim regarding "kiting" funds has no merit. *Id.* Without ever citing a single regulation, Plaintiff invents from whole cloth the notion that an institution cannot use operating funds which originated through one OPEID for whatever legitimate purpose the school may have. It is uncontroversial that FCC will often have a duty to refund to the DoE some or all of the Title IV tuition originally paid to the school upon a withdrawal or no-show. By definition, since the Title IV money was booked as revenue after disbursing to the student account, the source of the monies to be refunded belong to the school until such time as they are refunded. Thus, it is not only proper, but expected, that the school might use revenue paid to it through one OPEID to make a Title IV refund to another OPEID. *Id.* In fact, such a practice was never frowned upon by FCC's auditors or the DoE. SMF ¶¶ 37–38, 42, 67.

### b. *Plaintiff Fails to Show That Defendants Intentionally Drew Down Funds Beyond Students' Immediate Need.*

Under 34 C.F.R. § 668.14(b)(1)–(2), an institution shall time its draw down requests to meet the institution's immediate needs for such funds. Here, there is no genuine dispute that Defendants drew down money based upon student rosters. Every witness who worked at FCC during the relevant time frame testified that draws were in fact based upon rosters. SMF ¶¶ 29–31. Moreover, every non-Defendant former FCC employee who upon whom inquiry was made testified similarly under oath. SMF ¶ 38.

Moreover, John Murphy—an ally of Plaintiff who was not sued, but who succeeded Siana Stewart as the Vice President of Financial Services—directly refuted Plaintiff's theory: "it wasn't as cut and dry as . . . people were simply saying, 'I need a million dollars. I'm taking a

B I L Z I N   S U M B E R G   B A E N A   P R I C E   &   A X E L R O D   L L P

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

million dollars.'" SMF ¶30. Instead, the "draw downs were done based on information for potential funds that . . . people believed were going to be available . . . ." *Id.*

Drawing down funds based upon projected students is perfectly permissible under Title IV; it is the bedrock upon which the advance payment method is founded. As Murphy admitted: "[T]hese funds were believed to have been available at one point or were going to be available; and **they were drawn down in accordance with the ability to draw down the Title IV funds**." *Id.* (emphasis added). There is no evidence that funds were drawn down without immediate student need, and Plaintiff surely cannot show that any Defendant intentionally drew down funds without matching immediate need.

Through the lens of the DoE, it observed a widening disparity between G5 and COD, first in the spring of 2013, and again in the winter of 2013. But the disparity is easily explained by COD student record rejects caused by the Regent 8 corruption and not by any improper conduct on the part of one or more of the Defendants. Although Plaintiff relies on various charts and graphs that magnify the COD/G5 discrepancy, the cause of the discrepancy is never explained by Plaintiff.

Plaintiff also completely misunderstands Mr. Yawn's role regarding this regulation and Title IV more generally. Plaintiff alleged that Mr. Yawn "submitted inflated projected enrollment numbers" that formed the basis for draws not based upon immediate need. Am. Compl. ¶6(a). But Mr. Yawn simply had nothing to do with financial aid processing. SMF ¶¶6, 35.  Rather, his duties lay elsewhere with operations at the campus level.

### c. *Plaintiff Fails to Show That Defendants Intentionally Failed to Reconcile.*

Under 34 C.F.R. § 685.300(b)(5), the DoE provides that an institution must reconcile its internal records with COD on a monthly basis. Here, the testimony and documents in this case

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

prove that FCC did, in fact, reconcile on a monthly (or even more frequent) basis. SMF ¶¶32–33, 37, 50. Plaintiff, though, conflates reconciliation—which simply means analyzing and identifying the differences between the systems—and substantiation, i.e., actually bringing the systems into mathematical balance. SMF ¶62. The requirement that a school must reconcile every thirty days only means that the school must keep record of the reasons for any imbalance between its internal systems and COD. SMF ¶15. But actual "substantiation" in the sense of bringing G5 and COD into complete balance does not have to occur until a full year following the end of the award year. *Id*. Plaintiff's evidence again falls short of establishing that the regulation was violated, let alone intentionally so.

