Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                    FORT LAUDERDALE DIVISION
3                    No. 16-62028-CIV-LENARD/GOODMAN
4     CLINGMAN & HANGER MANAGEMENT
      ASSOCIATES, LLC, as Trustee,
5
                     Plaintiff,
6     vs.
7     DAVID KNOBEL, JEFFREY PIERNE,
      NEAL YAWN, DEAN BARTNESS, SIANA STEWART,
8     and CID YOUSEFI,
9                    Defendants.
      _____/
10
                             One S.E. Third Avenue
11                           Miami, Florida
                             February 9, 2018
12                           9:36 a.m. - 5:50 p.m.
13
14            VIDEO DEPOSITION OF JIM DONOHUE
15
16        Taken before SUZANNE VITALE, R.P.R., F.P.R.
17    and Notary Public for the State of Florida at Large,
18    pursuant to Notice of Taking Deposition filed in the
19    above cause.
20
21
22
23
24
25

Page 2

1 APPEARANCES:
2
    On behalf of Plaintiff:
3
    STORCH AMINI PC
4 2 Grand Central Tower
    140 East 45th Street
5 25th Floor
    New York, New York 10017
6 BY: LITA BETH WRIGHT, ESQ.
7
    On behalf of Defendants:
8
    BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
9 1450 Brickell Avenue
    23rd Floor
10 Miami, FL  33131
    BY:  MICHAEL N. KREITZER, ESQ.
11
12 ALSO PRESENT:
13    Bijan Amini (via phone)
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2            I N D E X
3
    Examination                    Page
4 Direct      By Mr. Kreitzer:          4
5
6            DEFENSE EXHIBITS
7 No.                            Page
8 Exhibit 321   Notice                 5
    Exhibit 322   Expert Report of Jim Donohue   33
9 Exhibit 323   Amended Complaint          88
10       CERTIFIED QUESTION:  Page 30:
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1 Thereupon the following proceedings were had:
2        THE VIDEOGRAPHER:  We are now on the video
3 record for the videotaped deposition of Jim
4 Donahue in the matter of the case Clingman
5 Hanger Management Associates, LLC, versus David
6 Knobel, et al.
7        Today is Friday, February 9th of 2018, and
8 the time is 9:36 a.m.
9        At this time, counsel, please say your
10 appearances for the record and after this, the
11 court reporter will swear in the witness.
12        MS. WRIGHT:  Lita Beth Wright from the
13 Storch Amini for witness.
14        MR. KREITZER:  Michael Kreitzer on behalf
15 of the defendants.
16 Thereupon:
17            JIM DONOHUE
18 a witness named in the notice heretofore filed,
19 being of lawful age and having been first duly
20 sworn, testified on his oath as follows:
21        THE WITNESS:  I do.
22            DIRECT EXAMINATION
23 BY MR. KREITZER:
24    Q.  Mr. Donohue, good morning.
25    A.  Good morning.

Page 5

1        (Thereupon, the referred-to document was
2 marked by the court reporter for Identification as
3 Defendant's Exhibit 321.)
4 BY MR. KREITZER:
5    Q.  Thanks for joining us today.
6        Mr. Donohue, I'm showing you what's been
7 marked as Exhibit 321, which is a notice of taking
8 the videotaped deposition duces tecum.
9        Have you seen this document before?
10        MS. WRIGHT:  Do you have a copy for me?
11        MR. KREITZER:  I gave it to you.
12        MS. WRIGHT:  Thanks.  Sorry.
13        THE WITNESS:  I don't believe I have.
14 BY MR. KREITZER:
15    Q.  This document required you to bring
16 certain documents with you today.  Those documents
17 are identified on page 7 of the actual notice.
18        Did you have a discussion with your
19 counsel about bringing any of these documents with
20 you today?
21    A.  No.
22    Q.  Did you bring with you documents and
23 communications concerning compensation for your
24 expert study or testimony?
25    A.  I did not bring documents with me today to

2 (Pages 2 - 5)

Page 6

1  the deposition.
2      Q.  How much are you being compensated for --
3  well, let's start with your expert study.
4          How much were you compensated for the
5  preparation of your expert study?
6      A.  My firm has billed approximately
7  $200,000 to date in this matter.
8      Q.  How much are you being paid to testify
9  here today?
10     A.  During this matter, my hourly rate --
11         MS. WRIGHT:  Objection to form.
12         THE WITNESS:  -- for my firm for my time
13     is 575 per hour.
14  BY MR. KREITZER:
15     Q.  So are you being paid 575 an hour to being
16  be here?
17         MS. WRIGHT:  Object to the form.
18         THE WITNESS:  Yes, my firm is billing
19     575 an hour for my time, my time today and my
20     time in my work.
21  BY MR. KREITZER:
22     Q.  All right.  And do you charge a different
23  rate for your testimony at trial?
24     A.  No.
25     Q.  So to the extent you testify in this case

Page 7

1  at trial, would it be a correct statement to say
2  that you will also be paid $575 an hour for that
3  testimony?
4          MS. WRIGHT:  Objection to form.
5          THE WITNESS:  Not totally.  My firm would
6      bill 575 an hour for my work in this matter and
7      that would include hours required to testify.
8  BY MR. KREITZER:
9      Q.  Are you a partner in your firm?
10     A.  No.
11     Q.  Do you share in the profits generated by
12  your firm?
13     A.  Well, I'm an employee.  So the revenues
14  and profits are used to pay my salary.
15     Q.  All right.  And do you make a bonus in
16  addition to your -- strike the question.
17         Do you make a base salary?
18     A.  I do.
19     Q.  Okay.  Are you paid a bonus in excess of
20  your base salary?
21     A.  Bonus and salary is part of my
22  compensation structure, yes.
23     Q.  All right.  And how is your bonus
24  compensation derived?
25     A.  Many factors.  But, generally, it's my

Page 8

1  performance and my work for the firm in many facets.
2      Q.  And do you also share in the profits of
3  the firm?  Do you receive any kind of profit
4  participation?
5      A.  Not a profit sharing plan, if you will.
6  Again, it's more that the profits and revenues
7  generate my salary and bonus, for example.
8      Q.  So, in other words, would a component of
9  your bonus include the profitability of the firm?
10     A.  By definition, the revenues and profits
11  for the firm would fund the salaries and bonus that
12  all employees receive, including me.
13     Q.  Do you receive any percentage of the
14  profits of your firm?
15     A.  Not directly like that.  It would be more
16  my salary and bonus would be funded by the
17  performance of the firm and of myself.
18     Q.  Okay.  And does your -- in connection with
19  your bonus compensation, is that formulaic or is it
20  more discretionary?
21     A.  There's some formula and some discretion.
22     Q.  What is the formula?
23     A.  I wish I knew, but I understand that they
24  look at things like revenue.  They look at things
25  like billable hours.  They look at my contribution

Page 9

1  to training, my contribution to client development
2  and consultant development, things like that.  It's
3  multifaceted.
4      Q.  So to the extent you're spending time
5  here, you would be generating billable hours,
6  correct?
7      A.  Correct.
8      Q.  So the more time you spend on this matter,
9  the higher your bonus compensation would be,
10  correct?
11         MS. WRIGHT:  Objection.
12         THE WITNESS:  It's hard to say.  If my
13     time that year and the firm that year has
14     performed, yes, it could reach a point where
15     additional time would help.  But, generally,
16     the more hours you have and the more you
17     perform and the more you provide service for
18     the firm in terms of training and things like
19     that, yes, that would generally increase my
20     compensation.
21  BY MR. KREITZER:
22     Q.  Okay.  You were also asked to bring with
23  you documents and communications identifying facts
24  and data that either the Storch Amini firm or the
25  Weissman and Dervishi firm had provided to you in

3 (Pages 6 - 9)

Page 10

1 connection with formulating your opinions in this
2 case.
3          Did you bring any of those documents with
4 you?
5     A.   As I said, I didn't bring documents with
6 me.  I have a report and things in this case, but I
7 didn't bring anything with me physically today.
8     Q.   All right.  You didn't even bring your
9 record; is that correct?
10    A.   I did bring my report, yes.
11    Q.   Does your report contain the actual facts
12 and data that -- let me strike the question.
13         Does your report contain any documents
14 that would have contained facts or data that the
15 Storch Amini firm had provided to you?
16    A.   My report contains quotes, cites and
17 information that is within those documents, but
18 obviously it doesn't attach the documents.  Those
19 documents are in the record which I understand has
20 been produced to the parties.
21    Q.   Is every document that was produced to you
22 by the Storch Amini firm referenced in some capacity
23 in your report?
24    A.   Either directly or indirectly, because I
25 cite the ranges of information available to me.

Page 11

1 They are referenced that way.
2          Some are cited directly with quotes and
3 things like that.  Others are within the Bates stamp
4 range that was available to me.
5     Q.   All right.  In connection with the Bates
6 stamp ranges that are set forth in your report,
7 would it be a correct statement to say that every
8 single document that you reviewed in connection with
9 formulating your opinions in this case is somewhere,
10 somehow referenced specifically in your report?
11    A.   Within the ranges, yes.  I'm not aware of
12 anything else I would see in this matter that's
13 outside those ranges and outside the things that I'm
14 specifically citing in my report.
15    Q.   Did you provide or did you bring -- strike
16 the question.
17         Did you bring with you all documents and
18 communications identifying every assumption that
19 either Storch Amini and/or Weissman and Dervishi
20 asked you to assume in connection with formulating
21 your opinions in the case4?
22    A.   Can you read that back, please?
23    Q.   I'll just rephrase it.  It will be faster.
24    A.   Sure.  Thank you.
25    Q.   So the request was, and I'll just read it

Page 12

1 verbatim, "All documents and communications
2 identifying assumptions that Storch Amini and/or
3 Weissman and Dervishi provided you and/or that you
4 relied on in formulating or informing the opinions
5 to be expressed by you in your report."
6          Did you bring those documents with you?
7     A.   I think, as we discussed this morning, I
8 have my report and my report cites those documents
9 and cites assumptions and things like that within
10 it.  But I didn't bring --
11    Q.   But you didn't bring documents.
12    A.   I'm sorry.  Let me finish.  I didn't bring
13 the actual documents.  No.  I brought my report.
14         MS. WRIGHT:  Michael, you're aware we
15    produced the documents to the extent that they
16    weren't already produced in the litigation with
17    this report.  I just want to make sure you're
18    aware of that.
19 BY MR. KREITZER:
20    Q.   The fourth request was to ask you to bring
21 with you all documents referenced in your expert
22 report upon which you base some or all of your
23 opinions, including any sources identified in the
24 exhibits to your report and all documents listed in
25 Exhibits 2 and 2A of your report.

Page 13

1          Did you bring those with you?
2     A.   Outside of my report, I did not bring the
3 production, which I understand has been produced.
4     Q.   Okay.
5          MR. KREITZER:  So, obviously, we'll
6    continue with the deposition, but we'll move to
7    continue it based on his failure to respond to
8    the notice.
9          MS. WRIGHT:  We've already -- the
10   documents were produced to you when we provided
11   the report to you.  You actually wanted us to
12   physically bring all the documents with us?
13         MR. KREITZER:  Of course.  That's what the
14   notice requires.
15         MS. WRIGHT:  You've had them available --
16   well, you have them.  And in a much easier
17   fashion than having to --
18         MR. KREITZER:  We can debate that in front
19   of the judge.
20         MS. WRIGHT:  Okay.  That's fine.
21         MR. KREITZER:  That's fine.
22 BY MR. KREITZER:
23    Q.   Mr. Donohue, did you have any assistance
24 in preparing your report?
25    A.   Yes.

4 (Pages 10 - 13)

Page 14

1    Q.  Who, if anyone, assisted you in preparing
2 the report?
3    A.  Fellow consultants at my firm were my
4 primary support.
5    Q.  Would you identify each of their names,
6 please?
7    A.  Sure.  Rich Franciosia.
8    Q.  Spell that for us.
9    A.  F-R-A-N-C-I-O-S-I-A.  Marie Minasi,
10 M-I-N-A-S-I.  Elhad Toam, T-O-A-M.  Michael Herrgle.
11 That was the primary support team.
12        There may have been some other analysts
13 that did some other assistance, but that was the
14 primary support team.
15    Q.  What is the position of Rich Franciola?
16    A.  Franciosia.
17    Q.  That's my bad handwriting.  I'm sorry.
18    A.  That's okay.  Senior associate.
19    Q.  And how did he assist you in connection
20 with formulating your opinions in the case, if at
21 all?
22    A.  He prepared analyses and research at my
23 direction that was used in connection with the
24 preparation of my report and exhibits.
25    Q.  What analysis and research did he perform?

Page 15

1    A.  He would help provide data collection
2 analysis.  For example, there's a lot of data
3 records here, and he would help provide those
4 records, identify them, help compile the information
5 that ends up in my report.
6    Q.  And how did he communicate to you whatever
7 findings or analysis that he actually performed?
8    A.  We would talk about it, in the first
9 instance, after talking about what needs to be done
10 and what should be researched.  That was one way we
11 communicated.
12        And, also, we prepared exhibits that
13 summarized the analyses.
14    Q.  And did he ever communicate to you by
15 e-mail?
16    A.  Yes.
17    Q.  Did he ever provide written reports to you
18 or summaries of the information that he was
19 locating?
20    A.  Yes, in that we would prepare Excel files
21 or Word documents, which is my report that would
22 contain this information.
23    Q.  Would his original versions of every one
24 of those files find their way into your report
25 without edit?

Page 16

1    A.  No.  Those are living Excel files.
2 They're updated with new data, things like that.
3    Q.  Did you produce here today any of those
4 Excel files?
5    A.  No.  Those Excel files are the product
6 that's in my report.
7    Q.  Well, what you mean to say is, after you
8 reviewed, edited and otherwise altered those
9 reports, they are the product that's in your report,
10 correct?
11    A.  The product that's in the final version of
12 those files after my analysis was completed.
13    Q.  Did you bring any of the initial versions
14 of those documents, the drafts, the preliminary
15 analysis, those sorts of things, did you bring any
16 of those with you here today?
17    A.  No, I did not.  And, again, those are
18 living documents that are updated.  So I don't know
19 if those versions would exist.
20    Q.  But you didn't even look, right?
21        MS. WRIGHT:  Objection.
22        THE WITNESS:  I didn't have to look.  I
23    know that those documents are updated.  The
24    Excel files are updated.  There's clearly a
25    process that goes on to collect that data.

Page 17

1 BY MR. KREITZER:
2    Q.  So, in other words, there could be a first
3 version and a second version and a third version and
4 so on, right?
5    A.  I don't know how to find it because again
6 it's being created.  Ten minutes after the document
7 is created, yes, it's a version, but it's in
8 process.  So I don't know if it's a version or
9 something that's in process.
10    Q.  If you went back to your computer system,
11 you might be able to look at the computer system and
12 determine whether there are earlier versions in any
13 of those documents still stored in your system,
14 right?  You could at least try to do that, right?
15    A.  If a particular version gets saved, but
16 there is one version of my report in Excel files.
17    Q.  The final version?
18    A.  Correct.
19    Q.  The one that you wanted to communicate
20 here today?
21    A.  Well, the appropriate version, the version
22 that has my complete analysis.
23    Q.  The version for which you're being paid
24 $575 an hour to present, right?
25    A.  All the work I did, my firm was

5 (Pages 14 - 17)

Page 18

1 compensated 575 an hour.
2      MS. WRIGHT:  Objection.
3 BY MR. KREITZER:
4    Q.  Okay.  Tell me about Marie Minasi?
5    A.  Minasi.
6    Q.  Okay.  At least I got that right.
7      And what is Ms. Minasi's position at your
8 firm?
9    A.  She's a consulting associate.
10    Q.  What is a consulting associate?
11    A.  That's a title for consulting.  After a
12 few years of experience, it's one of our titles in
13 our chain.
14    Q.  Was Mr. Franciosia?
15    A.  Franciosia.
16    Q.  Franciosia.  Was he the most senior person
17 working on this file with you?
18    A.  Elhad Toam is a principal.  So in terms of
19 titles, he would have a more senior title.  They're
20 both senior employees, in my view, but ...
21    Q.  Are you a principal in the firm?
22    A.  No.
23    Q.  What is your position in the firm?
24    A.  I'm a vice president.
25    Q.  How long have you been a vice president?

Page 19

1    A.  Since 2004.
2    Q.  I presume a vice president is more senior
3 than a principal?
4    A.  Yes.
5    Q.  And what role did Ms. Minasi perform?
6    A.  Similar to Mr. Franciosia, certain
7 analyses, research, finding information, compiling
8 information, doing other analyses at my direction.
9    Q.  And did you bring any of her work papers
10 or any of her preliminary reports with you here
11 today?
12    A.  No.  As we discussed, I only brought my
13 report with me here today.
14    Q.  What role did Mr. Toam play?
15    A.  Similar.  Doing certain research,
16 investigating certain data, preparing certain
17 analyses.
18    Q.  And did you bring all of his research,
19 data and analyses with you here today?
20      MS. WRIGHT:  Objection.
21      THE WITNESS:  As we discussed, I only
22 brought my report here today.
23 BY MR. KREITZER:
24    Q.  All right.  And what work did Mr. Hergle,
25 correct?

Page 20

1    A.  Yes.
2    Q.  What work did Mr. Hergle perform?
3    A.  Similar, in that he was supporting some of
4 those efforts, supporting some of the research
5 findings, some of the information gathering, other
6 analyses and research done at our direction.
7    Q.  And what position did Mr. Hergle have in
8 the firm?
9    A.  He is an analyst.
10    Q.  Give us an understanding of what an
11 analyst does relevant to, say, a principal or a
12 consulting associate.
13    A.  An analyst may be more responsible for
14 some of the initial research, finding certain
15 information, compiling some of the initial analyses,
16 whereas, the more senior team might be directing
17 that or instructing him to do that analysis,
18 reviewing that analysis, things of that nature.
19    Q.  Can you give us a sense of on how many
20 occasions you have been engaged to provide expert
21 testimony in a legal proceeding?
22      MS. WRIGHT:  Ever?
23      MR. KREITZER:  Yes.
24      THE WITNESS:  I don't have an exact number
25 for you, but it's clearly dozens of matters.

Page 21

1 BY MR. KREITZER:
2    Q.  Would you say more than 40?
3    A.  Yes.
4    Q.  Would you say more than 60?
5    A.  Yes.
6    Q.  Would you say more than a hundred?
7    A.  That's possible.  I've been doing this for
8 over 25 years.  So it's hard to think of it as in
9 counts of matters, because some matters take 10
10 hours, some matters take hundreds of hours, so ...
11    Q.  When you say you've been doing "this" for
12 more than 25 years, what is the "this" you're
13 referring to?
14    A.  My financial consulting, which includes
15 litigation and valuation work and things like that,
16 but my engagements overall.
17    Q.  On how many occasions have you actually
18 testified in a court of law?
19      MS. WRIGHT:  Objection.
20      THE WITNESS:  In trial, in a court?
21 BY MR. KREITZER:
22    Q.  Yes.
23    A.  A handful.
24    Q.  Describe for me or give me a better idea
25 of what a handful is to you.

6 (Pages 18 - 21)

Page 22

1    A.  It's around five or something like that.
2    Q.  Okay.  So of the between 60 and a hundred
3  or more litigation matters you've worked on, you've
4  testified in somewhere around five; is that correct?
5    A.  With respect to trials, yes.
6    Q.  Have you ever performed any of work --
7  strike the question.
8         Have you ever been hired by the Storch and
9  Amini firm to provide any work prior to this case,
10  before this case?
11    A.  My firm has been retained by Storch Amini
12  before, yes.
13    Q.  On how many occasions?
14    A.  I can think of at least two, as I sit
15  here.
16    Q.  Which are those?
17    A.  I recall a matter involving a biotech
18  company and another matter involving a breach of
19  contract for a supplier and distributor.
20    Q.  Do you remember the name of the case
21  involving the biotech company?
22    A.  Orbimed comes to mind.
23    Q.  Spell that for us.
24    A.  O-R-B-I-M-E-D.  That is probably not the
25  way to spell it, but that's all I remember.

Page 23

1    Q.  And in what court was that case?
2    A.  That was in New York City, and it was
3  probably -- it was probably state.
4    Q.  Did you testify in that case, that is,
5  testify at trial?
6    A.  No.
7    Q.  Do you know what the outcome of the case
8  was?
9    A.  I believe that case settled.
10    Q.  In connection -- how long ago was that
11  case?
12    A.  More than ten years ago.
13    Q.  And what attorney did you report to in
14  connection with your work on that case?
15    A.  I worked with Bijan Amini.
16    Q.  That's the same attorney who hired you in
17  this case?
18         MS. WRIGHT:  Objection.
19         THE WITNESS:  Well, his firm hired me, but
20    he's been working on this case, yes.
21  BY MR. KREITZER:
22    Q.  And in connection with the breach of
23  contract action, the breach of contract for a
24  supplier/distributor, do you remember the name of
25  that case or the parties involved in that case?

Page 24

1    A.  New England Wood Pellet, I believe was the
2  name of it.
3    Q.  And what was your role in that case?
4    A.  I was retained to investigate damages in
5  that case.
6    Q.  Okay.  Was that also the role you had in
7  the biotech case, that is, to investigate damages?
8    A.  Yes.
9    Q.  And how long ago did you perform your work
10  on that case?
11         MS. WRIGHT:  You're talking about the Wood
12    Pellet one?
13         MR. KREITZER:  Yes.
14         MS. WRIGHT:  Thank you.
15         THE WITNESS:  Less than five years ago.
16         And I should add that both of those cases
17    also involved some investigative records work
18    as well.
19  BY MR. KREITZER:
20    Q.  Okay.  Did that case proceed to trial?
21    A.  It did not.
22    Q.  Did it settle?
23    A.  That's my understanding.
24    Q.  And did you work with Mr. Amini on that
25  case as well?

Page 25

1    A.  I did, among others.
2    Q.  Can you think of any other cases in which
3  you have been engaged by Mr. Amini or his law firm?
4         MS. WRIGHT:  Objection to form.
5         THE WITNESS:  I can't as I sit here.  I
6    could look over my cases, but I can't as I sit
7    here.
8  BY MR. KREITZER:
9    Q.  Okay.  I want to talk to you a little bit
10  about your access to documents in this case.  I am
11  going to ask you a series of questions about that.
12         Were you able to review the business
13  records of Florida Career College in connection with
14  performing your work?
15    A.  To a large extent, I believe I was.  The
16  discovery included business records.
17    Q.  Were you able to review all of the
18  business records of the company?
19         MS. WRIGHT:  Objection.
20         THE WITNESS:  I don't know.  I was able to
21    review a large amount of business records, but
22    I don't know if there's other things out there
23    that I can't review.
24  BY MR. KREITZER:
25    Q.  Did you ever ask to review a business

7 (Pages 22 - 25)

Page 26

1  record which was not available or which you
2  understood was not available for you to review?
3      MS. WRIGHT: Objection.
4  BY MR. KREITZER:
5      Q.  And, of course, I'm speaking in terms of
6  this case, business records about --
7      MS. WRIGHT: I don't think you can ask him
8  about his communications with us.
9      MR. KREITZER: Sure, I, can, because he's
10  testifying expert. There's no privilege.
11      MS. WRIGHT: I don't think you're allowed
12  to ask -- I don't think you're allowed to get
13  discovery of your communications. It's
14  communications with us.
15      MR. KREITZER: I'm not even asking about
16  your communications. I'm asking about the
17  documents that he had an opportunity --
18      MS. WRIGHT: You just said, did you ever
19  ask to review. That's communication.
20      MR. KREITZER: No, I disagree. If you
21  want to take it up or instruct him not to
22  answer, just say so.
23      MS. WRIGHT: I'm just asking you a
24  question so I can clarify your position.
25      MR. KREITZER: My position is --

Page 27

1      MS. WRIGHT: Asking to request a
2  communication?
3      MR. KREITZER: No. Because I'm trying to
4  understand the documents that he had access to.
5  I'm not interested in what your answers were.
6      MS. WRIGHT: Then ask him what documents.
7      MR. KREITZER: I'll decide. Respectfully,
8  I'll decide how to ask the question. You
9  decide what objections you want to raise.
10  Fair enough?
11      MS. WRIGHT: Yeah. If you're going to ask
12  him for communications, I'm going to direct him
13  not to answer.
14  If you want to rephrase the question so
15  you can talk about his access to documents, I'm
16  happy to let him.
17  BY MR. KREITZER:
18      Q.  Did you ask to review any records that
19  were not made available to you?
20      A.  I can't answer your question in terms of
21  what I've asked. I looked for records, and I recall
22  trying to find data and not always finding the data
23  in the format I would like or for the time period
24  and things like that.
25  I -- generally, I recall looking for some

Page 28

1  things and not being able to find them, but I
2  can't -- I don't think I -- I think of it as asked,
3  but I certainly looked for things and sometimes some
4  information isn't available.
5      Q.  What was the source of the data that
6  you're now referring to? When you say you tried to
7  find data, but in some cases you couldn't locate it,
8  what was the source in which you were looking for
9  that data?
10      A.  Throughout my assignment, I had access to
11  the depositions, most of the depositions in this
12  matter.
13  I had access to some legal filings. I had
14  access to the production, which was basically
15  produced by many parties, including the parties in
16  the matter and third parties, if you will, as well.
17  They produced information.
18  That's the universe of the information
19  that I had.
20      Q.  Were you provided with a complete --
21  strike the question.
22  Were you -- strike that question.
23  Were you provided with the computer
24  records of Florida Career College?
25      MS. WRIGHT: Objection.

Page 29

1      MR. KREITZER: I'm just curious.
2  What is your objection to that?
3      MS. WRIGHT: I don't know what you mean by
4  "computer records." Could be anything.
5      MR. KREITZER: Okay. Thank you.
6  BY MR. KREITZER:
7      Q.  You can answer.
8      A.  To some extent, I believe, yes, because I
9  had access to native files. I had access to
10  e-mails. I had access to reports. I had access to
11  things that people were working with while at the
12  firm. I had access as to data they were storing.
13  So I did have access to computer files.
14  In fact, some of them were produced in the
15  litigation.
16      Q.  Okay. Do you believe you had access to
17  the entire computer records of Florida Career
18  College?
19      MS. WRIGHT: Objection.
20      THE WITNESS: I would doubt that
21  everything ends up in a litigation scenario.
22  They had 40 campuses and those campuses have
23  records.
24  I don't know, but I would suspect that,
25  while it was a lot of information and

8 (Pages 26 - 29)

Page 30

1  information necessary to do what I was doing, I
2  can't say that everything that FCC ever
3  maintained was produced.
4  BY MR. KREITZER:
5     Q.  Did you ever ask for a record, ask the
6  attorneys for Storch Amini for a record that they
7  told you was not available?
8        MS. WRIGHT:  Objection.  I'm not going to
9     let him answer that question.
10       Rephrase it.
11       MR. KREITZER:  Certify the question.
12 BY MR. KREITZER:
13    Q.  Was every record that you requested of the
14 attorneys who engaged you in this case provided to
15 you?
16       MS. WRIGHT:  Objection.  That's the same
17    question.  Same instruction.
18       MR. KREITZER:  You're instructing him not
19    to answer?  I just want to be clear.  Is that a
20    yes?  You need to speak verbally.
21       MS. WRIGHT:  Yes.
22       MR. KREITZER:  Okay.  Thank you.
23 BY MR. KREITZER:
24    Q.  Were there any records that you wished to
25 have seen which were not made available to you in

Page 31

1  connection with your investigation?
2     A.  Nothing that prevented me from issuing in
3  my report.
4     Q.  That wasn't my question.
5     A.  Okay.
6     Q.  Do you understand my question?
7     A.  Maybe I don't.
8     Q.  Okay.  My question was, were there any
9  records that you wished to have seen which were not
10 made available to you in connection with your
11 investigation?
12    A.  Wished?  I think there's records that
13 could have been more native and made my assignment
14 simpler and saved costs for the parties.  But aside
15 from that, I mentioned some things in my report that
16 weren't available.
17       So the wish part, I guess, is what I'm
18 having trouble with.
19       Do I wish that everything was native and
20 provided on day one and every deposition was done?
21 I'm sure we all do, but I lay out things in my
22 report that I was looking for.
23    Q.  Was every record that you desired to see
24 in connection with your investigation made available
25 to you?

Page 32

1     A.  I don't know how to answer your question.
2  Every record that I desired -- that I needed to
3  create my report was provided to me.
4        There were probably other things that
5  would have further supplemented the report or made
6  the process simpler like that.
7        So, yes.  So, to some degree, there was
8  records that would probably make it simpler, in a
9  format that would make it simpler.
10    Q.  What were those records?
11    A.  Well, for example, some of the DG5 data
12 was in PDF form versus native.  So having it all in
13 native would make it simpler.
14       It wouldn't change anything, but it would
15 make it simpler.
16    Q.  What else?  What other documents?
17    A.  The bad debt write-off, documents for the
18 bad debt write-off, some of those were estimates
19 made by the company.  I don't know if there's
20 further records surrounding those bad debt
21 write-offs, but that would have made things simpler.
22    Q.  What else?
23    A.  That's what comes to mind.  I would need
24 to look at my report to see if there's other areas
25 that I, as an example, that could have made the

Page 33

1  process simpler and provided more information.
2     Q.  Okay.  Let me show you what I've marked as
3  Exhibit 322 to your deposition.  It's a document
4  entitled "Expert Report of Jim Donohue, Submitted
5  January 12, 2018."
6        MS. WRIGHT:  Do you have a copy of that
7     one?  Thank you.
8        (Thereupon, the referred-to document was
9     marked by the court reporter for Identification as
10    Defendant's Exhibit 322.)
11       MS. WRIGHT:  You're calling it 322?
12       MR. KREITZER:  Number 322.
13 BY MR. KREITZER:
14    Q.  Do you recognize that document?
15    A.  I do.
16    Q.  What is it?
17    A.  It appears to be a copy of the expert
18 report I issued in this case in January.
19    Q.  All right.  Have you made any amendments
20 or alterations to that report since January 12,
21 2018?
22    A.  One thing I recall is that I provided a
23 list of information that was provided to me after I
24 issued this report.
25    Q.  What do you mean by that?

9 (Pages 30 - 33)

Page 34

1    A.  There were certain depositions that
2  occurred after I issued the report.  So I've
3  provided a list of documents and things like that,
4  such as the depositions that occurred after my
5  report.
6    Q.  Did you read those depositions and other
7  materials?
8    A.  I did read those depositions, yes.
9    Q.  Did they change or alter, in any respect,
10  any of the opinions that you set forth in your
11  report on January 12, 2018?
12    A.  No.
13    Q.  Now, you said that, if you had an
14  opportunity to review your report, that you might be
15  able to have your recollection refreshed as to other
16  documents that had not been provided to you in in
17  connection with formulating your opinions.
18       So I want to give you an opportunity, take
19  as much time as you need, to look over your report
20  and see if any -- if that assists in refreshing your
21  recollection.
22    MS. WRIGHT:  Note my objection.
23    THE WITNESS:  Reviewing my report, I
24  recall that there's-- it's basically the same
25  thing.

Page 35

1       There are some documents and some
2  information that, in a more native format or if
3  it was being tracked, would have been simpler
4  to prepare.  It wouldn't have changed the
5  analysis, but it would have been simpler to
6  prepare, and I think I already mentioned the G5
7  records.
8       I'm also reminded that the unsubstantiated
9  balance wasn't being tracked, and so having
10  more records on that would make the process
11  simpler, would have been more efficient, not
12  change anything.
13       And I think I already mentioned the bad
14  debt area.  There are some records there that
15  would have simplified matters.
16  BY MR. KREITZER:
17    Q.  Anything else?
18    A.  No.  That's the general theme.  I think a
19  lot of the areas was just finding the information
20  and getting it more efficient would have -- you
21  know, I certainly would desire that, but...
22    Q.  When you say "the unsubstantiated balances
23  weren't being tracked," what did you mean by that?
24    A.  Well, they were not being tracked
25  systematically at the company.  The unsubstantiated

Page 36

1  balances that I saw were provided by a series of
2  e-mails and other DOE communications, and that's how
3  I prepared them, but I assume that that could have
4  been in native or something like that, but it
5  wasn't.  It was in these e-mails, and it wasn't
6  being tracked and people testified -- they were not
7  aware of these balances at certain times.  So that's
8  what I mean.
9    Q.  All right.  When you say it wasn't being
10  tracked, do you reach that conclusion after having
11  reviewed the entirety of the computer records of
12  Florida Career College?
13    MS. WRIGHT:  Objection.
14    THE WITNESS:  I don't know when I reached
15    that conclusion during my work.
16  BY MR. KREITZER:
17    Q.  I wasn't asking when.
18       Finish your answer.  I apologize.  I
19  didn't mean to interrupt you.
20    A.  I thought that was your question.  Maybe
21  you can help me with your question.
22    Q.  Sure.  My actual question was, when you
23  say that it wasn't being tracked, did you reach that
24  conclusion after having reviewed the entire computer
25  records of Florida Career College?

Page 37

1    MS. WRIGHT:  Objection.
2    THE WITNESS:  I think I testified earlier
3    about "entire."  I don't know what else is out
4    there that hasn't been produced in this case.
5  BY MR. KREITZER:
6    Q.  Okay.
7    A.  I reached that conclusion with the
8  information available to me.
9    Q.  All right.  So I guess you would agree
10  with me that you just don't know what you don't
11  know.
12       Is that a fair statement?
13    A.  It's always a fair statement.  But, in
14  this matter, not necessarily, because I also see the
15  records.  I see what people are testifying about
16  what they know.  So if it was in the computer
17  records, and they knew it, they weren't talking
18  about it.
19    Q.  But I'm not asking you about the testimony
20  right now.  I'm asking you about records.
21       So, in that regard, did you come across or
22  when you reached the conclusion that the only
23  documents that you did not have access to would have
24  been the native G5 data, the company's estimates of
25  the bad debt, and -- or the composition of the bad

10 (Pages 34 - 37)

Page 38

1 debt, and the fact that the company was not
2 allegedly tracking unsubstantiated balances, is it
3 your testimony that every other record that you
4 desired to see in this case was provided to you?
5      MS. WRIGHT: Objection.
6      THE WITNESS: "The desire" I have trouble
7 with in your question.
8      I've tried to answer it by explaining that
9 I had the records needed to reach the
10 conclusions I reached.
11     And, yes, I'm aware that there's other
12 records that could have facilitated that
13 process and made it easier, but I'm not aware
14 of other records that I needed to reach my
15 opinions.
16 BY MR. KREITZER:
17     Q.  Well, when you say that you're aware that
18 there are other records that would have or they
19 could have facilitated your process, what other
20 records do you believe existed that could have
21 facilitated that process, your -- and the process I
22 a presume you mean is formulating your opinions,
23 right?
24     MS. WRIGHT: Objection.
25     THE WITNESS: The work in this case, yes.

Page 39

1 BY MR. KREITZER:
2      Q.  Yeah.  So what other records do you
3 believe would have facilitated your work?
4      MS. WRIGHT: Objection.
5      THE WITNESS: I think I explained that
6 native records would exist that would track G5,
7 for example, as one example.
8 BY MR. KREITZER:
9      Q.  Give me other examples.  I don't want just
10 examples.
11     I want to know every record that you
12 wished you had had access to that would have
13 assisted you in formulating your opinions, but which
14 you did not have access to.
15     MS. WRIGHT: Objection.
16 BY MR. KREITZER:
17     Q.  If any.
18     MS. WRIGHT: Same objection.
19     THE WITNESS: Well, again, you're asking
20 "wished." So would I have wished that some
21 things were in native so it's simpler process?
22 It's always helpful.
23 BY MR. KREITZER:
24     Q.  What documents do you wish -- let's take a
25 step back.

Page 40

1      Explain to the jury what you mean by a
2 "native file."
3      A.  It's a --
4      MS. WRIGHT: Objection.
5      THE WITNESS: For example, it's an Excel
6 file.  It's actually in the computer.  The data
7 is there.  You can look at the data, add up the
8 data, subtract the data and -- rather than
9 physically taking a piece of paper and adding
10 up those points.
11 BY MR. KREITZER:
12     Q.  And what native files do you -- did you
13 desire to have access to but which you did not have
14 access to in formulating your opinions?
15     MS. WRIGHT: Objection.
16 BY MR. KREITZER:
17     Q.  If any.
18     MS. WRIGHT: Same objection.
19     THE WITNESS: I gave you an example that
20 there's G5 records that I assume were in native
21 format in some form, but some of them were in
22 paper form, so it had to be created.
23     It doesn't change anything, but it would
24 make the process simpler.
25 BY MR. KREITZER:

Page 41

1      Q.  What other documents, if any?
2      MS. WRIGHT: Objection.
3      THE WITNESS: I think I already mentioned
4 that there's some bad debt records that would
5 have made that process simpler.  It wouldn't
6 change anything.  The unsubstantiated balance,
7 the records available to me, I utilized the DOE
8 communications which I assume were in native as
9 well.
10 BY MR. KREITZER:
11     Q.  Do you know if the company maintained
12 records of the unsubstantiated balances between G5
13 and COD -- I assume that's what you mean by
14 unsubstantiated balances, right, the balances
15 between G5 and COD?
16     A.  Correct.  Right.
17     Q.  Do you know if the company retained
18 records of the unsubstantiated balances between G5
19 and COD?
20     MS. WRIGHT: Objection.
21     THE WITNESS: Well, I know the company was
22 receiving e-mails that would show that, that
23 balance, for example, yes.
24 BY MR. KREITZER:
25     Q.  And do you know if the company maintained

11 (Pages 38 - 41)

Page 42

1 any other records, other than e-mails, regarding
2 unsubstantiated balances between COD and G5?
3     A.  Those e-mails are coming from DOE.  So I
4 assume the company had access to those e-mails.
5     Q.  That wasn't my question.
6         Maybe I should talk slower, respectfully.
7 Maybe I'm just talking too fast.
8         My question was, do you know if the
9 company maintained any other records, other than
10 e-mails, regarding unsubstantiated balances between
11 COD and G5?
12        MS. WRIGHT:  Objection.
13        THE WITNESS:  I don't know what other
14    records would have those figures.  I do know
15    that the testimony and the accounting
16    infrastructure was apparently not tracking that
17    balance.  So I don't know if there's something
18    else out there that was.
19 BY MR. KREITZER:
20    Q.  Did you look in the computer records of
21 FCC to determine whether there any records,
22 aside from e-mails, that were tracking the
23 unsubstantiated balances between COD and G5?
24        MS. WRIGHT:  Objection.
25        THE WITNESS:  Yes, I looked at the

Page 43

1    accounting records.
2 BY MR. KREITZER:
3    Q.  You did, okay.
4        So tell us which accounting records you
5 looked at.
6    A.  I looked at monthly board reports.
7    Q.  Okay.
8    A.  I looked at -- there's some general ledger
9 data, trial balance data, journal entries.
10        I looked at -- there were certainly some
11 detail for some of the entries.
12    Q.  What entries?
13    A.  For example, the bad debt entries.
14    Q.  Okay.
15    A.  There's detail for those.  I looked at
16 some bank statements.  I looked at some summary
17 reports, various summary reports that were used to
18 attempt to manage and monitor cash, and there was
19 different reports that did that.
20        I had records from a system they called
21 STARS that tracked some information.  I had some
22 other reports from the DOE that also tracked the
23 authorization and I -- it wasn't only DOE e-mails.
24 I should be more specific.  There were some other
25 reports that tracked G5 and COD balances that were

Page 44

1 from a system.
2    Q.  Anything else?
3    A.  There's a lot of records in this case and
4 that's a sampling of them that comes to mind.
5        There are probably others.  I mean, I
6 looked at a lot of records in this case.
7    Q.  You mentioned STARS.
8        What did you understand STARS to be, if
9 anything?
10    A.  From the testimony and from some of the
11 records in the case, I understand that STARS was
12 being used to manage --
13        MS. WRIGHT:  People have been trying to
14    call in.
15        MR. KREITZER:  Sorry.  Let's take a short
16    break.
17        THE VIDEOGRAPHER:  Off the record.  The
18    time is 10:24.
19        (Short recess taken.)
20        THE VIDEOGRAPHER:  We're now back on the
21    record.  The time is 10:26.
22 BY MR. KREITZER:
23    Q.  I apologize, sir, you got interrupted.
24        I asked you, what did you understand STARS
25 to be, if anything.

Page 45

1    A.  From the testimony in the case and some
2 records, I understand that STARS, as they would
3 refer to it, was the student information system that
4 would track many things, including the receipt of
5 Title IV funds, among other funds, and the use of
6 those funds, the disbursements to student, and it
7 would do so in some detail.
8    Q.  Okay.  And did you have complete access to
9 the STARS program in connection with performing your
10 investigation of this case?
11        MS. WRIGHT:  Objection.
12        THE WITNESS:  I'm sorry.  Complete access
13    to the program, what do you mean?
14 BY MR. KREITZER:
15    Q.  Were you able to run the program and
16 actually physically run the reports yourself by
17 directing the program to print reports?
18    A.  No, I did not run a live STARS program.  I
19 relied on the record, the contemporaneous record
20 that was provided in the production.
21    Q.  Who provided you with that contemporaneous
22 record, as you put it?
23    A.  Well, the record was provided by many
24 parties.
25    Q.  Okay.  Tell me which parties and which

12 (Pages 42 - 45)

Page 46

1 records you relied upon.
2    A.  Well, they are cited in my report.
3    Q.  All right.
4    A.  But, in general, there was STARS, STARS
5 types of records in the accounting records that I
6 received from the company.  I believe those are from
7 the company.  I'd have to think about the Bates
8 stamp.
9    Q.  Take your time, sir.  But I want to know
10 every STARS report that you relied upon in
11 formulating your opinions in this case.
12    A.  An example of those would be --
13    Q.  And, sir, I'm sorry to interrupt, but I
14 just want to be more efficient about this.  I didn't
15 ask you for an example.
16    I asked you, very specifically, for every
17 STARS report that you relied upon in formulating
18 your opinions in this case.
19    Go ahead.
20    A.  The sources listed on my Exhibit 9 would
21 be STARS information.
22    The sources I listed on Exhibit 9A would
23 be STARS information.
24    The sources I listed on Exhibit 9B would
25 include STARS information.

Page 47

1    The sources I listed on Exhibit 9C would
2 include STARS information.
3    The sources I listed on Exhibit 9D would
4 include STARS information.
5    The sources I listed on Exhibit 10A would
6 include STARS information.
7    The sources I listed on Exhibit 10C would
8 include STARS information.
9    The sources I listed on Exhibit 11 would
10 also include STARS information.
11    The sources I listed on Exhibit 12 would
12 also includes STARS information.
13    The sources I listed on Exhibit 13B would
14 include STARS information.
15    My report also includes cites to some
16 testimony just for completeness, and some exhibits
17 to depositions that included STARS information.
18    That would include deposition Exhibit 124.
19 And I believe deposition Exhibit 55, 56 and 57.
20    I think footnote 80 in my report is also
21 some STARS information.
22    I don't believe that's all of it, because
23 some of it, it's hard for me to tell in the
24 deposition exhibit numbering.  I don't know them by
25 number.  Some of them, I recall, but there was also

Page 48

1 STARS information that was used to prepare the 90/10
2 reports that were attached to the audit financials,
3 and that's attached to some of these deposition
4 exhibits, for example, and it's attached to any cite
5 to a financial statement, for example, but that's
6 all that comes to mind.
7    I mean, there was STARS information in the
8 record that I've seen or used here.
9    Q.  So, respectfully, sir, again, you didn't
10 answer the question that I asked you.  So let me ask
11 you the exact same question again.
12    What I asked you was specifically to
13 identify every STARS report that you relied upon in
14 formulating your opinions in this case.
15    Do you understand the question?
16    A.  I do.
17    Q.  I didn't ask you to tell me which exhibits
18 of yours may contain STARS data, which you spent
19 five or ten minutes telling us about.
20    I asked you specifically to tell us every
21 report that you relied upon, generated by STARS, in
22 formulating your opinions in this case.
23    Are you able to do that?
24    A.  I am, and I believe I did answer your
25 question.  Those sources are the STARS information

Page 49

1 and reports that I did use to prepare those
2 exhibits.
3    Q.  Is it your contention, therefore -- let's
4 go to Exhibit 9 -- is it your contention that
5 Exhibit 9, which was one of the answers that you
6 just gave, that Exhibit 9 is in the format of a
7 STARS report?
8    It's a simple yes or no.
9    A.  In the format of, I've seen STARS reports
10 that do the 90/10 calculation and Exhibit 9 is
11 roughly in that format.
12    Q.  Not roughly, sir.
13    Is it generated by STARS?  Is that a hard
14 question for you to understand?  That's my question.
15    Is that a difficult question for you to
16 understand?
17    A.  It's not a difficult question.
18    Q.  Because I'll try to simplify my question.
19    A.  It's not a difficult question, sir.
20    Q.  All right.  So now I'd like you to tell
21 me, is Exhibit 9A in a form generated by STARS?
22    A.  Exhibit 9 is obviously my report.
23    Q.  Thank you.
24    A.  If that's what you're asking.
25    Q.  So it's not generated by STARS, is it?

13 (Pages 46 - 49)

Page 50

1   A.  STARS did not generate Exhibit 9.
2   Q.  Thank you.  Did STARS generate --
3   A.  Let me finish.
4       The data in STARS provided the data that
5   was used to prepare Exhibit 9.
6   Q.  What STARS report, if any, did you rely
7   upon in creating Exhibit 9, if any?
8   A.  Much of this is in something they call the
9   90/10 report.
10  Q.  That wasn't generated by STARS, was it?
11  A.  The 90/10 report?
12  Q.  Yeah.
13  A.  That says STARS on it?
14  Q.  I don't know.  You tell me.
15      Is the 90/10 report generated by STARS?
16  A.  I think STARS is used to produce 90/10
17  reports.  I'm not saying it's the only thing that's
18  used to produce them.
19  Q.  So I'll go back to my question.
20      Is Exhibit 9 a report generated by STARS?
21  A.  As I testified before --
22      MS. WRIGHT:  Objection.
23      THE WITNESS:  -- Exhibit 9 is prepared by
24  me using STARS information.
25  BY MR. KREITZER:

Page 51

1   Q.  And, likewise, Exhibit 9B, 9C, 9D, these
2   aren't reports that were generated by STARS,
3   correct?
4       MS. WRIGHT:  Objection.
5       THE WITNESS:  All my exhibits were
6   prepared by me using information from the
7   company, including STARS information.
8   BY MR. KREITZER:
9   Q.  And can you tell me any STARS reports --
10  do you understand what a STARS report is?  Let's
11  start with that.  Maybe that will be easier.
12  A.  Generally, I include -- that includes
13  information coming from STARS, which includes a lot
14  of things.
15  Q.  Were you aware of the fact that STARS
16  actually created physical reports, just like any
17  computer program, you can ask it -- a lot of
18  computer programs -- you can ask it to create a
19  report and it prints out a report.
20      Are you familiar with that?
21  A.  I've seen that in the testimony, yes.
22  Q.  Okay.  Were you able to create any reports
23  using the STARS program?
24  A.  As I testified before, I did not have a
25  live STARS environment.  I'm relying on data and

Page 52

1   contemporaneous printouts from STARS or Excel files
2   from STARS.
3   Q.  Why weren't you given access to the STARS
4   program, if you know?
5   A.  I don't know one way or the other.  It was
6   not in the production in the live environment.
7   Q.  Did you ask?
8   A.  I don't recall asking for the company
9   systems to be turned back on.  They're in a
10  bankruptcy situation, and I'm dealing with data
11  after that point.
12  Q.  Would it have been helpful to you, in your
13  opinion, to have access to the actual STARS program
14  that was utilized at FCC?
15  A.  In the broadest sense, it would have made
16  things more efficient, because I wouldn't have to go
17  searching for STARS information.  But other than
18  that, no.
19  Q.  Did you have all of the information --
20  strike the question.
21      In connection with reports created by
22  STARS, are you of the view, are you of the opinion
23  that you had all the information necessary in order
24  for you to reach your conclusions?
25      MS. WRIGHT:  Objection.

Page 53

1       THE WITNESS:  Yes.  I had the information
2   I needed to reach my conclusions.
3   BY MR. KREITZER:
4   Q.  Okay.  Did you have access to the actual
5   student records that were maintained in STARS?
6   A.  Some of the STARS data was in student
7   form.  So I had some access to those records.
8   Q.  How many student records were you given
9   access to?  Strike the question.
10      You weren't given access to any, right?
11  But you're just saying you found some documents that
12  had student record information on it; is that
13  correct?
14      MS. WRIGHT:  Objection.
15      THE WITNESS:  Yes, some of the -- I was
16  not given access to a live STARS system, but I
17  had record data that was by student.  So if
18  that's what you mean when you say student
19  records, I had access to some student records.
20  BY MR. KREITZER:
21  Q.  Were you aware of a record called a pay
22  list?
23  A.  I recall some testimony about it, but
24  nothing specific comes to mind.
25  Q.  So, in other words, you weren't given

14 (Pages 50 - 53)

1 access to a record called a pay list, right?
2       MS. WRIGHT: Objection.
3       THE WITNESS: I don't know if someone else
4    would refer to that as a pay list. I was given
5    access to some STARS data, and if they looked
6    at it and said, oh, I call this a pay list, I
7    don't know.
8 BY MR. KREITZER:
9    Q. Do you know what a pay list is?
10   A. From my review of the testimony, I had
11 understood that that had something to do with what
12 the people felt was students available to draw down
13 money.
14   Q. What do you mean by "what people felt"?
15   A. Just my recollection of the testimony,
16 that when talking about the pay list, it was talking
17 about a student record being ready to pay or
18 something like that.
19   Q. What does it mean for a student record to
20 be ready to pay, if you know?
21   A. I don't recall that specific testimony
22 well enough, as I sit here, to describe it. I
23 understand there's a process that you need to go
24 through to substantiate a record. And, at some
25 point, you can. And at points before that, you

1 can't.
2    Q. What do you mean "it's a process you need
3 to go through to substantiate a record"?
4    A. That to substantiate a student, certain
5 things have to be done to get it ready to pay, put
6 it into COD and eventually get paid. I am
7 simplifying that process, but that's my
8 understanding.
9    Q. Did you perform any analysis of the pay
10 list that were generated by STARS during the fiscal
11 years of 2013 and 2014?
12   A. I don't recall performing a specific
13 analysis on something called pay list data. I
14 recall working with student data from my STARS
15 exhibits that we went through, but I don't recall
16 something called an analysis in the pay list data.
17   Q. Do you have an understanding as to how the
18 school determined the amount of money to be drawn
19 down from G5 during the years twenty -- during the
20 fiscal years 2013 and 2014?
21   A. I don't think I have a complete
22 understanding. I've seen a lot of records about it.
23 And, in theory, I did understand that it relates to
24 having students that are substantiated and eligible
25 to pull down funds, but also I know there was

1 references to predraws, and that's some of the
2 allegations in this case, that there were pulled
3 down without those records.
4    Q. Did you see any STARS-generated reports
5 that caused you to conclude that funds were drawn
6 down from G5 without actual student records to
7 support the draw?
8    A. Can you read that back, please?
9    Q. Sure.
10       MR. KREITZER: Read it back.
11    (Last question read back.)
12       THE WITNESS: I don't know how to answer
13    your question, because, in my work, it wouldn't
14    just be looking at STARS records. You're
15    considering the G5 balance as well as COD and
16    things like that. So I can't narrow it to just
17    looking at STARS records in my work.
18 BY MR. KREITZER:
19    Q. Did you review any STARS-generated reports
20 that caused you to conclude that funds were drawn
21 down from G5 without student records to support the
22 draw?
23    A. I've seen records and exhibits to
24 depositions that suggest that. I don't have
25 opinions about FCC's Title IV responsibilities, but

1 I have seen records that show that, at times, COD
2 and STARS and G5 were not in balance, so generally,
3 yes, but I'm not -- maybe I'm not understanding your
4 question.
5    Q. Okay. I am not asking you whether you saw
6 records showing an imbalance between G5 and COD.
7       I'm asking you whether you saw any
8 STARS-generated reports that caused you to conclude
9 that funds were drawn down from G5 without actual
10 student records to support the draw.
11    A. I've seen STARS reports or data that are
12 clearly below the G5 record at that time, so --
13    Q. That wasn't my question. You've said
14 that, but that's not my question. I don't mean to
15 interrupt you, but I really -- we're only going to
16 get through this if you can answer the questions
17 that I'm asking, right?
18       So the question I'm asking you is whether
19 you have ever seen any STARS-generated reports that
20 caused you to conclude that the funds that were
21 drawn down from G5 at any point in time were not
22 supported by actual student records that would
23 entitle the student to receive the student loan that
24 was a portion of that draw?
25       MS. WRIGHT: Objection.

15 (Pages 54 - 57)

Page 58

1    THE WITNESS: I guess the trouble I'm
2    having with your question is that you're saying
3    -- you're limiting it to a STARS record, yet,
4    it's a STARS record versus G5, but I can't rely
5    on the G5 difference. So I don't know how to
6    answer that question without referring to G5.
7  BY MR. KREITZER:
8    Q. Would it be a fair statement to say that
9  you never actually performed a forensic examination
10 of the actual student records that constituted or
11 were submitted in connection with any particular G5
12 draw-down?
13   MS. WRIGHT: Objection.
14   THE WITNESS: At that micro level, that
15   would generally be fair. Obviously, I have
16   macro data here that's talking about direct
17   loans and award years and comparing those, but
18   I did not prepare an analysis of student detail
19   for STARS draws or STARS records associated
20   with specific draws.
21   I've seen things about them in my work,
22   but my exhibits, as you know, don't relate to
23   that.
24 BY MR. KREITZER:
25   Q. Fair enough.

Page 59

1    For example, for any specific draw-down on
2  the G5 system in the year, fiscal year 2014, would
3  it be a correct statement to say that you didn't
4  actually look at the date of that draw, the amount
5  of that draw, and then try to correlate it to
6  whether there were sufficient students who were
7  entitled to financial aid that would equal or exceed
8  the amount of that draw, on any particular draw?
9    MS. WRIGHT: Objection.
10   THE WITNESS: I don't recall -- my work
11   doesn't approach it that way. My work
12   approaches it at a macro level, which is
13   looking at G5 versus STARS and COD.
14 BY MR. KREITZER:
15   Q. And I want to be -- I want you to define
16 for me -- you're obviously making a distinction --
17 you're using the term "macro," but you're making a
18 distinction, I suppose, between macro and micro.
19   Is that a fair statement?
20   A. That is.
21   Q. Can you explain to us, please, what you
22 mean by micro as compared with macro?
23   A. Sure. I think, in this instance, you are
24 talking about individual draws and individual
25 student listings and asking if I looked at

Page 60

1  individual student records.
2    The answer to that isn't no, because I've
3  looked at the G5 balance and the STARS balance and
4  the COD balance, just like DOE did, to compare them.
5    Q. But you didn't actually look at the
6  student data itself?
7    MS. WRIGHT: Objection.
8    THE WITNESS: Well, other than what we
9    talked about before, which is the STARS data,
10   was at a student level. So, yes, but, again,
11   it's being aggregated to create a balance at a
12   given time.
13 BY MR. KREITZER:
14   Q. Right. And you didn't look at that
15 balance at any given time. Let me strike the
16 question.
17   You didn't look at the student data
18 underlying that balance at any given time to
19 determine whether there were actual students who
20 were entitled to equal to or greater than the Title
21 IV loan proceeds that were the subject of that
22 particular draw-down, correct?
23   A. That's correct in that I looked at the
24 STARS balance. I did not look at the STARS record
25 and look at individual students. And I assumed that

Page 61

1  when the STARS report showed me a balance, I'm using
2  that balance. I did not go underneath to see, well,
3  are there some students that shouldn't be in the
4  balance and things like that.
5    Q. Fair enough. Have you ever heard of a
6  projected funding report?
7    A. Yes.
8    Q. Did you review all of the projected
9  funding reports that were available within the STARS
10 system.
11   MS. WRIGHT: Objection.
12 BY MR. KREITZER:
13   Q. For, say, the fiscal year 2014?
14   MS. WRIGHT: Objection.
15   THE WITNESS: I don't know.
16 BY MR. KREITZER:
17   Q. When you say you don't know, why don't you
18 know?
19   A. I don't know that I've seen all of them.
20 I believe some were attached to depositions, as
21 exhibits, and I don't know if I've seen all of them.
22   Q. Would it have been helpful in formulating
23 your opinions in this case to have had access to the
24 actual student data that represented a draw on any
25 particular day, say, in the fiscal year 2014?

16 (Pages 58 - 61)

Page 62

1      MS. WRIGHT:  Objection.
2      THE WITNESS:  To the extent -- it would be
3  helpful to the extent that the student data
4  isn't supporting the STARS numbers that I'm
5  using.  But other than that, no, because I'm
6  using a G5 balance and a STARS balance and a
7  COD balance.
8  BY MR. KREITZER:
9      Q.  And you wouldn't know, with respect to any
10  given G5 draw, whether the student data supported
11  that draw or not, correct, the individual student
12  data?
13      A.  Can you say that again?  I don't think
14  I --
15      Q.  That's okay.
16      MR. KREITZER:  Let's take just a
17  two-minute break, if that's okay, because I
18  think I left some documents upstairs.  I want
19  to go get them.
20      THE WITNESS:  This is your show.
21      THE VIDEOGRAPHER:  Off the record.  The
22  time is 10:54.
23      (Short recess taken.)
24      THE VIDEOGRAPHER:  We're now back on the
25  record.  The time is 11:08.  Media No. 2.

Page 63

1  BY MR. KREITZER:
2      Q.  Mr. Donohue, I've put in front of you
3  Exhibits 305 through 310.
4      Have you ever seen these documents before.
5      I'll ask this question again --
6      MR. KREITZER:  You heard me?
7      THE VIDEOGRAPHER:  It's fine.
8      THE WITNESS:  He did hear you?  I'm sorry.
9  BY MR. KREITZER:
10      Q.  He did hear me, and you can answer the
11  question.
12      A.  All right.  Yes.
13      Q.  What do you understand these to be?
14      A.  I understand these to be G5 award history
15  reports for various OPE IDs.
16      Q.  What is a G5 award history report?
17      A.  It generally shows draws and refunds and
18  authorization for a particular OPE ID for a
19  particular awards year.
20      Q.  Did you utilize these G5 award history
21  reports in formulating any of your opinions in this
22  case?
23      A.  I did use them.  I don't know if I used
24  the versions you've marked, but I did use
25  information like this.  These, I understand, were

Page 64

1  marked at Ms. Davis' deposition.
2      Q.  And you had a chance to even review
3  Ms. Davis' deposition testimony before you came here
4  today, correct?
5      A.  I did.
6      Q.  All right.  Now, do these documents
7  reflect the actual draws of funds by FCC for the
8  fiscal years 2013 and 2014?
9      And by FCC, let me be even broader, as you
10  put it in your report, the three largest OPE IDs.
11      A.  I believe they do.  I don't have the DUNS
12  numbers memorized, so I -- there are reports like
13  this that would reflect the draws and refunds for a
14  particular OPE ID for a particular program for a
15  particular year.
16      Q.  So if we just look at Exhibit 310, which
17  is the first one on top, I want to ask you a general
18  question, but it's effectively going to apply to all
19  of these reports, but I want to just use an example.
20      So if, on Exhibit 310, there is a draw of
21  $50,000 indicated on February 26th, 2014.
22      Do you see that?
23      A.  I do.
24      Q.  Did you perform any analysis to determine
25  whether, when the school drew down that $50,000 from

Page 65

1  the Department of Education, whether there were
2  actual students that supported that
3  $50,000 draw-down, that is, actually students with a
4  sufficient amount of entitlement to loan proceeds to
5  support that $50,000 draw?
6      A.  When you say "any," yes, I looked at the
7  overall balances of the G5 versus COD and STARS, and
8  that analysis would relate to this.
9      Did it narrowly relate to just that
10  $50,000?  No.  It was a macro basis.
11      Q.  And so, again, you're drawing that
12  distention between macro versus micro, and I want to
13  explore that for just one moment.
14      By macro, is it a correct statement to say
15  that your analysis compared, using this as a
16  hypothetical, because I know you did more than just
17  one date on on draw, but your analysis looked at
18  this $50,000 draw and it also looked at a COD
19  report, correct?
20      A.  Correct.
21      Q.  And from those two sources, you drew
22  certain conclusions.
23      Is that a fair statement?
24      MS. WRIGHT:  Objection.
25      THE WITNESS:  Yes, it wouldn't only be

17 (Pages 62 - 65)

Page 66

1  those two sources.  But, yes, I looked at the
2  balance, and, of course the balance is
3  basically made up of transactions like this.
4  So I considered it in my analysis.
5  BY MR. KREITZER:
6  Q.  But you did not do a micro analysis where
7  you would have drilled down to understand whether
8  there was a sufficient number of student records
9  reflecting students who were entitled to direct
10  student loans that would have equal or exceeded this
11  $50,000 draw on the date in which it was drawn,
12  February 26, 2014; is that correct?
13  A.  I did not isolate it that way, because,
14  again, it's a balance.  Both items are moving.
15  So looking at the one, you wouldn't get
16  the complete picture of the balance.  So I'm looked
17  at the balances.
18  Q.  Would your answer be the same for all of
19  draws that are reflected on Exhibits 305 through
20  310?
21  A.  It would generally be the same.  There
22  were some large predraws that were discussed at the
23  depositions which I looked at them and was aware of
24  them.  So we looked at those draws.
25  But, again, even that, we're looking at

Page 67

1  the balance at the time and comparing it with COD
2  and STARS, and there's testimony about the students
3  or lack of students for those particular draws, but
4  I did -- some draws and refunds, I paid -- I looked
5  at more, given the testimony.
6  Q.  Were you able to isolate any one or more
7  draw where there were a lack of students, student
8  records reflecting entitlement to direct student
9  loan monies for any particular draw?
10  MS. WRIGHT:  Objection.
11  THE WITNESS:  I recall some testimony
12  about some of the larger predraws, but, again,
13  my analysis is looking at the balances and the
14  large difference between COD, STARS and G5.  So
15  it's inherently considering a balance.
16  BY MR. KREITZER:
17  Q.  Okay.  So I know you said you looked at
18  some -- or you recall some testimony, but I'm asking
19  you a different question.
20  Did you actually perform any independent
21  analysis where you concluded that any single draw in
22  the fiscal year 2013 or the fiscal year 2014 where
23  there was a lack of students or student data to
24  substantiate that draw?
25  MS. WRIGHT:  Objection.

Page 68

1  THE WITNESS:  When you say "any analysis,"
2  I saw testimony about some predraws where it
3  was before the start of the year and things
4  like that where they called it a predraw.  So I
5  looked at those.
6  And, also, I reached my opinions in my
7  report, which about the balance, which
8  would certainly imply that.  But, again, I'm
9  not looking at it on a daily draw basis.  I'm
10  looking at the balances and what needs to be
11  substantiated.
12  BY MR. KREITZER:
13  Q.  Now, you mentioned -- you used this phrase
14  "predraw" a couple of times in your last answer or
15  two.
16  What do you understand a predraw to be?
17  A.  I understood, from the context of some of
18  the depositions and the documents, that it was
19  taking funds that would not necessarily be
20  substantiated already.
21  Q.  What do you mean by "not yet substantiated
22  already"?
23  A.  Well, basically, that wouldn't be
24  supported by student records at the time.
25  Q.  Okay.  Did you find, you personally, find

Page 69

1  any actual analytical evidence that there were any
2  draws done by FCC in fiscal year 2013 or fiscal year
3  2014 which were not supported by actual student
4  records at the time?
5  MS. WRIGHT:  Objection.
6  THE WITNESS:  Yes, in that my analysis
7  shows that COD and, at times, STARS were well
8  below the G5 draws, and I understand the
9  allegations in the case are about that, from
10  other expert witnesses, but I did see that
11  balance.  And, so, yes, I see that difference.
12  BY MR. KREITZER:
13  Q.  You see a difference in the balance?
14  A.  I do.
15  Q.  Did you ever analyze the difference in the
16  balance for any individual transaction, either for
17  fiscal year '13 or fiscal year '14, to determine
18  whether there were not students to support the
19  actual draw, student records to support the actual
20  draw?
21  MS. WRIGHT:  Objection.
22  THE WITNESS:  Well, I already mentioned
23  the predraw examples, where the testimony was
24  suggesting it, and I looked at those amounts.
25  But my work, again, was on the balances,

18 (Pages 66 - 69)

Page 70

1    and that's what that would suggest, that there
2    was a large difference between the two and the
3    testimony shows that as well.
4         And then, of course, there's write-downs
5    that suggest that it was.
6  BY MR. KREITZER:
7    Q.  I just want to focus in on the answer that
8  you just gave, because you said you -- you had
9  mentioned predraw examples -- strike the question.
10        When you say you looked at those amounts,
11   what did you mean by that?
12   A.  Well, I looked at those draws and the
13   context of those draws, like there was some in
14   December, for example, because they were raised in
15   the testimony.
16   Q.  Okay.  December of what year?
17   A.  December of '13.
18   Q.  When you say you looked at certain draws
19   in December of '13, did you look at the individual
20   student data to determine whether there were, in
21   fact, support in the student data for the amount of
22   the draw that occurred in December of '13?
23   A.  Not outside the balance concept we've been
24   talking about, which is I looked at the STARS
25   records and COD records and also the testimony that

Page 71

1  talked about it being a predraw for early -- early
2  starts or something like that.  So not beyond that.
3    Q.  Are you aware of any -- strike the
4  question.
5         I want to go back to documents that you
6  reviewed in formulating your opinions in this case.
7         Did you review any COD reject records or
8  record error documents?
9    A.  I'm not sure.  I've seen records that talk
10  about rejects, and I don't know if it's what you're
11  referring to as a reject record or not, but I've
12  seen discussions of rejects.
13   Q.  Okay.  Did anyone ever make you aware of
14  an issue that the company, that FCC was having in
15  terms of an unusually large number of rejects
16  occurring when data was uploaded into COD?
17   A.  I've generally seen testimony about that,
18  yes.
19   Q.  Did you formulate any opinions in
20  connection with whether the number of rejects
21  occurring in terms of those uploads was unusual?
22   A.  I didn't form opinions either way.  I saw
23  some testimony about having some rejects, more so in
24  fiscal '13, but I didn't form an opinion on the
25  amount of them either way.

Page 72

1    Q.  And did your work, that is, your expert
2  work, involve any determination of what was causing
3  the rejects of student data that was being uploaded
4  into the Department of Education's COD system?
5    A.  I don't have expert opinions about that.
6  I've read the record like others in this case, and I
7  see that there's discussion about it, but --
8    Q.  What, if any, impact, if you know, did the
9  large number of rejects caused by data being
10  uploaded into the COD system, have on the
11  unsubstantiated balances between G5 and COD?
12        MS. WRIGHT:  Objection.
13        THE WITNESS:  First, when you say "large,"
14   I don't know relative to what that means, but I
15   was aware that that was something that was
16   being discussed, and I looked at the balances
17   over time.
18        So I don't know if it's quantified against
19   that, because I'm looking at balances over
20   time.  I'm not looking at any one draw with
21   some rejects that gets kicked back.
22        I'm looking at balances over time that
23   would consider if you had a reject, you put the
24   paperwork later, for example.
25  BY MR. KREITZER:

Page 73

1    Q.  Okay.  Did you perform any analysis on any
2  individual draw with respect to, say, in the 2013
3  time frame, fiscal year 2013, as to the impact
4  that -- I'm sorry.  Let me strike the question.
5         Let me focus your attention on a
6  particular draw in 2013.  Maybe we'll do it this
7  way.
8         Again, looking at, say, exhibit -- let's
9  go to Exhibit 307.  Let me just have you, for
10  example, look at the draw that's on page 3 of 8, of
11  June 4, 2013.
12        This is a draw for -- I picked the wrong
13  one.  Hold on a second.
14        I'm sorry.  Let me have you focus on a
15  different one.  So let me have you look at the draw
16  that occurred on June 10, 2013.
17   A.  Same page?
18   Q.  Yes, same page, in the amount of $300,000.
19   A.  I see that.
20   Q.  Okay.  Do you know if, upon uploading
21  data, student data into COD to substantiate that
22  draw, how many rejects occurred as a consequence of
23  that upload?
24   A.  I do not.
25   Q.  And would your answer be the same with

19 (Pages 70 - 73)

Page 74

1 respect to all of the different draws that are
2 reflected on Exhibit 307?
3     A.  Specifically with respect to each draw,
4 no, I do not -- to the extent there were rejects, I
5 don't know the extent of them.
6     Q.  Okay.  And to the extent of any reject
7 that occurred in connection with any upload in the
8 COD, did your work include any investigation into
9 the cause of that reject?
10     A.  Yes, in that I looked at the testimony
11 about the rejects, and that was part of the things I
12 considered in reaching my opinions.
13     Q.  Did you reach any opinions in connection
14 with the cause of the rejects that were being
15 experienced at the three largest OPE IDs?
16     A.  I didn't reach opinions.  I just observed
17 that the fact witnesses were discussing software
18 issues.  That's what they were saying.
19     Q.  And what did you understand the software
20 issues to be?
21     A.  I don't have opinions about this, but just
22 from reading the record, I understand that they
23 related to how STARS would eventually talk with COD,
24 and that the software that was used to upload into
25 COD was, at least in fiscal '13 and some discussion

Page 75

1 in fiscal '14, causing some reject issues.  That's
2 what people have alleged.
3     Q.  Now, you do have opinions with respect to
4 the unsubstantiated balances between COD and G5,
5 correct?
6     A.  Yes, that's part of my forensic opinions,
7 yes.
8     Q.  All right.  And do you know what all the
9 causes were of the unsubstantiated balances between
10 G5 and COD?
11     A.  Well, the cause was the pulling net of
12 draws beyond what was substantiated in COD.
13     Q.  What do you mean by "the pulling net of
14 draws beyond what was substantiated in COD"?
15     A.  Thank you.  That was not artfully stated.
16         The net number.  In other words, the net
17 balance.  It was draws and refund activity on a net
18 basis resulted in a balance that was above the COD
19 balance.  Thank you.
20     Q.  So maybe in lay terms, are you saying that
21 the balance in G5 appeared to be greater than the
22 balance in COD?
23     A.  Correct.  Over time, across multiple OP
24 EIDs.
25     Q.  Did your work, your expert opinion, draw

Page 76

1 any conclusions as to what caused that imbalance
2 between COD and G5, the actual root cause of it?
3     A.  I can't get into people's heads as to why
4 they did what they did, but the root cause was
5 pulling, drawing down more money than you were
6 substantiating at COD over time.
7     Q.  Do you know why more money was -- strike
8 the question.
9         Do you know why COD was rejecting --
10 rejecting files that were being submitted -- strike
11 that question.
12         Do you know if the rejection of files by
13 the COD system contributed to the unsubstantiated
14 balances between G5 and COD?
15         MS. WRIGHT:  Note my objection.
16         THE WITNESS:  While it may have been one
17     of the things that would do that at a spot time
18     period, for example, over time, and with the
19     other information I've seen in the case, it
20     didn't occur to be the only thing, by any
21     means, that was causing that.
22 BY MR. KREITZER:
23     Q.  Well, let's start with the rejections and
24 then we'll talk about the other things.
25         So would you agree that rejections of COD

Page 77

1 records by the Department of Education was
2 contributing to the -- the unsubstantiated balances
3 between G5 and COD?
4         MS. WRIGHT:  Objection.
5         THE WITNESS:  Not with respect to my
6     analysis.  Again, for any spot draw, I could
7     understand how that could be occurring and
8     people are suggesting it, but I'm looking at
9     balances over time.
10         So I don't -- I don't know if it would be
11     a cause to that, but I could see, on any one
12     draw, if that's what you're saying occurred,
13     that's possible.  That would be one
14     contributing factor.
15 BY MR. KREITZER:
16     Q.  What other contributing factors did you
17 conclude caused, on any given draw, the amount of
18 the G5 draw-down to be different than the upload of
19 COD data?
20         MS. WRIGHT:  Objection.
21         THE WITNESS:  Again, I'm answering your
22     question about a particular draw, but my
23     opinions are about the balances.
24         I don't have specific opinions about
25     specific draws.  I'm looking at the balances

Page 78

1    over time.
2 BY MR. KREITZER:
3    Q.  Okay.  So, for example, you don't know
4 whether, on any given draw, you're not here to say,
5 on any given draw, that FCC drew down more money
6 than they actually had students to substantiate that
7 draw.
8        That's not one of your opinions, correct?
9    A.  I don't have expert opinions from a
10 liability perspective.  That's other witnesses and
11 fact witnesses.
12       But I am certainly seeing the evidence in
13 this case, and I've already mentioned that there
14 were some that - people testified that occurred,
15 that they pulled down predraws and Mr. Murphy
16 suggested they weren't students.
17   Q.  Did you ever substantiate whether
18 Mr. Murphy's alleged statement that there weren't
19 students was true or not?
20       MS. WRIGHT:  Objection.
21 BY MR. KREITZER:
22   Q.  Let me ask the question differently.
23       Did you ever find any evidence in your
24 forensic examination to suggest that Mr. Murphy's
25 alleged allegation that there weren't actual

Page 79

1 students was true or not?
2    A.  There was evidence of that, yes.
3    Q.  Tell me about that evidence.
4    A.  Well, in addition to testimony saying it,
5 there was the need to refund extensive amounts of
6 money, and there's some suggestion in the record
7 that overdrawn funds weren't applied to a student,
8 so when they came back, they couldn't be recorded
9 back.
10       Also, when the bad debt expense process
11 was done, it wasn't, again, by student, or at least
12 not magnitude, it was simply allocated against
13 revenue.  So it didn't appear to be by student.
14       So those things would support that.  But
15 there's fact witnesses and expert opinion about that
16 in other matters, other reports.
17   Q.  Did you ever find any evidence that
18 overdrawn funds, as you put it, weren't applied to a
19 particular student?
20   A.  Were or were not?
21   Q.  Were not.
22   A.  Yes.  I saw an e-mail where Ms. Turgot
23 suggests that overdrawn funds were not in the
24 ledger.
25   Q.  Any other evidence other than her

Page 80

1 statement.
2    A.  I believe Mr. Murphy testified about that.
3    Q.  Anything else?
4    A.  Ms. Davis testified about that, but I
5 believe she was talking about Mr. Murphy's
6 testimony.
7        This is indirect, but the inability to
8 relate the bad debt expense to students and campuses
9 directly could suggest that, because if it was by
10 student, you would know which receivable and which
11 campus to apply it to and you would take it off.
12   Q.  So all of your responses so far have been
13 in references to other witnesses' testimony.
14       Would that be a fair statement?
15   A.  Some of it was.  But the bad debt, that
16 was not referenced to someone else's testimony.
17   Q.  Well, you --
18   A.  They talked about that, too.  Sorry.
19   Q.  Right.
20   A.  Correct.
21   Q.  So you haven't found any actual analytical
22 evidence, yourself, that would suggest that
23 overdrawn funds weren't applied to a particular
24 student; isn't that correct?
25       MS. WRIGHT:  Objection.

Page 81

1        THE WITNESS:  No.  I mean, the bad debt,
2    for example, there is evidence, there's records
3    that show that, mechanically, they were not
4    able to actually take the bad debt charge and
5    apply it to particular campuses or students.
6 BY MR. KREITZER:
7    Q.  What is your evidence that they weren't
8 able to do that?  Because there's a difference, you
9 would agree with me, between being able to do it and
10 what was actually done, right?
11   A.  They did not do it during this time.  I
12 don't want to go back to testimony, but when talking
13 about doing it, Ms. Turgot testified that overdrawn
14 funds were not associated with a ledger.  So that
15 would suggest you're not able, but that's, granted,
16 the testimony.
17   Q.  So we can all read the testimony, and the
18 jury will certainly reach conclusions about hearing
19 the testimony, but I think your purpose here today
20 is to talk about your forensic examination, what
21 analytics you actually uncovered independent of
22 testimony.
23       Is that a fair statement of what your
24 understand your role to be?
25       MS. WRIGHT:  Objection.

21 (Pages 78 - 81)

Page 82

1      THE WITNESS:  Well, my role is to answer
2    your questions, which I'm doing.
3 BY MR. KREITZER:
4    Q.  Well, that's not your role in the case,
5 though, is it?
6    A.  To answer your questions?
7    Q.  Yeah.
8    A.  It's part of my role, yes.
9    Q.  All right.  But your role in this case,
10 just reading your expert opinion, is you have a
11 whole section of your expert opinion that's entitled
12 "Forensic Accounting Analysis," right?
13    A.  Yes.  That's one of my roles.
14    Q.  What's a forensic accounting analysis?
15 Tell us what that is.
16    A.  In this case, it was to analyze data and
17 reach certain conclusions and reach -- you know,
18 provide information about certain amounts of data.
19    Q.  So I want to just talk about the data that
20 you analyzed for a moment.  Is that okay?
21    A.  Okay.
22    Q.  All right.  So in connection with the data
23 that you analyzed, did you find any evidence to
24 suggest that there were any overdrawn funds that
25 weren't applied to a student?

Page 83

1      MS. WRIGHT:  Objection.
2      THE WITNESS:  I've already mentioned the
3    bad debt expense calculations that were not
4    related to a student.  That's data.
5      Testimony is outside of data, I
6    understand.  It's part of the forensic
7    accounting analysis, but it's outside of data.
8      And the amount of refunds that were sent
9    back would support that statement.  Again, I am
10    quantifying that amount.  I'm not -- I'm not
11    making opinions about Title IV process, but the
12    amount of refunds and the extent of the
13    balance, coupled with DOE information about it,
14    would support that.
15 BY MR. KREITZER:
16    Q.  What was the reason, to your
17 understanding, what was the reason that any
18 particular amount of refund was sent back to the
19 DOE?  Do you have a factual understanding?
20    A.  Well, they were sending back money that
21 they were not entitled to or had not substantiated.
22    Q.  Do you think there's a distinction between
23 not entitled to on the one hand and not
24 substantiated on the other?
25    A.  I don't know how it's viewed in DOE's

Page 84

1 eyes, but I understand the substantiated amount,
2 within reason, is what you're entitled to.
3    Q.  Did you perform any forensic examination
4 as to why any particular sums of money were not
5 substantiated?
6    A.  Again, that would be on a balance level,
7 looking at the balances.
8    Q.  From a macro level, but not a micro level,
9 correct?
10    A.  Yes, because they're both moving with
11 pluses and minuses, and so to do that analysis, you
12 need to look at the balance.
13    Q.  So you would agree with me, to the extent
14 there is any evidence in this case as to why any
15 particular sum of money was not substantiated, you
16 would not be the witness to be providing that
17 testimony, correct?
18      MS. WRIGHT:  Objection.
19      THE WITNESS:  Other than my forensic
20    accounting opinions about the balances as
21    described in my report, I am not providing the
22    Title IV or legal opinions that talk about
23    those balances.  I'm providing the forensic
24    opinion, correct.
25 BY MR. KREITZER:

Page 85

1    Q.  But you don't have a forensic opinion as
2 to why any particular sum of money was not
3 substantiated, correct?
4    A.  Well, collectively, I do, because it's a
5 balance.  So I'm laying out, with the data, that
6 your G5 -- the G5 balance was greater than COD and,
7 at times, STARS.
8    Q.  But I'm asking you the reasons why, and
9 you don't know the reasons why, correct?
10      MS. WRIGHT:  Objection.
11      THE WITNESS:  Well, I know that the reason
12    why is that they pulled more money than they
13    substantiated.
14 BY MR. KREITZER:
15    Q.  Right.  But you don't know why they
16 allegedly pulled more money than they substantiated.
17    A.  I don't want to get into their heads.
18 There's testimony about why they did what they did.
19 They apparently needed the money.
20    Q.  You're speculating now, correct?
21    A.  Well, I am, in part.  I've seen testimony
22 that suggests they needed the money for rent and
23 things like that, so I ...
24    Q.  Did you review audit reports prepared by
25 the Deemer Dana that firm?

22 (Pages 82 - 85)

Page 86

1    A.  Yes.
2    Q.  I think they call them attestation
3  reports.
4    A.  Well, thank you.  The title of the report,
5  I don't recall, but I recall reviewing the exhibits
6  to the Ken Wood deposition, whatever they're called.
7    Q.  What conclusions, if any, did you reach
8  from reviewing the attestation reports prepared by
9  the Deemer Dana firm in 2011 for the fiscal year
10  2011 and '12?
11    A.  Only that there was some error rates that
12  were a problem.  And I understood that that was one
13  of the reasons the full audit or full student record
14  review was eventually done, but that's what I recall
15  from that.
16    Q.  Do you know if a close-out audit was ever
17  prepared upon the closing of the FCC schools?  Let
18  me strike that question and do it differently.
19       Do you know what a close-out audit is?
20    A.  In this case, I recall that it's something
21  that reviews a particular award year or a particular
22  type of award at the end of the process.
23    Q.  Do you know what the purpose of a
24  close-out audit is?
25    A.  I don't recall documents about that, but

Page 87

1  from my reading of the record, I understood it to be
2  to see if Title IV funds were handled appropriately.
3    Q.  Do you know if a close-out audit was
4  performed at the close of the FCC schools?
5    A.  I don't recall that they occurred.  I
6  don't have a recollection for fiscal '14, anyway.
7    Q.  Do you have an understanding as to what
8  the effect on the individual OPE ID numbers is as a
9  consequence of a close-out audit having not been
10  performed?
11    A.  I don't know.
12    Q.  Did you take into account in your
13  financial analysis the -- fact that a close-out
14  audit was not performed?
15       MS. WRIGHT:  Objection.
16       THE WITNESS:  I was aware it was not
17       performed when I did my analysis, yes.
18  BY MR. KREITZER:
19    Q.  What, if any, impact is reflected in your
20  analysis as a consequence of the close-out audit
21  having not been performed for the -- for the, as you
22  say, the three biggest OPE IDs?
23    A.  I'm not aware of any, as I sit here.  If
24  some other records had some concerns, I suppose that
25  could alter some of the substantiated balance,

Page 88

1  something like that.  That would be a potential
2  impact, but I don't see it having any impact on my
3  opinions.
4    Q.  It would be fair to say you didn't take it
5  into account, that is to say, you didn't adjust your
6  financial conclusions as a consequence of a
7  close-out audit having not been performed for the
8  OPE ID numbers upon which you based your
9  investigation?
10       MS. WRIGHT:  Objection.
11       THE WITNESS:  I was aware of it and
12       reached my conclusions, and I can't point you
13       to something that mechanically changes my
14       opinions because of that.
15  BY MR. KREITZER:
16    Q.  I'm going to have you take a look at the
17  amended complaint in this case.  I don't know that
18  we've ever marked it as an exhibit.  So I'm just
19  going to mark it as Exhibit 323.
20       (Thereupon, the referred-to document was
21  marked by the court reporter for Identification as
22  Defendant's Exhibit 323.)
23  BY MR. KREITZER:
24    Q.  Have you ever seen and read the amended
25  complaint that was filed in this action?

Page 89

1    A.  Yes.
2    Q.  Turn your attention to page 2, paragraph 4
3  of the amended complaint.
4       Paragraph 4 states, "Specifically
5  defendants engaged in the following conduct in each
6  case in contravention of DOE regulations."
7       Did I read that correctly?
8    A.  Yes.
9    Q.  Item A says, "Failing to hold Title IV
10  funds in trust either in a separate account or
11  through accounting or internal controls sufficient
12  to track Title IV funds as if they were held in a
13  separate account."
14       Do you see that?
15    A.  I do.
16    Q.  Do you have an opinion as to whether that
17  is a correct statement or not?
18    A.  Just for clarification, correct as in
19  that's a requirement under Title IV, or correct as
20  if in that's what the plaintiffs are alleging?
21    Q.  Neither, actually.
22       I'm asking you whether you have an opinion
23  as to whether my clients failed to hold Title IV
24  funds in trust, either in a separate account or
25  through accounting or internal controls, sufficient

23 (Pages 86 - 89)

Page 90

1  to track Title IV funds as if they were held in a
2  separate account?
3      A.  I don't have legal or regulatory opinions
4  about the DOE regulations.  I have forensic
5  accounting opinions that I could see would relate to
6  this, and I make those in my report.
7      Q.  Do you have a forensic accounting opinion
8  as to whether or not my clients failed to hold Title
9  IV funds in trust either in a separate account or
10 through accounting or internal controls sufficient
11 to track Title IV funds as if they were held in a
12 separate account?
13     A.  That requires some legal and regulatory
14 interpretations that I'm not making, but my forensic
15 accounting opinions relate to these in that I was
16 tracking balances and how refunds were being
17 handled, how the balances were far greater than the
18 COD in STARS.
19         So I could see how that would relate to
20 that.  But, again, I'm not making regulatory and
21 legal opinions about this.
22     Q.  I'm not asking you to make a regulatory
23 opinion or a legal opinion.
24     A.  Okay.
25     Q.  I'm asking you to make an opinion based

Page 91

1  upon your forensic accounting work.
2      A.  It still, unfortunately, requires some
3  legal or regulatory interpretation as to what this
4  means, but I could see, from a layman, that having
5  those balances be the way they were and the
6  suggestion that they were not -- at times, that they
7  can't associate with students, you know, that could
8  be an internal control problem, but, again, it does
9  require some legal or regulatory.  At least A does.
10     Q.  So you're not a lawyer, correct?
11     A.  I am not.
12     Q.  And you're not a regulator, correct?
13     A.  I am not.
14     Q.  So would it be a fair statement to say
15 you're not forming an opinion, one way or the other,
16 with respect to item 4A?
17     A.  Not with respect to 4A from a legal or
18 regulatory process.
19     Q.  Sir, I'm not asking you from a legal
20 process or a regulatory process.
21         I'm just asking you what you're being paid
22 here to do.
23         Do you have an opinion as to item 4A?
24     A.  From a forensic accounting perspective,
25 one of the things that would concern me is that the

Page 92

1  bank recs for those accounts weren't being done in a
2  sufficient manner.  So that would concern me.
3      Q.  Whether or not that's a legal or
4  regulatory issue, I don't know, but from a forensic
5  accounting point of view, not doing the recs to know
6  what's in those separate accounts would concern me.
7      Q.  By recs, you mean?
8      A.  Reconciling the money that's being
9  deposited into the OPE ID bank accounts with the
10 student ledger.
11     Q.  Do you have an opinion as to whether the
12 monies were being reconciled between the OPE ID bank
13 accounts and the student ledgers?
14     A.  My work has led me to believe that they
15 were not occurring at times.
16     Q.  Would you show me where that is in your
17 opinion, please, if at all?
18     A.  Those words are not in my opinion.
19     Q.  Then let's move on.
20         How about 4B?  Do you have an opinion as
21 to whether my clients drew Title IV funds in amounts
22 far greater than that which could be supported by
23 current enrollment numbers?
24     A.  Again, with my forensic accounting caveat
25 that we talked about --

Page 93

1      Q.  No.  Tell me what caveat you have, sir.
2  It's a different question.
3      A.  This is a DOE -- this is being suggested
4  as a DOE regulation, which is a regulatory/legal
5  issue.  I'm not making regulatory/legal opinions.
6         I'm telling you, from my work in this
7  case, you're asking me if I saw evidence that they
8  were drawing funds far greater than which could be
9  supported by current enrollment numbers.  And my
10 work found that the G5 draws were greater than the
11 COD balance and, at times, the STARS balance.
12     Q.  And that would be the only factual basis
13 for you to reach this conclusion with respect to 4B,
14 correct?
15     MS. WRIGHT:  Objection.
16     THE WITNESS:  That would be the most
17     direct.  The others relate to it in that they
18     are reflecting the consequences of that in some
19     respect.
20 BY MR. KREITZER:
21     Q.  Let's move on to item 4C.
22         Do you have an opinion as to whether my
23 clients failed to refund excess Title IV funds which
24 were drawn for students who withdrew from or failed
25 to commence attending their respective programs?

24 (Pages 90 - 93)

Page 94

1    A.  As my forensic accounting role, I don't
2  know.
3        I know that the refund balance was, in
4  part, related to that, but I didn't analyze
5  individual student records.  But the refunds were
6  for -- you know, to the extent there was a draw that
7  was taken without students, I'm not sure how it
8  would apply, but there were refunds that were sent
9  back for students.
10   Q.  Let's move on to item E.
11       Do you have an opinion as to whether my
12  clients predrew, I'm changing the words slightly, it
13  says predrawing, but that my clients predrew, as
14  defined below, Title IV funds based on projected
15  future enrollment numbers which management knew to
16  be overstated?
17       MS. WRIGHT:  Objection.
18       THE WITNESS:  I can't talk about what
19   management knew and did not know.
20 BY MR. KREITZER:
21   Q.  Let's move on to the next item.
22       Do you have an opinion as to whether my
23  clients abandoned the pretense of limiting draws to
24  illusory enrollment numbers and simply drawing based
25  on the company's general liquidity needs?

Page 95

1    A.  Again, my opinions provide some underlying
2  foundation to that, but if this is talking about
3  management and what they were doing, I see in the
4  record that suggested, and I've seen the financial
5  accounting analysis that supports it, but I'm not
6  making opinions about this.
7    Q.  I want to turn your attention to page 14.
8  Allegation paragraph number 40.  It says, "The
9  Anthem school" -- the amended complaint states, "The
10  Anthem schools engaged in a similar practice, but
11  would also predraw Title IV funds from time to time
12  by causing its institutions to draw Title IV funds
13  during a given month premised upon enrollment
14  projections for future months."
15       And then it cites to a footnote, number 8,
16  and you're welcome to read the entire footnote, but
17  the portion that I want to focus on is the last two
18  sentences that says, "This is not the same as the
19  predraw practice FCC was engaged in which was to
20  draw money for student tuition months in advance of
21  the actual enrollment of students and disbursement
22  of funds to them.  Such premature draws necessarily
23  violate the three-day disbursement requirement."
24       Did I read that correctly?
25   A.  You did.

Page 96

1    Q.  Did you find any evidence that my clients
2  caused FCC to draw money for student tuition months
3  in advance of the actual enrollment of students and
4  disbursement of funds to them?
5       MS. WRIGHT:  Objection.
6       THE WITNESS:  I can't think of student
7   examples as I sit here.  It's only -- this
8   relates to my forensic opinions and that
9   clearly they were well above the COD, and this
10  would be one of the potential reasons it was
11  happening.
12 BY MR. KREITZER:
13   Q.  Let me turn your attention to paragraph 46
14  of the amended complaint on page 16.
15       The allegation is that, "Inflated
16  projected enrollment numbers, upon which monthly
17  draws were premised, were transmitted to the
18  financial services office which, in turn, resulted
19  in the financial services office drawing
20  substantially more than it should have."
21       Did I read that correctly?
22   A.  You did.
23   Q.  Did you find any evidence, in connection
24  with your forensic examination to suggest that my
25  clients inflated projected enrollment numbers upon

Page 97

1  which monthly draws were premised?
2       MS. WRIGHT:  Objection.
3       THE WITNESS:  I don't know one way or the
4   other.
5 BY MR. KREITZER:
6    Q.  Okay.
7    A.  Other than it's another potential way that
8  balance that I had found in my analysis would come
9  to be.
10   Q.  Let me turn your attention to paragraph 60
11  on page 19 of the amended complaint.
12       The allegation is as follows,
13  "Significantly, the financial services office would
14  regularly post refunds resulting from student
15  withdrawals to its internal records, meaning it
16  specifically knew that a given student withdrew and
17  that a refund was in order, but would not make
18  matching entries in COD or actually make the
19  required refund to the DOE."
20       Did I read that correctly?
21   A.  You did.
22   Q.  Did you find any evidence, in your
23  forensic examination, to support that allegation?
24       MS. WRIGHT:  Objection.  You probably
25   should read the whole paragraph.

25 (Pages 94 - 97)

Page 98

1     MR. KREITZER: You want to answer the
2 question for the witness, too, Counsel?
3     MS. WRIGHT: I'm not. You're doing
4 something misleading.
5     MR. KREITZER: I would urge you not to
6 coach him.
7     MS. WRIGHT: I'm not coaching him.
8     MR. KREITZER: He's a very sophisticated
9 witness who has testified more than a hundred
10 times, according to his testimony.
11     MS. WRIGHT: I'm glad you agree.
12     MR. KREITZER: I don't think you need to
13 coach him, all right?
14     MS. WRIGHT: You offered to let him read
15 all of footnote 8 before. I'm just saying --
16     MR. KREITZER: He's welcome to read
17 whatever he'd like. I just don't think you
18 should be helping him. He's doing just fine on
19 his own.
20     MS. WRIGHT: I agree.
21     MR. KREITZER: Okay. Good. Then you
22 don't need to help him.
23     MS. WRIGHT: Why don't you just wait for
24 his -- listen to his answer.
25     THE WITNESS: First, I want to make sure

Page 99

1 we're communicating. I did not say I testified
2 over a hundred times. Just for the record.
3 BY MR. KREITZER:
4     Q. Would you like me to ask the question
5 again. Why don't I?
6     A. Why don't you. Thank you.
7     Q. You're welcome to read, sir, any parts of
8 this amended complaint, including the entirety of it
9 at your leisure.
10     But I'm asking you specifically about the
11 first sentence of the allegation in the amended
12 complaint in paragraph 60. And it says,
13 "Significantly, the financial services office would
14 regularly post refunds resulting from student
15 withdrawals to its internal records, meaning it
16 specifically knew that a given student withdrew and
17 that a refund was in order, but would not make
18 matching entries in COD or actually make the
19 required refund to the DOE."
20     Did I read that correctly?
21     A. You did.
22     Q. Okay. My question is simply this. In
23 connection with your personal forensic examination
24 of this case, did you find facts to support that
25 allegation?

Page 100

1     MS. WRIGHT: Objection.
2     THE WITNESS: Yes.
3 BY MR. KREITZER:
4     Q. What facts did you find to support that
5 allegation?
6     A. Well, first --
7     Q. Forgive me. Let me withdraw that and ask
8 it differently.
9     Is this one of your opinions? Is this one
10 of your opinions in the case?
11     A. It's not worded like this in my report,
12 no. My opinions are about the balances and they're
13 described in my report.
14     Q. Then let's move on.
15     I'd like to turn your attention to
16 paragraph 66.
17     Did you find any evidence to support this
18 allegation that the financial services office did
19 not reconcile its COD-G5 discrepancies monthly as
20 required by DOE regulations and, instead, would only
21 reconcile discrepancies at the end of each program
22 year?
23     A. I have found evidence about the failure to
24 reconcile, yes.
25     Q. And that the school would only reconcile

Page 101

1 discrepancies at the end of each program year, you
2 found evidence to support that?
3     A. I don't know when they -- how to
4 understand when they did it. I know they did it
5 during fiscal '14.
6     Q. So you didn't find any forensic evidence
7 to support the allegation that the school would only
8 reconcile discrepancies at the end of each program
9 year, correct?
10     MS. WRIGHT: Objection.
11     THE WITNESS: I don't know how to time it
12 for you. I just know they weren't doing them.
13 BY MR. KREITZER:
14     Q. Let me turn your attention to paragraph 80
15 of the amended complaint.
16     Do you have an opinion as to whether,
17 beginning in early December 2013, if not sooner, FCC
18 abandoned the pretense of limiting draws to
19 projected enrollments?
20     A. I recall the December predraw that wasn't
21 related to projected enrollment as I sit here.
22     Q. Tell me what evidence you have uncovered
23 in connection with your forensic opinion to cause
24 you to conclude that the December predraw wasn't
25 related to projected enrollment.

26 (Pages 98 - 101)

Page 102

1    A.  Well, again, it would relate to the
2  balance and the substantial disconnect between G5,
3  STARS and COD.
4    Q.  So do I understand correctly from your
5  opinion, that your sole evidence to cause you to
6  conclude that the December predraw wasn't related to
7  projected enrollment was the disconnect between the
8  balance between G5, STARS and COD?
9        MS. WRIGHT:  Objection.
10        THE WITNESS:  No, that wouldn't be my sole
11     evidence.  I cite testimony and e-mails and
12     other business records throughout my report,
13     but you're asking about December, and I
14     remember the December predraw and there was
15     testimony about that.
16  BY MR. KREITZER:
17    Q.  Aside from testimony of other witnesses,
18  did you uncover any facts in connection with your
19  forensic analysis to cause you to conclude that the
20  December predraw wasn't related to projected
21  enrollment?
22    A.  I didn't categorize it that way.  I see
23  that my opinion is supporting this as to the why.
24  But there's certainly a disconnect in December,
25  among other months.

Page 103

1    Q.  When you say "there's certainly a
2  disconnect in December," you mean a difference
3  between the balance in G5 and the balance in COD,
4  correct?
5    A.  And the balance in STARS, as I've used
6  STARS in my report.
7    Q.  And other than that disconnect that you
8  just described, are you aware of any other forensic
9  evidence to support that allegation?
10        MS. WRIGHT:  Objection.
11        THE WITNESS:  We've already talked about
12     testimony and the forensics -- the bad debt
13     write-down would also indirectly support that,
14     because if there was no students and it was off
15     of something else, that would be a reason why
16     you don't know which campus to apply to.
17  BY MR. KREITZER:
18    Q.  Anything else?
19    A.  That's all that comes to mind as I sit
20  here.
21    Q.  Let me talk to you a few minutes about
22  STARS.
23        You mentioned that there was a disconnect
24  between G5, COD and STARS.
25        Do you remember that testimony?

Page 104

1    A.  Yeah, at times, yes.
2    Q.  Explain to us what you mean by the
3  disconnect in respect to STARS.
4    A.  The STARS records available provided cash
5  basis revenue for FCC at certain times, and that was
6  very different, at times, than G5 and COD.
7    Q.  Do you know why it was different?
8        MS. WRIGHT:  Objection.
9        THE WITNESS:  I assume multiple things can
10     influence those numbers, but one of them would
11     be drawing more G5 than you're supporting.
12  BY MR. KREITZER:
13    Q.  What do you mean by "drawing more G5 than
14  you're supporting"?
15    A.  Pulling down more G5 Title IV money than
16  is substantiated.
17    Q.  And what do you mean by "than is
18  substantiated"?  "Pulling down more G5 money than is
19  substantiated"?
20    A.  Substantiated at COD with the student
21  records to support the money you're drawing down.
22    Q.  If a student file was rejected by COD,
23  what would be the effect of that rejection on the
24  balance between G5, COD and STARS, if you know?
25        MS. WRIGHT:  Objection.

Page 105

1        THE WITNESS:  In theory, the rejection in
2     COD would remove that amount of dollars from
3     the substantiated balance.
4  BY MR. KREITZER:
5    Q.  So, in other words, a rejection would
6  cause the imbalance between G5 and COD to grow,
7  correct?
8        MS. WRIGHT:  Objection.
9        THE WITNESS:  For a time.
10  BY MR. KREITZER:
11    Q.  Get bigger?
12    A.  For a time.
13    Q.  Right.  And what would be the effect of a
14  reject on the record, the student's record in STARS,
15  if you know?
16        MS. WRIGHT:  Objection.
17        THE WITNESS:  It depends if they recorded
18     the reject back into STARS or not.
19  BY MR. KREITZER:
20    Q.  Did they?  What did your research show?
21    A.  There was a lot going on during the
22  reconciliation process.  So I can't tell you what
23  they were doing during that process.
24        Eventually, they were -- the reject
25  problem, I understood, was between STARS out to COD

Page 106

1 through Region 8, and so it was a COD problem from
2 the testimony I've seen, but a lot went on during
3 the reconciliation, and so --
4      Q.  We're going to come back to this, and
5 we're going to spend a lot of time on it, but when
6 you say the reconciliation -- I think you called it
7 the reconciliation problem, or the reconciliation
8 project, but let me not put words in your mouth --
9 you called it the reconciliation process.
10      So let me just understand, what do you
11 mean by "the reconciliation process"?
12      A.  Thank you.  There was an effort in late
13 fiscal '14, once the DOE -- it started happening
14 with the DOE after the March -- early March DOE
15 communication.  There was a process to reconcile G5
16 and COD, reconcile internally with the bank
17 statements back to G5, things like that.
18      The witnesses referred to the
19 reconciliation project that involved Mr. Yousefi,
20 Mr. Pierne talked about it, things like that.
21      Q.  Have you ever heard of a reconciliation
22 project regarding R2T4 or refunds?
23      A.  I believe that was part of that.
24      Q.  So, in your mind's eye, the reconciliation
25 project, using that term broadly, includes not only

Page 107

1 whatever efforts were being undertaken to explore
2 the R2T4 and refund project, but also the return to
3 the Department of Education of what you claim are
4 unsubstantiated balances between G5 and COD,
5 correct?
6      MS. WRIGHT:  Objection.
7      THE WITNESS:  Well, I'm using the term
8      like the witnesses used the term.
9      There was talk about a reconciliation
10      project in late fiscal '14, and I understand it
11      included many things, such as refunds and R2T4,
12      the cash balances with bank statements, things
13      like that.
14 BY MR. KREITZER:
15      Q.  Okay.  Now, I want to go back to STARS for
16 a moment.
17      If the testimony in this case were that
18 upon a student record being rejected by COD, that
19 whatever credit was -- whatever credit was posted in
20 the student's account, vis-a-vis, a disbursement
21 would be reversed because the COD wasn't approved,
22 how would that affect the -- the imbalance between
23 G5, COD and STARS?
24      MS. WRIGHT:  Objection.
25      THE WITNESS:  Again, if COD and STARS

Page 108

1      reflects something that is not substantiated
2      and it's adjusted, they would show an imbalance
3      between G5 until you either correct the
4      rejection and paper it back up to COD and STARS
5      or return the money.
6 BY MR. KREITZER:
7      Q.  In connection with the imbalance between
8 G5, COD and STARS, did you perform any forensic
9 analysis with respect to individual student records
10 to understand what actual student data, for lack of
11 a better term, was affecting that imbalance?
12      Do you understand my question?
13      MS. WRIGHT:  Objection.
14      THE WITNESS:  I don't know if I do.
15 BY MR. KREITZER:
16      Q.  Okay.  To the extent there was an
17 imbalance between G5, COD and STARS, would you agree
18 with me that that imbalance would have been caused
19 by the fact that the STARS -- the STARS data showed
20 a different number than the COD data which showed a
21 different number than the G5 data with respect to
22 draw-downs from the Department of Education?
23      A.  I think that's one sided, because it's not
24 just draw-downs.  It's also the substantiation of
25 student records.  So it's two different concepts

Page 109

1 there.
2      Q.  By substantiation of student records, you
3 mean the upload into COD of the actual disbursement
4 that occurred as a consequence of the G5 draw-down,
5 right?
6      MS. WRIGHT:  Objection.
7      THE WITNESS:  Not necessarily.  It's,
8      again, COD is reflecting what's substantiated.
9      They're pulling money before and after that
10      point at times, but, again, COD reflects what's
11      been substantiated.
12 BY MR. KREITZER:
13      Q.  What do you mean by "COD reflects what has
14 been substantiated"?
15      MS. WRIGHT:  Objection.
16      THE WITNESS:  I mean what FCC has uploaded
17      and told the DOE and what the DOE has accepted
18      and posted.
19 BY MR. KREITZER:
20      Q.  And if -- I want to ask you a
21 hypothetical.
22      If, on any given day, FCC had $100,000,
23 round numbers, $100,000 of student records of
24 students who were entitled to receive a Title IV
25 direct loan on any particular day, and the school

28 (Pages 106 - 109)

Page 110

1 wished to process that $100,000 worth of students,
2 is it your understanding that a step in that process
3 would be for the school to draw down $100,000 from
4 the G5 system at the Department of Education?
5       MS. WRIGHT:  Objection.
6       THE WITNESS:  Yes, that could be a step in
7    the theoretical process, depending on your
8    status with the DOE.
9 BY MR. KREITZER:
10   Q.  Correct.  And then, within a certain
11 period of time, the school has an obligation to
12 upload into the COD system the actual disbursements
13 that were made to the students that made up that
14 $100,000, right?
15   A.  Yes.  At that level, it's -- they have
16 some obligation to basically put in the COD, the
17 student detail, if you will.  The G5 is a wire.  No
18 student detail.  In COD, they put the student detail
19 that's supposed to be related to that amount.
20   Q.  And if there were $100,000 worth of
21 student detail, then, at the end of that
22 transaction, that is, the G5 draw-down and the COD
23 upload of disbursements, there would be no imbalance
24 at all, correct?
25   A.  In your hypothetical example, yes.

Page 111

1   Q.  Now, if the COD system rejected
2 $50,000 worth of those $100,000 of students, what,
3 if any, imbalance would appear at that moment in
4 time?
5   A.  At that instance --
6       MS. WRIGHT:  Objection.
7       THE WITNESS:  -- it would be
8    $50,000 difference.
9 BY MR. KREITZER:
10   Q.  And if that had actually occurred, would
11 you believe that -- or would you conclude that that
12 would have been an act of noncompliance by the
13 financial aid office?
14       MS. WRIGHT:  Objection.
15       THE WITNESS:  An act of non -- I don't
16    understand what you mean by an act of
17    noncompliance.
18 BY MR. KREITZER:
19   Q.  Sure.  If the COD -- if the COD system
20 rejected $50,000 worth of the files, would you
21 believe that my clients were at fault for the COD
22 system rejecting the files?
23       MS. WRIGHT:  Objection.
24       THE WITNESS:  They're subject to certain
25    regulations.  I'm not getting into that, but I

Page 112

1    understand, in my analysis, that they're
2    supposed to, at some point in time,
3    substantiate the draw-down of money.
4 BY MR. KREITZER:
5   Q.  In your mind's eye, it just doesn't matter
6 what the reason is that the imbalance occurs.
7       It doesn't matter to your analysis,
8 correct?
9       MS. WRIGHT:  Objection.
10       THE WITNESS:  When you say it doesn't
11    matter, in your hypothetical example, you're
12    talking about one day.
13       My analysis is about a balance over time
14    continuing.
15 BY MR. KREITZER:
16   Q.  Well, we'll get there.  We'll talk about a
17 balance over time, but I just want to focus on the
18 one day for a moment.
19       Does it matter to you, in your analysis,
20 what the reasons are why the COD file got rejected?
21   A.  Since I'm doing my analysis over time,
22 it's -- my analysis is still simply comparing the
23 balances as to why they're different.
24   Q.  Right.  Rather than the reasons why the
25 balances are different?

Page 113

1   A.  Well, my analysis has other forensic
2 accounting opinions that talk about differences with
3 STARS and bad debt concerns that go to that, but,
4 again, that particular opinion, which is the first
5 bullet on page 7, it's simply showing the difference
6 between DOE balance, COD and G5.
7   Q.  Again, without regard to the reasons why
8 there's an imbalance?
9   A.  That particular work isn't discussing the
10 why.  But to answer your question, it is looking at
11 it over time, so the why about a particular day is
12 less important.
13   Q.  Okay.
14       MR. KREITZER:  Why don't we break for
15    lunch and we'll reconvene.
16       THE VIDEOGRAPHER:  Let's go off the
17    record.  The time is 12:24.
18       (Lunch recess taken.)
19       THE VIDEOGRAPHER:  We are now back on the
20    record.  The time is 1:32.
21 BY MR. KREITZER:
22   Q.  Mr. Donohue, had you been provided with
23 sufficient records to enable you to determine
24 whether my clients were drawing down Title IV funds
25 in amounts greater than that which could have been

Page 114

1 supported by current enrollment numbers?
2     A.  I believe my analysis is directly related
3 to that, so I have been provided records that go to
4 that question, yes.
5     Q.  What records specifically are you now
6 referring to?
7     A.  Well --
8     Q.  The complete population.
9     A.  It would be the records supporting the
10 balance in G5 and the balance in COD, the records
11 concerning STARS.  There's testimony about some of
12 the predraws and things like that.
13        So those records would provide information
14 relevant to that question.
15     Q.  Tell me each STARS report or record you
16 were provided with.
17     MS. WRIGHT:  Objection.
18     THE WITNESS:  I believe we went through
19     that this morning.  I identified within my
20     report instances where I cite sources.
21 BY MR. KREITZER:
22     Q.  No, I understand.  But I'm asking you for
23 the actual STARS reports that you relied upon.
24        Do you know any of the names of the
25 reports that you relied upon?

Page 115

1     A.  I think we talked about there was
2 something called -- that people referred to as a
3 90/10 report --
4     Q.  Okay.  Anything else?
5     A.  -- within STARS.
6        Then there is STARS data.  I don't know if
7 it has a name, per se, but there's STARS data that
8 make up the cash basis revenue of the company at
9 times.
10     Q.  Anything else?
11     A.  Those are the -- the STARS data and the
12 90/10 report are the primary reports I recall as I
13 sit there.  I listed footnotes for you, and I think
14 that's what they're called.
15        I think one of my challenges is that some
16 of those are reports of STARS information.  Do I
17 have -- what other people call them, I don't know.
18 But it's STARS data.
19     Q.  Okay.  And in connection -- the STARS data
20 that you're referring to is that which enabled you
21 to determine or understand the cash basis revenue of
22 FCC, correct?
23     A.  Yes.  It's one of the things, absolutely.
24     Q.  Were you able to access the individual
25 student data for the periods fiscal year '13, fiscal

Page 116

1 year '14?
2     MS. WRIGHT:  Objection.
3     THE WITNESS:  Some of that STARS data is
4     by student as opposed to a collective total for
5     a period.
6 BY MR. KREITZER:
7     Q.  So, in other words, you weren't able --
8 well, were you able to look at the entire population
9 of students who received financial aid as reported
10 in the STARS system for the fiscal year 2014?
11     MS. WRIGHT:  Objection.
12     THE WITNESS:  It appeared to be a record
13     of fiscal '14.  I don't know if there's more,
14     but there was a STARS -- there was STARS data
15     that was by student that was the vast majority
16     or purported to be all of fiscal '14.
17 BY MR. KREITZER:
18     Q.  Was it all students who received financial
19 aid in fiscal year '14?
20     MS. WRIGHT:  Objection.
21     THE WITNESS:  I don't know if there's
22     others, but the way the reports were looked at,
23     it was looking at cash basis revenue for fiscal
24     '14 and there's some for fiscal '13.
25 BY MR. KREITZER:

Page 117

1     Q.  I'm not asking about cash basis revenue.
2 I'm asking you about specific student by
3 identification, name, et cetera, that identified how
4 much that student was disbursed or not disbursed
5 during fiscal year '14 for attending classes at FCC.
6        Were you able to access that data?
7     MS. WRIGHT:  Objection.
8     THE WITNESS:  There were student level
9     records for fiscal '14 for cash basis revenue
10     that I understand comes from STARS.
11 BY MR. KREITZER:
12     Q.  What student level records are you
13 referring to now?
14     A.  I am referring to -- I'm sorry.  Let me
15 ask you to clarify.  Can you just clarify your
16 question?
17     Q.  Sure.  You said there were student level
18 records for fiscal '14.  And so I'm asking you to
19 identify for me what those records were.
20        While you're at it, I'm going to ask you
21 the same question with respect to fiscal year '13,
22 so if you find them at the same time, that would be
23 great.
24     A.  My Exhibit 9, source 6.
25     Q.  Okay.  Of the document entitled

30 (Pages 114 - 117)

Page 118

1  P2222704-705?
2      A.  Yes.  I believe that Excel file has
3  student level information.
4      Q.  Okay.  Anything else that you relied upon
5  for student level information, other than that one
6  document?
7      A.  I believe that those -- the IEC footnotes
8  in the sources 2 and 5 may also be student level,
9  but I need to look at the file to confirm.
10     Q.  Did you bring those files with you?
11     A.  As I talked about this morning, I only
12  brought my report with me.
13     Q.  Even though you were required by the
14  notice to do it.  So you're not able to answer these
15  questions today; is that correct?
16     MS. WRIGHT:  Objection.
17     THE WITNESS:  I have answered your
18  question.
19     MS. WRIGHT:  You have them.  We provided
20  copies to you.  We identified it to you.
21     MR. KREITZER:  Excuse me.  Counsel, I
22  think -- you're not under oath at the moment,
23  but I can put you under oath if you want.
24     MS. WRIGHT:  Be my guest.  Give it a shot.
25  BY MR. KREITZER:

Page 119

1      Q.  Anything else, sir?
2      A.  Source 2 and source 5, I believe, are
3  student level.
4      Q.  Anything else that you relied upon in
5  forming your opinions with respect to student level
6  data?
7      A.  These other STAR data references, I would
8  need to look at to see if it was student or not.
9      Q.  This is your chance, sir, so tell us what
10  it is.
11     MS. WRIGHT:  Objection.
12     THE WITNESS:  I do recall some other
13  STARS-type data being at a student level.  I
14  can't tell you which one of these files may
15  have had other student level data as I sit
16  here, other than the ones I gave you.
17  BY MR. KREITZER:
18     Q.  Okay.  Thank you.
19     From that data that you claim you
20  reviewed, would you have been able to determine
21  whether the school had sufficient students on
22  rosters during any given draw to substantiate the G5
23  draw?
24     Would you have been able to determine that
25  if you elected to do so?

Page 120

1      MS. WRIGHT:  Objection.
2      THE WITNESS:  As we talked about this
3  morning, as to any given draw, that data was
4  aggregated by student, often by type of STARS
5  entry.  So my analysis was looking at the
6  balances.
7      I don't recall --
8  BY MR. KREITZER:
9      Q.  You don't mean it was aggregated by
10  student.  You mean it was aggregated in total,
11  correct?
12     I don't understand what you mean by
13  "aggregated by student."  It seems like a
14  contradiction.
15     A.  Sorry.  Sometimes it would total activity
16  for a student.
17     Q.  What do you mean by that?
18     A.  For a particular transaction type, it
19  would total the activity for a student, for example.
20     Q.  I don't understand what you mean.  So
21  let's break that down.
22     By transaction type, what do you mean by
23  that?
24     A.  Well, within STARS, there are multiple
25  transaction types in the data, and some reports I've

Page 121

1  seen at times might aggregate individual line items
2  for a particular student or a particular transaction
3  type, a refund or --
4      Q.  What do you mean by "aggregate"?
5      A.  Total, total.
6      Q.  So, in other words, are you saying that
7  you had access to each student, and that student's
8  data, that would have justified a particular G5
9  draw.  That's what I'm asking you.
10     MS. WRIGHT:  Objection.
11  BY MR. KREITZER:
12     Q.  Did you have that student level data
13  available to you?
14     MS. WRIGHT:  Objection.
15     THE WITNESS:  I don't know if it justified
16  a G5 draw, but I had student level data within
17  STARS information that was by student that
18  rolled up and provided the totals that you see
19  in Exhibit 9 and other places for cash basis
20  revenue for STARS.
21  BY MR. KREITZER:
22     Q.  Okay.  And, again, you've already told us,
23  then, what documents you're referring to, correct?
24     A.  I have given you a couple of examples.
25     Q.  No.

31 (Pages 118 - 121)

Page 122

1    A.   I strongly suspect that some of the other
2 files also have detail.
3    Q.   Take all the time you need, sir, but I
4 want to identify every document you relied upon
5 that had student level records.
6        We'll wait as long as you need, because we
7 intend to ask you about those records.  So it's
8 incredibly important that we know what they are.
9    A.   I believe I already covered the ones on
10 Exhibit 9.
11       I had a few specific, and a few of those
12 other ones may include detail as well.
13   Q.   Let's go through them.
14       You said 2, 5 and 6, footnotes 2, 5 and 6,
15 right?
16   A.   Yes.
17   Q.   Anything else?
18   A.   Not that I can recall or remember as I sit
19 here.
20   Q.   Okay.  Thank you.
21   A.   And then -- again, on 10C, I believe that
22 some of that IEC data may be by student.
23   Q.   What IEC data are you referring to?
24   A.   On 10C, there's some sources, 1 and 2, and
25 that may be by student, but I can't be sure as I sit

Page 123

1 here.
2    Q.   Exhibit 9A and Exhibit 7C.  Is that what
3 you're referring to?
4    A.   No.  I'm sorry.  10C, as in cat.  10C, as
5 in cat.
6    Q.   Okay.  Let's take a look.
7    A.   Sources 1 and 2.
8    Q.   So that is the AR history summary, 2012,
9 2013, Excel SX, correct?
10   A.   Yes.
11   Q.   And AR history summary 2013, 2014 and then
12 there's a big long number, but it's footnote number
13 2, correct?
14   A.   Yes.
15   Q.   Any others that you claim is source --
16 that you claim is student level records?
17       MS. WRIGHT:  Objection.
18       THE WITNESS:  That's all that comes to
19 mind.
20       I recall seeing student level data in the
21 IEC production, and I cited a few here.  I
22 don't know if there's more.
23 BY MR. KREITZER:
24   Q.   Let me turn your attention to your
25 report -- in fact, before I get there, I apologize.

Page 124

1 Let me ask you one more question.
2        I had put Exhibit 190 in front you a
3 moment ago.  Let me just cover that since it's in
4 front of you and then we'll move on from there.
5        Exhibit 190 is the Declaration of Sean
6 Harding in Support of the Debtor's Chapter 11
7 Petitions and Request for First Day Relief.
8        Did you have an opportunity to review this
9 document in formulating your opinions in this case?
10   A.   Yes.
11   Q.   And you understood that Mr. Harding was
12 making these statements under penalty of perjury,
13 correct?
14   A.   Yes, I believe that's probably --
15 hopefully, the standard, as it says on page 48.
16   Q.   I want to turn your attention to page 20
17 of his sworn statement.  And, in particular, I want
18 to refer first to paragraph 46.
19       Mr. Harding writes -- first of all, do you
20 understand who Mr. Harding is and was?
21   A.   Yes.
22   Q.   Okay.  What was Mr. Harding's role, if
23 anything, in connection with FCC?
24   A.   I understand that, in fiscal '14, FTI and
25 Mr. Harding, through FTI, was brought in to work

Page 125

1 with FCC.
2    Q.   What was Mr. Harding's role in working
3 with FCC?
4    A.   I believe it was -- for lack of a better
5 term, a restructuring advisor to come in and work
6 with FCC to see what was going on and investigate.
7    Q.   Okay.  Did you have occasion to interview
8 Mr. Harding at any time in connection with
9 formulating your opinions?
10       MS. WRIGHT:  Objection to form.
11       THE WITNESS:  I did not.
12 BY MR. KREITZER:
13   Q.   Did speak with him in any respect?
14   A.   I did not talk with Mr. Harding, no.
15   Q.   Did any of your team have occasion to
16 speak with Mr. Harding?
17   A.   No.
18   Q.   At paragraph 46, Mr. Harding writes, "The
19 debtor's financial problems began upon ETC," you
20 understand that to be FCC, effectively, right?
21   A.   I do.
22   Q.   So "The debtor's financial problems began
23 upon FCC's acquisition of Anthem Education in 2012."
24   A.   Do you agree with that statement, by the
25 way, based on your forensic examination?

32 (Pages 122 - 125)

Page 126

1    MS. WRIGHT:  Objection.
2    THE WITNESS:  I don't know if I agree or
3    disagree.  I understand people have testified
4    that the Anthem acquisition was a big
5    acquisition for the company, and I've seen this
6    testimony before or this declaration before.
7 BY MR. KREITZER:
8    Q.  Did you reach any conclusions on whether
9 the acquisition of Anthem had an adverse financial
10 impact upon FCC?
11    A.  No.  My opinions and my report are not
12 about the Anthem acquisition, per se, but it was
13 about the combined Anthem/FCC organization
14 thereafter.
15    Q.  Did you perform any cash flow analyses of
16 FCC beginning at the time that FCC acquired Anthem
17 in April of 2012 and going forward?
18    A.  Nothing that would begin in April 2012.  I
19 looked at cash flow activity throughout the period,
20 but my focus was largely fiscal '14, and I also
21 provided some cash flow information for fiscal '13.
22    Q.  How, if at all, did the Anthem acquisition
23 affect the cash flow or affect the available
24 resources -- strike the question.
25    How, if at all, did the acquisition of

Page 127

1 Anthem in April of 2012 affect the ongoing ability
2 of FCC to timely meet its financial obligations?
3    MS. WRIGHT:  Objection.
4    THE WITNESS:  Can you read that back,
5    please?
6 BY MR. KREITZER:
7    Q.  Sure.  How, if at all, did the acquisition
8 of Anthem -- let me read it exactly.
9    How, if at all, did the Anthem acquisition
10 affect the cash flow -- I'm reading the wrong
11 question.  Let's try it one more time.
12    How, if at all, did the acquisition of
13 Anthem in April of 2012 affect the ongoing ability
14 of FCC to meet timely its financial obligations?
15    MS. WRIGHT:  Objection to the form.
16    THE WITNESS:  I don't have an analysis of
17    that as I sit here.  It's an acquisition
18    that -- resources capital was raised for the
19    acquisition, some of it was used to pay for the
20    acquisition, some of it was used as excess
21    capital into the business.  It provided
22    revenue.  It provided cost.  I haven't analyzed
23    that question.
24 BY MR. KREITZER:
25    Q.  Fair enough.  Okay.

Page 128

1    Mr. Harding writes, "At the time of the
2 acquisition, Anthem Education had been a distressed
3 company that was losing approximately $800,000 of
4 cash per month."
5    Do you have any reason to dispute
6 Mr. Harding's sworn statement in that regard?
7    A.  I have no reason one way or the other.
8    Q.  Did you take into account the cash drain
9 that Anthem Education had on FCC and its financial
10 resources?
11    MS. WRIGHT:  Objection.
12    THE WITNESS:  Indirectly.  I considered
13    the FCC's records which reflect Anthem activity
14    during this time period.  So, indirectly, yes.
15 BY MR. KREITZER:
16    Q.  But not directly?
17    A.  Well, maybe better said.  It's -- Anthem
18 was acquired in April '12, so its financial activity
19 was within the records I was reviewing.  So I'm
20 directly reviewing them.
21    Did I look at Anthem separately in some
22 way?  No.  But it's within the same records I'm
23 reviewing.
24    Q.  At paragraph 47, Mr. Harding writes,
25 "Integration of the Anthem Education student

Page 129

1 information software systems and the FCC school
2 student information and financial aid management
3 software systems proved to be a major challenge for
4 the company and resulted in significant difficulties
5 and processing and reconciling Title IV funding."
6    Do you agree with Mr. Harding's statement
7 in that regard?
8    MS. WRIGHT:  Objection.
9    THE WITNESS:  I don't agree or disagree.
10    I generally recall testimony about system
11    issues in fiscal '13.  I haven't analyzed those
12    issues in fiscal '13 like Mr. Harding
13    apparently did or didn't.
14 BY MR. KREITZER:
15    Q.  So then you wouldn't know how those
16 financial aid and student information systems may
17 have actually proven to be a significant challenge
18 to FCC.
19    You just wouldn't know one way or the
20 other; is that correct?
21    A.  I recall testimony that that was
22 eventually resolved, but I wouldn't know one way or
23 the other about the instance and times that Mr.
24 Harding is talking about here.
25    Q.  Can we agree that, first of all, you don't

33 (Pages 126 - 129)

1 really have any -- you haven't derived -- I'll
2 withdraw that question.
3        You said in your last answer that the
4 student information and financial aid management
5 software had somehow been -- those problems with
6 that software had somehow eventually been resolved.
7        Do you remember that answer?
8        MS. WRIGHT: Objection.
9        THE WITNESS: Generally, I do remember
10    something suggesting that they felt they were
11    reconciled and COD and G5 were matching again,
12    things like that.
13 BY MR. KREITZER:
14    Q.   Tell me about that.  What evidence or what
15 documents did you review that caused you to conclude
16 that?
17    A.   Well, G5 and COD were matching for much
18 of -- for periods in fiscal '13, late in fiscal '13
19 when -- I guess after the software issue came to
20 light.
21    Q.   Did you confirm, independently, that, in
22 fact, COD and G5 were matching in 2013 at a point in
23 time, that is, hey were reconciled or substantiated?
24    A.   Yes.  There's certain data points, along
25 with STARS data that show that, like for a

1 particular OPE ID, for a particular loan year, that
2 the two are in balance, according to those records.
3    Q.   What about for all three of the OPE IDs
4 that you examined?
5        MS. WRIGHT: For 2013, right?
6        MR. KREITZER: Yes.
7        THE WITNESS: I can't recall all three as
8    I sit here, but I do recall testimony
9    suggesting that things -- they believed they
10    were reconciled, and things were in balance at
11    certain times, and a balance -- an
12    unsubstantiated balance issue in fiscal '13 was
13    brought down to the point that allowed the
14    schools to go back on -- at least some of the
15    OPE IDs, go back on advanced pay, for example.
16 BY MR. KREITZER:
17    Q.   Were you aware of the fact that some time
18 in 2013, there was a cash freeze implemented by the
19 department with respect to several of the OPE IDs?
20    A.   Yes.
21    Q.   What was the cause of that cash freeze, if
22 you know?
23        MS. WRIGHT: Objection.
24        THE WITNESS: Barbara Davis and the DOE
25    would have more information about that than me,

1 but I had understood it, from the testimony,
2    that it was, in part, due to the difference
3    between the G5 balance and the COD
4    substantiated balance.
5 BY MR. KREITZER:
6    Q.   So what you're saying, I think, is that
7 here was a point in time, in 2013, where the G5
8 balance and the COD balance were not reconciled,
9 that there was a difference between the two,
10 correct?
11    A.   Absolutely.
12    Q.   When was that, if you know?
13    A.   I want to say April.  I believe April of
14 2013.
15    Q.   And did your forensic analysis of the
16 records of FCC reveal to you how those accounts
17 became out of balance?
18    A.   Well, they became out of balance by having
19 more G5 Title IV funds than were substantiated in
20 COD.
21    Q.   And do you know why there was more G5
22 Title IV funds than what was substantiated or
23 reconciled in COD?
24    A.   A combination of pulling down more cash or
25 not substantiating.

1    Q.   Do you know why the COD accounts were not
2 substantiated?  Were you able to determine that from
3 your review of FCC's records?
4    A.   I recall testimony about it.  I don't
5 recall specifically, but I generally recall
6 testimony about what was going on at the time.
7    Q.   So you didn't do any independent analysis
8 in that respect, correct?
9    A.   Well, other than reviewing the factual
10 information about the G5 balances and the COD
11 balances and STARS balances to some degree as well
12 back at that time.
13    Q.   Did you, in your review of other
14 deposition testimony in this case, did you become
15 aware of the fact that the student information
16 systems and the financial aid management systems
17 caused by the integration of these two schools, that
18 is, Anthem and FCC, caused significant difficulties
19 in processing Title IV funds?
20        MS. WRIGHT: Objection.
21        THE WITNESS: I'm aware of testimony
22    saying that.  I'm aware of testimony talking
23    about challenges in fiscal '13.
24 BY MR. KREITZER:
25    Q.   Were you able, forensically, to dispute

34 (Pages 130 - 133)

Page 134

1 any of that testimony, that is, did you come across
2 any records, not testimony, but records in the
3 company that would cause that not to be the case or
4 cause you to question that testimony?
5         MS. WRIGHT:  Objection.
6         THE WITNESS:  Indirectly, yes.
7 BY MR. KREITZER:
8    Q.  What did you come across?
9    A.  I came across -- I later learned that bank
10 statements weren't being reconciled with G5,
11 financial accounting wasn't necessarily working with
12 them in a way to reveal some of these issues.  So it
13 did, indirectly, give me some pause about what
14 people were believing at the time and why those
15 things were caused.
16        But that's just my observation from
17 looking at the records.
18    Q.  What testimony are you relying upon to
19 cause you to conclude that financial accounting
20 wasn't working with financial aid in the year 2013?
21        MS. WRIGHT:  Objection.
22        THE WITNESS:  Well, testimony from
23    Mr. Dicicco, testimony from Mr. Zutes,
24    testimony from Mr. Pierne.  Ms. Zutes' report.
25 BY MR. KREITZER:

Page 135

1    Q.  Was Ms. Zutes even at the company in 2013?
2
3    A.  No.
4    Q.  So you think she had -- did you place any
5 great weight on what Ms. Zutes said about what the
6 company was doing in 2013 when she wasn't even
7 there?
8    A.  Maybe we're not communicating, but I
9 didn't say that she said something specifically
10 about '13.  She said things and she found things
11 that were concerning about the accounting
12 infrastructure.  And, to my knowledge, that's the
13 same infrastructure they had in '13 versus '14.
14    Q.  So you're just concluding that, because
15 whatever Ms. Zutes said in 2014 must be true for
16 2013.  That's your conclusion?
17        MS. WRIGHT:  Objection.
18        THE WITNESS:  Well, my conclusion is that
19    if there weren't processes to do these things,
20    I haven't seen evidence to suggest the process
21    was happening and stopped.
22 BY MR. KREITZER:
23    Q.  What process is it exactly that you're now
24 referring to that didn't exist?
25    A.  Well, for example, she talks about bank

Page 136

1 reconciliations, where you would compare the draws
2 from STARS -- I'm sorry -- the draws from G5 with
3 your student ledgers.
4    Q.  Okay.  Were you able to independently
5 confirm whether the company's bank statements
6 reconciled with the STARS data?
7        MS. WRIGHT:  Objection.
8        THE WITNESS:  Can you help me when?
9 BY MR. KREITZER:
10    Q.  Yeah, in 2013, at the point in time we're
11 talking about.
12        I mean, let's take a step back.
13        You've told us that you drew the
14 conclusion that the company was not reconciling its
15 bank statements with monies received in G5, and I
16 think you also told us, but you'll correct me if I'm
17 wrong, that you concluded that, in 2013, the
18 financial accounting department was not working with
19 the financial aid department.
20        Did I understand your testimony correctly?
21        MS. WRIGHT:  Objection.
22        THE WITNESS:  I think you generalized it a
23    little too much.
24 BY MR. KREITZER:
25    Q.  Okay.  So correct me.

Page 137

1    A.  I don't think I said -- for example, you
2 asked me what evidence I had about my concerns with
3 the rationale provided in fiscal '13 as to why there
4 was imbalances, and I provided my answer which was
5 about my concern with the accounting infrastructure
6 and that included evidence provided by Ms. Zutes
7 that the bank reconciliations weren't happening
8 properly, but also included looking at fiscal '14
9 and understanding how disconnected financial
10 accounting was from the financial aid people, and
11 recognizing that there's no suggestion that that
12 changed.  And so that's what I'm driving at.
13        It's Mrs. Zutes' comments about the bank's
14 reconciliations, for example.
15    Q.  Were you able to independently verify any
16 of Ms. Zutes' statements or claims in that regard?
17    A.  Yes.
18    Q.  How did you independently verify it?
19    A.  Well, my analysis, which does largely
20 relate to fiscal '14.
21    Q.  Well, I'm talking about '13, now, sir.
22 Let's stay with '13.
23    A.  Okay, '13.
24        So my analysis for fiscal '13 would still
25 be relevant because it's looking at that data and

35 (Pages 134 - 137)

1 noticing it's not reconciled, and there's these
2 unsubstantiated balances that are not necessarily
3 being reflected by financial accounting, and so that
4 would give pause about the fiscal '13 activity.
5    Q.   So you're basing your conclusion about
6 fiscal '13 on what you observed in '14?
7        MS. WRIGHT:  Objection.
8        THE WITNESS:  About the processes then.
9 BY MR. KREITZER:
10   Q.   Did you observe any of those facts in
11 2013?  I've asked you that three or four times now.
12       MS. WRIGHT:  He also answered it three or
13   four times.
14       THE WITNESS:  In addition to my concern
15   from fiscal '14, I do recall some documents
16   that showed that the bank accounts would have
17   amounts or I should say the OPE ID dollars
18   drawn for that month in the bank account were
19   different than the STARS reconciliation.
20       They're there.  I recall those.
21 BY MR. KREITZER:
22   Q.   Okay.  Anything else?
23   A.   No.  I think I covered it.
24   Q.   What, if any, impact, do you think
25 rejected student records out of COD would have on

1 the reconciliation between the company's bank
2 accounts and the STARS data, if you know?
3    A.   I don't have anything specific for you
4 but, in theory, obviously, the three work in tandem
5 at times.  And if you put one and one but not the
6 other, it would have an impact.
7    Q.   Were you able to determine, from your
8 forensic examination, what the difficulties were
9 that the company had in processing and reconciling
10 Title IV funds in 2013 were?
11       MS. WRIGHT:  Objection.
12       THE WITNESS:  I only recall from testimony
13   that there was -- I recall testimony about the
14   Regent software, rejects, R24, things like
15   that.
16 BY MR. KREITZER:
17   Q.   Anything else you recall?
18   A.   No.  That's generally what I recall.
19   Q.   So what did you understand, from your
20 forensic examination, that -- or how the Regent 8
21 software caused problems with the school's ability
22 to reconcile the G5 with the COD accounts?
23       MS. WRIGHT:  Objection.
24       MR. KREITZER:  What's your objection?
25       MS. WRIGHT:  I'm not sure if it properly

1 transcribed.
2       "So what did you understand from your
3   forensic examination, how the Regent 8 software
4   problems caused problems with the school's
5   ability to reconcile."
6       MR. KREITZER:  So your objection is with
7   the way in which the court reporter is --
8       MS. WRIGHT:  No, not at all.
9       MR. KREITZER:  -- simultaneously
10   reporting?
11       MS. WRIGHT:  No.  First of all, you paused
12   in the middle of it and sort of changed the
13   question.
14       MR. KREITZER:  We'll move on.
15       MS. WRIGHT:  Why don't you try -- try
16   again?
17       MR. KREITZER:  Respectfully, let's not
18   base your objections on a realtime screen,
19   because I think we would all agree that the
20   court reporter's working as hard as she can,
21   but not every word comes out correct.
22       MS. WRIGHT:  I actually think she recorded
23   your question correctly.  I didn't understand
24   your question as posed.  That was the
25   objection.  It didn't make sense, and there was

1 no foundation to it.
2 BY MR. KREITZER:
3    Q.   What do you understand the Regent 8 system
4 to be?
5    A.   I understand it has, from my testimony in
6 this case and things like that, from other people's
7 testimony in this case, I understand it's a software
8 program that was being used to, among other things,
9 to communicate and upload data into COD from FCC.
10   Q.   And when did, if you know, the company
11 implement the Regent 8 software?
12   A.   I don't have a date for you.  I recall
13 that there's a Regent and then a Regent 8, and I
14 just can't remember when the Regent 8 was.
15   Q.   From your forensic examination, were you
16 able to learn or understand how the Regent 8 system
17 affected the data that was transmitted to and from
18 STARS?
19       MS. WRIGHT:  Objection.
20       THE WITNESS:  How it affected data?  I
21   don't understand your question.
22 BY MR. KREITZER:
23   Q.   Sure.  So you told us that your
24 understanding of Regent 8 is that it was a software
25 program used to communicate and upload data into COD

Page 142

1 from FCC.
2      Did I understand that correctly?
3      A.  That's my layman software understanding
4 from the testimony, yes.
5      Q.  And from your forensic examination, were
6 you able to determine whether the Regent 8 system
7 properly uploaded the data from STARS into COD?
8      MS. WRIGHT: Objection.
9      THE WITNESS: I don't know.  I've seen
10     testimony suggesting at times it may not have,
11     and they're alleging it may not have, but I
12     didn't look at every Regent 8 upload into COD.
13 BY MR. KREITZER:
14     Q.  Did you look at any Regent 8 uploads into
15 COD?
16     A.  I did not look at them, but people talk
17 about them on the record.
18     Q.  So you didn't forensically, independently
19 determine anything in respect to how Regent 8
20 performed its role of uploading COD -- pardon me --
21 uploading STARS data into COD; is that correct?
22     A.  I did not look at Regent 8 code and Regent
23 8 issues like that, no, I did not look at Regent 8
24 software.
25     Q.  Did you come to understand, at any point

Page 143

1 in your forensic examination, that the Regent 8
2 program corrupted the data that was being uploaded
3 into COD?
4      A.  At times, in some testimony, there's
5 suggestion that that's -- that there was a software
6 problem with Regent 8.  That's what people are
7 saying in their testimony.
8      Q.  What consideration did you give to that
9 corruption in terms of trying to understand the
10 unsubstantiated balances between COD and G5?
11     MS. WRIGHT: Objection.
12     THE WITNESS: The consideration included
13     first recognizing that's what was being said by
14     company witnesses, and also looking at balances
15     over time.
16 BY MR. KREITZER:
17     Q.  So do you agree with the conclusion that
18 Regent 8 corrupted the data that was being uploaded
19 from STARS into COD?
20     MS. WRIGHT: Objection.
21     THE WITNESS: No, I don't agree with it
22     one way or the other.  Again, when you talk
23     about uploads, uploads occur on a weekly or a
24     daily basis.  I don't know if all were
25     corrupted or one was corrupted and when they

Page 144

1 were fixed.
2 BY MR. KREITZER:
3      Q.  All right.  So would it be a fair
4 statement to say that you didn't take into account
5 those claims by company officials of this corruption
6 issue in reaching your opinions in respect to the
7 unsubstantiated balances between G5 and COD?
8      MS. WRIGHT: Objection.
9      THE WITNESS: No, that would not be fair.
10 BY MR. KREITZER:
11     Q.  Tell me how you took into account the
12 corruption problem created by COD in reaching your
13 conclusions regarding the substantiation of G5 and
14 COD.
15     MS. WRIGHT: Objection.
16     THE WITNESS: One way I did that was by
17     not looking at an isolated draw and COD
18     substantiation.
19     I looked at multiple over time periods, in
20     fact, more than a fiscal time period, to help
21     look at the balances over time.
22 BY MR. KREITZER:
23     Q.  Do you know how Regent 8 corrupted the
24 data?
25     MS. WRIGHT: Objection.

Page 145

1 BY MR. KREITZER:
2      Q.  Has that ever been explained to you?
3      MS. WRIGHT: Objection.
4      THE WITNESS: I vaguely recall some
5     testimony about it, but ...
6 BY MR. KREITZER:
7      Q.  What do you vaguely recall?
8      A.  I vaguely recall something about
9 corrupting the record, and it would not be accepted
10 by COD.  That's what the allegation is, that they
11 would not -- that it would not end up in COD because
12 of whatever software problem.  That's what some
13 people have alleged.
14     Q.  Where did the corruption take place?  Did
15 it take place at the COD program hosted by the
16 Department of Education or at FCC, if you know?
17     MS. WRIGHT: Objection.
18     THE WITNESS: I don't know.
19 BY MR. KREITZER:
20     Q.  How many files were corrupted by Regent 8,
21 how many student files?
22     MS. WRIGHT: Objection.
23     THE WITNESS: I don't have a count for
24     you.
25 BY MR. KREITZER:

37 (Pages 142 - 145)

Page 146

1    Q.  What was the result of a file being
2  corrupted by Regent 8, how did that impact COD, if
3  you know?
4        MS. WRIGHT:  Objection.
5        THE WITNESS:  Well, in your
6     hypothetical --
7  BY MR. KREITZER:
8     Q.  There's nothing hypothetical about my
9  question, but you can answer it.
10    A.  Assuming it was corrupted, I understood
11  that the allegation is that the corruption would
12  prevent -- let's say it's a thousand dollars of
13  substantiation, it would prevent the thousand
14  dollars from being posted and accepted at COD, at
15  least at that time.
16    Q.  Okay.  And how long did the corruption
17  issue continue to infect the data of students that
18  attended FCC schools?
19        MS. WRIGHT:  Objection.
20        THE WITNESS:  I don't know.
21  BY MR. KREITZER:
22    Q.  Okay.  Would it have been meaningful for
23  you to know how long that data corruption problem
24  lasted in reaching conclusions about the
25  unsubstantiated balances between G5 and COD?

Page 147

1        MS. WRIGHT:  Objection.
2        THE WITNESS:  To the extent I was talking
3     about one day, yes, that would be meaningful to
4     know, but I'm not.  I'm talking about a long
5     time period.
6  BY MR. KREITZER:
7     Q.  Why would it be meaningful to know that if
8  it were one particular day?
9     A.  Well, if you're isolating something, and
10  there's -- it wouldn't change that the two are
11  different.  So to that extent, my analysis doesn't
12  change at all.
13    Q.  I don't understand what you mean by that.
14  I'm sorry.
15        What do you mean "it wouldn't change if
16  the two are different"?
17        What does that mean?
18    A.  Well, if G5 and COD are different and I'm
19  reporting they're different on that day and DOE
20  believed they're different on that day, it doesn't
21  change that fact that they are.
22    Q.  Okay.  But it also doesn't assist you in
23  understanding why they're different, right?
24    A.  It would assist me in understanding why
25  that particular upload was different.

Page 148

1    Q.  Okay.  So if there were, say, rejects,
2  hundreds of them, that is -- let me rephrase that.
3        If there were thousands of rejects of
4  student files in the year 2013, would that have been
5  meaningful for you to know in connection with
6  understanding why there were unsubstantiated
7  balances between G5 and COD?
8    A.  I already testified I knew about
9  allegations about Regent 8 issue in '13.  So I knew
10  that already.
11    Q.  Okay.  Did you know there were similar
12  corruption issues in 2014?
13        MS. WRIGHT:  Objection.
14        THE WITNESS:  I've seen testimony that's
15     alleging that there were similar corruption
16     issues.
17  BY MR. KREITZER:
18    Q.  In connection with your forensic
19  examination, which you tell us now you've spent over
20  $200,000 performing, were you able to verify whether
21  there were corruption issues in the COD files of
22  students who attended FCC schools that was caused by
23  Regent 8?
24        MS. WRIGHT:  Objection.
25        THE WITNESS:  I was not asked, and have

Page 149

1     not verified the software corruption issue that
2     you're talking about.
3  BY MR. KREITZER:
4     Q.  So whether the software infected the data
5  of students that attended FCC schools and whether
6  that infection of data caused the imbalance of COD
7  between G5, that's not something you were asked to
8  render an opinion about, correct?
9     A.  Can you read that back, please?
10        (Last question read back.)
11        MS. WRIGHT:  Objection.
12        THE WITNESS:  Not in that specific way,
13     no.  I was asked more broader questions about
14     the balances.
15  BY MR. KREITZER:
16    Q.  Did you review any of the reject codes
17  issued by -- do you know what a reject code is?
18  Let's start with that.
19    A.  Only a vague recollection of some
20  testimony.
21    Q.  Do you have an understanding that when a
22  file is uploaded to COD, if COD rejects that file,
23  it creates a document that identifies the students
24  whose files were rejected?  Are you aware of that?
25    A.  That was generally my vague recollection.

1    Q.  Did you review any of those documents that
2  would show files rejected by COD, student files
3  rejected by COD?
4    A.  I'm not sure.  I saw some files with
5  rejects and people saying they were rejects.  There
6  was no context to them, so I don't know if that's
7  what that is.
8    Q.  Would you agree with me that, if a file
9  was rejected by COD, that that would create an
10  imbalance between G5 and COD?
11       MS. WRIGHT:  Objection.
12       THE WITNESS:  In isolation, for that
13    particular student and their commensurate G5
14    pull, yes.
15  BY MR. KREITZER:
16    Q.  If there were thousands of these rejects
17  occurring, that would cause certainly a more
18  substantial imbalance between G5 and COD, based on
19  your understanding of how those records were,
20  correct?
21       MS. WRIGHT:  Objection.
22       THE WITNESS:  At that moment, yes, it
23    would be whatever that amount is times a
24    thousand.
25  BY MR. KREITZER:

1    Q.  In connection with your forensic
2  examination, did you look at how long it takes the
3  financial aid department to correct a student record
4  that was corrupted by the Regent 8 software?
5       MS. WRIGHT:  Objection.
6       THE WITNESS:  Nothing specific comes to
7    mind.  I just recall some testimony about it
8    taking some time to handle it.
9  BY MR. KREITZER:
10    Q.  Do you remember Barbara Davis' testimony
11  on that question?
12    A.  I think that's the testimony I recall,
13  something about somewhat manual, and it can take
14  time to put it --
15    Q.  She said, actually, it could take longer
16  than a week.
17       Isn't that what she said?
18    A.  I knew it was a day or more.  I don't
19  recall the time.
20    Q.  So if there were thousands of these
21  records infected by the defective Regent 8 software,
22  you would agree with me that it could take a very
23  substantial period of time for those records to be
24  created and for the imbalance between G5 and COD to
25  be corrected.

1       Is that a reasonable conclusion?
2       MS. WRIGHT:  Objection.
3       THE WITNESS:  I don't know one way or the
4    other.  I haven't repaired a reject myself, so
5    I don't --
6  BY MR. KREITZER:
7    Q.  So when you say that your examination
8  looked at the magnitude of the irreconciliations or
9  the imbalances and the amount of time of those
10  imbalances, and that was what you looked at,
11  correct?
12    A.  Among other things, yes.
13    Q.  You didn't take into consideration how
14  much time it may have taken the financial aid staff
15  to actually correct the records that had caused that
16  imbalance to correct the data corruption issue;
17  isn't that correct?
18       MS. WRIGHT:  Objection.
19       THE WITNESS:  I knew that if there was a
20    reject, it would take time to fix it.  So I was
21    aware of that.
22       And as I testified, that is why I looked
23    at not spot data of one draw, but I looked at
24    balances over time, and I looked at other
25    things, too, that go to that question.

1       I looked at the amount of refunds that
2    came back at certain times, coupled with
3    eventual bad debt write-downs that occurred.
4  BY MR. KREITZER:
5    Q.  Did you ever find the backup documentation
6  that categorized the actual bad debt write-down?
7       By that I mean what actual bad debts were
8  being written down?
9    A.  I did find some documents about that, yes.
10    Q.  What did you find?
11    A.  I found journal entries that recorded the
12  bad debt entry in the GL by campus, for example.
13    Q.  Uh-huh.  Anything else?
14    A.  And I think some of the reconciliation
15  work that was being done at the time in late fiscal
16  '14 related to that.
17    Q.  Anything else?
18    A.  That's what comes to mind.
19    Q.  Let's talk about the journal entries
20  first.
21       Do you actually have in your report the
22  actual text of those journal entries that recorded
23  the bad debt in the general ledger?
24    A.  When you say "the actual text," what do
25  you mean?

1    Q.  Yeah.  Well, there would be, in a journal
2  entry, right, there would actually be text
3  indicating the fact that there had been a bad debt
4  entry, right?
5    A.  Yes.
6    Q.  Okay.  What did that text say, if
7  anything?
8    A.  It said debit.  It basically had debits
9  and credits where it was reserving -- taking an
10  expense and reserving the accounts receivable by
11  campus.
12    Q.  Did it explain -- did that entry explain
13  what the reason for the bad debt was?
14    A.  It said additional bad debt.
15    Q.  Did it say anything else?
16    A.  There may have been some stuff about notes
17  receivable on the bad debt as well.  But the journal
18  entry itself, it said additional bad debt.
19    Q.  So what is it about an entry that states,
20  quote, Additional bad debt, that causes you to
21  believe that that was a write-down caused by the
22  imbalance between G5 and COD?
23    A.  Mr. Pierne's testimony and my analysis
24  overall showed -- Mr. Pierne testified that the
25  additional bad debt was due to the reconciliation

1  project, which included returning millions of
2  dollars to the DOE.
3    Q.  Let's break out your answer, because I
4  just want to be -- I want to understand specifically
5  what your thinking is in this regard.
6       Those words, "additional bad debt," that
7  you read on the general ledger, what caused -- was
8  there anything about those words that enabled you to
9  conclude that that bad debt entry was a result of
10  the reconciliation between G5 and COD?
11    A.  Yes, there was.
12    Q.  So what about those words that caused you
13  to conclude that?
14    A.  Among other things, Mr. Pierne's testimony
15  said that we're recording an additional bad debt for
16  the reconciliation project -- I'm paraphrasing --
17  but he explained that the debt -- the bad debt due
18  to the reconciliation project was recorded in March,
19  April, May and June, and he explained in multiple
20  e-mails that that's what that bad debt was for.
21    Q.  Isn't it, in fact, the truth that the bad
22  debt recorded in March, April, May and June was a
23  result of the R2T4 project?
24    A.  I would assume it's part of it.
25  Mr. Pierne characterized it as due to the

1  reconciliation and the return of funds to the DOE
2  and certain non-reoccurring issues, things like
3  that.  That's how he characterized it.
4    Q.  So, first of all, the return of funds to
5  the DOE doesn't indicate to you what the reason for
6  that return was, correct?
7       In other words, there's many, many funds
8  being returned, lots of funds being returned to the
9  DOE in the ordinary course of business; isn't that
10  correct?
11    A.  Not anywhere near the magnitude that was
12  going on now.
13    Q.  How many financial aid -- strike the
14  question.
15       How many schools have you provided
16  forensic examinations on before FCC?
17    A.  I don't know.
18    Q.  None, right?  I mean, I looked at your
19  resume.  There were none on your resume.
20    A.  I recall an evaluation at this time.  I
21  don't know if that included forensic activity as I
22  sit here.
23    Q.  And you couldn't possibly tell us the name
24  of that school, right?
25    A.  No.  It was a number of years ago.

1    Q.  How many years ago?
2    A.  I don't know.
3    Q.  So you really don't have an independent
4  understanding of what would be ordinary or
5  extraordinary in terms of the flow of monies going
6  back and forth between the DOE and a particular
7  school; isn't that right?  You just don't have any
8  prior experience in that regard?
9    A.  I think the most relevant experience here
10  is the actual DOE activity for this school.
11    Q.  Right.  So tell me, from your experience,
12  what is the average return of funds to the DOE for
13  students that begin a class but don't conclude it?
14  What percentage of students -- strike the question.
15       What is the average amount of funds that a
16  school returns to the DOE on account of students
17  that begin classes but don't conclude them?
18       MS. WRIGHT:  Objection.
19       THE WITNESS:  I don't have an average for
20    you as I sit here.
21  BY MR. KREITZER:
22    Q.  And what is the average amount of refunds
23  that -- in fact, let me not jump ahead.
24       Do you understand the difference between
25  an R2T4 and a refund?

40 (Pages 154 - 157)

Page 158

1    A.  I've seen testimony about that, yes.
2    Q.  Okay.  What's your understanding?
3    A.  My understanding is that one of them
4  relates to the refund of money back to DOE for a
5  student that has essentially started, and the other
6  relates to students that don't start, generally.
7  That's the testimony I've seen.
8    Q.  What's the title -- what is the title that
9  is given to monies that are returned because a
10  student doesn't start classes?
11    A.  I believe that's R2T4.  That's what the
12  testimony suggested, and the STARS records track
13  R2T4 and REF or just refunds as well.
14    Q.  And so it's your testimony that R2T4 is
15  the term used for students that do not start classes
16  and refunds is the term used for students that start
17  classes but don't complete them?
18    A.  I'm recalling some testimony.  I would
19  need it to refresh my recollection.  But that's what
20  I understood.
21    I understood there was a distinction, and
22  some of the witnesses talked about that.
23    Q.  What is the average amount of refunds that
24  a school the size of FCC would return to the
25  Department of Education on a yearly basis?

Page 159

1    MS. WRIGHT:  Objection.
2    THE WITNESS:  I don't have a particular
3    number for you, but from their FCC history, you
4    can see that it grew dramatically in fiscal
5    '14.
6  BY MR. KREITZER:
7    Q.  What caused you to conclude that the
8  amount of R2T4s and -- strike the question.
9    What caused you to conclude that the
10  amount of money returned to the Department of
11  Education for reconciliation work was out of line
12  with similarly situated schools?
13    MS. WRIGHT:  Objection.
14    THE WITNESS:  I don't know if I can --
15    maybe we're not connecting this.  I don't think
16    I've testified that I believe it's out of line
17    for similarly situated schools.
18    It was higher than what FCC had done in
19    the past.
20  BY MR. KREITZER:
21    Q.  How do you know that the funds that were
22  being returned in March, April, May and June were
23  the result of unsubstantiated balances between G5
24  and COD as compared with refunds or R2T4s?
25    A.  I'm sorry.  Can you restate that or read

Page 160

1  it back?
2    Q.  Sure.  How do you know that the funds that
3  were returned to the DOE in March, April, May and
4  June of 2014 were the result of unsubstantiated
5  balances between G5 and COD as compared to R2T4s or
6  refunds?
7    A.  I'm not understanding your question,
8  because the money sent back in March, for example,
9  was -- called the refund of DOE, and the STARS
10  records called most of those refunds either REF or
11  R2T4.  So they're sending money back.
12    Q.  Yep.
13    A.  It's going back so it has to be called
14  something, and some of it was overfunded, and it
15  wasn't an issue with the ledger, according to
16  testimony, but that's what the STARS records called
17  it.
18    Q.  So all of the monies that you were able to
19  identify in March, April, May and June of 2014
20  were returned to the DOE were either identified as
21  R2T4s or REFs, refunds; is that correct?
22    A.  Well, in the DOE's records that I've seen,
23  there were -- they're referred to as refunds,
24  period.  No distinction.  They're just refunds back
25  against a particular award year, direct loan, Pell.

Page 161

1    Within STARS, which is not direct cash
2  activity, because it's a database of recording cash
3  activity, they record refunds during this time
4  period, they record REFs and R2T4s.
5    Q.  Did it record return of reconciliation
6  imbalances?
7    MS. WRIGHT:  Objection.
8    THE WITNESS:  I don't recall that data as
9    I sit here.
10  BY MR. KREITZER:
11    Q.  Okay.
12    A.  Maybe I should clarify.  Can you read your
13  question back?
14    (Last question read back.)
15    THE WITNESS:  I should have asked you to
16    clarify.  Are you suggesting that that is a
17    code in STARS?
18  BY MR. KREITZER:
19    Q.  I'm not suggesting anything.  I got your
20  answer.
21    A.  Well, then I -- I understood --
22    Q.  Do you want to amend your answer?
23    MS. WRIGHT:  Objection.
24    THE WITNESS:  I want to understand the
25    question, because I understood, from your

41 (Pages 158 - 161)

Page 162

1 question, that you were suggesting there's
2 something called -- I had answered there's a
3 reference STARS, REF, and R2T4, and then the
4 next question was about that phrase, and that's
5 not a phrase I've seen in STARS.
6 BY MR. KREITZER:
7 Q. Okay. Let me turn your attention to
8 paragraph 48 of the declaration of Mr. Harding.
9 Paragraph 48 is much of what we've been
10 talking about for the last hour or so. It says,
11 quote, When the company attempted to integrate the
12 Anthem Education system into the FCC system," paren,
13 "which also included implementation of a new third
14 party financial aid management system," close paren,
15 "in early 2013, the software files did not process
16 correctly, which corrupted student records
17 transmitted to COD, creating an imbalance between G5
18 and COD systems."
19 Did I read that correctly?
20 A. You did.
21 Q. Do you agree with Mr. Harding's statement
22 based upon your forensic examination?
23 MS. WRIGHT: Objection.
24 THE WITNESS: I don't agree or disagree.
25 I was aware that this was something that was

Page 163

1 talked about in testimony.
2 BY MR. KREITZER:
3 Q. Okay. And you've performed no independent
4 examination to determine whether Mr. Harding's
5 statement was correct or not.
6 Is that your testimony?
7 A. Aside from what I testified this morning
8 about my concerns with the accounting
9 infrastructure, but I haven't looked at the software
10 issues, no.
11 Q. Let's move on to paragraph 49.
12 "Because of the software issues, the
13 company had to reconcile approximately 10,000
14 student records that were corrupted and begin having
15 to manually process its Title IV funding."
16 Did I read that correctly?
17 A. Yes.
18 Q. Okay. And did your forensic examination
19 confirm Mr. Harding's statement?
20 MS. WRIGHT: Objection.
21 THE WITNESS: Not one way or the other. I
22 was aware of this software issue, but I didn't
23 analyze the software back then.
24 BY MR. KREITZER:
25 Q. So you didn't look at how much time, for

Page 164

1 example, may have been consumed or -- strike that.
2 You didn't look at how much time was
3 necessary for the financial aid department to expend
4 in order to reconcile the G5 with the COD accounts,
5 correct?
6 A. Other than knowing that it was occurring,
7 it would take time and, therefore, I wasn't
8 analyzing a day. I was analyzing the time period we
9 talked about.
10 Q. The next sentence says, "Manually
11 processing and reconciling the Title IV funding for
12 a company now triple its original size, however,
13 proved to be extremely difficult and costly."
14 Did your forensic examination of the
15 records of FCC confirm that statement?
16 A. Not one way or the other.
17 MS. WRIGHT: Objection.
18 BY MR. KREITZER:
19 Q. You didn't see an increase in labor
20 expenses associated with the financial aid
21 department attempting to reconcile these plus or
22 minus 10,000 student records that had been
23 corrupted?
24 A. I don't recall anything as I sit here.
25 Q. Okay. That wasn't -- you weren't asked to

Page 165

1 investigate that, correct?
2 A. The cost of the labor needed to correct
3 the software issue, no.
4 Q. Do you think it is a material fact that,
5 as a result of the software issues encountered at
6 FCC, that approximately 10,000 student records were
7 corrupted? Do you think that's a material fact?
8 MS. WRIGHT: Objection.
9 THE WITNESS: I don't know one way or the
10 other. It depends on what issue you're talking
11 about.
12 BY MR. KREITZER:
13 Q. How would that fact, the fact that 10,000
14 student records were corrupted, according to
15 Mr. Harding, have impacted the ability of the
16 company to timely reconcile a G5 with the COD
17 program?
18 MS. WRIGHT: Objection.
19 THE WITNESS: I assume it would have an
20 impact on that spot moment, yes, because
21 they're not -- your COD number is not what you
22 thought it was, and you need to put those
23 rejects back in the system.
24 BY MR. KREITZER:
25 Q. And it's your general understanding that

42 (Pages 162 - 165)

Page 166

1 that event, to the extent it happened, was only at a
2 spot in time, only one time? Is that your general
3 understanding?
4       MS. WRIGHT: Objection.
5       THE WITNESS: No, that's my example.
6    That, for a particular draw, it would be off,
7    but I don't know how many times it happened.
8 BY MR. KREITZER:
9    Q. Were you aware of the fact that it
10 happened throughout 2014?
11       MS. WRIGHT: Objection.
12       THE WITNESS: Again, I don't know how many
13    times it happened. My use of the term "spot"
14    is about, if you're looking at one spot upload,
15    you might look at what happened to that upload.
16    I understand.
17 BY MR. KREITZER:
18    Q. Were you aware of the fact that the data
19 was corrupted and continued to be corrupted
20 throughout January, February and March of 2014?
21       MS. WRIGHT: Objection.
22       THE WITNESS: I was aware of testimony
23    alleging that there was software issues during
24    this time.
25 BY MR. KREITZER:

Page 167

1    Q. That wasn't my question.
2       Were you aware of the fact that the data
3 of student records in COD continued to be corrupted
4 throughout January, February and March of 2014?
5       MS. WRIGHT: Objection.
6       THE WITNESS: I didn't make an opinion on
7    whether or not it was or was not, but I saw
8    testimony alleging that there was software
9    issues.
10 BY MR. KREITZER:
11    Q. Based on your forensic examination, were
12 you ever able to conclude that that was not the
13 case, that the data had not been corrupted
14 throughout January, February and March of 2014?
15       MS. WRIGHT: Objection.
16       THE WITNESS: As I said, I didn't look at
17    the software corruption either way. So I
18    didn't make an opinion that it was or was not.
19 BY MR. KREITZER:
20    Q. Well, when you formed the opinion through
21 all these various charts, you have lots of charts in
22 your report, colorful, red dots and orange lines and
23 things like that, would it not have been important
24 for you to understand the reason why the G5 accounts
25 were larger than the COD accounts?

Page 168

1    A. The background and the things that are
2 important are in my report, and I already told you
3 this morning that the reason it was higher was that
4 it was -- the balance was greater than that was
5 substantiated, and I also know that they had to send
6 back significant amounts of money to the DOE.
7       The DOE elected to shut them down on
8 advanced pay in late March. And, eventually, bad
9 debts needed to correct their financial accounting
10 records. So I know those things as well, and as I
11 said earlier, I'm looking at it over time.
12    Q. Is it your contention that the Department
13 of Education discontinued the ability of FCC to draw
14 down Title IV financial aid direct loans?
15    A. When?
16       MS. WRIGHT: Objection to form.
17 BY MR. KREITZER:
18    Q. Say on April 1st or April 2nd.
19       I'll ask the question differently because
20 I don't have the exact dates, so let me do it
21 differently.
22       You're aware that the Department of
23 Education wrote a letter, I think, on either
24 March 1st or March 2nd, advising FCC that it needed
25 to substantiate the imbalance between G5 and COD,

Page 169

1 correct?
2       MS. WRIGHT: Objection to form.
3       THE WITNESS: Among other things, yes.
4    It's one of the things they said.
5 BY MR. KREITZER:
6    Q. Okay. And at the end of that month,
7 whether it was -- whether it was March 30 or
8 April 1st, I honestly don't remember as we sit here
9 right now, the Department of Education took specific
10 action because the accounts had not been fully
11 substantiated, correct?
12    A. Correct. They weren't substantiated or
13 the balance hadn't come down to match the
14 substantiated balance.
15    Q. As a consequence of that, the department
16 took some action, correct?
17    A. Yes.
18    Q. And what was the action that it took?
19    A. They took away their ability to be
20 advanced pay.
21    Q. What is the effect of taking away the
22 school's ability to be on advanced pay?
23    A. You can't draw down -- you can't draw down
24 money without records. So you become records first,
25 essentially.

43 (Pages 166 - 169)

Page 170

1    Q.  Okay.  So, in other words, you have to
2  upload your records to COD before you can download
3  funds from G5, correct?
4        MS. WRIGHT: Objection.
5        THE WITNESS: Yes, records first.  You
6     have to substantiate first and then once it's
7     substantiated, then you can pull.  You're no
8     longer on advanced pay.
9  BY MR. KREITZER:
10    Q.  Explain to us what you understand the
11  school physically had to do in order to engage in
12  records first?
13        How did that look different, if at all,
14  from advanced pay?
15    A.  Well, there would -- you don't have access
16  to your funds in the same way.  It's taking out
17  capital from the company because now you need to
18  substantiate the record, make sure it's posted, and
19  then you can pull the money.
20    Q.  Okay.  You said "substantiate the record,
21  make sure it's posted."
22        That's one and the same, correct?
23    A.  Yes.  I'm generalizing the terms, but I
24  understand it that you have to substantiate the
25  student, it has to be accepted and posted before you

Page 171

1  can have the cash.  Something they were doing with
2  our OPE IDs earlier in their time.
3    Q.  Is there anything more complicated -- when
4  you say substantiating the student, is there
5  anything more complicated than just uploading that
6  student's disbursement into COD?
7        MS. WRIGHT: Objection.
8        THE WITNESS: That's a DOE detail I'm not
9     aware of.  If it's different -- I understood
10     that the big difference is that you no longer
11     have advanced access to cash, and you need to
12     substantiate first.
13  BY MR. KREITZER:
14    Q.  Okay.  And did you ever perform any cash
15  flow analyses to show the distinction between being
16  on advanced pay at FCC versus being on records
17  first?
18    A.  I looked at some testimony on that.  I
19  looked at some records for OPE IDs that -- some that
20  were on advanced first and some that weren't.  So I
21  did look at that issue, yes.
22    Q.  And what did you conclude?
23    A.  I concluded that it takes some capital out
24  of the business because now you need to substantiate
25  it first and schools want to be on advanced pay.

Page 172

1    Q.  How much capital did you conclude was
2  removed from the business, so to speak, as a result
3  of the decision of the department to put FCC on
4  records first?
5        MS. WRIGHT: Objection.
6        THE WITNESS: I don't have a particular
7     number for you.  I understood it was important
8     to the schools.  Mr. Knobel testified or wrote
9     a letter that it was important.
10        They tried to get back on advanced pay.  I
11     don't have an exact number for you.
12  BY MR. KREITZER:
13    Q.  Is it your conclusion that the
14  department's decision to put the school on records
15  first caused the bankruptcy?
16    A.  I understand that's the plaintiff's
17  allegation, that --
18    Q.  What is your conclusion, if any?
19    A.  My conclusion is that advanced pay is
20  important and takes capital out of the school.
21    Q.  That wasn't my question.
22        My question is, did you conclude that the
23  decision by the Department of Education to put FCC
24  on records first caused the company to have to file
25  for bankruptcy?

Page 173

1        MS. WRIGHT: Objection.
2        THE WITNESS: I don't have an independent
3     opinion about this, but I see from the record
4     that it was a serious factor in their
5     bankruptcy.  It took away capital.
6  BY MR. KREITZER:
7    Q.  Clearly wasn't the sole factor, was it?
8        MS. WRIGHT: Objection.
9        THE WITNESS: I don't know, is it the sole
10     factor, but it was a serious concern, and I
11     understand plaintiff is alleging that that's
12     what happened.  And people have testified as
13     much.
14  BY MR. KREITZER:
15    Q.  What were the other factors that were in
16  play at the moment in time when the department put
17  the school on records first in 2014?
18        MS. WRIGHT: Objection.
19        THE WITNESS: The other factors?  I'm
20     sorry.
21  BY MR. KREITZER:
22    Q.  That's fair.  My question probably wasn't
23  complete.
24        What were the other factors affecting the
25  financial well-being of the company as of, say,

44 (Pages 170 - 173)

Page 174

1 April 1st, 2014, aside from the fact that the DOE
2 had decided to put the school on records first?
3       MS. WRIGHT: Objection.
4       THE WITNESS: Well, their financial
5   position at the time, including owing the DOE
6   money.
7 BY MR. KREITZER:
8   Q.  What was the financial position of the
9 company at the time?
10   A.  I can't recall off the top of my head.
11 But, at the time, they owed the DOE substantial
12 money and were trying to pay the DOE back.
13   Q.  Now, you claim that the school owed the
14 DOE substantial money.
15       What were the components of the money that
16 you claim the school owed the DOE?
17   A.  I understood they were unsubstantiated
18 balances that had to be paid back or substantiated.
19   Q.  What do you mean by that?
20   A.  The balances, as we talked, is two
21 different things.  It's a combination of the G5 net
22 amount and the COD amount.  And if you have a
23 balance, you either need to send money back to bring
24 the balance down or you need to substantiate that
25 balance for money you already took.

Page 175

1   Q.  Was, to your knowledge, the school
2 actively attempting to substantiate the balances for
3 the money it had taken?
4   A.  From the communication and the balance,
5 they were doing both.  They were trying to
6 substantiate the balance and they were wiring money
7 back at this time period.
8   Q.  Do you fault my clients for attempting to
9 try to substantiate the accounts?
10       MS. WRIGHT: Objection.
11       THE WITNESS: No.
12 BY MR. KREITZER:
13   Q.  Do you fault my clients for suffering
14 through the software corruption caused by Regent 8?
15       MS. WRIGHT: Objection.
16       THE WITNESS: When you say "do I fault
17   your clients," I really need you to explain
18   that to me.
19 BY MR. KREITZER:
20   Q.  Well, in your report, you say, as a
21 consequence of the breaches of my client, and then
22 you go on to reach certain opinions.
23       Do you remember that?
24   A.  I do.
25   Q.  So you're drawing a distinction between

Page 176

1 what you claim are breaches of my client that you
2 think entitle your client to money, right?
3       MS. WRIGHT: Objection.
4       THE WITNESS: Well, let's be clear.  I'm
5   not the plaintiff.  I'm preparing analyses and
6   I'm being asked to do things like assume
7   liability.  So we can't confuse those things.
8 BY MR. KREITZER:
9   Q.  Well, you didn't say, in your opinion, if
10 the plaintiff's allegations prove to be correct.
11       You actually say, based upon the breaches
12 of the defendants.
13       I mean, I could read it to you, if you'd
14 like.
15       Would you like me to?
16   A.  You could, but I believe I say --
17   Q.  I will read it to you.  It says --
18 paragraph 67, it says, quote --
19       MS. WRIGHT: Whoa, whoa, whoa.  I think
20   Jim was talking.  You interrupted him.
21 BY MR. KREITZER:
22   Q.  Do you want to say something, sir?
23   A.  I certainly say alleged in parts of my
24 report.
25   Q.  Really?  You do.  Actually, you do.

Page 177

1 You're correct?
2   A.  I say alleged.  In parts of my report, if
3 I have a breach without the word "alleged," I
4 clearly understand that the plaintiff needs to prove
5 its case.
6   Q.  I'll stand corrected on paragraph 67.  You
7 do say "alleged."
8       What it says is, quote, As discussed
9 above, the defendant's alleged breaches concern
10 FCC's improper use at DOE Title IV funds.
11       And then above that, in paragraph 67, you
12 say, "I have been asked by counsel for the
13 plaintiffs to estimate the fair value of FCC's
14 business enterprise but for the defendant's alleged
15 breaches."
16       So that's why I'm asking you about these
17 breaches.
18       So do you understand why I'm focusing in
19 on this issue?
20   A.  I do, but I'm assuming the breaches.
21   Q.  So let's go back to the financial position
22 of FCC as of the date that the department put the
23 company on records first.
24       You said that the company was returning
25 funds to the Department of Education at that time,

45 (Pages 174 - 177)

Page 178

1 correct?
2    A.  They had been throughout March and other
3 months, yes.
4    Q.  To your knowledge, is the fact that any of
5 those funds had to be returned the fault of any one
6 or more of my clients?
7        MS. WRIGHT:  Objection.
8        THE WITNESS:  I'm not here to ascribe
9    fault.  I know the plaintiff is alleging that
10    they -- your clients had an infrastructure that
11    allowed them to pull down money beyond what
12    they were supposed to take, but that's an
13    allegation in this case.
14        I'm not ascribing fault.  That's my
15    understanding of the allegations in this case.
16 BY MR. KREITZER:
17    Q.  And in point of fact, you don't have an
18 opinion whether there really was an infrastructure
19 that allowed my clients or allowed FCC to pull down
20 money beyond what it was supposed to take, correct?
21    A.  I have opinions in my report that clearly
22 relate to that subject, and my opinions are
23 described and I lay out the differences and the
24 balances, my concern with some of the accounting
25 infrastructure, but those are my opinions.

Page 179

1    Q.  How, if at all -- strike the question.
2        Do you know who my clients are?  Let's
3 start with that.
4    A.  Yes.
5    Q.  Okay.  And it's not a memory test, so I'm
6 not going to make you do that.
7        Now you understand that my clients are
8 David Knobel, Jeffrey Pierne, Neal Yawn, Dean
9 Bartness, Siana Stewart and Cid Yousefi, correct?
10    A.  Yes.
11    Q.  My client is not FCC, right?
12    A.  No.  I understand your clients are the
13 directors and officers, if you will, of the company.
14    Q.  One director, right?
15    A.  I'm using that as a term, but, yes.
16    Q.  And in all of your forensic examination
17 work that you did in this case, were you ever able
18 to determine whether any one or more of my clients
19 individually profited from any of the conduct that
20 the plaintiff is alleging?
21        MS. WRIGHT:  Objection.
22        THE WITNESS:  I don't know.
23 BY MR. KREITZER:
24    Q.  You weren't able to uncover any profit
25 earned by any one or more of them, correct?

Page 180

1    A.  I have not analyzed their personal salary
2 and things like that, no.
3        MR. KREITZER:  Why don't we take a break
4    so you can -- everybody can relax and we'll be
5    right back.
6        THE VIDEOGRAPHER:  We're going off the
7    record.  The time is 2:57.
8        (Short recess taken.)
9        THE VIDEOGRAPHER:  We're now back on the
10    record.  The time is 3:30.  Media No. 4.
11 BY MR. KREITZER:
12    Q.  Mr. Donohue, you said that, at the time
13 that the department elected to put FCC on records
14 first, that, aside from that event, there were other
15 events that were occurring or that the company was
16 experiencing that would have had a negative impact
17 upon the financial condition of the company.
18        Is that a fair statement?
19        MS. WRIGHT:  Objection.
20        THE WITNESS:  I don't know if I said that.
21    I don't recall saying something --
22 BY MR. KREITZER:
23    Q.  Let me ask you that question.
24        Do you believe that, at the same time that
25 the Department of Education placed FCC on records

Page 181

1 first in approximately April of 2014, that there
2 were other financial events occurring to the company
3 that were having a negative impact on its ability to
4 continue as an ongoing entity?
5        Is that a fair statement?
6    A.  I believe I do talk about some things in
7 my report.  There was -- you have to read that back.
8 I'm sorry.  I don't think I understand your
9 question.
10    Q.  Were there other events occurring to the
11 company in a financial nature that were having a
12 negative impact upon its ability to continue as an
13 ongoing enterprise aside from the Department of
14 Education's decision, in April of 2014, to put the
15 company on records first?
16    A.  Well, in that situation, in the actual
17 terms that they were also -- they had sent back a
18 lot of money prior to that point, which drained
19 resources, and they were about to miss payroll.  So
20 those are some of the, I guess, consequences of this
21 problem, but those are the things that were going on
22 at the time.
23    Q.  Aside from the fact that the company had
24 sent back money to the DOE, which you claim drained
25 resources and the fact that, according to you, the

46 (Pages 178 - 181)

Page 182

1 company was about to miss payroll, were there any
2 events that were, from your opinion, material to its
3 long-term survivability at that time?
4     MS. WRIGHT:  Objection.
5     THE WITNESS:  I think the only other thing
6 is that, at that time, they had already spent
7 some capex.
8     But, again, it all relates to this problem
9 and liquidity issues that the company incurred
10 during this reconciliation and the need to pay
11 back the DOE, but I'm not aware of any outside
12 event or other major issue in the economy and
13 things like that, that were impacting them.
14 BY MR. KREITZER:
15     Q.  The money that had to be sent back to the
16 department, as you claim, we already discussed the
17 fact that you do not know what the relative
18 proportion of that money was that was either refunds
19 or R2T4s on the one hand versus monies that
20 allegedly had to be returned in order to balance the
21 G5 and the COD accounts; am I correct?
22     A.  No.  I know that all of that was going on
23 and all of that was helping balance the COD
24 accounts.
25     Q.  Right.  But you don't know -- how much

Page 183

1 money was allegedly returned -- let me strike the
2 question.
3     How much money was allegedly returned to
4 the Department of Education in, say, the first
5 quarter of 2014?
6     A.  March was about 8 million -- I'm sorry.  I
7 mixed up my years.
8     You said first quarter of fiscal '14 or do
9 you mean calendar?
10     Q.  Let's say calendar year 2014.
11     A.  Close to $15 million.
12     Q.  How much?
13     A.  15.
14     Q.  One five?
15     A.  One five.
16     Q.  Do you break it out by month?
17     A.  I do.
18     Q.  How much is it per month?
19     A.  It's about 2.8 million, rounding in
20 January; 3.2 million in February; and 8.7 million
21 and change in March.
22     Q.  So of that 2.8 million in January, are you
23 able to say how much of that was refund money or
24 R2T4 money?
25     A.  The DOE records I have, G5, do not

Page 184

1 specify, for example, Davis 307, doesn't specify.
2 It calls them all refunds.  So those records don't
3 specify that.
4     The only thing that would be instructive
5 there, potentially, would be the STARS records that
6 are supposed to record that activity in an
7 individual student level and we call them either
8 refund or return, R2T4.
9     Q.  Wouldn't it also appear in the financial
10 records of FCC?
11     A.  Well, those are financial records of FCC,
12 yes.
13     Q.  I know they are.  But by that, I mean the
14 accounting records, the general ledger, for example.
15     A.  In some aggregate, we're looking at cash
16 management, and things like that.
17     But the description you're looking for,
18 which I assume is you're using the STARS
19 descriptions, would be recorded in the STARS system,
20 primarily.
21     Q.  And were you able to look into the STARS
22 data for January of 2014 to determine how much money
23 was returned to the department for R2T4?
24     A.  I was able to look into the STARS records
25 themselves and what FCC reflected in STARS to record

Page 185

1 activity with the DOE, but they're two different
2 things.
3     STARS was out of balance with DOE, COD and
4 G5, so there's a timing difference because G5 is the
5 actual wires back.  STARS is the accounting
6 recording of that activity during the time.
7     Q.  Right.  Understood.
8     So now were you able to look into the
9 STARS data to tell me how much money, in January of
10 2014, was returned to the department on account of
11 R2T4?
12     A.  Well, for example, the STARS records --
13     Q.  What exhibit are you looking at?
14     A.  I'm in 9A.
15     Q.  Okay.
16     A.  First, the STARS records for fiscal '14
17 show that there was substantial REF classified
18 refunds and R2T4 classified refunds.  And for
19 January, in particular, it's 2.5 million for refunds
20 and 1.234 million for R2T4, but that is the STARS
21 representation of that, not the wire to G5.
22     Q.  I presume you're looking at the row that
23 says REF and R2T4, right?
24     A.  Correct, in my Exhibit 9A, as in apple.
25     Q.  Below that is another row called SR.

Page 186

1    Do you see that?
2    A.  I do.
3    Q.  What is that?
4    A.  SR, I understand, is student refunds.
5    Q.  What does that mean?
6    A.  People have used this term in different
7    ways, but I understand what it means in here is an
8    actual repayment to the student for a credit
9    balance.
10   Q.  Is there an entry in STARS reflective of
11   monies being returned to the department on account
12   of the imbalance between G5 and COD?
13   A.  Can you ask that again, please?
14   Q.  Sure.  Is there any indication in STARS
15   data that would indicate monies being returned to
16   the department on account of the unsubstantiation
17   issue that you've been testifying about between G5
18   and COD?
19   A.  In part, in a broad sense, STARS is
20   tracking it internally.  So to the extent that cash
21   is sent back or activity is substantiated, that
22   would be activity that would be one way to close
23   that difference between STARS and G5.
24   Q.  Right.  That is to say if you actually
25   uploaded a student record, you're able to clean out

Page 187

1    whatever corruption was originally in the data and
2    COD actually accepted the student record, then your
3    point is that that would reduce the imbalance
4    because the amount now in COD would be a larger
5    amount, correct?
6        MS. WRIGHT:  Objection.
7        THE WITNESS:  We're talking about STARS,
8        and that would be about how the STARS -- if the
9        STARS data gets reflected in COD.
10   BY MR. KREITZER:
11   Q.  Right.  It doesn't change the STARS data.
12   It changes the COD data, right?
13   A.  Well, efforts to close the balance, which
14   I believe was your question, would be reflected in
15   STARS to either record a refund or an additional
16   substantiation.
17   Q.  Okay.  So show me where, in your words, an
18   additional substantiation would be reflected in
19   STARS.
20   A.  Well, it's the start of an additional
21   substantiation.  But, basically, within the total
22   Pell and those direct loan amounts, those are by
23   students, and I understand that that would be the
24   individual ledger that would be part of the process
25   to substantiate COD.

Page 188

1    Q.  All right.  So it wouldn't matter, in a
2    theoretical sense, what numbers were contained in
3    STARS if someone was trying to -- let me not go
4    there, because we'll go down a rabbit's hole for an
5    hour.  Let's do it differently.
6        MS. WRIGHT:  My daughter thanks you.
7    BY MR. KREITZER:
8    Q.  If there is a refund of or an R2T4 that is
9    required for students that were attending classes,
10   that number would appear in the columns -- I'm
11   sorry -- in the rows called REF and R2T4, correct?
12       MS. WRIGHT:  Objection.
13       THE WITNESS:  It depends on how that's
14       recorded, but I understood that adjustments to
15       STARS included refunds and R2T4 for different
16       types of circumstances.  That's what's been
17       suggested in the testimony.
18   BY MR. KREITZER:
19   Q.  But did you confirm that?
20   A.  Did I confirm that FCC was recording STARS
21   data correctly?
22   Q.  Yeah.
23   A.  I've not audited the student ledger to see
24   if they were recording STARS correctly.  I'm using
25   their STARS information as they've been using it.

Page 189

1    I've not looked at student records to see if they
2    were not recording STARS correctly, other than my
3    macro analysis, which is looking at all the records
4    together and the cash flows and how they relate to
5    one another with G5 and COD.
6    Q.  So we're back to the question of when the
7    school is allegedly refunding money back to the
8    department in order to reconcile G5 with COD.
9        You were trying to explain to us that that
10   event would be reflected in STARS.  That's what I
11   understood you to tell us earlier.  That's why we
12   started this conversation.
13       Am I correct?
14   A.  It could be, yes.
15   Q.  Show me where it is.
16   A.  If it was in STARS in the first place,
17   yes.
18   Q.  Show me where it is.
19   A.  Well, some of the refunds would be in the
20   first two lines.  The REF and R24s would be --
21   Q.  No.  These would not be refunds on account
22   of balancing G5 with COD.  You're not suggesting
23   that, are you?
24   A.  Well, I am suggesting that in that there's
25   balances.  They both have balances and the STARS

48 (Pages 186 - 189)

Page 190

1 activity, which becomes COD activity, in theory, is
2 reflected there.
3    Q.  I don't know if it's just late in the day
4 and maybe I'm not understanding you or you're not
5 understanding me.
6        But your report -- this is not a STARS
7 report that we're looking at, Exhibit 9A.  This is
8 your report, correct?
9    A.  It's my report.
10   Q.  All right.  And you're standing by this
11 report as being an accurate representation of
12 whatever it is you're trying to communicate by way
13 of this report, correct?
14   A.  Yeah.  These are the company's records.
15   Q.  Well, this is not the company's records.
16 This is your assimilation of the company's records,
17 correct?  There is no record created by the company
18 that looks like this, right?
19   A.  Not exactly like Exhibit 9A.
20   Q.  You created this.
21   A.  I created it, summarizing and showing that
22 the STARS 90/10 report, that's what the company
23 calls it, and I've characterized it by month like
24 they do.
25   Q.  Okay.  But to be clear, it's your report,

Page 191

1 not the company's?
2    A.  The company's report says the same numbers
3 as this.
4    Q.  Well, that remains to be seen, but I
5 understand your representation, okay?
6    A.  Okay.
7    Q.  All right.  We can agree to disagree on
8 that point.
9        But now I'm asking you where, if at all,
10 in this report is it reflected when the company
11 refunds money back to the department on account of
12 trying to substantiate the G5 and the COD accounts.
13       MS. WRIGHT:  Objection.
14 BY MR. KREITZER:
15   Q.  If at all.
16       MS. WRIGHT:  Objection.
17       THE WITNESS:  This report would reflect,
18    it would be an internal entry to reflect
19    activity that's either influencing the balance
20    of G5 or the balance of COD, and so that ends
21    up being reflected here.
22 BY MR. KREITZER:
23   Q.  So if the -- as if and when a student's
24 record is adjusted to reflect a disbursement from
25 Title IV, clearly, that event should be reflected in

Page 192

1 the student's individual ledger within STARS,
2 correct?
3    A.  Yes.
4    Q.  And, eventually, hopefully, that data is
5 uploaded into COD, correct?
6    A.  That's my general understanding, yes.
7    Q.  Unless the data is corrupted, it will
8 upload and be accepted, right?
9    A.  Yes.
10   Q.  Likewise, if the school experiences a
11 scenario where a student does not -- registers for
12 classes but does not actually commence attending
13 those classes, there would be a refund reflected in
14 STARS, correct?
15   A.  If the student was there in the first
16 place, yes.
17   Q.  Well, you and I have a difference of
18 agreement there -- a difference of opinion there, so
19 we won't -- we don't have to debate the difference
20 between a refund and an R2T4, but you would agree
21 with me that if the student doesn't show up or if
22 the student shows up but then ceases to continue to
23 matriculate, then, in either of those cases, the
24 school has an obligation to refund some or all of
25 the T4 money, right?

Page 193

1    A.  Yes, they have to refund the money, and my
2 reference before was about he would need to be in
3 STARS to take a credit back out again.  So whatever
4 it is, a refund or a T4.
5    Q.  So, in other words, if you looked at the
6 student's ledger card, and hypothetically the
7 student had $2,000 as a tuition expense, when the
8 school draws down money from G5, it should show a
9 disbursement on that student's ledger card in the
10 amount of $2,000, right?
11   A.  Yes.
12   Q.  Which means now the student, based on the
13 ledger card, doesn't owe anything more to the school
14 because the student has paid his tuition by virtue
15 of that loan?
16   A.  I understand.
17   Q.  And then that student account is uploaded
18 into COD showing that disbursement, and so now COD
19 recognizes that those funds have been properly
20 allocated to that student, correct?
21       MS. WRIGHT:  Objection.
22       THE WITNESS:  Understood.
23 BY MR. KREITZER:
24   Q.  All right.  And that is the process as you
25 generally understand it?

49 (Pages 190 - 193)

Page 194

1   A.  The timing differs, depending on what
2   advance pay records first you're on.  But, in
3   general, as to the timing, yes, you have to
4   substantiate and put the records up so you can pull
5   the two grand or support the two grand you pulled.
6       Q.  Since we're on the subject, to make sure
7   we have a meeting of the minds, if the school was on
8   records first, records first, then the school would
9   have to show the disbursement in STARS on the
10  student's account reflecting the credit to the
11  student for payment of that $2,000, and then upload
12  that student account into COD, correct?
13      A.  Yes.  It has to -- it can't just be in
14  STARS.  It needs to be up in CO.
15      Q.  Yep.  Once it's uploaded into COD, then
16  and only then can the school draw down that
17  $2,000 from G5?
18      MS. WRIGHT:  Objection.
19      THE WITNESS:  Yes, subject to any
20      regulations that come with being records first.
21      But that's my understanding.
22  BY MR. KREITZER:
23      Q.  Okay.  And just because you threw out that
24  qualification, are you aware of any?
25      A.  I'm not aware as I sit here, but I'm not

Page 195

1   purporting to be a master of the rules regarding
2   records first, but that's the general purpose of
3   those records.
4       Q.  I understand you and I are on the same
5   plane, we seem to have a similar understanding of
6   the process.
7       And, likewise, I see in your report 9A,
8   that there are, on a monthly basis, a certain amount
9   of money that is being refunded -- that is being
10  returned back to the department on account of
11  refunds or R2T4s, right?  That's right there on your
12  record.
13      A.  Well, it's being recorded in STARS.
14      Q.  Yes.  And so one would expect that it's
15  also being returned -- you would expect it to be
16  returned to G5, right?
17      MS. WRIGHT:  Objection.
18      THE WITNESS:  Yes.
19  BY MR. KREITZER:
20      Q.  The place I'm getting hung up in
21  understanding your testimony is where on this
22  schedule, if at all, does it show any monies being
23  returned or the accumulated amount of monies per
24  month being returned to the department just on
25  account of the imbalance between COD and G5.

Page 196

1       Does that appear anywhere in this report,
2   this Exhibit 9A?
3       A.  Well, it does.  Because when you say "just
4   on account of the imbalance" --
5       Q.  Yeah.
6       A.  -- the imbalance is about the
7   substantiated versus G5.  And so given that the
8   STARS records are supposed to be reflecting in COD,
9   to the extent you are substantiating more students
10  or ones you hadn't substantiated or to the extent
11  that you're returning money that you owed and
12  changing your COD balance, it would be there.  It
13  would be reflected that way.
14      Q.  Where?  Show me where the entry is in the
15  scenario where the school is returning money owed.
16  You've used that term.  So I want to use exactly the
17  same term.
18      A.  Well, if they're wiring money back, just
19  like for most draws and refunds, just like the draw
20  is associated with individual students, the refund
21  is often associated with individual students.
22      Q.  Right.  So show me which line on your
23  Exhibit 9A reflects that sum of money, the sum of
24  money that's being returned back to the department
25  because it's allegedly owed.

Page 197

1       A.  Well, STARS would be reflecting
2   internally, and the REF and the R2T4 lines would be
3   reflecting that.  The G5 would be reflecting the
4   actual cash payment of that amount, but not at the
5   same time, given the various differences between
6   STARS and G5 that I talk about in my report.
7       Q.  So any and all monies, to the best of your
8   understanding, that were returned back to the
9   department between January of 2014 and June 30th of
10  2014, would have fallen into the category of either
11  refunds, R2T4s or SRs; is that correct?
12      A.  No.
13      Q.  What other categories were returned to the
14  department between January of 2014 and June 30th of
15  2014?
16      A.  SR -- I don't believe SRs are returned to
17  the department.
18      Q.  Okay.  They're returned to the student?
19      A.  Returned to the student.
20      Q.  That was the only part of my question that
21  you were objecting to or responding to?
22      A.  I believe so.  If you want to ask it
23  again.
24      Q.  I will.  Is it a correct statement to say
25  then, in studying your Exhibit 9A, the only monies

50 (Pages 194 - 197)

Page 198

1 that were returned to the Department of Education
2 between January of 2014 and June 30th of 2014, would
3 have been in the category of refunds or R2T4s?
4 A. In normal course, I believe that would be
5 correct, because every draw and every refund, even
6 if it's a dollar amount, would have individual
7 students supporting each of those amounts.
8 However, in fiscal 2014, I saw testimony
9 that overdrawn amounts were not in the ledger, that
10 there was predrawn amounts that weren't associated
11 with students, according to Mr. Murphy. And so to
12 the extent those amounts were not in STARS to be
13 returned, then I'm not sure an entry would show at
14 that time.
15 Q. Okay. And in connection with your
16 forensic examination in this case, were you able to
17 identify any monies which were returned to the
18 department which were funds that had not been
19 recorded in STARS?
20 A. It's hard to associate them directly like
21 that because we're talking about total balances.
22 So, for example, in March 2014, they
23 physically wired $8 million back. But STARS only
24 records $3 million in refunds. So there are timing
25 differences. There's testimony about the overdrawn

Page 199

1 amounts not being associated with a student.
2 So I see that evidence, and it's two
3 different things. One is cash activity, actual cash
4 activity. The other is people's reflection of
5 refund activity in the STARS system.
6 Q. Well, I understand your answer, but aside
7 from this testimony, allegedly, of Mr. Murphy, were
8 you able to find any evidence of any monies which
9 were returned to the department for funds that had
10 not been recorded in STARS?
11 A. The evidence includes the fact that the
12 timing is different. Ms. Turgot also talked about
13 this, and Mr. DiCicco's e-mails did. That's the
14 evidence I've seen, that these things aren't
15 matching.
16 Q. You couldn't forensically, though,
17 numerically prove that; am I correct?
18 MS. WRIGHT: Objection.
19 THE WITNESS: No. I forensically provided
20 information that shows that STARS and G5 were
21 out of balance.
22 BY MR. KREITZER:
23 Q. Got that.
24 A. The monthly balances don't match up, and
25 that suggests that there was -- at times, there was

Page 200

1 money drawn that was outside of STARS.
2 Q. And that's your only evidence of the fact
3 that money was drawn outside of STARS, is that the
4 G5 and the COD did not balance?
5 MS. WRIGHT: Objection.
6 THE WITNESS: Well, that forensic
7 evidence, coupled with the testimony we've
8 talked about, and other forensic analyses in
9 here, including the way the bad debt was
10 handled as well.
11 BY MR. KREITZER:
12 Q. All right. And nothing in Exhibit 9A
13 would tell us -- none of the information contained
14 in Exhibit 9A would tell us how much money was
15 allegedly returned to the Department of Education as
16 a result of funds drawn down that were not
17 associated with a student?
18 A. It would depend, because you could look at
19 the draws and the refunds, and to the extent they
20 get outside of STARS, which they do, you could
21 ascribe those additional funds and refunds as
22 outside of STARS, but eventually there's
23 reconciliations going on. So it's really a timing
24 issue there.
25 Q. Are you able to tell us how much money was

Page 201

1 returned to the department between January and June
2 of 2014 that was not either refund money or R2T4
3 money?
4 A. Not as I sit here. Again, in theory, in
5 normal course, it should all be refund or R2T4.
6 To the extent there was some overdrawn
7 monies, that would be in addition to that if it
8 wasn't recorded.
9 Q. All right.
10 A. Again, the G5 records call them refunds.
11 Q. Is it your opinion, Mr. Donohue, that, but
12 for the school's requirement to return refund monies
13 and R2T4 monies in 2014, that the FCC schools would
14 have continued to be a going concern?
15 MS. WRIGHT: Objection.
16 THE WITNESS: I don't have opinions about
17 the liability issues in this case. So I'm
18 having trouble answering your question.
19 BY MR. KREITZER:
20 Q. In this case, I'm not asking you liability
21 at all.
22 I'm simply asking you whether -- I mean,
23 you're not disputing the fact that the school
24 returned R2T4 funds and refund monies in 2014,
25 right?

51 (Pages 198 - 201)

Page 202

1    You've been talking about it all day.
2    A.  No.  No.  They certainly returned millions
3 of dollars.  I can't characterize them all, as we
4 talked about it this way, because there's other
5 monies that's being returned.
6    Q.  But I asked you how much that other money
7 was and you haven't been able to tell me, right?
8    A.  Again, theoretically, it should have been
9 either refund or R2T4 --
10    Q.  I just want to be clear --
11    A.  -- that clearly were overdrawn amounts
12 that are refunded and they characterize it
13 internally one way and the G5 calls it a refund.
14    Q.  And I'm asking you now that, is it your
15 opinion that, but for the school's refund of R2T4
16 monies -- let me strike that.
17    I'm asking you now, sir, is it your
18 opinion that, but for the school's return of refund
19 monies and R2T4 monies in 2014, that the FCC schools
20 would have continued to be a going concern?
21    MS. WRIGHT:  Objection.
22    THE WITNESS:  I haven't analyzed it that
23    narrowly.  I understand that an allegation in
24    the case is that the breaches caused the Title
25    IV issues, which caused the bankruptcy, and

Page 203

1    I've been asked to assume the breaches don't
2    occur and that they would be a going concern.
3 BY MR. KREITZER
4    Q.  But I do think you've been asked, I think,
5 not to determine whether the breach has occurred or
6 not, but determine what the cause of the bankruptcy
7 was, right?  Isn't that part of your charge?
8    MS. WRIGHT:  Objection.
9 BY MR. KREITZER:
10    Q.  Maybe I'm misunderstanding your role.
11    A.  It wasn't necessarily part of my direct
12 charge, no.  It was related to what I'm doing, but
13 my direct charge was the financial analysis that
14 I've described in my report we've talked about
15 today, and I was providing valuation of FCC, but for
16 the breaches.
17    Q.  And your analysis evaluation -- let me ask
18 it differently.
19    Were there events occurring in the 2014
20 time frame that, in your opinion, had an impact on
21 the solvency of FCC which were unrelated to what the
22 plaintiff claims were the breaches by my clients?
23    MS. WRIGHT:  Objection.
24    THE WITNESS:  I'm not aware of anything
25    else like the Title IV reconciliation issue,

Page 204

1 given that it's 90 percent of their revenue in
2 cash.
3    And everything else I talked about stems
4 from the breach.  And we've talked about the
5 ability to restrict capital and things like
6 that.
7    But, again, that's the same issue.  It's
8 related to those breaches.  I understand the
9 plaintiff is claiming that the breaches caused
10 the bankruptcy of this company.
11    MR. KREITZER:  How much time do we have?
12    THE VIDEOGRAPHER:  4.37.
13    MR. KREITZER:  We used 4.37.
14    THE VIDEOGRAPHER:  Off the record.  The
15    time is 4:09.
16    (Short recess taken.)
17    THE VIDEOGRAPHER:  We're back on the
18    record.  The time is 4:10.
19 BY MR. KREITZER:
20    Q.  So in your report, Mr. Donohue, at
21 paragraph 7, you say, "To prepare my but-for
22 evaluation of FCC, I've been asked to assume that
23 FCC did not misuse DOE Title IV funds, and as a
24 result, did not lose the ability to receive Title IV
25 funds in the normal course of operations and would

Page 205

1 have continued to be a going concern."
2    I want to ask you about the notion of
3 losing the ability to receive Title IV funds in the
4 normal course of operations.
5    So we have talked, I think at great
6 length, about the distinction between advanced
7 funding on the one hand and records first on the
8 other.
9    Is it your opinion that the DOE's decision
10 to convert the company's funding mechanism to
11 records first was the sole cause of FCC's failure to
12 be a going concern?
13    MS. WRIGHT:  Objection.
14    THE WITNESS:  I don't have opinions about
15    the bankruptcy and the plaintiff's claims here,
16    but I do know that -- in that sentence, it's,
17    yes, it's the Title IV misuse, and part of that
18    is the losing of advanced pay, but it's also
19    the records reconstruction that has to happen
20    and the money has to flow back.
21    I understand that that is alleged to have
22    caused a liquidity crisis that put the company
23    in bankruptcy.
24 BY MR. KREITZER:
25    Q.  So this is where I'm having my challenges

52 (Pages 202 - 205)

Page 206

1 in understanding your testimony. So I'm glad we're
2 at this point.
3     So I'm not asking you to assume that FCC
4 misused Title IV funds. Of course, we adamantly
5 disagree with that, in point of fact.
6     But I understand that you weren't charged
7 with that responsibility. So you're not here to
8 tell us whether the funds were misused or not,
9 correct?
10    A.   Not from a legal and regulatory point of
11 view. I'm just providing financial accounting
12 opinions which I understand relate to that question,
13 but not from a legal point of view.
14    Q.   And not even from a factual point of view.
15 You're not here to factually say that my clients
16 misused Title IV funds, correct?
17        MS. WRIGHT: Objection.
18        THE WITNESS: The testimony and records
19     say what they say. I'm providing --
20 BY MR. KREITZER:
21    Q.   I'm asking you about that testimony and
22 that record. I'm asking you for your opinion in
23 this regard.
24        Sorry to interrupt you. I didn't mean to.
25        Do you want to finish?

Page 207

1    A.   No.
2    Q.   Okay. My question is a pretty discrete
3 one.
4        Are you rendering an opinion that my
5 clients factually, from your determination, misused
6 DOE Title IV funds?
7    A.   I am not providing liability opinions on
8 that. I'm providing forensic accounting opinions
9 that relate to it.
10    Q.   The forensic accounting opinions that
11 you're rendering are entirely related to the damages
12 as a consequence of that alleged conduct; is that
13 correct?
14        MS. WRIGHT: Objection.
15        THE WITNESS: Not entirely. They're
16     important to it, and I'm using it as support
17     for my analysis, my valuation analysis, but the
18     factual forensic accounting analysis I've done
19     is also instructive to the liability phase, but
20     other experts are opining on legalities and
21     regulatory issues with that.
22 BY MR. KREITZER:
23    Q.   And from the forensic analysis that you've
24 done, and by that I assume you mean your analytics
25 addressing the unsubstantiated balances --

Page 208

1    A.   Yes, the forensic section of my report,
2 right.
3    Q.   That forensic section doesn't cause you to
4 have an opinion on whether my clients misused Title
5 IV funds, correct?
6        MS. WRIGHT: Objection.
7        THE WITNESS: Doing my work, I lay out
8     some concerns within my report about control
9     and the accounting infrastructure and things
10    like that. They're in there.
11        But, again, the misuse I am talking about
12    here is about the legal and regulatory issues
13    with that.
14        Do I have observations about accounting
15    infrastructure and how you can get to a point
16    like this? I lay them out in my report.
17 BY MR. KREITZER:
18    Q.   We'll come back to that in just a couple
19 of minutes.
20        So now I want to focus not on the question
21 of whether my clients did or did not misuse DOE
22 Title IV funds, because you kind of -- that's not
23 part of your opinion, but I want to focus on this
24 concept that your opinion is based on the fact, or
25 you've been asked to assume that the company did not

Page 209

1 lose the ability to receive Title IV funds in the
2 normal course of operations. I want to focus on
3 that for a moment.
4        You understand where I'm going?
5    A.   I do.
6    Q.   So, hypothetically, if my clients had
7 allegedly engaged in this misuse of DOE Title IV
8 funds, which is not part of your opinion, but had
9 they done that, and despite that, the department had
10 not put the company on records first, that the
11 company still enjoyed the right to advanced funding,
12 is it your opinion that the company would continue
13 to be a going concern?
14        MS. WRIGHT: Objection.
15        THE WITNESS: In that hypothetical, you
16    appear to be suggesting that they would be able
17    to use the DOE line as a credit source, and the
18    credit source would not be shut down. And so
19    it wouldn't be advanced -- it would be assumed
20    to be advanced pay, and, you know, there's
21    still balances that need to be paid.
22        So that's what I'm confused at, is that
23    that's still going on, and that's the
24    plaintiff's allegations.
25 BY MR. KREITZER:

53 (Pages 206 - 209)

Page 210

1    Q.   So that's really what I'm trying to
2  understand, is that, is your opinion based on the
3  fact that there were monies that -- large amounts of
4  monies that were being repaid back to the Department
5  of Education in the first four months of 2014 and
6  that was the result or that was the cause of the
7  bankruptcy versus that the Department of Education
8  changed the method in which the schools were able to
9  draw down Title IV funds and that caused the
10  bankruptcy to occur.
11      I'm trying to understand what you claim
12  caused the bankruptcy to occur, if anything.
13      MS. WRIGHT:  Objection.
14      THE WITNESS:  I understand the plaintiff
15    is claiming that the breaches, which include
16    things like the misuse of funds, letting that
17    balance grow, losing the ability for Title IV
18    funds, that all of that caused the bankruptcy,
19    as -- you know, did one cause it versus the
20    other?  I haven't analyzed that question.
21    That's what did occur, and that's -- the
22    bankruptcy resulted.  All of that went on, and
23    it's not just that they were reduced to records
24    first.  It was the not knowing your financial
25    position throughout the years, and no longer

Page 211

1    having to show up and have an emergency capital
2    raise, missing payroll, spending capex that
3    maybe you shouldn't have spent if you weren't
4    going to have capital to do so.  It's a
5    combination of all of those, which I have
6    broadly defined throughout my report, it's a
7    Title IV issue in my report.
8  BY MR. KREITZER:
9    Q.   Let's go in order.  So you mentioned that
10  one of the circumstances that caused, in your mind,
11  the company to have to file for bankruptcy was
12  allegedly the company's not understanding or not
13  knowing its financial position.
14      Did I state that correctly?
15      MS. WRIGHT:  Objection.
16      THE WITNESS:  I am commenting that that
17    would contribute to it, and I understand that's
18    one of the things the plaintiff is alleging,
19    that the breach of duties which include these
20    problems result in things like that.
21  BY MR. KREITZER:
22    Q.   Did you uncover any evidence, aside from
23  testimony, I mean, numeric, forensic evidence to
24  suggest that the company did not know what its --
25  the management within the company did not know what

Page 212

1  its financial position was?
2    A.   Yes.
3    Q.   What forensic evidence did you uncover?
4    A.   One, there was a large unsubstantiated
5  balance growing throughout fiscal '14.
6    Two, the bad debt charges and the return
7  of the money and the reconciliation project wasn't
8  reflected in their financial statements until the
9  end.
10    Q.   Wasn't the reconciliation project
11  reflected contemporaneous with the actual refunds
12  being identified during the project?
13    A.   It was reflected at the end, after losing
14  Title IV ability, growing the balance and things
15  like that.
16    Q.   So when did the Department of Education
17  order that there be a program review of R2T4 and
18  refunds at the OP EIDs that belonged to FCC?
19    A.   I don't have a date for you.
20    Q.   Do you remember what year it was?
21    A.   I understood it was after fiscal '13 but,
22  again, I don't have an exact date for you.
23    Q.   Would you have anticipated that management
24  should have foreseen the decision of the department
25  to have a program review of R2T4 and refunds before

Page 213

1  the department asked for it?
2    MS. WRIGHT:  Objection.
3    THE WITNESS:  I don't have specific
4    opinions about the Title IV regulation
5    process -- sorry.  Mine is more about the need
6    for the refunds, the growing unsubstantiated
7    balance and things like that.
8  BY MR. KREITZER:
9    Q.   Is it your understanding that there is
10  something extraordinary or unusual about the
11  department asking a school to review its R2T4 and
12  refund calculations?  In other words, is that an
13  extra ordinary event?
14    MS. WRIGHT:  Objection.
15    THE WITNESS:  I don't know how to classify
16    it.  I don't know.
17  BY MR. KREITZER:
18    Q.   The reason I'm asking these questions is
19  because you pointed out that one of your bases for
20  believing that the school's management did not
21  understand its financial position is because of the
22  reconciliation project.
23    Do you remember that testimony?
24    A.   I do.
25    Q.   Okay.  And so I'm trying to understand why

54 (Pages 210 - 213)

Page 214

1  you believe that the management of the school should
2  have anticipated the reconciliation project at any
3  time before the department requested that there be a
4  reconciliation project.
5       MS. WRIGHT:  Is that a question?
6  Objection.
7       THE WITNESS:  Maybe we've miscommunicated,
8  but when I talk about the reconciliation
9  project, I'm talking, again, about the
10 unsubstantiated balance and bringing it down.
11 Not some narrower particular program audit.
12 It's all of them.
13      And, basically, not knowing your Title IV
14 positioning throughout the year.
15 BY MR. KREITZER:
16      Q.  So, to be clear, the reconciliation
17 project that you're referring to is not the R2T4
18 program audit that was ordered by the department?
19      A.  The reconciliation project I'm referring
20 to is the fiscal '14 effort to solve that
21 unsubstantiated balance, which I understood
22 eventually included things like that and other Title
23 IV issues.
24      People talk about it in a lot of ways, but
25 I appreciate that there's internal and external

Page 215

1  reconciliations, for example, but I'm talking about,
2  as defined in my report, what Mr. Pierne talked
3  about with respect to the bad debt, for example.
4       Q.  So the reconciliation project that you're
5  referring to, using that term, would be the refunds
6  that occurred in March of 2014?
7       MS. WRIGHT:  Objection.
8  BY MR. KREITZER:
9       Q.  Right?
10      A.  I don't know if that solved all of it, but
11 that would be part of it, some of those refunds in
12 2014.
13      Q.  Did you find any evidence in your forensic
14 examination that any of the monies refunded in 2014
15 related to G5 draw-downs for -- related to
16 non-existing student?
17      MS. WRIGHT:  Objection.
18      THE WITNESS:  I've seen testimony that
19 said that, but my analytical analysis, again,
20 I'm talking about balances, so the balance is
21 high and it was high because you pulled money
22 that was not a student.  It would relate to
23 that.
24      For example, if it was outside of STARS
25 and your cash basis revenue and COD and G5 were

Page 216

1       out of balance, that could be a possibility.
2  BY MR. KREITZER:
3       Q.  I know anything is a possibility, right?
4       But we're in a court of law where the
5  sworn testimony of witnesses is what is relevant,
6  and I'm not suggesting anything derogatory here.
7       But it is critical for me to understand
8  what you're trying to communicate by way of your
9  expert opinion.
10      So if it is your belief that part of the
11 monies refunded by the school, say, in the
12 March 2014 time period related to G5 draw-downs for
13 students that didn't exist and you have analytical
14 evidence of that, because that's why you were hired,
15 not just to read depositions of other witnesses, but
16 to do your own analysis, then we want to understand
17 what your evidence is in that regard.
18      Do you understand?
19      A.  I do.
20      Q.  So let me just ask the question again, and
21 if your answer is I didn't do that analysis, I
22 completely understand, but if you did do that
23 analysis, then I obviously have a lot of questions I
24 want to ask you about it.
25      So, again, my question is, in connection

Page 217

1  with your forensic examination, were you able to
2  determine whether any of the funds drawn -- any of
3  the funds returned to the department in March of
4  2014 related to G5 draw-downs for non-existent
5  students?
6       MS. WRIGHT:  Objection.
7       THE WITNESS:  It's hard to narrow it to
8  March of 2014.  A lot of money was returned in
9  March of 2014, and I've looked at the entire
10 time period.  So my opinions and conclusions
11 about it relate to the entire time period.
12      Again, it's money put in a system for a G5
13 balance and a COD balance, so it's not
14 fungible -- you know, it's fungible.  So you
15 need to be more specific about it than saying
16 that this dollar in March is something.
17 BY MR. KREITZER:
18      Q.  Well, let's start with March and then
19 we'll start going back in time.
20      But were you able to reach that conclusion
21 with respect to any of the monies that were refunded
22 in March of 2014?
23      MS. WRIGHT:  Objection.
24      THE WITNESS:  Same answer.  I'm not
25 looking at in just terms of March.  I'm looking

55 (Pages 214 - 217)

Page 218

1  at it overall.  And there was clearly a
2  suggestion in the testimony that there was
3  overdrawn amounts and the records support that
4  the balances are very different and the bad
5  debt process wasn't able to get back to a
6  student, so that supports that notion.
7      It's not just a possibility.  It's
8  concerning that that's possible.
9  BY MR. KREITZER:
10     Q.  But you weren't able to nail down any
11 particular draw that was based upon a fake student,
12 correct?
13     MS. WRIGHT:  Objection.
14     THE WITNESS:  I have not looked at draws
15  that way to say that name is fake.  I have not
16  done that, individual draws that way.  Thank
17  you.
18 BY MR. KREITZER:
19     Q.  If you were not able to conclude that any
20 particular amount was drawn down by my clients in
21 connection with their employment of FCC for a fake
22 student, for lack of a better term, then would you
23 agree with me that the monies that were refunded
24 were initially drawn down based upon a student on a
25 roster?

Page 219

1      MS. WRIGHT:  Objection.
2      THE WITNESS:  No, because my overall
3  analysis showed that there were amounts beyond
4  STARS and amounts beyond COD over a period of
5  time.  So I don't think I can take away that
6  just because I can't identify a fake student
7  name, that it means that money wasn't pulled
8  beyond the rosters.
9  BY MR. KREITZER:
10     Q.  But you have no actual evidence?
11     A.  My forensic analysis --
12     MS. WRIGHT:  Objection.
13     THE WITNESS:  -- that I talked about this
14  morning and the testimony suggests that.
15 BY MR. KREITZER:
16     Q.  Are you aware of any dollar amount that
17 the school drew down under G5 that it was not
18 entitled to draw down when it drew it?
19     A.  I don't have a specific dollar amount for
20 you.  All I know is that the result of the
21 draw-downs, coupled with the COD amounts, were
22 clearly out of balance.
23     Q.  And that's the entirety of your answer?
24     A.  Well, I think a lot of my report goes to
25 that answer as well, and what I did, along with the

Page 220

1  testimony we've been talking about from other
2  witnesses.
3      Q.  I don't want you to talk about other
4  witnesses at the moment.
5      I'm just asking for your forensic
6  analysis.
7      A.  It remains that you need to look at it
8  overall and look at the balances and see how those
9  balances relate.  You can't just cherry pick one and
10 say --
11     Q.  I'm not.  I'm just asking you, with
12 respect to any G5 draw-down, do you have any
13 evidence that you've identified forensically,
14 financially that would, you know, in connection with
15 your examination of the records of the company, not
16 people's testimony, that would cause you to form the
17 opinion that the company was not entitled to draw
18 down the monies that it drew down.
19     MS. WRIGHT:  Objection.
20     THE WITNESS:  I believe my analysis
21  relates to the other expert's opinions that
22  talk about that from a legal and regulatory
23  point of view, but it's providing that data and
24  you can see in the data that the two balances,
25  STARS and COD and G5, three balances, along

Page 221

1  with some of the draws that are called predraws
2  and pull-down and whole round number amounts,
3  for example, that would relate to that
4  question.  But, again, I'm not the legal or
5  regulatory expert here.
6      But the forensic analysis shows that
7  information, which is relevant to that
8  question.
9  BY MR. KREITZER:
10     Q.  Again, that information that you're
11 referring to is the imbalance between G5 and COD?
12     A.  The imbalance there, the STARS imbalance
13 as well, the bad debt write-down, things of that
14 nature.
15     Q.  How does the bad debt write-down cause you
16 to conclude that the company drew down funds from G5
17 that it wasn't entitled to?
18     A.  Again, I think it wasn't entitled to, no
19 legal or regulatory.  It's my forensic work that is
20 supporting that opinion.  But the bad debt
21 write-down and not being able to associate with a
22 student and seeing communications suggesting that
23 overdrawn funds are not associated in the ledger
24 would suggest that.
25     Q.  Can you identify for me any particular

56 (Pages 218 - 221)

Page 222

1 draw-down of funds by the school that was not able
2 to be associated with a student?
3      MS. WRIGHT:  Objection.
4      THE WITNESS:  I don't have a particular
5   draw in my few.  Again, it's the results of
6   activity and balances and statements about
7   overdrawn funds.
8 BY MR. KREITZER:
9   Q.  You mentioned that, in your report, you
10 render an opinion with respect to accounting
11 infrastructure or management control.
12   A.  I do talk about that.
13   Q.  Can you identify that section for me,
14 please?
15   A.  Well, first, I talk about, in my bad debt
16 opinion on page 7 into 8, that --
17   Q.  One second.
18   A.  Sorry.
19   Q.  Go ahead.
20   A.  That talks a little bit about the -- how
21 FCC apparently could not associate the bad debt with
22 specific activity and allocate it across schools.
23      While a lot of the report is -- could be
24 said to be the result of some of these lack of
25 controls.  Footnote 73 on page 25 talks about people

Page 223

1 not knowing about the extent of the refunds.
2      Paragraphs 50 and -- starting at paragraph
3 50, the gap between STARS and Title IV cash.
4      Footnote 79, talking about some of the
5 cash balances and the bank reconciliation report,
6 the account info report.  That's another.
7      Footnote 89 on paragraph 32 -- I'm
8 sorry -- page 32.
9      Footnote 90 on page 33.
10      And then on page 35, footnote 103 is
11 another example of me talking a little bit about the
12 lack of reconciliations and procedures for doing
13 that, and how these two numbers can get out of
14 balance like that.
15      Those would all touch on accounting
16 control issues.
17   Q.  In any of those footnotes, do you actually
18 render an opinion about the alleged lack of
19 accounting controls?
20   A.  Footnote 103 talks about a concern for the
21 lack of procedures and things like that, but
22 reviewing their controls isn't something I focused
23 on in my report.  But those are my observations
24 doing my work.
25   Q.  In connection with the assignment and

Page 224

1 summary of opinions section of your report, which
2 starts at page 4, paragraphs 6 through 12 -- I guess
3 it's 6 through 11 -- 6 through 12.  Sorry.
4      In those paragraphs, do any of those
5 paragraphs render an opinion in connection with lack
6 of controls at FCC?
7   A.  This section is my opinions about my
8 assignment in this matter.  While the lack of
9 controls likely contributed to some of these issues,
10 I'm not opining on their controls as part of my
11 primary assignment here, no.
12   Q.  Thank you.
13      Do you think that there are any other
14 possible explanations for the imbalance over time of
15 the G5 and COD accounts other than the alleged
16 breaches that the plaintiff has asked you to assume?
17      MS. WRIGHT:  Objection.
18      THE WITNESS:  I'm not aware of that extent
19   in that time period, what else would be causing
20   the imbalances.  But, again, I'm assuming
21   liability.
22 BY MR. KREITZER:
23   Q.  Let me talk to you about the capital raise
24 for a moment.
25      At paragraph 122, at page 58, you state

Page 225

1 that, "The former employees of FCC also believed" --
2 that's not the paragraph.  Stand by.
3      Paragraph 121.  That's the one I want to
4 look at.  You state that, "Despite the various
5 breaches as well as knowledge that DOE had ceased
6 FCC's ability to obtain advanced Title IV funding,
7 various investors loaned FCC more than $18 million
8 during the four months before the August 24th
9 bankruptcy."
10      Did I read that correctly?
11   A.  You did.
12   Q.  Who were the various investors that you're
13 referring to there?
14   A.  I don't recall if some of the banks
15 provided that or the Palmer Group.  I don't recall
16 the names of the investors as I sit here.
17   Q.  Do you remember whether any of the
18 $18 million that was provided came from the Abrams
19 Group and the Greenhill Group?
20   A.  I don't specifically recall.  I said
21 lenders.  I had understood that some of this might
22 have come from existing stakeholders.  I wasn't sure
23 how much or what their names were.
24   Q.  Okay.  How was the $18 million used?
25   A.  It was put into the company to meet

57 (Pages 222 - 225)

1 obligations in the company.
2     Q.   Now, the amount of the bad debt that you
3 have identified as creating a real challenge for the
4 company was what, about $36 million, I think?  You
5 tell me.  I don't want to put words in your mouth.
6     A.   I think that was their bad debt for the
7 year.  The additional bad debt charge that they
8 recorded was about 17, 18 million.
9     Q.   When you say "the additional bad debt
10 charge," recorded when?
11     A.   Recorded in March, April, May, June.
12 There was an additional bad debt charge above sort
13 of their normal bad debt or somewhat above.  I don't
14 know if the normal bad debt was normal during that
15 period due to the issues, but they referred to it as
16 additional.
17     Q.   And how much was that?
18     A.   I believe it was 17 and change.
19     Q.   17?  One-seven?
20     A.   One-seven, I believe.
21     Q.   Okay.  So it's your thinking that the
22 company ordinarily incurs bad debt somewhere in the
23 range of how much?
24     A.   Just a few percentage points a year.
25     Q.   Can you give me a number?

1     A.   I think it was something like 18 or 17 or
2 something like that.
3     Q.   17 to 18 million?
4     A.   Yes.
5     Q.   And that would be ordinary course of
6 operations, correct, historically?
7     A.   Yes.  Let me find that for you.
8     Q.   Sure.
9     A.   One moment.  Yeah, something like that,
10 like 18, 19 versus 18, 17.
11     Q.   And then it's your position that the
12 additional bad debt of $17 million recorded in
13 January through April, plus or minus, was
14 extraordinary, that is, out of the ordinary,
15 correct?
16     A.   Yes.  Given their history and given
17 testimony about it, yes.
18     Q.   And it's your position that it's that
19 incurrence of that additional bad debt that caused
20 the company to have to file for bankruptcy; am I
21 correct?
22     MS. WRIGHT:  Objection.
23     THE WITNESS:  No.  Again, I'm not making
24     plaintiff's allegations here.  But I understood
25     that it's not just the bad debt.  That's the

1 kind of a result of the problem or one of the
2 results.  It's also the Title IV issues,
3 mismanaging Title IV, things like that.
4 BY MR. KREITZER:
5     Q.   But the Title IV issue, to the extent
6 funds had to be returned to the department on
7 account of what you're calling the Title IV issues,
8 that amount was, plus or minus, 17 million, wasn't
9 it?
10     A.   It grew to about 18 million at one point,
11 yes.
12     Q.   Right.  And that is the amount of the
13 additional bad debt, right?
14     A.   It is.  I don't know if those are --
15 that's necessarily not one and the same thing.
16     Q.   Well, was the amount of monies that had to
17 be returned to the department on account of the
18 imbalance of COD and G5 recorded somewhere other
19 than in additional bad debt?
20     A.   It depends if you recognize it or not.
21     Q.   I don't understand what you mean by that.
22     A.   Well, the bad debt would only be unwinding
23 things that -- would traditionally be unwinding
24 things you've recognized as revenue and earnings
25 already.  That's why you're subtracting it.

1     Q.   But you already testified that the
2 adjustments or the refunds back to the department
3 were recorded in the ledger as additional bad debt.
4     Are we debating that?
5     Did I misunderstand you earlier?
6     A.   I think those are -- that's going on, but
7 it's not the only place that this -- that Title IV
8 reconciliation of fiscal - late fiscal '14 could be
9 reflected.
10     Q.   Where else was it reflected?
11     A.   Well, again, if you didn't recognize
12 certain revenue, it would not be a bad debt, so it
13 would be reflected somewhere else.
14     Q.   Well, where was it?  I mean, you did the
15 analysis.
16     Where did they reflect it, if somewhere
17 else?
18     A.   Again, it's balancings that are being
19 compared.  And so you asked me if there's anything
20 else, and it's possible there's revenue that's not
21 recognized, deferred, and if you sent that back, if
22 that was related to it, it would in there as well.
23     Q.   Respectfully, I feel like we're talking in
24 circles, and I'm sure it's my fault.
25     But you claim that there was a sum of

Page 230

1  money that was returned to the department in the
2  first four to five months of 2014 on account of the
3  need to substantiate G5 with COD; am I right?
4      MS. WRIGHT: Objection.
5      THE WITNESS: That's part of it. But, of
6  course, there's also a COD substantiating going
7  on.
8      The balance is a combination of two
9  things. You can either lower it with sending
10  money back or you can provide COD records to
11  support the --
12 BY MR. KREITZER:
13     Q. If the school provided the COD records to
14 substantiate the disbursement, then the school could
15 keep the money, right?
16     A. Yes, they could.
17     Q. All right. So we're not really talking
18 about that here today, are we?
19     A. I just want to appreciate that it is two
20 things.
21     MS. WRIGHT: Objection.
22 BY MR. KREITZER:
23     Q. I thought that was self-evident.
24     So what you are concerned about in
25 connection with your expert opinion is the

Page 231

1  $17 million that was returned to the department
2  allegedly to balance the unsubstantiated G5 with the
3  COD, correct?
4      A. Well, when you say "concerned about," my
5  analysis is focused on the balance and that included
6  those monies going back.
7      Q. And are there any other accounting entries
8  that exist that would show additional monies that
9  were being sent back to the department other than
10 this 17 million?
11     MS. WRIGHT: Objection.
12     THE WITNESS: I'm sure that the refunding,
13  the wiring back of money to bring the balance
14  down results in lots of accounting entries, or
15  it should.
16     So those are going on as well. I'm not
17  saying there's no other entries going on.
18 BY MR. KREITZER:
19     Q. Okay. How much money do you ascribe or do
20 you claim that the company had to -- strike that.
21     How much cash do you claim that the
22 company had to return to the department in order to
23 reconcile the G5, COD accounts?
24     MS. WRIGHT: Objection.
25     THE WITNESS: My exhibits would show the

Page 232

1  refunds back to the DOE that were needed to
2  bring the balance down in March and thereafter.
3      And of course, those refunds would include
4  not only refunds needed to bring the balance
5  down, but refunds that are happening in the
6  normal course.
7  BY MR. KREITZER:
8      Q. I understand that. We're not talking
9  about the ordinary course refunds.
10     A. Okay.
11     Q. Okay. So I'm talking about the refunds
12 that were necessary to bring the balance in line or
13 to balance G5 with COD.
14     Do you understand my question?
15     A. I do.
16     Q. How much money did the company pay in cash
17 to do that?
18     A. The records and testimony talk about a $17
19 million figure.
20     But, again, it's a balance. So when
21 there's wires going back, it's the wire is more than
22 just the amount being used to bring it down, because
23 they talk about $17 million.
24     Q. And the company borrowed $18 million,
25 right, from its investors sometime after April of

Page 233

1  2014, right?
2      A. Yes.
3      Q. So if the company borrowed $18 million and
4  it had to go out of pocket $17 million, then why did
5  the company -- why was the company not able to
6  sustain itself?
7      MS. WRIGHT: Objection.
8      THE WITNESS: Because I believe there was
9  continued DOE balances, and the balance was
10  growing over time. And, of course, advanced
11  pay, losing advanced pay didn't help. So all
12  of those things.
13 BY MR. KREITZER:
14     Q. Let's talk about it.
15     Are there any others or just those three?
16     A. No. The Title IV reconciliation and the
17 issues that the plaintiffs are alleging are all
18 related to that.
19     Q. So we've talked about the Title IV issues
20 because that was the $17 million that the school had
21 to return back to the DOE, correct?
22     A. I don't think it can be isolated to be
23 just the $17 million. There was other things going
24 on. There was other refunds being requested.
25     Q. I want to hear about those.

59 (Pages 230 - 233)

Page 234

1     What are these other things that are going
2  on?  Would you show me where they are reflected in
3  your reports?  Because I'm not familiar with these
4  other things.  So maybe you can help.
5     A.  I'm trying to see if there's a cite.  I
6  just recall other Title IV issues coming up around
7  the time of that issue.  I don't think it's just the
8  $17 million.
9     Q.  I need to understand that, sir.
10     Tell me what you know about that subject
11  that impacted your opinions in this case.
12     A.  All I can recall is that I recall some
13  other things and investors complaining that the
14  balance grew from when they put the money in to when
15  -- that point.  That's all I recall.
16     Q.  Do you have any -- do you reflect that
17  alleged circumstance in your opinion in any way?
18     A.  Only in an indirect way in that I'm
19  looking at all the dollars that are going back and
20  all the cash and the entire balance.
21     So to the extent that that's in there,
22  it's reflected in my cash numbers already.
23     Q.  Well, in your report, you made clear that
24  the company was able to substantiate, that is, bring
25  into balance the COD and the G5, correct?

Page 235

1     A.  Well, they bring it down at some point,
2  but it's still not totally in balance.
3     Q.  What does that mean, "bring it down"?
4     A.  They bring it down from 17 to some other
5  smaller number.
6     Q.  So you're taking issue with the fact that
7  -- you now claim the company did not balance its COD
8  and G5 accounts?
9     A.  I'm not claiming that.  I am claiming
10  that -- I don't think it was completely in balance
11  at some point in late 2014.
12     Q.  What does your report say about that?
13     A.  I don't think my report is talking about
14  what the balance was around the bankruptcy and
15  things like that.  I just knew that there was some
16  balance owed then.
17     Q.  We'll save that one for trial.
18     Other than this vague reference to, quote,
19  other things going on, end quote, are you able to
20  identify with any specificity what those other
21  things were?
22     A.  Can you ask that another way?  I don't
23  think I understand your question.
24     Q.  No, I can't.  You're the one that said it.
25     You said there's, quote, other things

Page 236

1  going on, end quote.  And I asked you what they
2  were.  And you answered by saying, I'm not exactly
3  sure, but there's other things going on.
4     So I'm now asking you one final time, can
5  you tell me what was going on at the company that
6  you think was material that affected the abilities
7  -- the ability of the company to be a going concern
8  after it had paid back the $17 million to the
9  department and after it received a loan from its
10  investors of almost an equal amount, 18 million
11  bucks?
12     MS. WRIGHT:  Objection.
13     THE WITNESS:  I understood that other
14     Title IV issues came to light after the
15     investors put money in.
16  BY MR. KREITZER:
17     Q.  And what were they?
18     A.  I don't know.
19     Q.  How much did those other Title IV issues
20  cost the company, if anything?
21     MS. WRIGHT:  Objection.
22     THE WITNESS:  I don't know.  I do know
23     that there was a balance between G5 cash and
24     COD of low single digit millions, but that's a
25     Title IV issue.  I don't know.

Page 237

1  BY MR. KREITZER:
2     Q.  Was it that low single digit millions that
3  caused the company to fail?
4     MS. WRIGHT:  Objection.
5     THE WITNESS:  No, I haven't testified that
6     that's what caused it to fail.  All the things
7     contributed to that, according to the
8     plaintiff's allegations.
9     MR. KREITZER:  I'm told we have five
10     minutes left on the video.  Now is probably a
11     good time.
12     THE VIDEOGRAPHER:  We're going off the
13     record.  The time is 5:02.
14     (Short recess taken.)
15     THE VIDEOGRAPHER:  We're now back on
16     record.  The time is 5:18.  Media No. 5.
17  BY MR. KREITZER:
18     Q.  Mr. Donohue, I want to ask you about your
19  actual valuation analysis.
20     Do I understand correctly that you
21  calculated alleged damages using two methodologies?
22     MS. WRIGHT:  Objection.
23     THE WITNESS:  I've calculated the
24     valuation of FCC using two methodologies.
25  BY MR. KREITZER:

60 (Pages 234 - 237)

Page 238

1    Q.   One of those methodologies, you refer to
2    as the fair value using market approach, correct?
3    A.   Correct.
4    Q.   And the second of those methodologies is
5    fair value using the income approach, correct?
6    A.   Correct.
7    Q.   And your market approach analysis resulted
8    in you formulating an opinion that the enterprise
9    value of FCC had a range of 37 to 51 million,
10   correct?
11   A.   Correct.
12   Q.   And we're going to talk a little bit about
13   that in a moment, but in the second approach, the
14   income approach, you reached the conclusion that the
15   enterprise value, after applying a 20 percent
16   marketability discount, ranged from 29 to
17   $27 million, correct?
18   A.   Correct.
19   Q.   And so are those your two opinions in
20   respect to the valuation, one being a value of 37 to
21   51, and the other being a valuation of 29 to 27?
22   A.   They are my opinions about those two
23   approaches, and then I conclude and select the
24   market approach for my valuation opinion.
25   Q.   And why do you select the market approach

Page 239

1    over the income approach?
2    A.   Mainly because I felt that I had
3    sufficient comparables to make that opinion and the
4    lack of long-term, but-for-the-breach projections
5    for FCC.
6    Q.   What do you mean by the "lack of
7    long-term, but-for-breach projections"?
8    A.   Well, the income approach is often done
9    using a projection of the cash flows of the company,
10   and the projections in this case were actual
11   projections with the breach, if you will, and there
12   was a lack of projections in the long-term view
13   without the breach.
14   Q.   But you knew, historically, what the
15   income of FCC was for many, many years, right?
16   A.   I did.
17   Q.   The alleged breach, even if it could be
18   proven, only occurred in one or two years, right?
19   A.   The breach relates to those more recent
20   years, I understand, yes.
21   Q.   So why did you feel uncomfortable
22   utilizing the income that had historically been
23   demonstrated by the company?
24   MS. WRIGHT:   Objection.
25   THE WITNESS:   Because, at the time of the

Page 240

1    breach, at the time of -- at the end of the
2    breach, 2014, where I had some financials that
3    were adjusted for breach activity, if you will,
4    I didn't have anything going forward from that
5    point in time.   So I did have history, but I
6    did not create projections for 2016, 2017,
7    things like that.
8    BY MR. KREITZER:
9    Q.   But could you have, if you elected to?
10   A.   Anything is possible.   But, again, I
11   also -- my answer was that I don't have the
12   long-term breach projections, and I have sufficient
13   market comparables, and analysts and people in this
14   industry appear to rely on that as a valuation
15   method, and so I had that as well.
16   Q.   So, in connection with the income
17   approach, though, you had a very, very long track
18   record with FCC, perhaps longer than many companies
19   that you've performed analytics on, correct?
20   A.   Well, the FCC, in its form, at the time of
21   bankruptcy, I had that for fiscal '14, '13 and part
22   of '12.
23   Q.   Even before that, many years before that,
24   but it hadn't yet acquired Anthem?
25   A.   Correct.

Page 241

1    Q.   Didn't you ultimately conclude that Anthem
2    was actually a drain on the financial resources of
3    the company?
4    MS. WRIGHT:   Objection.
5    THE WITNESS:   I didn't conclude one way or
6    the other.   I used the Anthem financial results
7    as they were incorporated into the FCC overall
8    financials.
9    BY MR. KREITZER:
10   Q.   Is that the reason why you decided not to
11   use the income approach, because the acquisition of
12   Anthem was a horrible decision at the end of the
13   day?   It substantially reduced the success of FCC,
14   and you didn't want to reflect the decision to
15   acquire Anthem in your overall analysis because it
16   had the effect of depressing the value of the
17   business by, I don't know, plus or minus $25
18   million; isn't that right?
19   MS. WRIGHT:   Objection.
20   THE WITNESS:   That's not why.   I lay out
21   why in my report, which is I had sufficient
22   market comparables that use the EBITDA from the
23   combined entity, which would include any
24   impacts associated with Anthem.
25   And I don't have management prepared

61 (Pages 238 - 241)

Page 242

1  projections but for the breach.  It's a unique
2  scenario.  You're valuing a company without --
3  in a but-for scenario, so it's a little
4  different.
5  BY MR. KREITZER:
6      Q.  So the challenge with doing a comparable
7  analysis, a market approach analysis, is you have to
8  find comparable businesses, right?
9      A.  Yes.
10     Q.  And I guess you went about doing that by
11 first identifying what you call table 16, a
12 description of potentially comparable companies,
13 right?
14     A.  Yes.  I started with companies in
15 educational services and then I narrowed it from
16 there.
17     Q.  Now, the reason for you picking these
18 comparable companies is you were -- you're hoping to
19 convince the jury that these are truly comparable
20 companies and, therefore, an analogy can be drawn
21 between the alleged success of these companies with
22 the alleged success of FCC, right?
23     MS. WRIGHT:  Objection.
24     THE WITNESS:  I'm not hoping to convince
25 anyone.  I am preparing an analysis that uses

Page 243

1  comparable companies to determine a benchmark
2  and that benchmark can be used to value your
3  subject.
4  BY MR. KREITZER:
5      Q.  Have you done any forward-looking analysis
6  of these selections, that is to say, following 2014,
7  whether all of your table 16 comparables -- let me
8  strike the question.  Let me ask it a different way.
9      In connection with your table 16
10 comparables, can you tell me whether all of those
11 companies are still in business today?
12     A.  I cannot.
13     Q.  No?  How about Corinthian Colleges, do you
14 have any insight into whether that company is still
15 in business today?
16     A.  I recall it being in the news more
17 recently.  But, again, my analysis is as of this
18 point in time.  And I'm looking at my report here at
19 that point in time.
20     Q.  Well, in other words, it was in the news
21 because it filed for bankruptcy, right?
22     A.  I don't know what form it took, but I do
23 know there was some distress, and I just don't know
24 what form it took.
25     Q.  And is that the reason why you elected not

Page 244

1  to use Corinthian as one of your comps because you
2  knew, as you wrote this report, that Corinthian had
3  gone under?
4      A.  No, that is not the reason.
5      Q.  What's the reason?
6      A.  I believe that Corinthian was the size.
7      Q.  You claimed in this report that Corinthian
8  was one of the largest for-profit post-secondary
9  education companies in the United States.
10     A.  Corinthian was the size.
11     What I did was I looked at the educational
12 services providers and then looked at FCC's size, a
13 few hundred million dollars in revenue, and I
14 excluded very large companies, including Corinthian,
15 that had revenues of some $1.3 billion, along with
16 other large companies like DeVry and Apollo that had
17 revenues in the billions versus the 200 million for
18 FCC.
19     Q.  Well, what was -- other than the fact
20 that, obviously, there's a difference between a
21 couple hundred million and a billion, I understand
22 that, but what was your thinking as to why a larger
23 school could not be comparable to FCC?
24     A.  I just -- looking at all of the
25 comparables and looking at the shear size of those

Page 245

1  larger ones, I felt it was better to look at
2  companies that were comparable in terms of size.
3      Q.  Was there any scientific reason that you
4  based your decision to exclude companies that were
5  larger than 500 million?
6      MS. WRIGHT:  Objection.
7      THE WITNESS:  I don't know how -- if it's
8  scientific or not, but size is something you
9  can consider when looking at comparables, and
10 several hundred million is more appropriate
11 than several billion for a few of them.  I
12 think a couple were 2 billion.  And I felt that
13 narrowing the sample was more appropriate.
14 BY MR. KREITZER:
15     Q.  Which of the other schools in your table
16 16 have failed since -- well, failed sometime after
17 2014?
18     A.  I don't know.
19     Q.  Is there anything other than size that
20 would make these schools in table 16 not comparable?
21     A.  Table 16, okay.  Sorry.  I just wanted to
22 make sure I was on the same table as you.
23     I also -- one of them had more of an
24 online presence with limited or no physical campus,
25 so I removed that.

62 (Pages 242 - 245)

1   Q.   Which one was that?
2   A.   I believe it was Capella Education Center.
3   Q.   Did you reach out for any industry
4   consultants or experts or people that were
5   knowledgeable in the education space to seek their
6   opinion as to what might be a comparable school to
7   FCC?
8   A.   I did not speak to any other consultants.
9   I looked at some research and other valuations that
10   were done, analyst reports, things of that nature.
11   Q.   I know you looked at 10Ks.  That would be
12   public filings with the SEC, right?
13   A.   Yes.
14   Q.   When you say you looked at other
15   analytics, what would those be?
16   A.   I'm sorry.  Analyst reports.  So
17   investment bank analyst reports.
18   Q.   Would you show me where those reports are?
19   A.   For example, on Exhibit 6, I cite the
20   Stifel, which is source footnotes 2 and 3, Stifel
21   report.
22   Q.   What is the Stifel report?
23   A.   It's an analyst report that's talking
24   about the industry.
25       I also cite -- I cite, on page 14 of my

1   report, I looked at a Deutsche Bank analyst report,
2   a Capstone Partners analyst report, Piper Jaffray
3   analyst report.  In my Exhibit 2, I also list them
4   and several others.
5   Q.   So let's break those down for a moment.
6       So what in the Stifel report of July 2013
7   assisted you in determining which schools to select
8   for the comparable analysis?
9   A.   As general background in the industry, it
10   just gave me some information about some of the
11   companies I found in my screen of comparable
12   companies.  So it was just instructive to help me
13   learn a little bit more about the industry,
14   understand some of the players and analyst estimates
15   for those players.
16   Q.   Were there analyst estimates in the Stifel
17   report as to these ten or so schools?
18       MS. WRIGHT:  Objection.
19       THE WITNESS:  There may have been.  I know
20   there's some in some of the other investment
21   bank analyst reports that we mentioned.
22   BY MR. KREITZER:
23   Q.   I'm not asking whether there may have
24   been.  I'm asking what you remember.
25   A.   Well, there were several investment

1   analyst reports.
2   Q.   We're going to talk about each one
3   separately.  So that's why I'm asking about that one
4   first.
5   A.   I don't remember.  I know some of them had
6   projections and others did not.
7   Q.   And in connection with the Capstone
8   Partners Investment Banking Advisor's report
9   entitled "Post-Secondary Education," Q2 2014, at
10   page 10, how did that page 10 somehow educate you on
11   which of the, again, 10 or 15, it looks like,
12   schools that you should have selected as the
13   comparable schools?
14   A.   I'm sorry.  Are you on page 10 of my
15   report or page 10 of --
16   Q.   No.  I thought you said that you gave me,
17   if my memory serves me, when I asked you about your
18   sources for determining which would be most
19   comparable schools, you pointed to the Stifel
20   report, which was footnote 2 of your report that is
21   Exhibit 6.  And then I thought you took me to page
22   15, and you told me about the Capstone Partners
23   Investment Banking Advisors' papers that is footnote
24   42.
25       Did I misunderstand you?

1   A.   No, no, that was a cite.  I thought you
2   meant page 10.  You mean page 10 of that document.
3   Q.   Page 10 of that document.  That's what you
4   cite.
5   A.   Correct.
6   Q.   So my question is, what in that report
7   helped educate you as to the different comparables
8   of these 10 or 15 schools?
9   A.   General background.  That's all I can
10   recall as I sit here.  I looked at it as part of my
11   analysis to understand the businesses of some of
12   these schools.
13   Q.   Did you look at anything else?  You did
14   tell me, sir, you pointed to Exhibit 2, but I'm not
15   sure I heard what it was in Exhibit 2 that --
16   A.   Exhibit 2 would list the analyst reports,
17   including the ones we talked about, and potentially
18   some others.  I think there was others.
19   Q.   Would you show me where those others are,
20   please?
21   A.   Sure.  Exhibit 2, which is probably the
22   third page of Exhibit 2.
23       I think, in addition to some of the ones
24   we talked about, there's some other particular
25   analyst reports on particular companies.

Page 250

1      So, for example, the first one, BMO
2  Capital Markets, also provided general background.
3      Q.   So aside from the decision to cut off some
4  schools because they had revenues in excess of
5  500 million, was there any other reason to exclude
6  some schools as opposed to others?
7      A.   I think we also mentioned -- I also
8  mentioned the online presence versus physical
9  presence.  For example, there was one that only had
10 online presence.
11     Q.   Had you included Corinthian in your study,
12 Corinthian being the school that has since filed for
13 bankruptcy, how would that have affected your
14 analysis of the going concern value of FCC?
15     MS. WRIGHT:  Objection.
16     THE WITNESS:  I'm not sure as I sit here,
17     because that would assume that I would feel
18     that larger schools, such as the $2 billion
19     schools should be comparable, and so it
20     wouldn't just be an adjustment for the one.
21     You would have to -- you would consider
22     adjusting the others as well.
23     So I don't know.  I don't have that
24     calculation.
25 BY MR. KREITZER:

Page 251

1      Q.   Is it customary, in your judgment, that
2  the comparable approach and the income approach
3  would vary so dramatically as they did in this case?
4      A.   Well, there's a lot of facts and
5  circumstances.  And you do want to look at the
6  approaches and try to reconcile them.
7      But, in this case, it's the facts and
8  circumstances here with the lack of projections.  It
9  explains some of that difference.
10     Q.   What do you mean by "it explains some of
11 that difference"?  The facts and circumstances here
12 with the lack of projections, it explains some of
13 that difference, what does that mean?
14     A.   Well, you're doing a but-for valuation
15 without projections, because they're not available.
16 So you're relying on the capitalization of earnings
17 method, which is a little more spot than the typical
18 income approach that might have a projection of cash
19 flow.
20     Q.   But the only reason you would do an income
21 approach -- strike that question.
22     In any business that fails, there's --
23 it's quite common to project out or forecast the
24 revenues and income of the company over time, isn't
25 it?  It's not unusual, is it?

Page 252

1      A.   I don't know if -- if it fails, what's
2  usual and not unusual, but I do appreciate that the
3  income approach is a method people use, and those
4  often include a projection or a spot capitalization
5  of earnings method.
6      Q.   And, in this case, what would you have had
7  to adjust in order to give yourself comfort that the
8  income approach could have been utilized?  Like is
9  there some adjustment you would have wanted to make
10 that you didn't?
11     A.   Well, what I would have wanted to adjust
12 is to have projections, reliable projections from
13 management of the cash flow stream that -- the
14 potential for this platform.
15     Q.   What was your source of projections when
16 utilizing the income approach?
17     A.   Here, I relied on the adjusted 2014
18 EBITDA.
19     Q.   Okay.
20     A.   And a projection -- a budget for just
21 2015.
22     Q.   Could you show me that budget?
23     A.   My Exhibit 14.
24     Q.   All right.
25     A.   And the budget would be deposition Exhibit

Page 253

1 133.  Yes, one -- I'm sorry.  I think I'm reading
2 the wrong line.  Hang on.
3     Q.   Okay.
4     A.   131.  Sorry.
5     And it's -- for completeness, it's 131,
6 and there's another file, P1740716-718.
7     Q.   What is that file?
8     A.   That is a native Excel file that is the
9 budget that is being reflected in deposition Exhibit
10 131.
11     Q.   Why did you elect to use this particular
12 budget?
13     A.   Because it was at or around the time of
14 the date of value, 6/30/2014.  It was prepared by
15 management after this Title IV reconciliation was
16 known, and I thought was a way to provide
17 information about what the but for the breach FCC
18 would look like.
19     Q.   Okay.  Did you satisfy yourself that this
20 was the most current projection of management?
21     A.   It was the most current.  Maybe I don't
22 understand what you're saying.  It was as of 6/24,
23 which is right around the valuation date.
24     Q.   Okay.
25     MR. KREITZER:  Give me two minutes and we

64 (Pages 250 - 253)

Page 254

1   may be done.
2      THE VIDEOGRAPHER:  Off the record.  The
3   time is 5:46.
4      (Short recess taken.)
5      THE VIDEOGRAPHER:  We're now back on the
6   record.  The time is 5:49.
7      MS. WRIGHT:  I note for the record that
8   the documents were provided with the report to
9   the extent that they weren't produced in the
10  litigation.  So that was over a month --
11  actually, a month ago almost.
12     THE VIDEOGRAPHER:  We're going off the
13  video record.  The time is 5:50.
14     (Adjourned at 5:50 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 255

1           AFFIDAVIT
2
3  STATE OF FLORIDA    )
   COUNTY OF _____ )
4
5      I, _____, being
   first duly sworn, do hereby acknowledge that I did
   read a true and certified copy of my deposition
6  which was taken in the case of Clingman v. Knobel,
   et al., taken on the 9th day of February, 2017, and
7  the corrections I desire to make are as indicated on
   the attached Errata Sheet.
8     _____
          (Deponent)
9
10  + + + + + + + + + + + + + + + + +
11        CERTIFICATE
12
13  STATE OF FLORIDA    )
   COUNTY OF _____ )
14
15
      Before me personally appeared
16  _____,
   to me well known / known to me to be the person
17  described in and who executed the foregoing
   instrument and acknowledged to and before me that he
18  executed the said instrument in the capacity and for
   the purpose therein expressed.
19
20     Witness my hand and official seal, this
   _____ day of _____, _____.
21
22
23    _____
        (Notary Public)
24
   My Commission Expires:
25

Page 256

1          ERRATA SHEET
2  Clingman v. Knobel, et al.
   Deponent:  JIM DONOHUE
3  Date of :  February 11th, 2018
4
5   PAGE   LINE       REMARKS
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20
21      _____
22      Signature of Witness
    _____
23  (Notary Public)
24  Dated this _____ day of _____, _____.
25  My Commission Expires: _____

Page 257

1       CERTIFICATE OF OATH
2
3  STATE OF FLORIDA   )
4  COUNTY OF BROWARD  )
5
6     I, the undersigned authority, certify
7
8  that JIM DONOHUE personally appeared before me
9
10 and was duly sworn.
11
12     WITNESS my hand and official seal this
13
14 12th day of February, 2018.
15
16
17
18
19
20    _Suzanne Vitale_
21  _____
22  SUZANNE VITALE, R.P.R., F.P.R.
23  Notary Public, State of Florida
24  My Commission No. DD179981
25  Expires: 5/24/2020

65 (Pages 254 - 257)

Page 258

1              CERTIFICATE

2

3    STATE OF FLORIDA  )

4    COUNTY OF DADE )

5

6         I, SUZANNE VITALE, R.P.R., F.P.R. do

7    hereby certify that I was authorized to and did

8    stenographically report the foregoing deposition

9    of JIM DONOHUE; that a review of the transcript

10   was requested; and that the transcript is a true

11   record of my stenographic notes.

12        I FURTHER CERTIFY that I am not a

13   relative, employee, attorney, or counsel of any

14   of the parties, nor am I a relative or employee

15   of any of the parties' attorney or counsel

16   connected with the action, nor am I financially

17   interested in the action.

18        Dated this 12th day of February, 2018.

19

20

21        *Suzanne Vitale*

22        _____

23        SUZANNE VITALE, R.P.R., F.P.R.

24        My Commission No. DD179981

25        Expires: 5/24/2020

Page 259

1  1           VERITEXT LEGAL SOLUTIONS
              One Biscayne Tower, Suite 2250
2  2            2 South Biscayne Boulevard
                  Miami, Florida 33131
3  3                305-376-8800
4  4   February 14, 2018
       Jim Donohue
5  5   c/o Lita Beth Wright,
       Storch Amini PC
6  6   140 E 45th St.
       2 Grand Central Tower 25th Fl
7  7   lbwright@storchamini.com
8  8   RE: Clingman & Hanger Management Associates, LLC -vs-
          Knobel, David, Et Al
9  9   Dear Ms. Wright:
10 10    With reference to the deposition of Jim Donohue
       taken on 2/9/2018 in connection with the above-captioned
11 11  case, please be advised that the transcript of the
       deposition has been completed and is awaiting
12 12  signature.
13 13    Please have your client read the transcript and complete
       the errata page. Upon completion, please send the signed
14 14  errata to our office at Two South Biscayne Blvd., Ste. 2250,
       Miami, FL, 33131, or email it to litsup-fla@veritext.com.
15 15
         If this is not taken care of, however, within the
16 16    next 30 days, we shall conclude that the reading
       and signing of the deposition has been waived and
17 17    the original, which has already been forwarded to
       the ordering attorney, may be filed with the Clerk
18 18    of the Court without further notice.
19 19  Sincerely,
20 20
21 21  Production Department
       Veritext Florida
22 22
23 23
24 24
25 25

66 (Pages 258 - 259)

[& - 2a]                                                                    Page 260

| & | | | |
|---|---|---|---|
| **&**   1:4 2:8 259:8 | 117:21 126:21 | 232:24 233:3 | 66:12 67:22 69:3 |
| **1** | 129:11,12 130:18 | 236:10 259:18 | 116:10 123:11 |
| **1**   122:24 123:7 | 130:18 131:12 | **19**   97:11 227:10 | 135:15 148:12 |
| 259:1 | 133:23 135:10,13 | 259:19 | 160:4,19 166:10,20 |
| **1.234**   185:20 | 137:3,21,22,23,24 | **190**   124:2,5 | 167:4,14 173:17 |
| **1.3**   244:15 | 138:4,6 148:9 | **1:32**   113:20 | 174:1 181:1,14 |
| **10**   21:9 73:16 | 212:21 240:21 | **1st**   168:18,24 169:8 | 183:5,10 184:22 |
| 248:10,10,11,14,15 | 259:13 | 174:1 | 185:10 197:9,10,14 |
| 249:2,2,3,8 259:10 | **131**   253:4,5,10 | **2** | 197:15 198:2,2,8 |
| **10,000**   163:13 | **133**   253:1 | | 198:22 201:2,13,24 |
| 164:22 165:6,13 | **13b**   47:13 | **2**   2:4 12:25 62:25 | 202:19 203:19 |
| **100,000**   109:22,23 | **14**   69:17 75:1 87:6 | 89:2 118:8 119:2 | 210:5 215:6,12,14 |
| 110:1,3,14,20 | 95:7 101:5 106:13 | 122:14,14,24 123:7 | 216:12 217:4,8,9 |
| 111:2 | 107:10 116:1,13,16 | 123:13 245:12 | 217:22 230:2 233:1 |
| **10017**   2:5 | 116:19,24 117:5,9 | 246:20 247:3 | 235:11 240:2 243:6 |
| **103**   223:10,20 | 117:18 124:24 | 248:20 249:14,15 | 245:17 248:9 |
| **10:24**   44:18 | 126:20 135:13 | 249:16,21,22 | 252:17 |
| **10:26**   44:21 | 137:8,20 138:6,15 | 250:18 259:2,2,6 | **2015**   252:21 |
| **10:54**   62:22 | 153:16 159:5 183:8 | **2,000**   193:7,10 | **2016**   240:6 |
| **10a**   47:5 | 185:16 212:5 | 194:11,17 | **2017**   240:6 255:6 |
| **10c**   47:7 122:21,24 | 214:20 229:8 | **2.5**   185:19 | **2018**   1:11 4:7 33:5 |
| 123:4,4 | 240:21 246:25 | **2.8**   183:19,22 | 33:21 34:11 256:3 |
| **10ks**   246:11 | 252:23 259:4,14 | **2/9/2018**   259:10 | 257:11 258:18 |
| **11**   47:9 124:6 224:3 | **140**   2:4 259:6 | **20**   124:16 238:15 | 259:4 |
| 259:11 | **1450**   2:9 | 259:20 | **21**   259:21 |
| **11:08**   62:25 | **15**   183:11,13 | **200**   244:17 | **22**   259:22 |
| **11th**   256:3 | 248:11,22 249:8 | **200,000**   6:7 148:20 | **2250**   259:1,14 |
| **12**   33:5,20 34:11 | 259:15 | **2004**   19:1 | **23**   259:23 |
| 47:11 86:10 128:18 | **16**   96:14 242:11 | **2011**   86:9,10 | **23rd**   2:9 |
| 224:2,3 240:22 | 243:7,9 245:16,20 | **2012**   123:8 125:23 | **24**   259:24 |
| 259:12 | 245:21 259:16 | 126:17,18 127:1,13 | **24th**   225:8 |
| **121**   225:3 | **16-62028**   1:3 | **2013**   55:11,20 64:8 | **25**   21:8,12 222:25 |
| **122**   224:25 | **17**   226:8,18,19 | 67:22 69:2 73:2,3,6 | 241:17 259:25 |
| **124**   47:18 | 227:1,3,10,12 | 73:11,16 101:17 | **25th**   2:5 259:6 |
| **12:24**   113:17 | 228:8 231:1,10 | 123:9,11 130:22 | **26**   66:12 |
| **12th**   257:14 258:18 | 232:18,23 233:4,20 | 131:5,18 132:7,14 | **26th**   64:21 |
| **13**   69:17 70:17,19 | 233:23 234:8 235:4 | 134:20 135:1,6,16 | **27**   238:17,21 |
| 70:22 71:24 74:25 | 236:8 259:17 | 136:10,17 138:11 | **29**   238:16,21 |
| 115:25 116:24 | **18**   225:7,18,24 | 139:10 148:4 | **2:57**   180:7 |
| | 226:8 227:1,3,10 | 162:15 247:6 | **2a**   12:25 |
| | 227:10 228:10 | **2014**   55:11,20 59:2 | |
| | | 61:13,25 64:8,21 | |

**2nd**  168:18,24

**3**

**3**  73:10 198:24
246:20 259:3
**3.2**  183:20
**30**  3:10 169:7
259:16
**300,000**  73:18
**305**  63:3 66:19
**305-376-8800**
259:3
**307**  73:9 74:2 184:1
**30th**  197:9,14
198:2
**310**  63:3 64:16,20
66:20
**32**  223:7,8
**321**  3:8 5:3,7
**322**  3:8 33:3,10,11
33:12
**323**  3:9 88:19,22
**33**  3:8 223:9
**33131**  2:10 259:2
259:14
**35**  223:10
**36**  226:4
**37**  238:9,20
**3:30**  180:10

**4**

**4**  3:4 73:11 89:2,4
180:10 224:2 259:4
**4.37.**  204:12,13
**40**  21:2 29:22 95:8
**42**  248:24
**45th**  2:4 259:6
**46**  96:13 124:18
125:18
**47**  128:24
**48**  124:15 162:8,9

**49**  163:11
**4:09**  204:15
**4:10**  204:18
**4a**  91:16,17,23
**4b**  92:20 93:13
**4c**  93:21

**5**

**5**  3:8 118:8 119:2
122:14,14 237:16
259:5
**5/24/2020**  257:25
258:25
**50**  223:2,3
**50,000**  64:21,25
65:3,5,10,18 66:11
111:2,8,20
**500**  245:5 250:5
**51**  238:9,21
**55**  47:19
**56**  47:19
**57**  47:19
**575**  6:13,15,19 7:2
7:6 17:24 18:1
**58**  224:25
**5:02**  237:13
**5:18**  237:16
**5:46**  254:3
**5:49**  254:6
**5:50**  1:12 254:13,14

**6**

**6**  117:24 122:14,14
224:2,3,3 246:19
248:21 259:6
**6/24**  253:22
**6/30/2014**  253:14
**60**  21:4 22:2 97:10
99:12
**66**  100:16
**67**  176:18 177:6,11

**7**

**7**  5:17 113:5 204:21
222:16 259:7
**73**  222:25
**79**  223:4
**7c**  123:2

**8**

**8**  73:10 95:15 98:15
106:1 139:20 140:3
141:3,11,13,14,16
141:24 142:6,12,14
142:19,22,23,23
143:1,6,18 144:23
145:20 146:2 148:9
148:23 151:4,21
175:14 183:6
198:23 222:16
259:8
**8.7**  183:20
**80**  47:20 101:14
**800,000**  128:3
**88**  3:9
**89**  223:7

**9**

**9**  1:11 46:20 49:4,5
49:6,10,22 50:1,5,7
50:20,23 117:24
121:19 122:10
259:9
**90**  204:1 223:9
**90/10**  48:1 49:10
50:9,11,15,16
115:3,12 190:22
**9:36**  1:12 4:8
**9a**  46:22 49:21
123:2 185:14,24
190:7,19 195:7
196:2,23 197:25
200:12,14

**9b**  46:24 51:1
**9c**  47:1 51:1
**9d**  47:3 51:1
**9th**  4:7 255:6

**a**

**a.m.**  1:12 4:8
**abandoned**  94:23
101:18
**abilities**  236:6
**ability**  127:1,13
139:21 140:5
165:15 168:13
169:19,22 181:3,12
204:5,24 205:3
209:1 210:17
212:14 225:6 236:7
**able**  17:11 25:12,17
25:20 28:1 34:15
45:15 48:23 51:22
67:6 81:4,8,9,15
115:24 116:7,8
117:6 118:14
119:20,24 133:2,25
136:4 137:15 139:7
141:16 142:6
148:20 160:18
167:12 179:17,24
183:23 184:21,24
185:8 186:25
198:16 199:8
200:25 202:7
209:16 210:8 217:1
217:20 218:5,10,19
221:21 222:1 233:5
234:24 235:19
**abrams**  225:18
**absolutely**  115:23
132:11
**accepted**  109:17
145:9 146:14
170:25 187:2 192:8

**access**   25:10 27:4
  27:15 28:10,13,14
  29:9,9,10,10,12,13
  29:16 37:23 39:12
  39:14 40:13,14
  42:4 45:8,12 52:3
  52:13 53:4,7,9,10
  53:16,19 54:1,5
  61:23 115:24 117:6
  121:7 170:15
  171:11
**account**   87:12 88:5
  89:10,13,24 90:2,9
  90:12 107:20 128:8
  138:18 144:4,11
  157:16 185:10
  186:11,16 189:21
  191:11 193:17
  194:10,12 195:10
  195:25 196:4 223:6
  228:7,17 230:2
**accounting**   42:15
  43:1,4 46:5 82:12
  82:14 83:7 84:20
  89:11,25 90:5,7,10
  90:15 91:1,24 92:5
  92:24 94:1 95:5
  113:2 134:11,19
  135:11 136:18
  137:5,10 138:3
  163:8 168:9 178:24
  184:14 185:5
  206:11 207:8,10,18
  208:9,14 222:10
  223:15,19 231:7,14
**accounts**   92:1,6,9
  92:13 132:16 133:1
  138:16 139:2,22
  154:10 164:4
  167:24,25 169:10
  175:9 182:21,24

**191**:12 224:15
  231:23 235:8
**accumulated**
  195:23
**accurate**   190:11
**acknowledge**   255:5
**acknowledged**
  255:17
**acquire**   241:15
**acquired**   126:16
  128:18 240:24
**acquisition**   125:23
  126:4,5,9,12,22,25
  127:7,9,12,17,19
  127:20 128:2
  241:11
**act**   111:12,15,16
**action**   23:23 88:25
  169:10,16,18
  258:16,17
**actively**   175:2
**activity**   75:17
  120:15,19 126:19
  128:13,18 138:4
  156:21 157:10
  161:2,3 184:6
  185:1,6 186:21,22
  190:1,1 191:19
  199:3,4,5 222:6,22
  240:3
**actual**   5:17 10:11
  12:13 36:22 52:13
  53:4 56:6 57:9,22
  58:10 60:19 61:24
  64:7 65:2 69:1,3,19
  69:19 76:2 78:25
  80:21 95:21 96:3
  108:10 109:3
  110:12 114:23
  153:6,7,22,24
  157:10 181:16

**185**:5 186:8 197:4
  199:3 212:11
  219:10 237:19
  239:10
**adamantly**   206:4
**add**   24:16 40:7
**adding**   40:9
**addition**   7:16 79:4
  138:14 201:7
  249:23
**additional**   9:15
  154:14,18,20,25
  155:6,15 187:15,18
  187:20 200:21
  226:7,9,12,16
  227:12,19 228:13
  228:19 229:3 231:8
**addressing**   207:25
**adjourned**   254:14
**adjust**   88:5 252:7
  252:11
**adjusted**   108:2
  191:24 240:3
  252:17
**adjusting**   250:22
**adjustment**   250:20
  252:9
**adjustments**
  188:14 229:2
**advance**   95:20 96:3
  194:2
**advanced**   131:15
  168:8 169:20,22
  170:8,14 171:11,16
  171:20,25 172:10
  172:19 205:6,18
  209:11,19,20 225:6
  233:10,11
**adverse**   126:9
**advised**   259:11

**advising**   168:24
**advisor**   125:5
**advisor's**   248:8
**advisors**   248:23
**affect**   107:22
  126:23,23 127:1,10
  127:13
**affidavit**   255:1
**age**   4:19
**aggregate**   121:1,4
  184:15
**aggregated**   60:11
  120:4,9,10,13
**ago**   23:10,12 24:9
  24:15 124:3 156:25
  157:1 254:11
**agree**   37:9 76:25
  81:9 84:13 98:11
  98:20 108:17
  125:24 126:2 129:6
  129:9,25 140:19
  143:17,21 150:8
  151:22 162:21,24
  191:7 192:20
  218:23
**agreement**   192:18
**ahead**   46:19 157:23
  222:19
**aid**   59:7 111:13
  116:9,19 129:2,16
  130:4 133:16
  134:20 136:19
  137:10 151:3
  152:14 156:13
  162:14 164:3,20
  168:14
**al**   4:6 255:6 256:2
  259:8
**allegation**   78:25
  95:8 96:15 97:12
  97:23 99:11,25

100:5,18 101:7
103:9 145:10
146:11 172:17
178:13 202:23
**allegations** 56:2
69:9 148:9 176:10
178:15 209:24
227:24 237:8
**alleged** 75:2 78:18
78:25 145:13
176:23 177:2,3,7,9
177:14 205:21
207:12 223:18
224:15 234:17
237:21 239:17
242:21,22
**allegedly** 38:2
85:16 182:20 183:1
183:3 189:7 196:25
199:7 200:15 209:7
211:12 231:2
**alleging** 89:20
142:11 148:15
166:23 167:8
173:11 178:9
179:20 211:18
233:17
**allocate** 222:22
**allocated** 79:12
193:20
**allowed** 26:11,12
131:13 178:11,19
178:19
**alter** 34:9 87:25
**alterations** 33:20
**altered** 16:8
**amend** 161:22
**amended** 3:9 88:17
88:24 89:3 95:9
96:14 97:11 99:8
99:11 101:15

**amendments** 33:19
**amini** 2:3,13 4:13
9:24 10:15,22
11:19 12:2 22:9,11
23:15 24:24 25:3
30:6 259:5
**amount** 25:21
55:18 59:4,8 65:4
70:21 71:25 73:18
77:17 83:8,10,12
83:18 84:1 105:2
110:19 150:23
152:9 153:1 157:15
157:22 158:23
159:8,10 174:22,22
187:4,5 193:10
195:8,23 197:4
198:6 218:20
219:16,19 226:2
228:8,12,16 232:22
236:10
**amounts** 69:24
70:10 79:5 82:18
92:21 113:25
138:17 168:6
187:22 198:7,9,10
198:12 199:1
202:11 210:3 218:3
219:3,4,21 221:2
**analogy** 242:20
**analyses** 14:22
15:13 19:7,8,17,19
20:6,15 126:15
171:15 176:5 200:8
**analysis** 14:25 15:2
15:7 16:12,15
17:22 20:17,18
35:5 55:9,13,16
58:18 64:24 65:8
65:15,17 66:4,6
67:13,21 68:1 69:6

73:1 77:6 82:12,14
83:7 84:11 87:13
87:17,20 95:5 97:8
102:19 108:9 112:1
112:7,13,19,21,22
113:1 114:2 120:5
127:16 132:15
133:7 137:19,24
147:11 154:23
189:3 203:13,17
207:17,17,18,23
215:19 216:16,21
216:23 219:3,11
220:6,20 221:6
229:15 231:5
237:19 238:7
241:15 242:7,7,25
243:5,17 247:8
249:11 250:14
**analyst** 20:9,11,13
246:10,16,17,23
247:1,2,3,14,16,21
248:1 249:16,25
**analysts** 14:12
240:13
**analytical** 69:1
80:21 215:19
216:13
**analytics** 81:21
207:24 240:19
246:15
**analyze** 69:15
82:16 94:4 163:23
**analyzed** 82:20,23
127:22 129:11
180:1 202:22
210:20
**analyzing** 164:8,8
**answer** 26:22 27:13
27:20 29:7 30:9,19
32:1 36:18 38:8

48:10,24 56:12
57:16 58:6 60:2
63:10 66:18 68:14
70:7 73:25 82:1,6
98:1,24 113:10
118:14 130:3,7
137:4 146:9 155:3
161:20,22 199:6
216:21 217:24
219:23,25 240:11
**answered** 118:17
138:12 162:2 236:2
**answering** 77:21
201:18
**answers** 27:5 49:5
**anthem** 95:9,10
125:23 126:4,9,12
126:13,16,22 127:1
127:8,9,13 128:2,9
128:13,17,21,25
133:18 162:12
240:24 241:1,6,12
241:15,24
**anticipated** 212:23
214:2
**anyway** 87:6
**apollo** 244:16
**apologize** 36:18
44:23 123:25
**apparently** 42:16
85:19 129:13
222:21
**appear** 79:13 111:3
184:9 188:10 196:1
209:16 240:14
**appearances** 2:1
4:10
**appeared** 75:21
116:12 255:15
257:8

appears 33:17
apple 185:24
applied 79:7,18
 80:23 82:25
apply 64:18 80:11
 81:5 94:8 103:16
applying 238:15
appreciate 214:25
 230:19 252:2
approach 59:11
 238:2,5,7,13,14,24
 238:25 239:1,8
 240:17 241:11
 242:7 251:2,2,18
 251:21 252:3,8,16
approaches 59:12
 238:23 251:6
appropriate 17:21
 245:10,13
appropriately 87:2
approved 107:21
approximately 6:6
 128:3 163:13 165:6
 181:1
april 126:17,18
 127:1,13 128:18
 132:13,13 155:19
 155:22 159:22
 160:3,19 168:18,18
 169:8 174:1 181:1
 181:14 226:11
 227:13 232:25
ar 123:8,11
area 35:14
areas 32:24 35:19
artfully 75:15
ascribe 178:8
 200:21 231:19
ascribing 178:14
aside 31:14 42:22
 102:17 163:7 174:1

180:14 181:13,23
199:6 211:22 250:3
asked 9:22 11:20
 27:21 28:2 44:24
 46:16 48:10,12,20
 137:2 138:11
 148:25 149:7,13
 161:15 164:25
 176:6 177:12 202:6
 203:1,4 204:22
 208:25 213:1
 224:16 229:19
 236:1 248:17
asking 26:15,16,23
 27:1 36:17 37:19
 37:20 39:19 49:24
 52:8 57:5,7,17,18
 59:25 67:18 85:8
 89:22 90:22,25
 91:19,21 93:7
 99:10 102:13
 114:22 117:1,2,18
 121:9 177:16 191:9
 201:20,22 202:14
 202:17 206:3,21,22
 213:11,18 220:5,11
 236:4 247:23,24
 248:3
assignment 28:10
 31:13 223:25 224:8
 224:11
assimilation 190:16
assist 14:19 147:22
 147:24
assistance 13:23
 14:13
assisted 14:1 39:13
 247:7
assists 34:20
associate 14:18
 18:9,10 20:12 91:7

198:20 221:21
222:21
associated 58:19
 81:14 164:20
 196:20,21 198:10
 199:1 200:17
 221:23 222:2
 241:24
associates 1:4 4:5
 259:8
assume 11:20 36:3
 40:20 41:8,13 42:4
 104:9 155:24
 165:19 176:6
 184:18 203:1
 204:22 206:3
 207:24 208:25
 224:16 250:17
assumed 60:25
 209:19
assuming 146:10
 177:20 224:20
assumption 11:18
assumptions 12:2,9
attach 10:18
attached 48:2,3,4
 61:20 255:7
attempt 43:18
attempted 162:11
attempting 164:21
 175:2,8
attended 146:18
 148:22 149:5
attending 93:25
 117:5 188:9 192:12
attention 73:5 89:2
 95:7 96:13 97:10
 100:15 101:14
 123:24 124:16
 162:7

attestation 86:2,8
attorney 23:13,16
 258:13,15 259:17
attorneys 30:6,14
audit 48:2 85:24
 86:13,16,19,24
 87:3,9,14,20 88:7
 214:11,18
audited 188:23
august 225:8
authority 257:6
authorization
 43:23 63:18
authorized 258:7
available 10:25
 11:4 13:15 26:1,2
 27:19 28:4 30:7,25
 31:10,16,24 37:8
 41:7 54:12 61:9
 104:4 121:13
 126:23 251:15
avenue 1:10 2:9
average 157:12,15
 157:19,22 158:23
awaiting 259:11
award 58:17 63:14
 63:16,20 86:21,22
 160:25
awards 63:19
aware 11:11 12:14
 12:18 36:7 38:11
 38:13,17 51:15
 53:21 66:23 71:3
 71:13 72:15 87:16
 87:23 88:11 103:8
 131:17 133:15,21
 133:22 149:24
 152:21 162:25
 163:22 166:9,18,22
 167:2 168:22 171:9
 182:11 194:24,25

203:24 219:16
224:18
**axelrod**   2:8

**b**

**b**   22:24
**back**   11:22 17:10
39:25 44:20 50:19
52:9 56:8,10,11
62:24 71:5 72:21
79:8,9 81:12 83:9
83:18,20 94:9
105:18 106:4,17
107:15 108:4
113:19 127:4
131:14,15 133:12
136:12 149:9,10
153:2 157:6 158:4
160:1,8,11,13,24
161:13,14 163:23
165:23 168:6
172:10 174:12,18
174:23 175:7
177:21 180:5,9
181:7,17,24 182:11
182:15 185:5
186:21 189:6,7
191:11 193:3
195:10 196:18,24
197:8 198:23
204:17 205:20
208:18 210:4
217:19 218:5 229:2
229:21 230:10
231:6,9,13 232:1
232:21 233:21
234:19 236:8
237:15 254:5
**background**   168:1
247:9 249:9 250:2
**backup**   153:5

**bad**   14:17 32:17,18
32:20 35:13 37:25
37:25 41:4 43:13
79:10 80:8,15 81:1
81:4 83:3 103:12
113:3 153:3,6,7,12
153:23 154:3,13,14
154:17,18,20,25
155:6,9,15,17,20
155:21 168:8 200:9
212:6 215:3 218:4
221:13,15,20
222:15,21 226:2,6
226:7,9,12,13,14
226:22 227:12,19
227:25 228:13,19
228:22 229:3,12
**baena**   2:8
**balance**   35:9 41:6
41:23 42:17 43:9
56:15 57:2 60:3,3,4
60:11,15,18,24
61:1,2,4 62:6,6,7
66:2,2,14,16 67:1
67:15 68:7 69:11
69:13,16 70:23
75:17,18,19,21,22
83:13 84:6,12 85:5
85:6 87:25 93:11
93:11 94:3 97:8
102:2,8 103:3,3,5
104:24 105:3
112:13,17 113:6
114:10,10 131:2,10
131:11,12 132:3,4
132:8,8,17,18
168:4 169:13,14
174:23,24,25 175:4
175:6 182:20,23
185:3 186:9 187:13
191:19,20 196:12

199:21 200:4
210:17 212:5,14
213:7 214:10,21
215:20 216:1
217:13,13 219:22
223:14 230:8 231:2
231:5,13 232:2,4
232:12,13,20 233:9
234:14,20,25 235:2
235:7,10,14,16
236:23
**balances**   35:22
36:1,7 38:2 41:12
41:14,14,18 42:2
42:10,23 43:25
65:7 66:17 67:13
68:10 69:25 72:11
72:16,19,22 75:4,9
76:14 77:2,9,23,25
84:7,20,23 90:16
90:17 91:5 100:12
107:4,12 112:23,25
120:6 133:10,11,11
138:2 143:10,14
144:7,21 146:25
148:7 149:14
152:24 159:23
160:5 174:18,20
175:2 178:24
189:25,25 198:21
199:24 207:25
209:21 215:20
218:4 220:8,9,24
220:25 222:6 223:5
233:9
**balancing**   189:22
**balancings**   229:18
**bank**   43:16 92:1,9
92:12 106:16
107:12 134:9
135:25 136:5,15

137:7 138:16,18
139:1 223:5 246:17
247:1,21
**bank's**   137:13
**banking**   248:8,23
**bankruptcy**   52:10
172:15,25 173:5
202:25 203:6
204:10 205:15,23
210:7,10,12,18,22
211:11 225:9
227:20 235:14
240:21 243:21
250:13
**banks**   225:14
**barbara**   131:24
151:10
**bartness**   1:7 179:9
**base**   7:17,20 12:22
140:18
**based**   13:7 88:8
90:25 94:14,24
125:25 150:18
162:22 167:11
176:11 193:12
208:24 210:2
218:11,24 245:4
**bases**   213:19
**basically**   28:14
34:24 66:3 68:23
110:16 154:8
187:21 214:13
**basing**   138:5
**basis**   65:10 68:9
75:18 93:12 104:5
115:8,21 116:23
117:1,9 121:19
143:24 158:25
195:8 215:25
**bates**   11:3,5 46:7

**began**  125:19,22
**beginning**  101:17
　126:16
**behalf**  2:2,7 4:14
**belief**  216:10
**believe**  5:13 23:9
　24:1 25:19 29:8,16
　38:20 39:3 46:6
　47:19,22 48:24
　61:20 64:11 80:2,5
　92:14 106:23
　111:11,21 114:2,18
　118:2,7 119:2
　122:9,21 124:14
　125:4 132:13
　154:21 158:11
　159:16 176:16
　180:24 181:6
　187:14 197:16,22
　198:4 214:1 220:20
　226:18,20 233:8
　244:6 246:2
**believed**  131:9
　147:20 225:1
**believing**  134:14
　213:20
**belonged**  212:18
**benchmark**  243:1,2
**best**  197:7
**beth**  2:6 4:12 259:5
**better**  21:24 108:11
　125:4 128:17
　218:22 245:1
**beyond**  71:2 75:12
　75:14 178:11,20
　219:3,4,8
**big**  123:12 126:4
　171:10
**bigger**  105:11
**biggest**  87:22

**bijan**  2:13 23:15
**bill**  7:6
**billable**  8:25 9:5
**billed**  6:6
**billing**  6:18
**billion**  244:15,21
　245:11,12 250:18
**billions**  244:17
**bilzin**  2:8
**biotech**  22:17,21
　24:7
**biscayne**  259:1,2
　259:14
**bit**  25:9 222:20
　223:11 238:12
　247:13
**blvd**  259:14
**bmo**  250:1
**board**  43:6
**bonus**  7:15,19,21
　7:23 8:7,9,11,16,19
　9:9
**borrowed**  232:24
　233:3
**boulevard**  259:2
**breach**  22:18 23:22
　23:23 177:3 203:5
　204:4 211:19 239:4
　239:7,11,13,17,19
　240:1,2,3,12 242:1
　253:17
**breaches**  175:21
　176:1,11 177:9,15
　177:17,20 202:24
　203:1,16,22 204:8
　204:9 210:15
　224:16 225:5
**break**  44:16 62:17
　113:14 120:21
　155:3 180:3 183:16
　247:5

**brickell**  2:9
**bring**  5:15,22,25
　9:22 10:3,5,7,8,10
　11:15,17 12:6,10
　12:11,12,20 13:1,2
　13:12 16:13,15
　19:9,18 118:10
　174:23 231:13
　232:2,4,12,22
　234:24 235:1,3,4
**bringing**  5:19
　214:10
**broad**  186:19
**broader**  64:9
　149:13
**broadest**  52:15
**broadly**  106:25
　211:6
**brought**  12:13
　19:12,22 118:12
　124:25 131:13
**broward**  257:4
**bucks**  236:11
**budget**  252:20,22
　252:25 253:9,12
**bullet**  113:5
**business**  25:12,16
　25:18,21,25 26:6
　102:12 127:21
　156:9 171:24 172:2
　177:14 241:17
　243:11,15 251:22
**businesses**  242:8
　249:11

**c**

**c**  14:9 259:5
**calculated**  237:21
　237:23
**calculation**  49:10
　250:24

**calculations**  83:3
　213:12
**calendar**  183:9,10
**call**  44:14 50:8 54:6
　86:2 115:17 184:7
　201:10 242:11
**called**  43:20 53:21
　54:1 55:13,16 68:4
　86:6 106:6,9 115:2
　115:14 160:9,10,13
　160:16 162:2
　185:25 188:11
　221:1
**calling**  33:11 228:7
**calls**  184:2 190:23
　202:13
**campus**  80:11
　103:16 153:12
　154:11 245:24
**campuses**  29:22,22
　80:8 81:5
**capacity**  10:22
　255:18
**capella**  246:2
**capex**  182:7 211:2
**capital**  127:18,21
　170:17 171:23
　172:1,20 173:5
　204:5 211:1,4
　224:23 250:2
**capitalization**
　251:16 252:4
**capstone**  247:2
　248:7,22
**captioned**  259:10
**card**  193:6,9,13
**care**  259:15
**career**  25:13 28:24
　29:17 36:12,25
**case**  4:4 6:25 10:2,6
　11:9 14:20 22:9,10

22:20 23:1,4,7,9,11
23:14,17,20,25,25
24:3,5,7,10,20,25
25:10 26:6 30:14
33:18 37:4 38:4,25
44:3,6,11 45:1,10
46:11,18 48:14,22
56:2 61:23 63:22
69:9 71:6 72:6
76:19 78:13 82:4,9
82:16 84:14 86:20
88:17 89:6 93:7
99:24 100:10
107:17 124:9
133:14 134:3 141:6
141:7 167:13 177:5
178:13,15 179:17
198:16 201:17,20
202:24 234:11
239:10 251:3,7
252:6 255:6 259:11
case4   11:21
cases   24:16 25:2,6
28:7 192:23
cash   43:18 104:4
107:12 115:8,21
116:23 117:1,9
121:19 126:15,19
126:21,23 127:10
128:4,8 131:18,21
132:24 161:1,2
171:1,11,14 184:15
186:20 189:4 197:4
199:3,3 204:2
215:25 223:3,5
231:21 232:16
234:20,22 236:23
239:9 251:18
252:13
cat   123:4,5

categories   197:13
categorize   102:22
categorized   153:6
category   197:10
198:3
cause   1:19 74:9,14
75:11 76:2,4 77:11
101:23 102:5,19
105:6 131:21 134:3
134:4,19 150:17
203:6 205:11 208:3
210:6,19 220:16
221:15
caused   56:5,20
57:8,20 72:9 76:1
77:17 96:2 108:18
130:15 133:17,18
134:15 139:21
140:4 148:22 149:6
152:15 154:21
155:7,12 159:7,9
172:15,24 175:14
202:24,25 204:9
205:22 210:9,12,18
211:10 227:19
237:3,6
causes   75:9 154:20
causing   72:2 75:1
76:21 95:12 224:19
caveat   92:24 93:1
ceased   225:5
ceases   192:22
center   246:2
central   2:4 259:6
certain   5:16 19:6
19:15,16,16 20:14
34:1 36:7 55:4
65:22 70:18 82:17
82:18 104:5 110:10
111:24 130:24
131:11 153:2 156:2

175:22 195:8
229:12
certainly   28:3
35:21 43:10 68:8
78:12 81:18 102:24
103:1 150:17
176:23 202:2
certificate   255:11
257:1 258:1
certified   3:10 255:5
certify   30:11 257:6
258:7,12
cetera   117:3
chain   18:13
challenge   129:3,17
226:3 242:6
challenges   115:15
133:23 205:25
chance   64:2 119:9
change   32:14 34:9
35:12 40:23 41:6
147:10,12,15,21
183:21 187:11
226:18
changed   35:4
137:12 140:12
210:8
changes   88:13
187:12
changing   94:12
196:12
chapter   124:6
characterize   202:3
202:12
characterized
155:25 156:3
190:23
charge   6:22 81:4
203:7,12,13 226:7
226:10,12

charged   206:6
charges   212:6
charts   167:21,21
cherry   220:9
cid   1:8 179:9
circles   229:24
circumstance
234:17
circumstances
188:16 211:10
251:5,8,11
cite   10:25 48:4
102:11 114:20
234:5 246:19,25,25
249:1,4
cited   11:2 46:2
123:21
cites   10:16 12:8,9
47:15 95:15
citing   11:14
city   23:2
civ   1:3
claim   107:3 119:19
123:15,16 174:13
174:16 176:1
181:24 182:16
210:11 229:25
231:20,21 235:7
claimed   244:7
claiming   204:9
210:15 235:9,9
claims   137:16
144:5 203:22
205:15
clarification   89:18
clarify   26:24
117:15,15 161:12
161:16
class   157:13
classes   117:5
157:17 158:10,15

158:17 188:9 192:12,13
**classified** 185:17 185:18
**classify** 213:15
**clean** 186:25
**clear** 30:19 176:4 190:25 202:10 214:16 234:23
**clearly** 16:24 20:25 57:12 96:9 173:7 177:4 178:21 191:25 202:11 218:1 219:22
**clerk** 259:17
**client** 9:1 175:21 176:1,2 179:11 259:13
**clients** 89:23 90:8 92:21 93:23 94:12 94:13,23 96:1,25 111:21 113:24 175:8,13,17 178:6 178:10,19 179:2,7 179:12,18 203:22 206:15 207:5 208:4 208:21 209:6 218:20
**clingman** 1:4 4:4 255:6 256:2 259:8
**close** 86:16,19,24 87:3,4,9,13,20 88:7 162:14 183:11 186:22 187:13
**closing** 86:17
**coach** 98:6,13
**coaching** 98:7
**cod** 41:13,15,19 42:2,11,23 43:25 55:6 56:15 57:1,6 59:13 60:4 62:7

65:7,18 67:1,14 69:7 70:25 71:7,16 72:4,10,11 73:21 74:8,23,25 75:4,10 75:12,14,18,22 76:2,6,9,13,14,25 77:3,19 85:6 90:18 93:11 96:9 97:18 99:18 100:19 102:3 102:8 103:3,24 104:6,20,22,24 105:2,6,25 106:1 106:16 107:4,18,21 107:23,25 108:4,8 108:17,20 109:3,8 109:10,13 110:12 110:16,18,22 111:1 111:19,19,21 112:20 113:6 114:10 130:11,17 130:22 132:3,8,20 132:23 133:1,10 138:25 139:22 141:9,25 142:7,12 142:15,20,21 143:3 143:10,19 144:7,12 144:14,17 145:10 145:11,15 146:2,14 146:25 147:18 148:7,21 149:6,22 149:22 150:2,3,9 150:10,18 151:24 154:22 155:10 159:24 160:5 162:17,18 164:4 165:16,21 167:3,25 168:25 170:2 171:6 174:22 182:21,23 185:3 186:12,18 187:2,4,9,12,25 189:5,8,22 190:1

191:12,20 192:5 193:18,18 194:12 194:15 195:25 196:8,12 200:4 215:25 217:13 219:4,21 220:25 221:11 224:15 228:18 230:3,6,10 230:13 231:3,23 232:13 234:25 235:7 236:24
**code** 142:22 149:17 161:17
**codes** 149:16
**collect** 16:25
**collection** 15:1
**collective** 116:4
**collectively** 85:4
**college** 25:13 28:24 29:18 36:12,25
**colleges** 243:13
**colorful** 167:22
**columns** 188:10
**combination** 132:24 174:21 211:5 230:8
**combined** 126:13 241:23
**come** 37:21 97:8 106:4 125:5 134:1 134:8 142:25 169:13 194:20 208:18 225:22
**comes** 22:22 32:23 44:4 48:6 53:24 103:19 117:10 123:18 140:21 151:6 153:18
**comfort** 252:7
**coming** 42:3 51:13 234:6

**commence** 93:25 192:12
**commensurate** 150:13
**commenting** 211:16
**comments** 137:13
**commission** 255:24 256:25 257:24 258:24
**common** 251:23
**communicate** 15:6 15:14 17:19 141:9 141:25 190:12 216:8
**communicated** 15:11
**communicating** 99:1 135:8
**communication** 26:19 27:2 106:15 175:4
**communications** 5:23 9:23 11:18 12:1 26:8,13,14,16 27:12 36:2 41:8 221:22
**companies** 240:18 242:12,14,18,20,21 243:1,11 244:9,14 244:16 245:2,4 247:11,12 249:25
**company** 22:18,21 25:18 32:19 35:25 38:1 41:11,17,21 41:25 42:4,9 46:6,7 51:7 52:8 71:14 115:8 126:5 128:3 129:4 134:3 135:1 135:6 136:14 139:9 141:10 143:14

144:5 162:11
163:13 164:12
165:16 170:17
172:24 173:25
174:9 177:23,24
179:13 180:15,17
181:2,11,15,23
182:1,9 190:17,22
191:10 204:10
205:22 208:25
209:10,11,12
211:11,24,25
220:15,17 221:16
225:25 226:1,4,22
227:20 231:20,22
232:16,24 233:3,5
233:5 234:24 235:7
236:5,7,20 237:3
239:9,23 241:3
242:2 243:14
251:24
company's 37:24
94:25 136:5 139:1
190:14,15,16 191:1
191:2 205:10
211:12
comparable 242:6
242:8,12,18,19
243:1 244:23 245:2
245:20 246:6 247:8
247:11 248:13,19
250:19 251:2
comparables 239:3
240:13 241:22
243:7,10 244:25
245:9 249:7
compare 60:4
136:1
compared 59:22
65:15 159:24 160:5
229:19

comparing 58:17
67:1 112:22
compensated 6:2,4
18:1
compensation 5:23
7:22,24 8:19 9:9,20
compile 15:4
compiling 19:7
20:15
complaining
234:13
complaint 3:9
88:17,25 89:3 95:9
96:14 97:11 99:8
99:12 101:15
complete 17:22
28:20 45:8,12
55:21 66:16 114:8
158:17 173:23
259:13
completed 16:12
259:11
completely 216:22
235:10
completeness 47:16
253:5
completion 259:13
complicated 171:3
171:5
component 8:8
components 174:15
composition 37:25
comps 244:1
computer 17:10,11
28:23 29:4,13,17
36:11,24 37:16
40:6 42:20 51:17
51:18
concept 70:23
208:24

concepts 108:25
concern 91:25 92:2
92:6 137:5 138:14
173:10 177:9
178:24 201:14
202:20 203:2 205:1
205:12 209:13
223:20 236:7
250:14
concerned 230:24
231:4
concerning 5:23
114:11 135:11
218:8
concerns 87:24
113:3 137:2 163:8
208:8
conclude 56:5,20
57:8,20 77:17
101:24 102:6,19
111:11 130:15
134:19 155:9,13
157:13,17 159:7,9
167:12 171:22
172:1,22 218:19
221:16 238:23
241:1,5 259:16
concluded 67:21
136:17 171:23
concluding 135:14
conclusion 36:10
36:15,24 37:7,22
93:13 135:16,18
136:14 138:5
143:17 152:1
172:13,18,19
217:20 238:14
conclusions 38:10
52:24 53:2 65:22
76:1 81:18 82:17
86:7 88:6,12 126:8

144:13 146:24
217:10
condition 180:17
conduct 89:5
179:19 207:12
confirm 118:9
130:21 136:5
163:19 164:15
188:19,20
confuse 176:7
confused 209:22
connected 258:16
connecting 159:15
connection 8:18
10:1 11:5,8,20
14:19,23 23:10,14
23:22 25:13 31:1
31:10,24 34:17
45:9 52:21 58:11
71:20 74:7,13
82:22 96:23 99:23
101:23 102:18
108:7 115:19
124:23 125:8 148:5
148:18 151:1
198:15 216:25
218:21 220:14
223:25 224:5
230:25 240:16
243:9 248:7 259:10
consequence 73:22
87:9,20 88:6 109:4
169:15 175:21
207:12
consequences
93:18 181:20
consider 72:23
245:9 250:21
consideration
143:8,12 152:13

**considered** 66:4
74:12 128:12
**considering** 56:15
67:15
**constituted** 58:10
**consultant** 9:2
**consultants** 14:3
246:4,8
**consulting** 18:9,10
18:11 20:12 21:14
**consumed** 164:1
**contain** 10:11,13
15:22 48:18
**contained** 10:14
188:2 200:13
**contains** 10:16
**contemporaneous**
45:19,21 52:1
212:11
**contention** 49:3,4
168:12
**context** 68:17
70:13 150:6
**continue** 13:6,7
146:17 181:4,12
192:22 209:12
**continued** 166:19
167:3 201:14
202:20 205:1 233:9
**continuing** 112:14
**contract** 22:19
23:23,23
**contradiction**
120:14
**contravention** 89:6
**contribute** 211:17
**contributed** 76:13
224:9 237:7
**contributing** 77:2
77:14,16

**contribution** 8:25
9:1
**control** 91:8 208:8
222:11 223:16
**controls** 89:11,25
90:10 222:25
223:19,22 224:6,9
224:10
**conversation**
189:12
**convert** 205:10
**convince** 242:19,24
**copies** 118:20
**copy** 5:10 33:6,17
255:5
**corinthian** 243:13
244:1,2,6,7,10,14
250:11,12
**correct** 7:1 9:6,7,10
10:9 11:7 16:10
17:18 19:25 22:4
41:16 51:3 53:13
59:3 60:22,23
62:11 64:4 65:14
65:19,20 66:12
75:5,23 78:8 80:20
80:24 84:9,17,24
85:3,9,20 89:17,18
89:19 91:10,12
93:14 101:9 103:4
105:7 107:5 108:3
110:10,24 112:8
115:22 118:15
120:11 121:23
123:9,13 124:13
129:20 132:10
133:8 136:16,25
140:21 142:21
149:8 150:20 151:3
152:11,15,16,17
156:6,10 160:21

163:5 164:5 165:1
165:2 168:9 169:1
169:11,12,16 170:3
170:22 176:10
177:1 178:1,20
179:9,25 182:21
185:24 187:5
188:11 189:13
190:8,13,17 192:2
192:5,14 193:20
194:12 197:11,24
198:5 199:17 206:9
206:16 207:13
208:5 218:12 227:6
227:15,21 231:3
233:21 234:25
238:2,3,5,6,10,11
238:17,18 240:19
240:25 249:5
**corrected** 151:25
177:6
**corrections** 255:7
**correctly** 89:7
95:24 96:21 97:20
99:20 102:4 136:20
140:23 142:2
162:16,19 163:16
188:21,24 189:2
211:14 225:10
237:20
**correlate** 59:5
**corrupted** 143:2,18
143:25,25 144:23
145:20 146:2,10
151:4 162:16
163:14 164:23
165:7,14 166:19,19
167:3,13 192:7
**corrupting** 145:9
**corruption** 143:9
144:5,12 145:14

146:11,16,23
148:12,15,21 149:1
152:16 167:17
175:14 187:1
**cost** 127:22 165:2
236:20
**costly** 164:13
**costs** 31:14
**counsel** 4:9 5:19
98:2 118:21 177:12
258:13,15
**count** 145:23
**counts** 21:9
**county** 255:3,13
257:4 258:4
**couple** 68:14
121:24 208:18
244:21 245:12
**coupled** 83:13
153:2 200:7 219:21
**course** 13:13 26:5
66:2 70:4 156:9
198:4 201:5 204:25
205:4 206:4 209:2
227:5 230:6 232:3
232:6,9 233:10
**court** 1:1 4:11 5:2
21:18,20 23:1 33:9
88:21 140:7,20
216:4 259:18
**cover** 124:3
**covered** 122:9
138:23
**create** 32:3 51:18
51:22 60:11 150:9
240:6
**created** 17:6,7
40:22 51:16 52:21
144:12 151:24
190:17,20,21

**creates** 149:23

**creating** 50:7
162:17 226:3

**credit** 107:19,19
186:8 193:3 194:10
209:17,18

**credits** 154:9

**crisis** 205:22

**critical** 216:7

**curious** 29:1

**current** 92:23 93:9
114:1 253:20,21

**customary** 251:1

**cut** 250:3

**d**

**d** 3:2 22:24

**dade** 258:4

**daily** 68:9 143:24

**damages** 24:4,7
207:11 237:21

**dana** 85:25 86:9

**data** 9:24 10:12,14
15:1,2 16:2,25
19:16,19 27:22,22
28:5,7,9 29:12
32:11 37:24 40:6,7
40:8,8 43:9,9 48:18
50:4,4 51:25 52:10
53:6,17 54:5 55:13
55:14,16 57:11
58:16 60:6,9,17
61:24 62:3,10,12
67:23 70:20,21
71:16 72:3,9 73:21
73:21 77:19 82:16
82:18,19,22 83:4,5
83:7 85:5 108:10
108:19,20,21 115:6
115:7,11,18,19,25
116:3,14 117:6
119:6,7,13,15,19

120:3,25 121:8,12
121:16 122:22,23
123:20 130:24,25
136:6 137:25 139:2
141:9,17,20,25
142:7,21 143:2,18
144:24 146:17,23
149:4,6 152:16,23
161:8 166:18 167:2
167:13 184:22
185:9 186:15 187:1
187:9,11,12 188:21
192:4,7 220:23,24

**database** 161:2

**date** 6:7 59:4 65:17
66:11 141:12
177:22 212:19,22
253:14,23 256:3

**dated** 256:24
258:18

**dates** 168:20

**daughter** 188:6

**david** 1:7 4:5 179:8
259:8

**davis** 64:1,3 80:4
131:24 151:10
184:1

**day** 31:20 61:25
95:23 109:22,25
112:12,18 113:11
124:7 147:3,8,19
147:20 151:18
164:8 190:3 202:1
241:13 255:6,20
256:24 257:14
258:18

**days** 259:16

**dd179981** 257:24
258:24

**dealing** 52:10

**dean** 1:7 179:8

**dear** 259:9

**debate** 13:18
192:19

**debating** 229:4

**debit** 154:8

**debits** 154:8

**debt** 32:17,18,20
35:14 37:25 38:1
41:4 43:13 79:10
80:8,15 81:1,4 83:3
103:12 113:3 153:3
153:6,12,23 154:3
154:13,14,17,18,20
154:25 155:6,9,15
155:17,17,20,22
200:9 212:6 215:3
218:5 221:13,15,20
222:15,21 226:2,6
226:7,9,12,13,14
226:22 227:12,19
227:25 228:13,19
228:22 229:3,12

**debtor's** 124:6
125:19,22

**debts** 153:7 168:9

**december** 70:14,16
70:17,19,22 101:17
101:20,24 102:6,13
102:14,20,24 103:2

**decide** 27:7,8,9

**decided** 174:2
241:10

**decision** 172:3,14
172:23 181:14
205:9 212:24
241:12,14 245:4
250:3

**declaration** 124:5
126:6 162:8

**dean** 1:7 179:8

**deemer** 85:25 86:9

**defective** 151:21

**defendant's** 5:3
33:10 88:22 177:9
177:14

**defendants** 1:9 2:7
4:15 89:5 176:12

**defense** 3:6

**deferred** 229:21

**define** 59:15

**defined** 94:14
211:6 215:2

**definition** 8:10

**degree** 32:7 133:11

**demonstrated**
239:23

**department** 65:1
72:4 77:1 107:3
108:22 110:4
131:19 136:18,19
145:16 151:3
158:25 159:10
164:3,21 168:12,22
169:9,15 172:3,23
173:16 177:22,25
180:13,25 181:13
182:16 183:4
184:23 185:10
186:11,16 189:8
191:11 195:10,24
196:24 197:9,14,17
198:1,18 199:9
200:15 201:1 209:9
210:4,7 212:16,24
213:1,11 214:3,18
217:3 228:6,17
229:2 230:1 231:1
231:9,22 236:9
259:21

**department's**
172:14

**depend** 200:18
**depending** 110:7
  194:1
**depends** 105:17
  165:10 188:13
  228:20
**deponent** 255:8
  256:2
**deposited** 92:9
**deposition** 1:14,18
  4:3 5:8 6:1 13:6
  31:20 33:3 47:18
  47:19,24 48:3 64:1
  64:3 86:6 133:14
  252:25 253:9 255:5
  258:8 259:10,11,16
**depositions** 28:11
  28:11 34:1,4,6,8
  47:17 56:24 61:20
  66:23 68:18 216:15
**depressing** 241:16
**derived** 7:24 130:1
**derogatory** 216:6
**dervishi** 9:25 11:19
  12:3
**describe** 21:24
  54:22
**described** 84:21
  100:13 103:8
  178:23 203:14
  255:17
**description** 184:17
  242:12
**descriptions**
  184:19
**desire** 35:21 38:6
  40:13 255:7
**desired** 31:23 32:2
  38:4
**despite** 209:9 225:4

**detail** 43:11,15
  45:7 58:18 110:17
  110:18,18,21 122:2
  122:12 171:8
**determination** 72:2
  207:5
**determine** 17:12
  42:21 60:19 64:24
  69:17 70:20 113:23
  115:21 119:20,24
  133:2 139:7 142:6
  142:19 163:4
  179:18 184:22
  203:5,6 217:2
  243:1
**determined** 55:18
**determining** 247:7
  248:18
**deutsche** 247:1
**development** 9:1,2
**devry** 244:16
**dg5** 32:11
**dicicco** 134:23
**dicicco's** 199:13
**difference** 58:5
  67:14 69:11,13,15
  70:2 81:8 103:2
  111:8 113:5 132:2
  132:9 157:24
  171:10 185:4
  186:23 192:17,18
  192:19 244:20
  251:9,11,13
**differences** 113:2
  178:23 197:5
  198:25
**different** 6:22
  43:19 67:19 73:15
  74:1 77:18 93:2
  104:6,7 108:20,21
  108:25 112:23,25

  138:19 147:11,16
  147:18,19,20,23,25
  170:13 171:9
  174:21 185:1 186:6
  188:15 199:3,12
  218:4 242:4 243:8
  249:7
**differently** 78:22
  86:18 100:8 168:19
  168:21 188:5
  203:18
**differs** 194:1
**difficult** 49:15,17
  49:19 164:13
**difficulties** 129:4
  133:18 139:8
**digit** 236:24 237:2
**direct** 3:4 4:22
  27:12 58:16 66:9
  67:8 93:17 109:25
  160:25 161:1
  168:14 187:22
  203:11,13
**directing** 20:16
  45:17
**direction** 14:23
  19:8 20:6
**directly** 8:15 10:24
  11:2 80:9 114:2
  128:16,20 198:20
**director** 179:14
**directors** 179:13
**disagree** 26:20
  126:3 129:9 162:24
  191:7 206:5
**disbursed** 117:4,4
**disbursement**
  95:21,23 96:4
  107:20 109:3 171:6
  191:24 193:9,18
  194:9 230:14

**disbursements**
  45:6 110:12,23
**disconnect** 102:2,7
  102:24 103:2,7,23
  104:3
**disconnected** 137:9
**discontinued**
  168:13
**discount** 238:16
**discovery** 25:16
  26:13
**discrepancies**
  100:19,21 101:1,8
**discrete** 207:2
**discretion** 8:21
**discretionary** 8:20
**discussed** 12:7
  19:12,21 66:22
  72:16 177:8 182:16
**discussing** 74:17
  113:9
**discussion** 5:18
  72:7 74:25
**discussions** 71:12
**dispute** 128:5
  133:25
**disputing** 201:23
**distention** 65:12
**distinction** 59:16
  59:18 83:22 158:21
  160:24 171:15
  175:25 205:6
**distress** 243:23
**distressed** 128:2
**distributor** 22:19
  23:24
**district** 1:1,1
**division** 1:2
**document** 5:1,9,15
  10:21 11:8 17:6
  33:3,8,14 88:20

117:25 118:6 122:4
124:9 149:23 249:2
249:3
**documentation**
153:5
**documents** 5:16,16
5:19,22,25 9:23
10:3,5,13,17,18,19
11:17 12:1,6,8,11
12:13,15,21,24
13:10,12 15:21
16:14,18,23 17:13
25:10 26:17 27:4,6
27:15 32:16,17
34:3,16 35:1 37:23
39:24 41:1 53:11
62:18 63:4 64:6
68:18 71:5,8 86:25
121:23 130:15
138:15 150:1 153:9
254:8
**doe** 36:2 41:7 42:3
43:22,23 60:4
83:13,19 89:6 90:4
93:3,4 97:19 99:19
100:20 106:13,14
106:14 109:17,17
110:8 113:6 131:24
147:19 155:2 156:1
156:5,9 157:6,10
157:12,16 158:4
160:3,9,20 168:6,7
171:8 174:1,5,11
174:12,14,16
177:10 181:24
182:11 183:25
185:1,3 204:23
206:4 207:6 208:21
209:7,17 225:5
232:1 233:9,21

**doing** 19:8,15 21:7
21:11 30:1 81:13
82:2 92:5 95:3 98:3
98:18 101:12
105:23 112:21
135:6 171:1 175:5
203:12 208:7
223:12,24 242:6,10
251:14
**dollar** 198:6 217:16
219:16,19
**dollars** 105:2
138:17 146:12,14
155:2 202:3 234:19
244:13
**donahue** 4:4
**donohue** 1:14 3:8
4:17,24 5:6 13:23
33:4 63:2 113:22
180:12 201:11
204:20 237:18
256:2 257:8 258:9
259:4,10
**dots** 167:22
**doubt** 29:20
**download** 170:2
**downs** 70:4 108:22
108:24 153:3
215:15 216:12
217:4 219:21
**dozens** 20:25
**drafts** 16:14
**drain** 128:8 241:2
**drained** 181:18,24
**dramatically** 159:4
251:3
**draw** 54:12 56:7,22
57:10,24 58:12
59:1,4,5,8,8 60:22
61:24 62:10,11
64:20 65:3,5,17,18

66:11 67:7,9,21,24
68:9 69:19,20
70:22 72:20 73:2,6
73:10,12,15,22
74:3 75:25 77:6,12
77:17,18,22 78:4,5
78:7 94:6 95:12,20
96:2 108:22,24
109:4 110:3,22
112:3 119:22,23
120:3 121:9,16
144:17 152:23
166:6 168:13
169:23,23 194:16
196:19 198:5 210:9
215:15 216:12
217:4 218:11
219:18,21 220:12
220:17 222:1,5
**drawing** 65:11 76:5
93:8 94:24 96:19
104:11,13,21
113:24 175:25
**drawn** 55:18 56:5
56:20 57:9,21
66:11 93:24 138:18
200:1,3,16 217:2
218:20,24 242:20
**draws** 58:19,20
59:24 63:17 64:7
64:13 66:19,24
67:3,4 69:2,8 70:12
70:13,18 74:1
75:12,14,17 77:25
93:10 94:23 95:22
96:17 97:1 101:18
136:1,2 193:8
196:19 200:19
218:14,16 221:1
**drew** 64:25 65:21
78:5 92:21 136:13

219:17,18 220:18
221:16
**drilled** 66:7
**driving** 137:12
**duces** 5:8
**due** 132:2 154:25
155:17,25 226:15
**duly** 4:19 255:5
257:10
**duns** 64:11
**duties** 211:19

**e**

**e** 3:2 15:15 22:24
29:10 36:2,5 41:22
42:1,3,4,10,22
43:23 79:22 94:10
102:11 155:20
199:13 259:6
**earlier** 17:12 37:2
168:11 171:2
189:11 229:5
**early** 71:1,1 101:17
106:14 162:15
**earned** 179:25
**earnings** 228:24
251:16 252:5
**easier** 13:16 38:13
51:11
**east** 2:4
**ebitda** 241:22
252:18
**economy** 182:12
**edit** 15:25
**edited** 16:8
**educate** 248:10
249:7
**education** 65:1
77:1 107:3 108:22
110:4 125:23 128:2
128:9,25 145:16
158:25 159:11

162:12 168:13,23
169:9 172:23
177:25 180:25
183:4 198:1 200:15
210:5,7 212:16
244:9 246:2,5
248:9
**education's**  72:4
181:14
**educational**  242:15
244:11
**effect**  87:8 104:23
105:13 169:21
241:16
**effectively**  64:18
125:20
**efficient**  35:11,20
46:14 52:16
**effort**  106:12
214:20
**efforts**  20:4 107:1
187:13
**eids**  75:24 212:18
**either**  9:24 10:24
11:19 69:16 71:22
71:25 89:10,24
90:9 108:3 160:10
160:20 167:17
168:23 174:23
182:18 184:7
187:15 191:19
192:23 197:10
201:2 202:9 230:9
**elect**  253:11
**elected**  119:25
168:7 180:13 240:9
243:25
**elhad**  14:10 18:18
**eligible**  55:24
**else's**  80:16

**email**  259:14
**emergency**  211:1
**employee**  7:13
258:13,14
**employees**  8:12
18:20 225:1
**employment**
218:21
**enable**  113:23
**enabled**  115:20
155:8
**encountered**  165:5
**ends**  15:5 29:21
191:20
**engage**  170:11
**engaged**  20:20 25:3
30:14 89:5 95:10
95:19 209:7
**engagements**  21:16
**england**  24:1
**enjoyed**  209:11
**enrollment**  92:23
93:9 94:15,24
95:13,21 96:3,16
96:25 101:21,25
102:7,21 114:1
**enrollments**  101:19
**enterprise**  177:14
181:13 238:8,15
**entire**  29:17 36:24
37:3 95:16 116:8
217:9,11 234:20
**entirely**  207:11,15
**entirety**  36:11 99:8
219:23
**entitle**  57:23 176:2
**entitled**  33:4 59:7
60:20 66:9 82:11
83:21,23 84:2
109:24 117:25
219:18 220:17

221:17,18 248:9
**entitlement**  65:4
67:8
**entity**  181:4 241:23
**entries**  43:9,11,12
43:13 97:18 99:18
153:11,19,22 231:7
231:14,17
**entry**  120:5 153:12
154:2,4,12,18,19
155:9 186:10
191:18 196:14
198:13
**environment**  51:25
52:6
**equal**  59:7 60:20
66:10 236:10
**errata**  255:7 256:1
259:13,14
**error**  71:8 86:11
**esq**  2:6,10
**essentially**  158:5
169:25
**estimate**  177:13
**estimates**  32:18
37:24 247:14,16
**et**  4:6 117:3 255:6
256:2 259:8
**evaluation**  156:20
203:17 204:22
**event**  166:1 180:14
182:12 189:10
191:25 213:13
**events**  180:15
181:2,10 182:2
203:19
**eventual**  153:3
**eventually**  55:6
74:23 86:14 105:24
129:22 130:6 168:8
192:4 200:22

214:22
**everybody**  180:4
**evidence**  69:1
78:12,23 79:2,3,17
79:25 80:22 81:2,7
82:23 84:14 93:7
96:1,23 97:22
100:17,23 101:2,6
101:22 102:5,11
103:9 130:14
135:20 137:2,6
199:2,8,11,14
200:2,7 211:22,23
212:3 215:13
216:14,17 219:10
220:13
**evident**  230:23
**exact**  20:24 48:11
168:20 172:11
212:22
**exactly**  127:8
135:23 190:19
196:16 236:2
**examination**  3:3
4:22 58:9 78:24
81:20 84:3 96:24
97:23 99:23 125:25
139:8,20 140:3
141:15 142:5 143:1
148:19 151:2 152:7
162:22 163:4,18
164:14 167:11
179:16 198:16
215:14 217:1
220:15
**examinations**
156:16
**examined**  131:4
**example**  8:7 15:2
32:11,25 39:7,7
40:5,19 41:23

43:13 46:12,15
48:4,5 59:1 64:19
70:14 72:24 73:10
76:18 78:3 81:2
110:25 112:11
120:19 131:15
135:25 137:1,14
153:12 160:8 164:1
166:5 184:1,14
185:12 198:22
215:1,3,24 221:3
223:11 246:19
250:1,9
**examples**  39:9,10
69:23 70:9 96:7
121:24
**exceed**  59:7
**exceeded**  66:10
**excel**  15:20 16:1,4
16:5,24 17:16 40:5
52:1 118:2 123:9
253:8
**excess**  7:19 93:23
127:20 250:4
**exclude**  245:4
250:5
**excluded**  244:14
**excuse**  118:21
**executed**  255:17,18
**exhibit**  3:8,8,9 5:3
5:7 33:3,10 46:20
46:22,24 47:1,3,5,7
47:9,11,13,18,19
47:24 49:4,5,6,10
49:21,22 50:1,5,7
50:20,23 51:1
64:16,20 73:8,9
74:2 88:18,19,22
117:24 121:19
122:10 123:2,2
124:2,5 185:13,24

190:7,19 196:2,23
197:25 200:12,14
246:19 247:3
248:21 249:14,15
249:16,21,22
252:23,25 253:9
**exhibits**  3:6 12:24
12:25 14:24 15:12
47:16 48:4,17 49:2
51:5 55:15 56:23
58:22 61:21 63:3
66:19 86:5 231:25
**exist**  16:19 39:6
135:24 216:13
231:8
**existed**  38:20
**existent**  217:4
**existing**  215:16
225:22
**expect**  195:14,15
**expend**  164:3
**expense**  79:10 80:8
83:3 154:10 193:7
**expenses**  164:20
**experience**  18:12
157:8,9,11
**experienced**  74:15
**experiences**  192:10
**experiencing**
180:16
**expert**  3:8 5:24 6:3
6:5 12:21 20:20
26:10 33:4,17
69:10 72:1,5 75:25
78:9 79:15 82:10
82:11 216:9 221:5
230:25
**expert's**  220:21
**experts**  207:20
246:4

**expires**  255:24
256:25 257:25
258:25
**explain**  40:1 59:21
104:2 154:12,12
170:10 175:17
189:9
**explained**  39:5
145:2 155:17,19
**explaining**  38:8
**explains**  251:9,10
251:12
**explanations**
224:14
**explore**  65:13
107:1
**expressed**  12:5
255:18
**extensive**  79:5
**extent**  6:25 9:4
12:15 25:15 29:8
62:2,3 74:4,5,6
83:12 84:13 94:6
108:16 147:2,11
166:1 186:20 196:9
196:10 198:12
200:19 201:6 223:1
224:18 228:5
234:21 254:9
**external**  214:25
**extra**  213:13
**extraordinary**
157:5 213:10
227:14
**extremely**  164:13
**eye**  106:24 112:5
**eyes**  84:1

**f**

**f**  14:9
**f.p.r.**  1:16 257:22
258:6,23

**facets**  8:1
**facilitated**  38:12,19
38:21 39:3
**fact**  29:14 38:1
51:15 70:21 74:17
78:11 79:15 87:13
108:19 123:25
130:22 131:17
133:15 144:20
147:21 154:3
155:21 157:23
165:4,7,13,13
166:9,18 167:2
174:1 178:4,17
181:23,25 182:17
199:11 200:2
201:23 206:5
208:24 210:3 235:6
244:19
**factor**  77:14 173:4
173:7,10
**factors**  7:25 77:16
173:15,19,24
**facts**  9:23 10:11,14
99:24 100:4 102:18
138:10 251:4,7,11
**factual**  83:19 93:12
133:9 206:14
207:18
**factually**  206:15
207:5
**fail**  237:3,6
**failed**  89:23 90:8
93:23,24 245:16,16
**failing**  89:9
**fails**  251:22 252:1
**failure**  13:7 100:23
205:11
**fair**  27:10 37:12,13
58:8,15,25 59:19
61:5 65:23 80:14

81:23 88:4 91:14
127:25 144:3,9
173:22 177:13
180:18 181:5 238:2
238:5
**fake**  218:11,15,21
219:6
**fallen**  197:10
**familiar**  51:20
234:3
**far**  80:12 90:17
92:22 93:8
**fashion**  13:17
**fast**  42:7
**faster**  11:23
**fault**  111:21 175:8
175:13,16 178:5,9
178:14 229:24
**fcc**  30:2 42:21
52:14 64:7,9 69:2
71:14 78:5 86:17
87:4 95:19 96:2
101:17 104:5
109:16,22 115:22
117:5 124:23 125:1
125:3,6,20 126:10
126:13,16,16 127:2
127:14 128:9 129:1
129:18 132:16
133:18 141:9 142:1
145:16 146:18
148:22 149:5
156:16 158:24
159:3,18 162:12
164:15 165:6
168:13,24 171:16
172:3,23 177:22
178:19 179:11
180:13,25 184:10
184:11,25 188:20
201:13 202:19

203:15,21 204:22
204:23 206:3
212:18 218:21
222:21 224:6 225:1
225:7 237:24 238:9
239:5,15 240:18,20
241:7,13 242:22
244:18,23 246:7
250:14 253:17
**fcc's**  56:25 125:23
128:13 133:3
177:10,13 205:11
225:6 244:12
**february**  1:11 4:7
64:21 66:12 166:20
167:4,14 183:20
255:6 256:3 257:14
258:18 259:4
**feel**  229:23 239:21
250:17
**fellow**  14:3
**felt**  54:12,14
130:10 239:2 245:1
245:12
**figure**  232:19
**figures**  42:14
**file**  18:17 40:2,6
104:22 112:20
118:2,9 146:1
149:22,22 150:8
172:24 211:11
227:20 253:6,7,8
**filed**  1:18 4:18
88:25 243:21
250:12 259:17
**files**  15:20,24 16:1
16:4,5,12,24 17:16
29:9,13 40:12 52:1
76:10,12 111:20,22
118:10 119:14
122:2 145:20,21

148:4,21 149:24
150:2,2,4 162:15
**filings**  28:13
246:12
**final**  16:11 17:17
236:4
**financial**  21:14
48:5 59:7 87:13
88:6 95:4 96:18,19
97:13 99:13 100:18
111:13 116:9,18
125:19,22 126:9
127:2,14 128:9,18
129:2,16 130:4
133:16 134:11,19
134:20 136:18,19
137:9,10 138:3
151:3 152:14
156:13 162:14
164:3,20 168:9,14
173:25 174:4,8
177:21 180:17
181:2,11 184:9,11
203:13 206:11
210:24 211:13
212:1,8 213:21
241:2,6
**financially**  220:14
258:16
**financials**  48:2
240:2 241:8
**find**  15:24 17:5
27:22 28:1,7 68:25
68:25 78:23 79:17
82:23 96:1,23
97:22 99:24 100:4
100:17 101:6
117:22 153:5,9,10
199:8 215:13 227:7
242:8

**finding**  19:7 20:14
27:22 35:19
**findings**  15:7 20:5
**fine**  13:20,21 63:7
98:18
**finish**  12:12 36:18
50:3 206:25
**firm**  6:6,12,18 7:5
7:9,12 8:1,3,9,11
8:14,17 9:13,18,24
9:25 10:15,22 14:3
17:25 18:8,21,23
20:8 22:9,11 23:19
25:3 29:12 85:25
86:9
**first**  4:19 15:8 17:2
64:17 72:13 98:25
99:11 100:6 113:4
124:7,18,19 129:25
140:11 143:13
153:20 156:4
169:24 170:5,6,12
171:12,17,20,25
172:4,15,24 173:17
174:2 177:23
180:14 181:1,15
183:4,8 185:16
189:16,20 192:15
194:2,8,8,20 195:2
205:7,11 209:10
210:5,24 222:15
230:2 242:11 248:4
250:1 255:5
**fiscal**  55:10,20 59:2
61:13,25 64:8
67:22,22 69:2,2,17
69:17 71:24 73:3
74:25 75:1 86:9
87:6 101:5 106:13
107:10 115:25,25
116:10,13,16,19,23

116:24 117:5,9,18
117:21 124:24
126:20,21 129:11
129:12 130:18,18
131:12 133:23
137:3,8,20,24
138:4,6,15 144:20
153:15 159:4 183:8
185:16 198:8 212:5
212:21 214:20
229:8,8 240:21
**five** 22:1,4 24:15
48:19 183:14,15
230:2 237:9
**fix** 152:20
**fixed** 144:1
**fl** 2:10 259:6,14
**fla** 259:14
**floor** 2:5,9
**florida** 1:1,11,17
25:13 28:24 29:17
36:12,25 255:2,13
257:3,23 258:3
259:2,21
**flow** 126:15,19,21
126:23 127:10
157:5 171:15
205:20 251:19
252:13
**flows** 189:4 239:9
**focus** 70:7 73:5,14
95:17 112:17
126:20 208:20,23
209:2
**focused** 223:22
231:5
**focusing** 177:18
**following** 4:1 89:5
243:6
**follows** 4:20 97:12

**footnote** 47:20
95:15,16 98:15
123:12 222:25
223:4,7,9,10,20
248:20,23
**footnotes** 115:13
118:7 122:14
223:17 246:20
**forecast** 251:23
**foregoing** 255:17
258:8
**forensic** 58:9 75:6
78:24 81:20 82:12
82:14 83:6 84:3,19
84:23 85:1 90:4,7
90:14 91:1,24 92:4
92:24 94:1 96:8,24
97:23 99:23 101:6
101:23 102:19
103:8 108:8 113:1
125:25 132:15
139:8,20 140:3
141:15 142:5 143:1
148:18 151:1
156:16,21 162:22
163:18 164:14
167:11 179:16
198:16 200:6,8
207:8,10,18,23
208:1,3 211:23
212:3 215:13 217:1
219:11 220:5 221:6
221:19
**forensically** 133:25
142:18 199:16,19
220:13
**forensics** 103:12
**foreseen** 212:24
**forgive** 100:7
**form** 6:11,17 7:4
25:4 32:12 40:21

40:22 49:21 53:7
71:22,24 125:10
127:15 168:16
169:2 220:16
240:20 243:22,24
**format** 27:23 32:9
35:2 40:21 49:6,9
49:11
**formed** 167:20
**former** 225:1
**forming** 91:15
119:5
**formula** 8:21,22
**formulaic** 8:19
**formulate** 71:19
**formulating** 10:1
11:9,20 12:4 14:20
34:17 38:22 39:13
40:14 46:11,17
48:14,22 61:22
63:21 71:6 124:9
125:9 238:8
**fort** 1:2
**forth** 11:6 34:10
157:6
**forward** 126:17
240:4 243:5
**forwarded** 259:17
**found** 53:11 80:21
93:10 97:8 100:23
101:2 135:10
153:11 247:11
**foundation** 95:2
141:1
**four** 138:11,13
210:5 225:8 230:2
**fourth** 12:20
**frame** 73:3 203:20
**franciola** 14:15
**franciosia** 14:7,16
18:14,15,16 19:6

**freeze** 131:18,21
**friday** 4:7
**front** 13:18 63:2
124:2,4
**fti** 124:24,25
**full** 86:13,13
**fully** 169:10
**fund** 8:11
**funded** 8:16
**funding** 61:6,9
129:5 163:15
164:11 205:7,10
209:11 225:6
**funds** 45:5,5,6
55:25 56:5,20 57:9
57:20 64:7 68:19
79:7,18,23 80:23
81:14 82:24 87:2
89:10,12,24 90:1,9
90:11 92:21 93:8
93:23 94:14 95:11
95:12,22 96:4
113:24 132:19,22
133:19 139:10
156:1,4,7,8 157:12
157:15 159:21
160:2 170:3,16
177:10,25 178:5
193:19 198:18
199:9 200:16,21
201:24 204:23,25
205:3 206:4,8,16
207:6 208:5,22
209:1,8 210:9,16
210:18 217:2,3
221:16,23 222:1,7
228:6
**fungible** 217:14,14
**further** 32:5,20
258:12 259:18

| future 94:15 95:14 |
| --- |

**g**

**g5** 35:6 37:24 39:6
40:20 41:12,15,18
42:2,11,23 43:25
55:19 56:6,15,21
57:2,6,9,12,21 58:4
58:5,6,11 59:2,13
60:3 62:6,10 63:14
63:16,20 65:7
67:14 69:8 72:11
75:4,10,21 76:2,14
77:3,18 85:6,6
93:10 100:19 102:2
102:8 103:3,24
104:6,11,13,15,18
104:24 105:6
106:15,17 107:4,23
108:3,8,17,21
109:4 110:4,17,22
113:6 114:10
119:22 121:8,16
130:11,17,22 132:3
132:7,19,21 133:10
134:10 136:2,15
139:22 143:10
144:7,13 146:25
147:18 148:7 149:7
150:10,13,18
151:24 154:22
155:10 159:23
160:5 162:17 164:4
165:16 167:24
168:25 170:3
174:21 182:21
183:25 185:4,4,21
186:12,17,23 189:5
189:8,22 191:12,20
193:8 194:17
195:16,25 196:7
197:3,6 199:20

200:4 201:10
202:13 215:15,25
216:12 217:4,12
219:17 220:12,25
221:11,16 224:15
228:18 230:3 231:2
231:23 232:13
234:25 235:8
236:23
**gap** 223:3
**gathering** 20:5
**general** 35:18 43:8
46:4 64:17 94:25
153:23 155:7
165:25 166:2
184:14 192:6 194:3
195:2 247:9 249:9
250:2
**generalized** 136:22
**generalizing**
170:23
**generally** 7:25 9:15
9:19 27:25 51:12
57:2 58:15 63:17
66:21 71:17 129:10
130:9 133:5 139:18
149:25 158:6
193:25
**generate** 8:7 50:1,2
**generated** 7:11
48:21 49:13,21,25
50:10,15,20 51:2
55:10 56:4,19 57:8
57:19
**generating** 9:5
**getting** 35:20
111:25 195:20
**give** 20:10,19 21:24
34:18 39:9 118:24
134:13 138:4 143:8
226:25 252:7

253:25
**given** 52:3 53:8,10
53:16,25 54:4
60:12,15,18 62:10
67:5 77:17 78:4,5
95:13 97:16 99:16
109:22 119:22
120:3 121:24 158:9
196:7 197:5 204:1
227:16,16
**gl** 153:12
**glad** 98:11 206:1
**go** 46:19 49:4 50:19
52:16 54:23 55:3
61:2 62:19 71:5
73:9 81:12 107:15
113:3,16 114:3
122:13 131:14,15
152:25 175:22
177:21 188:3,4
211:9 222:19 233:4
**goes** 16:25 219:24
**going** 25:11 27:11
27:12 30:8 57:15
64:18 88:16,19
105:21 106:4,5
117:20 125:6
126:17 133:6
156:12 157:5
160:13 179:6 180:6
181:21 182:22
200:23 201:14
202:20 203:2 205:1
205:12 209:4,13,23
211:4 217:19 229:6
230:6 231:6,16,17
232:21 233:23
234:1,19 235:19
236:1,3,5,7 237:12
238:12 240:4 248:2
250:14 254:12

**good** 4:24,25 98:21
237:11
**goodman** 1:3
**grand** 2:4 194:5,5
259:6
**granted** 81:15
**great** 117:23 135:5
205:5
**greater** 60:20
75:21 85:6 90:17
92:22 93:8,10
113:25 168:4
**greenhill** 225:19
**grew** 159:4 228:10
234:14
**group** 225:15,19,19
**grow** 105:6 210:17
**growing** 212:5,14
213:6 233:10
**guess** 31:17 37:9
58:1 130:19 181:20
224:2 242:10
**guest** 118:24

**h**

**hand** 83:23 182:19
205:7 255:20
257:12
**handful** 21:23,25
**handle** 151:8
**handled** 87:2 90:17
200:10
**handwriting** 14:17
**hang** 253:2
**hanger** 1:4 4:5
259:8
**happen** 205:19
**happened** 166:1,7
166:10,13,15
173:12
**happening** 96:11
106:13 135:21

137:7 232:5
**happy** 27:16
**hard** 9:12 21:8
47:23 49:13 140:20
198:20 217:7
**harding** 124:6,11
124:19,20,25 125:8
125:14,16,18 128:1
128:24 129:12,24
162:8 165:15
**harding's** 124:22
125:2 128:6 129:6
162:21 163:4,19
**head** 174:10
**heads** 76:3 85:17
**hear** 63:8,10
233:25
**heard** 61:5 63:6
106:21 249:15
**hearing** 81:18
**held** 89:12 90:1,11
**help** 9:15 15:1,3,4
36:21 98:22 136:8
144:20 233:11
234:4 247:12
**helped** 249:7
**helpful** 39:22 52:12
61:22 62:3
**helping** 98:18
182:23
**heretofore** 4:18
**hergle** 19:24 20:2,7
**herrgle** 14:10
**hey** 130:23
**high** 215:21,21
**higher** 9:9 159:18
168:3
**hired** 22:8 23:16,19
216:14
**historically** 227:6
239:14,22

**history** 63:14,16,20
123:8,11 159:3
227:16 240:5
**hold** 73:13 89:9,23
90:8
**hole** 188:4
**honestly** 169:8
**hopefully** 124:15
192:4
**hoping** 242:18,24
**horrible** 241:12
**hosted** 145:15
**hour** 6:13,15,19 7:2
7:6 17:24 18:1
162:10 188:5
**hourly** 6:10
**hours** 7:7 8:25 9:5
9:16 21:10,10
**huh** 153:13
**hundred** 21:6 22:2
98:9 99:2 244:13
244:21 245:10
**hundreds** 21:10
148:2
**hung** 195:20
**hypothetical** 65:16
109:21 110:25
112:11 146:6,8
209:15
**hypothetically**
193:6 209:6

**i**

**idea** 21:24
**identification** 5:2
33:9 88:21 117:3
**identified** 5:17
12:23 114:19 117:3
118:20 160:20
212:12 220:13
226:3

**identifies** 149:23
**identify** 14:5 15:4
48:13 117:19 122:4
160:19 198:17
219:6 221:25
222:13 235:20
**identifying** 9:23
11:18 12:2 242:11
**ids** 63:15 64:10
74:15 87:22 131:3
131:15,19 171:2,19
**iec** 118:7 122:22,23
123:21
**illusory** 94:24
**imbalance** 57:6
76:1 105:6 107:22
108:2,7,11,17,18
110:23 111:3 112:6
113:8 149:6 150:10
150:18 151:24
152:16 154:22
162:17 168:25
186:12 187:3
195:25 196:4,6
221:11,12,12
224:14 228:18
**imbalances** 137:4
152:9,10 161:6
224:20
**impact** 72:8 73:3
87:19 88:2,2
126:10 138:24
139:6 146:2 165:20
180:16 181:3,12
203:20
**impacted** 165:15
234:11
**impacting** 182:13
**impacts** 241:24
**implement** 141:11

**implementation**
162:13
**implemented**
131:18
**imply** 68:8
**important** 113:12
122:8 167:23 168:2
172:7,9,20 207:16
**improper** 177:10
**inability** 80:7
**include** 7:7 8:9
46:25 47:2,4,6,8,10
47:14,18 51:12
74:8 122:12 210:15
211:19 232:3
241:23 252:4
**included** 25:16
47:17 107:11 137:6
137:8 143:12 155:1
156:21 162:13
188:15 214:22
231:5 250:11
**includes** 21:14
47:12,15 51:12,13
106:25 199:11
**including** 8:12
12:23 28:15 45:4
51:7 99:8 174:5
200:9 244:14
249:17
**income** 238:5,14
239:1,8,15,22
240:16 241:11
251:2,18,20,24
252:3,8,16
**incorporated** 241:7
**increase** 9:19
164:19
**incredibly** 122:8
**incurred** 182:9

incurrence 227:19
incurs 226:22
independent 67:20
  81:21 133:7 157:3
  163:3 173:2
independently
  130:21 136:4
  137:15,18 142:18
indicate 156:5
  186:15
indicated 64:21
  255:7
indicating 154:3
indication 186:14
indirect 80:7
  234:18
indirectly 10:24
  103:13 128:12,14
  134:6,13
individual 59:24,24
  60:1,25 62:11
  69:16 70:19 73:2
  87:8 94:5 108:9
  115:24 121:1 184:7
  187:24 192:1
  196:20,21 198:6
  218:16
individually 179:19
industry 240:14
  246:3,24 247:9,13
infect 146:17
infected 149:4
  151:21
infection 149:6
inflated 96:15,25
influence 104:10
influencing 191:19
info 223:6
information 10:17
  10:25 15:4,18,22
  19:7,8 20:5,15 28:4

28:17,18 29:25
30:1 33:1,23 35:2
35:19 37:8 43:21
45:3 46:21,23,25
47:2,4,6,8,10,12,14
47:17,21 48:1,7,25
50:24 51:6,7,13
52:17,19,23 53:1
53:12 63:25 76:19
82:18 83:13 114:13
115:16 118:3,5
121:17 126:21
129:1,2,16 130:4
131:25 133:10,15
188:25 199:20
200:13 221:7,10
247:10 253:17
informing 12:4
infrastructure
  42:16 135:12,13
  137:5 163:9 178:10
  178:18,25 208:9,15
  222:11
inherently 67:15
initial 16:13 20:14
  20:15
initially 218:24
insight 243:14
instance 15:9 59:23
  111:5 129:23
instances 114:20
institutions 95:12
instruct 26:21
instructing 20:17
  30:18
instruction 30:17
instructive 184:4
  207:19 247:12
instrument 255:17
  255:18

integrate 162:11
integration 128:25
  133:17
intend 122:7
interested 27:5
  258:17
internal 89:11,25
  90:10 91:8 97:15
  99:15 191:18
  214:25
internally 106:16
  186:20 197:2
  202:13
interpretation 91:3
interpretations
  90:14
interrupt 36:19
  46:13 57:15 206:24
interrupted 44:23
  176:20
interview 125:7
investigate 24:4,7
  125:6 165:1
investigating 19:16
investigation 31:1
  31:11,24 45:10
  74:8 88:9
investigative 24:17
investment 246:17
  247:20,25 248:8,23
investors 225:7,12
  225:16 232:25
  234:13 236:10,15
involve 72:2
involved 23:25
  24:17 106:19
involving 22:17,18
  22:21
irreconciliations
  152:8

isolate 66:13 67:6
isolated 144:17
  233:22
isolating 147:9
isolation 150:12
issue 71:14 92:4
  93:5 130:19 131:12
  144:6 146:17 148:9
  149:1 152:16
  160:15 163:22
  165:3,10 171:21
  177:19 182:12
  186:17 200:24
  203:25 204:7 211:7
  228:5 234:7 235:6
  236:25
issued 33:18,24
  34:2 149:17
issues 74:18,20
  75:1 129:11,12
  134:12 142:23
  148:12,16,21 156:2
  163:10,12 165:5
  166:23 167:9 182:9
  201:17 202:25
  207:21 208:12
  214:23 223:16
  224:9 226:15 228:2
  228:7 233:17,19
  234:6 236:14,19
issuing 31:2
item 89:9 91:16,23
  93:21 94:10,21
items 66:14 121:1
iv 45:5 56:25 60:21
  83:11 84:22 87:2
  89:9,12,19,23 90:1
  90:9,11 92:21
  93:23 94:14 95:11
  95:12 104:15
  109:24 113:24

129:5 132:19,22
133:19 139:10
163:15 164:11
168:14 177:10
191:25 202:25
203:25 204:23,24
205:3,17 206:4,16
207:6 208:5,22
209:1,7 210:9,17
211:7 212:14 213:4
214:13,23 223:3
225:6 228:2,3,5,7
229:7 233:16,19
234:6 236:14,19,25
253:15

**j**

**jaffray** 247:2
**january** 33:5,18,20
34:11 166:20 167:4
167:14 183:20,22
184:22 185:9,19
197:9,14 198:2
201:1 227:13
**jeffrey** 1:7 179:8
**jim** 1:14 3:8 4:3,17
33:4 176:20 256:2
257:8 258:9 259:4
259:10
**joining** 5:5
**journal** 43:9
153:11,19,22 154:1
154:17
**judge** 13:19
**judgment** 251:1
**july** 247:6
**jump** 157:23
**june** 73:11,16
155:19,22 159:22
160:4,19 197:9,14
198:2 201:1 226:11

**jury** 40:1 81:18
242:19
**justified** 121:8,15

**k**

**keep** 230:15
**ken** 86:6
**kicked** 72:21
**kind** 8:3 208:22
228:1
**knew** 8:23 37:17
94:15,19 97:16
99:16 148:8,9
151:18 152:19
235:15 239:14
244:2
**knobel** 1:7 4:6
172:8 179:8 255:6
256:2 259:8
**know** 16:18,23 17:5
17:8 23:7 25:20,22
29:3,24 32:1,19
35:21 36:14 37:3
37:10,11,16 39:11
41:11,17,21,25
42:8,13,14,17 46:9
47:24 50:14 52:4,5
54:3,7,9,20 55:25
56:12 58:5,22
61:15,17,18,19,21
62:9 63:23 65:16
67:17 71:10 72:8
72:14,18 73:20
74:5 75:8 76:7,9,12
77:10 78:3 80:10
82:17 83:25 85:9
85:11,15 86:16,19
86:23 87:3,11
88:17 91:7 92:4,5
94:2,3,6,19 97:3
101:3,4,11,12
103:16 104:7,24

105:15 108:14
114:24 115:6,17
116:13,21 121:15
122:8 123:22 126:2
129:15,19,22
131:22 132:12,21
133:1 139:2 141:10
142:9 143:24
144:23 145:16,18
146:3,20,23 147:4
147:7 148:5,11
149:17 150:6 152:3
156:17,21 157:2
159:14,21 160:2
165:9 166:7,12
168:5,10 173:9
178:9 179:2,22
180:20 182:17,22
182:25 184:13
190:3 205:16
209:20 210:19
211:24,25 213:15
213:16 215:10
216:3 217:14
219:20 220:14
226:14 228:14
234:10 236:18,22
236:22,25 241:17
243:22,23,23 245:7
245:18 246:11
247:19 248:5
250:23 252:1
**knowing** 164:6
210:24 211:13
214:13 223:1
**knowledge** 135:12
175:1 178:4 225:5
**knowledgeable**
246:5
**known** 253:16
255:16,16

**kreitzer** 2:10 3:4
4:14,14,23 5:4,11
5:14 6:14,21 7:8
9:21 12:19 13:5,13
13:18,21,22 17:1
18:3 19:23 20:23
21:1,21 23:21
24:13,19 25:8,24
26:4,9,15,20,25
27:3,7,17 29:1,5,6
30:4,11,12,18,22
30:23 33:12,13
35:16 36:16 37:5
38:16 39:1,8,16,23
40:11,16,25 41:10
41:24 42:19 43:2
44:15,22 45:14
50:25 51:8 53:3,20
54:8 56:10,18 58:7
58:24 59:14 60:13
61:12,16 62:8,16
63:1,6,9 66:5 67:16
68:12 69:12 70:6
72:25 76:22 77:15
78:2,21 81:6 82:3
83:15 84:25 85:14
87:18 88:15,23
93:20 94:20 96:12
97:5 98:1,5,8,12,16
98:21 99:3 100:3
101:13 102:16
103:17 104:12
105:4,10,19 107:14
108:6,15 109:12,19
110:9 111:9,18
112:4,15 113:14,21
114:21 116:6,17,25
117:11 118:21,25
119:17 120:8
121:11,21 123:23
125:12 126:7 127:6

127:24 128:15
129:14 130:13
131:6,16 132:5
133:24 134:7,25
135:22 136:9,24
138:9,21 139:16,24
140:6,9,14,17
141:2,22 142:13
143:16 144:2,10,22
145:1,6,19,25
146:7,21 147:6
148:17 149:3,15
150:15,25 151:9
152:6 153:4 157:21
159:6,20 161:10,18
162:6 163:2,24
164:18 165:12,24
166:8,17,25 167:10
167:19 168:17
169:5 170:9 171:13
172:12 173:6,14,21
174:7 175:12,19
176:8,21 178:16
179:23 180:3,11,22
182:14 187:10
188:7,18 191:14,22
193:23 194:22
195:19 199:22
200:11 201:19
203:3,9 204:11,13
204:19 205:24
206:20 207:22
208:17 209:25
211:8,21 213:8,17
214:15 215:8 216:2
217:17 218:9,18
219:9,15 221:9
222:8 224:22 228:4
230:12,22 231:18
232:7 233:13
236:16 237:1,9,17

237:25 240:8 241:9
242:5 243:4 245:14
247:22 250:25
253:25

**l**

**labor** 164:19 165:2
**lack** 67:3,7,23
108:10 125:4
218:22 222:24
223:12,18,21 224:5
224:8 239:4,6,12
251:8,12
**large** 1:17 25:15,21
66:22 67:14 70:2
71:15 72:9,13
210:3 212:4 244:14
244:16
**largely** 126:20
137:19
**larger** 67:12
167:25 187:4
244:22 245:1,5
250:18
**largest** 64:10 74:15
244:8
**lasted** 146:24
**late** 106:12 107:10
130:18 153:15
168:8 190:3 229:8
235:11
**lauderdale** 1:2
**law** 21:18 25:3
216:4
**lawful** 4:19
**lawyer** 91:10
**lay** 31:21 75:20
178:23 208:7,16
241:20
**laying** 85:5
**layman** 91:4 142:3

**lbwright** 259:7
**learn** 141:16
247:13
**learned** 134:9
**led** 92:14
**ledger** 43:8 79:24
81:14 92:10 153:23
155:7 160:15
184:14 187:24
188:23 192:1 193:6
193:9,13 198:9
221:23 229:3
**ledgers** 92:13 136:3
**left** 62:18 237:10
**legal** 20:21 28:13
84:22 90:3,13,21
90:23 91:3,9,17,19
92:3 93:4,5 206:10
206:13 208:12
220:22 221:4,19
259:1
**legalities** 207:20
**leisure** 99:9
**lenard** 1:3
**lenders** 225:21
**length** 205:6
**letter** 168:23 172:9
**letting** 210:16
**level** 58:14 59:12
60:10 84:6,8,8
110:15 117:8,12,17
118:3,5,8 119:3,5
119:13,15 121:12
121:16 122:5
123:16,20 184:7
**liability** 78:10
176:7 201:17,20
207:7,19 224:21
**light** 130:20 236:14
**likewise** 51:1
192:10 195:7

**limited** 245:24
**limiting** 58:3 94:23
101:18
**line** 121:1 159:11
159:16 196:22
209:17 232:12
253:2 256:5
**lines** 167:22 189:20
197:2
**liquidity** 94:25
182:9 205:22
**list** 33:23 34:3
53:22 54:1,4,6,9,16
55:10,13,16 247:3
249:16
**listed** 12:24 46:20
46:22,24 47:1,3,5,7
47:9,11,13 115:13
**listen** 98:24
**listings** 59:25
**lita** 2:6 4:12 259:5
**litigation** 12:16
21:15 22:3 29:15
29:21 254:10
**litsup** 259:14
**little** 25:9 136:23
222:20 223:11
238:12 242:3
247:13 251:17
**live** 45:18 51:25
52:6 53:16
**living** 16:1,18
**llc** 1:4 4:5 259:8
**llp** 2:8
**loan** 57:23 60:21
65:4 67:9 109:25
131:1 160:25
187:22 193:15
236:9
**loaned** 225:7

**loans**  58:17 66:10
168:14
**locate**  28:7
**locating**  15:19
**long**  18:25 23:10
24:9 122:6 123:12
146:16,23 147:4
151:2 182:3 239:4
239:7,12 240:12,17
**longer**  151:15
170:8 171:10
210:25 240:18
**look**  8:24,24,25
16:20,22 17:11
25:6 32:24 34:19
40:7 42:20 59:4
60:5,14,17,24,25
64:16 70:19 73:10
73:15 84:12 88:16
116:8 118:9 119:8
123:6 128:21
142:12,14,16,22,23
144:21 151:2
163:25 164:2
166:15 167:16
170:13 171:21
184:21,24 185:8
200:18 220:7,8
225:4 245:1 249:13
251:5 253:18
**looked**  27:21 28:3
42:25 43:5,6,8,10
43:15,16 44:6 54:5
59:25 60:3,23 65:6
65:17,18 66:1,16
66:23,24 67:4,17
68:5 69:24 70:10
70:12,18,24 72:16
74:10 116:22
126:19 144:19
152:8,10,22,23,24

153:1 156:18 163:9
171:18,19 189:1
193:5 217:9 218:14
244:11,12 246:9,11
246:14 247:1
249:10
**looking**  27:25 28:8
31:22 56:14,17
59:13 66:15,25
67:13 68:9,10
72:19,20,22 73:8
77:8,25 84:7
113:10 116:23
120:5 134:17 137:8
137:25 143:14
144:17 166:14
168:11 184:15,17
185:13,22 189:3
190:7 217:25,25
234:19 243:5,18
244:24,25 245:9
**looks**  190:18
248:11
**lose**  204:24 209:1
**losing**  128:3 205:3
205:18 210:17
212:13 233:11
**lot**  15:2 29:25
35:19 44:3,6 51:13
51:17 55:22 105:21
106:2,5 181:18
214:24 216:23
217:8 219:24
222:23 251:4
**lots**  156:8 167:21
231:14
**low**  236:24 237:2
**lower**  230:9
**lunch**  113:15,18

**m**

**m**  14:10,10 22:24
**macro**  58:16 59:12
59:17,18,22 65:10
65:12,14 84:8
189:3
**magnitude**  79:12
152:8 156:11
**mail**  15:15 79:22
**mails**  29:10 36:2,5
41:22 42:1,3,4,10
42:22 43:23 102:11
155:20 199:13
**maintained**  30:3
41:11,25 42:9 53:5
**major**  129:3 182:12
**majority**  116:15
**making**  59:16,17
83:11 90:14,20
93:5 95:6 124:12
227:23
**manage**  43:18
44:12
**management**  1:4
4:5 94:15,19 95:3
129:2 130:4 133:16
162:14 184:16
211:25 212:23
213:20 214:1
222:11 241:25
252:13 253:15,20
259:8
**manner**  92:2
**manual**  151:13
**manually**  163:15
164:10
**march**  106:14,14
155:18,22 159:22
160:3,8,19 166:20
167:4,14 168:8,24
168:24 169:7 178:2

183:6,21 198:22
215:6 216:12 217:3
217:8,9,16,18,22
217:25 226:11
232:2
**marie**  14:9 18:4
**mark**  88:19
**marked**  5:2,7 33:2
33:9 63:24 64:1
88:18,21
**market**  238:2,7,24
238:25 240:13
241:22 242:7
**marketability**
238:16
**markets**  250:2
**master**  195:1
**match**  169:13
199:24
**matching**  97:18
99:18 130:11,17,22
199:15
**material**  165:4,7
182:2 236:6
**materials**  34:7
**matriculate**  192:23
**matter**  4:4 6:7,10
7:6 9:8 11:12 22:17
22:18 28:12,16
37:14 112:5,7,11
112:19 188:1 224:8
**matters**  20:25 21:9
21:9,10 22:3 35:15
79:16
**mean**  16:7 29:3
33:25 35:23 36:8
36:19 38:22 40:1
41:13 44:5 45:13
48:7 53:18 54:14
54:19 55:2 57:14
59:22 68:21 70:11

75:13 81:1 92:7
103:2 104:2,13,17
106:11 109:3,13,16
111:16 120:9,10,12
120:17,20,22 121:4
136:12 147:13,15
147:17 153:7,25
156:18 174:19
176:13 183:9
184:13 186:5
201:22 206:24
207:24 211:23
228:21 229:14
235:3 239:6 249:2
251:10,13
**meaning**  97:15
99:15
**meaningful**  146:22
147:3,7 148:5
**means**  72:14 76:21
91:4 186:7 193:12
219:7
**meant**  249:2
**mechanically**  81:3
88:13
**mechanism**  205:10
**media**  62:25 180:10
237:16
**meet**  127:2,14
225:25
**meeting**  194:7
**memorized**  64:12
**memory**  179:5
248:17
**mentioned**  31:15
35:6,13 41:3 44:7
68:13 69:22 70:9
78:13 83:2 103:23
211:9 222:9 247:21
250:7,8

**method**  210:8
240:15 251:17
252:3,5
**methodologies**
237:21,24 238:1,4
**miami**  1:11 2:10
259:2,14
**michael**  2:10 4:14
12:14 14:10
**micro**  58:14 59:18
59:22 65:12 66:6
84:8
**middle**  140:12
**million**  183:6,11,19
183:20,20,22
185:19,20 198:23
198:24 225:7,18,24
226:4,8 227:3,12
228:8,10 231:1,10
232:19,23,24 233:3
233:4,20,23 234:8
236:8,10 238:9,17
241:18 244:13,17
244:21 245:5,10
250:5
**millions**  155:1
202:2 236:24 237:2
**minasi**  14:9 18:4,5
19:5
**minasi's**  18:7
**mind**  22:22 32:23
44:4 48:6 53:24
103:19 123:19
151:7 153:18
211:10
**mind's**  106:24
112:5
**minds**  194:7
**mine**  213:5
**minus**  164:22
227:13 228:8

241:17
**minuses**  84:11
**minute**  62:17
**minutes**  17:6 48:19
103:21 208:19
237:10 253:25
**miscommunicated**
214:7
**misleading**  98:4
**mismanaging**
228:3
**missing**  211:2
**misunderstand**
229:5 248:25
**misunderstanding**
203:10
**misuse**  204:23
205:17 208:11,21
209:7 210:16
**misused**  206:4,8,16
207:5 208:4
**mixed**  183:7
**moment**  65:13
82:20 107:16 111:3
112:18 118:22
124:3 150:22
165:20 173:16
209:3 220:4 224:24
227:9 238:13 247:5
**money**  54:13 55:18
76:5,7 78:5 79:6
83:20 84:4,15 85:2
85:12,16,19,22
92:8 95:20 96:2
104:15,18,21 108:5
109:9 112:3 158:4
159:10 160:8,11
168:6 169:24
170:19 174:6,12,14
174:15,23,25 175:3
175:6 176:2 178:11

178:20 181:18,24
182:15,18 183:1,3
183:23,24 184:22
185:9 189:7 191:11
192:25 193:1,8
195:9 196:11,15,18
196:23,24 200:1,3
200:14,25 201:2,3
202:6 205:20 212:7
215:21 217:8,12
219:7 230:1,10,15
231:13,19 232:16
234:14 236:15
**monies**  67:9 92:12
136:15 157:5 158:9
160:18 182:19
186:11,15 195:22
195:23 197:7,25
198:17 199:8 201:7
201:12,13,24 202:5
202:16,19,19 210:3
210:4 215:14
216:11 217:21
218:23 220:18
228:16 231:6,8
**monitor**  43:18
**month**  95:13 128:4
138:18 169:6
183:16,18 190:23
195:24 254:10,11
**monthly**  43:6 96:16
97:1 100:19 195:8
199:24
**months**  95:14,20
96:2 102:25 178:3
210:5 225:8 230:2
**morning**  4:24,25
12:7 114:19 118:11
120:3 163:7 168:3
219:14

mouth   106:8 226:5
move   13:6 92:19
  93:21 94:10,21
  100:14 124:4
  140:14 163:11
moving   66:14
  84:10
multifaceted   9:3
multiple   75:23
  104:9 120:24
  144:19 155:19
murphy   78:15 80:2
  198:11 199:7
murphy's   78:18,24
  80:5

**n**

n   2:10 3:2 14:9,10
nail   218:10
name   22:20 23:24
  24:2 115:7 117:3
  156:23 218:15
  219:7
named   4:18
names   14:5 114:24
  225:16,23
narrow   56:16
  217:7
narrowed   242:15
narrower   214:11
narrowing   245:13
narrowly   65:9
  202:23
native   29:9 31:13
  31:19 32:12,13
  35:2 36:4 37:24
  39:6,21 40:2,12,20
  41:8 253:8
nature   20:18
  181:11 221:14
  246:10

neal   1:7 179:8
near   156:11
necessarily   37:14
  68:19 95:22 109:7
  134:11 138:2
  203:11 228:15
necessary   30:1
  52:23 164:3 232:12
need   30:20 32:23
  34:19 54:23 55:2
  79:5 84:12 98:12
  98:22 118:9 119:8
  122:3,6 158:19
  165:22 170:17
  171:11,24 174:23
  174:24 175:17
  182:10 193:2
  209:21 213:5
  217:15 220:7 230:3
  234:9
needed   32:2 38:9
  38:14 53:2 85:19
  85:22 165:2 168:9
  168:24 232:1,4
needs   15:9 68:10
  94:25 177:4 194:14
negative   180:16
  181:3,12
neither   89:21
net   75:11,13,16,16
  75:17 174:21
never   58:9
new   2:5,5 16:2 23:2
  24:1 162:13
news   243:16,20
non   111:15 156:2
  215:16 217:4
noncompliance
  111:12,17
normal   198:4 201:5
  204:25 205:4 209:2

226:13,14,14 232:6
notary   1:17 255:23
  256:23 257:23
note   34:22 76:15
  254:7
notes   154:16
  258:11
notice   1:18 3:8 4:18
  5:7,17 13:8,14
  118:14 259:18
noticing   138:1
notion   205:2 218:6
number   20:24
  33:12 47:25 66:8
  71:15,20 72:9
  75:16 95:8,15
  108:20,21 123:12
  123:12 156:25
  159:3 165:21 172:7
  172:11 188:10
  221:2 226:25 235:5
numbering   47:24
numbers   62:4
  64:12 87:8 88:8
  92:23 93:9 94:15
  94:24 96:16,25
  104:10 109:23
  114:1 188:2 191:2
  223:13 234:22
numeric   211:23
numerically   199:17

**o**

o   14:9,10 22:24
  259:5
oath   4:20 118:22
  118:23 257:1
object   6:17
objecting   197:21
objection   6:11 7:4
  9:11 16:21 18:2
  19:20 21:19 23:18

25:4,19 26:3 28:25
29:2,19 30:8,16
34:22 36:13 37:1
38:5,24 39:4,15,18
40:4,15,18 41:2,20
42:12,24 45:11
50:22 51:4 52:25
53:14 54:2 57:25
58:13 59:9 60:7
61:11,14 62:1
65:24 67:10,25
69:5,21 72:12
76:15 77:4,20
78:20 80:25 81:25
83:1 84:18 85:10
87:15 88:10 93:15
94:17 96:5 97:2,24
100:1 101:10 102:9
103:10 104:8,25
105:8,16 107:6,24
108:13 109:6,15
110:5 111:6,14,23
112:9 114:17 116:2
116:11,20 117:7
118:16 119:11
120:1 121:10,14
123:17 125:10
126:1 127:3,15
128:11 129:8 130:8
131:23 133:20
134:5,21 135:17
136:7,21 138:7
139:11,23,24 140:6
140:25 141:19
142:8 143:11,20
144:8,15,25 145:3
145:17,22 146:4,19
147:1 148:13,24
149:11 150:11,21
151:5 152:2,18
157:18 159:1,13

161:7,23 162:23
163:20 164:17
165:8,18 166:4,11
166:21 167:5,15
168:16 169:2 170:4
171:7 172:5 173:1
173:8,18 174:3
175:10,15 176:3
178:7 179:21
180:19 182:4 187:6
188:12 191:13,16
193:21 194:18
195:17 199:18
200:5 201:15
202:21 203:8,23
205:13 206:17
207:14 208:6
209:14 210:13
211:15 213:2,14
214:6 215:7,17
217:6,23 218:13
219:1,12 220:19
222:3 224:17
227:22 230:4,21
231:11,24 233:7
236:12,21 237:4,22
239:24 241:4,19
242:23 245:6
247:18 250:15
**objections** 27:9
  140:18
**obligation** 110:11
  110:16 192:24
**obligations** 127:2
  127:14 226:1
**observation** 134:16
**observations**
  208:14 223:23
**observe** 138:10
**observed** 74:16
  138:6

**obtain** 225:6
**obviously** 10:18
  13:5 49:22 58:15
  59:16 139:4 216:23
  244:20
**occasion** 125:7,15
**occasions** 20:20
  21:17 22:13
**occur** 76:20 143:23
  203:2 210:10,12,21
**occurred** 34:2,4
  70:22 73:16,22
  74:7 77:12 78:14
  87:5 109:4 111:10
  153:3 203:5 215:6
  239:18
**occurring** 71:16,21
  77:7 92:15 150:17
  164:6 180:15 181:2
  181:10 203:19
**occurs** 112:6
**offered** 98:14
**office** 96:18,19
  97:13 99:13 100:18
  111:13 259:14
**officers** 179:13
**official** 255:20
  257:12
**officials** 144:5
**offs** 32:21
**oh** 54:6
**okay** 7:19 8:18 9:22
  13:4,20 14:18 18:4
  18:6 22:2 24:6,20
  25:9 29:5,16 30:22
  31:5,8 33:2 37:6
  43:3,7,14 45:8,25
  51:22 53:4 57:5
  62:15,17 67:17
  68:25 70:16 71:13
  73:1,20 74:6 78:3

82:20,21 90:24
  97:6 98:21 99:22
  107:15 108:16
  113:13 115:4,19
  117:25 118:4
  119:18 121:22
  122:20 123:6
  124:22 125:7
  127:25 136:4,25
  137:23 138:22
  146:16,22 147:22
  148:1,11 154:6
  158:2 161:11 162:7
  163:3,18 164:25
  169:6 170:1,20
  171:14 179:5
  185:15 187:17
  190:25 191:5,6
  194:23 197:18
  198:15 207:2
  213:25 225:24
  226:21 231:19
  232:10,11 245:21
  252:19 253:3,19,24
**once** 106:13 170:6
  194:15
**ones** 119:16 122:9
  122:12 196:10
  245:1 249:17,23
**ongoing** 127:1,13
  181:4,13
**online** 245:24
  250:8,10
**op** 75:23 212:18
**ope** 63:15,18 64:10
  64:14 74:15 87:8
  87:22 88:8 92:9,12
  131:1,3,15,19
  138:17 171:2,19
**operations** 204:25
  205:4 209:2 227:6

**opining** 207:20
  224:10
**opinion** 52:13,22
  71:24 75:25 79:15
  82:10,11 84:24
  85:1 89:16,22 90:7
  90:23,23,25 91:15
  91:23 92:11,17,18
  92:20 93:22 94:11
  94:22 101:16,23
  102:5,23 113:4
  149:8 167:6,18,20
  173:3 176:9 178:18
  182:2 192:18
  201:11 202:15,18
  203:20 205:9
  206:22 207:4 208:4
  208:23,24 209:8,12
  210:2 216:9 220:17
  221:20 222:10,16
  223:18 224:5
  230:25 234:17
  238:8,24 239:3
  246:6
**opinions** 10:1 11:9
  11:21 12:4,23
  14:20 34:10,17
  38:15,22 39:13
  40:14 46:11,18
  48:14,22 56:25
  61:23 63:21 68:6
  71:6,19,22 72:5
  74:12,13,16,21
  75:3,6 77:23,24
  78:8,9 83:11 84:20
  84:22 88:3,14 90:3
  90:5,15,21 93:5
  95:1,6 96:8 100:9
  100:10,12 113:2
  119:5 124:9 125:9
  126:11 144:6

175:22 178:21,22
178:25 201:16
205:14 206:12
207:7,8,10 213:4
217:10 220:21
224:1,7 234:11
238:19,22
**opportunity**  26:17
34:14,18 124:8
**opposed**  116:4
250:6
**orange**  167:22
**orbimed**  22:22
**order**  52:23 97:17
99:17 164:4 170:11
182:20 189:8 211:9
212:17 231:22
252:7
**ordered**  214:18
**ordering**  259:17
**ordinarily**  226:22
**ordinary**  156:9
157:4 213:13 227:5
227:14 232:9
**organization**
126:13
**original**  15:23
164:12 259:17
**originally**  187:1
**outcome**  23:7
**outside**  11:13,13
13:2 70:23 83:5,7
182:11 200:1,3,20
200:22 215:24
**overall**  21:16 65:7
154:24 218:1 219:2
220:8 241:7,15
**overdrawn**  79:7,18
79:23 80:23 81:13
82:24 198:9,25
201:6 202:11 218:3

221:23 222:7
**overfunded**  160:14
**overstated**  94:16
**owe**  193:13
**owed**  174:11,13,16
196:11,15,25
235:16
**owing**  174:5

**p**

**p.m.**  1:12 254:14
**p1740716-718**
253:6
**p2222704-705**
118:1
**page**  3:3,7,10 5:17
73:10,17,18 89:2
95:7 96:14 97:11
113:5 124:15,16
222:16,25 223:8,9
223:10 224:2,25
246:25 248:10,10
248:14,15,21 249:2
249:2,3,22 256:5
259:13
**paid**  6:8,15 7:2,19
17:23 55:6 67:4
91:21 174:18
193:14 209:21
236:8
**palmer**  225:15
**paper**  40:9,22
108:4
**papers**  19:9 248:23
**paperwork**  72:24
**paragraph**  89:2,4
95:8 96:13 97:10
97:25 99:12 100:16
101:14 124:18
125:18 128:24
162:8,9 163:11
176:18 177:6,11

204:21 223:2,7
224:25 225:2,3
**paragraphs**  223:2
224:2,4,5
**paraphrasing**
155:16
**pardon**  142:20
**paren**  162:12,14
**part**  7:21 31:17
74:11 75:6 82:8
83:6 85:21 94:4
106:23 132:2
155:24 186:19
187:24 197:20
203:7,11 205:17
208:23 209:8
215:11 216:10
224:10 230:5
240:21 249:10
**participation**  8:4
**particular**  17:15
58:11 59:8 60:22
61:25 63:18,19
64:14,14,15 67:3,9
73:6 77:22 79:19
80:23 81:5 83:18
84:4,15 85:2 86:21
86:21 109:25 113:4
113:9,11 120:18
121:2,2,8 124:17
131:1,1 147:8,25
150:13 157:6 159:2
160:25 166:6 172:6
185:19 214:11
218:11,20 221:25
222:4 249:24,25
253:11
**parties**  10:20 23:25
28:15,15,16 31:14
45:24,25 258:14,15

**partner**  7:9
**partners**  247:2
248:8,22
**parts**  99:7 176:23
177:2
**party**  162:14
**pause**  134:13 138:4
**paused**  140:11
**pay**  7:14 53:21 54:1
54:4,6,9,16,17,20
55:5,9,13,16
127:19 131:15
168:8 169:20,22
170:8,14 171:16,25
172:10,19 174:12
182:10 194:2
205:18 209:20
232:16 233:11,11
**payment**  194:11
197:4
**payroll**  181:19
182:1 211:2
**pc**  2:3 259:5
**pdf**  32:12
**pell**  160:25 187:22
**pellet**  24:1,12
**penalty**  124:12
**people**  29:11 36:6
37:15 44:13 54:12
54:14 75:2 77:8
78:14 115:2,17
126:3 134:14
137:10 142:16
143:6 145:13 150:5
173:12 186:6
214:24 222:25
240:13 246:4 252:3
**people's**  76:3 141:6
199:4 220:16
**percent**  204:1
238:15

**percentage** 8:13 157:14 226:24
**perform** 9:17 14:25 19:5 20:2 24:9 55:9 64:24 67:20 73:1 84:3 108:8 126:15 171:14
**performance** 8:1 8:17
**performed** 9:14 15:7 22:6 58:9 87:4 87:10,14,17,21 88:7 142:20 163:3 240:19
**performing** 25:14 45:9 55:12 148:20
**period** 27:23 76:18 110:11 116:5 126:19 128:14 144:20 147:5 151:23 160:24 161:4 164:8 175:7 216:12 217:10,11 219:4 224:19 226:15
**periods** 115:25 130:18 144:19
**perjury** 124:12
**person** 18:16 255:16
**personal** 99:23 180:1
**personally** 68:25 255:15 257:8
**perspective** 78:10 91:24
**petitions** 124:7
**phase** 207:19
**phone** 2:13
**phrase** 68:13 162:4 162:5

**physical** 51:16 245:24 250:8
**physically** 10:7 13:12 40:9 45:16 170:11 198:23
**pick** 220:9
**picked** 73:12
**picking** 242:17
**picture** 66:16
**piece** 40:9
**pierne** 1:7 106:20 134:24 154:24 155:25 179:8 215:2
**pierne's** 154:23 155:14
**piper** 247:2
**place** 135:4 145:14 145:15 189:16 192:16 195:20 229:7
**placed** 180:25
**places** 121:19
**plaintiff** 1:5 2:2 173:11 176:5 177:4 178:9 179:20 203:22 204:9 210:14 211:18 224:16
**plaintiff's** 172:16 176:10 205:15 209:24 227:24 237:8
**plaintiffs** 89:20 177:13 233:17
**plan** 8:5
**plane** 195:5
**platform** 252:14
**play** 19:14 173:16
**players** 247:14,15
**please** 4:9 11:22 14:6 56:8 59:21

92:17 127:5 149:9 186:13 222:14 249:20 259:11,13 259:13
**plus** 164:21 227:13 228:8 241:17
**pluses** 84:11
**pocket** 233:4
**point** 9:14 52:11 54:25 57:21 88:12 92:5 109:10 112:2 130:22 131:13 132:7 136:10 142:25 178:17 181:18 187:3 191:8 206:2,5,10,13,14 208:15 220:23 228:10 234:15 235:1,11 240:5 243:18,19
**pointed** 213:19 248:19 249:14
**points** 40:10 54:25 130:24 226:24
**population** 114:8 116:8
**portion** 57:24 95:17
**posed** 140:24
**position** 14:15 18:7 18:23 20:7 26:24 26:25 174:5,8 177:21 210:25 211:13 212:1 213:21 227:11,18
**positioning** 214:14
**possibility** 216:1,3 218:7
**possible** 21:7 77:13 218:8 224:14 229:20 240:10

**possibly** 156:23
**post** 97:14 99:14 244:8 248:9
**posted** 107:19 109:18 146:14 170:18,21,25
**potential** 88:1 96:10 97:7 252:14
**potentially** 184:5 242:12 249:17
**practice** 95:10,19
**predraw** 68:4,14 68:16 69:23 70:9 71:1 95:11,19 101:20,24 102:6,14 102:20
**predrawing** 94:13
**predrawn** 198:10
**predraws** 56:1 66:22 67:12 68:2 78:15 114:12 221:1
**predrew** 94:12,13
**preliminary** 16:14 19:10
**premature** 95:22
**premised** 95:13 96:17 97:1
**preparation** 6:5 14:24
**prepare** 15:20 35:4 35:6 48:1 49:1 50:5 58:18 204:21
**prepared** 14:22 15:12 36:3 50:23 51:6 85:24 86:8,17 241:25 253:14
**preparing** 13:24 14:1 19:16 176:5 242:25
**presence** 245:24 250:8,9,10

**present**  2:12 17:24
**president**  18:24,25
  19:2
**presume**  19:2
  38:22 185:22
**pretense**  94:23
  101:18
**pretty**  207:2
**prevent**  146:12,13
**prevented**  31:2
**price**  2:8
**primarily**  184:20
**primary**  14:4,11,14
  115:12 224:11
**principal**  18:18,21
  19:3 20:11
**print**  45:17
**printouts**  52:1
**prints**  51:19
**prior**  22:9 157:8
  181:18
**privilege**  26:10
**probably**  22:24
  23:3,3 32:4,8 44:5
  97:24 124:14
  173:22 237:10
  249:21
**problem**  86:12 91:8
  105:25 106:1,7
  143:6 144:12
  145:12 146:23
  181:21 182:8 228:1
**problems**  125:19
  125:22 130:5
  139:21 140:4,4
  211:20
**procedures**  223:12
  223:21
**proceed**  24:20
**proceeding**  20:21

**proceedings**  4:1
**proceeds**  60:21
  65:4
**process**  16:25 17:8
  17:9 32:6 33:1
  35:10 38:13,19,21
  38:21 39:21 40:24
  41:5 54:23 55:2,7
  79:10 83:11 86:22
  91:18,20,20 105:22
  105:23 106:9,11,15
  110:1,2,7 135:20
  135:23 162:15
  163:15 187:24
  193:24 195:6 213:5
  218:5
**processes**  135:19
  138:8
**processing**  129:5
  133:19 139:9
  164:11
**produce**  16:3 50:16
  50:18
**produced**  10:20,21
  12:15,16 13:3,10
  28:15,17 29:14
  30:3 37:4 254:9
**product**  16:5,9,11
**production**  13:3
  28:14 45:20 52:6
  123:21 259:21
**profit**  8:3,5 179:24
  244:8
**profitability**  8:9
**profited**  179:19
**profits**  7:11,14 8:2
  8:6,10,14
**program**  45:9,13
  45:15,17,18 51:17
  51:23 52:4,13
  64:14 100:21 101:1

  101:8 141:8,25
  143:2 145:15
  165:17 212:17,25
  214:11,18
**programs**  51:18
  93:25
**project**  106:8,19,22
  106:25 107:2,10
  155:1,16,18,23
  212:7,10,12 213:22
  214:2,4,9,17,19
  215:4 251:23
**projected**  61:6,8
  94:14 96:16,25
  101:19,21,25 102:7
  102:20
**projection**  239:9
  251:18 252:4,20
  253:20
**projections**  95:14
  239:4,7,10,11,12
  240:6,12 242:1
  248:6 251:8,12,15
  252:12,12,15
**properly**  137:8
  139:25 142:7
  193:19
**proportion**  182:18
**prove**  176:10 177:4
  199:17
**proved**  129:3
  164:13
**proven**  129:17
  239:18
**provide**  9:17 11:15
  15:1,3,17 20:20
  22:9 82:18 95:1
  114:13 230:10
  253:16
**provided**  9:25
  10:15 12:3 13:10

  28:20,23 30:14
  31:20 32:3 33:1,22
  33:23 34:3,16 36:1
  38:4 45:20,21,23
  50:4 104:4 113:22
  114:3,16 118:19
  121:18 126:21
  127:21,22 137:3,4
  137:6 156:15
  199:19 225:15,18
  230:13 250:2 254:8
**providers**  244:12
**providing**  84:16,21
  84:23 203:15
  206:11,19 207:7,8
  220:23
**public**  1:17 246:12
  255:23 256:23
  257:23
**pull**  55:25 150:14
  170:7,19 178:11,19
  194:4 221:2
**pulled**  56:2 78:15
  85:12,16 194:5
  215:21 219:7
**pulling**  75:11,13
  76:5 104:15,18
  109:9 132:24
**purported**  116:16
**purporting**  195:1
**purpose**  81:19
  86:23 195:2 255:18
**pursuant**  1:18
**put**  45:22 55:5 63:2
  64:10 72:23 79:18
  106:8 110:16,18
  118:23 124:2 139:5
  151:14 165:22
  172:3,14,23 173:16
  174:2 177:22
  180:13 181:14

194:4 205:22
209:10 217:12
225:25 226:5
234:14 236:15

**q**

**q2**   248:9
**qualification**
194:24
**quantified**   72:18
**quantifying**   83:10
**quarter**   183:5,8
**question**   3:10 7:16
10:12 11:16 22:7
26:24 27:8,14,20
28:21,22 30:9,11
30:17 31:4,6,8 32:1
36:20,21,22 38:7
42:5,8 48:10,11,15
48:25 49:14,14,15
49:17,18,19 50:19
52:20 53:9 56:11
56:13 57:4,13,14
57:18 58:2,6 60:16
63:5,11 64:18
67:19 70:9 71:4
73:4 76:8,11 77:22
78:22 86:18 93:2
98:2 99:4,22
108:12 113:10
114:4,14 117:16,21
118:18 124:1
126:24 127:11,23
130:2 134:4 140:13
140:23,24 141:21
146:9 149:10
151:11 152:25
156:14 157:14
159:8 160:7 161:13
161:14,25 162:1,4
167:1 168:19
172:21,22 173:22

179:1 180:23 181:9
183:2 187:14 189:6
197:20 201:18
206:12 207:2
208:20 210:20
214:5 216:20,25
221:4,8 232:14
235:23 243:8 249:6
251:21
**questions**   25:11
57:16 82:2,6
118:15 149:13
213:18 216:23
**quite**   251:23
**quote**   154:20
162:11 176:18
177:8 235:18,19,25
236:1
**quotes**   10:16 11:2

**r**

**r**   14:9 22:24
**r.p.r.**   1:16 257:22
258:6,23
**r24**   139:14
**r24s**   189:20
**r2t4**   106:22 107:2
107:11 155:23
157:25 158:11,13
158:14 160:11
162:3 183:24 184:8
184:23 185:11,18
185:20,23 188:8,11
188:15 192:20
197:2 201:2,5,13
201:24 202:9,15,19
212:17,25 213:11
214:17
**r2t4s**   159:8,24
160:5,21 161:4
182:19 195:11
197:11 198:3

**rabbit's**   188:4
**raise**   27:9 211:2
224:23
**raised**   70:14
127:18
**range**   11:4 226:23
238:9
**ranged**   238:16
**ranges**   10:25 11:6
11:11,13
**rate**   6:10,23
**rates**   86:11
**rationale**   137:3
**reach**   9:14 36:10
36:23 38:9,14
52:24 53:2 74:13
74:16 81:18 82:17
82:17 86:7 93:13
126:8 175:22
217:20 246:3
**reached**   36:14 37:7
37:22 38:10 68:6
88:12 238:14
**reaching**   74:12
144:6,12 146:24
**read**   11:22,25 34:6
34:8 56:8,10,11
72:6 81:17 88:24
89:7 95:16,24
96:21 97:20,25
98:14,16 99:7,20
127:4,8 149:9,10
155:7 159:25
161:12,14 162:19
163:16 176:13,17
181:7 216:15
225:10 255:5
259:13
**reading**   74:22
82:10 87:1 127:10
253:1 259:16

**rabbit's**
**rabbit's**   188:4
**ready**   54:17,20
55:5
**real**   226:3
**really**   57:15 130:1
157:3 175:17
176:25 178:18
200:23 210:1
230:17
**realtime**   140:18
**reason**   83:16,17
84:2 85:11 103:15
112:6 128:5,7
154:13 156:5
167:24 168:3
213:18 241:10
242:17 243:25
244:4,5 245:3
250:5 251:20
**reasonable**   152:1
**reasons**   85:8,9
86:13 96:10 112:20
112:24 113:7
**recall**   22:17 27:21
27:25 33:22 34:24
47:25 52:8 53:23
54:21 55:12,14,15
59:10 67:11,18
86:5,5,14,20,25
87:5 101:20 115:12
119:12 120:7
122:18 123:20
129:10,21 131:7,8
133:4,5,5 138:15
138:20 139:12,13
139:17,18 141:12
145:4,7,8 151:7,12
151:19 156:20
161:8 164:24
174:10 180:21
225:14,15,20 234:6
234:12,12,15

243:16 249:10
**recalling** 158:18
**receipt** 45:4
**receivable** 80:10
154:10,17
**receive** 8:3,12,13
57:21 109:24
204:24 205:3 209:1
**received** 46:6 116:9
116:18 136:15
236:9
**receiving** 41:22
**recess** 44:19 62:23
113:18 180:8
204:16 237:14
254:4
**recognize** 33:14
228:20 229:11
**recognized** 228:24
229:21
**recognizes** 193:19
**recognizing** 137:11
143:13
**recollection** 34:15
34:21 54:15 87:6
149:19,25 158:19
**reconcile** 100:19,21
100:24,25 101:8
106:15,16 139:22
140:5 163:13 164:4
164:21 165:16
189:8 231:23 251:6
**reconciled** 92:12
130:11,23 131:10
132:8,23 134:10
136:6 138:1
**reconciliation**
105:22 106:3,6,7,7
106:9,11,19,21,24
107:9 138:19 139:1
153:14 154:25

155:10,16,18 156:1
159:11 161:5
182:10 203:25
212:7,10 213:22
214:2,4,8,16,19
215:4 223:5 229:8
233:16 253:15
**reconciliations**
136:1 137:7,14
200:23 215:1
223:12
**reconciling** 92:8
129:5 136:14 139:9
164:11
**reconstruction**
205:19
**reconvene** 113:15
**record** 4:3,10 10:9
10:19 26:1 30:5,6
30:13 31:23 32:2
38:3 39:11 44:17
44:21 45:19,19,22
45:23 48:8 53:12
53:17,21 54:1,17
54:19,24 55:3
57:12 58:3,4 60:24
62:21,25 71:8,11
72:6 74:22 79:6
86:13 87:1 95:4
99:2 105:14,14
107:18 113:17,20
114:15 116:12
142:17 145:9 151:3
161:3,4,5 170:18
170:20 173:3 180:7
180:10 184:6,25
186:25 187:2,15
190:17 191:24
195:12 204:14,18
206:22 237:13,16
240:18 254:2,6,7

254:13 258:11
**recorded** 79:8
105:17 140:22
153:11,22 155:18
155:22 184:19
188:14 195:13
198:19 199:10
201:8 226:8,10,11
227:12 228:18
229:3
**recording** 155:15
161:2 185:6 188:20
188:24 189:2
**records** 15:3,4
24:17 25:13,16,18
25:21 26:6 27:18
27:21 28:24 29:4
29:17,23 30:24
31:9,12 32:8,10,20
35:7,10,14 36:11
36:25 37:15,17,20
38:9,12,14,18,20
39:2,6 40:20 41:4,7
41:12,18 42:1,9,14
42:20,21 43:1,4,20
44:3,6,11 45:2 46:1
46:5,5 53:5,7,8,19
53:19 55:22 56:3,6
56:14,17,21,23
57:1,6,10,22 58:10
58:19 60:1 66:8
67:8 68:24 69:4,19
70:25,25 71:7,9
77:1 81:2 87:24
94:5 97:15 99:15
102:12 104:4,21
108:9,25 109:2,23
113:23 114:3,5,9
114:10,13 117:9,12
117:18,19 122:5,7
123:16 128:13,19

128:22 131:2
132:16 133:3 134:2
134:2,17 138:25
150:19 151:21,23
152:15 158:12
160:10,16,22
162:16 163:14
164:15,22 165:6,14
167:3 168:10
169:24,24 170:2,5
170:12 171:16,19
172:4,14,24 173:17
174:2 177:23
180:13,25 181:15
183:25 184:2,5,10
184:11,14,24
185:12,16 189:1,3
190:14,15,16 194:2
194:4,8,8,20 195:2
195:3 196:8 198:24
201:10 205:7,11,19
206:18 209:10
210:23 218:3
220:15 230:10,13
232:18
**recs** 92:1,5,7
**red** 167:22
**reduce** 187:3
**reduced** 210:23
241:13
**ref** 158:13 160:10
162:3 185:17,23
188:11 189:20
197:2
**refer** 45:3 54:4
124:18 238:1
**reference** 162:3
193:2 235:18
259:10
**referenced** 10:22
11:1,10 12:21

80:16
**references** 56:1
80:13 119:7
**referred** 5:1 33:8
88:20 106:18 115:2
160:23 226:15
**referring** 21:13
28:6 58:6 71:11
114:6 115:20
117:13,14 121:23
122:23 123:3
135:24 214:17,19
215:5 221:11
225:13
**reflect** 64:7,13
128:13 191:17,18
191:24 229:16
234:16 241:14
**reflected** 66:19
74:2 87:19 138:3
184:25 187:9,14,18
189:10 190:2
191:10,21,25
192:13 196:13
212:8,11,13 229:9
229:10,13 234:2,22
253:9
**reflecting** 66:9 67:8
93:18 109:8 194:10
196:8 197:1,3,3
**reflection** 199:4
**reflective** 186:10
**reflects** 108:1
109:10,13 196:23
**refresh** 158:19
**refreshed** 34:15
**refreshing** 34:20
**refs** 160:21 161:4
**refund** 75:17 79:5
83:18 93:23 94:3
97:17,19 99:17,19

107:2 121:3 157:25
158:4 160:9 183:23
184:8 187:15 188:8
192:13,20,24 193:1
193:4 196:20 198:5
199:5 201:2,5,12
201:24 202:9,13,15
202:18 213:12
**refunded** 195:9
202:12 215:14
216:11 217:21
218:23
**refunding** 189:7
231:12
**refunds** 63:17
64:13 67:4 83:8,12
90:16 94:5,8 97:14
99:14 106:22
107:11 153:1
157:22 158:13,16
158:23 159:24
160:6,10,21,23,24
161:3 182:18 184:2
185:18,18,19 186:4
188:15 189:19,21
191:11 195:11
196:19 197:11
198:3,24 200:19,21
201:10 212:11,18
212:25 213:6 215:5
215:11 223:1 229:2
232:1,3,4,5,9,11
233:24
**regard** 37:21 113:7
128:6 129:7 137:16
155:5 157:8 206:23
216:17
**regarding** 42:1,10
106:22 144:13
195:1

**regent** 139:14,20
140:3 141:3,11,13
141:13,14,16,24
142:6,12,14,19,22
142:22,23 143:1,6
143:18 144:23
145:20 146:2 148:9
148:23 151:4,21
175:14
**region** 106:1
**registers** 192:11
**regularly** 97:14
99:14
**regulation** 93:4
213:4
**regulations** 89:6
90:4 100:20 111:25
194:20
**regulator** 91:12
**regulatory** 90:3,13
90:20,22 91:3,9,18
91:20 92:4 93:4,5
206:10 207:21
208:12 220:22
221:5,19
**reject** 71:7,11
72:23 74:6,9 75:1
105:14,18,24
149:16,17 152:4,20
**rejected** 104:22
107:18 111:1,20
112:20 138:25
149:24 150:2,3,9
**rejecting** 76:9,10
111:22
**rejection** 76:12
104:23 105:1,5
108:4
**rejections** 76:23,25
**rejects** 71:10,12,15
71:20,23 72:3,9,21

73:22 74:4,11,14
139:14 148:1,3
149:22 150:5,5,16
165:23
**relate** 58:22 65:8,9
80:8 90:5,15,19
93:17 102:1 137:20
178:22 189:4
206:12 207:9
215:22 217:11
220:9 221:3
**related** 74:23 83:4
94:4 101:21,25
102:6,20 110:19
114:2 153:16
203:12 204:8
207:11 215:15,15
216:12 217:4
229:22 233:18
**relates** 55:23 96:8
158:4,6 182:8
220:21 239:19
**relative** 72:14
182:17 258:13,14
**relax** 180:4
**relevant** 20:11
114:14 137:25
157:9 216:5 221:7
**reliable** 252:12
**relied** 12:4 45:19
46:1,10,17 48:13
48:21 114:23,25
118:4 119:4 122:4
252:17
**relief** 124:7
**rely** 50:6 58:4
240:14
**relying** 51:25
134:18 251:16
**remains** 191:4
220:7

**remarks** 256:5
**remember** 22:20
  22:25 23:24 102:14
  103:25 122:18
  130:7,9 141:14
  151:10 169:8
  175:23 212:20
  213:23 225:17
  247:24 248:5
**reminded** 35:8
**remove** 105:2
**removed** 172:2
  245:25
**render** 149:8
  222:10 223:18
  224:5
**rendering** 207:4,11
**rent** 85:22
**reoccurring** 156:2
**repaid** 210:4
**repaired** 152:4
**repayment** 186:8
**rephrase** 11:23
  27:14 30:10 148:2
**report** 3:8 10:6,10
  10:11,13,16,23
  11:6,10,14 12:5,8,8
  12:13,17,22,24,25
  13:2,11,24 14:2,24
  15:5,21,24 16:6,9
  17:16 19:13,22
  23:13 31:3,15,22
  32:3,5,24 33:4,18
  33:20,24 34:2,5,11
  34:14,19,23 46:2
  46:10,17 47:15,20
  48:13,21 49:7,22
  50:6,9,11,15,20
  51:10,19,19 61:1,6
  63:16 64:10 65:19
  68:7 84:21 86:4

90:6 100:11,13
102:12 103:6
114:15,20 115:3,12
118:12 123:25
126:11 134:24
153:21 167:22
168:2 175:20
176:24 177:2
178:21 181:7 190:6
190:7,8,9,11,13,22
190:25 191:2,10,17
195:7 196:1 197:6
203:14 204:20
208:1,8,16 211:6,7
215:2 219:24 222:9
222:23 223:5,6,23
224:1 234:23
235:12,13 241:21
243:18 244:2,7
246:21,22,23 247:1
247:1,2,3,6,17
248:8,15,20,20
249:6 254:8 258:8
**reported** 116:9
**reporter** 4:11 5:2
  33:9 88:21 140:7
**reporter's** 140:20
**reporting** 140:10
  147:19
**reports** 15:17 16:9
  19:10 29:10 43:6
  43:17,17,19,22,25
  45:16,17 48:2 49:1
  49:9 50:17 51:2,9
  51:16,22 52:21
  56:4,19 57:8,11,19
  61:9 63:15,21
  64:12,19 79:16
  85:24 86:3,8
  114:23,25 115:12
  115:16 116:22

120:25 234:3
246:10,16,17,18
247:21 248:1
249:16,25
**representation**
  185:21 190:11
  191:5
**represented** 61:24
**request** 11:25
  12:20 27:1 124:7
**requested** 30:13
  214:3 233:24
  258:10
**require** 91:9
**required** 5:15 7:7
  97:19 99:19 100:20
  118:13 188:9
**requirement** 89:19
  95:23 201:12
**requires** 13:14
  90:13 91:2
**research** 14:22,25
  19:7,15,18 20:4,6
  20:14 105:20 246:9
**researched** 15:10
**reserving** 154:9,10
**resolved** 129:22
  130:6
**resources** 126:24
  127:18 128:10
  181:19,25 241:2
**respect** 22:5 34:9
  62:9 73:2 74:1,3
  75:3 77:5 91:16,17
  93:13,19 104:3
  108:9,21 117:21
  119:5 125:13
  131:19 133:8
  142:19 144:6 215:3
  217:21 220:12
  222:10 238:20

**respectfully** 27:7
  42:6 48:9 140:17
  229:23
**respective** 93:25
**respond** 13:7
**responding** 197:21
**responses** 80:12
**responsibilities**
  56:25
**responsibility**
  206:7
**responsible** 20:13
**restate** 159:25
**restrict** 204:5
**restructuring**
  125:5
**result** 146:1 155:9
  155:23 159:23
  160:4 165:5 172:2
  200:16 204:24
  210:6 211:20
  219:20 222:24
  228:1
**resulted** 75:18
  96:18 129:4 210:22
  238:7
**resulting** 97:14
  99:14
**results** 222:5 228:2
  231:14 241:6
**resume** 156:19,19
**retained** 22:11 24:4
  41:17
**return** 107:2 108:5
  156:1,4,6 157:12
  158:24 161:5 184:8
  201:12 202:18
  212:6 231:22
  233:21
**returned** 156:8,8
  158:9 159:10,22

160:3,20 178:5
182:20 183:1,3
184:23 185:10
186:11,15 195:10
195:15,16,23,24
196:24 197:8,13,16
197:18,19 198:1,13
198:17 199:9
200:15 201:1,24
202:2,5 217:3,8
228:6,17 230:1
231:1
**returning** 155:1
177:24 196:11,15
**returns** 157:16
**reveal** 132:16
134:12
**revenue** 8:24 79:13
104:5 115:8,21
116:23 117:1,9
121:20 127:22
204:1 215:25
228:24 229:12,20
244:13
**revenues** 7:13 8:6
8:10 244:15,17
250:4 251:24
**reversed** 107:21
**review** 25:12,17,21
25:23,25 26:2,19
27:18 34:14 54:10
56:19 61:8 64:2
71:7 85:24 86:14
124:8 130:15 133:3
133:13 149:16
150:1 212:17,25
213:11 258:9
**reviewed** 11:8 16:8
36:11,24 71:6
119:20

**reviewing** 20:18
34:23 86:5,8
128:19,20,23 133:9
223:22
**reviews** 86:21
**rich** 14:7,15
**right** 6:22 7:15,23
10:8 11:5 16:20
17:4,14,14,24 18:6
19:24 33:19 36:9
37:9,20 38:23
41:14,16 46:3
49:20 53:10 54:1
57:17 60:14 63:12
64:6 75:8 80:19
81:10 82:9,12,22
85:15 98:13 105:13
109:5 110:14
112:24 122:15
125:20 131:5 144:3
147:23 154:2,4
156:18,24 157:7,11
169:9 176:2 179:11
179:14 180:5
182:25 185:7,23
186:24 187:11,12
188:1 190:10,18
191:7 192:8,25
193:10,24 195:11
195:11,16 196:22
200:12 201:9,25
202:7 203:7 208:2
209:11 215:9 216:3
228:12,13 230:3,15
230:17 232:25
233:1 239:15,18
241:18 242:8,13,22
243:21 246:12
252:24 253:23
**role** 19:5,14 24:3,6
81:24 82:1,4,8,9

94:1 124:22 125:2
142:20 203:10
**roles** 82:13
**rolled** 121:18
**root** 76:2,4
**roster** 218:25
**rosters** 119:22
219:8
**roughly** 49:11,12
**round** 109:23
221:2
**rounding** 183:19
**row** 185:22,25
**rows** 188:11
**rules** 195:1
**run** 45:15,16,18

**s**

**s** 14:9,10
**s.e.** 1:10
**salaries** 8:11
**salary** 7:14,17,20
7:21 8:7,16 180:1
**sample** 245:13
**sampling** 44:4
**satisfy** 253:19
**save** 235:17
**saved** 17:15 31:14
**saw** 36:1 57:5,7
68:2 71:22 79:22
93:7 150:4 167:7
198:8
**saying** 50:17 53:11
58:2 74:18 75:20
77:12 79:4 98:15
121:6 132:6 133:22
143:7 150:5 180:21
217:15 231:17
236:2 253:22
**says** 50:13 89:9
94:13 95:8,18
99:12 124:15

162:10 164:10
176:17,18 177:8
185:23 191:2
**scenario** 29:21
192:11 196:15
242:2,3
**schedule** 195:22
**school** 55:18 64:25
95:9 100:25 101:7
109:25 110:3,11
119:21 129:1
156:24 157:7,10,16
158:24 170:11
172:14,20 173:17
174:2,13,16 175:1
189:7 192:10,24
193:8,13 194:7,8
194:16 196:15
201:23 213:11
214:1 216:11
219:17 222:1
230:13,14 233:20
244:23 246:6
250:12
**school's** 139:21
140:4 169:22
201:12 202:15,18
213:20
**schools** 86:17 87:4
95:10 131:14
133:17 146:18
148:22 149:5
156:15 159:12,17
171:25 172:8
201:13 202:19
210:8 222:22
245:15,20 247:7,17
248:12,13,19 249:8
249:12 250:4,6,18
250:19

scientific 245:3,8
screen 140:18
247:11
se 115:7 126:12
seal 255:20 257:12
sean 124:5
searching 52:17
sec 246:12
second 17:3 73:13
222:17 238:4,13
secondary 244:8
248:9
section 82:11 208:1
208:3 222:13 224:1
224:7
see 11:12 31:23
32:24 34:20 37:14
37:15 38:4 56:4
61:2 64:22 69:10
69:11,13 72:7
73:19 77:11 87:2
88:2 89:14 90:5,19
91:4 95:3 102:22
119:8 121:18 125:6
159:4 164:19 173:3
186:1 188:23 189:1
195:7 199:2 220:8
220:24 234:5
seeing 78:12
123:20 221:22
seek 246:5
seen 5:9 30:25 31:9
48:8 49:9 51:21
55:22 56:23 57:1
57:11,19 58:21
61:19,21 63:4 71:9
71:12,17 76:19
85:21 88:24 95:4
106:2 121:1 126:5
135:20 142:9
148:14 158:1,7

160:22 162:5 191:4
199:14 215:18
select 238:23,25
247:7
selected 248:12
selections 243:6
self 230:23
send 168:5 174:23
259:13
sending 83:20
160:11 230:9
senior 14:18 18:16
18:19,20 19:2
20:16
sense 20:19 52:15
140:25 186:19
188:2
sent 83:8,18 94:8
160:8 181:17,24
182:15 186:21
229:21 231:9
sentence 99:11
164:10 205:16
sentences 95:18
separate 89:10,13
89:24 90:2,9,12
92:6
separately 128:21
248:3
series 25:11 36:1
serious 173:4,10
serves 248:17
service 9:17
services 96:18,19
97:13 99:13 100:18
242:15 244:12
set 11:6 34:10
settle 24:22
settled 23:9
seven 226:19,20

share 7:11 8:2
sharing 8:5
shear 244:25
sheet 255:7 256:1
short 44:15,19
62:23 180:8 204:16
237:14 254:4
shot 118:24
show 33:2 41:22
57:1 62:20 81:3
92:16 105:20 108:2
130:25 150:2
171:15 185:17
187:17 189:15,18
192:21 193:8 194:9
195:22 196:14,22
198:13 211:1 231:8
231:25 234:2
246:18 249:19
252:22
showed 61:1
108:19,20 138:16
154:24 219:3
showing 5:6 57:6
113:5 190:21
193:18
shows 63:17 69:7
70:3 192:22 199:20
221:6
shut 168:7 209:18
siana 1:7 179:9
sided 108:23
signature 256:22
257:19 258:21
259:12
signed 259:13
significant 129:4
129:17 133:18
168:6
significantly 97:13
99:13

signing 259:16
similar 19:6,15
20:3 95:10 148:11
148:15 195:5
similarly 159:12,17
simple 49:8
simpler 31:14 32:6
32:8,9,13,15,21
33:1 35:3,5,11
39:21 40:24 41:5
simplified 35:15
simplify 49:18
simplifying 55:7
simply 79:12 94:24
99:22 112:22 113:5
201:22
simultaneously
140:9
sincerely 259:19
single 11:8 67:21
236:24 237:2
sir 44:23 46:9,13
48:9 49:12,19
91:19 93:1 99:7
119:1,9 122:3
137:21 176:22
202:17 234:9
249:14
sit 22:14 25:5,6
54:22 87:23 96:7
101:21 103:19
115:13 119:15
122:18,25 127:17
131:8 156:22
157:20 161:9
164:24 169:8
194:25 201:4
225:16 249:10
250:16
situated 159:12,17

**situation** 52:10 181:16

**size** 158:24 164:12 244:6,10,12,25 245:2,8,19

**slightly** 94:12

**slower** 42:6

**smaller** 235:5

**software** 74:17,19 74:24 129:1,3 130:5,6,19 139:14 139:21 140:3 141:7 141:11,24 142:3,24 143:5 145:12 149:1 149:4 151:4,21 162:15 163:9,12,22 163:23 165:3,5 166:23 167:8,17 175:14

**sole** 102:5,10 173:7 173:9 205:11

**solutions** 259:1

**solve** 214:20

**solved** 215:10

**solvency** 203:21

**somewhat** 151:13 226:13

**sooner** 101:17

**sophisticated** 98:8

**sorry** 5:12 12:12 14:17 44:15 45:12 46:13 63:8 73:4,14 80:18 117:14 120:15 123:4 136:2 147:14 159:25 173:20 181:8 183:6 188:11 206:24 213:5 222:18 223:8 224:3 245:21 246:16 248:14 253:1,4

**sort** 140:12 226:12

**sorts** 16:15

**source** 28:5,8 117:24 119:2,2 123:15 209:17,18 246:20 252:15

**sources** 12:23 46:20,22,24 47:1,3 47:5,7,9,11,13 48:25 65:21 66:1 114:20 118:8 122:24 123:7 248:18

**south** 259:2,14

**southern** 1:1

**space** 246:5

**speak** 30:20 125:13 125:16 172:2 246:8

**speaking** 26:5

**specific** 43:24 53:24 54:21 55:12 58:20 59:1 77:24 77:25 117:2 122:11 139:3 149:12 151:6 169:9 213:3 217:15 219:19 222:22

**specifically** 11:10 11:14 46:16 48:12 48:20 74:3 89:4 97:16 99:10,16 114:5 133:5 135:9 155:4 225:20

**specificity** 235:20

**specify** 184:1,1,3

**speculating** 85:20

**spell** 14:8 22:23,25

**spend** 9:8 106:5

**spending** 9:4 211:2

**spent** 48:18 148:19 182:6 211:3

**spot** 76:17 77:6 152:23 165:20 166:2,13,14 251:17 252:4

**sr** 185:25 186:4 197:16

**srs** 197:11,16

**st** 259:6

**staff** 152:14

**stakeholders** 225:22

**stamp** 11:3,6 46:8

**stand** 177:6 225:2

**standard** 124:15

**standing** 190:10

**star** 119:7

**stars** 43:21 44:7,8 44:11,24 45:2,9,18 46:4,4,10,17,21,23 46:25 47:2,4,6,8,10 47:12,14,17,21 48:1,7,13,18,21,25 49:7,9,13,21,25 50:1,2,4,6,10,13,15 50:16,20,24 51:2,7 51:9,10,13,15,23 51:25 52:1,2,3,13 52:17,22 53:5,6,16 54:5 55:10,14 56:4 56:14,17,19 57:2,8 57:11,19 58:3,4,19 58:19 59:13 60:3,9 60:24,24 61:1,9 62:4,6 65:7 67:2,14 69:7 70:24 74:23 85:7 90:18 93:11 102:3,8 103:5,6,22 103:24 104:3,4,24 105:14,18,25 107:15,23,25 108:4 108:8,17,19,19

113:3 114:11,15,23 115:5,6,7,11,16,18 115:19 116:3,10,14 116:14 117:10 119:13 120:4,24 121:17,20 130:25 133:11 136:2,6 138:19 139:2 141:18 142:7,21 143:19 158:12 160:9,16 161:1,17 162:3,5 184:5,18 184:19,21,24,25 185:3,5,9,12,16,20 186:10,14,19,23 187:7,8,9,11,15,19 188:3,15,20,24,25 189:2,10,16,25 190:6,22 192:1,14 193:3 194:9,14 195:13 196:8 197:1 197:6 198:12,19,23 199:5,10,20 200:1 200:3,20,22 215:24 219:4 220:25 221:12 223:3

**start** 6:3 51:11 68:3 76:23 149:18 158:6 158:10,15,16 179:3 187:20 217:18,19

**started** 106:13 158:5 189:12 242:14

**starting** 223:2

**starts** 71:2 224:2

**state** 1:17 23:3 211:14 224:25 225:4 255:2,13 257:3,23 258:3

**stated** 75:15

[statement - substantiation]                                                      Page 297

statement  7:1 11:7
37:12,13 48:5 58:8
59:3,19 65:14,23
78:18 80:1,14
81:23 83:9 89:17
91:14 124:17
125:24 128:6 129:6
144:4 162:21 163:5
163:19 164:15
180:18 181:5
197:24
statements  43:16
106:17 107:12
124:12 134:10
136:5,15 137:16
212:8 222:6
states  1:1 89:4 95:9
154:19 244:9
status  110:8
stay  137:22
ste  259:14
stems  204:3
stenographic
258:11
stenographically
258:8
step  39:25 110:2,6
136:12
stewart  1:7 179:9
stifel  246:20,20,22
247:6,16 248:19
stopped  135:21
storch  2:3 4:13
9:24 10:15,22
11:19 12:2 22:8,11
30:6 259:5
storchamini.com
259:7
stored  17:13
storing  29:12

stream  252:13
street  2:4
strike  7:16 10:12
11:15 22:7 28:21
28:22 52:20 53:9
60:15 70:9 71:3
73:4 76:7,10 86:18
126:24 156:13
157:14 159:8 164:1
179:1 183:1 202:16
231:20 243:8
251:21
strongly  122:1
structure  7:22
student  45:3,6 53:5
53:6,8,12,17,18,19
54:17,19 55:4,14
56:6,21 57:10,22
57:23,23 58:10,18
59:25 60:1,6,10,17
61:24 62:3,10,11
66:8,10 67:7,8,23
68:24 69:3,19
70:20,21 72:3
73:21 79:7,11,13
79:19 80:10,24
82:25 83:4 86:13
92:10,13 94:5
95:20 96:2,6 97:14
97:16 99:14,16
104:20,22 107:18
108:9,10,25 109:2
109:23 110:17,18
110:18,21 115:25
116:4,15 117:2,4,8
117:12,17 118:3,5
118:8 119:3,5,8,13
119:15 120:4,10,13
120:16,19 121:2,7
121:12,16,17 122:5
122:22,25 123:16

123:20 128:25
129:2,16 130:4
133:15 136:3
138:25 145:21
148:4 150:2,13
151:3 158:5,10
162:16 163:14
164:22 165:6,14
167:3 170:25 171:4
184:7 186:4,8,25
187:2 188:23 189:1
192:11,15,21,22
193:7,12,14,17,20
194:11,12 197:18
197:19 199:1
200:17 215:16,22
218:6,11,22,24
219:6 221:22 222:2
student's  105:14
107:20 121:7 171:6
191:23 192:1 193:6
193:9 194:10
students  54:12
55:24 59:6 60:19
60:25 61:3 65:2,3
66:9 67:2,3,7,23
69:18 78:6,16,19
79:1 80:8 81:5 91:7
93:24 94:7,9 95:21
96:3 103:14 109:24
110:1,13 111:2
116:9,18 119:21
146:17 148:22
149:5,23 157:13,14
157:16 158:6,15,16
187:23 188:9 196:9
196:20,21 198:7,11
216:13 217:5
study  5:24 6:3,5
250:11

studying  197:25
stuff  154:16
subject  60:21
111:24 178:22
194:6,19 234:10
243:3
submitted  33:4
58:11 76:10
substantial  102:2
150:18 151:23
174:11,14 185:17
substantially  96:20
241:13
substantiate  54:24
55:3,4 67:24 73:21
78:6,17 112:3
119:22 168:25
170:6,18,20,24
171:12,24 174:24
175:2,6,9 187:25
191:12 194:4 230:3
230:14 234:24
substantiated
55:24 68:11,20,21
75:12,14 83:21,24
84:1,5,15 85:3,13
85:16 87:25 104:16
104:18,19,20 105:3
108:1 109:8,11,14
130:23 132:4,19,22
133:2 168:5 169:11
169:12,14 170:7
174:18 186:21
196:7,10
substantiating  76:6
132:25 171:4 196:9
230:6
substantiation
108:24 109:2
144:13,18 146:13
187:16,18,21

subtract 40:8
subtracting 228:25
success 241:13
  242:21,22
suffering 175:13
sufficient 59:6 65:4
  66:8 89:11,25
  90:10 92:2 113:23
  119:21 239:3
  240:12 241:21
suggest 56:24 70:1
  70:5 78:24 80:9,22
  81:15 82:24 96:24
  135:20 211:24
  221:24
suggested 78:16
  93:3 95:4 158:12
  188:17
suggesting 69:24
  77:8 130:10 131:9
  142:10 161:16,19
  162:1 189:22,24
  209:16 216:6
  221:22
suggestion 79:6
  91:6 137:11 143:5
  218:2
suggests 79:23
  85:22 199:25
  219:14
suite 259:1
sum 84:15 85:2
  196:23,23 229:25
sumberg 2:8
summaries 15:18
summarized 15:13
summarizing
  190:21
summary 43:16,17
  123:8,11 224:1

sums 84:4
supplemented 32:5
supplier 22:19
  23:24
support 14:4,11,14
  56:7,21 57:10 65:5
  69:18,19 70:21
  79:14 83:9,14
  97:23 99:24 100:4
  100:17 101:2,7
  103:9,13 104:21
  124:6 194:5 207:16
  218:3 230:11
supported 57:22
  62:10 65:2 68:24
  69:3 92:22 93:9
  114:1
supporting 20:3,4
  62:4 102:23 104:11
  104:14 114:9 198:7
  221:20
supports 95:5
  218:6
suppose 59:18
  87:24
supposed 110:19
  112:2 178:12,20
  184:6 196:8
sure 11:24 12:17
  14:7 26:9 31:21
  36:22 56:9 59:23
  71:9 94:7 98:25
  111:19 117:17
  122:25 127:7
  139:25 141:23
  150:4 160:2 170:18
  170:21 186:14
  194:6 198:13
  225:22 227:8
  229:24 231:12
  236:3 245:22

249:15,21 250:16
surrounding 32:20
survivability 182:3
suspect 29:24
  122:1
sustain 233:6
suzanne 1:16
  257:22 258:6,23
swear 4:11
sworn 4:20 124:17
  128:6 216:5 255:5
  257:10
sx 123:9
system 17:10,11,13
  43:20 44:1 45:3
  53:16 59:2 61:10
  72:4,10 76:13
  110:4,12 111:1,19
  111:22 116:10
  129:10 141:3,16
  142:6 162:12,12,14
  165:23 184:19
  199:5 217:12
systematically
  35:25
systems 52:9 129:1
  129:3,16 133:16,16
  162:18

**t**

t 14:10
t4 192:25 193:4
table 242:11 243:7
  243:9 245:15,20,21
  245:22
take 21:9,10 26:21
  34:18 39:24 44:15
  46:9 62:16 80:11
  81:4 87:12 88:4,16
  122:3 123:6 128:8
  136:12 144:4
  145:14,15 151:13

151:15,22 152:13
  152:20 164:7
  178:12,20 180:3
  193:3 219:5
taken 1:16 44:19
  62:23 94:7 113:18
  152:14 175:3 180:8
  204:16 237:14
  254:4 255:6,6
  259:10,15
takes 151:2 171:23
  172:20
talk 15:8 25:9
  27:15 42:6 71:9
  74:23 76:24 81:20
  82:19 84:22 94:18
  103:21 107:9
  112:16 113:2
  125:14 142:16
  143:22 153:19
  181:6 197:6 214:8
  214:24 220:3,22
  222:12,15 224:23
  232:18,23 233:14
  238:12 248:2
talked 60:9 71:1
  80:18 92:25 103:11
  106:20 115:1
  118:11 120:2
  158:22 163:1 164:9
  174:20 199:12
  200:8 202:4 203:14
  204:3,4 205:5
  215:2 219:13
  233:19 249:17,24
talking 15:9 24:11
  37:17 42:7 54:16
  54:16 58:16 59:24
  70:24 80:5 81:12
  95:2 112:12 129:24
  133:22 136:11

137:21 147:2,4
149:2 162:10
165:10 176:20
187:7 198:21 202:1
208:11 214:9 215:1
215:20 220:1 223:4
223:11 229:23
230:17 232:8,11
235:13 246:23
**talks** 135:25 222:20
222:25 223:20
**tandem** 139:4
**team** 14:11,14
20:16 125:15
**tecum** 5:8
**tell** 18:4 43:4 45:25
47:23 48:17,20
49:20 50:14 51:9
79:3 82:15 93:1
101:22 105:22
114:15 119:9,14
130:14 144:11
148:19 156:23
157:11 185:9
189:11 200:13,14
200:25 202:7 206:8
226:5 234:10 236:5
243:10 249:14
**telling** 48:19 93:6
**ten** 17:6 23:12
48:19 247:17
**term** 59:17 106:25
107:7,8 108:11
125:5 158:15,16
166:13 179:15
182:3 186:6 196:16
196:17 215:5
218:22 239:4,7,12
240:12
**terms** 9:18 18:18
26:5 27:20 71:15

71:21 75:20 143:9
157:5 170:23
181:17 217:25
245:2
**test** 179:5
**testified** 4:20 21:18
22:4 36:6 37:2
50:21 51:24 78:14
80:2,4 81:13 98:9
99:1 126:3 148:8
152:22 154:24
159:16 163:7 172:8
173:12 229:1 237:5
**testify** 6:8,25 7:7
23:4,5
**testifying** 26:10
37:15 186:17
**testimony** 5:24
6:23 7:3 20:21
37:19 38:3 42:15
44:10 45:1 47:16
51:21 53:23 54:10
54:15,21 64:3 67:2
67:5,11,18 68:2
69:23 70:3,15,25
71:17,23 74:10
79:4 80:6,13,16
81:12,16,17,19,22
83:5 84:17 85:18
85:21 98:10 102:11
102:15,17 103:12
103:25 106:2
107:17 114:11
126:6 129:10,21
131:8 132:1 133:4
133:6,14,21,22
134:1,2,4,18,22,23
134:24 136:20
139:12,13 141:5,7
142:4,10 143:4,7
145:5 148:14

149:20 151:7,10,12
154:23 155:14
158:1,7,12,14,18
160:16 163:1,6
166:22 167:8
171:18 188:17
195:21 198:8,25
199:7 200:7 206:1
206:18,21 211:23
213:23 215:18
216:5 218:2 219:14
220:1,16 227:17
232:18
**text** 153:22,24
154:2,6
**thank** 11:24 24:14
29:5 30:22 33:7
49:23 50:2 75:15
75:19 86:4 99:6
106:12 119:18
122:20 218:16
224:12
**thanks** 5:5,12
188:6
**theme** 35:18
**theoretical** 110:7
188:2
**theoretically** 202:8
**theory** 55:23 105:1
139:4 190:1 201:4
**thing** 33:22 34:25
50:17 76:20 182:5
184:4 228:15
**things** 8:24,24 9:2
9:18 10:6 11:3,13
12:9 16:2,15 20:18
21:15 25:22 27:24
28:1,3 29:11 31:15
31:21 32:4,21 34:3
39:21 45:4 51:14
52:16 55:5 56:16

58:21 61:4 68:3
74:11 76:17,24
79:14 85:23 91:25
104:9 106:17,20
107:11,12 114:12
115:23 130:12
131:9,10 134:15
135:10,10,19
139:14 141:6,8
152:12,25 155:14
156:2 167:23 168:1
168:10 169:3,4
174:21 176:6,7
180:2 181:6,21
182:13 184:16
185:2 199:3,14
204:5 208:9 210:16
211:18,20 212:14
213:7 214:22
221:13 223:21
228:3,23,24 230:9
230:20 233:12,23
234:1,4,13 235:15
235:19,21,25 236:3
237:6 240:7 246:10
**think** 12:7 21:8
22:14 25:2 26:7,11
26:12 28:2,2 31:12
35:6,13,18 37:2
39:5 41:3 46:7
47:20 50:16 55:21
59:23 62:13,18
81:19 83:22 86:2
96:6 98:12,17
106:6 108:23 115:1
115:13,15 118:22
132:6 135:4 136:16
136:22 137:1
138:23,24 140:19
140:22 151:12
153:14 157:9

159:15 165:4,7
168:23 176:2,19
181:8 182:5 203:4
203:4 205:5 219:5
219:24 221:18
224:13 226:4,6
227:1 229:6 233:22
234:7 235:10,13,23
236:6 245:12
249:18,23 250:7
253:1
**thinking**  155:5
226:21 244:22
**third**  1:10 17:3
28:16 162:13
249:22
**thought**  36:20
165:22 230:23
248:16,21 249:1
253:16
**thousand**  146:12
146:13 150:24
**thousands**  148:3
150:16 151:20
**three**  64:10 74:15
87:22 95:23 131:3
131:7 138:11,12
139:4 220:25
233:15
**threw**  194:23
**time**  4:8,9 6:12,19
6:19,20 9:4,8,13,15
27:23 34:19 44:18
44:21 46:9 57:12
57:21 60:12,15,18
62:22,25 67:1
68:24 69:4 72:17
72:20,22 73:3
75:23 76:6,17,18
77:9 78:1 81:11
95:11,11 101:11

105:9,12 106:5
110:11 111:4 112:2
112:13,17,21
113:11,17,20
117:22 122:3 125:8
126:16 127:11
128:1,14 130:23
131:17 132:7 133:6
133:12 134:14
136:10 143:15
144:19,20,21
146:15 147:5 151:8
151:14,19,23 152:9
152:14,20,24
153:15 156:20
161:3 163:25 164:2
164:7,8 166:2,2,24
168:11 171:2
173:16 174:5,9,11
175:7 177:25 180:7
180:10,12,24
181:22 182:3,6
185:6 197:5 198:14
203:20 204:11,15
204:18 214:3
216:12 217:10,11
217:19 219:5
224:14,19 233:10
234:7 236:4 237:11
237:13,16 239:25
240:1,5,20 243:18
243:19 251:24
253:13 254:3,6,13
**timely**  127:2,14
165:16
**times**  36:7 57:1
68:14 69:7 85:7
91:6 92:15 93:11
98:10 99:2 104:1,5
104:6 109:10 115:9
121:1 129:23

131:11 138:11,13
139:5 142:10 143:4
150:23 153:2 166:7
166:13 199:25
**timing**  185:4 194:1
194:3 198:24
199:12 200:23
**title**  18:11,19 45:5
56:25 60:20 83:11
84:22 86:4 87:2
89:9,12,19,23 90:1
90:8,11 92:21
93:23 94:14 95:11
95:12 104:15
109:24 113:24
129:5 132:19,22
133:19 139:10
158:8,8 163:15
164:11 168:14
177:10 191:25
202:24 203:25
204:23,24 205:3,17
206:4,16 207:6
208:4,22 209:1,7
210:9,17 211:7
212:14 213:4
214:13,22 223:3
225:6 228:2,3,5,7
229:7 233:16,19
234:6 236:14,19,25
253:15
**titles**  18:12,19
**toam**  14:10 18:18
19:14
**today**  4:7 5:5,16,20
5:25 6:9,19 10:7
16:3,16 17:20
19:11,13,19,22
64:4 81:19 118:15
203:15 230:18
243:11,15

**told**  30:7 109:17
121:22 136:13,16
141:23 168:2 237:9
248:22
**top**  64:17 174:10
**total**  116:4 120:10
120:15,19 121:5,5
187:21 198:21
**totally**  7:5 235:2
**totals**  121:18
**touch**  223:15
**tower**  2:4 259:1,6
**track**  39:6 45:4
89:12 90:1,11
158:12 240:17
**tracked**  35:3,9,23
35:24 36:6,10,23
43:21,22,25
**tracking**  38:2
42:16,22 90:16
186:20
**traditionally**
228:23
**training**  9:1,18
**transaction**  69:16
110:22 120:18,22
120:25 121:2
**transactions**  66:3
**transcribed**  140:1
**transcript**  258:9,10
259:11,13
**transmitted**  96:17
141:17 162:17
**trial**  6:23 7:1 21:20
23:5 24:20 43:9
235:17
**trials**  22:5
**tried**  28:6 38:8
172:10
**triple**  164:12

**trouble** 31:18 38:6
58:1 201:18
**true** 78:19 79:1
135:15 255:5
258:10
**truly** 242:19
**trust** 89:10,24 90:9
**trustee** 1:4
**truth** 155:21
**try** 17:14 49:18
59:5 127:11 140:15
140:15 175:9 251:6
**trying** 27:3,22
44:13 143:9 174:12
175:5 188:3 189:9
190:12 191:12
210:1,11 213:25
216:8 234:5
**tuition** 95:20 96:2
193:7,14
**turgot** 79:22 81:13
199:12
**turn** 89:2 95:7
96:13,18 97:10
100:15 101:14
123:24 124:16
162:7
**turned** 52:9
**twenty** 55:19
**two** 22:14 62:17
65:21 66:1 68:15
70:2 95:17 108:25
131:2 132:9 133:17
147:10,16 174:20
185:1 189:20 194:5
194:5 199:2 212:6
220:24 223:13
230:8,19 237:21,24
238:19,22 239:18
253:25 259:14

**type** 86:22 119:13
120:4,18,22 121:3
**types** 46:5 120:25
188:16
**typical** 251:17

**u**

**uh** 153:13
**ultimately** 241:1
**uncomfortable**
239:21
**uncover** 102:18
179:24 211:22
212:3
**uncovered** 81:21
101:22
**underlying** 60:18
95:1
**underneath** 61:2
**undersigned** 257:6
**understand** 8:23
10:19 13:3 27:4
31:6 44:8,11,24
45:2 48:15 49:14
49:16 51:10 54:23
55:23 63:13,14,25
66:7 68:16 69:8
74:19,22 77:7
81:24 83:6 84:1
101:4 102:4 106:10
107:10 108:10,12
111:16 112:1
114:22 115:21
117:10 120:12,20
124:20,24 125:20
126:3 136:20
139:19 140:2,23
141:3,5,7,16,21
142:2,25 143:9
147:13 155:4
157:24 161:24
166:16 167:24

170:10,24 172:16
173:11 177:4,18
179:7,12 181:8
186:4,7 187:23
191:5 193:16,25
195:4 199:6 202:23
204:8 205:21 206:6
206:12 209:4 210:2
210:11,14 211:17
213:21,25 216:7,16
216:18,22 228:21
232:8,14 234:9
235:23 237:20
239:20 244:21
247:14 249:11
253:22
**understanding**
20:10 24:23 55:8
55:17,22 57:3
83:17,19 87:7
110:2 137:9 141:24
142:3 147:23,24
148:6 149:21
150:19 157:4 158:2
158:3 160:7 165:25
166:3 178:15 190:4
190:5 192:6 194:21
195:5,21 197:8
206:1 211:12 213:9
**understood** 26:2
54:11 68:17 86:12
87:1 105:25 124:11
132:1 146:10
158:20,21 161:21
161:25 171:9 172:7
174:17 185:7
188:14 189:11
193:22 212:21
214:21 225:21
227:24 236:13

**undertaken** 107:1
**unfortunately** 91:2
**unique** 242:1
**united** 1:1 244:9
**universe** 28:18
**unrelated** 203:21
**unsubstantiated**
35:8,22,25 38:2
41:6,12,14,18 42:2
42:10,23 72:11
75:4,9 76:13 77:2
107:4 131:12 138:2
143:10 144:7
146:25 148:6
159:23 160:4
174:17 207:25
212:4 213:6 214:10
214:21 231:2
**unsubstantiation**
186:16
**unusual** 71:21
213:10 251:25
252:2
**unusually** 71:15
**unwinding** 228:22
228:23
**updated** 16:2,18,23
16:24
**upload** 73:23 74:7
74:24 77:18 109:3
110:12,23 141:9,25
142:12 147:25
166:14,15 170:2
192:8 194:11
**uploaded** 71:16
72:3,10 109:16
142:7 143:2,18
149:22 186:25
192:5 193:17
194:15

**uploading** 73:20
142:20,21 171:5
**uploads** 71:21
142:14 143:23,23
**upstairs** 62:18
**urge** 98:5
**use** 45:5 49:1 63:23
63:24 64:19 166:13
177:10 196:16
209:17 241:11,22
244:1 252:3 253:11
**uses** 242:25
**usual** 252:2
**utilize** 63:20
**utilized** 41:7 52:14
252:8
**utilizing** 239:22
252:16

**v**

**v** 255:6 256:2
**vague** 149:19,25
235:18
**vaguely** 145:4,7,8
**valuation** 21:15
203:15 207:17
237:19,24 238:20
238:21,24 240:14
251:14 253:23
**valuations** 246:9
**value** 177:13 238:2
238:5,9,15,20
241:16 243:2
250:14 253:14
**valuing** 242:2
**various** 43:17
63:15 167:21 197:5
225:4,7,12
**vary** 251:3
**vast** 116:15
**verbally** 30:20

**verbatim** 12:1
**verified** 149:1
**verify** 137:15,18
148:20
**veritext** 259:1,21
**veritext.com.**
259:14
**version** 16:11 17:3
17:3,3,7,8,15,16,17
17:21,21,23
**versions** 15:23
16:13,19 17:12
63:24
**versus** 4:5 32:12
58:4 59:13 65:7,12
135:13 171:16
182:19 196:7 210:7
210:19 227:10
244:17 250:8
**vice** 18:24,25 19:2
**video** 1:14 4:2
237:10 254:13
**videographer** 4:2
44:17,20 62:21,24
63:7 113:16,19
180:6,9 204:12,14
204:17 237:12,15
254:2,5,12
**videotaped** 4:3 5:8
**view** 18:20 52:22
92:5 206:11,13,14
220:23 239:12
**viewed** 83:25
**violate** 95:23
**virtue** 193:14
**vis** 107:20,20
**vitale** 1:16 257:22
258:6,23
**vs** 1:6 259:8

**w**

**wait** 98:23 122:6
**waived** 259:16
**want** 12:17 25:9
26:21 27:9,14
30:19 34:18 39:9
39:11 46:9,14
59:15,15 62:18
64:17,19 65:12
70:7 71:5 81:12
82:19 85:17 95:7
95:17 98:1,25
107:15 109:20
112:17 118:23
122:4 124:16,17
132:13 155:4,4
161:22,24 171:25
176:22 196:16
197:22 202:10
205:2 206:25
208:20,23 209:2
216:16,24 220:3
225:3 226:5 230:19
233:25 237:18
241:14 251:5
**wanted** 13:11
17:19 245:21 252:9
252:11
**way** 11:1 15:10,24
22:25 52:5 59:11
66:13 71:22,25
73:7 91:5,15 97:3,7
102:22 116:22
125:25 128:7,22
129:19,22 134:12
140:7 143:22
144:16 149:12
152:3 163:21
164:16 165:9
167:17 170:16
186:22 190:12

196:13 200:9 202:4
202:13 216:8
218:15,16 234:17
234:18 235:22
241:5 243:8 253:16
**ways** 186:7 214:24
**we've** 13:9 70:23
88:18 103:11 162:9
200:7 203:14 204:4
214:7 220:1 233:19
**week** 151:16
**weekly** 143:23
**weight** 135:5
**weissman** 9:25
11:19 12:3
**welcome** 95:16
98:16 99:7
**went** 17:10 55:15
106:2 114:18
210:22 242:10
**whoa** 176:19,19,19
**wire** 110:17 185:21
232:21
**wired** 198:23
**wires** 185:5 232:21
**wiring** 175:6
196:18 231:13
**wish** 8:23 31:17,19
39:24
**wished** 30:24 31:9
31:12 39:12,20,20
110:1
**withdraw** 100:7
130:2
**withdrawals** 97:15
99:15
**withdrew** 93:24
97:16 99:16
**witness** 4:11,13,18
4:21 5:13 6:12,18
7:5 9:12 16:22

19:21 20:24 21:20
23:19 24:15 25:5
25:20 29:20 34:23
36:14 37:2 38:6,25
39:5,19 40:5,19
41:3,21 42:13,25
45:12 50:23 51:5
53:1,15 54:3 56:12
58:1,14 59:10 60:8
61:15 62:2,20 63:8
65:25 67:11 68:1
69:6,22 72:13
76:16 77:5,21 81:1
82:1 83:2 84:16,19
85:11 87:16 88:11
93:16 94:18 96:6
97:3 98:2,9,25
100:2 101:11
102:10 103:11
104:9 105:1,9,17
107:7,25 108:14
109:7,16 110:6
111:7,15,24 112:10
114:18 116:3,12,21
117:8 118:17
119:12 120:2
121:15 123:18
125:11 126:2 127:4
127:16 128:12
129:9 130:9 131:7
131:24 133:21
134:6,22 135:18
136:8,22 138:8,14
139:12 141:20
142:9 143:12,21
144:9,16 145:4,18
145:23 146:5,20
147:2 148:14,25
149:12 150:12,22
151:6 152:3,19
157:19 159:2,14

161:8,15,24 162:24
163:21 165:9,19
166:5,12,22 167:6
167:16 169:3 170:5
171:8 172:6 173:2
173:9,19 174:4
175:11,16 176:4
178:8 179:22
180:20 182:5 187:7
188:13 191:17
193:22 194:19
195:18 199:19
200:6 201:16
202:22 203:24
205:14 206:18
207:15 208:7
209:15 210:14
211:16 213:3,15
214:7 215:18 217:7
217:24 218:14
219:2,13 220:20
222:4 224:18
227:23 230:5
231:12,25 233:8
236:13,22 237:5,23
239:25 241:5,20
242:24 245:7
247:19 250:16
255:20 256:22
257:12
**witnesses**   69:10
74:17 78:10,11
79:15 80:13 102:17
106:18 107:8
143:14 158:22
216:5,15 220:2,4
**wood**   24:1,11 86:6
**word**   15:21 140:21
177:3
**worded**   100:11

**words**   8:8 17:2
53:25 75:16 92:18
94:12 105:5 106:8
116:7 121:6 155:6
155:8,12 156:7
170:1 187:17 193:5
213:12 226:5
243:20
**work**   6:20 7:6 8:1
17:25 19:9,24 20:2
21:15 22:6,9 23:14
24:9,17,24 25:14
36:15 38:25 39:3
56:13,17 58:21
59:10,11 69:25
72:1,2 74:8 75:25
91:1 92:14 93:6,10
113:9 124:25 125:5
139:4 153:15
159:11 179:17
208:7 221:19
223:24
**worked**   22:3 23:15
**working**   18:17
23:20 29:11 55:14
125:2 134:11,20
136:18 140:20
**worth**   110:1,20
111:2,20
**wright**   2:6 4:12,12
5:10,12 6:11,17 7:4
9:11 12:14 13:9,15
13:20 16:21 18:2
19:20 20:22 21:19
23:18 24:11,14
25:4,19 26:3,7,11
26:18,23 27:1,6,11
28:25 29:3,19 30:8
30:16,21 33:6,11
34:22 36:13 37:1
38:5,24 39:4,15,18

40:4,15,18 41:2,20
42:12,24 44:13
45:11 50:22 51:4
52:25 53:14 54:2
57:25 58:13 59:9
60:7 61:11,14 62:1
65:24 67:10,25
69:5,21 72:12
76:15 77:4,20
78:20 80:25 81:25
83:1 84:18 85:10
87:15 88:10 93:15
94:17 96:5 97:2,24
98:3,7,11,14,20,23
100:1 101:10 102:9
103:10 104:8,25
105:8,16 107:6,24
108:13 109:6,15
110:5 111:6,14,23
112:9 114:17 116:2
116:11,20 117:7
118:16,19,24
119:11 120:1
121:10,14 123:17
125:10 126:1 127:3
127:15 128:11
129:8 130:8 131:5
131:23 133:20
134:5,21 135:17
136:7,21 138:7,12
139:11,23,25 140:8
140:11,15,22
141:19 142:8
143:11,20 144:8,15
144:25 145:3,17,22
146:4,19 147:1
148:13,24 149:11
150:11,21 151:5
152:2,18 157:18
159:1,13 161:7,23
162:23 163:20

164:17 165:8,18
166:4,11,21 167:5
167:15 168:16
169:2 170:4 171:7
172:5 173:1,8,18
174:3 175:10,15
176:3,19 178:7
179:21 180:19
182:4 187:6 188:6
188:12 191:13,16
193:21 194:18
195:17 199:18
200:5 201:15
202:21 203:8,23
205:13 206:17
207:14 208:6
209:14 210:13
211:15 213:2,14
214:5 215:7,17
217:6,23 218:13
219:1,12 220:19
222:3 224:17
227:22 230:4,21
231:11,24 233:7
236:12,21 237:4,22
239:24 241:4,19
242:23 245:6
247:18 250:15
254:7 259:5,9
**write**   32:17,18,21
70:4 103:13 153:3
153:6 154:21
221:13,15,21
**writes**   124:19
125:18 128:1,24
**written**   15:17
153:8
**wrong**   73:12
127:10 136:17
253:2

**wrote**   168:23 172:8
244:2

**x**

**x**   3:2

**y**

**yawn**   1:7 179:8
**yeah**   27:11 39:2
50:12 82:7 104:1
136:10 154:1
188:22 190:14
196:5 227:9
**year**   9:13,13 59:2,2
61:13,25 63:19
64:15 67:22,22
68:3 69:2,2,17,17
70:16 73:3 86:9,21
100:22 101:1,9
115:25 116:1,10,19
117:5,21 131:1
134:20 148:4
160:25 183:10
212:20 214:14
226:7,24
**yearly**   158:25
**years**   18:12 21:8,12
23:12 24:15 55:11
55:19,20 58:17
64:8 156:25 157:1
183:7 210:25
239:15,18,20
240:23
**yep**   160:12 194:15
**york**   2:5,5 23:2
**yousefi**   1:8 106:19
179:9

**z**

**zutes**   134:23,24
135:1,5,15 137:6
137:13,16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS
           COMPANY CERTIFICATE AND DISCLOSURE STATEMENT


      Veritext Legal Solutions represents that the
      foregoing transcript is a true, correct and complete
      transcript of the colloquies, questions and answers
      as submitted by the court reporter. Veritext Legal
      Solutions further represents that the attached
      exhibits, if any, are true, correct and complete
      documents as submitted by the court reporter and/or
      attorneys in relation to this deposition and that
      the documents were processed in accordance with
      our litigation support and production standards.

      Veritext Legal Solutions is committed to maintaining
      the confidentiality of client and witness information,
      in accordance with the regulations promulgated under
      the Health Insurance Portability and Accountability
      Act (HIPAA), as amended with respect to protected
      health information and the Gramm-Leach-Bliley Act, as
      amended, with respect to Personally Identifiable
      Information (PII). Physical transcripts and exhibits
      are managed under strict facility and personnel access
      controls. Electronic files of documents are stored
      in encrypted form and are transmitted in an encrypted
      fashion to authenticated parties who are permitted to
      access the material. Our data is hosted in a Tier 4
      SSAE 16 certified facility.

      Veritext Legal Solutions complies with all federal and
      State regulations with respect to the provision of
      court reporting services, and maintains its neutrality
      and independence regardless of relationship or the
      financial outcome of any litigation. Veritext requires
      adherence to the foregoing professional and ethical
      standards from all of its subcontractors in their
      independent contractor agreements.

      Inquiries about Veritext Legal Solutions'
      confidentiality and security policies and practices
      should be directed to Veritext's Client Services
      Associates indicated on the cover of this document or
      at www.veritext.com.
```