# EXHIBITS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 16-62028-CIV-LENARD/GOODMAN

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC, as Trustee,

        Plaintiff,

- against -

DAVID KNOBEL, JEFFREY PIERNE,
NEAL YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI,

        Defendants.          /

## NOTICE OF TAKING VIDEOTAPED DEPOSITION *DUCES TECUM*

    PLEASE TAKE NOTICE that the undersigned attorney will take the deposition of:

NAME:        James Donohue

DATE & TIME:    Friday, February 9, 2018 at 10:00 a.m.

PLACE:        Bilzin Sumberg Baena Price & Axelrod LLP
                1450 Brickell Avenue, Suite 2300
                Miami, Florida 33131

    Such deposition will be taken before **Veritext Legal Solutions,** an officer duly authorized by the laws of the State of Florida to administer oaths or some other such duly-qualified officer who is neither counsel to either of the parties, nor related to the parties or their respective counsel, for the purpose of discovery or evidence in this cause, for use at trial or both. This deposition will be taken before any **Veritext Legal Solutions** representative present at the time and place of the deposition(s), and will be taken by stenographic and videographic means. The deponent is requested to have with him the documents requested below. The oral examination will continue from day to day until completed.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456



CASE NO. 16-62028-CIV-LENARD/GOODMAN

## Definitions

1. "Any" means one or more.

2. "Communication" means the transmittal of information by any means, including, but not limited to, conversations (whether face-to-face, by telephone or otherwise), meetings, conferences, correspondence, discussions, negotiations, opinions, letters, e-mails or other electronic or computer transmissions, memoranda, notes, reports and all other oral or written contracts or documents as defined herein.

3. "Concerning" means directly or indirectly describing, reflecting, responding to, about, commenting on, analyzing, containing, setting forth, discussing, comprising, identifying, mentioning, discussing, showing, evidencing, implying, supporting, contradicting, relied upon or referring to, or in any way pertaining to, the subject or topic in question, either in whole or in part, and shall be construed in their broadest sense.

4. "Defendants" means David Knobel, Jeffrey Pierne, Neal Yawn, Dean Bartness, Siana Stewart, and Cid Yousefi, including any and all attorneys, agents, employees, representatives, or other persons acting on their behalf.

5. "Document" means any document in your possession, custody, or control, or in the possession, custody, or control of your agents, attorneys, accountants, or other representatives and the term is used to include, without limitation the following items, whether original or any copy and whether printed, recorded, filmed, copied or reproduced by any process, or written or produced by hands, and whether or not claimed to be privileged, confidential or personal, and including all originals, masters and copies, regardless of its origin and location: all abstracts, accounting journals, accounting ledgers, advertisements, affidavits, agendas, agreements or proposed agreements, analyses, appointment books, appraisals, articles of incorporation, balance sheets, bank checks, bank deposit or withdrawal slips, bank credit or debit memoranda, bank statements, blueprints, books, books of account, budgets, bulletins, bylaws, canceled checks, charts, checks, codes, communications, communications with government bodies, computer data or printouts, conferences, contracts, correspondence, data processing cards, data sheets, desk calendars, details, diagrams, diaries, disks or data compilations from which information can be obtained or translated, drafts, drawings, emails, electromagnetic tapes, facsimiles, files, films, financial calculations, financial projections, financial statements, graphs, handwritten notes or comments however produced or reproduced, indexes, insertions, instructions, internal accounting records, interoffice communications, invoices, ledgers, letters, letters of intent, lists, logbooks, manuals, memoranda, microfilm, microfiche, minutes of meetings, motion pictures, newspaper or magazine articles, networks, nonconforming copies which contain deletions, notations or records of meetings, notes, notices of wire transfer of funds, outlines, pamphlets, papers, passbooks, periodicals, photocopies, photographs, pictures, plans, preliminary drafts, press releases, proposals, publications, punch cards, raw and refined data, receipts, recommendations, records, records of conferences or conversations or meetings, records of payment, recordings, reports, resolutions, results of investigations, schedules,

2

CASE NO. 16-62028-CIV-LENARD/GOODMAN

schematics, sepias, shipping papers, slides, specifications, speeches, statements of account, studies, summaries, surveys, tape recordings, tax returns, telegrams, telephone logs and records, telephone and other conversations or communications, teletypes, telexes, term sheets, transcripts, transcripts of tape recordings, video tapes, voice records, vouchers, work papers, worksheets, written notations, and any and all other papers similar to any of the foregoing. Any document containing thereon or attached thereto any alterations, comments, notes or other material not included in the copies or originals or referred to in the preceding definition shall be deemed a separate document within said definition. Any document shall include all exhibits, schedules or other writings affected by or referenced in any such document or other writings necessary to complete the information contained therein or make it not misleading.

6.  "Storch Amini" means Storch Amini PC, which is a New York law firm, and anyone acting as an agent thereof.

7.  "Weissman & Dervishi" means Weissman & Dervishi, P.A., a Florida law firm, and anyone acting as an agent thereof.

8.  "You" or "Your" means James Donohue.

## Instructions - General

1.  Documents responsive to these requests shall be produced either as they are kept in the usual course of business or organized and labeled to correspond with the categories in the request.

2.  These requests are directed to all documents in your possession, custody, or control, or in the possession, custody, or control of your agents, attorneys, accountants, or other representatives.

3.  The words "or" and "and" shall be read in the conjunctive and not in the disjunctive wherever they appear, and neither of these words shall be interpreted to limit the scope of a request.

4.  The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun, and vice versa. The masculine form of a noun or pronoun shall be considered to include within its meaning the feminine form of the noun or pronoun, and vice versa.

5.  Regardless of the tense employed, all verbs shall be read as applying to the past, present and future as is necessary to make any paragraph more, rather than less, inclusive.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

6.        Except to the extent protected by Federal Rule of Civil Procedure 26, each request includes a request for the original and all copies, preliminary drafts, or versions of documents that differ in any respect from the original document, such as differences in form or content or differences by reason of handwritten notes or comments. The requests include all attachments and enclosures of documents produced.

7.        These document requests are continuing in nature, and you are to serve supplementary responses and make additional documents available should additional responsive information or documents become known to you after service of your response hereto.

8.        If a privilege or other objection is asserted as to the production of any Document requested herein, please state in detail the nature of the privilege or other objection being asserted, and, with respect to any such Document, please identify the Document or writing by stating (a) the Document's date, subject matter, length (number of pages), and attachments or appendices; (b) the name of author(s) and/or source(s); (c) the recipient(s) to whom the document was distributed, shown or explained, (d) its present custodian, and (e) the present (or last known) location.

9.        If you are unable to respond fully to any document request, respond to the extent possible, and specify the reasons for your inability to respond in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document that are not being produced.

10.      When an objection is made to any request, the objection shall state with specificity all corresponding grounds.

11.      In the event that any Document called for by a request has been lost, destroyed or discarded, please identify that Document by stating: (a) any addressor and addressee, (b) any indicated or blind copies, (c) the Document's date, subject matter, number of pages, and attachments or appendices; (d) all persons to whom the Document was distributed, shown or explained; (e) its date and destruction or discard, manner of loss, destruction or discard, and reason for destruction or discard; and (f) all persons authorizing or carrying out such destruction or discard.

## Instructions - hard copy documents

Hard copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat). The database load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME" and "CUSTODIAN." The documents should be logically unitized (*i.e.*, distinct documents shall not

CASE NO. 16-62028-CIV-LENARD/GOODMAN

be merged into a single record, and single documents shall not be split into multiple records) and be produced in the order in which they are kept in the usual course of business. If an original document contains color to understand the meaning or content of the document, the document shall be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image. Multi-page OCR text for each document should also be provided. The OCR software shall maximize text quality over process speed. Settings such as "auto-skewing" and "auto-rotation" should be turned on.

## Instructions - ESI

1. Produce ESI in single-page 300 DPI GroupIV Monochrome Tagged Image File Format (.TIFF or .TIF) along with a Summation image and native load file (E-DII).

2. Provide a separate comma delimited file (.CSV), using data delimiter comma (, = ASCII 044) as the field separator and quote (" = ASCII 034) as the character(s) separator for all metadata fields available including but not limited to below list:

| FIELD NAME | Description |
|---|---|
| Docid | [Begdoc#]. |
| Auxid | [Endoc#]. |
| Attachids | Docid of attachment Documents. |
| Parentid | Docid for the parent email or document that has an attachment associated with it. |
| Attrange | Docid numbers for Documents attached to a record. |
| Pgcount | Number of pages in a document. |
| Doctype | Type of document. |
| Subject | Subject of document or email. |
| From | Author, senders. |
| To | Recipients. |
| CC | Copied recipients. |
| Datesent | E-mail sent date. |
| Datercvd | E-mail receive date. |
| Datecrtd | Date that an attached document was created, typically an email. |
| Body | Contents of the e-mail. |
| Author | File author. |
| Doctitle | Document name or title. |
| Doclink | Path or link to native file. |

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

CASE NO. 16-62028-CIV-LENARD/GOODMAN

3.   Provide OCR as single page text with a list load file (.lst).

4.   Include all native files (for both emails and email attachments) and as noted above in the metadata field list, populate the doclink field with the native file path.

5.   When the instructions above would not allow the produced Documents to be reasonably usable by Defendants, Defendants further requests that you produce any such Documents in their native format with the file type, MD5 Hash value, and path to the native file.

6.   Each party shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level. Attachments should not be eliminated as duplicates for purposes of production, unless the parent e-mail and all attachments are also duplicates. An e-mail that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an e-mail that does not include content in the content in those fields, even if all remaining content in the e-mail is identical. Removal of near-duplicate documents and e-mail thread suppression is not acceptable. De-duplication should be done across the entire collection (global de-duplication) and the CUSTODIAN field should list each custodian, separated by a semi-colon, who was a source of that document and the FILEPATH field will list each file path, separated by a semi-colon, that was a source of that document. Should the CUSTODIAN or FILEPATH metadata fields produced become outdated due to rolling productions, an overlay file providing all the custodians and file paths for the affected documents should be produced prior to substantial completion of the document production.

7.   Predictive coding/technology-assisted-review shall not be used for the purpose of culling the documents to be reviewed or produced without notifying the requesting party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

8.   The parties should meet and confer over the inclusion or exclusion of embedded files from the production.

9.   Compressed file types (i.e., .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

10.  To the extent a response to discovery requires production of electronic information stored in a database, including the production of text messages or similar communications, the parties will meet and confer regarding methods of production. Parties will consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.

11.  The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type and the file location.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

CASE NO. 16-62028-CIV-LENARD/GOODMAN

12. To maximize the security of information in transit, any media on which documents are produced may be encrypted. In such cases, the producing party shall transmit the encryption key or password to the receiving party, under separate cover, contemporaneously with sending the encrypted media.

13. If documents that the parties have agreed to produce in native format j need to be redacted, the parties should meet and confer regarding how to implement redactions while ensuring that proper formatting and usability are maintained.

## DOCUMENTS REQUESTED

1. All Documents and Communications concerning compensation for Your expert study or testimony.

2. All Documents and Communications identifying facts or data that Storch Amini and/or Weissman & Dervishi provided You and/or that You considered in forming the opinions to be expressed in Your report.

3. All Documents and Communications identifying assumptions Storch Amini and/or Weissman & Dervishi provided You and/or that You relied on in forming the opinions to be expressed in Your report.

4. All Documents referenced in your expert report upon which You based some or all of your opinions, including any sources identified in the exhibits to Your report and all Documents listed in Exhibits 2 and 2A of your report.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By:   /s/ Michael N. Kreitzer
**MICHAEL N. KREITZER**
(FBN 705561)
mkreitzer@bilzin.com
**KENNETH DUVALL**
(FBN 121826)
kduvall@bilzin.com
**DAVID W. TRENCH, ESQ.**
(FBN 0202975)
dtrench@bilzin.com
eservice@bilzin.com

7

CASE NO. 16-62028-CIV-LENARD/GOODMAN

mavin@bilzin.com
stapanes@bilzin.com
alopez@bilzn.com
*Counsel for David Knobel, Jeffrey
Pierne, Neal Yawn, Dean Bartness,
Siana Stewart and Cid Yousefi*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2018, I served the foregoing via email on Plaintiff's

counsel of record as identified below:

Brian Dervishi
Weissman & Dervishi, P.A.
SunTrust International Center
One Southeast Third Avenue, Suite 1700
Miami, FL 33131
bdervishi@wdpalaw.com
service@wdpalaw.com

Bijan Amini
Avery Samet
Lita Beth Wright
Cara Schmidt
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
bamini@storchamini.com
asamet@storchamini.com
lwright@storchamini.com
cschmidt@storchamini.com

_____/s/ Kenneth J. Duvall_____
Kenneth J. Duvall

MIAMI 5755480 82147/47883

8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC, as Trustee,

        Plaintiff,

-against-

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA STEWART,
and CID YOUSEFI,

        Defendants.

Case No. 0:16-cv-62028-JAL

**Expert Report of James J. Donohue**

**Submitted: January 12, 2018**



EXHIBIT
# 322

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

## TABLE OF CONTENTS

I.      **INTRODUCTION** ..................................................................................... 3

II.     **ASSIGNMENT AND SUMMARY OF OPINIONS** ................................ 4

    A.   FCC Value as of June 30, 2014 But For the Defendant Alleged Breaches ...............4

    B.   Forensic Accounting Analysis ...................................................................6

III.   **BACKGROUND** ...................................................................................... 8

    A.   FCC and the Defendants .........................................................................8

    B.   Title IV Programs .................................................................................10

        1)   Department of Education ................................................................10

        2)   DOE's G5 System.........................................................................11

        3)   DOE's COD System .....................................................................12

        4)   FCC's STARS.............................................................................12

    C.   Postsecondary Education Industry ...........................................................13

        1)   For Profit Education Industry Outlook ..............................................13

IV.   **FORENSIC ACCOUNTING ANALYSIS**............................................... 15

    A.   Unsubstantiated Cash Balances with the DOE .............................................15

    B.   FCC's Extensive Title IV Cash Refund Activity.......................................23

    C.   Comparison of FCC's Title IV Cash to FCC's STARS Title IV Cash Basis Revenue25

    D.   Comparison of FCC's Title IV STARS Cash Basis Revenue to DOE's COD.........28

    E.   Bad Debt Write Off in Fiscal Year 2014 ...................................................31

        1)   Bad Debt Write Off Due to the Title IV Refunds and Reconciliation............31

        2)   Bad Debt Charges Included Adjustments to Prior Periods............................34

V.    **BUT FOR ALLEDGED BREACH VALUATION OF FCC** .................... 36

    A.   FCC Absent the Defendants' Alleged Breaches ..........................................36

        1)   Continued Advanced DOE Funding ..................................................36

        2)   Timely Knowledge of FCC's True Financial Position .............................37

        3)   FCC EBITDA But For Alleged Breaches.............................................38

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al
Expert Report of James J. Donohue

B.    Premise of Value........................................................................42

C.    Fair Value using Market Approach.............................................43

    1)    Potentially Comparable Companies...............................43

    2)    Valuation Multiples .......................................................47

    3)    Comparable Company Enterprise Value Calculation Before Adjustments.....48

    4)    Adjustments for Marketability.......................................48

    5)    Adjustment for Control Premium ..................................50

    6)    Comparable Company Enterprise Value Calculation After Adjustments .......52

D.    Fair Value using Income Approach .............................................52

    1)    Run Rate Cash Flow for FCC but for the Alleged Breaches ...........................52

    2)    Discount Rate.................................................................53

    3)    Income Approach Enterprise Value Before Marketability Discount..............55

    4)    Adjustments for Marketability.......................................55

E.    Other Potential Valuation Indications.........................................55

    1)    Recent Historical FCC Equity Transactions .................55

    2)    Financial Reporting Valuations ....................................56

    3)    Financing Prior to Bankruptcy......................................57

    4)    Distressed Sale of FCC Assets During Bankruptcy.........................58

F.    FCC's Fair Value Conclusion .....................................................59

Page 2

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

## I.  <u>INTRODUCTION</u>

1.  The following is the expert report of James J. Donohue, a Vice President at Charles River Associates ("CRA"), submitted in connection with *Clingman & Hanger Management Associates, LLC, as Trustee,* (the "Plaintiff") v. *David Knobel, Jeffrey Pierne, Neal Yawn, Dean Bartness, Siana Stewart, and Cid Yousefi* (collectively referred to as the "Defendants").  As described below, I have been retained by Storch Amini PC on behalf of the Plaintiff as an expert witness in this matter to provide valuation and forensic accounting opinions concerning FCC Holdings, Inc. and its subsidiaries (together, "FCC").

2.  I am a Certified Public Accountant and have a Bachelor of Science degree in accountancy from Villanova University.  I am also a Certified Valuation Analyst and am Accredited in Business Valuation.  I am a Vice President at CRA and have attached my *curriculum vitae,* including all publications in the last ten years and all testimony experience in the last four years, as Exhibit 1. CRA is compensated on a rate-times-hours basis for the work I perform, and my hourly rate is $575.  I also direct a group of CRA consultants, who provide support to me as needed.[1]

3.  I have been responsible for substantial consulting assignments in a wide range of areas, including valuation, damages, and forensic accounting.  My valuation experience has involved many industries, ownership interests, and asset classes.  I have provided a variety of valuation and strategic consulting services for transaction, financial reporting, tax, and bankruptcy matters, including intellectual property-related fairness opinions.  For example, I have prepared numerous financial reporting valuations concerning Accounting Standards Codification ("ASC") Topic 805 (formerly FASB 141R), ASC Topic 350 (formerly FASB 142) and ASC Topic 360 (formerly FASB 144).  I have also assessed the appropriate measure of damages in numerous engagements involving a variety of claims.

4.  My forensic accounting experience includes numerous matters involving accounting and financial investigations, including substantial record reconstruction engagements.  These forensic accounting engagements have involved analyzing accounting issues, reviewing

---

[1] Neither CRA nor I have any financial interest in the outcome of this litigation.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

reserves, funds tracing, and reconstructing financial accounts based on the investigation. My clients in this area have included, among others, financial institutions, the Securities Investor Protection Corporation, the Resolution Trust Company, the Federal Deposit Insurance Company, large estates, and corporations.

5.  As part of my work on this matter, I have considered documents produced by the Plaintiff, Defendants, Accrediting Commission of Career Schools and Colleges, Bank of Montreal, Department of Education ("DOE"), TJS Deemer Dana, Education Consulting Solutions ("ECS"), Ernst & Young, FTI Consulting, Greenberg Traurig, Grant Thornton, IEC Corp ("IEC"), Powers Pyles Sutter & Verville, and Premier Education Group LP ("Premier"). These documents generally include, accounting and financial records, board of director reports, daily cash balances, Title IV fund records, budgets, forecasts, emails, agreements, and various other business records. I have also considered case filings, depositions, and public research. I had discussions with James Murphy, Plaintiff's industry expert, Ed Clingman and Teresa Hanger. A listing of the materials that I have considered in my work is attached as Exhibit 2.[2]

## II.  <u>ASSIGNMENT AND SUMMARY OF OPINIONS</u>

### A.   <u>FCC Value as of June 30, 2014 But For the Defendant Alleged Breaches</u>

6.  I have been asked by counsel for Plaintiff to estimate the fair value of an ongoing FCC business enterprise but for the Defendants' alleged breaches. The Plaintiff has alleged that the Defendants' breaches of fiduciary duty of care and loyalty caused FCC's bankruptcy and forced sale for roughly $4 million in late 2014. More specifically, the Plaintiff has alleged that the Defendants' improper use of DOE Title IV funds eventually caused the DOE to restrict FCC's advanced or more normal course use of Title IV funds, the essential source of liquidity for FCC. Despite additional capital raising and efforts to repay the DOE to restore normal course use of

---

[2] Between now and the time that I may be asked to testify at trial, I expect to continue my review, evaluation and analysis of information related to this case, as well as of relevant information presented at trial. For example, I understand that the fact depositions of TJS Deemer Dana LLP and DOE's Barbara Davis have yet to occur and I expect to review those depositions and associated exhibits after they occur. Further, I may rely on documents and other materials that have been produced in this matter as exhibits to my trial testimony. I have not yet selected which exhibits I may use. Also, I may use demonstrative exhibits and those exhibits have not yet been prepared.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

Title IV funds, the loss of timely access to Title IV funds caused a cash crisis and FCC's eventual bankruptcy in August 2014.

7. To prepare my but-for valuation of FCC, I have been asked to assume that FCC did not misuse DOE Title IV funds, and as a result, did not lose the ability to receive Title IV funds in the normal course of operations and would have continued to be a going concern. My valuation of FCC therefore assumes that FCC would have had continued timely access to Title IV funds and timely knowledge of the true cash and financial position of FCC throughout fiscal year 2014.[3] With continued traditional access to Title IV funds and timely knowledge of FCC's true financial position, FCC also would have had the ability to restrict or delay capital expenditures and the ability to raise capital in normal course as opposed to the during the cash crisis caused by the restricted Title IV funding.[4]

8. Equity transactions and valuations prepared by and for FCC indicated that the recent historical enterprise value of FCC had been in the $150 million to $200 million range. Equity transactions by FCC shareholders in April 2012 and in August 2013 suggested that FCC's enterprise value ranged from $140 million to $160 million.[5] A contemporaneous valuation prepared for FCC by Deloitte Financial Advisory Services LLP ("Deloitte") for financial reporting purposes indicated that the fair value of the FCC business enterprise as of June 30, 2013 exceeded $200 million (the "June 30, 2013 Deloitte Valuation").[6] An FCC prepared valuation for goodwill impairment purposes as of March 31, 2014 also indicated that FCC's enterprise value was greater than $200 million.[7]

9. My but-for valuation was performed as of June 30, 2014, and assumes that the alleged breaches concerning FCC Title IV misuse do not occur and that FCC would have more timely knowledge

---

[3] FCC's fiscal year ended on June 30. Fiscal year 2014 (or fiscal year 13/14) is therefore the 12 month period ending June 30, 2014 and fiscal year 2013 (fiscal year 12/13) is the 12 month period ending June 30, 2013.

[4] See for example, Deposition Exhibit 41.

[5] See Exhibit 18A and P1715937-972 at 972

[6] Deposition Exhibit 46.

[7] Deposition Exhibit 133.

Page 5

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

of FCC's true financial position.   Therefore, my valuation considers that, absent the breaches, FCC's financial position – including cash, revenue, and EBITDA – for fiscal year 2014 would have been lower than reported during the year, and that budget expectations for  fiscal 2014 would have been lower.  To estimate FCC's financial position but for the alleged breaches, I have considered FCC's actual fiscal year 2014 performance – which was eventually adjusted to attempt to reflect the financial impact of the alleged breaches – and FCC's projections for fiscal year 2015 EBITDA that were prepared in June 2014 and presented to potential investors.[8]

10. FCC's actual EBITDA for fiscal year 2014 and projected EBITDA for fiscal year 2015 can be used to approximate FCC's financial performance but for the Defendants' alleged breaches.  For example, FCC's actual EBITDA for fiscal year 2014 and projected EBITDA for fiscal year 2015 reflected millions of dollars in negative adjustments that were caused by FCC's Title IV reconciliation with the DOE.  While these millions of dollars adjustments would have occurred earlier but for the Defendants' alleged breaches, FCC did eventually reduce EBITDA to attempt to reflect the impact associated with the Title IV refunds and reconciliation.

11. Using FCC's actual EBITDA for fiscal year 2014 and projected EBITDA for fiscal year 2015 as a foundation for FCC financial performance but for the Defendants' breaches, the fair value of the going concern FCC business enterprise as of June 30, 2014 would range from $37 million to $51 million.[9]

**B.   <u>Forensic Accounting Analysis</u>**

12. Counsel for the Plaintiff has also requested that I provide certain forensic accounting analyses concerning FCC and DOE accounting records.  As described below, my analysis generally related to FCC's accounting for cash DOE Title IV funds and how that compared with the underlying student records internally maintained by FCC and provided to the DOE.  I have also been asked to review the $16.7 million in bad debt expenses that FCC recorded after being forced to return Title IV funds and reconcile the differences between FCC's Title IV records and

---

[8] These fiscal year 2015 EBITDA projections were also significantly lower than the EBITDA levels that had been contemplated by FCC as of June 30, 2013.

[9] See Exhibit 16.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

the Title IV records that FCC had provided to the DOE.  My forensic accounting findings are summarized briefly below and described in detail within my expert report.

- FCC had material unsubstantiated cash balances with the DOE throughout most of fiscal year 2014.  These unsubstantiated cash balances with the DOE grew to more than $18 million by March 2014.

- Despite roughly comparable student and revenue figures for fiscal year 2013 and fiscal year 2014, FCC's monthly DOE Title IV draw and, in particular, refund activity for fiscal year 2014, generally increased compared to fiscal year 2013.  Refund activity – which represents cash being wired back to the DOE that had been previously drawn down – increased substantially compared to the fiscal year 2013 time period.

- FCC's cumulative Title IV net cash drawn from the DOE meaningfully exceeded FCC's Title IV cash basis revenue during portions of fiscal year 2014.  The gap between FCC Title IV net cash drawn and FCC's Title IV cash basis revenue peaked at approximately $18 million as of December 31, 2013, but was eventually in balance by the end of fiscal year 2014.

- FCC's Title IV cash basis revenue and the DOE's COD records for 13/14 direct loans for FCC's three largest OPEIDs were generally comparable throughout fiscal year 2014.  However, consistent with the FCC Title IV cash basis revenue to Title IV cash discrepancy discussed above, the Title IV cash balance for these three OPEIDs was consistently above FCC Title IV cash basis revenue and COD amounts at DOE for much of fiscal year 2014 before eventually coming into balance at the end of the fiscal year.

- FCC's Title IV reconciliation and return of Title IV funds during fiscal year 2014 eventually resulted in approximately $16.7 million of additional bad debt expenses that were recorded in March, April, May, and June of 2014.  These additional bad debt expenses increased total bad debt for fiscal year 2014 to 80% more than the total amount of bad debt incurred during fiscal year 2013 (despite comparable revenues).  While mechanically recorded as bad debt towards the end of fiscal year 2014, much of these bad debt charges were not associated with writing down a valid receivable due to collection issues (like typical bad debt expenses), but were rather adjustments to essentially correct revenue and EBITDA amounts that were recorded during earlier portions of fiscal year 2014 and for fiscal year 2013.  Additionally, although these bad debt adjustments should have been associated with specific revenue, receivables, students, and schools, FCC apparently could not associate the bad debt with specific

Page 7

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

activity within the accounting system and allocated this bad debt across all schools based on relative revenue.

## III. BACKGROUND

### A.  FCC and the Defendants

13.  FCC was founded by David Knobel, its former CEO and a named defendant in this matter.  In 2004, Mr. Knobel sold a majority stake to TA Associates with Mr. Knobel retaining a minority share.  In 2007, Abrams Capital and Greenhill Capital Partners acquired the majority interest from TA Associates for $130 million and Mr. Knobel continued to retain a minority share.[10]  In 2012, FCC acquired Anthem Education Group ("Anthem"), which included 22 campuses and about 8,000 students.[11]  FCC's total student headcount at the end of fiscal year 2012 (after the Anthem acquisition) was reported to be about 12,000 students.  FCC also acquired U.S. Colleges in August 2013.[12]  FCC filed for bankruptcy in August 2014, and ceased operations and sold several campuses to IEC and Premier during the bankruptcy process.[13]

14.  FCC and its wholly owned subsidiaries, such as Education Training Corporation d/b/a Florida Career College, EduTech Acquisition Corp. and High-Tech Institute Holdings, Inc d/b/a Anthem Education Group operated postsecondary schools in the United States.[14]  Students were enrolled online and in numerous FCC campuses in states such as Arizona, Florida, Missouri, New Jersey, and Pennsylvania.  FCC offered master degrees, bachelor degrees and associate degrees in various fields such as business administration, criminal justice, healthcare management, nursing, paralegal and many others.[15]

---

[10] Deposition Exhibit 29; FCC PPA Report June 07 FINAL (2).pdf.

[11] P1715788 at 797 and 797; P1676352 at 362.  Net amount was $16.6 million.

[12] Relative to Anthem, U.S. Colleges was a much smaller acquisition and had annual revenues of about $4 million.  See P1158075 at 085.

[13] Amended Complaint, dated June 28, 2017.

[14] P1715937-972 at 946.

[15] P1689617-681 at 622; P1463058.

Page 8

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

15. FCC's revenues were reported to be approximately $231 million during fiscal year 2013 (the first complete year after the Anthem acquisition) and approximately $232 million during fiscal year 2014.[16] While revenues were reportedly flat, campus operating profit and EBITDA before Special Items decreased from $53 million and $29 million, respectively for fiscal year 2013, to $35 million and $9 million, respectively, for fiscal year 2014.[17] As discussed below, this profit decline was associated with the bad debt charges from FCC's Title IV refunds and reconciliation.  A summary of FCC's headcount and financial performance for fiscal years 2012, 2013, and 2014 is in the table below.

### Table 1: FCC's Financial Performance (in thousands, except headcount)[18]

|                          | Fiscal Year 2012 | Fiscal Year 2013 | Fiscal Year 2014 |
|--------------------------|------------------|------------------|------------------|
| Beginning Headcount      |                  | 12,439           | 10,664           |
| Ending Headcount         | 12,439           | 10,664           | 10,919           |
| Total Revenues           | $124,009         | $231,286         | $232,214         |
| Campus Operating Profit  | $37,149          | $52,741          | $35,066          |
| EBITDA Before Special Items | $23,796       | $28,670          | $9,316           |
| EBITDA                   | $19,492          | $25,373          | $5,195           |

---

[16] See Exhibit 3.  FCC's fiscal year reflects July 1 to June 30.

[17] See Exhibit 3.

[18] See Exhibit 3. P1167490-523 at 499.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

16. The Defendants in this matter include FCC's former management and key managerial personnel. The table below provides the Defendants' roles while employed at FCC.

### Table 2: Defendants' Roles at FCC

| Employee | Title | Employment |
|---|---|---|
| Siana Stewart | Vice President of Financial Services | 2005 to 2013 |
| David Knobel | Chief Executive Officer | 1995 to 2014 |
| Cid Yousefi | Senior Vice President of Information Technology | 2013 to 2014 |
| Neal Yawn | Chief Operating Officer | 2003 to 2008; 2012 to 2014 |
| Dean Bartness | Chief Compliance Officer | 2005 to 2009; 2011 to 2014 |
| Jeffrey Pierne | Chief Financial Officer | 2008 to 2014 |

**B.   Title IV Programs**

**1)   Department of Education**

17. The Department of Education establishes policies regarding federal financial aid and monitors the federal financial aid distributed to U.S. postsecondary institutions, such as FCC.[19] Postsecondary institutions, such as colleges and universities, have the ability to draw and receive funds from the DOE based on student enrollment.  To draw these funds from the DOE, a college signs a Program Participation Agreement ("PPA") allowing it to participate in Title IV, HEA Programs ("Title IV programs").[20]  Title IV programs, such as the Federal Pell Grant Program

---

[19] DOE, http://www2.ed.gov/about/landing.jhtml
[20] Stewart Deposition, pp.116-117.

Page 10

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

("Pell Grant") and the Federal Direct Student Loan Program ("Direct Loan"), provide financial student aid funds to colleges, where these colleges disburse these funds to its students.[21]

18.  I understand that PPA set standards for participating in the Title IV programs.[22]  For instance, the PPA provides standard for obtaining draws and refunding funds.   Firms participating in Title IV programs must also comply with the 90/10 Rule, which essentially limits the use of Title IV funds to 90% of cash basis revenue ("90/10" rule).[23]

19.  Upon signing the PPA, the DOE assigns an Office of Post-Secondary Education Identification Number ("OPEID").  FCC had several OPEIDs, where the OPEID had its own federal account and could draw Title IV program funds through the DOE G5 system.[24]  FCC had access to Title IV program funds (i.e., Direct Loan and Pell) through the DOE G5 system using the following OPEIDs: namely Miami (023058), Edutech (025862), Bryman (030764), Phoenix (022631), Parsippany (010851), Springfield (008441) and Maryland Heights (022392).[25]

### 2)  DOE's G5 System

20.  G5 is the DOE's financial aid management system.[26]  G5 tracks and reports cash drawdowns and refunds by Title IV program (i.e., Direct Loan and Pell) and award year (i.e., 12/13 and 13/14) for each OPEID.  For instance, FCC's cash drawdowns for Direct Loan and Pell awards in fiscal year 2014 were $218 million while refunds were $44 million, resulting in net drawdowns of $175 million.[27]

---

[21] Deposition Exhibit 2.

[22] Stewart Deposition, pp.116-117.

[23] P1715788-838 at 797.

[24] Stewart Deposition, pp.118-119.

[25] I have summarized the Title IV funding for each OPEID in Exhibit 5B.

[26] G5, https://www.g5.gov/g5/home

[27] See Exhibit 7C.

Page 11

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

### 3) DOE's COD System

21. DOE's Common Origination and Disbursement system ("COD") processes, stores and reconciles Title IV program data.[28] FCC provided the student information that is the basis for the COD reporting.

### 4) FCC's STARS

22. FCC maintained a proprietary system called STARS that showed "all the activities for a student, tuition charges, scheduled disbursement and actual disbursement."[29] FCC STARS system was also used to provide student population for revenue recognition, track headcount, and determine what funds should be drawn from DOE's G5, among other things.[30]

23. FCC's STARS system was used as the basis for providing student information to the DOE, which in turn was the basis for substantiating the COD records at DOE for the various FCC OPEIDs. According to Julande Turgot, Financial Processing Manager at FCC, STARS generated a student list spreadsheet containing information that would be entered into the COD system.[31]

24. FCC's STARS system was also used to provide the cash basis revenue information that was used by FCC to comply with the DOE's 90/10 Rule.[32] The STARS 90/10 reports tracked cash basis revenue from Title IV sources (i.e. the 90% in the 90/10 rule) and the cash basis revenue from other sources (i.e. the 10% in the 90/10 Rule).[33] A summary of the STARS 90/10 Report results for fiscal year 2013 and fiscal year 2014 are in the table below.

---

[28] COD, https://ifap.ed.gov/eannouncements/attachments/0329FAQCODAttach.pdf

[29] Yousefi Deposition, pp. 11-13.

[30] Pierne Deposition pp. 55-59 and 115-116; Turgot Deposition, pp. 21-30; Yawn Deposition pp. 21, 166, and 170.

[31] Turgot Deposition, pp. 29-30.

[32] Babson Deposition, pp. 9-14.

[33] The STARS 90/10 reports contained detail concerning the various types of cash revenue and refunds. Roxana Spirea, FCC's Corporate Director of Funds Management, explained that: "...DP, plus loan; [D]S is subsidized loan; [D]U is

Page 12

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

**Table 3: Title IV and Non-Title IV Funds per FCC's STARS 90/10 Reports[34]**

| | Fiscal Year 2013 | Fiscal Year 2014 |
|---|---|---|
| Title IV Funds | $176,766,883 | $174,823,003 |
| Non-Title IV Funds | $21,167,246 | $23,206,666 |
| **Total** | **$197,934,129** | **$198,029,670** |

## C.   Postsecondary Education Industry

25.   The postsecondary education industry in the United States consists of over 4,000 colleges and universities offering associates, bachelors, masters and doctorate degrees in various fields.[35] Major players in the for-profit postsecondary education industry include Apollo Group, Inc., Career Education Corporation, DeVry Inc., Education Management Corporation, and Strayer Education, Inc.

### 1)   For Profit Education Industry Outlook

26.   As part of my analysis, I have reviewed various industry reports and analyzed the historical and expected performance of public companies in the for-profit postsecondary education industry. For example, aggregate values and revenues for the public for-profit companies I analyzed generally declined from June 2011 to June 2014.[36]   For-profit industry reports also discussed a

---

unsubsidized loan," R2T4 was "return to Title IV" (or funds back to the government) and REF was "refund goes to student." See Spirea Deposition, pp. 61-62.

[34] See Exhibit 9.

[35] American Public Education, Inc., 2013 10-K, pp. 2-3.

[36] See Exhibit 6.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

historical decline in the for-profit education markets, and generally attributed this decline to various factors, including economic conditions and regulatory concerns.[37]

27. However, consensus revenue estimate for several of the public for-profit firms were expected to grow compared to the prior period, and some analysts were discussing stable or limited growth in the sector.  For example, a Q2 2014 Capstone Partners analyst report indicated that for profit education industry enrollment was expected to achieve a 1.4% compound annual growth rate ("CAGR") from 2012 through 2022.[38]  The same report indicated that revenue for the for-profit industry was likewise expected to achieve growth, with a projected 3% annual growth rate through 2018.[39]  This upward trend represented a rebound following the industry's declining performance in 2011, 2012 and 2013.

28. For profit schools were continuing to face regulatory risks in mid-2014.  For example, the DOE released its final proposal for round 2 of Gainful Employment on March 14, 2014.[40]  The proposal, which introduced metrics for use in determining whether a for-profit program adequately prepared a student for gainful employment, was expected to be finalized and instituted by calendar year 2016.  The proposal threatened Title IV funds for any program that failed to receive a passing grade on either of the two metrics.  In addition, the Higher Education Act was set to expire at the end of 2014, and some were concerned that reauthorization would include a redesign, potentially removing the 90/10 rule altogether, or including a new limit of 85%.[41]

---

[37] DB Education Services Industry Update, Deutsche Bank, December 20, 2013, pp. 23-25; Post-Secondary Education Q2 2014, Capstone Partners Investment Banking Advisors, 2014, pp. 2-3.

[38] Post-Secondary Education Q2 2014, Capstone Partners Investment Banking Advisors, 2014, p. 2.

[39] Post-Secondary Education Q2 2014, Capstone Partners Investment Banking Advisors, 2014, p. 3.

[40] Education 1Q Preview – Start Trends The Key Metric to Watch, Piper Jaffray, April 15, 2014, p. 5.

[41] DB Education Services Industry Update, Deutsche Bank, December 20, 2013, p. 17; Post-Secondary Education Q2 2014, Capstone Partners Investment Banking Advisors, 2014, p. 5.

29.  The industry analyst reports also provided revenue and EBITDA valuation multiples for various public for-profit education companies.  For example, the Capstone Partners Q2 2014 analyst report on postsecondary education indicated that the 2014 mean and median revenue valuation multiples were 0.9 times and 0.6 times, respectively.[42]  The same report indicated that the estimated 2014 mean and median EBITDA valuation multiples were 6.4 times and 6.5 times respectively.  An April 2014 analyst report from Piper Jaffrey similarly estimated that the mean 2014 and 2015 valuation EBITDA multiples for for-profit postsecondary education companies were estimated to be 7.0 times and 5.7 times, respectively.[43]

## IV.  FORENSIC ACCOUNTING ANALYSIS

### A.   Unsubstantiated Cash Balances with the DOE

30.  The DOE tracked FCC's cash draws and refunds of Title IV funds and compared this net cash amount with the net amount that FCC substantiated with proper student records.  As explained above, cash draws and refunds from the DOE for Title IV funding are referred to as Title IV or G5 draws and refunds, and substantiated student records provided by FCC to the DOE are maintained in DOE's COD system.[44]

31.  The DOE notified FCC when the net amount of Title IV or G5 cash drawn was greater than the COD amount (i.e. the amount substantiated with student records properly submitted to DOE).[45]  The amount of Title IV or G5 net cash drawn greater than the COD amount were known as unsubstantiated cash balances.  Based on my review and analysis of the available DOE unsubstantiated cash balances notices, FCC had material unsubstantiated cash balances throughout much of fiscal year 2014.[46]  As illustrated by the following chart, these unsubstantiated cash balances were primarily associated with FCC's three largest OPEIDs

---

[42] Post-Secondary Education Q2 2014, Capstone Partners Investment Banking Advisors, 2014, p. 10.

[43] Education 1Q Preview – Start Trends The Key Metric to Watch, Piper Jaffray, April 15, 2014, p. 13.

[44] Stewart Deposition, pp. 142-143.

[45] See Deposition Exhibits 3, 37, 199, and 218.   See Exhibit 8.  Also see, Stewart Deposition, pp. 142-144.

[46] See Exhibit 8.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al
Expert Report of James J. Donohue

(specifically Miami, Bryman and Phoenix) and grew to more than $18 million in early March 2014.[47]

Table 4: Unsubstantiated Balance for Direct Loans Award Years 12/13 and 13/14[48]



32. The DOE sent numerous notices during fiscal year 2014 requesting that FCC substantiate the disbursed funds or return the funds to resolve the unsubstantiated balance.[49] These DOE notices included net Title IV cash drawn, the net accepted and posted disbursements ("NAPD") (i.e., the amount substantiated within the COD system), and the net cash drawn greater than NAPD, or

---

[47] The Miami OPEID is at times also referred to as FCC in various records.

[48] Deposition Exhibit 37. Chart reflects Cash > NAPD for Miami, Phoenix and Bryman Direct Loan award years 12/13 and 13/14.

[49] See Exhibit 8.  For example, see P1848745 and Deposition Exhibit 218.  FCC received these letters from Barbara Davis and Sheri Nicoletti.

Page 16

**Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al**
**Expert Report of James J. Donohue**

the unsubstantiated imbalance.[50]  The DOE notices also identified the portion of the unsubstantiated balance that was aged greater than 30 days.[51]

33.   For example, a February 24, 2014 notice from the DOE concerning Bryman's $3.5 million unsubstantiated cash balance notified FCC's Julande Turgot that the Bryman OPEID had drawn $12.9 million in net Title IV cash, but had only substantiated $9.4 million for the 13/14 direct loan award.  The DOE notice also indicated that $753,484 of the unsubstantiated cash balance was aged over 30 days.[52]  A portion of the DOE notice is below.

| Response Via Email (Sheri) | 02/24/2014 09:58 AM |
| --- | --- |

Good Morning Julande Turgot,
Bryman School of Arizona (the) COD ID 76914894

COD is showing this school has Direct Loan unsubstantiated cash in the amount of $753,484.00 for 13-14 that were drawn down over 30 days old.  This could be due to recent downward changes.

| Cash > Net Accepted & Posted Disbursements | $3,553,484.00 |
| --- | --- |
| Net Accepted & Posted Disbursements | $9,338,103.00 |
| Net Drawdowns | $12,891,587.00 |

Please call or email me back as to when the school will be sending in disbursements or returning the funds to cover his, I have to update the Department of Ed weekly until this is substantiated.

34.   I have reviewed the available DOE notices for the FCC's Miami, Bryman and Phoenix and OPEIDs and compiled the net drawdowns (net Title IV cash drawn), net accepted & posted disbursements (COD amount), and resulting unsubstantiated balances for direct loan award years 12/13 and 13/14.  Charts illustrating this information for just the direct loan 13/14 award year are below and my complete compilation is attached as Exhibit 8.

35.   As illustrated by the below chart, the Miami 13/14 direct loan net Title IV cash drawn exceeded the DOE's COD amount for much of fiscal year 2014 prior to March 2014.

---

[50] For example, see Deposition Exhibits 3 and 218.
[51] See Exhibit 8.
[52] Deposition Exhibit 199.

Page 17

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

### Table 5: Miami Direct Loan 13/14 (G5 Cash compared to COD)[53]



36.    The Phoenix direct loan net Title IV cash drawn for the direct loan 13/14 award also exceeded the DOE's COD amount for much of fiscal year 2014.

---

[53] See Exhibit 12.

Page 18

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al
Expert Report of James J. Donohue

Table 6: Phoenix Direct Loan 13/14 (G5 Compared to COD)[54]



37.   While Bryman's net Title IV cash was essentially in balance with COD for the most of the first
half of fiscal year 2014, in December 2013 the unsubstantiated balance grew to $2 million and
approached nearly $4 million in early March 2014.

---

[54] See Exhibit 12.



Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al
Expert Report of James J. Donohue

### Table 7: Bryman Direct Loan 13/14 (G5 Compared to COD)[55]



38. In addition to disclosing the unsubstantiated balances, the numerous DOE notice emails during fiscal year 2014 also requested the balances be eliminated and specifically commented on large cash draws that are later returned after they were not reconciled with student records. For example, on February 4, 2014, the DOE's Ms. Davis stated "[w]e have been very concerned about the ongoing inability of the larger Anthem schools to reconcile funds drawn with disbursement records. Seems like a large amount of cash is drawn and then when disbursements cannot be reported timely to substantiate those funds, the funds are returned. And this has been

---

[55] See Exhibit 12.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

recurring for months and months." [56]   As of February 4, 2014, FCC had $11.4 million in unsubstantiated Cash > NAPD (or unsubstantiated funds) from Direct Loans with award years 11/12, 12/13, and 13/14, and Pell Grants with award years 11/12 and 12/13. [57]

39.   A February 26, 2014 email, Ms. Davis stated "I wanted to bring the current balances for your schools to your attention.  Please send refund confirmation numbers for those balances over 30 days immediately … Or send in records to substantiate the cash immediately." [58]  There were $15.8 million in unsubstantiated funds from Direct Loans with award years 12/13 and 13/14. [59]

40.   A March 4, 2014 email from the DOE's Ms. Davis notified FCC that FCC's advanced access to Title IV funds would be ceased unless all unsubstantiated funds were eliminated by the end of the month.  Ms. Davis explained: "…we cannot let this problem continue on for 3 additional months.  All of the Anthem Schools, including Bryman and Florida Career, need to be reconciled and have no funds unsubstantiated over 30 days by the end of March 2014." [60]  The unsubstantiated funds were approximately $18 million as of March 4, 2014. [61]

41.   Although FCC did eventually reduce the unsubstantiated balance during March 2014 - by both refunding $8 million in overdrawn Title IV cash to the DOE during the month of March and by posting student records to DOE – by the end of the March 2014 FCC still had unsubstantiated cash and the DOE restricted FCC's advanced access to Title IV funds.  In a March 31, 2014 email to FCC's Roxana Spirea, John Murphy and Julande Turgot, Ms. Davis stated "[a]s of this afternoon, each of the campuses still has cash draws that exceed disbursements and accepted to COD, ie unsubstantiated cash.  Federal Student Aid has reduced the Direct Loan available funds for both 2012/13 and 2013/14 to the greater of net disbursements or net draws, ie effectively

---

[56] Deposition Exhibit 81 at P2188887.

[57] Deposition Exhibit 81 at P2188892.

[58] P1779881-884 at 881.

[59] P1779881-884 at 881-882.

[60] P2371446-451 at 447.

[61] Deposition Exhibit 37.

placing your schools in a records first situation… the same as your other campuses and the same as is required of all schools for the Pell Grant program."[62]  There were $5.3 million in unsubstantiated funds from Direct Loans with award years 12/13 and 13/14. [63]

42.  Lastly, based on my review of the available accounting records, FCC was not properly recognizing the extent and impact of this liability to the DOE.  As discussed further below, FCC eventually incurs $16.7 million in additional bad debt expenses associated in large part with returning Title IV funds to the DOE and the Title IV reconciliation.  The vast majority of this adjustment concerned activity recorded through March 2014.[64]  Accordingly, FCC's financial position would be overstated to some extent as of and during the periods subsequent to March 2014.

43.  This lack of timely recognizing the extent and impact of this liability to the DOE would be consistent with Mr. Pierne's and Mr. DiCicco's testimony concerning their lack of knowledge of the sizeable DOE unsubstantiated cash balance at the start of March 2014.  For example, Mr. Pierne acknowledged in an email and during his deposition that he first became aware of the $17 million unsubstantiated balance situation in March 2014.[65]  FCC's VP Corporate Controller, Paul DiCicco, also testified that he did not have knowledge of unsubstantiated cash balances or the DOE email notices.[66]  In an email from Mr. DiCicco about accounting for refunds to the DOE, Mr. DiCicco commented that "[i]t seems we draw money and never track or post the overdrawn amounts?  As we reconcile you can imagine how this would be an issue from the accounting side."[67]

---

[62] Deposition Exhibit 37.

[63] Deposition Exhibit 37.

[64] Deposition Exhibits 62 and 123.

[65] Pierne Deposition, pp. 300-301 and Deposition Exhibit 128.

[66] DiCicco Deposition, pp. 72, 84-86.  Also see Deposition Exhibit 123, 219, and 134 (suggesting that "…Siana did not properly reconcile on a monthly basis…" and that "…[A]ccounting did not have transparently to this…").

[67] Deposition Exhibit 62.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al
Expert Report of James J. Donohue

B.   FCC's Extensive Title IV Cash Refund Activity

44.   As discussed above, the DOE G5 system tracked daily cash drawdown and refund activity for direct loans for each OPEID and for each direct loan award year.  I have reviewed FCC's cash DOE activity and summarized FCC's Title IV cash draws and refunds by month.[68]  As illustrated by the chart below, despite roughly comparable student and revenue figures for fiscal year 2013 and fiscal year 2014, FCC's monthly DOE Title IV cash draw and refund activity for direct loan awards for FCC's three largest OPEIDs generally increased in fiscal year 2014 compared to fiscal year 2013.[69]

---

[68] A summary of my analysis of FCC's Title IV draws and refunds is attached as Exhibit 13.  I have utilized G5 DOE draw and refund data obtained from the DOE, and DOE reports that were provided to Spring Zutes.  This G5 DOE draw and refund data was maintained by OPEID, by award year, and by the type of program (PELL or Direct Loan).  As illustrated at Exhibit 13, I also compared this G5 DOE draw and award data with FCC records tracking the same information.   For example, FCC cash related reports would include information about the receipt of Title IV draws and payment of Title IV refunds to the DOE.  This included consolidated month cash balance reports that would show aggregate activity for the bank accounts by certain sources (See Deposition Exhibit 129), daily cash forecast reports that would track actual and forecasted daily cash activity by bank and by certain activity (See Deposition Exhibit 122), and a bank reconciliation update or "acct.info report" that was started by Ms. Spirea in May 2014 as part of the reconciliation in an effort to preform bank reconciliation for track Title IV draw and refund activity (See Deposition Exhibit 140).  Ms. Spirea was not sure if accounting was provided this specific type of Title IV information in this specific format before the creation of this report. (See Spirea deposition at pp. 132-135).  Also see Exhibit 13.

[69] See Exhibits 3C and 7.

Page 23

**Table 8: Direct Loans for Miami, Bryman and Phoenix for Fiscal Years 2013 and 2014**



45. FCC's refund activity – which represents cash being wired back to the DOE that had been previously drawn down – increased substantially compared to the fiscal year 2013 time period. For 12/13 and 13/14 direct loans for these three OPEIDs - while total cash Title IV refunds were $5.6 in million in fiscal year 2013 (or 5% of draws), cash Title IV refunds to the DOE were approximately $40 million in fiscal year 2014 (or 30% of draws).[70]

46. Much of this extensive fiscal year 2014 refund activity was directly related to resolving the unsubstantiated balances with the DOE. As explained above, the unsubstantiated cash balances during fiscal year 2014 were mostly associated with FCC's three largest OPEIDs (specifically Miami, Bryman and Phoenix) and represented the difference between net Title IV cash drawn by

---

[70] See Exhibit 7. In fiscal year 2013, Title IV refunds were $5.6 million and Title IV draws were $114 million. In fiscal year 2014, Title IV refunds were $40 million while Title IV draws were $130 million.

FCC as compared to the COD amount for those OPEIDs.  The monthly Title IV cash draw and refund activity illustrated in the above chart is the same activity that created the net Title IV cash draw amount cited by the DOE.[71]

47.   For example, the DOE notified FCC during October and November 2013 that unsubstantiated cash balances for these three OPEIDs had grown to $14 million.[72]  In December 2013, FCC wired $8 million in Title IV refunds to the DOE, more than any month to date in fiscal year 2014 and in fiscal year 2013.[73]  Monthly Title IV refunds spike again to $8 million for March 2014.[74]  As noted above, the DOE had notified FCC at the start of March 2014 that the DOE would remove FCC advanced draw ability if FCC did not eliminate the $18 million unsubstantiated balance between net cash Title IV draws and COD.[75]

48.   My complete analysis of FCC Title IV or G5 drawdowns and refunds is attached as Exhibit 13.

C.   **Comparison of FCC's Title IV Cash to FCC's STARS Title IV Cash Basis Revenue**

49.   I have compared the cumulative cash basis Title IV revenue using data taken from FCC's STARS system with FCC's cumulative net cash amount using data taken from the DOE Title IV

---

[71] Deposition Exhibit 218.

[72] For example, see Exhibit 8.

[73] FCC's Mr. Babson indicated during his deposition that $8 million in Title IV cash refunds "in one month would probably seem high."  See Babson Deposition, pp. 121-122.  Mr. Pierne did not recall the December 2013 refunds or the aggregated value of refunds for fiscal year 2014.  See Pierne Deposition, pp. 48-50.  Mr. Knobel also did not recall the relatively large amount of refunds December 2013 or March 2014 - "Q. If the amount of a refund in a month was large, say, $8 million, was that something that would have been brought to your attention, to your knowledge? A. I don't believe that ever existed. I believe it would have, because that would have been, you know, a very large amount, and I do recall Mr. Pierne, you know, meeting with Mrs. Stewart and his staff, and as I said, I would sit in and I would listen in, and I don't recall hearing anything out of the ordinary like that." See Knobel Deposition, p. 75.

[74] During this time period, FCC was using one bank account to refund Title IV funds to the DOE and the December 2013 and March 2014 bank account statements show the wires and a total for wires showing the $8 million for each month.  See December 2013 and March 2014 refund bank statements at BMO showing $8 million in total ACH transfers to Department of Education. See BMO Student Refund xxxx4270 December 2013.pdf and BMO Student Refund xxxx4270 March 2014.pdf.

[75] Deposition Exhibit 49.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

or G5 information.[76]  As illustrated in the chart below, FCC Title IV net cash exceeded FCC's
STARS Title IV cash revenue throughout fiscal year 2014.[77]  The gap between FCC Title IV net
cash drawn and FCC's STARS Title IV cash revenue peaked at more than $18 million as of
December 31, 2013 and was eventually in balance by the end of fiscal year 2014.

Table 9: Difference between FCC's Title IV Cash
and FCC's Title IV STARS Cash Basis Revenue [78]



---

[76] At part of the eventual Title IV refund and reconciliation project, FCC at times also compared Title IV STARS cash basis revenue with FCC's Title IV net cash.  See for example, Deposition Exhibits 55, 56, 57 and 124.

[77] As shown on Exhibit 10 and 9A, I have based this comparison using monthly contemporaneous STARS reports and DOE G5 information.  As shown at Exhibit 9 and 11, I have also compared this monthly STARS information with STARS information provided by IEC (the purchase of certain FCC assets who acquired STARS records) and STARS information that was provided to a Spring Zutes a consultant that was involved during 2014 with FCC's Title IV reconciliation process.   The STARS information is also generally consistent other contemporaneous STARS information. See Deposition Exhibits 55, 56, and 57.

[78] See Exhibit 10.

Page 26

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

50. Chris Babson, VP of Finance at FCC, also recognized the gap between FCC's Title IV cash net draws and the FCC's Title IV cash revenue recorded in the STARS system, and raised this gap with Mr. Pierne and Ms. Stewart. The gap amounts recognized by Mr. Babson were generally comparable with gap amounts summarized in my chart above.

51. In January 2014, Mr. Babson's email to Ms. Stewart and Mr. Pierne stated, "…it looks like we've collected about $100-$102 million of T4… when I run the 90/10 report (which I've attached) we seem to have collected only $89.5 million in total cash, with $81.8 million coming from T4… In sum, the STARS report looks almost $15 to 20 million off for the first six months of the year."[79]

52. In March 2014, Mr. Babson continues to notify Mr. Pierne about the ongoing gap between FCC's Title IV net cash drawn and FCC's Title IV cash basis revenue. Mr. Babson's March 26, 2014 email to Mr. Pierne explained, "…net T4 is $129.7M for February YTD. The 90/10 report in STARS shows Net T4 of $119.8M February YTD."[80]

53. In the table below, I summarized the FCC Title IV net cash, the FCC Title IV cash basis revenue, and the gap between these monthly amounts.[81]

---

[79] Deposition Exhibit 124.   To estimate the Title IV cash received, Mr. Babson is using FCC daily cash forecast reports (which included actuals) for the Title IV cash figure (See for example, Deposition Exhibit 125). This daily forecast report did not directly show separate totals for Title IV draws and refunds, but rather a net Title IV number that often consisted of draw and refund amounts within the excel cell itself. So absent viewing the contents of an individual cell in native excel, the draw and refunds amount would not be apparent.  FCC monthly consolidated balance reports also did not break out Title IV draws and refunds.   As noted above, the Title IV bank reconciliation report prepared or "acct.info report" that was started by Ms. Spirea in May 2014 as part of the reconciliation (See Deposition Exhibit 140) more specifically tracked Title IV draws and refunds.

At Exhibit 13, I compared these internal FCC cash records with the corresponding G5 DOE records and they were generally comparable for Title IV G5 transactions.  I also reviewed samples of the FCC bank accounts associated with each OPEID account and DOE refunds.  The DOE G5 cash records were also consistent with other FCC reports that were prepared in connection with the reconciliation that showed G5 cash balances (See Deposition Exhibits 55, 56, and 57.)  Since the DOE G5 data was a more direct source (i.e. statements showing draw and refund wires) I have relied upon the DOE G5 data for the specific figures in my analysis above.  Furthermore, in June 30, 2013, the FCC monthly cash consolidated report included a $3.7 million Tuition Option payment (essentially factoring a receivable) as a Title IV draw.   See P1162713 and fiscal 2013 audited financial statements.

[80] P1456573.

[81] See Exhibit 10.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al
Expert Report of James J. Donohue

## Table 10:  FCC's Title IV Cash (G5) Compared to FCC's Title IV STARS Cash Basis Revenues (Cumulative Balances)

| As of Date | Title IV Funds G5 | Title IV STARS Cash Basis Revenue | Difference between Title IV in G5 and Title IV STARS |
|---|---|---|---|
| 07/31/13 | $22,792,111 | $17,431,198 | $5,360,913 |
| 08/31/13 | $38,674,737 | $28,913,332 | $9,761,406 |
| 09/30/13 | $56,319,179 | $40,026,921 | $16,292,259 |
| 10/31/13 | $74,892,769 | $58,800,441 | $16,092,328 |
| 11/30/13 | $90,828,691 | $75,766,400 | $15,062,291 |
| 12/31/13 | $100,335,167 | $81,826,693 | $18,508,474 |
| 01/31/14 | $116,962,244 | $100,891,732 | $16,070,512 |
| 02/28/14 | $134,587,544 | $119,775,702 | $14,811,842 |
| 03/31/14 | $142,409,003 | $135,547,150 | $6,861,854 |
| 04/30/14 | $152,462,246 | $150,938,172 | $1,524,075 |
| 05/31/14 | $165,774,187 | $164,323,424 | $1,450,763 |
| 06/30/14 | $175,120,005 | $174,823,003 | $297,001 |

### D.  Comparison of FCC's Title IV STARS Cash Basis Revenue to DOE's COD

54.  I have also compared the cumulative Title IV cash basis revenue recorded in the FCC STARS system with the cumulative revenue amounts reflected in the DOE's COD system.[82]  Given the available records in this matter, I have performed this comparison for FCC's direct loans for the 13/14 award year on a daily basis for FCC's three largest OPEID's: Miami, Bryman, and Phoenix.

---

[82] For this comparison I have utilized the STARS data that FCC provided to Spring Zutes in order to provide a daily comparison.  See Exhibits 8, 9, 10, and 11.  At part of the eventual Title IV refund and reconciliation project, FCC also compared Title IV STARS cash basis revenue with COD and with FCC's Title IV net cash (or G5).  See for example, Deposition Exhibits 55, 56, and 57.

Page 28

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

55. As illustrated by the charts below, FCC's STARS Title IV cash basis revenue figures and the DOE's COD records for 13/14 direct loans for these three OPEIDs were generally comparable throughout fiscal year 2014.[83]

Table 11: Miami Direct Loan 13/14 (G5 compared with COD and Title IV STARS)[84]



---

[83] Consistent with the STARS Title IV cash basis revenue to Title IV cash discrepancy discussed above, the cumulative Title IV cash balances for these three OPEIDs were therefore consistently above STARS and COD for much of fiscal year 2014 before eventually coming into balance at the end of the fiscal year.

[84] See Exhibit 12. Also, see Deposition Exhibit 55.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

**Table 12: Phoenix Direct Loan 13/14 (G5 compared to COD and Title IV STARS)[85]**



[85] See Exhibit 12.  Also, see Deposition Exhibit 56.

Page 30

<u>**Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al**</u>
**Expert Report of James J. Donohue**

### Table 13: Bryman Direct Loan 13/14 (G5 compared with COD and Title IV STARS)[86]



E.    <u>**Bad Debt Write Off in Fiscal Year 2014**</u>

   1) <u>**Bad Debt Write Off Due to the Title IV Refunds and Reconciliation**</u>

56.  I have also been asked to review the millions in bad debt expenses that FCC recorded after being
    forced to reconcile the differences between FCC's Title IV cash and revenue records with the
    Title IV records provided to the DOE and refunded millions in Title IV funds.  FCC's Title IV
    reconciliation project during fiscal year 2014 eventually resulted in approximately $16.7 million
    of additional bad debt expenses that were recorded in March, April, May, and June of 2014.
    With these additional bad debt expenses, FCC's total bad debt expense recorded in fiscal year

_____

[86] See Exhibit 12.  Also, see Deposition Exhibit 57.

Page 31

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

2014 (about $36.5 million) were more than 80% higher than the amount of bad debt incurred during fiscal year 2013 (about $19.8 million).[87]  A summary of the monthly bad debt expenses for fiscal year 2013 and fiscal year 2014 is below.

Table 14: FCC's Bad Debt Expenses in Fiscal Years 2013 and 2014[88]



57.   Both Mr. Pierne and Mr. DiCicco attributed the increased bad debt expenses with FCC's reconciliation of Title IV funds with the DOE's COD records.[89]  As shown in the table above, FCC started recording the additional bad debt charges in March 2014.  Mr. Pierne explained in

---

[87] Mr. DiCicco did not recall that the bad debt charges increased during fiscal year 2014.  See DiCicco Deposition, pp.106-107.

[88] See Exhibit 3A.

[89] Pierne Deposition, p. 308 and Deposition Exhibit 131 (Investor presentation attributed higher bad debt rate to T4 reconciliation at P1463077).  Also see Deposition Exhibit 219 - February 24, 2014 email from Mr. DiCicco to Mr. Murphy asking to be updated on G5 to COD reconciliation so that he can work through the impacts on accounting for cash and accounts receivable "…(both areas that have considerably loose to my liking)".

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

an April 2014 email that distributed the March 2014 board of directors report that the additional $4 million was a preliminary charge related to the "COD reconciliation issue" and was expected to grow. Mr. Pierne also explained that the charge was in March 2014 because that is when "…we first became aware of the situation".[90] The quote from Mr. Pierne's April 30, 2014 email is below:[91]

> We recorded a $4.0 million charge to earnings (recorded as bad debt expense) in March related to the COD reconciliation issue. This is a preliminary charge, which may well increase during the fourth quarter as we progress through the actual detailed reconciliation process. While we cannot accurately estimate the ultimate amount of any charge related to this issue as of now, since it is probable that there will be a charge to earnings we felt that it was appropriate to reflect some of that amount in the month of March, which is when we first became aware of the situation.

58. In a May 7, 2014 email, Paul DiCicco explained that in March 2014 FCC "…took an incremental charge of $4m of bad debt expense … this charge was taken in light of our recent 'gap' from the reconciliation process as we sort out and complete the Financial Services reconciliation process described earlier on the board call."[92]

59. A May 8, 2014 email from Mr. Pierne also indicated that the charges were due to reconciliation issues. A quote from Mr. Pierne's May 8 email is below:[93]

> Weaknesses in our financial aid systems and processes have resulted in the Company having large unreconciled financial aid disbursements for the current fiscal year. As we work to reconcile those balances it has become apparent that a significant amount of the unreconciled financial aid disbursements will be uncollectible.

60. On June 30, 2014, Mr. Pierne distributed the May 2014 Board of Directors report and noted in the cover email that an additional $4 million bad debt charge was recorded due to the return of

---

[90] During his deposition, Mr. Pierne testified that the situation was the $17 million unsubstantiated balance situation with the DOE that was communicated by Ms. Davis' email on March 4, 2014. See Pierne Deposition, pp. 300-301.

[91] See Deposition Exhibit 128. The Board of Directors package did not contain a separate line item for bad debt expense. Bad debt expense was recorded within the general administrative line item within the summary Board of Directors packages. See Pierne Deposition, p. 306.

[92] Deposition Exhibit 226 at P2345005.

[93] Deposition Exhibit 130.

Page 33

<u>**Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al**</u>
**Expert Report of James J. Donohue**

Title IV cash.[94]  The email also noted that the additional bad debt charges totaled $10 million year-to-date through May 2014, therefore indicating that the additional bad debt charge in April was $2 million.[95]  He also reported to the board that they were sorting between normal course and reconciliation/non-recurring refunds and would record any necessary charges in June to reflect the final results of the reconciliation project.  A quote from Mr. Pierne's email is below.

> We recorded a charge of $4.0 million to bad debt in May ($10 million year-to-date) to reflect additional estimated returns of Title IV funds. The reconciliation process is now complete and today we were able to extract from STARS the full refund files from FY14 on a student by student basis. We will be sorting those records between normal course refunds and reconciliation/non-recurring refunds and will record an additional charge in June, if necessary, to reflect the final results of the reconciliation project.

61.  In June 2014, FCC recorded another $6.7 million in additional bad debt expenses related to the Title IV reconciliation, raising the total additional bad debt expense to $16.7 million.[96]  This additional bad debt raised the total bad debt for fiscal year 2014 in total to more than $36 million, or about $16.6 million more than in fiscal year 2013 (despite similar revenue in fiscal year 2014 relative to fiscal year 2013).[97]  Bad debt expense in fiscal year 2014 was also more than $15 million higher than the budgeted bad debt for fiscal year 2014.[98]

## 2)  <u>Bad Debt Charges Included Adjustments to Prior Periods</u>

62.  While the $16.7 million in additional bad debt charges were mechanically recorded as additional bad debt towards the end of fiscal year 2014, these additional bad debt charges were largely adjustments to correct revenue and EBITDA amounts that were recorded during earlier portions of fiscal year 2014 and during portions of fiscal year 2013.

---

[94] Deposition Exhibit 137 and P1463594.

[95] Additional bad debt charges of $10 million year-to-date less $4 million in March and $4 million in May, indicates that April was $2 million ($10 million less $4 million and $4 million).

[96] See bad debt provision – June 2014.xlsx, June 14 ADD'L tab.

[97] See Exhibit 3.  Also See Deposition Exhibit 229.

[98] Deposition Exhibits 72 and 229.

Page 34

63. According to Mr. Pierne, these Title IV refunds and reconciliation related bad debt charges were generally recorded as a charge to bad debt and a write down of outstanding receivables.[99] Normally, a write down of a receivable would be associated with the inability to collect on a valid receivable that was created with valid revenue.  Historically, FCC had very low receivable write downs because the credit source for almost 90% of FCC's receivables was the government.[100]  Mr. Pierne acknowledged during his deposition that the primary driver of the FCC bad debt provision had historically been the unsecured student portion of receivables, and that the Title IV or government backed portion of receivables was not the primary driver of bad debt.[101]  Accordingly, the bad debt spike related to the reconciliation activity was not caused by the government suddenly refusing to pay valid receivables.

64. While some small portion of the reconciliation related bad debt charges were presumably related to the collection issues associated with normal valid receivables, the receivables written down due to the reconciliation were also related to unwinding receivables that should not have been recorded initially.[102]  The large amount of funds returned to the DOE were presumably initially recorded within FCC's accounting system and therefore created receivables, revenues, and earnings that had to be removed after the money was returned.[103]  The bad debt expenses for

---

[99] Pierne Deposition, p. 305. Also see Bad Debt Provision – Apr14.xlsx.  Account receivable at FCC represented amounts owed from students that were provided by the DOE.    A smaller portion of the write down also reduced notes receivable. Notes receivable generally related to amounts owed by students that were not supported by government programs.

[100] Write downs for notes receivable -- which were only backed by students – were typically much higher.

[101] Pierne Deposition, pp. 118-120.

[102] While recorded as bad debt, in April 2014, Mr. DiCicco had email discussions with Mr. Babson and Mr. Pierne where he discussed calling the charge an adjustment or impairment, below the line (below the operating section of the income statement as a separate item).  Mr. Pierne's view was that the charge should be an accounts receivable write down and noted that "We don't yet know whether we will have a goodwill impairment charge and I would not characterize it that way."  See Deposition Exhibit 127.    FCC's goodwill asset value throughout fiscal 2014 was over $130 million.  See Exhibit 4.

[103] Cash received from the DOE presumably would have been recorded within the FCC accounting infrastructure.  However, given Mr. Pierne's statement that he only became aware of the $17 million unsubstantiated cash situation in March 2014, Mr. DiCicco's lack of knowledge concerning unsubstantiated balances, the apparent lack of proper monthly reconciliations between COD and STARS, and the apparent lack of procedures for reconciling bank statement to Title IV deposits and to student account in STARS, it is somewhat unclear if the receipt of DOE funds were consistently recorded within FCC's accounting infrastructure on a timely and proper basis.  See Deposition Exhibit 143, Pierne Deposition, pp. 300-301, Deposition Exhibit 128, DiCicco Deposition, pp. 72, 84-86, Deposition Exhibit 123, 219, and 134 (suggesting that "...Siana

Page 35

would correct profits associated with these returned funds, but revenue would remain overstated for the written off receivables that should not have generated revenue initially.[104]

65. Lastly, although the reconciliation related bad debt adjustments should have been associated with specific revenue, receivables, students, and schools, FCC apparently could not associate the bad debt with specific activity within the accounting system and appears to have allocated this bad debt across all schools based on relative revenue.[105]

## V.   BUT FOR ALLEDGED BREACH VALUATION OF FCC

66. I have been asked by counsel for Plaintiff to estimate the fair value of the FCC business enterprise but for the Defendants' alleged breaches.  The following sections describe FCC's financial and operating position but for the alleged breaches, the premise of value, and the valuation methods considered and employed in this assignment.

### A.   FCC Absent the Defendants' Alleged Breaches

#### 1)   Continued Advanced DOE Funding

67. As discussed above, the Defendants' alleged breaches concern FCC's improper use of DOE Title IV funds. More specifically, the Plaintiff has alleged that the Defendants' improper use of DOE Title IV funds eventually caused the DOE to restrict FCC's advanced use of Title IV funds.  My valuation of FCC therefore assumes that FCC did not misuse Title IV funds, would have had continued advance use of Title IV funds (the essential source of liquidity for the company), and would be a going concern.[106]

---

did not properly reconcile on a monthly basis..." and that "...accounting did not have transparently to this..").   Also see P2183968-972, suggesting that some refunds to DOE may not have been related to specific campuses.

[104] See Babson Deposition pp. 47-49.

[105] See Pierne Deposition, pp. 306-307 and Deposition Exhibits 226 and 229.   Mr. Pierne explained that this additional bad debt was allocated across campuses and could not recall if the bad debt charge was later adjusted.    See Bad Debt Provision – Apr14.xlsx and Bad Debt Provision – June 2014.xlsx.

[106] FCC's fiscal year ended on June 30.  Fiscal year 2014 is therefore the 12 month period ending June 30, 2014 and fiscal year 2013 is the 12 month period ending June 30, 2013.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

### 2)  <u>Timely Knowledge of FCC's True Financial Position</u>

68.  Absent the alleged breaches, I have also assumed that FCC would have had more timely knowledge of FCC's true financial position.  As discussed above, FCC eventually returns the millions in excess DOE funds, reconciles Title IV funds with DOE, and records millions in bad debt expenses, but only does so suddenly at end of fiscal year 2014.  Without the improperly borrowed Title IV cash from the DOE – that is alleged to have been facilitated by the Defendants' alleged breaches – FCC would not have recorded the revenues, earnings, and receivables that are later written off.  With more accurate information, FCC's budget expectations for fiscal 2014 also would have been lower.[107]  Accordingly, I have assumed that absent the alleged breaches, FCC would not have initially recorded revenues, earnings, and receivables that were later written off, and would have had more timely knowledge of FCC's true financial position.  More timely knowledge of FCC's true financial position, coupled with continued advance access to Title IV funds, would have provided FCC with the opportunity to preserve or raise capital as a going concern, as opposed to the liquidity crisis and bankruptcy environment that did occur.

69.  For example, with more timely knowledge of FCC's true financial position, FCC could have elected to defer capital expenditures.  FCC's actual capital expenditures were about $13 million in fiscal year 2014, but most of these capital expenses were related to growth and could have been deferred.[108]  Even during the middle of fiscal year 2014, Mr. Knobel emailed Mr. Pierne concerning the liquidity issues, and suggested deferring capital expenditures for six months to build cash.[109]  Mr. Pierne also emailed Mr. Knobel in the middle of fiscal year 2014 and suggested other ideas to provide liquidity, including a hiring freeze and advertising reductions.[110]

---

[107] See Deposition Exhibit 72.  See Babson Deposition p. 48.

[108] See Deposition Exhibit 131 at P1463079 – Indicated that capital expenditures was historically used to launch new campuses.  Also see Deposition Exhibits 72 and 133.

[109] See for example, Deposition Exhibit 41.

[110] See Deposition Exhibit 125.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

70. More timely knowledge of FCC's true financial positon would have also improved FCC's ability to raise capital. For example, despite the DOE Title IV cash restrictions, missing payroll, surprising investors with the sudden need for an emergency cash infusion, and not being able to reliably estimate the unsubstantiated balance with the DOE, FCC was still able to raise about $18 million in debt financing in the months preceding bankruptcy.[111]

### 3) <u>FCC EBITDA But For Alleged Breaches</u>

71. As described in the following sections, FCC's actual EBITDA for fiscal year 2014 and projected EBITDA for fiscal year 2015 can be used to approximate FCC's financial performance but for the Defendants' alleged breaches.

#### a. *Actual Fiscal Year 2014 EBITDA*

72. FCC's Title IV refunds and reconciliation with the DOE during the months prior to bankruptcy resulted in material adjustments to FCC's fiscal year 2014 performance. While these adjustments would have occurred earlier but for the Defendants' alleged breaches, FCC did eventually reduce fiscal year 2014's EBITDA to attempt to reflect the impact associated with the Title IV refunds and reconciliation.[112] FCC's actual reported fiscal year 2014 EBITDA before special items was about $9.3 million. I also considered the special items and assumed that bonus stock option and certain accounting charges for leases should be deducted and EBITDA after those charges would be about $7.4 million.[113]

73. The $7.4 million run rate EBITDA included the impact of the millions in bad debt write downs processed as a result of the Title IV refunds and reconciliation and meaningfully understates FCC's but for the breach run rate for the following reasons.

---

[111] Deposition Exhibit 222.

[112] Deposition Exhibit 137.

[113] See Exhibit 14A. To the extent these were non-cash charges or should not have been paid given the assumed lower level of fiscal performance in my but-for valuation as compared to the budgeted performance, the run rate EBITDA would increase. For example, the stock charge was non-cash and likely budgeted at the start of the year, presumably based on higher performance. The June 30, 2013 Deloitte Valuation suggests these are nonoperating expenses.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

a.  Using 2014 fiscal EBITDA as a basis for a run rate essentially assumes that FCC would have the same level of unprecedented write downs moving forward.  Mr. Pierne indicated that these additional bad debt charges included non-recurring refunds, and absent the additional charges FCC's EBITDA run rate would be above $20 million.  FCC historically had EBITDA above $20 million and bad debt rates should be minimal with government backed Title IV funds if recorded and utilized appropriately.[114]  In a January 2015 letter to the Accrediting Commission of Career Schools and Colleges, Mr. Knobel also explained that FCC profit for the fiscal year was expected to be $20 million.[115]

b.  FCC's performance during fiscal year 2014 was also negatively impacted by the breaches and some of this negative impact would not have occurred had the Title IV shut down not occurred and had FCC as a going concern had timely knowledge of the true financial position.  For example, due diligence findings by potential investors in June 2014 recognized that the liquidity crisis "forced the company to make decisions that are almost certainly affecting operations (employees, students and employees)", such as, being late on payroll and slow paying vendors.[116]

c.  Not all of the bad debt write downs during fiscal year 2014 were necessarily associated with the EBITDA initially recognized during fiscal year 2014.  For example, millions in Title IV refunds during fiscal year 2014 were associated with the 12/13 award year and the Title IV reconciliation project resulted in some of the already posted COD balances for the 12/13 award year declining (meaning that FCC had to return Title IV funds to stay in balance with COD).[117]  Accordingly, some portion of the write downs were associated with prior periods and adjusting for the prior period write downs would increase the fiscal year 2014 run rate EBITDA.

---

[114] As noted above, Mr. Pierne acknowledged that historical bad debt rates for Title IV backed funds was minimal.  See Pierne Deposition, pp. 119-121.

[115] Deposition Exhibit 29.

[116] BMO01458-480 at 476 and Deposition Exhibit 222.

[117] See Exhibit 10B and Exhibit 8.  As discussed above, the unsubstantiated balance is the difference between net cash and the posted COD amount.   Accordingly, for an in balance award year (i.e. where the net cash and posted COD are equal), in the event that a posted COD balance declines, cash would need to refunded to bring the award back into balance.

### b. *Projected Fiscal Year 2015 EBITDA*

74. FCC's fiscal year 2015 EBITDA estimates, as prepared by FCC and presented to potential investors in June 2014, were prepared with knowledge of the FCC reconciliation process. FCC's projected fiscal year 2015 EBITDA before special items was about $10.8 million. I also considered the special items and assumed that bonus stock option and certain accounting charges for leases should also be deducted and EBITDA after those charges would be approximately $6.9 million.[118]

75. The $6.9 million run rate EBITDA also assumed that the higher bad debt rate associated with the Title IV reconciliation would continue into fiscal year 2015 and would therefore be understated for the same reasons discussed above. Mr. Pierne explained during his deposition that the fiscal year 2015 budget was "…a conservative presentation for investors coming in that would be potentially interested in acquiring the company who are aware of the company's historical problems" and that FCC therefore estimated that bad debt rates would be even more than in fiscal year 2014. Although Mr. Pierne's understanding was that "we largely believe the problem is behind us" FCC "decided, from a budgeting perspective and a perspective -- in a looking-forward financial perspective, to be conservative in the event that that didn't turn out to be the case. If it did turn out to be the case in the future, then there would be an 8 million – you know, there would be a $7 million increase in EBITDA in fiscal year 2015."[119]

### c. *FCC EBITDA But For Alleged Breaches*

76. Taking into consideration the 2014 and 2015 EBITDA described above, and the multiple reasons they are meaningfully understated, I have estimated the portion of the additional bad debt charge that would not continue, and therefore result in a higher run rate. While likely that a meaningful portion of the additional bad debt charge is non-recurring, and that the but for going concern FCC could have returned to EBITDA approaching historical levels, I have only adjusted EBITDA for bad debt charges that would be associated with the prior fiscal periods.

---

[118] See Exhibit 14B.

[119] Pierne Deposition, pp. 313-314.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
**Expert Report of James J. Donohue**

77. As noted above, FCC allocated the additional debt across all campuses based on revenue, and I have not located records that would specifically isolate how much of the additional bad debt charge recorded in fiscal year 2014 concerned charges that likely relate to prior fiscal periods. Lacking detail for the additional bad debt write downs I have estimated the portion of the additional bad debt adjustment that related to prior periods.

78. The additional bad debt was generated by the Title IV refunds and reconciliation, and more than 30% of FCC's Title IV cash refunds to the DOE during fiscal year 2014 were for the 12/13 award year.[120] The vast majority of an award year's activity would have occurred and been recorded in same fiscal year. For example, FCC STARS records for fiscal year 2013 and fiscal year 2014 indicate that roughly 80% of the current award year's activity is recorded during the current fiscal year.[121] I have therefore assumed that 30% of the $16.7 million bad debt charge related to the 12/13 award year and that 80% of that activity had been reflected during fiscal year 2013. This estimation would suggest that roughly $4.0 million of the $16.7 million ($16.7 million times 30% times 80%) related to fiscal year 2013.

79. As displayed in the below table, this adjustment would increase my run rate trailing EBITDA from $7.4 million to approximately $11.4 million and run rate forward EBITDA from $6.9 million to about $10.9 million.[122]

---

[120] See Exhibit 10B.

[121] See Exhibit 10C.

[122] See Exhibits 14A and 14B.

Page 41

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al
Expert Report of James J. Donohue

### Table 15: Run Rate LTM and Forward Year EBITDA

|  | LTM FY 13/14 | Forward Year FY 13/14 |
|---|---|---|
| EBITDA before Bad Debt Adjustments | $7,422,237 | $6,861,253 |
| Add: Bad Debt Adjustment | $4,000,000 | $4,000,000 |
| EBITDA after Bad Debt Adjustments | $11,422,237 | $10,861,253 |

### B.    Premise of Value

80.  As discussed earlier, the focus of the assignment was to determine the fair value of FCC but for the alleged breaches, as the Plaintiff has alleged that FCC would have remained a going concern but for the Defendants actions.  I have therefore estimated the fair value of the FCC enterprise as a going concern as of June 30, 2014.  Fair value is the price that would be received to sell the asset in an orderly transaction between market participants at the valuation date, June 30, 2014.[123]

81.  There are a number of generally accepted methods for valuing closely-held businesses. The methods chosen depend upon the business, industry, and economic circumstances of the company being valued, as well as the purpose of the engagement and the size of the interest being valued. Accepted methods include, but are not limited to, the capitalization of earnings or cash flow, a comparable company methodology, a discounting of future cash flows, and a net asset value approach.

82.  I have estimated my fair value using a market approach (comparable company) and an income approach (capitalization of earnings).  FCC and FCC's outside valuation professionals also utilized market and income approaches to prepare the contemporaneous valuations of FCC.

---

[123] FASB ASC 820.

Page 42

### C.   Fair Value using Market Approach

83. This analysis involved selecting companies with which FCC could be usefully compared. The following section describes the review process in the comparable company analysis.

#### 1)   Potentially Comparable Companies

84. Companies operating in the postsecondary education industry, similar to FCC, were selected for on the basis of the following criteria:

   a.  Each company operated in Education Services, as defined by Capital IQ;

   b.  Each was located in the United States;

   c.  Each was a publicly traded company;

   d.  Each had revenue of approximately $100 million or greater in calendar year 2013.

85. The screen resulted in 22 potentially comparable companies. Following the screen, additional information was gathered on each company. From this research, 7 companies were revealed to not have a focus on postsecondary education services and were subsequently removed from the list of potentially comparable companies. In addition, 1 company was determined to be a private company and was subsequently removed from the list of potentially comparable companies. Lastly, the Capital IQ screen was supplemented with 1 private company that was formerly public. The remaining 15 potentially comparable companies are listed and described below, and in Exhibit 15.[124]

#### Table 16: Description of Potentially Comparable Companies

| Company | Business Description |
|---|---|
| American Public Education, Inc. | According to its public filings, the company provides online and on-campus postsecondary education through two subsidiaries, American Public University System, Inc. and America Public University. The company's programs are |

---

[124] Deloitte and FCC considered many of these same companies when performing their valuations.

**Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al**
Expert Report of James J. Donohue

|  |  |
|---|---|
|  | primarily directed at the needs of the military and public safety communities, and the nursing and healthcare community.[125] |
| Apollo Group, Inc. | According to its public filings, the company provides "innovative and distinctive educational programs and services both online and on-campus through its wholly-owned subsidiaries, The University of Phoenix, Inc., Apollo Global, Inc., the Institute for Professional Development, and The College for Financial Planning Institutes Corporation.[126] |
| Bridgepoint Education, Inc. | According to its public filings, the company provides postsecondary education services both online and at its traditional campuses, Ashford University and the University of the Rockies.  The company's online platform is designed to deliver a quality education experience while offering the flexibility and convenience that many students require.[127] |
| Capella Education Company | According to its public filings, the company is an online postsecondary education services company, whose subsidiaries include Capella University, Resource Development International, Sophia Learning, LLC, and Capella Learning Solutions.  Capella University's programs include public service leadership, behavioral health and human services, business management and technology, and education.[128] |
| Career Education Corporation | According to its public filings, the company's schools and universities "offer high-quality education to a diverse population in a variety of career-oriented disciplines through online, on-ground and hybrid learning program offerings."[129] |
| Corinthian Colleges Inc. | According to its public filings, the company is "one of the largest for-profit post-secondary education companies in the United States and Canada, serving the large segment of the population seeking to acquire career-oriented education." The company operates 97 schools in 25 states and 14 schools in the province of Ontario, Canada.[130] |

---

[125] American Public Education, Inc. 2013 10-K.

[126] Apollo Education Group, Inc. 10-Q for the period ending May 31, 2013.

[127] Bridgepoint Education, Inc. 2013 10-K.

[128] Capella Education Company 2013 10-K.

[129] Career Education Corporation 2013 10-K.

[130] Corinthian Colleges, Inc. 2013 10-K.

Page 44

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

| | |
|---|---|
| DeVry, Inc. | According to its public filings, the company is a "global provider of educational services" offering a wide array of programs in business, healthcare and technology.[131] |
| Education Management Corporation | According to its public filings, the company is "among the largest providers of post-secondary education in North America." The company's programs focus on media arts, health sciences, design, psychology and behavioral sciences, culinary, business, fashion, legal, education and information technology.[132] |
| Grand Canyon Education, Inc. | According to its public filings, the company is a "regionally accredited provider of postsecondary education services." The company offers programs focused on education, healthcare, business and the liberal arts both online and onsite at its Phoenix, Arizona campus.[133] |
| Graham Holdings Company | According to its public filings, Graham Holdings is a "diversified education and media company." The Company's Kaplan subsidiary provides a variety of educational services both domestically and internationally.[134] |
| ITT Educational Services Inc. | According to its public filings, the company is a "leading proprietary provider of postsecondary degree programs in the United States." The company operates 147 campuses, 2 learning sites, and 1 training facility in 39 states.[135] |
| Lincoln Educational Services Corporation | According to its public filings, the company is a "leading provider of diversified career-oriented post-secondary education." The company operates 33 campuses and five training sites in 15 states focusing on five areas of study: automotive technology, health sciences, skilled trades, hospitality services and business and information technology.[136] |
| National American University Holdings, Inc. | According to its public filings, the company is a "provider of postsecondary education primarily focused on the needs of working adults and other non-traditional students." The company's programs focus on technical and professional fields, such as accounting, management, business administration, information |

---

[131] DeVry, Inc. 2013 10-K.

[132] Education Management Corporation 2013 10-K.

[133] Grand Canyon Education, Inc. 2013 10-K.

[134] Graham Holdings Company 2013 10-K.

[135] ITT Educational Services Inc. 2013 10-K.

[136] Lincoln Education Services Corporation 2013 10-K.

Page 45

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

| | technology, nursing and healthcare management. The company also operates a real estate business.[137] |
|---|---|
| Strayer Education Inc | According to its public filings, the company "provides post-secondary education services." The company focuses on making their education services relevant, accessible and affordable to working adults.[138] |
| Universal Technical Institute, Inc. | According to its public filings, the company provides "postsecondary education for students seeking careers as professional automotive, diesel, collision, repair, motorcycle, and marine technicians." The company offers undergraduate degrees and diploma programs at 11 campuses across the United States.[139] |

86.  Following the initial screen, additional criteria was considered to determine the companies most comparable to FCC. This criteria and the resulting excluded companies are described below.

a.  <u>Last Twelve Months ("LTM") Revenue (as of June 30, 2014)</u>: FCC's revenues for the twelve months ended June 30, 2014 were approximately $230 million. During the same time period, 9 of the potentially comparable companies had revenues exceeding $500 million and were excluded from the list of potentially comparable companies.

b.  <u>Title IV Funds</u>: FCC historically draws Title IV funds, as do the majority of the potentially comparable companies. All of these potentially comparable companies draw Title IV funds.

c.  <u>Campus Presence</u>: FCC maintains approximately 40 campuses, in addition to a more limited online presence.[140] The majority of the potentially comparable companies also maintain a campus and online presence. The 1 company that only has an online presence, with no physical campus, was removed from the list of potentially comparable companies. In addition, 1 company that predominantly has an online presence, and only has one physical campus dedicated entirely to a specific program, was removed from the list of potentially comparable companies.

---

[137] National American University Holdings, Inc. 2013 10-K.

[138] Strayer Education, Inc. 2013 10-K.

[139] Universal Technical Institute, Inc. 2013 10-K.

[140] Deposition Exhibit 131.

Page 46

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

87. Following the above exclusions, 4 comparable companies remained and were the foundation of the comparable companies analysis.

   2) <u>Valuation Multiples</u>

88. Valuation multiples for each of the comparable companies were calculated to evaluate the bases by which investors were valuing their common stocks. The enterprise value - consisting of the market value of its common stock as of June 30, 2014 (market price times total shares outstanding) plus the book value of debt, preferred stock (if any), and minority interest, reduced by cash and equivalents ("Enterprise Value") – was calculated for each comparable company. The Enterprise Value was then compared with EBITDA and revenue for each comparable company to create valuation multiples. Specific valuation multiples calculated include: Enterprise Value to LTM revenue, Enterprise Value to Forward Year revenue, Enterprise Value to LTM Adjusted EBITDA, and Enterprise Value to Forward Year EBITDA.

89. A table summarizing the valuation multiples analysis is below.[141]

### Table 17: Valuation Multiples

|  | LTM Revenue Multiple | Forward Year Revenue Multiple | LTM Adjusted EBITDA Multiple | Forward Year Adjusted EBITDA Multiple |
|---|---|---|---|---|
| High | 1.14x | 1.30x | 10.10x | 8.99x |
| Median | 0.54x | 0.54x | 7.21x | 7.09x |
| Average | 0.66x | 0.69x | 7.29x | 6.67x |
| Low | 0.42x | 0.40x | 4.63x | 3.51x |

---

[141] See Exhibit 15C. In addition to the comparable companies, I also considered comparable transactions as market approach valuation multiples can be derived from this methodology. I conducted a CapitalIQ transaction screen in the education services industry and identified transactions, however, most of these transactions were dated or lack sufficient information. Given the timeliness of these transactions, I did not prepare a transaction based market approach. . Thus, there was a transaction that occurred in or around 2013, but this transaction did not provide EBITDA figures. Given the inability to determine an EBITDA valuation multiple from this transaction, I excluded this transaction from my analysis.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al
Expert Report of James J. Donohue

### 3)  Comparable Company Enterprise Value Calculation Before Adjustments

90.  As discussed above, FCC's LTM and forward EBITDA run rates were approximately $11.4 million and $10.9 million, respectively.[142]  Given the status of the but for the alleged breaches FCC firm as compared to the comparable companies, including, but not limited to, FCC's decline in EBITDA compared with prior periods and FCC's earlier expectations, I have utilized the low end of the EBITDA valuation multiples to value FCC.[143]  These low end EBITDA valuation multiples (4.63x and 3.51x) are also below the multiples that were implied by FCC equity transactions and previous FCC valuations.

91.  Applying the low end of the EBITDA valuation multiples to the FCC LTM- and forward-year-EBITDA run-rate figures result in an enterprise value, before discounts and premiums, ranging from $52.9 million to $38.1 million, respectively.[144]  Given FCC's $200 plus million revenue, a $52.9 million valuation would imply a revenue multiple of 0.26, significantly below even the lowest revenue multiple indicated by the comparable companies multiple analysis.

### 4)  Adjustments for Marketability

92.  Because FCC is a closely held, private company, there is a limited market for its equity relative the public companies utilized to derive the valuation multiples.  As described in the following section, I have discounted my FCC enterprise value by 20% to reflect the lack of marketability associated with FCC.[145]

#### a.  *Restricted Stock Studies*

93.  Many studies have attempted to empirically quantify a discount for lack of marketability by examining the discounts observed in restricted stock transactions.  Discounts for lack of marketability have been measured using discounts taken in private placements of company

---

[142] See Exhibits 14A and 14B.

[143] See Exhibit 15C.

[144] See Exhibit 16.

[145] See Exhibit 20.   The June 30, 2013 Deloitte Valuation utilized a 22% marketability discount.

restricted stock, with respect to freely traded stock of the same subject company. Robert Reilly and Aaron Rotkowski present 15 such studies in their paper titled *The Discount for Lack of Marketability: Update on Current Studies and Analysis of Current Controversies*[146] The studies, in aggregate, cover a period of over 30 years from 1966-1998, with most of the studies covering periods ranging from 2 to 8 years. The studies observed average price discounts ranging from 13.0% to 35.6%, and median price discounts ranging from 9.0% to 45.0%, depending on the nature of transactions studied and time period covered. Most of the observed average and median discounts were above 20%. Generally, the observed average and median discounts appear to have trended downwards after 1990. Of the studies presented, a study conducted by FMV Opinions, Inc. covered the longest observation period of 18 years, from 1980 – 1997. The observed average and median discount in their study was 22.1% and 20.1%, respectively.

### b.  Option-Based Models

94.  Option-based valuation models have also been used to quantify marketability discounts. To estimate the applicable marketability discount, an average-strike put model developed by John D. Finnerty was employed, as shown in Exhibit 20A.[147] In a 2012 paper, Dr. Finnerty states that his "model-predicted marketability discounts are consistent with actual private placement discounts after adjusting for the information, ownership, concentration, and overvaluation effects that accompany a stock private placement."[148] FCC's share price volatility was estimated using the historical and implied volatility of the comparable companies, which was approximately 50% at the Valuation Date.[149]

---

[146] The paper was published in *Tax Lawyer*, Vol. 61, No. 1 (Fall 2007). Substantial portions of this paper were drawn from Chapter 17 of Pratt, Shannon P and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, Fifth Edition (New York: McGraw-Hill, 2008).
[147] Finnerty, John D. An Average-Strike Put Option Model of the Marketability Discount. The Journal of Derivatives, Volume 19, Number 4, Summer 2012.
[148] Finnerty, John D. An Average-Strike Put Option Model of the Marketability Discount. The Journal of Derivatives, Volume 19, Number 4, Summer 2012, p. 53.

[149] Dr. Finnerty reports that "[t]here is a tendency for [his] model to understate the discount when the volatility is less than 45% and greater than 75% and to overstate it when the volatility is between 45% and 75%." (An Average-Strike Put Option Model of the Marketability Discount, p. 66); See Exhibit 20B.

95. The Finnerty model resulted in marketability discounts of between 8% and 28% for holding periods of between six months and 10 years.[150]

96. Lastly, I have also generally considered the factors discussed in connection with Mandelbaum v. Commissioner (the "Mandelbaum Factors").[151]  The Mandelbaum Factors include:

   a.  Financial statement analysis

   b.  Dividend policy

   c.  Nature of the company, its history, its position in the industry and economic outlook

   d.  Amount of control in transferred shares

   e.  Restrictions on transferability of stock

   f.  Holding period for stock

   g.  Company redemption policy

   h.  Costs associated with making a public offering

   5) **Adjustment for Control Premium**

97. A control premium is the incremental amount an investor would pay above the marketable minority value in order to control the company.  The valuation ratios in this analysis have an implied lack of control given each company's numerous shareholders, unlike ability to control the entire FCC business.  Therefore, I have also adjusted the enterprise value calculations to include a control premium and reflect control over the entire FCC business.  Based on a review of Mergerstat and Capital IQ data, as described in the following sections, a 20% control premium was selected.[152]

---

[150] See Exhibit 20.

[151] Mandelbaum v. Commissioner [T.C. Memo 1995-255], as referenced in the Job Aid for IRS Professionals (http://www.irs.gov/pub/irs-utl/dlom.pdf).

[152] See Exhibit 19. The control premium used in the June 30, 2013 Deloitte Valuation of FCC was 25%.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
Expert Report of James J. Donohue

### a. *Mergerstat*

98. The Mergerstat Control Premium Study is one commonly referenced source used to determine control premiums. The study summarizes premiums paid for control in public company transactions involving an acquisition of at least a 50.01% interest. The premium is expressed as a percentage of the target company's unaffected marketable minority share price (referred to by Mergerstat as the "Mergerstat™ Unaffected Price").[153] Many factors may affect the size of a merger premium, including the target size and any potential synergies resulting from the transaction.

99. Mergerstat's domestic all industry median control premium for Q2 2014 was 29%. The Q2 2014 domestic all industry data represented 33 transactions. The Mergerstat Control Premium Study found no domestic education services transactions from 2013 to Q2 2014.

### b. *Capital IQ Transaction Screen*

100. Capital IQ was also used to assess control premiums. This analysis involved creating a comparable transaction screen, similar to the comparable company screen. Transactions involving companies operating in the postsecondary education segment were screened using the following criteria:[154]

   a. Each education services transaction with a disclosed value that was announced and closed between January 1, 2006 and June 30, 2014;

   b. Each operated in Education Services, as defined by Capital IQ;

   c. Each transaction was classified as a Merger/Acquisition by Capital IQ;

   d. The target was located in the United States;

   e. The target had revenues over the last twelve months greater than $50;

   f. Each was an acquisition of a majority equity stake;

---

[153] See the Mergerstat Control Premium Study for the 2nd Quarter 2014, p. ii.

[154] See Exhibit 19A.

g.  Each had a total transaction value greater than $0.

101. The screen resulted in 13 potentially comparable transactions.  Following the screen, transactions with negative control premiums were excluded from the list of comparable transactions.  The remaining 6 comparable transactions are displayed in Exhibit 19A.  The median 30-day stock premium for these transactions was approximately 20%.

### 6)  Comparable Company Enterprise Value Calculation After Adjustments

102. Applying the adjustments for the 20% marketability discount and the 20% control premium to the comparable company approach enterprise value results in an enterprise value range of $37 million to $51 million.[155]

### D.     Fair Value using Income Approach

103. The income approach values assets based on the present value of the future income streams expected from the asset under consideration.  There are three parameters that must be quantified in order to use this method:

- The future income stream from the asset;

- The duration of the income stream (i.e., the remaining useful life of the asset); and

- The risk associated with the realization of the income stream.

104. The future income stream from the asset may be quantified using a variety of approaches depending on the specific circumstances of each case.  Given the lack of long term projections for a but for FCC enterprise, I have utilized the capitalization of earnings method to estimate value.

### 1)  Run Rate Cash Flow for FCC but for the Alleged Breaches

105. As discussed above, FCC's LTM and forward EBITDA run rates were approximately $11.4 million and $10.9 million, respectively.   To estimate a perpetual cash flow for the capitalization

---

[155] See Exhibit 16.

of earnings method, I have considered working capital, capital expenditures, and income tax adjustments to my run rate EBITDA.

106. Based on a June 2014 investor presentation prepared by FCC, which estimated that maintenance related capital expenses were $75,000 per campus, I have assumed that capital expenditures would be approximately $3 million per year ($75,000 times 40).[156]  While FCC's actual capital expenditures were approximately $12.7 million in fiscal year 2014, these capital expenditures were associated with growth plans that expected meaningful increases in FCC's long term revenue.[157] Capital expenditures would be more limited when assuming limited growth (which is generally assumed when using a capitalization of earnings approach).  I have also assumed that capital expenditures and depreciation would equalize in the long run and that depreciation would therefore also be $3 million.

107. Given the limited growth, I have also assumed that meaningful working capital costs would not be required.

108. Using the $3 million annual depreciation as a tax shield, I calculated earnings before tax using a 40% tax rate.  As shown at Exhibit 17A, annual cash flow would be about $5.1 million and $4.7 million using the LTM and forward EBITDA run rates, respectively and the assumptions explained above.

### 2) Discount Rate

109. The rate at which projected cash flows are discounted depends on the return required by a prospective purchaser, which in turn is a function of the risk associated with the investment. The required rate of return was estimated by calculating a weighted average cost of capital ("WACC").  This requires determining a cost of debt, a cost of equity, and an assumed capital structure.

---

[156] Deposition Exhibit 131.

[157] Deposition Exhibit 72.

110. To evaluate the appropriate discount rate, a weighted cost of capital calculation using the capital asset pricing model and industry cost of capital data was utilized. The capital asset pricing model considers the risk-free rate with additional premiums for risk to determine an investors' expected return.[158] The components of this calculation are as follows and summarized at Exhibit 21B.

- Risk-Free Rate: The risk-free rate of return typically represents that rate of return free from market risk, or free from risk of default. A 10-year US Treasury bond yield for the risk-free rate, of 2.5% as of June 30, 2014.

- Equity Risk Premium: The equity risk premium represents the additional return required to compensate investors for the risk associated with owning equity securities. An equity risk premium of 6.2% was selected (long-horizon supply side). The beta calculations considered the comparable companies and educational services industry data.

- Small Company Risk Premium: Due to a variety of factors, including, but not limited to, narrower product lines and customer base and reliance on key employees, smaller companies typically are more risky than larger companies. The small company equity risk premium therefore represents an additional return required for smaller companies as compared to larger companies. The 2014 Duff & Phelps Valuation Handbook can be used to determine the premium for smaller companies. Given the size of FCC relative to the public companies in this data, the 10b category in terms of market capitalization was selected.[159] The small company risk premium for this category was 9%.

111. As shown on Exhibit 21B, adding these components together provides required equity returns ranging from approximately 18% to 20% (range based on comparable company beta and industry risk premium information).

112. Based on capital structures for the comparable companies and companies operating within the postsecondary education industry, the selected capital structure for the WACC calculation

---

[158] See "Chapter 4: Overview of Cost of Equity Capital Models." *Ibbotson SBBI 2011 Valuation Yearbook*.

[159] 2014 Duff & Phelps Valuation Handbook. The 10b size decile category encompasses companies with market capitalizations up to $185 million.

Page 54

ranged from 16% to 10% debt.[160]   The interest rate of 6.9% was based on 10 year BB rated corporate debt.[161]   The WACC using this capital structure, equity cost, and debt rate would be approximately 16%.[162]

### 3) Income Approach Enterprise Value Before Marketability Discount

113. The last step of the capitalization approach converts the run rate cash flow into a value using the capitalization rate.[163]   As explained above, the run rate cash flow based on LTM and forward EBITDA was $5.1 million and $4.7 million, respectively.   I have utilized a 2% growth rate to convert the 16% discount rate into a 14% capitalization rate.   Accordingly, the capitalization approach based enterprise value ranged from $37 million to $34 million, before considering marketability discounts.[164]

### 4) Adjustments for Marketability

114. As discussed above, a 20% discount was selected to reflect the lack of marketability associated with FCC.   My income approach enterprise values after applying a 20% marketability discount ranged from $29 million to $27 million.[165]

### E.   Other Potential Valuation Indications

### 1) Recent Historical FCC Equity Transactions

115. As part of my valuation analysis, I reviewed more recent historical transactions involving FCC equity.

---

[160] See Exhibit 21B.

[161] See Exhibit 21B.

[162] See Exhibit 21B.

[163] Chapter 10 of Pratt, Shannon P and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, Fifth Edition (New York: McGraw-Hill, 2008).

[164] See Exhibit 17.

[165] See Exhibit 17.

Page 55

116. In connection with FCC's Anthem acquisition in April 2012, FCC investors provided $30 million in equity at $4 per share.  In a May 2012 letter to the Director of Accreditation Development, FCC's Mr. Bartness explained that the $30 million was raised to fund the Anthem acquisition, but also provided FCC with $13 million in excess capital that would be used to invest and support operations.  Mr. Bartness also explained that a FCC "is a growing and financially stable company with solid operating margins and positive operating cash flows."[166] A $4 per share value in April 2012 would suggest that FCC's enterprise value was about $140 million before considering a control premium.[167]

117. In connection with FCC's August 2013 acquisition of U.S. Colleges, FCC common shareholders provided $2.5 million of FCC equity at $4 per share.  A $4 per share value would suggest that FCC enterprise value was about $160 million in August 2013, before considering a control premium.[168]  Given FCC's trailing twelve months EBITDA of $28.7 as of August 30, 2013, the implied trailing EBITDA multiple using a $160 million enterprise value would be 5.5 times EBITDA.[169]

## 2) Financial Reporting Valuations

118. FCC had Deloitte prepare annual valuations of FCC for financial reporting purposes for fiscal years 2009 through 2013.[170]  These annual valuations were utilized by FCC to assess goodwill and FCC stock compensation.[171]  These Deloitte valuations primarily utilized a discounted cash flow methodology (i.e. an income based approach) and a guideline company methodology (i.e. a market based approach) to estimate FCC's enterprise value.  The last Deloitte valuation prepared

---

[166] P0337470-474.

[167] See Exhibit 18A. $135.6 million equity value (33.9 million shares times $4 per share) plus debt of $34 million, less $24 million cash as of April 30, 2012 equals $146 million before adjustments for control premium.

[168] See Exhibit 18A; $138 million equity value (34.5 million shares times $4 per share) plus debt of $30 million, less $10 million cash as of August 31, 2013 equals $158 million before adjustments for control premium.

[169] See Exhibit 18.

[170] Deloitte also provided fair value services in connection with the FCC's accounting for the April 2012 Anthem valuation.

[171] Pierne Deposition, p. 224.

Page 56

prior to my June 30, 2014 valuation date was prepared as of June 30, 2013 and concluded that FCC's enterprise value was about $219 million (before considering discounts and premiums).[172] Given the trailing and forward EBITDA figures utilized in the June 30, 2013 Deloitte valuation, the implied trailing and forward EBITDA multiples were about 8 and 7 times EBITDA, respectively.

119. FCC also periodically prepared financial reporting valuations for internal monitoring purposes and stock option pricing.[173]  Similar to Deloitte's methodologies, FCC utilized a discounted cash flow methodology and a guideline company methodology to determine FCC's enterprise value. The last FCC prepared financial reporting valuation was updated in March 2014 and estimated that FCC's enterprise value was about $270 million (before considering discounts and premiums).[174]  Given the trailing and forward EBITDA figures utilized in this valuation, the implied trailing and forward EBITDA multiples was about 8 and 5 times EBITDA, respectively.[175]

120. A summary of Deloitte and FCC prepared valuations and the valuations implied by the FCC equity transactions is attached at Exhibit 18.

3) **Financing Prior to Bankruptcy**

121. Despite the various breaches, as well as knowledge that the DOE had ceased FCC's ability to obtain advanced Title IV funding, various investors loaned FCC more than $18 million during the four months before the August 2014 bankruptcy.[176]  $15 million of this new loan was committed to in April 2014 and an additional $4 million was committed to July 2014.  The investors, referred to as the Term A or Tranche A lenders, funded $8 million of the loan in April

---

[172] See Exhibit 18.

[173] Pierne Deposition, pp. 319-320.  Also see Babson Deposition at pp. 183-186 and Deposition Exhibit 133.

[174] Deposition Exhibit 133.

[175] See Exhibit 18.

[176] BMO01003-094 at 080.

<u>**Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al**</u>
**Expert Report of James J. Donohue**

2014, another $2 million in May 2014, and another $3.6 million in June 2014.[177]   The last $4 million was committed and funded in July 2014.   The willingness to provide $18 million of financing suggests that the lenders perceived some value in the ongoing FCC business, despite the alleged breaches and resulting liquidity crisis.

122. The former employees of FCC also believed that FCC had some value despite the alleged breaches.   After the bankruptcy in early 2015, as part of an objection to the proposed sale of the FCC assets, the FCC employees estimated that the portion of FCC being sold had revenues of $100 million and a value in excess of $50 million.   While not supported by a valuation report, Mr. Pierne, a former FCC employee and a defendant in this case, testified that he believed the value to be $50 million.[178]

    4)   <u>**Distressed Sale of FCC Assets During Bankruptcy**</u>

123. As part of the bankruptcy process, FCC sold certain campuses to IEC and certain campuses to Premier for roughly $4 million.[179]   These transactions also assumed certain liabilities and allowed several thousand students to continue their education.[180]   Since these transactions were impacted by the alleged breaches and were clearly distressed sales related to the bankruptcy process, they do not provide useful valuation benchmarks for my but for the alleged breaches valuation analysis.[181]

---

[177] I understand that one of the new Term A lenders failed to fund the entire commitment.   See August 26, 2014 Declaration of Sean Harding and Exhibit 4A.   See Deposition Exhibit 185.

[178] Deposition Exhibit 135 and Pierne Deposition, p. 328.

[179] Deposition Exhibit 187.

[180] See Sean Harding August 26, 2014 declaration.

[181] As just one of example of the impact of the distressed sale, according to Aaron Mortensen, Senior Vice President and General Counsel at IEC, the sale of FCC campuses to IEC was completed with an insufficient amount of time for due diligence.   Typically, IEC would allow for three to six months to conduct a due diligence for an acquisition, however, FCC was under duress and IEC had six weeks only to conduct its due diligence to complete the transaction.   For instance, he explained that "one of the biggest issues with the deal to begin with was what the potential liabilities outstanding might have been. There was certainly no time to conduct thorough financial aid due diligence" and they could not interview certain employee because they had already departed.   See Mortensen Deposition, pp. 22-25.

Page 58

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>
**Expert Report of James J. Donohue**

**F.** **<u>FCC's Fair Value Conclusion</u>**

124. Given my analysis as described above, including, but not limited to, the lack of a long term but for the breach projection for the FCC enterprise and the availability of sufficient comparable company valuation multiples for my market approach, I have concluded that the fair value of a but for the alleged breach FCC enterprise as a going concern is between $37 million and $51 million.[182]

James J. Donohue

January 12, 2018

---

[182] See Exhibit 16.

Page 59

Exhibit 1



# James J. Donohue
Vice President

BS, Accounting Villanova University

Certified Public Accountant
Certified Valuation Analyst
Accredited in Business Valuation

James J. Donohue is a vice president in the New York office of Charles River Associates. Mr. Donohue has been responsible for substantial client assignments in a wide range of areas, including intellectual property, damages, valuation, forensic accounting, securities, and bankruptcy. These services have been provided in industries such as, prepress technology, energy, medical products, manufacturing, biotechnology, computer software and hardware, publishing, apparel, consumer electronics, telecommunications, financial institutions, securities, consumer products, construction, and real estate. Mr. Donohue has participated in all stages of the investigation and litigation process, including providing trial, arbitration and deposition testimony as an expert damages witness, evaluating liability and damages claims, assisting in the preparation of complaints, assistance in depositions, trial/arbitration support, and the filing of expert reports.

Mr. Donohue's experience in intellectual property litigation matters has included assisting counsel and clients in assessing the appropriate economic measure of damages in patent, trademark, trade secret, and copyright disputes. This has included lost profit, royalty, and price erosion calculations. These engagements often entail a review and analysis of the client's market, cost structures, profit margins, capacity issues, licenses, and customer behavior. With respect to lost profit matters, the analyses include a calculation of incremental costs and sales for the product at issue.

Mr. Donohue has extensive experience in intangible asset and business valuation. He has performed and managed numerous valuation engagements for transactional, litigation, tax, and financial reporting purposes. His valuation experience has involved many industries, ownership interests, and asset classes. His financial reporting valuation experience includes valuation and impairment analysis with respect to Accounting Standards Codification (ASC) Topic 805, ASC Topic 350, and ASC Topic 360. During these engagements he has valued many forms of intangibles, including patents, trademarks, licensing agreements, technology groups, customer relationships, research and development projects, and non-compete agreements. He has also prepared fairness opinions and provided valuation consulting for intellectual property based transactions. Transaction experience includes acquisitions and bankruptcy related consulting in the medical product, printing, and biotechnology industries.

Mr. Donohue has also assisted clients and counsel with various intellectual property strategy and licensing engagements. Mr. Donohue has provided a variety of due diligence services for intellectual property based transactions, including valuations and strategic consulting for tax and financial reporting, and bankruptcy proceedings. He has managed patent licensing and sale engagements relating to consumer electronics and various other technologies. In this regard, Mr. Donohue is responsible for researching the potential markets, identifying potential buyers and developing licensing or sale terms. He has been involved with the negotiations, as well as structuring the transfer of the technology.

Charles River Associates

Mr. Donohue's forensic experience includes a variety of matters involving accounting and financial investigations. These engagements involved estates, corporate fraud, professional malpractice, and bankruptcy. Mr. Donohue's clients in this area have included, among others, financial institutions, the Securities Investor Protection Corporation (SIPC), the Resolution Trust Company (RTC), the Federal Deposit Insurance Company (FDIC), large estates, and corporations.

Prior to joining Charles River Associates, Mr. Donohue was a Managing Director at InteCap, Inc. and a Principal with Peterson Worldwide LLC.

## Professional credentials and affiliations

Certified Public Accountant

Certified Valuation Analyst

Accredited in Business Valuation

Member, American Institute of Certified Public Accountants

Member, Maryland Association of Certified Public Accountants

Member, National Association of Certified Valuation Analysts

Member, Licensing Executives Society

## Publications and presentations

Financial Reporting of Intangible Assets, chapter in Intellectual Property Operations & Implementation in the 21st Century Corporation, Lanning G. Bryer, Scott J. Lebson, & Matthew D. Asbell, John Wiley & Sons, Oct. 2011

Statement of Financial Accounting Standards No. 141 [R] "Business Combinations," with JH Cohn January 2009

Trademark and Copyright Valuation, Joint Committee on Taxation, August 2004

FASB 141, 142, 144, Accounting & Valuation, New Jersey Society of CPAs, Dec. 2003

International Federation of Accountants, Articles of Outstanding Merit, September 2003

A New Scorecard for Intellectual Property, Journal of Accountancy, April 2002

Merger & Acquisition Supplement to the Philadelphia Business Journal, September 2001

## Testimony 2014 to 2018

2017   Black Diamond Capital Management, LLC et al. v **Oppenheimer Master Loan Fund, LLC et al.** (Supreme Court of the State of New York). Deposition testimony concerning damages and valuation in the defense industry.

2017   **Au New Haven, LLC and Trelleborg Coated Systems US, Inc.** v. YKK Corporation et al (U.S. District Court, Southern District of New York).  Deposition testimony concerning damages in a patent infringement, breach of contract, and false advertising matter in the apparel industry.

2017   Paul Naumann et al. v. **William Kolbert et al**. (Supreme Court of the State of New York). Deposition testimony concerning damages and valuation in the professional services industry.

2017   First Manhattan Consulting Group, LLC et al., v. **Novantas, Inc., et al.,** (Supreme Court of the State of New York). Trial and deposition testimony concerning damages and valuation in the financial consulting services industry.

2016   Archie MD, Inc. v. **Elsevier, Inc.,** (U.S. District Court, Southern District of New York). Deposition testimony related to potential damages in a copyright infringement matter involving publishing and medical animations.

2016   Richard Duafala v. **Globecomm Systems Inc**. Arbitration testimony concerning an earn-out calculation dispute in the telecomm industry.

2016   Sistemas Automotrices de Mexico, SA v. **Meritor Heavy Vehicle Systems, LLC**. (U.S. District Court, Northern District of Illinois).  Deposition testimony concerning potential damages in a breach of contract dispute in the transportation industry.

2016   **Heritage Auctioneers & Galleries, Inc. dba Heritage Auctions** v. Christie's Inc., (Supreme Court of the State of New York).  Deposition testimony concerning potential damages in the luxury goods industry.

2016   **Target Corporation** v. RichRelevance Inc., (U.S. District Court, Southern District of New York). Deposition testimony concerning damages in a breach of contract dispute in the online advertising industry.

2016   Ahmed Seddiqi & Sons LLC v. **Harry Winston S.A.** (International Center for Dispute Resolution). Arbitration testimony concerning damages in the luxury goods industry.

2016   **Salans, LLP** v. VBH Properties S.R.L., et al. (Supreme Court of the State of New York). Deposition testimony concerning damages in the luxury goods industry.

2015   **Christina Quazzo** v. 9 Charlton St Corporation, Pearlbud Realty Corporation, et al. (Supreme Court of the State of New York) Deposition testimony concerning damages and forensic accounting issues in the real estate industry.

2015   **L-3 Linkabit** v. Sparton et al (U.S. District Court, Middle District of Florida Orlando Division). Deposition testimony concerning potential damages in a breach of warranty dispute in the satellite communications industry.

2014   **JA Men's Group, LLC, et al** v. JA Apparel Corp. (American Arbitration Association). Arbitration testimony related to potential damages in a brand focused breach of contract dispute in the apparel industry.

2014   Joseph Korff v. **Richard A. Corbett, et al**. (Supreme Court of the State of New York). Deposition testimony concerning valuation and damages in a real estate related contract dispute.

2014   Unified Teldata, Inc., v. **Avaya, Inc.** (American Arbitration Association) Deposition and arbitration testimony related to potential damages in a contract dispute in telecommunications industry.

2014   Zohar CDO 2003-1 Limited, et al. v. **Xinhua Sports & Entertainment Limited, et al.** (Supreme Court of the State of New York) Deposition testimony concerning forensic accounting issues  in a fraud matter involving a media company.

Charles River Associates

## Selected Forensic Accounting Engagements

- Retained by purchaser of telecomm consulting firm to evaluate alleged EBITDA earn-out manipulation. Mr. Donohue provided arbitration testimony in connection with this matter.

- Retained by partners in a real estate entity to analyze capital accounts and operational accounting for various closely held real estate entities.

- Mr. Donohue was retained by broker/dealer to investigate the alleged misappropriation of funds. The forensic analysis included the reconciliation of customer trading and firm accounting operations.

- Mr. Donohue was retained by a European heating product manufacturer to provided expert damage testimony in an ICC arbitration concerning an alleged breach of warranty claim.

- Mr. Donohue served as the financial expert in a securities fraud matter involving the misappropriation of funds from multiple client accounts. The analysis included tracing the distribution of the investors' funds in various accounts in the United States and abroad. Investments at issue included equities, bonds, and real estate. Mr. Donohue provided trial testimony in connection with this matter.

- Mr. Donohue was retained to investigate the financial records of two closely held property management companies in order to quantify and trace missing funds on behalf of a minority shareholder.

- Retained by Chinese based media company to review forensic accounting issues in a fraud matter.

- Mr. Donohue was retained by the beneficiaries of major real estate developer's estate to perform a detailed review and analysis of the valuation information relating to the estate's individual assets and aggregate estate value. This included a review of over 100 real estate appraisals of office buildings, hotels, retail space, multi-unit condos, apartment buildings, and undeveloped land. Mr. Donohue's building and appraisal analysis included the review of comparable sales, leases, occupancy rates, rent rolls, operating expenses, real estate tax issues, construction costs, improvement and maintenance costs, and mortgages. The overall trust analysis included a review of the related trust accountings and an investigation of numerous individual transactions that involved the trust and the estate.

- Retained by a public real estate company to evaluate potential damages in a breach of contract matter involving a large residential brokerage operation. Mr. Donohue provided deposition and arbitration testimony in connection with this matter.

- Mr. Donohue assisted a large Russian bank with the review and analysis of the bank's investments in the United States and abroad. His analysis included reviewing the fees and profitability of the institution's portfolio of mutual funds, bonds, commercial loans and treasury securities. Mr. Donohue also investigated the alleged misuse of corporate credit card and bank accounts.

- Mr. Donohue was retained by an investor in a failed nationwide furniture retailer to investigate various financial and accounting transactions that had preceded bankruptcy.

- Mr. Donohue advised the trustee of a large family trust to investigate fraud and mismanagement allegations. The analysis involved reviewing the trust's transactions to determine if the appropriate approvals were provided and to identify the location of the misappropriated funds. The analysis included a review of the trust's commercial real estate and securities assets.

- Mr. Donohue was retained by an asset manager to analyze the manager's handling of a client's assets. The asset manager's client was a high net-worth individual with numerous global and domestic real estate assets. The forensic investigation reviewed asset transfers during the manager's tenure and reconciled the net amounts received by the asset manager. The investigation also analyzed hotel operations and management contract performance.

- Mr. Donohue was retained on behalf of an investor in an internet retailer to investigate various accounting and financial concerns. In addition to an overall feasibility analysis, the forensic investigation included a review of receipts, disbursements and compensation.

- Mr. Donohue was retained by the seller of an internet consumer financial business to perform a forensic investigation of the business in connection with a post-transaction litigation with the buyer. The forensic investigation focused on the reliability and accuracy of the financial and accounting records at the time of the transaction.

- Retained as the regulator-approved Independent Consultant to assist a group of Canadian investment companies to supervise the development of a formal plan of distribution to fairly compensate shareholders for damages resulting from improper 'market timing' transactions, including the determination of individual payments, and the submission of a formal report to government regulators attesting to the fairness of the plan.

- Mr. Donohue assisted the court-appointed Trustee and the Securities Investor Protection Corporation ("SIPC") in the liquidation of the Adler Coleman Clearing Corporation. His primary role on this engagement was to evaluate the reliability of the debtor's books and records, which had been manipulated by an extensive fraudulent trading scheme. He acted as the corporation's controller during the liquidation process and provided deposition testimony as a fact witness.

- Mr. Donohue has been involved in a wide variety of financial institution related projects for the Resolution Trust Corporation ("RTC"), and the Federal Deposit Insurance Corporation ("FDIC"). In this regard, his experience includes the evaluation of claims of accounting malpractice, director and officer liability, and appraiser malpractice. Mr. Donohue's experience in this area included real estate loan portfolio reviews as well as detail examinations of individual credit decisions. The portfolio examinations included analyses of economic feasibility, credit worthiness of the borrower and other potential underwriting and monitoring deficiencies. The loan portfolios and projects at issue included commercial and residential real estate. The analysis of the real estate portfolio credits included individual appraisal and project reviews.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 2**
Documents Considered

**Production**

| Starting Bates | | Ending Bates |
|---|---|---|
| ACCSC000001 | to | ACCSC031837 |
| BARTNESS-000001 | to | BARTNESS-000937 |
| BMO000001 | to | BMO001496 |
| DEF0000001 | to | DEF0000244 |
| DOE000001 | to | DOE000562 |
| ECS0000048 | to | ECS0005403 |
| ECS00001 | to | ECS00047 |
| EY-FCC-000001 | to | EY-FCC-001245 |
| EY-FCC-2011-EWP-000001 | to | EY-FCC-2011-EWP-002215 |
| EY-FCC-2011-WP-000001 | to | EY-FCC-2011-WP-000705 |
| EY-FCC-2012-EWP-000001 | to | EY-FCC-2012-EWP-002515 |
| EY-FCC-2012-WP-000001 | to | EY-FCC-2012-WP-002493 |
| FTI_CHMA-0000001 | to | FTI_CHMA-0035038 |
| FTI00001 | to | FTI00100 |
| GT_FCC_000001 | to | GT_FCC_000035 |
| GT000054 | to | GT003587 |
| KNOBEL-000001 | to | KNOBEL-001161 |
| P0000001 | to | P2665793 |
| PIERNE-000001 | to | PIERNE-007813 |
| Powers00001 | to | Powers00170 |
| Premier_000001 | to | Premier_004935 |
| STEWART-000001 | to | STEWART-000004 |
| TJS000001 | to | TJS025379 |
| YAWN-000001 | to | YAWN-000595 |
| YOUSEFI-000001 | to | YOUSEFI-003803 |

**Discussions**
Discussion with James Murphy.
Discussion with Ed Clingman.
Discussion with Teresa Hanger.

**Depositions**
*See Exhibit 2A.*

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 2**
Documents Considered

**Non-Bates Production**
  FCC Network Drive
  FCC Desktop Drive
  108_BS Det Consolidated-07302014-1345.xls
  90 - 10 feb.xlsx
  90 10 Sep 2013.xlsx
  90 10 STARS vs. IT enhanced by OPEID 7.1.13-5.31.14.pdf
  9010 - Dec xlsx
  9010 - Nov xlsx
  9010 - Oct xlsx
  9010_Anthem_022631.pdf
  9010_Bryman_030764.pdf
  9010_MarylandHeights_022392.pdf
  9010_Miami_023058.pdf
  9010_Parsippany_010851.pdf
  9010_Springfield_008441.pdf
  Bad Debt Provision – Apr14 xlsx
  Bad debt provision – June 2014.xlsx
  BMO Student Refund xxxx4270 August 2013 .pdf
  BMO Student Refund xxxx4270 December 2013.pdf
  BMO Student Refund xxxx4270 February 2014.pdf
  BMO Student Refund xxxx4270 July 2013 .pdf
  BMO Student Refund xxxx4270 June 2014.pdf
  BMO Student Refund xxxx4270 March 2014.pdf
  BMO Student Refund xxxx4270 May 2014.pdf
  BMO Student Refund xxxx4270 November 2013.pdf
  BMO Student Refund xxxx4270 October 2013.pdf
  BMO Student Refund xxxx4270 September 2013.pdf
  BMO Student Refunds xxx4270 January 2014.pdf
  BMO Student Refunds xxxx4270 April 2014.pdf
  Board Deck-June.xlsx
  Copy of FC Sheila docs ETC final 10.2.13.pdf
  Dashboard 90-10 Support.pdf
  FCC - IEC - AR History Summary_2012-2013 xlsx (03135607x9D8E0) xlsx
  FCC - IEC - AR History Summary_2013-2014 (03135606x9D8E0) xlsx
  FCC PPA Report June 07 FINAL (2).pdf
  Student Refund April 2013.pdf
  Student Refund June 2013.pdf
  Student Refund March 2013.pdf
  Student Refund May 2013.pdf

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 2**
Documents Considered

**Legal Filings**
Amended Complaint, dated June 28, 2017.
Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated August 9, 2017.

**Bankruptcy Filings**
Bankruptcy Petition, dated August 25, 2014.
Declaration of Sean Harding in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief, dated August 25, 2014.
First Amended Joint Plan of Orderly Liquidation of FCC Holdings, Inc. and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code, dated January 28, 2015.
Objection of Former Employees to Confirmation of First Amended Liquidating Plan, dated March 11, 2015.

**Company Filings**
American Public Education, Inc., originally stated public filings from 2012 to 2014.
Apollo Group, Inc., originally stated public filings from 2012 to 2014.
Bridgepoint Education, Inc., originally stated public filings from 2012 to 2014. .
Capella Education Company, originally stated public filings from 2012 to 2014.
Career Education Corporation, originally stated public filings from 2012 to 2014.
Corinthian Colleges Inc., originally stated public filings from 2012 to 2014.
DeVry Education Group Inc., originally stated public filings from 2012 to 2014.
Education Management Corporation, originally stated public filings from 2012 to 2014.
Graham Holdings Company, originally stated public filings from 2012 to 2014.
Grand Canyon Education, Inc., originally stated public filings from 2012 to 2014.
ITT Educational Services Inc., originally stated public filings from 2012 to 2014.
Lincoln Educational Services Corporation, originally stated public filings from 2012 to 2014.
National American University Holdings, Inc., originally stated public filings from 2012 to 2014.
Strayer Education Inc, originally stated public filings from 2012 to 2014.
Universal Technical Institute, Inc., originally stated public filings from 2012 to 2014.

**Equity Research and Industry Reports**
American Public Education, BMO Capital Markets, dated May 8, 2014.
DB Education Services Industry Update, Deutsche Bank,dated December 20, 2013.
Education 1Q Preview – Start Trends The Key Metric To Watch, Piper Jaffray, dated April 15, 2014.
National American University Holdings, Inc. Wells Fargo, dated April 4, 2014.
Post-Secondary Education Q2 2014, Capstone Partners Investment Banking Advisors, 2014.
Postsecondary Snapshot, Stifel, dated July, 2013.
Postsecondary Snapshot, Stifel, dated June 2, 2014.
Strayer Education. BMO Capital Markets, dated May 7, 2014.
Universal Technical Institute, Inc., BMO Capital Markets, dated April, 2014.

Clineman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 2**
Documents Considered

**Websites / Databases**
  Bloomberg Terminal.
  Capital IQ, https://www.capitaliq.com
  COD, https://ifap.ed.gov/
  FASB, https://asc.fasb.org
  Federal Reserve, https://www.federalreserve.gov
  G5, https://www.g5.gov/
  IRS, http://www.irs.gov/
  SEC, http://www.sec.gov
  Thomson One.
  U.S. Department of Education, https://www.ed.gov
  U.S. Department of Treasury, https://www.treasury.gov
  U.S. Senate Committee on Health, Education Labor & Pensions, https://www.help.senate.gov/

**Books and Other Sources**
  Duff & Phelps, Guide to Cost of Capital Valuation Handbook 2014.
  Duff & Phelps, Industry Cost of Capital Valuation Handbook 2014.
  Finnerty, John D. "An Average-Strike Put Option Model of the Marketability Discount." *The Journal of Derivatives*, Volume 19, Number 4, (Summer 2012).
  Ibbotson SBBI, 2011 Valuation Yearbook.
  Mandelbaum v. Commissioner [T.C. Memo 1995-255]
  Mergerstat Control Premium Study, Q1 2013 through Q2 2013.
  Mergerstat Control Premium Study, Q1 2014 through Q2 2014.
  Pratt, Shannon P and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, Fifth Edition (New York: McGraw-Hill, 2008).
  Reilly, Robert and Rotkowski, Aaron. "The Discount for Lack of Marketability: Update on Current Studies and Analysis of Current Controversies." *The Tax Lawyer*, Vol. 61, No. 1 (Fall 2007).
  "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," U.S. Senate Committee on Health, Education Labor & Pensions.

Clineman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 2B**
Additional Documents Considered after Initial Report dated January 12, 2018

**Depositions**
Deposition of Kenneth Wood (Partner at TJS Deemer Dana), dated January 19, 2018 and Exhibits 271 to 287.
Deposition of Barbara Davis (Management Analyst in Internal Controls Division at Department of Education), dated January 31, 2018 (rough transcript) and Exhibits 288 to 320.

**Expert Reports**
Expert Report of James Murphy, dated January 12, 2018.
Expert Report of Aaron D. Lacey, dated January 12, 2018.

**Legal Filings**
Order Denying Motion to Dismiss Amended Complaint (D.E. 99), dated January 9, 2018.
Defendants' Motion to Extend Expert Deadlines and Expedite Briefing, dated January 18, 2018.
Plaintiffs' Opposition to Defendants' Motion to Extend Expert Deadlines and Expedite Briefing, dated January 19, 2018.
Defendants' Reply in Support of Their Motion to Extend Expert Deadlines, dated January 22, 2018.
Defendants' Answer and Affirmative Defenses, dated January 23, 2018.

**Non-Bates Production**

| | |
|---|---|
| 0.7.6582.5012.pdf | 0.7.6582.10657.pdf |
| 0.7.6582.5034.pdf | 0.7.6582.10659.pdf |
| 0.7.6582.5034-000002.pdf | 0.7.6582.10660.pdf |
| 0.7.6582.5052.pdf | 0.7.6582.10661.pdf |
| 0.7.6582.5055.pdf | 0.7.6582.10662.pdf |
| 0.7.6582.5061.pdf | 0.7.6582.10663.pdf |
| 0.7.6582.5075.pdf | 0.7.6582.10666.pdf |
| 0.7.6582.5079.pdf | 0.7.6582.10675.pdf |
| 0.7.6582.10531.pdf | 0.7.6582.10686.pdf |
| 0.7.6582.10545.pdf | 0.7.6582.10692.pdf |
| 0.7.6582.10545-000001.pdf | 0.7.6582.10694.pdf |
| 0.7.6582.10557.pdf | 0.7.6582.10695.pdf |
| 0.7.6582.10604.pdf | 0.7.6582.10697.pdf |
| 0.7.6582.10604-000004.pdf | 0.7.6582.10672.pdf |
| 0.7.6582.10607.pdf | 0.7.6582.10675.pdf |
| 0.7.6582.10623.pdf | 0.7.6582.10832.pdf |
| 0.7.6582.10636.pdf | 0.7.6582.10835.pdf |
| 0.7.6582.10640.pdf | 0.7.6582.10899.pdf |
| 0.7.6582.10647.pdf | 0.7.6582.10900.pdf |
| 0.7.6582.10648.pdf | 0.7.6582.10903.pdf |
| 0.7.6582.10649.pdf | 0.7.6582.10943.pdf |
| 0.7.6582.10650.pdf | 0.7.6582.10949.pdf |
| 0.7.6582.10651.pdf | 0.7.6582.10953.pdf |
| 0.7.6582.10652.pdf | 0.7.6582.10898.pdf |
| 0.7.6582.10653.pdf | 0.7.6582.10898-000001.pdf |

| |
|---|
| 0.7.6582.18089.pdf |
| 0.7.6582.18089-000001.pdf |
| 0.7.6582.18112.pdf |
| 0.7.6582.18112-000001.pdf |
| 0.7.6582.18172.pdf |
| FCC FAD for period 7.1.14 to12.31.14_Redacted.pdf |
| FCC FAD for period 1.1.15 to12.31.15_Redacted.pdf |
| FCC Anthem FOIA No. 17-02396 Final docs 2.pdf |
| FCC Anthem FOIA No. 17-02396 Final docs 1.pdf |
| FCC Anthem College 17-02752-F 2of2.pdf |
| FCC Anthem College 17-02752-F 1of2.pdf |
| FCC 023058 FAD 2012_Redacted.pdf |
| FCC 023058 FAD 2011_Redacted.pdf |
| FCC 023058 FAD 2010_Redacted.pdf |
| FCC stub audit FAD for period 7.1.13 to 6.30.14_Redacted.pdf |
| 17-02752- PIRMS Interim ltr.doc |
| 17-02396-F (Clingman_v_Knobel).pdf |
| org_directory.doc |

Clingman & Hauger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 2A
Depositions

| Name | Date | Defendant | Party | Title | Deposition Exhibits |
|---|---|---|---|---|---|
| Sima Stewart | October 19, 2017 | ✔ | FCC | Former Vice President of Financial Services | 1 - 24 |
| David Knobel | November 2, 2017 | ✔ | FCC | Former Chief Executive Officer | 29 - 47 |
| Cid Youssefi | November 10, 2017 | ✔ | FCC | Former Senior Vice President of Information Technology | 48 - 71 |
| Neal Yawn | November 15, 2017 | ✔ | FCC | Former Chief Operating Officer | 72 - 79 |
| John Murphy | November 20, 2017 | | FCC | Former Vice President of Student Financial Services | 80 - 100 |
| Dean Bartuess | November 28, 2017 | ✔ | FCC | Former Chief Compliance Officer | 101 - 119 |
| Jeffrey Pierne | December 1, 2017 | ✔ | FCC | Former Chief Financial Officer | 120 - 137 |
| Roxana Spirea | December 11, 2017 | | FCC | Former Corporate Director of Funds Management | 138 - 142 |
| Aaron Mortensen | December 12, 2017 | | IEC | Senior Vice President & General Counsel | IEC 10 - 15 |
| Shoukry Tiab | December 12, 2017 | | IEC | Chief Operating Officer | IEC 1 - 9 |
| Spring Zutes | December 14, 2017 | | ECS | Consultant | 142 - 151 |
| Sean Harding | December 15, 2017 | | FTI | Senior Managing Director | 156 - 191 |
| Julande Turgot | December 18, 2017 | | FCC | Former Financial Processing Manager | 192 - 205 |
| Kim Verga | December 19, 2017 | | FCC | Former Director of Centralized Financial Aid | 206 - 215 |
| Paul DiCicco | December 20, 2017 | | FCC | Former VP Corporate Controller | 216 - 231 |
| Charles Lang | December 21, 2017 | | Regent | Integration Consultant | 232 - 260 |
| Chris Babson | December 22, 2017 | | FCC | Former VP of Finance | 261 - 270 |

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 3**
FCC Profit & Loss Summary
*Figures in thousands*

| | [1] 1Q FY 12/13 | [1] 2Q FY 12/13 | [1] 3Q FY 12/13 | [1] 4Q FY 12/13 | [1] 1Q FY 13/14 | [1] 2Q FY 13/14 | [1] 3Q FY 13/14 | [1] 4Q FY 13/14 | FY 12/13 | FY 13/14 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Headcount** | | | | | | | | | | |
| Beginning Headcount | 12,439 | 11,899 | 10,465 | 10,998 | 10,664 | 11,882 | 10,128 | 12,337 | 12,439 | 10,664 |
| Ending Headcount | 11,899 | 10,465 | 10,998 | 10,664 | 11,882 | 10,128 | 12,337 | 10,919 | 10,664 | 10,919 |
| **Revenue** | | | | | | | | | | |
| Tuition | $53,999 | $52,225 | $54,834 | $54,049 | $49,734 | $55,866 | $52,360 | $51,222 | $215,106 | $209,183 |
| Other Revenue | $2,595 | $4,337 | $4,621 | $4,627 | $5,821 | $4,567 | $7,331 | $5,312 | $16,179 | $23,032 |
| **Tuition and Fees** | $56,594 | $56,561 | $59,455 | $58,676 | $55,556 | $60,433 | $59,691 | $56,534 | $231,286 | $232,214 |
| Cost of Instruction | $11,105 | $11,109 | $11,789 | $11,114 | $10,306 | $10,447 | $11,689 | $12,315 | $45,117 | $44,757 |
| Student Recruitment | $11,341 | $10,937 | $11,883 | $10,281 | $10,933 | $10,944 | $11,042 | $9,106 | $44,443 | $42,026 |
| G&A | $14,011 | $14,689 | $14,566 | $15,027 | $14,305 | $14,545 | $19,883 | $28,968 | $58,293 | $77,701 |
| Occupancy | $7,527 | $7,705 | $7,844 | $7,617 | $7,757 | $8,086 | $8,382 | $8,439 | $30,692 | $32,664 |
| **Campus Operating Profit** | $12,610 | $12,121 | $13,373 | $14,637 | $12,254 | $16,411 | $8,695 | ($2,294) | $52,741 | $35,066 |
| Central Overhead | $6,284 | $6,079 | $6,331 | $5,377 | $6,644 | $6,274 | $5,758 | $7,075 | $24,071 | $25,750 |
| **EBITDA Before Special Items** | $6,326 | $6,042 | $7,042 | $9,260 | $5,610 | $10,137 | $2,937 | ($9,368) | $28,670 | $9,316 |
| Bonus Stock Option | $77 | $476 | $349 | $331 | $324 | $317 | $309 | $271 | $1,232 | $1,221 |
| SFAS 13 | $192 | $206 | $119 | $886 | $428 | $193 | $250 | $233 | $1,403 | $1,104 |
| Addbacks - Other | $66 | $390 | $520 | ($314) | ($48) | ($71) | $960 | $954 | $661 | $1,795 |
| **EBITDA** | $5,992 | $4,971 | $6,054 | $8,357 | $4,905 | $9,698 | $1,418 | ($10,826) | $25,373 | $5,195 |
| Amortization | $1,775 | $1,790 | $1,974 | $778 | $759 | $764 | $760 | $601 | $6,317 | $2,884 |
| Depreciation | $1,773 | $1,249 | $1,623 | $3,014 | $2,057 | $2,139 | $2,148 | $2,049 | $7,659 | $8,393 |
| Interest Expense | $611 | $1,174 | $1,146 | $898 | $608 | $722 | $1,172 | $898 | $3,829 | $3,399 |
| Change in FV of Derivative | ($286) | ($338) | ($318) | ($262) | $0 | $0 | $0 | $0 | ($1,205) | $0 |
| **Income Before Taxes** | $2,118 | $1,096 | $1,629 | $3,930 | $1,482 | $6,074 | ($2,663) | ($14,373) | $8,773 | ($9,480) |
| *Selected Expense Line Items:* | | | | | | | | | | |
| Bad Debts | $4,888 | $5,060 | $4,776 | $5,118 | $4,122 | $4,939 | $9,487 | $17,921 | $19,842 | $36,469 |
| Depreciation & Amortization | $3,549 | $3,040 | $3,597 | $3,791 | $2,816 | $2,902 | $2,908 | $2,650 | $13,977 | $11,276 |

Sources:
[1] See Exhibit 3A and Exhibit 3B.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 3A
FCC Normalized Profit & Loss Statements
*Figures in thousands*

| | FY 12/13 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/31/12 | 08/31/12 | 09/30/12 | 10/31/12 | 11/30/12 | 12/31/12 | 01/31/13 | 02/28/13 | 03/31/13 | 04/30/13 | 05/31/13 | 06/30/13 |
| | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] |
| **Revenue** | | | | | | | | | | | | |
| *Tuition* | | | | | | | | | | | | |
| Tuition - Diploma Programs | $11,534 | $12,359 | $11,948 | $13,863 | $11,909 | $8,988 | $10,980 | $11,834 | $10,714 | $12,035 | $11,159 | $9,928 |
| Tuition - 2 Year Degree Programs | $5,729 | $5,339 | $5,904 | $5,830 | $5,477 | $5,014 | $6,778 | $6,195 | $6,276 | $6,971 | $5,999 | $5,538 |
| Tuition - 4 Year Degree Programs | $403 | $385 | $375 | $377 | $366 | $350 | $472 | $622 | $915 | $910 | $812 | $696 |
| Tuition - Other | $24 | $1 | ($52) | $26 | $4 | $20 | $46 | $0 | $0 | $0 | $0 | $0 |
| Total Tuition | $17,690 | $18,084 | $18,225 | $20,097 | $17,756 | $14,371 | $18,276 | $18,652 | $17,906 | $19,916 | $17,969 | $16,163 |
| | | | | | | | | | | | | |
| *Other Revenue* | | | | | | | | | | | | |
| Fees | $273 | $503 | $260 | $628 | $339 | $333 | $859 | $547 | $489 | $774 | $430 | $632 |
| Sales - Books | $393 | $599 | $428 | $1,666 | $673 | $589 | $1,125 | $750 | $736 | $1,008 | $1,068 | $562 |
| Sales - Other | $40 | $51 | $48 | $45 | $31 | $33 | $30 | $41 | $44 | $40 | $40 | $73 |
| Total Other Revenue | $706 | $1,152 | $736 | $2,339 | $1,043 | $955 | $2,014 | $1,338 | $1,269 | $1,822 | $1,538 | $1,268 |
| | | | | | | | | | | | | |
| Tuition and Fees | $18,396 | $19,237 | $18,961 | $22,436 | $18,799 | $15,326 | $20,290 | $19,990 | $19,174 | $21,738 | $19,507 | $17,431 |
| | | | | | | | | | | | | |
| **Cost of Instruction** | | | | | | | | | | | | |
| Payroll - Faculty | $2,516 | $2,492 | $2,968 | $2,717 | $2,405 | $2,239 | $2,571 | $2,606 | $2,537 | $2,444 | $2,487 | $2,238 |
| Other Costs of Instruction | $1,124 | $1,260 | $745 | $1,570 | $1,315 | $863 | $1,369 | $1,493 | $1,214 | $1,701 | $1,245 | $997 |
| Total Cost of Instruction | $3,640 | $3,752 | $3,713 | $4,287 | $3,720 | $3,103 | $3,940 | $4,098 | $3,750 | $4,145 | $3,733 | $3,236 |
| | | | | | | | | | | | | |
| **Student Recruitment** | | | | | | | | | | | | |
| Payroll - Student Recruitment | $1,777 | $1,941 | $2,109 | $2,054 | $1,931 | $2,003 | $2,297 | $1,952 | $1,942 | $1,896 | $1,909 | $1,762 |
| Call Center | $295 | $227 | $277 | $257 | $240 | $256 | $287 | $298 | $308 | $302 | $343 | $296 |
| Advertising - Internet | $1,083 | $1,270 | $1,101 | $1,170 | $1,390 | $1,390 | $1,220 | $1,109 | $1,613 | $1,056 | $1,093 | $1,044 |
| Advertising - Other | $684 | $327 | $250 | $395 | ($54) | $381 | $507 | $127 | $223 | $187 | $204 | $187 |
| Total Student Recruitment | $3,839 | $3,765 | $3,737 | $3,875 | $3,031 | $4,030 | $4,312 | $3,486 | $4,086 | $3,442 | $3,550 | $3,289 |
| | | | | | | | | | | | | |
| **General and Administrative** | | | | | | | | | | | | |
| Bad Debts | $1,545 | $1,597 | $1,746 | $2,183 | $1,653 | $1,224 | $1,684 | $1,451 | $1,641 | $2,194 | $1,534 | $1,390 |
| Payroll - Campus Adm | $1,089 | $1,199 | $1,054 | $1,105 | $950 | $1,011 | $1,064 | $1,003 | $1,086 | $1,061 | $1,238 | $1,071 |
| Payroll Taxes - G&A | $52 | $60 | $54 | $171 | $161 | $151 | $279 | $212 | $194 | $163 | $184 | $126 |
| Payroll -Fin Aid | $382 | $441 | $409 | $461 | $446 | $448 | $477 | $450 | $451 | $444 | $463 | $413 |
| Payroll - Career Services | $473 | $445 | $378 | $441 | $426 | $423 | $465 | $425 | $446 | $482 | $482 | $450 |
| Payroll - Other | $31 | $93 | $35 | $88 | $15 | $81 | $1 | $66 | $90 | $53 | $58 | $30 |
| Employee Benefits/Insurance | $418 | $359 | $415 | $469 | $519 | $483 | $509 | $490 | $329 | $426 | $170 | $103 |
| Interest Income | ($233) | ($244) | ($244) | ($243) | ($249) | ($261) | ($247) | ($257) | ($297) | ($224) | ($328) | ($309) |
| Other G&A | $933 | $767 | $736 | $1,010 | $753 | $769 | $829 | $845 | $890 | $1,161 | $998 | $1,196 |
| Total G&A | $4,690 | $4,717 | $4,604 | $5,686 | $4,674 | $4,329 | $5,060 | $4,674 | $4,831 | $5,759 | $4,799 | $4,469 |

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 3A
FCC Normalized Profit & Loss Statements
*Figures in thousands*

| | FY 12/13 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/31/12 | 08/31/12 | 09/30/12 | 10/31/12 | 11/30/12 | 12/31/12 | 01/31/13 | 02/28/13 | 03/31/13 | 04/30/13 | 05/31/13 | 06/30/13 |
| *Occupancy* | | | | | | | | | | | | |
| Rent | $1,960 | $2,011 | $2,037 | $1,954 | $2,094 | $2,053 | $2,098 | $2,123 | $2,046 | $2,036 | $2,147 | $1,893 |
| Occupancy - Other | $522 | $502 | $495 | $549 | $435 | $621 | $484 | $449 | $643 | $508 | $525 | $507 |
| Total Occupancy | $2,482 | $2,513 | $2,532 | $2,503 | $2,528 | $2,674 | $2,583 | $2,572 | $2,689 | $2,545 | $2,672 | $2,400 |
| | | | | | | | | | | | | |
| Campus Operating Profit | $3,745 | $4,489 | $4,376 | $6,085 | $4,845 | $1,191 | $4,395 | $5,160 | $3,818 | $5,847 | $4,754 | $4,037 |
| | | | | | | | | | | | | |
| Central Overhead | $1,806 | $2,468 | $2,010 | $2,285 | $2,199 | $1,595 | $2,172 | $2,150 | $2,009 | $2,114 | $1,897 | $1,366 |
| | | | | | | | | | | | | |
| EBITDA Before Special Items | $1,939 | $2,021 | $2,366 | $3,799 | $2,647 | ($404) | $2,223 | $3,010 | $1,809 | $3,733 | $2,857 | $2,670 |
| | | | | | | | | | | | | |
| Bonus Stock Option | $26 | $26 | $26 | $21 | $354 | $101 | $101 | $101 | $147 | $111 | $110 | $110 |
| SFAS 13 | $57 | $80 | $55 | $119 | $44 | $43 | $43 | $40 | $37 | $28 | $217 | $641 |
| Addbacks - Other | ($33) | $144 | ($45) | $133 | $348 | ($91) | $118 | $120 | $281 | $164 | $23 | ($501) |
| | | | | | | | | | | | | |
| EBITDA | $1,890 | $1,772 | $2,330 | $3,527 | $1,901 | ($457) | $1,961 | $2,749 | $1,343 | $3,429 | $2,508 | $2,420 |
| | | | | | | | | | | | | |
| Amortization | $589 | $588 | $599 | $592 | $593 | $605 | $595 | $758 | $621 | $481 | $266 | $31 |
| Depreciation | $591 | $591 | $591 | $416 | $416 | $416 | $416 | $416 | $790 | $458 | $637 | $1,918 |
| Interest Expense | $204 | $204 | $202 | $208 | $427 | $538 | $407 | $378 | $362 | $349 | $379 | $170 |
| Change in FV of Derivative | $28 | $3 | ($317) | $1 | $0 | ($340) | (50) | $1 | ($319) | $0 | $0 | ($262) |
| | | | | | | | | | | | | |
| Income Before Taxes | $478 | $385 | $1,255 | $2,310 | $464 | ($1,678) | $543 | $1,196 | ($111) | $2,141 | $1,226 | $564 |
| | | | | | | | | | | | | |
| State Tax Provision | $98 | ($6) | $25 | $25 | $247 | ($18) | $172 | $160 | $12 | $196 | $39 | $75 |
| Federal Tax Provision | $121 | $566 | $168 | $164 | $1,169 | ($113) | $510 | $817 | $276 | $1,214 | $127 | ($1,544) |
| Other Taxes | $25 | $33 | $30 | $58 | $37 | $24 | $39 | $33 | $16 | $34 | $14 | $192 |
| Deferred Taxes | $92 | $678 | ($929) | ($875) | ($312) | ($253) | $66 | ($710) | $313 | ($738) | $125 | $331 |
| | | | | | | | | | | | | |
| Net Income | $142 | ($885) | $1,962 | $2,937 | ($678) | ($1,317) | ($244) | $896 | ($728) | $1,435 | $920 | $1,509 |

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 3A
FCC Normalized Profit & Loss Statements
Figures in thousands

| | FY 13/14 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/31/13 | 08/31/13 | 09/30/13 | 10/31/13 | 11/30/13 | 12/31/13 | 01/31/14 | 02/28/14 | 03/31/14 | 04/30/14 | 05/31/14 | 06/30/14 |
| | [2] | [2] | [2] | [2] | [2] | [2] | [2] | [2] | [2] | [2] | [3] | [4] |
| **Revenue** | | | | | | | | | | | | |
| *Tuition* | | | | | | | | | | | | |
| Tuition - Diploma Programs | $10,023 | $11,199 | $10,572 | $12,767 | $12,017 | $10,472 | $9,805 | $11,669 | $12,080 | $12,287 | $11,472 | $10,463 |
| Tuition - 2 Year Degree Programs | $5,263 | $5,043 | $5,395 | $6,058 | $5,607 | $5,001 | $5,336 | $5,162 | $5,111 | $5,189 | $3,784 | $4,291 |
| Tuition - 4 Year Degree Programs | $676 | $731 | $736 | $864 | $789 | $791 | $874 | $865 | $841 | $877 | $871 | $804 |
| Tuition - Other | $0 | $0 | $98 | $737 | $458 | $305 | $134 | $254 | $228 | $373 | $419 | $393 |
| Total Tuition | $15,961 | $16,973 | $16,801 | $20,427 | $18,871 | $16,568 | $16,149 | $17,950 | $18,261 | $18,725 | $16,546 | $15,951 |
| | | | | | | | | | | | | |
| *Other Revenue* | | | | | | | | | | | | |
| Fees | $522 | $724 | $860 | $543 | $616 | $107 | $913 | $616 | $758 | $516 | $516 | $383 |
| Sales - Books | $1,113 | $1,472 | $1,047 | $1,439 | $1,172 | $519 | $1,485 | $1,369 | $2,023 | $1,206 | $1,269 | $1,398 |
| Sales - Other | $26 | $34 | $23 | $76 | $65 | $29 | $111 | $25 | $31 | $25 | $0 | $0 |
| Total Other Revenue | $1,661 | $2,230 | $1,930 | $2,059 | $1,854 | $655 | $2,509 | $2,010 | $2,812 | $1,746 | $1,785 | $1,781 |
| | | | | | | | | | | | | |
| Tuition and Fees | $17,621 | $19,203 | $18,731 | $22,486 | $20,725 | $17,223 | $18,658 | $19,960 | $21,073 | $20,472 | $18,331 | $17,732 |
| | | | | | | | | | | | | |
| *Cost of Instruction* | | | | | | | | | | | | |
| Payroll - Faculty | $2,248 | $2,302 | $2,146 | $2,355 | $2,355 | $2,284 | $2,046 | $2,468 | $2,441 | $2,412 | $2,426 | $2,438 |
| Other Costs of Instruction | $1,098 | $1,472 | $1,041 | $1,547 | $1,187 | $719 | $1,121 | $1,741 | $1,872 | $1,341 | $1,725 | $1,974 |
| Total Cost of Instruction | $3,345 | $3,774 | $3,187 | $3,902 | $3,542 | $3,003 | $3,167 | $4,208 | $4,313 | $3,753 | $4,151 | $4,412 |
| | | | | | | | | | | | | |
| *Student Recruitment* | | | | | | | | | | | | |
| Payroll - Student Recruitment | $1,773 | $1,732 | $1,733 | $1,779 | $1,866 | $1,894 | $2,068 | $2,184 | $1,934 | $1,827 | $1,772 | $1,659 |
| Call Center | $292 | $308 | $315 | $319 | $311 | $301 | $327 | $322 | $313 | $291 | $289 | $272 |
| Advertising - Internet | $1,394 | $1,433 | $1,531 | $1,413 | $1,377 | $1,069 | $1,346 | $1,009 | $957 | $856 | $928 | $927 |
| Advertising - Other | $137 | $159 | $127 | $281 | $182 | $152 | $232 | $145 | $205 | $65 | $114 | $105 |
| Total Student Recruitment | $3,595 | $3,632 | $3,706 | $3,792 | $3,736 | $3,416 | $3,974 | $3,660 | $3,409 | $3,038 | $3,104 | $2,964 |
| | | | | | | | | | | | | |
| *General and Administrative* | | | | | | | | | | | | |
| Bad Debts | $1,278 | $1,168 | $1,676 | $1,579 | $1,632 | $1,728 | $1,888 | $1,879 | $5,720 | $4,019 | $5,437 | $8,465 |
| Payroll - Campus Adm | $1,065 | $1,139 | $1,177 | $1,202 | $1,301 | $1,242 | $1,231 | $1,347 | $1,213 | $1,286 | $1,371 | $1,303 |
| Payroll Taxes - G&A | $155 | $160 | $168 | $183 | $187 | $163 | $273 | $302 | $214 | $195 | $199 | $193 |
| Payroll -Fin Aid | $440 | $450 | $440 | $454 | $502 | $488 | $489 | $517 | $463 | $461 | $482 | $468 |
| Payroll - Career Services | $438 | $411 | $400 | $416 | $435 | $432 | $415 | $412 | $405 | $423 | $429 | $439 |
| Payroll - Other | $43 | $38 | $54 | $19 | $61 | $51 | $42 | $30 | $81 | $60 | $37 | $57 |
| Employee Benefits/Insurance | $446 | $285 | $379 | $589 | $463 | $548 | $473 | $483 | $457 | $509 | $626 | $722 |
| Interest Income | ($243) | ($263) | $16 | ($1,023) | ($491) | ($401) | ($296) | ($307) | ($394) | ($355) | ($394) | ($394) |
| Other G&A | $993 | $946 | $1,045 | $1,142 | $749 | $893 | $914 | $762 | $869 | $862 | $864 | $1,205 |
| Total G&A | $4,615 | $4,335 | $5,356 | $4,560 | $4,839 | $5,145 | $5,428 | $5,427 | $9,029 | $7,460 | $9,050 | $12,458 |

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knebel et al

Exhibit 3A
FCC Normalized Profit & Loss Statements
*Figures in thousands*

| | FY 13/14 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/31/13 | 08/31/13 | 09/30/13 | 10/31/13 | 11/30/13 | 12/31/13 | 01/31/14 | 02/28/14 | 03/31/14 | 04/30/14 | 05/31/14 | 06/30/14 |
| *Occupancy* | | | | | | | | | | | | |
| Rent | $2,005 | $2,025 | $1,961 | $2,173 | $2,141 | $2,079 | $2,192 | $2,431 | $2,252 | $2,256 | $2,315 | $2,332 |
| Occupancy - Other | $614 | $535 | $619 | $604 | $551 | $540 | $518 | $476 | $515 | $434 | $485 | $616 |
| Total Occupancy | $2,619 | $2,559 | $2,579 | $2,776 | $2,691 | $2,618 | $2,709 | $2,906 | $2,766 | $2,691 | $2,800 | $2,948 |
| | | | | | | | | | | | | |
| Campus Operating Profit | $3,448 | $4,903 | $3,903 | $7,455 | $5,917 | $3,040 | $3,380 | $3,758 | $1,556 | $3,529 | ($773) | ($5,050) |
| | | | | | | | | | | | | |
| Central Overhead | $2,242 | $2,132 | $2,270 | $1,900 | $2,335 | $2,038 | $2,263 | $1,856 | $1,639 | $2,156 | $2,153 | $2,765 |
| | | | | | | | | | | | | |
| EBITDA Before Special Items | $1,206 | $2,771 | $1,632 | $5,554 | $3,582 | $1,001 | $1,118 | $1,903 | ($83) | $1,373 | ($2,927) | ($7,814) |
| | | | | | | | | | | | | |
| Bonus Stock Option | $110 | $107 | $108 | $108 | $104 | $104 | $104 | $104 | $101 | $101 | $101 | $69 |
| SFAS 13 | ($61) | $354 | $135 | $82 | $81 | $29 | $27 | $27 | $195 | $233 | $0 | $0 |
| Addbacks - Other | $0 | ($2) | ($46) | ($33) | ($60) | $23 | ($8) | $929 | $38 | $497 | $246 | $211 |
| | | | | | | | | | | | | |
| EBITDA | $1,158 | $2,313 | $1,435 | $5,397 | $3,456 | $845 | $994 | $842 | ($418) | $542 | ($3,274) | ($8,094) |
| | | | | | | | | | | | | |
| Amortization | $250 | $255 | $255 | $255 | $255 | $255 | $270 | $237 | $253 | $241 | $228 | $132 |
| Depreciation | $668 | $637 | $751 | $697 | $710 | $732 | $748 | $709 | $691 | $673 | $684 | $692 |
| Interest Expense | $205 | $146 | $256 | $180 | $183 | $360 | $208 | $704 | $260 | $209 | $338 | $351 |
| Change in FV of Derivative | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | |
| Income Before Taxes | $34 | $1,275 | $173 | $4,266 | $2,369 | ($501) | ($233) | ($808) | ($1,622) | ($580) | ($4,524) | ($9,269) |
| | | | | | | | | | | | | |
| State Tax Provision | $72 | $276 | $103 | $228 | $105 | ($14) | $47 | ($28) | ($369) | $24 | ($236) | ($456) |
| Federal Tax Provision | $447 | $481 | $711 | $1,579 | $892 | ($268) | $404 | ($241) | $958 | $204 | ($1,394) | ($2,739) |
| Other Taxes | $12 | $23 | $162 | $41 | $35 | $73 | $30 | $76 | $87 | $30 | $20 | ($96) |
| Deferred Taxes | $0 | ($46) | ($611) | $777 | ($250) | $0 | $0 | $0 | ($1,266) | $0 | $0 | $0 |
| | | | | | | | | | | | | |
| Net Income | ($498) | $540 | ($192) | $1,642 | $1,527 | ($292) | ($714) | ($615) | ($1,031) | ($838) | ($2,914) | ($5,978) |

Sources:
[1] P1742552  Line items were normalized
[2] P1742548  Line items were normalized
[3] P1753842  Line items were normalized; items below EBITDA Before Special Items from P1744615 at 624
[4] P1757763  Line items were normalized; items below EBITDA Before Special Items from P1757368 at 370

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 3B
FCC Headcount

| | FY 12/13 | | | | | | | | | | | | FY 12/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/31/12 | 08/31/12 | 09/30/12 | 10/31/12 | 11/30/12 | 12/31/12 | 01/31/13 | 02/28/13 | 03/31/13 | 04/30/13 | 05/31/13 | 06/30/13 | |
| Beginning Headcount | 12,439 | 12,382 | 12,483 | 11,899 | 11,913 | 11,414 | 10,465 | 11,604 | 11,505 | 10,998 | 11,525 | 10,836 | 12,439 |
| Starts | 1,243 | 1,648 | 919 | 1,496 | 835 | 343 | 2,149 | 1,154 | 1,006 | 2,040 | 1,052 | 1,374 | 15,259 |
| Other | (1,300) | (1,547) | (1,503) | (1,482) | (1,334) | (1,292) | (1,010) | (1,253) | (1,513) | (1,513) | (1,741) | (1,546) | (17,034) |
| Ending Headcount | 12,382 | 12,483 | 11,899 | 11,913 | 11,414 | 10,465 | 11,604 | 11,505 | 10,998 | 11,525 | 10,836 | 10,664 | 10,664 |
| Sources: | P1167490 at 0495; P1061255 at 259 | P1063376 at 381 | P1438638 at 643 | P1699708 at 713 | YOUSEFI-000112 at 117 | P1705826 at 831 | P2315053 at 063 | P1714236 at 243 | P1458895 at 902 | P14609910 at 917 | P1744615 at 622 | P1757368 at 374 | |

| | FY 13/14 | | | | | | | | | | | | FY 13/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/31/13 | 08/31/13 | 09/30/13 | 10/31/13 | 11/30/13 | 12/31/13 | 01/31/14 | 02/28/14 | 03/31/14 | 04/30/14 | 05/31/14 | 06/30/14 | |
| Beginning Headcount | 10,664 | 11,062 | 11,285 | 11,882 | 11,397 | 11,690 | 10,128 | 11,143 | 11,129 | 12,337 | 12,188 | 11,498 | 10,664 |
| Starts | 1,410 | 1,776 | 1,664 | 1,111 | 1,232 | 52 | 2,071 | 1,319 | 2,415 | 1,348 | 1,196 | 1,189 | 16,783 |
| Other | (1,012) | (1,553) | (1,067) | (1,596) | (939) | (1,614) | (1,056) | (1,333) | (1,207) | (1,497) | (1,886) | (1,768) | (16,528) |
| Ending Headcount | 11,062 | 11,285 | 11,882 | 11,397 | 11,690 | 10,128 | 11,143 | 11,129 | 12,337 | 12,188 | 11,498 | 10,919 | 10,919 |
| Sources: | P1061255 at 259 | P1063376 at 381 | P1438638 at 643 | P1699708 at 713 | YOUSEFI-000112 at 117 | P1705826 at 831 | P2315053 at 063 | P1714236 at 243 | P1458895 at 902 | P14609910 at 917 | P1744615 at 622 | P1757368 at 374 | |

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 3C**
FCC Revenue and Headcount by OPEID per BOD Reports

| | Revenue [1] | | Ending Headcount [1] | |
|---|---|---|---|---|
| | FY 12/13 | FY 13/14 | FY 12/13 | FY 13/14 |
| *OPEIDs* | | | | |
| Miami | $100,610 | $98,849 | 3,625 | 4,092 |
| Bryman | $37,532 | $38,570 | 2,105 | 1,773 |
| Phoenix | $51,078 | $47,841 | 2,564 | 1,975 |
| Maryland Heights | $15,166 | $15,498 | 782 | 861 |
| Parsippany | $14,949 | $14,810 | 796 | 960 |
| Springfield | $11,948 | $13,249 | 792 | 852 |
| FCC-ET | $0 | $0 | 0 | 0 |
| OPEID Total | $231,283 | $228,817 | 10,664 | 10,513 |
| | | | | |
| *Non-OPEID* | | | | |
| U.S. Colleges | $0 | $3,399 | 0 | 406 |
| | | | | |
| **Total** | **$231,283** | **$232,216** | **10,664** | **10,919** |

Sources:
[1] P1757368 at 375, 382, 389, 399, 406, 413, and 417. See also, Declaration of Sean Harding, August 26, 2014, pp. 49-51.
    Online revenues included in the Phoenix OPEID, as shown by 90/10 reports. See P1746720, tab "Anthem Online."

Clineman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 4
FCC Balance Sheet
Figures in thousands

| | [1] 1Q FY 12/13 | [1] 2Q FY 12/13 | [1] 3Q FY 12/13 | [1] 4Q FY 12/13 | [1] 1Q FY 13/14 | [1] 2Q FY 13/14 | [1] 3Q FY 13/14 | [1] 4Q FY 13/14 |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash and Cash Equivalents | $10,058 | $8,192 | $9,376 | $7,173 | $7,923 | $2,957 | $1,569 | $4,348 |
| Accounts Receivable | $19,657 | $15,427 | $24,956 | $42,772 | $37,719 | $29,274 | $36,640 | $35,322 |
| Notes Receivable | $2,594 | $5,275 | $5,406 | $4,872 | $5,244 | $6,451 | $8,469 | $11,332 |
| Inventory | $1,767 | $2,144 | $2,183 | $1,695 | $1,951 | $1,965 | $1,309 | $1,533 |
| Prepaid Expenses | $2,830 | $1,869 | $1,522 | $880 | $1,009 | $1,381 | $1,064 | $770 |
| Other Current Assets | $6,119 | $2,824 | $2,299 | $977 | $1,627 | $1,221 | $1,140 | $3,074 |
| Current Assets | $43,025 | $35,732 | $45,741 | $58,370 | $55,373 | $43,249 | $50,191 | $46,379 |
| | | | | | | | | |
| PPE, net | $35,193 | $38,080 | $38,543 | $36,908 | $37,410 | $40,298 | $41,645 | $42,234 |
| Notes Receivable LT | $7,746 | $9,604 | $9,636 | $10,844 | $11,481 | $12,969 | $15,935 | $18,015 |
| Deferred Tax Asset LT | $757 | $3,643 | $3,904 | $5,271 | $12,852 | $12,963 | $13,870 | $13,870 |
| Other Long Term Assets | $3,493 | $5,220 | $5,488 | $5,767 | $5,882 | $5,918 | $5,573 | $6,298 |
| Intangible Assets | $32,406 | $30,898 | $29,504 | $29,117 | $28,490 | $28,272 | $27,522 | $26,916 |
| Goodwill | $129,866 | $129,866 | $129,866 | $129,866 | $132,197 | $132,235 | $132,232 | $132,237 |
| | | | | | | | | |
| Total Assets | $252,487 | $253,042 | $262,681 | $276,142 | $283,686 | $275,904 | $286,969 | $285,949 |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Current Portion of Capital Leases | $966 | $888 | $923 | $625 | $518 | $591 | $662 | $657 |
| Current Portion of LT Debt | $165 | $2,250 | $2,250 | $4,666 | $4,666 | $2,103 | $2,396 | $0 |
| Accounts Payable | $8,037 | $10,861 | $10,048 | $9,990 | $8,613 | $10,133 | $14,873 | $16,130 |
| Accrued Payroll | $5,071 | $2,348 | $4,643 | $2,580 | $4,400 | $2,688 | $4,666 | $2,735 |
| Income Taxes Payable | $0 | $0 | $906 | $694 | $1,081 | $2,313 | $3,082 | $0 |
| Deferred Revenues | $24,879 | $21,856 | $31,141 | $35,260 | $35,190 | $23,837 | $30,574 | $21,636 |
| Other Current Liabilities | $1,637 | $1,483 | $3,535 | $2,673 | $3,265 | $1,856 | $1,732 | $4,132 |
| Current Liabilities | $40,754 | $39,686 | $53,445 | $56,488 | $57,732 | $43,521 | $57,985 | $45,290 |
| | | | | | | | | |
| LT Debt, Less Current Portion | $31,098 | $31,188 | $26,625 | $27,646 | $23,084 | $27,317 | $26,510 | $29,592 |
| LT Capital Leases | $822 | $988 | $1,101 | $1,002 | $892 | $1,246 | $1,340 | $1,191 |
| Deferred Taxes | $0 | $0 | $0 | $0 | $7,523 | $7,523 | $7,523 | $7,523 |
| Derivatives | $919 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Term A Loan | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $13,639 |
| Other Long Term Liabilities | $13,617 | $14,488 | $14,543 | $19,843 | $20,670 | $19,320 | $18,683 | $23,292 |
| | | | | | | | | |
| Total Liabilities | $87,211 | $86,349 | $95,714 | $104,980 | $109,902 | $98,927 | $112,041 | $120,527 |
| | | | | | | | | |
| Total Equity | $165,276 | $166,693 | $166,968 | $171,162 | $173,784 | $176,977 | $174,928 | $165,423 |
| | | | | | | | | |
| Total Liabilities + Equity | $252,487 | $253,042 | $262,681 | $276,142 | $283,686 | $275,904 | $286,969 | $285,950 |
| | | | | | | | | |
| *Selected items:* | | | | | | | | |
| Accounts Receivable | $19,657 | $15,427 | $24,956 | $42,772 | $37,719 | $29,274 | $36,640 | $35,322 |
| Notes Receivable | $10,341 | $14,879 | $15,042 | $15,715 | $16,725 | $19,420 | $24,404 | $29,347 |
| Deferred Revenues | $24,879 | $21,856 | $31,141 | $35,260 | $35,190 | $23,837 | $30,574 | $21,636 |

Sources:
[1] See Exhibit 4A

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 4A
FCC Balance Sheet Detail
Figures in thousands

| | 07/31/12 | 08/31/12 | 09/30/12 | 10/31/12 | 11/30/12 | 12/31/12 | 01/31/13 | 02/28/13 | 03/31/13 | 04/30/13 | 05/31/13 | 06/30/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] | [1] |
| **Assets** | | | | | | | | | | | | |
| Cash and Cash Equivalents | $12,892 | $13,246 | $10,058 | $18,304 | $6,375 | $8,192 | $9,105 | $8,605 | $9,376 | $7,129 | $5,385 | $7,173 |
| Accounts Receivable | $19,757 | $18,664 | $19,657 | $20,001 | $19,287 | $15,427 | $27,981 | $30,891 | $24,956 | $41,250 | $39,847 | $42,772 |
| Notes Receivable | $2,421 | $2,533 | $2,594 | $2,617 | $2,223 | $5,275 | $9,651 | $8,723 | $5,406 | $4,211 | $2,690 | $4,872 |
| Inventory | $1,776 | $1,780 | $1,767 | $1,758 | $1,719 | $2,144 | $2,086 | $2,092 | $2,183 | $1,912 | $1,760 | $1,695 |
| Prepaid Expenses | $3,145 | $3,230 | $2,830 | $2,440 | $2,042 | $1,869 | $1,780 | $1,598 | $1,522 | $1,220 | $1,098 | $880 |
| Other Current Assets | $5,540 | $2,757 | $6,119 | $7,604 | $4,479 | $2,824 | $2,275 | $2,284 | $2,299 | $2,345 | $2,866 | $977 |
| Current Assets | $45,532 | $42,210 | $43,025 | $52,723 | $36,124 | $35,732 | $52,878 | $54,191 | $45,741 | $57,967 | $53,046 | $58,370 |
| | | | | | | | | | | | | |
| PPE, net | $35,298 | $35,496 | $35,193 | $36,618 | $37,119 | $38,080 | $38,656 | $38,673 | $38,543 | $38,611 | $38,526 | $36,908 |
| Notes Receivable LT | $5,729 | $7,257 | $7,746 | $9,902 | $10,529 | $9,604 | $6,760 | $7,494 | $9,636 | $9,525 | $9,508 | $10,844 |
| Deferred Tax Asset LT | $251 | $1,618 | $757 | $32 | $4,868 | $3,643 | $3,449 | $4,104 | $3,904 | $4,597 | $3,959 | $5,271 |
| Other Long Term Assets | $3,142 | $3,464 | $3,493 | $3,693 | $4,563 | $5,220 | $5,216 | $5,213 | $5,488 | $5,261 | $5,265 | $5,767 |
| Intangible Assets | $33,340 | $32,871 | $32,406 | $31,936 | $31,677 | $30,898 | $30,350 | $29,655 | $29,504 | $29,125 | $28,924 | $29,117 |
| Goodwill | $129,866 | $129,866 | $129,866 | $129,866 | $129,866 | $129,866 | $129,866 | $129,866 | $129,866 | $129,866 | $129,866 | $129,866 |
| | | | | | | | | | | | | |
| Total Assets | $253,157 | $252,782 | $252,487 | $264,770 | $254,545 | $253,042 | $267,175 | $269,196 | $262,681 | $274,952 | $269,094 | $276,142 |
| **Liabilities** | | | | | | | | | | | | |
| Current Portion of Capital Leases | $1,027 | $937 | $966 | $1,016 | $865 | $888 | $850 | $804 | $923 | $851 | $690 | $625 |
| Current Portion of LT Debt | $31,346 | $247 | $165 | $165 | $1,688 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $2,250 | $4,666 |
| Accounts Payable | $11,570 | $9,600 | $8,037 | $13,510 | $9,611 | $10,861 | $10,594 | $10,183 | $10,048 | $11,025 | $11,114 | $9,990 |
| Accrued Payroll | $4,415 | $4,097 | $5,071 | $4,173 | $2,682 | $2,348 | $3,508 | $4,002 | $4,643 | $5,423 | $2,816 | $2,580 |
| Income Taxes Payable | $0 | $277 | $0 | $0 | $717 | $0 | $539 | $1,517 | $906 | $2,315 | $2,463 | $694 |
| Deferred Revenues | $23,621 | $26,108 | $24,879 | $27,479 | $25,989 | $21,856 | $33,220 | $36,143 | $33,141 | $37,615 | $29,202 | $35,260 |
| Other Current Liabilities | $1,323 | $1,402 | $1,637 | $1,707 | $1,472 | $1,483 | $3,547 | $3,496 | $3,535 | $3,552 | $3,570 | $2,673 |
| Current Liabilities | $73,301 | $42,668 | $40,754 | $48,049 | $43,024 | $39,686 | $54,519 | $58,395 | $55,445 | $63,030 | $52,106 | $56,488 |
| | | | | | | | | | | | | |
| LT Debt, Less Current Portion | $0 | $31,098 | $31,098 | $31,098 | $28,313 | $31,188 | $31,188 | $28,188 | $26,625 | $26,625 | $30,625 | $27,646 |
| LT Capital Leases | $517 | $908 | $822 | $530 | $55 | $988 | $445 | $413 | $1,101 | $1,144 | $1,687 | $1,002 |
| Deferred Taxes | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Derivatives | $580 | $0 | $919 | $920 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Term A Loan | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Long Term Liabilities | $14,611 | $14,819 | $13,617 | $15,940 | $15,122 | $14,488 | $14,473 | $14,652 | $14,543 | $15,638 | $15,732 | $19,843 |
| | | | | | | | | | | | | |
| Total Liabilities | $89,009 | $89,493 | $87,211 | $96,536 | $86,514 | $86,349 | $100,624 | $101,648 | $95,714 | $106,438 | $99,550 | $104,980 |
| | | | | | | | | | | | | |
| Total Equity | $164,148 | $163,289 | $165,276 | $168,234 | $168,031 | $166,693 | $166,550 | $167,548 | $166,968 | $168,515 | $169,544 | $171,162 |
| | | | | | | | | | | | | |
| Total Liabilities + Equity | $253,157 | $252,782 | $252,487 | $264,770 | $254,545 | $253,042 | $267,175 | $269,196 | $262,681 | $274,952 | $269,094 | $276,142 |

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 4A
FCC Balance Sheet Detail
Figures in thousands

| | FY 13/14 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/31/13 | 08/31/13 | 09/30/13 | 10/31/13 | 11/30/13 | 12/31/13 | 01/31/14 | 02/28/14 | 03/31/14 | 04/30/14 | 05/31/14 | 06/30/14 |
| | [2] | [2] | [2] | [2] | [2] | [2] | [2] | [2] | [2] | [2] | [3] | [4] |
| **Assets** | | | | | | | | | | | | |
| Cash and Cash Equivalents | $8,801 | $9,755 | $7,823 | $4,240 | $4,716 | $2,957 | $3,153 | $5,186 | $1,569 | $10,808 | $3,364 | $4,348 |
| Accounts Receivable | $33,111 | $25,512 | $37,719 | $29,784 | $28,674 | $29,274 | $33,973 | $31,805 | $36,640 | $36,633 | $22,832 | $25,322 |
| Notes Receivable | $4,650 | $4,638 | $5,244 | $4,999 | $5,250 | $6,451 | $6,284 | $5,240 | $8,469 | $9,551 | $9,925 | $11,332 |
| Inventory | $1,660 | $1,749 | $1,931 | $1,879 | $2,146 | $1,965 | $1,958 | $1,756 | $1,309 | $1,187 | $1,483 | $1,533 |
| Prepaid Expenses | $948 | $1,217 | $1,009 | $1,454 | $1,509 | $1,381 | $1,263 | $1,217 | $1,064 | $1,140 | $1,273 | $770 |
| Other Current Assets | $1,144 | $653 | $1,637 | $4,722 | $1,035 | $1,221 | $1,125 | $1,024 | $1,140 | $1,955 | $1,637 | $3,074 |
| Current Assets | $50,315 | $43,524 | $55,373 | $47,078 | $43,330 | $43,249 | $47,756 | $46,228 | $50,191 | $61,274 | $40,514 | $46,379 |
| | | | | | | | | | | | | |
| PPE, net | $36,486 | $36,662 | $37,410 | $38,752 | $39,995 | $40,298 | $40,549 | $41,327 | $41,645 | $42,999 | $42,886 | $42,234 |
| Notes Receivable LT | $11,171 | $11,858 | $11,481 | $14,348 | $12,815 | $12,969 | $13,820 | $14,353 | $15,935 | $17,962 | $19,207 | $18,015 |
| Deferred Tax Asset LT | $12,794 | $12,794 | $12,852 | $12,743 | $12,963 | $12,963 | $12,963 | $12,963 | $13,870 | $13,870 | $13,870 | $13,870 |
| Other Long Term Assets | $5,721 | $5,849 | $5,882 | $5,974 | $5,970 | $5,918 | $5,956 | $5,615 | $5,573 | $7,049 | $7,722 | $6,298 |
| Intangible Assets | $28,891 | $29,125 | $28,490 | $28,686 | $28,501 | $28,272 | $28,020 | $27,775 | $27,522 | $27,281 | $27,048 | $26,916 |
| Goodwill | $129,866 | $132,571 | $132,197 | $132,232 | $132,234 | $132,235 | $132,232 | $132,232 | $132,232 | $132,232 | $132,237 | $132,237 |
| | | | | | | | | | | | | |
| Total Assets | $275,242 | $272,384 | $283,686 | $279,813 | $275,808 | $275,904 | $281,296 | $280,493 | $286,969 | $302,667 | $283,484 | $285,949 |
| | | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | | |
| Current Portion of Capital Leases | $626 | $549 | $518 | $504 | $628 | $591 | $577 | $658 | $662 | $637 | $655 | $657 |
| Current Portion of LT Debt | $2,250 | $2,250 | $4,666 | $2,250 | $2,250 | $2,103 | $2,103 | $2,103 | $2,396 | $0 | $0 | $0 |
| Accounts Payable | $7,669 | $7,486 | $8,613 | $10,188 | $10,325 | $10,133 | $11,392 | $11,128 | $14,873 | $19,224 | $17,366 | $16,130 |
| Accrued Payroll | $3,220 | $3,955 | $4,400 | $4,934 | $2,052 | $2,688 | $3,532 | $4,288 | $4,666 | $5,238 | $2,031 | $2,735 |
| Income Taxes Payable | ($536) | $224 | $1,081 | $1,593 | $2,590 | $2,313 | $2,764 | $2,495 | $3,082 | $3,350 | $1,704 | $0 |
| Deferred Revenues | $29,666 | $24,425 | $35,190 | $30,050 | $26,485 | $23,837 | $27,469 | $27,149 | $30,574 | $27,986 | $16,456 | $21,636 |
| Other Current Liabilities | $3,227 | $3,538 | $3,265 | $2,534 | $2,284 | $1,856 | $2,099 | $1,787 | $1,732 | $4,055 | $5,853 | $4,132 |
| Current Liabilities | $46,621 | $42,427 | $57,732 | $52,054 | $46,614 | $43,521 | $49,936 | $49,608 | $57,985 | $60,492 | $44,065 | $45,290 |
| | | | | | | | | | | | | |
| LT Debt, Less Current Portion | $31,727 | $29,727 | $23,084 | $23,084 | $23,084 | $27,317 | $27,317 | $27,317 | $26,510 | $29,059 | $29,059 | $29,592 |
| LT Capital Leases | $932 | $930 | $892 | $841 | $1,289 | $1,246 | $1,210 | $1,414 | $1,340 | $1,295 | $1,243 | $1,191 |
| Deferred Taxes | $7,523 | $7,525 | $7,523 | $7,523 | $7,523 | $7,523 | $7,523 | $7,523 | $7,523 | $7,523 | $7,523 | $7,523 |
| Derivatives | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Term A Loan | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $8,000 | $10,000 | $13,639 |
| Other Long Term Liabilities | $17,718 | $17,905 | $20,670 | $20,777 | $20,133 | $19,320 | $18,942 | $18,773 | $18,683 | $22,108 | $20,254 | $23,292 |
| | | | | | | | | | | | | |
| Total Liabilities | $104,521 | $98,515 | $109,902 | $104,279 | $98,643 | $98,927 | $104,928 | $104,635 | $112,041 | $128,477 | $112,144 | $120,527 |
| | | | | | | | | | | | | |
| Total Equity | $170,721 | $173,869 | $173,784 | $175,534 | $177,165 | $176,977 | $176,368 | $175,858 | $174,928 | $174,190 | $171,340 | $165,423 |
| | | | | | | | | | | | | |
| Total Liabilities + Equity | $275,242 | $272,384 | $283,686 | $279,813 | $275,808 | $275,904 | $281,296 | $280,493 | $286,969 | $302,667 | $283,484 | $285,950 |

Sources:
[1] P1742552  Line items were normalized
[2] P1742548  Line items were normalized
[3] P1744615 at 623  Line items were normalized
[4] P1757368 at 369  Line items were normalized

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 4B**
**Balance Sheet Detail**
*Figures in thousands*

| | 6/30/2012 | 6/30/2013 | 6/30/2014 |
|---|---|---|---|
| | [1] | [2] | [3] |
| **Assets** | | | |
| *Current assets* | | | |
| Cash & cash equivalents | $9,079 | $7,173 | $4,348 |
| Accounts receivable | $22,653 | $44,361 | $41,549 |
| Allowance | ($1,816) | ($1,588) | ($16,227) |
| Notes receivable | $6,539 | $9,061 | $25,390 |
| Allowance notes | ($3,229) | ($4,189) | ($14,058) |
| Inventories | $1,663 | $1,695 | $1,533 |
| Prepaid expense | $1,891 | $880 | $770 |
| Deferred taxes | $2,081 | $681 | $1,001 |
| Income tax receivable | $0 | $0 | $1,443 |
| Other current assets | $1,207 | $296 | $630 |
| Total current assets | $40,068 | $58,370 | $46,378 |
| | | | |
| Property and equipment | $47,454 | $56,612 | $70,331 |
| Accum Dep | ($12,077) | ($19,704) | ($28,097) |
| Notes Receivable | $10,799 | $20,168 | $35,750 |
| Allowance notes | ($5,097) | ($9,324) | ($17,735) |
| Investment in subsidiaries | $0 | $0 | $0 |
| Deferred finance cost | $1,661 | $701 | $0 |
| Amort of Finance cost | ($1,388) | ($30) | $0 |
| Cash restricted | $368 | $0 | $0 |
| Deferred Taxes | $1,659 | $5,271 | $13,870 |
| Amort of Org cost | $0 | $0 | $0 |
| Life Insurance cash surrender value | $0 | $0 | $0 |
| Other long-term assets | $3,133 | $5,096 | $6,298 |
| Intangible assets | $59,698 | $61,149 | $61,832 |
| Amort of Intangibles | ($25,715) | ($32,032) | ($34,916) |
| Goodwill | $129,866 | $129,866 | $132,237 |
| Total Assets | $250,429 | $276,142 | $285,949 |

<u>Clingman & Hauser Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 4B**
**Balance Sheet Detail**
*Figures in thousands*

| | 6/30/2012 | 6/30/2013 | 6/30/2014 |
|---|---|---|---|
| | [1] | [2] | [3] |
| **Liabilities and Shareholders Investment** | | | |
| *Current Liabilities* | | | |
| Accounts payable | $6,620 | $9,990 | $16,130 |
| Accrued payroll and payroll taxes | $4,072 | $2,580 | $2,735 |
| Other accrued liabilities | $7,488 | $0 | $0 |
| Accrued corporate income taxes | $1,834 | $694 | $0 |
| Unearned tuition | $33,657 | $35,260 | $4,169 |
| Advanced payments | ($15,383) | $0 | $17,467 |
| Deferred taxes | $0 | $0 | $0 |
| Deferred Rent | $0 | $0 | $0 |
| Other current liabilities | $0 | $2,673 | $4,132 |
| Current portion notes | $1,080 | $625 | $657 |
| Current portion of long-term debt | $3,033 | $4,666 | $0 |
| Total Current Liabilities | $42,401 | $56,488 | $45,289 |
| | | | |
| Long-term debt, less current portion | $28,313 | $27,646 | $29,592 |
| PIK Interest | $0 | $0 | $0 |
| Notes, less current portion | $831 | $1,002 | $1,191 |
| Deferred taxes | $0 | $0 | $7,523 |
| Deferred rent | $7,827 | $11,981 | $14,604 |
| Derivative | $1,205 | $0 | $0 |
| Other long-term liabilities | $5,871 | $7,913 | $8,687 |
| **Total Liabilities** | $86,448 | $105,031 | $106,887 |
| | | | |
| PIK Interest | $0 | $0 | $0 |
| Term Loan A | $0 | $0 | $13,639 |
| | | | |
| **Total Shareholders Investment** | $163,981 | $171,111 | $165,424 |
| | | | |
| **Total Liabilities and Shareholders Investment** | $250,429 | $276,142 | $285,949 |

<u>Sources</u>:
[1] Board Deck-June.xlsx, see "Comparative BS" tab.
[2] Board Deck-June.xlsx, see Adjusted June 2013 figures on the "Comparative BS" tab. Value for Shareholders' investment
    from Audited Financials. See P1715937-972 at 941.
[3] Board Deck-June.xlsx, see "Comparative BS" tab.

Clingman & Hauger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 4C
FCC Capital Expenditures
*Figures in thousands*

| | 7/31/2012 | 8/31/2012 | 9/30/2012 | 10/31/2012 | 11/30/2012 | 12/31/2012 | 1/31/2013 | 2/28/2013 | 3/31/2013 | 4/30/2013 | 5/31/2013 | 6/30/2013 | FY 12/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Capital Expenditures** | | | | | | | | | | | | | |
| Purchase of Property and Equipment | $512 | $789 | $298 | $1,841 | $1,893 | $798 | $992 | $434 | $660 | $526 | $551 | $41 | $9,335 |
| Sources: | P1061255 at 263 | P1063376 at 386 | P1438638 at 649 | P1699708 at 719 | YOUSEFI-000112 at 123 | P1705826 at 837 | P2315058 at 069 | P1714236 at 247 | P1458895 at 906 | P14609910 at p 12 | P1744615 at 626 | P1757368 at 372 | |

| | 7/31/2013 | 8/31/2013 | 9/30/2013 | 10/31/2013 | 11/30/2013 | 12/31/2013 | 1/31/2014 | 2/28/2014 | 3/31/2014 | 4/30/2014 | 5/31/2014 | 6/30/2014 | FY 13/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Capital Expenditures** | | | | | | | | | | | | | |
| Purchase of Property and Equipment | $318 | $925 | $1,316 | $2,008 | $1,305 | $1,035 | $999 | $1,150 | $1,008 | $2,028 | $570 | $41 | $12,703 |
| Sources: | P1061255 at 263 | P1063376 at 386 | P1438638 at 649 | P1699708 at 719 | YOUSEFI-000112 at 123 | P1705826 at 837 | P2315058 at 069 | P1714236 at 247 | P1458895 at 906 | P14609910 at p 12 | P1744615 at 626 | P1757368 at 372 | |

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 4D**
Depreciation and Amortization

| | [1]<br>FY 11/12 | [1]<br>FY 12/13 | [2]<br>FY 13/14 |
|---|---|---|---|
| *Property and Equipment* | | | |
| Teaching Equipment & Furniture (10 years) | $8,820,549 | $10,660,954 | $14,748,130 |
| Computers (3-5 years) | $8,556,867 | $10,370,996 | $11,841,623 |
| Land | $2,030,000 | $2,030,000 | $2,030,000 |
| Library (10 years) | $293,448 | $423,999 | $467,507 |
| Buildings (31.5 years) | $1,079,292 | $1,083,806 | $1,083,806 |
| Leasehold Improvements (5-11 years) | $25,419,379 | $31,246,763 | $39,247,850 |
| Construction in Progress | $1,254,629 | $795,229 | $990,325 |
| Fixed Asset Clearing | 0 | $0 | ($78,115) |
| Total Property and Equipment | $47,454,164 | $56,611,747 | $70,331,126 |
| Accumulated Depreciation | ($12,076,989) | ($19,704,016) | ($28,097,015) |
| **Total Property and Equipment, net** | **$35,377,175** | **$36,907,731** | **$42,234,111** |
| *Change in Depreciation* | *$4,341,346* | *$7,627,027* | *$8,392,999* |
| | | | |
| *Intangible Assets* | | | |
| Goodwill | $129,865,613 | $129,865,613 | $132,237,362 |
| Intangible Assets with Indefinite Lives | $20,100,000 | $20,100,000 | $20,100,000 |
| Intangible Assets with Definite Lives (1-10 years) | $39,597,553 | $41,049,026 | $41,731,654 |
| Accumulated Amortization | ($25,714,739) | ($32,032,185) | ($34,915,986) |
| **Intangible Assets, net** | **$163,848,427** | **$158,982,454** | **$159,153,030** |
| *Change in Amortization* | *$3,061,494* | *$6,317,446* | *$2,883,801* |

<u>Sources:</u>
[1] P1715937 at 959; P16888003 at 027-029.
[2] 108_BS Det Consolidated-07302014-1345.xls

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 5**
FCC Income Statement per Audited Financials
*Figures in thousands*

| | [1]<br>Ernst & Young<br>FY 10/11 | [2]<br>Grant Thornton<br>FY 11/12 | [2]<br>Grant Thornton<br>FY 12/13 |
|---|---|---|---|
| Prepared by: | | | |
| *Revenues* | | | |
| Tuition and fees | $82,789 | $113,251 | $214,798 |
| Bookstore sales | $5,451 | $8,714 | $14,377 |
| Total Revenues | $88,240 | $121,965 | $229,175 |
| | | | |
| Educational services and facilities | $39,358 | $61,160 | $127,887 |
| Cost of bookstore sales | $3,653 | $5,873 | $9,416 |
| Selling and recruitment costs | $14,675 | $17,698 | $45,585 |
| General and administrative | $16,581 | $23,392 | $32,285 |
| Impairment of goodwill | $2,772 | $0 | $0 |
| Amortization of intangible assets | $2,089 | $3,061 | $6,317 |
| | | | |
| Income from operations | $9,112 | $10,780 | $7,684 |
| | | | |
| Interest income | $986 | $1,301 | $3,126 |
| Interest expense | ($3,090) | ($2,892) | ($3,827) |
| Change in fair value of derivative | $627 | $1,181 | $1,205 |
| Gain on bargain purchase | $0 | $10,425 | $0 |
| | | | |
| Income before income taxes | $7,636 | $20,795 | $8,189 |
| | | | |
| Income tax expense | $4,199 | $3,240 | $2,291 |
| | | | |
| *Discontinued operations* | | | |
| Loss from operations of discontinued online programs | ($205) | $0 | $0 |
| Income tax benefit | $72 | $0 | $0 |
| Net Income | $3,304 | $17,555 | $5,898 |

Sources:
[1] P1688003 at 007.
[2] P1715937 at 942.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 5A
FCC Balance Sheet per Audited Financials
*Figures in thousands*

| Prepared by: | [1] Ernst & Young FY 10/11 | [2] Grant Thornton FY 11/12 | [2] Grant Thornton FY 12/13 |
|---|---|---|---|
| **Assets** | | | |
| *Current assets* | | | |
| Cash and cash equivalents | $13,714 | $9,079 | $7,173 |
| Accounts receivable, net of allowances | $2,246 | $20,837 | $42,772 |
| Current portion of notes receivable, net of allowances | $1,471 | $3,310 | $4,872 |
| Inventories | $480 | $1,663 | $1,695 |
| Prepaid expense | $913 | $1,891 | $880 |
| Deferred taxes | $1,745 | $2,081 | $681 |
| Income tax receivable | $1,246 | $0 | $0 |
| Other current assets | $529 | $1,207 | $796 |
| Total Current Assets | $22,344 | $40,068 | $58,370 |
| | | | |
| Property and equipment, net of accumulated depreciation | $14,559 | $35,377 | $36,908 |
| Notes receivable, net of allowances | $3,605 | $5,702 | $10,844 |
| Deferred financing cost | $548 | $274 | $671 |
| Deferred taxes | $1,941 | $1,659 | $5,271 |
| Other long-term assets | $1,106 | $3,501 | $5,096 |
| Intangible assets, net of accumulated amortization | $9,156 | $33,983 | $29,117 |
| Goodwill | $129,866 | $129,866 | $129,866 |
| **Total Assets** | $183,125 | $250,429 | $276,142 |
| | | | |
| **Liabilities and Shareholders Investment** | | | |
| *Current liabilities* | | | |
| Accounts payable | $923 | $9,768 | $9,990 |
| Accrued payroll and payroll taxes | $1,727 | $4,072 | $2,580 |
| Other accrued liabilities | $3,122 | $4,340 | $2,673 |
| Accrued corporate income taxes | $0 | $1,834 | $694 |
| Deferred revenue | $5,665 | $18,274 | $35,260 |
| Current portion of capital lease obligation | $88 | $1,080 | $625 |
| Current portion of long-term debt and note payable | $498 | $3,033 | $4,666 |
| Total Current Liabilities | $12,023 | $42,401 | $56,488 |
| | | | |
| Capital lease obligations, less current portion | $55 | $831 | $1,002 |
| Long-term debt, less current portion | $47,296 | $28,313 | $27,646 |
| Fair value of derivative | $2,386 | $1,205 | $0 |
| Other long-term liabilities | $5,294 | $13,698 | $19,893 |
| Total Liabilities | $67,054 | $86,448 | $105,031 |
| | | | |
| Total Shareholders Investment | $116,071 | $163,981 | $171,111 |
| | | | |
| **Total Liabilities and Shareholders Investment** | $183,125 | $250,429 | $276,142 |

Sources:
[1] P1688003 at 006
[2] P1715937 at 941

<u>Clingman & Hanger Management Associntes, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 5B**
ETC 90/10 Rule of Title IV HEA Program Funds Revenue Test per Audited Financials
*Figures in thousands*

| | | | ETC | | Anthem | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | School: | Miami | EduTech | Bryman | Phoenix | Parsippany | Springfield | Maryland Heights | Total |
| | | OPEID: | 023058 | 025862 | 030764 | 022631 | 010851 | 008441 | 022392 | |
| [1] | FY 08/09 | Title IV Funding | $42,619 | $5,170 | | | | | | $47,788 |
| | | Cash Receipts | $54,994 | $6,753 | | | | | | $61,748 |
| | | *Title IV % Cash Receipts* | 77.50% | 76.55% | | | | | | 77.39% |
| [1] | FY 09/10 | Title IV Funding | $59,399 | $3,193 | | | | | | $62,592 |
| | | Cash Receipts | $74,341 | $3,926 | | | | | | $78,267 |
| | | *Title IV % Cash Receipts* | 79.90% | 81.32% | | | | | | 79.97% |
| [2] | FY 10/11 | Title IV Funding | $64,261 | $3,968 | | | | | | $68,230 |
| | | Cash Receipts | $82,401 | $5,099 | | | | | | $87,500 |
| | | *Title IV % Cash Receipts* | 77.99% | 77.82% | | | | | | 77.98% |
| [3] | FY 11/12 | Title IV Funding | $70,465 | $2,974 | $27,158 | $35,814 | $12,942 | $8,094 | $13,417 | $170,863 |
| | | Cash Receipts | $80,827 | $3,385 | $30,537 | $40,701 | $14,898 | $9,192 | $14,983 | $194,524 |
| | | *Title IV % Cash Receipts* | 87.18% | 87.84% | 88.93% | 87.99% | 86.87% | 88.05% | 89.55% | 87.84% |
| [4] | FY 12/13 | Title IV Funding | $71,289 | $95 | $32,045 | $43,654 | $10,339 | $9,146 | $10,199 | $176,767 |
| | | Cash Receipts | $80,803 | $194 | $35,953 | $47,086 | $12,127 | $10,220 | $11,593 | $197,976 |
| | | *Title IV % Cash Receipts* | 88.23% | 48.72% | 89.13% | 92.71% | 85.26% | 89.50% | 87.98% | 89.29% |
| [5] | FY 13/14 | Title IV Funding | $72,847 | ($7) | $30,431 | $34,209 | $12,301 | $11,431 | $13,612 | $174,823 |
| | | Cash Receipts | $82,477 | $17 | $35,631 | $38,464 | $13,712 | $12,547 | $15,182 | $198,030 |
| | | *Title IV % Cash Receipts* | 88.32% | -42.53% | 85.41% | 88.94% | 89.71% | 91.10% | 89.66% | 88.28% |

Sources:
[1] P0341713 at 744.
[2] P1715839 at 889.
[3] P1715788 at 833.
[4] P1715788 at 826-832.
[5] P1746726, see All OPEID tab.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 6
Postsecondary Schools Industry - Public Companies Financials from 2011 to 2014
*Figures in millions*

| Company | Market Capitalization | | | | Revenues | | | | EBITDA | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LTM June 2011 | LTM June 2012 | LTM June 2013 | LTM June 2014 | LTM June 2011 | LTM June 2012 | LTM June 2013 | LTM June 2014 | LTM June 2011 | LTM June 2012 | LTM June 2013 | LTM June 2014 |
| [1] National American University Holdings, Inc. | $199 | $102 | $95 | $84 | $101 | $111 | $119 | $119 | $19 | $13 | $16 | $13 |
| [1] American Public Education, Inc. | $796 | $577 | $654 | $601 | $224 | $291 | $328 | $339 | $61 | $75 | $87 | $79 |
| [1] Lincoln Educational Services Corporation | $387 | $148 | $126 | $108 | $608 | $416 | $353 | $329 | $135 | $44 | $27 | $14 |
| [1] Universal Technical Institute, Inc. | $483 | $333 | $252 | $299 | $460 | $424 | $386 | $379 | $70 | $42 | $26 | $22 |
| [1] Capella Education Company | $658 | $469 | $516 | $669 | $437 | $428 | $415 | $417 | $108 | $85 | $66 | $70 |
| [1] Strayer Education, Inc. | $1,547 | $1,293 | $502 | $554 | $655 | $587 | $536 | $463 | $225 | $170 | $120 | $115 |
| [1] Grand Canyon Education, Inc. | $638 | $943 | $1,463 | $2,144 | $404 | $458 | $558 | $641 | $90 | $114 | $153 | $187 |
| [1] Bridgepoint Education, Inc. | $1,321 | $1,143 | $659 | $600 | $853 | $937 | $859 | $674 | $286 | $241 | $162 | $58 |
| [1] Career Education Corporation | $1,641 | $450 | $194 | $315 | $1,968 | $1,553 | $1,129 | $689 | $448 | $130 | ($50) | ($13) |
| [1] ITT Educational Services Inc. | $2,196 | $1,466 | $570 | $390 | $1,582 | $1,396 | $1,165 | $1,003 | $612 | $475 | $286 | $125 |
| [1] Corinthian Colleges Inc. | $360 | $246 | $185 | $26 | $1,751 | $1,582 | $1,600 | $1,481 | $212 | $124 | $110 | $71 |
| [1] DeVry Education Group Inc. | $4,067 | $2,028 | $1,951 | $2,688 | $2,160 | $2,072 | $1,964 | $1,923 | $563 | $406 | $339 | $302 |
| [1] Education Management Corporation | $3,176 | $870 | $700 | $213 | $2,888 | $2,761 | $2,499 | $2,273 | $633 | $481 | $347 | $219 |
| [1] Graham Holdings Company | $3,323 | $2,848 | $3,590 | $5,318 | $4,323 | $3,628 | $3,291 | $2,841 | $745 | $567 | $613 | $501 |
| [1] Apollo Education Group, Inc. | $5,821 | $3,839 | $2,251 | $3,020 | $4,870 | $4,357 | $3,833 | $3,114 | $1,418 | $1,026 | $758 | $657 |
| Total | $26,616 | $16,754 | $13,710 | $17,029 | $23,284 | $21,001 | $19,034 | $16,684 | $5,625 | $3,993 | $3,060 | $2,420 |
| YoY Growth | | -37% | -18% | 24% | | -10% | -9% | -12% | | -29% | -23% | -21% |
| [2] Stifel, July 2013 Report (Calendar Year) Avg. YoY Growth | | | | | | | -8% | -2% | | | -21% | -6% |
| [3] Stifel, June 2014 Report (Calendar Year) Avg. YoY Growth | | | | | | | | -7% | | | | -15% |

Sources:
[1] Capital IQ. Values reflect the most recent financial information.
[2] Postsecondary Snapshot. Stifel, dated July 1, 2013.
[3] Postsecondary Snapshot. Stifel, dated June 2, 2014.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 6A**
Capital IQ Consensus Estimates of Public Companies' Financials
*Figures in millions*

| | Company | Consensus Estimates | |
|---|---|---|---|
| | | Revenue | Adjusted EBITDA |
| | | LTM 6/30/2015 | LTM 6/30/2015 |
| [1] | National American University Holdings, Inc. | $129 | |
| [1] | American Public Education, Inc. | $361 | $86 |
| [1] | Lincoln Educational Services Corporation | $354 | $16 |
| [1] | Universal Technical Institute, Inc. | $386 | $31 |
| [1] | Capella Education Company | $425 | $84 |
| [1] | Strayer Education, Inc. | $422 | $88 |
| [1] | Grand Canyon Education, Inc. | $711 | $221 |
| [1] | Bridgepoint Education, Inc. | $658 | $68 |
| [1] | Career Education Corporation | $922 | ($18) |
| [1] | ITT Educational Services Inc. | $962 | $102 |
| [1] | Corinthian Colleges Inc. | $1,268 | $84 |
| [1] | DeVry Education Group Inc. | $1,964 | $327 |
| [1] | Education Management Corporation | $2,193 | $239 |
| [1] | Graham Holdings Company | | |
| [1] | Apollo Education Group, Inc. | $2,848 | $518 |

Sources:
[1] Capital IQ and Thomson One consensus estimates as of June 30, 2014.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 7
Direct Loan 11/12, 12/13 and 13/14 for Miami, Bryman and Phoenix in Q5

Direct Loan 11/12, 12/13 and 13/14

| | | Miami | | | Bryman | | | Phoenix | | | Miami, Bryman and Phoenix | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net |
| [1] | July 2012 | $3,368,610 | ($81,151) | $3,287,459 | $3,457,308 | ($35,954) | $3,421,354 | $5,581,591 | ($24,552) | $5,557,039 | $12,407,509 | ($141,657) | $12,265,852 |
| [1] | August 2012 | $4,573,523 | ($670,758) | $3,902,765 | $2,770,313 | ($36,656) | $2,733,657 | $3,693,637 | ($11,462) | $3,682,175 | $11,037,473 | ($718,876) | $10,318,597 |
| [1] | September 2012 | $3,752,008 | ($223,467) | $3,528,541 | $1,936,660 | ($141,403) | $1,795,257 | $2,365,670 | ($182,093) | $2,183,577 | $8,054,338 | ($546,963) | $7,507,375 |
| [1] | October 2012 | $5,826,222 | ($12,584) | $5,813,638 | $2,023,776 | ($128,665) | $1,895,112 | $2,434,635 | ($131,185) | $2,303,450 | $10,284,633 | ($272,434) | $10,012,200 |
| [1] | November 2012 | $3,799,672 | ($491,003) | $3,308,669 | $1,642,056 | ($48,393) | $1,593,663 | $2,882,090 | ($30,691) | $2,851,399 | $8,323,818 | ($570,087) | $7,753,731 |
| [1] | December 2012 | $3,174,638 | ($553,900) | $2,620,738 | $1,995,647 | ($68,929) | $1,926,718 | $2,489,218 | ($212,029) | $2,277,189 | $7,659,503 | ($834,858) | $6,824,645 |
| [1] | January 2013 | $6,948,398 | $0 | $6,948,398 | $2,201,334 | ($9,128) | $2,192,206 | $2,740,454 | ($37,271) | $2,703,183 | $11,890,186 | ($46,399) | $11,843,787 |
| [1] | February 2013 | $4,616,469 | ($26,958) | $4,589,511 | $2,978,344 | $0 | $2,978,344 | $2,642,930 | ($5,487) | $2,637,443 | $10,237,743 | ($32,445) | $10,205,298 |
| [1] | March 2013 | $4,017,619 | $0 | $4,017,619 | $2,347,162 | $0 | $2,347,162 | $4,920,673 | ($2,523,538) | $2,397,135 | $11,185,454 | ($2,523,538) | $8,661,916 |
| [1] | April 2013 | $3,668,681 | $0 | $3,668,681 | $1,355,674 | ($869,148) | $486,526 | $2,019,302 | $1,162,318 | $3,181,620 | $7,043,657 | $293,170 | $7,336,827 |
| [1] | May 2013 | $2,841,336 | $0 | $2,841,336 | $0 | $0 | $0 | $1,145,814 | $0 | $1,145,814 | $3,987,150 | $0 | $3,987,150 |
| [1] | June 2013 | $6,700,930 | $0 | $6,700,930 | $1,411,878 | $0 | $1,411,878 | $3,776,500 | ($170,000) | $3,606,500 | $11,889,308 | ($170,000) | $11,719,308 |
| [2] | July 2013 | $5,345,253 | $0 | $5,345,253 | $4,892,779 | $0 | $4,892,779 | $4,445,205 | $0 | $4,445,205 | $14,683,237 | $0 | $14,683,237 |
| [2] | August 2013 | $5,045,000 | $0 | $5,045,000 | $892,502 | ($849,507) | $42,995 | $3,880,000 | ($760,000) | $3,120,000 | $9,817,502 | ($1,609,507) | $8,207,995 |
| [2] | September 2013 | $8,020,000 | ($572,111) | $7,447,889 | $1,762,913 | ($289,112) | $1,473,801 | $4,570,000 | ($1,650,440) | $2,919,560 | $14,352,913 | ($2,511,663) | $11,841,250 |
| [2] | October 2013 | $5,950,000 | ($1,738,259) | $4,211,741 | $2,554,983 | $0 | $2,554,983 | $5,500,000 | ($2,498,313) | $3,001,687 | $14,004,983 | ($4,236,572) | $9,768,411 |
| [2] | November 2013 | $6,200,000 | ($2,169,509) | $4,030,491 | $2,357,368 | ($762,120) | $1,595,248 | $4,200,000 | ($2,150,447) | $2,049,553 | $12,757,368 | ($5,082,076) | $7,675,292 |
| [2] | December 2013 | $4,875,000 | ($4,324,229) | $550,771 | $4,075,000 | ($485,068) | $3,589,932 | $4,975,000 | ($3,122,864) | $1,852,136 | $13,925,000 | ($7,932,161) | $5,992,839 |
| [2] | January 2014 | $4,120,000 | ($268,695) | $3,851,305 | $2,425,000 | ($277,861) | $2,147,139 | $3,206,145 | ($2,066,581) | $1,139,564 | $9,751,145 | ($2,613,137) | $7,138,008 |
| [2] | February 2014 | $8,225,000 | ($483,790) | $7,741,210 | $3,184,000 | ($803,569) | $2,380,431 | $3,500,000 | ($1,659,112) | $1,840,888 | $14,909,000 | ($2,946,471) | $11,962,529 |
| [2] | March 2014 | $4,249,702 | ($4,574,909) | ($325,207) | $0 | ($1,712,705) | ($1,712,705) | $1,250,000 | ($2,159,784) | ($909,784) | $5,499,702 | ($8,447,398) | ($2,947,696) |
| [2] | April 2014 | $2,448,846 | ($1,648,837) | $800,009 | $1,094,012 | ($3,523) | $1,090,489 | $1,523,226 | ($596,900) | $926,326 | $5,066,084 | ($2,249,260) | $2,816,824 |
| [2] | May 2014 | $4,879,846 | ($441,886) | $4,437,960 | $1,948,066 | ($364,145) | $1,583,921 | $1,672,418 | ($497,183) | $1,175,235 | $8,500,330 | ($1,303,214) | $7,197,116 |
| [2] | June 2014 | $4,002,714 | $0 | $4,002,714 | $1,110,673 | ($355,732) | $754,941 | $1,310,877 | ($581,607) | $729,270 | $6,424,264 | ($937,339) | $5,486,925 |
| | FY 12/13 | $53,288,106 | ($2,059,821) | $51,228,285 | $24,020,152 | ($1,338,276) | $22,681,877 | $36,692,513 | ($2,165,990) | $34,526,524 | $114,000,772 | ($5,564,087) | $108,436,685 |
| | FY 13/14 | $63,361,361 | ($16,222,225) | $47,139,136 | $26,297,296 | ($5,903,342) | $20,393,954 | $40,032,871 | ($17,743,231) | $22,289,640 | $129,691,528 | ($39,868,798) | $89,822,730 |

Sources:
[1] DOE000001-562 and TJS012977
[2] P2222704-705 and TJS012977

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 7A
Direct Loan 11/12, 12/13 and 13/14 for All OPEIDs in G5

| | | Direct Loan 11/12, 12/13 and 13/14 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Miami, Bryman and Phoenix | | | Parsippany, Springfield and Maryland Heights | | | All OPEIDs | | |
| | | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net |
| | | [1] | [1] | [1] | [2] | [2] | [2] | | | |
| FY 12/13 | July 2012 | $12,407,509 | ($141,657) | $12,265,852 | $2,094,689 | ($97,714) | $1,996,975 | $14,502,198 | ($239,371) | $14,262,827 |
| | August 2012 | $11,037,473 | ($718,876) | $10,318,597 | $3,276,338 | ($90,355) | $3,185,983 | $14,313,811 | ($809,231) | $13,504,580 |
| | September 2012 | $8,054,338 | ($546,963) | $7,507,375 | $2,187,812 | ($150,230) | $2,037,582 | $10,242,150 | ($697,193) | $9,544,957 |
| | October 2012 | $10,284,633 | ($272,434) | $10,012,200 | $2,049,424 | ($147,714) | $1,901,710 | $12,334,057 | ($420,148) | $11,913,910 |
| | November 2012 | $8,323,818 | ($570,087) | $7,753,731 | $2,058,512 | ($187,170) | $1,871,342 | $10,382,330 | ($757,257) | $9,625,073 |
| | December 2012 | $7,659,503 | ($834,858) | $6,824,645 | $1,503,287 | ($272,487) | $1,230,800 | $9,162,790 | ($1,107,345) | $8,055,445 |
| | January 2013 | $11,890,186 | ($46,399) | $11,843,787 | $2,882,672 | ($6,491) | $2,876,181 | $14,772,858 | ($52,890) | $14,719,968 |
| | February 2013 | $10,237,743 | ($32,445) | $10,205,298 | $4,383,544 | ($1,519) | $4,382,025 | $14,621,287 | ($33,964) | $14,587,323 |
| | March 2013 | $11,185,454 | ($2,523,538) | $8,661,916 | $4,231,921 | ($12,459) | $4,219,462 | $15,417,375 | ($2,535,997) | $12,881,378 |
| | April 2013 | $7,043,657 | $293,170 | $7,336,827 | $2,135,103 | ($287,013) | $1,848,090 | $9,178,760 | $6,157 | $9,184,917 |
| | May 2013 | $3,987,150 | $0 | $3,987,150 | $0 | $0 | $0 | $3,987,150 | $0 | $3,987,150 |
| | June 2013 | $11,889,308 | ($170,000) | $11,719,308 | $452,371 | ($3,295,341) | ($2,842,970) | $12,341,679 | ($3,465,341) | $8,876,338 |
| FY 13/14 | July 2013 | $14,683,237 | $0 | $14,683,237 | $2,740,018 | $0 | $2,740,018 | $17,423,255 | $0 | $17,423,255 |
| | August 2013 | $9,817,502 | ($1,609,507) | $8,207,995 | $2,351,068 | $0 | $2,351,068 | $12,168,570 | ($1,609,507) | $10,559,063 |
| | September 2013 | $14,352,913 | ($2,511,663) | $11,841,250 | $1,322,060 | $0 | $1,322,060 | $15,674,973 | ($2,511,663) | $13,163,310 |
| | October 2013 | $14,004,983 | ($4,236,572) | $9,768,411 | $2,771,229 | $0 | $2,771,229 | $16,776,212 | ($4,236,572) | $12,539,640 |
| | November 2013 | $12,757,368 | ($5,082,076) | $7,675,292 | $1,882,368 | ($154,039) | $1,728,329 | $14,639,736 | ($5,236,115) | $9,403,621 |
| | December 2013 | $13,925,000 | ($7,932,161) | $5,992,839 | $808,412 | $100,048 | $908,460 | $14,733,412 | ($7,832,113) | $6,901,299 |
| | January 2014 | $9,751,145 | ($2,613,137) | $7,138,008 | $2,473,536 | ($89,009) | $2,384,527 | $12,224,681 | ($2,702,146) | $9,522,535 |
| | February 2014 | $14,909,000 | ($2,946,471) | $11,962,529 | $1,836,907 | ($240,697) | $1,596,210 | $16,745,907 | ($3,187,168) | $13,558,739 |
| | March 2014 | $5,499,702 | ($2,682,394) | $2,817,308 | $4,058,998 | ($203,600) | $3,855,398 | $9,558,700 | ($2,885,994) | $6,672,706 |
| | April 2014 | $5,066,084 | ($2,249,260) | $2,816,824 | $2,368,344 | ($191,824) | $2,176,520 | $7,434,428 | ($2,441,084) | $4,993,344 |
| | May 2014 | $8,500,330 | ($1,303,214) | $7,197,116 | $2,502,717 | ($720,850) | $1,781,867 | $11,003,047 | ($2,024,064) | $8,978,983 |
| | June 2014 | $6,424,264 | ($937,339) | $5,486,925 | $1,325,544 | ($145,271) | $1,180,273 | $7,749,808 | ($1,082,610) | $6,667,198 |
| | FY 12/13 | $114,000,772 | ($5,564,087) | $108,436,685 | $27,255,673 | ($4,548,493) | $22,707,180 | $141,256,445 | ($10,112,580) | $131,143,865 |
| | FY 13/14 | $129,691,528 | ($39,868,798) | $89,822,730 | $26,441,201 | ($1,645,242) | $24,795,959 | $156,132,729 | ($41,514,040) | $114,618,689 |

Sources:
[1] See Exhibit 7.
[2] P2222704-705; TJS010343; TJS012977.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 7B**
Pell 11/12, 12/13 and 13/14 for All OPEIDs in G5

| | | Pell 11/12, 12/13 and 13/14 | | | | | | | | |
| | | Miami, Bryman and Phoenix | | | Parsippany, Springfield and Maryland Heights | | | All OPEIDs | | |
| | | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net |
|---|---|---|---|---|---|---|---|---|---|---|
| [1] | July 2012 | $6,238,432 | ($18,867) | $6,219,565 | $1,222,564 | ($32,237) | $1,190,327 | $7,460,996 | ($51,104) | $7,409,892 |
| [1] | August 2012 | $6,019,883 | ($98,097) | $5,921,786 | $1,425,648 | ($35,539) | $1,390,109 | $7,445,531 | ($133,636) | $7,311,895 |
| [1] | September 2012 | $4,119,684 | ($202,313) | $3,917,371 | $1,072,948 | ($47,727) | $1,025,221 | $5,192,632 | ($250,040) | $4,942,592 |
| [1] | October 2012 | $6,315,697 | ($142,675) | $6,173,021 | $1,035,248 | ($26,379) | $1,008,869 | $7,350,944 | ($169,054) | $7,181,890 |
| [1] | November 2012 | $4,201,705 | ($229,528) | $3,972,177 | $836,819 | ($25,825) | $810,994 | $5,038,523 | ($255,353) | $4,783,171 |
| [1] | December 2012 | $4,631,583 | ($175,176) | $4,456,407 | $842,262 | ($53,308) | $788,954 | $5,473,845 | ($228,484) | $5,245,361 |
| [1] | January 2013 | $1,398,826 | ($6,682) | $1,392,144 | $37,086 | ($19,157) | $17,929 | $1,435,912 | ($25,839) | $1,410,073 |
| [1] | February 2013 | $2,434,149 | ($43,058) | $2,391,090 | $721,119 | ($2,158) | $718,961 | $3,155,268 | ($45,216) | $3,110,051 |
| [1] | March 2013 | $4,550,190 | ($3,198) | $4,546,992 | $375,798 | $0 | $375,798 | $4,925,988 | ($3,198) | $4,922,790 |
| [1] | April 2013 | $2,223,175 | ($61,350) | $2,161,825 | $638,044 | $0 | $638,044 | $2,861,219 | ($61,350) | $2,799,869 |
| [1] | May 2013 | $3,949,498 | ($123,409) | $3,826,089 | $1,312,774 | ($5,915) | $1,306,859 | $5,262,272 | ($129,324) | $5,132,948 |
| [1] | June 2013 | $3,416,130 | $0 | $3,416,130 | $412,545 | $0 | $412,545 | $3,828,675 | $0 | $3,828,675 |
| [2] | July 2013 | $4,380,600 | ($102,665) | $4,277,935 | $1,104,321 | ($13,400) | $1,090,921 | $5,484,920 | ($116,065) | $5,368,856 |
| [2] | August 2013 | $4,685,681 | ($358,354) | $4,327,327 | $996,237 | $0 | $996,237 | $5,681,918 | ($358,354) | $5,323,563 |
| [2] | September 2013 | $3,633,951 | ($2,775) | $3,631,176 | $849,956 | $0 | $849,956 | $4,483,907 | ($2,775) | $4,481,132 |
| [2] | October 2013 | $4,955,702 | ($906,435) | $4,049,267 | $2,054,051 | ($69,369) | $1,984,682 | $7,009,753 | ($975,804) | $6,033,949 |
| [2] | November 2013 | $5,784,767 | ($123,674) | $5,661,093 | $919,181 | ($47,972) | $871,209 | $6,703,947 | ($171,646) | $6,532,302 |
| [2] | December 2013 | $2,297,555 | ($148,750) | $2,148,805 | $537,140 | ($80,768) | $456,372 | $2,834,695 | ($229,518) | $2,605,177 |
| [2] | January 2014 | $6,036,324 | ($53,783) | $5,982,541 | $1,132,296 | ($10,296) | $1,122,000 | $7,168,620 | ($64,078) | $7,104,542 |
| [2] | February 2014 | $3,222,049 | ($27,772) | $3,194,277 | $893,456 | ($21,172) | $872,284 | $4,115,506 | ($48,944) | $4,066,562 |
| [2] | March 2014 | $5,284,591 | ($32,225) | $5,252,366 | $1,716,277 | ($54,886) | $1,661,391 | $7,000,868 | ($87,111) | $6,913,757 |
| [2] | April 2014 | $3,713,848 | ($18,790) | $3,695,058 | $1,370,998 | ($6,157) | $1,364,841 | $5,084,846 | ($24,947) | $5,059,899 |
| [2] | May 2014 | $3,416,424 | ($88,372) | $3,328,052 | $1,035,012 | ($30,107) | $1,004,905 | $4,451,436 | ($118,479) | $4,332,957 |
| [2] | June 2014 | $2,133,209 | $0 | $2,133,209 | $545,412 | $0 | $545,412 | $2,678,620 | $0 | $2,678,620 |
| | FY 12/13 | $49,498,950 | ($1,104,354) | $48,394,597 | $9,932,854 | ($248,245) | $9,684,609 | $59,431,804 | ($1,352,599) | $58,079,206 |
| | FY 13/14 | $49,544,701 | ($1,863,594) | $47,681,107 | $13,154,336 | ($334,126) | $12,820,209 | $62,699,036 | ($2,197,721) | $60,501,316 |

Sources:
[1] P1846829 and TJS010775.
[2] P2222704-705 and TJS010775.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 7C**
Direct Loan and Pell 11/12, 12/13 and 13/14 for All OPEIDs in G5

| | | Direct Loan and Pell 11/12, 12/13 and 13/14 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Miami, Bryman and Phoenix | | | Parsippany, Springfield and Maryland Heights | | | All OPEIDs | | |
| | | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net |
| | | [1] | [1] | [1] | [1] | [1] | [1] | | | |
| FY 12/13 | July 2012 | $18,645,941 | ($160,524) | $18,485,417 | $3,317,253 | ($129,951) | $3,187,302 | $21,963,194 | ($290,475) | $21,672,719 |
| | August 2012 | $17,057,356 | ($816,973) | $16,240,383 | $4,701,986 | ($125,894) | $4,576,092 | $21,759,342 | ($942,867) | $20,816,475 |
| | September 2012 | $12,174,022 | ($749,276) | $11,424,746 | $3,260,760 | ($197,957) | $3,062,803 | $15,434,781 | ($947,233) | $14,487,548 |
| | October 2012 | $16,600,330 | ($415,109) | $16,185,221 | $3,084,672 | ($174,093) | $2,910,579 | $19,685,002 | ($589,202) | $19,095,799 |
| | November 2012 | $12,525,523 | ($799,614) | $11,725,908 | $2,895,331 | ($212,995) | $2,682,336 | $15,420,853 | ($1,012,609) | $14,408,244 |
| | December 2012 | $12,291,085 | ($1,010,034) | $11,281,051 | $2,345,549 | ($325,795) | $2,019,754 | $14,636,634 | ($1,335,829) | $13,300,805 |
| | January 2013 | $13,289,012 | ($53,081) | $13,235,931 | $2,919,758 | ($25,648) | $2,894,110 | $16,208,770 | ($78,729) | $16,130,041 |
| | February 2013 | $12,671,892 | ($75,503) | $12,596,388 | $5,104,663 | ($3,677) | $5,100,986 | $17,776,555 | ($79,180) | $17,697,374 |
| | March 2013 | $15,735,644 | ($2,526,736) | $13,208,908 | $4,607,719 | ($12,459) | $4,595,260 | $20,343,363 | ($2,539,195) | $17,804,168 |
| | April 2013 | $9,266,832 | $231,819 | $9,498,652 | $2,773,147 | ($287,013) | $2,486,134 | $12,039,979 | ($55,194) | $11,984,785 |
| | May 2013 | $7,936,648 | ($123,409) | $7,813,239 | $1,312,774 | ($5,915) | $1,306,859 | $9,249,422 | ($129,324) | $9,120,098 |
| | June 2013 | $15,305,438 | ($170,000) | $15,135,438 | $864,916 | ($3,295,341) | ($2,430,425) | $16,170,354 | ($3,465,341) | $12,705,013 |
| FY 13/14 | July 2013 | $19,063,837 | ($102,665) | $18,961,172 | $3,844,339 | ($13,400) | $3,830,939 | $22,908,175 | ($116,065) | $22,792,111 |
| | August 2013 | $14,503,183 | ($1,967,861) | $12,535,322 | $3,347,305 | $0 | $3,347,305 | $17,850,488 | ($1,967,861) | $15,882,626 |
| | September 2013 | $17,986,864 | ($2,514,438) | $15,472,426 | $2,172,016 | $0 | $2,172,016 | $20,158,880 | ($2,514,438) | $17,644,442 |
| | October 2013 | $18,960,685 | ($5,143,007) | $13,817,678 | $4,825,280 | ($69,369) | $4,755,911 | $23,785,965 | ($5,212,376) | $18,573,589 |
| | November 2013 | $18,542,135 | ($5,205,750) | $13,336,385 | $2,801,549 | ($202,011) | $2,599,538 | $21,343,683 | ($5,407,761) | $15,935,923 |
| | December 2013 | $16,222,555 | ($8,080,911) | $8,141,644 | $1,345,552 | $19,280 | $1,364,832 | $17,568,107 | ($8,061,631) | $9,506,476 |
| | January 2014 | $15,787,469 | ($2,666,920) | $13,120,549 | $3,605,832 | ($99,305) | $3,506,527 | $19,393,301 | ($2,766,224) | $16,627,077 |
| | February 2014 | $18,131,049 | ($2,974,243) | $15,156,806 | $2,730,363 | ($261,869) | $2,468,494 | $20,861,413 | ($3,236,112) | $17,625,301 |
| | March 2014 | $10,784,293 | ($8,479,623) | $2,304,670 | $5,775,275 | ($258,486) | $5,516,789 | $16,559,568 | ($8,738,109) | $7,821,459 |
| | April 2014 | $8,779,932 | ($2,268,050) | $6,511,882 | $3,739,342 | ($197,981) | $3,541,361 | $12,519,274 | ($2,466,031) | $10,053,243 |
| | May 2014 | $11,916,754 | ($1,391,586) | $10,525,168 | $3,537,729 | ($750,957) | $2,786,772 | $15,454,483 | ($2,142,543) | $13,311,940 |
| | June 2014 | $8,557,473 | ($937,339) | $7,620,134 | $1,870,956 | ($145,271) | $1,725,685 | $10,428,428 | ($1,082,610) | $9,345,818 |
| | FY 12/13 | $163,499,722 | ($6,668,440) | $156,831,282 | $37,188,527 | ($4,796,738) | $32,391,789 | $200,688,249 | ($11,465,178) | $189,223,071 |
| | FY 13/14 | $179,236,229 | ($41,732,392) | $137,503,837 | $39,595,537 | ($1,979,368) | $37,616,168 | $218,831,765 | ($43,711,761) | $175,120,005 |

Sources:
[1] See Exhibit 7A and Exhibit 7B.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 2/25/2013 | Bryman | | | $119,113 | $103,360 | Direct Loan | 11/12 | P1205056-060 |
| 4/4/2013 | Bryman | | | $124,312 | $121,568 | Direct Loan | 11/12 | P2007170-182 |
| 4/8/2013 | Bryman | | | $124,312 | $121,568 | Direct Loan | 11/12 | P2007170-182 |
| 7/26/2013 | Bryman | $19,998,390 | $20,049,616 | ($51,226) | ($51,226) | Direct Loan | 11/12 | P1836957 |
| 10/31/2013 | Bryman | $20,049,707 | $20,042,090 | $7,617 | | Direct Loan | 11/12 | P1836957 |
| | | | | | | | | |
| 2/25/2013 | Bryman | | | $3,748,471 | $1,421,746 | Direct Loan | 12/13 | P1205056-060 |
| 4/4/2013 | Bryman | | | $2,736,236 | $491,818 | Direct Loan | 12/13 | P2007170-182 |
| 4/8/2013 | Bryman | | | $3,586,925 | $1,913,251 | Direct Loan | 12/13 | P2007170-182 |
| 4/22/2013 | Bryman | | | $2,872,218 | $1,511,613 | Direct Loan | 12/13 | P1229986-989 |
| 4/29/2013 | Bryman | | | $2,448,278 | $1,328,771 | Direct Loan | 12/13 | P1229986-989 |
| 5/2/2013 | Bryman | | | $1,725,897 | $370,223 | Direct Loan | 12/13 | P1229986-989 |
| 5/3/2013 | Bryman | | | $1,518,419 | $162,745 | Direct Loan | 12/13 | P1229986-989 |
| 8/12/2013 | Bryman | $20,927,090 | $19,679,724 | $1,247,366 | $399,507 | Direct Loan | 12/13 | P1257139 |
| 8/26/2013 | Bryman | $20,527,583 | $19,833,361 | $694,222 | | Direct Loan | 12/13 | P1715756-578 |
| 9/3/2013 | Bryman | $20,527,583 | $20,238,471 | $289,112 | $289,112 | Direct Loan | 12/13 | P1261450 |
| 9/23/2013 | Bryman | $20,838,471 | $20,581,249 | $257,222 | | Direct Loan | 12/13 | P1715756-578 |
| 10/2/2013 | Bryman | $21,288,471 | $21,078,792 | $209,679 | | Direct Loan | 12/13 | P2056273 |
| 10/21/2013 | Bryman | $21,788,471 | $20,898,878 | $889,593 | | Direct Loan | 12/13 | P1715756-578 |
| 10/25/2013 | Bryman | $22,138,471 | $20,949,666 | $1,188,805 | | Direct Loan | 12/13 | P2059204 |
| 11/4/2013 | Bryman | $22,438,471 | $21,142,767 | $1,295,704 | $345,704 | Direct Loan | 12/13 | P1837397 |
| 11/11/2013 | Bryman | $22,638,471 | $21,276,251 | $1,362,220 | $212,220 | Direct Loan | 12/13 | P1839436 |
| 11/18/2013 | Bryman | $22,426,251 | $21,325,891 | $1,100,360 | $250,360 | Direct Loan | 12/13 | P1715756-578 |
| 11/20/2013 | Bryman | $22,426,251 | $21,476,641 | $949,610 | $99,610 | Direct Loan | 12/13 | P2061010 |
| 11/25/2013 | Bryman | $22,171,341 | $21,433,918 | $737,423 | $237,423 | Direct Loan | 12/13 | P1842805 |
| 12/2/2013 | Bryman | $21,876,351 | $21,426,120 | $450,231 | $250,231 | Direct Loan | 12/13 | P1843648 |
| 12/3/2013 | Bryman | $21,876,351 | $21,432,243 | $444,108 | $244,108 | Direct Loan | 12/13 | P1843998 |
| 12/4/2013 | Bryman | $21,632,243 | $21,416,915 | $215,328 | $209,377 | Direct Loan | 12/13 | P1845136 |
| 12/6/2013 | Bryman | $21,876,351 | $21,434,032 | $442,319 | $442,319 | Direct Loan | 12/13 | P2063136 |
| 12/9/2013 | Bryman | $21,632,243 | $21,416,915 | $215,328 | $215,328 | Direct Loan | 12/13 | P1844588 |
| 12/16/2013 | Bryman | $21,497,866 | $21,391,283 | $106,583 | $31,583 | Direct Loan | 12/13 | P1846674 |
| 12/23/2013 | Bryman | $21,547,866 | $21,398,527 | $149,339 | $24,339 | Direct Loan | 12/13 | P1715756-578 |
| 1/13/2014 | Bryman | $21,516,283 | $21,407,126 | $109,157 | $59,157 | Direct Loan | 12/13 | P1848995 |

<u>Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al</u>

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 1/20/2014 | Bryman | $21,516,283 | $21,431,274 | $85,009 | $85,009 | Direct Loan | 12/13 | P1849158 |
| 1/21/2014 | Bryman | $21,516,283 | $21,431,274 | $85,009 | $35,009 | Direct Loan | 12/13 | P1715756-578 |
| 1/27/2014 | Bryman | $21,589,534 | $21,418,715 | $170,819 | $70,819 | Direct Loan | 12/13 | P1849289 |
| 2/4/2014 | Bryman | $21,589,534 | $21,397,257 | $192,277 | $92,277 | Direct Loan | 12/13 | P2188887-892 |
| 2/24/2014 | Bryman | $21,497,257 | $21,408,230 | $89,027 | $0 | Direct Loan | 12/13 | P1715756-578 |
| 2/26/2014 | Bryman | | | $87,871 | $87,871 | Direct Loan | 12/13 | P1779881 |
| 3/3/2014 | Bryman | $21,547,257 | $21,409,386 | $137,871 | $87,871 | Direct Loan | 12/13 | P1715756-578 |
| 3/4/2014 | Bryman | | | $54,218 | $4,218 | Direct Loan | 12/13 | P2371446 |
| 3/10/2014 | Bryman | $21,455,168 | $21,400,265 | $54,903 | $4,903 | Direct Loan | 12/13 | P1715756-578 |
| 3/17/2014 | Bryman | $21,445,483 | $21,430,526 | $14,957 | $0 | Direct Loan | 12/13 | P1715756-578 |
| 3/24/2014 | Bryman | $21,445,483 | $21,452,481 | ($6,998) | $0 | Direct Loan | 12/13 | P1715756-578 |
| 3/27/2014 | Bryman | $21,445,483 | $21,456,750 | ($11,267) | $0 | Direct Loan | 12/13 | P1715756-578 |
| 3/31/2014 | Bryman | $21,445,483 | $21,449,488 | ($4,005) | $0 | Direct Loan | 12/13 | P1715756-578 |
| 5/12/2014 | Bryman | $21,442,241 | $21,308,313 | $133,928 | $133,647 | Direct Loan | 12/13 | P2085523 |
| 5/19/2014 | Bryman | $21,255,075 | $21,193,540 | $61,535 | | Direct Loan | 12/13 | P2086086 |
| 5/27/2014 | Bryman | $21,193,540 | $20,993,002 | $200,538 | | Direct Loan | 12/13 | P1795918 |
| 6/10/2014 | Bryman | $20,722,364 | $20,187,703 | $534,661 | | Direct Loan | 12/13 | P1799375 |
| 6/16/2014 | Bryman | $20,722,364 | $20,201,138 | $521,226 | | Direct Loan | 12/13 | P2087829 |
| 6/23/2014 | Bryman | $20,722,364 | $20,285,218 | $437,146 | $437,146 | Direct Loan | 12/13 | P1637045-753 |
| 6/30/2014 | Bryman | $20,722,364 | $20,156,227 | $566,137 | | Direct Loan | 12/13 | P1804576 |
| 7/21/2014 | Bryman | $20,152,248 | $20,117,822 | $34,426 | $34,326 | Direct Loan | 12/13 | P2090230 |
| 7/22/2014 | Bryman | $20,152,248 | $20,117,922 | $34,326 | | Direct Loan | 12/13 | P2536814 |
| | | | | | | | | |
| 8/26/2013 | Bryman | $818,790 | $893,804 | ($75,014) | | Direct Loan | 13/14 | P1715756-758 |
| 10/21/2013 | Bryman | $2,752,832 | $2,703,373 | $49,459 | | Direct Loan | 13/14 | P1715756-758 |
| 11/18/2013 | Bryman | $4,416,202 | $4,404,427 | $11,775 | | Direct Loan | 13/14 | P1715756-758 |
| 11/18/2013 | Bryman | $4,616,202 | $4,477,284 | $138,918 | $0 | Direct Loan | 13/14 | P2061009-010 |
| 11/21/2013 | Bryman | $4,928,991 | $4,928,991 | $0 | $0 | Direct Loan | 13/14 | P2061410-411 |
| 11/29/2013 | Bryman | $5,378,991 | $5,265,128 | $113,863 | $0 | Direct Loan | 13/14 | P1843997-998 |
| 12/4/2013 | Bryman | $5,978,991 | $5,695,609 | $283,382 | $0 | Direct Loan | 13/14 | P2063135-136 |
| 12/9/2013 | Bryman | $5,978,991 | $5,695,609 | $283,382 | $0 | Direct Loan | 13/14 | P2180663-665 |
| 12/23/2013 | Bryman | $8,078,991 | $6,046,423 | $2,032,568 | | Direct Loan | 13/14 | P1715756-758 |
| 1/13/2014 | Bryman | $9,653,991 | $7,089,023 | $2,564,968 | $839,968 | Direct Loan | 13/14 | P1848893 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 1/20/2014 | Bryman | $10,153,991 | $7,821,268 | $2,332,723 | $257,723 | Direct Loan | 13/14 | P1849154 |
| 1/21/2014 | Bryman | $10,153,991 | $7,821,268 | $2,332,723 | $107,723 | Direct Loan | 13/14 | P1715756-758 |
| 1/27/2014 | Bryman | $10,802,879 | $7,947,135 | $2,855,744 | $430,774 | Direct Loan | 13/14 | P1849292 |
| 2/3/2014 | Bryman | $11,402,879 | $7,968,315 | $3,434,564 | $1,109,564 | Direct Loan | 13/14 | P1849370 |
| 2/4/2014 | Bryman | $11,308,446 | $8,366,587 | $2,941,859 | $216,859 | Direct Loan | 13/14 | P2067625-626 |
| 2/4/2014 | Bryman | $11,402,879 | $7,968,315 | $3,434,564 | $1,109,564 | Direct Loan | 13/14 | P2188887-892 |
| 2/10/2014 | Bryman | $11,628,446 | $8,851,023 | $2,777,423 | $57,423 | Direct Loan | 13/14 | P2067937 |
| 2/24/2014 | Bryman | $12,891,587 | $9,338,103 | $3,553,484 | $253,484 | Direct Loan | 13/14 | P1715756-758 |
| 2/26/2014 | Bryman | | | $3,611,173 | $327,173 | Direct Loan | 13/14 | P1779881 |
| 3/3/2014 | Bryman | $13,825,587 | $9,931,215 | $3,894,372 | $260,372 | Direct Loan | 13/14 | P1715756-758 |
| 3/4/2014 | Bryman | | | $3,519,646 | $385,646 | Direct Loan | 13/14 | P2371446-451 |
| 3/10/2014 | Bryman | $13,065,215 | $10,337,206 | $2,728,009 | $314,009 | Direct Loan | 13/14 | P1715756-758 |
| 3/17/2014 | Bryman | $12,841,174 | $10,815,069 | $2,026,105 | $242,105 | Direct Loan | 13/14 | P1715756-758 |
| 3/24/2014 | Bryman | $12,632,965 | $10,935,532 | $1,697,433 | $763,433 | Direct Loan | 13/14 | P1715756-758 |
| 3/27/2014 | Bryman | $12,269,532 | $11,668,891 | $600,641 | $0 | Direct Loan | 13/14 | P1715756-758 |
| 3/31/2014 | Bryman | $12,214,656 | $11,711,758 | $502,898 | $549,366 | Direct Loan | 13/14 | P1715756-758 |
| 4/7/2014 | Bryman | $12,214,656 | $11,924,204 | $290,452 | $290,452 | Direct Loan | 13/14 | P2083005 |
| | | | | | | | | |
| 9/26/2013 | Bryman | $11,295,149 | | | $276,929 | Pell Grant | 12/13 | P1276614 |
| 11/21/2013 | Bryman | $10,943,233 | | | $51,140 | Pell Grant | 12/13 | P1842329 |
| 11/25/2013 | Bryman | $10,934,813 | $10,879,349 | $55,464 | $55,069 | Pell Grant | 12/13 | P1842807 |
| 2/4/2014 | Bryman | $10,864,797 | $10,861,967 | $2,830 | $2,830 | Pell Grant | 12/13 | P2188887-892 |
| 3/3/2014 | Bryman | $10,859,116 | $10,853,616 | $5,500 | $5,500 | Pell Grant | 12/13 | P1715756-578 |
| 6/16/2014 | Bryman | $10,898,279 | $10,895,407 | $2,872 | $2,872 | Pell Grant | 12/13 | P2087854 |
| 6/26/2014 | Bryman | $10,898,279 | $10,895,407 | $2,872 | $2,872 | Pell Grant | 12/13 | P2090241 |
| 7/21/2014 | Bryman | $10,893,673 | $10,891,148 | $2,525 | $2,525 | Pell Grant | 12/13 | P2090241 |
| | | | | | | | | |
| 2/24/2014 | Bryman | $6,519,542 | $6,578,855 | ($59,313) | | Pell Grant | 13/14 | P1715756-578 |
| 3/3/2014 | Bryman | $14,126,700 | $14,099,361 | $27,339 | | Pell Grant | 13/14 | P1715756-578 |
| 3/10/2014 | Bryman | $6,882,319 | $7,037,832 | ($155,513) | | Pell Grant | 13/14 | P1715756-578 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|------|--------|---------------|------|-------------|--------------------------|-------|------------|--------|
| 7/18/2012 | FCC | $47,960,683 | $47,948,776 | $11,907 | | Direct Loan | 10/11 | P0860829 |
| | | | | | | | | |
| 7/26/2013 | FCC | $49,346,399 | $49,374,982 | ($28,583) | ($28,583) | Direct Loan | 11/12 | P1251276 |
| 10/8/2013 | FCC | $49,370,771 | $49,370,142 | $629 | | Direct Loan | 11/12 | P1832900 |
| 10/31/2013 | FCC | $49,370,771 | $49,370,786 | ($15) | | Direct Loan | 11/12 | P1836963 |
| 3/27/2014 | FCC | $49,363,119 | $49,360,896 | $2,223 | $2,223 | Direct Loan | 11/12 | P1783775 |
| 6/10/2014 | FCC | $49,351,006 | $49,351,442 | ($436) | | Direct Loan | 11/12 | P2087497 |
| 6/19/2014 | FCC | $49,351,006 | $49,351,442 | ($436) | | Direct Loan | 11/12 | P2089422 |
| 7/8/2014 | FCC | $49,351,006 | $49,351,442 | ($436) | | Direct Loan | 11/12 | P2089422 |
| 7/15/2014 | FCC | $49,351,006 | $49,351,442 | ($436) | | Direct Loan | 11/12 | P1809184 |
| 7/24/2014 | FCC | $49,351,006 | $49,351,442 | ($436) | | Direct Loan | 11/12 | P2536801 |
| | | | | | | | | |
| 4/8/2013 | FCC | $33,234,839 | $27,138,796 | $6,096,043 | $281,757 | Direct Loan | 12/13 | P1227122 |
| 4/15/2013 | FCC | $33,861,839 | $28,647,875 | $5,213,964 | $2,032,671 | Direct Loan | 12/13 | P2008264 |
| 4/22/2013 | FCC | | | $6,148,023 | $2,479,342 | Direct Loan | 12/13 | P1229986-989 |
| 4/29/2013 | FCC | | | $4,177,168 | $1,063,746 | Direct Loan | 12/13 | P1229986-989 |
| 5/2/2013 | FCC | | | $3,410,014 | $0 | Direct Loan | 12/13 | P1229986-989 |
| 5/3/2013 | FCC | | | $3,295,230 | $0 | Direct Loan | 12/13 | P1229986-989 |
| 8/26/2013 | FCC | $47,921,088 | $47,324,927 | $596,161 | | Direct Loan | 12/13 | P1715756-578 |
| 9/23/2013 | FCC | $49,891,088 | $48,752,852 | $1,138,236 | | Direct Loan | 12/13 | P1715756-578 |
| 10/2/2013 | FCC | $50,991,088 | $48,922,521 | $2,068,567 | | Direct Loan | 12/13 | P2056273 |
| 10/7/2013 | FCC | $50,991,088 | $49,266,975 | $1,724,113 | $10,114 | Direct Loan | 12/13 | P1832595 |
| 10/14/2013 | FCC | $50,991,088 | $49,556,715 | $1,434,373 | $334,373 | Direct Loan | 12/13 | P1833692 |
| 10/21/2013 | FCC | $50,656,715 | $48,327,649 | $2,329,066 | $1,229,066 | Direct Loan | 12/13 | P1715756-578 |
| 10/25/2013 | FCC | $50,174,540 | $48,628,307 | $1,546,233 | | Direct Loan | 12/13 | P2059204 |
| 10/28/2013 | FCC | $50,029,767 | $48,603,521 | $1,426,246 | $26,246 | Direct Loan | 12/13 | P1836379 |
| 11/18/2013 | FCC | $50,306,281 | $49,236,235 | $1,070,046 | | Direct Loan | 12/13 | P1715756-578 |
| 11/20/2013 | FCC | $50,306,281 | $49,200,827 | $1,105,454 | $0 | Direct Loan | 12/13 | P2061010 |
| 11/25/2013 | FCC | $50,306,281 | $49,200,827 | $1,105,454 | $0 | Direct Loan | 12/13 | P2061411 |
| 12/2/2013 | FCC | $50,306,281 | $49,209,960 | $1,096,321 | $196,321 | Direct Loan | 12/13 | P1843646 |
| 12/3/2013 | FCC | $50,306,281 | $49,224,572 | $1,081,709 | $181,709 | Direct Loan | 12/13 | P1843998 |
| 12/4/2013 | FCC | $50,124,572 | $49,248,557 | $876,015 | $882,912 | Direct Loan | 12/13 | P1845136 |
| 12/6/2013 | FCC | $50,306,281 | $49,259,651 | $1,046,630 | $1,046,630 | Direct Loan | 12/13 | P2063136 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 12/9/2013 | FCC | $50,124,572 | $49,248,557 | $876,015 | $876,015 | Direct Loan | 12/13 | P1844597 |
| 12/16/2013 | FCC | $50,224,572 | $49,152,715 | $1,071,857 | $971,857 | Direct Loan | 12/13 | P2064464 |
| 12/23/2013 | FCC | $49,317,964 | $49,093,392 | $224,572 | $124,572 | Direct Loan | 12/13 | P1715756-578 |
| 12/30/2013 | FCC | $49,317,964 | $49,079,166 | $238,798 | $138,798 | Direct Loan | 12/13 | P1848741 |
| 1/13/2014 | FCC | $49,216,363 | $49,150,010 | $66,353 | $66,353 | Direct Loan | 12/13 | P1848991 |
| 1/20/2014 | FCC | $49,216,363 | $49,032,004 | $184,359 | $184,359 | Direct Loan | 12/13 | P1849160 |
| 1/21/2014 | FCC | $49,216,363 | $49,032,004 | $184,359 | $184,359 | Direct Loan | 12/13 | P1715756-578 |
| 1/27/2014 | FCC | $49,049,269 | $48,941,275 | $107,994 | $107,994 | Direct Loan | 12/13 | P1849287 |
| 2/4/2014 | FCC | $49,049,269 | $48,948,796 | $100,473 | $100,473 | Direct Loan | 12/13 | P2188887-892 |
| 2/10/2014 | FCC | $48,948,424 | $48,920,704 | $27,720 | $27,720 | Direct Loan | 12/13 | P2067935 |
| 2/18/2014 | FCC | $48,920,704 | $48,830,604 | $90,100 | $90,100 | Direct Loan | 12/13 | P2079371 |
| 2/24/2014 | FCC | $48,920,704 | $48,721,279 | $199,425 | $199,425 | Direct Loan | 12/13 | P1715756-578 |
| 2/26/2014 | FCC | | | $102,031 | $102,031 | Direct Loan | 12/13 | P1779881 |
| 3/3/2014 | FCC | $48,960,792 | $48,550,838 | $409,954 | $234,954 | Direct Loan | 12/13 | P1715756-578 |
| 3/4/2014 | FCC | | | $395,831 | $197,646 | Direct Loan | 12/13 | P2371446 |
| 3/10/2014 | FCC | $48,725,838 | $48,200,301 | $525,537 | $350,537 | Direct Loan | 12/13 | P1715756-578 |
| 3/17/2014 | FCC | $47,701,964 | $47,839,988 | ($138,024) | $0 | Direct Loan | 12/13 | P1715756-578 |
| 3/24/2014 | FCC | $47,727,038 | $47,414,761 | $312,277 | $166,980 | Direct Loan | 12/13 | P1715756-578 |
| 3/27/2014 | FCC | $47,490,712 | $47,295,865 | $194,847 | $48,130 | Direct Loan | 12/13 | P1715756-578 |
| 3/31/2014 | FCC | $47,276,537 | $47,034,038 | $242,499 | $73,114 | Direct Loan | 12/13 | P1715756-578 |
| 5/12/2014 | FCC | $46,890,388 | $46,765,709 | $124,679 | $87,061 | Direct Loan | 12/13 | P2085521 |
| 5/27/2014 | FCC | $46,728,646 | $46,477,250 | $251,396 | | Direct Loan | 12/13 | P1795916 |
| 6/16/2014 | FCC | $46,448,502 | $46,398,490 | $50,012 | | Direct Loan | 12/13 | P1800979 |
| 6/23/2014 | FCC | $46,448,502 | $46,363,221 | $85,281 | $85,281 | Direct Loan | 12/13 | P1802688 |
| 6/30/2014 | FCC | $46,448,502 | $46,354,667 | $93,835 | | Direct Loan | 12/13 | P1804581 |
| 7/22/2014 | FCC | $46,351,376 | $46,345,458 | $5,918 | | Direct Loan | 12/13 | P2536814 |
| | | | | | | | | |
| 8/26/2013 | FCC | $3,993,833 | $1,838,722 | $2,155,111 | | Direct Loan | 13/14 | P1715756-758 |
| 9/3/2013 | FCC | $5,238,833 | $2,823,770 | $2,415,063 | $570,063 | Direct Loan | 13/14 | P1261461 |
| 9/23/2013 | FCC | $7,568,770 | $4,303,101 | $3,265,669 | | Direct Loan | 13/14 | P1715756-758 |
| 10/2/2013 | FCC | $11,468,770 | $6,170,964 | $5,297,806 | $0 | Direct Loan | 13/14 | P2056273 |
| 10/7/2013 | FCC | $12,468,770 | $6,795,487 | $5,673,283 | $223,283 | Direct Loan | 13/14 | P1832599 |
| 10/21/2013 | FCC | $13,295,487 | $7,167,978 | $6,127,509 | $200,792 | Direct Loan | 13/14 | P1715756-758 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|------|--------|---------------|------|-------------|--------------------------|-------|-----------|--------|
| 10/24/2013 | FCC | $14,295,487 | $7,816,015 | $6,479,472 | $0 | Direct Loan | 13/14 | P2059203-204 |
| 10/28/2013 | FCC | $14,041,832 | $8,304,964 | $5,736,868 | $486,868 | Direct Loan | 13/14 | P1836377 |
| 11/18/2013 | FCC | $18,045,809 | $11,524,149 | $6,521,660 | | Direct Loan | 13/14 | P1715756-758 |
| 11/18/2013 | FCC | $18,245,809 | $12,270,090 | $5,975,719 | $0 | Direct Loan | 13/14 | P2061009-010 |
| 11/22/2013 | FCC | $18,795,809 | $14,056,049 | $4,739,760 | $0 | Direct Loan | 13/14 | P2061410-411 |
| 11/29/2013 | FCC | $20,395,809 | $14,602,149 | $5,793,660 | $493,660 | Direct Loan | 13/14 | P1843997-998 |
| 12/2/2013 | FCC | $20,395,809 | $14,348,086 | $6,047,723 | $747,723 | Direct Loan | 13/14 | P1843644 |
| 12/4/2013 | FCC | $21,595,809 | $14,928,342 | $6,667,467 | $2,367,467 | Direct Loan | 13/14 | P2063135-136 |
| 12/6/2013 | FCC | $21,102,149 | $14,921,054 | $6,181,095 | $2,068,122 | Direct Loan | 13/14 | P1845136 |
| 12/9/2013 | FCC | $21,102,149 | $14,921,054 | $6,181,095 | $2,081,095 | Direct Loan | 13/14 | P1844599 |
| 12/16/2013 | FCC | $22,202,149 | $14,809,897 | $7,392,252 | $2,742,252 | Direct Loan | 13/14 | P1846704 |
| 12/23/2013 | FCC | $20,244,810 | $15,679,694 | $4,565,116 | $40,116 | Direct Loan | 13/14 | P1715756-758 |
| 12/30/2013 | FCC | $20,684,897 | $15,718,442 | $4,966,455 | $1,441,455 | Direct Loan | 13/14 | P1848745 |
| 1/21/2014 | FCC | $23,654,897 | $20,383,955 | $3,270,942 | | Direct Loan | 13/14 | P1715756-758 |
| 1/27/2014 | FCC | $25,154,897 | $20,396,149 | $4,758,748 | $288,748 | Direct Loan | 13/14 | P1849285 |
| 2/4/2014 | FCC | $28,434,584 | $24,183,111 | $4,251,473 | $0 | Direct Loan | 13/14 | P2067625-626 |
| 2/4/2014 | FCC | $26,054,897 | $23,196,421 | $2,858,476 | $0 | Direct Loan | 13/14 | P2188887-892 |
| 2/24/2014 | FCC | $32,284,584 | $24,590,681 | $7,693,903 | $0 | Direct Loan | 13/14 | P1715756-758 |
| 2/26/2014 | FCC | | | $7,832,645 | $482,645 | Direct Loan | 13/14 | P1779881 |
| 3/3/2014 | FCC | $33,884,584 | $24,483,252 | $9,401,332 | $701,332 | Direct Loan | 13/14 | P1715756-758 |
| 3/4/2014 | FCC | | | $7,301,824 | $50,589 | Direct Loan | 13/14 | P2371446-451 |
| 3/10/2014 | FCC | $36,356,663 | $28,212,285 | $8,144,378 | $0 | Direct Loan | 13/14 | P1715756-758 |
| 3/17/2014 | FCC | $36,356,663 | $28,521,184 | $7,835,479 | $1,316,479 | Direct Loan | 13/14 | P1715756-758 |
| 3/24/2014 | FCC | $36,248,987 | $28,623,281 | $7,625,706 | $1,921,301 | Direct Loan | 13/14 | P1715756-758 |
| 3/27/2014 | FCC | $35,469,855 | $31,553,785 | $3,916,070 | $0 | Direct Loan | 13/14 | P1715756-758 |
| 3/31/2014 | FCC | $35,243,632 | $31,986,706 | $3,256,926 | $0 | Direct Loan | 13/14 | P1715756-758 |
| 4/7/2014 | FCC | $35,243,632 | $32,626,288 | $2,617,344 | $2,431,939 | Direct Loan | 13/14 | P2083009 |
| 4/15/2014 | FCC | $34,628,361 | $32,836,839 | $1,791,522 | $1,606,117 | Direct Loan | 13/14 | P2083595 |
| | | | | | | | | |
| 2/4/2014 | FCC | $21,030,902 | $21,027,310 | $3,592 | $3,592 | Pell Grant | 11/12 | P2188887-892 |
| | | | | | | | | |
| 2/4/2014 | FCC | $22,242,950 | $22,216,185 | $26,765 | $22,896 | Pell Grant | 12/13 | P2188887-892 |
| 2/24/2014 | FCC | $22,212,104 | $22,209,060 | $3,045 | $2,120 | Pell Grant | 12/13 | P1715756-578 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|------|--------|---------------|------|-------------|--------------------------|-------|-----------|--------|
| 3/3/2014 | FCC | $10,859,166 | $10,853,616 | $5,550 | $5,550 | Pell Grant | 12/13 | P1715756-578 |
| 3/10/2014 | FCC | $22,209,562 | $22,207,589 | $1,973 | | Pell Grant | 12/13 | P1715756-578 |
| | | | | | | | | |
| 2/24/2014 | FCC | $14,126,700 | $14,148,718 | ($22,018) | | Pell Grant | 13/14 | P1715756-578 |
| 3/3/2014 | FCC | $6,769,542 | $6,856,150 | ($86,608) | | Pell Grant | 13/14 | P1715756-578 |
| 3/10/2014 | FCC | $15,289,844 | $15,415,759 | ($125,915) | | Pell Grant | 13/14 | P1715756-578 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 2/25/2013 | Maryland Heights | | | $31,020 | $31,020 | Direct Loan | 11/12 | P1205056-060 |
| 4/4/2013 | Maryland Heights | | | $31,742 | $31,742 | Direct Loan | 11/12 | P2007170-182 |
| 4/8/2013 | Maryland Heights | | | $28,757 | $28,757 | Direct Loan | 11/12 | P2007170-182 |
| 7/26/2013 | Maryland Heights | $29,184,063 | $29,264,268 | ($80,205) | ($80,205) | Direct Loan | 11/12 | P1251292 |
| 10/31/2013 | Maryland Heights | $8,765,165 | $8,763,432 | $1,733 | | Direct Loan | 11/12 | P1836951 |
| | | | | | | | | |
| 2/25/2013 | Maryland Heights | | | $1,360,523 | $345,372 | Direct Loan | 12/13 | P1205056-060 |
| 4/4/2013 | Maryland Heights | | | $3,185,414 | $1,345,162 | Direct Loan | 12/13 | P2007170-182 |
| 4/8/2013 | Maryland Heights | | | $3,388,975 | $1,927,949 | Direct Loan | 12/13 | P2007170-182 |
| 4/22/2013 | Maryland Heights | | | $3,429,741 | $2,877,083 | Direct Loan | 12/13 | P1229986-989 |
| 4/29/2013 | Maryland Heights | | | $2,969,357 | $2,676,655 | Direct Loan | 12/13 | P1229986-989 |
| 5/2/2013 | Maryland Heights | | | $2,958,088 | $2,410,392 | Direct Loan | 12/13 | P1229986-989 |
| 5/3/2013 | Maryland Heights | | | | $2,319,624 | Direct Loan | 12/13 | P1229986-989 |
| 11/4/2013 | Maryland Heights | $8,032,012 | $7,983,527 | $48,485 | $28,938 | Direct Loan | 12/13 | P1837401 |
| 11/11/2013 | Maryland Heights | $8,032,012 | $8,004,060 | $27,952 | $27,952 | Direct Loan | 12/13 | P1839440 |
| 2/4/2014 | Maryland Heights | $8,107,431 | $8,083,129 | $24,302 | $0 | Direct Loan | 12/13 | P2188887-892 |
| 2/10/2014 | Maryland Heights | $8,107,431 | $8,081,689 | $25,742 | $22,967 | Direct Loan | 12/13 | P2067941 |
| 2/18/2014 | Maryland Heights | $8,107,431 | $8,080,276 | $27,155 | $24,380 | Direct Loan | 12/13 | P2079379 |
| 2/26/2014 | Maryland Heights | | | $35,553 | $8,398 | Direct Loan | 12/13 | P1779881 |
| 3/4/2014 | Maryland Heights | | | $27,155 | $0 | Direct Loan | 12/13 | P2371446 |
| 4/15/2014 | Maryland Heights | $8,107,431 | $8,075,161 | $32,270 | $32,270 | Direct Loan | 12/13 | P1850364 |
| 5/27/2014 | Maryland Heights | $7,954,230 | $7,862,526 | $91,704 | | Direct Loan | 12/13 | P1795921 |
| 7/22/2014 | Maryland Heights | $7,675,929 | $7,674,690 | $1,239 | | Direct Loan | 12/13 | P2536814 |
| | | | | | | | | |
| 3/4/2014 | Maryland Heights | | | ($137,610) | $0 | Direct Loan | 13/14 | P2371446 |
| | | | | | | | | |
| 9/30/2013 | Maryland Heights | $15,019,794 | $14,550,723 | $469,071 | | Pell Grant | 12/13 | P1277083 |
| 10/7/2013 | Maryland Heights | $4,275,981 | $4,240,213 | $35,768 | $35,768 | Pell Grant | 12/13 | P1832593 |
| 2/4/2014 | Maryland Heights | $4,279,877 | $4,277,102 | $2,775 | $2,775 | Pell Grant | 12/13 | P2188887-892 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 2/25/2013 | Parsippany | | | $215,898 | $149,499 | Direct Loan | 11/12 | P1205056-060 |
| 4/4/2013 | Parsippany | | | $224,690 | $185,183 | Direct Loan | 11/12 | P2007170-182 |
| 4/8/2013 | Parsippany | | | $224,690 | $185,183 | Direct Loan | 11/12 | P2007170-182 |
| 7/26/2013 | Parsippany | $7,137,860 | $7,157,240 | ($19,380) | | Direct Loan | 11/12 | P1251279 |
| 10/31/2013 | Parsippany | $7,314,390 | $7,320,487 | ($6,097) | | Direct Loan | 11/12 | P1836948 |
| | | | | | | | | |
| 2/25/2013 | Parsippany | | | $1,934,416 | $728,126 | Direct Loan | 12/13 | P1205056-060 |
| 4/4/2013 | Parsippany | | | $2,861,855 | $1,642,078 | Direct Loan | 12/13 | P2007170-182 |
| 4/8/2013 | Parsippany | | | $3,105,412 | $1,906,188 | Direct Loan | 12/13 | P2007170-182 |
| 4/22/2013 | Parsippany | | | $3,437,973 | $2,718,206 | Direct Loan | 12/13 | P1229986-989 |
| 4/29/2013 | Parsippany | | | $2,946,403 | $2,359,737 | Direct Loan | 12/13 | P1229986-989 |
| 5/2/2013 | Parsippany | | | $2,721,374 | $2,001,607 | Direct Loan | 12/13 | P1229986-989 |
| 5/3/2013 | Parsippany | | | $2,421,293 | $1,701,526 | Direct Loan | 12/13 | P1229986-989 |
| 11/4/2013 | Parsippany | $7,330,620 | $7,239,621 | $90,999 | $83,089 | Direct Loan | 12/13 | P1837399 |
| 11/11/2013 | Parsippany | $7,330,620 | $7,268,697 | $61,923 | $54,768 | Direct Loan | 12/13 | P1839438 |
| 12/30/2013 | Parsippany | $7,330,620 | $7,308,760 | $21,860 | $21,860 | Direct Loan | 12/13 | P1848737 |
| 2/4/2014 | Parsippany | $7,482,710 | $7,436,202 | $46,508 | $0 | Direct Loan | 12/13 | P2188887-892 |
| 2/10/2014 | Parsippany | $7,482,710 | $7,435,708 | $47,002 | $47,002 | Direct Loan | 12/13 | P2067939 |
| 2/18/2014 | Parsippany | $7,482,710 | $7,435,708 | $47,002 | $47,002 | Direct Loan | 12/13 | P2079375 |
| 2/26/2014 | Parsippany | | | $54,833 | $7,831 | Direct Loan | 12/13 | P1779881 |
| 3/4/2014 | Parsippany | | | $51,594 | $4,592 | Direct Loan | 12/13 | P2371446 |
| 4/15/2014 | Parsippany | $7,482,710 | $7,418,753 | $63,957 | $63,957 | Direct Loan | 12/13 | P1850362 |
| 5/5/2014 | Parsippany | $7,429,347 | $7,277,603 | $151,744 | $144,969 | Direct Loan | 12/13 | P2084998 |
| 5/12/2014 | Parsippany | $7,265,339 | $7,042,190 | $223,149 | $216,374 | Direct Loan | 12/13 | P2085525 |
| 7/22/2014 | Parsippany | $7,060,124 | $7,043,879 | $16,245 | | Direct Loan | 12/13 | P2536814 |
| | | | | | | | | |
| 3/4/2014 | Parsippany | | | ($138,238) | $0 | Direct Loan | 13/14 | P2371446 |
| | | | | | | | | |
| 2/4/2014 | Parsippany | $4,100,538 | $4,104,850 | ($4,312) | $0 | Pell Grant | 11/12 | P2188887-892 |
| | | | | | | | | |
| 2/4/2014 | Parsippany | $3,379,591 | $3,376,816 | $2,775 | $2,775 | Pell Grant | 12/13 | P2188887-892 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|------|--------|---------------|------|-------------|--------------------------|-------|------------|--------|
| 2/25/2013 | Phoenix | | | $67,423 | $45,056 | Direct Loan | 11/12 | P1205056-060 |
| 4/4/2013 | Phoenix | | | $78,669 | $26,215 | Direct Loan | 11/12 | P2007170-182 |
| 4/8/2013 | Phoenix | | | $75,699 | $23,245 | Direct Loan | 11/12 | P2007170-182 |
| 7/26/2013 | Phoenix | $8,757,254 | $8,765,165 | ($7,911) | | Direct Loan | 11/12 | P1251297 |
| 10/31/2013 | Phoenix | $29,264,268 | $29,253,138 | $11,130 | | Direct Loan | 11/12 | P1836954 |
| 1/22/2014 | Phoenix | $29,253,138 | $29,256,004 | ($2,866) | | Direct Loan | 11/12 | P1849236 |
| 2/4/2014 | Phoenix | $29,253,138 | $29,256,004 | ($2,866) | $0 | Direct Loan | 11/12 | P2188887-892 |
| 4/17/2014 | Phoenix | $29,256,004 | $29,255,901 | $103 | | Direct Loan | 11/12 | P2083998 |
| 4/28/2014 | Phoenix | $29,256,004 | $29,255,901 | $103 | | Direct Loan | 11/12 | P2084642 |
| 5/5/2014 | Phoenix | $29,256,004 | $29,255,901 | $103 | | Direct Loan | 11/12 | P1790872 |
| | | | | | | | | |
| 2/25/2013 | Phoenix | | | $3,045,293 | $1,107,032 | Direct Loan | 12/13 | P1205056-060 |
| 4/4/2013 | Phoenix | | | $2,247,686 | $0 | Direct Loan | 12/13 | P2007170-182 |
| 4/8/2013 | Phoenix | | | $4,859,774 | $0 | Direct Loan | 12/13 | P2007170-182 |
| 4/22/2013 | Phoenix | | | $3,541,749 | $284,441 | Direct Loan | 12/13 | P1229986-989 |
| 4/29/2013 | Phoenix | | | $2,867,023 | $984,583 | Direct Loan | 12/13 | P1229986-989 |
| 5/2/2013 | Phoenix | | | $2,419,261 | $487,736 | Direct Loan | 12/13 | P1229986-989 |
| 5/3/2013 | Phoenix | | | $2,066,071 | $46,769 | Direct Loan | 12/13 | P1229986-989 |
| 7/29/2013 | Phoenix | $26,151,105 | $24,558,308 | $1,592,797 | $332,797 | Direct Loan | 12/13 | P1251433 |
| 8/26/2013 | Phoenix | $26,721,105 | $25,969,987 | $751,118 | | Direct Loan | 12/13 | P1715756-578 |
| 9/23/2013 | Phoenix | $28,201,105 | $27,121,176 | $1,079,929 | | Direct Loan | 12/13 | P1715756-578 |
| 10/2/2013 | Phoenix | $29,021,105 | $27,693,008 | $1,328,097 | | Direct Loan | 12/13 | P2056273 |
| 10/7/2013 | Phoenix | $29,371,105 | $27,855,516 | $1,515,589 | $45,589 | Direct Loan | 12/13 | P1832601 |
| 10/21/2013 | Phoenix | $28,618,435 | $27,439,779 | $1,178,656 | $42,171 | Direct Loan | 12/13 | P1715756-578 |
| 10/25/2013 | Phoenix | $28,618,435 | $27,653,233 | $965,202 | | Direct Loan | 12/13 | P2059204 |
| 11/18/2013 | Phoenix | $29,370,267 | $28,089,089 | $1,281,178 | | Direct Loan | 12/13 | P1715756-578 |
| 11/20/2013 | Phoenix | $29,370,267 | $28,108,269 | $1,261,998 | $0 | Direct Loan | 12/13 | P2061010 |
| 11/25/2013 | Phoenix | $29,370,267 | $28,138,140 | $1,232,127 | $0 | Direct Loan | 12/13 | P2061411 |
| 12/2/2013 | Phoenix | $29,370,267 | $28,156,787 | $1,213,480 | $513,480 | Direct Loan | 12/13 | P1843650 |
| 12/3/2013 | Phoenix | $29,370,267 | $28,162,544 | $1,207,723 | $507,723 | Direct Loan | 12/13 | P1843998 |
| 12/4/2013 | Phoenix | $28,862,544 | $28,169,623 | $692,921 | $685,958 | Direct Loan | 12/13 | P1845136 |
| 12/6/2013 | Phoenix | $29,370,267 | $28,169,623 | $1,200,644 | $1,200,644 | Direct Loan | 12/13 | P2063136 |
| 12/9/2013 | Phoenix | $28,862,544 | $28,169,623 | $692,921 | $692,921 | Direct Loan | 12/13 | P1844595 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 12/16/2013 | Phoenix | $28,276,586 | $28,147,973 | $128,613 | $28,613 | Direct Loan | 12/13 | P1846668 |
| 12/23/2013 | Phoenix | $28,276,586 | $28,134,750 | $141,836 | $41,836 | Direct Loan | 12/13 | P1715756-578 |
| 12/30/2013 | Phoenix | $28,276,586 | $28,119,712 | $156,874 | $56,874 | Direct Loan | 12/13 | P1848733 |
| 1/13/2014 | Phoenix | $28,276,586 | $28,115,223 | $161,363 | $161,363 | Direct Loan | 12/13 | P1715756-578 |
| 1/20/2014 | Phoenix | $28,276,586 | $28,091,972 | $184,614 | $184,614 | Direct Loan | 12/13 | P1849000 |
| 1/21/2014 | Phoenix | $28,276,586 | $28,091,972 | $184,614 | $184,614 | Direct Loan | 12/13 | P1849143 |
| 2/3/2014 | Phoenix | $28,123,846 | $28,068,990 | $54,856 | $23,711 | Direct Loan | 12/13 | P1715756-578 |
| 2/4/2014 | Phoenix | $28,123,846 | $28,068,990 | $54,856 | $23,711 | Direct Loan | 12/13 | P1849366 |
| 2/24/2014 | Phoenix | $28,100,928 | $28,075,496 | $25,432 | $25,432 | Direct Loan | 12/13 | P2188887-892 |
| 2/26/2014 | Phoenix | | | $29,949 | $29,949 | Direct Loan | 12/13 | P1715756-578 |
| 3/3/2014 | Phoenix | $28,125,475 | $28,071,769 | $53,706 | $3,706 | Direct Loan | 12/13 | P1779881 |
| 3/4/2014 | Phoenix | | | $25,308 | $1,551 | Direct Loan | 12/13 | P1715756-578 |
| 3/10/2014 | Phoenix | $28,070,218 | $28,098,526 | ($28,308) | $0 | Direct Loan | 12/13 | P2371446 |
| 3/17/2014 | Phoenix | $28,067,087 | $28,082,171 | ($15,084) | $0 | Direct Loan | 12/13 | P1715756-578 |
| 3/24/2014 | Phoenix | $28,067,087 | $28,078,011 | ($10,924) | $0 | Direct Loan | 12/13 | P1715756-578 |
| 3/27/2014 | Phoenix | $28,067,087 | $28,063,156 | $3,931 | $3,902 | Direct Loan | 12/13 | P1715756-578 |
| 3/31/2014 | Phoenix | $28,020,787 | $28,051,278 | ($30,491) | $0 | Direct Loan | 12/13 | P1715756-578 |
| 5/27/2014 | Phoenix | $28,072,868 | $27,444,076 | $628,792 | | Direct Loan | 12/13 | P2086674 |
| 5/28/2014 | Phoenix | $28,072,868 | $27,365,709 | $707,159 | | Direct Loan | 12/13 | P2086674 |
| 6/10/2014 | Phoenix | $27,085,031 | $26,391,623 | $693,408 | | Direct Loan | 12/13 | P1799372 |
| 6/16/2014 | Phoenix | $27,085,031 | $26,401,442 | $683,589 | | Direct Loan | 12/13 | P1800981 |
| 6/23/2014 | Phoenix | $27,085,031 | $26,502,943 | $582,088 | $582,088 | Direct Loan | 12/13 | P1637045-753 |
| 6/30/2014 | Phoenix | $27,085,031 | $26,320,648 | $764,383 | | Direct Loan | 12/13 | P1804586 |
| 7/21/2014 | Phoenix | $26,303,396 | $26,272,521 | $30,875 | | Direct Loan | 12/13 | P2090228 |
| 7/22/2014 | Phoenix | $26,303,396 | $26,275,618 | $27,778 | | Direct Loan | 12/13 | P2536814 |
| 8/26/2013 | Phoenix | $3,005,000 | $751,493 | $2,253,507 | | Direct Loan | 13/14 | P1715756-758 |
| 9/3/2013 | Phoenix | $4,025,000 | $851,903 | $3,173,097 | $1,473,097 | Direct Loan | 13/14 | P1261590 |
| 9/23/2013 | Phoenix | $3,924,560 | $1,651,360 | $2,273,200 | | Direct Loan | 13/14 | P1715756-758 |
| 9/30/2013 | Phoenix | $5,274,560 | $1,783,497 | $3,491,063 | $591,063 | Direct Loan | 13/14 | P1277085 |
| 10/2/2013 | Phoenix | $6,274,560 | $2,080,439 | $4,194,121 | $294,121 | Direct Loan | 13/14 | P2056273 |
| 10/7/2013 | Phoenix | $6,183,560 | $2,309,794 | $3,873,766 | $1,023,766 | Direct Loan | 13/14 | P1832597 |
| 10/21/2013 | Phoenix | $5,809,794 | $2,815,606 | $2,994,188 | | Direct Loan | 13/14 | P1715756-758 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 10/24/2013 | Phoenix | $7,159,794 | $3,012,788 | $4,147,006 | $0 | Direct Loan | 13/14 | P2059203-204 |
| 11/18/2013 | Phoenix | $9,176,638 | $4,605,014 | $4,571,624 | | Direct Loan | 13/14 | P1715756-758 |
| 11/18/2013 | Phoenix | $9,376,638 | $5,408,788 | $3,967,850 | $0 | Direct Loan | 13/14 | P2061009-010 |
| 11/22/2013 | Phoenix | $10,026,638 | $5,828,363 | $4,198,275 | $0 | Direct Loan | 13/14 | P2061410-411 |
| 11/29/2013 | Phoenix | $10,976,638 | $6,363,904 | $4,612,734 | $1,112,734 | Direct Loan | 13/14 | P1843997-998 |
| 12/2/2013 | Phoenix | $10,976,638 | $6,238,695 | $4,737,943 | $1,237,943 | Direct Loan | 13/14 | P1843652 |
| 12/4/2013 | Phoenix | $11,776,638 | $6,951,108 | $4,825,530 | $1,675,530 | Direct Loan | 13/14 | P2063135-136 |
| 12/6/2013 | Phoenix | $10,663,904 | $6,953,149 | $3,710,755 | $351,993 | Direct Loan | 13/14 | P1845136 |
| 12/9/2013 | Phoenix | $10,663,904 | $6,953,149 | $3,710,755 | $560,755 | Direct Loan | 13/14 | P1844591 |
| 12/16/2013 | Phoenix | $11,911,911 | $7,247,455 | $4,664,456 | $464,456 | Direct Loan | 13/14 | P1846671 |
| 12/23/2013 | Phoenix | $11,986,911 | $7,486,350 | $4,500,561 | $625,561 | Direct Loan | 13/14 | P1715756-758 |
| 12/30/2013 | Phoenix | $12,672,455 | $7,446,126 | $5,226,329 | $1,601,329 | Direct Loan | 13/14 | P1848729 |
| 1/13/2014 | Phoenix | $14,297,455 | $9,107,109 | $5,190,346 | $2,340,346 | Direct Loan | 13/14 | P1849002 |
| 1/20/2014 | Phoenix | $14,065,372 | $9,646,968 | $4,418,404 | $793,404 | Direct Loan | 13/14 | P1849145 |
| 1/21/2014 | Phoenix | $14,065,372 | $9,646,968 | $4,418,404 | $718,404 | Direct Loan | 13/14 | P1715756-758 |
| 1/27/2014 | Phoenix | $14,364,759 | $9,799,172 | $4,565,587 | $990,587 | Direct Loan | 13/14 | P1849294 |
| 2/3/2014 | Phoenix | $15,214,759 | $10,692,870 | $4,521,889 | $1,346,889 | Direct Loan | 13/14 | P1849364 |
| 2/4/2014 | Phoenix | $14,938,542 | $11,077,925 | $3,860,617 | $85,617 | Direct Loan | 13/14 | P2067625-626 |
| 2/4/2014 | Phoenix | $15,214,759 | $10,692,870 | $4,521,889 | $1,346,889 | Direct Loan | 13/14 | P2188887-892 |
| 2/10/2014 | Phoenix | $15,338,542 | $11,342,853 | $3,995,689 | $195,689 | Direct Loan | 13/14 | P2067943 |
| 2/18/2014 | Phoenix | $15,942,853 | $11,662,875 | $4,279,978 | $529,978 | Direct Loan | 13/14 | P2079399 |
| 2/24/2014 | Phoenix | $16,842,853 | $11,662,489 | $5,180,364 | $1,130,364 | Direct Loan | 13/14 | P1715756-758 |
| 2/26/2014 | Phoenix | | | $3,948,783 | $0 | Direct Loan | 13/14 | P1779881 |
| 3/3/2014 | Phoenix | $17,054,018 | $12,853,806 | $4,200,212 | $100,212 | Direct Loan | 13/14 | P1715756-758 |
| 3/4/2014 | Phoenix | | | $4,182,614 | $732,614 | Direct Loan | 13/14 | P2371446-451 |
| 3/10/2014 | Phoenix | $17,553,806 | $13,217,252 | $4,336,554 | $636,554 | Direct Loan | 13/14 | P1715756-758 |
| 3/17/2014 | Phoenix | $16,574,879 | $13,568,292 | $3,006,587 | $106,587 | Direct Loan | 13/14 | P1715756-758 |
| 3/24/2014 | Phoenix | $16,468,292 | $13,647,948 | $2,820,344 | $820,344 | Direct Loan | 13/14 | P1715756-758 |
| 3/27/2014 | Phoenix | $16,248,922 | $15,006,723 | $1,242,199 | $0 | Direct Loan | 13/14 | P1715756-758 |
| 3/31/2014 | Phoenix | $16,248,922 | $14,965,149 | $1,283,773 | $81 | Direct Loan | 13/14 | P1715756-758 |
| 4/7/2014 | Phoenix | $16,248,922 | $15,301,511 | $947,411 | $947,411 | Direct Loan | 13/14 | P2083007 |
| 4/15/2014 | Phoenix | $15,971,694 | $15,585,106 | $386,588 | $386,588 | Direct Loan | 13/14 | P2083598 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 3/18/2013 | Phoenix | $15,883,141 | $15,882,607 | $534 | | Pell Grant | 10/11 | P1212144 |
| | | | | | | | | |
| 9/30/2013 | Phoenix | $11,295,149 | $10,930,489 | $364,660 | | Pell Grant | 12/13 | P1277087 |
| 11/4/2013 | Phoenix | $14,550,723 | $14,513,397 | $37,326 | $30,457 | Pell Grant | 12/13 | P1837403 |
| 11/11/2013 | Phoenix | $14,550,723 | $14,512,414 | $38,309 | $31,440 | Pell Grant | 12/13 | P1839442 |
| 2/4/2014 | Phoenix | $14,480,187 | $14,479,837 | $350 | $0 | Pell Grant | 12/13 | P2188887-892 |
| 3/3/2014 | Phoenix | $14,472,276 | $14,472,276 | $0 | | Pell Grant | 12/13 | P1715756-578 |
| 3/10/2014 | Phoenix | $14,472,276 | $14,469,501 | $2,775 | | Pell Grant | 12/13 | P1715756-578 |
| 6/23/2014 | Phoenix | $14,477,827 | $14,439,454 | $38,373 | | Pell Grant | 12/13 | P1637045-753 |
| 6/30/2014 | Phoenix | $14,477,827 | $14,441,336 | $36,491 | | Pell Grant | 12/13 | P1804584 |
| 7/21/2014 | Phoenix | $14,436,758 | $14,428,740 | $8,018 | $8,018 | Pell Grant | 12/13 | P2090244 |
| | | | | | | | | |
| 2/24/2014 | Phoenix | $9,096,646 | $9,098,456 | ($1,810) | | Pell Grant | 13/14 | P1715756-578 |
| 3/3/2014 | Phoenix | $9,343,436 | $9,628,240 | ($284,804) | | Pell Grant | 13/14 | P1715756-578 |
| 3/10/2014 | Phoenix | $9,633,418 | $9,791,205 | ($157,787) | | Pell Grant | 13/14 | P1715756-578 |

2222222222

222

222222

222

22222222

222222222222

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 8**
DOE's COD Emails sent to FCC

| Date | School | Net Drawdowns | NAPD | Cash > NAPD | Cash > NAPD over 30 days | Award | Award Year | Source |
|---|---|---|---|---|---|---|---|---|
| 2/25/2013 | Springfield | | | $22,808 | $21,401 | Direct Loan | 11/12 | P1205056-060 |
| 4/4/2013 | Springfield | | | $33,566 | $29,217 | Direct Loan | 11/12 | P2007170-182 |
| 4/8/2013 | Springfield | | | $33,566 | $29,217 | Direct Loan | 11/12 | P2007170-182 |
| 7/26/2013 | Springfield | $7,489,558 | $7,495,789 | ($6,231) | | Direct Loan | 11/12 | P1251281 |
| 2/25/2013 | Springfield | | | $1,009,054 | $40,704 | Direct Loan | 12/13 | P1205056-060 |
| 4/4/2013 | Springfield | | | $1,932,900 | $804,864 | Direct Loan | 12/13 | P2007170-182 |
| 4/8/2013 | Springfield | | | $2,133,921 | $1,143,382 | Direct Loan | 12/13 | P2007170-182 |
| 4/22/2013 | Springfield | | | $2,666,680 | $1,804,002 | Direct Loan | 12/13 | P1229986-989 |
| 4/29/2013 | Springfield | | | $1,916,582 | $1,090,218 | Direct Loan | 12/13 | P1229986-989 |
| 5/2/2013 | Springfield | | | $1,679,765 | $817,087 | Direct Loan | 12/13 | P1229986-989 |
| 5/3/2013 | Springfield | | | $1,332,738 | $470,060 | Direct Loan | 12/13 | P1229986-989 |
| 11/18/2013 | Springfield | $7,749,831 | $7,677,915 | $71,916 | $71,916 | Direct Loan | 12/13 | P1841612 |
| 12/30/2013 | Springfield | $8,077,334 | $7,855,673 | $221,661 | $88,713 | Direct Loan | 12/13 | P1848739 |
| 1/13/2014 | Springfield | $8,077,334 | $7,859,128 | $218,206 | $118,158 | Direct Loan | 12/13 | P1848997 |
| 1/20/2014 | Springfield | $8,077,334 | $7,834,697 | $242,637 | $53,580 | Direct Loan | 12/13 | P1849151 |
| 2/3/2014 | Springfield | $8,077,334 | $7,920,722 | $156,612 | $67,603 | Direct Loan | 12/13 | P1849368 |
| 2/4/2014 | Springfield | $8,077,334 | $7,920,722 | $156,612 | $67,603 | Direct Loan | 12/13 | P2188887-892 |
| 2/18/2014 | Springfield | $8,077,334 | $7,825,522 | $251,812 | $179,936 | Direct Loan | 12/13 | P2079373 |
| 2/26/2014 | Springfield | | | $125,156 | $517 | Direct Loan | 12/13 | P1779881 |
| 3/4/2014 | Springfield | | | $103,513 | $0 | Direct Loan | 12/13 | P2371446 |
| 3/17/2014 | Springfield | $8,077,334 | $7,923,079 | $154,255 | $38,383 | Direct Loan | 12/13 | P2081488 |
| 4/15/2014 | Springfield | $8,077,334 | $7,983,247 | $94,087 | $94,087 | Direct Loan | 12/13 | P1786308 |
| 7/22/2014 | Springfield | $8,075,555 | $8,075,545 | $10 | | Direct Loan | 12/13 | P2536814 |
| 2/26/2014 | Springfield | | | ($378) | $0 | Direct Loan | 13/14 | P1779881 |
| 3/4/2014 | Springfield | | | ($173,383) | $0 | Direct Loan | 13/14 | P2371446 |
| 2/4/2014 | Springfield | $3,109,213 | $3,110,775 | ($1,562) | $0 | Pell Grant | 12/13 | P2188887-892 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al.

**Exhibit 9**
STARS 90/10 Reports Summary

| | Fiscal Year 12/13 | | | | Fiscal Year 13/14 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | STARS 90/10 Reports | STARS AR History Report produced by IEC | Audited Financials | | STARS 90/10 Reports | STARS AR History Report produced by IEC | STARS provided to Spring Zutes |
| | [1] | [2] | [3] | | [4] | [5] | [6] |
| *Title IV Funds* | | | | | | | |
| PELL | $71,885,781 | $73,323,294 | | | $69,521,700 | $70,333,549 | $68,454,861 |
| FU | $0 | $0 | | | $0 | $0 | $0 |
| FS | $0 | $0 | | | ($4,625) | ($4,625) | $0 |
| FP | $0 | $0 | | | ($2,442) | ($2,442) | $0 |
| DP | $3,913,416 | $3,909,304 | | | $4,869,646 | $4,943,081 | $4,869,646 |
| DS | $57,656,796 | $57,607,033 | | | $58,184,735 | $58,988,572 | $58,182,265 |
| DU | $74,276,153 | $74,273,317 | | | $84,671,645 | $85,928,546 | $84,666,670 |
| [7] SEOG | $962,057 | $963,745 | | | $1,466,212 | $1,466,085 | $1,466,212 |
| Total Title IV Draws | $208,694,203 | $210,076,693 | | | $218,706,871 | $221,652,767 | $217,639,653 |
| | | | | | | | |
| REF | ($20,798,875) | ($20,826,840) | | | ($26,219,995) | ($26,240,002) | ($26,209,566) |
| R2T4 | ($6,248,550) | ($6,218,376) | | | ($12,591,883) | ($12,593,649) | ($12,595,454) |
| SR | ($3,131,137) | ($3,132,340) | | | ($5,071,989) | ($5,085,019) | |
| Total Title IV Refunds | ($30,178,562) | ($30,177,556) | | | ($43,883,867) | ($43,918,670) | ($38,805,020) |
| Adjustment | ($1,748,759) | | | | | | |
| Total Title IV | $176,766,883 | $179,899,137 | $176,766,883 | | $174,823,003 | $177,734,096 | $178,834,633 |
| *Non-Title IV Funds* | | | | | | | |
| Cash | $13,375,362 | | | | $21,910,416 | | |
| Other | $5,156,108 | | | | $0 | | |
| Eclipse Payments | $3,759,685 | | | | $2,940,561 | | |
| Books and Equipment | $150,231 | | | | $156,774 | | |
| SDC Cash | ($1,274,141) | | | | ($1,801,084) | | |
| Total Non-Title IV | $21,167,246 | | $21,208,700 | | $23,206,666 | | |
| | | | | | | | |
| Total Funds | $197,934,129 | | $197,975,583 | | $198,029,670 | | |

Sources:
[1] P1257674; Copy of FC Sheila docs ETC final 10.2.13.pdf.
[2] FCC - IEC - AR History Summary_2012-2013 xlsx (03135607x9D8E0) xlsx
[3] P1715788 at 826-832.
[4] P1746720.
[5] FCC - IEC - AR History Summary_2013-2014 (03135606x9D8E0).xlsx
[6] P2222704-705.
[7] For IEC and Spring Zutes Reconciliation, assumed 75% of the entire SEOG figure based on GL description.

Clinxman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 9A
Monthly Activity for Fiscal Year 13/14 per STARS 90/10 Reports

| | 7/31/2013 | 8/31/2013 | 9/30/2013 | 10/31/2013 | 11/30/2013 | 12/31/2013 | 1/31/2014 | 2/28/2014 | 3/31/2014 | 4/30/2014 | 5/31/2014 | 6/30/2014 | FY 13/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | |
| **[1] Title IV Funds** | | | | | | | | | | | | | |
| PELL | $7,039,447 | $4,571,222 | $4,731,895 | $7,506,687 | $7,311,578 | $3,132,595 | $8,031,090 | $6,942,191 | $5,759,574 | $5,377,529 | $4,654,469 | $4,463,420 | $69,521,700 |
| FU | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FS | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($4,625) | | ($4,625) |
| FP | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($2,442) | | ($2,442) |
| DP | $406,721 | $363,853 | $459,592 | $602,193 | $420,747 | $203,379 | $534,132 | $565,942 | $380,475 | $269,234 | $309,508 | $353,871 | $4,869,646 |
| DS | $5,762,136 | $4,540,333 | $3,859,732 | $5,963,850 | $5,135,172 | $2,344,830 | $6,016,034 | $6,208,875 | $4,966,001 | $5,280,228 | $4,468,724 | $3,638,822 | $58,184,735 |
| DU | $7,729,652 | $6,232,600 | $5,895,098 | $8,729,546 | $7,149,313 | $3,588,062 | $8,437,712 | $9,333,564 | $7,517,125 | $7,802,395 | $6,792,788 | $5,463,789 | $84,671,645 |
| SEOG | $239,340 | $142,811 | $45,972 | $45,383 | $69,244 | $40,470 | $111,440 | $126,470 | $99,187 | $138,491 | $119,648 | $287,756 | $1,466,212 |
| **Total Title IV Draws** | $21,177,296 | $15,850,820 | $14,992,289 | $22,847,659 | $20,086,054 | $9,309,337 | $23,130,407 | $23,177,045 | $18,722,361 | $18,867,875 | $16,338,070 | $14,207,657 | $218,706,871 |
| | | | | | | | | | | | | | |
| REF | ($2,550,807) | ($2,564,534) | ($2,675,996) | ($2,697,969) | ($1,648,185) | ($1,721,942) | ($2,523,177) | ($2,378,139) | ($1,592,977) | ($1,907,641) | ($1,844,132) | ($2,114,496) | ($26,219,995) |
| R2T4 | ($977,478) | ($1,093,605) | ($789,797) | ($988,175) | ($875,977) | ($1,051,517) | ($1,234,532) | ($1,278,750) | ($984,297) | ($1,192,757) | ($603,068) | ($1,431,930) | ($12,501,883) |
| SR | ($217,813) | ($710,548) | ($412,906) | ($387,995) | ($595,933) | ($475,584) | ($307,660) | ($636,186) | ($373,639) | ($376,456) | ($415,618) | ($161,651) | ($5,071,989) |
| **Total Title IV Refunds** | ($3,746,098) | ($4,368,687) | ($3,878,699) | ($4,074,139) | ($3,120,095) | ($3,249,043) | ($4,065,369) | ($4,293,075) | ($2,950,913) | ($3,476,853) | ($2,952,818) | ($3,708,078) | ($43,883,867) |
| | | | | | | | | | | | | | |
| **Total Title IV** | $17,431,198 | $11,482,134 | $11,113,589 | $18,773,520 | $16,965,959 | $6,060,294 | $19,065,038 | $18,883,971 | $15,771,447 | $15,391,022 | $13,385,252 | $10,499,580 | $174,823,003 |
| **Total Title IV Cumml.** | $17,431,198 | $28,913,332 | $40,026,921 | $58,800,441 | $75,766,400 | $81,826,693 | $100,891,732 | $119,775,702 | $135,547,150 | $150,938,172 | $164,323,424 | $174,823,003 | |
| | | | | | | | | | | | | | |
| **Non-Title IV Funds** | | | | | | | | | | | | | |
| Cash | $825,059 | $1,050,628 | $729,723 | $1,243,691 | $1,401,392 | $1,643,414 | $2,035,229 | $1,213,409 | $1,707,368 | $7,448,051 | $1,476,183 | $1,136,270 | $21,910,416 |
| US Colleges | $0 | $0 | $236,546 | ($82,136) | ($10,789) | ($143,621) | $0 | $0 | $0 | $0 | $0 | $0 | |
| BooksAndEquipment | $12,457 | $19,706 | $10,233 | $10,915 | $13,924 | $10,612 | $9,795 | $15,706 | $20,266 | $13,854 | $6,401 | $12,905 | $156,774 |
| Eclipse Payments | $326,637 | $279,051 | $271,427 | $239,607 | $226,091 | $234,259 | $215,698 | $270,509 | $248,880 | $221,211 | $207,208 | $199,983 | $2,940,561 |
| SDC Cash | ($156,834) | ($122,037) | ($209,112) | ($122,177) | ($107,928) | ($109,260) | ($211,726) | ($150,535) | ($86,388) | ($247,240) | ($116,173) | ($161,672) | ($1,801,084) |
| **Total Non-Title IV** | $1,007,319 | $1,227,347 | $1,038,817 | $1,289,899 | $1,522,690 | $1,635,404 | $2,048,996 | $1,349,089 | $1,890,125 | $7,435,876 | $1,573,618 | $1,187,485 | $23,206,666 |
| **Total Non-Title IV Cumml.** | $1,007,319 | $2,234,666 | $3,273,484 | $4,563,383 | $6,086,073 | $7,721,477 | $9,770,473 | $11,119,562 | $13,009,686 | $20,445,563 | $22,019,181 | $23,206,666 | |
| | | | | | | | | | | | | | |
| **Total All Funds** | $18,438,517 | $12,709,481 | $12,152,407 | $20,063,419 | $18,488,649 | $7,695,697 | $21,114,034 | $20,233,060 | $17,661,572 | $22,826,898 | $14,958,870 | $11,687,065 | $198,029,670 |
| **Total All Funds Cumml.** | $18,438,517 | $31,147,998 | $43,300,405 | $63,363,824 | $81,852,473 | $89,548,170 | $110,662,204 | $130,895,264 | $148,556,836 | $171,383,734 | $186,342,605 | $198,029,670 | |

Sources:
[1] P1260297.
[2] P1266244.
[3] 90 10 Sep 2013 xlsx
[4] 9010 - Oct.xlsx
[5] 9010 - Nov.xlsx
[6] 9010 - Dec.xlsx
[7] Dashboard 90-10 Support.pdf
[8] 90 - 10 feb.xlsx
[9] P1718989-994.
[10] 9010_Bryman_030764.pdf; 9010_MarylandHeights_022392.pdf; 9010_Miami_023058.pdf; 9010_Parsippany_010851.pdf; 9010_Anthem_022631.pdf; 9010_Springfield_008441.pdf
[11] 90 10 STARS vs. IT enhanced by OPEID 7 1.13-5.31.14.pdf
[12] P1746720.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 9B
Monthly Activity for Fiscal Year 13/14 per STARS 90/10 Reports for Miami

Miami

| | 7/31/2013 | 8/31/2013 | 9/30/2013 | 10/31/2013 | 11/30/2013 | 12/31/2013 | 1/31/2014 | 2/28/2014 | 3/31/2014 | 4/30/2014 | 5/31/2014 | 6/30/2014 | FY 13/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | |
| **[1] *Title IV Funds*** | | | | | | | | | | | | | |
| PELL | $2,116,219 | $1,475,058 | $2,034,248 | $3,375,339 | $2,318,415 | $1,002,303 | $3,685,751 | $3,200,862 | $2,442,679 | $2,252,103 | $1,983,287 | $2,216,441 | $28,102,706 |
| FU | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FS | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FP | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DP | $152,964 | $160,952 | $248,742 | $342,018 | $177,083 | $98,533 | $264,495 | $265,122 | $165,090 | $152,665 | $141,917 | $185,681 | $2,355,262 |
| DS | $1,256,394 | $1,801,123 | $1,596,408 | $2,463,316 | $1,658,771 | $751,276 | $2,367,988 | $3,017,861 | $1,667,980 | $2,104,023 | $1,782,229 | $1,887,946 | $22,355,316 |
| DU | $1,909,216 | $2,732,092 | $2,581,466 | $4,001,628 | $2,653,447 | $1,206,510 | $3,606,817 | $4,767,175 | $2,690,524 | $3,242,396 | $2,879,644 | $3,038,054 | $35,308,969 |
| SEOG | $84,118 | $11,363 | $5,453 | $8,253 | $8,775 | $9,075 | $27,000 | $50,663 | $6,450 | $13,688 | $17,288 | $17,850 | $259,975 |
| **Total Title IV Draws** | $5,518,910 | $6,180,589 | $6,466,318 | $10,190,554 | $6,816,491 | $3,067,697 | $9,952,051 | $11,301,683 | $6,972,723 | $7,764,874 | $6,804,365 | $7,345,972 | $88,382,228 |
| REF | ($767,913) | ($847,350) | ($1,062,985) | ($1,322,469) | ($672,992) | ($878,580) | ($1,320,824) | ($1,164,363) | ($854,250) | ($792,580) | ($848,914) | ($1,017,063) | ($11,550,282) |
| R2T4 | ($333,012) | ($268,710) | ($193,872) | ($238,509) | ($212,909) | ($306,609) | ($372,465) | ($241,172) | ($343,623) | ($250,571) | ($136,315) | ($345,647) | ($3,243,416) |
| SR | ($20,099) | ($102,178) | ($81,142) | ($57,002) | ($35,346) | ($51,890) | ($62,659) | ($71,799) | ($60,608) | ($43,066) | ($95,426) | ($60,670) | ($741,886) |
| **Total Title IV Refunds** | ($1,121,025) | ($1,218,238) | ($1,338,000) | ($1,617,981) | ($921,248) | ($1,237,079) | ($1,755,948) | ($1,477,334) | ($1,258,481) | ($1,086,217) | ($1,080,654) | ($1,423,380) | ($15,535,583) |
| **Total Title IV** | $4,397,886 | $4,962,351 | $5,128,318 | $8,572,574 | $5,895,244 | $1,830,618 | $8,196,103 | $9,824,350 | $5,714,242 | $6,678,657 | $5,723,710 | $5,922,593 | $72,846,645 |
| Total Title IV Cumul. | $4,397,886 | $9,360,236 | $14,488,555 | $23,061,128 | $28,956,372 | $30,786,990 | $38,983,093 | $48,807,443 | $54,521,685 | $61,200,342 | $66,924,052 | $72,846,645 | |
| ***Non-Title IV Funds*** | | | | | | | | | | | | | |
| Cash | $114,507 | $259,918 | $131,615 | $444,134 | $704,019 | $382,290 | $702,201 | $439,994 | $571,568 | $5,186,900 | $394,122 | $290,632 | $9,621,899 |
| US Colleges | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| BooksAndEquipment | $11,757 | $18,325 | $9,292 | $10,246 | $12,949 | $10,479 | $8,785 | $14,868 | $17,699 | $13,417 | $5,464 | $12,331 | $145,612 |
| Eclipse Payments | $151,697 | $112,391 | $65,701 | $45,915 | $40,146 | $34,808 | $48,568 | $51,016 | $41,375 | $29,121 | $30,127 | $28,953 | $679,819 |
| SDC Cash | ($81,508) | ($57,236) | ($112,443) | ($33,126) | ($55,201) | ($55,643) | ($99,954) | ($74,456) | ($30,116) | ($103,391) | ($61,987) | ($52,236) | ($817,298) |
| **Total Non-Title IV** | $196,454 | $333,397 | $94,165 | $467,169 | $701,914 | $371,933 | $659,601 | $431,421 | $600,526 | $5,126,047 | $367,725 | $279,679 | $9,630,032 |
| Total Non-Title IV Cumul. | $196,454 | $529,851 | $624,016 | $1,091,185 | $1,793,099 | $2,165,032 | $2,824,633 | $3,256,054 | $3,856,580 | $8,982,627 | $9,350,353 | $9,630,032 | |
| **Total All Funds** | $4,594,339 | $5,295,748 | $5,222,483 | $9,039,743 | $6,597,157 | $2,202,552 | $8,855,704 | $10,255,771 | $6,314,768 | $11,804,704 | $6,091,436 | $6,202,272 | $82,476,677 |
| Total All Funds Cumul. | $4,594,339 | $9,890,087 | $15,112,571 | $24,152,313 | $30,749,470 | $32,952,022 | $41,807,726 | $52,063,497 | $58,378,265 | $70,182,969 | $76,274,405 | $82,476,677 | |

Sources:
[1] P1260297.
[2] P1266244.
[3] 90 10 Sep 2013 xlsx
[4] 9010 - Oct.xlsx
[5] 9010 - Nov.xlsx
[6] 9010 - Dec.xlsx
[7] Dashboard 90-10 Support.pdf
[8] 90 - 10 feb.xlsx
[9] P1718989-994.
[10] 9010_Brynna_030764.pdf; 9010_MarylandHeights_022392.pdf; 9010_Miami_023058.pdf; 9010_Parsippany_010851.pdf; 9010_Anthem_022631.pdf; 9010_Springfield_008441.pdf
[11] 90 10 STARS vs. IT enhanced by OPEID 7 1.13-5.31.14.pdf
[12] P1746720.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 9C
Monthly Activity for Fiscal Year 13/14 per STARS 90/10 Reports for Phoenix

|  | Phoenix | | | | | | | | | | | | FY 13/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 7/31/2013 | 8/31/2013 | 9/30/2013 | 10/31/2013 | 11/30/2013 | 12/31/2013 | 1/31/2014 | 2/28/2014 | 3/31/2014 | 4/30/2014 | 5/31/2014 | 6/30/2014 |  |
|  | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] |  |
| **[1] Title IV Funds** | | | | | | | | | | | | | |
| PELL | $1,867,152 | $1,198,206 | $1,021,577 | $1,679,487 | $2,336,252 | $848,934 | $1,955,486 | $1,348,224 | $864,590 | $871,802 | $715,877 | $569,098 | $15,276,685 |
| FU | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FS | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FP | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DP | $29,425 | $54,778 | $26,983 | $70,274 | $75,620 | $27,982 | $75,144 | $96,833 | $62,829 | $41,874 | $67,601 | $35,121 | $664,464 |
| DS | $1,390,324 | $1,126,778 | $869,747 | $1,398,477 | $1,589,556 | $599,015 | $1,647,526 | $1,227,073 | $1,065,637 | $1,196,683 | $933,609 | $707,956 | $13,752,381 |
| DU | $1,481,773 | $1,349,786 | $1,239,332 | $1,680,858 | $1,811,536 | $869,047 | $1,966,586 | $1,613,278 | $1,372,602 | $1,519,208 | $1,238,731 | $934,238 | $17,076,974 |
| SEOG | $25,368 | $7,313 | $14,400 | $6,938 | $10,575 | $6,750 | $8,438 | $23,850 | $10,623 | $12,375 | $11,033 | $25,581 | $163,242 |
| Total Title IV Draws | $4,794,041 | $3,736,860 | $3,172,039 | $4,836,033 | $5,823,539 | $2,351,728 | $5,653,178 | $4,309,259 | $3,376,280 | $3,641,943 | $2,966,852 | $2,271,995 | $46,933,746 |
| | | | | | | | | | | | | | |
| REF | ($908,096) | ($849,877) | ($779,694) | ($559,999) | ($397,467) | ($432,125) | ($565,989) | ($540,778) | ($343,144) | ($521,204) | ($377,212) | ($523,591) | ($6,839,175) |
| R2T4 | ($316,997) | ($298,292) | ($184,951) | ($277,022) | ($271,594) | ($307,779) | ($376,770) | ($425,807) | ($308,666) | ($414,580) | ($221,307) | ($361,385) | ($3,765,149) |
| SR | ($124,073) | ($201,127) | ($216,813) | ($232,670) | ($218,983) | ($230,720) | ($172,936) | ($196,353) | ($201,819) | ($177,850) | ($100,499) | ($46,627) | ($2,120,470) |
| Total Title IV Refunds | ($1,349,166) | ($1,349,296) | ($1,181,458) | ($1,169,691) | ($888,045) | ($970,624) | ($1,115,695) | ($1,162,937) | ($853,629) | ($1,113,634) | ($699,017) | ($931,603) | ($12,724,794) |
| | | | | | | | | | | | | | |
| Total Title IV | $3,444,875 | $2,387,564 | $1,990,581 | $3,726,342 | $4,935,494 | $1,381,104 | $4,537,483 | $3,146,321 | $2,522,651 | $2,528,309 | $2,267,834 | $1,340,392 | $34,208,952 |
| Total Title IV Cumul. | $3,444,875 | $5,832,439 | $7,823,020 | $11,549,363 | $16,484,856 | $17,865,961 | $22,403,444 | $25,549,766 | $28,072,416 | $30,600,726 | $32,868,560 | $34,208,952 | |
| | | | | | | | | | | | | | |
| **Non-Title IV Funds** | | | | | | | | | | | | | |
| Cash | $386,321 | $479,092 | $71,140 | $294,558 | $258,483 | $404,247 | $484,963 | $369,216 | $432,755 | $347,859 | $356,243 | $325,628 | $4,210,505 |
| US Colleges | $0 | $0 | $0 | $0 | ($4,963) | ($66,066) | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| BooksAndEquipment | $205 | $38 | $15 | $26 | $0 | $3 | $57 | $95 | $1,747 | $127 | $0 | $0 | $2,313 |
| Eclipse Payments | $40,613 | $53,970 | $51,060 | $56,077 | $51,943 | $40,081 | $53,861 | $40,277 | $44,664 | $33,447 | $40,609 | | $555,990 |
| SDC Cash | ($38,099) | ($26,571) | ($41,490) | ($38,889) | ($26,035) | ($30,041) | ($83,728) | ($48,218) | ($35,974) | ($68,401) | ($16,682) | ($59,813) | ($513,941) |
| Total Non-Title IV | $389,040 | $506,530 | $80,725 | $382,801 | $279,428 | $348,224 | $453,142 | $361,370 | $449,925 | $324,249 | $373,008 | $306,425 | $4,254,867 |
| Total Non-Title IV Cumul. | $389,040 | $895,570 | $976,295 | $1,359,096 | $1,638,524 | $1,986,748 | $2,439,890 | $2,801,261 | $3,251,185 | $3,575,435 | $3,948,442 | $4,254,867 | |
| | | | | | | | | | | | | | |
| Total All Funds | $3,833,915 | $2,894,094 | $2,071,306 | $4,109,143 | $5,214,922 | $1,729,328 | $4,990,626 | $3,507,692 | $2,972,575 | $2,852,558 | $2,640,842 | $1,646,817 | $38,463,819 |
| Total All Funds Cumul. | $3,833,915 | $6,728,009 | $8,799,315 | $12,908,458 | $18,123,381 | $19,852,709 | $24,843,335 | $28,351,026 | $31,323,602 | $34,176,160 | $36,817,002 | $38,463,819 | |

Sources:
[1] P1260297.
[2] P1266244.
[3] 90 10 Sep 2013 xlsx
[4] 9010 - Oct.xlsx
[5] 9010 - Nov.xlsx
[6] 9010 - Dec.xlsx
[7] Dashboard 90-10 Support.pdf
[8] 90 - 10 feb.xlsx
[9] P1718989-994.
[10] 9010_Brymnn_030764.pdf; 9010_MarylandHeights_022392.pdf; 9010_Miami_023058.pdf; 9010_Parsippany_010851.pdf; 9010_Anthem_022631.pdf; 9010_Springfield_008441.pdf
[11] 90 10 STARS vs. IT enhanced by OPEID 7 1.13-5.31.14.pdf
[12] P1746720.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 9D
Monthly Activity for Fiscal Year 13/14 per STARS 90/10 Reports for Bryman

| | | | | | | | Bryman | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/31/2013 | 8/31/2013 | 9/30/2013 | 10/31/2013 | 11/30/2013 | 12/31/2013 | 1/31/2014 | 2/28/2014 | 3/31/2014 | 4/30/2014 | 5/31/2014 | 6/30/2014 | FY 13/14 |
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] | [12] | |
| [1] *Title IV Funds* | | | | | | | | | | | | | |
| PELL | $1,321,379 | $1,051,926 | $788,428 | $1,116,003 | $1,561,755 | $620,537 | $1,231,880 | $1,157,366 | $839,182 | $869,535 | $851,028 | $759,354 | $12,168,371 |
| FU | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FS | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FP | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DP | $85,223 | $33,907 | $66,052 | $71,612 | $76,978 | $19,400 | $76,230 | $54,013 | $49,281 | $24,183 | $39,193 | $49,295 | $645,366 |
| DS | $1,492,603 | $795,568 | $695,174 | $927,148 | $1,053,848 | $499,584 | $1,014,474 | $939,934 | $779,403 | $807,283 | $832,018 | $512,491 | $10,349,527 |
| DU | $1,869,913 | $1,029,730 | $1,016,854 | $1,312,193 | $1,426,212 | $733,267 | $1,495,741 | $1,352,867 | $1,166,693 | $1,216,849 | $1,201,710 | $738,187 | $14,560,415 |
| SEOG | $34,018 | $1,688 | $2,720 | $4,814 | $11,014 | $3,450 | $17,738 | $13,913 | $7,011 | $8,427 | $20,675 | $17,224 | $142,690 |
| Total Title IV Draws | $4,803,134 | $2,912,818 | $2,569,227 | $3,431,769 | $4,129,807 | $1,876,238 | $3,836,062 | $3,518,092 | $2,841,769 | $2,926,276 | $2,944,623 | $2,076,551 | $37,866,369 |
| | | | | | | | | | | | | | |
| REF | ($514,167) | ($547,002) | ($555,583) | ($463,892) | ($306,800) | ($202,663) | ($388,455) | ($387,181) | ($176,082) | ($301,258) | ($315,627) | ($265,239) | ($4,423,949) |
| R2T4 | ($174,490) | ($212,625) | ($170,804) | ($225,035) | ($146,199) | ($202,508) | ($252,829) | ($284,388) | ($82,957) | ($221,542) | ($140,556) | ($224,497) | ($2,338,430) |
| SR | ($50,705) | ($63,688) | ($42,332) | ($52,498) | ($45,424) | ($121,347) | ($53,157) | ($58,141) | ($57,187) | ($54,864) | ($38,797) | ($35,084) | ($673,224) |
| Total Title IV Refunds | ($739,362) | ($823,315) | ($768,719) | ($741,425) | ($498,423) | ($526,518) | ($694,441) | ($729,710) | ($316,226) | ($577,664) | ($494,980) | ($524,820) | ($7,435,603) |
| | | | | | | | | | | | | | |
| Total Title IV | $4,063,773 | $2,089,503 | $1,800,509 | $2,690,344 | $3,631,385 | $1,349,720 | $3,141,621 | $2,788,382 | $2,525,543 | $2,348,612 | $2,449,643 | $1,551,731 | $30,430,765 |
| Total Title IV Cumul. | $4,063,773 | $6,153,276 | $7,953,785 | $10,644,129 | $14,275,514 | $15,625,233 | $18,766,854 | $21,555,236 | $24,080,779 | $26,429,392 | $28,879,035 | $30,430,765 | |
| | | | | | | | | | | | | | |
| *Non-Title IV Funds* | | | | | | | | | | | | | |
| Cash | $110,958 | $98,957 | $200,238 | $182,691 | $183,414 | $655,783 | $533,395 | $234,507 | $394,421 | $1,581,470 | $429,014 | $299,676 | $4,904,526 |
| US Colleges | $0 | $0 | $236,546 | ($153,165) | ($5,826) | ($77,555) | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| BooksAndEquipment | $0 | $15 | ($15) | $0 | $531 | $0 | $410 | $183 | $0 | $0 | $835 | $0 | $1,959 |
| Eclipse Payments | $40,899 | $53,025 | $43,569 | $55,733 | $47,264 | $40,658 | $45,183 | $71,967 | $45,940 | $31,132 | $36,863 | $40,338 | $552,569 |
| SDC Cash | ($21,896) | ($15,601) | ($25,453) | ($41,367) | ($57,071) | ($8,689) | ($24,713) | ($15,785) | ($2,201) | ($51,950) | ($17,264) | ($26,960) | ($258,949) |
| Total Non-Title IV | $129,961 | $136,396 | $454,885 | $43,892 | $218,313 | $610,197 | $554,274 | $290,871 | $438,160 | $1,560,652 | $449,447 | $313,054 | $5,200,104 |
| Total Non-Title IV Cumul. | $129,961 | $266,357 | $721,242 | $765,134 | $983,448 | $1,593,644 | $2,147,919 | $2,438,790 | $2,876,950 | $4,437,602 | $4,887,049 | $5,200,104 | |
| | | | | | | | | | | | | | |
| Total All Funds | $4,193,733 | $2,225,899 | $2,255,394 | $2,734,237 | $3,849,698 | $1,959,916 | $3,695,895 | $3,079,254 | $2,963,703 | $3,909,264 | $2,899,090 | $1,864,785 | $35,630,869 |
| Total All Funds Cumul. | $4,193,733 | $6,419,633 | $8,675,027 | $11,409,264 | $15,258,961 | $17,218,878 | $20,914,773 | $23,994,026 | $26,957,730 | $30,866,994 | $33,766,084 | $35,630,869 | |

Sources:
[1] P1260297.
[2] P1266244.
[3] 90 10 Sep 2013 xlsx
[4] 9010 - Oct.xlsx
[5] 9010 - Nov.xlsx
[6] 9010 - Dec.xlsx
[7] Dashboard 90-10 Support.pdf
[8] 90 - 10 feb.xlsx
[9] P1718989-994.
[10] 9010_Bryman_030764.pdf; 9010_MarylandHeights_022392.pdf; 9010_Minmi_023058.pdf; 9010_Parsippany_010851.pdf; 9010_Anthem_022631.pdf; 9010_Springfield_008441.pdf
[11] 90 10 STARS vs. IT enhanced by OPEID 7 1.13-5.31.14.pdf
[12] P1746720.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 10**
Monthly Activity for Fiscal Year 13/14 between Title IV STARS and Title IV Cash in G5

| | 7/31/2013 | 8/31/2013 | 9/30/2013 | 10/31/2013 | 11/30/2013 | 12/31/2013 | 1/31/2014 | 2/28/2014 | 3/31/2014 | 4/30/2014 | 5/31/2014 | 6/30/2014 | FY 13/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Title IV Draws* | | | | | | | | | | | | | |
| [1] STARS | $21,177,296 | $15,850,820 | $14,992,289 | $22,847,659 | $20,086,054 | $9,369,337 | $23,130,407 | $23,177,045 | $18,722,361 | $18,867,875 | $16,338,070 | $14,207,657 | $218,706,871 |
| [2] G5 | $22,908,175 | $17,850,488 | $20,158,880 | $23,785,965 | $21,343,683 | $17,568,107 | $19,393,301 | $20,861,413 | $16,559,568 | $12,519,274 | $15,454,483 | $10,428,428 | $218,831,765 |
| *Title IV Refunds* | | | | | | | | | | | | | |
| [1] STARS | ($3,746,098) | ($4,368,687) | ($3,878,699) | ($4,074,139) | ($3,120,095) | ($3,249,043) | ($4,065,369) | ($4,293,075) | ($2,950,913) | ($3,476,853) | ($2,952,818) | ($3,708,078) | ($43,883,867) |
| [2] G5 | ($116,065) | ($1,967,861) | ($2,514,438) | ($5,212,376) | ($5,407,761) | ($8,061,631) | ($2,766,224) | ($3,236,112) | ($8,738,109) | ($2,466,031) | ($2,142,543) | ($1,082,610) | ($43,711,761) |
| *Title IV Net* | | | | | | | | | | | | | |
| [1] STARS | $17,431,198 | $11,482,134 | $11,113,589 | $18,773,520 | $16,965,959 | $6,060,294 | $19,065,038 | $18,883,971 | $15,771,447 | $15,391,022 | $13,385,252 | $10,499,580 | $174,823,003 |
| [2] G5 | $22,792,111 | $15,882,626 | $17,644,442 | $18,573,589 | $15,935,923 | $9,506,476 | $16,627,077 | $17,625,301 | $7,821,459 | $10,053,243 | $13,311,940 | $9,345,818 | $175,120,005 |
| *Title IV Net Cumulative* | | | | | | | | | | | | | |
| [1] STARS | $17,431,198 | $28,913,332 | $40,026,921 | $58,800,441 | $75,766,400 | $81,826,693 | $100,891,732 | $119,775,702 | $135,547,150 | $150,938,172 | $164,323,424 | $174,823,003 | |
| [2] G5 | $22,792,111 | $38,674,737 | $56,319,179 | $74,892,769 | $90,828,691 | $100,335,167 | $116,962,244 | $134,587,544 | $142,409,003 | $152,462,246 | $165,774,187 | $175,120,005 | |
| Difference between Title IV Cash in G5 and Title IV STARS | $5,360,913 | $9,761,406 | $16,292,259 | $16,092,328 | $15,062,291 | $18,508,474 | $16,070,512 | $14,811,842 | $6,861,854 | $1,524,075 | $1,450,763 | $297,001 | |

Sources:
[1] See Exhibit 9A
[2] See Exhibit 7C

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 10A**
Title IV STARS compared to Title IV Cash in G5 for Fiscal Year 13/14

| | | Fiscal Year 13/14 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Miami | Bryman | Phoenix | Maryland Heights | Parsippany | Springfield | FCC-ET | Total |
| | *Title IV Draws* | | | | | | | | |
| [1] | STARS | $88,382,228 | $37,866,369 | $46,933,746 | $16,206,527 | $14,429,609 | $14,895,082 | ($6,691) | $218,706,871 |
| [2] | G5 | $89,270,494 | $36,949,741 | $53,015,994 | $13,585,683 | $12,910,901 | $13,098,952 | $0 | $218,831,765 |
| | *Title IV Refunds* | | | | | | | | |
| [1] | STARS | ($15,535,583) | ($7,435,603) | ($12,724,794) | ($2,594,793) | ($2,128,584) | ($3,464,045) | ($464) | ($43,883,867) |
| [2] | G5 | ($16,518,366) | ($6,477,493) | ($18,736,533) | ($697,849) | ($702,490) | ($579,029) | $0 | ($43,711,761) |
| | *Title IV Net* | | | | | | | | |
| [1] | STARS | $72,846,645 | $30,430,765 | $34,208,952 | $13,611,735 | $12,301,025 | $11,431,037 | ($7,155) | $174,823,003 |
| [2] | G5 | $72,752,128 | $30,472,248 | $34,279,461 | $12,887,834 | $12,208,411 | $12,519,923 | $0 | $175,120,005 |

Sources:
[1] P1746720.
[2] P2222704-705 and TJS012977.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 10B
Direct Loan Drawdowns and Refunds by Fiscal Year and Award Year in G5

### Fiscal Year 12/13

|  | Award Year 11/12 | | | Award Year 12/13 | | | Award Year 13/14 | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net |
| **FY 12/13** | | | | | | | | | | | | |
| [1] Miami | $7,122,107 | ($539,910) | $6,582,197 | $46,165,999 | ($1,519,911) | $44,646,088 | $0 | $0 | $0 | $53,288,106 | ($2,059,821) | $51,228,285 |
| [1] Phoenix | $10,380,536 | ($738,674) | $9,641,863 | $26,311,977 | ($1,427,316) | $24,884,661 | $0 | $0 | $0 | $36,692,513 | ($2,165,990) | $34,526,524 |
| [1] Bryman | $6,340,116 | ($453,791) | $5,886,326 | $17,680,036 | ($884,485) | $16,795,551 | $0 | $0 | $0 | $24,020,152 | ($1,338,276) | $22,681,877 |
| FY 12/13 | $23,842,760 | ($1,732,375) | $22,110,385 | $90,158,012 | ($3,831,712) | $86,326,300 | $0 | $0 | $0 | $114,000,772 | ($5,564,087) | $108,436,685 |
|  | 21% | 31% | 20% | 79% | 69% | 80% | 0% | 0% | 0% | 100% | 100% | 100% |

### Fiscal Year 13/14

|  | Award Year 11/12 | | | Award Year 12/13 | | | Award Year 13/14 | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net |
| **FY 13/14** | | | | | | | | | | | | |
| [2] Miami | $26,420 | ($2,048) | $24,372 | $8,302,915 | ($6,500,501) | $1,802,414 | $55,032,026 | ($9,719,676) | $45,312,350 | $63,361,361 | ($16,222,225) | $47,139,136 |
| [2] Phoenix | $80,205 | $0 | $80,205 | $7,014,179 | ($4,820,253) | $2,193,926 | $32,938,487 | ($12,922,978) | $20,015,509 | $40,032,871 | ($17,743,231) | $22,289,640 |
| [2] Bryman | $107,554 | $0 | $107,554 | $7,249,281 | ($3,330,007) | $3,919,274 | $18,940,461 | ($2,573,335) | $16,367,126 | $26,297,296 | ($5,903,342) | $20,393,954 |
| FY 13/14 | $214,179 | ($2,048) | $212,131 | $22,566,375 | ($14,650,761) | $7,915,614 | $106,910,974 | ($25,215,989) | $81,694,985 | $129,691,528 | ($39,868,798) | $89,822,730 |
|  | 0% | 0% | 0% | 17% | 37% | 9% | 82% | 63% | 91% | 100% | 100% | 100% |

Sources:
[1] DOE000001-078; DOE000079-562 at 288-302; TJS012977.
[2] P2222704-705 and TJS012977.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 10C
Direct Loan Drawdowns and Refunds by Fiscal Year and Award Year in STARS

**Fiscal Year 12/13**

| | Award Year 11/12 | | | Award Year 12/13 | | | Award Year 13/14 | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net |
| [1] STARS | $26,081,410 | ($2,231,165) | $23,850,245 | $109,708,320 | ($12,752,919) | $96,955,401 | $25,222 | ($1,534) | $23,688 | $135,814,953 | ($14,985,618) | $120,829,334 |
| | *19%* | *15%* | *20%* | *81%* | *85%* | *80%* | *0%* | *0%* | *0%* | *100%* | *100%* | *100%* |

**Fiscal Year 13/14**

| | Award Year 11/12 | | | Award Year 12/13 | | | Award Year 13/14 | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net | Title IV Draws | Title IV Refunds | Title IV Net |
| [2] STARS | $64,949 | ($77,530) | ($12,581) | $28,816,876 | ($11,593,559) | $17,223,317 | $120,971,120 | ($16,618,387) | $104,352,733 | $149,852,945 | ($28,289,476) | $121,563,468 |
| | *0%* | *0%* | *0%* | *19%* | *41%* | *14%* | *81%* | *59%* | *86%* | *100%* | *100%* | *100%* |

Sources:
[1] FCC - IEC - AR History Summary_2012-2013.xlsx (03135607x9D8E0).xlsx
[2] FCC - IEC - AR History Summary_2013-2014 (03135606x9D8E0).xlsx

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 11
Title IV STARS (excluding SR) compared to Spring Zutes Reconciliation on a Monthly Basis

|  |  | 7/31/2013 | 8/31/2013 | 9/30/2013 | 10/31/2013 | 11/30/2013 | 12/31/2013 | 1/31/2014 | 2/28/2014 | 3/31/2014 | 4/30/2014 | 5/31/2014 | 6/30/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Title IV Drawdowns* | | | | | | | | | | | | |
| [1] | STARS | $21,177,296 | $15,850,820 | $14,992,289 | $22,847,659 | $20,086,054 | $9,309,337 | $23,130,407 | $23,177,045 | $18,722,361 | $18,867,875 | $16,338,070 | $14,207,657 |
| [2] | Spring Zutes | $21,173,307 | $15,839,748 | $14,990,610 | $22,835,834 | $20,077,628 | $9,306,804 | $23,121,716 | $23,175,952 | $18,722,317 | $18,872,283 | $16,343,486 | $13,179,999 |
| | *Title IV Refunds (excl. SR)* | | | | | | | | | | | | |
| [3] | STARS | ($3,528,284) | ($3,658,138) | ($3,465,794) | ($3,686,145) | ($2,524,162) | ($2,773,459) | ($3,757,709) | ($3,656,889) | ($2,577,274) | ($3,100,398) | ($2,537,200) | ($3,546,426) |
| [4] | Spring Zutes | ($3,526,415) | ($3,652,682) | ($3,464,136) | ($3,682,022) | ($2,520,608) | ($2,771,970) | ($3,755,792) | ($3,657,594) | ($2,578,606) | ($3,115,485) | ($2,537,191) | ($3,542,518) |
| | *Title IV Net (excl. SR)* | | | | | | | | | | | | |
| [5] | STARS | $17,649,011 | $12,192,682 | $11,526,495 | $19,161,514 | $17,561,893 | $6,535,877 | $19,372,698 | $19,520,157 | $16,145,087 | $15,767,478 | $13,800,870 | $10,661,231 |
| [6] | Spring Zutes | $17,646,891 | $12,187,066 | $11,526,474 | $19,153,812 | $17,557,021 | $6,534,833 | $19,365,924 | $19,518,358 | $16,143,711 | $15,756,798 | $13,806,295 | $9,637,481 |
| | *Title IV Net Cmml. (excl. SR)* | | | | | | | | | | | | |
| | STARS | $17,649,011 | $29,841,693 | $41,368,188 | $60,529,703 | $78,091,595 | $84,627,472 | $104,000,170 | $123,520,327 | $139,665,414 | $155,432,891 | $169,233,761 | $179,894,992 |
| | Spring Zutes | $17,646,891 | $29,833,957 | $41,360,432 | $60,514,244 | $78,071,264 | $84,606,097 | $103,972,021 | $123,490,379 | $139,634,090 | $155,390,887 | $169,197,182 | $178,834,663 |

Sources:
[1] See Exhibit 9A.
[2] P2222704-705.
[3] See Exhibit 9A; includes REF and R2T4 and excludes SR (or student disbursements federal).
[4] P2222704-705.
[5] = [1] + [3]
[6] = [2] + [4]

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 7/1/2013 | $0 | | $0 | $0 | | $0 | $0 | | $0 |
| 7/2/2013 | $0 | | $0 | $0 | | $117 | $0 | | $0 |
| 7/3/2013 | $550,000 | | $0 | $0 | | $0 | $0 | | $0 |
| 7/4/2013 | $550,000 | | $0 | $0 | | $0 | $0 | | $0 |
| 7/5/2013 | $550,000 | | $0 | $0 | | $0 | $0 | | $0 |
| 7/6/2013 | $550,000 | | $0 | $0 | | $0 | $0 | | $0 |
| 7/7/2013 | $550,000 | | $0 | $0 | | $0 | $0 | | $0 |
| 7/8/2013 | $550,000 | | $64,336 | $0 | | $23,881 | $0 | | $1,444 |
| 7/9/2013 | $550,000 | | $64,336 | $0 | | $23,881 | $0 | | $1,444 |
| 7/10/2013 | $550,000 | | $64,336 | $12,364 | | $23,881 | $0 | | $1,444 |
| 7/11/2013 | $700,000 | | $342,902 | $12,364 | | $23,881 | $150,000 | | $1,444 |
| 7/12/2013 | $700,000 | | $342,902 | $34,216 | | $23,881 | $150,000 | | $19,776 |
| 7/13/2013 | $700,000 | | $342,902 | $34,216 | | $23,881 | $150,000 | | $19,776 |
| 7/14/2013 | $700,000 | | $342,902 | $34,216 | | $23,881 | $150,000 | | $19,776 |
| 7/15/2013 | $700,000 | | $342,902 | $34,216 | | $23,881 | $150,000 | | $19,776 |
| 7/16/2013 | $700,000 | | $342,902 | $34,216 | | $23,881 | $150,000 | | $71,116 |
| 7/17/2013 | $700,000 | | $342,902 | $34,216 | | $23,881 | $150,000 | | $77,185 |
| 7/18/2013 | $700,000 | | $342,902 | $34,216 | | $23,881 | $150,000 | | $77,185 |
| 7/19/2013 | $700,000 | | $432,954 | $34,216 | | $104,549 | $150,000 | | $77,185 |
| 7/20/2013 | $700,000 | | $432,954 | $34,216 | | $104,549 | $150,000 | | $77,185 |
| 7/21/2013 | $700,000 | | $432,954 | $34,216 | | $104,549 | $150,000 | | $77,185 |
| 7/22/2013 | $700,000 | | $432,954 | $177,212 | | $109,005 | $150,000 | | $77,185 |
| 7/23/2013 | $700,000 | | $432,954 | $177,212 | | $109,005 | $150,000 | | $77,185 |
| 7/24/2013 | $700,000 | | $432,954 | $177,212 | | $109,005 | $150,000 | | $77,185 |
| 7/25/2013 | $700,000 | | $432,954 | $177,212 | | $109,005 | $150,000 | | $77,185 |
| 7/26/2013 | $1,017,833 | | $1,029,455 | $194,716 | | $109,005 | $150,000 | | $81,477 |
| 7/27/2013 | $1,017,833 | | $1,029,455 | $194,716 | | $109,005 | $150,000 | | $81,477 |
| 7/28/2013 | $1,017,833 | | $1,029,455 | $194,716 | | $109,005 | $150,000 | | $81,477 |
| 7/29/2013 | $1,653,833 | | $1,296,160 | $194,716 | | $196,343 | $675,000 | | $159,752 |
| 7/30/2013 | $2,543,833 | | $1,291,459 | $211,225 | | $196,343 | $1,575,000 | | $232,204 |
| 7/31/2013 | $3,393,833 | | $1,495,894 | $211,225 | | $379,245 | $2,325,000 | | $232,204 |
| 8/1/2013 | $3,393,833 | | $1,495,944 | $211,225 | | $379,245 | $2,325,000 | | $232,204 |
| 8/2/2013 | $3,393,833 | | $1,474,987 | $211,225 | | $379,245 | $2,325,000 | | $232,204 |
| 8/3/2013 | $3,393,833 | | $1,474,987 | $211,225 | | $379,245 | $2,325,000 | | $232,204 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 8/4/2013 | $3,393,833 | | $1,474,987 | $211,225 | | $379,245 | $2,325,000 | | $232,204 |
| 8/5/2013 | $3,393,833 | | $1,524,759 | $442,598 | | $467,485 | $2,705,000 | | $302,054 |
| 8/6/2013 | $3,393,833 | | $1,513,117 | $442,598 | | $479,231 | $2,705,000 | | $301,332 |
| 8/7/2013 | $3,393,833 | | $1,621,073 | $493,195 | | $516,350 | $2,705,000 | | $344,497 |
| 8/8/2013 | $3,393,833 | | $1,622,418 | $493,195 | | $515,381 | $2,705,000 | | $343,569 |
| 8/9/2013 | $3,393,833 | | $1,622,418 | $493,195 | | $515,381 | $2,705,000 | | $343,569 |
| 8/10/2013 | $3,393,833 | | $1,622,418 | $493,195 | | $515,381 | $2,705,000 | | $343,569 |
| 8/11/2013 | $3,393,833 | | $1,622,418 | $493,195 | | $515,381 | $2,705,000 | | $343,569 |
| 8/12/2013 | $3,393,833 | | $1,622,418 | $507,564 | | $515,381 | $2,705,000 | | $343,569 |
| 8/13/2013 | $3,393,833 | | $1,612,830 | $610,209 | | $675,713 | $2,705,000 | | $543,096 |
| 8/14/2013 | $3,643,833 | | $1,679,693 | $653,698 | | $688,979 | $2,905,000 | | $599,293 |
| 8/15/2013 | $3,643,833 | | $1,675,806 | $653,698 | | $776,218 | $2,905,000 | | $637,347 |
| 8/16/2013 | $3,643,833 | | $1,675,806 | $653,698 | | $776,218 | $2,905,000 | | $637,347 |
| 8/17/2013 | $3,643,833 | | $1,675,806 | $653,698 | | $776,218 | $2,905,000 | | $637,347 |
| 8/18/2013 | $3,643,833 | | $1,675,806 | $653,698 | | $776,218 | $2,905,000 | | $637,347 |
| 8/19/2013 | $3,643,833 | | $1,665,431 | $653,698 | | $768,745 | $2,905,000 | | $633,731 |
| 8/20/2013 | $3,643,833 | | $1,673,872 | $789,565 | | $793,755 | $2,905,000 | | $686,547 |
| 8/21/2013 | $3,743,833 | | $1,673,872 | $789,565 | | $793,755 | $3,005,000 | | $686,547 |
| 8/22/2013 | $3,993,833 | | $1,859,919 | $818,790 | | $912,384 | $3,005,000 | | $758,558 |
| 8/23/2013 | $4,088,833 | | $1,899,619 | $838,506 | | $997,778 | $3,065,000 | | $855,507 |
| 8/24/2013 | $4,088,833 | | $1,899,619 | $838,506 | | $997,778 | $3,065,000 | | $855,507 |
| 8/25/2013 | $4,088,833 | | $1,899,619 | $838,506 | | $997,778 | $3,065,000 | | $855,507 |
| 8/26/2013 | $4,288,833 | $1,838,722 | $2,248,985 | $893,804 | $893,804 | $1,101,170 | $3,265,000 | $751,493 | $950,308 |
| 8/27/2013 | $4,688,833 | | $2,242,439 | $902,087 | | $1,098,565 | $3,625,000 | | $942,155 |
| 8/28/2013 | $5,538,833 | | $3,254,579 | $920,529 | | $1,164,792 | $4,275,000 | | $1,140,218 |
| 8/29/2013 | $6,088,833 | | $3,268,885 | $953,727 | | $1,223,033 | $4,675,000 | | $1,215,336 |
| 8/30/2013 | $6,088,833 | | $3,268,885 | $953,727 | | $1,223,033 | $4,675,000 | | $1,215,336 |
| 8/31/2013 | $6,088,833 | | $3,268,885 | $953,727 | | $1,223,033 | $4,675,000 | | $1,215,336 |
| 9/1/2013 | $6,088,833 | | $3,268,885 | $953,727 | | $1,223,033 | $4,675,000 | | $1,215,336 |
| 9/2/2013 | $6,088,833 | | $3,268,885 | $953,727 | | $1,223,033 | $4,675,000 | | $1,215,336 |
| 9/3/2013 | $7,588,833 | $2,823,770 | $3,257,566 | $1,035,960 | | $1,216,872 | $5,175,000 | $851,903 | $1,210,758 |
| 9/4/2013 | $7,588,833 | | $3,330,600 | $1,058,463 | | $1,257,485 | $5,175,000 | | $1,273,868 |
| 9/5/2013 | $7,588,833 | | $3,376,748 | $1,058,463 | | $1,259,610 | $5,195,000 | | $1,274,343 |
| 9/6/2013 | $7,588,833 | | $3,376,748 | $1,091,051 | | $1,259,610 | $5,195,000 | | $1,274,343 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 9/7/2013 | $7,588,833 | | $3,376,748 | $1,091,051 | | $1,259,610 | $5,195,000 | | $1,274,343 |
| 9/8/2013 | $7,588,833 | | $3,376,748 | $1,091,051 | | $1,259,610 | $5,195,000 | | $1,274,343 |
| 9/9/2013 | $7,018,770 | | $3,376,748 | $1,097,446 | | $1,259,610 | $4,090,903 | | $1,270,033 |
| 9/10/2013 | $7,368,770 | | $3,924,535 | $1,097,446 | | $1,317,142 | $4,090,903 | | $1,425,848 |
| 9/11/2013 | $7,368,770 | | $3,973,339 | $1,150,236 | | $1,811,906 | $4,090,903 | | $1,566,917 |
| 9/12/2013 | $7,368,770 | | $3,945,038 | $1,165,247 | | $1,803,452 | $4,090,903 | | $1,551,686 |
| 9/13/2013 | $7,368,770 | | $4,003,058 | $1,165,247 | | $1,821,040 | $3,924,560 | | $1,597,022 |
| 9/14/2013 | $7,368,770 | | $4,003,058 | $1,165,247 | | $1,821,040 | $3,924,560 | | $1,597,022 |
| 9/15/2013 | $7,368,770 | | $4,003,058 | $1,165,247 | | $1,821,040 | $3,924,560 | | $1,597,022 |
| 9/16/2013 | $7,368,770 | | $4,002,454 | $1,440,772 | | $1,821,040 | $3,924,560 | | $1,597,980 |
| 9/17/2013 | $7,368,770 | | $4,226,016 | $1,671,071 | | $1,915,222 | $3,924,560 | | $1,841,010 |
| 9/18/2013 | $7,568,770 | | $4,226,016 | $1,671,071 | | $1,915,222 | $3,924,560 | | $1,841,010 |
| 9/19/2013 | $7,568,770 | | $4,188,658 | $1,671,071 | | $1,910,522 | $3,924,560 | | $1,837,395 |
| 9/20/2013 | $7,568,770 | | $4,319,657 | $1,671,071 | | $1,938,895 | $3,924,560 | | $1,903,241 |
| 9/21/2013 | $7,568,770 | | $4,319,657 | $1,671,071 | | $1,938,895 | $3,924,560 | | $1,903,241 |
| 9/22/2013 | $7,568,770 | | $4,319,657 | $1,671,071 | | $1,938,895 | $3,924,560 | | $1,903,241 |
| 9/23/2013 | $7,818,770 | $4,303,101 | $4,467,062 | $1,671,071 | | $1,954,681 | $4,074,560 | $1,651,360 | $1,926,742 |
| 9/24/2013 | $8,568,770 | | $5,480,159 | $1,671,071 | | $1,935,161 | $4,574,560 | | $1,983,389 |
| 9/25/2013 | $9,268,770 | | $6,206,159 | $1,801,145 | | $2,186,622 | $4,574,560 | | $2,294,202 |
| 9/26/2013 | $9,268,770 | | $6,169,921 | $1,816,640 | | $2,174,051 | $4,574,560 | | $2,294,202 |
| 9/27/2013 | $10,268,770 | | $6,400,467 | $1,816,640 | | $2,217,544 | $5,274,560 | | $2,327,478 |
| 9/28/2013 | $10,268,770 | | $6,400,350 | $1,816,640 | | $2,217,544 | $5,274,560 | | $2,327,478 |
| 9/29/2013 | $10,268,770 | | $6,400,350 | $1,816,640 | | $2,217,476 | $5,274,560 | | $2,327,478 |
| 9/30/2013 | $11,468,770 | | $6,400,350 | $1,816,640 | | $2,217,032 | $6,274,560 | $1,783,497 | $2,327,482 |
| 10/1/2013 | $11,468,770 | | $6,893,754 | $1,821,973 | | $2,314,328 | $6,274,560 | | $2,429,717 |
| 10/2/2013 | $12,468,770 | $6,170,964 | $7,172,802 | $2,049,409 | | $2,329,009 | $6,774,560 | $2,080,439 | $2,511,439 |
| 10/3/2013 | $12,468,770 | | $7,204,213 | $2,078,044 | | $2,398,489 | $6,183,560 | | $2,693,315 |
| 10/4/2013 | $12,693,770 | | $7,204,177 | $2,078,044 | | $2,398,489 | $6,183,560 | | $2,693,315 |
| 10/5/2013 | $12,468,770 | | $7,204,177 | $2,078,044 | | $2,398,489 | $6,183,560 | | $2,693,315 |
| 10/6/2013 | $12,468,770 | | $7,204,177 | $2,078,044 | | $2,398,489 | $6,183,560 | | $2,693,315 |
| 10/7/2013 | $12,468,770 | $6,795,487 | $7,337,916 | $2,197,911 | | $2,448,791 | $6,183,560 | $2,309,794 | $2,739,991 |
| 10/8/2013 | $12,968,770 | | $7,444,233 | $2,228,934 | | $2,731,743 | $5,799,560 | | $2,904,359 |
| 10/9/2013 | $12,968,770 | | $7,447,684 | $2,242,553 | | $2,731,743 | $5,799,560 | | $2,904,359 |
| 10/10/2013 | $12,745,487 | | $7,410,621 | $2,388,268 | | $2,713,364 | $5,359,794 | | $2,884,915 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 10/11/2013 | $12,745,487 | | $7,477,577 | $2,388,268 | | $2,731,768 | $5,359,794 | | $2,909,511 |
| 10/12/2013 | $12,745,487 | | $7,464,019 | $2,388,268 | | $2,731,768 | $5,359,794 | | $2,909,511 |
| 10/13/2013 | $12,745,487 | | $7,464,019 | $2,388,268 | | $2,731,768 | $5,359,794 | | $2,909,511 |
| 10/14/2013 | $12,745,487 | | $7,601,441 | $2,388,268 | | $2,731,768 | $5,359,794 | | $2,909,511 |
| 10/15/2013 | $12,745,487 | | $7,512,893 | $2,540,776 | | $2,955,785 | $5,359,794 | | $3,145,440 |
| 10/16/2013 | $13,295,487 | | $7,517,142 | $2,540,776 | | $2,969,261 | $5,809,794 | | $3,144,214 |
| 10/17/2013 | $13,295,487 | | $7,448,707 | $2,752,832 | | $2,944,815 | $5,809,794 | | $3,127,392 |
| 10/18/2013 | $13,295,487 | | $7,597,810 | $2,752,832 | | $3,045,428 | $5,809,794 | | $3,201,767 |
| 10/19/2013 | $13,295,487 | | $7,597,810 | $2,752,832 | | $3,045,428 | $5,809,794 | | $3,201,767 |
| 10/20/2013 | $13,295,487 | | $7,597,810 | $2,752,832 | | $3,045,428 | $5,809,794 | | $3,201,767 |
| 10/21/2013 | $13,295,487 | $7,167,978 | $7,648,684 | $2,752,832 | $2,703,373 | $3,119,926 | $6,259,794 | $2,815,606 | $3,266,378 |
| 10/22/2013 | $13,595,487 | | $7,615,311 | $2,752,832 | | $3,116,224 | $6,709,794 | | $3,269,458 |
| 10/23/2013 | $14,295,487 | | $7,669,175 | $2,752,832 | | $3,116,526 | $7,159,794 | | $3,269,458 |
| 10/24/2013 | $14,295,487 | $7,816,015 | $7,669,175 | $2,752,832 | | $3,116,526 | $7,159,794 | $3,012,788 | $3,320,723 |
| 10/25/2013 | $14,041,832 | | $7,750,601 | $2,752,832 | | $3,134,723 | $7,159,794 | | $3,339,394 |
| 10/26/2013 | $14,041,832 | | $7,750,601 | $2,752,832 | | $3,134,723 | $7,159,794 | | $3,339,394 |
| 10/27/2013 | $14,041,832 | | $7,750,601 | $2,752,832 | | $3,134,723 | $7,159,794 | | $3,339,394 |
| 10/28/2013 | $14,741,832 | $8,304,964 | $7,745,159 | $2,752,832 | | $3,496,283 | $7,859,794 | | $3,339,394 |
| 10/29/2013 | $15,641,832 | | $7,818,940 | $3,136,263 | | $3,486,241 | $8,559,794 | | $3,309,132 |
| 10/30/2013 | $15,841,832 | | $11,187,089 | $3,221,623 | | $3,486,241 | $8,559,794 | | $4,020,368 |
| 10/31/2013 | $16,341,832 | | $11,183,622 | $3,221,623 | | $3,447,336 | $9,059,794 | | $3,979,150 |
| 11/1/2013 | $18,041,832 | | $11,306,326 | $3,221,623 | | $3,558,762 | $9,809,794 | | $4,062,722 |
| 11/2/2013 | $18,041,832 | | $11,306,326 | $3,221,623 | | $3,558,762 | $9,809,794 | | $4,062,722 |
| 11/3/2013 | $18,041,832 | | $11,306,326 | $3,221,623 | | $3,558,762 | $9,809,794 | | $4,062,722 |
| 11/4/2013 | $18,541,832 | | $11,397,448 | $3,266,124 | | $3,663,270 | $10,209,794 | | $4,176,427 |
| 11/5/2013 | $18,541,832 | | $11,352,653 | $3,317,675 | | $3,652,487 | $10,209,794 | | $4,266,252 |
| 11/6/2013 | $17,495,809 | | $11,358,306 | $3,439,136 | | $3,636,907 | $8,626,638 | | $4,266,251 |
| 11/7/2013 | $17,495,809 | | $11,484,065 | $3,616,202 | | $3,674,309 | $8,626,638 | | $4,334,003 |
| 11/8/2013 | $17,495,809 | | $11,553,275 | $3,616,202 | | $3,678,941 | $8,626,638 | | $4,334,003 |
| 11/9/2013 | $17,495,809 | | $11,557,671 | $3,616,202 | | $3,678,941 | $8,626,638 | | $4,334,003 |
| 11/10/2013 | $17,495,809 | | $11,557,671 | $3,616,202 | | $3,678,941 | $8,626,638 | | $4,334,003 |
| 11/11/2013 | $17,495,809 | | $11,575,689 | $3,616,202 | | $3,806,607 | $8,626,638 | | $4,334,003 |
| 11/12/2013 | $17,945,809 | | $11,680,609 | $4,166,202 | | $4,469,073 | $9,076,638 | | $4,926,343 |
| 11/13/2013 | $18,045,809 | | $11,680,611 | $4,416,202 | | $4,469,076 | $9,176,638 | | $4,926,343 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 11/14/2013 | $18,045,809 | | $11,595,956 | $4,416,202 | | $4,458,556 | $9,176,638 | | $4,867,868 |
| 11/15/2013 | $18,245,809 | | $11,702,523 | $4,616,202 | | $4,591,366 | $9,376,638 | | $5,093,299 |
| 11/16/2013 | $18,245,809 | | $11,702,586 | $4,616,202 | | $4,591,366 | $9,376,638 | | $5,093,299 |
| 11/17/2013 | $18,245,809 | | $11,702,586 | $4,616,202 | | $4,591,366 | $9,376,638 | | $5,093,299 |
| 11/18/2013 | $18,245,809 | $11,524,149 | $11,702,586 | $4,616,202 | $4,404,427 | $4,591,366 | $9,376,638 | $4,605,014 | $5,093,290 |
| 11/19/2013 | $18,245,809 | | $11,629,406 | $4,728,991 | | $4,564,811 | $9,576,638 | | $5,067,629 |
| 11/20/2013 | $18,545,809 | | $11,594,149 | $4,928,991 | | $4,545,599 | $9,826,638 | | $5,610,065 |
| 11/21/2013 | $18,795,809 | | $11,594,149 | $4,928,991 | $4,928,991 | $4,545,599 | $10,026,638 | | $5,610,065 |
| 11/22/2013 | $18,795,809 | $14,056,049 | $11,680,533 | $4,928,991 | | $4,553,818 | $10,026,638 | $5,828,363 | $5,775,544 |
| 11/23/2013 | $18,795,809 | | $11,680,533 | $4,928,991 | | $4,553,818 | $10,026,638 | | $5,775,544 |
| 11/24/2013 | $18,795,809 | | $11,680,533 | $4,928,991 | | $4,553,818 | $10,026,638 | | $5,775,544 |
| 11/25/2013 | $18,795,809 | | $14,261,017 | $4,928,991 | | $5,211,422 | $10,026,638 | | $6,253,495 |
| 11/26/2013 | $19,145,809 | | $14,548,586 | $5,028,991 | | $5,349,507 | $10,376,638 | | $6,735,644 |
| 11/27/2013 | $20,395,809 | | $14,545,122 | $5,378,991 | | $5,342,070 | $10,976,638 | | $6,723,378 |
| 11/28/2013 | $20,395,809 | | $14,545,122 | $5,378,991 | | $5,342,070 | $10,976,638 | | $6,723,378 |
| 11/29/2013 | $20,395,809 | $14,602,149 | $14,545,122 | $5,378,991 | $5,265,128 | $5,342,070 | $10,976,638 | $6,363,904 | $6,723,378 |
| 11/30/2013 | $20,395,809 | | $14,545,122 | $5,378,991 | | $5,342,070 | $10,976,638 | | $6,723,378 |
| 12/1/2013 | $20,395,809 | | $15,086,793 | $5,378,991 | | $5,713,306 | $10,976,638 | | $7,175,331 |
| 12/2/2013 | $20,595,809 | $14,348,086 | $15,086,638 | $5,478,991 | | $5,713,270 | $11,176,638 | $6,238,695 | $7,175,331 |
| 12/3/2013 | $21,595,809 | | $15,046,933 | $5,978,991 | | $5,673,397 | $11,776,638 | | $7,129,973 |
| 12/4/2013 | $21,595,809 | $14,928,342 | $15,195,616 | $5,978,991 | $5,695,609 | $5,881,992 | $11,776,638 | $6,951,108 | $7,390,459 |
| 12/5/2013 | $21,595,809 | | $15,090,160 | $5,978,991 | | $5,806,807 | $11,776,638 | | $7,368,600 |
| 12/6/2013 | $21,102,149 | $14,921,054 | $15,090,160 | $5,978,991 | | $5,806,807 | $10,663,904 | $6,953,149 | $7,368,600 |
| 12/7/2013 | $21,102,149 | | $15,090,160 | $5,978,991 | | $5,806,807 | $10,663,904 | | $7,368,600 |
| 12/8/2013 | $21,102,149 | | $15,090,160 | $5,978,991 | | $5,806,807 | $10,663,904 | | $7,368,600 |
| 12/9/2013 | $21,102,149 | $14,921,054 | $15,048,451 | $5,978,991 | $5,695,609 | $5,795,422 | $10,663,904 | $6,953,149 | $7,442,723 |
| 12/10/2013 | $21,102,149 | | $15,135,398 | $6,978,991 | | $5,977,162 | $11,163,904 | | $7,561,388 |
| 12/11/2013 | $22,202,149 | | $15,149,178 | $7,478,991 | | $6,044,133 | $12,163,904 | | $7,633,286 |
| 12/12/2013 | $22,202,149 | | $15,100,980 | $7,928,991 | | $6,020,105 | $12,263,904 | | $7,582,816 |
| 12/13/2013 | $22,202,149 | | $15,100,980 | $7,928,991 | | $6,024,124 | $11,911,911 | | $7,592,871 |
| 12/14/2013 | $22,202,149 | | $15,100,980 | $7,928,991 | | $6,024,124 | $11,911,911 | | $7,592,871 |
| 12/15/2013 | $22,202,149 | | $15,100,980 | $7,928,991 | | $6,024,124 | $11,911,911 | | $7,592,871 |
| 12/16/2013 | $20,919,810 | $14,809,897 | $15,130,124 | $8,328,991 | | $6,146,800 | $12,661,911 | $7,247,455 | $7,696,193 |
| 12/17/2013 | $21,069,810 | | $15,055,774 | $8,478,991 | | $6,147,711 | $12,811,911 | | $7,615,590 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 12/18/2013 | $21,069,810 | | $15,055,728 | $8,478,991 | | $6,223,367 | $12,811,911 | | $7,641,700 |
| 12/19/2013 | $20,434,897 | | $14,995,715 | $8,628,991 | | $6,214,029 | $12,422,455 | | $7,599,038 |
| 12/20/2013 | $20,434,897 | | $15,018,151 | $8,628,991 | | $6,258,491 | $12,422,455 | | $7,667,705 |
| 12/21/2013 | $20,434,897 | | $15,018,151 | $8,628,991 | | $6,258,491 | $12,422,455 | | $7,667,705 |
| 12/22/2013 | $20,434,897 | | $15,018,151 | $8,628,991 | | $6,258,491 | $12,422,455 | | $7,667,705 |
| 12/23/2013 | $20,434,897 | $15,679,694 | $15,024,649 | $8,628,991 | $6,046,423 | $6,258,836 | $12,422,455 | $7,486,350 | $7,689,605 |
| 12/24/2013 | $20,684,897 | | $16,009,762 | $8,628,991 | | $6,263,579 | $12,672,455 | | $7,746,206 |
| 12/25/2013 | $20,684,897 | | $16,009,762 | $8,628,991 | | $6,263,579 | $12,672,455 | | $7,746,206 |
| 12/26/2013 | $20,684,897 | | $16,009,762 | $8,628,991 | | $6,263,579 | $12,672,455 | | $7,759,847 |
| 12/27/2013 | $21,684,897 | | $16,009,762 | $9,328,991 | | $6,265,311 | $13,672,455 | | $7,759,847 |
| 12/28/2013 | $21,684,897 | | $16,009,762 | $9,328,991 | | $6,265,311 | $13,672,455 | | $7,759,847 |
| 12/29/2013 | $21,684,897 | | $16,009,762 | $9,328,991 | | $6,265,311 | $13,672,455 | | $7,759,847 |
| 12/30/2013 | $21,934,897 | $15,718,442 | $15,845,954 | $9,328,991 | | $6,192,902 | $13,922,455 | $7,446,126 | $7,662,436 |
| 12/31/2013 | $21,934,897 | | $15,845,954 | $9,328,991 | | $6,213,896 | $13,922,455 | | $7,700,631 |
| 1/1/2014 | $21,934,897 | | $15,845,954 | $9,328,991 | | $6,213,896 | $13,922,455 | | $7,700,631 |
| 1/2/2014 | $21,934,897 | | $15,846,445 | $9,328,991 | | $6,213,896 | $13,922,455 | | $7,700,627 |
| 1/3/2014 | $21,934,897 | | $15,846,445 | $9,328,991 | | $6,213,896 | $13,922,455 | | $7,700,627 |
| 1/4/2014 | $21,934,897 | | $15,846,445 | $9,328,991 | | $6,213,896 | $13,922,455 | | $7,700,627 |
| 1/5/2014 | $21,934,897 | | $15,846,445 | $9,328,991 | | $6,213,896 | $13,922,455 | | $7,700,627 |
| 1/6/2014 | $22,334,897 | | $15,935,112 | $9,578,991 | | $6,450,895 | $14,222,455 | | $7,782,392 |
| 1/7/2014 | $22,334,897 | | $20,215,932 | $9,578,991 | | $7,418,696 | $14,222,455 | | $9,134,761 |
| 1/8/2014 | $22,334,897 | | $20,215,932 | $9,578,991 | | $7,418,716 | $14,222,455 | | $9,134,646 |
| 1/9/2014 | $22,584,897 | | $20,610,162 | $9,653,991 | | $7,685,529 | $14,297,455 | | $9,452,453 |
| 1/10/2014 | $22,584,897 | | $20,657,237 | $9,653,991 | | $7,692,278 | $14,297,455 | | $9,500,576 |
| 1/11/2014 | $22,584,897 | | $20,657,235 | $9,653,991 | | $7,692,278 | $14,297,455 | | $9,500,543 |
| 1/12/2014 | $22,584,897 | | $20,657,235 | $9,653,991 | | $7,692,278 | $14,297,455 | | $9,500,543 |
| 1/13/2014 | $22,984,897 | | $20,694,134 | $9,653,991 | $7,089,023 | $7,878,098 | $13,465,372 | $9,107,109 | $9,674,887 |
| 1/14/2014 | $22,984,897 | | $20,779,422 | $9,653,991 | | $7,971,029 | $13,465,372 | | $9,813,568 |
| 1/15/2014 | $22,984,897 | | $20,741,990 | $9,653,991 | | $8,047,706 | $13,465,372 | | $9,863,186 |
| 1/16/2014 | $23,654,897 | | $20,655,819 | $10,153,991 | | $8,061,433 | $14,065,372 | | $9,895,485 |
| 1/17/2014 | $23,654,897 | | $20,655,819 | $10,153,991 | | $8,061,433 | $14,065,372 | | $9,895,485 |
| 1/18/2014 | $23,654,897 | | $20,655,819 | $10,153,991 | | $8,061,433 | $14,065,372 | | $9,895,485 |
| 1/19/2014 | $23,654,897 | | $20,655,819 | $10,153,991 | | $8,061,433 | $14,065,372 | | $9,895,485 |
| 1/20/2014 | $23,654,897 | | $20,655,819 | $10,153,991 | $7,821,268 | $8,061,433 | $14,065,372 | $9,646,968 | $9,895,485 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 1/21/2014 | $24,254,897 | $20,383,955 | $20,612,648 | $10,553,991 | $7,821,268 | $8,038,525 | $14,665,372 | $9,646,968 | $9,856,113 |
| 1/22/2014 | $25,154,897 | | $20,666,185 | $10,802,879 | | $8,056,915 | $14,364,759 | | $9,871,204 |
| 1/23/2014 | $25,154,897 | | $20,543,761 | $10,802,879 | | $8,039,039 | $14,364,759 | | $9,828,350 |
| 1/24/2014 | $25,154,897 | | $20,601,222 | $10,802,879 | | $8,057,756 | $14,364,759 | | $9,869,745 |
| 1/25/2014 | $25,154,897 | | $20,601,222 | $10,802,879 | | $8,057,756 | $14,364,759 | | $9,869,745 |
| 1/26/2014 | $25,154,897 | | $20,601,222 | $10,802,879 | | $8,057,756 | $14,364,759 | | $9,869,745 |
| 1/27/2014 | $25,404,897 | $20,396,149 | $20,474,210 | $10,902,879 | $7,947,135 | $8,083,687 | $14,564,759 | $9,799,172 | $9,951,152 |
| 1/28/2014 | $25,404,897 | | $20,477,343 | $10,902,879 | | $8,094,249 | $14,564,759 | | $9,980,109 |
| 1/29/2014 | $25,404,897 | | $21,030,477 | $10,902,879 | | $8,297,921 | $14,564,759 | | $10,742,058 |
| 1/30/2014 | $26,054,897 | | $20,954,031 | $11,402,879 | | $8,258,978 | $15,214,759 | | $10,696,516 |
| 1/31/2014 | $26,054,897 | | $20,954,031 | $11,402,879 | | $8,258,978 | $15,214,759 | | $10,696,465 |
| 2/1/2014 | $26,054,897 | | $20,954,031 | $11,402,879 | | $8,258,978 | $15,214,759 | | $10,696,465 |
| 2/2/2014 | $26,054,897 | | $20,954,031 | $11,402,879 | | $8,258,978 | $15,214,759 | | $10,696,465 |
| 2/3/2014 | $28,434,584 | | $24,273,736 | $11,308,446 | $7,968,315 | $8,554,238 | $14,938,542 | $10,692,870 | $11,133,525 |
| 2/4/2014 | $28,434,584 | $23,196,421 | $24,871,308 | $11,308,446 | $7,968,315 | $8,961,782 | $14,938,542 | $10,692,870 | $11,484,434 |
| 2/5/2014 | $30,034,584 | | $24,871,308 | $11,708,446 | | $8,961,782 | $15,518,542 | | $11,483,322 |
| 2/6/2014 | $31,034,584 | | $24,781,156 | $12,028,446 | | $8,921,204 | $15,918,542 | | $11,415,253 |
| 2/7/2014 | $31,034,584 | | $24,948,845 | $12,028,446 | | $8,949,256 | $15,918,542 | | $11,621,604 |
| 2/8/2014 | $31,034,584 | | $24,948,845 | $12,028,446 | | $8,949,256 | $15,918,542 | | $11,621,604 |
| 2/9/2014 | $31,034,584 | | $24,948,845 | $12,028,446 | | $8,949,256 | $15,918,542 | | $11,621,604 |
| 2/10/2014 | $31,184,584 | | $25,094,207 | $11,811,587 | $8,851,023 | $9,435,792 | $15,932,925 | $11,342,853 | $11,869,723 |
| 2/11/2014 | $31,284,584 | | $24,989,776 | $12,041,587 | | $9,364,146 | $16,052,925 | | $11,808,717 |
| 2/12/2014 | $31,284,584 | | $25,079,723 | $12,041,587 | | $9,430,893 | $16,052,925 | | $11,950,671 |
| 2/13/2014 | $31,284,584 | | $25,030,250 | $12,041,587 | | $9,411,572 | $15,942,853 | | $11,850,530 |
| 2/14/2014 | $31,884,584 | | $25,030,250 | $12,571,587 | | $9,411,572 | $16,492,853 | | $11,850,530 |
| 2/15/2014 | $31,884,584 | | $25,030,250 | $12,571,587 | | $9,411,572 | $16,492,853 | | $11,850,530 |
| 2/16/2014 | $31,884,584 | | $25,030,250 | $12,571,587 | | $9,411,572 | $16,492,853 | | $11,850,530 |
| 2/17/2014 | $31,884,584 | | $25,033,138 | $12,571,587 | | $9,411,572 | $16,492,853 | | $11,850,530 |
| 2/18/2014 | $31,884,584 | | $24,884,347 | $12,571,587 | | $9,522,904 | $16,492,853 | $11,662,875 | $11,868,023 |
| 2/19/2014 | $32,284,584 | | $24,884,347 | $12,891,587 | | $9,522,904 | $16,842,853 | | $11,868,023 |
| 2/20/2014 | $32,284,584 | | $24,783,260 | $12,891,587 | | $9,574,302 | $16,842,853 | | $11,874,186 |
| 2/21/2014 | $32,284,584 | | $24,783,260 | $13,175,587 | | $9,574,302 | $17,092,853 | | $11,874,186 |
| 2/22/2014 | $32,284,584 | | $24,783,260 | $13,175,587 | | $9,574,302 | $17,092,853 | | $11,874,186 |
| 2/23/2014 | $32,284,584 | | $24,783,260 | $13,175,587 | | $9,574,302 | $17,092,853 | | $11,874,186 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 2/24/2014 | $32,284,584 | $24,590,681 | $24,783,260 | $13,175,587 | $9,338,103 | $10,109,286 | $16,554,018 | $11,662,489 | $13,033,781 |
| 2/25/2014 | $32,284,584 | | $24,655,360 | $13,375,587 | | $10,031,595 | $16,754,018 | | $12,975,429 |
| 2/26/2014 | $33,884,584 | | $24,655,360 | $13,825,587 | | $10,031,579 | $17,054,018 | | $12,975,429 |
| 2/27/2014 | $33,884,584 | | $28,141,762 | $13,825,587 | | $10,044,735 | $17,054,018 | | $12,972,400 |
| 2/28/2014 | $33,884,584 | | $28,141,762 | $13,825,587 | | $10,044,735 | $17,054,018 | | $12,972,400 |
| 3/1/2014 | $33,884,584 | | $28,141,762 | $13,825,587 | | $10,044,735 | $17,054,018 | | $12,972,400 |
| 3/2/2014 | $33,884,584 | | $28,141,762 | $13,825,587 | | $10,044,735 | $17,054,018 | | $12,972,400 |
| 3/3/2014 | $37,320,939 | $24,483,252 | $28,141,762 | $13,498,414 | $9,931,215 | $10,042,772 | $18,304,018 | $12,853,806 | $12,972,400 |
| 3/4/2014 | $37,320,939 | | $28,112,914 | $13,498,414 | | $10,022,659 | $18,304,018 | | $12,959,942 |
| 3/5/2014 | $37,320,939 | | $28,449,441 | $13,498,414 | | $10,378,862 | $18,304,018 | | $13,298,347 |
| 3/6/2014 | $36,452,252 | | $28,376,162 | $13,065,215 | | $10,345,008 | $17,553,806 | | $13,216,911 |
| 3/7/2014 | $36,356,663 | | $28,597,055 | $13,065,215 | | $10,595,274 | $17,553,806 | | $13,470,306 |
| 3/8/2014 | $36,356,663 | | $28,597,055 | $13,065,215 | | $10,596,636 | $17,553,806 | | $13,470,307 |
| 3/9/2014 | $36,356,663 | | $28,597,055 | $13,065,215 | | $10,596,636 | $17,553,806 | | $13,470,307 |
| 3/10/2014 | $36,356,663 | $28,212,285 | $28,673,539 | $13,065,215 | $10,337,206 | $10,617,327 | $17,553,806 | $13,217,252 | $13,555,038 |
| 3/11/2014 | $36,356,663 | | $28,766,037 | $13,065,215 | | $10,839,351 | $17,553,806 | | $13,661,807 |
| 3/12/2014 | $36,356,663 | | $28,610,956 | $13,029,739 | | $10,843,596 | $17,099,930 | | $13,547,689 |
| 3/13/2014 | $36,356,663 | | $28,642,842 | $13,029,739 | | $10,863,365 | $17,099,930 | | $13,623,463 |
| 3/14/2014 | $36,356,663 | | $28,655,377 | $12,841,174 | | $10,876,966 | $16,574,879 | | $13,632,754 |
| 3/15/2014 | $36,356,663 | | $28,649,108 | $12,841,174 | | $10,876,966 | $16,574,879 | | $13,632,754 |
| 3/16/2014 | $36,356,663 | | $28,649,108 | $12,841,174 | | $10,876,966 | $16,574,879 | | $13,632,754 |
| 3/17/2014 | $36,356,663 | $28,521,184 | $28,705,166 | $12,841,174 | $10,815,069 | $10,953,124 | $16,574,879 | $13,568,292 | $13,685,406 |
| 3/18/2014 | $36,356,663 | | $28,757,720 | $12,841,174 | | $11,029,547 | $16,574,879 | | $13,740,621 |
| 3/19/2014 | $36,394,284 | | $31,430,215 | $12,794,740 | | $11,690,094 | $16,513,999 | | $14,959,968 |
| 3/20/2014 | $36,248,987 | | $31,430,213 | $12,632,965 | | $11,690,094 | $16,468,292 | | $14,959,968 |
| 3/21/2014 | $36,248,987 | | $31,430,213 | $12,632,965 | | $11,690,094 | $16,468,292 | | $14,959,968 |
| 3/22/2014 | $36,248,987 | | $31,419,698 | $12,632,965 | | $11,690,096 | $16,468,292 | | $14,959,968 |
| 3/23/2014 | $36,248,987 | | $31,419,698 | $12,632,965 | | $11,690,096 | $16,468,292 | | $14,959,968 |
| 3/24/2014 | $36,248,987 | $28,623,281 | $31,542,447 | $12,550,162 | $10,935,532 | $11,754,136 | $16,468,292 | $13,647,948 | $15,037,750 |
| 3/25/2014 | $36,136,699 | | $31,547,169 | $12,550,162 | | $11,776,863 | $16,468,292 | | $15,053,385 |
| 3/26/2014 | $35,951,294 | | $31,556,789 | $12,550,162 | | $11,786,016 | $16,468,292 | | $15,065,868 |
| 3/27/2014 | $35,469,855 | $31,553,785 | $31,296,203 | $12,269,532 | $11,668,891 | $11,729,789 | $16,248,922 | $15,006,723 | $14,964,237 |
| 3/28/2014 | $35,393,044 | | $31,293,729 | $12,214,656 | | $11,729,789 | $16,248,922 | | $14,957,643 |
| 3/29/2014 | $35,393,044 | | $32,257,404 | $12,214,656 | | $11,796,337 | $16,248,922 | | $15,002,347 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 3/30/2014 | $35,393,044 | | $32,257,404 | $12,214,656 | | $11,796,337 | $16,248,922 | | $15,002,347 |
| 3/31/2014 | $35,243,632 | $31,986,706 | $32,254,967 | $12,214,656 | $11,711,758 | $11,796,339 | $16,248,922 | $14,965,149 | $15,001,038 |
| 4/1/2014 | $35,243,632 | | $32,254,967 | $12,214,656 | | $11,798,076 | $16,248,922 | | $15,001,038 |
| 4/2/2014 | $35,243,632 | | $32,594,655 | $12,214,656 | | $12,342,415 | $16,248,922 | | $15,450,442 |
| 4/3/2014 | $35,243,632 | | $32,594,655 | $12,214,656 | | $12,346,341 | $16,248,922 | | $15,450,458 |
| 4/4/2014 | $35,243,632 | | $32,597,789 | $12,214,656 | | $12,346,342 | $16,248,922 | | $15,450,456 |
| 4/5/2014 | $35,243,632 | | $32,597,789 | $12,214,656 | | $12,342,441 | $16,248,922 | | $15,451,114 |
| 4/6/2014 | $35,243,632 | | $32,597,789 | $12,214,656 | | $12,342,441 | $16,248,922 | | $15,451,114 |
| 4/7/2014 | $35,243,632 | $32,626,288 | $32,711,768 | $12,214,656 | $11,924,204 | $12,566,246 | $16,248,922 | $15,301,511 | $15,541,920 |
| 4/8/2014 | $35,243,632 | | $32,761,628 | $12,214,656 | | $12,577,763 | $16,248,922 | | $15,608,671 |
| 4/9/2014 | $35,243,632 | | $32,753,120 | $12,214,656 | | $12,568,271 | $16,248,922 | | $15,522,948 |
| 4/10/2014 | $34,813,686 | | $32,750,070 | $12,214,656 | | $12,529,209 | $16,101,511 | | $15,524,199 |
| 4/11/2014 | $34,813,686 | | $32,750,070 | $12,214,656 | | $12,529,209 | $16,101,511 | | $15,524,199 |
| 4/12/2014 | $34,813,686 | | $32,750,070 | $12,214,656 | | $12,529,209 | $16,101,511 | | $15,524,199 |
| 4/13/2014 | $34,813,686 | | $32,750,070 | $12,214,656 | | $12,529,209 | $16,101,511 | | $15,589,393 |
| 4/14/2014 | $34,738,430 | | $32,803,584 | $12,284,811 | | $12,595,440 | $16,101,511 | | $15,597,807 |
| 4/15/2014 | $34,628,361 | $32,836,839 | $32,789,543 | $12,423,042 | | $12,585,048 | $15,971,694 | $15,585,106 | $15,402,938 |
| 4/16/2014 | $34,628,361 | | $32,471,339 | $12,651,410 | | $12,513,534 | $15,971,694 | | $15,454,804 |
| 4/17/2014 | $34,628,361 | | $32,487,210 | $12,651,410 | | $12,549,767 | $15,971,694 | | $15,454,804 |
| 4/18/2014 | $34,318,361 | | $32,487,210 | $12,769,800 | | $12,549,767 | $15,870,277 | | $15,454,804 |
| 4/19/2014 | $34,318,361 | | $32,487,210 | $12,769,800 | | $12,549,767 | $15,870,277 | | $15,454,804 |
| 4/20/2014 | $34,318,361 | | $35,234,108 | $12,769,800 | | $12,767,256 | $15,795,530 | | $15,454,804 |
| 4/21/2014 | $34,162,014 | | $35,234,107 | $12,769,800 | | $13,226,262 | $15,694,586 | | $16,758,537 |
| 4/22/2014 | $34,018,562 | | $35,809,576 | $12,769,800 | | $13,157,528 | $15,908,565 | | $16,576,494 |
| 4/23/2014 | $34,535,520 | | $35,722,231 | $12,769,800 | | $13,157,528 | $16,244,825 | | $16,579,474 |
| 4/24/2014 | $34,982,263 | | $35,724,719 | $13,165,827 | | $13,197,239 | $16,244,825 | | $16,676,434 |
| 4/25/2014 | $35,885,652 | | $36,519,853 | $13,165,827 | | $13,197,239 | $16,244,825 | | $16,672,662 |
| 4/26/2014 | $35,885,652 | | $36,519,853 | $13,165,827 | | $13,197,239 | $16,244,825 | | $16,672,662 |
| 4/27/2014 | $35,885,652 | | $36,519,853 | $13,165,827 | | $13,299,573 | $17,032,214 | | $16,839,449 |
| 4/28/2014 | $36,429,790 | | $36,754,548 | $13,241,629 | | $13,299,655 | $17,032,214 | | $16,833,387 |
| 4/29/2014 | $36,429,790 | | $36,731,686 | $13,308,387 | | $13,510,945 | $17,032,214 | | $17,102,728 |
| 4/30/2014 | $36,429,790 | | $37,102,273 | $13,427,785 | | $13,432,348 | $17,032,214 | | $17,055,291 |
| 5/1/2014 | $36,866,771 | | $37,005,470 | $13,569,471 | | $13,607,024 | $17,032,214 | | $17,191,472 |
| 5/2/2014 | $37,087,955 | | $37,093,490 | | | | $17,077,901 | | |

<u>Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al</u>

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 5/3/2014 | $37,087,955 | | $37,090,769 | $13,569,471 | | $13,607,024 | $17,077,901 | | $17,191,472 |
| 5/4/2014 | $37,087,955 | | $37,090,769 | $13,569,471 | | $13,607,024 | $17,077,901 | | $17,191,472 |
| 5/5/2014 | $37,087,955 | | $37,177,580 | $13,569,471 | | $13,635,075 | $17,077,901 | | $17,237,367 |
| 5/6/2014 | $37,221,968 | | $37,434,752 | $13,757,537 | | $14,039,650 | $17,189,150 | | $17,380,504 |
| 5/7/2014 | $37,334,325 | | $37,434,752 | $13,936,770 | | $14,039,652 | $17,289,514 | | $17,376,906 |
| 5/8/2014 | $37,388,738 | | $37,394,889 | $14,094,110 | | $14,031,931 | $17,289,514 | | $17,367,507 |
| 5/9/2014 | $37,388,738 | | $37,417,834 | $14,094,110 | | $14,041,364 | $17,289,514 | | $17,391,513 |
| 5/10/2014 | $37,388,738 | | $37,417,834 | $14,094,110 | | $14,041,364 | $17,289,514 | | $17,390,358 |
| 5/11/2014 | $37,388,738 | | $37,468,257 | $14,094,110 | | $14,077,253 | $17,289,514 | | $17,410,915 |
| 5/12/2014 | $37,456,752 | | $37,680,387 | $14,135,553 | | $14,106,078 | $17,331,832 | | $17,407,487 |
| 5/13/2014 | $37,518,457 | | $37,765,161 | $14,157,573 | | $14,131,702 | $17,344,357 | | $17,415,304 |
| 5/14/2014 | $37,694,468 | | $37,684,942 | $14,157,573 | | $14,100,148 | $17,344,357 | | $17,362,329 |
| 5/15/2014 | $37,754,602 | | $37,737,553 | $14,196,845 | | $14,120,524 | $17,344,357 | | $17,402,807 |
| 5/16/2014 | $37,754,602 | | $37,733,859 | $14,196,845 | | $14,119,157 | $17,344,357 | | $17,402,913 |
| 5/17/2014 | $37,754,602 | | $37,733,859 | $14,196,845 | | $14,119,157 | $17,344,357 | | $17,402,913 |
| 5/18/2014 | $37,754,602 | | $37,733,859 | $14,196,845 | | $14,119,157 | $17,344,357 | | $17,402,913 |
| 5/19/2014 | $37,821,710 | | $37,839,148 | $14,213,272 | | $14,147,196 | $17,401,163 | | $17,648,279 |
| 5/20/2014 | $37,821,710 | | $37,877,255 | $14,246,450 | | $14,386,045 | $17,652,694 | | $17,875,419 |
| 5/21/2014 | $37,821,710 | | $37,868,756 | $14,246,450 | | $14,845,252 | $17,652,694 | | $18,482,755 |
| 5/22/2014 | $37,914,844 | | $40,429,089 | $14,576,111 | | $14,845,865 | $17,959,589 | | $18,534,679 |
| 5/23/2014 | $38,191,977 | | $40,225,087 | $14,845,790 | | $14,785,306 | $18,372,720 | | $18,404,914 |
| 5/24/2014 | $38,191,977 | | $40,223,108 | $14,845,790 | | $14,927,400 | $18,372,720 | | $18,482,943 |
| 5/25/2014 | $38,191,977 | | $40,223,108 | $14,845,790 | | $14,927,400 | $18,372,720 | | $18,482,943 |
| 5/26/2014 | $38,191,977 | | $40,223,108 | $14,845,790 | | $14,927,400 | $18,372,720 | | $18,482,943 |
| 5/27/2014 | $39,697,761 | | $40,277,058 | $14,845,790 | | $14,930,284 | $18,372,720 | | $18,497,322 |
| 5/28/2014 | $40,217,414 | | $41,312,435 | $14,990,522 | | $15,216,054 | $18,491,552 | | $18,832,232 |
| 5/29/2014 | $40,893,320 | | $41,281,261 | $15,096,827 | | $15,199,594 | $18,523,183 | | $18,792,584 |
| 5/30/2014 | $41,309,636 | | $41,389,377 | $15,256,453 | | $15,334,299 | $18,704,632 | | $19,070,615 |
| 5/31/2014 | $41,309,636 | | $41,389,377 | $15,256,453 | | $15,329,599 | $18,704,632 | | $19,069,626 |
| 6/1/2014 | $41,309,636 | | $41,389,377 | $15,256,453 | | $15,329,599 | $18,704,632 | | $19,069,626 |
| 6/2/2014 | $41,309,636 | | $41,354,518 | $15,256,453 | | $15,324,664 | $18,704,632 | | $19,067,659 |
| 6/3/2014 | $41,326,477 | | $41,421,246 | $15,335,899 | | $15,453,073 | $18,889,290 | | $19,158,182 |
| 6/4/2014 | $41,326,477 | | $41,408,731 | $15,429,317 | | $15,466,584 | $18,902,232 | | $19,192,697 |
| 6/5/2014 | $41,326,477 | | $41,258,123 | $15,429,317 | | $15,453,307 | $18,902,232 | | $19,185,022 |

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

**Exhibit 12**
G5 Compared to COD compared to Title IV STARS for Miami, Bryman and Phoenix Direct Loan 13/14

| | Miami Direct Loan 13/14 | | | Bryman Direct Loan 13/14 | | | Phoenix Direct Loan 13/14 | | |
|---|---|---|---|---|---|---|---|---|---|
| | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs | G5 | COD | Title IV STARs |
| | [1] | [2] | [3] | [1] | [2] | [3] | [1] | [2] | [3] |
| 6/6/2014 | $41,326,477 | | $41,189,216 | $15,429,317 | | $15,425,396 | $18,902,232 | | $19,039,935 |
| 6/7/2014 | $41,326,477 | | $41,173,066 | $15,429,317 | | $15,425,396 | $18,902,232 | | $19,039,935 |
| 6/8/2014 | $41,326,477 | | $41,173,066 | $15,429,317 | | $15,425,396 | $18,902,232 | | $19,039,935 |
| 6/9/2014 | $41,326,477 | | $41,209,676 | $15,429,317 | | $15,455,886 | $18,902,232 | | $19,043,172 |
| 6/10/2014 | $41,326,477 | | $41,192,801 | $15,429,317 | | $15,457,702 | $18,902,232 | | $19,042,049 |
| 6/11/2014 | $41,326,477 | | $41,167,754 | $15,478,999 | | $15,467,072 | $18,977,244 | | $18,972,400 |
| 6/12/2014 | $41,326,477 | | $41,067,880 | $15,478,999 | | $15,477,939 | $18,977,244 | | $19,001,993 |
| 6/13/2014 | $41,326,477 | | $41,063,878 | $15,478,999 | | $15,474,790 | $18,977,244 | | $18,986,930 |
| 6/14/2014 | $41,326,477 | | $41,035,750 | $15,478,999 | | $15,460,462 | $18,977,244 | | $18,946,835 |
| 6/15/2014 | $41,326,477 | | $41,035,750 | $15,478,999 | | $15,460,462 | $18,977,244 | | $18,946,835 |
| 6/16/2014 | $41,326,477 | | $43,767,230 | $15,478,999 | | $16,211,157 | $18,977,244 | | $20,062,934 |
| 6/17/2014 | $41,383,356 | | $43,764,699 | $15,508,080 | | $16,212,794 | $19,103,221 | | $20,031,336 |
| 6/18/2014 | $41,997,243 | | $43,747,174 | $15,928,765 | | $16,211,147 | $19,103,221 | | $19,992,703 |
| 6/19/2014 | $42,866,773 | | $43,716,610 | $16,110,523 | | $16,178,512 | $19,271,690 | | $19,925,121 |
| 6/20/2014 | $43,357,782 | | $44,504,300 | $16,179,831 | | $16,237,630 | $19,544,181 | | $20,006,283 |
| 6/21/2014 | $43,357,782 | | $44,504,300 | $16,179,831 | | $16,237,630 | $19,544,181 | | $20,006,283 |
| 6/22/2014 | $43,357,782 | | $44,504,300 | $16,179,831 | | $16,237,630 | $19,544,181 | | $20,006,283 |
| 6/23/2014 | $43,844,790 | | $44,678,980 | $16,179,831 | | $16,349,110 | $19,863,407 | | $20,155,128 |
| 6/24/2014 | $44,411,732 | | $44,683,571 | $16,288,262 | | $16,405,982 | $19,975,943 | | $20,154,059 |
| 6/25/2014 | $44,411,732 | | $45,495,580 | $16,288,262 | | $16,374,533 | $19,975,943 | | $20,085,111 |
| 6/26/2014 | $44,960,387 | | $45,663,030 | $16,339,685 | | $16,420,502 | $19,975,943 | | $20,248,655 |
| 6/27/2014 | $45,271,851 | | $45,628,496 | $16,367,126 | | $16,403,493 | $19,975,943 | | $20,214,559 |
| 6/28/2014 | $45,271,851 | | $45,628,496 | $16,367,126 | | $16,403,493 | $19,975,943 | | $20,214,559 |
| 6/29/2014 | $45,271,851 | | $45,628,496 | $16,367,126 | | $16,403,493 | $19,975,943 | | $20,214,559 |
| 6/30/2014 | $45,312,350 | | $45,668,995 | $16,367,126 | | $16,420,392 | $20,015,509 | | $20,263,304 |

Sources:
[1] P2222704-705.
[2] See Exhibit 8.
[3] P2222704-705.

Chapman & Hauser Management Associates, LLC, as Trustee v. David Knabel et al

Exhibit 13
DOE G5 Title IV Cash Comparison with FCC Title IV Cash Sources

| | DOE G5 Title IV Cash | | | | | | | FCC Title IV Cash Related Sources | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DOE Award History produced by DOE and TIS Drawze Draws (DL & P+E 11/12, 12/13 and 13/14) | | | DOE Award History provided to Spring Zones (DL & P+E 12/13 and 13/14) | | | | Monthly Cash Balance Report | | | | Bank Statement DOE Refunds | | Daily Cash Balance Report | | | | ACCT. INFO Report | | |
| | | | | | | | | | | Student Refund | | | | | Refunds/ Student Refund | | | | | | |
| | Draws | Refunds | Net | Draws | Refunds | Net | | FA Deposits | Checks Cleared | Net | | | | Draws | Checks | Net | | Draws | Refunds | Net |
| | [1] | [1] | [1] | [2] | [2] | [2] | | [3] | [3] | [3] | | [4] | | [3] | [3] | [3] | | [6] | [6] | [6] |
| **FY 11/12** | | | | | | | | | | | | | | | | | | | | |
| July 2012 | $21,963,194 | ($298,475) | $21,672,719 | ... | | | | $21,331,382 | ($1,189,243) | $20,162,019 | ... | | | ... | | | ... | | | |
| August 2012 | $21,799,342 | ($298,667) | $20,816,675 | ... | | | | $21,701,851 | ($961,286) | $20,740,466 | ... | | | ... | | | ... | | | |
| September 2012 | $15,434,781 | ($947,233) | $14,487,548 | ... | | | | $14,398,147 | ($911,284) | $13,486,861 | ... | | | ... | | | ... | | | |
| October 2012 | $19,085,002 | ($589,202) | $18,995,799 | ... | | | | $18,803,206 | ($1,356,647) | $17,446,339 | ... | | | ... | | | ... | | | |
| November 2012 | $15,420,853 | ($1,012,609) | $14,408,244 | ... | | | | $15,235,993 | ($3,006,458) | $14,249,535 | ... | | | ... | | | ... | | | |
| December 2012 | $14,636,634 | ($31,335,829) | $13,300,805 | ... | | | | $13,615,149 | ($16,036,923) | $12,578,225 | ... | | | ... | | | ... | | | |
| January 2013 | $16,208,770 | ($58,729) | $16,150,041 | ... | | | | $16,150,784 | ($552,435) | $15,637,349 | ... | | | $16,159,804 | ($519,075) | $15,641,729 | ... | | | |
| February 2013 | $17,776,593 | ($79,168) | $17,697,374 | ... | | | | $17,811,158 | ($303,002) | $17,306,135 | ... | | | $17,817,214 | ($452,896) | $17,384,318 | ... | | | |
| March 2013 | $20,341,343 | ($2,539,195) | $17,804,368 | ... | | | | $19,047,675 | ($586,458) | $18,463,217 | ... | | | $18,682,137 | ($667,221) | $18,074,916 | ... | | | |
| April 2013 | $12,839,979 | ($55,194) | $11,864,785 | ... | | | | $11,073,307 | ($709,497) | $10,313,730 | ... | | | ($1,238,017) | $11,073,207 | ($521,400) | $10,551,808 | ... | | | |
| May 2013 | $9,249,422 | ($129,324) | $9,120,098 | ... | | | | $9,629,890 | ($581,813) | $9,148,077 | ... | | | ($1,291,953) | $9,727,015 | ($334,925) | $9,372,090 | ... | | | |
| June 2013 | $16,170,354 | ($43,463,341) | $12,703,013 | ... | | | | $20,182,187 | ($3,282,669) | $16,900,518 | ... | | | ($3,453,341) | $13,171,951 | ($4,042,114) | $13,123,837 | ... | | | |
| **FY 13/14** | | | | | | | | | | | | | | | | | | | | |
| July 2013 | | | | $22,461,216 | ($116,065) | $22,345,152 | | $19,410,291 | | ($116,065) | | | ... | | | $19,410,290 | ... | | | |
| August 2013 | | | | $17,850,488 | ($361,901) | $17,582,026 | | $21,026,963 | | ($1,991,337) | | | ... | $12,562,278 | ($3166,343) | $21,026,964 | ... | | | |
| September 2013 | | | | $20,158,860 | ($22,505,013) | $17,649,265 | | $15,588,245 | | ($2,314,438) | | | ... | $23,662,025 | ($4,628,370) | $12,795,935 | ... | | | |
| October 2013 | | | | $23,785,965 | ($39,212,376) | $18,573,389 | | $20,028,250 | | ($33,212,376) | | | ... | $23,465,767 | ($53,378,192) | $20,033,249 | ... | | | |
| November 2013 | | | | $21,343,083 | ($5,407,761) | $15,935,923 | | $18,137,525 | | ($3,328,153) | | | ... | $23,465,767 | ($53,378,192) | $18,137,575 | ... | | | |
| December 2013 | | | | $17,565,107 | ($8,061,631) | $9,504,476 | | $9,483,151 | | ($3,400,200) | | | ... | $17,601,449 | ($8,158,298) | $9,463,151 | ... | | | |
| January 2014 | | | | $19,393,301 | ($2,366,224) | $16,627,077 | | $14,946,098 | | ($34,389,565) | | | ... | $19,333,662 | ($4,389,340) | $14,946,097 | ... | $19,535,662 | ($4,591,654) | $14,944,007 |
| February 2014 | | | | $20,861,413 | ($3,236,312) | $17,625,301 | | $18,473,432 | | ($32,406,147) | | | ... | $20,888,613 | ($2,406,147) | $18,398,466 | ... | $20,888,613 | ($12,490,207) | $18,398,406 |
| March 2014 | | | | $16,559,568 | ($5,738,309) | $7,821,439 | | $8,733,978 | | ($57,608,537) | | | ... | $16,270,881 | ($57,629,191) | $8,641,690 | ... | $16,340,210 | ($57,608,577) | $8,641,634 |
| April 2014 | | | | $12,539,274 | ($2,466,031) | $10,053,243 | | $9,840,521 | | ($52,467,885) | | | ... | $12,049,988 | ($32,109,187) | $9,840,801 | ... | $12,308,665 | ($2,467,885) | $9,840,800 |
| May 2014 | | | | $15,654,483 | ($32,142,543) | $13,511,940 | | $12,678,170 | | ($52,335,907) | | | ... | $15,215,156 | ($32,516,987) | $12,678,168 | ... | $15,215,156 | ($12,336,987) | $12,678,168 |
| June 2014 | | | | $10,428,428 | ($1,982,010) | $9,343,818 | | $9,627,103 | | ($1,669,333) | | | ... | $11,296,439 | ($1,669,333) | $9,627,104 | ... | $11,296,439 | ($1,669,335) | $9,627,104 |
| **FY 12/13** | $200,468,569 | ($11,463,178) | $189,223,071 | | | | | $199,732,509 | ($15,598,013) | $184,134,494 | | | | | | | | | | |
| **FY 13/14** | | | | $218,184,956 | ($43,706,933) | $176,677,860 | | | | $177,983,958 | | ($44,752,142) | | $214,387,812 | ($39,295,621) | $175,901,691 | | | | |

Sources:
[1] DOE000001-078, DOE0000079-561, P1840829, T2S010343, T2ST35012977, T2S010775.
[2] P22227704-7905.
[3] June 2013 includes tuition option deposit. P0350042, P0355510, P0363594, P0380957, P0382841, P0393074, P1140829, P1047382, P1140050, P1153289, P1138299, P1162713, P1168229, P1177001, P1689050, P1693181, P1700054, P1703916, P1707229, P1709893, P1715464, P1740736.
   BMO Student Refund March 2012.pdf, Student Refund April 2012.pdf, Student Refund May 2013.pdf, Student Refund June 2013.pdf, BMO Student Refund xxxx4270 July 2013.pdf, BMO Student Refund xxxx4270 August 2013.pdf, BMO Student Refund xxxx4270 September 2013.pdf, BMO Student Refund xxxx4270 October 2013.pdf,
   BMO Student Refund xxxx4270 November 2013.pdf, BMO Student Refund xxxx4270 December 2013.pdf, BMO Student Refund xxxx4270 January 2014.pdf, BMO Student Refund xxxx4270 February 2014.pdf, BMO Student Refund xxxx4270 March 2014.pdf, BMO Student Refunds xxxx4270 April 2014.pdf, BMO Student Refund xxxx4270 May 2014.pdf, BMO Student Refund xxxx4270 June 2014.pdf.
[5] P1163125 and P1744717.
[6] P1822721.

<u>Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al</u>

**Exhibit 13A**
G5 Title IV Cash for Miami, Phoenix and Bryman Direct Loan 13/14

| | | G5 Title IV Cash | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | DOE Award History produced by DOE (Miami, Phoenix and Bryman DL 13/14) | | | ... | DOE Award History provided to Spring Zutes (Miami, Phoenix and Bryman DL 13/14) | | |
| | | Draws [1] | Refunds [1] | Net | ... | Draws [2] | Refunds [2] | Net |
| FY 13/14 | July 2013 | $5,930,058 | $0 | $5,930,058 | ... | $5,930,058 | $0 | $5,930,058 |
| | August 2013 | $5,787,502 | $0 | $5,787,502 | ... | $5,787,502 | $0 | $5,787,502 |
| | September 2013 | $10,062,913 | ($2,220,503) | $7,842,410 | ... | $10,062,913 | ($2,220,503) | $7,842,410 |
| | October 2013 | $11,154,983 | ($2,091,704) | $9,063,279 | ... | $11,154,983 | ($2,091,704) | $9,063,279 |
| | November 2013 | $10,957,368 | ($2,829,179) | $8,128,189 | ... | $10,957,368 | ($2,829,179) | $8,128,189 |
| | December 2013 | $13,600,000 | ($5,165,095) | $8,434,905 | ... | $13,600,000 | ($5,165,095) | $8,434,905 |
| | January 2014 | $9,620,000 | ($3,724,771) | $5,895,229 | ... | $9,620,000 | ($2,133,808) | $7,486,192 |
| | February 2014 | $14,634,000 | ($1,761,201) | $12,872,799 | ... | $14,634,000 | ($2,542,346) | $12,091,654 |
| | March 2014 | $5,354,405 | ($5,601,566) | ($247,161) | ... | $5,354,405 | ($6,411,384) | ($1,056,979) |
| | July 2013 to March 2014 | $87,101,229 | ($23,394,019) | $63,707,210 | ... | $87,101,229 | ($23,394,019) | $63,707,210 |

Sources:
[1] DOE000001-078.
[2] P2222704-705.

Clingman & Hanger Management Associates, LLC, as Trustee v. David Knobel et al

Exhibit 13B
STARS Title IV Reconciliation

| | STARS 90/10 Reports | | | | STARS AR History Report produced by IEC | | | | STARS provided to Spring Zutes (excludes SR) | | | | Audited Financials |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Draws [1] | Refunds [1] | Net | ... | Draws [2] | Refunds [2] | Net | ... | Draws [3] | Refunds [3] | Net | ... | Net [4] |
| **FY 12/13** | | | | | | | | | | | | | |
| July 2012 | | | | ... | | | | ... | | | | ... | |
| August 2012 | | | | ... | | | | ... | | | | ... | |
| September 2012 | | | | ... | | | | ... | | | | ... | |
| October 2012 | | | | ... | | | | ... | | | | ... | |
| November 2012 | | | | ... | | | | ... | | | | ... | |
| December 2012 | | | | ... | | | | ... | | | | ... | |
| January 2013 | | | | ... | | | | ... | | | | ... | |
| February 2013 | | | | ... | | | | ... | | | | ... | |
| March 2013 | | | | ... | | | | ... | | | | ... | |
| April 2013 | | | | ... | | | | ... | | | | ... | |
| May 2013 | | | | ... | | | | ... | | | | ... | |
| June 2013 | $208,694,203 | ($31,927,320) | $176,766,883 | ... | $210,076,693 | ($30,177,556) | $179,899,137 | ... | | | | ... | $176,766,883 |
| **FY 13/14** | | | | | | | | | | | | | |
| July 2013 | $21,177,296 | ($3,746,098) | $17,431,198 | ... | | | | ... | $21,173,307 | ($3,526,415) | $17,646,891 | | |
| August 2013 | $37,028,116 | ($8,114,785) | $28,913,332 | ... | | | | ... | $37,013,055 | ($7,179,098) | $29,833,957 | | |
| September 2013 | $52,020,405 | ($11,993,484) | $40,026,921 | ... | | | | ... | $52,003,665 | ($10,643,234) | $41,360,432 | | |
| October 2013 | $74,868,064 | ($16,067,623) | $58,800,441 | ... | | | | ... | $74,839,499 | ($14,325,255) | $60,514,244 | | |
| November 2013 | $94,954,118 | ($19,187,719) | $75,766,400 | ... | | | | ... | $94,917,127 | ($16,845,863) | $78,071,264 | | |
| December 2013 | $104,263,455 | ($22,436,762) | $81,826,693 | ... | | | | ... | $104,223,931 | ($19,617,834) | $84,606,097 | | |
| January 2014 | $127,393,862 | ($26,502,130) | $100,891,732 | ... | | | | ... | $127,345,647 | ($23,373,626) | $103,972,021 | | |
| February 2014 | $150,570,907 | ($30,795,205) | $119,775,702 | ... | | | | ... | $150,521,599 | ($27,031,220) | $123,490,379 | | |
| March 2014 | $169,293,268 | ($33,746,118) | $135,547,150 | ... | | | | ... | $169,243,915 | ($29,609,826) | $139,634,090 | | |
| April 2014 | $188,161,143 | ($37,222,972) | $150,938,172 | ... | | | | ... | $188,116,198 | ($32,725,311) | $155,390,887 | | |
| May 2014 | $204,499,213 | ($40,175,790) | $164,323,424 | ... | | | | ... | $204,459,684 | ($35,262,502) | $169,197,182 | | |
| June 2014 | $218,706,871 | ($43,883,867) | $174,823,003 | ... | $221,652,767 | ($43,918,670) | $177,734,096 | ... | $217,639,683 | ($38,805,020) | $178,834,663 | | |
| FY 12/13 | $208,694,203 | ($31,927,320) | $176,766,883 | ... | $210,076,693 | ($30,177,556) | $179,899,137 | ... | | | | ... | $176,766,883 |
| FY 13/14 | $218,706,871 | ($43,883,867) | $174,823,003 | ... | $221,652,767 | ($43,918,670) | $177,734,096 | ... | $217,639,683 | ($38,805,020) | $178,834,663 | ... | $176,766,883 |

Sources:
[1] See Exhibit 9 and Exhibit 9A. June 2013 refunds include an adjustment of $1.7 million
[2] See Exhibit 9
[3] P2222704-705
[4] P1715788 at 826-832

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 14**
FCC Revenues and EBITDA Estimates through June 30, 2014

| | Document Type | As of Date | Actual FY 12/13 | Actual / Budget FY 13/14 | Budget FY 14/15 |
|---|---|---|---|---|---|
| *Revenues* | | | | | |
| Deloitte 2013 Valuation | Impairment Valuation | 06/30/13 | $231,208,000 | $239,458,000 | $298,899,000 |
| Deposition Exhibit 133 | Impairment Valuation | 03/31/14 | $231,247,000 | $239,413,000 | $266,324,000 |
| Deposition Exhibit 131 (P1740716-718) | Investor Presentation | 06/24/14 | $231,246,920 | $233,936,768 | $234,005,201 |
| Exhibit 3 | | 06/30/14 | $231,285,585 | $232,214,349 | n/a |
| *EBITDA Before Special Items* | | | | | |
| Deloitte 2013 Valuation | Impairment Valuation | 06/30/13 | $27,082,000 | $30,337,000 | $42,259,000 |
| Deposition Exhibit 133 | Impairment Valuation | 03/31/14 | $28,617,000 | $32,989,000 | $48,780,000 |
| Deposition Exhibit 131 (P1740716-718) | Investor Presentation | 06/24/14 | $28,616,606 | $20,036,925 | $10,770,018 |
| Exhibit 3 | | 06/30/14 | $28,669,898 | $9,315,890 | n/a |
| *EBITDA* | | | | | |
| Deloitte 2013 Valuation | Impairment Valuation | 06/30/13 | n/a | n/a | n/a |
| Deposition Exhibit 133 | Impairment Valuation | 03/31/14 | n/a | n/a | n/a |
| Deposition Exhibit 131 (P1740716-718) | Investor Presentation | 06/24/14 | $22,479,450 | $26,322,353 | $3,895,789 |
| Exhibit 3 | | 06/30/14 | $25,373,249 | $5,195,277 | n/a |

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 14A**
Run-rate LTM EBITDA

| | [1] LTM FY 13/14 | [2] Adjustments | [3] LTM Adj. FY 13/14 |
|---|---|---|---|
| EBITDA Before Special Items | **$9,315,891** | | **$9,315,891** |
| | | | |
| Bonus Stock Option | $1,221,363 | | $1,221,363 |
| Deal Costs | $453,930 | ($453,930) | $0 |
| Restructuring | $1,114,029 | ($1,114,029) | $0 |
| SFAS 13 | $1,103,800 | | $1,103,800 |
| Landlord Lease Incentive | ($603,509) | | ($603,509) |
| Deferred Rent, net | $172,000 | | $172,000 |
| Other Income and Loss | $659,000 | ($659,000) | $0 |
| | | | |
| EBITDA before Bad Debt Adjustments | **$5,195,278** | | **$7,422,237** |
| [4]  Add: Bad Debt Adjustment for prior period | | $4,000,000 | $4,000,000 |
| | | | |
| EBITDA after Bad Debt Adjustments | | | **$11,422,237** |

<u>Sources:</u>
[1]  P1742548.  Acquisition cost allocated to Deal Costs and Restructuring per the monthly BOD reports.
[2]  Adjustments identified as non-recurring.
[3]  = [1] + [2]
[4]  See Expert Report of James J. Donohue.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 14B**
Run-rate Forward Year EBITDA

|  | [1]<br>Forward Year<br>FY 14/15 | [2]<br>Adjustments | [3]<br>Forward Year Adj.<br>FY 14/15 |
|---|---|---|---|
| EBITDA Before Special Items | $10,770,018 |  | $10,770,018 |
| Bonus Stock Option | $1,208,765 |  | $1,208,765 |
| Restructuring | $1,750,000 | ($1,750,000) | $0 |
| Discontinued Operations | $1,215,465 | ($1,215,465) | $0 |
| Deferred Rent, net | $2,700,000 |  | $2,700,000 |
| EBITDA before Bad Debt Adjustments | $3,895,788 |  | $6,861,253 |
| [4]  Add: Bad Debt Adjustment for prior period |  | $4,000,000 | $4,000,000 |
| EBITDA after Bad Debt Adjustments |  |  | $10,861,253 |

Sources:
[1] P1740716-718.
[2] Adjustments identified as non-recurring.
[3] = [1] + [2]
[4] See Exhibit 14A.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 15
Potentially Comparable Companies

|  | Company | LTM Revenue (mm) [1] | Enrollment (Est. 2014) | Post-secondary Campus | Post-secondary Online | Operates U.S. Campuses | Draws Title IV Funds | Title IV Issues | FCC 2014 Valuation | Deloitte 2013 Valuation | Selected |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [2] | FCC Holdings, Inc. | $232.2 | 10,919 | ✔ | ✔ | ✔ | ✔ | ✔ |  |  |  |
|  |  | ... |  | ... | ... | ... | ... |  |  | ... | ... |
| [3] | National American University Holdings, Inc. | $128.9 | 10,857 | ✔ | ✔ | ✔ | ✔ |  |  |  | ✔ |
| [4] | American Public Education, Inc. | $334.2 | 112,000 |  | ✔ | ✔ | ✔ |  | ✔ |  |  |
| [5] | Lincoln Educational Services Corporation | $338.7 | 13,648 | ✔ |  | ✔ | ✔ |  | ✔ | ✔ | ✔ |
| [6] | Universal Technical Institute, Inc. | $378.5 | 12,600 | ✔ |  | ✔ | ✔ |  | ✔ | ✔ |  |
| [7] | Capella Education Company | $416.0 |  |  | ✔ |  | ✔ |  | ✔ |  |  |
| [8] | Strayer Education, Inc. | $482.6 | 41,213 | ✔ | ✔ | ✔ | ✔ |  | ✔ | ✔ | ✔ |
| [9] | Grand Canyon Education, Inc. | $623.7 | 57,707 | ✔ | ✔ | ✔ | ✔ |  | ✔ |  |  |
| [10] | Bridgepoint Education, Inc. | $695.7 | 61,117 | ✔ | ✔ | ✔ | ✔ |  | ✔ |  |  |
| [11] | Career Education Corporation | $1,016.0 | 49,000 | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |  |  |
| [12] | ITT Educational Services Inc. | $1,072.3 | 55,485 | ✔ | ✔ | ✔ | ✔ |  | ✔ |  |  |
| [13] | Corinthian Colleges Inc. | $1,480.8 |  | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |  |  |
| [14] | DeVry Education Group Inc. | $1,918.3 | 41,977 | ✔ | ✔ | ✔ | ✔ |  | ✔ |  |  |
| [15] | Education Management Corporation | $2,364.5 | 118,090 | ✔ | ✔ | ✔ | ✔ |  | ✔ |  |  |
| [16] | Graham Holdings Company | $3,507.8 | 61,023 | ✔ | ✔ | ✔ | ✔ |  |  |  |  |
| [17] | Apollo Education Group, Inc. | $3,180.3 |  | ✔ | ✔ | ✔ | ✔ |  | ✔ |  |  |

Sources:
[1] Capital IQ; reflects Latest Filing Date prior to June 30, 2014.
[2] See Exhibit 3 and P1757368-420 at 374.
[3] National American University Holdings, Inc., 2014 10-K.
[4] American Public Education, Inc., 2014 10-K.
[5] Lincoln Educational Services Corporation, 2014 10-K.
[6] Universal Technical Institute, Inc., 2014 10-K.
[7] Capella Education Company, 2014 10-K.
[8] Strayer Education, Inc., 2014 10-K.
[9] Grand Canyon Education, Inc., 2014 10-K.
[10] Bridgepoint Education, Inc., 2014 10-K.
[11] Career Education Corporation, 2014 10-K.
[12] ITT Educational Services Inc., 2014 10-K.
[13] Corinthian Colleges Inc., 2013 10-K.
[14] DeVry Education Group Inc., 2014 10-K.
[15] Education Management Corporation, 2014 10-K.
[16] Graham Holdings Company, 2014 10-K.
[17] Apollo Group, Inc., 2013 10-K.

Clingman & Hauger Management Associates, LLC, as Trustee, v. David Knobel et al.

Exhibit 15A
Comparative Companies' Financials and Multiples as of LTM June 30, 2013

| | | [1] | [2] | [2] | [2] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Company | As-of Date | Market Capitalization | Total Debt | Minority Interest | Preferred Shares | Cash and Cash Equivalents | Enterprise Value (mm) | LTM Revenue (mm) | EV / LTM Revenue Multiple | LTM Adjusted EBITDA (mm) | EV / Adjusted EBITDA Multiple |
| National American University Holdings, Inc. | 6/30/2013 | $93.7 | $10.5 | ($0.1) | $0.0 | $33.1 | $70.9 | $129.1 | 1.82x | $15.7 | 4.50x |
| Lincoln Educational Services Corporation | 6/30/2013 | $126.5 | $35.9 | $0.0 | $0.0 | $17.3 | $145.1 | $391.6 | 2.70x | $25.3 | 5.75x |
| Universal Technical Institute, Inc. | 6/30/2013 | $252.2 | $0.0 | $0.0 | $0.0 | $79.3 | $172.9 | $394.4 | 2.28x | $30.7 | 5.62x |
| Strayer Education, Inc. | 6/30/2013 | $502.5 | $125.2 | $0.0 | $0.0 | $50.8 | $576.9 | $550.0 | 0.95x | $127.0 | 4.54x |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| High | | | | | | | | | 2.70x | | 5.75x |
| Median | | | | | | | | | 2.05x | | 5.08x |
| Average | | | | | | | | | 1.94x | | 5.10x |
| Low | | | | | | | | | 0.95x | | 4.50x |

Sources:
[1] Capital IQ; reflects June 30, 2013.
[2] Capital IQ; company filings as of April 2013 or May 2013.
[3] Enterprise Value equals Market Capitalization plus Total Debt plus Minority Interest plus Preferred Shares less Cash and Cash Equivalents.
[4] See Exhibit 15B.
[5] [3] / [4]
[6] See Exhibit 15B.
[7] [3] / [6]

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 15B**
Comparative Companies' EBITDA Calculation as of June 30, 2013
*Figures in millions*

| | LTM | | | |
|---|---|---|---|---|
| | [1]<br>National<br>American<br>University<br>Holdings, Inc. | [2]<br>Lincoln<br>Educational<br>Services<br>Corporation | [3]<br>Universal<br>Technical<br>Institute, Inc. | [4]<br>Strayer<br>Education, Inc. |
| Latest Filing Date | 4/5/13 | 5/7/13 | 5/1/13 | 5/3/13 |
| LTM As of Date | 2/28/13 | 3/31/13 | 3/31/13 | 3/31/13 |
| | | | | |
| Total Revenues | $129.1 | $391.6 | $394.4 | $550.0 |
| Less: Cost of Revenues | $37.4 | $225.0 | $207.0 | $324.7 |
| Less: SG&A | $81.7 | $202.7 | $179.6 | $122.6 |
| Operating Income | $10.0 | ($36.1) | $7.8 | $102.6 |
| | | | | |
| Plus: D&A | $5.3 | $25.8 | $22.9 | $24.3 |
| | | | | |
| EBITDA | $15.3 | ($10.3) | $30.7 | $127.0 |
| | | | | |
| Plus: Non-Recurring Items | $0.4 | $35.6 | | |
| | | | | |
| Adjusted EBITDA | $15.7 | $25.3 | $30.7 | $127.0 |

Sources:
[1] National American University Holdings, Inc. public filings (as originally stated) for 2012 and 2013.
[2] Lincoln Educational Services Corporation public filings (as originally stated) for 2012 and 2013.
[3] Universal Technical Institute, Inc. public filings (as originally stated) for 2012 and 2013.
[4] Strayer Education, Inc. public filings (as originally stated) for 2012 and 2013.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

Exhibit 15C
Comparative Companies' Financials and Multiples as of LTM June 30, 2014

| | | [1] | [2] | [2] | [2] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company | As-of Date | Market Capitalization | Total Debt | Minority Interest | Preferred Shares | Cash and Cash Equivalents | Enterprise Value (mm) | LTM Revenue (mm) | LTM Revenue Multiple | Forward Year Revenue (mm) | Forward Year Revenue Multiple | LTM Adjusted EBITDA (mm) | LTM Adjusted EBITDA Multiple | Forward Year Adjusted EBITDA (mm) | Forward Year Adjusted EBITDA Multiple |
| National American University Holdings, Inc. | 6/30/2014 | $77.3 | $12.3 | ($0.2) | $0.0 | $31.9 | $57.7 | $128.9 | 0.45x | $129.2 | 0.45x | $12.3 | 4.69x | $16.4 | 3.51x |
| Lincoln Educational Services Corporation | 6/30/2014 | $107.8 | $40.5 | $0.0 | $0.0 | $7.1 | $141.2 | $338.7 | 0.42x | $354.4 | 0.40x | $14.5 | 9.74x | $15.7 | 8.99x |
| Universal Technical Institute, Inc. | 6/30/2014 | $299.3 | $33.3 | $0.0 | $0.0 | $89.9 | $242.8 | $378.5 | 0.64x | $386.2 | 0.63x | $24.0 | 10.10x | $30.7 | 7.92x |
| Strayer Education, Inc. | 6/30/2014 | $554.3 | $121.1 | $0.0 | $0.0 | $126.2 | $549.2 | $482.6 | 1.14x | $422.4 | 1.30x | $118.6 | 4.63x | $87.8 | 6.26x |
| High | | | | | | | | | 1.14x | | 1.30x | | 10.10x | | 8.99x |
| Median | | | | | | | | | 0.54x | | 0.54x | | 7.21x | | 7.09x |
| Average | | | | | | | | | 0.66x | | 0.69x | | 7.29x | | 6.67x |
| Low | | | | | | | | | 0.42x | | 0.40x | | 4.63x | | 3.51x |

Sources:
[1] Capital IQ; reflects June 30, 2014.
[2] Capital IQ; companies' filings as of April or May 2014.
[3] Enterprise Value equals Market Capitalization plus Total Debt plus Minority Interest plus Preferred Shares less Cash and Cash Equivalents.
[4] See Exhibit 15D.
[5] [3] / [4]
[6] See Exhibit 15D.
[7] [3] / [6]
[8] See Exhibit 15D.
[9] [3] / [8]
[10] See Exhibit 15D.
[11] [3] / [10]

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 15D**
Comparative Companies' EBITDA Calculation as of June 30, 2014
*Figures in millions*

| | LTM | | | | | Forward Year | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | [1] National American University Holdings, Inc. | [2] Lincoln Educational Services Corporation | [3] Universal Technical Institute, Inc. | [4] Strayer Education, Inc. | | [5] National American University Holdings, Inc. | [6] Lincoln Educational Services Corporation | [6] Universal Technical Institute, Inc. | [6] Strayer Education, Inc. |
| Latest Filing Date | 4/4/14 | 5/9/14 | 4/30/14 | 5/9/14 | | | | | |
| LTM As of Date | 2/28/14 | 3/31/14 | 3/31/14 | 3/31/14 | | 5/31/15 | 6/30/15 | 6/30/15 | 6/30/15 |
| | | | | | | | | | |
| Total Revenues | $128.9 | $338.7 | $378.5 | $482.6 | | $129.2 | $354.4 | $386.2 | $422.4 |
| Less: Cost of Revenues | $36.3 | $175.1 | $201.2 | $315.3 | | | | | |
| Less: SG&A | $86.5 | $175.2 | $174.0 | $138.6 | | | | | |
| Operating Income | $6.1 | ($11.6) | $3.4 | $28.7 | | | | | |
| | | | | | | | | | |
| Plus: D&A | $6.2 | $22.8 | $20.7 | $35.2 | | | | | |
| | | | | | | | | | |
| EBITDA | $12.3 | $11.2 | $24.0 | $63.9 | | | | | |
| | | | | | | | | | |
| Plus: Non-Recurring Items | ($0.0) | $3.3 | | | | | | | |
| Plus: Restructuring Charges | | | | $54.7 | | | | | |
| | | | | | | | | | |
| Adjusted EBITDA | $12.3 | $14.5 | $24.0 | $118.6 | | $16.4 | $15.7 | $30.7 | $87.8 |

Sources:
[1] National American University Holdings, Inc. public filings (as originally stated) for 2013 and 2014.
[2] Lincoln Educational Services Corporation public filings (as originally stated) for 2013 and 2014.
[3] Universal Technical Institute, Inc. public filings (as originally stated) for 2013 and 2014.
[4] Strayer Education, Inc. public filings (as originally stated) for 2013 and 2014.
[5] See Exhibit 6A; National American University Holdings, Inc, Wells Fargo, dated April 4, 2014.
[6] See Exhibit 6A.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 16**
FCC Enterprise Value Calculations using <u>Market Approach (EBITDA)</u>

|  |  | **LTM** | **Forward Year** |
|---|---|---|---|
| [1] | EBITDA after Bad Debt Adjustments | $11,422,237 | $10,861,253 |
| [2] | Selected Multiple | 4.63x | 3.51x |
| [3] | FCC Enterprise Value | $52,913,582 | $38,126,403 |
| [4] | Lack of Marketability Discount | -20% | -20% |
| [5] | Control Premium | 20% | 20% |
| [6] | FCC Enterprise Value Adj. | $50,797,039 | $36,601,347 |

<u>Sources:</u>
[1]  See Exhibit 14A and Exhibit 14B.
[2]  See Exhibit 15C.
[3]  = [1] * [2]
[4]  See Exhibit 20.
[5]  See Exhibit 19.
[6]  = [3] * ( 1 + ( [4] ) * ( 1 + [5] )

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 16A**
FCC Enterprise Value Calculations using <u>Market Approach (Revenue)</u>

|  |  | LTM | Forward Year |
|---|---|---|---|
| [1] | Estimated Revenues | $200,000,000 | $200,000,000 |
| [2] | Selected Multiple | 0.42x | 0.40x |
| [3] | FCC Enterprise Value | $83,367,716 | $79,687,683 |
| [4] | Lack of Marketability Discount | -20% | -20% |
| [5] | Control Premium | 20% | 20% |
| [6] | FCC Enterprise Value Adj. | $80,033,007 | $76,500,176 |

<u>Sources:</u>
[1]  See Exhibit 14.
[2]  See Exhibit 15C.
[3]  = [1] * [2]
[4]  See Exhibit 20.
[5]  See Exhibit 19.
[6]  = [3] * ( 1 + ( [4] ) * ( 1 + [5] )

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 17**
FCC Enterprise Value Calculations using <u>Income Approach</u>

|     |                              | LTM          | Forward Year |
|-----|------------------------------|--------------|--------------|
| [1] | Cash Flow                    | $5,053,342   | $4,716,752   |
| [2] | Cash Flow Adjusted           | $5,154,409   | $4,716,752   |
| [3] | Capitalization rate          | *14%*        | *14%*        |
| [4] | FCC Enterprise Value         | $36,817,207  | $33,691,084  |
| [5] | Lack of Marketability Discount | *-20%*     | *-20%*       |
| [6] | FCC Enterprise Value Adj.    | $29,453,766  | $26,952,867  |

|     | **Inputs**    |     |
|-----|---------------|-----|
| [7] | Discount Rate | 16% |
| [8] | Growth Rate   | 2%  |

<u>Sources:</u>
[1]  See Exhibit 17A.
[2]  LTM = [1] * (1 + Growth Rate) and Forward Year, see [1]
[3]  = [7] - [8]
[4]  = [2] / [3]
[5]  See Exhibit 20.
[6]  = [4] * ( 1+ [5] )
[7]  See Exhibit 21B.
[8]  See Exhibit 21C.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 17A**
Cash Flow Calculation for Income Approach

|  |  | LTM | Forward Year |
|---|---|---|---|
| [1] | EBITDA after Bad Debt Adjustments | $11,422,237 | $10,861,253 |
| [2] | Less: Depreciation | $3,000,000 | $3,000,000 |
| [3] | EBIT | $8,422,237 | $7,861,253 |
| [4] | EBIT after Taxes | $5,053,342 | $4,716,752 |
| [5] | Add: Depreciation | $3,000,000 | $3,000,000 |
| [6] | Less: Capital Expenditures | $3,000,000 | $3,000,000 |
| [7] | Cash Flow | $5,053,342 | $4,716,752 |

<u>Sources:</u>
[1] See Exhibit 14A and Exhibit 14B.
[2] Assumed depreciation and capital expenditures are equivalent.
[3] = [1] * [2]
[4] Assumed 40% tax rate.
[5] = [2]
[6] = $75,000 per campus times 40 campuses.
[7] = [4] + [5] - [6]

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al.

**Exhibit 18**
Enterprise Value Calculations by Deloitte and FCC

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
|---|---|---|---|---|---|---|---|---|---|
| Prepared By:<br>As of Date: | Deloitte<br>06/30/09 | Deloitte<br>06/30/10 | Deloitte<br>06/30/11 | FCC Equity Transaction<br>04/30/12 | Deloitte<br>06/30/12 | FCC<br>02/25/13 | Deloitte<br>06/30/13 | FCC Equity Transaction<br>08/30/13 | FCC<br>3/31/14 |
| *Methodologies* | | | | | | | | | |
| Discounted Cash Flow | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | | ✓ |
| Guideline Company LTM | ✓ | ✓ | ✓ | | | ✓ | ✓ | | ✓ |
| Guideline Company Forward Year | | | | | ✓ | | ✓ | | |
| Private Transaction | | ✓ | | | | | | | |
| FCC Enterprise Value | $171,600,000 | $191,749,000 | $159,925,000 | $146,052,000 | $203,750,000 | $192,844,000 | $219,000,000 | $158,194,000 | $270,319,000 |
| LTM Revenue | $69,894,000 | $90,603,000 | $89,368,000 | | $230,149,000 | $236,725,000 | $231,208,000 | $230,477,698 | $239,413,000 |
| Implied Revenue Multiple | 2.5x | 2.1x | 1.8x | | .9x | .8x | .9x | .7x | 1.1x |
| LTM EBITDA | $12,861,000 | $24,510,000 | $18,254,000 | | | $30,836,500 | $27,082,000 | $28,686,836 | $32,989,000 |
| Implied EBITDA Multiple | 13.3x | 7.8x | 8.8x | | | 6.3x | 8.1x | 5.5x | 8.2x |
| Forward Year EBITDA | $18,256,000 | $26,291,000 | $18,195,000 | | $35,177,000 | $42,575,323 | $30,337,000 | | $48,780,000 |
| Implied EBITDA Multiple | 9.4x | 7.3x | 8.8x | | 5.8x | 4.5x | 7.2x | | 5.5x |

Sources:
[1] P1167781.
[2] P1167722.
[3] P1167878.
[4] See Exhibit 18A and P1167490 at 499.
[5] P0369087.
[6] P1143526.
[7] Deposition Exhibit 46.
[8] See Exhibit 18A and Exhibit 3A.
[9] Deposition Exhibit 133.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 18A**
Enterprise Value Calculation using Recent FCC Equity Transactions

|  |  | Apr 2012 |  | Aug 2013 |
|---|---|---|---|---|
| Acquired: |  | Anthem |  | US Colleges |
| Price per Share | [1] | $4.00 | [7] | $4.00 |
| Number of Shares | [2] | 33,900,000 | [8] | 34,500,000 |
| Equity Value after Adjustments | [3] | $135,600,000 | [9] | $138,000,000 |
| Plus: Debt | [4] | $34,437,000 | [10] | $30,313,000 |
| Less: Cash | [5] | $23,985,000 | [11] | $10,119,000 |
| Enterprise Value | [6] | $146,052,000 | [12] | $158,194,000 |

<u>Sources:</u>
[1]  P1715788.
[2]  P1157754 at 761 (Prior Year).
[3]  = [1] * [2]
[4]  P1157754 at 761 (Prior Year).
[5]  P1157754 at 761 (Prior Year).
[6]  = [3] + [4] - [5]
[7]  P1715788 at 823.
[8]  P1063376 at 383.
[9]  = [7] * [8]
[10]  P1063376 at 383.
[11]  P1063376 at 383.
[12]  = [9] + [10] - [11]

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 19**
Control Premium Estimate

| | | Domestic Only | All |
|---|---|---|---|
| | **All Industries (median)** | | |
| [1] | Q1 2013 | 35% | 35% |
| [1] | Q2 2013 | 33% | 30% |
| [1] | Q3 2013 | 33% | 33% |
| [1] | Q4 2013 | 31% | 32% |
| [2] | Q1 2014 | 27% | 26% |
| [2] | Q2 2014 | 29% | 26% |
| | | | |
| | **Education Services (median)** | | |
| [3] | 2006-2014 | 22% | |
| | | | |
| [4] | Deloitte 2013 Valuation | | 25% |
| | | | |
| | **Estimated Control Premium** | **20%** | |

Sources:
[1] Mergerstat Control Premium Study Control Premium Study, Q1 2013 through Q4 2013
[2] Mergerstat Control Premium Study Control Premium Study, Q1 2014 through Q2 2014
[3] See Exhibit 19A.
[4] Deposition Exhibit 46.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 19A**
Discount for Lack of Control Analysis

| [1] | Target Name | Closing Date | % Sought | Stock Premium | | |
|-----|-------------|--------------|----------|---------------|--------|--------|
| | | | | 1-Day | 1-Week | 30-Day |
| | Learning Care Group, Inc. | 1/11/2006 | 100% | 37.61% | 26.05% | 25.00% |
| | Education Management Corporation | 6/1/2006 | 100% | 16.28% | 13.04% | 35.52% |
| | Educate, Inc. | 6/14/2007 | 100% | 13.31% | 21.21% | 19.94% |
| | PLATO Learning, Inc. (nka:Edmentum, Inc.) | 5/25/2010 | 100% | 14.05% | 16.67% | 34.94% |
| | Nobel Learning Communities, Inc. | 8/9/2011 | 100% | 36.00% | 18.45% | 18.21% |
| | Archipelago Learning, Inc. | 5/17/2012 | 100% | 22.79% | 17.34% | 4.72% |

| Summary Statistics | | | |
|--------------------|-------|-------|-------|
| Observations | 6 | 6 | 6 |
| Min | 13.3% | 13.0% | 4.7% |
| Max | 37.6% | 26.1% | 35.5% |
| Average | 23.3% | 18.8% | 23.1% |
| Median | 19.5% | 17.9% | 22.5% |

Sources:
[1] CapitalIQ.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 20**
Estimated Discount for Lack of Marketability

|  | | Estimated Discount for Lack of Marketability |
|---|---|---|
| [1] | Finnerty Model-Estimated Discounts | |
|  | 6-Month | 8.0% |
|  | 1-Year | 11.2% |
|  | 5-Year | 22.7% |
|  | 10-Year | 28.3% |
| [2] | Restricted Stock Studies | |
|  | Baja, Denis, Ferris and Sarin (1990-95) | 22.2% |
|  | Johnson Study (1991-95) | 20.0% |
|  | Management Planning, Inc. (1980-96) | 27.0% |
|  | Columbia Financial Advisors (1996-97) | 21.0% |
|  | Columbia Financial Advisors (1997-98) | 13.0% |
|  | Liquistat (2005-06) | 32.8% |
|  | FMV Opinions, Inc. (1980-97) | 22.1% |
| [3] | Deloitte 2013 Valuation | 22.0% |
|  | **Estimated Discount for Lack of Marketability** | **20%** |

Sources:
[1] See Exhibit 20A.
[2] Reilly, Robert and Rotowski, "The Discount for Lack of Marketability: Update on Current Studies and Analysis of Current Controversies." Tax Lawyer V51 No. 1 (2007)
[3] Deposition Exhibit 46.

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 20A**
Finnerty Model

| | | Discounts by Time to Maturity *(T)* | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 0.5 years | 1.0 years | 5.0 years | 6.0 years | 7.0 years | 8.0 years | 9.0 years | 10.0 years |
| [1] Restriction Period | | 0.5 years | 1.0 years | 5.0 years | 6.0 years | 7.0 years | 8.0 years | 9.0 years | 10.0 years |
| [1] Resulting Discount | | 8.0% | 11.2% | 22.7% | 24.3% | 25.6% | 26.6% | 27.5% | 28.3% |

<u>Sources:</u>
[1] Assumes no dividends and volatility of 50.00%.  See Exhibit 20B for the volatility estimate.  A discussion of the Finnerty model can be found in
   Finnerty, John D. An Average-Strike Put Option Model of the Marketability Discount. The Journal of Derivatives, Volume 19, Number 4, Summer 2012.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 20B**
Comparable Companies' Volatility

| [1] Comparable Company | Historical Volatility | Weekly Observations | Implied Volatility |
|---|---|---|---|
| National American University Holdings, Inc. | 46% | 260 | NA |
| Lincoln Educational Services Corporation | 57% | 260 | 58% |
| Universal Technical Institute, Inc. | 38% | 260 | 33% |
| Strayer Education, Inc. | 50% | 260 | 50% |
| Median | 48% | | 50% |
| Volatility Selected | 50% | | |

Sources:
[1] Bloomberg. Historical volatility is 5-year volatility through June 30, 2014, when available.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 21**
Estimated Unleveraged Betas for Educational Services Comparable Companies

| | | | | | | | [2] | [3] |
|---|---|---|---|---|---|---|---|---|
| | | | **[1]** | | | | | |
| | | | **Capital Structure (in millions, except percentages)** | | | | | |
| | SIC Code | Total Debt | Minority Interest | Preferred Shares | Market Value of Equity | Debt-to-Capital Ratio | Levered Beta | Unlevered Beta |
| National American University Holdings, Inc. | 8200 | $12 | ($0) | $0 | $77 | 14% | 0.83 | 0.76 |
| Lincoln Educational Services Corporation | 8200 | $50 | $0 | $0 | $108 | 32% | 1.46 | 1.14 |
| Universal Technical Institute, Inc. | 8200 | $38 | $0 | $0 | $299 | 11% | 1.02 | 0.94 |
| Strayer Education, Inc. | 8200 | $120 | $0 | $0 | $554 | 18% | 0.98 | 0.86 |
| | | | | | Median | 16% | 1.00 | 0.90 |

Sources:
[1]  Capital IQ.
[2]  Bloomberg Terminal. Betas were pulled as of 06/30/2014 for a 5-year period. Bloomberg provides an adjusted Levered Beta that is an estimate of a security's future beta. It uses the historical data of the stock, but assumes that a security's beta moves towards the market average over time.
[3]  = Levered Beta ÷ ( 1 + ( 1 - Assumed Tax Rate of 40% × (Total Debt ÷ Market Value of Equity))

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al

**Exhibit 21A**
Selected Cost of Capital Data for Educational Services Industry Composites

| | SIC Code | Industry Description | WACC CAPM | Cost of Debt | Unlevered Beta | Levered Beta | Debt to Total Capital |
|---|---|---|---|---|---|---|---|
| [1] | SIC 8200 | Educational Services | 9.80 | 6.90 | 1.20 | 1.20 | 10.3% |

Sources:
[1] Duff & Phelps, Industry Cost of Capital Valuation Handbook, 2014. Small Composite information was used based on FCC's 2014 sales and total assets compared to the 3 smallest companies in SIC 8200.

Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al.

Exhibit 21B
Weighted Average Cost of Capital ("WACC") Calculations

| | | Educational Services | | Deloitte 2013 Valuation | Deposition Exhibit 133 |
|---|---|---|---|---|---|
| | | Based on Comparable Company Data | Based on Industry Composite Data | Based on Comparable Company Data | Based on Comparable Company Data |
| | **Levered Beta Estimate** | | | | |
| [1] | Unlevered Beta | 0.90 | 1.20 | 0.78 | |
| [2] | Debt-to-Capital Ratio | 15.8% | 10.3% | 13.6% | 5.0% |
| [3] | Levered Beta | 1.00 | 1.28 | 0.85 | |
| | **Cost of Equity Estimate** | | | | |
| [4] | Risk-Free Rate | 2.5% | 2.5% | 3.2% | 3.2% |
| [5] | Levered Beta | 1.00 | 1.28 | 0.85 | 1.23 |
| [6] | Equity Risk Premium | 6.2% | 6.2% | 6.3% | 7.0% |
| [7] | Size Premium | 9.0% | 9.0% | 6.0% | 4.1% |
| | Company Specific Risk | | | 4.0% | 1.5% |
| [8] | Cost of Equity | 17.7% | 19.5% | 18.5% | 17.4% |
| | **After-Tax Cost of Debt** | | | | |
| [9] | Cost of Debt | 6.9% | 6.9% | 5.4% | 6.0% |
| [10] | Assumed Tax rate | 40.0% | 40.0% | 40.0% | 40.0% |
| [11] | After-Tax Cost of Debt | 4.1% | 4.1% | 3.2% | 3.6% |
| | **WACC Estimate** | | | | |
| [12] | Debt-to-Capital Ratio | 15.8% | 10.3% | 13.6% | 5.0% |
| [13] | After-Tax Cost of Debt | 4.1% | 4.1% | 3.2% | 3.6% |
| [14] | Equity-to-capital Ratio | 84.2% | 89.7% | 86.4% | 95.0% |
| [15] | Cost of Equity | 17.7% | 19.5% | 18.5% | 17.4% |
| [16] | WACC | 16.0% | 18.0% | 16.5% | 16.7% |
| | Selected WACC | 16.0% | | | |

Sources:
[1]   See Exhibit 21 and Exhibit 21A.
[2]   See Exhibit 21 and Exhibit 21A.
[3]   = [1] × ( 1 + (1 - 40%) × ( [2] / ( 1 - [2] ))
[4]   U.S. Department of Treasury, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2014; 10-Year Treasury Yield, June 30, 2014.
[5]   = [3]
[6]   Duff & Phelps, Guide to Cost of Capital Valuation Handbook 2014, Appendix 3; Long-horizon expected equity risk premium (supply side).
[7]   Duff & Phelps, Guide to Cost of Capital Valuation Handbook 2014, p. 4-10; 10b decile (OLS Beta Size Premium), companies with market capitalizations of up to $185 million, see Appendix 3.
[8]   = [4] + [5] × [6] + [7]
[9]   Bloomberg; 10-year BB rated corporate composite curve index (BVSC0193) at June 30, 2014.
[10]  Assumed marginal tax rate.
[11]  = [9] × ( 1 - [10] )
[12]  See Exhibit 21 and Exhibit 21A.
[13]  = [11]
[14]  = ( 1 - [12] )
[15]  = [8]
[16]  = [12] × [13] + [14] × [15]

<u>Clingman & Hanger Management Associates, LLC, as Trustee, v. David Knobel et al</u>

**Exhibit 21C**
Growth Rate Analysis

| | | 2014 | 2015 | 2016 | Longer Run |
|---|---|---|---|---|---|
| [1] | *Federal Reserve Economic Projections as of June 2014* | | | | |
| | Change in Real GDP - High | 2.3% | 3.2% | 3.0% | 2.3% |
| | Change in Real GDP - Low | 2.1% | 3.0% | 2.5% | 2.1% |
| | | | | | |
| [2] | Inflation - High | 1.6% | 2.0% | 2.0% | 2.0% |
| | Inflation - Low | 1.5% | 1.6% | 1.7% | 2.0% |
| | | | | | |
| [3] | *SIC 8200 - Educational Services* | | | | |
| | Growth Rate for Long-term EPS (small composite) | 14.4% | | | |

<u>Sources:</u>
[1] Federal Reserve, https://www.federalreserve.gov/monetarypolicy/files/fomcprojtabl20140618.pdf; Economic Projections of the
    Federal Reserve Board Members and Federal Reserve Bank Presidents, June 2014. Using the central tendency.
[2] Core PCE Inflation was used for 2014-2016 and excludes Food and Energy. PCE Inflation was used for Longer Run since Core
    PCE Inflation longer run projections are not collected.
[3] Duff & Phelps, Industry Cost of Capital Valuation Handbook, 2014.

Case 0:16-cv-62028-JAL   Document 85   Entered on FLSD Docket 06/28/2017   Page 1 of 43

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

RECEIVED
Bilzin Sumberg
By Iramirez at 10:08 am, Jun 28, 2017
DOCKETED

## CASE NO. 16-62028-CIV-LENARD/GOODMAN

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC, as Trustee,

        Plaintiff,

- against -

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA STEWART,
and CID YOUSEFI,

        Defendants.

## AMENDED COMPLAINT

## JURY TRIAL DEMANDED

Clingman & Hanger Management Associates, LLC, as trustee (the "Trustee") of the liquidating trust (the "Trust") established by the chapter 11 plan of liquidation (the "Plan") of FCC Holdings, Inc. and its subsidiaries (together, "FCC"), hereby alleges:

## PRELIMINARY STATEMENT

1.  FCC's officers made a bet that they could take unauthorized funds from the United States Department of Education (the "DOE"), use them to fund a company expansion, sell the company at a tremendous profit, and receive tens of millions of dollars in bonus compensation. Foreseeably, the DOE discovered the scheme and cut FCC off from 90% of its cash flow. Without cash flow, FCC – an otherwise profitable company valued at over $150 million and with only $30 million in debt – collapsed in a matter of weeks. The board of directors (the "Board") was forced to sell its most profitable assets in a fire sale and the company filed for bankruptcy protection.

2.  Prior to its collapse, FCC owned and operated forty-one for-profit, post-secondary education schools in fourteen states. Pursuant to Title IV of the Higher Education Act of 1965,

1



the DOE provided tuition funding for students attending Title IV-eligible programs at FCC schools in the form of grants and loans, such as the Direct Loan and Pell Grant programs ("Title IV funds"). Approximately 90% of FCC's revenue and cash consisted of Title IV funds paid to FCC to satisfy student tuition obligations.

3.      However, instead of limiting its Title IV fund draws based on FCC's then-current enrollment data or treating Title IV funds as trust funds, as required by DOE regulations, Defendants took advantage of the ability to draw Title IV funds before having to "substantiate" the same with the DOE (by identifying specific students to whom the funds were "disbursed") by drawing tens of millions of dollars to pay FCC's operating costs and capital expenditures without regard to whether those funds were or could be justified based on the actual tuition FCC earned from qualified, bona fide enrolled students.

4.      Specifically, Defendants engaged in the following conduct, in each case in contravention of DOE regulations (as discussed below):

    (a)    failing to hold Title IV funds in trust either in a separate account or through accounting or internal controls sufficient to track Title IV funds as if they were held in a separate account;

    (b)    drawing Title IV funds in amounts far greater than that which could be supported by current enrollment numbers;

    (c)    failing to refund "excess" Title IV funds which were drawn for students who withdrew from or failed to commence attending their respective programs;

    (d)    failing to reconcile Title IV fund draws with student-level disbursement data;

    (e)    pre-drawing (defined below) Title IV funds based on projected future enrollment numbers which management knew to be overstated; and

    (f)    subsequently abandoning the pretense of limiting draws to illusory enrollment numbers and simply drawing based on the company's general liquidity needs.

5.      Defendants knew or should have known of DOE regulations designed to prevent the use of Title IV funds in this manner. FCC had previously had its funding frozen by the DOE less than a year earlier in May of 2013 when the difference between the amounts drawn down

and the amount substantiated grew too large.  Despite this prior DOE funding freeze, Defendants continued to draw Title IV funds based on the company's short term cash needs, without regard to whether FCC's schools had enrollment numbers that could justify the draws.

6.     Each of the above-named Defendants participated in the foregoing scheme:

(a)     Neil Yawn ("Yawn"), FCC's Chief Operations Officer ("COO"), submitted inflated projected enrollment numbers to FCC's Financial Services Office upon which the office's Title IV fund draws were premised, which resulted in the office drawing substantially more from the DOE than it should have.  In addition, Yawn systematically underreported student withdrawals from FCC programs to the Financial Services Office, which if properly reported would have triggered the refund of Title IV funds to the DOE.  This, in turn, resulted in a significant mismatch between the amount of Title IV funds drawn by FCC and the amount substantiated with the DOE.

(b)     Siana Stewart ("Stewart"), FCC's Vice President of Financial Services, supervised FCC's Financial Services Office, and then Cid Yousefi ("Yousefi") oversaw FCC's drawing, reconciliation, and refunding of Title IV funds following Stewart's resignation.  The imbalance resulting from the foregoing should have been kept in check, but was not due to their requests for funds beyond what even the inflated student data could support and their failure to reconcile, on a monthly basis, Title IV fund draws with student-level disbursement data reported to the DOE, as required by DOE regulations.

(c)     David Knobel ("Knobel"), the Chief Executive Officer ("CEO") and a director of FCC, and Jeffrey Pierne ("Pierne"), FCC's Chief Financial Officer ("CFO"), enabled the abuse of Title IV funds by not holding the funds in trust, either by keeping them in a separate account or by employing accounting or internal controls sufficient to track Title IV funds as if they were held in a separate account.  Title IV funds should

3

have been held separately until they were promptly disbursed to students, resulting in the majority of the funds coming back to FCC in the form of tuition payments and some funds going directly to students for living expenses. Instead, Title IV funds from all of FCC's various schools registered under different identification numbers (*see, infra* ¶¶ 30-31) were deposited directly into FCC's operations accounts to be used without substantiating how much tuition FCC was owed. Knobel and Pierne also aggravated existing imbalances by directing the drawdown of Title IV funds based on inflated projected enrollment numbers to pay current operating expenses and to fund the company's expansion, even though Pierne and Stewart knew FCC could not comply with the DOE's "prompt disbursement rule" (defined below) with respect to such funds.

(d)     Pierne, Stewart, and Yousefi also completely abandoned their responsibility to ensure FCC held Title IV funds in trust by engaging in a practice akin to check kiting, namely, repeatedly directing the drawing of or causing to be drawn large amounts of Title IV funds on behalf of certain FCC schools without regard to whether the draws could be justified by enrollment numbers, then refunding the bare minimum required by the DOE's payment system.

(e)     Dean Bartness ("Bartness"), FCC's Chief Compliance Officer ("CCO"), was responsible for ensuring compliance with DOE regulations. He completely abandoned his primary responsibility of ensuring FCC complied with Title IV and did nothing to prevent FCC from drawing Title IV funds or failing to substantiate or refund Title IV funds as required by DOE regulations, which directly contributed to the company's collapse.

7.      In May 2013, the DOE temporarily suspended FCC's ability to draw Title IV funds without first substantiating the same after FCC drew but did not properly substantiate or

4

refund over $15 million in Title IV funds. After substantiating or refunding the $15 million, management re-engaged in the same conduct/inaction as it had the prior year and additional conduct, in each case in violation of DOE regulations (*see* ¶4(e), *supra*). By March 2014, after FCC had drawn approximately $20 million in unsubstantiated Title IV funds, the DOE demanded that FCC repay or substantiate all unsubstantiated funds within thirty days and permanently eliminated FCC's ability to draw Title IV funds without first substantiating the same. This doomed FCC, which relied on Title IV funds to supply approximately 90% of its revenue and cash.

8.       Immediately upon learning of Defendants' misconduct, the Board, in April 2014, removed Knobel as director and CEO, and Yawn resigned. However, by then the company's liquidation was inevitable. By August 2014, the company sold off its most valuable schools and filed for bankruptcy protection. After several months in bankruptcy, FCC confirmed a chapter 11 plan (the "Plan") in which it could not recover enough to pay even administrative expense claims in full, let alone pre-petition claims. The Plan created the Trust for, among other things, the express purpose of asserting FCC's causes of action against any parties causing harm to FCC. A copy of the First Amended Joint Plan of Orderly Liquidation of FCC Holdings, Inc., and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code; the FCC Holdings, Inc. Liquidating Trust Agreement among FCC Holdings, Inc. and the Other Affiliated Debtors Party Hereto; and the Order Confirming First Amended Joint Plan of Orderly Liquidation of FCC Holdings, Inc. and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code are attached as Exhibits 1 – 3.

9.       All told, Defendants' acts and omissions were the direct and proximate cause of the collapse of profitable schools which had been valued at over $150 million only two years

before, but sold for less than $3 million. But for Defendants' greed and fiduciary duty breaches, none of this had to happen.

10.     Accordingly, the Trustee, as the assignee of FCC's causes of action and as Plan fiduciary for the bankruptcy estate, the beneficiaries of which are FCC's creditors (which include FCC's lenders, trade creditors, and the DOE) and FCC's equity holders, seeks damages suffered by FCC from the Defendants on account of their breaches of fiduciary duty and their destruction of approximately $150 million in value, to the detriment of FCC and its bankruptcy estate, the Debtor's prepetition creditors and its equity holders.

## PARTIES

### I.   THE PLAINTIFF

11.     The Trustee is trustee of the Trust established by the Plan confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 18, 2015 in FCC's chapter 11 bankruptcy case. The Trustee's members, W. Edward Clingman, Jr. and Teresa S. Hanger, are Virginia citizens.

12.     By order dated March 18, 2015 (the "Confirmation Order"), the Bankruptcy Court confirmed FCC's chapter 11 plan of liquidation (the "Plan") and expressly transferred FCC's retained causes of action to the Trust. (Exhibit 3 Confirmation Order ¶¶ L and 11.) As discussed above, the Plan created the Trust, and appointed the Trustee, for the purpose of maximizing recoveries for the bankruptcy estate. Pursuant to the Plan, all of FCC's causes of actions were transferred to the Trust, and the Trustee was substituted for FCC in all relevant judicial proceedings. (Exhibit 1 Plan §§ 5.02 ("the Debtors will transfer to the Liquidating Trust all of their rights, title, and interests in all of the Liquidating Trust Assets"), 5.06 ("the Liquidating Trustee shall be deemed to be a judicial substitute for each of the Debtors as the party-in-interest . . . in any judicial proceeding or appeal to which a Debtor is a party"), 13.06 ("The rights,

benefits . . . of any Entity named or referred to in the Plan . . . shall inure to the benefit of . . . [any] successor, or assign of such Entity, including, but not limited to, the Liquidating Trustee"); Exhibit 2 Trust Agreement §§ 1.2-4 (outlining the transfer and acceptance of the Liquidating Trust Assets to the Trustee for the partial purpose of pursuing retained Causes of Action), 3.1-2 (detailing the Trustee's duty to pursue retained Causes of Action), 6.3 (empowering the Trustee to prosecute retained Causes of Action).)  The Trustee brings several of those causes of action herein.

## II.      THE DEFENDANTS

13.      Knobel is a Florida citizen who in 1994 founded the FCC Schools (defined below) in Fort Lauderdale, Florida and served as a director and the CEO of FCC at all relevant times until his removal by the Board on or about April 29, 2014.  Knobel also served on the Florida Commission for Independent Education, the seven-member state commission charged with regulating for-profit education institutions in Florida, from at least 2004 through 2010, and was therefore no doubt well versed with the regulations applicable to FCC, including DOE regulations at the center of this action.

14.      Pierne is a Florida citizen who served as FCC's CFO from in or about December 2008 until August 22, 2014 and as a Board member from April 4, 2014 until August 22, 2014.  As CFO, Pierne's responsibilities included financial planning/liquidity analysis, communicating financial risks to the Board, and supervising accounting personnel.

15.      Bartness is a Florida citizen who served as FCC's CCO and Corporate Secretary from in or about February 2005 until August 21, 2014.  As CCO, Bartness's responsibilities included ensuring compliance with DOE regulations and communicating related risks to the Board.

Case 0:16-cv-62028-JAL   Document 251-2   Entered on FLSD Docket 03/21/2018   Page 172 of
207
Case 0:16-cv-62028-JAL   Document 85   Entered on FLSD Docket 06/28/2017   Page 8 of 43

16.     Yawn is a Florida citizen who served as FCC's COO at least from April 2012 until his resignation on or about April 4, 2014. As COO, Yawn's responsibilities included determining projected DOE funding amounts from current student enrollment in FCC's various programs and ensuring transmission of such projections to the Financial Services Office, as well as keeping track of student withdrawals from such programs and ensuring transmission of such information to the Financial Services Office.

17.     Stewart is a Florida citizen who was employed in FCC's Financial Services Office beginning in 2005, and oversaw the office's operations as FCC's Vice President of Financial Services from 2009 until her resignation in or about December 2013. Following Stewart's resignation, she continued to provide consulting services to FCC. As Vice President of Financial Services, Stewart reported to both Knobel and Pierne. Her responsibilities included drawing, substantiating, and refunding Title IV funds in accordance with DOE regulations. Stewart managed and directed dozens of employees at various levels in order to handle her broad range of responsibilities. Both Stewart's title and her level of managerial oversight and responsibility made her an officer of the company.

18.     Yousefi is a Florida citizen who served as FCC's Senior Vice President of Information Technology from in or about June 2013 until in or about August 2014. In that role, Yousefi was responsible for all strategic and tactical activities related to FCC's systems, technology and student financial aid, and he reported directly to Knobel. Upon Stewart's resignation in or about December 2013, Yousefi assumed Stewart's responsibilities of drawing, substantiating, and refunding Title IV funds in accordance with DOE regulations. Both Yousefi's title and his level of managerial oversight and responsibility made him an officer of the company.

8

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship of the parties and the amount in controversy exceeds $75,000.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendants are either residents of this judicial district, or a substantial part of the events or omissions giving rise to this action took place in this judicial district.

## BACKGROUND

### I.    FCC OVERVIEW

21.    Prior to the commencement of FCC's chapter 11 case, FCC owned and operated fourteen Florida Career College schools (the "FCC Schools"), twenty-two Anthem Education schools (the "Anthem Schools"), and five California schools which did not offer Title IV-eligible programs (the "US Colleges"), and further offered online courses through "Anthem Online."

A.    FCC's History

22.    Knobel founded FCC in 1994.  In 2004, he sold a majority interest in FCC to private equity firm TA Associates for approximately $53 million.

23.    In 2007, private equity firms Greenhill Capital Partners LLC and Abrams Capital LLC invested approximately $132 million to purchase a majority interest in FCC, which at the time owned and operated seven schools.

24.    At the close of the transaction, Greenhill and Abrams Capital each owned 46% of FCC (through affiliates) and Knobel owned 7% of FCC (a final 1% was owned by a former FCC officer).

25.    From in or about 2011 until Knobel's removal in April 2014, the Board was comprised of him, two Abrams Capital directors, and two Greenhill directors.

9

26.     On April 12, 2012, FCC acquired the Anthem Schools for a net purchase price of approximately $16 million.

27.     In August 2013, FCC acquired the US Colleges for a net purchase price of nearly $2.8 million.

28.     FCC managed its schools from its Fort Lauderdale, Florida headquarters.

B.  FCC's Drawdown Method

29.     FCC derived approximately 90% of its revenues and cash from Title IV funds drawn from the DOE.  As such, access to Title IV funds was critical to FCC's continued operations.  As Ernst & Young noted in every consolidated balance sheet, loss of or even limited access to Title IV funds "could have a material adverse effect on financial position, results of operations and cash flows."

30.     In order for a post-secondary, higher education institution (an "institution") to draw Title IV funds, it must first apply for and receive a DOE Office of Postsecondary Education ID number (an "OPEID").

31.     The fourteen FCC Schools operated under one OPEID.  The twenty-two Anthem Schools operated under five OPEIDs, commonly referred to by the name of the institution's main campus or location (i.e., Phoenix, Bryman, Maryland Heights, Parsippany, and Springfield).  The five US Colleges did not draw Title IV funds and did not have an OPEID.

32.     Once an institution receives an OPEID, it may draw Title IV funds using a DOE-approved payment method.

33.     Under the "advance" payment method that was historically utilized by FCC, an institution may draw Title IV funds via the DOE's payment system ("G5") before "substantiating" the same by reporting to the DOE the individual students to whom such funds

Case 0:16-cv-62028-JAL   Document 251-2   Entered on FLSD Docket 03/21/2018   Page 175 of
207
Case 0:16-cv-62028-JAL   Document 85   Entered on FLSD Docket 06/28/2017   Page 11 of 43

are "disbursed" via the DOE's common origination and disbursement system ("COD"). *See* 34

C.F.R. § 668.162(b).

      34.     However, FCC's ability to draw funds under this method on behalf of its

institutions was subject to its compliance with a number of conditions:

      (a)     FCC was prohibited from drawing Title IV funds on behalf of an institution in an amount greater than that required to satisfy student loan balances of students currently enrolled at the institution;[1]

      (b)     the institution was required to disburse Title IV funds to students within three days of drawing those funds;[2]

      (c)     the institution was required to refund to the DOE Title IV funds drawn to the extent its students withdrew from its Title IV-eligible programs or never commenced attending such programs;[3]

      (d)     the institution was required to hold Title IV funds it drew in trust for students, to the extent draws could be credited to a student account, or for the DOE, to the extent "excess" Title IV funds could not be timely substantiated and therefore had to be refunded;[4] and

---

[1] *See* 34 C.F.R. § 668.14(b)(1)-(2) (institution may only use Title IV funds to satisfy student loans taken to cover cost of attendance resulting from student enrollment in a Title IV-eligible program, and must "time its requests for funds … to meet the institution's immediate … needs" for such funds); 34 C.F.R. § 668.162(b)(1) (institution's requests for Title IV funds "may not exceed the amount of funds the institution needs immediately for disbursements the institution has made or will make to students" or to satisfy tuition obligations); 34 C.F.R. §§ 668.162(b)(3), 166 (institution must "disburse" Title IV funds drawn by crediting such funds against tuition balances within three business days of its receipt and is prohibited from holding "excess" Title IV funds).

[2] See 34 C.F.R. § 668.162(b)(3) ("The institution must disburse the funds requested as soon as administratively feasible but no later than three business days following the date the institution received those funds.")

[3] *See* 34 C.F.R. § 668.21 (Title IV funds must be promptly refunded if a student does not begin attendance at an institution. "The institution must return those funds for which it is responsible under paragraph (a) of this section to the respective title IV, HEA program as soon as possible, but no later than 30 days after the date that the institution becomes aware that the student will not or has not begun attendance."); 34 C.F.R. § 668.22 (if a student withdraws from an institution after beginning attendance, the amount of Title IV assistance "earned" by him/her must be determined. If the amount disbursed exceeds the amount earned, the institution must refund "unearned funds" within 45 days after the institution determines the student withdrew).

[4] *See* 34 C.F.R. § 668.161(b) (Title IV "funds received by an institution … are held in trust for the intended student beneficiaries [or] the Secretary"); 34 C.F.R. § 668.163(e) (institutions must "exercise the level of care and diligence required of a fiduciary with regard to maintaining and investing title IV … funds"); 34 C.F.R. § 668.14(b)(2) (institutions are "fiduciar[ies] responsible for administering Federal funds"); 34 CFR § 668.163(d)(1) ("An institution must [m]aintain accounting and internal control systems that identify the cash balance of the funds of each title IV, HEA program that are included in the institution's depository account or accounts as readily as if those funds were maintained in a separate depository account . . .")

(e)   the institution was required to "reconcile" its COD-G5 discrepancies monthly, and at the end of each "program year" (which ran July 1-June 30).[5]

35.   As a practical matter, an institution operating under the advance payment method that complies with the foregoing conditions should not have cash flow problems absent a precipitous decline in enrollment numbers.   By definition, the institution is receiving cash associated with educating a particular student before the student commences enrollment, and before the institution has incurred the cost of educating him or her.   In contrast, the operating expenses associated with educating the institution's students (e.g., rent, payroll, etc.) are ordinarily paid and expensed over time.[6]

36.   The Financial Services Office, headed by Stewart and later partially overseen by Yousefi, was responsible for drawing Title IV funds on behalf of each FCC institution, substantiating draws via COD, and refunding unsubstantiated draws via G5.

## C. FCC's Value Creation Plan

37.   Following FCC's acquisition of the Anthem Schools in April 2012, management proposed a plan to maximize owners' return on investment and management's incentive compensation which involved selling or closing nine Anthem Schools in states with regulators management considered "hostile to our industry," building out new schools across sun-belt states, and making operational improvements at the new schools and remaining Anthem Schools

---

[5] See, e.g., 34 C.F.R. § 685.300 (monthly reconciliation required for Direct Loans); 34 C.F.R. § 674.19(d)(1) (same for Perkins loans); Federal Student Aid Handbook, Vol. 4 (annual reconciliation required to complete mandatory Fiscal Operations Report).

[6] Because the advance payment method pays institutions upfront, an advance payment method-eligible institution should not experience cash flow problems unless: (a) operating cash (i.e., Title IV funds) is being used to fund long term capital expenditures or debt repayment which are more appropriately funded through the sale of equity interests or issuance of long term debt, or (b) operating expenses exceed operating revenues (indicating a fundamental problem with the business).

required to achieve annual per-school-EBITDA[7] comparable to that of the FCC Schools. Management believed once it began approaching EBITDA targets at these schools, it could sell the company for $450-$500 million by 2017, whereupon Knobel would receive 10% of the net proceeds and management (including each other defendant) would share in an additional 10% of the net proceeds.

38.     Over the next two years, FCC did not divest the Anthem Schools identified for divestment, but did commit over $20 million to capital expenditures associated with the buildout of three new schools that would operate under the FCC Schools' OPEID and additional improvements.

## II.   FCC NONCOMPLIANCE WITH DOE REGULATIONS

### A. Pre-Merger Drawdown Practices

39.     Historically, the FCC Schools' Financial Services Office drew Title IV funds during a given month by netting projected DOE funding amounts from new student starts and continuing students that month with amounts to be refunded as a result of students' withdrawal from or failure to commence attending their programs.   Both figures were generated by aggregating enrollment projections and refund data supplied by the management of each campus, which in turn reported to the COO.   The Financial Services Office would then substantiate prior draws by updating COD with current student enrollment information and refund Title IV funds, within the specified period of time (*see, infra*, n.3), that could not be substantiated when FCC was unable to disburse the funds within three business days of the draw, as required by 34 C.F.R. § 668.162(b)(3) (the "prompt disbursement rule")

---

[7] The term "EBITDA" means earnings before interest, tax, depreciation, and amortization.

40.     The Anthem Schools engaged in a similar practice but would also "pre-draw" Title IV funds from time to time by causing its institutions to draw Title IV funds during a given month premised upon enrollment projections for future months (such draw, a "pre-draw").[8]

41.     Both Pierne and Stewart knew the Anthem Schools' pre-draw practice violated DOE regulations because it would ordinarily result in the Anthem Schools holding Title IV funds that were neither disbursed nor refunded within the time required by the prompt disbursement rule.

42.     In a June 8, 2012 document entitled "PreDrawMemo," Marc Prochello, the Anthem Schools' controller, explained to FCC's auditor, Ernst & Young LLP ("E&Y"), that the Anthem Schools pre-drew Title IV funds between December 1, 2011 and the merger date, and that as of the merger date there remained roughly $3.3 million in pre-drawn funds that had neither been disbursed nor refunded.  In response to this memo, E&Y e-mailed both Mr. Prochello and FCC's controller, Stella Laurella, copying Pierne, asking that Mr. Prochello "include a comment in your memo as to the Company's compliance" as of the merger date.

43.     During the internal e-mail thread among FCC officers that followed, Ms. Laurella proposed stating to E&Y by telling the auditors that as of the merger date, the Anthem Schools "were in compliance with DOE regulations as the funds on-hand were in the process of being identified as belonging to student accounts or being prepared for returning to G5." Mr. Prochello responded "[t]he only issue with that is, we really weren't in compliance" because pre-drawn

---

[8] Because of the various uses of the term "pre-draw," note that the DOE regulations define an acceptable pre-draw as one in which Title IV funds are drawn from G5 and immediately be disbursed to students to pay their tuition and other expenses.  This draw is based on an estimated enrollment, though, and so it is possible the school may have funds from the draw that are not disbursed due to student withdrawals or drops.  At that point the school has an additional 30-45 days to determine how much money is owed back to the DOE and refund it.  This is not the same as the pre-draw practice FCC was engaging in, which was to draw money for student tuition months in advance of the actual enrollment of students and disbursement of funds to them.  Such premature draws necessarily violate the three-day disbursement requirement.

funds had not been disbursed to students within three business days.   Stewart responded by proposing to modify the original memo by stating:

> As of ... April 12, 2012, [the Anthem Schools were] in compliance with DOE regulations which allow institutions to pre-draw funds based on estimated student eligibility, [and] once drawn the institution goes through a process to determine actual eligibility. Upon the completion of this process all eligible funds are posted to student accounts and all ineligible funds are returned to the [DOE].

Substantially similar language made it into the revised memo submitted to E&Y, which Pierne signed off on.   The revised memo was misleading because it failed to disclose, among other things, that the pre-draws were not anticipated to be immediately disbursed and timely refunded as required by the prompt disbursement rule.

### B. FCC's Post-Merger Drawdown Practice

44.   Following the acquisition of the Anthem Schools, FCC management assumed responsibility for managing all aspects of the drawdown process across all OPEIDs.  Thus, Yawn was responsible for projecting enrollments and DOE funding amounts across all OPEIDs, as well as supplying the Financial Services Office with all information required to determine amounts to be refunded to the DOE as a result of student withdrawals under 34 C.F.R. §§ 668.21-22.   In addition, Stewart, and later Yousefi, were responsible for drawing and refunding Title IV funds, reconciling COD-G5 discrepancies, and interfacing with the DOE.   Bartness was responsible for ensuring the drawdown, reconciliation, and refund process complied with DOE regulations.

45.   Following the acquisition, FCC management engaged in a variety of practices in furtherance of efforts to treat access to Title IV funds under the advance payment method as an interest-free credit line, in contravention of DOE regulations, as described below.[9]

---

[9] The notion that access to Title IV funds under the advance payment method was equivalent to an interest-free credit line was so ingrained in the mindset of FCC management that the company's restructuring advisors, FTI Consulting, Inc. stated as much in bankruptcy filings based upon communications and input from management and

1.  Draws Premised on Inflated Enrollment Numbers

46.    Inflated projected enrollment numbers, upon which monthly draws were premised, were transmitted to the Financial Services Office, which in turn resulted in the Financial Services Office drawing substantially more than it should have.  New student starts regularly fell short of projections by 10-20%.

47.    For example, on March 28, 2014, Pierne wrote directly to Knobel that the Title IV collections estimate for March, a single month, had been off by approximately $9 million: "cash flow in March from T4 funds was reduced to $12 million compared to our previous forecast of approximately $21 million (due both to the balancing issue and continued start shortfalls), which has created a significant cash squeeze."

48.    Further, on April 10, 2014, FTI circulated to Knobel and Pierne, among others, a "summary report of FTI's initial near-term liquidity analysis and financial aid funding process." Specifically, the report concluded that "There was a lack of adequate substantiated support for the cash projections in the forecast."

49.    An April 24, 2014 Board presentation by FTI entitled "Financial Aid – Assessment, Deep Dive," cited "lack of trust in forecasts that originate from campus management" as a "systemic issue … associated with the Financial Aid area" which resulted in DOE action against FCC.

50.    Not only did the Financial Services Office draw against inflated projected enrollment numbers, it also drew Title IV funds for a program unapproved by the DOE, the

---

FCC's DOE regulatory counsel.  *See* Declaration of Sean Harding, *In re FCC Holdings, Inc.*, Ch. 11 Case No. 14-11987 (Bankr. D. Del. Aug. 26, 2014) [ECF No. 13] at ¶ 45 ("Prior to April 2014, the Company operated under the 'advance funding method,' whereby the G5 system essentially operated as a line of credit for the Company to draw down on, based on the amount of funding an institution is eligible for based on what it inputs into the 'COD' system").

Case 0:16-cv-62028-JAL   Document 251-2   Entered on FLSD Docket 03/21/2018   Page 181 of 207
Case 0:16-cv-62028-JAL   Document 85   Entered on FLSD Docket 06/28/2017   Page 17 of 43

Patient Care Technician ("PCT") program, that was rolled out across multiple campuses despite not being authorized to receive such funds.

51.     Bartness acknowledged to a colleague that such wrongdoing was "obvious" in hindsight.  On June 12, 2014, Bartness stated to the VP–Regulatory and Legal Affairs that he "would bet [Knobel] told Mark [Young] to enroll as they were desperate to meet start budgets. They dug themselves into a ditch that got too deep for them to climb out of . . . ."

52.     Bartness—as Chief Compliance Officer—further explained, "We're toast on that PCT program…Maybe they could charge Mark Young….Gotta believe David [Knobel] knew, too[.]"  The VP–Regulatory and Legal Affairs replied, "had to, his name was on the provisional ecar[10][.]"

53.     On June 14, 2014, upon learning that disbursements to a non-approved program had occurred, an outside consultant performing due diligence on FCC on behalf of an outside investor wrote to Bartness, Yousefi and Pierne, among others, directing Bartness to "begin a project immediately to identify any program that currently does not have required approvals from the oversight agencies, programmatic accrediting agencies, and the U.S. Department of Education…. Further, you should prepare policy/procedures/process to ensure this can't happen in the future.  I just can't imagine starting a program without the requisite approvals."

            2.     <u>Noncompliance with Prompt Disbursement Rule; Persistent Underreporting of Student Withdrawals</u>

54.     FCC was required to disburse funds to students within three days of drawing them from the DOE's G5 system.  Schools are not permitted to draw Title IV funds and keep them for potential future use by students.  They are only permitted to draw funds when they can be used by students, though it is permissible for the school to estimate the number of students who need

_____

[10] Eligibility and Certification Approval Report

funds. Any imbalance created by such estimates are dealt with in the reconciliation and refund process. (*See supra* ¶ 34(c) & n.3.)

55.     After its acquisition of Anthem, FCC began pre-drawing funds in advance of student needs in order to pay for capital expansion and operational expenses as Anthem had previously done.

56.     On December 4, 2013, Yousefi wrote to Stewart for clarification about the cash drawdown process. Yousefi stated that the Manager of Financial Aid Processing had explained drawdowns to be "based on what is available in G5 and what [Stewart] approve[s]… My expectation is that everything would be tied to a roster, so you can always balance," that is, that the draws would be based on student enrollment because the funds were being disbursed to students. Stewart responded that it was based on a roster, but immediately backtracked and admitted some Title IV drawdowns were unrelated to disbursements to students and used for other purposes, stating that "The availability in g5 has been used recently because of the number of rejects we have been having." Stewart acknowledged that her approval was necessary "when our refunds are greater than our draws and a pre-draw [m]ay be needed."

57.     On February 4, 2014, the DOE expressly noted its concern about FCC's practices in this area, in an email that was then forwarded to Yousefi:

> We have been very concerned about the ongoing inability of the larger Anthem schools to reconcile funds drawn with disbursement records. Seems like a large amount of cash is drawn and then when disbursements cannot be reported timely to substantiate those funds, the funds are returned. And this has been recurring for months and months.

58.     The Financial Services Office also ceased timely refunding Title IV funds which could not be substantiated because they were not disbursed within three business days of the draw, as required by the prompt disbursement rule, and instead only refunded Title IV funds

based on erroneous reports from Yawn which Stewart and Yousefi knew misstated the amount of withdrawals.

59.     Campus management systematically and knowingly underreported student withdrawals to the Financial Services Office. The pattern of underreporting is evident from the fact that FCC's Title IV auditor identified major refund errors across all OPEIDs for the 2012-13 program year, based on just a sample of student files. The DOE concluded from the auditor's report that FCC's pattern of under-refunding Title IV funds was sufficiently egregious that it directed FCC to review and recalculate refunds at four of its six OPEIDs for all students that either withdrew or never commenced attending a program offered by the relevant institution during the program year, and to refund the difference between what was and what should have been refunded. FCC's subsequent review, in turn, revealed its overall error rate was around 50% (and reached 66% at the Parsippany OPEID).

60.     Significantly, the Financial Services Office would regularly post refunds resulting from student withdrawals to its internal records, meaning it specifically knew that a given student withdrew and that a refund was in order, but would not make matching entries in COD or actually make the required refund to the DOE. A consultant who advised on reconciliation-related matters after the DOE revoked FCC's ability to draw Title IV funds under the advance funding method remarked as follows on this practice: "To post a refund to the ledgers, without having made the refund, gives the appearance of intentional misrepresentation. I am further troubled by the fact that so many of the staff are aware of a decision to not post refunds/returns to COD which violates the Department's cash management requirements."

61.     Further, FCC's records reflect that more than 50% of its student population during a given year would withdraw, resulting in the need for a refund. For example, FCC's records for the 2012-13 program year reflect that almost 28,000 students had enrolled in Title IV-eligible

programs at the FCC and Anthem Schools that year. Of those students, approximately 4,000 (14%) withdrew and approximately 11,000 (39%) never commenced attending, while approximately 3,500 (12%) graduated and approximately 8,500 (30%) were listed as actively enrolled (30%).[11] Despite the fact that a full *54%* of students enrolled in Title IV-eligible programs that year withdrew or never commenced attending the programs for which they were enrolled, thereby necessitating a refund under 34 C.F.R. §§ 668.21-22, the Financial Services office continued to draw based on FCC's inflated estimates of *projected* new student starts and continuing students for DOE funding amounts for that month, and refund based only upon inaccurately reported withdrawals.

62.     As early as June 17, 2013, as part of his weekly review, Yousefi wrote directly to Knobel explaining that there was "No system of checks and balances in place to ensure what is exported out of STARS is the same as what is imported into Regent; the same for importing COD data into Regent."

63.     In a timeline of events as of July 2013 (the "Timeline") circulated among Knobel, Pierne, Yawn and Yousefi (the apparent author), Yousefi explained how large the refund problem had become. The "[m]ajority of the $11,229,754 [of total refunds not paid as of 6/30/13] was carried forward to the next fiscal year, but probably not factored in the budgeted cashflow for FY 2014. Meanwhile, monthly refunds are getting added to the pile!" From July through September 2013, the "FA team" struggled to balance "cash drawdown, normal monthly refunds getting added to the balance forward, plus paying the refunds (from the balance forward)

---

[11] Approximately 3% of students did not fit in any of the foregoing categories (*e.g.*, students that enrolled for a future program year).

that are nearing the 45 day deadline." During that time, the team processed "an additional $10,651,056 in refunds to add to the pile that was carried forward."

64.     As further example, on January 7, 2014, Pierne reported to Knobel that there was "an additional $1 million or so in T4 refunds" still owing from withdrawals in November that needed to be paid immediately. Pierne reported that Yousefi was "working on quantifying this."

65.     On April 17, 2014, Yousefi explained to the VP–Corporate Controller that with respect to the reconciliation, "as much as we are all looking for a silver bullet, what we are doing is not going to fix all the ledger issues in STARS going back to the beginning of the FY[.]"

### 3.     Failure to Reconcile Monthly

66.     The Financial Services Office did not reconcile its COD-G5 discrepancies monthly, as required by DOE regulations (*see* ¶33(d), *supra*), and instead would only reconcile discrepancies at the end of each program year. This had major monetary consequences for FCC, as under 34 C.F.R. § 668.164 if reconciliation is not completed before the end of the applicable funding period for a particular student, FCC would forever lose the ability to substantiate Title IV funds drawn to satisfy that student's tuition obligations and would have to refund the same. Ultimately, FCC's failure to timely reconcile resulted in its having to refund millions of dollars in Title IV funds it would have been entitled to retain had it timely substantiated the related draws.

67.     On March 9, 2014, Yousefi authored a memo entitled "COD Reconciliation" that cast doubt as to whether FCC had even been reconciling at the end of the school year:

> [Stewart] claims that we reconciled through 6/30/2013, but the others discount the reconciliation as a cursory look and the amounts were not reconciled. Reconciling through 6/30/2013 doesn't really help us with July through now.

68.     Yousefi's memo is supported by handwritten notes taken by Yawn dated March 26, 2014, in which he wrote that he was "told we hadn't reconciled COD since Jun 30, 2013."

Even in March 2014, when the DOE had made clear that failure to repay or substantiate all unsubstantiated funds would result in the permanent loss of FCC's ability to draw Title IV funds prior to substantiating them, Yawn noted "after DK call night of 3/26 re: Jeff + T4 collections" that "1. Doesn't know if we are actually reconciling COD or just posting enough to get the numbers closer."

        4.   <u>Pre-Draws Guaranteed Not to Comply with Prompt Disbursement Rule</u>

69.    Despite the fact that Pierne and Stewart were aware the Anthem Schools' practice of pre-drawing Title IV funds violated DOE regulations (*see* ¶¶40-42, *supra*), following the merger FCC adopted the exact same practice across its institutions (including the FCC Schools), and without implementing a system designed to ensure prompt disbursement rule compliance.[12]

70.    Even as early as mid-2012, Pierne expressed concern to the Director of Finance regarding the lack of available cash for FCC operations. Pierne stated, "No way we are going to be able to sell running with $1.5 million in cash for the last six months of the year." The Director of Finance responded that one option for increasing cash on hand would be "to push [Anthem's] T4 collection rate closer to 90 percent versus the current 87[.]"

71.    Throughout the post-acquisition life of FCC, Pierne repeatedly demanded that Title IV funds be drawn in order to generate cash for operational expenses. As one example, on April 22, 2013, Pierne pushed Stewart to utilize drawdowns on Title IV funds to generate cash for payroll and other operational expenses: "We need to get cash in here this week. It is a payroll week and we have rents to pay by next Tuesday." In response, Stewart noted that she didn't "know what the DOE will say about our draws, so I will let you know about this week's funds

22

once we have the call at 2pm." Stewart invited Pierne to join the call with the DOE, to which Pierne responded that he "would prefer to be off the call."

72.     As yet another example, on September 5, 2013, Pierne pressed Yousefi and Stewart to quickly draw down available Title IV funds to be applied toward operational expenses. Pierne stated, "Let's try for tomorrow please. I've got payroll going out today." When Stewart explained that the funds might not be available that quickly, Pierne asked her to confirm that her forecast for the next week would then increase by $1.1 million. He explained, "This is really important. I want to repay the remaining borrowings under the revolver and the answer to this question will drive the timing of repayment."

73.     As noted in the Timeline, "The carried forward refunds caught up with us in December [2013] because of a no-revenue month, which forced [Stewart] to do a pre-draw to keep the float going."

74.     A December 24-27, 2013 e-mail thread among Knobel, Pierne, and Yousefi illustrated how FCC senior management would openly and knowingly pre-draw funds based solely on FCC's short-term cash needs, and not based upon substantiated, or even projected, enrollment numbers at a given institution:

> Pierne (to Knobel): To ensure that we make payroll this week I am going to draw the remaining $600,000 available on the revolver today. That gives us about $1 million in cushion based on yesterday's cash forecast. I talked to Cid yesterday and he has over $9 million in T4 posted at COD for the January start and available to draw that on 12/30. I would like to do a pre-draw on this start to make sure we get some AP cleared prior to year end and to support cash on hand at the balance sheet date. My thought is to set the pre-draw amount after we prepare an updated forecast later this morning.

> Knobel (to Pierne): I would be inclined to use a bit of float and draw down on the various accounts to the minimums, but I don't know the details as well as you. I support your decision if you feel it is a necessity.

23

Pierne (to Yousefi): Take a look at the attached forecast. It shows about $1.2 million in T4 arriving between tomorrow and December 31. Is any of that information accurate? If not, I'm going to need to replace it with a pre-draw on the January start. I'd like to keep the pre-draw low, so **$2 million** or so on 12/30 probably gets the job done...

Yousefi (to Pierne): Jeff — we need to lower the projection by about $400k to $800k instead of $1.2m to come in by next Tue.

Pierne (to Yousefi): If we disburse **$2.5 million** of funds from the January start to arrive on 12/30 and we collect all of the $800,000 in your earlier forecast, then we are good from a cash perspective until January 6, when we could pull the remaining Pell for the start. If you have a high level of confidence that the $800,000 will arrive on time, then please accelerate $2.5 million from the January start to arrive on December 30 (Monday). If you have a low level of confidence in the ability to collect the $800,000, then let's draw **$3 million** from January to arrive on December 30. I am trying to do only one early draw to make the back end reconciliation process easier.

Yousefi (to Pierne): I'm thinking **$2.7M** just give us a little bit of cushion. I don't fully understand Siana's formula [for determining how much to draw via G5] and feel better to have a little buffer. If you are OK with that, then I'll arrange for the funds to get pulled down tomorrow morning ... are you up for golf on Sat or Sun?

Yousefi (to Financial Services Office Employee): We need to do a $2.7M draw against the DL [Direct Loans] from Phoenix, Bryman and possibly FCC OPEID. Please ... let me know the available balances for DL for each ... OPEID so that we can decide on the breakdown. It is important that we have the funds on Monday...

Financial Services Office Employee (to Yousefi): Below are the balances for the OPEID's that you inquired about:
FCC DL 13/14 available balance - $28,121,756
Phoenix DL 13/14 available balance - $15,320,172
Bryman DL 13/14 available balance - $13,193,233.

Yousefi (to Financial Services Office Employee): [L]et's use the following breakdown: $1M from FCC, $1M from Phoenix and $700K from Bryman...

Pierne (to Knobel): We decided to pull $2.7 million from the January start on Monday. That allows us to pay rents and clear some payables by year end. It also covers us until we can pull the rest of the Pell...

> Knobel (to Pierne): So tight. We need to think about a 6 month
> pause in capex for July to Dec and build up cash.

75. Pierne knew this practice violated DOE regulations, as he signed off on a memo following FCC's acquisition of the Anthem Schools which was the product of an e-mail thread discussing how the practice of pre-drawing Title IV funds typically resulted in a prompt disbursement rule violation. (See, supra ¶ 43.)

76. That each of Yousefi, Pierne, and Knobel did not need an explanation of what the practice entailed or what the ramification of the same might be makes clear that by this time the practice had long become entrenched as a part of FCC's Title IV fund management strategy.[13]

77. On March 6, 2014, Pierne wrote exclusively to Knobel, stating that they needed to discuss the cash forecast that day. Pierne explained, "Cid's latest forecast takes T4 receipts for the rest of March from $16.9 million to $7.7 million, a $9.2 million reduction. I am working with Cid to see if this can be increased because at this level I can't pay any payables until the end of the month."

78. Despite the clear instruction from the DOE that FCC was to repay or substantiate approximately $20 million in unsubstantiated Title IV funds by the end of March or else lose the ability to draw Title IV funds without first substantiating them, Pierne continued—along with at least Knobel and Yousefi—to direct payment of operational expenses out of Title IV funds. For example, on March 20, 2014, Pierne wrote to FCC's VP of Procurement and Development, copying Knobel, asking that he pay "critical project costs," as Pierne had "a bit more cash on hand than expected. But I need to catch up with Cid on his updated draw plans."

---

[13] In undertaking its investigation prior to the filing of the original complaint, the Trustee was unable to obtain e-mail records for Knobel or Yawn from IEC Corp. (which took possession of FCC's e-mail records upon its acquisition of FCC's most valuable schools, discussed below), which appear to have been removed from FCC's records prior to IEC Corp.'s receipt of the same.

79.     On March 25, 2014, Pierne wrote to Knobel: "We received about $500,000 in net

T4 proceeds today.  I think I am going to get Jeff Gray [a contractor] and Google paid today

(about 4400,000 [*sic*] in total)."  Despite these payments, and Pierne's representation only five

days earlier that he had "more cash on hand than expected," the DOE would determine by March

31, 2014 that FCC had failed to repay or substantiate the outstanding Title IV amounts.

          5.     <u>Title IV Fund "Kiting"</u>

80.     Beginning in early December 2013, if not sooner, FCC abandoned the pretense of

limiting draws to projected enrollments.  Instead, the Financial Services Office began drawing

large amounts of Title IV funds at one or more OPEIDs to enable FCC to satisfy general

business obligations, without regard to whether the funds could be substantiated and based upon

DOE drawdown capacity, not realistic enrollment projections, and then used those draws, in part,

to refund the bare minimum required by G5 before repeating with funds from one or more

different OPEIDs. This practice persisted through February 2014, despite repeated DOE

warnings concerning the consequences of the same (described below).

81.     Pierne and Yousefi had to have known about this practice because, as

demonstrated above, Yousefi took instructions from Pierne regarding the amount of Title IV

funds needed during a given period in order for FCC to satisfy its expenses for such period.

Moreover, none of these draws would have taken place without Yousefi's explicit approval.

82.     On December 10, 2013, Yousefi wrote to Stewart, among others, exclaiming

surprise at the amount of refunds due.  In response, Stewart replied, "We can offset the impact by

pre-drawing some of next week's funds and not refunding some until next week.  I have been

managing this because of the demand for funds." As addressed in Section II.B.5, *infra*, the use

of Title IV funds allocated to one OPEID to pay refunds due from a different OPEID was an

impermissible use of such funds.

83.  Again in Yousefi's March 9, 2014 memo entitled "COD Reconciliation," he explained how FCC had been using pre-draw Title IV funds to pay back previous draws that it could not substantiate with proof of student enrollment:

- It all stems from not processing refunds timely, and being squeezed for cash last April. And, not reconciling refunds and rejects, and doing pre-draws to cover them.
- The focus was to increase the authorization so we could pull down the funds, so refunds and rejects became secondary – Some of the $11M refunds from June [2013] was [*sic*] carried forward to July
- We were paying refunds when we had to, within 45 days, and at times were doing pre-draws to pay refunds
- In addition, we weren't processing rejects daily, so the money we pulled down for rejected students were not put back. The average was about $1M - $2M that got floated from month to month. Having discussed with [Stewart] herself, Kim and Julande. Although the stories vary a bit, the common theme is that we were not reconciling refunds and rejects, so we were borrowing (pre-drawing) to pay the refunds when they were due.

84.  For example, on March 17, 2014, Yousefi wrote to the Corporate Director of Student Financing, asking how much "of what is due" belonged to FCC. The Director replied that "all of it" did, and that "we took what we drew today from pell and springfirled [*sic*] and did the 30 days refunds as follows; 45k for anthem, 195 for Bryman…..we are left with 1.1 mil for fcc[.]"

85.  Three days later, on March 20, 2014, that same Director informed Yousefi that "we have about 50k we can draw today which we will send towards the 13/14 dl for fcc…….will do the same with whatever we get tomorrow." Yousefi replied, "We should use what we generate Monday to paydown the $5M in COD 30 day[.]"

86.  The next day, Yousefi wrote to Knobel and Pierne: "As of today, we have processed and prepped about $7M for a draw on Monday to come in by Wed; I expect us to be over $8M by Monday. With the above draw, we will be able to pay COD the $5M that is due from last week by Wed, which is good news!"

87.     The DOE cited this specific practice in explaining its decision to permanently revoke FCC's ability to draw Title IV funds under the advance payment method, as described below.

### C.  FCC's Financial Reports to Management Suggest its Title IV Draws Violated DOE Regulations

88.     Based on FCC's internal monthly financial reports, as well as audited financial statements prepared by FCC's independent certified public accountants, management knew or should have known FCC was drawing far more in Title IV funds than it was entitled to under DOE regulations.

89.     Stagnant Enrollment Numbers.  FCC's records reflect that upon the acquisition of the Anthem Schools, monthly student headcount increased from approximately 4,000 to 12,000. However, thereafter monthly student headcount numbers fluctuated significantly but by and large remained stagnant and trended lower, a situation which would not support significant growth in Title IV draws (discussed below).

90.     Explosive Growth in A/R and Deferred Revenues.   Historically, accounts receivable ("A/R"), a component of gross revenues linked to Title IV draws, ranged from approximately $9-16 million per program year, or approximately 10-20% of FCC's total revenues.  However, during the 2012-13 program year, the first full program year following the acquisition of the Anthem Schools, A/R grew to approximately $74 million (far outpacing headcount growth), and comprised approximately 34% of total revenues.   Moreover, during the 2013-14 program year, during which headcounts and total revenues remained flat, A/R still grew to approximately $140 million, or approximately 66% of total revenues.   Deferred revenue, which is also linked to Title IV draws, also deviated from its historic norm and increased significantly during the 2012-13 and 2013-14 program years.

91.     <u>Significant Reduction in A/R Allowance</u>.  At the same time that FCC's financial reporting reflected major increases in A/R and deferred revenue, its records reflect a significant decrease in A/R allowance, representing the amount of A/R that FCC estimated writing off as uncollectible.  Ordinarily, a company's A/R allowance is determined by its past, actual collection records, and historically, FCC's allowance was 52-57%.  However, following the merger date this figure dropped to 21-25%, meaning FCC management represented it expected to collect roughly 30% more A/R after the merger with Anthem, which at the time was not profitable, and before FCC implemented any of its contemplated operational improvements at the Anthem Schools.  This allowance was increased to 35% for the 2013-14 program year, presumably because its 21-25% estimate proved wholly inaccurate.

92.     <u>Negative Cash Flow</u>.  Prior to the merger date, FCC had positive cash flow, after accounting for its expenses.  However, following the merger FCC's capital expenditures grew significantly as it invested in the buildout of new schools and additional capital expenditures.  As a result, FCC had negative cash flow during each of the 2011-12, 2012-13, and 2013-14 program year, which would explain why it anticipated running out of cash in August 2014, only a few months after it was forced to refund the Title IV funds it previously overdrew.

93.     <u>Divergence of Key Balance Sheet Items from Historic Norms</u>.  The divergence of each of A/R, deferred revenue, A/R allowance, and cash flow from their historic norms should have been cause for alarm for FCC's C-level officers (*i.e.*, Knobel, Pierne, Yawn, and Bartness), each of whom received monthly reports reflecting the foregoing, and in particular Pierne, the officer responsible for financial reporting.  At a minimum, management knew or should have known the significant growth in A/R and deferred revenue and corresponding decrease in A/R allowance in the face of stagnant enrollment numbers and revenue growth meant FCC was drawing far more in Title IV funds than permitted by DOE regulations.  However, management

29

ignored the problem and took no steps to investigate the foregoing or otherwise stem its practice of overdrawing Title IV funds.

### D. FCC's Drawdown Practices Resulted in a Covenant Breach under FCC's Credit Agreement

94.     Section 8.14(a) of that certain Credit Agreement ("Credit Agreement"), dated as of November 2, 2012, among FCC Holdings, Inc., as borrower, its debtor subsidiaries, as guarantors, Bank of Montreal, as agent, and the lenders party thereto, pursuant to which FCC borrowed approximately $30 million, included a covenant that FCC:

> comply in all respects with the requirements of all federal, state, and local laws, rules, and regulations … pertaining to its Property or business operations, where any such non-compliance … could reasonably be expected to constitute a Significant Regulatory Event or have a Material Adverse Effect.

95.     The Term "Property," in turn, includes intangible property such as access to Title IV funds under the advance payment method.

96.     In addition, "Significant Regulatory Event" includes "any material limitation of Title IV Program funding."

97.     Further, "Material Adverse Effect" includes "a material adverse change in, or material adverse effect upon, the operations, business … or financial condition of [FCC] or … a material impairment of the ability of [FCC] to perform [its] material obligations under [the Credit Agreement]."

98.     Each of the above-mentioned drawdown practices which violated DOE regulations also violated Section 8.14(a) of the Credit Agreement:

> (a)     the practice of drawing Title IV funds premised on inflated enrollment projections and pre-drawing funds violated DOE regulations prohibiting FCC from drawing Title IV funds in amounts greater than that required to satisfy tuition balances of currently enrolled students;

(b)    the persistent failure to report student withdrawals, or refund Title IV funds on account of the same, violated DOE regulations requiring the opposite;

(c)    the practice of treating access to Title IV funds under the advance payment method as an interest-free credit line and Title IV fund "kiting" during January and February 2014 in order to satisfy business expenses and refund requirements, not student tuition obligations, violated federal regulations requiring that FCC treat Title IV funds as trust funds; and

(d)    the failure to reconcile discrepancies between FCC's G5 draws and disbursement data reported to COD monthly violated federal regulations requiring monthly reconciliation.

*See* notes 1-4, *supra*.

E.    <u>DOE Response to Drawdown Practices that Violated DOE Regulations</u>

1. <u>2012-13 Program Year</u>

99.    As a result of the foregoing (except for the Title IV fund "kiting"), on or about April 22, 2013 the DOE notified Stewart that FCC had unsubstantiated draws exceeding $15 million across all OPEIDs and availability under G5 at each OPEID would be reduced to $0 until FCC substantiated all of its prior draws. The DOE further stated if FCC did not substantiate all prior draws by the end of May, none of its institutions would be eligible for advance draws of Title IV funds during the 2013-14 program year, and instead would need to substantiate before funds would become available via G5.

100.    Stewart attributed FCC's failure to substantiate its draws to malfunctioning financial aid management software (called "<u>Regent 8</u>") that was rolled out at the FCC and Anthem Schools in January and February 2013, respectively, and which Stewart alleged was not reporting disbursement data to COD accurately.

101.    However, the DOE rejected this excuse. In its August 7, 2013 Program Review Report assessing compliance with DOE requirements at FCC's Atlanta campus, the DOE found that FCC inaccurately reported information to COD. FCC's November 27, 2013 response to this finding stated disbursements the DOE identified as incorrect in its report "were processed using a

previous Financial Aid Management system and is not a reflection of our current systems and processes … we feel this was an isolated incident." The DOE, in turn, stated as follows in its February 10, 2014 reply:

> [FCC's] response to this finding is unacceptable and inadequate … [FCC] must review COD reporting procedures to determine why disbursement dates and conflicting information reported are not accurate for its students … [FCC] must correct its procedures so that disbursement dates reported to COD are the dates that Federal Pell funds and Direct Loans are credited to the student's account or paid to the student directly … In addition, [FCC] must describe procedures that the institution will put in place in order to correct these deficiencies.

102.    Moreover, FCC's stated position that it could not reconcile because of a software malfunction was not credible. In response to the FCC's April 22, 2013 notification, FCC hired ten temporary employees to manually reconcile student records to ensure Title IV fund award information was reported to COD. In just one month's time, the Financial Services Office achieved full balance between COD and G5 at its three largest OPEIDs, which together represented 70% of the student population, via manual reconciliation. FCC subsequently continued to manually reconcile in this manner until it successfully reimplemented Regent 8 (discussed below).

103.    Nevertheless, the DOE granted Stewart's request and agreed to award each OPEID an initial G5 funding level consistent with its historic norm for the subsequent program year upon elimination of its COD-G5 imbalance (which already occurred at the largest OPEIDs).

2.    2013-14 Program Year

104.    FCC hired Yousefi in June 2013 to, *inter alia*, supervise the Regent 8 reimplementation.

105.    Although the software was reimplemented across all OPEIDs by November 2013, a COD-G5 imbalance nevertheless reappeared at each OPEID due to FCC's drawdown practices.

106.    As a result of FCC's Title IV fund overdraws during the 2013-14 program year, its Financial Services Office believed that by January 28, 2014 its COD-G5 imbalance across all OPEIDs was approximately $10 million.

107.    On February 4, 2014, the DOE e-mailed John Murphy, who replaced Stewart on January 1, 2014 as Vice President of Financial Services (but reported to Yousefi) ("Murphy"), expressing concern about FCC's growing imbalance.

108.    In addition, on February 26, 2014, the DOE notified Murphy that FCC's three largest OPEIDs had over $15 million in unsubstantiated draws, and instructed FCC to promptly refund or substantiate the funds.

109.    No meaningful action was taken in response, and in fact, FCC pre-drew Title IV funds in advance of the March start date.

110.    On March 4, 2014, the DOE e-mailed Murphy and several other Financial Services Office employees requesting a conversation "regarding your [Direct Loan] processing and the weekly need to refund large sums of unsubstantiated funds for several of your schools." During this conversation, the DOE notified the FCC participants that the out-of-balance condition had grown to an unacceptable level and instructed them as follows:

> All of the [FCC and] Anthem Schools … need to be reconciled and have no funds unsubstantiated over 30 days by the end of March 2014 … [I]f by the end of March … we still see issues with drawing funds and not being able to submit records successfully to substantiate those funds then FSA will reduce the available balances for each of the schools to $0 which will place you in a position where you must successfully report Direct Loan disbursement records to COD prior to drawing any funding from G5.

111.    As a result, FCC had to stop drawing Title IV funds.  On March 18, 2014, Murphy notified the DOE FCC "refunded/posted disbursements in excess of $7M," but the next

day the DOE notified him FCC still had $13 million in unsubstantiated draws at the three largest OPEIDs.

112.     On March 31, 2014, the DOE notified Murphy that because substantial imbalances remained at the three largest OPEIDs, FCC's funding level under each OPEID would be reduced to $0, and each OPEID would need to substantiate disbursements via COD before Title IV funds would be available to draw via G5 for the 2014-15 program year.

### III.     FCC'S RESPONSE TO LOSS OF TITLE IV FUNDING

#### A.   Replacement of CEO and COO with Restructuring Advisors

113.     During April 2014, FCC hired FTI as its restructuring advisor, Knobel was removed as director and CEO, and Yawn resigned.   Further, during this period Pierne was appointed to the Board.

#### B.   Additional Debt

114.     To keep FCC afloat, FCC entered into an amended Credit Agreement, dated as of April 29, 2014, pursuant to which loans under FCC's 2012 Credit Agreement were subordinated to $15 million in new loans from FCC's private equity fund owners and a third party.

#### C.   Delay of Payments to Creditors

115.     To manage its liquidity, FCC delayed payments to creditors, and even delayed payroll scheduled for April 4, 2014.   Knobel lied to his employees when he explained the delay was due to a "temporary disruption in funding our operating accounts" brought on by capital expenditures that would ensure the company's success.

#### D.   Attempts to Resolve Outstanding DOE Obligations

116.     In the meantime, management scrambled to substantiate or refund Title IV funds it previously drew to avoid potential penalties associated with failing to repay trust funds.   By the

end of April 2014, management believed it resolved nearly all outstanding balances at its three largest OPEIDs.

117.    Further, in or about June 2014, at FTI's recommendation FCC commenced using software which automatically searched FCC's COD records for inconsistencies with FCC's internal records, which FCC had not previously used even though the Federal Student Aid Handbook recommends use of such software to discover/address discrepancies.  Based on this analysis, FCC concluded it owed the DOE approximately $2.5 million in additional reconciliation-related obligations which it refunded.

118.    Notwithstanding the foregoing, the DOE subsequently filed a proof of claim against FCC Holdings, Inc. stating it still owed approximately $32 million and $1.4 million in unpaid Pell Grant and Direct Loan obligations, respectively, under four OPEIDs.

**E.  Sale of FCC's Schools**

119.    FCC anticipated running out of cash in August, and commenced marketing its schools on or about June 15, 2014.

120.    Following preliminary discussions, FCC signed confidentiality agreements with five potential purchasers.

121.    FCC entered into a two-step asset purchase agreement with IEC Corp., dated as of August 21, 2014.  Step 1 involved the pre-bankruptcy sale of the FCC Schools and their OPEID. Step 2 involved the sale of the US Colleges and, subject to FCC receiving certain DOE change of control approvals by August 29, 2014, the sale of nine Anthem Schools and their four respective OPEIDs.

122.    Consideration for the transaction was $1 million in cash, a $1 million lender consent fee payable to Bank of Montreal, as agent under its Credit Agreement, the funding of

certain expenses to enable FCC to operate parts of its business through closing, and the assumption of certain liabilities (*i.e.*, DOE liabilities associated with the purchased OPEIDs).

123.    In addition, on August 22, 2014 FCC sold three Anthem Schools and the OPEID under which they operated to Premier Education Group, L.P.   Consideration for this transaction was a $150,000 lender consent fee and the assumption of certain liabilities (*i.e.*, DOE liabilities associated with the purchased OPEID).

124.    On August 26, 2014, FCC commenced a chapter 11 case.

125.    FCC did not receive the DOE approvals required to consummate the sale of the nine Anthem Schools which were the subject of the Step 2 sale to IEC by August 29, 2014.   As a result, FCC was unable to monetize these nine schools and the ten Anthem Schools which were not the subject of the IEC or Premier transactions, which were either closed or taught out.[14]

## CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY OF CARE
### (All Defendants)

126.    The Trustee incorporates by reference each allegation in the foregoing paragraphs.

127.    Defendants owed a fiduciary duty of care *to FCC*.   A fiduciary duty of care requires officers and directors to perform their duties free of gross negligence by using the amount of care that ordinarily careful and prudent officers would use in similar circumstances and by making business decisions considering all material information reasonably available. Defendants breached this duty, resulting in the loss of the one thing necessary for FCC to survive: access to Title IV funds.

---

[14] A "teach out" arrangement is one whereby a school closes, but another (typically unaffiliated) school accepts students from programs offered by the closed school so that they may continue their education without interruption.

128.    Knobel and Pierne violated their duty of care by directing the Financial Services Office to pre-draw Title IV funds, unrelated to student needs, which necessarily violated the prompt disbursement rule and risked the DOE eliminating FCC's ability to draw Title IV funds at all.  Those funds were crucial to FCC, as they made up 90% of its revenue.  Both Knobel and Pierne were aware that a potential consequence of violating these regulations was loss of funding, as FCC had suffered that exact consequence in May 2013 when it was first caught by the DOE.

129.    Furthermore, Knobel and Pierne both knew that taking actions that violated the terms of FCC's credit agreement, such as failing to "comply in all respects with the requirements of all federal, state, and local laws, rules, and regulations," would risk Bank of Montreal cancelling FCC's loan and requiring FCC to repay the balance immediately.  If FCC were already struggling to meets its cash needs, a careful and prudent officer would not risk exacerbating the situation by simultaneously violating the terms of his company's credit agreement.

130.    Even when the Defendants were drawing down Title IV funds based on projected student enrollment and refunding funds based on withdrawal reports, Knobel, Pierne, Stewart, Yawn, and Yousefi were all still violating their duty of care because they were submitting information from and relying on reporting systems that they knew were inaccurate.  When FCC had been caught improperly drawing, substantiating, and refunding Title IV funds by the DOE in May 2013, it struggled to reconcile the funds it drew down with student data, in part, because STARS and the Regents 8 system were not able to accurately transmit information from one to another.  Thus, it was impossible for Regents 8 to accurately reconcile funds drawn with student enrollment data.  Furthermore, STARS was discovered to have a number of inaccuracies regarding student enrollment.  The failure of these systems required FCC to hire temporary staff

for the sole purpose of manually reconciling student data with funds drawn, a process which took months. Yet once FCC had reconciled and was allowed to draw Title IV funds in advance again, Knobel, Pierne, Stewart, Yawn, and Yousefi made decisions based on the same, inaccurate information from failed systems as they had done before the DOE investigation.

131.    Yawn went back to submitting inflated projections of student enrollment, which was used to determine DOE funding amounts, and submitting inaccurate withdraw numbers. Yawn worked with Yousefi on trying to fix technology systems at FCC, but they never completed this project. Thus, Yawn was aware that prior to the DOE permanently cutting off FCC's ability to pre-draw Title IV funds in March 2014, these systems had never been fixed, and yet he allowed the Financial Services Office to continue to base Title IV draws off of incorrect information. Moreover, Yawn's systematic failure to accurately report student withdrawals from FCC, which would have resulted in the need to refund Title IV funds, resulted in FCC retaining tens of millions of dollars in Title IV funds which FCC could not substantiate but was required to refund under DOE regulations.

132.    Stewart and Yousefi, who oversaw the drawdown and refund of Title IV funds, went back to using the inaccurate information from STARS and Regents 8 to request and refund Title IV funds, even though they knew the enrollment data was inaccurate and, even if it had been accurate, was also not being correctly transmitted to Regents 8 for reconciliation. Additionally, they further caused the resulting imbalance to spiral out of control by also failing to reconcile G5 draws with disbursement data reported to COD on a monthly basis, as required by DOE regulations.

133.    At the same time, Knobel and Pierne went back to setting budgets and making capital expansion plans based on cash flow projections from systems they knew had never been fixed after the DOE investigation revealed their failure to accurately project enrollment,

withdrawals, funding, and refunds.   They too had been involved in the previous manual reconciliation process at the end of the 2012-13 school year and so were also aware that the technology systems resulted in millions of dollars of overdraws and insufficient refunds.

134.   Bartness was responsible for ensuring compliance with DOE regulations. Although FCC temporarily lost access to Title IV funds during the 2012-13 program year as a result of its failure to draw, substantiate, or refund Title IV funds in accordance with DOE regulations, he did not take any action to remedy the situation the following program year and ensure that those who oversaw the technology systems and the Financial Services Office were producing and using reliable information that would keep FCC compliant with DOE regulations.

135.   The foregoing acts and omissions by Defendants also caused FCC to breach the terms of its 2012 Credit Agreement.

136.   As a result of Defendants' fiduciary duty breaches *to FCC*, FCC suffered damages in an amount to be determined after trial, but not less than $150 million.   The Trustee, as FCC's assignee, commenced this action to recover the same as the judicial substitute for FCC and for the benefit of FCC and its bankruptcy estate.

137.   The Trustee is entitled to judgment against all Defendants, jointly and severally, *for damage caused to FCC.*

138.   In addition, Defendants' conduct has demonstrated the high degree of moral turpitude and wanton dishonesty directed at the DOE, FCC's students, and the public at large such that an award of punitive damages is also warranted in an amount to be determined after trial.

## SECOND CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (All Defendants)

139.    The Trustee incorporates by reference each allegation in the foregoing paragraphs.

140.    Defendants owed a fiduciary duty of loyalty *to FCC*.  A fiduciary duty of loyalty encompasses both a requirement that officers and directors monitor the business in good faith and that they refrain from engaging in illegal or self-dealing conduct.  Defendants breached this duty, resulting in the loss of the one thing necessary for FCC to survive: access to Title IV funds.

141.    Knobel, Pierne, Yawn, Bartness, and Stewart all had stock options or vested stock and would financially benefit if FCC had achieved its goals of expanding rapidly and then selling its schools at the predicted valuation that reached as high as $450-500 million.  Knobel, in particular, would have netted over 10% of the proceeds of such a sale, which could have amounted to as much as $45-50 million for him personally.  Knobel, Pierne, Yawn, Bartness, and Stewart breached their duty of loyalty by engaging in or, at least, ignoring the improper draw of Title IV funds to fund expansion of campuses and programs.

142.    Knobel, Pierne, and Stewart also violated the duty of loyalty by engaging in illegal conduct.  They drew down Title IV funds unrelated to even the flawed student data that was provided in violation of DOE regulations.  In consultation with Knobel, Pierne repeatedly requested that Stewart draw down additional Title IV funds in a transparent attempt to use access to Title IV funds under the advance payment method as an interest-free credit line to satisfy business expenses, all in contravention of DOE regulations requiring that such funds be held in trust, disbursed within three days to satisfy current students' tuition obligations, and otherwise refunded to the DOE.  After receiving Pierne's requests, Stewart would then direct employees to

pre-draw hundreds of thousands of dollars, sometimes more than a million dollars at one time, in Title IV funds beyond what was available based on the inaccurate student enrollment information.

143.    Stewart and Yousefi further violated the duty of loyalty by failing to reconcile G5 draws with disbursement data reported to COD on a monthly basis, as required by DOE regulations. This not only enabled the resulting imbalance to spiral out of control, it resulted in FCC subsequently having to refund millions of dollars in legitimate Title IV fund draws that were not timely substantiated pursuant to 34 C.F.R. § 668.164.

144.    In addition, Pierne, Stewart, and Yousefi aggravated the resulting imbalance by directing that the Financial Services Office engage in conduct which amounted to Title IV fund "kiting," in which Title IV funds would be pre-drawn in the name of one institution in order to pay part of the refund owed by another institution in an attempt to prevent the DOE from being alerted to the overdraws, in contravention of DOE regulations requiring that such funds be held in trust and used only to satisfy current students' tuition obligations.

145.    In the alternative, if the Defendants did not know their actions violated DOE regulations it is because they consciously failed to monitor or oversee FCC's operations. Knobel, the CEO, and Pierne, the CFO, were responsible for monitoring the financial condition of FCC and, to that end, regularly received financial reports both in the form of informal cash flow or budget reports and formal audited financial statements. Based on these reports, they should have known FCC's draws did not comply with DOE regulations because major anomalies in FCC's financial reporting indicated as much.

146.    In addition, all of the Defendants utterly failed to implement systems and procedures or employ qualified personnel to ensure the technologies systems accurately reported information, the Financial Services Office's draw down procedure complied with DOE

regulations, Title IV funds were kept separate in trust to be used for student tuition, and refunds were accurately processed in the time period required by the DOE. The result was improper overdraws of Title IV funds, an inability to substantiate the money drawn down, improper use of the Title IV funds, and, as a natural consequence, an inability to refund the amounts that were owed back to the DOE.

147.    The foregoing acts and omissions by Defendants also caused FCC to breach the terms of its 2012 Credit Agreement.

148.    As a result of Defendants' fiduciary duty breaches *to FCC*, FCC suffered damages in an amount to be determined after trial, but not less than $150 million. The Trustee, as FCC's assignee, commenced this action to recover the same as the judicial substitute for FCC and for the benefit of FCC and its bankruptcy estate.

149.    The Trustee is entitled to judgment against all Defendants, jointly and severally, *for damage caused to FCC*.

150.    In addition, Defendants' conduct has demonstrated the high degree of moral turpitude and wanton dishonesty directed at the DOE, FCC's students, and the public at large such that an award of punitive damages is also warranted in an amount to be determined after trial.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee requests that this Court enter judgment in its favor against all Defendants, jointly and severally and in the amount determined after trial, but not less than $150 million, plus attorneys' fees and costs, prejudgment interest, and punitive damages, together with such other and further relief as this Court deems just and proper.

Dated: June 28, 2017

Respectfully submitted,

/s/ Brian S. Dervishi
Brian S. Dervishi
WEISSMAN & DERVISHI, P.A.
SunTrust International Center
One Southeast Third Avenue
Suite 1700
Miami, Florida 33131
(305) 347-4070
bdervishi@wdpalaw.com
service@wdpalaw.com

- and -

Bijan Amini
Avery Samet
Jeffrey Chubak
STORCH AMINI PC
2 GRAND CENTRAL TOWER
140 EAST 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@samlegal.com
asamet@samlegal.com

*Attorneys for Plaintiff Clingman &
Hanger Management Associates, LLC,
as Trustee*