# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC as Trustee

           Plaintiff,

v.

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI

           Defendants.

CASE NO. 16-CV-62028-JAL-JG

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE PROPOSED EXPERT
<u>JAMES DONOHUE</u>**

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

Table of Authorities ............................................................................................... ii

Introduction ............................................................................................................1

Statement of Facts ..................................................................................................3

**ARGUMENT** .........................................................................................................7

   **I.**    **DONOHUE IS NOT PRESENTED AS A LIABILITY OR CAUSATION EXPERT** ...........................................................................7

  **II.**    **DEFENDANTS ATTACK ONLY THE WEIGHT OF DONOHUE'S TESTIMONY WHICH IS NO BASIS FOR PRECLUSION** .......................9

 **III.**    **DONOHUE'S FORENSIC OPINIONS ARE SUBSTANTIVELY UNCHALLENGED** .................................................................................16

**CONCLUSION** ..................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Bazemore v. Friday,*
  478 U.S. 385 (1986) ..................................................................................................... 9

*Bellis v. Tokio Marine & Fire Ins. Co.,*
  2006 WL 648013 (S.D.N.Y. Mar. 14, 2006) ............................................................... 7

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.,*
  582 F.3d 1227 (11th Cir. 2009) ................................................................................... 8

*Braggs v. Dunn,*
  317 F.R.D. 634 (M.D. Ala. 2016) ............................................................................... 8

*Celebrity Cruises Inc. v. Essef Corp.,*
  434 F. Supp. 2d 169 (S.D.N.Y. 2006) ............................................................... 14, 15 n.4

*City of Tuscaloosa v. Harcros Chems., Inc.,*
  158 F.3d 548 (11th Cir. 1998) ............................................................................... 10, 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993). ............................................................................................... 9, 10

*Frymire-Brinati v. KPMG Peat Marwick,*
  2 F.3d 183 (7th Cir. 1993) ......................................................................................... 13

*Habersham Plantation Corp. v. Molyneux,*
  2011 WL 13214323 (S.D. Fla. Sept. 13, 2011) ......................................................... 10

*Hall v. Nettles,*
  2010 WL 11493784 (N.D. Ga. Jan. 7, 2010) ....................................................... 11-12

*Hemmings v. Tidyman's Inc.,*
  285 F.3d 1174 (9th Cir. 2002) ..................................................................................... 9

*In re Bond,*
  2012 WL 3867427 (Bankr. D. Ariz. Sept. 5, 2012) .................................................. 13

*In re Mahoney,*
  251 B.R. 748 (Bankr. S.D. Fla. 2000) ....................................................................... 15

*In re Med. Diversified,*
  334 B.R. 89 (Bankr. E.D.N.Y. 2005) .......................................................... 12, 13, 14, 14 n.3

*In re Rural Metro Corp.*,
    88 A.3d 54 (Del. Ch. 2014)................................................................. 15

*Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*,
    2014 WL 4986482 (M.D. Fla. Oct. 6, 2014).......................................... 17

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003)................................................ 12-13, 14, 14 n.3

*Local Access, LLC v. Peerless Network, Inc.*,
    2016 WL 4466890 (M.D. Fla. Aug. 24, 2016)........................................ 11

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001)................................................................ 9

*Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003).......................................................... 9, 11

*Rink v. Cheminova, Inc.*,
    400 F.3d 1286 (11th Cir. 2005)........................................................... 10

*Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*,
    2017 WL 1319553 (E.D. Tex. Apr. 10, 2017) ........................................ 7

*Rosenfeld v. Oceania Cruises, Inc.*,
    654 F.3d 1190 (11th Cir. 2011).......................................................... 9, 11

*Rowe v. DPI Specialty Foods, Inc.*,
    2015 WL 4949097 (D. Utah Aug. 19, 2015)
    *aff'd in relevant part,* 2018 WL 1180654 (10th Cir. Mar. 7, 2018)........... 7

*Seamon v. Remington Arms Co., LLC*,
    813 F.3d 983 (11th Cir. 2016)................................................................ 9

*Sofillas v. Carnival Corp.*,
    2016 WL 5407889 (S.D. Fla. July 8, 2016) ................................ 11, 16, 17 n.5

*Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*,
    2008 WL 3819752 (M.D. Fla. Aug. 12, 2008)....................................... 16

*U.S. v. Frazier*,
    387 F.3d 1246 (11th Cir. 2004)........................................................... 10

*United States v. Scrima*,
    819 F.2d 996 (11th Cir. 1987)............................................................. 17

iii

**Rules**

Federal Rules of Evidence 702 ........................................................................ 10

Federal Rules of Evidence 703 ........................................................................ 17

**Other Authorities**

S. Bernstein, S. Seabury, J. Williams, *Squaring Bankruptcy Valuation Practice with* Daubert *Demands,* 16 ABI Law Rev. (2008) ............................................ 12

S. Pratt, *Valuing a Business, Fifth Edition* (McGraw Hill 2008) ................................. 14

Plaintiff Clingman & Hanger Management Associates, LLC, as Trustee ("Plaintiff") opposes the motion filed by Defendants David Knobel, Jeffrey Pierne, Neal Yawn, Dean Bartness, Cid Yousefi and Siana Stewart (collectively, "Defendants") to exclude the expert report of and preclude any trial testimony by James Donohue (D.E. 245 (hereinafter the "Motion")), a forensic accountant who is both a Certified Public Accountant and a Certified Valuation Analyst, and who will testify as to the "but for" valuation of FCC Holdings, Inc. and subsidiaries ("FCC"), and to his forensic analysis of FCC and Department of Education ("DOE") accounting records, for the reasons set forth below.

