**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-62028-CIV-LENARD/GOODMAN**

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC, as Trustee,

                  Plaintiff,

    - against -

DAVID KNOBEL, JEFFREY PIERNE,
NEAL YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI,

                  Defendants.

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Plaintiff Clingman & Hanger Management Associates, LLC, as trustee ("Plaintiff") submits this statement of material facts in opposition to the Motion for Summary Judgment (D.E. 247) filed by Defendants.

**<u>Disputed Statements of Fact</u>**

5. Disputed as incomplete. *See infra*, ¶ 35.

7. Disputed. Stewart served as Vice President of Financial Services until at least December 19, 2013. *See* Corrective Actions plans signed on behalf of FCC as "V.P. Fin. Ser." (D.E. 235-2 at 173; 233; 252; 292.) Stewart directed pre-draws between December 10 and December 19. (D.E. 220-2 at 99; D.E. 231-2 at 120; 156.)

8. Disputed. Yousefi continued to oversee FCC's Financial Services Office until he left the company in Summer 2014. (D.E. 220-1, Yousefi Tr. 118:2-24.) John Murphy joined FCC in January 2014 but reported to Yousefi the entire time. (*Id.*) ("Q: From the time that Mr. Murphy started in early January 2014 to the time you left, did he continue to report to you? A: He did.")

10. Disputed as incomplete. To participate in federal student aid programs, an institution must apply for and, if accepted, enter into a Program Participation Agreement ("PPA"), countersigned by the institution's C.E.O. (D.E. 252-2 (Murphy Report) at 23), in this case, David Knobel. (D.E. 219-2 at 18.) The PPA required Knobel to establish administrative and fiscal procedures to ensure proper administration of federal funds. (*Id.* at 5; D.E. 252-2 (Murphy Report) at 23-24; D.E. 250-2 (Lacey Report) at 167.) The DOE assigns each accepted institution an identifying number known as an OPEID. (D.E. 252-2 (Murphy Report) at 24.) The DOE recognizes each OPEID as a separate entity for Title IV purposes. (*Id.*) During the 2012-13 and 2013-14 academic years, FCC operated under 6 OPEIDs, internally named: FCC (Miami), Phoenix, Bryman, Maryland Heights, Parsippany and Springfield. (D.E. 183 ¶¶ 30, 31).

12. Disputed. A school can only draw funds for which it has an immediate need to disburse to eligible students for tuition and related expenses. (D.E. 252-2 (Murphy Report) at 33, 35-36; D.E. 250-2 (Lacey Report) at 171; D.E. 250-1, Lacey Tr. 152-156; D.E. 239-1, Davis Tr. 263:3-12.) A school may disburse Direct Loan funds to eligible students 10 days before the program start date only in limited circumstances (returning students for particular programs). (*See* D.E. 252-2 (Murphy Report) at 42; 34 C.F.R. 668.164(i)(1) and (2).) The school may not disburse federal student aid before determining and documenting that the student is eligible to receive it. (*Id.* at 36; D.E. 250-1, Lacey Tr. 221:12-222:10 (future or projected enrollment numbers are not immediate need).) FCC booked revenue on an accrual basis based upon the student's term, not based upon the date or amount of any disbursement. (D.E. 238-1, Pierne Tr. 115:6-24.) Defendants misstate Davis' testimony concerning use of Title IV funds for general operational purposes upon crediting the student's account. (D.E. 239-1, Davis Tr. 573:7-574:12 ("I disagree… the point that you're making is if the school disbursed the funds to the student account, but yet could not report what they did with those funds, that money is the school's and so the Department has no say-so over unreported, unsubstantiated funds. And I definitely can't agree with that.") (emphasis added).) Even after funds are disbursed and substantiated, the school must maintain a cash reserve to repay all refunds. (D.E. 250-1, Lacey Tr. 346:8-17.)

13. Disputed. The report due to COD within 15 days of disbursement is not general "student specific details" but proof of the disbursement to the student's account. (D.E. 252-2 (Murphy Report) at 32, 40.)

15. Disputed. Plaintiff disputes Defendants' characterization of what reconciliation requires. Internal reconciliation ensures that what is posted to the student accounts matches the data in the school's financial aid system, including that internal cash transactions (*i.e.* the posting

of disbursements to students) match the school's bank statements. (*Id.* at 45; D.E. 239-1, Davis Tr. 27:24-28:2.) External reconciliation verifies that internal disbursement records match the disbursement data in the COD system, and that internal adjustments and refunds match the data in COD and G5. (D.E. 252-2 (Murphy Report) at 45; D.E. 230-1, Spirea Tr. 89:18-20.) Defendants' citations to Davis' testimony do not support a contrary description. Instead, Davis testified that "[r]econciliation is ensuring that the <u>exact</u> disbursement amount and disbursement date is reflected in the Department's systems and that the disbursements that are posted <u>equal</u> the amount of funds that are drawn." (D.E. 239-1, Davis Tr. 383:16-20 (emphasis added); *see also* D.E. 252-2 (Murphy Report) at 45 (schools must resolve discrepancies between internal records of direct loan funds received and direct loan disbursement records submitted to COD on a monthly basis).) Further, Davis testified that schools must ensure COD and G5 <u>match</u> on a monthly basis, and that the requirement to close out award years by July 31 of the following year does not supersede the monthly reconciliation requirement. (D.E. 239-1, Davis Tr. 398:3-399:14.) Best practice is for schools to reconcile more frequently than monthly. (D.E. 252-2 (Murphy Report) at 45.)

