## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC as Trustee

        Plaintiff,

v.

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI

        Defendants.

CASE NO. 16-CV-62028-JAL-JG

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**PAGE**

Table of Authorities ........................................................................................................ iii

Introduction.................................................................................................................... 1

Statement of Facts ......................................................................................................... 3

Standards on the Motion .............................................................................................. 13

**ARGUMENT** ........................................................................................................... 13

**I.    DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF LOYALTY** ........................................................... 13

    **A.  Defendants Caused FCC to Violate Federal Regulations** ................................... 13

        1. Borrowing Money from G5 (Pre-Drawing) ............................................. 14

        2. Knowingly Failed to Reconcile Monthly .................................................. 15

        3. Failing to Make Refunds ........................................................................... 15

    **B.  Defendants Failed to Implement Adequate Monitoring Procedures and Failed to Monitor the Inadequate Procedures They Did Have** ......................... 16

        1. Officers Have the Same Fiduciary Duties as Directors Under Delaware Law .......................................................................................... 16

        2. FCC Lacked Proper Monitoring Procedures ............................................. 17

        3. Defendants Failed to Monitor .................................................................. 20

        4. The Chief Compliance Officer Had a Duty to Monitor Compliance ......... 20

**II.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF CARE** ......................................................................................... 21

    **A.  The Standard for the Duty of Care is Gross Negligence** ................................... 21

    **B.  Defendants Ignore the Evidence Concerning their Gross Negligence** ............... 22

    **C.  Defendants' Corruption Story** ......................................................................... 23

**D. Defendants' Concurrent Spoliation Motion Indicates Summary Judgment Should Not Be Granted** .......................................................................................... 24

**CONCLUSION** ........................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**<u>Cases</u>**

*Adickes v. S.H. Kress & Co.,*
  398 U.S. 144 (1970) ........................................................................................................ 13

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................................................ 13

*Chanel, Inc. v. Italian Activewear of Florida, Inc.,*
  931 F.2d 1471 (11th Cir. 1991) ...................................................................................... 13

*Desimone v. Barrows,*
  924 A.2d 908. (Del. Ch. 2007) ........................................................................................ 13

*In re Walt Disney Co. Deriv. Litig.,*
  907 A.2d 693, (Del. Ch. 2008) ........................................................................................ 21

*Gantler v. Stephens,*
  965 A.2d 695 (Del. 2009) ........................................................................................ 16, 17

*In re Massey Energy Co.,*
  2011 WL 2176479 (Del. Ch. 2011) ........................................................................... 17 n.3

*In re World Health Alternatives, Inc.,*
  385 B.R. 576 (Bankr. D. Del. 2008) ............................................................................... 17

*Pleasant Valley Biofuels, LLC v. Sanchez-Medina,*
  2014 WL 11881019 (S.D. Fla. 2014) .............................................................................. 22

*Setai Hotel Acquis., LLC v. Miami Beach Luxury Rentals, Inc.,*
  2017 WL 3503371 (S.D. Fla. Aug, 15, 2017) ................................................................. 13

*U.S. v. $688,670.42,*
  449 F. App'x 871 (11th Cir. 2011) .................................................................................. 13

*Williams v. Obstfeld,*
  314 F.3d 1270 (11th Cir. 2002) ...................................................................................... 13

**<u>Rules</u>**

Fed. R. Civ. P. 56(a) ............................................................................................................. 13

## PRELIMINARY STATEMENT

Between July 2013 and April 2014, Florida Career College ("FCC") took and held federal financial aid funds in quantities far greater than FCC was disbursing to eligible students. FCC's officers and employees internally referred to the practice as "pre-drawing" or "borrowing" federal funds. By early 2014, the United States Department of Education (the "DOE") warned FCC against the practice and in March demanded that FCC submit proof of disbursement of all funds drawn ("substantiate") or return any excess, which at that point exceeded $15 million. After FCC could do neither, the DOE revoked FCC's ability to draw further before substantiating the remaining excess. FCC promptly collapsed as it missed payroll, fired its Chief Executive Officer, and uncovered millions of additional funds required to be returned to the DOE. Hemorrhaging cash, cut-off from its ordinary cash flow and incapable of even identifying its ultimate liability to the Title IV program, FCC was forced into a fire sale, obtaining under $4 million for assets previously valued in excess of $150 million.

On this motion for summary judgment (D.E. 247) (the "Motion"), Defendants bear the burden of persuading the Court that no genuine dispute exists as to any material fact necessary to support Plaintiff's causes of action. Defendants advance several fact-intensive arguments: FCC always drew down federal funds based on eligible students; FCC always reconciled and refunded federal funds to the government as required; the reason the DOE showed a $15 million imbalance between what was drawn and what was reported was because the student records in the DOE's official database of student loans (the "COD") had been corrupted through no fault of Defendants; none of the Defendants had a duty under Delaware law to monitor FCC's compliance with federal regulations, and in particular, Dean Bartness, the Chief Compliance Officer, had no such responsibility.

The record contradicts those arguments. Student records in COD, the official government record of student loans, were never corrupted, and no relevant witnesses were aware of such corruption. (D.E. 263 ¶ 46.) In Winter 2014, FCC employees, including Defendants, understood and reported that FCC's failure to substantiate students was due to FCC's "pre-drawing" without eligible students. (*Id*. ¶ 62.) In Spring 2014, after the DOE reduced FCC's available balances, FCC employees, including the Defendants, identified and returned over $10 million in overdrawn funds to address the imbalance problem. (*Id*.)

Defendants nevertheless assert that FCC actually disbursed to real, eligible students all the money that it could not substantiate to the government. They base that claim entirely on Defendant Stewart's assertion that FCC actually *had* the data the DOE was requesting in 2013 and 2014, and that if only they could find that data, Defendants would *now* show that FCC had eligible students. That argument, even if true (it is not) would lead to the absurd conclusion that Defendants came to the wrong conclusions in 2014 about the problem, wrongfully repaid the government over $10 million, and lost FCC's normal access to financial aid funds for no good reason.

