**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 16-62028-CIV-LENARD/GOODMAN**

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC as Trustee

            Plaintiff,

v.

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI

            Defendants.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT AND RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF
MATERIAL FACTS**

## I.    Introduction

Plaintiff turns the burden of proof on its head. Because Defendants demonstrated the absence of a genuine issue of material fact in their Motion (Dkt. 247), the burden shifted to Plaintiff to come forward with evidence demonstrating a genuine issue of material fact for trial. (Mot. at 16.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).) In its Opposition (Dkt. 264), Plaintiff has failed to present credible evidence that Defendants intentionally violated Title IV regulations, utterly lacked or consciously disregarded their financial aid systems, or acted so recklessly or outside the bounds of reason to overcome the protections afforded by the business judgment rule (the "BJR").

In the face of clean audits and no governmental findings against any Defendant, Plaintiff offers only its own spin about Defendants' emails to make claims that are not supported by the law. Nor does Plaintiff show it can proceed to trial under a *Caremark* claim. Even if such a claim were to apply to officers, the uncontroverted evidence shows Defendants not only had financial systems in place, but also monitored these systems and made efforts to address issues identified by those systems. Plaintiff does not take issue with the failure of the Regent 8 program, but it nevertheless seeks to hold FCC's former employees accountable for the consequences as if the employees somehow had a legal duty to guarantee the success of third-party software.

Finally, Plaintiff cannot point to any evidence showing Defendants acted so recklessly or irrationally that the BJR would not apply. Plaintiff makes the classic mistake of confusing results with process, i.e., assuming that because FCC went bankrupt, then someone must be personally responsible. On this record, there is no dispute that Defendants acted prudently under trying circumstances, a far cry from acting in a grossly negligent manner. Because Plaintiff has failed to show there are genuine disputes about any material facts, summary judgment is appropriate.

## II.    Response to Plaintiff's Additional Statements of Material Fact

68.    This statement is not an "[a]dditional [f]act[] [c]oncerning the Title IV [r]egulations" (Dkt. 263 at 15). It does not set forth any fact; instead, it is an attempt to restate the law with expert testimony. *See* 34 C.F.R. § 668.166. There is no record basis for the statement that "the general [sic] accepted practice is to not hold any excess cash" except the *ipse dixit* of proposed expert James Murphy, who should be excluded on *Daubert* grounds. Further, the practice at other schools is immaterial here because Plaintiff's theory of liability is grounded upon violations of DoE regulations.

69.    Again, this statement is an attempt to restate the law. *See* 34 C.F.R. §§ 668.21, .22, .171, and .173. Defendants refer to their response in ¶14 in their Statement of Facts explaining how funds drawn down for one student can be disbursed to another eligible student.

70.    This also is not a statement of fact but an attempt to restate the law with expert opinion. *See* 34 C.F.R. §§ 668.14, .161, and .164. Plaintiff does not state that Defendants lacked an internal system of checks and balances and offers no evidence in support of such a statement. A school no longer holds Title IV funds "in trust" once the funds are disbursed to a student by direct payment or crediting the student's ledger account. *See* 34 C.F.R. § 668.164(a)(1). Plaintiff cites only to two expert reports, both of which Defendants have moved to exclude.

72.    The citations to Plaintiff's statement do not show the draws prior to July 1, 2013 to support Plaintiff's broad claim that FCC always previously drew "specific dollars and cents." Nor do the citations support the statement about a "pattern" or "massive refunds." Davis testified that the regulations do not prohibit a school from drawing less money than it was entitled to draw by rounding down the draw amounts for administrative ease. (Davis Tr. 270:6–15, Dkt. 236-1 at 270.) Stewart provided uncontroverted testimony that she would draw a percentage of available funds rather than the entire amount, resulting in a round number. (Stewart Tr. 161:10–13; Dkt.

2

219-1 at 41.) Further, Davis did not "warn" FCC about the issue of substantiation but instead asked for an update and expressed willingness to discuss the issue. (Dkt. 228-2 at 2.)

73.    Plaintiff's statement cites to the Donohue expert report, but his report cannot support the statement. Donohue provided no opinion about substantiation, disbursements, or any other aspect of the Title IV legal or regulatory process. (Donohue Tr. 84:13–24, 90:7–91:9, 206:6–207:9, 220:11–221:8, Dkt. 251-1 at 22, 24, 53, 56.) His report is based on data that does not support Plaintiff's conclusions about substantiation or disbursements into STARS. In fact, the STARS data is erroneous, missing information, was manipulated after the fact, does not list all eligible students (including "no show or cancelled" students), and does not account for rejected student records over time. (Stewart Decl. ¶¶24–26, Dkt. 246-1.) The "no show or cancelled" students alone historically accounted for up to 10% of the draws at FCC. (*Id.* ¶27.)

75.    Defendants refer to their response in ¶72 above with respect to the drawing of round numbers and refer to their response to ¶73 above with respect to the lack of support for the statement that FCC drew more funds than it had in STARS or reported to COD.

