**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 16-62028-CIV-LENARD/GOODMAN**

CLINGMAN & HANGER MANAGEMENT
ASSOCIATES, LLC as Trustee

Plaintiff,

v.

DAVID KNOBEL, JEFFREY PIERNE, NEAL
YAWN, DEAN BARTNESS, SIANA
STEWART, and CID YOUSEFI

Defendants.

**DEFENDANTS' MOTIONS IN LIMINE AND MEMORANDUM OF LAW IN SUPPORT**

## Introduction

Pursuant to the Court's Scheduling Order (Dkt. 53 at 3), Defendants submit the following motion in limine and incorporated memorandum of law in support.  Defendants seek to exclude certain evidence as inadmissible on the grounds that such evidence is not relevant, is unfairly prejudicial, constitutes improper hearsay, or cannot be authenticated.

## Legal Standard For Admissibility Of Evidence At The Motion In Limine Stage

"Rules 401–403 of the Federal Rules of Evidence set forth the basic rules controlling the admissibility of evidence."  *French Cuff, Ltd. v. Markel Am. Ins. Co.*, No. 07-60006-CIV, 2010 WL 11504372, at *3 (S.D. Fla. Feb. 8, 2010) (Lenard, J.).  "Rule 401 defines 'relevant evidence' as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Only relevant evidence is admissible under Rule 402."  *Id*.  "Finally, pursuant to Rule 403, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*.

In addition, the "following evidence rules must be considered: . . . is [the evidence] authentic as required by Rule 901(a) . . . if the [evidence] is offered for its substantive truth, is it hearsay as defined by Rule 801, and if so, is it covered by an applicable exception (Rules 803, 804 and 807) . . . [and] is the form of the [material] that is being offered as evidence an original or duplicate under the original writing rule, of if not, is there admissible secondary evidence to prove the content of the [evidence] (Rules 1001–1008) . . . ."  *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 538 (D. Md. 2007).

The Court should grant a motion in limine where the "proposed evidence is clearly inadmissible on all potential grounds." *Brown v. NCL (Bahamas) Ltd.*, 2016 WL 8730147, at *2 (S.D. Fla. Oct. 13, 2016) (Lenard, J.).

**I.    Any Testimony And Purported Interview Notes Of The Greenberg Traurig Attorneys Should Be Excluded Because Such Evidence Cannot Be Offered "Solely For Impeachment."**

On April 19, 2018, Magistrate Judge Goodman issued a report and recommendation to this Court regarding Defendants' Motion to Strike Plaintiff's Untimely Disclosed Witnesses. (Dkt. 284).[1]  Defendants had moved to exclude the witnesses—former FCC corporate counsel (the "Greenberg Lawyers") who had interviewed certain Defendants and purportedly created unauthenticated interview notes (the "Greenberg Notes")—because the witnesses were not timely disclosed by Plaintiff under Federal Rule of Civil Procedure 26.  (Dkt. 184).  Judge Goodman agreed that the disclosure was untimely and recommended that this Court prohibit Plaintiff from introducing testimony from the Greenberg Lawyers for substantive purposes. (Dkt. 284 at 12).  Judge Goodman further recommended that this Court prohibit the Greenberg Lawyers from testifying at all unless the testimony is used **solely** for impeachment.  (*Id.*)

"Solely for impeachment" is a category of testimony that "is a narrow exception that should be limited to circumstances where the evidence offered by the witness plays **no role other than impeachment**." *Lawson v. Plantation Gen. Hosp., L.P.*, 2010 WL 11504835, at *3 (S.D. Fla. May 3, 2010) (emphasis added). "[I]t is the **rare case** where an attack on a witness's credibility cannot be linked to some **substantive element of a claim**." *Id.*  (emphasis added). *See also, e.g.,* Matters Useful for Impeachment, 8 Fed. Prac. & Proc. Civ. § 2015 (3d ed.) ("Even

---

[1] The deadline for Plaintiff to object to the report and recommendation was last Thursday, May 3, 2018.  Plaintiff did not object.

those who have been most concerned about protecting impeachment material recognize that substantive evidence must be subject to discovery even though it also tends to contradict evidence of the discovering party."); *Hammonds v. Jackson*, 2015 WL 12867065, at *3 (N.D. Ga. Mar. 16, 2015) ("If a document has some impeachment value, **but also has independent relevance to the merits of the case**, the document is not 'solely' for impeachment and must be disclosed.") (emphasis added).[2]

Whether evidence **only has** impeachment value or **also has** independent substantive value does not turn on the professed purpose of the proponent.  Instead, the Court must objectively evaluate the nature of the evidence to determine whether its only possible role is impeachment or whether it also has inherent substantive value.  In *Chiasson v. Zapata Gulf Marine Corp*., the Fifth Circuit reversed the district court for admitting untimely disclosed evidence on the premise it was offered "solely for impeachment."  988 F.2d 513, 517 (5th Cir. 1993).  At issue was a videotape showing the plaintiff—who was suing for personal injuries—performing daily activities.  *Id*. at 514–15.  The defendant offered the tape purportedly only for impeachment because the tape contradicted plaintiff's testimony about the extent of her injuries. *Id*. at 517.  The district court admitted the evidence, concluding that it had only impeachment and not substantive value.  *Id*.

