# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 16-62028-CIV-LENARD/GOODMAN

**CLINGMAN & HANGER**
**MANAGEMENT ASSOCIATES, LLC,**
**as trustee,**

      Plaintiff,

**v.**

**DAVID KNOBEL, et al.,**

      Defendants.

_____/

## OMNIBUS ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE PROPOSED EXPERT AARON D. LACEY (D.E. 241), GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE PROPOSED EXPERT JAMES MURPHY (D.E. 244), AND DENYING DEFENDANTS' MOTION TO EXCLUDE PROPOSED EXPERT JAMES DONOHUE (D.E. 245)

**THIS CAUSE** is before the Court on Defendants' Motion to Exclude Proposed Expert Aaron D. Lacey, (D.E. 241), filed March 9, 2018.  Plaintiff filed a Response on March 26, 2018, (D.E. 265), to which Defendants filed a Reply on April 5, 2018, (D.E. 276).

Also before the Court is Defendants' Motion to Exclude Proposed Expert James Murphy, (D.E. 244), filed March 9, 2018.  Plaintiff filed a Response on March 26, 2018, (D.E. 261), to which Defendants filed a Reply on April 5, 2018, (D.E. 277).

Also before the Court is Defendants' Motion to Exclude Proposed Expert James Donohue, (D.E. 245), filed March 9, 2018.  Plaintiff filed a Response on March 26, 2018, (D.E. 260), to which Defendants filed a Reply on April 5, 2018, (D.E. 278).

Upon review of the Motions, Responses, Replies, and the record, the Court finds as follows.

## I.    Background

Defendants are former high-level employees of FCC Holdings, Inc. ("FCC"), which owned and operated several for-profit, post-secondary schools prior to its collapse in 2014.  (See Am. Compl. (D.E. 85) ¶¶ 2, 6, 8, 21.)  On August 26, 2014, FCC filed for Chapter 11 bankruptcy.  (Id. ¶ 124.)  On March 18, 2015, the United States Bankruptcy Court for the District of Delaware confirmed the Plan in FCC's Chapter 11 Bankruptcy Case, established a trust, and appointed Plaintiff Clingman & Hanger Management Associates, LLC as Trustee.  (Id. ¶¶ 11-12.)

On June 28, 2017, Plaintiff filed the operative Amended Complaint on behalf of FCC, asserting claims under Delaware law for (1) breach of the fiduciary duty of care, (id. ¶¶ 126-138), and (2) breach of the fiduciary duty of loyalty, (id. ¶¶ 139-150).  The Amended Complaint alleges that Defendants violated Department of Education ("DOE") regulations under Title IV of the Higher Education Act of 1965 by: (1) improperly drawing Title IV funds based on the cash needs of the school rather than the substantiated needs of verified student borrowers; (2) failing to reconcile its Title IV funds regularly or timely, as required by its agreement with the DOE; (3) failing to properly return unused Title IV funds to DOE after students failed to attend (or withdrew from) school; (4)

holding excess Title IV funds and continued to draw additional unwarranted funds from the federal government; and (5) failing to properly monitor financial aid activities to ensure compliance with DOE regulations.  (Id. ¶¶ 2-3; 39-125.)

Among the experts Plaintiff retained to testify in this case are: (1) attorney Aaron D. Lacey, who would opine as to whether the conduct described above, "if committed by an institution, would indeed constitute failure to comply with the requirements governing participation in Title IV Programs[,]" (Lacey Report, D.E. 241-2 at 5); (2) former City University of New York ("CUNY") financial aid administrator James Murphy, who would opine as an industry expert as to how the Title IV program works from the perspective of a college administering financial aid, and whether the FCC's alleged conduct is consistent with industry practices, (Murphy Report, D.E. 244-1); and (3) Certified Public Accountant James J. Donohue who would provide valuation and forensic accounting opinions, (Donohue Report, D.E. 245-1 ¶1).

Defendants have moved to exclude the testimony of these three proposed experts pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Federal Rules of Evidence 403, 702, and 703.  (D.E. 241, 244, 245.)

## II.   Legal Standard

Federal Rule of Evidence 702 provides the general rule regarding the admissibility of expert testimony.  It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires federal district courts to perform a "gatekeeping" function concerning the admissibility of scientific and technical evidence. <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (citing <u>Daubert</u>, 509 U.S. at 589 n.7, 597); <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 147 (1999)). "This function 'inherently require[s] the trial court to conduct an exacting analysis' of the <u>foundations</u> of expert opinions to ensure they meet the standards for admissibility under Rule 702." <u>Id.</u> (quoting <u>McCorvey v. Baxter Healthcare Corp.</u>, 298 F.3d 1253, 1257 (11th Cir. 2002)).

Also relevant is Rule 703, which governs the permissible sources of an expert's opinion:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. Thus, "[t]he rule allows experts to base their opinions on 'facts or data' (1) that an expert has 'been made aware of or personally observed' or (2) that experts in the particular field would 'reasonably rely on.' Those 'kinds of facts or data' need not be admissible." <u>United States v. Clay</u>, 832 F.3d 1259, 1315 (11th Cir. 2016).

When determining the admissibility of expert testimony, the Court engages in a three-part inquiry which considers whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert, 509 U.S. at 589). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion . . . ." Frazier, 387 F.3d at 1260.

District courts have broad discretion in deciding to admit or exclude expert testimony. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997). However, "[a] district court's gatekeeper role 'is not intended to supplant the adversary system or the role of the jury.'" Id. (citing Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison, 184 F.3d at 1311)). "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. (quoting Daubert, 509 U.S. at 596).

Finally, the Daubert analysis does not operate in a vacuum. Any proffer of scientific evidence is also subject to other rules of evidence." Allison v. McGhan, 184 F.3d 1300, 1309 (11th Cir. 1999). Although relevant evidence is generally admissible under Rules 401 and 402, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III.   Discussion

The Court will address Defendants' separate motions to exclude the expert testimony of Aaron D. Lacey, James Murphy, and James Donohue in turn.

### a.   Aaron D. Lacey

Defendants first move to exclude the testimony of attorney Aaron D. Lacey. (D.E. 241.) Mr. Lacey's practice is "dedicated entirely to assisting institutions of higher education to navigate complex legal and regulatory matters." (Lacey Report at 2.) Plaintiff retained Mr. Lacey to opine as to whether Defendants alleged conduct, "if committed by an institution, would indeed constitute a failure to comply with the requirements governing participation in the Title IV Programs." (Id. at 3.)