### d. *Plaintiff Fails to Show That Defendants Intentionally Failed to Refund or Return Loan Monies.*

Under 34 C.F.R. § 668.21(b), an institution shall refund monies to Title IV within thirty days of becoming aware that the student has not begun attendance ("Refund"). Similarly, under 34 C.F.R. § 668.22(j), an institution should return monies within forty-five days of determining that a student has withdrawn from classes (known as Return to Title IV, or "R2T4"). The record is clear that Defendants did not intentionally fail to make refunds or R2T4. SMF ¶¶31, 13.

Also, Plaintiff's allegation specifically as to Mr. Yawn again misses the mark. In its Amended Complaint, Plaintiff alleged that Mr. Yawn "systematically underreported student withdrawals," but no evidence has borne this out. Am. Compl. ¶6(a). Mr. Yawn was not responsible for reporting student withdrawals. As he testified, student withdrawals were recorded into STARS at the campus level by personnel who would be in the position to know whether the student had withdrawn. SMF ¶34. Indeed, Mr. Yawn specifically testified that responsibility for tracking the withdrawals did not rest at the corporate level, let alone with Mr. Yawn specifically. *Id*.

31

3.   Plaintiff Fails to Bring a Proper *Caremark* Claim, and Cannot Prove One in Any Event.

Plaintiff's final claim is, if anything, its most difficult to establish. A "*Caremark* claim" alleges a breach of the fiduciary duty of loyalty based on a failure to monitor." *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006)). "In a typical Caremark case, plaintiffs argue that the defendants are liable for damages that arise from a failure to properly monitor or oversee employee misconduct or violations of law." *In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009).

A *Caremark* claim requires the Plaintiff to prove facts satisfying one of two conditions— either that (1) "the directors utterly failed to implement any reporting or information system or controls;" or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Id.* at 370. "Thus, to establish oversight liability a plaintiff must show that the directors knew they were not discharging their fiduciary obligations or that the directors demonstrated a conscious disregard for their responsibilities such as by failing to act in the face of a known duty to act." *Citigroup*, 964 A.2d at 123.

"The [*Caremark*] test is rooted in concepts of bad faith; indeed, a showing of bad faith is a necessary condition to director oversight liability." *Id.* A *Caremark* claim requires a showing that "the directors acted with **scienter** which, in turn, requires not only proof that a director acted inconsistently with his fiduciary duties, but also most importantly, that the director **knew** he was so acting." *Horman v. Abney*, C.A. No. 12290-VCS, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) (citation and brackets omitted) (emphasis added)). Because of these high standards, *Caremark* claims have "been considered '**possibly the most difficult theory in corporation**

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

law[.]'" *In re China Auto. Sys. Inc. Derivative Litig.*, 2013 WL 4672059, at *7 (Del. Ch. Aug. 30, 2013) (quoting *Stone*, 911 A.2d at 372) (footnotes omitted) (emphasis added).

### a.   Plaintiff Fails to Bring a Proper Caremark Claim.

Plaintiff appears to assume that a *Caremark* claim can be brought against officers as well as directors, but this confidence is misplaced. Defendants are not aware of a single case in Delaware state court applying the *Caremark* analysis against officers. For this fundamental reason, Plaintiff's *Caremark* claim must fail.

Under *Caremark*, "[t]he claim is that the **directors** allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." *Caremark*, 698 A.2d at 967. (emphasis added). In *Stone*, where the Delaware Supreme Court adopted and refined *Caremark*, the Court described *Caremark* as "articulat[ing] the necessary conditions predicate for **director** oversight liability[.]" 911 A.2d at 370 (emphasis added).