## PRELIMINARY STATEMENT

In August 2013, FCC raised $2.5 million of capital in an equity transaction in which not only objective third parties, but also Defendant Knobel, who invested $165,000 of his own money, valued FCC at more than $158 million. Yet FCC sold its assets in a pre-packaged bankruptcy almost exactly one year later, in August 2014, for just $4 million.

That $158 million valuation was no outlier. Seven months after the equity transaction, as of March 31, 2014—the same day the Department of Education put FCC on a records-first program that precipitated its spiral into bankruptcy five months later—Defendants themselves valued FCC at $270 million. Thus, it would be completely defensible to conclude that Defendants' breaches of fiduciary duty, which caused the records-first policy and the bankruptcy, damaged FCC by at least $266 million. Had Plaintiff adopted Defendants' own valuation, Defendants would have had to argue that their own valuation was fraudulent.

Nevertheless, FCC's expert, James Donohue, concluded that it would be inappropriate to simply rely on Defendants' valuations—or, for that matter, those of third parties like Deloitte Financial Advisory Services LLP ("Deloitte"), which valued FCC at more than $200 million as of June 2013 (*see* D.E. 223-2 (Expert Report of James J. Donohue (the "Donohue Report") at 211 n.

7, citing D.E. 221-2 at 243)—because those valuations were premised on the unimpeded continuation of the alleged wrongdoing. Donohue concluded that if Defendants had not breached their fiduciary duties, thereby artificially inflating its value and causing FCC to file for bankruptcy, the company would have been worth from $37 million to $51 million as of June 30, 2014. (D.E. 223-2 (Donohue Report) at 70.) [1]

Even though Donohue's discounting their own valuation by more than $200 million was directly in Defendants' interests (since it decreases their potential liability for having destroyed the company), it puts Defendants in a bind. Because they cannot identify anything material that changed for FCC to justify any change from their own valuation of $270 million just five months before—other than the direct consequences of what Plaintiff alleges to have been their breaches of duty and loyalty—accepting a lower valuation would necessarily mean either (1) that their own valuations were fraudulent, or (2) that FCC's value was in fact reduced by far more than even Plaintiff is seeking by reason of their alleged conduct.

Defendants now seek the solution to their quandary in the wholesale exclusion of Donohue's testimony. Thus, they offer no counter-valuation of their own and simply argue that (1) Donohue's valuation should be ignored simply because he did not prove a negative, that FCC would not have gone into bankruptcy but for their conduct, even though Defendants offer no evidence to suggest that anyone thought that a possibility and Defendants themselves are on record as stating that it was not; (2) that Donohue made errors in applying a recognized valuation

---

[1] Donohue valued FCC "as of June 30, 2014" as a continuing enterprise based on "assumptions that the alleged breaches concerning FCC Title IV misuse [did] not occur and that FCC would have more timely knowledge of FCC's true financial position[.]" (*Id.* at 69-70.) June 30 is the end of FCC's fiscal year (*id.* at 69 n.3), a few months before the bankruptcy filing, and was approximately when, because of the alleged breaches, FCC was starting to plan to sell itself, which it ultimately did in a $4 million transaction that the Bankruptcy Court approved. Defendants have not disputed the propriety of that date for valuation purposes and, therefore, that is the relevant date for assessing facts claimed to impact the valuation.

methodology, a contention universally recognized as going only to the weight, not the admissibility, of testimony; and (3) that his forensic analysis should be excluded because it does not (it actually does) satisfy a made-up requirement that an expert must personally employ his own forensic analysis for some additional purpose before that analysis or its implications can be considered by the jury.

Inasmuch as Defendants question neither Donohue's qualifications, the reliability of his methodology, nor the helpfulness of his testimony, as such conditions are defined by Eleventh Circuit precedent, their attacks on his valuation opinion present, at best, grounds to be explored with him as a witness before the jury, not a basis for keeping his opinion away from the jury. Similarly, Defendants' assertion that Donohue's forensic analysis—*none of the conclusions in which were disputed by Defendants' own expert*—should be excluded because he did not rely on it for his valuation opinion, is wrong both as a matter of fact and law, as is their unsupported and unsupportable assertion that his findings somehow constitutes inadmissible "hearsay."

## STATEMENT OF FACTS

Defendants rely for their motion only on the report of their own expert, Robert Burton, and Donohue's report and deposition (D.E. 245-3, 245-1 and 245-2, respectively). Their primary argument seems to be that, before his "but for" valuation is admissible, Donohue had some obligation to prove that FCC would not have gone into bankruptcy even if Defendants had done nothing wrong. That assertion seeks to impose on Donohue a duty that he simply does not have, as addressed below. But curiously, beyond just trying to impose such a burden, the Motion makes a factual assertion: "the evidence shows that even if Defendants' alleged actions did not occur the company would still have entered bankruptcy because of its severe liquidity constraints, rendering Mr. Donohue's valuation worthless." (D.E. 245 at 2.) The only such supposed "evidence" that they identify is their own expert report:

> the Court should exclude Mr. Donohue's valuation opinion because it assumes that the company would have remained a going concern even if the alleged breaches did not occur without providing any basis for his assumption **which assumption is contradicted by the report of Defendants' expert Robert Burton**.