25. Disputed. FCC had start dates approximately every four weeks, but no Title IV eligible start dates in December. (D.E. 224-2 at 58; D.E. 224-1, Yawn Tr. 169:4-170:7; D.E. 183 ¶ 21.)

26. Disputed. Plaintiff agrees that FCC had a general process for identifying students potentially eligible to receive Title IV funds, but disputes the names of the reports and their alleged substance. (*See* D.E. 219-1, Stewart Tr. 35:3-8 (no mention of "projected funding report"); 306:18-21 (discussing use of "projected funding report" to determine monthly cash forecasting, not draws).) Plaintiff disputes that FCC always followed this process. See statements 28 and 30.

27. Disputed. Plaintiff agrees that FCC had a general process for packaging students and confirming their eligibility for financial aid but disputes that FCC always followed this process.

*See* statements 28 and 30. By way of another example, to qualify for Title IV aid, students must be enrolled in an eligible program listed on a school's Eligibility Certification Approval Report ("ECAR") filed with the DOE. (D.E. 252-2 (Murphy Report) at 22.) New programs must be added to the ECAR before students enrolled in such programs can receive Title IV aid. (*Id*.) FCC drew down over $1 million (primarily in 2013/2014) for students enrolled in a Patient Care Technician program ("PCT"), without listing the PCT program on the ECARs. (*Id*. at 171:9-173:11; D.E. 226-2 at 78.) Therefore, FCC needed to return those funds to the DOE. (*Id*. at 172:9-173:11.) Bartness acknowledged this failing was his responsibility, because he was responsible for ensuring that FCC's new programs were on the ECAR. (*Id*. at 68:20-69:12; 172:23-173:11.) Bartness believed that Knobel caused the wrongful PCT draws. (D.E. 226-2 at 102; D.E. 226-2 at 104 ("I bet he [Knobel] told Mark to enroll as they were desperate to make start budgets."). Bartness also concluded that Stewart knowingly offered the PCT program in January 2014 "without securing the required approval from the DOE." (D.E. 226-2 at 156.) The same issue repeated itself with the Health Information Technology program. (D.E. 253-1, Zutes Tr. 41:7-42:17 (identifying liability at $623,170); D.E. 253-2 at 66 (same).)

28. Disputed. Plaintiff agrees that FCC had a general process for generating a roster of students eligible for Title IV funds but disputes that FCC always based its G5 draws on such a list. Pre-draws were overdrawn funds not based on any students and not disbursed to student ledgers. (D.E. 231-1, Turgot Tr. 140:22-25; 175:9-25; D.E. 231-2 at 98.) Because pre-draws pulled funds without regard to students, FCC could not attribute refunds of pre-draws to particular students or campuses within an OPEID. (D.E. 231-1, Turgot Tr. 153:11-154:13; D.E. 231-2 at 98.) Stewart based pre-draws on the availability in G5 assigned at the beginning of the award year, not particular students. (D.E. 231-1, Turgot Tr. 143:6-144:10; 228:25-229:14). At the start of each award year

(July 1), the DOE allocates a Direct Loan authorization level for each OPEID based upon the OPEID's funding history. (D.E. 252-2 (Murphy Report) at 33.) At any given time, a school's "available balance" to draw is the difference between the authorized amount and the school's net drawdowns and refunds to date. (*Id*. at 42.) This information is recorded in the G5 system. (D.E. 236-2 at 325; D.E. 236-1, Davis Tr. 195:4-196:10. *See also* D.E. 219-2 at 111 (Yousefi asked Stewart: "Can you please explain the cash order process to me? According to Julande [Turgot], it is based on what is available in G5 and what you approve… My expectation is that everything would be tied to a roster[.]" Stewart replies: "Sure it is based on a roster. The availability in g5 has been used recently because of the number of rejects we have been having. My approval has only been necessary when our refunds are greater than our draws and a pre-draw May be needed.").)

29. Disputed. Kimberly Verga, the director of centralized financial aid,[1] testified that FCC generally performed the reverse: (1) draw funds from G5, (2) about five business days later post proof of disbursement to COD, and (3) after a manual process, post disbursements to student accounts. (D.E. 234-1, Verga Tr. 138:2-11; 296:24-297:20; 299:15-18; D.E. 231-2 at 6 (showing $0.00 in applied accepted and posted disbursements relating to draws); D.E. 234-2 at 53; D.E. 236-1, Davis Tr. 92:23-93:7.) Defendants' citations do not support the statement that FCC submitted proof of disbursement to the COD according to the regulations. They did not. (D.E. 228 at 2.)

30. Disputed. FCC did not "always" draw funds through G5 based on a payment roster. For example, pre-draws were not based on a payment roster. (D.E. 231-1, Turgot Tr. 192:22-25 ("Q. So did FCC…in your time there ever take funds from the Department of Education without having first submitted a roster? A. On a pre-draw, yes."); D.E. 228-1, Murphy Tr. 41:9-42:11;

---

[1] Verga currently works for Defendants Knobel, Stewart and Yousefi at their new joint company Campus Ivy. (D.E. 234-1, Verga Tr. 27:7-23; D.E. 219-1, Knobel Tr. 291:18-292:7.)