In truth, Defendants knew of their problems and failed to fix them. In the words of David Knobel, Chief Executive Officer to Neal Yawn, Chief Operating Officer: "All in all we knew that accounting and financial aid was a miss and none of us did enough to out the real problems and potential consequences." In the words of Dean Bartness, Chief Compliance Officer: "Much like the admission reps [who went to jail], the pressure was on to perform, so they [Knobel and Mark Young, a VP] took exceptionally risky actions to produce results and in the end it blew up in their faces." Or, still more precisely, in the words of Cid Yousefi, who oversaw FCC's Financial Aid Office: "The common theme is that we were not reconciling refunds and rejects, so we were borrowing (pre-drawing) to pay the refunds when they were due."

The Court should deny the Motion as Defendants cannot satisfy their burden of persuading the Court that no genuine dispute exists as to any material fact necessary to prove Plaintiff's causes of action that Defendants are liable for FCC's collapse because they: (a) knowingly caused FCC to engage in illegal activity, (b) failed to monitor FCC's financial aid drawdown activity, despite a duty to so, and (c) exercised gross negligence with respect to this activity, all in breach of their fiduciary duties to FCC.

## STATEMENT OF FACTS

FCC operated 41 for-profit colleges. (D.E. 183 ¶ 21.)  It earned 90% of its revenues from Title IV student financial aid funds drawn from the DOE. (*Id*. ¶ 21.) For Title IV purposes, FCC operated under six OPEIDs. (D.E. 263 ¶ 10.) Each OPEID was a separate institution for purposes of drawing Title IV funds and complying with Title IV regulations. (*Id*.) At the beginning of each academic year (around July 1), the DOE set an initial Direct Loan authorization amount for each OPEID based upon FCC's historical draws. (*Id*. ¶ 28.) A school's "available balance" to draw is the difference between the authorized amount and the school's net drawdowns and refunds to date. (*Id*.)

While these funds were *available* for FCC to draw on any given day in 2013-14, regulations prohibited FCC from drawing more financial aid funds than those which FCC had an "immediate need" to disburse to eligible students. (*Id*. ¶ 12.) Other regulations prohibited FCC from holding "excess cash" or financial aid funds which FCC, for whatever reason, did not disburse to students within three days. (*Id*. ¶ 68.) Regulations, as well as best practices, required FCC to reconcile, on a monthly basis if not more frequently, internal records of funds disbursed to students with Title IV draws from G5 and reporting of disbursements to COD. (*Id*. ¶ 15.) Other regulations required FCC to have a system of internal checks and balances to ensure that FCC neither drew nor kept federal funds to which it was not entitled. (*Id*. ¶ 70.) Finally, regulations required FCC to have

3

fiduciary level controls over all Title IV funds. (*Id*.) As chief executive officer, David Knobel signed the Program Participation Agreement for each OPEID, pursuant to which he agreed to keep FCC in compliance with Title IV regulations. (*Id*. ¶ 10.)

FCC employed a database named STARS to track student records, including disbursements of Title IV funds to and from student accounts. (D.E. 247 ¶ 17.) FCC generated periodic reports from STARS showing how much FCC had disbursed to students and refunded to the DOE for a multiplicity of reporting functions. (*Id*.)

In January 2013, FCC implemented new software named Regent 8 to automate the reporting of student disbursements in STARS to the DOE's COD database. (D.E. 247 ¶¶ 43-44.) However, Regent 8 interfaced poorly with STARS and FCC had trouble submitting disbursement records to COD which COD would accept. To substantiate students, FCC returned to manually submitting to COD the student disbursement data (D.E. 247 ¶ 47) which was recorded in STARS. (*Id*. ¶ 17.) Records which COD rejected did not change the data in COD; COD only changes data when it approves a posted disbursement. (D.E. 263 ¶ 46.)

Because of FCC's failure to report disbursements, the DOE put FCC on "records first"— meaning FCC could not draw further funds until it substantiated them, and then, when the problem persisted, on "freeze cash" status—meaning FCC could not draw any funds until its older draws were substantiated. (D.E. 247 ¶¶ 51, 53; D.E. 263 ¶ 51.) This was a major event at FCC and Defendants Knobel, Pierne and Stewart all knew about the problem. (D.E. 247 ¶ 52.) By July 2, 2013, FCC had substantiated its draws and Pierne reported to the Board "the entire backlog of files corrupted by Regent have been cleared." (D.E. 238-1, Pierne Tr. 128:25-129:9.) The DOE removed the records first and freeze cash restrictions by July, but kept the Bryman OPEID on records first until November 2013. (D.E. 263 ¶ 56.)

Defendant Yousefi subsequently discovered that between April 1, 2013 and June 30, 2013, FCC posted over $11 million in refunds to STARS, but neither reported nor made refunds to the DOE. (*Id.* ¶ 31.) Instead, after July 1, 2013, FCC engaged in a pattern of drawing large round number amounts—prior draws had been for specific dollars and cents—of Direct Loan funds, not substantiating those draws within the required time period and then making massive refunds. (*Id.* ¶ 72, 75.) The round number draws drew the DOE's notice because funds are supposed to be drawn based on immediate need to disburse to specific students over the next three days. (*Id.*)

Beginning on July 1, 2013, for the Miami (FCC) and Phoenix OPEIDs, FCC drew down more Direct Loan funds from G5 than it could substantiate and than it had recorded having disbursed to students in STARS (for 2013-14 Direct Loans). (*Id.* ¶ 73.) Below are graphs comparing Direct Loan draws on the Miami and Phoenix OPEIDs (orange line) to FCC's internal disbursements in STARS (blue line) and to FCC's reported disbursements in the COD demonstrating the discrepancy (red dots):

**Miami Direct Loan 13/14 (G5 compared with COD and Title IV STARS)**



**Phoenix Direct Loan 13/14 (G5 compared to COD and Title IV STARS)**



(D.E. 223-2 (Donohue Report) at 93-94.)