76.    Plaintiff's statement is incomplete, as it omits that Stewart based all draw amounts on students in immediate need. (Dkt. 259 at 12.) Stewart specifically testified that "pre-draws" (like any other draw) were based on students eligible for disbursement within the regulatory time period. (Stewart Tr. 252:21–253:3, 265:20–266:5, Dkt. 219-1 at 64, 67-68.) All witnesses, including Turgot, support Stewart's testimony on this point. (Turgot Tr. 195:15–25, Dkt. 231-1 at 50; *see also* Dkt. 247 ¶30.) Stewart spent several days preparing a "pre-draw" by processing student large rosters. (Stewart Tr. 267:1–19, Dkt 219-1 at 68.)

77.    Plaintiff's statement fails to explain that refunds can be made up to thirty days after the school becomes aware of the student's withdrawal. *See* 34 C.F.R. §668.21(b). Further,

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Turgot did not report that "nothing was available to draw for Phoenix and Bryman 2014 Direct Loans," but instead reported that no funds were available "today." Turgot's statement would not include pre-draws based on student starts in the future. *See* 34 C.F.R. §668.164(i) (discussing "early disbursements," which could occur up to 10 days before the start of class).

78.     Defendants refer to their response in ¶¶76–77 above for a description of how Stewart based "pre-draws" on rosters and the "early disbursement" provision under Title IV regulations. Plaintiff's citations do not support its statement that FCC held funds "for 30 days without disbursing to students and refunds that were posted in STARS not but paid to the COD." Turgot did not make such a statement, Stewart did not "confirm" it, and the statement is nonsensical because funds are not "paid" to COD. Rather, student records are reported to COD. (Weems Report ¶¶20–22, Dkt. 233-2.) Turgot simply stated refunds were coming due after 30 days, which is the time period to make refunds under Title IV regulations (accruing from the date the school realizes the student has not shown up for class). *See* 34 C.F.R. §668.21(b).

79.     Defendants refer to the response to ¶¶76–79 above regarding the basis for draws.

80.     Plaintiff's citation does not show Pierne "direct[ing]" Stewart to "pull down" any funds, but instead requesting a forecast. Pierne does not discuss a purpose of "show[ing] additional cash in hand on the balance sheet." *See* Dkt. 219-2 at 113. Stewart responded that she would provide a forecast based upon an "approval list" of eligible students. (*Id.*)

81.     Plaintiff provides no citations for its first sentence. The statement does not indicate when the "$4 million" was due for a refund or return to Title IV to the DoE. Plaintiff's citations do not support the statement that Stewart proposed "removing the largest refunds to be made that day" or proposed a draw instead of returning "$4 million to the DOE." There is no indication that the lawful pre-draws were unsupported by student rosters or prohibited by the

4

"early disbursement" provision of the regulations, *see* response to ¶¶76–79 above, or that the refunds were beyond the 30-day requirement. *See* 34 C.F.R. §668.21(b).

82.     Pierne did not ask Knobel for "permission" for the draw; Financial Services (under Yousefi) had already posted over $9 million worth of student records at COD to prove the immediate need for the early disbursements. (Dkt. 221-2 at 220.) Knobel did not "agree[] without asking for explanation . . . ." Rather, Pierne informed him the funds were already posted, precluding the need for Knobel to ask for further details. *Id.*

83.     Yousefi stated he did not "fully understand" exactly how Stewart had calculated the draws during her tenure, but as seen in the response to ¶82 above, Yousefi knew that Financial Services had already posted over $9 million worth of student records to draw against.

84.     The employee who performed the draws was different from the employee who reported she would "run another pay list on Monday." Lisa Edwards reported the balances, while Kim Verga stated she would run another pay list on Monday. (Dkt. 234-2 at 92, 94.) Per ¶82 above, Yousefi was already aware that sufficient student records were available to draw against.

85.     The statement fails to identify the schools, dates, or dollar amounts of any purported pre-draws; it is unclear when the statement claims the pre-draws began or ended, or what dates constitute "Winter 2014." Also, Yousefi was only responsible for Financial Services only from December 10, 2013 until January 13, 2014. (Dkt. 247 ¶8.) There is no evidence that Kim Verga ever reported Cid Yousefi to human resources for any issue. The cited letter was reporting issues about John Murphy, and only referencing Cid Yousefi as context. (Dkt. 234-2 at 36–37.) The discussion about pre-draws related to the reconciliation project involved consultant Spring Zutes, who is not in human resources. (*Id.*)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

86.     Stewart did not work at FCC through the entire month of December (Dkt. 247 ¶7), and Knobel and Pierne did not directly manage the Financial Services Office, but merely oversaw it (*id.* ¶¶ 3–4.) Defendants refer to the response to ¶76 in that all draws, including "pre-draws," were based upon student rosters. Defendants also refer to the response to ¶73 to show that Plaintiff cannot rely upon the report of Donohue to establish this statement.