The Fifth Circuit reversed, holding that, even if the tape had "some impeachment value, it is also of a substantive nature."  *Id*.  "Substantive evidence is that which is offered to establish the truth of a matter to be determined by the trier of fact."  *Id*.  Since one of the issues in that case was the "severity of her pain and the extent to which she has lost the enjoyment of normal activity . . . [e]vidence which would tend to prove or disprove such losses must be considered

---

[2] *Report and recommendation adopted*, 2015 WL 12866453 (N.D. Ga. May 18, 2015), *aff'd sub nom. Hammonds v. Fulton Cty.*, 628 F. App'x 716 (11th Cir. 2016).

'substantive.'"  *Id.*  "Because the tape is, **at the very least in part substantive**, it should have been disclosed . . . regardless of its impeachment value. The district court abused its discretion by allowing non-disclosure and admitting the tape into evidence." *Id.* at 517–18 (emphasis added).

The *Chiasson* holding was recently affirmed in the Fifth Circuit in *Olivarez v. GEO Grp., Inc.,* 844 F.3d 200, 205 (5th Cir. 2016) (affirming exclusion of evidence because it had "substantive value").  This position has been adopted by a majority of other Circuits.  *See Searles v. Van Bebber*, 251 F.3d 869, 877 (10th Cir. 2001) ("If, as the judge saw it, the evidence was really more than mere impeachment evidence, then the witnesses should have been disclosed."); *Wilson v. AM General Corp.*, 167 F.3d 1114, 1122 (7th Cir. 1999) (same); *Klonoski v. Mahlab*, 156 F.3d 255, 270 (1st Cir. 1998)[3] (same); *see also, e.g., Brooks v. Kerry*, 37 F. Supp. 3d 187, 204 (D.D.C. 2014) (same); *Newsome v. Penske Truck Leasing Corp.*, 437 F. Supp. 2d 431, 436 (D. Md. 2006) (same).  Although the Eleventh Circuit has not ruled on this issue, it will likely adopt the majority position when the issue is properly presented.

Here, the testimony of the Greenberg Lawyers and the content of the Greenberg Notes would necessarily play a role other than impeachment because they would have independent relevance to the merits of the case.  Plaintiff acknowledge this in a prior memorandum, stating: "[t]he statements made in the Greenberg Notes **directly support Plaintiff's allegations** that the Defendants knowingly drew funds from the DOE to which they were not entitled, failed to conduct mandatory reconciliations, failed to timely make refunds to the DOE, and failed to have adequate checks and balances."  (Dkt. 197 at 7) (emphasis added).  It is clear from Defendants' pending motion for summary judgment (Dkt. 247) that these allegations are central to this case.

---

[3] *Superseded by rule on other grounds as recognized in In re Subpoena to Witzel,* 531 F.3d 113, 118 (1st Cir. 2008).

Indeed, by the allegations of the Amended Complaint and through deposition questioning, it appears that Plaintiff hopes to offer the testimony of the Greenberg Lawyers along with the Greenberg Notes to attempt to prove that Defendant Cid Yousefi admitted to regulatory violations during the course of the Greenberg interviews, including: that FCC was drawing down funds from the DOE without student rosters; that FCC was not reconciling its records; and that FCC was not making refunds.  Each of these allegations is denied by Defendants, including Yousefi, and the Notes themselves have never been authenticated.  But there is no doubt that proof of these allegations is central to Plaintiff's case. (*See* Dkt. 197 at 3).  This is not the "rare case" where the attack on a Defendant's credibility is independent of the substantive elements of the claim.  Because this evidence goes to the heart of this action, it is impossible for such testimony to be offered solely for impeachment.  Therefore, this Court should exclude any testimony from the Greenberg Lawyers.

The Greenberg Notes also should be excluded because they cannot be properly authenticated.  The Notes were not signed or even seen by any Defendant until discovery in this case.  No Defendant authenticated the Notes.  *Compare United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir. 2011) (holding that prior inconsistent statements under Rule 613 were authentic under Rule 901 where impeached parties had verified their signatures on the documents).  The only witnesses who could possibly authenticate the Notes are the Greenberg Lawyers.  But since their testimony should be excluded for the reasons argued above, the Notes they authored should also be excluded.