Defendants do not challenge Mr. Lacey's qualifications; instead, they argue that his testimony should be excluded because it will not assist the trier of fact, will create confusion, and lacks probative value. (D.E. 241 at 4.) Specifically, they argue that Mr. Lacey's opinions should be excluded because: (1) they are impermissible legal conclusions; (2) they improperly function as a closing argument for Plaintiff; (3) he is simply serving as a conduit for hearsay; and (4) those opinions not based upon hearsay are based upon analysis from another expert. (Id. at 5-18.) Because the Court finds that Mr. Lacey's opinions must be excluded as impermissible legal conclusions, the Court will confine its analysis to that issue.

First, Defendants argue that Mr. Lacey impermissibly explains the applicable legal standards.  (Id. at 7 (citing Cordoves v. Miami-Dade Cty., 104 F. Supp. 3d 1350, 1364 (S.D. Fla. 2015)).)  They argue that Mr. Lacey may not provide an overview of the Title IV regulatory framework.  (Id. at 7-9.)

In the Court's January 9, 2018 Order Denying Defendants' Motion to Dismiss the Amended Complaint, the Court observed that "[u]nder Delaware law, a fiduciary breaches his duty of loyalty when he knowingly violates the law."  (D.E. 173 at 17 (citing Desimone, 924 A.2d 908, 934 (Del. Ch. 2007)).)   The Court found that the Amended Complaint adequately alleged that Defendants knowingly engaged in various conduct that violated DOE regulations and, therefore, stated a claim for breach of the duty of loyalty.  (Id. at 17-18.)

As such, Plaintiff argues that Mr. Lacey should be permitted to testify regarding Title IV's regulatory framework to assist the trier of fact in understanding the issues surrounding the breach of the duty of loyalty claim.  (Resp. at 10-13.)  It argues that there is no per se rule against an expert witness offering testimony to explain a regulatory framework.  (Id. at 11 (citing United States v. Offill, 666 F.3d 168, 175 (4th Cir. 2011)).) It argues that the "federal regulatory environment in which FCC operated, and the catastrophic consequences for FCC of DOE cutting of its funding due to its regulatory violations, are the crucial factual context in which the ultimate issue here of the Defendants' compliance with their Delaware-law fiduciary obligations must be evaluated."  (Id.)  It argues that "the jury cannot decide the reasonableness of Defendants'

conduct (a quintessential fact question) without understanding the regulatory regime with which FCC was required to comply."  (Id. at 14.)

The Eleventh Circuit has apparently not addressed the specific question of whether an expert may testify regarding a complex regulatory scheme where it would help the jury to decide a fact in issue.  However, it has held generally that an expert may not offer legal conclusions:

> While it is well established that a qualified expert in a civil case may offer his opinion on an "ultimate issue" in a case, Fed. R. Evid. 704(a), experts "may not testify to the legal implications of conduct" or "tell the jury what result to reach."  Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990).  Rather, "the court must be the jury's only source of law," and questions of law are not subject to expert testimony.  Id. "[C]ourts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law."  United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977). Thus, the district court must take "adequate steps to protect against the danger that [an] expert's opinion would be accepted as a legal conclusion."  United States v. Herring, 955 F.2d 703, 709 (11th Cir. 1992).

Commodores Entm't Corp. v. McClary, 879 F.3d 1114, 1128-29 (11th Cir. 2018).

Within the Eleventh Circuit, district courts have gone both ways on the issue of whether an expert may testify regarding regulatory schemes.  Compare Cordoves, 104 F. Supp. 3d at 1364-65 (excluding expert opinion explaining the Americans with Disabilities Act ("ADA") service-animal regulatory scheme), with Cason v. C.R. Bard, Inc., CIVIL ACTION NO. 1:12–CV–1288–MHS, 2015 WL 9913809, at *12-13 (N.D. Ga. Feb. 9, 2015) (finding that expert may testify regarding regulations and guidelines of the Food and Drug Administration ("FDA"), and the defendant's compliance or alleged non-compliance with those regulations).

8

Defendants rely primarily on Judge Altonaga's order in <u>Cordoves</u>, 104 F. Supp. 3d at 1364-65.  In that case, the plaintiff sued Miami-Dade County for violating the ADA after she was kicked out of the Dadeland Mall because she had her service dog with her. 104 F. Supp. 3d at 1355.  The plaintiff retained an expert to testify regarding, inter alia, the regulatory scheme governing interaction with individuals accompanied by service animals.  <u>Id.</u> at 1356.  The expert's declaration quoted and summarized the relevant statutory provisions, regulations, and regulatory guidance materials.  <u>Id.</u> at 1365.  Judge Altonaga found that the expert's testimony "explaining the ADA service-animal regulatory scheme is not helpful because it consists entirely of impermissible legal standards."  <u>Id.</u> at 1364.  She therefore excluded the testimony.  <u>See id.</u> at 1364-65.  In doing so, she relied on the Eleventh Circuit's general position that "the court must be the jury's only source of law."  <u>Id.</u> at 1364 (quoting <u>Montgomery</u>, 898 F.2d at 1541).  <u>See also</u> <u>Steele v. Depuy Orthopaedics, Inc.</u>, 295 F. Supp. 2d 439, 446 (D.N.J. 2003) (excluding expert's testimony regarding what is required by FDA regulations because "whether the FDA's approval of a PMA supplement imposes requirements on a particular device is a question of law to be determined by the Court, not a question of fact for the jury").

Conversely, the Northern District of Georgia has permitted an expert to testify regarding a complex regulatory scheme.  <u>Cason</u>, 2015 WL 9913809, at *12-13.  In that case, the plaintiff sued a medical products manufacturer for, inter alia, products liability regarding an allegedly defective filter she had implanted in her following a gastric bypass surgery.  <u>Id.</u> at *1.  One of the defendant's defenses was that it had complied with the

applicable FDA regulations.  Id. at *6.  The district court permitted an expert engineer to testify regarding the applicable FDA regulations and guidelines.  Id. at *12.  It further permitted the expert to testify regarding the defendant's compliance or non-compliance with the regulations and guidelines, finding that the defendant's "compliance with FDA regulations will not infringe on the jury's role in determining the ultimate issue in this case, i.e., whether the G2 Filter was defectively designed and/or labeled."  Id.  The court found that such testimony does not "tell the jury what result to reach or communicate a legal standard," but merely explains "the regulatory requirements applicable to the product at issue and express [an] opinion as to whether the manufacturer complied with these requirements."  Id.  See also Offill, 666 F.3d at 175 (holding that an expert may testify to a complex statutory or regulatory scheme when the judge determines that the witness's testimony would be helpful to the jury, even if it "arguably states a legal conclusion"), United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) (holding that the district court properly permitted an expert witness to give background testimony regarding federal securities regulations and the filing requirements of Schedule 13D).