Every case in the State of Delaware since has applied *Caremark* only to directors. *See, e.g., Citigroup*, 964 A.2d at 123; *Horman*, 2017 WL 242571.[6] For example, in the recent case of *Horman*, the Chancery Court described *Caremark* as "review[ing] the state of **director** oversight law and described the circumstances under which could hold **directors** personally liable for harm caused to the corporation under the theory that the **directors** 'violated a duty to be active

---

[6] The only case of which Defendants are aware that extended *Caremark* to officers is *In re World Health Alternatives, Inc.*, 385 B.R. 576, 591–92 (Bankr. D. Del. 2008). In that case, the Court conflated the basic premise that officers are subject to certain fiduciary duties with the novel proposition that officers are subject to claims for director oversight liability. *Id*. Defendants do not dispute that officers are subject to some fiduciary duties, but there is no authority in Delaware law holding or even suggesting that officers can be sued for the board's failure to monitor.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

monitors of corporate performance.'" 2017 WL 242571, at *7 (quoting *Caremark*, 698 A.2d at 697 (emphasis added)).

The policy rationale behind *Caremark* claims is to hold the board of directors accountable for their duty to monitor the officers and employees of the company. But this rationale does not extend to officers, who do not have similar oversight responsibilities over the entire company. For example, in *Horman*, the Chancery Court discussed the existence of the board's audit committee as well as various other compliance departments, such as a legal department. 2017 WL 242571, at *8. But officers such as Defendants cannot be held accountable for any failure of the board to constitute an audit committee or to create certain departments within the company, such as an in-house legal department. Therefore, this Court should not recognize a *Caremark* claim against Defendants.

### b. *Plaintiff Fails to Show That FCC Had No Information Systems in Place.*

Assuming, *arguendo*, that officers are subject to *Caremark* claims, there is no genuine dispute that FCC had adequate systems in place. "Obviously the level of detail that is appropriate for such an information system is a question of business judgment." *Caremark*, 698 A.2d at 970 (Del. Ch. 1996). "And obviously too, no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law." *Id.*

It is undisputed that FCC had multiple information systems in place to monitor student information and help ensure compliance with Title IV regulations First, FCC used STARS to keep track of various types of student data, including academic progress, financial aid eligibility, and student ledger (balance) activity. SMF ¶17. FCC had used STARS for years without

incident. SMF ¶18. Second, FCC used the Great Plains system to track higher-level financial information; like STARS, FCC used this system without incident. SMF ¶18.

Third, FCC used various systems to assist in processing data from STARS into a format that could be reported to COD. In the past, FCC had the Carbon product for this purpose. SMF ¶19. FCC would then transmit the processed files to COD by FCC via DoE's system called EdConnect. SMF ¶20. Subsequently, FCC used a system offered by the DoE itself, EdExpress, in lieu of Carbon. SMF ¶22. After the Anthem acquisition, FCC required a system with greater automation than EdExpress, and opted to use another product from Regent called Regent 8. SMF ¶43. When Regent 8 malfunctioned, FCC reverted to using EdExpress. SMF ¶47. Thus, there can be no dispute that FCC deployed several systems to manage and monitor financial aid processes, which is a far cry from "utterly failing" to have systems in place.

### c. *Plaintiff Fails to Show That Defendants Consciously Failed to Monitor Their Information Systems.*

Given that FCC had multiple systems in place, Plaintiff must show that a Defendant consciously failed to monitor the systems. But there is no evidence that the Defendants responsible for monitoring the financial aid systems consciously disregarded any reporting from the systems. To the contrary, the evidence shows that Defendants were consumed with attempts to address the problems arising from the Regent 8 failure. SMF ¶¶48–56.