(*Id.* at 5 (emphasis added).) Burton, however, says no such thing. His report is annexed to the Motion as Exhibit 3 and in it he confines his opinions to asserting that Donohue supposedly failed to take certain facts into account rendering his opinion "unreliable," and which omission "may have materially impacted his conclusions." (D.E. 245-3 at 6-7, 10.) Defendants' expert ***does not*** say that FCC would ***not*** have survived as a going concern absent Defendants' wrongdoing.[2]

Thus, Defendants offer nothing at all to support that bald assertion that is counter to the overwhelming weight of evidence—most of it generated by Defendants themselves and thus constituting admissions—that everyone believed that FCC would have continued as a going concern before Defendants' wrongdoing came to light. As just a few examples:

- While the Defendants assert in their motion that FCC was facing "strong headwinds" and now want to suggest that it faced inevitable bankruptcy, between June 2009 and March 2014, FCC was consistently valued as a going concern at between $146 million (a value produced through a $30 million equity transaction as of April 2012) and $276 million (as valued by Defendants in a goodwill impairment model as of March 2014), in separate valuations by investors, by Deloitte, and by Defendants themselves. (*See* D.E. 223-2 (Donohue Report) at 221; *see also* D.E. 221-2 at 250 (June 2013 valuation by Deloitte cited therein).)

---

[2] The closest he comes is to assert that "FCC was a troubled company with poor liquidity and limited working capital prior to the DOE's March 2014 funding restrictions" and cites the fact that the "DOE had previously frozen funding to FCC in May 2013." (D.E. 245-3 at 11, n. 17.) The May 2013 funding freeze does not prove that FCC was "a troubled company" and, in fact, Defendants assert in their Summary Judgement Motion that the DOE's funding restrictions were entirely unconnected to FCC's financial health and supposedly resulted solely from a software glitch. (*See* D.E. 247 at 30.) Notably, Deloitte valued FCC at more than $200 million as of June 30, 2013, just a month *after* the May 2013 funding freeze. (D.E. 221-2 at 250.)

- FCC received clean opinions from its auditors, Ernst & Young and Grant Thornton, both in June 2012, two months after the Anthem acquisition, and again in June 2013, without any indication that FCC might not continue as a going concern. (*See* D.E. 223-2 (Donohue Report) at 148, n. 1, 150, n. 2.)

- Even after the DOE imposed funding restrictions in March 2014, and after Defendants obtained debt funding in April 2014, the Defendants do not tell their investors, or even their own Board, that FCC would have to go out of business.

- In May 2014 (three months before the bankruptcy and after DOE had forced FCC to resolve the unsubstantiated balances and placed it on records-first status), defendant Dean Bartness sent the Arizona State Board for Private Postsecondary Education FCC's financial statements for the period ending April 30, 2014, and represented in his cover letter that "We believe that the attached financials . . . sufficiently demonstrate the financial strength of [Anthem]," stating not that they expected Anthem to go out of business, but that they expected it to regain its Florida license by the end of May. (D.E. 226-2 at 137.) Defendant Jeffrey Pierne had received a copy of that letter contemporaneously by email. (*Id*. at 139.)

- In January 2015, five months *after* the bankruptcy filing, defendant David Knobel was *still* asserting that FCC was viable and that he could have saved it, noting that at the time of the bankruptcy filing "the company's profit for the current fiscal year was projected to be over 20 million dollars." (*See* D.E. 221-2 at 9.)

- In March 2015, certain former FCC employees, including defendants David Knobel and Jeffrey Pierne, argued to the Bankruptcy Court that the portion of FCC sold during the bankruptcy had annual revenues close to $100 million and a value in excess of $50 million at the time of the bankruptcy sale. (*See* D.E. 238-2 at 595.) Pierne also testified that "If the sponsors or the lenders

were willing to fund an organized exit of the business, the assets were worth substantially more than $50 million." (D.E. 238-1, Pierne Tr. at 283-284.)

These examples represent just the tip of the evidentiary iceberg. A projection that the company is expecting to make $20 million *in profit* that year—even after being cut off by the DOE from making advance draws—is not evidence of inevitable bankruptcy. The declaration to the Arizona State Board that FCC still demonstrated sufficient financial strength (even after the DOE had put it on records-first), and the representation to the Bankruptcy Court that a portion of FCC was still worth more than $50 million, do not provide evidence of inevitable bankruptcy. Defendants point to absolutely nothing to support their current assertion that "even if Defendants' alleged actions did not occur the company would still have entered bankruptcy" and their own contemporaneous assertions—as well as those of third parties like Deloitte—flatly contradict the contrary position they are somehow trying to take now with this Court.

The foregoing facts are "relevant" here only to the extent that Defendants premise their argument on a wholly unsupported factual foundation when they simply declare, in the face of all the contrary evidence and their own admissions, that it was unreasonable to assume that FCC would have continued as a going concern absent their wrongdoing. Given the above "iceberg," a contrary assumption would be the unreasonable one since it would be based on nothing Defendants have identified, and even their own expert was unwilling to support it directly.

But the issue is not relevant to Defendants' Motion to preclude Donohue's testimony because, as discussed below, there is no reason to evaluate whether Donohue's assumption is "reasonable" because the determinative issue is whether the jury finds by a preponderance of the evidence that it is factually borne out. Donohue's role as a valuation expert is to assist the jury in assessing damages *if* it concludes that FCC would more likely than not have survived as a going

6

concern absent Defendants' breaches of fiduciary duty; the role of such expert is not, as Defendants assert, "to provide the evidentiary basis for such assumption," but to assist in understanding the consequences if the facts bear it out.