66:2-13; 215:5-11; D.E. 253-1, Zutes Tr. 176:17-177:24 ("Q. So there was no—there was no allocation of the funds drawn to a roster of eligible students? A. Correct.); 192:5-11 (recommending FCC stop drawing funds without a roster of eligible active students); D.E.236-1, Davis Tr. 266:24-267:14; 269:20-24.)

31. Disputed. FCC did not ensure that refunds were always processed in a timely manner. (*See* D.E. 221-2 at 13 (Knobel to Yawn: "the error rate is about 50% for the correctness and timing of refunds"); D.E. 220-2 at 25 ($11.2 million in posted refunds in STARS not paid until Summer 2013); 28 ("It all stems from not processing refunds timely[.]"); 58 (Yousefi: refunds not given back after 45 days beginning in August due to lack of funds, compounded imbalance); 135 (Yousefi report showing refund error rates of 49 to 66%); 138 (Yousefi: process breakdown on refunds); 143 (Yousefi report showing refund error rates of 49 to 66%; $10.8 million needing refunding); D.E. 226-2 at 26 (DOE full file review based upon refund 20.75% error in sample); D.E. 253-2 at 82 (Zutes: late refunds demonstrate that FCC is not administratively capable); 94 ("so many staff are aware of decision to not post refunds/ returns to COD which violates the Departments cash management requirements."); D.E. 253-1, Zutes Tr. 188:11-189:14.

32. Disputed. Stewart and her department did not reconcile STARS records to COD records on a monthly basis, and Knobel, Pierne, Yousefi and Yawn all knew that. (*See* D.E. 221-1, Knobel Tr. 16:13-17-24; 184:17-18 (reading handwritten notes Ex. 32 at 765 stating "Apparent that Siana did not reconcile."); D.E. 238-2 at 443 (January 2, 2014 email, Yousefi to Pierne: "Jeff—I've learned that we have not fully reconciled the 12/13 award year against COD and STARS! This can present liability for Anthem and needs to be attended to asap."); D.E. 224-2 at 226 (Yawn handwritten notes from March 2014) ("Then told we hadn't Reconciled COD since Jun 30, 2013."); D.E. 238-2 at 589 (Pierne's talking points: "It became apparent that Siana did not properly

reconcile on a monthly basis."); D.E. 220-2 at 28 (Yousefi talking points for executive team) ("Reconciling through 6/30/2013 doesn't really help us with July through now [March 9, 2014]."); D.E. 220-1, Yousefi Tr. 128:10-21.) On May 7, 2014, Yousefi advised the Board of FCC's failure to conduct regular reconciliations and attributed that FCC's COD imbalance to the lack of reconciliation." (D.E. 220-2 at 152; D.E. 236-1, Davis Tr. 152:25-153-6 ("Q: Is it fair to state that as far as you and the department of education was concerned that they had not determined the ability to satisfactorily post disbursements? ATTY: Objection to form. A: They were not reconciling, so yes.").)

33. Disputed. Defendants accurately quote, but twist, Plaintiff's interrogatory responses in subsections a-d. Plaintiff identified the systemic problems at FCC underlying Plaintiff's claims in response to the appropriate interrogatories. (D.E. 218-1 (Response to 4(B) (drawing funds in excess of students); 4(C) (failure to refund); 4(D) (failure to reconcile); 4(E) (improper and inflated draws).) Defendants inaccurately quote Plaintiff's response to interrogatory no. 12 (subsection e) which describes $11.2 million in unpaid refunds.

34. Disputed. Defendants' citations do not support the statements that Yawn had no role in processing, submitting or overseeing the Title IV financial program and was not responsible for reporting student withdrawals. Yawn supervised FCC's campuses which processed, submitted and reported student Title IV financial aid data to FCC's central financial aid office. (D.E. 219-1, Stewart Tr. 61:80-63:23; D.E. 224-1, Yawn Tr. 126:9-127:13; D.E. 224-1, Yawn Tr. 178:23-179:6). Pierne testified that monitoring was part of the regular operating activities of the company and fell under Yawn's responsibility. (D.E. 238-1, Pierne Tr. 32:11-33:11.) In connection with supervising that activity, Yawn noticed numerous red flags with the processing of Title IV funds: D.E. 224-1, Yawn Tr. 171:15-25; 174:11-176:9; D.E. 224-2 at 190; D.E. 224-2 at 195 ("it is clear

that there is no coordination or choreography of the entire process to result in highly accurate packaging and projections and timely disbursement of funds.").

35. Disputed. Bartness was responsible for overseeing Title IV compliance issues. (D.E. 238-1, Pierne Tr. 21:24-22:21; *see also* D.E. 221-1, Knobel Tr. 343:14-20 ("Q. And did [Bartness] have any role, to your knowledge, with financial aid? A. He had—Sandy May reported to him, and Sandy would do audits of financial aid, internal audits of financial aid in schools. Q. And that was under his supervision? A. Yes."); D.E. 226-2 at 18; D.E. 226-1, Bartness Tr. 7:7-18; D.E. 262-1 at 38:5-12).) Sandra May was FCC's Vice President of Title IV Compliance. (D.E. 226-1, Bartness Tr. 43:12-23.) Bartness was responsible for presenting DOE Title IV program reviews to FCC's Board of Directors (*id*. 82:23–83:22), reviewing FCC's responses to the DOE (*id*. 87:17-21), examining whether DOE findings were systemic across FCC (*id*. 87:23–88:25) and gathering files for DOE program reviews (*id*. 91:18–93:9).