Between July 1, 2013 and November 11, 2013, FCC draws for the Bryman OPEID were consistent with internal STARS disbursements and substantiations to COD. (D.E. 263 ¶ 74.)  On November 11, 2013, the DOE removed Bryman from records first status by restoring its available balance of $17.9 million for 2013-14 Direct Loans—meaning that FCC could draw without substantiating students first. (*Id.* ¶ 75.) FCC began drawing large round numbers on the Bryman OPEID in amounts that exceeded what it had disbursed to individual students in STARS and reported to COD. (*Id.*) Below is a graph comparing the Direct Loan draws on the Bryman OPEID to FCC's internal disbursements in STARS and to COD:

**Bryman Direct Loan 13/14 (G5 compared with COD and Title IV STARS)**



(D.E. 223-2 at 95.) Knobel, Pierne, Stewart and Yousefi caused FCC to "pre-draw" these funds from its available balance in G5, in excess of FCC's eligible students in STARS, to obtain cash for operational needs—including payroll, payables and DOE refunds. (D.E. 263 ¶¶ 76-86.) Essentially, FCC was borrowing money from the government and hoping to either pay it back or make up the difference in future students.

This process came off the rails in December 2013—a month when FCC had no new Title IV starts and almost no revenue. (*Id.* ¶¶ 25, 90.) In that month alone, first Yousefi and Stewart, and then when Stewart departed, Knobel, Pierne and Yousefi, pre-drew almost $10 million from FCC's three largest OPEIDs, with only $1.1 million of it attributable to new disbursements in STARS. (*Id.* ¶ 86; *see also id.* ¶¶ 76-84.) Defendants drew down $8.8 million that did not correspond to any increase in STARS during those three weeks, while refunding almost $8 million that same month. (*Id.* ¶ 86.) In Yousefi's words: "The carried forward refunds caught up with us

in December because of a no-revenue month, which forced Siana to do a predraw to keep the float going.") (*Id.* ¶ 90.)

The corresponding emails leave no doubt Defendants understood exactly what they were doing, drawing down funds without supporting enrollment. On December 12, 2013, in response to Yousefi's surprise at the size of the refunds, Turgot explained that such large refunds were due "because of the pre draws and also refunds posted to the ledger are not included in our payments when ordering funds." (D.E. 231-2 at 143; *see also* D.E. 263 ¶ 78.) When Yousefi asked: "Hi Siana, Can you please explain the cash order process to me? According to [Turgot], it is based on what is available in G5 and what you approve… My expectation is that everything would be tied to a roster," Stewart replied: "Sure it is based on a roster. The availability in g5 has been used recently because of the number of rejects we have been having. My approval has only been necessary when our refunds are greater than our draws and a pre-draw [m]ay be needed." (D.E. 219-2 at 111.)

For example, at 12:54 pm on December 11, 2013, Turgot sent Stewart the daily chart of funds which FCC could draw by OPEID, Award Year and Funding Source. (D.E. 263 at ¶¶ 76-77.) Each funding source reflected a specific dollar and cent number available to draw or needed to refund. (*Id.*) In the aggregate, Turgot reported that over $2.65 million needed to be returned to the DOE, including $2,032,339 for FCC OPEID, Direct Loans 2014. (*Id.* ¶ 77.) Turgot reported that nothing was available to draw for Phoenix and Bryman Direct Loans. (*Id.*) Five minutes later, at 12:59 pm, Stewart responded with an updated chart, instructing Turgot to pre-draw $1.1 million on the FCC OPEID, Direct Loans 2014 by adding a line under FCC:  "FCC pre draw" and $1,100,000 under "Direct Loans 14." (*Id.* ¶ 78.) The addition of the other round numbers in the

boxes where Turgot had reported $0.00 in available funds (*i.e.* $1,000,000.00 for Phoenix Direct Loans 14), similarly instructed Turgot to pre-draw those amounts. (*Id*.)

On December 16, 2013 (though she supposedly left on December 10), Stewart directed a pre-draw of $750,000 on the FCC [Miami] OPEID, $750,000 on the Phoenix OPEID and $400,000 on the Bryman OPEID. (D.E. 231-1 at 156; D.E. 231-1, Turgot Tr. 148:17-23.) Turgot testified that these pre-draws were not connected to any students, the funds were not disbursed to student ledgers and because the pre-draws pulled funds without regard to students, FCC could not attribute refunds on the pre-draws to particular students or campuses within an OPEID. (*Id*.)

With Stewart gone, on December 24, 2013, Pierne requested permission from Knobel to do a predraw "to make sure we get some AP cleared prior to year end and to support cash on hand at the balance sheet date[,]" even though the funds were not yet available to be drawn. (*Id*. ¶ 82.) Knobel agreed without asking for explanation: "I would be inclined to use a bit of a float…" (*Id*.) On December 26, 2013, Pierne asked Yousefi to draw $2.5 million from the January start to satisfy FCC's cash needs. (*Id*. ¶ 83.) Yousefi responded that he would take even more just to have a cushion, even though he did not understand the formula for doing so: "Jeff- I'm thinking $2.7M just give us a little bit of cushion. I don't fully understand Siana's formula and feel better to have a little buffer." (*Id*.) On December 27, 2013, Yousefi directed a financial aid employee that "We need to do a $2.7M draw against the DL from Phoenix, Bryman and possibly FCC OPEID" and asked her to provide available balances in G5 so that he could determine which OPEIDS to take money from. (*Id*. ¶ 84.) The next morning that employee reported the available balances as $28 million (FCC), $15 million (Phoenix) and $15 million (Bryman). (*Id*.) In response, Yousefi instructed her "We need to drawdown $2.7M, so let's use the following breakdown:  $1M from FCC, $1M from Phoenix and $700K from Bryman." (*Id*.)

On January 3, 2014, Christopher Babson, FCC's director of finance, reported to Pierne that FCC's treasury systems had recorded receiving between $15-20 million more in Title IV cash than FCC had recorded disbursing in STARS. (*Id.* ¶ 62.) On January 28, 2014, Kim Verga, the number two at the financial aid department, identified $9.9 million in 2013-14 Direct Loans at the FCC, Phoenix and Bryman OPEIDs which FCC had pre-drawn and which needed to be refunded to the government in order for FCC to balance. (*Id.*)

On February 4, 2014, Barbara Davis of the DOE emailed John Murphy, FCC's new VP of financial aid:

> We have been very concerned about the ongoing inability of the larger Anthem schools to reconcile funds drawn with disbursement records. Seems like a large amount of cash is drawn and then when disbursements cannot be reported timely to substantiate those funds, the funds are returned. And this has been recurring for months and months.