87.     Murphy testified that his information was passed along to Pierne and others in the "leadership" through Yousefi. (Murphy Tr. 74:9–17, Dkt. 228-1 at 20.)

88.     The statement refers to Davis' request for refund confirmations or records for balances **over 30 days due**, but then confusingly refers to the over $15 million in total "unsubstantiated" cash, which includes funds less than 30 days old. At that time, a school had 15 days from the time of disbursement to report to COD. (Davis Tr. 98:21–99:2, Dkt 236-1 at 26.)

89.     Murphy testified that all draws at FCC were based on expected student starts and refunds would be made if students did not actually attend or complete classes. (Murphy Tr. 240:1–241:20, 247:4–248:1, 248:9–249:21, Dkt. 228-1 at 61, 63.) Spirea likewise testified that FCC never "drew any funds without student rosters." (Spirea Tr. 149:22–25, Dkt. 230-1 at 38.)

90.     The cited materials do not support the statement that the imbalances grew "so large" because FCC was borrowing money to repay refunds. The transcript excerpt concerns another point, and the documents only describe the difficulties in processing refunds, which Yousefi explained was due to the Regent 8 reject problem. (Yousefi Tr. 208:19–25, Dkt. 220-1 at 53.) Further, there is no regulation prohibiting the use of funds (after disbursement to students) for operating expenses, including refunds. (*Id.* 115:15–116:9, Dkt. 220-1 at 30.)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

## III.   Argument

### A.  Plaintiff abandoned several claims.

Plaintiff has fully abandoned its claim that Defendants breached their duties of loyalty by engaging in financially self-interested activities at FCC because they allegedly had stock interests in FCC. (Opp'n at 21 n.6; Am. Compl. ¶141, Dkt. 85 at 40.)

Plaintiff also has abandoned important aspects of its duty of loyalty claims. As to its *Caremark* claim against Yawn, Plaintiff makes a single passing, and misleading, reference to Yawn. (Opp'n at 20.) Pierne did not testify that Yawn was responsible for monitoring any of the financial aid activities at issue in this case. Pierne simply stated that Yawn was responsible for **campus**-level activities, as distinct from the **corporate**-level activities forming the basis of Plaintiff's case. Rather than dispute Defendants' description of Yawn's responsibilities in their Statement of Facts, Plaintiff admits Yawn did not have responsibility for financial aid compliance. (Dkt. 247 ¶6.) Likewise, Plaintiff fails to mention Bartness at all, abandoning any claims for his knowing violations of the law. Opp'n 13–16.

Finally, Plaintiff abandoned its claims that any Defendant violated their duty of loyalty by failing to hold funds "in trust" for students or by engaging in a "kiting" scheme by drawing funds from one OPEID to refund at another. By failing to argue these points in response, Plaintiff has waived these claims.[1]

### B.  Bartness was not responsible for financial aid compliance.

Plaintiff misrepresents the record regarding the scope of Bartness' duties as Chief Compliance Officer. No witness testified that Bartness was responsible for overseeing

---

[1] *See, e.g., Lannen v. Broward Cty. Sheriff's Office,* 2011 WL 13214322, at *3 (S.D. Fla. Aug. 29, 2011) (granting dispositive relief where non-movant failed to address argument in motion (citing Local Rule 7.1(c))).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

compliance of the corporate-level financial aid practices at issue. Plaintiff's citations to Pierne and Knobel (Dkt. 263 ¶35) are misleading. Pierne testified that Bartness did not have oversight responsibility for financial aid. (Pierne Tr. 22:4–5, Dkt. 238-1 at 7.) Knobel testified only that Sandy May (who reported to Bartness) would audit financial aid at the campus-level. (Knobel Tr. 343:14–20, Dkt. 221-1 at 86.) Again, no campus-level financial aid activities are at issue.[2]

### C.  There is no evidence that any regulatory violations occurred.

Plaintiff addressed only three purported regulatory issues in its summary judgement response:  "pre-drawing," "reconciliation," and "refunding." But Plaintiff has cited to no summary judgement evidence that any one or more of the Defendants violated any of these regulation. Plaintiff's sworn interrogatory answers highlight the uncontroverted fact that Defendants did not improperly draw down funds, rely upon any "inflated" projections, fail to timely refund or return monies, underreport a student withdrawal, or fail to make a refund despite acknowledging it must to do so. (Dkt. 247 ¶33.)  With these admissions secured, Plaintiff has conceded its case. *See* Am. Compl., Dkt. 85 at 11–12 n.15.