The Greenberg Notes are also inadmissible because they constitute hearsay not subject to any exception.  Fed. R. Evid. 802.  The Notes are out-of-court statements by the Greenberg Lawyers that Plaintiff will likely offer for their truth.  Fed. R. Evid. 801(c).  Nor can Plaintiff

introduce the Notes for a non-hearsay impeachment purpose because doing so would have a substantive impact on the case in violation of the "solely for impeachment" rule discussed above.

**II.**   **Plaintiff Cannot Offer Hearsay And Irrelevant Statements Through Barbara Davis.**

The Court should exclude irrelevant hearsay statements that Plaintiff may seek to admit through Barbara Davis, the designee of the Department of Education's ("DoE"). Plaintiff may seek to admit certain statements from the Davis depositions that are inadmissible as irrelevant and hearsay.

First, Davis testified that an attorney for FCC informed her via letter that FCC lacked certain records to substantiate funds drawn down from the federal government. (Dkt. 239-1, Davis Tr. Vol. II 454:9–25, 479:9–17). Davis' testimony about the content of this letter is textbook hearsay not subject to any exception because the attorney's communication is an out-of-court statement that would be offered via Davis for its truth. Fed. R. Evid. 802.[4]

Next, Plaintiff may seek to testify about statements made to her by non-party witness John Murphy. Davis testified that Murphy allegedly called her in April or May of 2014 to tell her about "things going on" that were not "right" at FCC. (*Id.* 478:14–21, 8–17). Like the letter from FCC's attorney, Davis' testimony about Murphy's statements is inadmissible as hearsay not subject to any exception.

In addition to the hearsay objections, Davis' testimony from both of these sources is inadmissible because it is irrelevant. Plaintiff's case is founded upon the contention that Defendants' actions caused the DoE to restrict Title IV funding on March 31, 2014, which in

---

[4] Moreover, no such letter was ever identified by Davis. In fact, Davis expressly refused to authenticate the letter proffered to her by Plaintiff's counsel on this point at her deposition. ("I don't think this is the exact letter that I was referencing." (*Id.* 558:22–23)). Thus, Davis' testimony about the content of the purported letter not only would be hearsay, but hearsay about a document that has never been identified or authenticated, and may not even exist.

turn allegedly caused FCC to file for bankruptcy protection, which in turn led to Plaintiff's alleged damages.  (Dkt. 85 ¶¶79, 112).[5]  Both the unidentified letter and the Murphy telephone call occurred after March 31, 2014.  But any information Davis received after March 31, 2014 cannot be relevant to Plaintiff's claims because it could not have informed Davis' earlier decision to place FCC into a different funding program.

Put another way, a "fact . . . of consequence" here is whether Davis changed FCC's Title IV funding on March 31, 2014 because Defendants violated Title IV regulations.  Fed. R. Civ. P. 401.  Anything Davis learned after that date cannot make that fact "more or less probable than it would be without the evidence[.]"  *Id.*

## III.   The Unsigned and Redacted Interview Notes Purportedly From The DoE's Inspector General Are Unauthenticated Hearsay.

At the deposition of Defendant Dean Bartness, Plaintiff showed Bartness notes purported to be from an interview of him by employees from the DoE's Inspector General's Office ("Interview Notes").  (Dkt. 226-2 at 76, deposition exhibit 107).  The Interview Notes, which are heavily-redacted and unsigned by either Bartness or the interviewers, are hearsay statements of DoE employees that cannot be admitted for the truth of the matters asserted.  *Compare Isiwele*, 635 F.3d at 200 (admitting evidence where parties agreed that their signatures were on the documents in question).  Moreover, the Notes cannot be authenticated because the authors of the notes are not even known given that the DoE withheld this information by heavily redacting the Notes.  Thus, the Court should exclude these Interview Notes as unauthenticated hearsay.

---

[5] As pleaded in the operative complaint, Plaintiff must prove that Defendants' actions not only caused the DoE to take the action it took on March 31, 2014, but that the DoE's action in turn caused Plaintiff's damages.  *See Triton Const. Co. v. E. Shore Elec. Servs., Inc.,* 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (a plaintiff seeking compensatory damages for breach of fiduciary duty must "demonstrate that the defendant caused the injury.").

**IV.**   **The Court Should Exclude Evidence About The Patient Care Technician Program As Irrelevant.**

Plaintiff might also attempt to admit evidence about FCC's Patient Care Technician Program ("PCT Program"), which was one of FCC's course offerings.  But the PCT Program has nothing to do with the claims or defenses in this case.