Although the Court agrees with Plaintiff that an explanation of Title IV's regulatory scheme would assist the jury in determining whether Defendants breached their duty of loyalty, the Eleventh Circuit's opinions in Commodores Entertainment and Montgomery appear to foreclose such expert testimony: "'the court must be the jury's only source of law,' and questions of law are not subject to expert testimony." Commodores Entm't, 879 F.3d at 1128-29 (quoting Montgomery, 898 F.2d at 1541)). Plaintiff is offering Mr. Lacey to be a source of law—specifically, the jury's source for

an explanation of Title IV's regulatory scheme.  (See Lacey Report at 5-7 (giving an overview of Title IV's regulatory framework).)  Such testimony is prohibited by the Eleventh Circuit.  Commodores Entm't, 879 F.3d at 1128-29.  The Court will instruct the jury on Title IV's regulatory framework, as appropriate.

In addition to offering impermissible legal standards, Mr. Lacey's testimony also includes several impermissible legal conclusions.  The Motion specifically identifies the following statements from Mr. Lacey's deposition transcript, which is attached to the Motion as Exhibit 1 (D.E. 241-1):  Lacey Dep. Tr. 40:6-10 ("I'm opining to the legal implications, or specifically, when you say 'legal,' the implications under Title IV law for behavior such as that that's being alleged in this case."); id. at 80:17-24 ("Again, I want to be clear that, you know, we're opining on whether or not the actions or events that are alleged of noncompliance that are alleged would have violated Title IV. So our opinion, my opinion, I should say, is based and focused more on the outcome . . . not the activity itself."); id. at 157:22-158:2 ("My purpose was to understand what is the nature of the allegations that are being made and to opine as to whether or not, if those allegations and that type of conduct were true, whether that would violate Title IV rules and regulations."); id. at 233:3-18 (Q. "You're opining about the legal implications of the trustee's allegations, if true, right? A. Correct. . . . Q. So you're opining on the legality of FCC's actions, according to plaintiff's allegations, based on your understanding of the record, fair? . . . . A. . . . based on the things I've reviewed.").  Mr. Lacey clarified that he did not base his opinion on any evidence he reviewed, but rather on the allegations asserted.  (Lacey Dep. Tr. 82:15-21 ("But you didn't opine on whether any of the

11

evidence you reviewed actually constituted a Title IV violation. You just opined on whether the allegations, if true, would constitute a Title IV violation? . . . A. Correct."); id. at 112:23-113:1 ("Well, [my] opinion is whether an institution that did something or engaged in noncompliance such as is alleged here would be in violation of Title IV requirements.").

Ultimately, Mr. Lacey came to the following conclusion: "**It is my opinion that if FCC committed the alleged actions, FCC violated multiple federal laws governing the administration of the Title IV Programs.**"   (Lacey Report at 18 (emphasis in original).)   Mr. Lacey never opined as to <u>Defendants</u>' conduct, only FCC's.   (<u>See</u> Lacey Dep. Tr. 71:16 – 72:23.)

This opinion clearly violates the Eleventh Circuit's prohibition against expert witnesses offering legal conclusions: "experts 'may not testify to the legal implications of conduct' or 'tell the jury what result to reach.'"   <u>Commodores Entm't</u>, 879 F.3d at 1128 (quoting <u>Montgomery</u>, 898 F.2d at 1541)).   In this regard, Plaintiff argues that proof that FCC violated Title IV regulations will be relevant to the jury's determination as to whether Defendants' violated their fiduciary duty, "but [will] be inadequate, standing alone, to establish Defendants' liability, because no claim is made that they are vicariously liable for FCC's alleged regulatory violations regardless of how they did or did not discharge their fiduciary obligations of loyalty and care." (Resp. at 15.)   It argues that Mr. Lacey's testimony is "several steps away from the ultimate issue of the Defendants' individual liability that the jury must decide."   (<u>Id.</u>)   The Court rejects this argument because the Amended Complaint specifically alleges that Defendants breached

12

their duty of loyalty to FCC <u>when they caused FCC to violate DOE regulations</u>.[1]  (Am.

Compl. ¶¶ 142-150.)  Mr. Lacey's testimony, therefore, is not several steps removed from

an opinion on the ultimate issue—it <u>is</u> an opinion on the ultimate issue.  And although an

expert may offer an opinion embracing the ultimate issue, Fed. R. Evid. 704(a), he "may

not testify to the legal implications of conduct" or "tell the jury what result to reach."

<u>Montgomery.</u>, 898 F.2d at 1541.  Here, Plaintiff is offering Mr. Lacey to testify to the

legal implications of the conduct alleged to have occurred in this case, which would

essentially tell the jury what result to reach.  It is therefore impermissible, and the Court

must exclude Mr. Lacey's testimony.  <u>See</u> <u>Trinidad v. Moore</u>, Civil Action No.: 2:15-cv-

323-WHA, 2017 WL 490350, at *3 (M.D. Ala. Feb. 6, 2017) ("Whether someone has

violated or is in compliance with the law is a legal conclusion."); <u>Smith v. Wyeth Ayerst</u>

<u>Labs. Co.</u>, 278 F. Supp. 2d 684, 702 (W.D.N.C. 2003) ("Regarding FDA labeling

requirements, Defendant asserts that Dr. Moye should not be allowed to provide opinion

testimony about Wyeth's compliance, or alleged lack thereof.  The Court agrees since to

allow such testimony would infringe upon the jury's role in determining an ultimate issue

in the case.").

Because Mr. Lacey is being offered to impermissibly testify regarding legal

standards, and to impermissibly give legal conclusions, the Court grants Defendants'

Motion to exclude Mr. Lacey's testimony.

---

[1]    Whether Defendants violated DOE regulations is also relevant to Count 1 of the Amended Complaint, which alleges that Defendants breached their fiduciary duty of care when they violated DOE regulations.  (Am. Compl. ¶¶ 128-136.)

b.    **James Murphy**

Defendants next move to exclude the expert testimony of James Murphy.  (D.E. 244.)  For more than forty years, Mr. Murphy served as a financial aid administrator with the City University of New York ("CUNY"), the third largest public university in the United States, serving over 270,000 students.  (Murphy Report (D.E. 244-1) ¶ 4.)  As Dean (and before that, Associate Dean) for Enrollment Management he was responsible for the day to day operations of CUNY's Office of Enrollment Management which manages admissions and front end financial aid processing for the entire CUNY system.  (Id. ¶ 5.)  In those positions, he was required to stay current on all federal and state regulations.  (Id.)