Regarding Mr. Knobel and Mr. Pierne, Delaware law does not expect such highly-placed officers to have "detailed information about all aspects of the operation of the enterprise. Such a requirement would simple be inconsistent with the scale and scope of efficient organization size in this technological age." *Caremark*, 698 A.2d at 971. Nonetheless, they not only monitored the situation, but also provided resources the address the Regent 8 and reject issues. SMF ¶52.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Given Plaintiff's failure to allege any insight into Defendants' states of mind under Delaware law, Plaintiff is required to point to obvious "red flags" ignored by Defendants in order to warrant the inference that they consciously violated the warnings being given off by FCC's systems. *South v. Baker*, 62 A.3d 1 (Del. Ch. 2012). But instead of ignoring the "red flags," Defendants instead reacted to them with diligence. SMF ¶¶48–56.

Defendants were not alone in encountering problems with Regent. The Department of Education's corporate designee testified that other schools experienced issues with Regent software, and more specifically, experienced the exact same type of issue: rejected student records at COD, which would cause an imbalance between the funds drawn down on G5 and the funds accepted at COD. SMF ¶46.

Again, the mere fact that Plaintiff claims that losses were caused by Defendants' alleged actions is immaterial. Under *Caremark* itself, massive liability resulting from **criminal** violations does not even create a breach of fiduciary duty. 698 A.2d 972 ("The liability that eventuated in this instance was huge. But the fact that it resulted from a violation of criminal law alone does not create a breach of fiduciary duty by directors."). Here, Plaintiff has not established any violations of law, let alone of a criminal nature.

### d.  *Plaintiff Fails to Establish a Genuine Dispute that Mr. Bartness Was in Charge of Title IV Compliance.*

Plaintiff's only allegation against Mr. Bartness is a *Caremark*-style claim: that he failed to ensure that FCC complied with Title IV regulations. Am. Compl. ¶6(e). But Plaintiff simply assumed that because Mr. Bartness' title was Chief Compliance Officer, Mr. Bartness was necessarily responsible for all forms of compliance at FCC, including compliance at the corporate financial aid office. Not so.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Mr. Bartness testified that he was not responsible for overseeing the corporate financial aid office. SMF ¶35. Likewise, the two individuals who reported to Mr. Bartness, Tatsiana Tuchinsky and Sandra May, had no responsibility for ensuring Title IV compliance at the corporate level. *Id*.

Plaintiff has no evidence to create a genuine dispute that Mr. Bartness had any responsibility for ensuring compliance with Title IV vis-à-vis any of the regulations at issue in this case. Therefore, this Court should grant summary judgment in favor of Mr. Bartness.

## IV.   <u>Conclusion</u>

Plaintiff has failed to collect any evidence showing that Defendants acted with the intent or reckless disregard necessary to establish that they could be personally liable for the tens of millions of dollars Plaintiff seeks. For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment and enter judgment in favor of Defendants on all counts.

## V.   <u>Request for Hearing</u>

Pursuant to Local Rule 7.1(b)(2), Defendants request oral argument for their Motion for Summary Judgment. Given the expansive record in this case, Defendants submit that a hearing might be helpful to the Court in ruling upon the Motion. Defendants estimate that two hours should provide sufficient time for both sides to present their arguments and respond to questions from the Court.

B I L Z I N   S U M B E R G   B A E N A   P R I C E   &   A X E L R O D   L L P

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
  & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By:    /s/ Michael N. Kreitzer
       **MICHAEL N. KREITZER**
       (FBN 705561)
       mkreitzer@bilzin.com
       **KENNETH DUVALL**
       (FBN 121826)
       kduvall@bilzin.com
       **DAVID W. TRENCH, ESQ.**
       (FBN 0202975)
       dtrench@bilzin.com
       eservice@bilzin.com
       mavin@bilzin.com
       stapanes@bilzin.com
       *Counsel for David Knobel, Jeffrey*
       *Pierne, Neal Yawn, Dean Bartness,*
       *Siana Stewart and Cid Yousefi*

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2018, I electronically filed the foregoing with the Clerk

of Court, using CM/ECF.  I also certify that the foregoing document was served on all counsel of

record via transmission of Notice of Electronic filing generated by CM/ECF.

          */s/ Kenneth Duvall*
          Kenneth Duvall