**ARGUMENT**

**I.   DONOHUE IS NOT PRESENTED AS A LIABILITY OR CAUSATION EXPERT**

James Donohue is presented as a forensic accountant and valuation expert, not as an expert on liability or causation. (*See* D.E. 223-2 (Donohue Report) at 68-71.) Although his findings will be useful to the jury and other experts for purposes of evaluating liability and proximate cause, Donohue offers no opinion on those subjects himself. Defendants, however, complain that "Mr. Donohue must have assumed that 'but for' the conduct alleged in the Amended Complaint, FCC would not have entered bankruptcy and Mr. Donohue's valuation would be accurate." (D.E. 245 at 5 (footnote omitted).) That is entirely correct, and there is nothing wrong with it. An expert may, as Donohue does, assume liability and causation as "it is perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages." *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553, at *4-5 (E.D. Tex. Apr. 10, 2017) (noting that "[t]his principle has been expressed in numerous cases, and it is beyond serious challenge," collecting extensive authority). *See also Rowe v. DPI Specialty Foods, Inc.*, 2015 WL 4949097, at *5 (D. Utah Aug. 19, 2015) ("it is necessarily the role of a damages expert to offer an opinion based only on assumptions [as to causation] because only the jury has the opportunity to conclude the factual issues in the case. Until a jury has found facts to resolve the factual issues presented to them, an expert has nothing other than assumptions on which economic analysis may be based."), *aff'd in relevant part*, 2018 WL 1180654 (10th Cir. Mar. 7, 2018); *Bellis v. Tokio Marine & Fire Ins. Co.*, 2006 WL 648013, at *5 (S.D.N.Y. Mar. 14, 2006) ("Although the Court has precluded Plaintiff's causation experts, the Court does not find that Plaintiff's

7

damages experts must also be precluded. Because it is possible that the jury will find reliable evidence that there was damage ... caused by Defendants, Plaintiff's damages experts shall be permitted to testify").

The sole case Defendants rely upon, *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009) (D.E. 245 at 7), is not to the contrary. There, the court precluded a damages theory that did not "fit" with the liability theory inasmuch as it sought "damages" for conduct that was not claimed to be illegal and thus sought to hold defendant "accountable for even those portions of its overcharging that were not unlawful according to the liability theory." 582 F.3d at 1233. *See also Braggs v. Dunn*, 317 F.R.D. 634, 650 n.17 (M.D. Ala. 2016) (noting that the *Boca Raton Cmty. Hosp*. reports were "unhelpful to the triers of fact because they merely identified an undifferentiated category of acts (of various kinds), some of which were lawful and some of which were unlawful; a given act's inclusion in that category gave the factfinder no information about its status as lawful or unlawful."). Here, Defendants do not and cannot claim that Donohue is basing his valuation on anything other than the value FCC would have had if Defendants' wrongful conduct had not forced it into bankruptcy—a perfect "fit" with Plaintiff's liability theory.

Quite simply: as Defendants themselves recognize, once Plaintiff proves liability and causation, Donohue's analysis provides the damages; and if Plaintiff fails to prove liability and causation, then that will be the end for a different reason. Neither possibility, however, provides reason to preclude Donohue from testifying *in limine*.

## II.   DEFENDANTS ATTACK ONLY THE WEIGHT OF DONOHUE'S TESTIMONY WHICH IS NO BASIS FOR PRECLUSION

The other ground on which Defendants seek to preclude Donohue's valuation testimony is because they assert that "he chose to rely on a single poorly-executed and uncorroborated valuation method that is not the best indicator of value in this context." (D.E. 245 at 2.) That statement is factually false and, at best, would only present something to be weighed at trial, not a basis for precluding testimony from a qualified expert utilizing accepted methodology.

As the Eleventh Circuit explained, Defendants' objections, even if they had a factual basis, are not of the type encompassed by the Supreme Court's holding in *Daubert*:

> "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003); *Maiz* [*v. Virani*]*,* 253 F.3d [641] at 666 [11th Cir. 2001] ("A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." (internal quotation marks omitted)). "Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Tech.,* 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798). Indeed, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1188 (9th Cir. 2002). *See also Quiet Tech.,* 326 F.3d at 1345 (noting that, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility" (quoting *Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986))).

*Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir. 2011) (reversing exclusion of expert and remanding for new trial). "Once an expert opinion has satisfied *Daubert,* a court may not exclude the opinion simply because it believes that the opinion is not—in its view—particularly strong or persuasive. The weight to be given to admissible expert testimony is a matter for the jury." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 990 (11th Cir. 2016).

It should not go unnoticed that, in their "*Daubert* motion," Defendants barely mention

*Daubert* and never attempt to apply its teachings. *Daubert* in fact mandates denial of the motion

because Defendants do not and cannot dispute that its three requirements, as applied in this Circuit,

are satisfied:

> Under Federal Rule of Evidence 702 and *Daubert v. Merrill Dow.
> Pharms, Inc.*, 509 U.S. 579 (1993), district courts must act as
> "gatekeepers," admitting expert testimony only if it is both reliable
> and relevant, to prevent speculative and unreliable testimony from
> reaching the jury. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291
> (11th Cir. 2005). The advisory committee's note to Rule 702
> instructs that "[t]he trial judge in all cases of proffered expert
> testimony must find that it is properly grounded, well-reasoned, and
> not speculative before it can be admitted." Fed. R. Evid. 702,
> advisory committee's note (2000 amendments). Specifically, the
> district court must consider whether 1) the expert is qualified to
> testify competently regarding the matters he intends to address; 2)
> the methodology by which the expert reaches his conclusions is
> sufficiently reliable as determined by the sort of inquiry mandated
> in *Daubert;* and 3) the testimony assists the trier of fact, through the
> application of scientific, technical, or specialized expertise, to
> understand the evidence or to determine a fact in issue. *City of
> Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th
> Cir. 1998) (footnote omitted). In the Eleventh Circuit, these three
> considerations are known as "qualifications, reliability, and
> helpfulness," and must not be conflated by the district court. *U.S. v.
> Frazier*, 387 F.3d 1246, 1260 (11th Cir. 2004).