36. Disputed. Deemer Dana performed a compliance attestation examination for the 2012-13 year and not an audit of FCC. (D.E. 235-1, Wood Tr. 24:25-25:4 ("We never performed an audit for Florida Career College.").) The compliance attestation examination was not designed to disclose fraud or illegal acts. (*Id*. 165:2-11.) ("Q. The compliance examination, the compliance attestation examination that you performed, was it designed to disclose fraud or illegal acts? A. No."). Defendants' citation does support the claim that Deemer Dana's process "included on-site testing of student records and all of FCC's reporting systems." (*Id*. 39:21-40:1). Deemer Dana warned management <u>not</u> to rely on its report to uncover fraud or illegal acts. (D.E. 235-2 at 15 ("The services that we will perform are not designed and cannot be relied upon to disclose errors, fraud or illegal acts, should any exist.").)

8

37. Disputed. For the 2012-13 award year, Deemer Dana conducted a compliance attestation review by sampling a number of students at each OPEID. Deemer Dana issued findings with respect to those 2012-13 samples. Wood did not testify that FCC was reconciling STARS with COD on an ongoing basis. Wood testified that he located drawdowns in the 2012-13 period that were not associated with actual students. (D.E. 235-1, Wood Tr. 122:9-14.)

38. Disputed. Defendants' citations do not support the statements.

39. Disputed. Deemer Dana was never engaged to perform a closeout audit and did not know if one occurred. (*Id.* 79:4-12 ("We were never engaged to perform a closeout.").)

40. Disputed. Testimony cited by Defendants discusses whether Deemer Dana was engaged by IEC and does not state that "Sean Harding refused to engage any firm." (*Id.* 80:22-25; 210:2-211:2.) IEC attempted to work with Pierne to conduct the closeout audit but Pierne "was not interested in assisting." (D.E. 229-1, Mortensen Tr. 103:23-104:11.)

41. Disputed. FCC received significant, negative program reviews for the 2012-13 academic year from the DOE. (D.E. 219-2 at 124.) A program review is a DOE compliance review of a school's Title IV processes. (D.E. 250-2 (Lacey Report) at 168.) Based upon Deemer Dana's identification of refund error rates of 20.75%, the DOE initiated a full refund reconstruction at three FCC OPEIDs. (D.E. 226-2 at 26.)

46. Disputed. Plaintiff admits that FCC activated Regent 8 on January 23, 2013, but disputes that Regent 8 corrupted student records in the COD system. Turgot, the FCC employee responsible for interacting with COD, "never heard that the Data in the COD system was wrong." (D.E. 231-1, Turgot Tr. 182:9-22.) Roxana Spirea did not recall ever hearing that COD records were corrupted and had no idea how such records could be corrupted. (D.E. 230-1, Spirea Tr. 58:16-25.) Regent's corporate representative testified he was "not aware of any alleged corruptions

in any databases of the COD[,]" (D.E. 240-1, Lang Tr. 92:5-18) and neither Stewart nor Yousefi ever told him that (Lang Tr. 285:10-25). Only accepted records, not rejected ones, could affect data in COD. (D.E. 236-1, Davis Tr. 166:12-16 ("Q. Okay. And what happens when the COD system actually rejects a particular invalid value? A. The record is—it's not built in the COD system. It's not—the—data is rejected. It's not allowed in, it's not built in the system."); D.E. 236-1, Davis Tr. 308:1-14; *accord* D.E. 252-1, James Murphy Tr. 108:2-5 ("I did see some reference to rejects, but the rejects would not have been uploaded to COD.").) Deemer Dana: (i) did not independently confirm that Regent had corrupted records in COD (D.E. 235-1, Wood Tr. 170:25-172:20); (ii) had no role in identifying or reporting the problem (Tr. 134:19-21); and (iii) had no knowledge of attempts to cure "corruption issues" (Tr. 137:19-23). Davis only testified that unspecified Regent products caused unspecified problems at other schools. (D.E. 236-1, Davis Tr. 295:7-24.)

48. Disputed. No data had been corrupted within the COD system. (*See* ¶ 47, *supra*.)

49. Disputed. The DOE did not attribute "the problem" to Regent 8 (D.E. 236-2 at 230), rather the cited email summarizes a conversation where Stewart, Verga and Turgot told the DOE that FCC had converted to Regent 8 and was "working closely with Regents staff to iron out processing issues." (*Id*.) The email does not discuss corruption of data in COD, or correcting such data, but rather implies that COD was accurate but FCC's *systems* were failing to upload the proper information. (*Id*.) It instructs FCC to substantiate all funds drawn or return those funds within two weeks and states, "we discussed monitoring your manual disbursement progress using the COD web funding and school summary screens…." (*Id*. at 233.)

50. Disputed. Defendants provide no citation for the statement that the DOE "at no time" concluded that the G5/COD imbalance was caused by a failure of the school to disburse Title IV

funds to students. The citation to D.E. 236-2 at 233 provides no support for the DOE observing massive rejects.