(D.E. 228-2 at 2.) Murphy concluded that FCC had been drawing funds without associated student records in order to sustain operations. (D.E. 228-1, Murphy Tr. 39:22-44:11.) Murphy and Roxanna Spirea, hired in February 2014 to help with reconciliation, began that process but were unable to locate records with which to do so. (*Id.* 65:8-12 ("obviously, there weren't records. That is the whole problem with the unsubstantiated cash. If I had records, I would have been able to substantiate the cash, one way or another. We did not have those records."); *see also* D.E. 263 ¶ 62, 89.)

On February 26, 2014, Davis notified FCC that it had drawn $15.8 million more than it had substantiated in students. (D.E. 263 ¶ 88.) Davis advised FCC to either justify the students or refund the money immediately. (*Id.*) Murphy raised the issue with Yousefi and Pierne and advised them to "pay down the pre-draws ASAP," but they shut him out of discussions. (*Id.* ¶ 87.) Pierne later claimed that March was the first time he learned of the unsubstantiated funds. (D.E. 238-1,

Pierne Tr. 68:9-15.) On March 4, 2014, Davis notified FCC of its imbalance of $15.2 million between the amount it had drawn and the amount it had substantiated. (*Id.* ¶ 63.) She informed FCC that all of its OPEIDs needed to be reconciled by the end of March 2014 or FCC would lose its ability to access Title IV funds. (*Id.*)

On March 9, 2014, Yousefi conceded in a presentation for FCC's executive team that FCC had not been performing monthly reconciliations since the previous June. He stated that FCC had not been paying refunds timely or processing accounts correctly. (*Id.* ¶ 90.) He blamed Stewart: "Although the stories vary a bit, the common theme is that we were not reconciling refunds and rejects, *so we were borrowing (pre-drawing) to pay the refunds when they came due.*" (D.E. 220-2 at 28 (emphasis added).) Verga, in a formal complaint to FCC human resources, complained that Yousefi also improperly engaged in pre-draws: "I gave three emails to Spring [Zutes] with the evidence that Cid was completing pre draws in G5. In addition to the emails he also tried to draw 2 million dollars at the beginning of April but it was denied in G-5. This would have been another pre-draw since we posted all eligible students from March to the balances owed and did not have any remaining money to draw." (D.E. 234-2 at 37.) On March 26, 2014, Babson confirmed to Pierne that, through February, FCC had overdrawn $9.9 million in Title IV funds beyond the amount that FCC had disbursed to students. (D.E. 222-2 at 4.)

By March 31, 2014, when FCC still had an unsubstantiated cash balance of $5 million, the DOE immediately cut off FCC's ability to draw funds without first resolving the existing balance and then only on a records first basis. (D.E. 263 ¶ 64.) As Verga mentioned, the DOE action had the effect of stopping Yousefi's $2 million pre-draw. (*Id.* ¶ 85.) FCC lost one month's working capital (*id.* ¶ 64) and could not meet its upcoming obligations, including payroll (*id.*).

On April 4, FCC's board convened an emergency meeting at which it authorized borrowing an additional $2 million to fund payroll and asked Knobel, Pierne, Yousefi and Bartness how the situation had arisen and why the Board had not been informed earlier. (*Id.*) They told the Board that FCC had been out of balance since October 2013 and explained they did not tell the Board because they expected to have enough cash on hand to repay the DOE if they were cut off. (*Id.*) The Board engaged FTI Consulting as crisis managers and an FTI representative as Chief Restructuring Officer. (*Id.*) The Board then fired Knobel as CEO and removed him from the Board at the end of April. (*Id.*) Yawn resigned on April 7, 2014. (*Id.*)

Over the next few months, Yousefi, working with consultants, continued to uncover millions of additional dollars required to be refunded to the DOE. (*Id.* ¶ 31 (Yousefi reported error rates of 49-66% in records underlying a subset of programs in three OPEIDs, which alone resulted in $4.8 million of additional funds due back to the DOE); D.E. 221-2 at 13 (Knobel advising Yawn that the April audits discovered error rates of 50% in the correctness and timing of refunds).) So incapable were they of determining their ultimate liability for the pre-draws, that Pierne resorted to creating large additions to FCC's bad debt reserve—$10 million alone in April and May, an admission that they could not reconcile their Title IV accounts at least to that level and needed a place to record the refunds. (D.E. 238-2 at 618.)  At the time of FCC's bankruptcy filing, FCC had still not substantiated $3 million to the DOE.  (D.E. 239-1, Davis Tr. 341:10-16).

Without cash flow, its most senior executives, a clear path to DOE compliance or even a basic handle on the extent of its liabilities, FCC had no choice but to close and seek a sale of its assets. It sold nine schools to one purchaser, IEC, for $2.8 million, and three schools to Premier for $150,000, plus the assumption of certain liabilities. (D.E. 183 ¶¶ 121-23.)  The transactions

closed on August 21 and 22, 2014, respectively, the remaining schools were closed, and FCC filed

for bankruptcy liquidation on August 26, 2014. (*Id.* ¶¶ 121-24.)

## STANDARDS ON THE MOTION

On this motion, Defendants bear the burden of persuading the Court that no genuine dispute

exists as to any material fact and that Defendants are entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a). A dispute about a material fact is genuine if no reasonable fact-finder could return

a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The Court must construe the evidence and factual inferences arising therefrom in the Plaintiff's

favor. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## ARGUMENT

## I.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF LOYALTY

### A.   <u>Defendants Caused FCC to Violate Federal Regulations</u>

Under Delaware law, a fiduciary breaches his duty of loyalty when he or she knowingly

causes the corporation to violate the law. (*See* D.E. 173 at 17, quoting *Desimone v. Barrows*, 924

A.2d 908, 934. (Del. Ch. 2007).) "As a general rule, a party's state of mind (such as knowledge or

intent) is a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian

Activewear of Florida, Inc.*, 931 F.2d 1471, 1476 (11th Cir. 1991)*. See also U.S. v. $688,670.42*,

449 F. App'x 871, 876 (11th Cir. 2011) (collecting cases); *Williams v. Obstfeld*, 314 F.3d 1270,

1277 (11th Cir. 2002) (summary judgment on the question of knowledge or intent is a "rare

instance"). *See also Setai Hotel Acquis., LLC v. Miami Beach Luxury Rentals, Inc.*, 2017 WL

3503371, at *13 (S.D. Fla. Aug, 15, 2017) ("In short, making a determination on this factor would

require the Court "to consider one party's evidence more credible than the other."). Nevertheless,

the record demonstrates that Defendants Knobel, Pierne, Stewart and Yousefi knowingly caused FCC to violate the law.