In an effort to wiggle out from under the truth, Plaintiff now claims that its admissions were misconstrued.  (Dkt. 263 ¶33.)  But a party cannot contradict its prior admissions to avoid summary judgement. *See, e.g., Forte v. Otis Elevator Co.,* 2015 WL 12860841, at *2–4 (S.D. Fla. Feb. 18, 2015) (striking affidavit where it contradicted interrogatory responses).[3]

---

[2] Nor is Bartness' previous testimony in the unrelated action cited by Plaintiff to the contrary. Bartness testified that he was responsible for regulatory accreditation and licensure issues—not regulatory financial aid issues. (Bartness Tr. 35:6–7, 101:2–3, Dkt. 262-1 at 10, 26.) Finally, Plaintiff's reference to program eligibility is a red herring. There is no claim that the DOE took any action against FCC based on this issue or that this issue otherwise caused FCC any damages.

[3] Here, Plaintiff does not even have a "sham" affidavit to rely upon in contradicting its prior sworn interrogatory answers, as in *Forte* and similar cases. Instead, Plaintiff relies only upon unsupported argument of counsel in its attempt to avoid its binding answers.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

To be sure, FCC's financial aid auditor (Deemer Dana) gave it a clean bill of health in the 2012–13 year. (Dkt. 247 ¶¶36–41.) Deemer Dana found FCC complied with all Title IV requirements, the very regulations at issue in this case. (Dkt. 247 ¶¶ 37–38.) Plaintiff says it "disputes" the audit findings but offers no summary judgement evidence. Without more, Plaintiff's naked claim that Defendants' citations to the audits (called "attestations") "do not support the statements" is legally insufficient to defeat an otherwise meritorious summary judgement motion.

Plaintiff kicks up dust by claiming that Deemer Dana did not attempt to perform the close-out audit in 2014. The claim is objectively false. The evidence is uncontroverted that Deemer Dana sent several engagement letters to FCC and IEC for that very purpose, but neither entity engaged. (Dkt. 247 ¶¶39 and 40, Dkt. 263 ¶40.) The close-out audit never occurred because neither FCC nor anyone else (including Plaintiff) wanted to pay for it. (Clingman Tr. 145:23–146:1, Dkt. 237-1 at 37-38.) Finally, it is uncontroverted that no governmental agency, including the DoE, took any action (administrative, civil, or otherwise) against FCC, let alone against any Defendants. (Dkt. 247 ¶65.)

### D.  There is no evidence that Defendants intentionally violated any regulations.

Even if Plaintiff could show that regulatory violations occurred, Plaintiff must proffer evidence that any given Defendant (except Yawn, against whom no such claim is even pled) **intentionally** violated the regulations. Trying to avoid summary judgment, Plaintiff makes the sweeping claim that issues of state of mind are not proper for disposition at summary judgment.

Plaintiff cites three cases where the courts held that **plaintiffs** were not entitled to summary judgment because of the issue of state of mind. Opp'n at 13.[4] Defendants agree that, if

---

[4] *See also United States v. $688,670.42 Seized from Regions Bank Account No. XXXXXX5028*, 449 F. App'x 871, 877 (11th Cir. 2011) (denying plaintiff-Government summary judgment); *see*

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Plaintiff moved for summary judgment on this issue, it should have been denied. But that is an

entirely different question than whether **Defendants** are entitled to summary judgment.

In the fourth case cited by Plaintiff, *Williams v. Obstfeld*, 314 F.3d 1270, 1277 (11th Cir.

2002), the Court granted summary judgment in favor of the defendants on the issue of intent. The

Court observed that "[t]here are many instances in the law where the evidence of state of mind is

so unequivocal that summary judgment is proper and, indeed, expressly mandated by Rule 56."

*Id.* (citations omitted). Importantly, although the Court acknowledged the law had been broken

because of another party's criminal conduct, it found that the plaintiff had "presented no

evidence the [defendants at issue] **knew** the mortgage funds had been stolen from [the insurance

company]." *Id.*[5] Thus, even if Plaintiff could show regulatory violations (which it cannot), there

is a gulf between such a showing and a showing that such violations were intentional.

Delaware case law likewise emphasizes that fiduciaries do not breach their duties simply

because there were errors at the company. In *In re Allergan, Inc. Stockholder Litig.*, 2014 WL

---

*also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)
(noting that summary judgment was particularly inappropriate in the case because the "moving
party is also the party with the burden of proof on the issue"); *Setai Hotel Acquisition, LLC v.
Miami Beach Luxury Rentals, Inc.*, 2017 WL 3503371, at \*13 (S.D. Fla. Aug. 15, 2017) ("[E]ven
if the facts in the record could support an inference of knowledge or willful blindness . . . they do
not so clearly compel that conclusion as to warrant finding intent as a matter of law.").

[5] *See also Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1580 (11th Cir. 1988) (affirming
award of summary judgment to defendant on issue of bad faith, noting that "summary judgment
is . . . proper if the party opposing summary judgment fails to indicate that he can produce the
requisite quantum of evidence to enable him to reach the jury with his claim") (internal quotation
marks omitted) (quoting *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975)). *See also, e.g.*,
*Hahn*, 523 F.2d at 468 ("[A] party against whom summary judgment is sought is [not] entitled to
a trial simply because he has asserted a cause of action to which state of mind is a material
element."); *Roper v. Exxon Corp.*, 198 F.3d 242 (5th Cir. 1999) ("A party cannot raise a fact
issue simply by stating the defendant's state of mind is at issue."); *Miles v. Jones*, 2010 WL
5574324, at \*7 (S.D. Fla. Nov. 22, 2010) ("Even when the defendant's state of mind is at issue,
the plaintiff must give some indication that he can produce the requisite quantum of evidence to
enable him to reach the jury with his claim.") (internal quotation marks and citation omitted).