In its Amended Complaint, Plaintiff alleged that the PCT Program received Title IV funds even though it was not approved to receive such funds.  (Dkt. 85 ¶¶50–53).  At the deposition of Defendant Bartness, Plaintiff's counsel inquired about the PCT Program, which apparently had not been added to the Eligibility and Certification Approval Report, or "ECAR," as required by the DoE.  (Dkt. 226-1, Bartness Tr. 171:6–172:7).

But this issue has no bearing on Plaintiff's causes of action.  Plaintiff contends that Defendants intentionally violated certain regulations identified in its Amended Complaint regarding funds management.  (Dkt. 85, Am. Compl. ¶34 & nn. 1–5).  At bottom, Plaintiff's case turns on whether Defendants drew down Title IV funds without sufficient student enrollment to justify the draws.  (*Id.* ¶¶3–4).  Whether the PCT Program was properly approved by the DoE, though, has no "tendency to make [that] fact more or less probable . . . ."  Fed. R. Evid. 401(a).

There is no evidence showing that the issue with the PCT Program played any role in the DoE's decision to change FCC's funding method, which (as noted above) is the action that Plaintiff contends resulted from Defendants' actions and resulted in Plaintiff's damages.  (Dkt. 85 ¶¶ 79, 112).  Again, the DoE made its decision on March 31, 2014, which preceded discovery of the issue with the PCT Program in June of that year.  (Bartness Tr. 171:3–5).  Thus, it is impossible that any issue with that Program played any role in the DoE's decision to alter FCC's funding method.  Plaintiff's only purpose in introducing such evidence would be to mislead the

jury about the actual reasons for the DoE's action on March 31, 2014.  Admission of such evidence would unfairly prejudice Defendants.  Fed. R. Evid. 403.

**V.    Evidence Of Purported "Industry Custom And Practice" Should Be Excluded As Irrelevant, Confusing, Misleading, And Unfairly Prejudicial.**

Plaintiff has indicated that it plans to offer evidence at trial that Defendants' alleged conduct did not comply with "industry" standards."  Any such evidence is irrelevant to Plaintiff's claims, which are based exclusively on violations of federal regulations.  (Am. Compl., Dkt. 85, Counts I and II).  Admitting such evidence not only would violate Rule 401, but also would violate Rule 403 by confusing the jury about the standard of liability, thereby prejudicing the Defendants by increasing the risk of a verdict based upon improper evidence.

A review of the Amended Complaint reveals that this case is about whether Defendants complied with federal law, not about "industry practice or standards."  Plaintiff has pleaded that Defendants are liable for breaches of fiduciary duty (both loyalty and care) because they had violated federal Title IV regulations.  The count for breach of the fiduciary duty of loyalty is premised on intentional violations of the regulations at issue (Dkt. 85 ¶¶142–144) or upon the failure to monitor FCC's compliance with those regulations (a *Caremark* claim).  (*Id.* ¶¶145–146).

Similarly, the county for breach of fiduciary duty of care is premised exclusively on the theory that Defendants' gross negligence resulted in regulatory violations that damaged the company.  For example, Plaintiff alleged in this count that Defendants David Knobel and Jeffrey Pierne "violated the prompt disbursement rule"[6] (*id.* ¶128), Defendant Neal Yawn caused FCC to violate "DOE regulations" pertaining to refund requirements[7] (*id.* ¶131), Defendant Siana

---

[6] This "rule" is a DoE regulation.  *See* Am. Compl. n. 1 (citing 34 C.F.R. §§ 668.162(b)(3)).

[7] *See* Am. Compl. n. 3 (citing 34 C.F.R. § 668.21).

Stewart and Cid Yousefi's failed to reconcile data violated "DOE regulations[8] (*id.* ¶132), and Defendant Bartness "was responsible for ensuring compliance with DOE regulations (*id.* ¶134). *See also* Def. Reply in Supp. Mot. to Exclude James Murphy (Dkt. 277 at 1–4 & nn. 1–2) (detailing how all of the allegations in the causes of action hinge on regulatory violations); Def. Reply in Supp. Mot. to Exclude Aaron Lacey (Dkt. 276 at 5–7 & nn. 3–4) (same).  Critically, none of the regulations incorporate "industry practice or standards" as part of the standard of liability.