Plaintiff has asked Mr. Murphy to "provide an overview and background of federal student aid processes including key technical concepts that are relevant to this case, as well as background on the generally accepted practices used to manage financial aid processes in accordance with the policies, procedures, rules and regulations of the Department of Education that govern federal student aid programs.  (Id. ¶ 1.)  Plaintiff also asked him to opine as to whether FCC's financial aid process during the 2013-2014 academic year complied with the policies, procedures, rules and guidelines that govern such programs."  (Id.)

Defendants do not challenge Mr. Murphy's qualifications; instead, they argue that Mr. Murphy's opinion should be excluded because: (1) the opinion is not based upon reliable principles and methods; (2) it is an improper attempt to present legal opinions to the jury; (3) the opinion improperly relies upon the unverified analysis of James

14

Donahue, another of Plaintiff's experts; and (4) the opinions simply rehash Plaintiff's evidence. (D.E. 244.) In their Reply brief, they further argue that an opinion regarding industry custom and practices is irrelevant to whether Defendants breached a fiduciary duty under Delaware law. (D.E. 277.) The Court will briefly address why custom and practice evidence is relevant before turning to the other arguments.

As to relevance, the Amended Complaint alleges that Defendants breached their fiduciary duties of care and loyalty. (D.E. 85.) With respect to the duty of loyalty claim, Plaintiff must prove that Defendants <u>knowingly</u> violated the law. <u>See</u> <u>Desimone v. Barrows</u>, 924 A.2d 908, 934 (Del. Ch. 2007) ("[B]y consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused."). Evidence that Defendants did not act consistent with industry custom and practice provides context for Defendants' conduct and "a basis from which the jury [can] evaluate the[ir] knowledge and state of mind[.]" <u>PFS Distrib. Co. v. Raduechel</u>, 574 F.3d 580, 597 (8th Cir. 2009) (holding that testimony of accounting expert—who opined that accountant acted in compliance with professional accounting standards—and bank expert—who testified that bank correctly handled relevant file under banking standards—were relevant to knowledge or state of mind of accountant and bank vice president and, thus, were admissible in trial on claims against accountant and vice president under Iowa law for conspiracy and aiding and abetting employees' breach of fiduciary duty to employer). As such, the Court finds Mr. Murphy's industry custom and practice testimony to be relevant. <u>See id.</u>; <u>see also</u> <u>Williams v. First Advantage LNS Screening Solutions</u>, Case No. 1:13cv222–MW/GRJ,

15

2015 WL 9690018, at *3 (N.D. Fla. Mar. 31, 2015) (finding that expert testimony on industry standards provided a "factual benchmark" and "context" which "permits the jury to make a determination of whether Defendant employed reasonable procedures in light of prevailing industry norms"); CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assocs., 411 B.R. 571, 588 (N.D. Ill. 2009) (finding that although an expert may not opine about whether the defendants breached their fiduciary duties or apply the law to specific actions taken, he may testify about the defendants' conduct in light of industry practices and standards).

The Court will now address Defendant's remaining arguments, beginning with the argument that Mr. Murphy's testimony constitutes legal conclusions, as the Court's disposition on that issue narrows the remaining issues.

### 1.    Legal conclusions

Defendants argue that Mr. Murphy's testimony impermissibly provides legal opinions in the form of (1) legal standards, (D.E. 244 at 6-8, 10-12) and (2) the legal implications of the allegations, (Id. at 8-10).

### A.    Legal standards

Mr. Murphy was retained to, inter alia, "provide an overview and background of federal student aid processes including key technical concepts that are relevant to this case, as well as background on the generally accepted practices used to manage financial aid processes in accordance with the policies, procedures, rules and regulations of the Department of Education that govern student aid programs." (Murphy Report ¶ 1.)

Defendants argue that Mr. Murphy is attempting to offer impermissible testimony regarding the applicable regulatory standards, and that he "merely recites the applicable regulations or the supplemental Handbook . . . ." (D.E. 244 at 7 (citing Murphy Report Table of Contents).)  They further argue that Mr. Murphy is impermissibly giving legal opinions disguised as opinions about industry standards.  (Id. at 10 (citing Asokan v. Am. Gen. Life Ins. Co., Case No: 6:15-cv-2048-Orl-40KRS, 2017 WL 4542889, at *3 (M.D. Fla. Aug. 29, 2017)).)

Plaintiff argues that Mr. Murphy may permissibly testify regarding industry custom and practice which is "driven by Title IV laws and regulations which governs what schools must do and how they do it."  (D.E. 261 at 9.)  It argues that "[s]chools develop their policies and procedures to comply with those laws and regulations as they understand them[,]" and "an expert is not giving an impermissible 'legal opinion' just because he or she references statutes or regulations."  (Id. at 9-10 (citations omitted).)

For the reasons discussed in the previous subsection, Mr. Murphy may not simply recite the applicable regulations, as the Court is to be the jury's only source on the law.  See Cordoves, 104 F. Supp. 3d at 1365.

However, the Court finds that Mr. Murphy may testify regarding industry custom and practices and how those customs and practices are shaped by the relevant law.  Northfield Ins. Co. v. Royal Surplus Lines Ins. Co., No. SACV 03–0492–JVS(CWx), 2003 WL 25948971, at *2 (C.D. Cal. July 6, 2003) ("[T]o the extent regulatory statutes form part of the industry standard, [the expert] may testify to such statutes and may express opinions as whether conduct comported therewith.  He may not express an

ultimate opinion as to whether [the insurance company] acted in bad faith."); Saldana v. Texas Dep't of Transp., Civil No. A–14–CV–282–LY, 2015 WL 3952328, at *4 (W.D. Tex. June 29, 2015) (finding that the expert may testify regarding generally accepted human resource practices she derived from judicial decisions, regulations, government agency publications, scholarly research, etc.). Such testimony does not tell the jury what the law is, but rather how the industry's customs and practices comport with the industry's understanding of the law. In this regard, Mr. Murphy's industry custom and practices testimony is different from Mr. Lacey's proposed testimony, which sought to explain to the jury what the law is. (See supra Section III(a).)

### B.    Legal implications of allegations

Defendants next argue that Mr. Murphy may not opine on the legal implications of the allegations. (D.E. 244 at 8.) They cite as an example Mr. Murphy's opinion that "[a] failure to reconcile Title IV funds will result in violations of cash management regulations including the inability to substantiate the cash drawn down from G5." (Murphy Report ¶ 92.) Plaintiff argues that non-attorney experts are permitted to offer opinions embracing the ultimate issue of the case. (D.E. 261 at 11-12.)