*Habersham Plantation Corp. v. Molyneux*, 2011 WL 13214323, at *1 (S.D. Fla. Sept. 13, 2011).

After *Daubert*, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid.

702, advisory committee's note (2000 amendments).

Donohue is a CPA, a Certified Valuation Analyst, is Accredited in Business Valuation, and

has both extensive valuation and forensic accounting experience. (*See* D.E. 223-2 (Donohue

Report) at 67-68, 124-28.) Defendants do not contend that he is not qualified to provide valuation

and forensic accounting opinions. Neither do they dispute that his testimony as to damages and his

forensic accounting analysis would be helpful to the trier of fact, nor could they do so inasmuch

as expert testimony on those subjects is routinely welcomed. Thus, there is no dispute that the first

and third *Tuscaloosa* factors are satisfied.

Nor, in truth, are Defendants challenging the last factor to be considered, "reliability,"

because that factor is concerned with the reliability *of the methodology* employed, and Defendants

concede that the methodologies Donohue employed, the "Market Approach" and the "Income

Approach," are both valid and recognized methodologies for valuing a business. (*See, e.g.*, D.E.

245 at 12-13.) They argue that Donohue's application of the "income approach" relied upon

"unrealistic industry projections" and "failed to consider an adjustment to value for a working

capital deficiency," (*id*. at 12), and that his "market approach" was supposedly flawed because he

did not select the best comparable companies (*id*. at 13-15); Donohue is prepared to refute every

one of those assertions, but trial is the time to do that because they relate to the accuracy of his

valuation, not its admissibility:

> [Defendant's] argument is that [the expert] misused a method that,
> in the abstract, is reliable…. Thus, the alleged flaws in [the expert's]
> analysis are of a character that impugn the accuracy of his results,
> not the general scientific validity of his methods. The identification
> of such flaws in generally reliable scientific evidence is precisely
> the role of cross-examination.

*Quiet Tech.*, 326 F.3d at 1345. *See also Tuscaloosa*, 158 F.3d at 562 n.16, and 565 n.25; *Rosenfeld,*

654 F.3d at 1193; *Sofillas v. Carnival Corp.,* 2016 WL 5407889, at *3 (S.D. Fla. July 8, 2016)

("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an

objection going to the weight of the evidence rather than its admissibility." (quotations and

citations omitted)); *Local Access, LLC v. Peerless Network, Inc.*, 2016 WL 4466890, at *4 (M.D.

Fla. Aug. 24, 2016) ("To the extent [defendant] believes that [the expert's] assumptions are

inappropriate or based on insufficient information, these contentions are best tested through cross-

examination and contrary evidence."); *Hall v. Nettles*, 2010 WL 11493784, at *10 (N.D. Ga. Jan.

11

7, 2010) ("the Court finds that Defendants' arguments go to the weight of [the expert's] testimony, not its reliability. Defendants do not challenge the. . . method used by [the expert], but rather, his application of that method to the facts of this case. Their disagreement with his application goes to the credibility and weight of his testimony.").

As described in his report, Donohue employed best practices in valuing the company both through the "Income Approach" and the "Market Approach" to cross-check his valuation. (D.E. 223-2 (Donohue Report) at 106, 107-16, 116-19.) *Cf., In re Med. Diversified, Inc.,* 334 B.R. 89, 99 (Bankr. E.D.N.Y. 2005) (noting that the expert used two methods of valuation, but criticizing him for using two approaches that were both "market" approaches). "The income approach analysis usually takes the form of a discounted cash flow analysis, although, in the appropriate circumstances, an expert may employ a direct capitalization method [which Donohue employed] or other methods." S. Bernstein, S. Seabury, J. Williams, *Squaring Bankruptcy Valuation Practice with Daubert Demands,* 16 ABI Law Rev. 161, 173 & n.50 (2008) (citation omitted). The market approach which Donohue also employed, the "comparable company method," is likewise recognized to be a "generally accepted valuation technique." *Id.* at 173 & n.52. And the two methods did in fact validate each other; the ranges produced by Donohue's two approaches were within $8 million of each other. (D.E. 223-2 (Donohue Report) at 116, 119.)

It should not go unnoticed that even their own expert does not support Defendants' *ipse dixit* declaration that the assertedly "large [$8 million] gap between the values shows that the approaches do not validate each other" (D.E. 245 at 16; *see* D.E. 245-3.) Given that the highest point of Donohue's market approach valuation is $219 million less than Defendant's own valuation, a second methodology that produces a range within $8 million of the other certainly would appear to strongly validate his conclusion. *See Lippe v. Bairnco Corp.,* 288 B.R. 678, 690

(Bankr. S.D.N.Y. 2003) ("Common sense and the authorities in the area suggest that an opinion as to the value of a business should be expressed as a range of values rather than as a single number."). It certainly is no less validating than the $30 million difference between the two approaches produced by Deloitte in its 2013 valuation of FCC, which Deloitte "reconciled" by just splitting the difference. (D.E. 238-2 at 193.)