51. Disputed as incomplete. The DOE gave FCC two weeks to reconcile the imbalance, because of the importance of the issue of substantiation and because the DOE immediately reduced FCC's 2012/13 Direct Loan balance to $0 available balance, not because of FCC's "track record." (D.E. 236-2 at 233.)

54. Disputed as incomplete. On June 25, 2013, the DOE lifted the freeze cash for the OPEIDs that had reconciled their imbalance because they no longer had unsubstantiated funds. (D.E. 236-1, Davis. Tr. 312:11-15.)

55. Disputed as incomplete. The DOE lifted the freeze cash status from FCC's OPEIDs as and when they substantiated all of their G5 draws in COD and had no more unsubstantiated funds. (D.E. 219-2 at 64; D.E. 236-2 at 257; D.E. 219-1, Stewart Tr. 213:23-25.)

56. Disputed. Plaintiff agrees that the DOE removed the schools from records, with the exception of the Bryman OPEID, which it lifted on November 11, 2013, but disputes that this indicates Defendants "successfully addressed the rejects issue." (D.E. 234-1, Verga Tr. 222:5-223:1; D.E. 234-2 at 85.)

57. Disputed. Defendants' citations do not support the statement that Regent corrupted data fields in the COD system or that such issues reappeared in November 2013. Stewart testified that *rejects* began occurring in June 2013 (D.E. 219-1, Stewart Tr. 179:1-13) and that there was corruption in the COD database after June 2013 (*id.* 187:17-25). Stewart identified rejects but did not try to determine what percentage of rejects were due to corruption versus other issues. (*Id.* 309:17:20.) As discussed in paragraph 46, the witnesses with knowledge of the COD process had no knowledge of any corruption in COD, and such corruption from one year to the next would not

be possible. Davis had no memory of FCC telling her that any data corruption had reappeared. (D.E. 236-1, Davis Tr. 444:12-17.) Knobel did not raise the corruption issue when he emailed Davis to appeal the March 31, 2014 records first decision. (D.E. 236-2 at 39.) Even if such corruption had occurred in early 2013, it would not have affected 2013-14 records, which consist of separate data in separate databases. (D.E. 252-1, James Murphy Tr. 123:20-124:23; *accord* D.E. 228-1, John Murphy Tr. 113:3-114:16.)

58. Disputed. Plaintiff agrees that FCC had problems reporting origination fees but disputes this was a unique problem relating to Regent 8. (D.E. 236-1, Davis Tr. 324:15-17; 326:20-21; *accord* D.E. 252-1, James Murphy Tr. 89:6–91:7.)

59. Disputed. The cited email refers to FCC's problems handling origination fees but does not state that the DOE realized such fees were one of FCC's larger challenges. (D.E. 236-2 at 260.)

60. Disputed. Stewart admitted to deviating from her ordinary practice to make up for the lost cash caused by rejects. (D.E. 219-1, Stewart Tr. 279:22-280:7 (authorized pre-draws based on "future week drawdowns" instead of rosters); *id*. 278:1-8 (engaged in this process to "compensate" for impact on FCC's G5 balance from rejects); D.E. 219-2 at 111.) Bartness confirmed the same to the DOE Office of Inspector General: "FCC drew down funds based upon enrollment projections. Incorrect projections continued for months which led to FCC's inability to reconcile." (D.E. 226-1, Bartness Tr. 159:20-24; D.E. 226-2 at 77.)

61. Disputed. Spirea only began at FCC in February 2014. (D.E. 230-1, Spirea Tr. 18:7-8.)

62. Disputed. The imbalance between FCC's G5 draws and reported disbursements to COD occurred because FCC took more federal aid than it had students to which it could disburse. For example, on January 3, 2014, Christopher Babson (FCC's Director of Finance) reported to Pierne that FCC had drawn between $15 and $20 million *more* from the government that it had disbursed

to students according to its STARS data. (D.E. 238-2 at 444.) Even after speaking with Stewart the next day, Babson could not explain the gap (D.E. 222-2 at 2), and no one ever told him the gap was caused by the Regent system (D.E. 222-1, Babson Tr. 70:13-18). On January 28, 2014, Verga identified $9.9 million that FCC had pre-drawn without corresponding disbursements, and identifying the specific amounts recorded in STARS, reported to COD and drawn from G5 by OPEID. (D.E. 234-2 at 50.) Verga stated that these pre-draws needed to be repaid to the DOE in order for FCC to balance. (*Id.*) On March 10 and 11, 2014, Turgot sent Yousefi analyses showing that FCC had taken over $10 million from G5 that it did not disburse to STARS: FCC-Direct Loans-Award Year 13-14: $**5.8 million** (D.E. 220-2 at 81); Phoenix-Direct Loans-Award Year 13-14: **$4.1 million** (D.E. 220-2 at 87); Bryman-Direct Loans-Award Year 13-14: **$2.5 million** (D.E. 231-1, Turgot Tr. 118:16-120:5). On March 26, 2014, Babson informed Pierne that, through February, FCC had drawn $9.9 million more from the government beyond its eligible students posted in STARS. (D.E. 222-2 at 4.) FCC ultimately resolved the imbalance between G5 and COD by returning millions to the DOE and by booking a $10 million bad debt charge to reflect estimated returns of Title IV funds. (D.E. 238-2 at 618.) FCC's unsubstantiated cash represented cash drawn without matching records, namely the pre-draws. (D.E. 228-1, John Murphy Tr. 65:8-12, 73:2-8 ("Q. And the pre-draws that you're referring to, what are those? A. That was consistent with the unsubstantiated cash that was drawn down by the school that did not have the matching records; and that's why I was saying, 'We need to pay that back. We can't be drawing down funds.'").) Exs. 44 and 50, cited by Defendants, state the imbalance was due to not making refunds and "carrying" them "forward"; "doing a pre-draw to keep the float going" and not doing any reconciliation. (D.E. 221-2 at 237 and D.E. 220-2 at 31.) The prior year, the DOE took action against FCC after FCC failed to substantiate funds drawn and balance COD and G5.