1.     Borrowing Money from G5 (Pre-Drawing)

Knobel, Pierne, Stewart and Yousefi all knowingly caused FCC to violate Title IV regulations by engaging in pre-drawing. Pierne and Knobel would communicate to Stewart or Yousefi that FCC needed to draw a certain amount of federal funds on particular days or weeks in order to meet the operational needs of FCC.[1]  (D.E. 263 ¶¶ 76-86.) Operational needs included payables, balance sheet needs and additional cash necessary to refund amounts that FCC had already improperly drawn. (*Id*.) Yousefi, John Murphy, Verga and Turgot all attributed FCC's unsubstantiated cash imbalance to these pre-draws. (*Id*. ¶ 62.)

This practice violated federal Title IV regulations prohibiting schools from (a) taking money for which they do not have an immediate need to disburse to eligible students (*id*. ¶ 12), (b) keeping money which they cannot disburse to eligible students within three business days (*id*. ¶ 68), (c) failing to have a fiduciary system in place tracking such to ensure that federal student aid funds are used as intended (*id*. ¶ 70) and (d) failing to report disbursements of Title IV funds within 15 days of disbursement (*id*. ¶ 13).[2]

Defendants argue without citation that drawing funds based upon projected students is "perfectly permissible under Title IV." (D.E. 247 at 30.) That is false. Schools may draw only for immediate need to disburse to eligible students and must confirm such eligibility before disbursing any funds. (*Id*. ¶ 12; D.E. 250-1, Lacey Tr. 221:12–222:10; D.E. 236-1, Davis Tr. 262:24-263:6.)

---

[1] Examples of these directives were also specifically alleged in the Complaint (D.E. 85 ¶ 71) and referenced by the Court (D.E. 173 at 21-22.) Defendants do not address them.
[2] The specific regulations at issue are cited in the expert reports. (*See* D.E. 250-2 (Lacey Report) at 169-72, 175-80.)

To the extent Defendants were drawing funds based upon projected students (*see* D.E. 263 ¶ 60), they had no basis to do so.

2.    <u>Knowingly Failed to Reconcile Monthly</u>

Defendants misstate the requirement to reconcile Direct Loans on a monthly basis. (*Id.* ¶ 15.) Reconciliation means the school must resolve any discrepancies between its internal records of Direct Loan funds received and its Direct Loan disbursement records submitted to COD. (*Id.*)

Reconciliation does not mean that schools just need to "track funds" or that schools can hold on to unreconciled cash until one year after the end of the program year. (*Id.*) Generally accepted procedures are to reconcile at least monthly, and even more frequently. (*Id.*)

Defendants knew FCC was not performing monthly reconciliations between June 2013 and March 2014, and admitted to it in contemporaneous documents. (*Id.* ¶ 32.) Knobel knew FCC was not reconciling on a monthly basis after the Regent 8 issue occurred. (*Id.*) So did Pierne and Yousefi: "Jeff - I've learned that we have not fully reconciled the 12/13 award year against COD and STARS! This can present liability for Anthem and needs to be attended to asap." (*Id.*) Yousefi told Knobel, Pierne and Yawn: "Reconciling through 6/30/2013 doesn't really help us with July through now [March 9, 2014]." (*Id.*) Yawn noted: "We hadn't reconciled COD since Jun[e] 30, 2013." (*Id.*) Pierne agreed: "It became apparent that Siana did not properly reconcile on a monthly basis." (*Id.*) In a report to FCC's Board, Yousefi attributed the COD imbalance to FCC's failure to conduct monthly reconciliations and noted that "reconciliation is the only way to ensure proper posting of financial aid and timely refund calculation." (*Id.*) Defendants identify no documentary evidence to support their claim that any monthly reconciliations were conducted.

3.    <u>Failing to Make Refunds</u>

Defendants rely solely on Yousefi's testimony for the proposition that "FCC ensured refunds were always processed in a timely manner." (D.E. 247 ¶ 31.) However, in Spring 2014,

15

Yousefi uncovered refund error rates of 49-66%, with $10.8 million needing refunding. (D.E. 263 ¶ 31.) Knobel similarly told Yawn that "the error rate is about 50% for the correctness and timing of refunds." (*Id.*) According to Verga and Yousefi, Stewart failed to refund over *$11 million* posted as refunds to STARS in Spring 2013 but not repaid to the DOE, even in part, until Summer 2013 at the earliest. (*Id.*) Further, FCC under Stewart stopped giving back 45-day refunds beginning in August 2013 due to a lack of funds. (*Id.*) Spring Zutes, subsequently hired to reconcile FCC's accounts, noted that FCC had a practice of not posting refunds and returns to COD ("so many staff are aware of decision to not post refunds/ returns to COD which violates the Department cash management requirements.") (*Id.*)

Failing to make timely refunds violates the law. (D.E. 263 ¶ 69.) When a student never begins classes, or withdraws, the student is no longer eligible for federal financial aid funds. (*Id.*; D.E. 247 ¶ 16.) This means the school no longer has the right keep this money and must return it within mandated time periods (30 or 45 days) to the DOE. (D.E. 263 ¶ 69.) For this reason, Yawn described missing even a single timely refund as "major issue." (*Id.*)

### B.   Defendants Failed to Implement Adequate Monitoring Procedures and Failed to Monitor the Inadequate Procedures They Did Have

#### 1.   Officers Have the Same Fiduciary Duties as Directors Under Delaware Law

"Under Delaware law, corporate officers owe the same fiduciary duties as corporate directors, including the duties of loyalty and care." (D.E. 173 at 7, *citing Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).) Despite this Court's ruling and the ruling of the Delaware Supreme Court, Defendants argue that the subspecies of duty of loyalty claims known as *Caremark* claims do not apply to corporate officers. (D.E. 247 at 33-34.) Defendants cite no precedent in support of this argument, which would directly contradict the holding of *Gantler* that fiduciary duties of officers and directors are *identical*:

> That issue—whether or not officers owe fiduciary duties identical to those of directors—has been characterized as a matter of first impression for this Court. In the past, we have implied that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors. We now explicitly so hold.