5791350, at *9 (Del. Ch. Nov. 7, 2014), the plaintiff brought a claim for breach of the duty to make accurate disclosures, a claim based on the duties of both loyalty and care. The plaintiff argued that judgment could be entered against fiduciaries as long as the fiduciaries had made an inaccurate disclosure, "as if the standard was one of strict liability." *Id*. But the Chancery Court rejected this argument because "[t]he [Delaware] Supreme Court . . . [has] explained that directors who ***knowingly*** disseminate false information . . . may be held accountable . . . ." *Id*.

The same is true here. Fiduciaries are not strictly liable for regulatory violations at the company. Plaintiff must show evidence of intentional violations to survive summary judgment. Here, the proof of intent is wholly lacking in Plaintiff's case. Plaintiff asks this Court to draw an inference that regulatory violations occurred and then asks the Court to draw the further inference that such violations must have been intentional. This is a classic "where there is smoke, there must be a fire" argument.  But, of course, this Court may not "draw inference upon inference to create a jury issue for the plaintiff." *Miles*, 2010 WL 5574324, at *7.

### E.  No Delaware state court has held that *Caremark* claims apply to officers.

Plaintiff fails to cite any case from a Delaware state court addressing the issue of whether a *Caremark* claim applies to officers. Opp'n at 16–17. Plaintiff cites only *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009). But *Gantler* simply held that officers and directors owe duties of loyalty and care, not whether *Caremark* claims apply to officers.

Defendants do not dispute that officers are subject to the duty of loyalty, but do dispute that **officers** are somehow subject to claims based on **directors'** failure to monitor. This remains an open issue under Delaware law, and in the absence of a pronouncement from the Delaware Supreme Court, this Court must look to Delaware's lower courts for guidance.

In the only lower court decision cited by Plaintiff, *In re Massey Energy Co.*, 2011 WL 2176479 (Del. Ch. May 31, 2011), the defendant did not raise this issue. As Plaintiff admits, the

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

CEO in that case was also a director. Opp'n at 17 n.3. In fact, the majority of the defendants in *Massey* were directors, including officers who simultaneously sat on the board. *In re Massey*, 2011 WL 2028545 (Del. Ch. May 24, 2011) (paragraphs 21 through 34 of the complaint). Unlike *Massey*, Plaintiff has disavowed making any claim against Knobel (or Pierne) because they were directors. Rather, Plaintiff confirmed it is making claims against all Defendants (including Knobel and Pierne) solely in their capacities as officers. (Dkt. 102 at 19–20.)

In the absence of any Delaware case finding *Caremark* claims apply against officers, Plaintiff is asking the Court to take a step no Delaware state court has taken. This Court should apply *Caremark* as it has been applied since its inception: as a claim for liability against the board of directors for their failure to exercise oversight over officers and other employees.

### F.  There is no evidence there was an "utter lack" of systems in place or Defendants "consciously disregarded" those systems.

Plaintiff misrepresents the requirements of *Caremark*, which only requires that Defendants have systems in place and that they monitor them. *See* Mot. at 34. Only actual evidence supporting the "utter" failure to have systems in place, or the "conscious disregard" of such systems, would allow this claim to survive. *Id*. at 32. Whether Defendants had "weaknesses" in the process does not mean that there was an "utter" lack of systems in place, just as a Defendant's hindsight statement that FCC did not do "enough" to address any issues does not mean that Defendants consciously disregarded the systems. Opp'n at 19.

It is undisputed that Defendants had multiple financial aid systems in place. (Dkt. 247 ¶¶17–24, 43–45) (describing FCC's financial aid systems and processes in depth); (Dkt. 264) (describing the accounting system, "Great Plains"). It is likewise uncontroverted that FCC had an accounting system in place. (Dkt. 247 ¶18.) Plaintiff claims that "none of [FCC's systems]

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

accurately interfaced with each other, and Defendants knew that." Opp'n at 18. But this argument is flawed for two reasons.

First, the fact that the systems exist defeats the argument that FCC "utterly lacked" systems. Second, the system that failed was the Regent 8 software, not FCC's student-tracking system called STARS or the Great Plains accounting system.  It is uncontroverted that Regent 8 was quickly taken off-line after FCC realized the problems it had caused and never re-deployed. (Dkt. 247 ¶47.) The facts alleged in the Amended Complaint do not criticize Defendants for taking Regent 8 off-line proactively. Instead, the case is based on the data corruption caused by Regent 8 that lingered through the following academic year despite the best efforts of Defendants to correct the corrupted files.  In short, there is no evidence of missing or unsupervised systems.