Plaintiff has made clear that at least one of its experts plans to offer his opinion about whether Defendants adhered to "industry" custom and practice.  *See* Pl. Opp'n to Def. Mot. to Exclude James Murphy (Dkt. 261 at 1).  Plaintiff also may attempt to inject additional "industry" evidence into this case through other witnesses, including fact witnesses.  For example, Barbara Davis, the deponent from the Department of Education's ("DoE"), testified about actions taken by other schools in managing their Title IV funds in comparison to actions taken by FCC.  (Dkt. 239-1, Davis Tr. Vol. II 429:14–22.)  Whether Defendants breached the standard of care as Plaintiff alleged in this case does not depend upon what other schools did; it depends solely on whether Defendants intentionally violated federal regulations or were recklessly indifferent or acting beyond the bounds of reason in allowing FCC to violate federal regulations.  Therefore, the Court should exclude any such evidence as irrelevant under Rule 401.

The Court should also exclude this evidence under Rule 403 because Defendants would be unfairly prejudiced by introduction of this evidence.  The balancing test under Rule 403 yields a simple result: the complete lack of probative value of evidence stands in contrast to the jury confusion that would result from introduction of this evidence.  The jury would likely conflate

---

[8] *See* Am. Compl. n. 5 (citing 34 C.F.R. § 685.300).

the true standard of gross negligence with the lesser standard of ordinary care based on "industry custom."  Defendants ask this Court to rule that all evidence of industry practice or standards, including expert and lay opinion, is inadmissible.

**VI.**   **Spring Zutes' Reports and Emails About Financial Aid Practices Are Inadmissible.**

Plaintiff will attempt to admit multiple reports and emails created by third-party witness Spring Zutes.  Zutes was not an employee at FCC.  Instead, she worked only as a consultant for a few months in 2014, hired by a potential purchaser of FCC to advise in the purchaser's decision. (Dkt. 253-1, Zutes Tr. 21:13-22:13).  As a consultant, Zutes created and sent many emails and reports after March 31, 2014 regarding FCC's financial aid practices, but these documents are inadmissible because they are irrelevant.

At Zutes' deposition, she was shown multiple reports and emails generated in or after April 2014. (Dkt. 253-2 at 1–96, deposition exhibits 69, 142–151).  Specifically, Zutes was shown an email and report sent on July 8, 2014 (deposition exhibit 96), a narrative report originally dated April 12, 2014 and updated on May 29, 2014 (deposition exhibits 142 and 143), a "refund reconstruction" (deposition exhibit 150), and a series of emails between her, her boss (Bill Clohan), her colleague (Jamie Morley), and others (including FCC employees). (Deposition exhibits 144–151).

All of these documents are irrelevant because they had no bearing on the decision of the DoE to alter FCC's funding method on March 31, 2014.  For example, in the email sent on June 14 at 2:46 p.m. from Zutes to her boss, Bill Clohan, Zutes discussed a specific financial aid practice of posting refunds to student ledgers without making the refunds.  (Dkt. 253-2 at 93–95, deposition exhibit 151.)  But this email was sent months after March 31, 2014, which alone makes it immaterial.  As noted above, Plaintiff's case is that Defendants' actions leading up to that date caused the DoE to take action on that date, which in turn caused FCC's bankruptcy and

Plaintiff's damages.  (Dkt. 85 ¶112).  In fact, the Amended Complaint makes no allegations about Defendants' financial aid practices after March 31, 2014.  Moreover, the DoE's basis for taking its action on March 31, 2014 was necessarily fixed at that moment in time and cannot be retroactively modified by an email created months later by a consultant.

The email is also irrelevant because it is aimed at the financial aid practices under John Murphy, who (again) is not a Defendant.  Zutes' criticism of Murphy's financial aid procedures has no bearing on whether Defendants intentionally violated Title IV regulations.

The same analysis applies to the other emails and the reports: they are not probative as to the question of what caused the DoE to take action on March 31, 2014.  Indeed, Zutes did not begin consulting at FCC until April 2014.  (Dkt. 253-1, Zutes Tr. 131:15–132:19).  Because these documents are not relevant to Plaintiff's claims in this case, all of these Zutes reports and emails should be excluded.

Moreover, the report sent by Zutes on July 8, 2014 is inadmissible for additional reasons. The report is in the form of a spreadsheet containing data, some of which was created by her and some of which was created by other individuals (the "Spreadsheet").  (Dkt. 253-2 at 2) (deposition exhibit 96).  The Spreadsheet purports to contain information about the amount of student loan monies drawn from the DoE on the one hand and the amount of those loan monies FCC disbursed to students on the other hand.  But the Spreadsheet is cannot be authenticated and contains inadmissible hearsay.