Under Rule 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, as previously discussed, "experts 'may not testify to the legal implications of conduct' or 'tell the jury what result to reach.'" Commodores Entm't, 879 F.3d at 1128 (quoting Montgomery, 898 F.2d at 1541).

The Court finds that Mr. Murphy may not testify that the conduct alleged in the Amended Complaint violates the law. See In re Delta/Airtran Baggage Fee Antitrust

Litig., 245 F. Supp. 3d 1343, 1362 (N.D. Ga. 2017) ("[W]hile an expert may testify about whether certain conduct is or is not indicative of collusion, an expert may not testify that certain conduct did or did not violate the law.") (citation omitted); Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 183 (S.D.N.Y. 2008) ("Even if his testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case.") (citation omitted). The Court excludes Mr. Murphy's testimony to the extent that he opines that certain conduct violates the law.

However, Mr. Murphy may permissibly testify regarding whether certain conduct is consistent with industry custom and practices. See, e.g., Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 218 (3d Cir. 2006) (holding that expert may testify regarding customs and business practices of securities industry to help jury determine whether party acted with scienter, but may not testify as to whether the party complied with legal duties that arose under federal securities law); Am. Auto. Ins. Co. v. First Mercury Ins. Co., No. 13:CV-439 MCA/LF, 2017 WL 4410780, at *8 (D.N.M. Sept. 30, 2017) ("The experts may not characterize the actions of either as being in 'bad/good faith,' or 'reasonable' or 'unreasonable.' Instead, they may testify as to facts relevant to good faith, such as industry standards for claims handling, typical practices and procedures, and the facts behind the parties' claims handling in this case."); Gallatin Fuels, Inc. v. Westchester Fire Ins. Co., 410 F. Supp. 2d 417, 421 (W.D. Pa. 2006) (permitting expert testimony on "insurance claims adjusting procedure [and] an insurer's compliance with industry customs and standards"). Although this testimony may "embrace[] an ultimate issue[,]"

19

Fed. R. Evid. 704(a), it does not state a legal conclusion or tell the jury what result to reach.

### 2.    Reliable principles and methods

Next, Defendants argue that Mr. Murphy's opinion is not based upon reliable principles and methods.  (D.E. 244 at 3.)  Under the Federal Rules of Evidence:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.  Defendants argue that Mr. Murphy did not rely upon data of the kind that is reasonably relied upon by experts in his field, but instead relied upon "cherry-picked emails" and Mr. Donohue's Report.  (D.E. 244 at 4-5.)  It argues that "an expert must rely on student-level data to be able to form the types of opinions that Murphy states."  (D.E. 277 at 9 (citing Weems Report ¶ 4).)

As to the emails, the only specific example Defendants provide is in their Reply brief where they argue that Mr. Murphy "relies exclusively upon emails between FCC personnel for his conclusion that FCC violated the 'immediate need' rule by drawing down 'for operational reasons.'"  (Reply at 7 (citing Murphy Report ¶ 67 (last bullet point)).)  The referenced opinion in Mr. Murphy's Report cites to Exhibits 20, 39, 40, 44, and 214.  To take one example, Exhibit 20 is an email exchange between Defendant

Pierne and Defendant Stewart.[2]   (See D.E. 219-2 at 113.)   Stewart gives Pierne an "Updated Cash Forecast" reflecting that "$686,186 hit the bank today." (Id.) Two days later, Pierne responds to Stewart stating that he "would really like to generate $1 million more in ca[sh] next week than what is in the forecast, and hold onto that excess for the rest of the month.  Would like to end this month with $6 million or more in cash.  I think you said that you can do that." (Id.) Stewart replies that she will "revise the forecast . . . once the approval list is generated." (Id.)

The Court finds that Mr. Murphy may not opine that FCC violated the "immediate need" rule because that is a legal conclusion whether it is based on emails or any other evidence.  See Montgomery, 898 F.2d at 1541 ("A witness . . . may not testify to the legal implications of conduct.")  The Court excludes these legal conclusions.

The Court further finds that Mr. Murphy may not testify, based solely on emails, that Defendants actually engaged in certain conduct, such as drawing down Title IV funds" and retaining excess funds for operational purposes.   The Court finds that information contained in emails alone is not a reliable method for determining if such a financial transaction occurred.  See McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005) ("[T]he trial court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (quoting Kumho Tire, 526 U.S. at 152).

---

[2]       The Court could not locate where, if at all, Exhibits 39, 40, 44, and 214 are located in the record, and the Parties do not provide guidance.

21

However, the Court finds no <u>Daubert</u> issue with a financial aid administration expert reviewing an email between a university's officers that discusses a course of conduct regarding the administration of financial aid and opining, based on his knowledge and experience, as to whether such conduct is consistent with industry custom and practices.  <u>See</u> <u>Kumho Tire</u>, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").)  Indeed, Rule 703 permits an expert to base an opinion "on facts or data in the case that the expert has been made aware of or personally observed."  And emails between Defendants are excluded from the hearsay rule under Rule 801(d)(2), and are therefore admissible as evidence.  <u>Weatherly v. Ala. State. Univ.</u>, Civil Action No. 2:10CV192–WHA, 2012 WL 274754, at *4 (Jan. 31, 2012).

### 3.    Relying upon the analysis of another expert

Defendants next argue that several of Mr. Murphy's opinions should be excluded because they are based upon the work of another expert, James Donohue, who is Plaintiff's forensic accountant.  (D.E. 244 at 12.)  They argue that "Mr. Murphy blindly relies upon Mr. Donohue's (flawed) analysis without doing his own analysis or even checking Mr. Donohue's work."  (<u>Id.</u> at 13.)  Specifically, Defendants argue that

> Mr. Murphy bases his opinion on Tables 11, 12 and 13 prepared by Mr. Donohue in comparing the activity in direct loan 13/14 funds drawn from G5 with disbursement records posted in COD and disbursements recorded in STARS."  Murphy Report ¶ 68.  Based on these tables, Mr. Murphy opines that FCC violated some of the most important regulations relevant to this case: the "immediate need" rule, the three-day disbursement rule, the excess cash rule, and the fifteen-day disbursement record submission rule. (<u>Id.</u> ¶¶ 68-69, 72, 74, 76.)