Finally, Defendants assert that even though Donohue employed valid and recognized market and income valuation methodologies, his valuation should be excluded solely because he did not employ one particular example of an Income Approach, a Discounted Cash Flow Analysis ("DCF"). (D.E. 245 at 9-12.) In support of that remarkable proposition, Defendants cite only cases that do not support it at all, and which merely find DCF to be the "most rigorous" or "preferred" methodology—when circumstances permit it to be appropriately utilized—but none that, even then, hold it to be the sole acceptable methodology. *See In re Bond,* 2012 WL 3867427, at *4 (Bankr. D. Ariz. Sept. 5, 2012) (cited at D.E. 245 at 9-10) (although acknowledging that most experts prefer the discounted cash flow method, holding that "nothing in this decision prevents Debtors from using a different methodology than that suggested by the Court."); *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186 (7th Cir. 1993) (not suggesting that a discounted cash flow methodology is the "methodology that experts in valuation find essential," as Defendants imply (D.E. 245 at 9), but referring to the essential need, when employing that methodology, to consider potential cash flows and to avoid valuing assets "at zero" just because they historically generated no cash flow).

In neither *Lippe,* (*id.* at 9-12), nor *In re Med. Diversified,* (*id.* at 5-6), was the valuation testimony rejected because the experts did not use DCF, as Defendants assert, but because the valuations were so arbitrary that neither expert could even articulate *why* he did not use DCF.

13

*Lippe*, 288 B.R. at 690; *Med. Diversified*, 334 B.R. at 99. *See, e.g.*, *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 180 (S.D.N.Y. 2006) (listing some of the other faults of those experts).

Although Defendants cite to *Celebrity Cruises,* they draw the wrong conclusion when they assert that it stands for the proposition that "where the objective [is] to value a single business entity at a fixed point in time,' the DCF method is the appropriate method." (D.E. 245 at 15.)[3] What the *Celebrity Cruises* court squarely held is that, nothing in *Lippe* or *Med. Diversified* changes the fact that "*it would be wrong to conclude that there is a categorical requirement that any valuation analysis must be supported by DCF calculations*. Courts recognize that different methods may be acceptable, depending upon the context." 434 F. Supp. 2d at 179 (emphasis added). *See also* S. Pratt, *Valuing a Business, Fifth Edition* (McGraw Hill 2008) at 239 ("The capitalized economic income method [what Donohue used] is used as frequently as the discounted economic income method [*i.e.*, DCF], and probably even more frequently in the valuation of smaller businesses…" and moreover, "…the capitalized economic income method [what Donohue used] is simply an abridged version of the discount economic income method [*i.e.*, DCF].").

Thus, contrary to Defendants' assertions, no single methodology, including DCF, is always "the best." The *Celebrity Cruises* court noted that, for example, "[t]he discounted economic income method is practical only to the extent that the projections used are reasonable to the decision-maker for whom the valuation is being prepared. Without supportable projections, the discounted economic income method can convey an aura of precision that is not justified." 434 F. Supp. 2d at 179 (quoting Shannon P. Pratt, et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (2000) at 154). Donohue explained that it was precisely the absence of supportable "but-for" projections that led him to conclude that the DCF methodology was not

---

[3] Even that characterization is inaccurate: the court noted that the *Lippe* and *Med. Diversified* courts only expressed a "*preference*" for the DCF method. 434 F. Supp. 2d at 179-80.

appropriate here. (*See* D.E. 251-1, Donohue Tr. 238:25-239:13, 241:10-242:4; D.E. 223-2 (Donohue Report) at 116.) *See also In re Mahoney*, 251 B.R. 748, 752, 754 (Bankr. S.D. Fla. 2000) (accepting the opinion of an expert who did not utilize the discounted cash flow methodology to value a company on the grounds that, among other reasons, "[the company] did not prepare budgets or forecasts necessary for the discounted cash flow method."); *In re Rural Metro Corp.*, 88 A.3d 54, 107 & n. 28 (Del. Ch. 2014) (noting that DCF calculations are of doubtful value when they are not grounded in projections originating from management).[4]

Defendants are forgetting that this is not a valuation of an actual ongoing business but a "but for" valuation that values the business but for the Defendants' alleged breaches. As Donohue was forced to explain at deposition, "I don't have management prepared projections but for the breach. It's a unique scenario. You're valuing a company without—in a but-for scenario, so it's a little different." (D.E. 251-1, Donohue Tr. 241:25-242:4.) Defendants can debate at trial what methodology under these circumstances is "better," or whether the methodology is being properly applied to the facts, but they offer no reason for rejecting Donohue's analysis under *Daubert* so that such debate cannot occur. "Simply because the experts disagree as to the most reliable method for calculating damages does not require the exclusion of [the expert's] opinion. Such arguments

---

[4] Defendants actually fault Donohue for not preparing his own projections in order to perform a discounted cash flow analysis because he testified at deposition that it would have been "possible, insofar as "[a]nything is possible," to prepare his own projections. (D.E. 245 at 11.) Of course he "could have" prepared such projections, but doing so would have required judgments as to, *inter alia*, "future cash flows (which are largely dependent on judgments and assumptions about a company's growth rate) and judgments about liquidity and the cost of capital." *Celebrity Cruises*, 434 F. Supp. 2d at 179. As discussed in the text, that is the reason that DCF is most meaningful when the projections come from management. Defendants offer no basis for questioning Donohue's conclusion that nothing would be gained by employing that methodology here when it required such layers of what necessarily would have to amount to speculation. Indeed, Defendants' own expert merely noted that "[i]n the absence of long range projections from management, Donohue makes no effort to develop such projections based upon available financial data"—but even he does not fault Donohue for not doing so or contend that it would have been an appropriate or sensible thing to do under the circumstances. (*See* D.E. 245-3 (Burton Report) at 33.)