63. Disputed. On March 4, 2014, Davis also told FCC to reconcile all off its OPEIDs, and not to draw further funds until FCC could substantiate its unsubstantiated balances. (D.E. 220-2 at 6-7.) Davis showed that FCC had unsubstantiated balances of over $15 million. (*Id*.) Davis warned that FCC would be placed on records first by March 31 "if we still see issues with drawing funds and not being able to submit records successfully to COD to substantiate those funds[.]". (*Id*.)

64. Disputed. On March 31, 2014, the DOE notified FCC that FCC still had unsubstantiated cash draws at the FCC, Phoenix and Bryman OPEIDS exceeding $5 million. (D.E. 221-2 at 165.) Therefore, the DOE reduced FCC's "Direct Loan available funds for both 2012/13 and 2013/14 to the greater of net disbursements or net draws, effectively placing your school in a records first situation…" (*Id*. at 162) This meant that FCC could not draw any funds from these sources until it reconciled the $5 million. As a result, FCC could not draw any Direct Loan funds from Bryman until April 14, 2014 (D.E. 236-2 at 476), from Phoenix until April 21, 2014 (*id*. at 526) and from FCC until April 23, 2014 (*id*. at 501), the dates after which it no longer had unsubstantiated cash. (D.E. 227-2 at 97.) FCC lost working capital by lacking the ability to draw ahead of disbursement. (D.E. 221-2 at 7 (Knobel letter: "This had the effect of taking one month's cash flow out of the business while the company adjusted from advance draw to roster draws.").) On April 1, 2014, following the March 31st DOE action, Knobel admitted to Davis that "[i]n my 32 years as an administrator of Title IV funds I never imagined that I would be so disconnected to the day to day operations. I will not let that happen again." (D.E. 221-2 at 163.) FCC missed payroll scheduled for April 4, 2014. (D.E. 183 ¶ 115). On April 4, 2014, the Board convened an emergency meeting where Knobel, Pierne, Yousefi and Bartness admitted that FCC had been out of balance since October 2013 but they had not told the Board because they expected to have enough cash to repay the DOE if they were cut off. (D.E. 221-2 at 55.) The Board approved borrowing $2 million to

fund the missed payroll and engaged FTI Consulting as financial advisor and Chief Restructuring Officer. (*Id*. at 56, 60.) Later that month, Knobel, fired as CEO, was removed from the Board of Directors (D.E. 183 ¶ 113) and on April 7, 2014, Yawn resigned. (D.E. 226-2 at 72.) On April 30, 2014, Knobel admitted to Yawn: "The full extent of the amounts due back to the DOE is not yet determined but will be large. All in all we knew that accounting and financial aid was a miss and none of us did enough to out the real problems and potential consequences." (D.E. 221-2 at 13.)

65. Disputed. Defendants' citation provides no support for the statement.

**Plaintiff's Additional Statements of Material Fact**

Additional Facts Concerning the Title IV Regulations

68. Any amount of federal student aid not disbursed to eligible students within three days of drawdown is "excess cash" and must be immediately returned to the DOE. (D.E. 252-2 (Murphy Report) at 40; D.E. 250-2 (Lacey Report) at 171-72.) There is a narrow exception for excess cash which can be held for seven days, but the general accepted practice is to not hold any excess cash. (D.E. 252-2 (Murphy Report) at 40.)

69. "Parallel" to the ban on excess cash, schools must return drawn funds that went unused by students. (D.E. 250-2 (Lacey Report) at 174.) Schools must maintain sufficient cash reserves to refund unearned Title IV funds. (*Id*. at 174-75.) Yawn considered failing to timely return even a single withdrawn student's funds to be a "major issue." (D.E. 224-1, Yawn Tr. 132:17-134:2.)

70. Schools must have an internal system of checks and balances over its authorization and disbursement of federal student aid. (D.E. 252-2 (Murphy Report) at 27; D.E. 250-2 (Lacey Report) at 178.) Schools must have fiduciary level controls over Title IV funds, as schools hold such funds in trust for the benefit of students or the DOE. (D.E. 250-2 (Lacey Report) at 179-80; D.E. 252-2 (Murphy Report) at 18-19.)

Additional Facts Concerning OPEIDs and Direct Loans

71. For 2013-2014 Direct Loans, the DOE set initial authorizations for the FCC and Phoenix OPEIDs at $23.3 million and $12.8 million, respectively. (D.E. 236-2 at 329; D.E. 236-2 at 360; D.E. 236-1, Davis Tr. 195:21-196:2.) On November 11, 2013, the DOE increased their authorizations by $25 million and by $15.1 million. (D.E. 236-2 at 327; D.E. 236-2 at 356.)