*Gantler*, 965 A.2d at 708–09 (Del. 2009). In the footnotes, the Delaware Supreme Court relied on multiple Delaware decisions dating to 1939, implicitly standing for the same proposition. *Id.* Defendants concede that precedent exists for upholding *Caremark* claims against officers (D.E. 247 at 33, n. 6, *citing In re World Health Alternatives, Inc.*, 385 B.R. 576, 591-93 (Bankr. D. Del. 2008) (analyzing multiple Delaware fiduciary duty cases, including *Caremark*, to conclude that corporate officers owe the identical fiduciary duties as corporate directors).) Defendants imply that the ruling reached in *World Health* is still an open question to be challenged; however, it is not, as *World Health* predates the Delaware Supreme Court's decision in *Gantler*.[3]

### 2. FCC Lacked Proper Monitoring Procedures

Defendants' protestations that FCC's officers had no responsibility to set up accurate monitoring systems and controls to ensure FCC's compliance with Title IV regulations (D.E. 247 at 35) is belied by the evidence in this case. The regulations themselves, Program Participation Agreement and Credit Agreement with the Bank of Montreal each required FCC's officers to monitor FCC's compliance with the DOE regulations at issue in this case.

First, Title IV regulations require institutions to have an internal system of checks and balances to ensure that federal funds are used as intended. (D.E. 250-2 (Lacey Report) at 166-67, 178.) To participate in Title IV programs, a school must demonstrate adequate processes,

---

[3] In any event, Defendants are wrong that Delaware state claims have not been upheld against officers. *See*, *e.g*., *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. 2011) (upholding *Caremark* claim against directors and officers, including Chief Executive Officer, who like Knobel, also sat on the Board).

procedures and personnel. (*Id.* 166.) Institutions must "develop a system to identify and resolve discrepancies in Title IV information for each student received by various institutional offices." (*Id.*) The generally accepted practice at schools is to separate authorization and business functions. (D.E. 252-2 (Murphy Report) at 11.) Schools generally have one office (the financial aid office) oversee the origination of student aid and interaction with COD, and one office (the business office) oversee drawdowns and disbursements. (*Id.*)

Second, the Program Participation Agreement, signed by Knobel on behalf of FCC's six OPEIDs, required Knobel to establish administrative and fiscal procedures and records necessary to ensure proper administration of federal funds. (D.E. 219-2 at 5; D.E. 250-2 (Lacey Report) at 167.) Third, FCC's credit agreement with the Bank of Montreal required Knobel and Pierne to monitor FCC's compliance with Title IV cash management regulations. (D.E. 263 ¶ 91.)

Finally, the regulations require fiduciary level controls over all Title IV funds received by the school. (D.E. 250-2 (Lacey Report) at 179-80.) According to the Handbook, "[f]ailure to have such a system in place calls into question a school's administrative capability, its fiscal responsibility, and its system of internal controls. In short, it calls into question a school's qualifications to participate in the FSA programs." (D.E. 252-2 (Murphy Report) at 35.)

Defendants argue that no genuine issue exists as to whether FCC had proper monitoring procedures in place because FCC employed three computer systems. (D.E. 247 at 34-35.) This is a non-sequitur. The allegation is that FCC lacked monitoring systems to ensure compliance with Title IV cash management regulations. FCC may have used multiple computer programs, but none of them accurately interfaced with each other, and Defendants knew that. Moreover, what Defendants lacked was a system of reporting and information which could accurately tell them whether they were handling federal funds in an appropriate matter.

The Defendants themselves did not consider FCC to have adequate controls over student aid programs. Knobel told Yawn, "All in all we knew that accounting and financial aid was a miss and none of us did enough to out the real problems and potential consequences." (D.E. 221-2 at 13). Yousefi reported to the Board "The COD imbalance which is now at zero, and the refund audits point to a breakdown in process and data integrity with the financial aid and STARS system that goes back to 2012[.]" (D.E. 220-2 at 152.) Yawn reported to Knobel, "It is clear that there is no coordination or choreography of the entire process to result in highly accurate packaging and projections and timely disbursement of funds." (D.E. 224-2 at 195.) Pierne told his accounting team "Weaknesses in our financial aid systems and processes have resulted in the Company having large unreconciled financial aid disbursements for the current fiscal year." (D.E. 238-2 at 551.)

Others at the Company agreed. An April 24, 2014 Board Presentation cited "lack of trust in forecasts that originate from campus management" as a "systemic issue" associated with the Financial Aid area which resulted in financial action against FCC. (D.E. 227-2 at 102.) A consultant hired by FCC reported that "Late refunds ...document the fact that we are not, as of today, administratively capable."[4] (D.E. 253-2 at 82.)  Barbara Davis of the DOE had the same opinion:

> We're responsible to make sure that taxpayer dollars are accounted for. So if a school is having problems, we, I, try to help them, but ultimately give us the records or give us the money. And I'm sorry you're having problems. That's not our issue. You have a fid- -- fiduciary responsibility to tell us what you did with that money. How you do it is your school's choice. And it's part of being administratively capable. (D.E. 239-1, Davis. Tr. 427:12-21.)

---

[4] Although the Dismissal Order found that the allegations of these facts in the Amended Complaint would, if true, support a *Caremark* claim (D.E. 173 at 22-24), Defendants fail to address them.