Plaintiff's allusion to the testimony of Barbara Davis of the DoE is irrelevant  Neither she nor the DoE ever made a finding that FCC did not have adequate systems in place. She was merely stating that the DoE bears responsibility to ensure that schools account for federal funds, and that schools have discretion in how they do so. Opp'n at 19.

Plaintiff's citation to the April 24, 2014 board presentation is likewise insufficient to create a genuine dispute. The "[l]ack of trust in forecasts that originate from campus management" has nothing to do with this case. Plaintiff again conflates campus-level activity with the corporate-level activity at issue . Opp'n at 19. Plaintiff then claims this issue "resulted in financial action against FCC." That statement, besides having no basis in the record, is false.

Nor is there a genuine dispute that Defendants diligently monitored the systems. Stewart's job was to monitor compliance with Title IV regulations daily and she did so. It is undisputed that Stewart met regularly with her team, that Pierne met regularly with Stewart to oversee her, and that Pierne and the rest of the officers and management team (including all

13

Defendants) met regularly to remain apprised of any developments. (Dkt. 247 ¶¶23–24.) Further, Pierne and Stewart reacted decisively when Regent 8 caused problems. (*Id.* ¶¶52–53.)

Further, the entire reconciliation process was FCC's means (or in the language of *Caremark*, the "system") by which FCC monitored its compliance with Title IV regulations. (Dkt. 246-1 at 6). Contrary to Plaintiff's misrepresentation, Defendants have identified documents evincing this reconciliation process. (Dkt. 279 at 2; Dkt. 279-2, 279-3, and 279-4). As noted above, FCC's Title IV auditor, Deemer Dana, would have flagged any material reconciliation issues if it had found any.

Finally, contrary to Plaintiff's bald assertions, neither Bartness nor Yawn had any responsibility for monitoring compliance with the activities at issue, and Plaintiff's citations are substantively false. Pierne does not even mention Bartness in the cited excerpt and Pierne only referenced Yawn's responsibilities at the campus level, which is irrelevant. Opp'n at 20.

### G. Plaintiff has not offered evidence that Defendants were recklessly indifferent or acting without the bounds of reason.

Plaintiff bears the burden of proof to overcome the BJR to establish a claim for breach of care. But it failed to present any evidence showing gross negligence so as to overcome the BJR.

Plaintiff attempted to water down the meaning of gross negligence, but Delaware case law consistently holds that this standard means "reckless indifference or actions that are without the bounds of reasons." Mot. at 21. No evidence rises to this level for any Defendant, and Plaintiff devotes little more than one page to this argument. Opp'n at 22–23. Indeed, there is little in the record for Plaintiff to discuss. Plaintiff only mentions two Defendants (Knobel and Pierne), essentially abandoning any attempt to show the other Defendants were grossly negligent.

"Although the Court is required to draw all reasonable inferences in favor of the party opposing summary judgment, those inferences must be based on facts in the record." *Miles*, 2010

WL 5574324, at *7. "The Court is not required, or even permitted, to deny a summary judgment motion based on unreasonable inferences that amount to nothing more than speculation or conjecture." *Id.* Plaintiff cites to emails involving Knobel and Pierne (Dkt. 263 ¶¶80, 82–86) that discuss drawing down funds from G5, sometimes in advance of the student start dates. The regulations permit this practice as long as the school's students have an immediate need for such funds. (Dkt. 274 ¶12, Dkt. 263 ¶12, ¶77.)  Plaintiff offers no evidence that FCC did not have a student roster to support ever draw or that funds drawn were not posted to student accounts.

To the contrary: Plaintiff admitted as much in its interrogatory answers.  Plaintiff is speculating that, because the CEO and CFO did not directly reference in emails an operational detail (i.e., student rosters), that the rosters did not exist. *See, e.g., Johnson v. Univ. of Ala. Health Servs. Found., PC*, 2016 WL 705962, at *6 (N.D. Ala. Feb. 23, 2016) (rejecting plaintiff's speculative inference from emails as "mere conjecture, unsupported by any evidence or reasonable inference" (quoting *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005))).

Moreover, it should not escape notice that Plaintiff now admits FCC had student rosters. (Dkt. 266 at 12). Thus, Plaintiff's speculative interpretation of these emails flies in the face of its own record and cannot resist summary judgment.

Plaintiff also cites the DoE's decision to put FCC on cash freeze. But the DoE's action was not punitive and certainly was not a finding that Defendants were reckless in any way. As noted above, the DoE took no action against FCC, let alone against any of the Defendants.

Plaintiff continues to confuse outcome with process. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 373 (Del. 2006) ("With the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith."). That same principle applies

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

to Knobel's statement about improving performance in the future: Plaintiff cannot state a cause of action simply because the result of Defendants' actions did not turn out as planned.