"Simply because information has been created stored on a computer does not make the information reliable or authentic."  *Computer-stored records and databases*, 1 eDiscovery & Digital Evidence § 13:19 (citing *The Sedona Conference Commentary on ESI Evidence and Admissibility*, 9 Sedona Conf. J. 217, 222 (2008)).  "Courts have recognized that authentication

of electronically stored information may require greater scrutiny than that required for the authentication of 'hard copy' documents." eDiscovery & Digital Evidence § 13:1 (citing *Lorraine*, 241 F.R.D. at 542). "[T]he difficulty with authenticating ESI stems from the fact that proponents must, in essence, authenticate the computer itself as well as the data entry and retrieval processes to authenticate the resulting data." *Admissibility of evidence at trial— Authentication*, eDiscovery for Corporate Counsel § 16:5 (citing *Lorraine*, 241 F.R.D. at 544).

In *United States v. Fernandez*, the Eleventh Circuit found "the district court did not abuse its discretion in admitting the electronic compilation of . . . data, and the summaries and extracts of this data." 392 F. App'x 743, 746 (11th Cir. 2010). The Court of Appeals emphasized that "[t]he custodian's testimony at trial showed that the data was kept by a routine procedure supervised by a federal governmental agency which designed safeguards for the security and accuracy of the data." *Id.* Further, [t]he custodian's testimony also showed that the exhibit was a **business record generated by government-supervised procedures in the regular course of business, and there was no evidence to question the trustworthiness of the electronic information**." *Id.* (emphasis added). The Court also noted that lack of contemporaneous objection to introduction of the exhibit at trial, prompting deferential plain error review on appeal. *Id.*

Plaintiff cannot satisfy these elements in offering the Spreadsheet as evidence. Zutes was not an FCC employee who created the Spreadsheet in the regular and ordinary course of business; she was a consultant hired by a potential purchaser of FCC. (Dkt. 253-1, Zutes Tr. 21:13–22:13). And far from being a typical document generated at FCC, the Spreadsheet was created as a one-off by Zutes as part of a project for the Chief Restructuring Officer, Sean Harding. (Dkt. 253-2 at 2, Zutes Tr. 77:20–78:4). Moreover, at her deposition, Zutes was unable

13

to establish that a reliable process or system at FCC had produced the Spreadsheet, let alone that such process or system had produced accurate results in the spreadsheet.

The Spreadsheet contains four tabs. (**Exhibit 1**).  The third tab of the Spreadsheet ("G5 Draw Detail") purports to be composed of "information . . . directly from the government" as provided by an FCC employee (Roxana Spirea).  (*Id*. 79:11–14, 97:13–14).  Zutes cannot authenticate this data and admitted at deposition that she did not comprehend and could not explain this data.  When asked what certain columns in that tab meant, Zutes simply did not know.  (*Id*. 82:18–21) (stating she is "not sure" what adjustments meant); (*see also id*. 83:14–15) (admitting she does not know what an "offset" is).

As to the data in the fourth tab ("Ledger Detail") that supposedly came from STARS (*id*. 61:12–15), which is FCC's student information database.  At deposition, Zutes refused to authenticate the STARS data, stating that she did not "feel comfortable" explaining how the data was generated from the STARS database.  (Zutes Tr. 90:2–11).  Zutes admitted that she does not even know how certain fields were created.  (*Id*. 86:9–11) (failing to explain how the "date posted" was determined).  Nor could Zutes explain what certain terms in the Spreadsheet meant. (*Id*. 86:16–87:3) (stating that she did not know what a "credit" meant).

Zutes also was unable to swear to an explanation of how different columns in the fourth tab were populated, hazarding only speculative "guesstimations."  (*Id*. 90:13–21, 91:3–9). Zutes likewise conceded that she could not explain why certain data points did not appear on the spreadsheet even though she believed that these values should have appeared. (*Id*. 89:23–25).

Moreover, Zutes acknowledged that she had manipulated the data fields in the fourth tab. (*Id*. 85:17–25, 83:16–20).  In fact, Zutes used the term "SZ" for Spring Zutes within the Spreadsheet itself to denote fields that she had personally created.  (*Id*.; *see also id.* at 92:5–19).

In other words, Zutes testified that these column headers "did not come out of STARS . . . ." (*Id*. 85:22). Beyond all of this, Zutes realized at her deposition that the Spreadsheet was no longer complete because it "probably has lost my formulas." (*Id*. 92:6).

As for the first and second tabs ("Summary" and "Draws to ledger DL"), Zutes created them based solely on the data in the third and fourth tabs. (Zutes Tr. 97:15–98:7). The information in the first two tabs was not created and maintained in the ordinary course of business by any employee at FCC, but rather by Zutes. She did not verify the accuracy of the underlying data, speak to the mode of storing the data, or any other basic elements of authenticity.