(Id.)  Plaintiff argues that an expert may review and interpret another expert's opinion, and may rely on the facts and data collected by other experts.  (D.E. 261 at 13 (citing Sofillas v. Carnival Corp., Civil Action No. 14-23920-Civ-Scola, 2016 WL 5407889, at *4 (S.D. Fla. July 8, 2016).  In their Reply, Defendants argue that an expert may only rely upon the findings of another expert if he conducts an independent investigation and assesses the validity of the opinions of the experts he relied upon.  (Reply at 8-9 (citing Masforce Europe, BVBA v. Mastry Marine & Indus. Design, Inc., No. 811–CV–1814–T–24AEP, 2013 WL 8148666, at *4 (M.D. Fla. Aug. 27, 2013); United States v. Batchelor-Robjohns, No. 03-20164-CIV, 2005 WL 1761429, at *5 (S.D. Fla. June 3, 2005)).

The Court need not determine whether Mr. Murphy's reliance on Mr. Donohue's Report constitutes an impermissible methodology because the Court finds that the opinions formed therefrom are impermissible legal conclusions.  The Court has already found that Mr. Murphy may not opine regarding the legal implications of conduct, (see supra Section III(b)(1)), but may only testify regarding whether certain conduct is consistent with industry custom and practices, (id.).  Here, Defendants seek to exclude Mr. Murphy's opinions that, based on Mr. Donohue's Report, Defendants violated the "immediate need" rule, the three-day disbursement rule, the excess cash rule, and the fifteen-day disbursement record submission rule.  (D.E. 244 at 13.)  These are legal conclusions that have already been excluded.

### 4.   Rehashing evidence

Defendants next argue that Mr. Murphy does nothing more than rehash Plaintiff's evidence and provide a closing argument.  (Id. at 15.)  The Court rejects this argument

out of hand; the Court has already found that Mr. Murphy's testimony as to industry custom and practices does more than rehash Plaintiff's evidence or "provide a closing argument," it provides context and is relevant to the issue of whether Defendants' knowingly violated the law.  PFS Distrib. Co., 574 F.3d at 597; Williams, 2015 WL 9690018, at *3.

For these reasons, Defendants' Motion to Exclude Proposed Expert James Murphy is granted in part and denied in part consistent with this Order.

### c.    James Donohue

Finally, Defendants move to exclude the testimony of Plaintiff's damages expert, James Donohue.  (D.E. 245.)  Mr. Donohue, who is a Vice President at Charles River Associates, is a Certified Public Accountant ("CPA"), Certified Valuation Analyst, and is accredited in business valuation.[3]  (Donohue Report, D.E. 245-1 ¶¶1-2.)  He was retained to "estimate the fair market value of an ongoing FCC business enterprise but for the Defendants' alleged breaches."  (Id. ¶ 6.)  To prepare his "but-for" valuation of FCC, he was asked "to assume that FCC did not misuse DOE Title IV funds, and as a result, did not lose the ability to receive Title IV funds in the normal course of operations and would have continued to be a going concern."  (Id. ¶ 7.)

Mr. Donohue performed two valuations of FCC: (1) a "market" approach based on comparable companies, and (2) an "income" approach based on the present value of future income streams.  (Id. ¶¶ 102-103.)  According to Mr. Donohue, FCC's value using the market approach is $37 million to $51 million.  (Id. ¶ 102.)  Using the income

---

[3]        Defendants do not challenge Mr. Donohue's qualifications as an expert.

approach, Mr. Donohue valued FCC at $27 million to $29 million.   Mr. Donohue
ultimately favored the market approach, concluding that, but for the breaches, the fair
value of FCC as a going concern was between $37 million and $51 million on June 30,
2014.[4]  (Id. ¶ 124.)

Defendants argue that Mr. Donohue's opinions should be excluded because: (1)
there is no basis for the assumption that FCC would have continued as a going concern
but for Defendants' alleged breaches; (2) Mr. Donohue failed to use the preferred method
of valuation, the valuation he performed is flawed, and the failed to reconcile the
discrepancy in the two valuations he performed; and (3) the "forensic accounting" Mr.
Donohue performed is based upon hearsay and included in his Report solely for the
purpose of assisting the expert opinions of Mr. Lacey and Mr. Murphy.  (D.E. 245 at 1-
3.)

### 1.    Valuation assumption

First, Defendants argue that Mr. Donohue provides no basis for the assumption
that but for Defendants' alleged illegal conduct, FCC would have continued as a going
concern.  (Id. at 5-6.)  They argue that there is no evidence that their alleged conduct was
the sole cause for FCC's bankruptcy and, therefore, Mr. Donohue's valuation method
does not "fit" Plaintiff's theory of the case.  (Id. at 7-8 (citing Boca Raton Cmty. Hosp.,
Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1233 (11th Cir. 2009)).)

Plaintiff argues that Mr. Donohue is not being offered as a liability or causation
expert, and that a valuation expert may permissibly assume that a corporation would have

---

[4]    Defendants do not challenge the valuation date.

continued as a going concern but for the Defendants' alleged conduct.  (D.E. 260 at 7.)

The Court agrees.

> Only evidence can establish proof, only the jury can find facts and decide
> issues of causation, and only the attorneys in the case can argue about the
> meaning of the evidence. . . . [I]t is necessarily the role of a damages expert
> to offer an opinion based only on assumptions because only the jury has the
> opportunity to conclude the factual issues in the case.  Until a jury has
> found facts to resolve the factual issues presented to them, an expert has
> nothing other than assumptions on which economic analysis may be based.

Rowe v. DPI Specialty Foods, Inc., No. 2:13–cv–00708–DN–DJF, 2015 WL 4949097, at

*5 (D. Utah Aug. 19, 2015), aff'd in relevant part, __ F. App'x __, 2018 WL 1180654, at

*9-10 (10th Cir. Mar. 7, 2018).  The assumptions upon which Mr. Donohue bases his

valuation squarely fit with the allegations contained in the Amended Complaint, which

alleges that after DOE cut off FCC's cash flow upon discovering Defendants' scheme,

FCC's board of directors was forced to sell its most profitable assets in a fire sale and file

for bankruptcy protection.  (D.E. 85 ¶ 1.)  "Because it is possible that the jury will find

reliable evidence that there was damage . . . caused by Defendants, Plaintiff's damages

experts shall be permitted to testify."  Bellis v. Tokio Marine & Fire Ins. Co., Ltd., No.