15

go more to the weight of the evidence, than the admissibility of the evidence under *Daubert*. The certainty and correctness of [the expert's] opinion will be tested through cross-examination and presentation of contrary evidence and not by a *Daubert* challenge." *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.,* 2008 WL 3819752, at *4 (M.D. Fla. Aug. 12, 2008).

### III.   DONOHUE'S FORENSIC OPINIONS ARE SUBSTANTIVELY UNCHALLENGED

Defendants separately seek to preclude testimony as to Donohue's forensic findings, but not because they contend that his methodology is wrong or his conclusions inaccurate. On this motion they question neither. Instead, they seek to preclude his forensic opinions merely because they assert that he does not rely on them for purposes of his separate valuation opinion and because they assert that they are "just a conduit for hearsay." (D.E. 245 at 17-19.) Both assertions are wrong as a matter of both fact and law.

As an initial matter, Donohue's forensic work in fact is part of the foundation of his valuation opinion, a fact which should have been obvious to Defendants inasmuch as to do a "but for" valuation, it obviously is first necessary to forensically adjust the financials to reflect the "but for" conditions.  It should have been unmistakably obvious given that Donohue expressly cited to his forensic analysis in formulating his valuation opinion. (*See, e.g*, D.E. 223-2 (Donohue Report) at 102 n.113, 103 n.117, 104 n.118, 105 nn. 120-22, 112 n.142.)

Yet even if Donohue had not relied on it himself for his valuation, there is nothing wrong with preparing a forensic analysis for other experts to interpret for other purposes, applying their own separate skills.  *See, e.g., Sofillas*, 2016 WL 5407889, at *4 ("'The facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert's opinions and

findings.'" (citation omitted).)[5]  Defendants cite no authority suggesting that a valuation expert cannot, if qualified, also provide forensic opinions for other purposes, even if he does not rely on them himself, nor do they even attempt to articulate why any such rule would make sense, or how it is that experts are routinely retained to give, and give, testimony solely as to their forensic findings. And they do not question Donohue's qualifications to do the forensic analysis.

As to Defendants' assertion that "Donohue is functioning as a conduit for hearsay" (D.E. 245 at 17), they acknowledge that Fed. R. Evid. 703 expressly provides that an expert may rely on inadmissible evidence (hearsay or otherwise) "[i]f experts in the particular field would reasonably rely on these kinds of facts or data in forming an opinion." *Id.* What is impermissible, as in the case Defendants cite, is for an expert to simply parrot a piece of inadmissible evidence solely for the purposes of getting it before the jury. *See Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.,* 2014 WL 4986482, at *1 (M.D. Fla. Oct. 6, 2014); *United States v. Scrima,* 819 F.2d 996, 1002 (11th Cir. 1987) (D.E. 245 at 17). But Defendants do not actually accuse Donohue of doing that. Not only does he rely (as any forensic accountant would) upon available company and government records (*see* D.E. 223-2 (Donohue Report) at 70-72, 79-100), but Defendants do not deny that such records are themselves admissible under Fed. R. Evid. 803, or that Donohue's charts and summaries of those records are admissible under Rule 1006, and Defendants have

---

[5] What is prohibited is to "'simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.' ... In other words, an expert cannot blindly rely or ratify another expert's opinion, but the expert may review and interpret another expert's opinion in forming his own conclusions so long as that is the normal practice in his field." *Sofillas,* 2016 WL 5407889, at *4. Defendants purposefully misconstrue statements such as the foregoing to nonsensically suggest, for example, that a financial aid expert should have to "assess the validity" of a forensic accountant's work by doing the work of a forensic accountant herself before she can rely on it. That, of course, makes no sense. What the courts are actually saying is that one forensic accountant, for example, may not "simply repeat or adopt" the findings of another forensic accountant without independently verifying them, but that a financial aid consultant, for example, who regularly relies on accounting records prepared by others, is permitted to rely on the accounting records assembled by a forensic accountant to provide his separate analysis.

identified *nothing* in Donohue's forensic analysis that would not have been independently admissible. More importantly, they have identified no evidence that Donohue is looking to put before the jury that is both inadmissible and unrelated to his opinions or analysis. The entire argument is simply a red herring.

Accordingly, given that Defendants do not dispute that Donohue is qualified, and do not dispute the methodology of his forensic analysis, his testimony on the subject will be admissible provided only that it will be helpful to the Court or jury. (*See supra* at 10-11.) There can be little doubt that it will be helpful here.

Counsel for the Trustee requested that Donohue analyze FCC's accounting for bad debt expenses and FCC's accounting for cash DOE Title IV funds, and how that compared with the underlying student records internally maintained by FCC and provided to the DOE. Donohue's forensic findings are summarized in five points on pages 7-8 of his Report and each provides information relevant to the Trustee's claims in this matter that could not be provided by isolated documents or fact witness testimony alone. These findings required analysis, calculations, compilations and summaries that would be helpful to the Court or jury. Furthermore, as summarized below, many of the findings should have been more readily available within FCC's records, but needed to be addressed by the forensic accountant because FCC was not adequately tracking this important information.