72. After July 1, 2013, FCC drew large, round numbers in 2013-2014 Direct Loans from the FCC and Phoenix OPEIDs, whereas before it had drawn specific dollars and cents. (D.E. 236-2 at 325; D.E. 236-2 at 356; D.E. 223-2 at 185.) FCC engaged in a pattern of not substantiating those draws within the required time period and then making massive refunds. (D.E. 236-1, Davis Tr. 104:21-105:6; 204:16-20 (round number draws are a red flag).) The DOE warned FCC about engaging in this pattern at least as early February 4, 2014. (D.E. 228-2 at 2.)

73. Between July 1, 2013 and April 2014, FCC drew down more 2013-2014 Direct Loan funds for the Miami (FCC) and Phoenix OPEIDs than it could substantiate, and more than it had recorded having disbursed to students in STARS. (D.E. 223-2 (Donohue Report) at 93-94, 185.)

74. While Bryman was on records first, between July 1, 2013 and November 11, 2013, FCC's Direct Loan draws for this OPEID were consistent with the STARS disbursements and substantiations to COD. (*Id.* at 95, 185.)

75. On November 11, 2013, the DOE restored Bryman's $17.9 million in availability. (D.E. 236-2 at 331; D.E. 236-1, Davis Tr. 208:20-22.) The next day, FCC began drawing large round number amounts for Bryman. (D.E. 236-2 at 332; DE. 236-1, Davis Tr. 208:20-22.) Thereafter, FCC began drawing more Direct Loan funds than it had in STARS and more than it reported to the COD. (D.E. 223-2 (Donohue Report) at 95, 185.)

<u>FCC Engaged in Pre-draws to Fund Operations</u>

76. Stewart directed the pre-draws as follows: Turgot would prepare a daily chart showing the net amount of funds FCC could draw or needed to refund based upon what FCC had processed

in COD. (*E.g.* D.E. 219-2 at 80; D.E. 231-1, Turgot Tr. 22:1-15; 26:19-28:20; D.E. 219-1, Stewart Tr. 261:19-22.) Stewart would return the chart to Turgot with additional pre-draw lines or large round numbers added to the zero boxes on the chart. (D.E. 231-1, Turgot 72:8-25; D.E. 219-1, Stewart Tr. 265:5-19.) Later than afternoon, Turgot would enter a draw for the requested funds in G5. (D.E. 231-1, Turgot Tr. 97:9-15).

77. For example, on December 11, 2013, Stewart directed a pre-draw of $1.1 million on FCC and $1 million on Phoenix for the 2014 Direct Loans (among other pre-draws). (D.E. 231-2 at 120.) At 12:54 pm, Turgot sent Stewart the daily chart showing that FCC needed to refund over $2.65 million, including $2,032,339 for FCC 2014 Direct Loans. (D.E. 231-2 at 116.) Turgot reported that nothing was available to draw for Phoenix and Bryman 2014 Direct Loans. (*Id.*).

78. Five minutes later, Stewart directed Turgot to pre-draw $1.1 million in 2014 Direct Loans on the FCC OPEID by adding an additional line: "FCC pre draw" and $1,100,000 under "Direct Loans 14." (D.E. 231-1, Turgot Tr. 72:8-25.) Stewart directed Turgot to pre-draw $1,000,000 for Phoenix Direct Loans 14 and $500,000 for Bryman Direct Loans 14 by adding those numbers into the boxes where Turgot had reported no available funds. (D.E. 231-2 at 120.) Turgot drew the funds and reported them to others including Yousefi. (D.E. 231-2 at 126), who asked "why do we have such large refund numbers?" (D.E. 231-2 at 143.) Turgot answered that the large refunds were due to pre-draws which FCC had held for 30 days without disbursing to students and refunds that were posted in STARS but not paid to the COD. (*Id.*; D.E. 231-1, Turgot Tr. 80:13-81-9; 81:31-82:6.) Stewart confirmed Turgot's response. (D.E. 231-2 at 143.)

79. On December 16, 2013, Stewart directed three pre-draws: $750,000 (FCC), $750,000 (Phoenix) and $400,000 (Bryman). (D.E. 231-1 at 156; D.E. 231-1, Turgot Tr. 148:17-23.)

80. In October 2013, Pierne directed Stewart to pull down an additional $1 million in Title IV funds and "to hold onto that excess until the end of the month" so that he could show additional cash in hand on the balance sheet. (D.E. 219-2 at 113.)

81. Yousefi and Stewart authorized a pre-draw on December 10, 2013. Turgot emailed the daily chart showing over $4 million owed to the DOE. (D.E. 231-2 at 96.) Yousefi expressed surprise ("Big numbers?!!") by the amount of refunds due. (D.E. 220-2 at 99.) Stewart proposed adding pre-draws at the Phoenix and Bryman OPEIDs and removing the largest refunds to be made that day. (*Id*.) ("We can offset the impact by pre-drawing some of next week's funds and not refunding some until next week.") In total, Stewart proposed drawing $370,000 instead of returning $4 million to the DOE. (*Id*.) Yousefi agreed: "go with your numbers for now until I finish with the plan of drawing down and reconciling funds daily." (D.E. 220-2 at 106.)