3.      Defendants Failed to Monitor

To the extent Defendants had systems in place for monitoring Title IV compliance, they failed to actually do so. Knobel admitted to Yawn and Davis that he had failed to monitor financial aid processes. (D.E. 263 ¶¶ 64; D.E. 221-2 at 183.) Bartness, the Chief Compliance Officer, was unaware of anyone within FCC conducting internal audits of the central Financial Aid Office. (D.E. 226-1, Bartness Tr. 58:17-20.) He claimed Pierne "had responsibility for ensuring that FCC complied with the Title IV fund draw-down requirements." (*Id.* 119:13-19.) Pierne testified that other than meeting with Stewart, he did nothing to monitor the Financial Aid Office's compliance with Title IV regulations. (D.E. 238-1, Pierne Tr. 32:11-35:3.) *He* claimed that Bartness and Yawn were responsible for ensuring internal compliance. (*Id.*) Yousefi, though effectively the senior financial aid officer for much of the activity complained of, has since consistently disavowed responsibility. (D.E. 183 ¶ 18; D.E. 247 ¶ 8.)

4.      The Chief Compliance Officer Had a Duty to Monitor Compliance

The Motion argues that neither Bartness nor his department had responsibility over Title IV compliance at FCC (D.E. 247 at 37), relying solely on Bartness' testimony.[5]  Both Knobel and Pierne, however, testified that Bartness and his department were responsible for overseeing financial aid compliance with Title IV regulations. (D.E. 263 ¶ 35.) Bartness presented Title IV compliance issues to the Board of Directors and oversaw FCC's response to DOE Title IV program reviews. (*Id.*) Bartness also directly supervised Sandra May, FCC Vice President of Title IV compliance. (*Id.*) Bartness, who holds himself out as an expert in Title IV regulatory compliance, has testified before this Court in an unrelated case that as Chief Compliance Officer at FCC he

---

[5] Defendants provide no support for the statement that the vice presidents who Bartness supervised "had no responsibility for ensuring Title IV compliance at the corporate level." (D.E. 247 at 37.) This assertion does not appear in their statement of material facts.

worked in "compliance with respect to post-secondary schools receiving Title IV funds." his duties extended to all Title IV regulatory compliance. (D.E. 226-2 at 18; D.E. 226-1, Bartness Tr. 7:7-18; D.E. 262-1 at 38:5-12.)

Bartness admitted he was responsible for ensuring FCC's programs were eligible for Title IV aid before FCC drew down and disbursed aid to students enrolled in those programs. (D.E. 263 ¶ 27.) During 2013-14, FCC needed to return $1.6 million that it drew for students enrolled in two ineligible programs (Patient Care Technician and Health Information Technologies). (*Id.*) Bartness admitted blame but also stated Stewart and Knobel knowingly caused these unlawful draws (*id.* ¶ 27 ("I bet he [Knobel] told Mark to enroll as they were desperate to make start budgets.").[6]

## II. DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE CLAIM FOR BREACH OF THE FIDUCIARY DUTY OF CARE

### A. The Standard for the Duty of Care is Gross Negligence

The Court has already rejected Defendants' argument that the Delaware fiduciary duty of care requires something other than gross negligence, such as irrationality or bad faith. (D.E. 173 at 29-30.) "The fiduciary duty of care requires that [Defendants] use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, and that deficiencies in the [Defendants'] process are actionable only if [Defendants'] actions are grossly negligent." (*Id.* at 30, *quoting In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2008).) Evidence establishing that Defendants breached this standard is sufficient, by itself, to rebut the business judgment rule. (D.E. 173 at 30, *quoting McMullin*, 765, A.2d at 922.)

---

[6] Defendants have moved to dismiss a claim for "self-dealing" (D.E. 247 at 26), however Plaintiff does not rely on self-dealing. Plaintiff alleges that Defendants breached their duty of loyalty by knowingly causing FCC to violate the law and failing to monitor FCC from breaking the law. (D.E. 85 at 40-42; D.E. 173 at 16.)

**B.      Defendants Ignore the Evidence Concerning Their Gross Negligence**

In the Dismissal Order, the Court pointed to numerous facts alleged by the Amended Complaint which, if proven, would support a claim for breach of the duty of care. (D.E. 173 at 30-32.) The Motion addresses none of these facts even though each is supported by the record. For example, "Knobel and Pierne directed the Financial Services Office to pre-draw Title IV funds, unrelated to student needs, even though such a practice violated DOE regulations and could result in a loss of funding." (D.E. 173 at 30; D.E. 263 ¶¶ 80, 82-86.) "Knobel and Pierne both knew that taking actions that failed to comply with the law would risk Bank of Montreal cancelling FCC's loan." (D.E. 173 at 30; D.E. 263 ¶ 91.)  In May of academic year 2013, the DOE put FCC on a cash freeze after FCC failed to substantiate missing funds and informed FCC's officers that a similar failure to substantiate would result in FCC being ineligible for advance draws of Title IV funds in the 2013-14 award year. (D.E. 173 at 30-31; D.E. 263 ¶¶ 51, 54-55.) In June, Knobel congratulated Stewart for coming off of the freeze, telling her "we will never let this happened again." (D.E. 219-2 at 64.)

Yet, in April 2014 after the DOE's March 31 action, Knobel told the DOE the same thing: "[i]n my 32 years as an administrator of Title IV funds I never imagined that I would be so disconnected to the day to day operations. I will not let that happen again." (D.E. 263 ¶ 64). Between those two points in time, Knobel, Pierne, Stewart, Yawn and Yousefi continued to rely on FCC's same systems despite knowing about their problems. (*Supra*, 18-19; D.E. 263 ¶ 34.)

In addition, Plaintiff will submit expert testimony concerning what information a careful and prudent officer of a financial aid-dependent organization would have looked to before making drawdown decisions. *See Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, 2014 WL 11881019, at *5 (S.D. Fla. 2014) (gross negligence of escrow agent established by expert testimony concerning the duties and obligations of a typical escrow agent); D.E. 252-2 (Murphy Report) at

40 (generally accepted practice is to (1) separate functions so the financial aid office oversees origination of student aid (including interaction with COD), while the business office oversees drawdown of funds and disbursement to students and (2) submit disbursement records on a regular basis soon after drawing funds); D.E. 252-2 (Murphy Report) at 45 (most student information systems are set up to reconcile frequently). Indeed, the Handbook warns that failure to reconcile will result in violations of cash management regulations. (D.E. 252-2 (Murphy Report) at 47.)