Rather than being recklessly indifferent, Defendants did all they could under trying circumstances. Despite testing it as much as they could, the Regent 8 problem was massive in scale and rejects continued even after it was taken off-line. (Dkt. 247 ¶¶45, 47; *see also* Dkt. 264 at 8) ("Regent 8 interfaced poorly with STARS and FCC had trouble submitting disbursement records to COD which COD would accept."). Pierne authorized Stewart to hire as much staff as necessary—which she did—and Knobel remained apprised of the situation. (Dkt. 247 ¶52.)

Plaintiff's attempt to "dispute" the massive scale of the Regent data corruption borders on misrepresentation: it claims that "Defendants' citations do not support the statement that Regent corrupted data fields in the COD system or that such issues reappeared in November 2013." (Dkt. 263 ¶57.) Such a claim requires willful blindness. Dkt. 247 ¶57 ("Based on feedback from the team, when they would clear the rejects, they would share, oh, this reject happened because of an anomaly found that took place back in February 2013. **And so we would know, based on the feedback, that these things were still stemming from occurrences from the Regent file**.") (citing Stewart Tr. 309:10–16, Dkt. 219-1 at 78) (emphasis added). Nor does Plaintiff dispute the DoE's statement that "FCC has a really good reconciliation history" but was simply going through a "rough patch" due to Regent 8. (Dkt. 247 ¶50.)

Plaintiff's attempt to create a dispute as to whether Regent corrupted data is an illusion. Plaintiff claims that Regent 8 never corrupted the records in COD because certain witnesses were not aware of the corruption. (Dkt. 263 ¶46.) But Turgot testified FCC "had some problem with the process when Regent was doing it that we had to do reconciliation," and simply did not recall whether the problem continued afterwards. (Turgot Tr. 182:9–22, Dkt. 231-1 at 47.) And Spirea,

16

who joined FCC only in 2014, testified that she did not know exactly how data at COD could be corrupted. (Spirea Tr. 58:16–25, Dkt. 230-1 at 16.) None of this actually controverts Defendants' evidence that Regent 8 corrupted the data at COD. Even Plaintiff elsewhere does not dispute the efforts take to address the "corrupted data." (Dkt. 247 ¶52).

Plaintiff likewise cannot create a genuine dispute as to whether the Regent 8 corruption in the spring of 2013 continued causing rejects in the 2013–14 academic year. In the face of Defendants' evidence that the corruption did cause problems in the 2013–14 year (Dkt. 247 ¶57), Plaintiff resorts to claiming that this is impossible. (Dkt. 263 ¶57). But Plaintiff's support for this claim is (1) a citation to John Murphy that does not even discuss this issue and (2) a citation to putative expert James Murphy, who testified that he did not bother to determine how Regent 8 had affected the data in this case. (Murphy Tr. 125:17–126:12, Dkt. 252-1 at 32–33.)

Plaintiff has failed to show what more Defendants could have done, and more importantly, failed to show that Defendants were acting recklessly or outside the bounds of reason. Even under Delaware's enhanced levels of scrutiny, management's "decisions must be reasonable, not perfect." *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009). Under the more lenient BJR, Defendants cannot be held personally liable because Plaintiff, with hindsight following a bankruptcy, believes they fell short of perfection.

Finally, Plaintiff misdirects the Court by suggesting it "will submit expert testimony concerning what information a careful and prudent officer of a financial aid-dependent organization would have looked to before making drawdown decisions." Opp'n at 22. As discussed in Defendant's *Daubert* motion against James Murphy (Dkt. 244), Murphy did not opine about "industry" standards; he provided improper legal opinions. And as discussed in the reply memorandum, "industry" standards are, in any event, irrelevant in this case. (Dkt. 277).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Relatedly, the standard of what a "careful and prudent officer" would do is not the standard for gross negligence, but instead the standard for garden-variety negligence.[6]

### H.  The Motion should be granted regardless of whether sanctions are awarded.

Having pursued a case in which critical evidence favorable to Defendants was spoliated, Plaintiff now seeks to compound the prejudice by arguing that the spoliation precludes entry of summary judgment against it. In their motion for sanctions (Dkt. 246), Defendants requested appropriate relief for the failure to preserve important documents. These missing documents would have enabled Defendant to definitively disprove Plaintiff's case on a draw-by-draw and even student-by-student basis. But Defendants do not have to affirmatively disprove Plaintiff's case to prevail at summary judgment.

Defendants need only show that Plaintiff—bearing the burden of proof—cannot prove its case. *See United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys. in State of Ala.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991) ("When the nonmoving party has the burden of proof at trial, the moving party . . . . simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case.") (internal punctuation marks omitted).[7] Through the Motion and this Reply, Defendants have demonstrated that there is no genuine issue of material fact as to multiple elements of Plaintiff's claims and that they are entitled to judgment as a matter of law. Defendants do not need to rely upon the

---

[6] Plaintiff's citation to *Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, 2014 WL 11881019 (S.D. Fla. Nov. 21, 2014) is inapposite. *Pleasant Valley* did not involve Delaware law, did not involve claims based on regulatory violations, and does not set the standard for duty of care as to what "a careful and prudent officer" would do. That phrase does not even appear in the case.