In the end, Zutes testified that she could only explain the first two "summary" tabs that she had created: "These are **one thing I do remember**." (*Id*. 97:21) (emphasis added). But these tabs were merely her summaries of information from the other tabs, i.e., information about which she was "not sure" (DoE and G5 data in the third tab) or about which that she did not "feel comfortable" explaining (STARS data in the fourth tab). In other words, the Spreadsheet contains either tabs of data from STARS or the government that Zutes could not authenticate or summaries based on that suspect data.

At this point, there is no possibility that Plaintiff can establish an adequate foundation for introducing the Spreadsheet. Despite Defendants' extensive efforts during discovery, the STARS database still is not available to even attempt to authenticate the data in the Spreadsheet. *See* Def. Mot. for Sanctions, at 4–6 (Dkt. 246). In addition, Defendants have proffered evidence showing the unreliability and untrustworthiness of the Spreadsheet. Specifically, Siana Stewart, the former Vice President of Financial Services at FCC, stated that the data in the Spreadsheet is

incomplete and internally inconsistent.  *See* Decl. of Siana Stewart ¶¶25–27 (Dkt. 246-1).
Plaintiff has no witness or evidence to rebut Stewart on these points.

In addition to the lack of authentication, the Spreadsheet is inadmissible because it
contains hearsay.  "Generally, mechanically generated records don't qualify as 'statements' for
hearsay purposes, **but when those records are developed with human input, they can become
hearsay statements**."  *United States v. Bates*, 665 F. App'x 810, 814 (11th Cir. 2016) (finding
that district court abused its discretion in admitting reports containing hearsay) (emphasis
added).

The Spreadsheet does contain human input from Zutes.  As noted above, she created two
of the tabs in the Spreadsheet.  (*Id.* 83:16–20).  She also testified she "created [her] own"
description for data within the Spreadsheet tab supposedly containing STARS data.  (Zutes Tr.
85:19–25).  Thus, the Spreadsheet is a record that was "developed with human input" triggering
the rule against hearsay.

Plaintiff will not be able to invoke any exceptions to the bar against hearsay.  The
business records exception does not apply because it was neither made nor kept in the course of a
regularly conducted activity.  Fed. R. Evid. 803(6)(B)–(C).  Nor did Zutes have adequate
knowledge about the information in the spreadsheet, as she acknowledged she was not
"comfortable" discussing the data that came from the STARS database.  Fed. R. Evid. 803(A).
No other exception to the rule against hearsay appears pertinent.  For these reasons, the Court
should exclude the Zutes Spreadsheet from evidence.

## VII.    The Barbara Davis Report Cannot Be Authenticated, Is Untrustworthy, And Should Be Excluded.

Similarly, Plaintiff may seek to offer into evidence an *ad hoc* report created for Davis
("Report") long after the events giving rise to the case occurred.  (Dkt. 239-2 at 16–25)

(deposition exhibit 346).  Specifically, at Davis' deposition, Plaintiff showed her the Report, which purportedly contains disbursement data and adjustments to disbursement records. (Dkt. 239-1, Davis Tr. Vol. II 494:24–495:7).  Like the Zutes Spreadsheet, the Report cannot be properly authenticated and must be excluded.

"Federal Rule of Evidence 901(b)(9) set[s] forth as an example of authentication[:] '**evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result**.'" *United States v. Lamons*, 532 F.3d 1251, 1265 (11th Cir. 2008) (emphasis added). The advisory committee notes to this Rule clarify that 901(b)(9) is designed to apply to computer data. *See* Fed. R. Evid. 901, 1972 Advisory Committee Note.[9]

Davis' testimony did not establish any of the necessary elements for authenticating the Report.  There is no testimony showing: that the computing equipment and software used to generate the Report is recognized as standard; the method of storing the data; the measures taken to verify the proper operation and accuracy of the programs and formulas; the measures taken to ensure accuracy of the data as entered; that the computer process produces an accurate result when correctly employed properly operated; or the time and mode of preparation of the

---

[9] *See also, e.g., Indianapolis Minority Contractions Ass'n, Inc. v. Wiley*, 1998 WL 1988826, at *7 (S.D. Ind. May 13, 1998), *aff'd sub nom. Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743 (7th Cir. 1999) (excluding evidence; "as a condition precedent to admissibility of computer records, the proponent must establish that the process or system used produces an accurate result, Fed.R.Evid. 901(b)(9), and that foundation has not been established"); *compare United States v. Bansal*, 663 F.3d 634, 667 (3d Cir. 2011) (admitting evidence under 901(b)(9) where "government called a witness to testify about how the . . . website works and how reliable its contents are").

printout.[10]   The lack of foundation as to any (let alone all) of these elements should preclude introduction of the Report.