93 Civ. 6549(DAB), 2006 WL 648013, at *5 (S.D.N.Y. Mar. 14, 2006).[5]

---

[5]   And in any event, Mr. Donohue's assumption that FCC would have continued as a going concern is further supported by record evidence.  For example, in June 2013, Deloitte Financial Advisory Services LLP gave FCC a valuation exceeding $200 million.  (Donohue Report ¶ 8.)  FCC received another valuation exceeding $200 million in March 2014—just months before DOE discovered Defendants' scheme and cut off FCC's cash flow.  (Id.)  In June 2012 and June 2013, FCC received a clean opinion from its auditors, Ernst & Young and Grant Thornton.  (Donohue Report D.E. 245-1 at 86; D.E. 223-2 at 148.)  In May 2014—three months before the bankruptcy but after DOE had forced FCC to resolve the unsubstantiated balances and placed it on records-first status), Defendant Bartness sent the Arizona State Board for Private Postsecondary Education FCC's financial statements for the period ending April 30, 2014, and represented in a cover letter: "We believe that the attached financials . . . sufficiently demonstrate

## 2.      Valuation method

Next, Defendants argue that Mr. Donohue's valuation opinion should be excluded because he "failed to use the most reliable method to determine value, i.e., the DCF [discounted cash-flow] method."  (D.E. 245 at 8.)  They further argue that Mr. Donohue "made multiple errors in both the income approach he chose and in lieu of the DCF method and the alternative value approach."  (Id. at 8-9.)  They further argue that Mr. Donohue performed, but arbitrarily discarded, the income approach in favor of the market approach which yielded a higher value.  (Id. at 9.)

### A.      Failure to use DCF method and alleged errors

In his Report, Mr. Donohue first employed the "market value approach," which compared FCC to other similar companies.  (Donohue Report ¶¶ 83-102.)  Using this method, Mr. Donohue valued FCC at $37 million to $51 million.  (Id. ¶ 102.)  Mr. Donohue then employed the "income approach," which "values assets based on the present value of the future income streams expected from the asset under consideration."  (Id. ¶ 103.)  Using this approach, Mr. Donohue valued FCC at $27 million to $29 million.  Mr. Donohue ultimately concluded that but for the breaches, the fair value of FCC as a going concern is between $37 million and $51 million.  (Id. ¶ 124.)

Defendants argue that Mr. Donohue should have used the DCF method of valuation which, they submit, is considered the "essential" valuation method.  (Id. at 9-12

---

the financial strength of [Anthem]," and stated that they expected Anthem to regain its Florida license by the end of May.  (D.E. 226-2 at 137.)  Plaintiff provides further examples in its Response brief.  (D.E. 260 at 4-6.)

Consequently, the Court finds that Mr. Donohue's assumptions are supported by evidence and not improper.

(citing, e.g., Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 186 (7th Cir. 1993); In re Bond, No. 4:11-BK-33849-EWH, 2012 WL 3867427, at *4 (Bankr. D. Ariz. Sept. 5, 2012)).)  They further argue that Mr. Donohue's market- and income-based valuations contain multiple errors.  (Id. at 12- 15.)

Plaintiff argues that Defendants' arguments go only to the weight the jury should give the testimony, not its admissibility.  (D.E. 260 at 9 (citing Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011)).)  It argues that Mr. Donohue's valuation testimony satisfies Daubert's qualifications, reliability, and helpfulness requirements and, therefore, is admissible.  (Id. at 10.)  It argues that the valuation methods Mr. Donohue employed are valid and recognized methods for valuing a business, (id. at 11), and that Defendants' challenges to Mr. Donohue's application of those methods is a subject for cross-examination, (id. at 11 (citing Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1345 (11th Cir. 2003))).

In Quiet Technologies, the Eleventh Circuit discussed the distinction between the reliability of a methodology, which is a threshold admissibility issue, and the expert's application of the methodology, which is an issue of persuasiveness for the factfinder. 326 F.3d at 1343-45.  In that case, the plaintiff argued that the expert misapplied a methodology that the district court found to be reliable.  Id. at 1344.  The Eleventh Circuit held that the plaintiff's arguments went to the accuracy of the results, an issue for cross examination, not the reliability of the methodology.  Id. at 1345.

Here, Mr. Donohue ultimately valued FCC using the market value, or "guideline company" approach.  (Donohue Report ¶ 124.)  Plaintiff cites to a law review article from

the American Bankruptcy Institute stating that this method is one of "three accepted valuation techniques" for valuing a company.  (D.E. 260 at 12 (citing S. Bernstein, S. Seabury, J. Williams, <u>Squaring Bankruptcy Valuation Practice with Daubert Demands</u>, 16 ABI Law Rev. 161, 173 & n.52 (2008)).[6])  The United States Tax Court recognizes the market value method as an accepted valuation method.  <u>See</u> <u>Estate of Gallagher v. C.I.R.</u>, 101 T.C.M. (CCH) 1702 (T.C. 2011) ("A generally accepted method for valuing stock of a closely held company, the guideline company method is 'a market-based valuation approach that estimates the value of the subject company by comparing it to similar public companies.'") (quoting <u>Estate of True v. Commissioner</u>, T.C. Memo. 2001-167, <u>aff'd</u> 390 F.3d 1210 (10th Cir. 2004)); <u>see also</u> <u>Estate of Desmond v. C.I.R.</u>, 77 T.C.M. (CCH) 1529 (T.C. 1999).  Although the Eleventh Circuit has apparently not addressed the issue, other courts of appeal and district courts accept the market value approach for valuing a company.  <u>See</u> <u>Perez v. Bruister</u>, 823 F.3d 250, 267-68 (5th Cir. 2016) (rejecting argument that "guideline company" method is unreliable); <u>Okerlund v. United States</u>, 53 Fed. Cl. 341, 347-48 (Fed. Cl. 2002), <u>aff'd</u> 365 F.3d 1044 (Fed. Cir. 2004); <u>Steiner Corp. v. Benninghoff</u>, 5 F. Supp. 2d 1117, 1124 (D. Nev. 1998) (recognizing "guidelines company" method as one of the three "most accepted" valuations methods).

Based on a review of the relevant authorities, the Court finds that the market value (or "comparable company" or "guideline company") method is a reliable method for

---

[6]     The article is available at: http://commission.abi.org/sites/default/files/ 72c51e24b0c346e1b756bcf61fd78449.pdf (last visited April 23, 2018).

valuing a company.  See, e.g., Perez, 823 F.3d at 267-68.  The Court further finds that Defendants' arguments regarding Mr. Donohue's application of that method is an issue for cross-examination.  Quiet Tech., 326 F.3d at 1345 ("The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination."); see also Cummings v. Standard Register Co., 265 F.3d 56, 65 (1st Cir. 2002) (holding that "whatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony"); In re TMI Litig., 193 F.3d 613, 692 (3d Cir. 1999) ("'So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic] weigh its inadequacies.'" (quoting Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998))); Wilmington v. J.I. Case Co., 793 F.2d 909, 920 (8th Cir. 1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] were brought out forcefully at trial. . . . [T]hese matters go to the weight of the expert's testimony rather than to its admissibility.")).