Donohue analyzed and summarized FCC's unsubstantiated cash balances by OPEID, award type, and award year, balances that FCC was not adequately tracking. FCC's CFO, defendant Jeffrey Pierne himself, acknowledged in an email and during his deposition that he was unaware of the $17 million unsubstantiated balance situation with the DOE even in March 2014. (D.E. 238-1, Pierne Tr. 300-301; D.E. 238-2 at 506.)

Donohue analyzed and summarized FCC's G5 daily cash draw and refund activity with the DOE, by OPEID, award type, and award year. While individual records exist that show this detailed level of activity (individual draws and refunds, for example), Donohue's work allows the information to be analyzed, compared with other records, and presented in a clear manner. For example, despite FCC's need to refund $8 million to the DOE in one month on two occasions, both Pierne and Knobel professed to be unable to recall that level of refunds during their depositions (D.E. 223-2 (Donohue Report) at 89.) Tellingly, Donohue also found that FCC cash management reports were aggregating daily or monthly draws and refunds as one figure, and did not disclose the total draw and total refund activity separately. (*Id.* at 87.)

Donohue's analysis also identified and investigated the records underlying the large gap between FCC's G5 net cash draws and FCC's Title IV cash basis revenue as tracked by FCC's STARS system in the middle of fiscal 2014. Chris Babson, VP of Finance at FCC, also recognized this same gap and raised the gap with Pierne and Stewart in January 2014. (D.E. 238-2 at 444.) Without an analysis of the records underlying the gap, Pierne could not explain the gap during his deposition and Donohue's forensic analysis was needed to review the underlying records and demonstrate how the gap related to the unsubstantiated balance with the DOE. (D.E. 238-1, Pierne Tr. 181-82, 188-89.)

Donohue compared FCC's Title IV cash basis revenue as tracked by FCC's STARS system with DOE's COD records over time, and found that they were generally comparable during fiscal 2014. This analysis therefore demonstrated that FCC's cash net G5 draws were consistently higher than both FCC's internally managed STARs Title IV cash basis revenue and COD amounts at DOE, for much of fiscal year 2014, before eventually coming into balance at the end of the fiscal year after FCC was forced to reconcile Title IV funding by the DOE. FCC compared these three

sources on a few isolated occasions, but did not have a process to regularly reconcile these sources, which is consistent with, for example, an email exchange between Paul DiCicco and John Murphy, VP of Financial Aid of FCC, in March 2014 and the May 2014 findings of Spring Zutes, a consultant, which concluded that FCC did not adequately reconcile Title IV cash, bank statements, and student records. (D.E. 220-2 at 77-94; D.E. 228-2 at 50; D.E. 238-2 at 444; D.E. 253-2 at 43.)

Lastly, Donohue's forensic analysis demonstrates how the large fiscal 2014 bad debt expense charges related to the FCC's DOE Title IV reconciliation and that the bad debt expenses were largely correcting FCC's revenue and EBITDA for fiscal year 2014 and fiscal year 2013. Donohue also uses his bad debt analysis to estimate the portion of bad debt that relates to prior periods, and despite the Defendants' incorrect assertion, clearly uses that estimate in his but for valuation. His investigation and analysis of historical bad debt levels, bad debt journal entries and calculations, and how the bad debt charges also relate to prior periods provides insight that is not readily apparent just from isolated documents and fact witness testimony. For example, without an analysis of the underlying records, even DiCicco, FCC's controller, did not recall that the bad debt charges increased during fiscal year 2014 compared to the prior year (despite that fact that they nearly doubled) and the FCC Board of Directors' packages did not even contain a separate line item for bad debt expense because bad debt expense was recorded within the general administrative line item (*see* D.E. 238-1, Pierne Tr. 306).

It will be helpful for the Court and jury to have this information.

### CONCLUSION

Defendants' motion to exclude the testimony of James Donohue should be denied and Plaintiff granted such other and further relief as the Court deems just and proper.

Dated: March 26, 2018                    Respectfully submitted,


                                         /s/ Brian S. Dervishi
                                         Brian S. Dervishi (Bar No. 350303)
                                         Peter A. Tappert (Bar No. 27100)
                                         WEISSMAN & DERVISHI, P.A.
                                         SunTrust International Center
                                         One Southeast Third Avenue, Suite 1700
                                         Miami, Florida 33131
                                         (305) 347-4070
                                         bdervishi@wdpalaw.com
                                         ptappert@wdpalaw.com
                                         service@wdpalaw.com

                                         - and -

                                         Bijan Amini (admitted *pro hac vice*)
                                         Lita Beth Wright (admitted *pro hac vice*)
                                         Avery Samet (admitted *pro hac vice*)
                                         STORCH AMINI PC
                                         2 Grand Central Tower
                                         140 East 45th Street, 25th Floor
                                         New York, New York 10017
                                         (212) 490-4100
                                         bamini@storchamini.com
                                         lbwright@storchamini.com
                                         asamet@storchamini.com


                                         *Attorneys for Plaintiff Clingman &*
                                         *Hanger Management Associates, LLC,*
                                         *as Trustee*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2018, the foregoing was filed and served on the parties

named below via the Court's ECF system.

/s/ Brian S. Dervishi

Michael N. Kreitzer, Esq.
Kenneth Duvall, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131
kreitzer@bilzin.com
kduvall@bilzin.com
eservice@bilzin.com
mavin@bilzin.com
stapanes@bilzin.com