82. On December 24, 2013, Pierne asked Knobel's permission to do a predraw "to make sure we get some AP cleared prior to year end and to support cash on hand at the balance sheet date[,]" even though the funds were unavailable until December 30. (D.E. 221-2 at 220.) Knobel agreed without asking for explanation stating "I would be inclined to use a bit of a float…" (*Id.*)

83. On December 26, 2013, Pierne asked Yousefi to draw $2.5 million to satisfy FCC's cash needs. (D.E. 220-2 at 129.) Yousefi responded that he would take $2.7 million just to have a cushion, even though he admitted that he did not understand the formula for doing so. (*Id.*)

84. On December 27, 2013, Yousefi directed an employee "to do a $2.7M draw against the DL from Phoenix, Bryman and possibly FCC OPEID" and asked for each OPEID's available balances in G5 so he could determine how to draw the money. (D.E. 234-2 at 92.) The employee reported available balances for FCC, $28 million, Phoenix, $15 million and Bryman, $15 million. (D.E. 234-2 at 94.) Yousefi responded "We need to drawdown $2.7M, so let's use the following

18

breakdown:  $1M from FCC, $1M from Phoenix and $700K from Bryman." (*Id*.) She drew the funds and told Yousefi that she would "run another pay list on Monday and see what we can update in ED-Express." (*Id*.) Yousefi agreed. (*Id*.) Drawing funds for operational reasons and then checking for students is not consistent with immediate need. (D.E. 250-1, Lacey Tr. 160:24-162:6.)

85. The pre-draws continued from at least September 2013 and continued under Yousefi's direction through Winter 2014. (*E.g*., D.E. 219-2 at 72, 78-80; D.E. 231-2 at 120; D.E. 234-2 at 38-48 ("the ones in red are a pre-draw"); *see also* D.E. 234-2 at 50; D.E. 234-2 at 81; D.E. 231-2 at 182-93; D.E. 234-2 at 83.)  Verga reported Yousefi to human resources for the pre-draws and for attempting a $2 million pre-draw when the DOE put FCC on records first. (D.E. 234-2 at 37.)

86. Between December 10 and 31, 2013 alone, Yousefi, Stewart, Knobel and Pierne directed pre-draws totaling almost $10 million from FCC's three larges OPEIDs, but disbursed only $1.1 million to STARS. (D.E. 223-2 at 189-190.) During the same month, FCC paid almost $8 million in refunds to the DOE. (D.E. 223-2 at 154.)

87. In February 2014, Murphy advised Yousefi to "pay down the pre-draws ASAP." (D.E. 228-2 at 20.) Murphy made Pierne aware of the issue, but "the more I pushed the issue the less I was included in subsequent meetings[.]" (*Id*. 73:21-74:21.)

88. On February 26, 2014, Davis again instructed FCC to "send refund confirmation numbers for those balances over 30 days immediately…. Or send in records to substantiate the cash immediately." (D.E. 228-2 at 22 (ellipsis in original).) FCC's unsubstantiated balances exceeded $15 million, mainly at the 13/14 Direct Loans for FCC, Phoenix and Bryman. (*Id*.)

89. On March 3, 2014, Spirea (a financial aid employee) calculated that FCC lacked the $40 million of students needed to substantiate its balances by March 31. (D.E. 228-2 at 27; D.E. 228-1, Murphy Tr. 94:18-23 ("I completely agree with that… we did not have pending

disbursements either in COD or on potential new starts that would equate to $40 million coming into the organization.").

90. On March 9, 2014, Yousefi reported to Knobel, Pierne and Yawn that the imbalances grew so large because FCC was borrowing money to repay refunds. (D.E. 220-2 at 31 ("The carry forward refunds caught up with us in December because of a no-revenue month, which forced Siana to do a pre-draw to keep the float going."); D.E. 220-2 at 28 ("The focus was to increase the authorization so we could pull down funds, so refunds and rejects became secondary… the common theme is that we were not reconciling refunds and rejects, so we were borrowing (pre-drawing) to pay the refunds when they came due."); D.E. 220-1, Yousefi Tr. 128:10-21.)

91. Section 8.14(a) of FCC's $30 million credit agreement with Bank of Montreal as agent, included a covenant that FCC comply with all federal regulations where non-compliance would result in a material adverse effect or constitute a significant regulatory event.  (D.E. 183 ¶94-97).

Dated: March 26, 2018

Respectfully submitted,

/s/ Brian S. Dervishi
Brian S. Dervishi (Bar No. 350303)
Peter A.Tappert (Bar No. 27100)
WEISSMAN & DERVISHI, P.A.
SunTrust International Center
One Southeast Third Avenue, Suite 1700
Miami, Florida 33131
(305) 347-4070
bdervishi@wdpalaw.com
ptappert@wdpalaw.com
service@wdpalaw.com

- and -

Bijan Amini (admitted *pro hac vice*)
Lita Beth Wright (admitted *pro hac vice*)
Avery Samet (admitted *pro hac vice*)
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@storchamini.com
lbwright@storchamini.com
asamet@storchamini.com

*Attorneys for Plaintiff Clingman &*
*Hanger Management Associates, LLC,*
*as Trustee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 26, 2018, the foregoing was filed and served on the parties

named below via the Court's ECF system.

/s/ Brian S. Dervishi

Michael N. Kreitzer, Esq.
Kenneth Duvall, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131
kreitzer@bilzin.com
kduvall@bilzin.com
eservice@bilzin.com
mavin@bilzin.com
stapanes@bilzin.com