### C. **Defendants' Corruption Story**

Defendants argue that the government had incorrect data in COD, which caused COD to reject otherwise valid student records. (D.E. 247 at 22-25.) All of these facts are controverted by Plaintiff. There was no data corrupted in COD records in 2013, and such corruption is not possible. (D.E. 263 ¶¶ 46, 57.) When addressing the $15 million imbalance in Winter and Spring 2014, FCC's employees, including Defendants, did not reference alleged corruption of records in the COD. (*Id.* ¶ 62.) As shown by the graphs above, FCC's substantiated disbursements to COD tracked (in the aggregate) FCC's recorded disbursements in STARS, and both fell below FCC's draws from G5. (*Id.* ¶¶ 73, 75.)  If Defendants were correct, the STARS data would have diverged from the COD data and tracked the G5 data.

Instead, FCC drew materially more Direct Loan funds than it had students to justify in its STARS database. (*Id.* ¶¶ 73, 75, 86.) As discussed above, in addition to the data, FCC's contemporaneous emails, reports, analyses and memoranda confirm the same fact—FCC took tens of millions more from the government than it could justify in students, and upon being ordered to justify or return it, collapsed. (*Id.* ¶¶ 27, 62, 64, 73, 75, 77-90.) Defendants cite to no contemporaneous documents referencing that COD's data was wrong. Even when faced with devastating consequences from the DOE's March 31, 2014 action, Defendants did not tell the DOE that COD data had been corrupted. (*Id.* ¶ 57.)

**D.     Defendants' Concurrent Spoliation Motion Indicates Summary Judgment
Should Not Be Granted**

On this Motion, Defendants claim there are no disputed material facts preventing entry of

summary judgment in their favor. (D.E. 247 at 37.) However, in their concurrent spoliation motion,

Defendants argue that Plaintiff should be prohibited from presenting evidence that "can only be

rebutted by missing evidence[.]" (D.E. 246 at 19.) That evidence includes: the DOE's records of

funding provided to FCC through G5, the DOE's 2013-14 notification to FCC of unsubstantiated

cash balances, and the FCC emails "referencing FCC's draws." (*Id*.) If the Defendants cannot rebut

this evidence, they should not have filed a motion for summary judgment asserting a lack of

genuine dispute over material facts.

In any event, Defendants argue (in the spoliation motion) that none of this vast body of

information should be considered because Defendant Stewart had lists which justified the pre-

draws—which she cannot locate in the data produced in this case. Defendants (all of whom were

officers of FCC at the time, with oversight over Title IV compliance, and who participated in all

the meetings, email exchanges, and presentations discussed above) rely solely on Stewart's

declaration. No other witness in this case has identified such lists, nor do the contemporaneous

documents reference them. The percipient witnesses affirmatively testified that FCC did not have

student records underlying the pre-draws. (*See* D.E. 228-1, John Murphy Tr. 73:2-8 (no documents

with which to substantiate pre-draws); D.E. 231-1, Turgot Tr. 140:22-25 (pre-draws represented

overdrawn funds not tied to any roster) and 175:9-2 (these funds were not disbursed to student

ledgers).) The contemporaneous documents affirmatively reference that FCC lacked the students

to justify the pre-draws. (D.E. 234-2 at 50 (identifying $9.9 million of pre-draws without

corresponding disbursements in STARS); D.E. 220-2 at 77-94 (showing no corresponding

disbursements in STARS for the December pre-draws, and identifying over $10 million drawn

from G5 without corresponding disbursements in STARS); D.E. 228-2 at 27 (calculating that FCC required $40 million in records by the end of March 2014 to substantiate balances, which it did not have).)

Stewart testified that she based pre-draws on future student disbursements (disallowed by the regulations), but at deposition had difficulty explaining how she calculated the pre-draws. (D.E. 219-1, Stewart Tr. 246:3-10 (unable to recall criteria she used to determine how much to pre-draw), 252:21-253:21 ("Now, it's difficult to tell you without all my supporting documentation, but it would have been a direct relationship between how many was rejected and what.").)[7] Bartness, FCC's Chief Compliance Officer, reported this practice to the Inspector General of the DOE. (D.E. 226-2 at 77 ("FCC drew funds based on enrollment projections. Incorrect projections continued for months which led to FCC's inability to reconcile.").)

Most importantly for this Motion, Defendants—with full access and control over FCC's records—could not produce these records to the DOE in response to multiple warnings over a period of two months. (D.E. 228-2 at 2, 22; D.E. 220-2 at 6-11.) Instead, Defendants returned over $10 million to the DOE which they could not attribute to students as a result of their failure to substantiate funds drawn in large round numbers from G5. Defendants' excuses are implausible under the record of this case.

## CONCLUSION

As set forth above, Defendants' motion for summary judgment should be denied.

---

[7] *Those* documents, however vaguely described, are not the documents that Stewart claims are missing.

Dated: March 26, 2018                          Respectfully submitted,


                                               /s/ Brian S. Dervishi
                                               Brian S. Dervishi (Bar No. 350303)
                                               Peter A.Tappert (Bar No. 27100)
                                               WEISSMAN & DERVISHI, P.A.
                                               SunTrust International Center
                                               One Southeast Third Avenue, Suite 1700
                                               Miami, Florida 33131
                                               (305) 347-4070
                                               bdervishi@wdpalaw.com
                                               ptappert@wdpalaw.com
                                               service@wdpalaw.com

                                               - and -

                                               Bijan Amini (admitted *pro hac vice*)
                                               Lita Beth Wright (admitted *pro hac vice*)
                                               Avery Samet (admitted *pro hac vice*)
                                               STORCH AMINI PC
                                               2 Grand Central Tower
                                               140 East 45th Street, 25th Floor
                                               New York, New York 10017
                                               (212) 490-4100
                                               bamini@storchamini.com
                                               lbwright@storchamini.com
                                               asamet@storchamini.com
                                               Attorneys for Plaintiff Clingman &
                                               Hanger Management Associates, LLC,
                                               as Trustee

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2018, the foregoing was filed and served on the parties

named below via the Court's ECF system.

/s/ Brian S. Dervishi

Michael N. Kreitzer, Esq.
Kenneth Duvall, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131
kreitzer@bilzin.com
kduvall@bilzin.com
eservice@bilzin.com
mavin@bilzin.com
stapanes@bilzin.com