[7] "Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438. If the missing evidence had not been spoliated, Defendants would have relied on that evidence under this alternate route to summary judgment.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

missing evidence to make this showing. They do so by pointing to existing evidence or, even more simply, to the absence of evidence showing fatal gaps in Plaintiff's case. Thus, the spoliation of evidence is not a bar to an award of summary judgment in Defendants' favor.

## I.   Plaintiff cannot withstand summary judgment without its experts.

As demonstrated above, even with its three experts, Plaintiff cannot resist summary judgment. *See, e.g., Weiss v. Standard Ins. Co.,* 672 F. Supp. 2d 1313, 1320 (S.D. Fla. 2009) ("The rules governing admissibility of expert testimony were not intended . . . to make summary judgment impossible whenever a party has produced an expert to support its position.") (citation omitted). If this Court grants one or more of Defendants' pending motions to exclude Plaintiff's experts (Dkt. 241, 244–45), it becomes even clearer that Plaintiff cannot create any genuine issue of material fact for trial. *See, e.g., Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1322 (11th Cir. 1999) (affirming grant of summary judgment because district court had properly excluded expert testimony that was essential to establish an element of plaintiff's case).

Plaintiff's case has very few fact witnesses; Plaintiff itself is a liquidating trustee without any personal knowledge of the facts in this case. (Dkt. 247 ¶67). Plaintiff depends inordinately upon experts James Murphy and Aaron Lacey, as is apparent from the many citations to their reports and/or transcripts in the Opposition. (Dkt. 263–64.)[8] But as discussed in Defendants' *Daubert* memoranda, one of the several grounds for their exclusion is that they each function as mouthpieces for improper, closing argument opinions that merely summarize deposition exhibits, testimony, and other hearsay in a plaintiff-friendly manner. *See* Lacey Reply, at 13–15, Dkt. 241; Murphy Reply, at 15–16, Dkt. 244. Without them, Plaintiff has no one to tell its story at trial.

---

[8] Plaintiff cites to the experts scores of times throughout the Opposition, and often relies exclusively upon them in attempting to manufacture genuine disputes on material issues. *See, e.g.,* Opp'n at 22, 23 (relying solely on Murphy to create phantom issue about general industry practice); Statement of Material Facts ¶15 (same).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Another ground for exclusion raised against Murphy is that his testimony—as characterized by Plaintiff itself in its brief—is immaterial to the issues in this case. "An issue of fact is 'material' if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case." *Espinoza v. Galardi South Enters., Inc.*, 2018 WL 1729757, at *2 (S.D. Fla. Apr. 10, 2018) (citations omitted). Plaintiff asserts that Murphy opines on industry custom and practice, which is not material in this case. (Dkt. 277 at 1–4).

Likewise, Lacey's opinions should be excluded, *inter alia*, because he does not opine as to any facts in this case. (Dkt. 241 at 14–15.) "To usefully support a motion for summary judgment, an affidavit must set forth facts' and by implication in the case of experts (who are not 'fact witnesses') a process of reasoning beginning from a firm foundation." *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1515 (S.D. Fla. 1996). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Id.*

Finally, Plaintiff's damages are exclusively dependent upon the unreliable opinion of James Donohue. (Dkt. 218-1 at 3) (referring Defendants exclusively to Donohue's report for its damages calculations). But Donohue failed to reconcile his valuation methods or account for other likely contributing factors, among other methodological flaws. (Dkt. 245, 278.) "An expert's opinion that lacks any credible support does not create an issue of fact." *Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985).

## IV.   <u>Conclusion</u>

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment and dismiss Plaintiff's Amended Complaint in its entirety with prejudice.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
  & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By:    /s/ Michael N. Kreitzer
　　　　**MICHAEL N. KREITZER**
　　　　(FBN 705561)
　　　　mkreitzer@bilzin.com
　　　　**KENNETH DUVALL**
　　　　(FBN 121826)
　　　　kduvall@bilzin.com
　　　　**DAVID W. TRENCH**
　　　　(FBN 0202975)
　　　　dtrench@bilzin.com
　　　　eservice@bilzin.com
　　　　mavin@bilzin.com
　　　　stapanes@bilzin.com
　　　　*Counsel for David Knobel, Jeffrey
　　　　Pierne, Neal Yawn, Dean Bartness,
　　　　Siana Stewart and Cid Yousefi*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2018, I electronically filed the foregoing with the Clerk

of Court, using CM/ECF. I also certify that the foregoing document was served on all counsel of

record via transmission of Notice of Electronic filing generated by CM/ECF.

　　　　　　　*/s/ Kenneth J. Duvall*
　　　　　　　Kenneth J. Duvall