In fact, all that Davis established was that the Report was not a standard report used by the DoE.  Davis testified that the Report was a unique report she "had our COD system folks build for me . . . ." (Davis Tr. 495:9–11, 497:4–11).  Moreover, Davis stated that she actually created the Report at the request of Plaintiff's counsel during the course of this litigation (and many years after the events giving rise to the case).  (*Id.* 496:1–12) ("[W]hat we produced for you . . . we ran them for the three schools that you [Plaintiff's counsel] wanted them for.").

Such an *ad hoc* report does not qualify as a business record because it was not made in the regular course of a regularly conducted business activity.  Nor was it made at or reasonably near the happening of the event.  Instead, the Report was created during litigation at the behest of a party, which renders the report untrustworthy.  *See* Fed. R. Evid. 803, 2014 Advisory Committee Note ("For example, the opponent might argue that a record was prepared in anticipation of litigation and is favorable to the preparing party without needing to introduce evidence on the point. A determination of untrustworthiness necessarily depends on the circumstances.").  The circumstances surrounding the Davis Report mandate its exclusion from evidence at the trial of this case.

## VIII.   Plaintiff Should Not Be Allowed To Speculate About Whether The DoE Will Take Any Action Against Defendants In The Future.

Given that this case turns on whether Defendants intentionally violated DoE regulations, evidence as to the DoE's enforcement actions—or, as discovery has revealed in this case, the lack thereof—will be relevant evidence for the jury to consider.  What will not be relevant,

---

[10] These elements are typically applied by courts when authenticating computer-generated data. *See, e.g.,* Computer-stored records, 1 eDiscovery & Digital Evidence § 13:25 (collecting authorities).

however, is any speculation by Plaintiff that the DoE might yet bring actions against Defendants in the future.  There is no evidence (including the testimony and documents provided by the DoE during discovery) that the DoE is considering taking any such action against Defendants now, nearly four years after FCC filed for bankruptcy in August 2014.  Therefore, the Court should preclude Plaintiff from offering such rank speculation.

IX.   **The Court Should Exclude Any Evidence Relating To Defendants' Stock Options or Other Compensation.**

In the Amended Complaint, Plaintiff alleged that Defendants breached their duty of loyalty because they took actions adverse to the company in order to enrich themselves through stock options or vested stock.  (Dkt. 85 ¶141).  Defendants moved for summary judgment on any claim of self-dealing relating to Defendants' stock, stock options, or variable incentive plans. (Dkt. 274 at 26–27).  In response, Plaintiff abandoned any such claim, relying exclusively on intentional violations of the law and *Caremark*-style claims to set forth its breach of the duty of loyalty count.  (Dkt. 264 n.6).

Because Plaintiff abandoned this claim, any evidence relating to Defendants' stock, stock options, or variable compensation plans is no longer relevant to any claim in this case.  Fed. R. Evid. 401.  It necessarily follows that introduction of this irrelevant evidence could serve only to confuse the jury and unfairly prejudice Defendants.  Fed. R. Evid. 403.  Thus, the Court should exclude any such evidence.  (*See, e.g.,* 226-2 at 154, deposition exhibit 117).

## Conclusion

For the foregoing reasons, the Court should exclude the foregoing evidence as inadmissible on all possible grounds.  If the Court decides to defer certain evidentiary rulings until trial, Defendants request that he Court prohibit Plaintiff from referring to any of the challenged evidence in opening statements.

## Certification Pursuant to L.R. 7.1(a)(3)

The undersigned counsel certifies that the parties have met and conferred in a good faith effort to resolve the issues listed above and were not able to do so.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

By:    /s/ Michael N. Kreitzer
       **MICHAEL N. KREITZER**
       (FBN 705561)
       mkreitzer@bilzin.com
       **KENNETH DUVALL**
       (FBN 121826)
       kduvall@bilzin.com
       **DAVID W. TRENCH**
       (FBN 0202975)
       dtrench@bilzin.com
       eservice@bilzin.com
       mavin@bilzin.com
       stapanes@bilzin.com
       *Counsel for David Knobel, Jeffrey Pierne, Neal Yawn, Dean Bartness, Siana Stewart and Cid Yousefi*

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2018, I electronically filed the foregoing with the Clerk of Court, using CM/ECF. I also certify that the foregoing document was served on all counsel of record via transmission of Notice of Electronic filing generated by CM/ECF.

*/s/ Kenneth J. Duvall*
       Kenneth J. Duvall