### B.     Failure to validate market value with income approach

Defendants next argue that Mr. Donohue's $37 million to $51 million market valuation is unreliable because he failed to validate it with his income-based valuation of $27 million to $29 million.  (D.E. 245 at 15-16 (citing In re Iridium Operating LLC, 373 B.R. 283, 351 (Bankr. S.D.N.Y. 2007); Lippe v. Bairnco Corp., 99 F. App'x 274, 279 (2d Cir. 2004)).)

Plaintiff argues that Mr. Donohue employed the income approach and the market approach "to cross-check his valuation."  (D.E. 260 at 12.)  It further argues that the two approaches <u>did</u> validate each other:

> Given that the highest point of Donohue's market approach valuation is $219 million less than Defendant's own valuation, a second methodology that produces a range within $8 million of the other certainly would appear to strongly validate his conclusion.   <u>See</u> <u>Lippe v. Bairnco Corp.</u>, 288 B.R. 678, 690 (Bankr. S.D.N.Y. 2003) ("Common sense and the authorities in the area suggest that an opinion as to the value of a business should be expressed as a range of values rather than as a single number."). It certainly is no less validating than the $30 million difference between the two approaches produced by Deloitte in its 2013 valuation of FCC, which Deloitte "reconciled" by just splitting the difference. (D.E. 238-2 at 193.)

(<u>Id.</u>)

In their Reply, Defendants argue that the fact Deloitte reconciled their two valuations by splitting the difference indicates that Mr. Donohue should have done the same, or at least explain why he chose the market valuation over the income valuation. (D.E. 278 at 8.)

Defendants attach to their Reply a chapter of <u>Valuing a Business: The Analysis and Appraisal of Closely Held Companies</u> (Fifth edition), by Shannon Pratt.  (D.E. 278-1.)  According to that book,

> When all the relevant valuation factors have been individually analyzed and assessed, they should be brought together to arrive at a final estimate that represents the valuation conclusion.  Sometimes it may be obvious that the analyst should rely on the indications of a single valuation method or approach.  This could be due to (1) the nature of the company or (2) the nature of the business interest subject to valuation.  In other cases, two or more valuation approaches may produce such similar value indications that it is not mathematically significant how much weight each approach receives.  However, in many cases, business valuation approaches and methods generate apparently inconsistent value indications and the

> objective of the subject analysis is a point value estimate, the indications
> should be reconciled into a single value estimate.

(Id. at 3.)  The Chapter then goes on to describe the reconciliation process.  (See id.)

The Court finds that Mr. Donohue's failure to reconcile his market valuation with his income valuation goes to the weight the jury should give the valuation, not to its admissibility.  The Court has already found the market approach to be a reliable method of valuing a company.  (See supra Section III(c)(2)(A) (citing Perez, 823 F.3d at 267-68).)  The fact that Mr. Donohue's income valuation was not identical to his market valuation does not necessarily render the market valuation unreliable.  See In re Commercial Fin. Servs., Inc., 350 B.R. 520, 535 (Bankr. N.D. Okla. 2005) (observing that an expert's valuation opinion "is not unreliable simply because one can envision a contrary conclusion if different methodological paths are taken or alternative assumptions are made.") (citing Berlyn, Inc. v. Gazette Newspapers, Inc., 214 F. Supp. 2d 530, 540-41 (D. Md. 2002)).  The two valuation methods are based on different criteria—that they achieve different results is not surprising.  (See Donohue Report ¶¶ 83-114.)  Defendants are free to cross-examine Mr. Donohue as to why he chose the market valuation and why he chose not to reconcile the market and income values. See K.M.C. Co., Inc. v. Irving Trust Co., 757 F.2d 752, 796-64 (6th Cir. 1985).

In K.M.C., the plaintiff offered a valuation expert who used five different methods to value a company as a going concern, which produced values ranging from $4,183,600 to $14,281,600.  757 F.2d at 763.  The expert averaged the five valuations to conclude that the proper valuation was $10,351,200.  Id.  The defendant objected to the valuation

in part on the ground that averaging the values "produced a grossly distorted value for the business as a going concern." Id. at 763-64.  A magistrate judge found that the valuations had "some logical bases," and that the defendant's objections went to weight, rather than admissibility.  Id. at 764.  The Sixth Circuit held that this finding was not clearly erroneous and affirmed.  Id. at 764.

Here, although Defendants are arguing the converse—i.e., that Mr. Donohue's valuation is unreliable because he did not average the two valuations—the same principle applies: the objection goes to weight, not to admissibility.  See id.

### 3.    Conduit for hearsay

Finally, Defendants argue that the "forensic accounting" portion of Mr. Donohue's Report should be excluded because it is not the basis for any of his opinions; rather, the calculations are based on hearsay that Plaintiff is attempting to introduce for other reasons—namely, so that Plaintiff's other experts can rely on them.  (D.E. 245 at 17-19 (citing Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc., No. 8:12–cv–691– T–24–MAP, 2014 WL 4986482, at *2 (M.D. Fla. Oct. 6, 2014)).)

Plaintiff argues that Mr. Donohue did use his forensic accounting as part of the foundation for his valuation, and even if he had not, "there is nothing wrong with preparing a forensic analysis for other experts to interpret for other purposes, applying their own separate skills."  (D.E. 260 at 16 (citing Sofillas, 2016 WL 5407889, at *4) ("The facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonable rely on other expert's opinions and findings.") (quoting In re Wright

33

Med. Tech. Inc., 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2000)).)   And in any event, Plaintiff argues that Defendants have failed to identify anything in Mr. Donohue's forensic analysis that would not have been independently admissible.  (Id. at 17-18.)

In their Reply, Defendants maintain that Mr. Donohue is attempting to act as a conduit for inadmissible hearsay so that James Murphy and Aaron Lacey may rely on the facts or data.  (D.E. 278 at 9.)

The Court deems this issue to be moot based upon its prior rulings in this Order. Specifically, the Court has excluded the opinions of Aaron Lacey in toto, (see supra Section III(a), and has excluded the opinions of James Murphy that were based upon Mr. Donohue's Report, (see supra Section III(b)(3)).

## IV.   Conclusion'

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.       Defendants' Motion to Exclude Proposed Expert Aaron D. Lacey (D.E. 241) is **GRANTED**;

2.     Defendants' Motion to Exclude Proposed Expert James Murphy is **GRANTED IN PART AND DENIED IN PART** (D.E. 244) consistent with this Order;

**3.**     Defendants' Motion to Exclude Proposed Expert James Donohue is

**DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 8th day of May,

2018.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**